J. Timothy Hobbs, Esq. (DC Bar #976470)
Tim.Hobbs@klgates.com
**K&L GATES LLP**
925 Fourth Avenue, Suite 2900
Seattle, WA  98104
Telephone:     (206) 370-7664
Facsimile:     (206) 623-7022


Michael F. Scanlon, Esq. (DC Bar #479777)
Michael.Scanlon@klgates.com
**K&L GATES LLP**
1601 K Street, N.W.
Washington, DC   20006
Telephone:     (202) 778-9000
Facsimile:     (202) 778-9100

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| A.P. BELL FISH COMPANY, INC.<br>4600 124th Street West<br>Cortez, FL 34215<br><br>SOUTHERN OFFSHORE FISHING<br>ASSOCIATION, INC.<br>13417 Gulf Lane #B<br>Madeira Beach, FL 33708<br><br>and<br><br>GULF OF MEXICO REEF FISH<br>SHAREHOLDERS' ALLIANCE<br>1902 Wharf Rd.<br>Galveston, TX 77550<br><br>                    Plaintiffs,<br>   v.<br><br>GINA RAIMONDO, in her official capacity<br>as Secretary of the United States Department<br>of Commerce<br>Office of the Secretary<br>Room 5858<br>14th St. and Constitution Ave., NW<br>Washington, DC 20230 | No.  \_\_\_\_<br><br>**COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF**<br><br>**EXPEDITED REVIEW<br>REQUESTED PURSUANT TO<br>16 U.S.C. § 1855(f)(4)** |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF - 1

NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION
Department of Commerce
Room 5128
14th St. and Constitution Ave., NW
Washington, DC 20230

and

NATIONAL MARINE FISHERIES
SERVICE
Department of Commerce
Room 14636
1315 East-West Highway
Silver Spring, MD 20910

Defendants.

## I.    INTRODUCTION

1.    This case is about the government's allocation of fishing privileges for catching red grouper in the Gulf of Mexico between two user groups.  The challenged agency action takes fish away from the commercial fishing sector, and gives them to the recreational fishing sector.  But the recreational sector is wasteful, catching and throwing back millions of red grouper each year, of which hundreds of thousands die.  Allocating more fish to the recreational sector will increase this waste, reduce the amount of fish available for consumption, and increase the risk of overfishing the stock.  These outcomes are unlawful.

2.    This case is the latest in a series of cases challenging defendants' unlawful favoritism of the recreational fishing sector in the Gulf of Mexico.  In 2014 this Court ruled that defendants violated multiple provisions of law by repeatedly failing to hold the recreational sector to its catch limits designed to conserve the stock. *Guindon v. Pritzker*, 31 F. Supp. 3d 169 (D.D.C. 2014).  In 2017 this Court ruled that defendants unlawfully reallocated fishing privileges to the

recreational sector and unfairly harmed the commercial sector.  *Guindon v. Pritzker*, 240 F. Supp. 3d 181 (D.D.C. 2017).  A third case involved defendants' egregious re-opening of a recreational fishing season that defendants admitted in the Federal Register would cause the recreational sector to "substantially exceed its annual catch limit," 82 Fed. Reg. 27777, 27779 (June 19, 2017).  That case was not adjudicated on the merits, but defendants nevertheless pledged to this Court that the season re-opening was a "one-time action" they would not repeat.  *See* Joint Motion to Hold Case in Abeyance, *Ocean Conservancy v. Ross*, No. 1:17-cv-1408, Dkt. # 38 (D.D.C. Dec. 19, 2017) at ¶¶ 1(a), 1(c).

3.      The Court is called upon once again to review defendants' actions that unlawfully benefit the recreational fishing sector, harm the commercial fishing sector and seafood consumers, and jeopardize conservation.  The action at issue is Amendment 53 to the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico ("Amendment 53").  Amendment 53 increases the recreational sector's percentage allocation of the Gulf of Mexico red grouper catch limit from 24 percent to 40.7 percent, and correspondingly decreases the commercial sector's allocation from 76 percent to 59.3 percent.  But because the recreational sector catches, kills, and discards so many fish, Amendment 53 also reduces the total catch limit governing both sectors' fishing to account for the increased waste that will occur in the recreational sector.  Reallocation thus reduces the total amount of fish available for consumption by all users, and unfairly forces the commercial sector to subsidize the waste in the recreational sector.  And because recreational anglers are not required to report to defendants how many red grouper they keep or discard, increasing their allocation increases management uncertainty and the risk that too many fish will be caught to sustain the stock, as NMFS itself concluded in Amendment 53.  These outcomes are

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF - 3

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

the opposite of what Congress intended when it adopted the Magnuson-Stevens Fishery Conservation and Management Act.

4.      Amendment 53 is both substantively deficient and procedurally improper. Amendment 53 nominally takes effect on June 1, 2022; however, defendants effectuated this reallocation over two years ago, prior to undertaking any public rulemaking process. Since 2020 defendants have allocated to the recreational sector 40 percent of the total red grouper harvest, the allocation amount set by Amendment 53, even though the approved recreational sector allocation in 2020 and 2021 was only 24 percent. Amendment 53 is a results-based, post-hoc rulemaking to adopt actions defendants already implemented.

5.      Amendment 53 is unlawful and the Court should strike it down.

## II.      JURISDICTION AND VENUE

6.      This action arises under the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. §§ 1801-1884; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and the National Environmental Policy Act of 1969 as amended ("NEPA"), 43 U.S.C. §§ 4321 *et seq*.

7.      This Court has jurisdiction over this action pursuant to the MSA, which provides that "[t]he district courts of the United States shall have exclusive jurisdiction over any case or controversy arising under" the MSA. 16 U.S.C. § 1861(d). The MSA also provides that regulations promulgated by NMFS, and actions taken by NMFS under regulations implementing a fishery management plan ("FMP"), shall be subject to judicial review "if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable." 16 U.S.C. § 1855(f). The Plaintiffs are

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

challenging a final rule published in the Federal Register on May 2, 2022, that implements Amendment 53 and modifies the catch limits for the commercial and recreational sectors to reflect their new allocations.  87 Fed. Reg. 25573 (May 2, 2022) ("Amendment 53 Final Rule").  Plaintiffs filed this Complaint within thirty days after the date of the Amendment 53 Final Rule in accordance with 16 U.S.C. § 1855(f).

8.     This Court further has jurisdiction over this action pursuant to the APA, which provides that final agency action for which there is no other adequate remedy in a court is subject to judicial review.  5 U.S.C. §§ 701-706.

9.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States," and 28 U.S.C. § 1361, which grants the district courts "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

10.     This Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and may grant relief pursuant to the MSA, 16 U.S.C. §§ 1861(d) and 1855(f), as well as the APA, 5 U.S.C. § 706.

11.     Venue is properly vested in this judicial district under 28 U.S.C. § 1391(b) and (e), because the defendants are officers or employees of the United States and are located in this district and because a substantial part of the events and omissions which gave rise to this action occurred in this district.

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

### III.    PARTIES

12.    Plaintiff A.P. Bell Fish Company, Inc. ("A.P. Bell") is a commercial fishing, fish processing, and wholesale and retail fish distribution business located in Cortez, Florida.  A.P. Bell has been in business for over 80 years.  Through its various subsidiaries, A.P. Bell owns individual fishing quota ("IFQ") shares issued by NMFS that authorize it to harvest a fixed portion of the commercial sector's annual catch limit ("ACL") for red grouper in the Gulf of Mexico.   In accordance with its IFQ shares, A.P. Bell receives from NMFS and holds annual IFQ allocation for red grouper authorizing it to harvest a fixed number of pounds of red grouper in specific years including in 2022.  A.P. Bell owns eighteen commercial fishing vessels, of which thirteen are used primarily to harvest red grouper from the Gulf of Mexico using the IFQ allocation issued to A.P. Bell.  A.P. Bell is harmed by Amendment 53 because it reduces the allocation of red grouper for the commercial sector, and thus reduces the amount of red grouper A.P. Bell is authorized to catch and sell each year as a participant in the commercial sector.   A.P. Bell is also harmed by Amendment 53 because it will increase recreational sector bycatch of red grouper, increase uncertainty for managing red grouper, and increase the risk that the red grouper stock will be overfished or subject to overfishing, each of which carries the potential to negatively affect the red grouper stock and reduce the amount of fish the stock can sustainably yield for harvest each year. A.P. Bell is a member of the Southern Offshore Fishing Association.

