**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| A.P. BELL FISH COMPANY, INC.; SOUTHERN OFFSHORE FISHING ASSOCIATION, INC., and GULF OF MEXICO REEF FISH SHAREHOLDERS' ALLIANCE, | |
| Plaintiffs, | |
| v. | Case No. 1:22-cv-01260-TJK |
| GINA M. RAIMONDO, in her official capacity as Secretary of the United States Department of Commerce; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; NATIONAL MARINE FISHERIES SERVICE, | EXPEDITED PURSUANT TO 16 U.S.C. § 1855(f)(4) NOTE ON MOTION CALENDAR: OCTOBER 18, 2022 |
| Defendants, | |
| and | |
| COASTAL CONSERVATION ASSOCIATION, | |
| Intervenor-Defendant. | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7(h), A.P. Bell Fish

Company, Inc., Southern Offshore Fishing Association, Inc., and Gulf of Mexico Reef Fish

Shareholders' Alliance (collectively, "Plaintiffs") hereby move for summary judgment on all of

their claims that defendants Gina M. Raimondo as Secretary of Commerce, the National Oceanic

and Atmospheric Administration, and the National Marine Fisheries Service violated the

Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), *see* 16 U.S.C. §§

1801-1884; the Administrative Procedure Act ("APA"), *see* 5 U.S.C. §§ 701-706, and the

National Environmental Policy Act of 1969 as amended ("NEPA"), *see* 42 U.S.C. §§ 4321 *et*

*seq*. In support of this motion, Plaintiffs submit a Memorandum of Law, the declarations of

Karen L. Bell and Glen Brooks, and a forthcoming appendix containing copies of those portions of the administrative record cited by the parties.  A proposed order is attached.


DATED this 29th day of July, 2022.          Respectfully submitted,

                                            K&L GATES LLP


                                            By: *J. Timothy Hobbs*
                                            J. Timothy Hobbs (DC Bar # 976470)
                                            Tim.Hobbs@klgates.com
                                            925 Fourth Avenue, Suite 2900
                                            Seattle, WA 98104
                                            Telephone: (206) 623-7580
                                            Facsimile: (206) 623-7022

                                            Michael F. Scanlon (DC Bar # 479777)
                                            Michael.Scanlon@klgates.com
                                            1601 K Street, NW
                                            Washington, DC 20006
                                            Telephone: (202) 661-3764
                                            Facsimile: (202) 778-9100

                                            Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| A.P. BELL FISH COMPANY, INC.; SOUTHERN OFFSHORE FISHING ASSOCIATION, INC., and GULF OF MEXICO REEF FISH SHAREHOLDERS' ALLIANCE,<br><br>_____Plaintiffs,<br><br>v.<br><br>GINA M. RAIMONDO, in her official capacity as Secretary of the United States Department of Commerce; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; NATIONAL MARINE FISHERIES SERVICE,<br><br>_____Defendants,<br><br>and<br><br>COASTAL CONSERVATION ASSOCIATION,<br><br>_____Intervenor-Defendant. | Case No. 1:22-cv-01260-TJK<br><br>EXPEDITED PURSUANT TO 16 U.S.C. § 1855(f)(4) |

## MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

J. Timothy Hobbs (DC Bar # 976470)
Tim.Hobbs@klgates.com
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
Telephone: (206) 623-7580
Facsimile: (206) 623-7022

Michael F. Scanlon (DC Bar # 479777)
Michael.Scanlon@klgates.com
1601 K Street, NW
Washington, DC 20006
Telephone: (202) 661-3764
Facsimile: (202) 778-9100

_Attorneys for Plaintiffs_

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................ 1

II.     STATUTORY AND REGULATORY FRAMEWORK ................................... 2

III.    FACTUAL BACKGROUND .................................................................. 4

    A.   Management of Red Grouper in the Gulf of Mexico ................................ 4

    B.   Differences Between the Commercial and Recreational Sectors................. 6

        1.   The commercial sector is limited and subject to rigorous management controls, including mandatory catch reporting.......................... 6

        2.   Most of the recreational sector is not subject to rigorous management controls; it is largely open access and catch reporting is unreliable.......................... 7

    C.   The Initial Allocation of Red Grouper Between the Sectors ..................... 8

    D.   Changes in Recreational Sector Catch Estimates ........................ 9

    E.   Development of Amendment 53 ........................................ 11

        1.   NMFS preemptively reallocated the quota during Amendment 53's development.... 11

        2.   NMFS's preemptive reallocation skewed the analysis in Amendment 53. ............... 12

    F.   Ecological Effects of Amendment 53 ...................................... 13

        1.   Amendment 53 will increase bycatch and dead discards of red grouper. .................. 13

        2.   Amendment 53 will cause a less productive red grouper stock with smaller yields... 15

        3.   Amendment 53 will increase management uncertainty and risk of overfishing......... 15

    G.   NMFS Justified Amendment 53 on an Economic Theory it Found "Erroneous"....... 16

IV.     PLAINTIFFS' STANDING................................................................ 17

V.      STANDARD OF REVIEW .............................................................. 18

VI.     ARGUMENT .............................................................................. 19

    A.   Amendment 53 Violates MSA National Standard 4. ................................ 19

        1.   Amendment 53 is not "Reasonably Calculated to Promote Conservation."............... 19

# TABLE OF CONTENTS
(continued)

Page

2.   Amendment 53 is not "Fair and Equitable." ................................................... 21

a.   Amendment 53 forces the commercial sector to subsidize recreational discards. . 22

b.   Amendment 53 penalizes the commercial sector for reporting its landings. ......... 24

c.   Amendment 53 is not motivated by any particular FMP objective....................... 25

B.   Amendment 53 Violates National Standard 9 ................................................. 26

C.   Amendment 53 Violates MSA Section 303(a)(15) ....................................... 28

D.   The FMP Fails to Contain a Standardized Bycatch Reporting Methodology............. 31

E.   Amendment 53 Violates MSA National Standard 2 ..................................... 33

F.   Amendment 53 Violates the Administrative Procedure Act....................................... 35

1.   Amendment 53 arbitrarily relies on economic theory NMFS found "erroneous." ..... 35

2.   NMFS arbitrarily used the old allocation formula when a key finding changed. ....... 36

3.   NMFS assessed impacts of Amendment 53 against an unlawful baseline. ............... 37

4.   NMFS arbitrarily determines which landings data are the "best available." ............. 39

5.   NMFS's recalibration of historical landings data is irreparably flawed. ................... 40

G.   Amendment 53 Violates NEPA ................................................................. 43

1.   NMFS pre-determined the outcome............................................................ 43

2.   NMFS failed to consider a reasonable range of alternatives. ................................... 44

VII.   CONCLUSION.......................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Accord Nat. Res. Def. Council, Inc. v. Daley*,
209 F.3d 747 (D.C. Cir. 2000) ........................................................................21, 27

*Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
429 F.3d 1136 (D.C. Cir. 2005) ................................................................................18

*Amerijet Int'l, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014) ................................................................................42

*ANR Storage Co. v. FERC*,
904 F.3d 1020 (D.C. Cir. 2018) ................................................................................38

*Arctic Sole Seafoods v. Gutierrez*,
622 F. Supp. 2d 1050 (W.D. Wash. 2008) ...............................................................28

*Chevron, U.S.A. v. Natural Res. Def. Council*,
467 U.S. 837 (1984).................................................................................................18

*City of Portland, Oregon v. EPA*,
507 F.3d 706 (D.C. Cir. 2007) ................................................................................35

*Coastal Conservation Ass'n v. Blank*,
No. 2:09-cv-641, 2011 WL 4530544 (M.D. Fla. Sept. 29, 2011).............................6

*Conservation L. Found. v. Evans*,
209 F. Supp. 2d 1 (D.D.C. 2001)..............................................................................26

*Conservation Law Foundation v. Ross*,
374 F. Supp. 3d 77 (D.D.C. 2019) ....................................................................21, 27

*Ctr. for Biological Diversity v. Zinke*,
900 F.3d 1053 (9th Cir. 2018) ...........................................................................35, 36

*Ctr. for Sustainable Econ. v. Jewell*,
779 F.3d 588 (D.C. Cir. 2015) ................................................................................17

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) (Kennedy, J., concurring)......................................................35

*Fla. Health Scis. Ctr., Inc. v. Becerra*,
No. 19-cv-3487, 2021 WL 2823104 (D.D.C. July 7, 2021) ....................................34

*Flaherty v. Raimondo*,
   531 F. Supp. 3d 76 (D.D.C. 2021) ..........................................................44

*Food & Water Watch v. FERC*,
   28 F.4th 277 (D.C. Cir. 2022) ................................................................44

*Fox Television Stations, Inc. v. F.C.C.*,
   280 F.3d 1027 (D.C. Cir. 2002), *opinion modified on reh'g*, 293 F.3d 537
   (D.C. Cir. 2002) ......................................................................................37

*Groundfish Forum v. Ross*,
   375 F.Supp.3d 72 (D.D.C. 2019) .............................................19, 20, 21

*Guindon v. Pritzker*,
   240 F. Supp. 3d 181 (D.D.C. 2017) ............................................. *passim*

*Guindon v. Pritzker*,
   31 F. Supp. 3d 169 (D.D.C. 2014) ............................................... *passim*

*Loper Bright Enters., Inc. v. Raimondo*,
   544 F. Supp. 3d 82 (D.D.C. 2021) ..........................................................43

*Metcalf v. Daley*,
   214 F.3d 1135 (9th Cir. 2000) ................................................................43

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) .................................................................... *passim*

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
   177 F.3d 800 (9th Cir. 1999) ..................................................................44

*Nat. Res. Def. Council, Inc. v. EPA*,
   859 F.2d 156 (D.C. Cir. 1988) ................................................................34

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005) ...............................................................................35

*Ocean Conservancy v. Ross*,
   No. 1:17-cv-1408, Dkt. # 38 (D.D.C. Dec. 19, 2017) ...............................1

*Oceana, Inc. v. Evans*,
   384 F. Supp. 2d 203 (D.D.C. 2005), *order clarified*, 389 F. Supp. 2d 4
   (D.D.C. 2005) ........................................................................................33

*Oceana, Inc. v. Evans*,
   No. 04-cv-0811, 2005 WL 555416 (D.D.C. Mar. 9, 2005) .....................32

*Oceana, Inc. v. Locke,*
   670 F.3d 1238 (D.C. Cir. 2011) ...................................................................18, 21, 30, 31

*Oceana, Inc. v. Locke,*
   831 F. Supp. 2d 95 (D.D.C. 2011) ........................................................................29

*Oceana, Inc. v. Pritzker,*
   24 F. Supp. 3d 49 (D.D.C. 2014) .........................................................................27

*Overseas Shipholding Grp., Inc. v. Skinner,*
   767 F. Supp. 287 (D.D.C. 1991) ..........................................................................17

*Safari Club Int'l v. Jewell,*
   960 F. Supp. 2d 17 (D.D.C. 2013) .......................................................................18

*Sherley v. Sebelius,*
   689 F.3d 776 (D.C. Cir. 2012) .......................................................................34, 35

*Sierra Club v. Salazar,*
   177 F. Supp. 3d 512 (D.D.C. 2016) .....................................................................40

*WildEarth Guardians v. Salazar,*
   741 F. Supp. 2d 89 (D.D.C. 2010) .......................................................................42

**Statutes**

5 U.S.C. § 706(2)(A) ...............................................................................................18

16 U.S.C. 1851(a)(2) ...............................................................................................33

16 U.S.C. § 1801(b)(1) ..............................................................................................2

16 U.S.C. § 1801(b)(3) ..............................................................................................2

16 U.S.C. § 1802(2) ...................................................................................................3

16 U.S.C. § 1802(34) .................................................................................................5

16 U.S.C. § 1851(a) ...................................................................................................3

16 U.S.C. § 1851(a)(1) ...............................................................................................3

16 U.S.C. § 1851(a)(4) ...........................................................................................3, 19

16 U.S.C. § 1851(a)(4)(A) ........................................................................................21

16 U.S.C. § 1851(a)(9) ...........................................................................................3, 26

16 U.S.C. § 1851(a)(9)(B) ........................................................................................28

16 U.S.C. § 1851(b) ............................................................................................................3

16 U.S.C § 1852 .................................................................................................................2

16 U.S.C. § 1852(h) ...........................................................................................................2

16 U.S.C. § 1853(a)(1)(A) ..................................................................................................3

16 U.S.C. § 1853(a)(1)(C) ..................................................................................................3

16 U.S.C. § 1853(a)(11) ...........................................................................................26, 31

