**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

A.P. BELL FISH COMPANY, INC.,
SOUTHERN OFFSHORE FISHING
ASSOCIATION, INC., and GULF OF
MEXICO REEF FISH SHAREHOLDERS'
ALLIANCE,

                    Plaintiffs,

      v.

GINA M. RAIMONDO, in her official
capacity as Secretary of the United States
Department of Commerce; NATIONAL
OCEANIC AND ATMOSPHERIC
ADMINISTRATION; NATIONAL MARINE
FISHERIES SERVICE,

                    Defendants,

  and

COASTAL CONSERVATION
ASSOCIATION and LOUISIANA,

                Intervenor-Defendants.

Case No. 1:22-cv-01260-TJK

EXPEDITED PURSUANT TO
16 U.S.C. § 1855(f)(4)

NOTE ON MOTION CALENDAR:
OCTOBER 18, 2022

---

**PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS AND INTERVENOR-
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AND
REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

J. Timothy Hobbs (DC Bar # 976470)
Tim.Hobbs@klgates.com
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
Telephone: (206) 623-7580
Facsimile: (206) 623-7022

Michael F. Scanlon (DC Bar # 479777)
Michael.Scanlon@klgates.com
1601 K Street, NW
Washington, DC 20006
Telephone: (202) 661-3764
Facsimile: (202) 778-9100

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................ 1

II.   ARGUMENT ..................................................................................................... 1

A.   NMFS and Intervenors Mischaracterize Various Issues in this Case ................... 1

1.   Plaintiffs supported an Allocation Review per Gulf Council policy. ........ 1

2.   Increasing the recreational sector's allocation increases bycatch. ............. 2

3.   Amendment 53 is not based on "more accurate" data. ............................. 2

4.   Amendment 53 is not a "reset" of the allocation based on new data. ........ 3

5.   High bycatch and management uncertainty are not immutable
characteristics of recreational fishing. ....................................... 4

6.   Plaintiffs seek vacatur of unlawful NMFS action, not judicial
management. ........................................................................ 6

B.   Amendment 53 Violates MSA National Standard 4 ................................. 6

1.   Amendment 53 is not "reasonably calculated to promote
conservation." .................................................................... 7

2.   Amendment 53 is not "fair and equitable." ................................... 10

C.   Amendment 53 Violates National Standard 9 ..................................... 12

D.   Amendment 53 Violates MSA Section 303(a)(15) ............................... 13

E.   The FMP Fails to Contain a Standardized Bycatch Reporting Methodology ..... 15

1.   Plaintiffs' challenge to SBRM requirements is not time barred. ............. 16

2.   NMFS ignores precedent and the FMP is defective. ......................... 17

F.   Amendment 53 Violates MSA National Standard 2 ............................. 18

G.   Amendment 53 Violates the Administrative Procedure Act In Other Ways ....... 19

1.   Amendment 53 arbitrarily relies on economic theory NMFS found
"erroneous." ..................................................................... 21

2.   NMFS arbitrarily used the old allocation formula when a key finding
changed. ......................................................................... 22

# TABLE OF CONTENTS
(continued)

**Page**

3.   NMFS assessed impacts of Amendment 53 against an unlawful baseline. ...................................................................................... 22

4.   NMFS arbitrarily determines which landings data are the "best available." ................................................................................... 24

5.   NMFS's recalibration of historical landings data is irreparably flawed. . 24

H.   Amendment 53 Violates NEPA ........................................................... 25

III.   CONCLUSION ............................................................................................. 26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Black v. Pritzker*,
    121 F. Supp. 3d 63 (D.D.C. 2015) ........................................................................19

*Conserv. L. Found. v. Evans*,
    209 F. Supp. 2d 1 (D.D.C. 2001) .............................................................12, 17, 23

*Delaware Dep't of Nat. Res. & Envtl. Control v. Envtl. Prot. Agency*,
    895 F.3d 90 (D.C. Cir. 2018) ...............................................................................8

*Dinkel v. MedStar Health, Inc.*,
    880 F. Supp. 2d 49 (D.D.C. 2012) ........................................................................13

*Graceba Total Commc'ns, Inc. v. F.C.C.*,
    115 F.3d 1038 (D.C. Cir. 1997) ...........................................................................17

*Groundfish Forum v. Ross*,
    375 F. Supp. 3d 72 (D.D.C. 2019) .............................................................. *passim*

*Groundfish Forum v. Ross*,
    No. 1:16-cv-02495, Dkt. # 38-1 (D.D.C. August 23, 2017) ....................................21

*Guindon v. Pritzker*,
    240 F. Supp. 3d 181 (D.D.C. 2017) ........................................................................6

*Metcalf v. Daley*,
    214 F.3d 1135 (9th Cir. 2000) .............................................................................25

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..........................................................................2, 19, 20

*Nat. Res. Def. Council v. Daley*,
    209 F.3d 747 (D.C. Cir. 2000) .....................................................................5, 7, 12

*Navab-Safavi v. Broad. Bd. of Governors*,
    650 F. Supp. 2d 40 (D.D.C. 2009), *aff'd sub nom. Navab-Safavi v. Glassman*,
    637 F.3d 311 (D.C. Cir. 2011) .....................................................................19, 20

*Oceana, Inc. v. Evans*,
    384 F. Supp. 2d 203 (D.D.C.), *order clarified*, 389 F. Supp. 2d 4 (D.D.C.
    2005) ........................................................................................................16

*Oceana, Inc, v. Locke*,
    831 F. Supp. 2d 95 (D.D.C. 2011) ........................................................................14

*Oceana, Inc. v. Raimondo*,
   530 F. Supp. 3d 16 (D.D.C. 2021), *aff'd*, 35 F.4th 904 (D.C. Cir. 2022) ...............................20

*Oregon Nat. Res. Council v. Thomas*,
   92 F.3d 792 (9th Cir. 1996) ...............................................................................................20

*Pub. Citizen v. Nuclear Regul. Comm'n*,
   901 F.2d 147 (D.C. Cir. 1990) ...........................................................................................16

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004) .............................................................................................................8

*St. James Hosp. v. Heckler*,
   760 F.2d 1460 (7th Cir. 1985) .............................................................................................25

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
   139 S. Ct. 361 (2018) ...........................................................................................................20

**Statutes**

5 U.S.C. § 701(a)(2) .....................................................................................................................20

5 U.S.C. § 706(2) ...........................................................................................................................6

16 U.S.C. § 1851(a)(1) ...................................................................................................................8

16 U.S.C. § 1851(a)(2) .................................................................................................................18

16 U.S.C. § 1851(a)(4) ................................................................................................................6, 9

16 U.S.C. § 1851(a)(4)(B) .............................................................................................................7

16 U.S.C. § 1853(a) ........................................................................................................................5

16 U.S.C. § 1853(a)(11) ...........................................................................................................15, 17

16 U.S.C. § 1853(b) ........................................................................................................................5

16 U.S.C. § 1855(f)(1) ..................................................................................................................19

16 U.S.C. § 1855(f)(1)(B) ............................................................................................................19

**Other Authorities**

50 C.F.R. §§ 600.310(e)(2)(i)(D) ................................................................................................15

50 C.F.R. § 600.310(f)(1)(i) .........................................................................................................15

50 C.F.R. § 600.350(b) ...............................................................................................................4, 9