13.    Plaintiff Southern Offshore Fishing Association, Inc. ("SOFA") is a non-profit corporation organized under the laws of Florida and located in Madeira Beach, Florida.  SOFA is a trade association formed over 30 years ago to promote fresh, high quality, domestic seafood, and works to keep the Gulf of Mexico clean and environmentally secure.  SOFA represents commercial

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

fish harvesters in the Gulf of Mexico, including those who fish commercially for and sell red grouper from the Gulf of Mexico.  Members of SOFA own IFQ shares and/or IFQ allocation authorizing them to harvest certain amounts of red grouper from the Gulf of Mexico each year. Amendment 53 harms SOFA's members because it reduces the commercial sector's allocation for red grouper and thus decreases the number of pounds of fish SOFA's members are authorized to catch and sell from the Gulf of Mexico each year.  Amendment 53 also harms SOFA's members because it increases red grouper bycatch in the recreational sector, and sets a lower red grouper catch limit for both the commercial and recreational sectors to account for mortality associated with increased recreational sector bycatch.  Amendment 53 further harms SOFA's members because their livelihoods depend upon the health of the red grouper stock, but Amendment 53 will increase management uncertainty and the risk of overfishing and depletion of the red grouper stock.  SOFA and its members advocated against Amendment 53 because it will harm their livelihoods and the health of the red grouper population.

14.     Plaintiff Gulf of Mexico Reef Fish Shareholders' Alliance ("Shareholders' Alliance") is a non-profit corporation organized under the laws of the State of Texas and located in Galveston, Texas.  The Shareholders' Alliance is a trade organization representing commercial fish harvesters in the Gulf of Mexico, including those who fish commercially for and sell red grouper from the Gulf of Mexico.  Members of the Shareholders' Alliance own IFQ shares and IFQ allocation issued by NMFS authorizing them to harvest certain amounts of red grouper from the Gulf of Mexico each year.  Amendment 53 harms Shareholders' Alliance members because it reduces the commercial sector's allocation for red grouper and thus decreases the number of pounds of fish Shareholders' Alliance members are authorized to catch and sell from the Gulf of

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

Mexico each year.  Amendment 53 also harms Shareholders' Alliance members because it increases red grouper bycatch in the recreational sector, and sets a lower red grouper catch limit for both the commercial and recreational sectors to account for mortality associated with increased recreational sector bycatch.  Amendment 53 further harms Shareholders' Alliance members because their livelihoods depend upon the health of the red grouper stock, but Amendment 53 will increase management uncertainty and the risk of overfishing and depletion of the red grouper stock.  The Shareholders' Alliance and its members advocated against Amendment 53 because it will harm their livelihoods and the health of the red grouper population.  Members of the Shareholders' Alliance also enjoy recreational fishing and boating in the Gulf of Mexico and thus have recreational and aesthetic interests in the conservation of the red grouper stock that the Shareholders' Alliance's advocacy efforts help protect.  The Shareholders' Alliance also operates the Gulf of Mexico Reef Fish Quota Bank ("Quota Bank"), which owns red grouper IFQ shares and IFQ allocation.  The Shareholders' Alliance leases out IFQ allocation from the Quota Bank for various purposes including to assist new entrants into the commercial reef fish fishery in the Gulf of Mexico.  Thus, the Shareholders' Alliance itself is directly affected by Amendment 53 for the same reasons its members' interests are affected.  The Shareholders' Alliance was an intervenor-defendant in prior litigation filed by plaintiffs seeking to vacate the IFQ program under which Shareholders' Alliance members catch and sell red grouper.  *See Coastal Conservation Association v. Blank*, No. 2:09-cv-641, 2011 WL 4530544 (M.D. Fla. Sept. 29, 2011) (rejecting plaintiffs' claims and upholding the IFQ program).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF - 8

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

15.     Defendant Gina Raimondo is the Secretary of the U.S. Department of Commerce. She is sued in her official capacity as the Secretary of Commerce and as the chief officer of the National Oceanic and Atmospheric Administration.

16.     Defendant National Oceanic and Atmospheric Administration ("NOAA") is an agency of the U.S. Department of Commerce with supervisory responsibility for the National Marine Fisheries Service.  The Secretary of Commerce has delegated responsibility for managing U.S. marine fisheries to NOAA, which in turn has further delegated that responsibility to the National Marine Fisheries Service (collectively, "NMFS").

17.     Defendant National Marine Fisheries Service is an agency of the U.S. Department of Commerce that has been delegated the primary responsibility to manage United States marine fisheries through its approval of fishery plans, plan amendments, and regulations implementing those plans and plan amendments.  This lawsuit concerns actions of the National Marine Fisheries Service's Southeast Regional Office.

## IV.     FACTUAL BACKGROUND

### A.  Statutory Framework

18.     The MSA governs the management of marine fisheries in the U.S. Exclusive Economic Zone.  Under the MSA, the country is divided into eight regions, with each region having a regional fishery management council that is charged with managing the marine fisheries in its respective jurisdiction.  *See* 16 U.S.C. § 1852.

19.     The regional fishery management councils develop measures to manage stocks of fish under their respective jurisdictions and propose those management measures to the Secretary. *Id*. § 1852(h).  The Secretary, acting through NOAA and its subagency, National Marine Fisheries

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF - 9

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

Service, must approve the proposed measures if consistent with the MSA and other laws and, where appropriate, promulgate the necessary federal regulations. *Id*. § 1854.

20.     The numerous species of reef fish in the Gulf of Mexico are managed as a complex by the Gulf of Mexico Fishery Management Council ("Gulf Council").  16 U.S.C. § 1802(a)(1)(E); *see also* 50 C.F.R. § 622, Appendix A, Table 3 (listing Gulf of Mexico reef fish species).  The Gulf Council originally implemented a fishery management plan for reef fish (the "Reef Fish FMP") in 1981.  The Reef Fish FMP has been amended several times.  The Reef Fish FMP as amended and all implementing regulations were developed and approved under the authority of the MSA and must comply with the MSA's provisions.

**B.  Management of Red Grouper in the Gulf of Mexico**

21.     Red grouper (image below) are found in the Gulf of Mexico and western Atlantic Ocean.  Red grouper are bottom dwelling fish that prefer offshore rocky flat bottom habitats or rocky ledges at depths up to 1,000 feet.  They grow up to 50 inches long and can reach 50 pounds, and are top predators in reef community food webs.  Red grouper are targeted by both commercial fish harvesters and recreational anglers.



*Drawing of a Red Grouper* (NMFS)[1]

---

[1] NMFS, Species Directory, Red Grouper, available at
https://www.fisheries.noaa.gov/species/red-grouper

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF - 10

22.     Red grouper in the Gulf of Mexico are managed under the Gulf Council's Reef Fish FMP.   The Reef Fish FMP and its implementing regulations establish measures to regulate commercial and recreational fishing for red grouper.

23.     The stock of red grouper in the Gulf of Mexico was subject to overfishing and declared overfished in October 2000.   *See* 69 Fed. Reg. 1278 (Jan. 8, 2004).   A stock of fish is considered overfished when its biomass has declined below a level that jeopardizes the capacity of the stock to produce the maximum sustainable yield ("MSY") on a continuing basis.   *See* 16 U.S.C. § 1802(34); 50 C.F.R. § 600.310(e)(2)(i)(E).

24.     Under Secretarial Amendment 1 to the Reef Fish FMP, NMFS implemented a rebuilding plan that was intended to rebuild the stock by 2014.   *See* 69 Fed. Reg. 1278 (Jan. 8, 2004).   Despite the rebuilding plan, the stock has not rebuilt to the target level.   A stock assessment in 2019 concluded that the stock is no longer considered overfished or subject to overfishing, but is below the Spawning Stock Biomass target of 30 percent of the Spawning Potential Ratio, or the spawning potential of a stock not subject to any fishing.   The stock is not presently considered overfished because NMFS recently lowered the benchmark at which the stock would be considered overfished.   Based on the previous benchmark, the stock would still be considered overfished.   In real terms, based on data through 2017 used for the latest stock assessment completed in 2019, stock abundance is the lowest on record.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF - 11

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

**Fig. 1: Trends in Red Grouper Stock Abundance**[2]



25.    In order to prevent overfishing and rebuild the stock as required by the MSA, the Gulf Council's Scientific and Statistical Committee ("SSC") first establishes the Overfishing Limit ("OFL").  The OFL is a scientific estimate of the catch above which overfishing is occurring.  *See* 50 C.F.R. § 600.310(e)(2)(i)(D).  The SSC then recommends where the Gulf Council should set the Acceptable Biological Catch ("ABC"), which is the level of annual catch that accounts for scientific uncertainty in the estimate of OFL.  *See id*. § 600.310(f)(2)(ii).  The ABC must not exceed the OFL, but can be reduced from OFL to create a buffer to account for scientific uncertainty.  *Id*. § 600.310(f)(3).  Once the Gulf Council establishes the ABC, the Gulf Council must then set the ACL.  "ACL cannot exceed the ABC but may be divided into sector-ACLs." *Id*.