16 U.S.C. § 1853(a)(15) ..........................................................................3, 28, 29, 30

16 U.S.C. § 1854 ................................................................................................................2

16 U.S.C. § 1855(f)(1)(B) ...............................................................................................18

42 U.S.C. 4332(2)(C) .....................................................................................................44

**Other Authorities**

40 C.F.R. § 1502.2(g) ......................................................................................................43

50 C.F.R. §§ 600.305 to 600.355 ....................................................................................3

50 C.F.R. § 600.310(e)(2)(i)(B) .......................................................................................5

50 C.F.R. § 600.310(e)(2)(i)(C) .....................................................................................29

50 C.F.R. § 600.310(e)(2)(i)(D) ...............................................................................3, 28

50 C.F.R. § 600.310(e)(2)(i)(E) .......................................................................................5

50 C.F.R. § 600.310(f)(1)(i) .............................................................................29, 37, 44

50 C.F.R. § 600.310(f)(1)(iii) ...........................................................................................4

50 C.F.R. § 600.310(f)(2)(ii) ...........................................................................................3

50 C.F.R. § 600.310(f)(3) .................................................................................................4

50 C.F.R. § 600.310(f)(4)(i) .............................................................................................4

50 C.F.R. § 600.310(g)(4) ................................................................................................4

50 C.F.R. § 600.315(e)(1) ..............................................................................................34

50 C.F.R. § 600.325(c)(3)(i) .............................................................................22, 25, 26

50 C.F.R. § 600.350(b) ......................................................................................20, 30

50 C.F.R. § 622.21(a)......................................................................................6, 7

50 C.F.R. § 622.21(a)(3) ..........................................................................................7

50 C.F.R. § 622.22 ......................................................................................6, 7

50 C.F.R. § 622.22(b)(3)...........................................................................................7

50 C.F.R. § 622.22(b)(3)...........................................................................................7

50 C.F.R. § 622.22(b)(5)...........................................................................................7

50 C.F.R. § 622.27 ...................................................................................................7

50 C.F.R. § 622.28 ...................................................................................................7

50 C.F.R. § 622.41(e)(1), (e)(2)(iv) ..........................................................................5

50 C.F.R. § 622.41(e)(2)(iv) ...................................................................................12

49 Fed. Reg. 39548, 39553 (Oct. 9, 1984)................................................................4

69 Fed. Reg. 1278 (Jan. 8, 2004)...............................................................................5

73 Fed. Reg. 68390 (Nov. 18, 2008)..........................................................................8

74 Fed. Reg. 3178, 3180 (Jan. 16, 2009)...................................................................4

74 Fed. Reg. 17604 (Apr. 16, 2009)...........................................................................8

74 Fed. Reg. 44732 (Aug. 31, 2009)..........................................................................6

82 Fed. Reg. 27777, 27779 (June 19, 2017) ..............................................................1

84 Fed. Reg. 22389 (May 17, 2019) ........................................................................38

84 Fed. Reg 25573 (May 2, 2022) ..................................................................... *passim*

84 Fed. Reg. 52036 (October 1, 2019)......................................................................38

Gulf of Mexico Fishery Management Council, Modification of Gulf of Mexico
     Red Grouper Annual Catch Limits and Annual Catch Targets (April 2019),
     available at: https://gulfcouncil.org/wp-content/uploads/FINAL-Red-Grouper-
     2019-ACL-Modification-042919-1.pdf..........................................................30, 38

NOAA Fisheries, Stock SMART (Status, Management, Assessments & Resource
    Trends) for Red Grouper in the Gulf of Mexico, available at
    https://www.st.nmfs.noaa.gov/stocksmart?stockname=Red%20grouper%20-
    %20Gulf%20of%20Mexico&stockid=10331 ............................................................................5

## I.       INTRODUCTION

Plaintiffs challenge an action that reallocates the harvest of red grouper in the Gulf of Mexico, taking fish from the commercial fishing sector and giving them to the recreational sector.  Plaintiffs are commercial fishermen and women who work hard to catch these fish and serve them to consumers around the country.  Defendants, the National Marine Fisheries Service, et al. ("NMFS"), approved this action.  Recreational anglers may benefit.  But apart from harming the commercial sector and consumers, this action is unlawful because it will also harm the red grouper population.

The challenged action will increase bycatch and discards by recreational anglers, reduce the size of the red grouper population, reduce the amount of fish that can be sustainably harvested each year by both sectors, and increase the risk of overfishing the stock.  These are all results Congress sought to avoid when it enacted the Magnuson-Stevens Fishery Conservation and Management Act ("MSA").  The Court should set this action aside.

This is not the first time NMFS has violated the law in taking actions that are contrary to the conservation goals of the MSA and that benefit the recreational sector at the expense of the commercial sector.  In 2014 this Court held that NMFS violated multiple legal requirements by repeatedly allowing the recreational sector to catch too many fish.  *Guindon v. Pritzker*, 31 F. Supp. 3d 169 (D.D.C. 2014) ("*Guindon I*").  A few years later the Court held that NMFS broke the law when it unfairly reallocated more fish to the recreational sector.  *Guindon v. Pritzker*, 240 F. Supp. 3d 181 (D.D.C. 2017) ("*Guindon II*").  Immediately after the *Guindon II* ruling, NMFS re-opened a fishing season for recreational anglers that NMFS admitted—in the Federal Register—would cause the recreational sector to "substantially exceed its annual catch limit, which was designed to prevent overfishing the stock," and "delay the ultimate rebuilding of the stock by as many as 6 years." 82 Fed. Reg. 27777, 27779 (June 19, 2017).  NMFS pledged to this Court that the season re-opening was a "one-time action" it would not repeat.  *See* Joint Motion to Hold Case in Abeyance, *Ocean Conservancy v. Ross*, No. 1:17-cv-1408, Dkt. # 38

(D.D.C. Dec. 19, 2017) at ¶¶ 1(a), 1(c).  NMFS's record of compliance with its legal mandates in the Gulf of Mexico is poor.

The challenged action is Amendment 53 to a management plan for reef fish in the Gulf of Mexico.  NMFS implemented a new survey to estimate what recreational anglers were catching.  That survey suggested anglers were catching more fish than previously thought.  The premise of Amendment 53 is to adjust the allocation between the commercial and recreational sectors to reflect this new information: in short, giving recreational anglers more fish going forward because new information suggested they were catching more in the past.

Plaintiffs agree that the new information was cause for reviewing the allocation between the two sectors.  But the new information also showed that recreational anglers are discarding far more fish than previously estimated.  Recreational anglers discard millions of fish each year, of which hundreds of thousands die.  This is a waste that harms the stock in ways that were not understood before.  But nothing was done to address it.  The resulting reallocation is fatally flawed.

## II.    STATUTORY AND REGULATORY FRAMEWORK

Congress enacted the MSA in 1976 "to take immediate action to conserve and manage the fishery resources found off the coasts of the United States" and "to promote domestic commercial and recreational fishing under sound conservation and management principles." 16 U.S.C. §§ 1801(b)(1), 1801(b)(3). Under the MSA, the country is divided into eight regions, with each region having a regional fishery management council ("Regional Council") that is charged with managing the marine fisheries in its respective jurisdiction. *See id*. § 1852. The Regional Councils develop fishery management plans ("FMPs") to manage stocks of fish under their respective jurisdictions and propose management measures to the Secretary of Commerce. *Id*. § 1852(h).  The Secretary, acting through the National Oceanic and Atmospheric Agency and the National Marine Fisheries Service, must approve the proposed measures if consistent with the MSA and other laws and, where appropriate, promulgate the necessary federal regulations. *Id*. § 1854.

2

The FMPs developed by the Regional Councils and approved by NMFS must include measures that are "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *Id.* § 1853(a)(1)(A). FMPs must specify "annual catch limits…at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." *Id.* § 1853(a)(15). FMPs must be consistent with all of the MSA's provisions, including ten National Standards. *Id.* §§ 1853(a)(1)(C), 1851(a).

As relevant here, National Standard 1 states that management measures "shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." *Id.* § 1851(a)(1). National Standard 4 requires that an allocation of fishing privileges between user groups must be "fair and equitable" and "reasonably calculated to promote conservation." *Id.* § 1851(a)(4). National Standard 9 states that management measures "shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." *Id.* § 1851(a)(9). Bycatch is unwanted catch—"fish which are harvested in a fishery, but which are not sold or kept for personal use." *Id.* § 1802(2).

As required by the MSA, NMFS has developed "advisory guidelines" for the National Standards "to assist in the development of fishery management plans." *Id.* § 1851(b); *see* 50 C.F.R. §§ 600.305 to 600.355. These guidelines do "not have the force and effect of law," 16 U.S.C. § 1851(b), but are subject to "considerable deference." *Guindon I*, 31 F. Supp. 3d at 198 (citing *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001)).

NMFS's guidelines contain a process and terminology for setting catch limits. Under the guidelines, a Regional Council's Scientific and Statistical Committee first establishes the Overfishing Limit ("OFL"). The OFL is a scientific estimate of the catch above which overfishing is occurring. *See* 50 C.F.R. § 600.310(e)(2)(i)(D). The committee then specifies where the Regional Council should set the Acceptable Biological Catch ("ABC"), which is the level of annual catch that accounts for scientific uncertainty in the estimate of OFL. *See id.* §

600.310(f)(2)(ii).  The ABC must not exceed the OFL, but can be reduced from OFL to create a buffer to account for scientific uncertainty.  *Id.* § 600.310(f)(3).

After the committee specifies the ABC, the Regional Council must then set the Annual Catch Limit ("ACL").  "ACL cannot exceed the ABC," *id.* § 600.310(f)(4)(i), but "may be divided into sector-ACLs," *id.* § 600.310(f)(1)(iii), such as a recreational sector ACL and a commercial sector ACL that equal the total ACL.

Finally, a Regional Council may set an Annual Catch Target ("ACT"), which is a catch limit set below the ACL to account for management uncertainty and ensure the ACL is not exceeded.  *See id.* § 600.310(g)(4).  The relationship between these limits is reflected in the following chart.

**Fig. 1 – Relationship Between OFL, ABC, ACL, and ACT[1]**



### III.    FACTUAL BACKGROUND

### A.    Management of Red Grouper in the Gulf of Mexico

Red grouper are bottom dwelling fish found in the Gulf of Mexico primarily off the west coast of Florida.  AR 8047, 8049. 8059.  The Gulf of Mexico Fishery Management Council ("Gulf Council") manages red grouper along with other reef fish species under its Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico ("Reef Fish FMP"), first implemented in 1984.  *See* 49 Fed. Reg. 39548, 39553 (Oct. 9, 1984).

---

[1] 74 Fed. Reg. 3178, 3180 (Jan. 16, 2009).

The stock of red grouper supports both commercial and recreational fishing. Accordingly, the Gulf Council and NMFS adopted sector ACLs for the commercial and recreational sectors, which apportion the red grouper total ACL between the sectors based on an allocation formula. *See* 50 C.F.R. § 622.41(e)(1), (e)(2)(iv). The Gulf Council and NMFS also adopted ACTs for each sector to help ensure the ACL is not exceeded. *See id.*

The red grouper stock is in poor condition. The stock was subject to overfishing and declared overfished in October 2000. *See* 69 Fed. Reg. 1278 (Jan. 8, 2004). A stock of fish is considered overfished when its biomass has declined to a level that jeopardizes its capacity to produce the maximum sustainable yield on a continuing basis. *See* 16 U.S.C. § 1802(34); 50 C.F.R. § 600.310(e)(2)(i)(E). Overfishing occurs when a stock is subjected to a level of fishing mortality that jeopardizes the capacity of the stock to produce the maximum sustainable yield on a continuing basis. 50 C.F.R. § 600.310(e)(2)(i)(B).

NMFS implemented a rebuilding plan that was intended to rebuild the stock by 2014. *See* 69 Fed. Reg. at 1278. But the stock remains below the target level. AR 7965. Based on the latest stock assessment completed in 2019, stock abundance is the lowest on record.

**Fig. 2: Trends in Red Grouper Stock Abundance[2]**



---

[2] NOAA Fisheries, Stock SMART (Status, Management, Assessments & Resource Trends) for Red Grouper in the Gulf of Mexico, available at: https://www.st.nmfs.noaa.gov/stocksmart?stockname=Red%20grouper%20-%20Gulf%20of%20Mexico&stockid=10331. *See also* AR 4479-4480, 4444.

The stock would be considered overfished under prior metrics, but NMFS lowered the

level at which the stock is considered overfished.  AR 4469.  An analysis using data through

2020 indicated some improvement in the red grouper stock, but estimated stock abundance is

still historically low and below target levels.  *See* AR 6480-6481.