50 C.F.R. § 600.350(c)(1) ...........................................................................................8

50 C.F.R. § 600.350(c)(2)(ii) .....................................................................................2

50 C.F.R. § 622.41(e)(2)(i) .......................................................................................14

50 C.F.R. § 622.41(e)(2)(iv) (2021) .........................................................................23

**List of Acronyms**

| | |
|---|---|
| ABC | Acceptable biological catch |
| ACL | Annual catch limit |
| ACT | Annual catch target |
| APA | Administrative Procedure Act |
| APAIS | Access Point Angler Intercept Survey |
| AR | Administrative Record |
| CHTS | Coastal Household Telephone Survey |
| EEZ | Exclusive economic zone |
| EIS | Environmental Impact Statement |
| FES | Fishing Effort Survey |
| FMP | Fishery Management Plan |
| IFQ | Individual fishing quota |
| MFMT | Maximum fishing mortality threshold |
| MRFSS | Marine Recreational Fishery Statistics Survey |
| MRIP | Marine Recreational Information Program |
| MSA | Magnuson-Stevens Fishery Conservation and Management Act |
| MSY | Maximum sustainable yield |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |
| OFL | Overfishing limit |
| SBRM | Standardized bycatch reporting methodology |
| SEDAR | Southeast Data, Assessment, and Review |
| SEFSC | Southeast Fisheries Science Center |
| SPR | Spawning potential ratio |
| SSB | Spawning stock biomass |
| SSC | Scientific and Statistical Committee |

## I.      INTRODUCTION

The Court should vacate Amendment 53 because it violates numerous statutory requirements and harms the stock of red grouper in the Gulf of Mexico.  The record is clear that Amendment 53 will increase bycatch and dead discards of red grouper, shrink the size of the stock and make it less productive, increase management uncertainty, and increase the risk of overfishing.  These results are contrary to the stated goals of the Magnuson-Stevens Act ("MSA").  Amendment 53 is also unfair, arbitrary and lacking scientific foundation.

Defendants the National Marine Fisheries Service, et al. ("NMFS"), and intervenors Louisiana and Coastal Conservation Association ("CCA") (collectively, "Intervenors"), fail to grapple with the substance of Plaintiffs' arguments or address case law from this Court about what the MSA requires.  In some respects their opposition briefs support Plaintiffs' claims.  Their defense of Amendment 53 falls short and the Court should reject it.

## II.     ARGUMENT

## A.      NMFS and Intervenors Mischaracterize Various Issues in this Case

Plaintiffs first address mischaracterizations in NMFS and Intervenors' opposition briefs.

### 1.       Plaintiffs supported an Allocation Review per Gulf Council policy.

NMFS's brief is replete with references to Plaintiffs' "desired allocation."  *See, e.g.*, Dkt. # 36 at 10[1] ("Plaintiffs oppose Amendment 53 because NMFS did not select their desired allocation.").  NMFS is incorrect.  What Plaintiffs desired was to follow the Gulf Council's Allocation Policy and conduct an Allocation Review.  *See, e.g.*, AR 14168 ("Amendment 53 should be sent back to the Gulf Council so a proper [allocation] review can be conducted."); 14232-33; 14014; 8236-8237; Dkt. # 20 at 13.  An Allocation Review examines achievement of management objectives and how changing the allocation could better achieve those objectives.  Dkt. # 20 at 36-37; AR 8196, 8228, 8281-8282.  But no such review occurred; the Gulf Council ignored its own policy and skipped over that process.  *See* AR 443 (NMFS making a motion

---

[1] All references to the docket are to the ECF pagination.

before the Gulf of Mexico Fishery Management Council ("Gulf Council") in 2019 to initiate Amendment 53 and allocate 40% to the recreational sector without undertaking an Allocation Review). Without such a review, Plaintiffs did not support changing the allocation.

2. **Increasing the recreational sector's allocation increases bycatch.**

The record is clear that "an increase of allocation to the recreational fleet results in more encounters and higher overall discards (of which 11.6% will die)." AR 9692; *see also* 9686, 8187. Thus, because Amendment 53 increases the recreational sector's allocation from 24% to 40.7%, it will necessarily increase bycatch and dead discards. *See* Dkt. # 20 at 24-25.

NMFS says that "Amendment 53 does not increase bycatch. Instead…recreational catch data collected using FES changed NMFS's *understanding* of recreational landings and bycatch." Dkt. # 36 at 36.[2] This contention changes nothing. Faced with this new "understanding" about higher bycatch and dead discards in the recreational sector, NMFS did nothing to mitigate it. To the contrary, NMFS locked in a larger allocation for the recreational sector going forward that comes with a level of bycatch and dead discards far higher than what was previously understood. NMFS deliberately took an action that ensures these higher levels of bycatch and dead discards will continue into the future.[3]

3. **Amendment 53 is not based on "more accurate" data.**

Both Louisiana and CCA's briefs are founded on the assertion that Amendment 53 uses superior data to change the allocation between the sectors. Dkt. # 32 at 20 (Amendment 53 "substituted the more accurate data for the less accurate"); Dkt. # 34 at 24 ("We simply have more accurate historical data."). NMFS's brief confirms that there is no basis for Louisiana and CCA to assert that the data is "more accurate."

---

[2] NMFS did not make this argument when promulgating Amendment 53. *See* AR 17424-17425 (response to Comment 11). NMFS's response *excused* higher bycatch by pointing to purported socio-economic benefits. *See id.* NMFS's post-hoc justification should not be credited because an "agency's action must be upheld, if it all, on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50.

[3] Louisiana's suggestion that a "recreational catch and release program" exists for red grouper, Dkt. # 32 at 23, is wrong; in such programs, "the retention of a particular species is prohibited." 50 C.F.R. § 600.350(c)(2)(ii).

NMFS concedes that it "is impossible to determine the accuracy of either CHTS or FES data." Dkt. # 36 at 44.  Indeed, the peer reviewers of NMFS's calibration model concluded it was not possible to determine whether the new FES landings estimates were "more accurate" than prior CHTS estimates.  AR 18696 ("No conclusions can be reached regarding the accuracy of calibrating self-reported data from one survey mode to the other.").  And their review "primarily focused on the mathematical aspects of the calibration and not on which set of estimates reflects a truer representation of fishing effort." AR 18699.

NMFS's concession that it is "impossible to determine the accuracy" of the revised landings estimates is fatal to Amendment 53, because the very purpose of the amendment is to ensure "that the historical participation by the recreational and commercial sectors is accurately reflected by the sector ACLs." AR 7981.  If it is impossible to determine whether the new landings data are more accurate than the old data, then there is no way to ensure that historical participation is "accurately reflected" by the allocation and resulting sector ACLs.  NMFS has acknowledged that it is impossible to achieve the purpose of the Amendment 53.

### 4.    Amendment 53 is not a "reset" of the allocation based on new data.

Louisiana and CCA wrongly contend that Amendment 53 merely resets the allocation from Amendment 30B using new data.  *See* Dkt. # 32 at 14 ("the Rule merely converts the Amendment 30B sector allocations from CHTS to FES, to match the stock assessments and catch monitoring."); Dkt. # 34 at 19 ("Amendment 53 was not a true 'reallocation,' and instead was simply a conversion of the old allocations to the new system that uses better data.").

As explained immediately above, Amendment 53 does not use "better data."  NMFS also rejected Intervenors' comments in the Final Rule.  *See* AR 17429 (response to Comment 25: "The revised allocation does shift some of the allowable harvest from the commercial sector to the recreational sector.").

In addition, Louisiana and CCA completely ignore new information regarding massive increases in bycatch and dead discards in the recreational sector that will result from this change. Louisiana and CCA want credit for the higher recreational landings in the past, but no

responsibility for the higher bycatch and dead discards that accompanied those higher landings. *See* Dkt. # 20 at 24, Fig. 3.  Higher bycatch and dead discards pose conservation problems.  *See* 50 C.F.R. § 600.350(b).  They also force the commercial sector to fish under a catch limit that is reduced to account for higher estimates of what recreational anglers will be discarding dead.  AR 8070.[4]  The commercial sector is punished for a problem occurring predominantly in the recreational sector.  Amendment 53 is not merely a "conversion" of the allocation using new data, it is a change in policy and direction that harms the resource and the economic interests of the commercial sector.   CCA contends that "the commercial sector did not lose a pound of fish," Dkt. # 34 at 6, but in reality the commercial sector lost 1.19 million pounds each year.  AR 7697 (comparing Alternatives 2 and 3).