---

[2] NMFS, Stock SMART (Status, Management, Assessments & Resource Trends) for Red Grouper in the Gulf of Mexico, available at https://www.st.nmfs.noaa.gov/stocksmart?stockname=Red%20grouper%20-%20Gulf%20of%20Mexico&stockid=10331.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF - 12

**Fig. 2 – Relationship Between OFL, ABC, ACL, and ACT**[3]



26.     For red grouper, the ACL is divided into two "sector ACLs"—a commercial sector ACL and a recreational sector ACL that together equal the total ACL.  NMFS has also approved Annual Catch Targets ("ACTs") for the commercial and recreational sectors.  An ACT is a catch limit set below the ACL to account for management uncertainty and ensure the ACL is not exceeded.  *See* 50 C.F.R. § 600.310(g)(4).  In regulation and common parlance, these ACLs and ACTs are sometimes referred to as "quotas."  *See* 50 C.F.R. § 622.39(a)(1)(iii)(C) (commercial sector quota for red grouper); 622.41(e)(1) ("The commercial sector ACT for red grouper is equal to the applicable quota specified in § 622.39(a)(1)(iii)(C)"); § 622.41(e)(2)(iv) (specifying the recreational sector ACL and ACT for red grouper).

**C.  Management Measures for the Commercial Sector**

27.     The commercial sector of the red grouper fishery is limited access, meaning that there are a fixed number of commercial fishing permits available.  There are currently less than 850 permits in total; less than 400 permits are used each year for harvesting red grouper.  The

---

[3] 74 Fed. Reg. 3178, 3180 (Jan. 16, 2009).

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6684

commercial red grouper fishery operates under an individual fishing quota program (the "IFQ Program") implemented in 2010 by Amendment 29 to the Reef Fish FMP.  *See* 74 Fed. Reg. 44732 (Aug. 31, 2009).  Under the IFQ Program, IFQ shares were issued to commercial permit holders based on their historical landings of red grouper.  IFQ shares are long-term harvesting privileges that authorize the holder to catch a fixed percentage of the commercial sector's ACL each year. On or about January 1 of each year, IFQ shareholders receive from NMFS a distribution of IFQ allocation corresponding to their IFQ share percentage, which authorizes the holder to harvest a specific number of pounds of red grouper in that calendar year.  For example, if a person holds one percent of the red grouper IFQ shares, and the commercial quota/ACT for a given calendar yet is set at one million pounds, then that IFQ shareholder would receive 10,000 pounds of red grouper IFQ allocation to harvest in that calendar year.  IFQ shares and annual IFQ allocations are held in electronic online accounts maintained by NMFS.  Both IFQ shares and annual IFQ allocation are transferable.

28.     The commercial sector is subject to strict accountability measures to ensure that the commercial sector ACL is not exceeded.  *See* 50 C.F.R. § 622.22.  Commercial vessels must have vessel monitoring systems that report their location to NMFS, they must have sufficient IFQ allocation in their online vessel accounts to cover their landings, they must inform NMFS where and when they will offload their catch each time they return from a fishing trip, and they must sell their landings to a licensed fish dealer.  Each pound of fish landed is tracked and accounted for in real time.  Commercial vessels must also maintain logbooks in which they record landings and other information from their fishing trips.  Approximately 20 percent of vessels must also fill out mandatory supplemental logbook reports to report the number and species of any fish discarded at

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

sea.  Commercial vessels must also carry human observers when required by NMFS that record what is caught, kept and discarded at sea.  Some commercial fishing vessels, including some operated by members of SOFA and the Shareholders' Alliance, have also voluntarily installed video cameras onboard to test the efficacy of these systems in collecting high resolution bycatch and other fishery data.

### D.  Management Measures for the Recreational Sector

29.     The recreational sector of the red grouper fishery is split into two components: (1) the charter/for-hire component, which consists of federally-permitted vessels that take anglers fishing for a fee; and (2) the private angler component, which consists of anglers fishing on privately owned vessels.  The charter/for-hire component and the private angler component do not have separate catch limits for red grouper; instead they both fish under the recreational sector ACL/ACT.   The charter/for-hire component is limited access and has mandatory reporting requirements, like the commercial sector.  The private angler component, however, is open access. No federal permit is required to fish for red grouper as a private angler, and private anglers are not required to report to NMFS what they catch or discard.  Private anglers land over 80 percent of the recreational sector ACL/ACT each year.

### E.  Initial Allocation Between the Commercial and Recreational Fishing Sectors

30.     Under Amendment 30B to the Reef Fish FMP effective in 2009, the Gulf Council recommended and NMFS approved an allocation of red grouper catch between the commercial and recreational sectors.  *See* 73 Fed. Reg. 68390 (Nov. 18, 2008) (proposed rule); 74 Fed. Reg. 17604 (Apr. 16, 2009) (final rule).  Based on the sectors' respective average landings (pounds of fish caught and brought to shore) from 1986-2005, Amendment 30B allocated 76 percent of the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF - 15

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

ACL to the commercial sector and 24 percent of the ACL to the recreational sector.  In Amendment 30B, the Gulf Council noted that the "proportion of dead discards to landings for red grouper is similar between the two sectors and the proposed shifts in allocation are small, so the difference in red grouper discards among [reallocation] alternatives would be minimal."

31.     For the commercial sector, landings estimates used for the allocation decision in Amendment 30B were generated by the Accumulated Landings System ("ALS") maintained by NMFS's Southeast Fisheries Science Center ("SEFSC").  ALS was generally comprised of information from "trip tickets," or mandatory reporting about fish landed for sale by commercial fish harvesters at NMFS-permitted fish dealers.

32.     For the recreational sector, landings estimates used for the allocation decision in Amendment 30B were generated by the Marine Recreational Fishing Statistics Survey ("MRFSS").  Unlike commercial fish harvesters, recreational anglers were not required to report their landings under MRFSS.  Instead, MRFSS used a combination of two data inputs to estimate by extrapolation the landings by recreational anglers: 1) dockside interviews of a small percentage of recreational anglers (known as the Access Point Angler Intercept Survey or "APAIS"); and 2) random telephone surveys of households located within 25 to 50 miles of the coast to inquire about marine recreational fishing activities (known as the Coastal Household Telephone Survey or "CHTS").

**F.  Changes to Methods for Estimating Recreational Sector Catches**

33.     In 2006 the National Research Council ("NRC") of the National Academy of Sciences published a report on MRFSS.  The report found "that marine recreational fishing is a significant source of fishing mortality for many marine species," that "[b]oth the telephone and

access components of the current [MRFSS] approach have serious flaws in design or implementation and use inadequate analysis methods that need to be addressed immediately," and that MRFSS "should be completely redesigned to improve its effectiveness and appropriateness of sampling and estimation procedures, its applicability to various kinds of management decisions, and its usefulness for social and economic analysis."

34.     NMFS responded to the 2006 NRC report by replacing MRFSS with a new survey to estimate recreational catches called the Marine Recreational Information Program ("MRIP").

35.     Initially, MRIP retained the two basic inputs from MRFSS to estimate recreational catches: dockside intercepts (APAIS) and telephone surveys (CHTS), but with improvements. In 2015, however, NMFS implemented a new survey distributed by U.S. mail to replace CHTS called the Fishing Effort Survey ("FES"). NMFS conducted both surveys—CHTS and FES—for three years, 2015 through 2017. NMFS then discontinued CHTS. The MRIP survey now relies primarily on the dockside intercepts of recreational anglers (APAIS) and mail-in surveys (FES) to estimate recreational landings. Recreational anglers still are not required to report what they catch to NMFS, and so NMFS must estimate recreational sector landings and discards by making extrapolations from data collected from surveys (APAIS and FES) of a small subset of recreational anglers. The survey is now referred to as "MRIP-FES."