**B.      Differences Between the Commercial and Recreational Sectors**

**1.      The commercial sector is limited and subject to rigorous management
controls, including mandatory catch reporting.**

The commercial sector of the red grouper fishery is limited access, meaning that there is a

fixed number of commercial fishing permits available.  There are currently less than 850 permits

in total; less than 400 vessels commercially harvest red grouper each year.  AR 8004, 8037.  The

commercial sector serves consumers of grouper across the country, providing public access to a

public resource.  *See, e.g.*, AR 14085, 14106, 14108, 14111, 14115.

The commercial red grouper fishery operates under an individual fishing quota program

(the "IFQ Program") implemented in 2010 by Amendment 29 to the Reef Fish FMP.  *See* 74

Fed. Reg. 44732 (Aug. 31, 2009); *Coastal Conservation Ass'n v. Blank*, No. 2:09-cv-641, 2011

WL 4530544 (M.D. Fla. Sept. 29, 2011) (upholding program).  Under the IFQ Program, IFQ

shares were issued to commercial permit holders based on their historical landings[3] of red

grouper.  *See* 50 C.F.R. § 622.22; AR 7975-7976.  IFQ shares are long-term harvesting

privileges that authorize the holder to catch a fixed percentage of the commercial sector's ACT

each year.  50 C.F.R. § 622.21(a).

On January 1 of each year, IFQ shareholders receive from NMFS a distribution of IFQ

allocation corresponding to their IFQ share percentage, which authorizes the holder to harvest a

specific number of pounds of red grouper in that calendar year.  AR 7975.  For example, if a

person holds one percent of the red grouper IFQ shares, and the commercial sector ACT for a

given calendar year is set at one million pounds, then that IFQ shareholder would receive 10,000

pounds of red grouper IFQ allocation to harvest in that calendar year.  AR 8135-8136.  IFQ

---

[3] "Landings" are fish brought to shore, or landed.

shares and annual IFQ allocation are held in electronic online accounts maintained by NMFS.  50 C.F.R. § 622.21(a)(3).  Both IFQ shares and annual IFQ allocation are transferable.  *Id*. § 622.21(a).

Strict monitoring ensures that the commercial sector ACT is not exceeded.  *See id.* § 622.22.  Commercial vessels must have vessel monitoring systems that report their location to NMFS, *id*. § 622.28, they must have sufficient IFQ allocation in their online vessel accounts to cover their landings, *id*. § 622.22(b)(3), they must inform NMFS where and when they will offload their landings each time they return from a fishing trip, *id*. § 622.22(b)(5), and they must sell their landings to a licensed fish dealer, which must also report the landed quantity to NMFS, *id*. § 622.22(b)(3).  Each pound of fish landed is tracked and accounted for in real time.  *See id*.  As this Court has recognized, IFQ Programs eliminate management uncertainty.  *Guindon II*, 240 F. Supp. 3d at 195 ("[T]he IFQ program has ended quota overruns.") (internal quotation and citation omitted).

Commercial vessels must also maintain logbooks in which they record landings and other information from their fishing trips.  AR 8170.  In addition, each year 20% of vessels must also fill out discard logs for each trip to report the number and species of any fish discarded at sea.  *Id*.; AR 18637.  Commercial vessels must also carry human observers when required by NMFS who record what is caught, kept and discarded at sea.  *Id*.; AR 8170; 50 C.F.R. § 622.27.

### 2.    Most of the recreational sector is not subject to rigorous management controls; it is largely open access and catch reporting is unreliable.

The recreational sector of the red grouper fishery is split into two components: (1) the charter/for-hire component, which consists of federally-permitted vessels that take anglers fishing for a fee; and (2) the private angler component, which consists of anglers fishing on privately owned vessels.  The charter/for-hire component and the private angler component do not have separate catch limits for red grouper; instead they both fish under the recreational sector ACL.  The charter/for-hire component is limited access, with 1,312 permits in total, and has mandatory reporting requirements.  AR 18597, 8008.

The private angler component is open access.  No federal permit is required to fish for red grouper as a private angler, AR 8053, and private anglers are not required to report to NMFS what they catch or discard.  As a result, NMFS must estimate landings and discards by private anglers by making extrapolations from voluntary, random surveys.  *See* sections III(C)-(D), *infra*.  NMFS estimates that private anglers catch roughly 80% of the recreational sector landings, AR 4405, but the lack of reporting causes uncertainty and imprecision.  *See* AR 9692 ("all recreational data sources have a high level of uncertainty because self-reported data are not considered overly reliable and not all recreational fishermen are surveyed").

## C.     The Initial Allocation of Red Grouper Between the Sectors

Under Amendment 30B to the Reef Fish FMP effective in 2009, NMFS approved an allocation of red grouper catch between the commercial and recreational sectors.  *See* 73 Fed. Reg. 68390 (Nov. 18, 2008) (proposed rule); 74 Fed. Reg. 17604 (Apr. 16, 2009) (final rule). Based on the sectors' respective average landings from 1986-2005, Amendment 30B allocated 76% of the ACL to the commercial sector and 24% of the ACL to the recreational sector.  *Id.*

In Amendment 30B, the Gulf Council found that the "proportion of dead discards to landings for red grouper is similar between the two sectors and the proposed shifts in allocation are small, so the difference in red grouper discards among [reallocation] alternatives would be minimal."  AR 10483.  As discussed below, this finding would radically change in the future.

For the commercial sector, landings estimates used for the allocation decision in Amendment 30B were generated by the Accumulated Landings System maintained by NMFS. AR 10568, 7221.  The system was generally comprised of information from "trip tickets," or mandatory reporting about weighed and reported pounds of fish landed for sale by commercial fish harvesters at NMFS-permitted fish dealers.  *See id.*; AR 11955.

For the recreational sector, landings estimates used for the allocation decision in Amendment 30B were generated by the Marine Recreational Fishing Statistics Survey ("MRFSS").  AR 10475.  Unlike commercial fish harvesters, recreational anglers were not required to report their landings under MRFSS.  Instead, MRFSS used a combination of two data

inputs to estimate by extrapolation the landings by recreational anglers: 1) dockside interviews of a small percentage of recreational anglers (known as the Access Point Angler Intercept Survey or "APAIS"), AR 18893; and 2) random telephone surveys of households located within 25 to 50 miles of the coast to inquire about marine recreational fishing activities (known as the Coastal Household Telephone Survey or "CHTS"), AR 18923.

**D.**      **Changes in Recreational Sector Catch Estimates**

In 2006 the National Research Council ("NRC") of the National Academy of Sciences published a report on MRFSS.  AR 12286.  The report found "that marine recreational fishing is a significant source of fishing mortality for many marine species," that "[b]oth the telephone and access components of the current [MRFSS] approach have serious flaws in design or implementation and use inadequate analysis methods that need to be addressed immediately," and that MRFSS "should be completely redesigned to improve its effectiveness and appropriateness of sampling and estimation procedures, its applicability to various kinds of management decisions, and its usefulness for social and economic analysis."  AR 12303-12305.

NMFS responded to the 2006 NRC report by replacing MRFSS with a new survey to estimate recreational catches called the Marine Recreational Information Program ("MRIP"). AR 18886.  Initially, MRIP retained the two basic inputs from MRFSS to estimate recreational catches: dockside intercepts (APAIS) and telephone surveys (CHTS), but with improvements.

In 2015, however, NMFS implemented a new survey distributed by U.S. mail to replace CHTS called the Fishing Effort Survey ("FES").  AR 18914.  NMFS conducted both surveys— CHTS and FES—for three years, 2015 through 2017.  AR 18971.  NMFS then discontinued CHTS.  *Id*. The MRIP survey now relies primarily on the dockside intercepts of recreational anglers (APAIS) and mail-in surveys (FES) to estimate recreational landings.  AR 18891.

Recreational anglers still are not required to report what they catch to NMFS, and so NMFS must estimate recreational sector landings and discards by making extrapolations from data collected from voluntary surveys (APAIS and FES) of a small subset of recreational anglers. The survey is now referred to as "MRIP-FES."  *See, e.g.*, AR 17423.

The shift from telephone (CHTS) to mail (FES) surveys indicated that recreational anglers were catching significantly more fish than previously estimated.  AR 4406.  By comparing catch estimates under CHTS and FES over 2015-2017, NMFS developed a calibration ratio to convert recreational landings estimated under MRIP-CHTS into MRIP-FES "units," and vice versa.  AR 12499.

Based on the CHTS-FES calibration ratio NMFS developed, NMFS then proceeded to retrospectively "recalibrate" the entire time series of recreational landings estimates for multiple fish species going back to the early 1980s.  *See* AR 12491.  NMFS's recalibration exercise indicated that the recreational sector had significantly higher landings each year, including landings of red grouper during the years of 1986-2005 that Amendment 30B used to allocate the red grouper ACL between the recreational and commercial sectors.  *See* AR 7992-7993.

But the recalibration exercise showed wide variability between the historical landings estimates and the new recalibrated landings estimates.  For example, according to a dataset published in Amendment 53, the 1996 landings estimates increased from 893,755 pounds (MRFSS units) to 910,313 pounds (MRIP-FES units), an 18.5 percent increase.  AR 7992.  But for 1989, landings estimates increased from 2,761,150 pounds (MRFSS units) to 7,632,792 pounds (MRIP-FES units), a 176.4 percent increase.  *Id*.  Members of the Gulf Council, the Council's various advisory committees, and the public expressed grave concerns about the reliability of the recalibrated landings estimates. *See, e.g.*, AR 4028, 4043, 3901, 1805-1806 (Reef Fish Advisory Committee unanimous resolution stating "we have been unable to reach a consensus, due to a lack of confidence in the recreational data used to inform the proposed allocations in the alternatives").

Indeed, one peer reviewer of NMFS's FES calibration model explained that it "is not possible" to "evaluate accuracy of the [landings] estimates." AR 8276.  This is because anglers must "recall the number of trips they took within the past two months" and "there is a possibility that these trips are mis-remembered." *Id*.  The reviewer explained that "a variety of factors can result in the reported trips differing from the actual number of trips taken and this type of

problem is well documented in the survey literature." *Id.* To determine accuracy, "a validation study would need to be devised that paired an onsite validation with the offsite survey," but this would be "difficult and very expensive." *Id.*  Additionally, because individual recreational fishermen have differing abilities to accurately recall details of past fishing trips and the population of recreational fishermen changes over time as new entrants join and older participants leave the fishery, applying the recalibration formula to periods well before 2015 and well after 2017 is likely to produce different results than during the 2015-2017 period during which both data collection methods were used.  *See id.*; *see also* AR 9908, 12537.  Thus, there is no basis to determine whether the recalibrated landings estimates are accurate, especially outside of the 2015-2017 period.

## E.    Development of Amendment 53

### 1.    NMFS preemptively reallocated the quota during Amendment 53's development.

A stock assessment for red grouper was conducted in 2019, referred to as SEDAR 61. AR 5344-5628.  NMFS's recreational sector landings estimates, recalibrated into MRIP-FES units, were fed into the stock assessment model.  NMFS presented the results of the stock assessment to the Gulf Council in October 2019, and urged it to begin drafting an FMP amendment to reallocate based on the new landings estimates.  AR 699.  NMFS specifically recommended that the Gulf Council increase the recreational sector's allocation from 24% to 40%. *Id.*

While the Gulf Council developed Amendment 53, however, NMFS jumped the gun and effectuated its own reallocation without any rulemaking process or public review.  NMFS did this by taking recreational sector landings, estimated from MRIP-FES, and converting those landings into "CHTS units" for purposes of tracking the recreational sector's use of its ACL and when to close the fishing season.  *See* AR 7989 ("To compare recreational landings to the current recreational ACL and annual catch target (ACT), the SEFSC converted the MRIP-FES estimates into MRIP-CHTS units."); AR 8124 ("Currently, recreational landings for red grouper (as well

as many other reef fish) are calculated in MRIP-FES, and must be converted to MRIP-CHTS for quota monitoring.").

Thus, while the recreational sector's codified ACL was 1.0 million pounds, 50 C.F.R. § 622.41(e)(2)(iv) (2021), after 2019 NMFS permitted the recreational sector to catch 2.1 million pounds. *See* AR 17420 ("In MRIP-FES units, the current recreational ACL" is "estimated to be 2.10 million pounds."). In effect, this gave the recreational sector a longer fishing season. At the same time, NMFS held the commercial sector to its codified sector ACL of 3.16 million pounds.