To the extent there are valid concerns with the data underlying the initial allocation under Amendment 30B, the appropriate response is for the Gulf Council to conduct an Allocation Review pursuant to its policy.  *See* AR 8196, 8227-28.  The answer is not to arbitrarily plug in new data while ignoring the effects of the change, including new information about recreational bycatch and dead discards and negative stock impacts that would result from locking in higher levels of bycatch going forward.

### 5.      High bycatch and management uncertainty are not immutable characteristics of recreational fishing.

NMFS and Intervenors contend that, because the recreational sector has higher levels of bycatch and dead discards and greater uncertainty in landings, any reallocation would fail under Plaintiffs' arguments.  *See* Dkt. # 36 at 32, # 32 at 24.  That contention is a tacit admission that Amendment 53 will not promote conservation.  But the contention also wrongly assumes that nothing can be done to improve performance of the recreational sector, and in particular the component that fishes on privately owned vessels (the "private angler component").

No party disputes that "recreational fishing and commercial fishing are different activities" and that different management approaches "should be adapted to the characteristics of

---

[4] NMFS's efforts to account for this discard mortality are flawed.  *See* Dkt. # 20 at 39-44; section II(D), *infra*.

each sector." Dkt. # 34 at 28 (cleaned up; quoting 16 U.S.C. § 1801(a)(13)).  But Congress set conservation and accountability standards to apply to all fishing—without regard to whether the fishing is commercial or recreational—which makes sense because fish stocks are shared public resources and protecting them for long-term utilization by *all users* is paramount.  *See, e.g.*, *Nat. Res. Def. Council v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000) ("the Service must give priority to conservation measures").  Congress did not exempt recreational fishing from the MSA's substantive requirements.

Moreover, Congress provided the Gulf Council and NMFS with numerous tools to manage fisheries and improve performance of any sector's fishing activities.  *See, e.g.,* 16 U.S.C. § 1853(b) (authorizing permitting and reporting requirements, time/area closures to fishing (such as to protect concentrations of juveniles), bycatch limitations, fishing gear requirements, limited access systems, "harvest incentives for participants within each gear group to employ fishing practices that result in lower levels of bycatch or in lower levels of the mortality of bycatch," etc.); § 1853a (limited access privilege programs).

The commercial sector and the for-hire component have embraced these tools and improved the performance of their fishing activities, while the private angler component has not. The commercial sector adopted an IFQ program under Amendment 29 that eliminated management uncertainty and overharvesting.  *See* Dkt. # 20 at 17.  The for-hire component adopted a limited access system and recently added electronic catch reporting.  *See* Dkt. # 21-1 at 8-9.  The lone holdout is private anglers, who remain subject to no federal permitting or reporting requirements, and without incentives to reduce bycatch. Amendment 53 similarly fails to adopt any measures to improve management of private anglers, but locks in a larger allocation for that sector.

Louisiana suggests that private anglers are unmanageable because they are too numerous. Dkt. # 32 at 25.  But agencies across the country manage recreational fishing, including through permits, licensing and reporting requirements.  *See, e.g.*, Wash. Admin. Code 220-310-020 (anglers must possess a "catch record card" to fish for salmon and other species, must write

5

down the date, location and species of each fish caught, and return the card to the state agency each year). Indeed, the National Academy of Sciences recently issued a report to Congress with recommendations for improving management of private anglers. *See* AR 10094 (recommending "harvest tags or day passes for private anglers" that "foster accountability while enhancing fishing experiences and opportunities to heterogeneous groups of anglers"). Solutions exist to reduce bycatch and improve catch accounting in the recreational sector.

Plaintiffs do not suggest or seek to implement any specific measures for the private angler component; those are for private anglers to address through the Gulf Council process. Rather, Plaintiffs challenge NMFS's actions as unlawful—not because NMFS has failed to act to impose management measures on the recreational sector—but because NMFS's decision to divert more fish to the recreational sector is contrary to law where, as here, the projected result is increased management uncertainty and harm to the resource because of the failure to improve management of the recreational sector.

### 6.    Plaintiffs seek vacatur of unlawful NMFS action, not judicial management.

Louisiana wrongly contends that Plaintiffs seek to impose their desired allocation through judicial fiat. *See* Dkt. # 32 at 15. To the contrary, Plaintiffs merely seek the common APA remedies of declaratory relief and vacatur. *See* 5 U.S.C. § 706(2). Any regulatory changes necessary to comply with the Court's ruling would be issues for the Gulf Council and/or NMFS, not the Court, to determine in the first instance. Moreover, even if the Court were to order Plaintiffs' requested relief and vacate Amendment 53, the Gulf Council would remain free to immediately "pursue a new allocation" of red grouper in accordance with legal requirements. *Guindon v. Pritzker*, 240 F. Supp. 3d 181, 195 (D.D.C. 2017) ("*Guindon II*").

### B.    Amendment 53 Violates MSA National Standard 4

Amendment 53 violates National Standard 4 because it will not "promote conservation" and is not "fair and equitable." 16 U.S.C. § 1851(a)(4). *See* Dkt. # 20 at 30-37.

**1.      Amendment 53 is not "reasonably calculated to promote conservation."**

National Standard 4 provides that an allocation of fishing privileges "shall be reasonably calculated to promote conservation." 16 U.S.C. § 1851(a)(4)(B).  "[B]y the standard's terms, if the Service decides to allocate fishing privileges to a specific group, that allocation must actually 'promote' a conservation purpose—that is, advance or further it—rather than just avoid jeopardizing one." *Groundfish Forum v. Ross*, 375 F. Supp. 3d 72, 89 (D.D.C. 2019) (quoting Webster's Third New International Dictionary (1961) ("defining 'to promote,' in relevant part, as 'to contribute to the growth, enlargement, or prosperity of: further, encourage'")).

In their opening brief, Plaintiffs explain that Amendment 53 is not "reasonably calculated to promote conservation" as required by National Standard 4 because it will increase bycatch and dead discards, increase mortality of younger fish and thus change the age structure of the stock to make it less productive, reduce the maximum sustainable yield the stock can produce over time, and increase management uncertainty and the risk of overfishing.  *See* Dkt. # 20 at 30-32 (citing AR 9692, 9686, 8187, 8082, 7970, 8110, and 50 C.F.R. § 600.350(b)).  These outcomes are projected by NMFS.  *See id.*  Unlike the conservation-neutral allocation struck down in *Groundfish Forum* because it did not "promote" conservation, Amendment 53 is conservation negative and thus more egregiously contravenes the standard.  *A fortiori*, Amendment 53 must also be vacated.

Neither NMFS, Louisiana, nor CCA addresses *Groundfish Forum*.  Instead, NMFS says that Plaintiffs' contention that the "stock is indisputably worse off as a result of Amendment 53," Dkt. # 20 at 31, could "not be further from the truth." Dkt. # 36 at 28.  NMFS has returned to "Bizarro world, where reality is turned upside down." *Daley*, 209 F.3d at 754 (holding that it was unreasonable for NMFS to conclude that a measure with an 18% probability of success "offers a 'fairly high level of confidence'" in meeting management objectives).  It is similarly unreasonable for NMFS to conclude that an allocation "promotes conservation" where it will result in a stock that is smaller, less productive, subject to more management uncertainty and risk of overfishing.