36.     The shift from CHTS to FES indicated that recreational anglers were catching significantly more fish than previously estimated. By comparing catch estimates under CHTS and FES over 2015-2017, NMFS developed a calibration ratio to convert recreational landings estimated under MRIP-CHTS into MRIP-FES "units," and vice versa.

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

37.     Based on the CHTS-FES calibration ratio NMFS developed, NMFS then proceeded to retrospectively "recalibrate" the entire time series of recreational landings estimates for multiple fish species going back to the early 1980s.  Due to the evolving nature of these surveys over time, this recalibration exercise required NMFS to make multiple adjustments to the historical landings estimates.  To date NMFS has not publicly revealed the precise methodology by which it took the observed CHTS: FES ratio observed from 2015-2017 and adjusted recreational sector landings estimates going back to 1981.  Some of the historical landings estimates were derived from MRFSS, including the estimates from 1986-2005 used to set the initial allocation under Amendment 30B.  NMFS has not explained whether or how its recalibration exercise addressed the "serious flaws in design or implementation" or the "inadequate analysis methods" in MRFSS that the NRC had identified in its 2006 report.  In general, NMFS's recalibration exercise indicated that the recreational sector had significantly higher landings each year, including landings of red grouper during the years of 1986-2005 that Amendment 30B used to allocate the red grouper ACL between the recreational and commercial sectors.  But the recalibration exercise showed wide variability between the historical landings estimates and the new recalibrated landings estimates. For example, according to one dataset published in Amendment 53, the 1996 landings estimates increased from 893,755 pounds (MRFSS units) to 910,313 pounds (MRIP-FES units), an 18.5 percent increase.  But for 1989, landings estimates increased from 2,761,150 pounds (MRFSS units) to 7,632,792 pounds (MRIP-FES units), a 176.4 percent increase.  Members of the Gulf Council and the public expressed grave concerns about the reliability of the recalibrated landings estimates.

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

**G. NMFS Urged the Gulf Council to Reallocate Using the Revised Landings Estimates**

38.     In a letter dated April 23, 2019, the chair of the Gulf Council sent a letter to NMFS outlining the Gulf Council's Allocation Policy.  The Allocation Policy sets forth various "triggers" to conduct an allocation review.  An allocation review is defined in NMFS policy documents as the evaluation of "successful attainment of management objectives and adjusting strategies in response."  NMFS policy documents explain that "the identification of purpose and need for an action and the development of action alternatives (re-allocation) should occur in response to allocation review findings that a re-allocation is warranted."  The Gulf Council's April 23, 2019 letter to NMFS stated that the Gulf Council "could initiate an allocation review should relevant new information, e.g., data recalibration, be made available."

39.     NMFS's recalibration of historical recreational landings data should therefore have triggered an allocation review pursuant to the Gulf Council's Allocation Policy.  An allocation review would have assessed the extent to which the initial allocation meets management objectives set forth in the Reef Fish FMP, and whether a reallocation was warranted to better achieve those objectives.  But NMFS urged the Gulf Council to dispense with an allocation review and proceed with reallocating more quota to the recreational sector.  On October 22, 2019, the NMFS Southeast Regional Administrator made the following motion at the Gulf Council:

> "I move that we ask the [Scientific and Statistical Committee] to review red grouper projections based on the allocation time series from Amendment 30B (1986 to 2005) and the best available landings used as inputs in the new stock assessment, which is approximately 40.52 percent recreational 32 and 59.48 percent commercial, and <u>direct staff to start work on a plan amendment to update the red grouper allocation</u> and establish catch levels based on the new assessment." (emphasis added)

The motion ultimately resulted in Amendment 53 to the Reef Fish FMP, which is the subject of this lawsuit.  As conceived by NMFS in 2019, Amendment 53 changes the red grouper allocation

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF - 19

from 24 percent recreational and 76 percent commercial set by Amendment 30B, to 40.7 percent recreational and 59.3 percent commercial.

40.     NMFS's approach was flawed, however, because it ignored other new information generated by NMFS's recalibration exercise; specifically that the recreational sector discards ten times the number of fish as the commercial sector.  *See* Section I, *infra*.  This new information conflicted with the Gulf Council's prior determination in Amendment 30B that dead discards between the commercial and recreational sectors were roughly equivalent.  NMFS urged the Gulf Council to formulaically plug the higher estimated recreational landings estimates into the allocation scheme adopted in Amendment 30B, but this approach ignored how a key finding about dead discards supporting that prior allocation scheme had drastically changed.  An allocation review would have enabled the Gulf Council to consider such additional new information in evaluating whether a reallocation was warranted to better meet management objectives.  But at NMFS's urging, the Gulf Council skipped an allocation review in violation of its own Allocation Policy.

## H.  NMFS Unlawfully Reallocated the Quota Even Prior to Amendment 53

41.     Starting in 2020 after successfully urging the Gulf Council to begin developing an FMP amendment to increase the recreational sector's allocation to approximately 40 percent, NMFS unlawfully adopted an informal reallocation while the Gulf Council developed Amendment 53.  Prior to Amendment 53, the codified recreational sector ACL was 1.0 million pounds.  50 C.F.R. § 622.41(e)(2)(iv) (2021).  NMFS determined, without undertaking any public rulemaking process, that the recreational sector should have an effective but unpublished sector ACL of 2.10 million pounds, the "MRIP-FES equivalent" of the codified 1.0 million pounds sector ACL.  At

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF - 20

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

the same time, NMFS held the commercial sector to its sector ACL of 3.16 million pounds.  50

C.F.R. § 622.41(e)(1) (2021).  Prior to Amendment 53, NMFS effectively set the total ACL at 5.26

million pounds, and allocated the recreational sector 40 percent (2.10 million pounds) of that total

ACL.  This preemptive reallocation is shown in Table 1 of Amendment 53, in the second row titled

"MRIP-FES equivalent."

### Fig. 3: Amendment 53, Table 1

Table 1.  OFL, ABC, total and sector ACLs for **Alternatives 1-6**.

|  | OFL* | ABC | Total ACL | Comm ACL | Rec ACL |
|---|---|---|---|---|---|
| Alternative 1** MRFSS data 1986-2005 (76% commercial:24% recreational) | 14.16 | 13.92 | 4.16 | 3.16 | 1.00 |
| MRIP-FES equivalent |  |  | (5.26) |  | (2.10) |
| Alternative 2*** Retain current percentages (76% commercial:24% recreational) | 5.35 | 4.90 | 4.90 | 3.72 | 1.18 |
| Preferred Alternative 3*** MRIP-FES data 1986-2005 (59.3% commercial:40.7% recreational) | 4.66 | 4.26 | 4.26 | 2.53 | 1.73 |
| Alternative 4*** MRIP-FES data 1986-2009 (60.5% commercial:39.5% recreational) | 4.70 | 4.30 | 4.30 | 2.60 | 1.70 |
| Alternative 5*** MRIP-FES data 1986-2018 (59.7% commercial:40.3% recreational) | 4.67 | 4.28 | 4.28 | 2.56 | 1.72 |
| Alternative 6*** MRIP-FES data but retain commercial ACL at 3.16mp (68.7% commercial:31.3% recreational) | 5.03 | 4.60 | 4.60 | 3.16 | 1.44 |

*Values for OFL, ACB, total ACL, commercial ACL, and recreational ACL are in mp gw.
**The recreational portion of the current OFL, ABC, and ACLs are based on MRIP-CHTS data.
***The recreational sector ACL is in MRIP-FES units.

42.     In 2020 and 2021, the recreational sector landed over 2.10 million pounds of red

grouper each year, despite its codified ACL of 1.0 million pounds.  Specifically, landings data

from NMFS's website indicate that the recreational sector landed 2.33 million pounds of red

grouper in 2020 and 2.70 million pounds in 2021.  In these years the recreational sector exceeded

both its 1.0 million pound sector ACL codified in NMFS regulations, and the unofficial,

unpublished sector ACL of 2.10 million pounds set by NMFS in conflict with its regulations.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF - 21

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

43.     This preemptive reallocation by NMFS, undertaken without any public rulemaking process, violated its own regulations and the existing 76/24 percent allocation set by Amendment 30B.  Amendment 53 is thus a post-hoc rulemaking to cover actions NMFS already took on its own in derogation of the MSA and rulemaking requirements of the APA and NEPA.