As a result, the effective (but not codified) total ACL was 5.26 million pounds, of which NMFS gave the recreational sector 2.10 million pounds, or 40 percent—the same percentage ultimately adopted by Amendment 53. *See* AR 7967. On its own, prior to the effective date of Amendment 53, and without any public notice or review, NMFS changed the allocation to be 60% commercial to 40% recreational in violation of the 76/24% allocation set by the Reef Fish FMP and in violation of its own codified ACLs.

> **2.  NMFS's preemptive reallocation skewed the analysis in Amendment 53.**

NMFS's decision to preemptively increase the recreational sector's allocation during the development of Amendment 53 affected the analysis. In justifying Amendment 53, NMFS contends that "the *revised allocation* reduces the commercial and recreational ACLs by similar percentages (approximately 20 percent and 18 percent, respectively) and is expected to result in the greatest net economic benefits to the Nation." AR 17424 (emphasis added). NMFS calculates the reduction based off its effective (but not codified) recreational sector ACL of 2.10 million pounds. But that level of harvest already represents an allocation to the recreational sector of 40% (2.10/5.26 = .40). The "revised allocation" in Amendment 53 is not what causes the 18 percent reduction for the recreational sector. That reduction is attributable to precautionary guidance from the Scientific and Statistical Committee about how to deal with the potential effects of a "red tide"—or toxic algae bloom—in 2018 that likely killed a portion of the stock. *See* AR 7978-7979. Amendment 53 *increases* the codified recreational ACL at 50 C.F.R.

§ 622.41(e)(2)(4) from 1.0 million pounds to 1.73 million pounds. Rather than reducing the recreational ACL by 18 percent, Amendment 53 increases it by 73 percent.

**F.   Ecological Effects of Amendment 53**

The record shows that Amendment 53 will have negative effects on the red grouper stock by increasing bycatch, decreasing stock productivity, and increasing management uncertainty and risk of overfishing. Four Gulf Council members filed a Minority Report urging NMFS to disapprove Amendment 53 for these and other reasons. AR 8274, 8279.

**1.   Amendment 53 will increase bycatch and dead discards of red grouper.**

NMFS's new recreational fishing survey, MRIP-FES, indicated that the recreational sector discards far more fish than previously estimated. This was new information the Gulf Council and NMFS did not have when they approved the initial allocation under Amendment 30B. The effect of NMFS's recalibration exercise on discards is shown by the increase from the blue line to the red line in the chart below from the 2019 stock assessment.

**Fig. 3 – Recreational Discards (showing effect of MRIP-FES recalibration)[4]**



At the same time, the 2019 stock assessment found that the commercial sector discards fewer red grouper than previously estimated. AR 4409.

---

[4] AR 0004410.

Over the last decade the recreational sector has discarded anywhere from 2.5 to 6.8 million individual red grouper each year.  AR 8172.  An estimated 11.6 percent of those fish died after being discarded, AR 18294, meaning that roughly 300,000 to 800,000 fish were discarded *dead* each year by recreational anglers.  Discards in the commercial sector, by comparison, are "less than a tenth of recreational discards."  AR 8070.  The recreational sector discards "an order of magnitude more fish (in number of fish) than the commercial sector."  *Id*.

**Fig. 4: Red Grouper Discards by Sector (#s of fish)[5]**



Reallocating a larger portion of the ACL to the recreational sector will increase bycatch and discards of red grouper.  "Because the recreational sector selects for smaller and younger fish compared to the commercial sector as shown in SEDAR 61 (see Figures 4.28 and 4.29), an increase of allocation to the recreational fleet results in more encounters and higher overall discards (of which 11.6% will die)."  AR 9692; *see also* AR 9686, 8187.

---

[5] Source data at AR 8171, 8172.

2. **Amendment 53 will cause a less productive red grouper stock with smaller yields.**

Shifting allocation to the recreational sector will also have other negative effects that result from the recreational sector's catch of "smaller and younger fish compared to the commercial sector." AR 9692.  In particular:

> Shifts in allocations ultimately change the age specific population structure of the stock. Harvest of larger numbers of smaller, younger fish result in a smaller overall population at equilibrium (100 years into the future). Therefore, when the inputs into the assessment model include more recreational harvest than previously assumed, this leads to a lower overall OFL estimate at equilibrium.

*Id.* (emphasis added).  *See also* AR 9686 ("changing the age-specific population structure of the stock…leads to a lower maximum sustainable yield and annual OFL.").

This is why the total ACL must decrease as more fish are allocated to the recreational sector.  "[W]hen more fish are allocated to the recreational sector, total landings have to be constrained more to account for the greater dead discards from recreational red grouper fishing." AR 8070; *see also* AR 8188 ("Bycatch is considered wasteful because it reduces overall yield obtained from the fishery.").  As shown in Table 1 of Amendment 53, the total ACL would be 4.90 million pounds under the prior 76/24 percent allocation.  But the total ACL drops to 4.26 million pounds—a 640,000 pound decrease—when the allocation is changed to 59.3/40.7 percent under the selected alternative.

3. **Amendment 53 will increase management uncertainty and risk of overfishing.**

Because recreational anglers are not required to report to NMFS what they catch, estimates of recreational sector landings and discards are imprecise and have a high degree of uncertainty.  AR 18639.  Because of this, Amendment 53 explains that allocating a larger portion of the catch to the recreational sector increases uncertainty about total catch, which in turn increases the risk of overfishing the stock.  "[A]llocating a greater percentage of the ACL to a sector that has more uncertainty in landings…is more likely to result in an overfishing or eventual overfished status for Gulf red grouper." AR 7970; *see also* AR 8082 ("Alternatives that result in larger allocations to the recreational sector could increase the likelihood of overfishing

because of the uncertainty in determining recreational landings."); AR 8110 (there is "an increased potential for overfishing of red grouper if there is an increase in allocation the recreational sector, which is associated with more uncertainty in constraining harvest").

At bottom, Amendment 53 will increase discards, change the age structure of the stock so it is less productive, reduce the maximum sustainable yield, decrease the amount of fish available to harvest, and increase management uncertainty and risk of overfishing.

**G.     NMFS Justified Amendment 53 on an Economic Theory it Found "Erroneous"**

NMFS contends that the negative stock impacts from Amendment 53 are justified because "the revised allocation…is expected to result in the greatest net economic benefits to the Nation." AR 17424.  However, NMFS previously found that no such conclusion can be drawn in this context.  *See* AR 11948 ("it is not possible to determine the expected net economic outcome resulting from the proposed sector reallocations, because inferences about economic efficiency are erroneous when each sector's quota is not efficiently allocated within the sector").

The commercial sector operates under an IFQ program, in which a market for transferable IFQ shares and annual IFQ allocation efficiently distributes the use of quota across the participants in the commercial sector.  AR 11991.  In an earlier amendment to the Reef Fish FMP, Amendment 28, NMFS acknowledged that an IFQ program constitutes "a reasonable approximation for an efficient resource allocation."  *Id*.

But the recreational sector is open access, and there is no market or other mechanism to efficiently distribute quota across the participants in the recreational sector.  *Id*. NMFS acknowledged in Amendment 28 that "the open access management approach in the recreational sector cannot be conducive to an efficient allocation…within the recreational sector."  *Id*.

NMFS further acknowledged in Amendment 28 that "changes in net benefit estimates…and associated inferences about economic efficiency <u>are erroneous</u> when each sector's quota is not efficiently allocated within the sector (i.e., quota is not assigned to those participants that have the highest willingness to pay for the resource).  As a result, policy prescriptions based on such inferences would not be valid, and therefore, not useful."  *Id*.

(emphasis added).  In other words, because the recreational sector is open access, there is no way to ensure that those anglers who place a higher value on allocation are the ones who use it.

Amendment 28 was initially premised on the theory that reallocation would increase net benefits, but the purpose and need for Amendment 28 were revised after that theory was discredited.  *See Guindon II*, 240 F. Supp. 3d at 190-91 ("After learning that it was not possible to determine changes in economic benefits and receiving information from the MRIP calibration, the Gulf Council modified the purpose of Amendment 28.").

The same conditions exist in the red grouper fishery: the commercial sector operates under an IFQ program, AR 8003, and the recreational sector is open access.  AR 8007 ("Private recreational fishing vessels are not required to have a federal permit").  Thus, under NMFS's own analysis, the determination that Amendment 53 will "result in the greatest net economic benefits to the nation" is "erroneous."

## IV.    PLAINTIFFS' STANDING

As a participant in the commercial sector, Plaintiff A.P. Bell Fish Company, Inc.'s Article III standing to challenge a reduction in the commercial sector's red grouper allocation with attendant environmental harms is self-evident.  *See Guindon I*, 31 F. Supp. 3d at 187 (holding that plaintiffs in the commercial sector had standing to challenge regulation of the recreational sector under the Reef Fish FMP); *Guindon II*, 240 F. Supp. 3d at 193 (finding "no reason to deny standing here" in challenge to reallocation of red snapper) (citing *Guindon I* and *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002)).  Similarly, Plaintiffs Southern Offshore Fishing Association, Inc. ("SOFA") and Gulf of Mexico Reef Fish Shareholders' Alliance ("Shareholders' Alliance") have associational standing to bring this suit on behalf of their members who participate in the commercial red grouper fishery and are harmed by NMFS's reallocation to the recreational sector and the negative environmental impacts that will result. *See Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 596 (D.C. Cir. 2015); *Overseas Shipholding Grp., Inc. v. Skinner*, 767 F. Supp. 287, 295 (D.D.C. 1991).  All Plaintiffs have

prudential standing because they are in the zone of interests protected by the MSA and NEPA. *See Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 51, 59 (D.D.C. 2013).

For avoidance of doubt, Plaintiffs also rely on the Declarations of Karen L. Bell ("Bell Decl.") and Glen Brooks ("Brooks Decl.") filed herewith, members of SOFA and the Shareholders' Alliance, respectively. Their declarations explain how they have suffered and will continue to suffer concrete and particularized injury by Amendment 53 with respect to their economic, conservation and other interests in the red grouper fishery. *See* Bell Decl. at ¶¶ 6-8; Brooks Decl. at ¶¶ 6-8. A ruling vacating Amendment 53 would redress their injuries. *See* Bell Decl. at ¶ 7; Brooks Decl. at ¶ 7.

## V.   STANDARD OF REVIEW

Agency actions under the MSA are reviewed pursuant to Section 706(2) of the APA. 16 U.S.C. § 1855(f)(1)(B); *Oceana, Inc. v. Locke*, 670 F.3d 1238, 1240 (D.C. Cir. 2011). Under the APA, a reviewing court may set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

In reviewing an agency's interpretation of a statute it administers, the Court first looks to whether the intent of Congress is clear; if it is, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously express intent of Congress." *Chevron, U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984). If the intent of Congress is not clear, the agency's interpretation is entitled to deference if it is "reasonable" and not otherwise "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843-44.

Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to difference in view or the product of agency expertise." *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1144-45 (D.C. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*")). The agency must have a

"reasoned basis" for its regulatory actions, and must "cogently explain" why it has exercised its discretion in a given manner. *State Farm*, 463 U.S. at 43, 48.

## VI.   ARGUMENT

The Court should vacate Amendment 53 because it violates numerous provisions of the MSA, the APA, and NEPA.

### A.   Amendment 53 Violates MSA National Standard 4.

Amendment 53 violates National Standard 4 because it will not "promote conservation" and is not "fair and equitable."  16 U.S.C. § 1851(a)(4).

#### 1.   Amendment 53 is not "Reasonably Calculated to Promote Conservation."

National Standard 4 of the MSA provides that if it "becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be …reasonably calculated to promote conservation."  *Id*. § 1851(a)(4).  Amendment 53 will weaken conservation and thus violates the standard.

In *Groundfish Forum v. Ross*, 375 F.Supp.3d 72, 89 (D.D.C. 2019), this Court recognized that:

> [B]y the standard's terms, if the Service decides to allocate fishing privileges to a specific group, that allocation must actually 'promote' a conservation purpose—that is, advance or further it—rather than just avoid jeopardizing one. *See* Webster's Third New International Dictionary (1961) (defining "to promote," in relevant part, as "to contribute to the growth, enlargement, or prosperity of: further, encourage").

*Groundfish Forum* involved an allocation of harvesting privileges to vessels delivering their catch to onshore processing plants in a specific geographic region in Alaska.  *Id*. at 75. NMFS claimed the allocation was conservation neutral, did not weaken the FMP's conservation goals, and that the FMP as a whole still promoted conservation. *Id*. at 89.  The Court rejected this argument based on the plain language of National Standard 4 that an allocation itself—not the overall FMP—must actually "promote" conservation, and holding that a conservation neutral allocation does not comport with the standard.  *Id*.