NMFS and Intervenors' arguments about how Amendment 53 will promote conservation all fail because none of them show how the *change in allocation* effectuated by Amendment 53 will "contribute to the growth, enlargement, or prosperity of" of the red grouper stock. *Groundfish Forum*, 375 F. Supp. 3d at 89.

NMFS contends that Amendment 53 promotes conservation by "preventing overfishing," in that the amendment sets various catch limits designed to prevent overfishing of the stock. Dkt. # 36 at 28.  But National Standard 4 concerns allocations, not catch limits.  *See* 50 C.F.R. § 600.350(c)(1) ("only those measures that result in direct distributions of fishing privileges will be judged against the allocation requirements of Standard 4"); *Groundfish Forum*, 375 F. Supp. 3d at 89 ("Congress attached that requirement [to promote conservation] specifically to the 'allocat[ion] [of] …fishing privileges'").  Plaintiffs challenge the increase in the recreational sector's allocation from 24% to 40.7% as causing the negative impacts to conservation described above, including increased bycatch, a less productive stock, increased management uncertainty and overfishing risk.

Moreover, preventing overfishing is expressly required by National Standard 1; all management actions "shall prevent overfishing."  16 U.S.C. § 1851(a)(1).  If "preventing overfishing" satisfied the requirement to "promote conservation," then this portion of National Standard 4 would be superfluous.  *See Delaware Dep't of Nat. Res. & Envtl. Control v. Envtl. Prot. Agency*, 895 F.3d 90, 99 (D.C. Cir. 2018) ("[W]e strive to construe statutes so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.") (cleaned up).  But Congress used different language in National Standard 4 than in National Standard 1.  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 n. 9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.") (cleaned up).

NMFS reasserts that the selected allocation under Amendment 53 "has the same probability of overfishing" as the other alternatives considered.  Dkt. # 36 at 28.  As Plaintiffs' opening brief explained, "NMFS's assertion that the risk of overfishing is 'the same' disregards

the increased risk resulting from increased uncertainty by reallocating to the recreational sector." Dkt. # 20 at 41 (citing 50 C.F.R. § 600.350(b)); *see also id.* at 26 (quoting AR 7970 ("Allocating a greater percentage of the [annual catch limit ("ACL")] to a sector that has more uncertainty in landings…is more likely to result in an overfishing or eventual overfished status for Gulf red grouper.")).  NMFS does not respond to that argument and continues to ignore its own regulations that explain how increased bycatch can substantially increase uncertainty, which makes it more difficult to ensure that "overfishing levels are not exceeded." § 600.350(b).

CCA contends that "Amendment 53 takes conservation into account," Dkt. # 34 at 31, which falls short of what National Standard 4 requires.  *See Groundfish Forum*, 375 F. Supp. 3d at 89 (an "allocation must actually 'promote' a conservation purpose").  CCA does not dispute that negative outcomes for the stock will result from Amendment 53; CCA instead argues these result from immutable aspects of recreational fishing.  *See* Dkt. # 32 at 27-28.  As discussed above, that is incorrect, and Congress did not exempt recreational fishing from MSA requirements.  Even accepting the argument that nothing can be done to cure management uncertainty in the recreational sector, the argument supports Plaintiffs' position that it is therefore contrary to the conservation goals of National Standard 4 to divert an increased share of the resource to a sector with chronic, immutable management uncertainty.

For its part, Louisiana omits words from the statute, purporting to quote a definition for "conservation" but in reality quoting the definition for "conservation and management" set forth at 16 U.S.C. § 1802(5).  Dkt. # 32 at 27.  "Conservation and management" is a term of art used throughout the MSA, including in National Standard 4 and eight other standards.  *See, e.g.*, 16 U.S.C. § 1851(a)(4) ("Conservation and management measures shall…").  That definition does not apply to the requirement to "promote conservation" in National Standard 4; indeed, the result would be circular in requiring that "conservation and management measures" promote "conservation and management."

NMFS falls back to its justification in the Final Rule that Amendment 53 promotes "wise use" of the resource and "is expected to result in the greatest net economic benefits to the

Nation." Dkt. # 36 at 29 (citing AR 17423-17424).  But, as Plaintiffs' opening brief explained,

that rationale fails because it elevates economic interests over conservation interests, which the

MSA does not allow.  Dkt. # 20 at 32 (citing *Groundfish Forum*, 375 F. Supp. 3d at 92; *Daley*,

209 F.3d at 753).  NMFS does not dispute that reading of the MSA.  Nor does NMFS contend

that the statutory requirement to promote conservation is ambiguous or that its interpretation is

entitled to deference.[5]  *Groundfish Forum* is dispositive and fatal to Amendment 53.

At bottom, the allocation set by Amendment 53 will have negative impacts that will make

the stock worse off in the long term.  Because the change in allocation under Amendment 53

does not "contribute to the growth, enlargement, or prosperity of" of the red grouper stock,

*Groundfish Forum*, 375 F. Supp. 3d at 89, it must be vacated.

### 2.     Amendment 53 is not "fair and equitable."

Plaintiffs' opening brief raises three reasons why Amendment 53 is not "fair and

equitable" as required by National Standard 4.  Dkt. # 20 at 32-37.  NMFS and Intervenors'

arguments in opposition lack merit.

First, Amendment 53 is unfair because it penalizes the commercial sector twice: first with

a reduction in its allocation (from 76% to 59.3%), and second with a reduction in the commercial

sector ACL to account for the increased dead discards that will result from shifting more

allocation to the recreational sector.  Dkt. # 20 at 33-35.  The latter feature is what distinguishes

this case from those cited by NMFS where courts upheld other allocations even though they

disadvantaged one group.  *See* Dkt. # 36 at 30.  Plaintiffs acknowledged that any allocation will

disadvantage someone, and that alone does not violate the standard.  Dkt. # 20 at 34.

The unfairness here arises from forcing the commercial sector to deal with a problem in

the recreational sector that is caused by shifting more of the allocation to that sector; namely,

more dead discards and other negative stock impacts that necessitate a reduced catch limit.  *Id*.;

AR 9692.  What would be fair, and incentivize bycatch reduction, is holding each sector

---

[5] That argument would also fail, as Plaintiffs explain in their opening brief.  *See* Dkt. # 20 at 31.

accountable for its own dead discards as part of its sector ACL.[6] It is not rational or fair to force the commercial sector, and consumers they serve, to give up fish so that recreational anglers can throw them away dead.

NMFS contends that Amendment 53 "best represents what was actually happening in the fishery during the years used to establish the initial allocation." Dkt. # 36 at 30 (quotations omitted).  NMFS is incorrect; the commercial sector did not forfeit a significant amount of landings to account for recreational dead discards.  *See* AR 10483 (Amendment 30B finding that the proportion of landings to discards in the commercial and recreational sectors was similar).  NMFS continues to ignore this key finding about how discards changed between Amendment 30B and Amendment 53.  Dkt. # 20 at 24.

Second, Amendment 53 is unfair because the landings data for the commercial and recreational sectors used for allocation decisions are not comparable in reliability or accuracy, which disadvantages the commercial sector.  *See* Dkt. # 20 at 35.  Plaintiffs cited *Guindon II* as an example of a court striking down a reallocation to the recreational sector because the allocation scheme similarly disadvantaged the commercial sector, noting the case was distinguishable.  *Id*. at 36 (citing *Guindon II*, 240 F. Supp. 3d at 195).  NMFS explains why the case is distinguishable, Dkt. # 36 at 32-33, but does not address Plaintiffs' fairness argument.