## I.  Amendment 53 Will Increase Bycatch of Red Grouper

44.     NMFS's new recreational fishing survey, MRIP-FES, indicated that the recreational sector discards far more fish than previously estimated.  This was new information the Gulf Council and NMFS did not have when they approved the initial allocation under Amendment 30B.

**Fig. 4: Effect of FES Calibration on Recreational Discard Estimates**



45.     The recreational sector discards an average of 3.71 million red grouper each year. An estimated 11.6 percent of those fish die after being discarded, or an average of 430,000 fish discarded dead each year by recreational anglers.  Discards in the commercial sector, by comparison, are "less than a tenth of recreational discards" according to Amendment 53.

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

Amendment 53 explains that "recreational sector discards are an order of magnitude greater than the commercial sector."

**Fig. 5: Red Grouper Discards by Sector (#s of fish)**



46.      Reallocating a larger percentage of the ACL to the recreational sector will therefore increase bycatch and dead discards.  Amendment 53 admits that the "recreational sector discards a much larger amount of red grouper as bycatch," and that reallocating more quota to that sector will therefore result in "increased bycatch."

47.      Amendment 53 includes a "Bycatch Practicability Analysis," which is flawed because it assesses changes in bycatch relative to the unlawful status quo where NMFS has already given the recreational sector an effective sector ACL of 2.10 million pounds even though its codified ACL was 1.0 million pounds.  NMFS asserts that Amendment 53 will "result in a decrease in both the commercial and recreational sector ACL, which is expected to reduce bycatch and bycatch mortality."  But under Amendment 53, the codified recreational sector ACL actually *increases* from 1.0 million pounds to 1.73 million pounds.  By assessing changes in bycatch relative to status quo where NMFS has unlawfully permitted the recreational sector to harvest over

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF - 23

2.10 million pounds without any public rulemaking process, NMFS's analysis obscures the true effects on bycatch from reallocation. In reality, as Amendment 53 acknowledges, increasing the recreational sector ACL will increase bycatch and bycatch mortality.

**J.  Under Amendment 53, Total Landings Must Be Reduced to Account for Increased Recreational Dead Discards, Which Unfairly Harms the Commercial Sector**

48.     Amendment 53 explains that in order to "mitigate the effects of the increased [recreational sector] bycatch" resulting from reallocation, the allocation change under Amendment 53 is "accompanied by a decrease in overall ACL."

49.     If the Gulf Council and NMFS had maintained the existing allocation set by Amendment 30B, the total ACL would be 4.90 million pounds.  Under Amendment 53, the recreational sector's allocation is increased to 40.7 percent from 24 percent.  That allocation change necessitates a reduction in the total ACL from 4.90 million pounds to 4.26 million pounds, or a decrease of 640,000 pounds.  Amendment 53 admits that the need for this reduction in total ACL is to "mitigate the effects of increased bycatch."

50.     The total ACL governs fishing by both the commercial and recreational sectors. Thus, by reducing the total ACL to mitigate the effects of increased recreational sector bycatch, the commercial sector is penalized twice: once via the reduction in is sector allocation and then again with the overall reduction in the total ACL for the bycatch occurring in the recreational sector.  This outcome is unfair to the commercial sector.

**K.  Amendment 53 Will Increase Uncertainty and Risk of Overfishing**

51.     Unlike the commercial sector, recreational anglers are not required to report to NMFS the number of fish they land or discard.  The recreational sector is an "open access" fishery and anglers do not even need a federal permit to fish for red grouper.  Any reporting of catch by

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF - 24

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

recreational anglers is voluntary and random if anglers happen to be intercepted when they return from a fishing trip (APAIS) or decide to fill out and mail in a survey (FES) months after the fishing trip has concluded.  The data about recreational landings and discards are self-reported, and NMFS acknowledges that such data are highly uncertain, difficult to validate, and thus unreliable.

52.     Amendment 53 repeatedly acknowledges that allocating a larger percentage of the total ACL to the recreational sector will therefore increase management uncertainty and risk of overfishing.  For example, Amendment 53 explains that "[a]lternatives that result in larger allocations to the recreational sector could increase the likelihood of overfishing because of the uncertainty in determining recreational landings," that "allocating a greater percentage of the ACL to a sector that has more uncertainty in landings…is more likely to result in an overfishing or eventual overfished status for Gulf red grouper," and that there is "an increased potential for overfishing of red grouper if there is an increase in allocation the recreational sector, which is associated with more uncertainty in constraining harvest."

53.     NMFS contends in the Amendment 53 Final Rule that the "risk of overfishing is the same under all the reallocation alternatives considered by the Council."  This contention is flawed and arbitrary.  NMFS's contention ignores the numerous statements in Amendment 53 and in NMFS's own regulations that increased bycatch leads to increased management uncertainty and overfishing risk.  NMFS's contention is also flawed because the OFL set by Amendment 53 excludes recreational sector dead discards.  NMFS's contention that the risk of overfishing is "the same" between the alternatives only holds because NMFS defines "overfishing" for this purpose to exclude a significant amount of fishing mortality.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF - 25

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

**L.  Amendment 53 Relies on Economic Analysis that NMFS Itself Found "Erroneous"**

54.    NMFS attempts to justify the allocation change it initiated under Amendment 53 by claiming it will "result in the greatest net economic benefits to the nation." But NMFS previously acknowledged that no such conclusion can be drawn in this context.

55.    The commercial sector operates under an IFQ program, in which a market for transferable IFQ shares and annual IFQ allocation efficiently distributes the use of quota across the participants in the commercial sector.   In an earlier amendment to the Reef Fish FMP, Amendment 28, NMFS acknowledged that an IFQ program constitutes "a reasonable approximation for an efficient resource allocation."  But the recreational sector is open access, and there is no market or other mechanism to efficiently distribute quota across the participants in the recreational sector.  NMFS acknowledged in Amendment 28 that "the open access management approach in the recreational sector cannot be conducive to an efficient allocation…within the recreational sector."  NMFS further acknowledged in Amendment 28 that "changes in net benefit estimates…and associated inferences about economic efficiency are erroneous when each sector's quota is not efficiently allocated within the sector (i.e., quota is not assigned to those participants that have the highest willingness to pay for the resource).  As a result, policy prescriptions based on such inferences would not be valid, and therefore, not useful."

56.    Thus, under NMFS's own analysis, the determination that Amendment 53 will "result in the greatest net economic benefits to the nation" is "erroneous."

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

**M.  Amendment 53 Relies on Unreliable and Outdated Information**

57.     Much of the analysis purporting to support reallocation under Amendment 53 is based on data or methodologies unavailable to the public, or fails use the most recent and best available data.

58.     For example, Amendment 53 uses NMFS's "ACL Monitoring Datasets" for commercial and recreational sector landings over the base period of 1986-2005 to calculate the allocation change.  NMFS acknowledged by email to the Shareholders' Alliance that these landings data are not generally available to the public.  This is a problem because these landings data inexplicably change over time resulting in internal inconsistencies and conflicts between this data and other public information published by NMFS.  Data integrity issues are compounded by the fact that the public has no way to evaluate their validity.  Amendment 53 purports to rely on recreational sector landings estimates used for the 2019 stock assessment, but the landings estimates provided in Amendment 53 (*see* Table 2.1.2) do not match the landings estimates used in the stock assessment (*see* SEDAR 61, Executive Summary).  For example, the 2019 stock assessment indicates that recreational sector landings in 1987 were 2,208,539 pounds.  But Amendment 53 indicates that recreational sector landings in 1987 were 2,495,130 pounds, a 13 percent increase.  A third set of data from a 2019 NMFS presentation to the Gulf Council indicates that recreational sector landings in 1987 were 2,212,589 pounds.  And a fourth set of data published on NMFS's website indicates that the recreational sector landings in 1987 were 2,113,082 pounds.  NMFS has given no rational explanation for these and other discrepancies across these datasets.  As another example, for analyzing the economic effects of reallocation on the recreational sector, Amendment 53 used an estimate of $110 per fish to determine the consumer surplus valuation of

incremental catch by anglers, citing a 2012 paper.  An updated paper in 2021 estimates the value of incremental grouper allocation at $46 per fish, or less than half the value from the 2012 paper. The difference between $110 per fish and $46 per fish has a material effect on the economic analyses underlying Amendment 53, and indicates the economic benefits from reallocation are lower than presented in Amendment 53.  NMFS failed to use the best available information and the result skewed the analysis in favor of the recreational sector.