Unlike the allocation at issue in *Groundfish Forum*, however, Amendment 53 is not conservation neutral but conservation negative.  Amendment 53 will increase bycatch and discards, AR 9692, 9686, 8187, which poses a conservation problem as explained in NMFS's guidelines.  *See* 50 C.F.R. § 600.350(b) ("[B]ycatch can increase substantially the uncertainty concerning total fishing-related mortality, which makes it more difficult to assess the status of stocks, to set the appropriate [optimum yield] and define overfishing levels, and to ensure that [optimum yields] are attained and overfishing levels are not exceeded.").

Amendment 53 will also change the age structure of the stock to make it less productive, AR 9692, 9686; reduce the maximum sustainable yield the stock can produce, AR 9686; and increase management uncertainty and the risk of overfishing, AR 8082, 7970, 8110.  The stock is indisputably worse off as a result of Amendment 53.  NMFS quibbles about *the degree* to which conservation is impaired, not the fact of impairment.  *See, e.g.*, AR 8260 (reallocation "does not *substantially* increase the risk of overfishing") (emphasis added).   On this record, Amendment 53 cannot be said to "promote" conservation.

NMFS contends otherwise, asserting that Amendment 53 "promotes wise use by considering both the biological impacts to the red grouper stock, including preventing overfishing, and the economic and social impacts to fishery participants." AR 17424 (citing NMFS's National Standard 4 guidelines).  The Court must therefore wrestle with the guidelines' meaning of "wise use" it found unclear and sidestepped in *Groundfish Forum*, 375 F. Supp. 3d at 92.  NMFS's justification here, however, cannot withstand scrutiny.  Even if the statutory requirement to "promote conservation" were ambiguous (it is not), NMFS's "explanations of what the National Standards require…are so divorced from the statutory text that they would necessarily fail under *Chevron's* second step." *Id*. at 85 n. 10.

NMFS's primary contention is that the economic and social benefits of Amendment 53 outweigh the negative biological outcomes for the stock from Amendment 53.  *See* AR 17424

(asserting that Amendment 53 will "result in the greatest net economic benefits to the nation"[6]). But National Standard 4 permits no such balancing; the requirement that an allocation "shall" promote conservation is an "unqualified directive" that leaves no room for weighing socio-economic or other factors.  *See Conservation Law Found. v. Ross*, 374 F. Supp. 3d 77, 92 (D.D.C. 2019) ("National standard one is an unqualified directive: the Service 'shall prevent overfishing while achieving ... optimum yield.'") (emphasis in original).

Nor does the statutory language permit NMFS to equate promoting socio-economic benefits with promoting conservation.  *See Groundfish Forum*, 375 F. Supp. 3d at 92 (Congress's inclusion of National Standard 8 suggests that socio-economic benefits to communities "are *distinct* from the 'conservation' objectives contemplated in National Standard 4," and citing examples of this distinction in NMFS's own guidelines).  *Accord Nat. Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000) (distinguishing between conservation and economic considerations and finding that "under the Fishery Act, the Service must give priority to conservation measures").

Whatever "wise use" may mean under NMFS's guidelines, an allocation that increases bycatch, increases management uncertainty and risk of overfishing, and alters the stock structure to make it less productive with smaller yields, all in service of promoting economic benefits for one of two sectors that both depend on the stock, is neither "wise" nor comports with the requirement to "promote conservation."  "[T]he self-proclaimed wisdom of the approach cannot save it because the Congress, in its more commanding wisdom, has not authorized it."  *Oceana*, 670 F.3d at 1243.  Because Amendment 53 does not "promote conservation," it violates National Standard 4 and should be vacated.

> **2.     Amendment 53 is not "Fair and Equitable."**

Amendment 53 also violates the requirement under National Standard 4 that an allocation be "fair and equitable to all such [United States] fishermen." 16 U.S.C. § 1851(a)(4)(A).  To be

---

[6] This conclusion is also flawed; NMFS itself recently found it to be "erroneous;" *see* section VI(F)(1), below.

sure, any allocation produces winners and losers; NMFS's guidelines recognize that advantaging one group to the detriment of another is inherent in an allocation.  50 C.F.R. § 600.325(c)(3)(i). But the particular circumstances here are unfair to the commercial sector.

> a.   **Amendment 53 forces the commercial sector to subsidize recreational discards.**

Amendment 53 is unfair to the commercial sector because it reduces the commercial sector's ACL to cover the increased dead discards that will occur in the recreational sector. Amendment 53 thus penalizes the commercial sector twice: first by the reduction in percentage of the total ACL (from 76% to 59.3%), and second by the reduction in the ACL to account for the increase in dead discards that results from shifting more allocation to the recreational sector.

The effects of reallocation are evident in Table 1 of Amendment 53.

### Fig. 5 – Table 1 from Amendment 53[7]

Table 1.  OFL, ABC, total and sector ACLs for **Alternatives 1-6**.

|  | OFL* | ABC | Total ACL | Comm ACL | Rec ACL |
|---|---|---|---|---|---|
| Alternative 1** MRFSS data 1986-2005 (76% commercial:24% recreational) | 14.16 | 13.92 | 4.16 | 3.16 | 1.00 |
| MRIP-FES equivalent |  |  | (5.26) |  | (2.10) |
| Alternative 2*** Retain current percentages (76% commercial:24% recreational) | 5.35 | 4.90 | 4.90 | 3.72 | 1.18 |
| Preferred Alternative 3*** MRIP-FES data 1986-2005 (59.3% commercial:40.7% recreational) | 4.66 | 4.26 | 4.26 | 2.53 | 1.73 |
| Alternative 4*** MRIP-FES data 1986-2009 (60.5% commercial:39.5% recreational) | 4.70 | 4.30 | 4.30 | 2.60 | 1.70 |
| Alternative 5*** MRIP-FES data 1986-2018 (59.7% commercial:40.3% recreational) | 4.67 | 4.28 | 4.28 | 2.56 | 1.72 |
| Alternative 6*** MRIP-FES data but retain commercial ACL at 3.16mp (68.7% commercial:31.3% recreational) | 5.03 | 4.60 | 4.60 | 3.16 | 1.44 |

*Values for OFL, ACB, total ACL, commercial ACL, and recreational ACL are in mp gw.
**The recreational portion of the current OFL, ABC, and ACLs are based on MRIP-CHTS data.
***The recreational sector ACL is in MRIP-FES units.

Alternative 2 would maintain the current 76/24% allocation but adjust the catch limits to be consistent with the latest stock assessment advice.  The selected alternative (Preferred

_____

[7] AR 7967.

Alternative 3) changes the allocation to 59.3/40.7%.  Both the commercial and recreational sectors are governed by the Total ACL (Table 1, fourth column).  Under Alternative 2, the total ACL is 4.90 million pounds.  Under Alternative 3, the total ACL is 4.26 million pounds.  Thus, shifting more of the allocation to the recreational sector necessitates a reduction in the total ACL of 640,000 pounds.

Amendment 53 explains the reason for this reduction: "The recreational sector discards a much larger amount of red grouper as bycatch, but the increases in recreational allocation are accompanied by a decrease in overall ACL to mitigate the effects of the increased bycatch." AR 8187.  *See also* AR 8070 ("when more fish are allocated to the recreational sector, total landings have to be constrained more to account for the greater dead discards from recreational red grouper fishing").  The explanation in NMFS's Record of Decision is slightly different.  AR 9692.  NMFS says the ACL reduction is caused by two factors: increased dead discards by recreational anglers and a less productive stock that results from anglers harvesting "larger numbers of smaller, younger fish" which results "in a smaller overall population." *Id.*

Either way, the point holds: the commercial sector ends up with a smaller ACL because of increased bycatch and other negative effects that result from shifting more of the allocation to the recreational sector.  In the Final Rule,[8] NMFS states that the "commercial sector is not subsidizing dead discards from the recreational sector." AR 17423. But the record shows otherwise.  To "subsidize" is to pay part of the cost of something, which is precisely what the commercial sector is doing here: paying part of the cost of negative impacts associated with increasing the recreational sector's allocation.  NMFS's explanation "runs counter to the evidence before the agency" and is thus irrational.  *State Farm*, 463 U.S. at 43.

Changing the allocation percentages is one thing—any allocation will disadvantage someone.  But also forcing the commercial sector to give up additional fish—fish that would

---

[8] Final Rule for Amendment 53, 84 Fed. Reg. 25573 (May 2, 2022); AR 17419-17436.

otherwise wind up in restaurants and grocery stores to be enjoyed by consumers—so that anglers can discard them dead into the Gulf of Mexico is unfair and irrational.

> **b.** **Amendment 53 penalizes the commercial sector for reporting its landings.**

As discussed above, the commercial and recreational sectors are subject to vastly different regulatory regimes.  Commercial fishermen must hold limited access permits, are required to report their landings, and are subject to numerous other monitoring and reporting requirements.  Recreational anglers, on the other hand, need no federal permit and are not required to report anything to NMFS.  This forces NMFS to estimate recreational landings by making extrapolations from a small sample of voluntary surveys.  The result is inevitably fraught with uncertainty, and it "is not possible" to evaluate the accuracy of these estimates.  AR 8276. There is a disparity in the accuracy and reliability of landings *reported* by the commercial sector, and landings *estimated* for the recreational sector.  *See* AR 1800-1801 (NMFS scientist stating, "because of the way the data are collected for commercial, they are generally regarded as more precise, whereas there is considerable uncertainty with the recreational estimates").  Yet in using those data sets to make allocation decisions, Amendment 53 treats them as comparable.

In *Guindon II*, the Court vacated a reallocation of red snapper in favor of the recreational sector under Amendment 28 to the Reef Fish FMP because it was not fair and equitable as required by National Standard 4.  240 F. Supp. 3d at 195.  Like this case, Amendment 28 similarly dealt with recalibrated recreational landings estimates that showed the recreational sector had been catching more fish than previously estimated.  *Id.* at 190.  When those recalibrated landings estimates were fed into the stock assessment, the yield increased, and Amendment 28 allocated that increased yield to the recreational sector on the premise that the sector had been catching more fish all along.  *Id.*  But the Court found a "fundamental flaw" in that approach: the allocation scheme required a sector to overharvest in order to obtain an increase in its allocation.  *Id.* at 195.  And because the commercial sector operated under an IFQ

program that eliminated the possibility of overharvesting, the allocation scheme unfairly put the commercial sector at a permanent disadvantage.  *Id*.

*Guindon II* is distinguishable because the allocation scheme under Amendment 28 differs from Amendment 53.  But its basic premise holds.  The commercial sector is disadvantaged because its reported landings are reliable and not subject to revision through recalibration like recreational landings estimates.  At bottom, the commercial sector has a more stringent and effective regulatory regime that is lacking in the recreational sector.  *See* AR 3784-3785.  As in *Guindon II*, it is unfair to disadvantage the commercial sector on that basis.

<blockquote>c.  **Amendment 53 is not motivated by any particular FMP objective.**</blockquote>

Amendment 53 is also unfair to the commercial sector because it was not designed to promote any particular FMP objective.  NMFS's guidelines provide that to be "fair and equitable," the "motive for making a particular allocation should be justified in terms of the objectives of the FMP; otherwise, the disadvantaged user groups or individuals would suffer without cause." 50 C.F.R. § 600.325(c)(3)(i).

The "motivation" for Amendment 53 is not expressed in terms of meeting FMP objectives.  The amendment contains a list of FMP objectives, AR 7980-7981, but no analysis about how shifting allocation to the recreational sector would promote any one of them.  Indeed, the Minority Report pointed this out and explained that reallocation actually undermines several FMP objectives.  AR 8276.  NMFS vaguely responded to this critique after the Gulf Council voted to approve Amendment 53.  AR 8264, 11215 (objectives "include preventing overfishing and promoting stability in the fishery by allowing for enhanced fisher flexibility and increasing fishing opportunities to the extent practicable").  But the premise for Amendment 53 was not tied to FMP objectives.

One explanation for this defect is that the Gulf Council failed to follow its own Allocation Policy, which is supposed to start with an assessment of FMP objectives and whether the existing allocation is meeting them.  Under the policy, that is called an "allocation review."