Third, Amendment 53 is unfair because it was not "motivated" by any particular FMP objective as required to be fair and equitable under NMFS's own guidelines.  Dkt. # 20 at 36 (citing 50 C.F.R. § 600.325(c)(3)(i)).  NMFS concedes that it was only later in the process of developing Amendment 53—specifically, in "response to comments on the draft EIS," Dkt. # 36 at 34—that NMFS added a discussion to the document about FMP objectives.  That was *after* the Gulf Council took final action.  *See* AR 11215 (redline showing changes made to Amendment 53 after the Gulf Council took final action); *see* AR 3447-3716 (June 2021 version of Amendment 53 the Gulf Council voted on without any discussion of promoting FMP objectives).  This proves

---

[6] The failure to set OFL and ACLs that include dead discards also violates § 1853(a)(15); *see* section II(D), *infra*.

the point: the "motivation" for the amendment—its impetus or initial justification—had nothing to do with FMP objectives; they were an afterthought.  *See also* AR 443 (NMFS making motion before the Gulf Council to initiate Amendment 53 without discussion of FMP objectives).  The Gulf Council would have avoided this problem by following its own Allocation Policy.

**C.     Amendment 53 Violates National Standard 9**

Plaintiffs' opening brief explains that Amendment 53 will increase bycatch for no conservation purpose and will harm the stock to achieve economic objectives, which conflicts with the statutory requirement to minimize bycatch to the extent practicable under National Standard 9.  Dkt. # 20 at 37-39.

In response, NMFS contends that Amendment 53 does not actually increase bycatch, and that NMFS "considered" bycatch but ultimately concluded that economic and social effects outweighed bycatch implications.  Dkt. # 36 at 34-36.  NMFS's response is meritless.

There is no dispute that increasing the recreational sector's allocation will increase bycatch and dead discards.  AR 9692.  Thus, by reallocating to the recreational sector, Amendment 53 deliberately locks in a higher level of bycatch going forward.  Indeed, of all the alternatives considered under Amendment 53, NMFS implemented the largest reallocation, which *maximizes* bycatch.  *See* AR 7967 (Table 1 in Amendment 53, which shows that the Total ACL is the lowest under Preferred Alternative 3); AR 8070 (as more fish are allocated to the recreational sector, "total landings have to be constrained more to account for the greater dead discards from recreational red grouper fishing.").

Plaintiffs do not contend that NMFS was required to "adopt every measure that could conceivably reduce bycatch." Dkt. # 36 at 35 (cleaned up; quoting *Nat. Res. Def. Council v. NMFS*, 71 F. Supp. 3d 35, 66 (D.D.C. 2014)).  Plaintiffs merely contend that adopting the alternative that maximizes bycatch without any offsetting conservation purpose violates National Standard 9.  Under the MSA, Congress sought to prioritize conservation, *Daley*, 209 F.3d at 753, and "'bring a stop to this inexcusable amount of waste'" from bycatch.  *Conserv. L. Found. v. Evans*, 209 F. Supp. 2d 1, 12 n. 23 (D.D.C. 2001) (quoting 142 Cong. Rec. S10810 (daily ed.

Sept. 18, 1996)).  But Amendment 53 generates more waste and hampers conservation of the red grouper stock, outcomes that are the opposite of what Congress intended.

Finally, NMFS fails to respond to Plaintiffs' argument that Amendment 53 violates the second clause of National Standard 9, in that the amendment considered no measures to "minimize the mortality" of bycatch that "cannot be avoided." Dkt. # 20 at 39.  NMFS failed to respond to this argument in the Final Rule,[7] and still offers no response.  At this point, the argument is conceded.  *See Dinkel v. MedStar Health, Inc.*, 880 F. Supp. 2d 49, 58 (D.D.C. 2012)) ("[W]here a party fails to respond to arguments in opposition papers, the Court may treat those specific arguments as conceded.")  Amendment 53 violates National Standard 9 for this reason as well.

### D.   Amendment 53 Violates MSA Section 303(a)(15)

Plaintiffs' opening brief explains how the overfishing limit ("OFL") and ACL established by Amendment 53 do not comport with MSA section 303(a)(15), 16 U.S.C. § 1853(a)(15), because they exclude dead discards and apply only to fish landed.  Dkt. # 20 at 39-42.  The number of fish caught and discarded dead by recreational anglers is significant— roughly equivalent to the number of fish anglers bring to shore.  *Id*. at 39 (citing AR 18593).  But NMFS does not monitor or track dead discards against a predetermined annual mortality limit.  This violates § 1853(a)(15) and undermines MSA objectives.

There is no dispute that NMFS attempts to estimate the amount of dead discards that will result from recreational fishing.  Indeed, that is the source of Plaintiffs' argument under National Standard 4 above: that Amendment 53 unfairly forces the commercial sector to subsidize increased recreational discards that are *expected to result* from shifting more allocation to the recreational sector.

But a future *projection* of what discards *might be* is insufficient to comply with § 1853(a)(15), which requires in-season reporting, and monitoring against some limit.  Bycatch

---

[7] Multiple commenters raised this argument.  *See, e.g.*, AR 13931, 13935, 13975, 14024-14028.

must "be *accurately reported throughout the fishing season* at levels such that ACLs can be monitored and enforced," and bycatch monitoring provisions must be "*mandatory* and sufficiently specific." *Oceana, Inc, v. Locke*, 831 F. Supp. 2d 95, 111-12 (D.D.C. 2011) (emphasis added).  This does not exist for the recreational sector.

There is no "mandatory" reporting of bycatch to NMFS by private anglers; any reporting is voluntary, as NMFS concedes.  Dkt. # 36 at 38.  Anglers in some states do not even have the option to report bycatch if they wanted to.  *See id.*  The accuracy of any self-reporting that does occur cannot be determined, as NMFS also concedes.  Dkt. # 36 at 44-45 ("It is impossible to determine the accuracy of either CHTS or FES data.").  Nor does NMFS attempt to track bycatch throughout the fishing season so that it can react with accountability measures if bycatch exceeds the projections.  With respect to bycatch, none of the things this Court says are required to comply with § 1853(a)(15) exist for red grouper.

NMFS's brief proves the point.  NMFS admits that in 2021 the recreational sector exceeded its ACL by 70%, landing 1.7 million pounds of fish (in "CHTS units") when its ACL was 1.0 million pounds.  Dkt. # 36 at 40 n. 14.  NMFS determined the recreational sector met is ACL on June 30, 2021, but closed the fishing season months later on September 15, 2001.  *Id.*  But what about dead discards?  Were they also 70% more than projected?  Did overfishing occur as a result of dead discards such that the stock was harmed?  NMFS does not and cannot say because it does not track dead discards against a fixed annual limit.

Moreover, NMFS's trigger to react—to close the fishing season—is tied to its monitoring of landings only.  *See* 50 C.F.R. § 622.41(e)(2)(i) ("if red grouper recreational *landings*…reach or are projected to reach the applicable ACL" NMFS will "close the recreational sector for the remainder of the fishing year") (emphasis added).  Dead discards play no role in that determination, and no accountability measures are triggered regardless of bycatch levels.

As Plaintiffs point out in their opening brief, by moving roughly half of all recreational fishing mortality "off the books," NMFS undermines key conservation goals of the MSA.  Dkt. #

20 at 41-42.  These management deficiencies may explain why the red grouper population fails to rebuild and remains at historically low levels of abundance. *See* AR 6480-6481.

NMFS evades the crux of Plaintiffs' argument.  Dkt. # 36 at 39-40.  There is no dispute that, under NMFS regulations, the Acceptable Biological Catch ("ABC") "may be expressed in terms of landings" if bycatch and other sources of mortality "are incorporated into the determination of ABC." 50 C.F.R. § 600.310(f)(1)(i).  But Plaintiffs' argument is not directed at the ABC; Plaintiffs' argument is that the OFL set by Amendment 53 unlawfully excludes dead discards.  Dkt. # 20 at 39-40.