## V.      FIRST CAUSE OF ACTION – VIOLATION OF MSA NATIONAL STANDARD FOUR (16 U.S.C. § 1851(a)(4))

59.     Paragraphs 1 through 58 are hereby incorporated by reference.

60.     Section 301(a)(4) of the MSA, 16 U.S.C. § 1851(a)(4) ("National Standard Four"), states that allocations of fishing privileges "shall be…fair and equitable to all such [U.S.] fishermen" and "reasonably calculated to promote conservation."

61.     The allocation under Amendment 53 will increase bycatch, increase management uncertainty, and increase risk of overfishing of the red grouper stock as explained in NMFS's own analyses.  Accordingly, the allocation under Amendment 53 is not "reasonably calculated to promote conservation" in violation of National Standard Four.

62.     In addition, Amendment 53 requires the total ACL to be reduced in order to account for increased recreational sector dead discards caused by reallocating a larger percentage of the ACL to the recreational sector.  This reduction in the total ACL thus reduces the commercial sector's ACL.  The commercial sector is therefore forced to fish under a catch limit that is reduced to account for increased dead discards resulting from reallocation of quota to the recreational sector.  In effect, Amendment 53 forces the commercial sector to subsidize dead

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

discards in the recreational sector.  The allocation under Amendment 53 is thus not "fair and equitable" in violation of National Standard Four.

63.     In addition, NMFS's guidelines for National Standard Four provide that, to be fair and equitable, an allocation should "be rationally connected with the achievement of [optimum yield] or with the furtherance of a legitimate FMP objective."  50 C.F.R. § 600.325(c)(3)(i).  The Gulf Council did not develop Amendment 53 to promote any particular FMP objective. Amendment 53 also decreases yields and thus thwarts achievement of optimum yield. Amendment 53 violates National Standard Four for these reasons as well.

## VI.   SECOND CAUSE OF ACTION – VIOLATION OF MSA NATIONAL STANDARD NINE (16 U.S.C. § 1851(a)(9))

64.     Paragraphs 1 through 63 are hereby incorporated by reference.

65.     Section 301(a)(9) of the MSA, 16 U.S.C. § 1851(a)(9) ("National Standard 9") requires that "[c]onservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch."

66.     NMFS projects that reallocation under Amendment 53 will increase bycatch of red grouper relative to maintaining the status quo allocation between the commercial and recreational sectors.  The selected allocation under Amendment 53 maximizes bycatch relative to all the reallocation alternatives the Gulf Council and NMFS considered in this action.

67.     NMFS projects that 11.6 percent of all red grouper discarded by the recreational sector will die, or roughly 430,000 dead fish per year on average from the 3.71 million red grouper the recreational sector discards on average each year.  Amendment 53 fails to assess and

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6684

does not contain any measures to minimize the mortality of bycatch occurring in the recreational sector.

68.     Amendment 53 therefore fails to minimize bycatch to the extent practicable and fails to minimize the mortality of bycatch to the extent practicable in violation of National Standard 9.

**VII.     THIRD CAUSE OF ACTION – VIOLATION OF MSA SECTION 303(a)(11)**

69.     Paragraphs 1 through 68 are hereby incorporated by reference.

70.     Section 303(a)(11) of the MSA, 16 U.S.C. § 1853(a)(11), requires any FMP to "establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery, and include conservation and management measures that, to the extent practicable and in the following priority—(A) minimize bycatch; and (B) minimize the mortality of bycatch which cannot be avoided."

71.     The Reef Fish FMP does not have a bycatch reporting methodology that is standardized across the reef fish fishery to assess the amount and type of bycatch occurring in the fishery.  The voluntary surveys of recreational anglers (MRIP-FES) are not comparable to or as reliable as the mandatory reporting that occurs in the commercial sector.  In the commercial sector, participants must fill out and submit to NMFS logbooks for each fishing trip that record landings, twenty percent of participants must fill out mandatory supplemental logbook reports to report discards, and upon request by NMFS vessels must carry human observers to record any bycatch.  These measures enable NMFS to make reliable estimates about bycatch in the commercial sector.  By contrast, the recreational sector—which is responsible for over 90 percent of red grouper bycatch—has no mandatory bycatch reporting.  Anglers can voluntarily

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

participate in dockside or mail-in surveys, but coverage is sparse and the data collected is unreliable.  It is arbitrary for NMFS to require mandatory reporting from the commercial sector, which is responsible for less than 10 percent of red grouper bycatch, but not to require mandatory reporting from the recreational sector, which is responsible for over 90 percent of red grouper bycatch.

72.     Amendment 53 exacerbates this problem because it increases bycatch as a function of increasing the recreational sector's red grouper allocation.  Thus, it is critical for NMFS to implement a standardized methodology across the fishery so that bycatch data can be gathered from the recreational sector, which is responsible for over 90 percent of red grouper bycatch, that is as reliable as the data gathered from the commercial sector.  This data is needed to reduce uncertainty about mortality and ensure overfishing is prevented.  NMFS's own regulations recognize that "bycatch can increase substantially the uncertainty concerning total fishing-related mortality, which makes it more difficult to assess the status of stocks, to set the appropriate optimum yield ("OY") and define overfishing levels, and to ensure that OYs are attained and overfishing levels are not exceeded." 50 C.F.R. § 600.350(b).

73.     By failing to establish a bycatch reporting methodology that is standardized across the reef fish fishery to assess the amount and type of bycatch occurring in the fishery, Amendment 53 violates MSA Section 303(a)(11).

**VIII.     FOURTH CAUSE OF ACTION – VIOLATION OF MSA SECTION 303(a)(15)**

74.     Paragraphs 1 through 73 are hereby incorporated by reference.

75.     Section 303(a)(15) of the MSA, 16 U.S.C. § 1853(a)(15), requires all FMPs to "establish a mechanism for specifying annual catch limits in the plan (including a multiyear

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

plan), implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery, including measures to ensure accountability."  NMFS defines the word "catch" to mean the "total quantity of fish, measured in weight or numbers of fish, taken in commercial, recreational, subsistence, tribal, and other fisheries.  Catch includes fish that are retained for any purpose, as well as mortality of fish that are discarded."  50 C.F.R. § 600.310(f)(1)(i).  Thus, the term "catch" includes dead discards, and the annual catch limit must therefore include dead discards.  Similarly, NMFS defines the OFL as "the annual amount of catch that corresponds to the estimate of [the maximum fishing mortality threshold] applied to a stock or stock complex's abundance and is expressed in terms of numbers or weight of fish." 50 C.F.R. § 600.310(e)(2)(i)(D).  Dead discards must therefore be included in the specification of OFL.

76.     NMFS's guidelines explain that the ABC (on which the total ACL is based; see Fig. 2, supra) "should be expressed in terms of catch, but may be expressed in terms of landings as long as estimates of bycatch and any other fishing mortality not accounted for in the landings are incorporated into the determination of ABC." 50 C.F.R. § 600.310(f)(3)(i).  Thus, where the ABC expressed in terms of landings (not "catch"), dead discards must be reflected in the OFL and then removed when setting the ABC.  Otherwise the OFL would arbitrarily exclude some quantity of fishing mortality.

77.     Amendment 53 violates these steps for setting ACLs set forth in NMFS's regulations.  Amendment 53 sets the OFL at 4.66 million pounds, the ABC at 4.26 million pounds, and the total ACL at 4.26 million pounds.  Neither the OFL, ABC nor the total ACL include bycatch mortality.  Instead, NMFS attempts to estimate bycatch mortality and account

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

for it prior to setting the OFL, but these estimates are not subject to public review.  Nor is there any publicly available method for tracking estimated discards during the fishing season against NMFS's projections to ensure their accuracy or to ensure overfishing does not occur.  The recreational sector has no incentive to minimize bycatch or bycatch mortality.  It is arbitrary for NMFS to set an OFL that excludes a significant portion of fishing mortality occurring in the fishery, namely recreational sector dead discards.  By attempting to account for a significant source of fishing mortality "off the books," NMFS undermines key conservation goals of the MSA.

78.     Amendment 53 sets an OFL, ABC, total ACL, and sector ACLs for the red grouper fishery that exclude dead discards and include only fish landed.  Amendment 53 therefore violates MSA section 303(a)(15).