AR 8196.[9]  The Gulf Council's policy states that "the Council could initiate an allocation review should relevant new information, e.g., data recalibration, be made available." AR 8228.  An allocation review entails "evaluating successful attainment of management objectives and adjusting strategies in response." AR 8282.  In turn, "the identification of purpose and need and the development of action alternatives (reallocation) should occur in response to allocation review findings that a reallocation is warranted." *Id.*

But no allocation review occurred; the Gulf Council initiated Amendment 53 without evaluating attainment of FMP objectives and whether a reallocation was warranted.  AR 699. NMFS asserts that "[n]othing in the policy states that the steps are mandatory or that the review and evaluation of options must happen sequentially." AR 17421.  But that explanation conflicts with the plain language of the policy, which clearly requires a step-wise approach that did not occur here.  AR 8196.  Had the Gulf Council followed its policy, some type of reallocation may have been justified in terms of FMP objectives as NMFS's guidelines contemplate for an allocation to be considered "fair and equitable."  50 C.F.R. § 600.325(c)(3)(i).

## B.    Amendment 53 Violates National Standard 9

National Standard 9 provides that "conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." 16 U.S.C. § 1851(a)(9); *see also id*. § 1853(a)(11). "Congress made clear that it sought to 'bring to a stop this inexcusable amount of waste.'" *Conservation L. Found. v. Evans*, 209 F. Supp. 2d 1, 15 (D.D.C. 2001) (citing  142 Cong. Rec. S10810 (daily ed. Sept. 18, 1996) (Sen. Ted Stevens)).  Amendment 53 increases bycatch and violates this standard.

National Standard 9 is qualified; bycatch and bycatch mortality must be minimized "to the extent practicable."  "Congress's inclusion of the term 'practicable' is thus critical; it is the

---

[9] This bates number on this page is obscured in the record.  It is page 223 of Amendment 53 (AR Doc. # 182).  The Gulf Council's policy is laid out in a letter to NMFS (Appendix F, pp. 254-255 of Amendment 53, AR 8227-8228). That letter references two NMFS procedural directives, which are found at Appendix D (Am. 53, pp. 221-237) and Appendix E (Am. 53, pp. 238-252).

means by which it 'delegated to the agency the discretion to weigh the relevant factors' embodied in the MSA's competing objectives." *Conservation Law Found.*, 374 F. Supp. 3d at 91–92 (quoting *Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 67 (D.D.C. 2014)).  "For example, National Standards 1, 7, and 9 require, respectively, that the agency balance optimum yield with conservation, minimize costs and avoid duplication, and minimize bycatch." *Oceana*, 24 F. Supp. 3d at 68.  Compliance with National Standard 9 thus turns on whether NMFS abused its discretion or acted arbitrarily and capriciously.  *See id.*

Amendment 53 acknowledges that "managers must balance the competing objectives of maximizing yield, ending overfishing, and reducing bycatch to the extent practicable." AR 8176. But the problem here is that no balance is struck: Amendment 53 will reduce yields, AR 9686, increase the risk of overfishing, AR 8082, 8110, and increase bycatch, AR 17306, 9692, 8187.

Indeed, this case presents a novel question under National Standard 9 because the action at issue will increase bycatch whereas the standard contemplates minimization of bycatch.  Other regulatory measures, such as a minimum size limit to retain a fish, may increase bycatch; a fish under that size limit would have to be discarded.  *See* AR 18582.  But those measures have a specific conservation purpose; i.e., to protect smaller fish.  *See id.* ("Under these circumstances, there is some biological benefit to managed species that outweighs any increases in discards from the action.").  Here, however, there is no biological benefit.  To the contrary, there is biological harm.  AR 9686, 8082, 8110, 17306, 9692, 8187.

An action that both increases bycatch and harms the stock, as here, simply cannot be squared with the MSA's objectives.  *See Daley*, 209 F.3d at 753 (priority must be given to conservation).  An action, like a minimum size limit, that increases bycatch but promotes conservation reflects a rational balance between National Standards 1 and 9.  But an action that increases bycatch, reduces yields, and harms conservation does not; it subverts the conservation objectives of the National Standards to prioritize socio-economic considerations, which the MSA does not allow.  *Id.*  NMFS abused its discretion under National Standard 9 because the outcome does not prioritize conservation or reflect a rational balancing of the MSA's objectives.  *See*

27

*Arctic Sole Seafoods v. Gutierrez*, 622 F. Supp. 2d 1050, 1061 (W.D. Wash. 2008) (NMFS's action was unlawful because it conflicted with the goal Congress intended).

Amendment 53 also violates National Standard 9 because no consideration was given to measures to "minimize the mortality" of bycatch that "cannot be avoided." 16 U.S.C. § 1851(a)(9)(B).  NMFS treats increased discards as a given.  *See* AR 17423 ("These different goals and objectives impact fishing behavior, which generally results in more discards by the recreational sector.").  It is not rational for NMFS to take an action that increases bycatch but fail to consider measures to minimize the mortality of that increased bycatch; NMFS has "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

## C.     Amendment 53 Violates MSA Section 303(a)(15)

Under Section 303(a)(15) of the MSA, management plans must "establish a mechanism for specifying annual catch limits…at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." 16 U.S.C. § 1853(a)(15).  Amendment 53 and the Reef Fish FMP do not comply with this requirement because dead discards are not accounted for in annual catch limits.  Between 2015-2019, the recreational sector discarded around 2.75 million red grouper each year, of which an estimated 11.6% died, or around 320,000 dead fish each year. AR 18593.  Over the same time, the recreational sector landed around 370,000 fish each year. *Id*.  The recreational sector discards roughly one fish dead for each one landed.  The OFL and ACL set by Amendment 53, however, cover only red grouper landings, not dead discards.  As described below, by excluding a significant portion of fishing mortality from its annual catch accounting, NMFS violates § 1853(a)(15).

NMFS's guidelines set forth the process to comply with § 1853(a)(15).  *See* section II, Fig. 1, *supra*.  The first step under the guidelines is to establish the OFL.  OFL is defined as "the annual amount of <u>catch</u> that corresponds to the estimate of [the maximum fishing mortality threshold] applied to a stock…and is expressed in terms of numbers or weight of fish." 50 C.F.R. § 600.310(e)(2)(i)(D) (emphasis added).  The term "catch" is defined as the "total quantity of fish taken" in all fisheries and "includes fish that are retained for any purpose, as well as

mortality of fish that are discarded." *Id*. § 600.310(f)(1)(i).  Thus, "catch" includes dead discards, and the specification of OFL must therefore include dead discards.  This makes sense because dead discards are caused by fishing, and the over*fishing* limit is supposed to represent the level of removals from fishing beyond which overfishing is occurring.  *See id*. § 600.310(e)(2)(i)(C) (the "maximum fishing mortality threshold" is "the level of fishing mortality…above which overfishing is occurring").  The setting of ABC, ACL and ACT all follow the setting of the OFL.

Amendment 53 does not follow this approach, however.  The OFL and ACL established by Amendment 53 (4.66 million pounds and 4.26 million pounds, respectively, AR 7967) include landings only.  They do not include dead discards.  Instead, mortality from dead discards and other removals (e.g., projected mortality from red tide events) is estimated separately, and factored in by projection models that produce "yield streams" the stock can produce into the future.  *See* AR 17422.  When the Gulf Council's Scientific and Statistical Committee reviews catch projections produced by NMFS, they are in yields (landings), and estimated dead discards are already deducted.  *Id*.  This is why the OFL and ACL set by Amendment 53 include landings only, not all "catch."  This does not comport with MSA requirements because the Amendment 53 OFL is untethered to actual fishing mortality.

The Court addressed the requirements of § 1853(a)(15) in *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95 (D.D.C. 2011).  In that case, NMFS acknowledged that the MSA requires NMFS to "'set annual catch limits…, and because bycatch counts against those limits, the total amount of bycatch must be accurately assessed to ensure that catch limits are not exceeded.'"  *Id*. at 110 (quoting NMFS's brief).  The Court agreed that bycatch must "be accurately reported throughout the fishing season at levels such that ACLs can be monitored and enforced," *id*. at 111, and that bycatch monitoring provisions must be "mandatory and sufficiently specific," *id*. at 112.  The Court found that NMFS met those requirements in that case because the FMP amendment at issue required vessels to carry federal fishery observers to monitor bycatch, and that the specified level of observer coverage would be sufficient to "establish[] the bycatch measurements

implicitly needed to support the system of ACLs and [accountability measures] that § (a)(15) requires." *Id*. at 113.

Amendment 53 does not comport with these requirements.  First, it sets red grouper OFLs and ACLs that exclude dead discards, particularly the significant amount of dead discards occurring in the recreational sector.  The Amendment 53 OFL and ACL are limits on landings, not "catch."  The flaw in this approach is that there is no accountability to a "catch limit" that includes all "catch," i.e., mortality from fishing activities.  NMFS admittedly undertakes efforts to estimate dead discards, but there is no annual upper "limit" on dead discards, and no measures "to ensure accountability" to any such limit as required by § 1853(a)(15).

NMFS contends that the "risk of overfishing is the same under all of the allocation alternatives considered by the Council." AR 17422.  NMFS cites probability calculations made by the SSC at the different "level[s] of harvest." *Id*.  But those calculations assume away any uncertainty in hitting those harvest levels.  The very problem with bycatch is that it "can increase substantially the uncertainty concerning total fishing-related mortality," which makes it more difficult to ensure that "overfishing levels are not exceeded," as NMFS's own guidelines acknowledge.  50 C.F.R. § 600.350(b).  NMFS's assertion that the risk of overfishing is "the same" disregards the increased risk resulting from increased uncertainty by reallocating to the recreational sector.  NMFS's statement both runs counter to the evidence before the agency, and completely fails to consider an important aspect of the problem.  *State Farm*, 463 U.S. at 43.

Under NMFS's guidelines, accountability measures "for when an ACL is exceeded are mandatory: '[T]he Council *must* determine as soon as possible after the fishing year if an ACL was exceeded.  If an ACL was exceeded, [accountability measures] *must* be triggered and implemented as soon as possible.'" *Oceana*, 831 F. Supp. 3d at 119-20 (quoting 50 C.F.R. § 600.310(g)(3)) (emphasis supplied by the Court).

But here, there is no accountability for bycatch.  Particularly in the private angler component, the number of fish killed as bycatch is comparable to the number of fish landed. AR 18593.  By attempting to move roughly half of all recreational fishing mortality off the

books, NMFS undermines key conservation goals of the MSA. "If not properly managed and accounted for, bycatch mortality could potentially reduce stock biomass of bycatch species…to an unsustainable level." AR 18595.

There is no "mandatory and sufficiently specific" mechanism to track recreational discards on an annual basis and account for such discards as part of the Amendment 53 OFL and ACL. *Oceana,* 831 F. Supp. 3d at 112.  As a result, the recreational sector has no incentive to avoid or reduce dead discards; the recreational sector can discard red grouper with impunity and it will not affect its fishing seasons or catch limits because no accountability measures will kick in. No effort is made to assess annually whether the recreational sector discarded more or less red grouper than projected when setting OFLs/ACLs that cover only landings.

When Congress amended the MSA to require ACLs and accountability measures, it did not intend for the Regional Councils to simply exclude a significant source of fishing mortality from these limits.  NMFS agrees.  *See Oceana*, 831 F. Supp. 3d at 110 (NMFS stating that "the total amount of bycatch must be accurately assessed to ensure that catch limits are not exceeded").

**D.     The FMP Fails to Contain a Standardized Bycatch Reporting Methodology**

Another provision of the MSA related to bycatch provides that "[a]ny fishery management plan which is prepared by any Council…with respect to any fishery, shall…establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery…" 16 U.S.C. § 1853(a)(11).  The Gulf Council's Reef Fish FMP does not comply with this requirement because the private angler component of the recreational sector is not required to report bycatch and existing voluntary surveys are not reliable.

Both the commercial sector and the for-hire component of the recreational sector have rigorous bycatch reporting requirements.  *See* AR 18633.  Each year 20% of commercial vessels provide discard logs for each trip.  *Id*. The discard logs plus data gathered by human observers are used to obtain accurate estimates of discards.  *Id*.  In 2021 a new reporting program took effect for the for-hire component, called the Southeast For-Hire Integrated Electronic Reporting

program, which requires for-hire vessels to electronically report all catch while at sea, including discards. *Id.*

Discards by the private angler component, by contrast, are estimated from voluntary surveys under MRIP-FES as described above. These surveys "have a high level of uncertainty because self-reported data are not considered as reliable and not all recreational fishermen are surveyed." AR 18639. Not all Gulf States participate in MRIP-FES, so the survey is not consistently employed across the reef fish fishery. *See* 18598 ("MRIP-FES does not operate" in "Louisiana and Texas"); 18596 (Texas "does not collect data on bycatch"). The Gulf Council has recognized the need to improve bycatch reporting by the private angler component. AR 18641 ("One area of improvement identified by Gulf Council members was discard data from the recreational sector, especially the private angling component. Because all recreational data are self-reported, Gulf Council members expressed general concern about the estimates generated.").