NMFS's regulations do not allow the OFL to be expressed in terms of only landings.  *See id.*  To the contrary, the OFL is defined as the level of "catch" (landings *plus* dead discards)— i.e., the fishing mortality—above which over*fishing* is occurring.  *See* 50 C.F.R. §§ 600.310(e)(2)(i)(D); 600.310(f)(1)(i); 600.310(e)(2)(i)(C).  But the OFL for red grouper excludes a significant amount fishing mortality from recreational sector dead discards.

NMFS does not address Plaintiffs' argument as to the OFL.  It is therefore undisputed that the OFL set by Amendment 53 violates NMFS's regulations implementing § 1853(a)(15).  Nor does Amendment 53 comport with this Court's precedent on what § 1853(a)(15) requires.  The OFL and resulting ACLs set by Amendment 53 are thus unlawful.

### E.   The FMP Fails to Contain a Standardized Bycatch Reporting Methodology

The Reef Fish FMP is flawed because it fails to include a standardized bycatch reporting methodology ("SBRM") sufficient "to assess the amount and type of bycatch occurring in the fishery." 16 U.S.C. § 1853(a)(11); *see* Dkt. # 20 at 42-44.  While rigorous bycatch reporting exists for the commercial sector and for-hire component, there are no bycatch reporting requirements for the private angler component which is responsible for approximately 77% of all red grouper discards.  *Id.* at 43 (citing AR 8171-8172).

NMFS contends that Plaintiffs' SBRM challenge is time-barred, and that the voluntary surveys used for data collection from private anglers comport with statutory requirements.  Dkt. # 36 at 39-40.  NMFS is wrong.

     **1.**      **Plaintiffs' challenge to SBRM requirements is not time barred.**

Plaintiffs' challenge is not time barred for two reasons.  First, NMFS effectively re-opened the validity of SBRMs in the Reef Fish Fishery through Amendment 53.  *See Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 247, *order clarified*, 389 F. Supp. 2d 4 (D.D.C. 2005) ("*Oceana II*").  There, Oceana filed suit against Amendment 10 to the FMP at issue but challenged a truncated "framework" process for amending the FMP established by Amendment 4.  *Id*.  Amendment 10 added to the list of measures that could be addressed through the framework process but did not change the process itself.  *Id*.  Because "Oceana timely challenged the framework provisions *in its comments* on the Amendment 10 proposed rule," there was "no bar to plaintiff's asserting this claim." *Id*. (emphasis added).  *See also Pub. Citizen v. Nuclear Regul. Comm'n*, 901 F.2d 147, 150 (D.C. Cir. 1990) ("where an agency's actions show that it…has reconsidered the rule and decided to keep it in effect, challenges to the rule are in order").

Here, as NMFS acknowledges, the Gulf Council and NMFS completed a review of the SBRMs in February 2022, determined they were sufficient, and made no changes.  Dkt. # 36 at 38 (citing AR 18556-98).  This was during the comment period on the proposed rule for Amendment 53.  *See id*. (dated February 2022); AR 13903 (comment period on proposed rule closed February 18, 2022).  Plaintiffs commented that statements in Amendment 53 showed that bycatch reporting in the reef fish fishery did not constitute a valid SBRM, AR 9895, and Plaintiffs attached to their comments a copy of the SBRM review whitepaper, AR 11498.  NMFS substantively responded to that comment in the Final Rule, AR 17425 (response to Comment 12), effectively conceding that the comment was within the scope of the rulemaking.  As in *Oceana II*, 384 F. Supp. 2d at 247, because Plaintiffs raised this issue in comments to the rule being challenged here, their SBRM claim is not time barred.

Second, even if Plaintiffs' SBRM challenge is deemed a challenge to Amendment 22, as NMFS contends, Dkt. # 36 at 37, that is not a bar, either.  "It is well established in this Circuit that a party against whom a rule is applied may bring a substantive challenge to a rule at the time

of its application." *Conservervation Law Foundation*, 209 F. Supp. 2d at 12 (permitting substantive challenge to FMP amendment by environmental groups brought after the MSA's 30-day limitations period); *see also Graceba Total Commc'ns, Inc. v. F.C.C.*, 115 F.3d 1038, 1040 (D.C. Cir. 1997) ("limiting review of a rule to the period immediately following rulemaking 'would effectively deny many parties ultimately affected by a rule an opportunity to question its validity'… For this reason, we permit both constitutional and statutory challenges to an agency's application or reconsideration of a previously promulgated rule, even if the period for review of the initial rulemaking has expired").

Plaintiffs bring a substantive challenge, contending that the Reef Fish FMP does not comport with the substantive requirements of § 1853(a)(11), which harms their interests in connection with an increased allocation to the recreational sector under Amendment 53. Accordingly, as in *Conservation Law Foundation*, Plaintiffs' challenge is not time barred.

### 2.    NMFS ignores precedent and the FMP is defective.

On the merits, NMFS contends that any methodology will satisfy § 1853(a)(11) as long as the FMP has specified one.  Dkt. # 36 at 38.  That contention conflicts with this Court's precedents, which NMFS does not even address.  *See* Dkt. # 20 at 43-44 (citing *Oceana, Inc. v. Evans*, No. 04-cv-0811, 2005 WL 555416, at *40 (D.D.C. Mar. 9, 2005) ("*Oceana I*"); *Oceana II*, 384 F. Supp. 2d at 234).

NMFS contends that "Section 303(a)(11) does not mandate a particular SBRM for a particular sector." Dkt. # 36 at 38.  What the statute requires is a "standardized" methodology to assess bycatch "in the fishery," § 303(a)(11), which here is the reef fish fishery.  The term "standardized" means "to bring into conformity with a standard especially in order to assure consistency and regularity."[8]  "A methodology need not necessarily be detailed, but it must at the very least provide decisionmakers and the public with a program of what actually will be *done* to

---

[8] *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/standardize.

improve bycatch reporting, and why these measures will be sufficient based upon the best available science." *Oceana II*, 384 F. Supp. 3d at 234.

NMFS concedes that the reporting methodology is not standardized, because private anglers in some states can voluntarily report bycatch if they choose, but not in other states.  Dkt. # 36 at 38.  The voluntary nature of this "reporting" by definition is non-standardized because consistency and regularity will vary with the whims of individuals.  NMFS acknowledges that the resulting data are uncertain and "not considered overly reliable." *Id*. at 39 (quoting AR 18597).  Indeed, it is "impossible" to determine their accuracy.  *Id*. at 44.  The Gulf Council acknowledged the shortcomings with this methodology and need for improvements.  AR 17425.  More is required to comport with Congress's intentions; the reporting methodology must be standardized across all sectors of the fishery so an accurate assessment of bycatch can be made.

## F.    Amendment 53 Violates MSA National Standard 2

The parties' dispute under National Standard 2, 16 U.S.C. § 1851(a)(2), largely boils down to whether an unpublished paper written by NMFS economists and presented for publication on January 29, 2020, was "available" to NMFS when the economic analyses for Amendment 53 were drafted in October of 2020.  *See* Dkt. # 20 at 44-46; Dkt. # 36 at 26.  That paper had valuations for red grouper in the recreational sector that were lower than the valuations in the paper Amendment 53 relied on, and altered—if not upended—the economic analyses.  *See* Dkt. # 20 at 44.

NMFS says Plaintiffs provide no case law that "an unpublished whitepaper by NMFS economists must be treated as available for NMFS's consideration as soon as it is submitted for publication." Dkt. # 36 at 26.  But the paper was drafted by NMFS's own economists, and Amendment 53 relies on unpublished whitepapers from non-NMFS economists.  Dkt. # 20 at 45 (citing AR 8072, 8153, 17589).  NMFS's conduct is arbitrary and capricious.