## IX.     FIFTH CAUSE OF ACTION – VIOLATION OF MSA NATIONAL STANDARD ONE

79.     Paragraphs 1 through 78 are hereby incorporated by reference.

80.     Section 301(a)(1) of the MSA, 16 U.S.C. § 1851(a)(1) ("National Standard One") states that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."

81.     Secretarial Amendment 1 to the Reef Fish FMP set the OY for the red grouper fishery as the yield at "75 percent of $F_{MSY}$," or the yield from fishing with a total fishing mortality rate of 75 percent of the rate that would produce the MSY.

82.     Amendment 53 does not establish an ABC, total ACL or sector ACLs that are tied to the achievement of the OY set by Secretarial Amendment 1.  By reallocating more of the total

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

ACL to the recreational sector, Amendment 53 will increase dead discards from the recreational

sector, which necessitates a corresponding decrease in the ABC and total ACL.  Thus, by

changing the allocation between the commercial and recreational sectors, Amendment 53

reduces the yield the stock can produce for consumption.  As a result, the conservation and

management measures for the red grouper fishery do not achieve optimum yield on a continuing

basis in violation of National Standard One.

**X.      SIXTH CAUSE OF ACTION – VIOLATION OF MSA SECTIONS 303(a)(3),
303(a)(4)(A), AND 302(h)(5)**

83.     Paragraphs 1 through 82 are hereby incorporated by reference.

84.     Section 303(a)(3) of the MSA, 16 U.S.C. § 1853(a)(3), states that any FMP

"shall… assess and specify the…optimum yield from, the fishery, and include a summary of the

information utilized in making such specification."  Section 303(a)(4)(A) of the MSA, 16 U.S.C.

§ 1853(a)(4)(A), states that any FMP "shall…assess and specify…the capacity and the extent to

which fishing vessels of the United States, on an annual basis, will harvest the optimum yield."

Section 302(h)(5) of the MSA, 16 U.S.C. § 1852(h)(5), states that each Regional Fishery

Management Council "shall…review on a continuing basis, and revise as appropriate, the

assessments and specifications made pursuant to section 1853(a)(3) and (4) of this title with

respect to the optimum yield from…each fishery."

85.     The OY for the red grouper fishery was set by NMFS under Secretarial

Amendment 1 to the FMP in 2004.  The Gulf Council has not reviewed on a continuing basis the

assessment and specification of OY.  The Gulf Council has not reviewed on a continuing basis

the assessment and specification of the capacity and the extent to which fishing vessels of the

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

United States, on an annual basis, will harvest the optimum yield.  The Gulf Council has not revised these assessments and specifications as appropriate.

86.     Amendment 53 effectively reduces OY because it lowers the OFL, ABC, and total ACL to account for increased dead discards that result from shifting more of the allocation to the recreational sector.  The amount of fish landed by both the commercial and recreational sectors must be reduced to account for the increased amount of fish that will be discarded dead by the recreational sector under Amendment 53.  Accommodating increased bycatch is not a relevant social, economic, or ecological factor that could be used to reduce OY.

87.     Under these circumstances, Amendment 53 should have revised the assessment and specification of OY, and the capacity and the extent to which fishing vessels of the United States, on an annual basis, will harvest the OY.  Amendment 53 fails to do so.

88.     Amendment 53 and the Reef Fish FMP violates MSA Section 303(a)(3), 303(a)(4)(A), and 302(h)(5).

## XI.     SEVENTH CAUSE OF ACTION – VIOLATION OF MSA NATIONAL STANDARD TWO

89.     Paragraphs 1 through 88 are hereby incorporated by reference.

90.     Section 301(a)(2) of the MSA, 16 U.S.C. § 1851(a)(2) ("National Standard Two") provides that "conservation and management measures shall be based upon the best scientific information available."  NMFS's National Standard Two guidelines provide that management actions require "high quality" data and that "successful fishery management depends, in part, on the thorough analysis of this information." 50 C.F.R. § 600.315(a)(1).  NMFS's guidelines recognize that the MSA "provides broad public and stakeholder…access to the scientific

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

information upon with the [management] process and management measures are based." *Id*. §
600.315(a)(6)(iv).

91.     Amendment 53 relies upon poor quality and unreliable estimates of recreational
sector landings from 1986-2005.  The landings estimates provided by NMFS for these years
change over time without rational explanation.  NMFS has not publicly disclosed its precise
methods for recalibrating landings estimates from 1986-2005, initially estimated using MRFSS,
into "MRIP-FES units." Nor has NMFS explained how its recalibration methodology addressed
the "serious flaws in design or implementation" or "inadequate analysis methods" that tainted
MRFSS landings estimates according to the 2006 NRC study.

92.     The commercial sector landings data used in Amendment 53 also inexplicably
changed from prior published data.  Commercial sector landings were based on reports made by
commercial fish harvesters at the time of landing fish at licensed fish dealers.  These data were
not subject to any recalibration, as were recreational sector landings estimates.  But the
commercial sector landings data used for reallocation under Amendment 53 do not match
landings data used in prior red grouper stock assessments.  NMFS asserts that determining the
reason for these discrepancies would require a "forensic analysis."  NMFS admittedly does not
know the reason for these changed landings data, and therefore cannot rationally certify that the
commercial sector landings data used in Amendment 53 constitute the best scientific information
available as required by National Standard Two.

93.     Amendment 53 relies on an outdated study from 2012 to assess the economic
impacts to the recreational sector resulting from reallocation.  NMFS ignored a new study from
2021 and other studies that, if used, would have materially changed the economic analysis in

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

Amendment 53 and showed that the economic benefits projected from reallocation are significantly less than estimated in Amendment 53.

94.     NMFS disregarded superior or contrary data in developing and approving Amendment 53.

95.     Amendment 53 is not based upon the "best available science" as required by MSA National Standard Two.

## XII.     EIGHTH CAUSE OF ACTION -- VIOLATION OF MSA NATIONAL STANDARD EIGHT

96.     Paragraphs 1 through 95 are hereby incorporated by reference.

97.     Section 301(a)(8) of the MSA, 16 U.S.C. § 1851(a)(8) ("National Standard Eight"), requires NMFS to "take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of [National Standard Two], in order to provide for the sustained participation of such communities" and "to the extent practicable, minimize adverse economic impacts on such communities."  NMFS's guidelines for National Standard Eight recognize that an allocation "may benefit some communities at the expense of others,"  but explain that "[d]eliberations regarding the importance of fishing communities…must not compromise the achievement of conservation requirements and goals of the FMP."

98.     Amendment 53 benefits the recreational fishing community at the expense of the commercial fishing community while simultaneously undermining conservation objectives for the red grouper fishery.  Amendment 53 codifies a level of participation by the recreational fishing community that, due to increased bycatch and management risk, undermines achievement

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

of conservation requirements and goals of the FMP while simultaneously maximizing adverse economic impacts to the commercial fishing community.

99.    Amendment 53 violates National Standard Eight.

## XIII.    NINTH CAUSE OF ACTION – VIOLATIONS OF THE ADMINISTRATIVE PROCEDURE ACT

100.    Paragraphs 1 through 99 are hereby incorporated by reference.

101.    Under the APA, this Court shall "hold unlawful and set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or]…without observance of procedure required by law…" 5 U.S.C. §§ 706(2)(A), 706(2)(D).

102.    In approving Amendment 53 and promulgating the Amendment 53 Final Rule, NMFS acted arbitrarily, capriciously, and in violation of law, abused its discretion, and acted without observance of procedure required by law.

103.    Amendment 53 violates the APA for the reasons set forth in paragraphs 38 through 99 above.

104.    In addition, Amendment 53 is an unlawful post-hoc rulemaking. NMFS has already reallocated a more than 40 percent of the total red grouper harvest to the recreational sector starting in 2020. NMFS predetermined the outcome of the rulemaking for Amendment 53.

105.    Amendment 53 relies on secret data not disclosed to the public. This includes without limitation NMFS SEFSC's ACL Monitoring Datasets, calibrations and other revisions of historical landings data, calculations of increased dead discards from various allocation scenarios, and unexplained economic analyses. Under the APA, the public is entitled to access the technical

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF - 38

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

information about which rules are based and a failure to provide such information violates the APA.