Lack of reliable bycatch reporting by the private angler component is a problem because that component is responsible for most of the bycatch. *See* AR 8171-8172. Specifically, the private angler component is responsible for approximately 77% of all red grouper discards. *Id.* It is not rational for NMFS to have rigorous reporting requirements for commercial and for-hire vessels, but not for the private angler component where most discards occur.

In the Final Rule, NMFS noted that "the Council recommended evaluation and coordination with state and Federal partners to improve bycatch data collection in the future." AR 17425. But "an FMP that merely suggests a hoped-for result, as opposed to 'establish[ing]' a particular standardized methodology, does not measure up to the statute's requirements." *Oceana, Inc. v. Evans*, No. 04-cv-0811, 2005 WL 555416, at *40 (D.D.C. Mar. 9, 2005).

More is required here, particularly because Amendment 53 will increase red grouper bycatch by the private angler component. "A methodology need not necessarily be detailed, but it must at the very least provide decisionmakers and the public with a program of what actually will be *done* to improve bycatch reporting, and why these measures will be sufficient based on

the best available science." *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 234 (D.D.C. 2005), *order clarified*, 389 F. Supp. 2d 4 (D.D.C. 2005).

### E.     Amendment 53 Violates MSA National Standard 2

NMFS violated National Standard 2 because it ignored contrary and superior economic data when promulgating Amendment 53.  National Standard 2 requires that management measures "shall be based upon the best scientific information available." 16 U.S.C. 1851(a)(2). "NMFS may not disregard superior data in reaching its conclusion." *Guindon I*, 31 F. Supp. 3d at 195 (internal quotations and citation omitted).  A challenge under National Standard 2 must show "some indication that superior or contrary data was available and that the agency ignored such information." *Id*. (internal quotations and citation omitted).

In projecting economic impacts, Amendment 53 relied on a 2012 paper that estimated a value of $110 per fish to determine the consumer surplus valuation of incremental catch by anglers.  *See* AR 8074.  Some of the same authors of the 2012 paper published a new paper in 2021 that estimated the value at $46 per fish, less than half the value used for Amendment 53. AR 9902 (citing AR 12209 (Carter, Liese, and Lovell)).  The difference in value has a material effect on the projected economic benefits and demonstrates that they are grossly inflated.  *See* AR 9902-9905.  In particular, using the lower end of the range of estimated values from the 2021 paper completely reverses the conclusions in Amendment 53.  AR 9904 ("This would mean that economic *losses* will result from reallocating quota to the recreational sector.").

In the Final Rule, NMFS asserts that the 2021 paper "was not available at the time the analysis for Amendment 53 was conducted." AR 17432.[10]  This response is not rational.  It suggests that once NMFS performs an analysis, it can blind itself to new information that calls its analysis into question, even before a final decision is made.  That approach conflicts with what Congress plainly intended by National Standard 2.

---

[10] NMFS refers to this as "the 2022" paper, AR 17432, presumably because it appeared in the January 2022 volume of *Marine Resource Economics*.  AR 12209.  The paper was published online in 2021, *id*.

NMFS's response is also wrong; the 2021 paper was available.  All three authors of the 2021 paper are NMFS economists.  AR 12209.  The journal that published the paper received it for consideration on January 29, 2020, *id*., so the paper evidently was prepared and available to NMFS by that date.  At that time, Amendment 53 was just an "options paper" that contained no economic analysis.  *See* AR 782.  The economic analysis for Amendment 53 did not appear in a draft of the amendment until October 2020.  *See* AR 1543, 1640.  The fact that the paper was not officially published until 2021 is irrelevant; Amendment 53 relies on unpublished work by other economists.  *See* AR 8072 (citing "Keithly and Tabarestani (2018);" AR 8153, 17589).

Indeed, the 2021 paper was available to NMFS right from the start of Amendment 53's development.  It was the latest information about grouper valuations in the recreational sector; a critical issue for Amendment 53.  Yet NMFS ignored that new information in favor of older work that estimated higher values.  NMFS's guidelines provide that "new information should be incorporated into the final FMP where practicable." 50 C.F.R. § 600.315(e)(1).  NMFS does not explain why it was not practicable to incorporate this new information from its own economists that undercut the older information NMFS used for analysis of Amendment 53's impacts.

NMFS's response is also deficient under the APA.  "Agency action will be considered arbitrary or capricious unless an 'agency adequately responds to relevant and significant public comments.'" *Fla. Health Scis. Ctr., Inc. v. Becerra*, No. 19-cv-3487, 2021 WL 2823104, at *14 (D.D.C. July 7, 2021) (quoting *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 211 (D.C. Cir. 2011)) (alterations omitted).  "The fundamental purpose of the response requirement is, of course, to show that the agency has indeed considered all significant points articulated by the public." *Nat. Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 188 (D.C. Cir. 1988).  As such, "the opportunity to comment is meaningless unless the agency responds to significant points raised by the public." *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) (quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977)). "Significant comments are those 'which, if true, raise points relevant to the agency's decision and which, if adopted, would require a change in an

agency's proposed rule.'" *City of Portland, Oregon v. EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007) (quoting *Home Box Office*, 567 F.2d at 35 n.58).

Plaintiffs' opportunity to comment on this subject was "meaningless." *Sherley*, 689 F.3d at 784.  Amendment 53 is justified primarily on the basis of economic benefits.  *See* AR 17424. NMFS does not address the substance of Plaintiffs' comments that the economic benefits projected for Amendment 53 are at least inflated and possibly altogether wrong based on the work of NMFS's own economists.  National Standard 2 and the APA require more.

**F.     Amendment 53 Violates the Administrative Procedure Act**

In addition to the reasons discussed above, Amendment 53 violates the APA because it is arbitrary and capricious in other ways.

**1.     Amendment 53 arbitrarily relies on economic theory NMFS found "erroneous."**

Amendment 53 contends that reallocation "is expected to result in the greatest net economic benefits to the Nation." AR 17424.  But in Amendment 28, NMFS determined that "changes in net benefit estimates" are "erroneous" where, as here, a "sector's quota is not efficiently allocated within the sector." AR 11991; 11948.  The Gulf Council and NMFS concluded that Amendment 28 could not proceed on the basis that a reallocation to the recreational sector would increase net economic benefits.  *Id.*; *see Guindon II*, 240 F. Supp. 3d at 191.  Amendment 53 therefore stands on the very economic theory that NMFS abandoned for Amendment 28 as being "erroneous."

An "[u]nexplained inconsistency" between two agency actions can be grounds for an arbitrary and capricious finding.  *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).  "An agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009) (Kennedy, J., concurring) (citing *State Farm*, 463 U.S. at 29).  In *Ctr. for Biological Diversity v. Zinke*, for example, it was arbitrary for an agency to rely on a study it had previously

discredited when deciding against an ESA listing for a fish species without providing a reasoned explanation for its change of view. 900 F.3d 1053, 1070 (9th Cir. 2018).

Here, the Final Rule concurs that the prior findings from Amendment 28 remain valid: "economic theory does suggest that it is not possible to maximize net economic benefits to the Nation because resources are not being efficiently allocated in that [recreational] sector.  As a result, it is not possible to maximize net economic benefits to the Nation…regardless of which allocation is selected." AR 17432.  But the Final Rule then contradicts itself by claiming that "Amendment 53 does not suggest that the selected sector allocation maximizes net economic benefits to the nation." *Id.*  The Final Rule says precisely the opposite: "the revised allocation…is expected to result in the greatest net economic benefits to the Nation." AR 17424.  The two statements are diametrically opposed; if there is a difference between "maximizing" benefits and "resulting in the greatest" benefits, NMFS does not explain it.

NMFS has therefore either failed to explain a change in its position from Amendment 28 to Amendment 53, or NMFS is just talking out of both sides of its mouth.  Either way, the justification is arbitrary and capricious in violation of the APA.  Lacking this supporting justification, Amendment 53 fails.

**2.      NMFS arbitrarily used the old allocation formula when a key finding changed.**

The initial allocation formula for red grouper under Amendment 30B used the sectors' respective landings over the base years of 1986-2005.  AR 17420.  In selecting that allocation formula, Amendment 30B found that the proportion of landings to discards "is similar between the two sectors and the proposed shifts in allocation are small, so the difference in red grouper dead discards among [allocation] alternatives would be minimal." AR 10483.

This finding changed dramatically for Amendment 53.  Based on MRIP-FES calibrations, the latest estimates show that the proportion of discards to landings in the commercial sector is 35.1%, AR 18589, compared to 782% in the recreational sector, AR 18593, meaning that the recreational sector discards nearly eight fish for each one retained.  In real numbers, on average

each year the private angler component retains 307,054 red grouper and discards 2,399,889 red grouper. *Id*.; see also AR 8171-8172.

These new findings had a material effect on the allocation; specifically, shifting more quota to the recreational sector will substantially increase discards, AR 8070, which was not the case at the time of Amendment 30B.  But Amendment 53 proceeds on the unfounded assumption that the Council would have selected the same allocation under Amendment 30B even if had known about these extensive discards by the recreational sector.

The stated purpose of Amendment 53 is to "reflect[] the historical participation by the commercial and recreational sectors." AR 17424.  But "participation" in the fishery includes discards; the Final Rule explains that "fishing behavior" of the recreational fleet "generally results in more discards." AR 17423; *see also* 50 C.F.R. § 600.310(f)(1)(i) ("catch" includes "mortality of fish that are discarded").  In adopting the same allocation formula used for Amendment 30B, looking only at recreational landings but without taking into account new information about increased recreational sector discards, NMFS "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

Nor did NMFS address this issue in the Final Rule, even though it was raised by Plaintiffs.  AR 9893-9894.  *See Fox Television Stations, Inc. v. F.C.C.*, 280 F.3d 1027, 1051 (D.C. Cir. 2002), *opinion modified on reh'g*, 293 F.3d 537 (D.C. Cir. 2002) (failing to respond to comments "require[s] that we reverse as arbitrary and capricious the [agency's] decision").

### 3.    NMFS assessed impacts of Amendment 53 against an unlawful baseline.

As explained above, NMFS implemented its own reallocation during the development of Amendment 53 by resetting the ACL at 5.26 million pounds and giving the recreational sector an ACL of 2.10 million pounds, or 40% of the total.  The FMP at that time dictated a 24% allocation, which was reflected in the codified ACLs.  NMFS simply ignored its own regulations. This was unlawful.  *See Guindon I*, 31 F. Supp. 3d at 201 ("NMFS essentially guaranteed that the actual catch allocation would skew widely from the 51/49 allocation, as indeed it did. This violated [MSA] Section 304(b).").

NMFS claims that prior rulemakings "set the recreational ACL in MRIP-CHTS units based on 2017 landings, as approved by the Council (84 FR 22389; May 17, 2019 and 84 FR 52036; October 1, 2019.)." AR 17426.  But neither of the cited Federal Register notices say anything about "CHTS units." Nor does the underlying Gulf Council action.[11]  The ACLs are set in pounds of fish.  "CHTS units" is a fiction of NMFS's own creation that never went through public rulemaking.

Under the APA, an agency's decision must be reasonable and reasonably explained, and its reasoning cannot be internally inconsistent.  *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1024 (D.C. Cir. 2018).  NMFS's unlawful preemptive reallocation obscured the impacts of Amendment 53 and resulted in unreasonable explanations and internal inconsistencies.

For example, the Final Rule explains that "the revised allocation reduces the commercial and recreational ACLs by similar percentages (approximately 20 percent and 18 percent, respectively) and is expected to result in the greatest net economic benefits to the Nation." AR 17424.  It makes no sense that the "revised allocation" in favor of the recreational sector would "reduce" the recreational sector ACL.  The "revised allocation" was baked in when NMFS unilaterally increased the recreational sector's ACL to 2.1 million pounds without any public rulemaking process.  The referenced "reduction" is simply due to aligning the new catch limits with advice from the latest stock assessment.  *See* AR 7960 (yield projections were affected not only by allocations but by advice from the stock assessment and about the severity of the 2018 red tide).  This is not a reasonable explanation.

Similarly, NMFS's preemptive reallocation obscured the Bycatch Practicability Analysis in Amendment 53 and caused it to be internally inconsistent.  The analysis recognizes that the recreational sector "discards a much larger amount of red grouper as bycatch, but the increases in

---

[11] Gulf of Mexico Fishery Management Council, Modification of Gulf of Mexico Red Grouper Annual Catch Limits and Annual Catch Targets (April 2019), available at: https://gulfcouncil.org/wp-content/uploads/FINAL-Red-Grouper-2019-ACL-Modification-042919-1.pdf

recreational allocation are accompanied by a decrease in overall ACL to mitigate the effects *of the increased bycatch*." AR 8187 (emphasis added).  But the analysis concludes that there will be "neutral to low positive biological impacts" from "revising catch percentage allocations" by "further reducing bycatch and bycatch mortality in the directed grouper fishery." AR 8188.  One statement says bycatch will increase, the other says bycatch will decrease.  But the analysis used the uncodified recreational sector ACL of 2.1 million pounds as the baseline.  The actual effects on bycatch from NMFS's unilateral decision to increase that ACL were never assessed.