Plaintiffs also argued that NMFS failed to respond to the substance of the new paper after Plaintiffs raised it, which by itself is an APA violation.  Dkt. # 20 at 45-46.  NMFS proves Plaintiffs' point by including the substantive response to that paper with its opposition brief.

Dkt. # 36 at 26-27 (notes 8 and 9).  But it is too late now; the proper remedy for this violation is to vacate and remand Amendment 53.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("*State Farm*") ("an agency's action must be upheld, if at all, on the basis articulated by the agency itself").

## G.    Amendment 53 Violates the Administrative Procedure Act In Other Ways

Apart from specific MSA violations, Plaintiffs' opening brief also addressed a number of other ways that Amendment 53 and NMFS's findings and conclusions are arbitrary and capricious and thus violate the APA.  Dkt. # 20 at 46-53.

NMFS argues that Plaintiffs fail to state a claim under the APA because they "fail to articulate any statutory criteria against which the Court could review Amendment 53." Dkt. # 36 at 41.  NMFS misunderstands the function of the APA and its interplay with the MSA.

"The standard of review for agency decisions under the Magnuson–Stevens Act is borrowed from the APA." *Black v. Pritzker*, 121 F. Supp. 3d 63, 76 (D.D.C. 2015). The APA "define[s] the uniform procedures that agencies could employ when administering public rights established in other statutes and to provide for judicial review of that administration." *Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 71–72 (D.D.C. 2009), *aff'd sub nom. Navab-Safavi v. Glassman*, 637 F.3d 311 (D.C. Cir. 2011). Here, the MSA is the statute that establishes public rights; the APA provides the statutory framework for evaluating the procedure by which NMFS administers those rights.

The MSA expressly authorizes review of regulations promulgated by NMFS under the statutory criteria provided by the APA. 16 U.S.C. § 1855(f)(1) ("Regulations promulgated by the Secretary under this chapter… shall be subject to review to the extent authorized by, and in accordance with, chapter 2 of Title 5."). The MSA provides that a court may set aside "any such regulation or action *on a ground specified* in section 706(2)(A), (B), (C), or (D)" of the APA. 16 U.S.C. § 1855(f)(1)(B) (emphasis added). In turn, 5 U.S.C. § 706(2)(A) provides that a court may "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." In other words, "the

APA therefore supplies the relevant legal standard." *Oceana, Inc. v. Raimondo*, 530 F. Supp. 3d 16, 29 (D.D.C. 2021), *aff'd*, 35 F.4th 904 (D.C. Cir. 2022).

In this case, Plaintiffs claim that actions, findings, and conclusions of NMFS in promulgating Amendment 53 are arbitrary and capricious under the standards set forth in the APA. Supreme Court precedent provides the criteria against which to review NMFS's conduct. An agency satisfies the APA if it "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm,* 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156 (1962)). Agency action is arbitrary and capricious if it "entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before [it], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 43 (alterations).

The cases NMFS cites, Dkt. # 36 at 41-42, are irrelevant. *Navab-Safavi v. Broad. Bd. of Governors* addressed whether the APA precludes the availability of a *Bivens* recovery. 650 F. Supp. 2d at 70. In *Oregon Nat. Res. Council v. Thomas*, the court dismissed plaintiff's APA claims because the agency action at issue—timber sales—was committed to agency discretion by law, and thus explicitly exempt from review under the APA. 92 F.3d 792, 798 (9th Cir. 1996); 5 U.S.C. § 701(a)(2). Neither situation is present here. This is not a *Bivens* action and the relevant statutory scheme, the MSA, expressly allows NMFS's actions to be challenged "on a ground specified" in certain sections of the APA. Therefore the "basic presumption of judicial review" of agency action under the APA applies. *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136 (1967)).

Indeed, courts are routinely presented with claims that NMFS's conduct was arbitrary and capricious under the APA without regard to a specific MSA provision. *See, e.g., Groundfish Forum*, 375 F. Supp. 3d at 80 (describing plaintiffs' fifth claim for relief, separate from their four

MSA claims, that NMFS "failed to articulate a rational basis in promulgating A113 such that the decision to adopt and implement the amendment was arbitrary and capricious under the APA").[9]

### 1.     Amendment 53 arbitrarily relies on economic theory NMFS found "erroneous."

Plaintiffs explained in their opening brief that Amendment 53 relies on economic theory that NMFS found "erroneous" when developing Amendment 28, that NMFS's explanation for this discrepancy was flawed, and that the Final Rule was internally inconsistent.  Dkt. # 20 at 46-47; AR 11991; 11948.  NMFS provides nothing new in response, and its brief—like the Final Rule—is also internally inconsistent.

NMFS found in Amendment 28 that it is not possible to estimate changes in net economic benefits from shifting allocation *across sectors* where, as here, the allocation is efficiently allocated in the commercial sector but not in the recreational sector.  *Id*.  NMFS contends that Amendment 53 does not claim to maximize net economic benefits to the Nation, but merely generates "relatively greater" net benefits compared to the alternatives considered.  Dkt. # 36 at 50.  But, as Plaintiffs pointed out, the Final Rule expressly declares that the revised allocation "is expected to result in the greatest net economic benefits to the Nation." AR 17424.  NMFS fails to address the inconsistency, and its brief repeats the same contention elsewhere to justify NMFS's action.  *See* Dkt. # 36 at 29 ("NMFS selected the alternative that 'is expected to result in the greatest net economic benefits to the Nation.'") (quoting AR 17424).  This is a textbook example of arbitrary and capricious reasoning.

NMFS's purported explanation also fails.  It does not matter which allocation alternatives are considered; the problem lies in making conclusions about net benefit changes from allocation shifts of any size across sectors.  *See* AR 11991 ("[C]hanges in net benefit estimates based on the generally accepted application of the equimarginal principle…and associated inferences about economic efficiency are erroneous when each sector's quota is not efficiently allocated within

---

[9] NMFS did not contend in that case that plaintiffs' standalone APA claim failed to state a claim.  Defs.' Cross-Mot. for Summ. J., *Groundfish Forum v. Ross*, No. 1:16-cv-02495, Dkt. # 38-1 at 46 (D.D.C. August 23, 2017).

the sector (i.e., quota is not assigned to those participants that have the highest willingness to pay for the resource). As a result, policy prescriptions based on such inferences would not be valid, and therefore, not useful.").   Conclusions about maximizing net benefits to the Nation or generating relatively greater net benefits among the alternatives considered are equally erroneous.

### 2.  NMFS arbitrarily used the old allocation formula when a key finding changed.

In both the Final Rule and its opposition brief, NMFS fails to confront the finding in Amendment 30B that the proportion of discards to landings of red grouper was thought to be similar between the commercial and recreational sectors at the time of the initial allocation.  *See* Dkt. # 20 at 47-48; AR 10483.  That finding changed dramatically after MRIP-FES, which shows that the recreational sector discards far more red grouper than the commercial sector for each pound landed. Dkt. # 20 at 47-48.  But Amendment 53 uses the same allocation formula without making any adjustment for new information about higher recreational sector discards.

NMFS contends that reallocation under Amendment 53 "best represents what was actually happening in the fishery during the years used to establish the initial allocation." Dkt. # 36 at 47 (quoting AR 17306-07).  But again, that statement only looks at landings, not dead discards, which new information shows are dramatically higher for the recreational sector.  Thus, the allocation formula does not address what was "actually happening in the fishery" during 1986-2005.  Historical participation in the fishery includes dead discards.  *See* Dkt. # 20 at 48. Plugging new numbers into the old formula fails to consider an important aspect of the problem.