106.    Amendment 53 does not require mandatory reporting of landings and discards by the recreational sector.  Under Amendment 53, the recreational sector will be responsible for over 40 percent of red grouper landings, and over 90 percent of red grouper discards.  The commercial sector is required to report its landings and discards.  Amendment 53 arbitrarily fails to require comparable reporting of landings and discards by the recreational sector.

107.    Amendment 53 sets an ACT for the recreational sector ostensibly based on the Gulf Council's ACL/AM Control Rule.  The control rule provides that the recreational sector ACT should be set nine percent lower than the recreational sector ACL.  But in violation of the control rule, Amendment 53 arbitrarily applies the ACT only in a year following a year in which the recreational sector exceeds its ACL.  Amendment 53 does not explain the basis for the selective application of the ACT in violation of the Gulf Council's control rule.

108.    Amendment 53 contends that reallocation to the recreational sector is "expected to result in the greatest net economic benefits to the nation."  But NMFS previously determined that such a conclusion is "erroneous."  Amendment 53 is arbitrary and capricious because it conflicts with accepted economic principles and NMFS's own analyses.

109.    Certain analyses in Amendment 53 assume that the ratio of CHTS to FES recreational sector landings estimates is 1.0 to 2.10.  Amendment 53 does not explain the basis for this ratio, and it conflicts with the observed CHTS to FES ratios set forth in landings data published in Amendment 53.  Amendment 53's use of the 1.0 to 2.10 CHTS to FES ratio is arbitrary.

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

110.    Amendment 53 did not comply with the Gulf Council's Allocation Policy.  That policy states that the Gulf Council will undertake a comprehensive allocation review upon receipt of "relevant new information, e.g., data recalibration."  The shift from CHTS to FES prompted NMFS to undertake a recalibration of historical recreational landings data.  This should have triggered a comprehensive allocation review pursuant to the Gulf Council's Allocation Policy.  No such allocation review was performed.

111.    NMFS made extensive and material revisions to Amendment 53 after the Gulf Council voted to adopt it, but the Gulf Council never reviewed or approved the changes NMFS made.  In these circumstances the MSA contemplates that the Gulf Council, not NMFS, shall develop FMPs and FMP amendments.  Because the Gulf Council did not review or approve the final version of Amendment 53, the amendment was therefore adopted without observance of procedure required by the MSA.

112.    NMFS also violated MSA Section 304(b)(3), 16 U.S.C. § 1854(b)(3), by failing to publish the Amendment 53 Final Rule "within 30 days after the end of the comment period" on the proposed rule for Amendment 53.  That comment period ended on February 18, 2022.  NMFS was required by statute to publish the Amendment 53 Final Rule by March 21, 2022.  NMFS did not publish the Amendment 53 Final Rule until May 2, 2022.  This delay was unlawful and prejudicial to plaintiffs' ability to seek timely judicial review of Amendment 53.

113.    Amendment 53 violates the APA for the reasons above and for additional reasons to be demonstrated on summary judgment.

## XIV.    TENTH CAUSE OF ACTION – VIOLATION OF NEPA

114.    Paragraphs 1 through 113 are hereby incorporated by reference.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF - 40

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

115.     Among other requirements, NEPA requires that management actions like Amendment 53 "specify the underlying purpose and need for the proposed action," "[e]valuate reasonable alternatives to the proposed action," "[d]iscuss each alternative considered in detail…so that reviewers may evaluate their comparative merits," and include a "no action" alternative.  40 C.F.R. §§ 1502.13, 1502.14.  Agencies like NMFS must evaluate alternatives against a "no action" alternative that is legally viable, not predetermine the result of the environmental analysis, and must take a "hard look" at environmental impacts.

116.     Amendment 53 acknowledges that the "no action" alternative is "not legally viable," but fails to explain all the reasons why that is the case.  One reason the "no action" alternative is not legally viable is because NMFS unlawfully reallocated the quota prior to the Amendment 53 Final Rule.  Since 2020, without undertaking any public rulemaking procedure, NMFS has allowed the recreational sector to harvest over 40 percent of total landings in the red grouper fishery.  Amendment 53 thus evaluates allocation alternatives against a "no action" alternative that is unlawful in violation of NEPA.  The environmental impacts of NMFS's unilateral decision to reallocate the quota prior to Amendment 53 were not assessed and subject to public review.

117.     Amendment 53 also violates NEPA because NMFS predetermined the result of the environmental analysis and committed to a course of action before the environmental review was complete.  Indeed, NMFS actually reallocated the quota starting in 2020, before there was even a draft environmental impact statement for Amendment 53.  NMFS initiated the development of Amendment 53 at the Gulf Council, and voted with the Gulf Council majority to adopt Amendment 53 three days before the comment period closed on the draft environmental impact statement.  At

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF - 41

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

that point, the policy choice was locked in by the Gulf Council, and NMFS lacked authority to select a different policy choice.  In reality, NMFS had already made and effectuated the policy choice on its own years earlier.  The outcome of Amendment 53 was predetermined and effectuated prior to completion of environmental analyses in violation of NEPA.

118.    The NEPA analysis for Amendment 53 is also flawed because NMFS combined two different actions together, which obscures the impacts of each action.  Action 1 in Amendment 53 does two things: it updates the catch limits using recalibrated recreational sector catch estimates to track with the recent stock assessment, and it also reallocates quota from the commercial sector to the recreational sector.  By combining these actions together, the impacts related specifically to reallocation are obscured.

119.    NMFS did not consider a reasonable range of alternatives as required by NEPA. Amendment 53 only examined alternatives that would reallocate quota to the recreational sector. No alternatives were considered that would reallocate quota to the commercial sector.  In addition, no alternatives were considered that looked at both landings and dead discards to inform the true extent of the sectors' historical participation in the fishery.  The Gulf Council also failed to follow its own Allocation Policy, which would have resulted in an expanded range of alternatives.  The Gulf Council and NMFS started with the conclusion that any reallocation must only benefit the recreational sector, and did not rigorously explore and objectively evaluate other alternatives.

120.    Amendment 53 also violates NEPA because it does not take a hard look at the environmental impacts of reallocating more quota to the recreational sector.  Amendment 53 minimizes the effects of increased bycatch from reallocating quota to the recreational sector, and the attendant effects on management uncertainty and risk of overfishing.  For example, by asserting

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

that the "risk of overfishing" is "the same" between allocation alternatives, but defining "overfishing" to exclude dead discards, NMFS minimizes the real effects on the stock from increasing the recreational sector's allocation.   Nor does Amendment 53 assess how prior misunderstandings about recreational dead discards may have inhibited stock rebuilding.

121.   Amendment 53 violates NEPA.

## XV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1.   Enter a declaratory judgment that Amendment 53 and the Amendment 53 Final Rule violate the Magnuson-Stevens Fishery Conservation and Management Act, the Administrative Procedure Act, and the National Environmental Policy Act;

2.   Vacate Amendment 53 and the Amendment 53 Final Rule;

3.   Enter an injunction requiring NMFS to (i) recalculate and recodify the OFL, ABC, ACL, sector ACLs and sector ACTs using the prior allocation and accounting for dead discards in the OFL, (ii) ensure that the recreational sector adheres to its codified ACL, and (iii) use the best available scientific information to monitor usage of the recreational sector ACL;

4.   Award Plaintiffs their fees, expenses, and costs pursuant to Equal Access to Justice Act, 28 U.S.C. § 2412(d); and

5.   Such other and further relief as this Court deems just and appropriate.

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084

DATED this 6th day of May, 2022.

K&L GATES LLP

By:    /s J. Timothy Hobbs
       J. Timothy Hobbs (DC Bar # 976470)
       Tim.Hobbs@klgates.com
       925 Fourth Avenue, Suite 2900
       Seattle, WA  98104
       Telephone:     (206) 623-7580
       Facsimile:     (206) 623-7022

       Michael F. Scanlon (DC Bar # 479777)
       Michael.Scanlon@klgates.com
       1601 K Street, NW
       Washington, DC 20006
       Telephone: (202) 661-3764
       Facsimile: (202) 778-9100

       *Attorneys for Plaintiffs A.P. Bell Fish*
       *Company, Inc., Southern Offshore Fishing*
       *Association, Inc., and Gulf of Mexico Reef Fish*
       *Shareholders' Alliance*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE
RELIEF - 44

K&L GATES LLP
925 FOURTH AVENUE, SUITE 2900
SEATTLE, WA 98104
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 370-6084