### 4.    NMFS arbitrarily determines which landings data are the "best available."

Amendment 53 relies on recreational and commercial landings data from NMFS's own "internal data file" to set the allocation between the sectors.  AR 17426.  These landings data are known as the "ACL Monitoring Datasets." *See id*.; AR 7967.  They are not available to the public.  AR 12269, 17426.  NMFS acknowledges that it manipulates these data and that they conflict with other NMFS data.  *See* AR 17426.  Indeed, looking at just one year as an example (1987), the record shows four different estimates for recreational sector landings that year. *Compare* (in pounds) AR 7992 (2,495,130); AR 326 (2,314,546 ), AR 12277 (2,208,539) AR 12279 (2,113,082).  NMFS picks and chooses which data set to use for different purposes and its explanations are unreasonable.

The initial premise for Amendment 53 was to reset the allocation based on the new MRIP-FES recalibrated recreational landings data that were used in the 2019 stock assessment. AR 699.  But then NMFS further revised those data with "a custom procedure for weight estimation." AR 17426.  The effect of that change resulted in a larger allocation to the recreational sector.  *See* AR 4583, 5269-5270, AR 5150.  NMFS determined that, for allocation purposes, these newly revised data were the best available.  AR 8264.  NMFS claims to use these data for quota monitoring, *id*., but that is incorrect.  NMFS converts those data into "CHTS units" for quota monitoring.  AR 8124.  NMFS's process is byzantine and incoherent, and its explanation is not "satisfactory." *State Farm*, 463 U.S. at 43.

Further, NMFS's landings data also conflict with landings data collected by Florida's State Reef Fish Survey.  Florida's data track with the older CHTS survey and suggest that MRIP-FES significantly overestimates recreational harvest.  AR 8000.  NMFS has certified Florida's landings data as statistically valid.  *Id.*  Indeed, Florida's sampling program was designed to overcome the shortcomings of MRIP-FES.  *See* AR 4825 (Florida's program was designed "to reduce sampling error and the number of possible sources of non-sampling error relative to the general MRIP survey" and "has reduced the magnitude and potential sources of error for state level private recreational reef fish landings and discards").

If Florida's landings data were used in Amendment 53, there would be little change in the allocation.  *See* AR 8000.  NMFS explains that Florida's dataset was "not used to revise the allocation because it was not provided for consideration in the SEDAR 61 assessment that generated the current OFL and ABC recommendations." AR 17427.  But the same is true for NMFS's data, as modified by its "custom procedure for weight estimation."  *See* AR 7978 ("an update to the weight estimation metrics…modifies the recreational data from what were used in SEDAR 61 (2019)").  Those data also were not provided for consideration in the stock assessment, but they are nevertheless the basis for reallocation.  NMFS's explanations make no sense.  "Such cherry-picking embodies arbitrary and capricious conduct." *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 540 (D.D.C. 2016).

**5.     NMFS's recalibration of historical landings data is irreparably flawed.**

The reallocation under Amendment 53 uses NMFS's recalibrated historical landings estimates for the recreational sector over the base period of 1986-2005.  But NMFS, and peer reviewers of its methods, found significant flaws with these estimates.  NMFS's own findings indicate that its calibration model was not applicable to landings estimates from prior to 2000.  Peer reviewers found there was no basis to conclude that the recalibrated landings estimates were more accurate than the old ones.  Thus, there is no rational basis to use the revised landings estimates to change the allocation between the sectors.

NMFS's calibration model is based on the observed differences between the CHTS and FES when both surveys were run side-by-side from 2015-2017.  *See* AR 12498.  NMFS took those observed differences and retrospectively applied them in order to recalibrate prior landings data going back to 1981.  *See* AR 12511.  But after 2000, CHTS was increasingly unreliable.  AR 12492.  CHTS was a telephone survey that called landlines, but the population was increasingly shifting to cell phones, which created biases.  *Id*.  Because of this, NMFS determined that "the CHTS-based estimates since 2000 are not comparable to CHTS-based estimates prior to 2000, and have become increasingly less so with time." *Id*.  Thus, it follows that the observed differences between CHTS and FES from 2015-2017 cannot be used to recalibrate CHTS landings estimates from prior to 2000 into FES units.  The observed ratio from 2015-2017 is "not comparable" to years prior to 2000.

Moreover, peer reviewers of NMFS's calibration model raised questions about the accuracy of revised historical landings estimates.  NMFS specifically asked the peer reviewers to determine whether the revised 1981-2016 landings estimates "based on the application of the proposed FES/CHTS calibration model would be more accurate than the estimates that are currently available?" AR 18704.  The peer reviewers answered in the negative.  AR 18699.  They noted that "angler self-reported data" is "not subject to verification" and is "subject to a variety of biases including recall problems which can result in misremembered time and number of trips." *Id*. Because of this, "there is no basis to comment on accuracy of either survey." *Id*.  In other words, although FES may be a better survey, it cannot cure the inherent unreliability in self-reported data that is not subject to verification, and there is no way to assess whether the new estimates are more accurate than the old ones.

These specific criticisms were raised in the Minority Report, AR 8276, and in comments to NMFS, AR 9908.  But NMFS does not directly take them on.  Instead, NMFS provides two general responses.  Neither is sufficient.

First, NMFS says its determination that Amendment 53 is based on the best available science is supported by a September 8, 2021 memorandum from its Southeast Fisheries Science

Center.  AR 17423.  That memorandum is literally one sentence long, stating that the Center reviewed Amendment 53 "and certifies that it is based on the best scientific information available." AR 9713.  But "conclusory statements will not do; an agency's statement must be one of *reasoning.*" *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (internal quotations and citation omitted).

Second, NMFS says that because the latest stock assessment (SEDAR 61) used NMFS's recalibrated landings estimates, and the Gulf Council's scientific committee approved the assessment, by extension the landings estimates themselves are the best science.  AR 17423 ("the SSC accepted SEDAR 61 as the best scientific information available, specifically acknowledging that it utilizes MRIP-FES recreational landings estimates").  But this response is not a substitute for addressing specific flaws in NMFS's methodology—flaws that were identified by NMFS itself and peer reviewers of its work.  The SSC cannot absolve NMFS of its duty to ensure that management measures are based upon the best available science.  Indeed, the buck stops with NMFS. AR 3284 ("[U]ltimately, it's the Secretary of Commerce and NMFS who make the determination about whether anything is the best available science.").

NMFS has not explained how its recalibrated landings estimates back to 1981 are valid in light of its own findings that the time period used to create the calibration model (2015-2017) is "not comparable" to years before 2000.  AR 12492.  That is critical because Amendment 53 uses estimates from those earlier years (back to 1986) to modify the allocation between the sectors. Nor has NMFS rationally explained how it determined that the new estimates are better than the old ones, given its peer reviewers' comments that the accuracy of neither set can be determined.

There is no dispute that FES is a "better survey" than CHTS.  AR 17423.  Plaintiffs agree that it is.  The dispute is about applying the differences observed between those surveys to retrospectively revise landings estimates from decades earlier.  The record indicates this is not a credible approach, and NMFS has not provided a rational explanation why it is.  *See WildEarth Guardians v. Salazar*, 741 F. Supp. 2d 89, 101 (D.D.C. 2010) (agency's "failure to explain" an inconsistency in its findings rendered the resulting decision arbitrary and capricious).

**G.      Amendment 53 Violates NEPA**

The Court should also vacate Amendment 53 because it did not comply with NEPA. NMFS pre-determined the outcome prior to completing its NEPA analysis and did not consider a reasonable range of alternatives.

**1.      NMFS pre-determined the outcome.**

The NEPA analysis is flawed because NMFS pre-determined the outcome.  In this case NMFS unilaterally *implemented* the outcome before the environmental analysis was complete.

NEPA requires an assessment of the environmental impacts of *proposed* action, "rather than justifying decisions already made." 40 C.F.R. § 1502.2(g).  The "comprehensive 'hard look' mandated by Congress" under NEPA "must be taken objectively and in good faith, not…as a subterfuge designed to rationalize a decision already made." *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000).  But the "standard for demonstrating predetermination is high." *Loper Bright Enters., Inc. v. Raimondo*, 544 F. Supp. 3d 82, 121 (D.D.C. 2021).  Agencies and agency officials need not be subjectively impartial.  *Id.*  Thus, predetermination requires a showing that the agency "*irreversibly* and *irretrievably* commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, *before* the agency has completed that environmental analysis." *Id.* (internal quotations and citations omitted).  This, in turn, looks to the "practical effects" of agency conduct rather than subjective agency bias in favor of the action.  *Id.*

This is the rare case where the high bar to demonstrate predetermination is met.  NMFS unilaterally increased the recreational sector's allocation to 40% while Amendment 53 was under development and before the NEPA analysis was even commenced.  *See* section VI(F)(3), *supra*. Unlike in *Metcalf*, where the agency merely *committed* to support the Makah Tribe's future proposal to hunt whales prior to undertaking the requisite NEPA analysis, 214 F.3d at 1143, here NMFS actually implemented the very action being evaluated.  If reaching a written agreement or signing a contract for future performance constitutes an "irreversible and irretrievable" commitment, *see id.*, then *a fortiori* actually performing the act does too.

**2.      NMFS failed to consider a reasonable range of alternatives.**

"NEPA establishes an environmental review process under which federal agencies identify the reasonable alternatives to a contemplated action and look hard at the environmental effects of their decisions." *Food & Water Watch v. FERC*, 28 F.4th 277, 282 (D.C. Cir. 2022). An environmental impact statement ("EIS") is required for a major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  An EIS must "consider a limited range of alternatives to the relevant action, defined by the agency's objectives." *Flaherty v. Raimondo*, 531 F. Supp. 3d 76, 86 (D.D.C. 2021) (citing *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991) ("[T]he proposed alternative is reasonable only if it will bring about the ends of the federal action")).

The primary objective of Amendment 53 is to revise the red grouper allocation and ensure that "the historical *participation* by the recreational and commercial sectors is accurately reflected by the sector ACLs." AR 7981 (emphasis added).  The reallocation alternatives the Gulf Council considered, however, only looked at historical *landings* by the sectors.  But landings cover only part of the way a sector participates in the fishery.  The "fishing behavior" of the recreational sector begets more discards.  AR 17423.  The MRIP-FES recalibration exercise indicated not only that recreational landings were higher in the past, but so were recreational discards.  But Amendment 53 did not look at any alternatives that took these increased discards into account as part of the recreational sector's participation.

Reallocation alternatives factoring discards into the specification of OFL and ACL would have increased those limits to sweep in the additional mortality.  But such alternatives would also have been consistent with NMFS guidelines that require "catch" (including discards) to be included.  50 C.F.R. § 600.310(f)(1)(i).  Such alternatives may also have improved management of the stock by making each sector accountable for its own discards and reducing management uncertainty.  Indeed, given the additional objective to prevent overfishing, AR 7981, such alternatives may have better achieved the Council's objectives.  *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1999) (agency erred by "fail[ing] to consider an

alternative that was more consistent with its basic policy objectives than the alternatives that were the subject of final consideration").

As it was, the range of alternatives was too narrow and irrationally defined "participation" as "landings" but without explaining that limitation.

## VII.   CONCLUSION

The Court should vacate Amendment 53 for the foregoing reasons.[12]

DATED this 29th day of July, 2022.

Respectfully submitted,

K&L GATES LLP

By: *J. Timothy Hobbs*
J. Timothy Hobbs (DC Bar # 976470)
Tim.Hobbs@klgates.com
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
Telephone: (206) 623-7580
Facsimile: (206) 623-7022

Michael F. Scanlon (DC Bar # 479777)
Michael.Scanlon@klgates.com
1601 K Street, NW
Washington, DC 20006
Telephone: (202) 661-3764
Facsimile: (202) 778-9100

*Attorneys for Plaintiffs A.P. Bell Fish Company, Inc., Southern Offshore Fishing Association, Inc., and Gulf of Mexico Reef Fish Shareholders' Alliance*

---

[12] Plaintiffs are not moving for summary judgment on the 5th, 6th, or 8th Causes of Action in their Complaint.