### 3.  NMFS assessed impacts of Amendment 53 against an unlawful baseline.

NMFS's opposition brief confirms Plaintiffs' contention that NMFS effectuated its own reallocation while Amendment 53 was under development, giving the recreational sector 40% of total landings without any public rulemaking process.  Dkt. # 20 at 22-23, 48-50.  That decision obscured the analysis of Amendment 53's effects.  *Id.*

There is no dispute that the recreational sector's codified ACL prior to Amendment 53 was 1.0 million pounds.  *See* 50 C.F.R. § 622.41(e)(2)(iv) (2021).  There is no dispute that NMFS allowed the recreational sector to land 2.10 million pounds, although NMFS made no change to the recreational sector ACL in its regulations.  Dkt. # 36 at 48.  NMFS complains about Plaintiffs' "mischaracterization of 2.1 million pounds as an uncodified recreational sector ACL." Dkt. # 36 at 49 n. 24.  But there is no other way to describe it: the recreational sector was held to an ACL of 2.10 million pounds and that limit was not codified in NMFS's regulations.

Nor is there any dispute that the effective total ACL prior to Amendment 53 was 5.26 million pounds, even though the sum of the sectors' ACLs codified in NMFS's regulations was 4.16 million pounds.  Dkt. # 36 at 54 (the "total ACL of 4.16 million pounds...becomes 5.26 million pounds and the recreational sector ACL becomes 2.1 million pounds").

The rest is simple math.  NMFS preemptively allocated the recreational sector 2.1 million pounds from a 5.26 million pound total ACL, or 40%.  NMFS took that action because otherwise "recreational fishermen would have been allowed to catch far fewer fish than they had caught in 2017." Dkt. # 36 at 48.[10]  But NMFS undertook no rulemaking to effectuate the change.  NMFS simply ignored its own regulations and the allocation fixed by the FMP.  This was unlawful.  *See Conservation Law Foundation*, 209 F. Supp. 2d at 9 (""[I]t is well established that government agencies are bound by their own regulations, including their FMPs.").

NMFS's opposition brief does not address how its preemptive reallocation tainted the analysis for Amendment 53.  It is misleading for NMFS to tell the public that the "revised allocation" in Amendment 53—i.e., increasing the recreational sector's allocation from 24% to 40.7%— "reduces the commercial and recreational sector ACLs by similar percentages." AR

---

[10] NMFS's brief references the "MRIP-CHTS recreational sector ACL."  Dkt. # 36 at 48.  There is no such thing. The stock assessment model incorporates a variety of input data; recreational landings data is one of many.  *See* Dkt. # 34 at 27 ("assessments rely on a series of surveys and assumptions").  The model then outputs a yield stream in pounds of fish, which is then apportioned out as sector ACLs according to the allocation fixed by the FMP.  Just because the *input* for recreational landings may be in "CHTS units" does not mean the recreational sector's allocated portion *of the output* can simply be converted into "FES units." Moreover, the recreational sector's input data affects the total output, including the commercial sector's allocated portion.

17424.  That statement assumes that the recreational sector ACL was 2.1 million pounds.  But that uncodified ACL already reflected an allocation of 40%; the allocation is not further "revised" by Amendment 53.  This is not a cogent explanation.

4.      **NMFS arbitrarily determines which landings data are the "best available."**

Plaintiffs do not dispute that NMFS's determination of what data constitutes the best available science is entitled to deference.  Dkt. # 36 at 42.  Plaintiffs contend that no deference is due here because NMFS has not provided a satisfactory explanation for why its own landings data are conflicting and constantly changing, and why it uses a given data set for some purposes but not others.  Dkt. # 20 at 50-51.  NMFS's opposition brief provides no clarity.

The initial premise of Amendment 53 was to revise the allocation using the MRIP-FES recreational landings data fed into the stock assessment (SEDAR 61).  AR 699.  But Amendment 53 does not use those data for reallocation; instead, NMFS further modified the landings data after they were fed into the assessment.  AR 7978.  So there is a mismatch between the data used in the assessment and the data used for Amendment 53.  NMFS does not explain why one set should be used for the assessment and another set for allocation, or why those datasets conflict with other landings data.  *See* Dkt. # 20 at 50.

5.      **NMFS's recalibration of historical landings data is irreparably flawed.**

Plaintiffs' opening brief challenges NMFS's retrospective recalibration of historical landings data, and shortcomings in NMFS's response to these comments in the Final Rule.  Dkt. # 20 at 51-53.  NMFS's response confirms the validity of Plaintiffs' arguments.

As discussed above, NMFS concedes that it "is impossible to determine the accuracy of either CHTS or FES data." Dkt. # 36 at 44.  Peer reviewers of the statistical model used for the recalibration described it as "eloquent approach."  Dkt. # 36 at 44; AR 18690.  But it is no better at estimating historical landings, because all the underlying data fed into the model is voluntarily reported and unreliable.  AR 18699.  The new landings estimates are as unreliable as the old ones and produce unexplained variances.  *See* AR 18693 (comparison of new and old estimates

"resulted in large differences (2 to 11-fold)" but "no single hypothesis (or covariate) was sufficient" to "account for these differences").

"[I]t is an agency's duty to establish the statistical validity of the evidence before it prior to reaching conclusions based on that evidence." *St. James Hosp. v. Heckler*, 760 F.2d 1460, 1467 (7th Cir. 1985). NMFS did not discharge that duty here. *See* AR 18699 ("Lacking a sufficient <u>statistical justification</u> for standardizing the MRIP data to the FES estimates created problems both during the review and in addressing the [Terms of Reference].") (emphasis in original). The very purpose of Amendment 53, to ensure that "historical participation" by the sectors is "accurately reflected by the sector ACLs," AR 7981, cannot be achieved with this data.

## H.   Amendment 53 Violates NEPA

The NEPA analysis is flawed because the outcome was predetermined and NMFS failed to consider a reasonable range of alternatives. *See* Dkt. # 20 at 54.

NMFS says Plaintiffs point to "no evidence" of predetermination. Dkt. # 36 at 53. The evidence is found in NMFS's own statements. While Amendment 53 was under development, NMFS acknowledges that it unilaterally increased the total ACL to 5.26 million pounds and authorized the recreational sector to catch 2.10 million pounds, or 40% of the total. Dkt. # 36 at 54. Amendment 53 purports to increase the recreational sector's allocation from 24 to 40.7%. Thus, NMFS preemptively implemented Amendment 53. This case is a more egregious example of pre-determination than in *Metcalf v. Daley*, which NMFS does not address. 214 F.3d 1135, 1142 (9th Cir. 2000) (predetermination occurred where agency agreed to support a whale hunt prior to NEPA review). NMFS' contention that it did not "lose the right to preclude any or all fishing activities," Dkt. # 36 at 54, is irrelevant; NMFS had already implemented the action.

NMFS does not address the substance of Plaintiffs' arguments that Amendment 53 failed to contain a reasonable range of alternatives. Dkt. # 20 at 55-56. Plaintiffs argued that the range should have included alternatives that factored dead discards into the specification of OFL and ACL, as those alternatives would have been more consistent with the purpose of reflecting historical "participation" in the fishery. *Id.*

### III.   CONCLUSION

The Court should vacate Amendment 53.

DATED this 16th day of September, 2022.

Respectfully submitted,

K&L GATES LLP

By: *J. Timothy Hobbs*

J. Timothy Hobbs (DC Bar # 976470)
Tim.Hobbs@klgates.com
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
Telephone: (206) 623-7580
Facsimile: (206) 623-7022

Michael F. Scanlon (DC Bar # 479777)
Michael.Scanlon@klgates.com
1601 K Street, NW
Washington, DC 20006
Telephone: (202) 661-3764
Facsimile: (202) 778-9100

*Attorneys for Plaintiffs A.P. Bell Fish Company, Inc., Southern Offshore Fishing Association, Inc., and Gulf of Mexico Reef Fish Shareholders' Alliance*