# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| A.P. BELL FISH COMPANY, INC., SOUTHERN OFFSHORE FISHING ASSOCIATION, INC., and GULF OF MEXICO REEF FISH SHAREHOLDERS' ALLIANCE,<br><br>                                         Plaintiffs,<br><br>        v.<br><br>GINA M. RAIMONDO, in her official capacity as Secretary of the United States Department of Commerce; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; NATIONAL MARINE FISHERIES SERVICE,<br><br>                                         Defendants,<br><br>  and<br><br>COASTAL CONSERVATION ASSOCIATION and LOUISIANA,<br><br>                                Intervenor-Defendants. | Case No. 1:22-cv-01260-TJK<br><br>Hon. Timothy J. Kelly |

## JOINT APPENDIX VOLUME III

**Administrative Record Document Numbers**

082
093
097
099

# ADMINISTRATIVE RECORD

# NO. 082

```
 1                 GULF OF MEXICO FISHERY MANAGEMENT COUNCIL
 2
 3                           284TH MEETING
 4
 5                        FULL COUNCIL SESSION
 6
 7                            Via Webinar
 8
 9                          April 14-15, 2021
10
```

11 **VOTING MEMBERS**
12 Kevin Anson (designee for Scott Bannon)...................Alabama
13 Patrick Banks............................................Louisiana
14 Susan Boggs..............................................Alabama
15 Leann Bosarge............................................Mississippi
16 Dale Diaz................................................Mississippi
17 Jonathan Dugas...........................................Louisiana
18 Phil Dyskow..............................................Florida
19 Tom Frazer...............................................Florida
20 Martha Guyas (designee for Jessica McCawley).............Florida
21 Robin Riechers...........................................Texas
22 John Sanchez.............................................Florida
23 Bob Shipp................................................Alabama
24 Joe Spraggins............................................Mississippi
25 Andy Strelcheck..........................................NMFS
26 Greg Stunz...............................................Texas
27 Ed Swindell..............................................Louisiana
28 Troy Williamson..........................................Texas
29
30 **NON-VOTING MEMBERS**
31 Dave Donaldson...........................................GSMFC
32 Lt. Nicholas Giancola....................................USCG
33
34 **STAFF**
35 Matt Freeman.............................................Economist
36 John Froeschke...........................................Deputy Director
37 Beth Hager...............................................Administrative Officer
38 Lisa Hollensead..........................................Fishery Biologist
39 Mary Levy................................................NOAA General Counsel
40 Jessica Matos..........Document Editor & Administrative Assistant
41 Natasha Mendez-Ferrer....................................Fishery Biologist
42 Emily Muehlstein.........................Public Information Officer
43 Ryan Rindone.................Lead Fishery Biologist/SEDAR Liaison
44 Bernadine Roy............................................Office Manager
45 Camilla Shireman........Administrative & Communications Assistant
46 Carrie Simmons...........................................Executive Director
47 Carly Somerset.....................Fisheries Outreach Specialist
48

0003092

**OTHER PARTICIPANTS**

1
2  Jeff Angers.........................Center for Sportfishing Policy
3  Tristan Armer.................................................MS
4  Jeff Boyd.......................................Orange Beach, AL
5  Rick Burris..................................................MS
6  Eric Brazer...................................Shareholders Alliance
7  Catherine Bruger...............................Ocean Conservancy
8  Patrick Carron...............................................MS
9  Richard Cody...............................................NOAA
10 Michael Currey...............................................AL
11 April Depaola..................................Orange Beach, AL
12 Blakely Ellis...........................................CCA, AL
13 John Franck............................................Franklin, TN
14 Benny Gallaway........................LGL Ecological, TX
15 Jim Green.................................................Destin, FL
16 Ken Haddad..............................................ASA, AL
17 James Hall..................................................AL
18 Chad Hanson.......................Pew Charitable Trusts
19 Seth Haukebo............................................Galveston, TX
20 Scott Hickman.........................................Galveston, TX
21 Peter Hood...............................................NMFS
22 Glenn Hughes................................................ASA
23 Dylan Hubbard...............................................FL
24 Gary Jarvis............................................Destin, FL
25 Michael Jennings...................................Freeport, TX
26 Joshua Kilborn..............................................FL
27 Edwin Lamberth.........................................Mobile, AL
28 Brian Lewis.................................................FL
29 Bill Kelly...........................................FKCFA, FL
30 Ray Mayhall............................................Mobile, AL
31 Jay Mullins.................................................FL
32 Clay Porch...............................................SEFSC
33 Cory Quint...........................................Mobile, AL
34 Nathan Putnam.....................LGL Ecological, Galveston, TX
35 Kellie Ralston.............................................ASA
36 Nick Ruland.................................................
37 Joe Scarpa..........................................NOAA OLE
38 Herbert Stevenson...........................................AL
39 Sean Sullivan.........................................Mobile, AL
40 Mark Tryon.........................................Gulf Breeze, FL
41 Ted Venker.................................................CCA
42 Spud Woodward...........................................SAFMC
43 Brad Young.........................................Nashville, TN
44 Bob Zales.........................................Panama City, FL
45 Jim Zurbrick...................................Steinhatchee, FL
46
47                              - - -
48

2

TABLE OF CONTENTS

Table of Motions...................................................4

Call to Order, Announcements, and Introductions...................6

Presentation of the 2020 Officer of the Year/Team of the Year
Award.............................................................8

Adoption of Agenda and Approval of Minutes........................9

Presentations....................................................10
    Exploring Unexplained Variability in Stock-Recruitment
        Relationship Estimates for the Gulf of Mexico's Greater
        Amberjack (Seriola dumerili).............................10
    Recommendations to the Gulf of Mexico Fishery Management
        Council: Coordinating Data and Approaches to Conduct a
        Kemp's Ridley Sea Turtle Stock Assessment................25

Public Comment...................................................35

Committee Reports................................................97
    Shrimp Committee Report......................................97
    Mackerel Committee Report...................................107
    Data Collection Committee Report............................124
    Habitat Protection and Restoration Committee Report.........140
    Reef Fish Committee Report..................................142

Supporting Agencies Update......................................250
    South Atlantic Council Liaison..............................250
    NOAA Office of Law Enforcement..............................251
    Mississippi Law Enforcement Efforts.........................254
    Gulf States Marine Fisheries Commission.....................256
    U.S. Coast Guard............................................257

Other Business..................................................258
    USDA Dietary Guidelines from Department of Health and Human
        Services................................................258
    Background Information on Executive Orders from NMFS........260

Adjournment.....................................................260

- - -

3

0003094

TABLE OF MOTIONS

PAGE 101:  Motion to direct staff to begin a framework action to set up reporting requirements for the expiring 3G cELB program to transition it to a new platform for effort reporting of the Gulf of Mexico federal shrimp fishery.  The motion carried on page 103.

PAGE 104:  Motion to recommend to NMFS that federal waters be closed out to 200 miles to run concurrent with the date that the State of Texas recommends for the 2021 Texas shrimp closure in the Texas Territorial Sea.  The motion carried on page 105.

PAGE 106:  Motion that staff send a letter to SEFSC expressing our support for conducting an assessment of the Kemp's ridley stock when time and funds allow, and that this assessment consider the modeling approach presented by LGL Ecological Research Associates.  The motion carried on page 107.

PAGE 109:  Motion in Action 2 to move Alternative 4 to Considered but Rejected.  The motion carried on page 109.

PAGE 110:  Motion in Action 5.1 to remove "Preferred" from Option 2b in Alternative 2.  The motion carried on page 114.
                    1
PAGE 114:  Motion in Action 5.2 to select all the South Atlantic preferred alternatives and options.  The motion carried on page 114.

PAGE 116:  Motion in Action 7 to make Alternative 2 the preferred.  The motion carried on page 120.

PAGE 134:  Motion to direct staff to begin a framework action to address equipment failure and possible exceptions for charter vessels, headboats, and commercial reporting.  The motion carried on page 139.

PAGE 151:  Motion in Action 1 to make Alternative 2 the preferred alternative.  The motion carried on page 174.

PAGE 174:  Motion to request the SSC consider new information and revised report (GRSC) to provide catch advice for red snapper for 2021 and beyond.  As part of the discussion, the SSC should consider the existing ABC Control Rule as well as the National Standard Guidelines.  The motion carried on page 179.

PAGE 181:  Motion to approve the Framework Action: Modification of Annual Catch Limits for Gulf of Mexico Red Snapper and that

0003095

1  it be forwarded to the Secretary of Commerce for review and
2  implementation, and deem the codified text as necessary and
3  appropriate, giving staff editorial license to make the
4  necessary changes in the document.  The Council Chair is given
5  the authority to deem any changes to the codified text as
6  necessary and appropriate.  The motion carried on page 183.

7

8  PAGE 186:  Motion in Action 1 to add a new Alternative 6 that
9  would change the state-specific red snapper private angling
10 component annual catch limits (ACL) using modified percentages
11 from those identified in Amendment 50A in state survey
12 currencies through 2023.  Alabama would retain the ACL that was
13 issued in Amendment 50A (1,122,662 pounds).  The motion failed
14 on page 192.

15

16 PAGE 193:  Motion that the council accept state surveys of
17 recreational red snapper as best available science.  The motion
18 failed on page 206.

19

20 PAGE 206:  Motion in Action 1 to make Alternative 2 the
21 preferred, with an implementation date of January 1, 2023.  The
22 motion carried on page 224.

23

24 PAGE 228:  Motion in Action 1 to make Alternative 2 the
25 preferred.  The motion failed on page 238.

26

27 PAGE 239:  Motion to approve the Framework Action: Gulf of
28 Mexico Red Snapper Recreational Data Calibration and
29 Recreational Catch Limits and that it be forwarded to the
30 Secretary of Commerce for review and implementation, and deem
31 the codified text as necessary and appropriate, giving staff
32 editorial license to make the necessary changes in the document.
33 The Council Chair is given the authority to deem any changes to
34 the codified text as necessary and appropriate.  The motion
35 carried on page 241.

36

37                          - - -

38

0003096

1  The Full Council of the Gulf of Mexico Fishery Management
2  Council convened via webinar on Wednesday morning, April 14,
3  2021, and was called to order by Chairman Tom Frazer.
4
5              **CALL TO ORDER, ANNOUNCEMENTS, AND INTRODUCTIONS**
6
7  **CHAIRMAN TOM FRAZER:**  Welcome to the 284th meeting of the Gulf
8  Council. My name is Tom Frazer, Chair of the council.  The Gulf
9  Council is one of eight regional councils established in 1976 by
10 the Fishery Conservation and Management Act, known today as the
11 Magnuson-Stevens Act.  The council's purpose is to serve as a
12 deliberative body to advise the Secretary of Commerce on fishery
13 management measures in the federal waters of the Gulf of Mexico.
14 These measures help ensure that fishery resources in the Gulf
15 are sustained, while providing the best overall benefit to the
16 nation.
17
18 The council has seventeen voting members, eleven of whom are
19 appointed by the Secretary of Commerce and include individuals
20 from a range of geographical areas in the Gulf of Mexico with
21 experience in various aspects of fisheries.
22
23 The membership also includes the five state fishery managers
24 from each Gulf state and the Regional Administrator from NOAA's
25 Southeast Fisheries Service, as well as several non-voting
26 members.
27
28 Public input is a vital part of the council's deliberative
29 process, and comments, both oral and written, are accepted and
30 considered by the council throughout the process.  Anyone
31 wishing to speak during public comment should call the toll-free
32 phone number provided on our website and on the screen during
33 the public comment period during the meeting.
34
35 A digital recording is used for the public record, and,
36 therefore, for the purpose of voice identification, please
37 unmute your line when your name is called and state your first
38 and last name.
39
40 **MS. BERNADINE ROY:**  Kevin Anson.
41
42 **MR. KEVIN ANSON:**  Kevin Anson.
43
44 **MS. ROY:**  Patrick Banks.
45
46 **MR. PATRICK BANKS:**  Patrick Banks.
47
48 **MS. ROY:**  Susan Boggs.

0003097

```
 1
 2   MS. SUSAN BOGGS:  Susan Boggs.
 3
 4   MS. ROY:  Thank you, Susan.  Leann Bosarge.
 5
 6   MS. LEANN BOSARGE:  Leann Bosarge.
 7
 8   MS. ROY:  Andy Strelcheck.
 9
10   MR. ANDY STRELCHECK:  Andy Strelcheck.
11
12   MS. ROY:  Dale Diaz.
13
14   MR. DALE DIAZ:  Dale Diaz.
15
16   MS. ROY:  J.D. Dugas.
17
18   MR. J.D. DUGAS:  J.D. Dugas.
19
20   MS. ROY:  Phil Dyskow.
21
22   MR. PHIL DYSKOW:  Phil Dyskow.
23
24   MS. ROY:  Tom Frazer.
25
26   CHAIRMAN FRAZER:  Tom Frazer.
27
28   MS. ROY:  Martha Guyas.
29
30   MS. MARTHA GUYAS:  Martha Guyas.
31
32   MS. ROY:  Robin Riechers.
33
34   MR. ROBIN RIECHERS:  Robin Riechers.
35
36   MS. ROY:  John Sanchez.
37
38   MR. JOHN SANCHEZ:  John Sanchez.
39
40   MS. ROY:  Bob Shipp.  Joe Spraggins.
41
42   MR. RICK BURRIS:  This is Rick Burris.
43
44   MS. ROY:  Thank you, Rick.  Greg Stunz.
45
46   DR. GREG STUNZ:  Greg Stunz.
47
48   MS. ROY:  Ed Swindell.
```

                                    7

0003098

1
2  **MR. ED SWINDELL:**  Ed Swindell.
3
4  **MS. ROY:**  Troy Williamson.
5
6  **MR. TROY WILLIAMSON:**  Troy Williamson.
7
8  **MS. ROY:**  Thank you.  Dave Donaldson.
9
10  **MR. DAVE DONALDSON:**  Dave Donaldson.
11
12  **MS. ROY:**  Thank you.  Nicholas Giancola.
13
14  **LT. NICHOLAS GIANCOLA:**  Nicholas Giancola.
15
16  **MS. ROY:**  Thank you.  You can proceed.
17
18  **CHAIRMAN FRAZER:**  Thank you, Bernie.  I am going to go ahead and
19  turn this over to Mr. Diaz for an announcement of the 2020
20  Officer of the Year or Team of the Year Award.  Mr. Diaz.
21
22  **ANNOUNCEMENT OF THE 2020 OFFICER OF THE YEAR/TEAM OF THE YEAR**
23  **AWARD**
24
25  **MR. DIAZ:**  Thank you, Mr. Chairman.  About five years ago, the
26  Gulf of Mexico Fishery Management Council started the Law
27  Enforcement Officer/Team of the Year Award to recognize
28  excellence in federal fisheries law enforcement.  The council
29  recognizes that law enforcement is vital to accomplishing the
30  goals of the council and to properly manage the resources of the
31  Gulf of Mexico.
32
33  It gives me great pleasure to announce that Texas Marine
34  Tactical Operation Group has been chosen as the Gulf of Mexico
35  Fishery Management Council's Law Enforcement Team of the Year
36  Award.
37
38  The Texas Parks and Wildlife Division of Law Enforcement has
39  created a specialized unit, comprised of specially trained,
40  equipped, and tactically provisioned game wardens known as the
41  Marine Tactical Operation Group for Marine Operations.  In 2020,
42  the Marine Tactical Operation Group has seized over 116,000 feet
43  of longline, 2,500 feet of gillnet, and recovered over 3,600
44  pounds of red snapper, safely released three sea turtles, and
45  has seized two commercial Mexican fishing vessels and referred
46  five cases to NOAA, all while patrolling the Gulf of Mexico in
47  the department's long-range vessel, the Captain Murchison.
48

0003099

1 While patrolling the Rio Grande, the team has also seized over
2 14,500 feet of gillnet, seven hoop nets, along with releasing
3 thousands of pounds of spotted seatrout, redfish, snook, blue
4 crab, and other aquatic species back into the water.  This small
5 five-person team wholeheartedly believes in the work that they
6 do, and they strive to protect Texas waterways.
7
8 With a positive attitude and professional poise, they have been
9 able to build and maintain relationships with their state and
10 federal partners.  These hardworking individuals selflessly work
11 endlessly, endless hours, for the betterment and protection of
12 Texas fisheries, natural resources, all while having a smile on
13 their face.  Congratulations to the Texas Marine Tactical
14 Operation Group.  We appreciate your work.
15
16 Mr. Chairman, I do believe that this award will be officially
17 presented whenever we meet in Texas this year, and the Texas
18 meeting is scheduled for August 23rd through 26th in San Antonio,
19 Texas.  Mr. Chairman.
20
21 **ADOPTION OF AGENDA AND APPROVAL OF MINUTES**
22
23 **CHAIRMAN FRAZER:**  Thank you, Mr. Diaz, and, again,
24 congratulations to the Marine Tactical Operations Group out of
25 Texas, a well-deserved honor, and I look forward to presenting
26 that award in August when we visit San Antonio, and so thank you
27 for your fine work.
28
29 We will go ahead and move forward with the Adoption of the
30 Agenda and the Approval of the Minutes.  If you could refer to
31 Tab A in your briefing materials, that will be the Adoption of
32 the Agenda.  I don't think we necessarily -- We've got it pulled
33 up here, and so can I get a motion to approve the agenda as
34 written?
35
36 **MR. BANKS:**  So moved, Mr. Chairman.
37
38 **CHAIRMAN FRAZER:**  It's moved by Mr. Banks.  Is there a second?
39
40 **MR. DIAZ:**  Second.
41
42 **CHAIRMAN FRAZER:**  It's seconded by Mr. Diaz.  Okay.  Is there
43 any discussion?  I am not seeing any, and so is there any
44 opposition to approving the agenda as written?  Seeing no hands
45 or hearing no objection, we will consider the agenda adopted.
46 The next order of business is the Adoption of the Minutes, which
47 would be Tab A, Number 4 in the briefing materials.  Can I get a
48 motion to approve those minutes?

0003100

1
2  **MR. DIAZ:**  So moved, Mr. Chair.
3
4  **CHAIRMAN FRAZER:**  Okay.  Motion to approve the minutes by Mr.
5  Diaz.  Is there a second?
6
7  **MR. RIECHERS:**  Second.
8
9  **CHAIRMAN FRAZER:**  It's seconded by Mr. Riechers.  Thank you,
10  Robin.  All right.  Is there any other discussion or any edits
11  or modifications that might come up here?  I am not hearing any
12  or seeing any hands, and so is there any objection to approving
13  the minutes as written?  Hearing no objection, or no opposition,
14  I will consider the minutes approved.
15
16  We are going to move right into a presentation.  As folks are
17  aware, the council sponsored a number of research projects
18  recently, seven of those in fact, and this is one of those that
19  were supported, and it's an update, and so I'm going to turn it
20  over to Dr. Josh Kilborn to give a presentation having to do
21  with stock-recruitment relationship estimates for greater
22  amberjack, and so, Dr. Kilborn, thank you so much for joining us
23  here today, and we look forward to your presentation.
24
25                      **PRESENTATIONS**
26      **EXPLORING UNEXPLAINED VARIABILITY IN STOCK-RECRUITMENT**
27      **RELATIONSHIP ESTIMATES FOR THE GULF OF MEXICO'S GREATER**
28                **AMBERJACK (*SERIOLA DUMERILI*)**
29
30  **DR. JOSHUA KILBORN:**  Good morning.  Thank you for having me
31  today.  I really appreciate the opportunity to come out and talk
32  to you all about the greater amberjack work that I did, and so,
33  basically, the scope and the objective of this work was to look
34  at some greater amberjack recruitment deviations from the Stock
35  Synthesis model and try to relate them to some general
36  ecological considerations throughout the Gulf as a large marine
37  ecosystem kind of as a whole.
38
39  This a multiscale analysis that was conducted over both space
40  and time, and there was some explicit modeling of temporal
41  autocorrelation structures that I tried to pay attention to
42  here, as well as trying to bring in some focus on the sargassum
43  as a habitat as well as bringing in some of the ecosystem status
44  report indicators for the Gulf as a whole, and so I was actually
45  pretty excited to hear you all talking about the ESRs earlier,
46  because those were the basis for a lot of my data collection.
47
48  All of this was kind of with an eye towards identifying which
                              10

0003101

1  leading indicators might be useful to potentially add into more
2  formal assessments from the SEDAR process, but also to see if
3  there was any potential capacity to inform kind of short-term
4  interim efforts that might be able to predict some of those
5  recruitment deviations in any given year in between formal
6  assessments.
7
8  I'm going to walk you through the different data sources that I
9  used, as well as the different model parameterizations that I
10  had, because things got kind of messy pretty quickly in this
11  project.
12
13  All of the different models that I'm looking at here are kind of
14  falling into this constraint analysis framework, where we have
15  the response indicator representing something that we care
16  about, and, in this case, that's the amberjack recruitment
17  deviations and trying to understand them through the lens of
18  these constraints that are related to either anthropogenic or
19  climate signals or some other type of habitat considerations,
20  like sargassum and other ecological considerations.
21
22  The recruitment deviations that I'm working with are based off
23  of the 2016 Stock Synthesis model that came out, and, when I
24  talk about deviations, what I am specifically referring to are
25  these red lines that you see here, and those are the difference
26  between the predicted SS3 value for recruitment in any given
27  year versus the Beverton-Holt estimate in that same year, and so
28  those red lines represent the data that I am actually exploring.
29
30  What we see is that there's a number of positive and negative
31  deviations throughout the series, right, and so these data here
32  are the actual deviation time series that I explored, and I
33  looked at the period of 1970 through 2015, and, basically, in a
34  nutshell, a positive deviation is the case where the SS3 model
35  prediction was higher than the Beverton-Holt, and so this would
36  be translating to kind of an underestimate of recruitment
37  success in any given year, and so the reality is that the
38  recruit class was better than we expected.
39
40  The other side of that coin would be the negative deviations,
41  where we have kind of this overestimation of what the
42  recruitment success is in any given year, and what we can see
43  immediately is that there's over three times as many of these
44  negative deviations as there are positive deviations, and so
45  trying to understand this pattern, or these deviations over
46  time, is kind of the goal of this project.
47
48  Remember that I am trying to fit all of this into this kind of

11

0003102

1  constrained analysis framework, and so, if we kind of turn to
2  the predictor side of the equation now, what we're talking
3  about, in the first set of models, are the sargassum habitat,
4  and so I have half-a-degree pixel aerial coverage of sargassum
5  data that was monitored throughout the Gulf of Mexico, and I
6  went ahead and broke it up into a number of different spatial
7  areas that were specific to not only the different restricted
8  management areas that are within the Gulf, but also the full
9  essential fish habitat for the reef fish complex, and then I
10 have a number of different kind of Bayesian-scale experimental
11 areas that I was also looking at that capture the central Gulf
12 portion, as well as the mouth of the Gulf area there, which is
13 actually a pretty interesting little area.
14
15 All of these data were actually recorded on a monthly time
16 scale, and so I had to sort of kind of come up with some way to
17 put them into the context of amberjack, and so the idea was to
18 focus on the recruitment aspect of amberjack, and, ideally, try
19 to encapsulate some form of utilization of this sargassum as
20 habitat in the early life stages of the amberjack's ontogeny.
21
22 To do that, I broke up these annualized data into seasonal data,
23 so that I could pair them with the annual recruitment values of
24 the deviations from them, and so I have one model that looks at
25 the sargassum coverage and all those different spatial areas
26 that covers the spawning and larval dispersal period from March
27 through May and then a second model that looks at the June
28 through August season, which should correspond with the pelagic
29 feeding stages, and then, ultimately, the settlement into the
30 young-of-the-year new recruit class.
31
32 All of the models that I'm going to describe here went through a
33 correlation kind of first check, to figure out which variables
34 were not overly correlated with each other, and so the two
35 sargassum models that ultimately came out had slightly different
36 spatial areas within them, and so the spawning dispersal period
37 had the six management areas that you see listed along the
38 bottom, as well as the essential fish habitat for reef fish and
39 that mouth of the Gulf of Mexico area as well.
40
41 Those data actually spanned through 2018, but, because the
42 amberjack data only exist through 2015 for this model, then
43 that's where these models ended.
44
45 For the pelagic and recruitment period, it's a slightly
46 different mixture of the spatial areas, but it's still really
47 good coverage across the entire Gulf, to start to answer the
48 question of are there any specific areas that are notable for

12

1  amberjack, and are they utilizing any of those sargassum as
2  habitat in them.
3
4  There's actually two ecosystem status reports for the Gulf of
5  Mexico that have been produced, and I used both of them as the
6  source for data for the next portion, and, from them, I was able
7  to pull out three different ecological models that worked over
8  the time period that I had amberjack deviation data available.
9  The problem is there's a lot of mismatches in the timing of
10 these indicators, and so I had to get a little creative with how
11 I structured these predictor models.
12
13 The first model covers the entire period that I had available of
14 1970 through 2015, and the only two variables that were
15 available over that long time period without any gaps in the
16 time series were the number of oil platforms in the Gulf as well
17 as the number of non-petroleum-industry-related artificial
18 reefs.  The first model just focuses on those two habitat
19 predictors as being influential to the amberjack recruitment
20 deviations.
21
22 Then I have a more general model that has a slightly compressed
23 time period, because those were the only dates that I had all of
24 these data available over that period, and so this model went
25 from 1982 through 2010, and it included a number of different
26 general ecological considerations that ranged from climate and
27 environment, things like the Atlantic Multidecadal Oscillation
28 and various water temperature metrics, as well as those
29 artificial habitat indicators that I talked about previously,
30 some influence from the Mississippi/Atchafalaya River Basin,
31 zooplankton levels, the number of oil spills, et cetera.  Again,
32 a lot of different things, but mostly focused on the effects to
33 early life stages of amberjack.
34
35 Then the last model was covering the period 1987 to 2015, and
36 this model focused on some eutrophication factors, mostly in the
37 northern Gulf of Mexico, and so I've got the dissolved oxygen
38 levels offshore of Texas and Louisiana for both spring and fall,
39 and then the concentrations of nitrogen oxides and total
40 phosphates as well, and that model covered 1987 to 2015.
41
42 Each of the models that I just described had a completely
43 different time period associated with it, and remember that I
44 said that I wanted to really get into some of the really
45 explicit temporal aspects of these data, and so, for each of the
46 different time periods, instead of directly asking the question
47 do these predictors affect the amberjack, I want to mediate all
48 of these through the effect of time.

0003104

1
2  The question becomes what are the effects of time on the
3  amberjack, and so we'll go ahead and take each of those
4  different time periods represented by the different models and
5  decompose all of the temporal variability scales that exist
6  within those time scales into the different component patterns
7  that might be present.
8
9  We can go from a continuous change throughout the entire period
10 to a series of oscillating cycles that have reducing
11 frequencies, as you get higher up in asymmetric eigenvector map
12 number, and so it would be a repeating process over a shorter
13 timeframe than AEM 2 might be.
14
15 The idea here is to take these temporal eigenfunctions and do a
16 forward variable selection process to determine which of those
17 temporal scales that can characterize the entire time period,
18 which of them are most important to the recruitment deviations.
19
20 Then, once we figure out what the optimal subset of those
21 temporal factors are, then I can create a linear model that can
22 be partitioned into two pieces, and so one that explains the
23 temporally-structured amberjack recruitment deviations and then
24 another which is a detrended set of information that accounts
25 for the non-temporally-structured deviations, and so now I can
26 start attaching those two streams of evidence with the predictor
27 indicators, to try to figure out which ones are temporally
28 structured and which ones are non-temporally structured.
29
30 Once you do that, the first thing that happens is you can see
31 that all of the different models in each of the time periods,
32 ranging from sixteen years to forty-six years, were able to be
33 explained, to some degree, by these synthetic temporal
34 variables, and so there is between 17 and 32 percent of the
35 total variability from the amberjack deviations that can be
36 explained by these temporal patterns, and they range from the
37 kind of decadal scale oscillations to a longer-term multidecadal
38 signal.
39
40 This just a visualization of the composition of those amberjack
41 recruitment deviations over time, and so, on the top-left, we
42 have the most complex of the four models that was developed, and
43 this one actually encapsulates two different time trends within
44 it, a twenty-eight-year continuous declining trend and then an
45 eight-year repeating cycle, but the black triangles represent
46 the actual recruitment deviations that we're trying to model,
47 and then the green lines represent the temporal signal, and the
48 blue line represents the remaining detrended non-temporal

1  aspect.  That green line and the blue line are where we kind of
2  jump off from and start exploring the predictors.
3
4  Again, this is just the other set of models.  It's just so you
5  can sort of see how that decomposition worked, and the real
6  takeaway is that all of them have some amount of temporal
7  variability explained, but the lion's share remains in this
8  unexplained, or detrended, portion.
9
10 Remember that now the next step is to take those time series and
11 then perform another variable selection process against those to
12 determine which of the ecological considerations that we're
13 interested in might be operating on those time scales or have
14 some capacity to explain the amberjack recruitment.
15
16 The first kind of high-level takeaway is that, out of the five
17 different models that I looked at, two of them being the
18 different seasonal models for sargassum, only four of them
19 produced significant selected subsets of predictor indicators
20 that were important, and, if you look at the three under the fit
21 column, those three are actually adding some nuance to our
22 understanding of the time series of the temporally-structured
23 amberjack deviations, and they are only explaining the temporal
24 signal, and there was no additional capacity to explain any of
25 the detrended data in those three models.
26
27 The ecological model, on the other hand, was actually able to
28 explain some of the detrended variability, and so this is
29 additional variability on top of the temporal signal that we're
30 able to explain, to the tune of 24 percent of the original
31 amberjack deviations, and so that ecological model ultimately is
32 the best out of all of the models that was explored.
33
34 That one picked out the Atlantic Multidecadal Oscillation as
35 well as the number of oil platforms throughout the Gulf as being
36 the important signal, and so you can see these variables
37 selected in red here, and those are basically the leading
38 indicators that we would be most interested in the context of
39 amberjack.
40
41 This is the detrended amberjack model that I was just referring
42 to for the ecological covariates.  The black triangles are still
43 the recruitment variability that we're modeling over that time
44 period, and the blue line is now the detrended aspect that we're
45 trying to describe using the AMO and the number of oil
46 platforms, which is that red line, and you can see -- I'm not
47 going to belabor these figures, but I just wanted you to sort of
48 see the visualized version of what these models look like, and

15

1  there is some pretty decent agreement between the predictors,
2  covariates, and the response data.
3
4  This is the same type of visualization, only now we're
5  explaining the green line, and so this is the long-term habitat
6  model and the long trend that explains these data.  Then these
7  are the final two models that didn't explain a ton of
8  variability, but, again, you can see they are pretty well
9  capturing these temporally-structured response.
10
11  That was a lot of kind of technical, messy stuff, and so now I'm
12  going to try to put it all together in a little bit of a better
13  context.  Remember I said the ecological model and the habitat
14  model had the greatest capacity to actually explain deviations
15  in the amberjack, and they both picked out two separate
16  indicators as being important to that process, but, like I said
17  before, the ecological model is the only one that wasn't
18  temporally structured, and so this is kind of new variability
19  that we're capturing on top of the temporal structure.
20
21  It's interesting that this model, as well as the habitat model,
22  actually selected the oil industry platforms as being really
23  important, and they showed a positive relationship with the
24  amberjack recruitment deviations.
25
26  The AMO, on the other hand, had a negative relationship, or an
27  inverse relationship, and so that's interesting, but then we
28  also see an inverse relationship with the artificial reef
29  structures in the Gulf, and, if you look at that, kind of in
30  tandem with the relationship for the oil platform, that becomes
31  a little bit confusing.  The point is that the habitat and the
32  climate environment in these two models really did capture kind
33  of the best -- They had the best capacity to explain the
34  recruitment deviations.
35
36  The sargassum and the eutrophication model didn't capture as
37  much variability, but they did still have important variables
38  that were selected, and, in the case of sargassum, the Florida
39  Middle Grounds having an inverse relationship to the amberjack
40  recruitment deviations was kind of interesting, and I will talk
41  about that in a couple of minutes, but that was explaining
42  variability that was already explained by the eight-year
43  temporal signal, and so adding a little bit of nuance to our
44  understanding, but not necessarily capturing more than what we
45  could just model with the temporal signals.  Then the
46  eutrophication model showed a positive relationship with the
47  dissolved oxygen offshore of Texas, which, again, is an
48  interesting concept that I will talk about here in a second.

                                16

1
2  Putting all of this into kind of a leading-indicator context,
3  which variables and which models have the best capacity to
4  increase our understanding, and I would say that the climate and
5  habitat indicators really are probably where the story is.  They
6  have the best ability to explain the recruitment variability.
7  The problem is though that both the AMO and these artificial
8  habitat structures are really complicated signals, in and of
9  themselves.
10
11  Knowing that the AMO gives us some predictive capacity, it's
12  great, but it doesn't help us understand the mechanism or the
13  context surrounding why those changes are happening, and so
14  that's going to make it really difficult to implement into a
15  decision-making framework, because we don't fully understand
16  which of the teleconnections associated with the AMO are
17  actually playing out in the process.  Is it precipitation, is it
18  hurricane activity, loop current changes, or any of those things
19  in combination?
20
21  The oil platform stuff is also kind of ambiguous, because the
22  oil platforms don't exist in only one place in the Gulf of
23  Mexico, right, and they are pretty spread out.  They're somewhat
24  clumped in various areas, but they're still a diffuse habitat
25  resource for the animals to use.  Figuring out which kind of
26  artificial structure is important and why, whether it's auditory
27  or chemical cues or some other type of habitat consideration, is
28  really unclear.
29
30  The sargassum and the dissolved oxygen information I think is
31  also really useful, and probably easier to start to understand
32  the actual mechanism behind it, but they didn't capture a ton of
33  variability, and so that's not great, but it is more information
34  than we had before, but what's really interesting is like the
35  Florida Middle Grounds having this inverse relationship with
36  amberjack recruitment, and that's kind of a counterintuitive
37  thing, right?
38
39  You would expect that, if sargassum provides habitat, and that
40  potentially provides refuge, or something else, then maybe that
41  would increase the success of recruitment, but, in this case, it
42  doesn't seem to be, and that area has been shown to contribute
43  to larval entrainment and things like that, and so maybe there's
44  some kind of increased predation going on resulting from the
45  physics, but, again, we don't really know what the story is
46  there.
47
48  The same thing with the offshore dissolved oxygen in the fall

17

1  off of Texas, during a time period when you wouldn't really
2  expect larvae to be in the water, and so maybe this is, again, a
3  situation where the water quality is affecting the quality of
4  the gametes or the offspring afterwards, and so, again, not a
5  full understanding of what's going on there, and there's a lot
6  of how and why that needs to be understood before we can really
7  make solid decisions off of these things, but I do think there's
8  some capacity to learn more there.
9
10  Like I said at the beginning, these autocorrelation structures
11  appear to be very powerful at explaining these decadal and
12  multidecadal signals of variability throughout our stock-
13  recruitment relationship, and to the tune of between 17 and 32
14  percent of that variability, and so this might actually describe
15  some sort of temporal process that we're not paying attention
16  to, and that maybe we should be, or maybe this is some sort of
17  mechanistic bias in the mathematical models.
18
19  Again, it's unclear, but I do think that this highlights some
20  aspect that we need to be paying a little bit closer attention
21  to, because, if we can explain the recruitment variability by
22  just using completely synthetic variables, then I think
23  something is going on there that we're missing.
24
25  To kind of wrap it up, if we're talking about immediate term,
26  really short-term predictive capacity to inform interim
27  assessments or updates in between the formal assessments, I'm
28  not sure there's a lot of that capacity that exists right now,
29  and part of it comes from the fact that we have a lot of
30  complicated scale problems going on in this system, but also the
31  fact that the publicly-available data, which is what you would
32  need if you were going to do something in between a formal
33  assessment period, that data is kind of mismatched in a lot of
34  the temporal and spatial considerations, and so it makes it
35  really difficult to work with.
36
37  As you can see, I had to use five different models to attack
38  this problem, because I couldn't get all the data to match up
39  nicely, and so that's something that we need to pay attention
40  to, especially if we're going to be trying to avoid getting
41  caught off-guard by some sort of regime shift or chaotic change
42  in the system.
43
44  On the other hand, informing the formal assessments I think is a
45  very real thing that we should be starting to think about, and I
46  think that these models that I just described actually came up
47  with some interesting covariates that we might want to start
48  paying attention to.  Again, this is a very complicated spatial

                                    18

0003109

1   and temporal process, but there are some areas that I think we
2   could start with that are going to have a higher return on
3   investment faster than others.
4
5   If you want to learn about the effects of water quality, things
6   like dissolved oxygen, you can immediately start going into the
7   lab and testing the range for the various life stages of the
8   animal and see how that affects survivability or success of the
9   species, and so that stuff I think you can immediately start
10  including into decision-making, if you get that lab work done.
11
12  Sargassum, as a habitat, and other habitat considerations, I
13  think that's a more complicated problem, and I think there's a
14  lot of ground that you can make up there, as far as having the
15  capacity to explain more variability, but you really are going
16  to need to get out in the field and start understanding these
17  preferences of type.
18
19  Is it artificial or natural structure that's important?  Is it
20  algal mats or windrows that might be important?  What type of
21  age structures are present on these habitats, and which life
22  stages are utilizing which habitat types?  All of that stuff is
23  going to be really important to this question, and so I think
24  that needs to be done in a pretty focused and vigorous way.
25
26  The same thing with this issue of the AMO, right, and there's
27  just so many different teleconnections associated with this
28  climate signal that to be able to disentangle it all I think is
29  a very difficult problem, and so while, again, I think it will
30  lead to more explained variability, understanding the mechanism
31  is going to be really difficult, and all of this can be
32  influenced and expanded on with a lot of different simulation
33  studies and management strategy evaluations, to really kind of
34  get the issues sorted out.
35
36  That is actually all that I have today for you, and I would like
37  to thank the council for funding this work, as pass-through
38  funding through NOAA, and I really appreciate the opportunity,
39  and I would also like to thank my colleagues here in my lab, as
40  well as Dr. Chuanmin Hu's lab, who helped provide the sargassum
41  data here at the University of South Florida, and so I will go
42  ahead and take any questions, and I know I have a couple of
43  minutes left, if anybody has any.  Thank you very much.
44
45  **CHAIRMAN FRAZER:**  Great.  Thanks, Josh.  That was a really nice
46  presentation, and so I will see if we have any questions for
47  you, right before we break for lunch, and we certainly have time
48  for a couple.  Kevin Anson.

19

1
2   **MR. ANSON:**   Thank you, Mr. Chair.   Dr. Kilborn, thank you for
3   the presentation.   It was very informative and very interesting.
4   We had spoken a little bit earlier, in the Habitat Committee,
5   about southern flounder and some of the challenges that species
6   is facing that could be related to environmental conditions, as
7   well as habitat, which is related or can be impacted by climate,
8   and so I am just curious though about the sources of the data,
9   the artificial reef data.   You said publicly-accessible
10  databases, and I'm curious, specifically for Alabama, the data
11  sources you used.
12
13  **DR. KILBORN:**   I actually used the ecosystem status reports and
14  all the data that are available from them on the -- There is a
15  NMFS ecosystem status kind of indicators website that you can go
16  to for the Gulf of Mexico that has access to all of the
17  different indicators that are included in those reports, and so
18  they're actually Gulf-wide metrics, and they are not specific to
19  certain areas, and I know some areas are a little looser than
20  others with how they monitor the various artificial structures
21  that are being put out into the water, and so that is a concern,
22  for sure, but all of those data were drawn directly from the
23  ecosystem status reports, and I believe that particular metric
24  for the artificial reefs came out of the 2017 update.
25
26  This is part of the problem, is that all of the information
27  contained in the ecosystem status reports are generalized to
28  annual values Gulf-wide, and so that's adding to the complexity
29  of the problem here, is that we're kind of speaking in very
30  general terms about what these different indicators mean or
31  account for.
32
33  **MR. ANSON:**   Thank you for that explanation, and, yes, I agree
34  with your earlier comment that that could be a little messy, if
35  you will, using generalized data, and so I believe size of reef
36  matters for this species, and even if, at the state level, for
37  instance in Alabama, if we had supplied the data for state
38  reefs, let's say, that were deployed, it would not capture all
39  of the reefs that were deployed, but there would probably not be
40  any indication as to reef height, which I think there's some
41  correlation there for greater amberjack, as far as not one reef
42  is the same as the next reef type of thing.
43
44  Then the last thing I guess I would comment is your
45  recommendations, going forward, is that it appears a lot of
46  these species are environmentally influenced, as far as their
47  recruitment, and it would be interesting to see if somehow some
48  of this eutrophication model that you've developed could be

20

0003111

1  applied for other species, since we don't seem to have a
2  spawner-recruit relationship, per se, as far as abundance of
3  fish, and there may be some environmental conditions that we
4  have long-term data for that might be helpful to try to kind of
5  model or take a look at recruitment over time series for species
6  that we manage, and so thank you.
7
8  **DR. KILBORN:**  No problem, and, just to follow-up on that, real
9  quick, I have done some other species explorations throughout
10 the Gulf, and these dissolved oxygen values appear to be
11 important, and so, yes, the oxygen environment keeps popping up
12 in my analyses as being influential to a number of different
13 species, and so I think there's a lot going on with that
14 particular metric as well.  Thank you.  Are there any other
15 questions?
16
17 **CHAIRMAN FRAZER:**  There sure is.  Mr. Banks from Louisiana has a
18 question for you.
19
20 **MR. BANKS:**  Thank you, Mr. Chairman.  My question has to do with
21 more the unknown, and so this was an extremely interesting
22 presentation, and it is very interesting work, and so I
23 appreciate that presentation.  If this work is showing between
24 17 and 32 percent explained variability in recruitment, do you
25 have some ideas, or maybe your next step in the research, to try
26 to find out the source of all of that unexplained variability?
27 What's your next step, I guess, to try to hone-in on that
28 unexplained variability and the factors that are important in
29 that?
30
31 **DR. KILBORN:**  That's a good question.  I don't have a great
32 answer for you, to be completely honest, because I think a lot
33 of that unexplained variability is going to come from things
34 that we're not really paying attention to right now.  Like I
35 said, I was only looking at the indicators that were already
36 collected by the National Marine Fisheries Service for our
37 region.
38
39 The only new data that I brought into this process was the
40 sargassum coverage data, and that actually showed a little bit
41 of promise already, and so that gives you an idea of the fact
42 that there is stuff that we're not paying attention to that is
43 undoubtedly important to a number of different species in the
44 Gulf waters, and so I think, personally, if I were going to --
45 If I had unlimited money to go and look at this problem, I think
46 the next thing I would do is focus on habitat.
47
48 I do think that habitat is a really important issue, especially

21

0003112

1 with amberjack, and there's a lot of things that we're not
2 paying attention to, as far as habitat.  We're counting certain
3 things, but, like Mr. -- I'm sorry, and I forget who the
4 question was from, but, from the first question, they already
5 pointed out that we're not paying attention to the height of a
6 lot of these artificial structures, and so I think high-relief
7 structure is probably the variable that we need to be paying
8 attention to, or one of the variables.
9
10 Again, I think there is a number of different kind of field-
11 related questions that need to be answered first, before we can
12 really build a predictive model, but we can only work with what
13 we have right now, and so that's what I have done, and
14 highlighting some threads to pull on, I think, already, but,
15 moving forward, I think we need to kind of get creative and
16 start thinking outside of the box, and a little bit less
17 traditionally, and start to understand what other things have we
18 not been paying attention to that might actually be controlling
19 these systems.
20
21 **MR. BANKS:**  I appreciate that explanation, and I think you're
22 exactly right, because it goes to what Kevin said, especially
23 when you look at the model that showed that oil platforms seem
24 to have, at least directly speaking, a big impact on explaining
25 variability in recruitment, but artificial reefs did not, and I
26 think that goes to the difference in the structural complexity
27 to those two habitats.  All artificial reefs, as Kevin said,
28 aren't created the same, and they certainly, at least usually,
29 from a height standpoint, don't have the height that an oil
30 platform does, and so I think you hit the nail on the head, and
31 so I appreciate that.
32
33 **DR. KILBORN:**  Thank you.
34
35 **CHAIRMAN FRAZER:**  We're going to go ahead and entertain one more
36 question from Dr. Porch.
37
38 **DR. CLAY PORCH:**  Thank you for that, Dr. Kilborn.  That's a very
39 interesting presentation, and there's a lot of food for thought.
40 I wondered if you could tell us a little bit about how you
41 initially selected all of the covariates and avoided the
42 potential of spurious correlations, because, as you know, if you
43 look for enough things, you will find correlations, even if
44 there is no real cause and effect, and so I'm curious about the
45 initial selection.  Then, related to that, have you put any
46 thought, or do you have any discussion, regarding the mechanisms
47 that would contribute to the correlations that it appears that
48 you're seeing?

22

1
2  **DR. KILBORN:**  Sure.  So, like I said, kind of in the body of the
3  talk, one of the really big challenges of dealing with ecosystem
4  status report data is figuring out the timing of the different
5  indicators and how they kind of match up with their time series
6  start and endpoints, and so that is kind of one of the big
7  things that immediately starts weeding variables out for you,
8  whether you want to or not, and it's just how available are the
9  data over the time period you're interested in.
10
11  That plays a pretty big role in which variables I can actually
12  start to investigate in this multivariate context.  That being
13  said, to get around some of that, and to include as many
14  variables as I could, that's why I broke it up into several
15  different models, and so that's why there is a habitat model and
16  a general ecological model and a eutrophication model, and so
17  that was kind of the first cut, was that.
18
19  Then the focus was, like I said, trying to find things that I
20  could hypothesize as maybe being influential to the early life
21  history stages of amberjack, and so that's where most of those
22  variables that were selected came from, is kind of those general
23  hypotheses of this might be something that affects recruitment
24  success, or a match/mismatch kind of hypothesis, for this
25  scenario.
26
27  That kind of led to the different models and the variables that
28  were selected there, but then, once I collected a large number
29  of variables, I still wanted to do -- I want to, and have to,
30  avoid the multicollinearity problems, and so I did do
31  correlation analyses for all of the variables in the selected
32  indicator suites for the sub-models, and I only retained
33  variables that were less than 85 percent correlated with any of
34  the other variables.
35
36  That's why, when I was looking at the sargassum stuff, a lot of
37  the large basin-scale variables ended up dropping out, because
38  they were highly correlated with something else that was more
39  spatially explicit and a little bit more useful, in my opinion,
40  and so there was a little bit of kind of researcher bias that
41  went into those decisions, but all of it was based on these
42  correlation analyses and the significance of those correlations
43  and all that good stuff.
44
45  Then, from there, moving into the variable selection process, I
46  actually used Akaike's information criterion to try to reduce
47  and to pull out the optimal models that were the most
48  parsimonious subsets of the variables that I had that could
23

0003114

1  explain substantial proportions of the variability, and so I
2  think that was the first question.
3
4  Then the second question was did I dig into any of the mechanism
5  or speculate on what sort of mechanisms or processes might be
6  causing them, and, like I said in the talk, there's some things,
7  and I touched on it a little bit in the report, of a few of the
8  mechanisms that might be at play, but I kind of am real cagey
9  about answering that question in a direct manner, because I
10 don't know the answers to those questions.
11
12 Like I said, the Florida Middle Grounds and sargassum having an
13 inverse relationship is weird and unintuitive, and so maybe that
14 does have something to do with the physical processes there
15 entraining larvae, which we've seen before in that area, and
16 maybe, if that happens, where there's a big sargassum year and
17 other species are taking advantage of that habitat, then maybe
18 they are increasing their predation.  Again, it's hard to say
19 for sure without getting in the field and really observing
20 what's going on.
21
22 I can make similar claims about various other mechanisms, but
23 none of it really makes any sense until we get out there and
24 start validating some of these things.
25
26 **DR. PORCH:**  Thank you for that.  Just for the council's benefit,
27 I wanted you to know that we're actually -- The Southeast Center
28 is involved with several other partners to explore those very
29 things, the mechanisms that might control recruitment, and so a
30 lot of ongoing work that I think is benefiting from
31 collaborations and projects like this.
32
33 **DR. KILBORN:**  Thank you.
34
35 **CHAIRMAN FRAZER:**  Josh, I just wanted to thank you again, on
36 behalf of the council, for coming and giving the presentation,
37 because there is a lot of interest in this work, and we could
38 probably have a very, very lengthy question-and-answer period,
39 but, in the interest of time, I'm going to let you go and say
40 thank you, and I look forward to an opportunity in the future to
41 talk more about stuff.
42
43 **DR. KILBORN:**  Thank you.
44
45 **CHAIRMAN FRAZER:**  You bet.  Thanks, Josh.  We are going to go
46 ahead and break for lunch, and we will reconvene at 1:00, and so
47 will see everybody after lunch.  Thank you.
48

24

```
 1  (Whereupon, the meeting recessed for lunch on April 14, 2021.)
 2
 3                              - - -
 4
 5                         April 14, 2021
 6
 7                  WEDNESDAY AFTERNOON SESSION
 8
 9                              - - -
10
11  The Full Council of the Gulf of Mexico Fishery Management
12  Council reconvened via webinar on Wednesday afternoon, April 14,
13  2021, and was called to order by Chairman Tom Frazer.
14
15  CHAIRMAN FRAZER:  Welcome back, everybody.  I hope you guys
16  enjoyed your lunch.  We're going to go ahead and continue with a
17  presentation on Coordinating Data and Approaches to Conduct a
18  Kemp's Ridley Sea Turtle Stock Assessment, and that presentation
19  will be given by Dr. Gallaway and Dr. Putnam, or one or the
20  other, and so we will go ahead and get that presentation loaded
21  up.
22
23  DR. BENNY GALLAWAY:  Thank you very much.  Dr. Putnam will be
24  making the presentation.  Thank you.
25
26  CHAIRMAN FRAZER:  All right.  Dr. Putnam, we will let you go
27  ahead and get started.
28
29      RECOMMENDATIONS TO THE GULF OF MEXICO FISHERY MANAGEMENT
30    COUNCIL: COORDINATING DATA AND APPROACHES TO CONDUCT A KEMP'S
31                RIDLEY SEA TURTLE STOCK ASSESSMENT
32
33  DR. NATHAN PUTNAM:  Good afternoon, everyone.  I'm going to give
34  a presentation about some work that was funded by the Gulf of
35  Mexico Fishery Management Council last year, and myself and Dr.
36  Gallaway from the LGL Ecological Research Associates led this
37  work, and we got a good bit of help and input from folks at the
38  Southeast Fisheries Science Center, Chris Sasso and Paul
39  Richards in particular, and a retired NOAA guy, who you all
40  might be aware of, Charles Caillouet.  We put this together, and
41  these are our recommendations for coordinating data and
42  approaches to conduct a Kemp's ridley sea turtle stock
43  assessment.
44
45  In the presentation, I will give you guys a brief introduction
46  on why we need a stock assessment, how that relates to the key
47  aspects of Kemp's ridley biology, some of the elements of the
48  most recent stock assessment that had been conducted by Gallaway
```

25

1  et al. in 2016, or published in 2016, and then some thoughts on
2  other proxies, indices, and factors to include that could
3  provide some of the important information on Kemp's ridley vital
4  rates and a better assessment of their population dynamics and
5  their status and some recommendations for the stock assessment
6  modeling approach that could be taken.
7
8  We would like to know -- So, why do we need a stock assessment?
9  Well, because we would like to know what the Kemp's ridley
10 population is doing.  They have a rather interesting set of
11 trends here that you can see here, or that you might be able to
12 see, and the nesting by Kemp's ridley occurs predominantly in
13 the western Gulf of Mexico.  More than 90 percent of nesting is
14 focused in the region around Tamaulipas, Mexico, shown with the
15 red squares.  A minor amount is in Veracruz, in those orange
16 squares, and then a fairly small amount is on the Texas coast,
17 shown in yellow.
18
19 The magnitude of nesting and the time can be seen on the right-
20 hand side of your screen, and the Kemp's ridley population, when
21 protections began by Mexico in the mid-1960s, was supporting
22 about 6,000 nests a year.  As you can see, that declines through
23 the mid-1980s, to a rather worrisome low level of only 700 or
24 800 nests, and then it gradually begins to increase, and it was
25 actually on an exponential pace, growing around 20 percent each
26 year from 1990 up to 2009, and then something happened, boom, in
27 2010.  There's a sharp decline from that exponential growth that
28 had been occurring, and, since then, the nesting has been rather
29 variable and difficult to predict from one year to the next.
30
31 What happened in 2010 has been a source of considerable
32 speculation, and a handful of hypotheses have been put forth.
33 What happened in 2010?  Well, there was an oil spill, and did
34 that cause the major decline?  Other thoughts might be on
35 shrimping, which has sort of historically been a major problem
36 for sea turtles, and it's been thought to be an order of
37 magnitude more problematic, in terms of mortalities, than other
38 anthropogenic activities combined, and then, also, there are
39 questions of whether this could be somehow related to density
40 dependence, and at what point does the population become self-
41 limiting, and at what point is the Gulf only able to hold so
42 many turtles?
43
44 Each of these questions has been addressed at some level, and
45 the oil spill was sort of scratched off early on by the NRDA
46 trustees, saying that sort of the timing of the oil spill and
47 the associated damages and response was sort of later in the
48 year, in terms of when they thought that Kemp's ridleys would

26

0003117

1   probably be migrating to nests in Tamaulipas, and so they didn't
2   think that the major downturn in 2010 was responsible -- That
3   the BP oil spill was responsible for the major downturn that
4   occurred in 2010, basically leaving open the possibility that
5   habitat degradation from the spill might limit the population's
6   ability to rebound subsequently, but they didn't think that the
7   big drop in 2010 was likely related to the oil spill.
8
9   What about shrimping?  That was investigated by a rather large
10  team of strategical experts about four years ago, in terms of
11  developing a Kemp's ridley stock assessment model, and that was
12  led by LGL's Dr. Gallaway.
13
14  In that stock assessment model, what was particularly unique
15  about it was that they accounted for shrimping effort, in terms
16  of estimating anthropogenic mortality, and they assumed, in that
17  model, that all anthropogenic mortality should be related to
18  shrimping, and so they sort of shifted all anthropogenic
19  mortality to shrimping, and, in those assessments, it was pretty
20  clear that now way could you slice out an explanation for a
21  downturn in Kemp's ridley nesting in 2010 with shrimping effort.
22  That just didn't seem to be compatible with the existing data,
23  in terms of the magnitude of shrimping effort, its distribution
24  over the habitat that Kemp's ridleys occur, and so that was
25  scratched from the list.
26
27  What about density dependence?  We took part in an analysis that
28  was led by Charles Caillouet, one of the co-authors on this
29  paper, and one of LGL's team statisticians, Scott Raborn, and
30  that is our one hypothesis so far that has not been scratched
31  off the list, and you can see the citation on the next slide in
32  Chelonian Conservation and Biology, where the trends in nesting
33  are certainly consistent with density independence over a
34  portion of the data that have been recorded, in terms of
35  nesting, from say before the 1960s through about the year 2000.
36
37  Then, from 2000 on, there is evidence for a density dependence,
38  with the idea that being that you can only get so many turtles
39  out of more and more eggs and that, at some point, resources
40  become limiting and competition among turtles becomes a buffer
41  against further rapid population growth.
42
43  That's not to say though -- The analysis that was done there,
44  it's a bit of a curve-fitting exercise, and the model that was
45  applied was, if you assume exponential growth, what does the
46  population look like, what do the trends look like, how well is
47  the variance explained.  If you assume it's a logarithmic
48  function, what does the trend look like?

0003118

1
2  You can draw lines through messy data in all sorts of ways,
3  which is what this graph shows, and what we are recommending,
4  and what we think is worthwhile, is a more mechanistic approach
5  to assessing the Kemp's ridley population and changes through
6  time.
7
8  What we think would be -- There's nothing wrong with some curve
9  fitting and some hypothesis testing and investigation from that
10 perspective, but we think that, taking into account some key
11 aspects of Kemp's ridley biology and working towards a process-
12 based method for assessing what the population is currently
13 doing and what it's likely to do in the future is the more
14 productive route.
15
16 To catch you up to speed on some key aspects of Kemp's ridley
17 biology, you already know that they nest primarily in the
18 western Gulf of Mexico, and they're really focused, primarily,
19 off the coast of Tamaulipas, and the turtles -- After eggs have
20 been laid, the young will scamper down the beach, and they
21 disperse into the Gulf of Mexico, and they are transported by
22 surface currents to oceanic nursery habitats, where they remain
23 for a period of a year or two.
24
25 They eventually recruit to the continental shelf foraging
26 grounds, particularly in the northern Gulf of Mexico, and also,
27 to some degree certainly, the Atlantic seaboard, after which
28 they will -- After say another ten years or so, they will reach
29 maturity and return to the vicinity of their natal site, to
30 those nesting beaches, where they will mate and lay eggs and
31 then return back to their foraging grounds on the continental
32 shelf, typically a distance from the nesting sites, back towards
33 Louisiana and west Florida and the Campeche Bank.
34
35 With that in mind, we can think about how certain elements of
36 the life cycle could give us insight into population dynamics.
37 Can we better predict future nesting with information on
38 hatchling production input into the population? As you go
39 along, they drift along for that two-year period, and those
40 recruitments -- If we could measure recruitment into those
41 foraging grounds, from the pelagic into the neritic environment,
42 would that help predict future nesting? There's, obviously,
43 some interest in stock-recruitment relationships, and that might
44 be useful to apply to sea turtles in addition to fish.
45
46 Then the third question we might ask is do foraging conditions
47 predict future nesting, and so how does food availability and
48 prey availability and mortality, things that might be

                                 28

1  detrimental to turtles, influence future nesting?
2
3  The closer you get back to that circle, likely the more
4  informative, perhaps the more powerful, information is, in terms
5  of accounting for what type of nesting is going to happen in a
6  given year, and so, from the next slide, you can see an example
7  of sort of what we're thinking about.
8
9  On the top graph, this is hatchling production as it relates to
10  nests, and so there's a logarithmic relationship between
11  hatchlings produced and numbers of nests laid, in this case
12  twelve years later.
13
14  Below that, we have a relationship that we are showing between
15  juvenile strandings in Florida, on the west coast of Florida,
16  and the number of nests produced eight years later, and so a
17  timeline of eight years, and so you can see, again,
18  interestingly, interesting in terms of the shapes of the curves,
19  you have a logarithmic function, in terms of hatchling
20  production, and you have a linear function, in terms of those
21  strandings data, which might be indicative of recruitment, and
22  so, as more young turtles recruit to the West Florida Shelf
23  feeding grounds, you might expect to see more strandings, and
24  that seems to be consistent with some of the data that we have
25  accumulated.
26
27  At a fundamental level then, we can think about assessing
28  population status with information on the reproductive output,
29  the immigration into the population, natural mortality,
30  anthropogenic mortality, and immigration out of the population.
31  For Kemp's ridleys, which are engaging, as we already talked
32  about, in natal homing, if we're thinking about the population
33  from an index of nesting, then immigration and emigration can be
34  sort of assumed to be minimal, and we can focus mostly on things
35  that relate to reproductive output and things that relate to
36  mortality.
37
38  If we're wanting to do that, if we're wanting to think about
39  forecasting Kemp's ridley nesting, if we look at past nesting
40  and look at the relationship of hatchling production, again at
41  that twelve-year time lag, we can see that there's a -- That
42  does a decent job of predicting the overall trend in the
43  population.
44
45  If you look at the next slide, which is forecasting nesting
46  using a recruitment index, it does a decent job of picking up
47  the wiggles that you see from one year to the next, and, if you
48  add those together, we see that you can do a pretty decent job

29

1   of accounting for future nesting based on those two indices of
2   hatchling production, or strandings, a metric for -- A
3   strandings metric for recruitment, and up to 78 percent of the
4   variants can be accounted for by those two factors.
5
6   What we would like to think is that, perhaps with additional
7   information on the later life stages, and so, for instance,
8   things related to foraging grounds for the larger juveniles, in
9   terms of them eventually reaching maturity, or the adults, in
10  terms of them developing a sufficient energy source to migrate
11  and reproduce, we could probably do even better than that.
12
13  Taking a step back, this is sort of the elements from the past
14  Kemp's ridley stock assessment, and it was really instrumental,
15  as I already alluded to, in a number of ways.  If you go to the
16  next slide, I highlight some of the key things that were really
17  useful in this from the stock assessment, in that we had good
18  data for nesting, and we had good data for hatchling production.
19
20  Thanks to the survey efforts they are doing in Mexico, we have a
21  good idea, a very good idea, of how many nests are laid and how
22  many hatchlings are actually coming off of those beaches and
23  then what was added in was this information on shrimping effort
24  and spatially segregated across the Gulf and by depth zone and
25  relating that to shrimp trawl mortality and catchability of
26  turtles by different ages, and then, later on, accounting for
27  the influence of TEDs, in terms of reducing the risk of turtles
28  to mortality from shrimp trawls.
29
30  In that effort, and, again, I have sort of highlighted
31  particularly some stuff about that stock assessment in green.
32  In red, we have some information that was included, but the
33  information on there that was available at the time wasn't maybe
34  as robust as we would like.  For instance, things related to the
35  proportion of hatchlings that are female, that's going to be
36  pretty important for nesting, if you're censusing the female
37  portion of the population.  It would be nice to know how many of
38  those hatchlings that are coming off the beaches are females and
39  if there are differences in terms of sex-biased survival or
40  distributions.
41
42  Another thing that was sort of lacking was the habitat
43  weighting, and so information on Kemp's ridley distribution in
44  the Gulf was based on expert opinion on the relative importance
45  of each of the shrimping zones to mature females, and those were
46  certainly informed opinions, but not statistically robust, and I
47  will step outside of the bounds here to say that, in my own
48  opinion, it's not the most robust way to estimate distributions

                                   30

0003121

1  of turtles.
2
3  Then we have things like clutch frequency and remigration
4  interval and natural mortality, which were set or fit by the
5  model without a good deal of information on what might cause
6  those to vary through time.
7
8  In terms of making things better for the future, there are a
9  handful of proxies and indices and factors that we think could
10  be included at this point, and they primarily relate around
11  spatial and temporal variation in the Kemp's ridley distribution
12  and better information on the variation and the demographic
13  parameters of this population.
14
15  For instance, for the spatiotemporal variation in Kemp's ridley
16  distribution, you can imagine why that would be useful if you
17  have -- Again, on the left side of this, we have a map that
18  shows an estimated mean abundance of Kemp's ridley by -- In one-
19  degree-by-one-degree latitude and longitudes over the period of
20  1996 through 2018.
21
22  We can overlay that on various threats to Kemp's ridleys.  For
23  instance, say you have Gulf of Mexico shrimping effort, and we
24  have recreational fishing effort in the final panel to the
25  right, and we can look at how those are changing through time,
26  and so we see, on the bottom panel, Kemp's ridleys tend to be
27  increasing, but not uniformly across the Gulf.  Some places are
28  seeing higher increases than others, in terms of those model
29  predictions, at least.
30
31  We see that shrimping effort has been declining over this time
32  period, but not uniformly across the Gulf.  That's, again,
33  primarily, as you can see, in the western Gulf, and things like
34  recreational fishing effort have also been changing through
35  time, and they're predominantly increasing along the West
36  Florida Shelf and around North Carolina, but stable or declining
37  in other locations.
38
39  Relating turtle distribution and abundance to the distribution
40  and magnitude of potential threats, we should be able to get
41  better estimates of natural mortality rates, and, again,
42  thinking about this by life stage is going to be a useful
43  direction for future stock assessments.
44
45  As an example for thinking about variation, potentially, in
46  demographic parameters, one of the main -- Two of the main
47  things that we need to think about, in particular, are clutch
48  frequency and how many nests are laid by a turtle in a given

                              31

1  year and the remigration interval, the number of years turtles
2  take between nesting.
3
4  That is because, if a turtle lays one or two nests in a season,
5  that means that your population size could differ by 50 percent,
6  and so, if each turtle is laying one nest, and you get 10,000
7  nests, that means something very different, in terms of
8  population abundance, than if you have 10,000 nests and turtles
9  are laying two nests per season.
10
11 If that varies through time, you could get pretty wide swings in
12 your abundance, or your abundance indices, and, given that such
13 changes are rather profound, or could be changing 50 percent,
14 based on clutch frequency, or maybe 33 percent changes based on
15 the differences in remigration interval through time, and those
16 two things could conceivably account for all of the major peaks
17 and troughs in nesting data that we have seen so far.
18
19 Getting a handle on that would be useful, and this graph here
20 shows some of the work by Donna Shaver, who has been tracking
21 that rather important information for Texas.  Getting similar
22 information for Mexico, where the bulk of the population is
23 nesting, is also important, and so that's something that we are
24 working towards, with developing analysis of a long-term tagging
25 database that, again, probably needs to be continued through
26 time, as a way of tracking the population status.
27
28 Those were a handful of examples of what we think should be
29 included in future stock assessments, in terms of providing
30 indices on things that could influence reproductive output and
31 that could influence mortality in these populations, and the
32 yellow things are items all related to spatial variation in
33 Kemp's ridley distributions, and the blue are related to
34 variation in demographic parameters, and the green are something
35 of a mix between those two.  With each of these, we have decent
36 data available that could be input and included into a stock
37 assessment model.
38
39 What we think would be a productive way to look at that would be
40 to, with all of those various indices, to conduct a series of
41 range-finding analyses, using sort of simple matrix models that
42 have been described in a publication with our colleagues at
43 Texas A&M University, and Benny Gallaway is an author on that
44 paper, and so we think that we could have -- We could benefit
45 from a sensitivity analyses to look at how each of these
46 potential indices, or parameters, could be influenced, could be
47 shaped, by the data that we have available.
48

0003123

1  Then, once we have a good sense of what factors are going to be
2  important for assessing the Kemp's ridley stock, and accounting
3  for variation through time, then a robust modeling approach,
4  sort of following in the footsteps of the Gallaway et al. 2016
5  assessment, which would be able to incorporate really any of
6  those indices that we have mentioned in the previous slide and
7  be able to account for, again, a variety of factors that could
8  influence reproductive output and mortality rates.
9
10 With that, I think I will close and thank you for the time.  If
11 we go to the next slide, I have some acknowledgements for folks
12 who have contributed to some of the thoughts and the work that
13 was presented in here, and I am happy to take questions.
14
15 **CHAIRMAN FRAZER:**  Thank you, Dr. Putnam.  That was a really nice
16 presentation, and I'm sure we'll have a few hands up.  I will
17 give a second for the little lag time that we have on our screen
18 here.  It looks like the first hand is Ms. Bosarge.
19
20 **MS. BOSARGE:**    Thank you, Mr. Chairman, and thank you, Dr.
21 Putnam, for the presentation.  I thought it was quite
22 informative.  This is actually the second time I've seen it, and
23 I believe you also presented it to the Shrimp Advisory Panel a
24 couple of weeks ago I guess it was now.
25
26 **DR. PUTNAM:**  Yes.
27
28 **MS. BOSARGE:**  So I'm intrigued by a lot of the different ideas
29 that you have.  I appreciate the effort to try and bring in some
30 different indices, and I especially like that stranding index
31 and trying to sort of quantify recruitment and abundance a
32 little bit in that way.
33
34 I think it is a good idea to always explore the newer data that
35 may be out there as we collect more and more, and the Shrimp AP
36 did pass a motion, after seeing your presentation, and their
37 motion stated that the Shrimp AP requests the council to support
38 the conducting of a new stock assessment of the Kemp's ridley
39 sea turtle population according to the modeling approach
40 presented to the AP by LGL Ecological Research Associates and
41 for the council to communicate that support to NOAA.
42
43 I am certainly onboard with that motion, and I hope -- I know
44 that time and funds are always limited resources within the
45 Science Center and within NOAA, generally speaking.  However, we
46 just had a presentation that was asking us, during the Habitat
47 Committee, about climate change, and it mentioned protected
48 species and things of that nature, and so there may be -- In

0003124

1   this next round of budgets and funding, there may be some
2   shifting priorities, maybe, for the agency, and, if there are,
3   and you do have some funds that can be directed towards
4   something like this, some endangered species work, I would hope
5   that you would put this type of project high on your list, a
6   stock assessment for the Kemp's ridley sea turtle, and keep that
7   in mind, as it's extremely important to not only the shrimp
8   fleet, but the council and management in general.  Thank you.
9
10  **CHAIRMAN FRAZER:**  Thank you, Ms. Bosarge, for those comments.  I
11  will wait and make sure that we don't have any other hands.  I
12  am not seeing any, Dr. Putnam, and so, again, I want to thank
13  you for your presentation.  It was quite informative, and I
14  enjoyed it, and we'll see if we can pass along some of those
15  recommendations that Ms. Bosarge made.  With that said, we are
16  going to transition platforms here, and I'm going to have Bernie
17  provide some instructions for us before we go to our public
18  comment period, which is scheduled for 2:00 p.m.  Bernie.
19
20  **MS. ROY:**  Good afternoon.  What I'm going to do is end this
21  current conference call, and then I will be putting the phone
22  numbers up for the council members to call in, and I will have
23  the instructions for the public to also do the same if they wish
24  to speak.  I will be doing that momentarily.  We can go ahead
25  and hang up now, and I will put those instructions up.  Thank
26  you.
27
28  **CHAIRMAN FRAZER:**  Good afternoon, everyone.  Public input is a
29  vital part of the council's deliberative process, and comments,
30  both oral and written, are accepted and considered by the
31  council throughout the process.
32
33  The Sustainable Fisheries Act requires that all statements
34  include a brief description of the background and interest of
35  the persons in the subject of the statement.  All written
36  information shall include a statement of the source and date of
37  such information.
38
39  Oral or written communications provided to the council, its
40  members, or its staff that relate to matters within the
41  council's purview are public in nature.  Please email any
42  written comments to the staff at gulfcouncil@gulfcouncil.org, as
43  all written comments will also be posted on the council's
44  website for viewing by council members and the public, and it
45  will be maintained by the council as part of the permanent
46  record.
47
48  Knowingly and willfully submitting false information to the

1   council is a violation of federal law.  If you would like to
2   provide testimony, please dial the toll-free-operator-assisted
3   number at 1-(833)970-2435, as shown on the screen.
4
5   Please press *1 on your telephone now to be placed into the
6   speaker queue.  The operator will come on the line and let you
7   know when it's your turn to speak.  When your line is unmuted,
8   please introduce yourself by stating your first and last name
9   for the record and begin your testimony.  Stay tuned after
10  speaking for any questions the council may have for you.  You
11  will lose your place in the queue if you are not present when
12  called.  To re-enter the queue, you must press *1.  If you get
13  disconnected from the phone call, you will have to call back in
14  and press *1 to re-enter to queue.
15
16  You will have three minutes to comment.  There will be a
17  countdown timer visible on the screen.  We accept only one
18  registration per person.  Please wait on the line after you have
19  finished speaking to find out whether the council has any
20  comments or questions for you.  I will now go to the operator
21  for our first speaker.
22
23  **OPERATOR:**  Our first speaker is Catherine Bruger.
24
25                         **PUBLIC COMMENT**
26
27  **MS. CATHERINE BRUGER:**  Thank you.  I am Catherine Bruger, Policy
28  Analyst for Ocean Conservancy.  First off, I wanted to thank the
29  council staff for making these virtual meetings possible.  We
30  realize that it can be trying at times, but we appreciate your
31  perseverance.
32
33  We have patiently supported council attempts to address these
34  critical calibration issues.  This represents Ocean
35  Conservancy's eleventh testimony to the council on the subject.
36  We know there are council members who understand the
37  mathematical rationale behind the common currency issue, and we
38  applaud the council staff for their clarifying presentation on
39  the subject, yet state management continues to violate the law.
40
41  At this point, to state that the council hasn't had enough time
42  and needs to delay action is ludicrous.  The council has
43  squandered opportunities to solve this problem by deflecting,
44  delaying, and advancing illegal options.  Every member of this
45  council took an oath promising to conserve and manage our
46  fisheries for the greatest overall benefit of the nation, being
47  careful to balance competing private or regional interests.  You
48  promised, quote, to uphold the provisions, standards, and

                              35

1  requirements of the Magnuson-Stevens Fishery Conservation and
2  Management Act.
3
4  Failing to bring state management into compliance with the law
5  violates your oath to represent the nation's best interests, not
6  just recreational interests and not just your state's interests,
7  and not just this year's interests.  The burden of delaying
8  action is being shouldered by accountable sectors.
9
10 The private angler component has not been confined to an
11 accountable ACL since 2017.  The bottom longline index currently
12 reflects that abundance estimates have flattened or declined
13 since then.  Overfishing occurred in 2019, and that designation
14 will unfairly tarnish the reputation of the for-hire and
15 commercial sectors.  How these overages will impact reallocation
16 discussions is yet to be seen, by the mere existence of four
17 years of uncalibrated data looms as a troubling recipe for
18 unjust and unfair decision-making.
19
20 Last, we deeply appreciate the work of the SSC, who faced both
21 an unprecedented range of scientific uncertainty and political
22 pressure.  While the Great Red Snapper Count will undoubtedly
23 advance our understanding of red snapper, premature press
24 statements packaged as final results left the public with false
25 hope for more fish.  Now we owe it to the public to clarify that
26 scientific integrity is alive in peer review.
27
28 We reiterate that the appropriate next steps for the Great Red
29 Snapper Count are to complete peer review by addressing the
30 concerns of the reviewers and proceed through the regular SEDAR
31 process.  We are confident that, by following this well-defined
32 and transparent process, the results can help grow our knowledge
33 of the stock, while simultaneously reducing management
34 uncertainty.  Our request is simple.  The council must take
35 final action at this meeting to address overages due to a lack
36 of common currency. Thank you, Mr. Chair.
37
38 **CHAIRMAN FRAZER:**  Thank you, Ms. Bruger.  I will wait just a
39 second, to make sure that there aren't any hands up from the
40 council.  Okay.  I am not seeing any.  Again, thank you, Ms.
41 Bruger, for your comments.  We'll go to our next speaker.
42
43 **OPERATOR:**  Our next speaker is Bob Zales.
44
45 **MR. BOB ZALES, II:**  This is Bob Zales, representing SOFA and
46 NACO.  A couple of things.  Number one, I sent an email in there
47 about our charter and headboat recreational data program, and
48 there's a key issue on there, and it's not something that just

36

1  applies to the vessel owners, with the loss of income that they
2  could lose if an electronic device fails, but the key issue is
3  for the family with the small children who have planned their
4  vacation for months around their fishing trip.
5
6  When they get to a boat and that equipment fails, that boat,
7  according to what you all have there now, cannot sail, and,
8  during the red snapper season, there will not be another boat
9  available.    That family will lose their importance of their
10  vacation, and those little children, who had looked forward to
11  catching their first red snapper, are going to be highly
12  disappointed.
13
14  There's a real simple way to fix it.  All of you have to do is,
15  if that equipment fails, allow the charter boats to be able to
16  call-in and call-out until they either get a replacement piece
17  of equipment or get that one fixed.
18
19  On the commercial side, the red grouper issue is still a
20  critical issue, especially with the allocation.  What little bit
21  I heard this morning, and I guess it was Leann that was talking
22  about most of this, there are still significant problems with
23  this change from MRIP to the MRIP-FES system.
24
25  Apparently, there is problems with the weight calculations, and
26  there is clearly problems with going back through history thirty
27  years to try to figure out what was caught, and things were
28  entirely different thirty years ago.  Before we go to changing
29  allocations in any fishery based on this information, this new
30  system needs to be fully vetted out, and let's work out all the
31  details and get all the issues done, and then let's see where
32  the information lies and then go from there.
33
34  Another problem that we have with the red grouper fishery is the
35  discard mortality on red snapper for the vessels that have no
36  quota, that are either being forced to lease quota or they're
37  discarding the fish.  This is not good for the stock, and it's
38  not good for the fishermen.
39
40  There are now issues, from what I understand down-state, to
41  where you have some fish houses now that are kind of holding
42  some of these guys hostage, because they will lease them quota
43  if they sell fish only to them, and so what you've got is you've
44  got some fish houses that are small and family-operated that
45  don't have any quota that are now losing the vessels that
46  traditionally have sold to them.  Those are issues that need to
47  be looked, and that's my testimony.  If anybody has got any
48  questions, I will be glad to try to answer them.

                                    37

1
2  **CHAIRMAN FRAZER:**  Thank you, Captain Zales.  Let's see if we
3  have any questions from the council members.  I am not seeing
4  any, and so, again, thank you, Captain Zales, for your comments.
5
6  **MR. DUGAS:**  Mr. Chairman, I thought I had my hand raised.
7
8  **CHAIRMAN FRAZER:**  I didn't see it.  Sorry, J.D., but go ahead.
9  Do we still have Bob Zales on the line?
10
11  **OPERATOR:**  We don't have him on the line anymore.
12
13  **CHAIRMAN FRAZER:**  All right.  I'm sorry about that, J.D., but
14  you can ask your question, and I will write it down and get it
15  to him.
16
17  **MR. DUGAS:**  Mr. Chairman, in regard to Captain Zales' comments,
18  I thought that the charter captains, if they had an issue
19  hailing-out, that they could simply call in to NMFS' office, and
20  so maybe the question is not for Captain Zales, but maybe for
21  someone at NMFS.
22
23  **CHAIRMAN FRAZER:**  Sure, J.D., and I've written that question
24  down, and I think what we can do is go ahead and clarify that
25  for you later in the council meeting, okay?
26
27  **MR. DUGAS:**  Thank you.
28
29  **CHAIRMAN FRAZER:**  All right.  Will do.  We will now go to our
30  next speaker.
31
32  **OPERATOR:**  Your next speaker is Gary Jarvis.
33
34  **MR. GARY JARVIS:**  Captain and Mayor Gary Jarvis, Destin,
35  Florida, which I'm speaking on behalf, and as Executive Director
36  of the Charter Fishermen's Association.
37
38  The Charter Fishermen's Association has always focused our
39  efforts to work within the management process that utilizes
40  science-based approaches for an accountable and sustainable
41  fishery.  Our industry has made sacrifices over the years to
42  bring sustainable and accountable and stable seasons to our
43  anglers and businesses that could be counted upon.
44
45  The findings and subsequent discussions of the Great Red Snapper
46  Count and its relationship to the fishery has us in a position
47  to support an increase in the ACL, with such a large -- of the
48  level that was set.  Yet, it's important to note that we

                                    38

1  supported an increase that is sustainable and legal.
2
3  Our board of directors, who are professional fishers with over
4  twenty to forty-plus years on the waters of the Gulf of Mexico,
5  feel that the fishery can easily sustain a 10 percent increase
6  for one year, until the benchmark stock assessment is completed
7  and it allows the science to determine what the Great Red
8  Snapper Count as a whole means for the management of the
9  fishery.
10
11 After the discussions and the votes made yesterday during the
12 Reef Fish Committee, to see if they would also like to see the
13 for-hire sector's buffer be reduced to 3 percent, and, in the
14 last seven years, we've remained accountable, and we have
15 underfished our sector's allocation, and we believe this
16 consistent, sustainable management of our sector has earned us a
17 reduction in our buffer like that of the commercial sector.
18
19 We feel like our sector has reasonable expectations, considering
20 the flexibility given to the private angler sector, that we
21 should be given some consideration for increased access, while
22 remaining well under our ACL.
23
24 Our organization also has worked diligently with the SEFHIER
25 team to enhance and fix the challenges that we've had with the
26 launch of the electronic logbooks.  We have provided a support
27 program to help our fleet members set up accounts and address
28 individual issues, and I just want to say a big thank-you to
29 Rich and Jenny and the SEFHIER team, and also the app providers,
30 who have all been open to our suggestions and the fixes in the
31 past four months.
32
33 It's not perfect yet, but we hope that our communication will
34 overcome the remaining issues that we have to work through, and,
35 also, we are front and center encouraging buy-in and compliance
36 with ELB requirements for federally-permitted charter/for-hire
37 fishermen.  This is truly a team effort, and we're glad to be
38 part of it.
39
40 Then a P.S.  By the way, can anyone tell us if and when there
41 will be an amberjack season here in the spring on May 1?  Thank
42 you, everyone.
43
44 **CHAIRMAN FRAZER:**  Thank you, Captain Jarvis.  I am seeing if we
45 have any hands up.  I see, on my screen, J.D., but I suspect
46 that's an old hand.
47
48 **MR. DUGAS:**  Yes, sir.

39

1
2  **CHAIRMAN FRAZER:**  Is your hand up, Andy Strelcheck?
3
4  **MR. STRELCHECK:**  Yes, and thanks, Tom.  Thanks, Captain Jarvis.
5  First, I wanted to thank you and the many charter captains that
6  are working with NOAA Fisheries to improve the SEFHIER program.
7  We really appreciate you working with us and identifying
8  problems and troubleshooting it and then, obviously, being
9  patient as we work through some of those challenges to make the
10  program better.
11
12  I did have a question for you, just so I understood your comment
13  correctly, and you said that the CFA supports a sustainable
14  catch limit.  You also said that you would support an increase
15  of 10 percent, and so I'm not quite understanding kind of how
16  that jibes with the current ACL that's before the council of
17  15.4 million pounds.  Are you suggesting to go higher than that,
18  or you're supportive of the current preferred alternative?
19
20  **MR. JARVIS:**  Well, what we based that on is all the discussion -
21  - I should say -- I would like to say fighting, but that's
22  probably not appropriate, but about the Great Red Snapper Count
23  and the decisions that came out of the SSC, and we just feel
24  like, if there's going to be any type of flexibility or increase
25  to the fishery, because of that disparity between the OFL that's
26  been raised by fifteen million pounds, and there has been no
27  definitive comments or votes by the council, up to this point,
28  based on the SSC-recommended 300,000 pound increase.
29
30  We're just giving our anecdotal two-cents worth that, if there's
31  going to be an increase in the interim, after listening
32  especially to the motion that was passed in Reef Fish, that our
33  fishery could sustain a 10 percent increase, and so we're just
34  going on the public record that we feel like that wouldn't be
35  too high.  The caveat is, as you saw in my public comments, that
36  it's considered sustainable and legal, and so we kind of left
37  ourselves an out there.
38
39  **MR. STRELCHECK:**  Thanks, Gary.
40
41  **CHAIRMAN FRAZER:**  I am looking to see if there are any other
42  hands, and I am not seeing any, Captain Jarvis, and so thank you
43  for your comment.  I appreciate it.
44
45  **MR. JARVIS:**  Thank you, sir.
46
47  **CHAIRMAN FRAZER:**  You betcha.  We'll go to our next speaker.
48

0003131

1  **OPERATOR:**  Your next speaker is Dylan Hubbard.
2
3  **MR. DYLAN HUBBARD:**  Thank you for your time, council members.
4  I'm Dylan Hubbard from Hubbard's Marina out of central west
5  Florida.  One thing, on the Great Red Snapper Count, is this was
6  such a unique approach to our fisheries science, and I hope to
7  see many more projects like this is the future.  Fisheries-
8  independent science is so valuable, yet so expensive and time-
9  consuming to collect and maintain historical time series.
10
11  Since this issue is going on, I feel like there's probably a lot
12  of influential people listening into these public comments, and
13  I feel it's a great time to point out that the Gulf, South
14  Atlantic, and Caribbean Councils all share one science center,
15  while other councils have their own dedicated science center,
16  allowing for more research track assessments more frequently.
17
18  I feel like studies like this Great Red Snapper Count shine a
19  light on the importance for our councils to have their own more-
20  well-funded science centers, but the Gulf of Mexico will be
21  keeping Dr. Porch, if any additional centers come out of this
22  comment.
23
24  Also, I hope to keep politics out of our fisheries science,
25  moving forward.  I would really like to see the federal for-hire
26  buffer decrease from its current 9 percent buffer between the
27  ACL and ACT for red snapper to some more exponentially lower
28  amount.  This would provide us more access to fully utilize our
29  fishery and quota and provide more access to the private
30  recreational anglers that use our vessels to access this
31  fishery.
32
33  For red grouper, which seems to be getting pushed back to the
34  back of the room right now, because of the outstanding issues
35  with a more Gulf-wide species like red snapper, I am encouraged
36  that the IA is slated to be reviewed by the SSC, finally, in
37  May, and that IA has been ready since January, and I feel that
38  this health check of our fishery will show that the fishery has
39  rebounded considerably and remains on the rise of rebounding.
40  We've seen this on the water, and many people have been talking
41  about this in our area.  This is a very cyclical species, and
42  the trends in this species are very cyclical, and I think we're
43  on the uprising of a more healthy fishery.
44
45  I think these IAs annually are so important, and I so appreciate
46  the council for making that a directive to the Southeast
47  Fisheries Science Center, but, as the Reef Fish AP motion
48  stated, I think there's a super big importance of automating

41

1  those health check catch level recommendations into this
2  cyclical fishery, to kind of more smooth out those landings, and
3  also our catch levels, and so moving to automating that would be
4  awesome.
5
6  On Amendment 53, I would encourage the council to take a hard
7  look at the Reef Fish AP's motion on adding an additional
8  alternative to the document.  This was a very hard thought-out
9  approach to somehow reach a more middle-ground option between
10 the extremes of Alternatives 2 and 6 to the commercial fleet or
11 Alternatives 3, 4, and 5 to the recreational fleet.
12
13 This document really muddies the water on an already difficult
14 circumstance, and it's unfortunate that we can't celebrate the
15 efforts of improving private recreational data collection, but,
16 instead, we're left to fight for historical access and our
17 ability to continue prosecuting our fishery, as we have
18 historically.  This is the last of the major reef fish that has
19 a year-round season in our area along central west Florida, and
20 my family business really depends on this species.
21
22 Lastly, on the Great Red Snapper Count, as mentioned, I think I
23 could support a very small increase to the red snapper ACL, but
24 there's a lot of issues that the Great Red Snapper Count brings
25 up, especially reproductivity of the stock.  Just simply looking
26 at it, there's all these more fish out there than we thought,
27 and then obviously they're not reproducing as quickly as we
28 thought, and I think any increase in this fishery needs to be
29 considered legal, and that needs to be the main focus here.
30
31 We cannot continue to make illegal motions and support
32 overfishing our ACL or ABC, and especially our OFL, which has
33 been exceeded in past years.  Due to COVID, nothing really came
34 of those OFL overfishing -- Exceeding our OFL, which is
35 concerning, especially with localized depletion occurring in
36 some areas and in some fisheries, and luckily not in mine, but
37 this is definitely something we need to take a pause with.
38
39 Red snapper is kind of the fisheries management success story,
40 and I would hate to see us start backsliding as we too
41 aggressively approach increases with some ground-breaking
42 science approaches like the Great Red Snapper Count.
43
44 Then, also, I want to make sure that we continue to stay under
45 our ABC and ACLs and really keep track of those landings, no
46 matter what sector it might come out of.
47
48 Then, lastly, amberjack trips are scheduled literally two weeks

                                    42

1 from now, and my area has a huge, huge issue that we are waiting
2 to go out fishing for amberjack.  We have people flying in, and
3 it would be really nice to be able to give them a heads-up
4 whether or not we're going to be able to target amberjack.  I
5 understand there's a bunch of issues with the MRIP data from
6 last year, and COVID caused a lot of problems, and I get it,
7 but, if we're not going to have the season, just let us know, so
8 we can let our guests know, and that would be really, really
9 nice, to have that come out of this meeting.  Then I want to
10 echo some of the earlier --
11
12 **CHAIRMAN FRAZER:**  Dylan --
13
14 **MR. HUBBARD:**  I'm out of time.  I get it.  Thank you, all.
15
16 **CHAIRMAN FRAZER:**  Thank you.  Let's see if there's any hands.  I
17 see Andy still has a hand up, and I'm wondering if that's an old
18 hand.
19
20 **MR. STRELCHECK:**  No, it's a new hand.
21
22 **CHAIRMAN FRAZER:**  Go ahead, Andy.
23
24 **MR. STRELCHECK:**  Thanks, Tom.  Thanks, Dylan, for your comments,
25 and Gary brought it as well for amberjack.  Just to let the
26 industry know, we are trying to do some calculations to finalize
27 an estimate for whether we can reopen greater amberjack or not.
28 Dylan alluded to we've been waiting on MRIP data from 2020,
29 which has been delayed due to COVID, and so we are trying to get
30 to a decision point as quickly as possible and make an
31 announcement regarding fisheries status as far in advance of
32 that May 1 date as possible, and so I just wanted to give you a
33 heads-up on that.  Thanks.
34
35 **MR. HUBBARD:**  I appreciate that, Andy, and I know you guys are
36 working on it, and I know this has caused a ton of issues for
37 the agency and private business, and virtually everybody across
38 the world, and so I get that.  As much notice as we can give our
39 guests is great, and that's always a benefit.
40
41 **CHAIRMAN FRAZER:**  Okay.  I am not seeing any other hands at
42 present, and so we will go ahead.  Thank you, Dylan, for your
43 comments, and we'll go ahead and move to our next speaker.
44
45 **OPERATOR:**  Your next speaker is Ken Haddad.
46
47 **MR. KEN HADDAD:**  My name is Ken Haddad with the American
48 Sportfishing Association.  Mr. Chairman and council members,

0003134

1  thank you for allowing me to speak.  My focus is on red snapper,
2  and I want to spend a second on the optics, as viewed from the
3  recreational public.  Simply put, it really looks bad right now.
4
5  We have an SSC that mathematically did not incorporate the Gulf
6  Red Snapper Count into its recommendation of ABC, while doing so
7  for the OFL, and we have a framework amendment that is on the
8  verge of creating a scenario where two states, or all states,
9  will have substantial reductions in catch.
10
11 I listened to the entire SSC meeting as they addressed snapper,
12 and, to me, it was very captivating, actually, and an open view
13 of the SSC operating under pressure.  While we sympathize with
14 the situation the SSC was put under, it did not, in their final
15 recommendation that barely passed, take into account what
16 appeared to be broad scientific acceptance of the independent
17 reviewers, whose main critical focus was on the western Gulf,
18 and that was underestimating the count of snapper in the western
19 Gulf.
20
21 Most other concerns that were brought up will be addressed in
22 the final document for the GRSC, which I believe will be in
23 June, and so we strongly urge that the ABC decision be sent back
24 to the SSC and a request for them to fully document a new
25 decision, including relevance to the National Standard 8, the
26 use of the ABC Control Rule, and to develop better consensus for
27 incorporating the snapper count into the ABC, as defined by the
28 OFL that they set.
29
30 We further ask that you take no action or defer action on the
31 framework until after the GRSC report is finalized, the SSC has
32 met and revisited the ABC, concerns between common currency
33 conversion  relative  to  Alabama  and  Mississippi  are
34 scientifically vetted and straightened out, and the council is
35 satisfied that adequate information has been brought forward in
36 order to make the best-informed decisions on the framework.
37
38 To build on the car analogy, when you're driving a car and you
39 have the bigger engine under the hood, but you're headed for a
40 cliff, you don't just sit there and keep going straight over the
41 cliff.  You turn or stop the car, and we think now is the time
42 to do that.  For grouper, Amendment 53, we support Preferred
43 Alternative 3 or Alternatives 4 or 5 for Action 1.  Thank you,
44 Mr. Chairman.
45
46 **CHAIRMAN FRAZER:**  Thank you, Mr. Haddad.  Let's see if there are
47 any hands up.  I am not seeing any.  Again, thanks, Ken, for
48 your comments, and we will go ahead to our next speaker.

0003135

1
2  **OPERATOR:**  Your next speaker is Herbert Stevenson.
3
4  **MR. HERBERT STEVENSON:**  I'm just a recreational fisherman from
5  south Alabama, and, looking at what state management has done
6  here, it seems to be working, and it gives us an opportunity to
7  change seasons and extend seasons based on weather and other
8  factors.  I would like to see it stay in the states' hands, and
9  I encourage the council to certify the state data collection
10 surveys that are the best available for recreational harvest.
11 The federal data collection, the mail-in surveys and phone
12 surveys, are subject, at best.
13
14 Rather than penalizing states like Alabama and Mississippi,
15 which have some of the tightest data systems in the Gulf, I
16 encourage the council to take no action on the framework under
17 consideration today.  I would encourage this council to table
18 the entire concept of recalibration until all the data from the
19 snapper count and the state data and the MRIP recalibrations are
20 run through the next benchmark stock assessment.
21
22 Just in general, we're seeing more snapper, on a daily basis,
23 than we have in years, and so to discredit, or not use, the
24 Great Snapper Count just seems kind of ridiculous to me, but I
25 urge the council to take whatever action they can to remove the
26 fishery from the federal management and turn it over to the
27 states, or at least the council should remove the fishery from
28 the MRIP process altogether and simply let the state data
29 systems be used for management going forward, and I thank you.
30
31 **CHAIRMAN FRAZER:**  Thank you, Mr. Stevenson.  It looks like we
32 have a question from Kevin Anson.
33
34 **MR. ANSON:**  Thank you, Mr. Chair and Mr. Stevenson.  No
35 question, but just thank you for calling in, and thank you for -
36 - As a member of the private recreational sector calling in, and
37 I know it's difficult for you all to do that and take time out
38 of your schedules to follow the process, but I certainly just
39 appreciate your input.  Thank you, sir.
40
41 **MR. STEVENSON:**  Great.  Thank you.
42
43 **CHAIRMAN FRAZER:**  Okay.  I am not seeing any other hands right
44 now, and so, again, I thank you as well, Mr. Stevenson, for your
45 comments, and we'll go ahead and move on to our next speaker.
46
47 **OPERATOR:**  Your next speaker is Glenn Hughes.
48

0003136

1   **MR. GLENN HUGHES:**   Thanks for the work that you do and for
2   allowing me to speak today.   I'm Glenn Hughes, and I'm the
3   President of the American Sportfishing Association, and we're
4   the trade group that represents the manufacturers for
5   recreational fishing, from rods-and-reels and lines and lures to
6   tackle boxes and fishing nets and marine electronics and so much
7   more.
8
9   In 2020, our industry contributed more than $209 million to
10  conservation just through federal excise taxes alone to support
11  sportfish restoration, and we believe that we represent the best
12  interests of the fifty-five million anglers that enjoyed fishing
13  across the country this past year.
14
15  I want to mention that I love fishing in the Gulf of Mexico, and
16  it's some of my favorite fishing around the country, as do
17  millions of anglers recreationally across the five Gulf states,
18  and really folks outside of the five states, and one of the
19  reasons is because of the abundance of red snapper and the
20  enjoyment in catching them.
21
22  I also appreciate the economic value that it has for our
23  industry and for each of the states and tourism and charters and
24  taxes, and we believe that the state management system is
25  working and should continue as-is.   The states have their finger
26  on the red snapper pulse, and there are reasons for the longer
27  seasons.   Number one is because the fish are there.   Of course,
28  the seasons can still be adjusted accordingly, based on weather
29  and other factors, if necessary.
30
31  I encourage the council to take no action on calibrating state
32  recreational data collection systems with federal data.   The
33  council should wait until all of the data is run through the
34  upcoming full stock assessment, including the Great Red Snapper
35  Count, as well as the federal and state recreational data.
36
37  The economic engine of the red snapper recreational fishing is
38  critical to the Gulf, and to move forward now would jeopardize
39  the state management for anglers in the Gulf and really
40  devastate that economic engine, and that's all I have to say.
41  Thanks.
42
43  **CHAIRMAN FRAZER:**   Thank you, Mr. Hughes.   I am waiting to see if
44  we have any hands.   I am not seeing any, and so, again, I thank
45  you for your testimony, and we will move on to our next speaker.
46
47  **OPERATOR:**   Your next speaker is Bill Kelly.
48

0003137

1   **MR. BILL KELLY:**   Mr. Chairman and council members, my name is
2   Bill Kelly, and I'm the Executive Director of the Florida Keys
3   Commercial Fishermen's Association, and I want to thank you for
4   this opportunity to speak to you today regarding the king
5   mackerel gillnet fishery in the Gulf of Mexico Southern Sub-
6   Zone, which I have done on an ongoing basis for the past eleven
7   years.
8
9   As most of you know, we have a track record of working with the
10  council to sustainably harvest the resource and to protect
11  harvesters as well.   In the past five year, the 45,000-pound
12  trip limit has virtually eliminated fine, and real-time harvest
13  data collected by one of our fishermen's wives, Ms. Betsy
14  Daniels, for NOAA has virtually eliminated overruns, and
15  transport in the Florida ports has increased fleet efficiency
16  and benefitted consumers.
17
18  Fair and equitable allocation of the resource is the very heart
19  of this issue.   Over the past ten years, we have watched the
20  recreational side harvest less than half of their six-million-
21  pound ACL, while the commercial sector has reached their annual
22  ACL, while receiving no increases in quota over that same
23  timeframe.
24
25  At the council meeting in June of 2020, I was shocked to see the
26  council's allocation review schedule, with king mackerel slated
27  for the year 2025.   By then, the council would most likely want
28  another stock assessment, as this latest iteration would
29  probably be considered out-of-date.
30
31  On Monday, at the Mackerel Committee meeting, Mr. Sanchez
32  pointed out that the current allocation, at 574,000 pounds,
33  affords just 33,760 pounds of fish per permit holder in this
34  high-yield fishery.   The question was raised as to what number
35  would the industry consider appropriate, and I have that number
36  for you.   We would like to see the allocation increased to
37  75,000 pounds per permit, to a total ACL of 1.2 million pounds
38  annually, and no less than 60,000 pounds, or an ACL of
39  1,020,000, pounds per year.
40
41  With the current ACL pricing operating and costs, it's extremely
42  difficult to turn a profit.   This is especially true when
43  fishermen are converting from trap fishing to roller rigs for
44  kingfish, and most are traveling a hundred miles or more one way
45  to fish.   At this time, stakeholders are willing to engage in
46  the grassroots discussion on an ITQ program, or a variation
47  thereof.   However, the first meaningful step has to be the
48  council's move to address allocation.

47

1
2 Again, I am surprised that Amendment 33 was not placed on the
3 agenda for this meeting, and I hope that you will do for the
4 June meeting, which is actually scheduled for Key West.  I will
5 see that every gillnet permit holder is in attendance at that
6 meeting to provide both written and oral comment and meet with
7 staff to discuss options.  Thank you.
8
9 **CHAIRMAN FRAZER:**  Thank you, Captain Kelly.  I'm seeing if we
10 have any hands up.  I am not seeing any, and so, again, thank
11 you, Bill, for taking the time to provide those comments, and we
12 will move on to our next speaker.
13
14 **OPERATOR:**  Your next speaker is James Hall.
15
16 **MR. JAMES HALL:**  Hi, guys.  My name is James Hall, and I
17 appreciate the opportunity to speak at this function.  I'm a
18 recreational angler, and so I'm kind of calling on behalf of
19 every recreational angler that I have ever talked to off the
20 coast of Alabama that has fished for red snapper.
21
22 I own a condo in Fort Morgan, and I've been a recreational
23 saltwater angler in the area for more than a decade, and I have
24 spent no fewer than probably thirty days fishing the Gulf off
25 the Alabama coast for the past several years.  I'm the Editor-
26 in-Chief of *Bassmaster Magazine*, and I only say that because,
27 for the past twenty-two years, I have worked for Bass, a company
28 founded on strong fishery conservation ethics, and so I
29 understand the ramifications of fishery conservation.
30
31 I fell in love with this Gulf fishery, and I plan to retire
32 there, and I don't want to see the mismanagement of snapper
33 populations go in either direction, overharvest or underharvest,
34 and, to that, I will say that state management is working.  I
35 have seen it myself, and the seasons based on state management
36 can be adjusted based on a myriad of factors.
37
38 The reporting requirements make sense, and I have seen a lot of
39 anglers gladly embrace these reporting requirements.  I would
40 like to see the states continue to manage the private
41 recreational sector, as they have for the past couple of years,
42 and, anecdotally, I will just tell you, man, that there are so
43 many snapper out there that it's almost frustrating.
44
45 We go out, and my son and I go out, and we hit our first couple
46 of reefs, and we catch our limit in less than an hour, and then
47 we go looking for other fish to catch, and we simply can't get
48 away from the things, and so the populations are super, super
48

```
 1   strong.
 2
 3   The Great Red Snapper Count, actually, once I saw that, it
 4   brought to light what recreational anglers already know, if they
 5   have spent any time on the water at all, and that's that snapper
 6   numbers are far greater than any of the feds know or want to
 7   admit, and so I encourage the council to certify, once and for
 8   all, that the state data collection surveys are the best
 9   available science for recreational harvest.
10
11   The federal data collection system has clearly had issues
12   throughout its history, and NOAA is calibrating data from phone
13   surveys, or mail-in surveys, and I don't know how you can
14   believe that that is accurate, and so, rather than severely
15   penalizing Alabama and our neighbor states, and Alabama, which
16   has the tightest data system in the entire Gulf, I encourage the
17   council to take no action in the framework action under
18   consideration today.
19
20   I would encourage the council to table the entire concept of
21   recalibration until all the data, the snapper count and the
22   state data, et cetera, are run through the next benchmark stock
23   assessment.
24
25   I don't see how the council can conclude that any data they have
26   ever had on red snapper is better than what the Great Red
27   Snapper Count just produced, and the processes and procedures
28   that I read about going in the end of that count were
29   unbelievable, and so it's baffling to think that this process is
30   being disregarded and that states are having to calibrate to the
31   federal system that is shown to be faulty and unreliable.
32
33   Also, it's terrible timing to consider any reduction of snapper
34   season, and there is a lot of small businesses in Fort Morgan,
35   where our place is, and Gulf Shores and Orange Beach that are
36   barely hanging on after the COVID-19 pandemic, and reducing the
37   number of days the recreational guys can fish for snapper will
38   greatly reduce tourism, I'm sure, and there's no telling how
39   many dollars will be lost for these businesses and how many
40   businesses will fail because of faulty science, and I think it
41   would be a travesty.
42
43   In conclusion, given the state data systems and the Great Red
44   Snapper Count, it would make a great deal of sense to simply hit
45   the reset button and start over with managing this fishery with
46   the new information in hand, and so, with that, I say thank you
47   for the time, and I appreciate the opportunity.
48
```

0003140

1   **CHAIRMAN FRAZER:**   Thank you, Mr. Hall, for your testimony.
2   Let's wait just a minute.   It looks like Kevin Anson's hand is
3   up.
4
5   **MR. ANSON:**   Thank you, Mr. Chair.   I have the same comment as
6   before to Mr. Stevenson, but, Mr. Hall, thank you for providing
7   your testimony today.   We appreciate hearing new voices when we
8   discuss these issues, and so just thank you.   Thank you for your
9   time.
10
11  **MR. HALL:**   My pleasure.   Thanks.
12
13  **CHAIRMAN FRAZER:**   Okay.   I am not seeing any other hands at this
14  time.   Again, Mr. Hall, just like Mr. Anson said, I thank you
15  for your testimony, and we'll move on to our next speaker.
16
17  **OPERATOR:**   Your next speaker is John Franck.
18
19  **MR. JOHN FRANCK:**   Good afternoon.   I'm John Franck from
20  Franklin, Tennessee, and thank you for everything that you all
21  do and for allowing me to register a comment today.   I'm a
22  recreational fisherman, and, while I'm a resident of Tennessee,
23  I've been an Alabama saltwater fishing license holder for the
24  last twenty years or so, and I make it down to the Alabama coast
25  approximately eight to ten times a year and fish the coastal
26  waters and the waters of the Gulf of Mexico, mostly, like the
27  previous speaker, out of Fort Morgan and Orange Beach.
28
29  When on the coast, we generously support all the locally-owned
30  Alabama businesses, including restaurants, tackle stores, and
31  marinas.   I care about the Alabama and Gulf of Mexico fisheries,
32  and I want the snapper fishery to remain as robust and available
33  for my future grandchildren as it has been over the past few
34  years.
35
36  I try to stay informed about the fishery, even though I don't
37  live on the coast, and it seems that the state management is
38  working, and the seasons are now longer, and they can be
39  adjusted according to weather and other factors, as it was back
40  in 2020.   The reporting requirements make sense, and I would
41  like to see the states continue to manage the private
42  recreational sector as they have for the past couple of years.
43  For my observations, both on the water and what I follow, it's
44  the red snapper is in abundance and remains in abundance.
45
46  From my readings and research, the federal data collection
47  system seems to have had some significant issues, throughout its
48  history, and there's just a lot of skepticism regarding the

50

0003141

1   federal data collection efforts, and it seems to me to continue
2   to rely on this data -- Well, it's concerning.
3
4   It seems to me that, rather than penalizing the State of
5   Alabama, and I understand that Mississippi is potentially at
6   issue here, with a significantly-altered snapper season this
7   year, and I would urge the council to not take any action in the
8   framework of action under consideration today, and I would also
9   respectfully urge, encourage, and request the council to take
10  off the table the full concept of a recalibration until all the
11  factors and data are taken into consideration, including the
12  Great Red Snapper Count, which demonstrates there are a lot of
13  snapper out in the Gulf of Mexico, and the state data, as well
14  as the MRIP recalibrations, and all of these are run through the
15  next benchmark assessments.
16
17  As the previous caller mentioned, red snapper is so important
18  and so critical to the Alabama state economy, and particularly
19  to local coastal business owners and their families, who have
20  been going through a lot this past year, and not to use all the
21  data, all the available data, all the applicable information at
22  hand, and making the right decisions just doesn't seem fair, and
23  it doesn't seem reasonable, and it certainly doesn't seem right.
24
25  Please take whatever actions the council can to use all the
26  available current data and information and allow the states to
27  manage, and I probably should have started with this, but red
28  snapper is also pretty doggone important to us folks up here in
29  Tennessee, and I appreciate your time in allowing me to speak
30  today.
31
32  **CHAIRMAN FRAZER:**   Thank you, Mr. Franck.   We've got a question
33  from Kevin Anson.
34
35  **MR. ANSON:**   Again, not a question, Mr. Chair.   This will be my
36  third-time-is-the-charm, but I did want to make a point with Mr.
37  Franck, the same thing I've said with Mr. Stevenson and Mr.
38  Hall, and that is, Mr. Franck, thank you for providing your
39  testimony.   Again, it's good to hear new voices and new
40  perspectives from folks, and so, for anyone else that might be
41  discussing or bringing similar comments, particularly if they
42  have experiences or are from Alabama, I'm just going to thank
43  them in advance, and that's all, but thank you.
44
45  **MR. FRANCK:**   Thank you.
46
47  **CHAIRMAN FRAZER:**   All right.   I am not seeing any additional
48  hands, and so, again, thank you, Mr. Franck, for your testimony.

0003142

1  We'll go ahead and move on to our next speaker.
2
3  **OPERATOR:**  Your next speaker is Jim Zurbrick.
4
5  **MR. JIM ZURBRICK:**  Hello, council members.  It's good to be able
6  to speak in front of you, or almost in front of you.  I am Fish
7  for America's President, and I'm also a federal fishery dealer,
8  and I'm a Gulf full-time reef fisherman and a permit holder, and
9  so I've got a little experience when I speak on some of these
10  issues.
11
12  I do want to thank the Ocean Conservancy, Catherine Bruger, and
13  she really made the point.  I feel and understand the
14  frustration, and I think that their organization has used great
15  restraint in the proceedings over the last months, and actually
16  going on a couple of years now.
17
18  I personally am glad that we're getting an increase, and the ABC
19  is going to increase for red snapper, and I can't imagine that
20  somebody would like not to accept it, especially with all the
21  good that it would do for discards.  I mean, discards is a
22  driving force for so many of our fisheries that even a small
23  amount would help our commercial situation, with some of the
24  leasing issues and with discards, and so I'm glad that,
25  hopefully, you're going to accept the recommendation from the
26  SSC.
27
28  I am going to read something off of a prepared sheet here, and
29  so it's not going to sound like me, but reallocation penalizes
30  accountable commercial fishermen for staying within their
31  quotas, while rewarding a less accountable recreational sector
32  for exceeding theirs, and this is in regard to Amendment 53.
33
34  That flies in the face of National Standard 4 of the MSA, which
35  requires that an allocation be fair and equitable, among other
36  requirements.  Rewarding the recreational sector for
37  overharvesting in a period where the commercial sector stayed
38  within its quotas is not fair and equitable.
39
40  Reallocation is also unfair because Amendment 53 has penalized
41  the commercial sector for recreational discards.  Under all the
42  reallocation scenarios, the ABC dropped from approximately 4.9
43  million pounds to 4.3 million pounds, a loss of roughly 600,000,
44  and this is because, when more fish are allocated to the
45  recreational sector, total landings have to be constrained to
46  account for the greater dead discards from recreational red
47  grouper fishing.
48

0003143

1  Why should the commercial sector have to pay for recreational
2  anglers to discard dead fish?  This is a recreational sector
3  problem, and it's only fair to make the recreational sector
4  address it.   If the Gulf Council ultimately decides to
5  reallocate, it should deduct the entire ABC decrease
6  attributable to increased recreational discards from the
7  recreational sector's quota.
8
9  Amendment 53, therefore, unfairly punishes the commercial sector
10 twice, first by basing the reallocation on a period when only
11 the recreational sector exceeded its quotas and second by
12 reducing the overall ABC to account for greater recreational
13 discards after reallocation.
14
15 Hopefully you folks are going to make a decision to ask for much
16 more data, and I think Dylan made a great comment there, when he
17 said, hey, let's see what the assessment coming up has to say
18 and get some more info.
19
20 Also, we have to be talking about what we're going to do with
21 the increase for triggerfish on the commercial sector.  Are we
22 going to go to an increased trip limit, or are we going to not
23 have a closure, and so those are some questions that I know that
24 we are going to have to address, and I thank you very much.
25
26 **CHAIRMAN FRAZER:**  Thank you, Captain Zurbrick.  Let's see if we
27 have any hands.  I am not seeing any, and so, again, I thank you
28 for your testimony, and we'll go ahead and move on to our next -
29 - Excuse me.  We do have a hand, Jim, from Ms. Bosarge.
30
31 **MS. BOSARGE:**  I just wanted to thank Mr. Zurbrick for his
32 testimony.  I always look forward to hearing what he has to say,
33 regardless of the species or the topic, and I think he always
34 has really insightful comments, and so thank you.
35
36 **MR. ZURBRICK:**  Thank you.
37
38 **CHAIRMAN FRAZER:**  Okay.  I am waiting just a minute, Jim, to see
39 if there's any other hands.  I am not seeing any, and so, again,
40 thanks for the time and the comments, and we'll go ahead and
41 move on to our next speaker.
42
43 **OPERATOR:**  Your next speaker is Michael Currey.
44
45 **MR. MICHAEL CURREY:**  Hello, council.  My name is Michael Currey,
46 and I live in Baldwin County, Alabama.   I own property in
47 Florida, and I work in the marine industry.  I travel a lot, and
48 so you may hear some background noise from my vehicle, because I

0003144

1   am working, and I had some time behind the windshield to listen
2   to the calls and to join, and so excuse my background noise,
3   please.
4
5   As a recreational angler, I got excited about reading the Great
6   American Red Snapper Count, because everything that I've been
7   seeing, through my whole adulthood and childhood, is accurate.
8   That data is accurate, and I urge the council to consider that
9   data and use it to help make decisions, because I'm old enough
10  to remember, a few years ago, the council and the federal
11  government asking the states to take some more responsibility
12  and to build some programs and to take accountability for us
13  cowboyish recreational anglers that are out there, and they did,
14  and they've done a great job.
15
16  States like Mississippi and Alabama, that don't have deep
17  pockets, and they don't have deep budgets, and they sure as heck
18  don't have a very big coastline, have spent dollars to help
19  protect their resource and to protect, most importantly, the
20  resource, but also recreational angling.  They've done a great
21  job.
22
23  We have to protect that, and, at the end of the day, what
24  everyone is discussing on the recreational side, in my opinion,
25  is a states' rights issue.  They're trying to be protected from
26  federal bureaucracies that are overreaching and overwhelmed and
27  underfunded and everything else, and so, when independent data
28  comes around, we should act on it and look upon it and help
29  support better decisions, and I think, again, the better
30  decision now is to punt.   It's to figure out exactly how
31  everything is going to shake out with the data that is up and
32  coming and is currently out there.
33
34  I will finish with this.  Again, as a recreational angler, it is
35  very frustrating not knowing, and I've heard it from the
36  commercial guys too, when are we going to have amberjack season,
37  and when are we going to have the triggerfish season.   Red
38  snapper are kind of like the canary in the mine, I feel like.
39  It's like everyone is looking at that bird to die, and red
40  snapper have become like our point of where we have to hold
41  onto, because I can't, with my family and my kids, I can't go
42  out there and catch much of anything at all.
43
44  Seasons are either closed, or they're open, or they're super
45  short, or they're unavailable to me, due to life, due to
46  weather, due to other circumstances, and so it's very difficult
47  to take advantage of our resource, due to -- I understand the
48  COVID things and stalled delay times, but it's very frustrating,

1  as a recreational angler, to see that we have done everything
2  that the states have asked us to do and the states have done and
3  to have it maybe pulled out from underneath us because of
4  federal bureaucracies, and I appreciate the time.
5
6  I know this is a very difficult position for council members,
7  and we're all vying for a public and national resource, and so
8  it's very difficult to manage, and I appreciate everyone's time
9  that they spend on it, and that's all I have to add, and thank
10  you for very much for your time.
11
12  **CHAIRMAN FRAZER:**  Thank you, Mr. Currey, for your testimony.  I
13  will wait just a minute to see if we have any questions from the
14  council.  I am not seeing any, and so, again, thank you for your
15  comments, and we'll go ahead and move on to our next speaker.
16
17  **OPERATOR:**  Your next speaker is Brad Young.
18
19  **MR. BRAD YOUNG:**  Good afternoon, and thank you, council, for
20  allowing me to speak and allowing public testimony and for the
21  work you do.  I know it's a tough job, and there are a lot of
22  people pulling you in different directions.  I am calling from
23  Nashville, Tennessee, and I've got a boat, and our family has
24  had a boat, in Orange Beach, Alabama, for twenty-five-plus
25  years, and we've fished down there for that long, and I hope to
26  continue to do it with my kids.
27
28  We have watched the snapper seasons go, as a lot of people on
29  the phone know, from six months to three days and all over the
30  place.  I'm going to echo a lot of what Mr. Currey said in front
31  of me, was that the Great Red Snapper Count verified a lot of
32  what we had already seen, that we see on the water, and you
33  can't get anything else by them.  I mean, the snapper are
34  everywhere, and there's almost an imbalance of species of fish
35  that are out there.
36
37  Also, like he said, Snapper Check was something that we
38  enthusiastically participate in, so we can get some real-time
39  data for you guys to make the best decisions for everybody
40  involved, which is what we want, and we all want the fishery to
41  last for everybody, and nobody that I fish with, that I'm
42  around, wants and imbalance here, but I do think that, if this
43  is recalibrated and Alabama loses what it looks like they might,
44  then, gosh, you're going to have frustrated people who felt they
45  really worked really hard to comply with the laws and the
46  Snapper Check and all of that, and, all of a sudden, it's taken
47  away from them, and then what you're reading in the newspaper is
48  the Great Red Snapper Count and saying there's three-times as
                                    55

0003146

1  many as we thought, and so I hope the council will vote no
2  action today, and thank you for the opportunity to speak, and
3  thank you for the jobs you do.  I know it's not easy, but that's
4  all.
5
6  **CHAIRMAN FRAZER:**  Thank you, Mr. Young, for your comments.
7  Let's see if we have any hands.  I am not seeing any, and so we
8  will go ahead and move on to our next speaker.
9
10  **OPERATOR:**  Your next speaker is Lawrence Marino.
11
12  **MR. LAWRENCE MARINO:**  Good afternoon, council.  My name is Larry
13  Marino, and I'm here today on behalf of Louisiana Attorney
14  General Jeff Landry.  Regarding the framework action to modify
15  the OFL and the ABC for red snapper, it's obviously
16  disappointing to everyone that the ABC won't be increasing
17  nearly as much as the Great Red Snapper Count had suggested.
18
19  It's going to be tough news for the fishing public, after all
20  the buildup and after finding that there's three-times as many
21  fish as previously thought.  It's also going to be difficult for
22  them to understand, because the explanation is technical, but
23  the result seems counterintuitive.
24
25  It is what it is, and, in any event, we ask that the SSC work to
26  resolve their uncertainty and concerns for next season and that
27  the council prepare to do another framework action for that for
28  next year, so that perhaps there can be an increase to the ABC
29  for next season, without having to wait for the completion of
30  SEDAR 74 and incorporation of that into the ABC recommendations
31  for 2023, or even for 2024.
32
33  Regarding the framework action for red snapper recalibrations,
34  as to the alternatives on the table, I specifically urge the
35  council not to select Alternative 3.  As we all know, the
36  problem is whether to use the numbers from the state systems or
37  to convert them all to numbers from the federal system.  This is
38  only a problem for two states, and we certainly wish those
39  states well in resolving this problem, but a solution that
40  involves reducing the other states' quotas, specifically
41  including Louisiana, is unfair and improper.
42
43  The problem should be dealt with regarding the states that have
44  the problem and not by passing the problem to the other states,
45  but that's what Alternative 3 does.  It reduces the quotas for
46  Louisiana and Florida and Texas, whose numbers do line up with
47  the federal numbers.  This would literally reallocate their
48  quotas to Alabama and Mississippi, and they must speak against

                                 56

0003147

1 doing this.  It's not a proper solution to the problem to push
2 it off on the other states.  I therefore, once again, urge the
3 council to reject, or to at least not select, Alternative 3.
4 Thank you.
5
6 **CHAIRMAN FRAZER:**  Thank you, Mr. Marino.  We'll wait just a
7 second here.  I am not seeing any hands, and so thank you again
8 for your testimony, and we'll go ahead and move on to our next
9 speaker.
10
11 **MR. MARINO:**  Thank you.
12
13 **OPERATOR:**  Your next speaker is Nick Ruland.  We have our next
14 speaker, Scott Hickman.
15
16 **MR. SCOTT HICKMAN:**  Good afternoon, Mr. Chairman and esteemed
17 council members from around the Gulf of Mexico.  This is Captain
18 Scott Hickman in Galveston, Texas.  I'm a thirty-five-year-plus
19 participant in the charter/for-hire fishery, and I'm a Gulf of
20 Mexico reef fish red snapper shareholder.
21
22 First off, the SSC meeting -- I followed some of that, and just
23 seeing the outcome and how politicized it seems to me that the
24 SSC process has become is pretty disheartening.  I think I heard
25 one of the council members talk about how the SSC is like a
26 sacred body, and that's kind of how the scientific process
27 should be, and so many politics shouldn't get involved in it.
28
29 The Great American Red Snapper Count, I was a proud participant
30 in that, and the Louisiana red snapper abundance count, with Dr.
31 Benny Gallaway and his team, which I think that report is due
32 out this spring, and the Bureau of Ocean Energy Management count
33 on all the platforms in the western Gulf with Dr. Gallaway and
34 Dr. Settelmeyer's teams, and I have got a pretty good idea of
35 the fieldwork and what goes into getting this data.
36
37 I believe in the science, and I've been part of it on multiple
38 different projects, and we do have a lot of red snapper in the
39 Gulf of Mexico compared to when I have been in the fishery
40 thirty-five years ago.  We've done a great job, and you all have
41 done a great job, and this giant gap between the ABC and the OFL
42 is absolutely craziness, and I don't like the current way the
43 council is moving forward that will let one sector continue to
44 overfish while everybody else is constrained to be inside their
45 ACLs.
46
47 I have visited with some of you, where I talked and gave the
48 impression that we have plenty of fish and that a one-year 10
                                    57

0003148

1   percent increase across-the-board would be a good experiment, to
2   see how the fishery reacts to a 10 percent increase, and it
3   would go a long way in helping some of these states that are in
4   the bind that they're in, to try to fix the common currency
5   issues, and 10 percent ain't going to kill this fishery, but
6   this idea of just letting folks just be unaccountable under this
7   giant OFL is just wrong.
8
9   It's just the wrong step to take when we've done such a great
10  job getting to this point, and I just disagree with the way that
11  the council is moving forward, but I really believe a 10 percent
12  increase for one year and get into the full benchmark and digest
13  and go through what's coming out of the Louisiana red snapper
14  abundance project with Dr. Gallaway's team that's coming up and
15  then really go through everything on the Great American Red
16  Snapper Count, which there's a tremendous amount of good data in
17  that.
18
19  I am not saying it's perfect around the Gulf, and some areas did
20  better than others, and I won't kick on anybody, but there's a
21  lot of things to think about here, and a 10 percent increase
22  would not hurt this fishery, in my eyes, and I've spent my whole
23  life in this fishery.
24
25  That being said, we finished the expansion of the Flower Garden
26  Banks, and I was the chairman of the SAC, and I wanted to thank
27  everybody that's on the council for the hard work that they did
28  helping us on the fisheries part of that, and we have fourteen
29  new amazing banks in the central and western Gulf of Mexico
30  that's part of our sanctuary, and habitat is a very important
31  thing, and I would like to see the council start to get more
32  active in moving forward with Coral Amendment 10.  More habitat
33  and more coral equals more fish, and that all is one big piece
34  of this whole puzzle, and so I appreciate everybody's time, and
35  please do the right thing on this red snapper issue with the OFL
36  and the ABC.  Thank you, all.
37
38  **CHAIRMAN FRAZER:**  Thank you, Captain Hickman.  I am waiting to
39  see if we have any hands.  I am not seeing any, and so, again,
40  thank you for your comments, and we'll go ahead and move to our
41  next speaker.  Thank you.
42
43  **OPERATOR:**  Your next speaker is Jim Green.
44
45  **MR. JIM GREEN:**  Thank you.  Hello.  I'm Captain Jim Green,
46  Destin, Florida, President of the Destin Charter Boat
47  Association, President of the Charter Fishermen's Association,
48  and I'm speaking today on behalf of the DCBA.

58

1
2   We want to thank the agency and the Gulf Council for the
3   development of the SEFHIER program.  The weekly webinar has
4   allowed our industry to work hand-in-hand to better the
5   implementation of the program.  The development of the port
6   ambassador program to outreach and educate our fleet has been a
7   large success, and it has allowed our ambassadors to setup
8   communication and discuss issues seen in real time and share
9   experiences and find solutions while the software is being
10  updated.
11
12  As we move forward into the electronic monitoring, as you've
13  heard from Gary and Bob and a few others, we desperately wish
14  that we had a protocol set up for equipment failure.  The for-
15  hire sector is managed with specific season dates.  In return,
16  our customers are available on those specific dates, and the
17  industry is concerned and wants to have a protocol set up to
18  allow us to fish while our equipment is either repaired or
19  replaced, and we understand the first concern would be those
20  trying to work the system, and we feel a strict process be
21  required, where it's either an email, an online form, or a phone
22  call with a time stamp alerting the agency to the equipment
23  failure.  From that point, we have a window of three to five
24  business days to correct the problem.
25
26  This program is a data collection and effort monitoring program,
27  and it does not manage an allocation-based fishery, or a quota-
28  based fishery, and we should be able to think outside the box on
29  this issue.  The council has shown its willingness to develop a
30  custom for-hire program, and so let's move forward on to the
31  next phase by removing the concerns that are foreseeable.  The
32  SEFHIER program is not complete, and the DCBA and the CFA are
33  committed to getting this program right and functioning
34  properly.
35
36  Red snapper, the DCBA supports any legal increase and access for
37  our industry, and we feel that we've made strides and have
38  become accountable and continue to support initiatives that
39  impose more burden on us to make our fishery better.  We feel
40  that our buffer should be lowered to 3 percent of that of the
41  commercial sector, especially after the last seven years of
42  consistent, accountable management of our sector's allocation.
43
44  With that, I want to move into where I'm just speaking
45  personally, and I'm not speaking for any organization, because,
46  even in our industry, and it has everyone frustrated and kind of
47  at odds with what has happened with the Great Red Snapper Count
48  and how it's applied to our fishery.

59

1
2  A lot of us are scratching our heads on how such a large OFL
3  would be set with such a small increase in ACL and ACT.  It has
4  set up a political firestorm, and, quite frankly, hands the
5  council a mess, which is not the word I would use, but I have to
6  use in this setting.
7
8  You applied it to our fishery as what one can only assume is
9  best available science, but, in the same breath, you speak of
10 all of its uncertainties.  If the Great Red Snapper Count was
11 not ready for primetime, why is it applied at all?  To be
12 honest, it's a blackeye to the SSC, in my opinion.
13
14 I understand every state is trying to get their management
15 correct, and some are already there and closer, but this was not
16 unforeseen.  Everyone knew that Amendment 50 data was going to
17 have to be calibrated.  Everyone knew that, because they were
18 allowed to manage their own data, and so why, in the eleventh
19 hour, is everybody scrambling?
20
21 It's very frustrating when you have a sector like the for-hire
22 sector that has operated within its constraints of the law and
23 are looking to further our anglers' access, but not have the
24 room on the agenda to approach such issues.  We have, in our
25 industry, those that lose over half of the months of access
26 because of early summer weather patterns, and that could be used
27 as an increase in fishing days, but we understand the process.
28
29 We've been told that we don't get to cherry-pick the data, and
30 it's either ready or not, and it's either accepted or not, and
31 now we're all wondering what happened to our process, and it's
32 very frustrating when such unclear adjustments have been made in
33 our fishery, and I appreciate the opportunity to speak today.
34
35 **CHAIRMAN FRAZER:**  Thank you, Captain Green.  We have a hand up
36 from Mr. Sanchez.
37
38 **MR. SANCHEZ:**  Captain Green, thank you for your comments.
39 Backing up to one of your earlier comments about setting up some
40 protocol for ELB equipment failure, reporting failure, maybe --
41 This is just a suggestion, but ask for a lengthier amount of
42 time to do repairs, because, at least in the industries that I'm
43 involved in, getting piece parts for any piece of equipment,
44 post-COVID, has become nightmarish, and so trying to do
45 something in four business days might become real, real
46 challenging.  Thank you.
47
48 **MR. GREEN:**  I agree, and three to five business days was kind of

1   just -- When you hear VMS tablets go down and stuff, and that
2   they have to overnight one to you, and so I appreciate that
3   input, and, yes, that would be very helpful.  I just wanted to
4   make sure that we had something that addressed the issue and
5   made the agency and regulators feel good, but, at the same time,
6   made sure that we get it correct and we get that reporting
7   properly, and I'm open to a balance of that.  Yes, sir.
8
9   **CHAIRMAN FRAZER:**  All right.  I am not seeing any other hands,
10  and so, again, Captain Green, thank you for your comments, and
11  we'll go ahead and let you go, and we'll move on to our next
12  speaker.
13
14  **MR. GREEN:**  Thank you, all.
15
16  **OPERATOR:**  Your next speaker is Edwin Lamberth.
17
18  **MR. EDWIN LAMBERTH:**  Good afternoon.  My name is Edwin Lamberth,
19  and I'm an attorney in Mobile, Alabama.  I've been a
20  recreational fisherman with my family in the Gulf of Mexico for
21  more than forty years, and I've also worked in the charter/for-
22  hire industry, and I appreciate the opportunity to talk today
23  about some of the issues facing the red snapper fishery.
24
25  First of all, the states have done an excellent job managing red
26  snapper each year under state management.  We've had more
27  opportunities to fish, and now, as a result of a threat of
28  litigation, which is nobody managing the fishery by the way,
29  we're being forced into this recalibration from an inaccurate --
30  Can you hear me?
31
32  **CHAIRMAN FRAZER:**  Yes, we can, sir.
33
34  **MR. LAMBERTH:**  From an inaccurate, old survey method, the
35  telephone survey and MRIP, which I don't know anyone who has
36  ever received that.  I have never received a telephone call, and
37  I have never received a mail, yet Alabama has arguably the most
38  accurate data, and I applaud our state guys for the work that
39  they've done, and we're -- The tail is wagging the dog here.
40
41  It's taking less-accurate data and attempting to calibrate it to
42  more accurate data and discount the more accurate data.  That is
43  just a completely arbitrary and capricious way to go about doing
44  this, and it should be rejected, and so I ask the council that
45  they take no action on this recalibration issue.
46
47  With respect to the SSC's recommendation, it's also equally, if
48  not more, arbitrary and capricious.  No rational person denies

61

1  that the Great Red Snapper Count was accurate and reliable and
2  based on better science than the council has ever had before.
3  It is way more accurate than the old telephone survey or MRIP,
4  and there is precedent for doing this in the past, and so,
5  inexplicably, the SSC refused to use the Great Red Snapper Count
6  and use this longline study, without any explanation.
7
8  What it does is it penalizes states like Alabama for doing an
9  excellent job with their data management and monitoring their
10 snapper populations, and so I would ask that the council reject
11 the SSC's recommendation and send this issue back to the SSC, so
12 that the accurate and reliable data from the Great Red Snapper
13 Count can be incorporated into the management system.
14
15 **CHAIRMAN FRAZER:**  Okay.  Thank you, Mr. Lamberth, for your
16 comments.  I am not seeing any hands, and so we will go ahead
17 and move on to our next speaker.
18
19 **OPERATOR:**  Your next speaker is Chad Hanson.
20
21 **MR. CHAD HANSON:**  Good afternoon, members of the Gulf Council
22 and staff.  Thanks for the opportunity to provide comments in
23 this format today.  My name is Chad Hanson, and I'm a Science
24 and Policy Analyst with the Pew Charitable Trusts, and I would
25 like to address three interrelated topics today.
26
27 One of the tenets of the Magnuson-Stevens Act is the requirement
28 that good science drives and supports management decisions.
29 Integrating new data into the management should follow
30 established procedures to safeguard the scientific process and
31 maintain a high level of integrity and objectivity in how the
32 council receives and uses advice from its scientific experts.
33
34 Adapting new research that falls outside of the usual process,
35 like the recently-concluded Red Snapper Count, takes time and
36 should be done with care.  Trading expediency for due diligence
37 often does not produce the best results for the fish, the
38 fishery, or the ecosystem.
39
40 The Great Red Snapper Count was a comprehensive study that
41 provided a lot of good data on the red snapper population, and,
42 although the study was not specifically designed to be a
43 standalone stock assessment, it provides numerous potential
44 estimates for fisheries monitoring the Gulf going forward.
45
46 The primary focus of the study was to provide a snapshot of red
47 snapper abundance across the Gulf, and this study employed
48 multiple research methods at various depths and habitats.

0003153

1  Interestingly, red snapper accounted for only about 15 percent
2  of the species documented in some portions of the study.
3
4  To me, one of the key takeaways in this study demonstrates the
5  value of transitioning fisheries monitoring into an ecosystem
6  approach.  The GRSC offers valuable insights on designing and
7  integrating long-term monitoring programs to better target
8  different habitat types and the associated species.  We
9  encourage the council and its ecosystem and scientific advisors
10 to coordinate with the NMFS Science Center on developing a long-
11 term ecosystem-based monitoring plan.
12
13 Lastly, earlier today, you received a great presentation from
14 Dr. Josh Kilborn on examining the uncertainties associated with
15 assessing greater amberjack.  I couldn't help but think how
16 helpful a fishery ecosystem plan could be to provide strategies
17 to address this fishery.  In conjunction with the Science
18 Center's ecosystem status report, an FEP provides a roadmap for
19 how to incorporate local knowledge and scientific data in
20 ecosystem factors.
21
22 For example, it can give the council mechanisms to address
23 factors like changes in habitat, such as discussed earlier by
24 Dr. Kilborn, sea temperatures, circulation patterns, and
25 increasing episodic events like red tide, to name a few.  Also,
26 the FEP is the optimal place to address climate impacts on
27 fisheries, as discussed early this morning, regarding the Biden
28 administration's Executive Order.
29
30 To close, we are enthusiastic about engaging with the council as
31 it develops the FEP, and we look forward to collaborating with
32 all of you and the stakeholders as this effort moves forward.
33 Thanks again for the opportunity to discuss these issues with
34 you today.
35
36 **CHAIRMAN FRAZER:**  Thank you, Mr. Hanson.  I am not seeing any
37 hands at the moment, and so, again, I want to thank you for your
38 testimony, and we'll go ahead and move on to our next speaker.
39
40 **OPERATOR:**  Your next speaker is Ted Venker.
41
42 **MR. TED VENKER:**  Thanks, council.  I'm Ted Venker, and I'm the
43 Conservation Director for the Coastal Conservation Association.
44 I am not a scientist, but I did listen to the entire SSC meeting
45 last week, and I used to believe exactly what Johnny said
46 yesterday about the sanctity of science and believing that the
47 SSC was one area that would rise above that chaos.
48

63

1  That wasn't the case last week, and that meeting, in my opinion,
2  was quite a mess, but the one thing that shouldn't be confused
3  is that the discussions of uncertainty were almost universally
4  referencing a likelihood that the count is underestimating the
5  population, particularly in the western Gulf.  That was not the
6  sense that I got listening to the report that the council heard
7  this week.
8
9  Also, it seemed to me that the guidance to the SSC coming from
10 NOAA on who could vote on the proceedings was really confusing.
11 If I recall correctly, it started off by saying anyone on the
12 SSC who participated in the count had to recuse themselves.  By
13 the end of the meeting, that guidance seemed to evolve to be
14 voluntary, but that was after most of the votes had already
15 taken place, and I don't think I was the only one confused.
16
17 Toward the end of the meeting, one SSC member, Will Patterson,
18 expressed some alarm at not knowing what he was supposed to do
19 and abruptly left the meeting entirely, and so you at least one
20 SSC member eject during the meeting, and the Chairman resigned
21 almost immediately afterward, and I have to respectfully
22 disagree with the comment that I heard yesterday.  I heard Joe
23 Powers say distinctly that he had not read the report, and that
24 is reflected on page 33, line 6 of the minutes from that
25 meeting.
26
27 Additionally, I don't think that anyone disagrees with the need
28 to calibrate the state data, and the question is why are we
29 calibrating to perhaps the worst metric we have for private
30 recreational harvest of red snapper?
31
32 MRIP and all its imputations and models has done nothing to earn
33 the faith of the angling public or anyone else, and it is just
34 like the bottom longline survey for red snapper.  Just because
35 we've used it for a long time, it doesn't mean that it's right,
36 or anywhere close to right.  There is a reason that the Pacific
37 Fishery Management Council pulled out of MRIP altogether and
38 uses just state surveys for their bottom fish management.
39
40 We have encouraged the council to take no action, or at least
41 defer action on calibration until all this new information in
42 the snapper count, state data results, and MRIP's own
43 calibration are fed into the next stock assessment and the
44 council can base some decisions from a more educated place.
45
46 We would also encourage the council to follow the Pacific
47 Council's lead and consider moving away from MRIP altogether,
48 and perhaps that process could start by inviting someone from

64

1  that council to make a presentation here on how that works.
2
3  Finally, to everyone afraid of overfishing the stock or breaking
4  the law, let's not forget that twenty-two of the best scientists
5  in the Gulf led the snapper count, and eighty-plus scientists
6  participated in it, and eleven institutions around the Gulf
7  supported it.
8
9  The count found at least 800 million pounds of red snapper that
10 we didn't know were there, and so we can talk about cars and
11 engines and things like that, but the fact is that we are
12 nowhere near overfishing this stock, and, if anything, we are
13 managing it like it's a Prius, when we have a Ferrari.  I really
14 appreciate the time to address the council today, and thank you,
15 guys, for what you do.
16
17 **CHAIRMAN FRAZER:**  Thank you, Ted, for your comments.  I am not
18 seeing any hands right now, and so we have it looks like one
19 more speaker, and we will go to him now.
20
21 **OPERATOR:**  Your last speaker is Chris Horton.
22
23 **MR. CHRIS HORTON:**  Thank you, Mr. Chairman and members of the
24 council.  My name is Chris Horton, and I'm the Senior Director
25 of  Fisheries  Policy  for  the  Congressional  Sportsmen's
26 Foundation.  I will limit my remarks to the red snapper debacle
27 that we find ourselves in once again, and specifically to the
28 justification for deferring the framework action on deferring
29 the state data calibrations.
30
31 First of all, I was very dismayed with the process and the
32 outcome of the SSC meeting a couple of weeks ago.  The SSC is
33 supposed to objectively evaluate the science and provide its
34 unbiased recommendations for the management decisions by the
35 council.  NS 2 says that these recommendations should be by
36 consensus, or as close as possible.
37
38 They were far from that at this last SSC meeting, and the votes
39 were sharply divided.  Ironically, SSC members seemed to agree
40 that the Great Red Snapper Count demonstrates that we have a
41 substantially larger stock, and this will be a game-changer for
42 future stock assessments.
43
44 Setting the OFL using a much smaller portion of the Great Red
45 Snapper Count estimates, based on the uncharacterized bottom,
46 represents  a  somewhat  understandable  precautionary  approach.
47 However, using the bottom longline data to set the ABC is the
48 precautionary approach to the extreme.  I can't understand the

0003156

1  justification for using two starkly different datasets for the
2  best available science to essentially inform a single ACL.
3
4  The next ABC needs to be sent back to the SSC.  The most
5  fundamental component of science-based management is really a
6  mess, and it's just -- The calibration of state datasets of this
7  -- We have a lot to sort out, but the good news is we know we
8  have a lot more fish out there than we originally thought, and,
9  with an OFL that is now ten-million pounds higher than last
10  year, we aren't in danger of overfishing the stock.
11
12  The state data collection programs are clearly the best
13  available science when it comes to recreational catch estimates,
14  yet we're looking to force calibration back to MRIP metrics that
15  we know are wrong and will change drastically in two years, in a
16  positive way, once all this information has been incorporated.
17  We have perhaps the best opportunity we have ever had with this
18  fishery to safely hit pause and get management right, based on
19  the wealth of the new information.
20
21  Finally, NOAA seems to be only natural resource management
22  agency that can take something good for all and make it bad for
23  a few, or at least that's what it's going to look like to the
24  average angler in Mississippi and Alabama, and any faith that
25  we've restored in federal fisheries management over the last few
26  years under the state EFPs and Amendment 50 will be gone, and
27  then some, if we move forward with the calibrations.  Thank you,
28  Mr. Chairman.
29
30  **CHAIRMAN FRAZER:**  Thank you, Mr. Horton, for those comments.  I
31  am seeing if there are any hands, and I am not seeing any at the
32  moment, and so I am going to go ahead and remind folks that, if
33  they want to make a comment, that they can call the number
34  that's on the screen.  Once they get in, they would have to
35  press *1 to enter the speaker queue.  It looks like we have a
36  number of folks that are on the line here, and I just wanted to
37  let you know that I'm going to turn the introductions, or the
38  monitoring, over to our Executive Director, Dr. Simmons, for the
39  time being.  I have to step away to take a phone call, but I
40  will join you when I come back.  Dr. Simmons, you're okay?
41
42  **EXECUTIVE DIRECTOR CARRIE SIMMONS:**  Yes.  Thank you, Mr. Chair.
43  Okay.  Our next speaker is Kellie Ralston.
44
45  **MS. KELLIE RALSTON:**  Thanks, Carrie.  I'm Kellie Ralston, and I
46  am the Southeast Fisheries Policy Director for the American
47  Sportfishing Association.  I just wanted to express that we
48  appreciate the difficult position currently facing the council

66

1  regarding red snapper.
2
3  I think, on the positive side, state management has been a
4  tremendous success for anglers.  We've had consistent seasons,
5  and states have been able to tailor their seasons to the needs
6  of their constituents, and it has allowed for expanded
7  recreational access to this important fishery.
8
9  In addition, Gulf state data collection programs have allowed
10 for more precise and timely estimates of recreational harvest,
11 and the results of the groundbreaking Great Red Snapper Count
12 have given us an expanded understanding of the stock's
13 abundance, but we certainly have challenges remaining, primarily
14 with incorporating that state data and the Great Red Snapper
15 Count results into stock assessments and management.
16
17 Given the compressed timeline for the SSC review of the Great
18 Red Snapper Count and the resulting OFL and ABC recommendations
19 that are based really on two different interim analyses, and the
20 additional information that we're anticipating in the final
21 Great Red Snapper Count report, we would ask the council to
22 return the ABC recommendation to the SSC with a request for
23 further review and that it be based on the Great Red Snapper
24 Count interim analysis for consistency with the OFL.
25
26 With the OFL in place, the concern of overfishing under status
27 quo is not an issue, and so we also ask the council to defer
28 further actions on the calibration framework until after the SSC
29 finishes its review in the fall, so that you as the council can
30 make decisions based on the most complete information available.
31 Thanks again for the opportunity to speak to you today.
32
33 **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Ms. Ralston.  I think we
34 have a hand up.  Mr. Banks, did you have a question?
35
36 **MR. BANKS:**  No, and I was just going to respond to a few of the
37 comments that have been made over the course of public comment,
38 but I can do that at the very end.
39
40 **EXECUTIVE DIRECTOR SIMMONS:**  Okay.  Thank you.
41
42 **MR. BANKS:**  I keep hearing the same thing over and over, and I
43 think we need to clarify what the true issue is.  Thank you.
44
45 **EXECUTIVE DIRECTOR SIMMONS:**  Okay.  Certainly.  Any other hands
46 for Ms. Ralston?  Okay.  Bernie, I am not seeing any others.
47 Our next speaker is Jay Mullins.  Thank you.
48

1   **MR. JAY MULLINS:**  Good afternoon.  For what I wanted to say is I
2   was overly impressed by Mr. Frazer's comments yesterday, and he
3   was talking in regards to making wiser decisions at the council
4   level because of the social and economic impacts that some very
5   rash decisions have been made in our current fishing system
6   here, and I was also impressed to hear that we're not going to
7   make no fast, quick decisions on pushing a lot of fish out
8   there, when we really -- Forty years may sound like a lot of
9   history, but it's actually nothing.  It's a drop in the bucket
10  when we look at our fishery.
11
12  Has it made an amazing comeback?  Absolutely, the red snappers
13  have, but something that we can take away from the Great Red
14  Snapper Count is that we've got an overabundance of red snapper
15  here in the eastern Gulf, and we have sent multiple letters in
16  to you guys, and our senators here from the State of Florida,
17  about the issue that we have over here with the discard issue of
18  the red snapper that the IFQ system was supposed to help
19  alleviate, but it's actually not.
20
21  Furthermore, I don't really know too many things, but, when it
22  comes to a recreational issue -- Because I don't classify myself
23  commercial or recreational, and I'm a fisherman.  I just happen
24  to be blessed to be able to catch a lot of fish and get paid a
25  lot of money to do so.  You know, that's a blessing from God
26  that I've got a passion and I get paid handsomely to go out and
27  catch fish for a living.
28
29  I don't pay somebody else, and I rely on God to fulfill all my
30  needs in life, but having a year-round fishery that is a year-
31  round open fishery, as the red grouper are here in the State of
32  Florida, that's kind of harsh on the ecosystem, period.  Putting
33  that much pressure on one species is very tough, and we can hurt
34  our environment.
35
36  I think we need to take a step back and look at -- You know, we
37  all have seasons, and the reason why we have seasons in life for
38  stuff is so we have a sustainable future, you know, and that's
39  one thing.  You know, we try to feed the American public, and,
40  at the end of the day, the American public is going to be the
41  one that gets penalized, if you want to take more fish from the
42  commercial fishermen and give it to the recreational.
43
44  Do I admit the recreational sector is growing?  Absolutely, and
45  the commercial sector is shrinking, and I stated that at the
46  first meeting that I attended there a few years ago, and we need
47  to start sustaining our commercial fishermen, because we are a
48  dying breed.  We have no recruitment.  Our recruitment is

68

1  getting pushed out of the business because we have a major drug
2  epidemic going on.
3
4  I wish some people would look at this and make some more
5  intuitive decisions when it comes to the management.  You know,
6  to say that we don't have red snapper in the eastern Gulf is a
7  joke.  We all know that we do.  We want 10 percent.  Well, if
8  science doesn't back a 10 percent increase, we don't need a 10
9  percent increase.
10
11 I feel the best science, as was stated yesterday that we need to
12 hold back and confirm all of this stuff, is the best way to move
13 forward with it.  I had the honor of taking my seven-year-old
14 son out on a two-week-long fishing trip with me offshore, and I
15 had to answer a seven-year-old's questions of why we have to
16 throw back fish, why we have to cut off all the sharks, and --
17
18 **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Mullins, I'm sorry, but we need
19 you to wrap it up, sir.
20
21 **MR. MULLINS:**  All right.  Well, I would appreciate that we take
22 a more intuitive look as to how we can handle our discard issue,
23 as you all have gotten letters from us here in the eastern Gulf,
24 which I know we represent the majority of fishermen out there,
25 and these aren't just letters of ideas.  These are facts that we
26 sent you.  Thank you very much.
27
28 **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, sir.  Could you stay on,
29 to make sure that we don't have any questions from council
30 members?
31
32 **MR. MULLINS:**  Yes, ma'am.
33
34 **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Sanchez.
35
36 **MR. SANCHEZ:**  Jay, I just wanted to say hello.  We've been
37 speaking throughout the last few weeks, and I understand your
38 concerns with red snapper discards and everything, and I guess,
39 if we work our way through this red snapper situation that we're
40 in now, we'll certainly be looking at that and trying to address
41 it, or at least I will.  I appreciate you taking the time to
42 call in, and you can call me anytime.
43
44 **MR. MULLINS:**  Thank you, sir.
45
46 **EXECUTIVE DIRECTOR SIMMONS:**  Thank you.  Okay.  I am not seeing
47 any other hands.  Mr. Anson.
48

1   **MR. ANSON:**  I may have missed it, but, Mr. Mullins, thank you
2   for providing testimony.  Are you a shareholder of red snapper
3   IFQ?
4
5   **MR. MULLINS:**  I'm an eastern Gulf longliner.  I have 160,000-
6   pound-a-year average of fish, of reef fish, and we were allotted
7   200 pounds of red snapper, because we had a Class 2 license, a
8   200-pound, where we had to come in the first ten days of the
9   month, and so, if that gives you any idea of the unfair
10  distribution of the allocation, and that should open everybody's
11  eyes.  That one of the top producers in the eastern Gulf was
12  allotted 200 pounds is a joke, and so no.
13
14  **MR. ANSON:**  I didn't want to cut you off, but I wanted to just
15  thank you for the information, and thank you for providing your
16  testimony.
17
18  **MR. MULLINS:**  Yes, sir.
19
20  **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Mullins.  Bernie,
21  did you need to say something?
22
23  **MS. ROY:**  Joanna, can you introduce the next speaker, please?
24
25  **OPERATOR:**  The next speaker is Seth Haukebo.
26
27  **MR. SETH HAUKEBO:**  Thank you, Dr. Simmons, and thank you,
28  council members.  My name is Seth Haukebo, and I am a
29  recreational angler speaking on my own behalf today and not on
30  the behalf of any organization.  First of all, I want to say
31  that ASA does not speak for me, or a lot of the recreational
32  anglers that I know personally.
33
34  On the topic of the Great Red Snapper Count, I am still waiting
35  to hear more about the results from the tagging portion of the
36  study, which can be used to better understand extraction rates.
37  I'm sure the results are still preliminary, and perhaps not
38  ready to be published across several websites, or across several
39  different news articles, but I did hear that the tag returns
40  were out the roof, which indicates higher fishing pressure than
41  originally expected.
42
43  I would like to see how some of this data compares to the state
44  data, as well as the FES data and how those extraction rates
45  compare across the region.  I was disappointed to hear Dr. Stunz
46  mention, this week, that the study isn't responsible to the
47  council or the SSC, and only to Congress and those funding
48  agencies, and I would hope that the review process and the

                                    70

1  management implications would be a little bit more collaborative
2  than that, and I think we saw a lot of collaboration in the
3  review, but a lot more contention this week, no doubt.
4
5  Regarding the issue of common currency, I want to remind the
6  council members that at the core of the issue was the need to
7  use the same currency to set the ACL and measure in-season
8  management, in-season harvest, and another option that's not
9  mentioned in the current options document is using historical
10 landings datasets from the states to set the ACL.
11
12 I think most folks would know this would lead to an even lower
13 ACL that was set using the federal data, and I'm also not sure
14 how, if we use this data to assess the size of the stock, how
15 that would compare to the initial results of the Great Red
16 Snapper Count.
17
18 Lastly, I will say, again, that I'm a recreational angler, and
19 my testimony is just as anecdotal as other recreational anglers,
20 but, over the last two summers, I've had great fishing at the
21 beginning of the private angler red snapper season, but, as I've
22 heard from a lot of the other folks, by the end of the first
23 month, or by the end of the season, most of the places that I
24 fish have been pretty beat down, and I can't imagine doubling or
25 tripling the ABC, and therefore doubling or tripling the season
26 length.  Thank you, all, for all of your work, and I appreciate
27 your time.
28
29 **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Haukebo.  Let's see
30 if we have any questions from the council members.  I see Dr.
31 Stunz has his hand up.
32
33 **DR. STUNZ:**  Thank you, Dr. Simmons.  I just wanted to comment to
34 the piece concerning the tagging component of the Great Red
35 Snapper Count that was brought up, and, yes, that was a key
36 component that we were very proud of and happy to report on.
37 However, despite our request, that was not put in the terms of
38 reference for something to be evaluated by the SSC.
39
40 We did make a short presentation, the lead investigator for that
41 to the SSC, but that was specifically not part of those terms of
42 reference.  However, the results are captured in the report, and
43 they will be part of the peer-reviewed publications in the
44 future.
45
46 **MR. HAUKEBO:**  Thank you, Dr. Stunz.
47
48 **EXECUTIVE DIRECTOR SIMMONS:**  All right.  Thank you.  I see, Mr.

0003162

 1  Anson, your hand is up.
 2
 3  **MR. ANSON:**   Thank you, Dr. Simmons.  Seth, thank you for the
 4  comments.   You mentioned that you have a hard time finding
 5  snapper after about a month.  Where do you normally fish out of?
 6
 7  **MR. HAUKEBO:**  I fish out of Texas, Galveston, Texas.
 8
 9  **MR. ANSON:**   Okay.  Do you fish on known structure or published
10  numbers, either through like a map or that the state provides?
11
12  **MR. HAUKEBO:**    Yes,  primarily  known  and  primarily  public
13  locations.
14
15  **MR. ANSON:**   Okay.  Thank you.  I do appreciate all the comments
16  you   made   regarding   careful   analysis   and   thoughtful
17  consideration, particularly as it relates to the state data and
18  trying to use the state data to compare to the federal data and
19  using a tagging study to help that, you know trying to look at
20  everything kind of separately, yet all together at the same
21  time, so that you would help to try to use that information to
22  reconcile not only the information from the Great Red Snapper
23  Count, but generally how the fishery has been managed and how it
24  has performed, and so I appreciate those comments.  Thank you.
25
26  **MR. HAUKEBO:**  Thank you, Mr. Anson.
27
28  **EXECUTIVE DIRECTOR SIMMONS:**   Thank you.  I am not seeing any
29  other hands.  Thank you so much, Seth.  I think we're ready for
30  our next speaker.
31
32  **OPERATOR:**  Our next speaker is Brian Lewis.
33
34  **MR. BRIAN LEWIS:**   Good afternoon, and thank you, Chair and
35  members of the council.  As she mentioned, my name is Brian
36  Lewis, and I am a member of the Gulf Shareholders Alliance, and
37  I am an IFQ stakeholder, a vessel owner here in the State of
38  Florida, and I just wanted to mention that we basically fish for
39  America, and let's not forget that.
40
41  I would like to address reallocation of the red grouper in
42  Amendment 53, or recalibration, if you want to call it that.  I
43  don't know what to call it, and I call it a big mess.  I call it
44  a big, rushed, hot mess, and I think a lot more time needs to be
45  spent on all of this.  There is so much uncertainty in it.
46
47  I  listened  to  a  very  rushed,  what  I  felt,  this  morning,
48  presentation of the Amendment 53.  I felt like there's been so

0003163

1  much time spent on red snapper, red snapper, red snapper, and
2  that's all I've heard for the last five years, I feel like.
3  Enough is enough.
4
5  I can't see how we can honestly try to reallocate any red
6  grouper over to another sector that has no real accountability,
7  and I am talking about the private recreational fishermen.  I
8  know we've made some leaps and bounds, but we need to make more
9  steps forward instead of ten steps backwards.
10
11  I have watched -- I want you to know that I invested $350,000 to
12  buy IFQ, red grouper mostly, and I just lost, because of the
13  reduction in the TAC, 28,000 pounds of my allocation.  If any of
14  these alternatives that I am seeing occur, I am probably going
15  to be looking another 16 percent, and I just don't see it.  I
16  just don't see the math.
17
18  I heard Leann mention earlier that the private recreational --
19  Correct me if I'm wrong, but they are counting fish instead of
20  weight, pounds, and you count our fish, and our commercial
21  sector is totally accountable.  We do hail-outs, landing
22  notifications, and we get greeted by law enforcement, and they
23  can come see everything we've got, and we have no idea what the
24  private recreational is really catching.  To extrapolate
25  numbers, or whatever way we're trying to do this, it simply
26  doesn't work.
27
28  I am reading some of my other information, and I kind of went
29  off my records here, but I want to say this.  When economists
30  analyze data from the commercial fishing sector, they are using
31  accurate records to validate how many fish were caught, what
32  they are worth at the dock and throughout the distribution.  The
33  trip tickets and other federal reports are not manipulated.
34  These records accurately describe the transaction of the
35  harvesting in the seafood industry.
36
37  Conversely, there are not adequate catch records for the
38  recreational anglers.  We believe the only way to manage and
39  enforce the fishery in the recreational sector is to make
40  enforcement equitable amongst the sectors.  The American
41  consumers deserve that equitable access to sustainably-harvested
42  seafood.  If you keep taking away from the commercial sector and
43  giving it to somebody else, I don't see that as fair and
44  equitable in any way.
45
46  With that said, the American consumers of domestically-produced
47  seafood have not been adequately considered by the Gulf Council,
48  as required by the MSA.  The MSA requires that all Americans are

73

1  to be evaluated in the consideration to assess the benefits to
2  the nation that our fisheries have in this country.  The Gulf
3  Council and National Marine Fisheries -- I am wrapping it up.
4  National Marine Fisheries has a duty to uphold the MSA and all
5  of its provisions.
6
7  In closing, please do not take away allocation from the
8  commercial sector just to give a couple of extra days to the
9  recreational sector and have no idea what they're really
10 catching.  If reallocation has to occur, it should not be -- We
11 should not be penalized as commercial fishers, and you need to
12 find another way to get that.  Otherwise, this whole amendment
13 needs to be tabled and a lot more investigation needs to happen.
14 Thank you for listening, and I look forward to positive changes
15 in the management of our fish stocks, and I am open to
16 questions.
17
18 **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Lewis.  I will see
19 if there's any questions from council members.  I will give
20 everybody a second here.  We're not seeing any hands, Mr. Lewis.
21 Excuse me.  Ms. Bosarge.
22
23 **MS. BOSARGE:**  Thank you.  I just wanted to thank Mr. Lewis, and
24 I don't know that I have heard from you before, and so it's nice
25 to hear new voices, and maybe one day we'll have another in-
26 person meeting and I can see your face.  Thank you.
27
28 **MR. LEWIS:**  Well, I'm not a new voice.  I'm an old voice, and I
29 do a lot of my stuff on the public commenting section on the
30 internet, and you may read about that, and you're welcome to do
31 so, and I've been around here in this fishery for the last
32 twenty years, and it's tough.  It's a tough business.  It's
33 becoming a rich-man's business and not a poor-man's business,
34 and that's for sure.
35
36 **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Lewis.  Ms.
37 Muehlstein, do you have an announcement to make?
38
39 **MS. ROY:**  Hi.  I just wanted to say that, if you would like to
40 speak and you do not see your name on the screen -- There's been
41 a little confusion, and so just please press *1 to enter that
42 speaking queue, and then we will add your name to the list.
43 Joanna, you can go ahead and just announce the next speaker.
44 Thank you.
45
46 **OPERATOR:**  You're welcome.  The next speaker is Ray Mayhall.
47
48 **MR. RAY MAYHALL:**  Thank you.  Good afternoon, and thank you for
                                    74

1  the opportunity to visit with you for a minute.  My name is Ray
2  Mayhall, and I live here in Mobile, Alabama.  I was born and
3  raised here, but my real, real snapper fishing started taking
4  place in 2008, when I retired, and so I really have been able to
5  spend some time doing it since then.
6
7  Quite frankly, I have always been puzzled by the dilemma of
8  saying there's a shortage, because, if anything, I see an
9  overage, as a matter of a fact, because I have fished for a
10 decade or so, and it seems like the other species have gone away
11 because there is so many snapper eating everything up.  We
12 barely ever catch a b-liner anymore, and the triggerfish are
13 like super-duper gone, but the smoothest that I have seen the
14 system work so far is the last two years here in the State of
15 Alabama.
16
17 Their system for capturing data and what they do seems to be
18 very efficient, and it's been very accurate, and it's also given
19 us a lot of flexibility in how we can fish when the weather
20 affects the days that we can go.  Conversely though, the MRIP
21 data clearly has had issues over time, and NOAA is still trying
22 to calibrate the data from an old phone survey system to a new
23 mail survey, and I just don't understand how possibly that data
24 could be meaningful in asking to recalibrate data coming from
25 different sources from a bad source.  It's just confusing.
26
27 It's just a bad idea, and now we've got the results of this
28 Great Snapper Count, which I have not seen all the data yet, but
29 I've read anecdotal articles about it, and it seems like we do
30 in fact confirm, with that data, that there is a huge amount of
31 snapper out there.
32
33 With that count, and the fact that we now have the state doing a
34 great job of counting and doing their things, it seems to me
35 that now is the time that we need to just stop for a minute and
36 reset, and we need to start managing this fishery with a new
37 method of information and a new method of counting as you go.
38 It seems more reliable, and it's more accurate, and it works
39 better for all concerned.
40
41 Trying to count forty years of bad data with new just doesn't
42 make any sense, and so my request of the council is to remove
43 the fishery from federal management and turn it over to the
44 states, or at least remove the fishery from the MRIP process
45 entirely and let the state data systems be used as management
46 going forward.
47
48 The Pacific Fishery Management Council did this in 2004, and so

0003166

1  there's precedent for doing this, and, if we can't do that now,
2  then let's stick with the status quo for at least a year and
3  give ourselves time to evaluate all the sources of data that
4  you're doing and finally make the right decision based on the
5  facts.
6
7  This resource, and not just snappers, but all fish, is super
8  important to both our citizens and to our economy, and to keep
9  making bad decisions is just really a bad idea.  I realize that
10  you all have a tough job, and I really appreciate you taking
11  your time to serve, and I just appreciate that you took the time
12  to listen to me today.  Thank you.
13
14  **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Mayhall.  Let's see
15  if we have any questions from council members.  I am not seeing
16  any hands.  Thank you so much for your testimony.
17
18  **MR. MAYHALL:**  Thank you very much.
19
20  **EXECUTIVE DIRECTOR SIMMONS:**  We'll go to our next speaker.
21  Thank you.
22
23  **OPERATOR:**  Your next speaker is Mark Tryon.
24
25  **MR. MARK TRYON:**  Thank you.  Mark Tryon, and I'm a commercial
26  fisherman, primarily for red snapper, out of Gulf Breeze,
27  Florida.  I'm not quite as prepared as I normally would be for
28  the public testimony, and we've been busy this week.  We went
29  out fishing on Monday and offloaded and delivered fish
30  yesterday, and then we cleaned the boat up and iced and gassed
31  it up again today, hoping to get out, if the weather permits,
32  for the next couple of days.
33
34  Regarding the red snapper increase, I would like to quote
35  Captain Wayne Werner, and one of his lines I've heard before a
36  number of times is we've climbed the mountain, regarding red
37  snapper, as far as making sacrifices and increasing the stock
38  tremendously, to where you never dreamed that it would be so
39  healthy, and let's not slide back down the mountain again, via
40  overfishing.
41
42  I think, any increases, we have to be very conservative and
43  careful, and I say that from the point of view of remembering
44  the old days, when the fishery was tremendously overfished, and
45  you would go out there and fishing was tough for everybody,
46  commercial and recreational.
47
48  I'm a little bit alarmed at the stock in my area, and it's still

0003167

1   good fishing, but it's a little bit off of what it was the last
2   two years, and so far, year-to-date, my catches per trip, and I
3   am doing day trips, twelve to fourteen-hour rod-and-reel
4   fishing, we're off about 25 percent of what we were doing last
5   year, and so it's still decent fishing, but it makes me a little
6   bit worried about going too far too fast with increases.
7
8   Regarding the state management, we need an accountable common
9   currency, and some states are more accountable than others, and
10  I will just say this, that my state of Florida, in my opinion,
11  it's a locally inadequate system in regard to accountability.
12
13  Anyway, one more thing, just regarding something to improve the
14  recreational fishing and to give people more days, and maybe
15  protect some of these large fish -- You know, over in Texas,
16  they've got, for instance, with redfish, if you're a
17  recreational angler, when you get a saltwater license there, you
18  get a tag for a trophy redfish, and I would like to see
19  something like that considered at least in managing this red
20  snapper fishery, and maybe some sort of a slot limit with
21  allowances for a limited amount of trophy fish being caught, and
22  that would eliminate some, or a lot, of the discards, in my
23  mind, within the fishery.
24
25  Then, finally, one last point on the red grouper potential
26  reallocation, I think, as the one gentleman said before, there
27  should be no reallocation without accountability in the
28  recreational sector, and that's about all I have to say, and
29  thank you for letting me speak today.
30
31  **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Tryon.  Let's see if
32  there's any questions from council members.  I am not seeing any
33  hands.  Thank you so much for your testimony.
34
35  **OPERATOR:**  Once again, as a reminder, if you would like to speak
36  and do not see your name on the list on the screen, please press
37  *1 to enter the speaker queue.  Your next speaker is Tristan
38  Armer.
39
40  **MR. TRISTAN ARMER:**  Hello.  Tristan Armer here, and I'm a
41  recreational angler from Mississippi.  I spoke to you all back
42  in January about the red snapper calibration effort that's
43  underway, and, as I said to you then and I repeat to you today,
44  the American red snapper in the Gulf of Mexico, the stock health
45  is not an issue.  It's not overfished, and it's not undergoing
46  overfishing.
47
48  Instead, and, in fact, we just learned there's three-times as

0003168

1  many snapper swimming in the sea as previously thought, and so,
2  with all due respect, about four years ago, the Gulf Council had
3  managed red snapper into a crisis, and don't bristle at that,
4  but a proposed three-day recreational season is a management
5  crisis.
6
7  National Standard 1 requires the Gulf Council to maximize the
8  yield and opportunity for fishing, as long as the stock health
9  is not going into overfishing, and so how did you all get to
10 that point?  How was it managed to the point of crisis?  We all
11 relied on your tool, MRIP, and let's be clear that MRIP was
12 never a tool designed for in-season fishing management, and
13 that's not what it was designed to do.  You all are trying to
14 use a hammer to drive a screw, or a screwdriver to drive a nail.
15
16 When the crisis came up, Mississippi came along and solved it
17 with Tails 'n Scales.  Tails 'n Scales is actually designed for
18 in-season management.  Tails 'n Scales, the byproduct of it is
19 that there's a known universe of Mississippi recreational
20 anglers, and they're the same guys that log in, and they're the
21 same guys that report all their catch, and we know this, because
22 the little bottleneck passes in Mississippi get hit hard by
23 MDMR.  They pull folks over, and, at the beginning of the
24 season, they've got 95 percent compliance.  After they take
25 people's catch and fine them $500, by the end of the season,
26 you're getting 99 percent compliance.
27
28 Now, NOAA Fisheries put out a publication in 2019, and even that
29 publication from NOAA says that Tails 'n Scales is a more
30 precise estimate of red snapper effort and catch, and that's
31 NOAA's own words and not mine.
32
33 I went back and read the minutes from the SSC meeting.  At the
34 SSC meeting in August, your scientist said that Tails 'n Scales,
35 quote, really rang the bell.  Another scientist said, you know
36 what, it's a darned-near census of fish caught, and it's not
37 even so much an estimate or a survey, but it's a census.
38
39 The scientists went on to say that what we're doing here is not
40 calibration, but scaling, and you're just taking the Tails 'n
41 Scales data and trying to make it match MRIP data, and so,
42 again, you're going to rely and move good data into a failed
43 tool, and it's going to lead to what it did before when you
44 relied on MRIP, which is a management crisis.
45
46 The Mississippi State House passed a resolution, about a week
47 ago, dissuading you all from proceeding forward on this, quote,
48 unquote, calibration effort, and I really think that you all

0003169

1  need to pause.  Don't rush into a bad decision.  You had Alabama
2  and Mississippi come up with a better mousetrap.  Consider it.
3  Look at what you all did and the efforts you went to to convert,
4  or calibrate, from the telephone survey to the mail-in survey.
5
6  You didn't do that same effort going from Tails 'n Scales into
7  MRIP, and so I don't think you're ready to do it, and, if you do
8  do it, you're going to be relying on MRIP, and you're going to
9  wind up in crisis again.  I would encourage you guys not to take
10  any action.
11
12  Go back and go to your SSC, which said -- It said, in August,
13  and read the minutes, that we would be better off finding a
14  better way to calibrate and not scale.  It requires more
15  scientific consideration than what you all have given it.  Thani
16  you for listening.
17
18  **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Armer.  Okay.  Let's
19  see if there is any questions from council members, or comments.
20  Give me a second.  Okay.  I am not seeing any hands, Mr. Armer.
21  Thank you very much for your testimony.
22
23  **MR. ARMER:**  Take care, you all.
24
25  **OPERATOR:**  Your next speaker is Mr. Jeff Angers.
26
27  **MR. JEFF ANGERS:**  Thank you, Dr. Frazer and members.  My name is
28  Jeff  Angers,  and  I'm  the  President  of  the  Center  for
29  Sportfishing Policy.  We have known, for a long time, that red
30  snapper  is  the  poster  fish  of  federal  mismanagement.   It is
31  simply difficult for the agency to manage success, but I have to
32  say the convoluted mess of data calibration that has played out
33  for months and the boogeyman scare tactics coming from the top
34  down are really embarrassing.
35
36  Overfishing is not occurring, and we are not even close to it.
37  What we have are two states, Mississippi and Alabama, being
38  punished by MRIP because the survey never accurately collected
39  data off these two coasts.  The notion that MRIP is the gold
40  standard and that the more robust and timely state programs must
41  be calibrated back to it simply lacks common sense.
42
43  The failures of MRIP for in-season quota monitoring are exactly
44  why  we  have  state  data  collection  and  state  control  of  the
45  private  recreational  component  of  this  fishery  in  the  first
46  place.  The faults of MRIP are well documented, and it is going
47  through  its  own  recalibration  now,  and  so,  as  a  council,  I
48  encourage  you  to  not  allow  yourselves  to  be  forced  into  this

1  decision.
2
3  You can declare that the state data collection surveys are the
4  best available science for recreational harvest, and I encourage
5  you to do that.    Then, rather than punishing Alabama and
6  Mississippi with old, faulty federal data, I encourage you to
7  take no action on calibration.   We all know the importance of
8  common currency, but do we have to arrive at it today?
9
10 It is arbitrary and capricious to rush calibration at a time
11 when we have so many unknowns, including the Great Red Snapper
12 Count and incorporating MRIP-FES estimates and the next
13 benchmark stock assessment.
14
15 Now, as for what came out of the SSC, we have every reason to
16 believe that something fishy is going on, and the guidance
17 should be sent back for -- The catch guidance should be sent
18 back for reconsideration.
19
20 First, the SSC members who participated in the Great Red Snapper
21 Count were asked to abstain from motions and voting, in keeping
22 with historical SSC practice.  Yet, SSC meeting minutes from as
23 recent as this year show NMFS Science Center staff voting on
24 their own assessments, and it wasn't until after members
25 abstained that staff informed the committee that that guidance
26 was only voluntary.
27
28 Second, it is troubling that we have this landmark independent
29 study that was praised by the SSC, and even said to be a
30 conservative estimate of abundance, but the SSC decided to use
31 the bottom longline survey for the ABC and set it outrageously
32 lower than the OFL.  Something fishy is going on here, and I'm
33 wrapping it up.
34
35 The abrupt resignation of SSC Chairman Joe Powers, after forty
36 years in fishery management in the Gulf, to me highlights the
37 disgust following that meeting.  Members of Congress, state
38 managers, and the public have every reason today to mistrust the
39 federal management process.  Thank you very much.
40
41 **EXECUTIVE DIRECTOR SIMMONS:**   Thank you, Mr. Angers.  Let's see
42 if there's any questions from council members, or comments.  Mr.
43 Strelcheck.
44
45 **MR. STRELCHECK:**  Hi, Jeff.  Thanks for your comments.  I wanted
46 to get, I guess, some clarification from you on what you just
47 stated.  You are opposing calibration, but then you later stated
48 that you would recommend that the council not rush to action,

80

 1  and so those seem to conflict with one another, and I just
 2  wanted to get clarification from you, in terms of your position.
 3  Is your position that the council shouldn't calibrate at all or
 4  that we're rushing calibration and that calibration decisions
 5  should be made at some point later in time?
 6
 7  **MR. ANGERS:**   The latter.   We all know and acknowledge the
 8  importance of one fish caught in Florida being the same as one
 9  fish caught in Texas.   My point is, with all of this new and
10  better information in the mix today, why do we have to arrive at
11  a conclusion or a calibration today?
12
13  We don't, and I think, ultimately, there will be a focus on
14  getting to a common currency, and that can come when all of
15  these variables, these variables that moved our abundance
16  estimate from thirty-six million fish to 100-million-fish-plus,
17  the transition from MRIP Coastal Telephone to FES, and perhaps
18  the next benchmark stock assessment, and a lot of this is in
19  flux.
20
21  A lot of the information that we have today is newer and better,
22  and I think everyone around the table would certainly
23  acknowledge that, and I'm just concerned that we are at a rush
24  to judgment now, and I don't think it's urgent that we punish
25  Mississippi and Alabama when we have had buy-in to the catch and
26  effort collection systems in both states, in all five states,
27  and now, all of a sudden, because of these ratios that came out
28  last year, we've got to get it done by tomorrow, and I don't
29  think that it's urgent to do it now, especially knowing where we
30  are with the absolute abundance of this stock, because all of us
31  can be assured, thanks to fine work of everyone on the Great Red
32  Snapper Count, that overfishing is not occurring.
33
34  **EXECUTIVE DIRECTOR SIMMONS:**  All right.  Thank you.  I think Ms.
35  Bosarge has a question as well, or a comment.
36
37  **MS. BOSARGE:**   Thank you, Jeff.   I was just wondering, and you
38  referred to -- I forget exactly how you put it, but essentially
39  that NOAA was voting to bless its own work, but I was just
40  wondering -- I didn't remember that situation, and what agenda
41  item were you referring to where that happened?
42
43  **MR. ANGERS:**  Ms. Bosarge, I have got the references for the last
44  three years, where NMFS Science Center staff was voting on their
45  own assessments, and I am happy to compile that and send it to
46  the council in writing, but I was really kind of wanting to
47  highlight the disparity with the way that council staff treated
48  the SSC members that were involved in the Great Red Snapper

1  Count versus how council staff dealt with NMFS staff, dealing
2  with their own assessments, and so I'm happy to put all of that
3  in writing, so there's no misunderstanding, because I think it's
4  important that this is clear and that there was a double
5  standard, and, as I said a couple of times, that SSC meeting
6  that went on during Holy Week, something fishing is going on.
7  Something fishy, and I will compile all of that, Ms. Bosarge,
8  and send that to your attention.
9
10  **MS. BOSARGE:**  You can just send it to the council's attention,
11  and I appreciate that.  Thank you.
12
13  **MR. ANGERS:**  Yes, ma'am.  You bet.
14
15  **EXECUTIVE DIRECTOR SIMMONS:**  Thank you.  I am going to turn it
16  back over to our fearless leader, and he has returned, Dr.
17  Frazer.
18
19  **CHAIRMAN FRAZER:**  All right.  Thank you, guys.  I apologize for
20  having to step out briefly.  We will go ahead and turn it over
21  to our next speaker.
22
23  **OPERATOR:**  Once again, as a reminder, if you would like to speak
24  and you do not see your name on the list on the screen, please
25  press *1 to enter the speaker queue.  Your next speaker is Sean
26  Sullivan.
27
28  **MR. SEAN SULLIVAN:**  I would like to say thank you, Dr. Frazer
29  and the rest of the council, for this time to address you.  My
30  name is Sean Sullivan, and I'm from Mobile, and I'm a
31  recreational angler.  I'm a person who believes the public
32  resource, that we've been talking about, belongs to all of us,
33  all Americans.  Also, I'm a conservationist who dearly loves the
34  resources of the Gulf of Mexico, all of them, including snapper.
35
36  I'm also somebody who believes in the science, and that's the
37  catch phrase these days, and I am, and I am one who realizes
38  that, through research, science has evolved over time, and I'm
39  always looking for the newest information.  Think about it.
40  Over time, the decisions that have been made, that have changed
41  and reinforced because of novel and increasingly accurate
42  information, and I think that's what we're looking at right now
43  that's sitting in our laps with the Great American Snapper
44  Count.
45
46  We're at a crossroads now, and I think earlier speakers have
47  said that, and I believe that's true, where more advanced
48  information that's in opposition, maybe, to the way we've always

82

1  done it is staring it in the face, and you all's legacy is to do
2  what's right and what's true, or is it to just continue what's
3  been shown to be a flawed status quo?
4
5  I've thought about it this way.  Like if you were driving
6  somewhere, and we're all in a bus going somewhere, and you had
7  doubts about what direction you were going, was it the right one
8  or the wrong one, and would we speed up, or would we slow down?
9  Would we stop, or would we check out the new information, the
10  new map, before we went that way?
11
12  Now, my home state here in Alabama, like our neighbors to the
13  west in Mississippi, have instituted programs to actively and
14  accurately manage our allotment of red snapper tonnage.  When
15  they increased effort during when the COVID quarantine happened,
16  what happened here?  Alabama Marine Resources, through our
17  snapper reporting system, was able to quickly and nimbly halt
18  our season.  Would a post-season telephone survey hold a candle
19  to that?  Of course, the answer to that is no.
20
21  While The Great American Snapper survey is a conservative
22  estimate of snapper biomass, it's three-times larger than the
23  antiquated past counts, and I'm asking you all, the council, to
24  embrace science and the newest data out there, and, at a
25  minimum, take no action on the framework action under
26  consideration today.
27
28  When people like me talk about our trust in state management, I
29  do it because I know the dedication to the resource of our state
30  agencies, and I know that they are engaged in making sure that
31  we have robust populations of snapper and other reef fish for
32  generations, and the trust that was built with local management,
33  versus the failed federal management has been hard won and a
34  lengthy process.
35
36  It's been a tough process to get people to engage in these
37  processes and trust them, and, if the council chooses to ignore
38  science in some sort of salute to the byzantine fisheries
39  policies of the past, you are failing not only the people of
40  this country, but, more importantly, you're failing the men and
41  women on the front lines of states like mine here in Alabama
42  that have worked so hard to bring accurate and nimble management
43  to our fishery.
44
45  Once again, I implore the council to do what's right and to take
46  no action, at the least, if not move forward with looking at the
47  Great American Snapper Count and what means for the number of
48  fish in the Gulf of Mexico.
83

```
1
2   CHAIRMAN FRAZER:   Thank you, Mr. Sullivan, for those comments.
3   Let's see if we have any hands.   I am not seeing any, and so,
4   again, thank you for your testimony, and we will go ahead and
5   move on to our next speaker.
6
7   OPERATOR:   Your next speaker is Eric Brazer.
8
9   MR. ERIC BRAZER:   Thank you very much, Mr. Chairman.   My name is
10  Eric Brazer, and I'm the Deputy Director of the Gulf of Mexico
11  Reef Fish Shareholders Alliance, and I thank you guys for
12  allowing me the opportunity to speak today.
13
14  I'm going to lead off with red grouper, and we are asking that
15  you reconsider your preferred alternative in Amendment 53 to
16  Alternative 2, which would recalibrate without reallocating.
17  Our support for this has been laid out in our current letter and
18  the previous letters that we submitted to you.
19
20  I also want to acknowledge the sign-on letter submitted on
21  behalf of what I believe are the seven largest commercial
22  fishing organizations in Florida, and I honestly can't remember
23  the last time that we were all on the same page and were as
24  strongly in lock-step as we are right now, and that's something
25  that I would like to highlight to the council.
26
27  We all agree that Alternative 2 is a legally viable option, and
28  we agree that reallocation by recalibration is unfair and
29  inequitable.   We agree that reallocation will hurt the red
30  grouper stock at a time that we need to be protecting and
31  regrowing it, and we all agree that reallocation hurts a
32  commercial fishing industry that is recovering from a global
33  health pandemic.   We all agree that the Gulf Council has been de
34  facto reallocating to the recreational sector for years, and it
35  is, unfortunately, likely doing so right now.   We all agree that
36  reallocation by recalibration sets a dangerous precedent, and we
37  all agree that reallocation will not guarantee a longer
38  recreational season.
39
40  At the point that Amendment 53 goes out to public hearings, we
41  strongly recommend at least one in-person public hearing,
42  Madeira Beach, and we would like council staff to consider how
43  this could be done while keeping council staff safe, and we're
44  going to help any way that we can, and I'm sure the other
45  industry groups in Madeira Beach would as well.
46
47  To red grouper, we've heard a lot today and this week of slow
48  down.   Sorry.   For red snapper.   Slow down, and this is not
```

84

1  urgent, and let's hit pause, and don't rush, and why today.  We
2  were reminded by the agency, this week, that the council has
3  known about this for half a decade, that this was going to be
4  necessary, calibration and common currency are necessary, and
5  this is not a surprise.
6
7  We urge you to take the medicine and make the decision and put
8  this past us.  The commercial sector is concerned about
9  overfishing that has been allowed by avoiding calibration and
10 the impacts on the stock and the potential for commercial quota
11 reductions, which is why I asked the question that I did
12 yesterday during the roundtable, and, honestly, we're worried
13 that some of the states are going to blow through the ABC and
14 effectively play a game of chicken with the agency, hoping that
15 the Great Red Snapper Count will backfill what will be an
16 inevitable overage, and that's not right.  If there is an ACL
17 overage, commercial fishermen would sure like their fair share,
18 their 51 percent of that fish.
19
20 As for the Great Red Snapper Count, we support the SSC, and we
21 hope that the council supports its SSC the way the committee
22 supported its SSC.
23
24 Briefly, and on the Executive Order, we're glad that there was a
25 brief discussion about this at the committee level, and I want
26 to echo what Martha and Leann said about considering the human
27 dimension, the component of climate and fisheries resilience,
28 and I think it was Dr. Stunz who mentioned the Ecosystem
29 Technical Committee, and we would love to get a timeline on when
30 that committee is going to be meeting again, especially in light
31 of the EO.
32
33 In conclusion, the last thing that I want to touch on, briefly,
34 is electronic logbooks.  We're really looking forward to more
35 public outreach, and we've got a laundry list of questions that
36 need to be answered before we can really get onboard with this.
37 Some of those questions are listed in our letter, and I'm sure
38 that others are going to come up.
39
40 We're hoping that the Science Center can mirror, in a sense, the
41 IFQ portal, and this is my shameless plug for the regional IFQ
42 portal.  It's incredibly user-friendly, and it's real-time, and
43 the staff IT support is always available, and they go out of
44 their way to make sure that their product is easy for fishermen
45 to use, and so thank you again for the opportunity to speak.
46
47 **CHAIRMAN FRAZER:**  Thank you, Mr. Brazer, for your comments.  I
48 am looking to see if we have any hands up, and I am not seeing

0003176

1 any, and so, again, thank you for your testimony, and we will
2 move forward to our next speaker.
3
4 **OPERATOR:**  Once again, as a reminder, if you would like to speak
5 and you do not see your name on the list on the screen, please
6 press *1 to enter the speaker queue.  Your next presenter is
7 April Depaola.
8
9 **MS. APRIL DEPAOLA:**  Good afternoon, council.  Thank you so much
10 for the opportunity to allow us all to speak, in light of not
11 being able to be together today.  My name is April Depaola, and
12 I am a recreational angler here in Orange Beach, Alabama.  I
13 live here as well as own a real estate company here.
14
15 I am going to keep this super short, and I don't want to get too
16 much into the weeds, and I am not in this day-to-day, and this
17 is not my livelihood.  Catching the fish is not my livelihood.
18 The recreational snapper, specifically, affects our business and
19 our local economy though.
20
21 Having our tourists come down to fish here and allow them to be
22 able to fish, as well as our family and friends to be able to
23 come down and fish and people to come down and buy real estate,
24 buy their second home, and red snapper is their ultimate -- It's
25 what most of them want to fish for.
26
27 The red snapper fishery management that's been going on under
28 the state guidance, and I can only speak for Alabama
29 specifically, but, over the last two years, it has just been --
30 It seems to operate flawlessly, and it seems to have had the
31 most accurate data collection, and the recreational anglers all
32 seem to be working well with it, and it's been efficient for our
33 state.
34
35 When I read about the new guidance with the ABC, as a
36 recreational angler, this does not make any sense on how this
37 reallocation is happening and being figured.  I know there's a
38 lot more work that you guys are doing in the background, things
39 that we don't understand and can't see going on, but these
40 numbers just don't make sense, and with a different -- In these
41 data collection figures, it seems like they're just trying to be
42 meshed together, and I think that's really going to enhance the
43 mistrust with the federal management process.
44
45 I feel like that the new data that the Gulf Council is
46 considering should just be completely disregarded and the SSC
47 reconsider their entire data collection process.
48

86

1  My urge is for the council to take whatever action they can to
2  just remove this fishery from the federal management system and
3  turn it over to the states or let the state data system be used
4  for the management going forward, and it seems to have worked
5  wonderfully over the last two years.  I urge the council to take
6  no action in the framework action that's under consideration
7  today.  That's all I have, and I appreciate all of you all's
8  time.
9
10 **CHAIRMAN FRAZER:**  Thank you, Ms. Depaola, for your comments.
11 Let's see if we have any hands.  I am not seeing any, and so,
12 again, thank you for your testimony.  We will move on to our
13 next speaker.
14
15 **OPERATOR:**  Your next speaker is Cory Quint.
16
17 **MR. CORY QUINT:**  My name is Cory Quint, and I'm from Mobile,
18 Alabama.  I'm a recreational angler, and I also was the
19 president, last year, of the world's largest fishing tournament,
20 the Alabama Deep-Sea Fishing Rodeo.
21
22 I have heard a lot on this call, and I've been on it for quite a
23 little while, and it seems that there's a whole lot of a me-me-
24 me mentality, versus us-us-us, and I think a lot of that boils
25 down to the allocation and how you guys have been counting it.
26 You guys have used the MRIP system for so long, and, as
27 mentioned before, it was the -- It was what you guys would
28 consider the gold standard, and, obviously, there's been flaws
29 on that.
30
31 I did work with, last year, hosting that tournament, and I do
32 work with Scott Bannon and Chris Blankenship with MRD here in
33 Alabama, and I just wanted to give credit where credit is due,
34 and they have done a phenomenal job with the management of the
35 fishery, as far as data collection and, speaking from an angling
36 standpoint, personally, I have caught snapper anywhere from
37 inshore, north of the island, to sixty miles offshore while
38 we're trying to catch other fish.  You're having to fight your
39 way through these snapper to try to fish, or try to catch other
40 species that you're targeting.
41
42 I have also heard on this call to, hey, let's go ahead and
43 recalibrate, and I've also heard people say, hey, let's slow
44 down.  Obviously, whenever there is two polar opposites, there's
45 an issue, and something needs to be done with that, and I think,
46 personally, that it needs to be, at least for another year, it
47 needs to be state managed, while everybody takes a step back and
48 looks and tries to find the best avenue to make sure that

87

1  everything is correct, and that's all I've got to say.   I
2  appreciate you guys' time.
3
4  **CHAIRMAN FRAZER:**   Thank you, Mr. Quint, for your comments.
5  Let's see if we have any hands up.  I am not seeing any, and so,
6  again, thank you.   We will go ahead and move to our next
7  speaker.
8
9  **OPERATOR:**  Your next speaker is Blakely Ellis.
10
11 **MR. BLAKELY ELLIS:**  Hello, council.  My name is Blakely Ellis,
12 and I'm the Executive Director for the Coastal Conservation
13 Association in Alabama.  As always, I appreciate the opportunity
14 to speak to you all.
15
16 You know, to start off, I wanted to take the chance to give an
17 atta-boy and a great job out to all of the universities that
18 worked on the Great Red Snapper Count, Dr. Stunz, and Dr.
19 Patterson from South Alabama in our state, and I have really
20 enjoyed watching that unfold, especially the parts of all of
21 these universities working together on one big project like
22 that, which was such a huge undertaking, and it really give us
23 some really encouraging news, and so good job to everybody on
24 that.
25
26 Then I kind of said that to start out, but then, right after
27 that, listening to the council meeting this week, and listening
28 to the tortured process that goes into computing the MRIP
29 numbers, and it's not hard to figure why there's so much
30 confusion about it, with all the different variables that can
31 manipulated to get possibly just about any result that you want.
32
33 It does make me question why you wouldn't consider using more
34 consistent, reliable data like Alabama has, versus something
35 like MRIP.  It's definitely showing that the states are able to
36 tweak their seasons as they go on.  If you have a bad weather
37 day, or we're not catching as many, we can either speed up or
38 slow down, and it's real time.
39
40 I say all of that also to bring up the point of, if this
41 recalibration situation moves forward with states like Alabama
42 being cut by as much as 50 percent, and I know that it's not
43 directly related to the Alabama Snapper Check process, but I can
44 tell you that it's going to take a huge step backwards in all
45 the work that's gone into not only developing that system, but
46 working to gain the trust of private recreational anglers.
47
48 The idea of reporting your catch and that being calculated and
                                    88

```
 1  resulting in better data, which would be a better season and
 2  more days to fish, has been a long race to get here, and, if we
 3  end up getting that cut in half, I can just tell you that it's
 4  going to be pretty devastating, as far as regaining that trust
 5  and losing a lot of that goodwill that's been gained over the
 6  last few years by these states collecting their own data and
 7  seeing the results of that, but I guess I'm about out of time,
 8  and so I do appreciate the opportunity to speak, and thank you.
 9
10  CHAIRMAN FRAZER:  Thank you, Mr. Ellis, for your comments.  We
11  really appreciate you taking the time out of your day.  Let's
12  see if I have any hands up.  I am not seeing any, and so, again,
13  thank you for your comments, and we'll go ahead and move on to
14  our next speaker.
15
16  MR. SWINDELL:  Mr. Chairman, I had my hand up.
17
18  CHAIRMAN FRAZER:  I'm sorry, Mr. Swindell.  I did not see it.
19  Go ahead, Ed.
20
21  MR. SWINDELL:  I would like to ask the gentleman a question.
22  Did any of your members or did you receive any of the telephone
23  survey that was done in Alabama?
24
25  OPERATOR:  Excuse me, but the last speaker is not on the line
26  anymore, but, if he would like to speak, he may press *1 again,
27  so that I can open his line.
28
29  CHAIRMAN FRAZER:  Mr. Ellis, if you are listening, if you want
30  to hit *1, we'll allow you to re-engage in the discussion.
31
32  OPERATOR:  His line is now open.
33
34  MR. ELLIS:  This is Blakely Ellis.
35
36  CHAIRMAN FRAZER:  Okay.  Great.  Mr. Swindell, if you wouldn't
37  mind repeating your question for Mr. Ellis, and he's on the
38  line.
39
40  MR. SWINDELL:  Mr. Ellis, this is Ed Swindell from Louisiana,
41  and I'm interested in knowing whether or not you or any of your
42  organization people are known to have received the telephone
43  survey about the red snapper count that was done.
44
45  MR. ELLIS:  I appreciate the question.  Your question was have I
46  heard of any Alabama anglers or members of CCA Alabama getting
47  word or receiving a telephone survey regarding the Great Red
48  Snapper Count, and is that correct?
```

89

```
 1
 2   MR. SWINDELL:  Yes.
 3
 4   MR. ELLIS:  I can answer that with one word, and that's no.  I
 5   am not sure if that was part of that study or not, but I have
 6   not heard of any with the Great Red Snapper Count, and I
 7   couldn't tell you that I know anybody, or have met anyone, that
 8   has ever received a phone call survey for reef fish or a
 9   postcard or anything like that, and so I guess it's no on both
10   counts, as far as I'm aware of.
11
12   MR. SWINDELL:  Okay.  It was not dealing with the Great Red
13   Snapper Count, and that was done totally different.  What I am
14   referring to is the Household Telephone Survey that was done by
15   the National Marine Fisheries Service people.
16
17   MR. ELLIS:  The answer is still no, as far as I'm aware of.
18
19   MR. SWINDELL:  Okay.  Thank you, sir.
20
21   CHAIRMAN FRAZER:  I see that Dr. Stunz has his hand up, and I'm
22   assuming it's addressing the relevancy, I guess, of the
23   questionnaire and the Great Red Snapper Count, and so, Greg, go
24   ahead.
25
26   DR. STUNZ:  Yes, Mr. Chairman, and that's the case.  No, there
27   was not any telephone surveys like that for the Great Red
28   Snapper Count that I think he's referring to.
29
30   CHAIRMAN FRAZER:  Thanks, Greg, for clarifying that.  I am not
31   seeing any other hands at this point, and so thank you, Mr.
32   Ellis, for re-engaging in the conversation.  I appreciate that.
33
34   MR. ELLIS:  Yes, sir.  Thank you, all.
35
36   CHAIRMAN FRAZER:  You bet.  We'll go ahead now and move on to
37   our next speaker.
38
39   OPERATOR:  Thank you.  As a reminder, if you would like to speak
40   and do not see your name on the list on the screen, please press
41   *1 to enter the speaker queue.  Your next speaker is Jeff Boyd.
42
43   MR. JEFF BOYD:  Good afternoon, council.  My name is Jeff Boyd,
44   and I am a city council member in Orange Beach, Alabama, and I
45   thank you very much for taking the time to listen to us.  It is
46   great to hear voices from Galveston, Texas all the way to the
47   east coast of Florida.  As we have conversations locally, we
48   always wonder kind of what those voices are, and it's great to
```

0003181

1  hear them.
2
3  I would like to reiterate, from some of the prior calls from
4  Orange Beach, from Sean Sullivan, who is a disc jockey in Mobile
5  at one of the great radio stations, and Alabama has done a
6  tremendous job with their counts.  In fact, in the last season,
7  if you did not have your count done by the time you came in
8  under the pass in Orange Beach, and you were pulled over, you
9  were cited and ticketed for not counting.  They were super
10 strict about it, and they did an incredible job.
11
12 I will go backwards in history, to when snapper season was cut
13 to three days, or nine days first, and then it was cut to three
14 days, and I actually wrote a letter to the Secretary of
15 Commerce, Wilbur Ross, after visiting with the head of FEMA in
16 Washington, D.C., imploring and begging him, based on over a
17 billion dollars of economics, when you look at people buying
18 condos and people buying boats and all summer long sending their
19 customers to Orange Beach, and I was begging him to extend out a
20 thirteen-weekend season instead of a shorter season.
21
22 With the help of Senator Shelby and Steve Scalise and Bradley
23 Byrne, it was successful, and I am very grateful to Wilbur Ross,
24 the Secretary, for doing that.  I say that because Orange Beach
25 has been hit by COVID, just like everyone else, and we were
26 slammed by Hurricane Sally last year, and we lost almost 900
27 boats between Orange Beach and Ono Island.
28
29 Most of our docks are still in disrepair, and so, as we go into
30 the next season, we've already been beat up to no end, and to
31 take action that might reduce our snapper count by 50 more
32 percent would just be like a dagger in the heart for Orange
33 Beach, and that's a city that has spent over fifty years, and I
34 can't tell you the amount of personal money from the city, as a
35 council member from our fishery and from our fishing
36 associations, to build reefs, and we have almost 20,000 reefs in
37 the Gulf of Mexico, from zero to sixty miles out.
38
39 I called in to say, one, thank you for hearing our voice, and,
40 two, begging you to take no action and let these numbers filter,
41 and let us process them, and let us move forward.  Thank you for
42 your time.
43
44 **CHAIRMAN FRAZER:**  Thank you, Mr. Boyd, for your comments.  I am
45 looking to see if we have any questions from the council.  It
46 looks like Susan Boggs has her hand up.  Go ahead, Ms. Boggs.
47
48 **MR. BOGGS:**  Thank you, Mr. Chair.  I just wanted to thank Mr.

0003182

1 Boyd for calling in this afternoon and taking the time to do
2 that.  Thank you, Jeff.
3
4 **MR. BOYD:**  You're quite welcome, Miss Susan, and I thank you for
5 serving as a representative of our area.  You and your husband
6 are incredible in the fishing industry, on the recreational
7 side, of the charter recreational side, and we're proud to have
8 you in our city, and thank you.
9
10 **CHAIRMAN FRAZER:**  Okay.  I am not seeing any other hands, and I
11 will take a quick spin through here.  Mr. Boyd, thank you for
12 your comments, and I am going to ask our moderator if we have
13 any more speakers.  I don't see any in the queue.
14
15 **OPERATOR:**  We do not have any other speakers in the queue, but,
16 if they would like to speak, they may press *1 to enter the
17 speaker queue.  We have another speaker, Michael Jennings.
18
19 **MR. MICHAEL JENNINGS:**  Hello, Chairman and council.  This is
20 Mike Jennings with Cowboy Charters out of Freeport, Texas.  I
21 have two federally-permitted and one state-water-registered boat
22 out of Freeport, Texas, and I'm on one of them today, and so I
23 apologize if it sounds funny, if there's a lot of wind noise,
24 and just bear with me, and I will get this over with as quick as
25 possible.
26
27 I think my testimony today is somewhat unorthodox, and it's more
28 questions than it is comments, and I know that that's not that
29 forum for a bunch of questions, and I'm hoping that maybe my
30 questions will just spur some amongst the council as they move
31 into Full Council.
32
33 I don't envy you all's job, after listening to the SSC meeting
34 as much as I could last week, and then, yesterday, I think, with
35 all the stuff that's in front of the SSC right now, I think
36 everyone can find a portion, or some portions of this, pretty
37 confusing, and things can happen before it actually dawns on you
38 what just took place, and then you have to figure out what the
39 ramifications are once that move is made.
40
41 My questions right now basically refer to the ABC and the OFL
42 levels and the way they were set and just why the SSC set the
43 ABC 44 percent below the OFL, and, I mean, that's the question I
44 think we all need to be asking ourselves, and why did they not
45 just simply follow their own ABC Control Rule?
46
47 Given what is historically the difference being, what, 2 or 3
48 percent, and so most of us have to ask ourselves what was the

1  reason for that, and then, yesterday, we had the motion that --
2  It's not a dig or anything, and I promise, but we had the motion
3  that we would basically close the door on any further discussion
4  on the short term, as far as allocation, or not allocation, but
5  as an increase or anything along those lines, and turn it into a
6  plan amendment, and that's the way I understood it anyway, and
7  so, with that taking place, and as quickly as it did, it all
8  makes us sit back and wonder if this was just simply a way to
9  lock in some kind of a big buffer, so to speak, or was it an
10 attempt to overt the downside of all this recalibration that
11 we're talking about going to final action on tomorrow.
12
13 If that's the case, I mean, slow down on that recalibration, and
14 let's vote no action, and let's rethink a lot of this as we move
15 forward and not use what I consider, or most of us consider, a
16 mistake by the SSC as some kind of alternative attempt to not
17 face the issues at hand, or the problems at hand, I guess, so to
18 speak.
19
20 I think one of the things that I have not heard today is, when
21 you take into consideration the Rule 30B on the recreational
22 sector, if you've got a state that makes a mistake, and I
23 understand it would be unintentionally, but still makes a
24 mistake and overfishes to some excessive level, when does that
25 become an issue of the 44 percent of overfishing, and that's
26 what I'm driving at, is you could overfish by forty-something
27 percent without ever having to institute any paybacks, yet at
28 what point does 30B kick in and you start this de facto
29 reallocation from the charter/for-hire side over to the side
30 that made the mistake?
31
32 It could work vice versa, and the charter/for-hire side could
33 make that mistake as well, and so, with that said, I would like
34 to ask the council to really reconsider or think about their
35 votes tomorrow in Full Council, as far as any further discussion
36 on whether this SSC decision could give us an increase in the
37 short-term or if it's just going to allow us an opportunity for
38 one to overfish and hurt another one in the long run.
39
40 With that said, we're all still struggling, and I will close it
41 up, but I think we're all still struggling with the fact that
42 we've got this large disparity between the ABC and the OFL.  If
43 the Great Red Snapper Count was good enough to give us a 44
44 percent buffer, and I will use that word, and it may not be the
45 correct word, on the overfishing limit, why was it not good
46 enough to have a discussion on an increase?
47
48 I am also one that -- Close to my heart is that Great Red
                                   93

1  Snapper Count, and I'm also -- As Scott Hickman talked about
2  earlier today, I'm a proud participant in that count, in that
3  project, along with the Louisiana red snapper abundance project,
4  et cetera, and I have a lot of intimate knowledge on how these
5  scientists and these people on my boats are doing this work, and
6  I have watched how diligent they are and how dedicated they are
7  to getting what they do right, to the point that, if I did
8  something wrong, they would make me do it over again until I got
9  it right, and there was just no exceptions.  I'm really
10 impressed with how those projects went on, and I appreciate you
11 all giving me time to kind of ramble today, and I will get off
12 this line.  Thank you very much.
13
14 **CHAIRMAN FRAZER:**  Thank you, Captain Jennings, for your
15 comments. I am not seeing any hands at this point, and I am not
16 seeing any speakers in the queue, and so I will ask our
17 moderator, Joanna, if there's anybody else out there.
18
19 **OPERATOR:**  At this moment, there are no speakers in the queue,
20 but, once again, if they would like to speak, they may press *1
21 to enter the speaker queue.  We do not have any other speakers
22 on the line.
23
24 **CHAIRMAN FRAZER:**  Okay.  At this point, I think we will go ahead
25 and stop the speakers, but I would like to give an opportunity
26 to two folks on the council to speak.  I know that Mr. Banks
27 wanted to address some concerns, and so, Patrick, if you want to
28 go, I will let you go first.
29
30 **MR. BANKS:**  Thank you, Mr. Chairman.  Just like we did at the
31 last council meeting, I am continuing to hear some comments that
32 are made by the public, and I want to try to clear them up.  I
33 made similar comments during public comment at the last meeting,
34 or maybe the meeting before, and I think that Ms. Muehlstein did
35 a great job of trying to clear it up as well in her presentation
36 yesterday.
37
38 The issue of calibration is not one of which system is better.
39 I truly believe that the way each of the states counts the fish
40 that are landed is the most precise way to do it.  It is a
41 better way to count the fish that are landed than MRIP.  It's
42 more precise, but that's not the issue.
43
44 The issue is that fish for each state were given to them based
45 on MRIP numbers, the MRIP currency, and we're counting them in
46 the state currency, and so the issue is not which one is better.
47 Canada would argue that their dollar is better than the U.S.
48 dollar, but that's not the issue.  The issue, when you go across

94

1  to Canada, is how does our dollar relate to their dollar, and so
2  how do the state currencies relate to the MRIP currencies, and
3  so that's what we're trying to do with calibration, and I just
4  hope that some of the speakers during the public comment are
5  still on the line and they hear what I'm saying, because I agree
6  with them that the state surveys are better.
7
8  I heard a lot about Alabama and how good their survey is, and I
9  would agree.  I think it's a great way to count fish, and I do
10  personally think LA Creel is the better way to count fish, but
11  that's just my opinion, but the fact of the matter is it's how
12  they relate to each other.
13
14  Another point I heard was why do we have to calibrate to a,
15  quote, bad system called MRIP, and it's because, again, that is
16  the currency in which the fish were given to us.  We were not
17  given fish in our own state currencies, and so we have to
18  calibrate the two.
19
20  Another comment was, quote, we don't know what the recreational
21  are catching, and that's incorrect.  I don't recall who said
22  that, but that is incorrect.  We have a darned good idea of what
23  the recreational are catching, through our state surveys, but
24  that is not the point.  The point is relating that to the MRIP
25  currency, and so that's what we have to do with the calibration,
26  and I just wanted to make those points and hope that the public
27  is listening as well, because that's really what's at issue
28  here, is calibration.  Thank you.
29
30  **CHAIRMAN FRAZER:**  Thank you, Mr. Banks.  I think those comments
31  are worth sharing with folks, and it's a complicated matter, and
32  it's not as straightforward as many people make it out to be,
33  but you're exactly right.  I don't think people here are arguing
34  that the state data collection efforts aren't good, and I think
35  people recognize the value of those individual surveys and the
36  precision that they generate around these particular catch
37  estimates, but it's one of trying to somehow convert those state
38  surveys into a different currency.  With time, hopefully we will
39  be able to use those state data in the assessments, but that
40  hasn't happened yet.
41
42  With that said, I would also like to extend an opportunity to
43  our Executive Director, Dr. Simmons, to clarify some of the
44  issues as they related to the process, the review process, in
45  the SSC meeting that was reference by several folks.  Dr.
46  Simmons.
47
48  **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Chair.  We set up

0003186

1   the SSC meeting in a two-part meeting.  It was back-to-back, but
2   we tried to set it up as a two-part meeting, just because we
3   didn't have time to have a separate workshop for a review of the
4   Great Red Snapper Count.
5
6   Because of these two distinct components, the first one was a
7   peer review of the Great Red Snapper Count, and the second is
8   the formal SSC meeting to evaluate the catch advice that was
9   produced by the Southeast Fisheries Science Center.
10
11  We did ask, because there is nothing written in the SOPPs, that
12  a number of the SSC members, and there were five of them, that
13  had participated in the development of the Great Red Snapper
14  Count and were involved in the study.  Based on National
15  Standard 2, which addresses formal peer review, we asked them to
16  abstain from any motions and voting regarding whether the
17  absolute abundance estimate for the Great Red Snapper Count is
18  reliable and consistent with input data and population
19  biological characteristics for red snapper in the Gulf of
20  Mexico, and they did that.  They abstained from the first part
21  of the meeting.
22
23  During the second part of the meeting, which was deliberations
24  of BSIA and catch advice, the PIs were not advised to abstain
25  from that part of the meeting.  That would be similar to, I
26  believe, what a commenter brought up regarding NOAA staff voting
27  on potential catch advice after stock assessments.
28
29  Those PIs were allowed to vote on that particular part of the
30  meeting, and so the abstentions that you see for OFL were other
31  SSC members that decided to abstain, and they were not PIs on
32  the study, and, for the ABC, there was an SSC member that voted
33  on the OFL that decided to abstain on the ABC.  Thank you, Mr.
34  Chair.  I hope this clears it up.
35
36  **CHAIRMAN FRAZER:**  Thank you, Dr. Simmons, for clarification of
37  the process.  I am going to take a quick peek at the roster here
38  and see if anybody else has anything they want to say.  I am not
39  seeing anything, or any hands, and so I appreciate the
40  tremendous amount of testimony that we received today, and there
41  is clearly a number of perspectives, many well-informed
42  perspectives, on this call and will contribute to what I'm sure
43  will be a rich discussion amongst the council tomorrow.
44
45  Again, thank you everybody for their time, and I think we will
46  go ahead and call it a day, and we will reconvene in the morning
47  at -- Let me check the time, because I believe we start at 8:30
48  tomorrow.  Yes.  So the meeting will start tomorrow at 8:30

0003187

1  a.m., and so, if you can, please -- I expect it to be a full
2  day, and so if you can log in a little bit early, so we can get
3  on it, that would be great.  You all have a good evening, and I
4  will see you tomorrow.
5
6  (Whereupon, the meeting recessed on April 14, 2021.)
7
8                              - - -
9
10                        April 15, 2021
11
12                   THURSDAY MORNING SESSION
13
14                              - - -
15
16  The Full Council of the Gulf of Mexico Fishery Management
17  Council reconvened via webinar on Thursday morning, April 15,
18  2021, and was called to order by Chairman Tom Frazer.
19
20  **CHAIRMAN FRAZER:**  We are going to get started with our committee
21  reports, and we will just start with the Shrimp Committee
22  Report.  Ms. Bosarge, if you're ready.
23
24                       **COMMITTEE REPORTS**
25                   **SHRIMP COMMITTEE REPORT**
26
27  **MS. BOSARGE:**  Yes, sir, Mr. Chair.  Thank you.  The Shrimp
28  Committee Report, we met on April 12, 2021.  It was chaired by
29  myself, Ms. Leann Bosarge.  The committee adopted the agenda,
30  Tab D, Number 1, as reorganized, with the update on effort data
31  collection, Tab D, Numbers 7(a) through 7(c) moved after the
32  action guide and next steps, Tab D, Number 3.  The committee
33  approved the minutes, Tab D, Number 2, of the November 2020
34  meeting as written.
35
36  Update on Effort Data Collection, Status of 3G Cellular ELBs,
37  otherwise known as cELBs, Dr. Gloeckner presented on the shrimp
38  cellular electronic logbook interim data collection process.
39  The cELB units ceased transmitting on December 31, 2020.
40  However, the Stennis unit shut down the machine receiving the
41  data on December 7, 2020.
42
43  The units are still collecting data, but just not cellularly
44  transmitting the data to NFMS.  The data will be manually
45  retrieved from the units in 2021.  Dr. Gloeckner reviewed the
46  timeline and steps for manual collection of the data.  This
47  entails the Science Center sending new SanDisk cards in self-
48  addressed envelopes to shrimp permit holders with instructions
                               97

1  for changing out the old SanDisk card with the new one and
2  sending the old SanDisk to the Gulf States Marine Fisheries
3  Commission for downloading and then transfer of the data to the
4  Science Center.
5
6  Ms. Bosarge inquired if the reason that the data from the
7  SanDisk cards has to go to the Gulf States Marine Fisheries
8  Commission first is to avoid a computer virus.  Dr. Gloeckner
9  confirmed that there are some federal security guidelines, and
10 so it's easier for the Science Center to access the data from
11 the Gulf States Marine Fisheries Commission.
12
13 Ms. Bosarge inquired about the computer servers from Stennis
14 that had been used to collect data from the 3G cELBs, which have
15 been relocated to facilities in Ashville, North Carolina and
16 Pascagoula, Mississippi, and if those could be used to collect
17 the data from the SanDisk cards.  Dr. Gloeckner replied that the
18 servers were old, and he was unsure as to their status.
19
20 Mr. Anson inquired how shrimpers know that the data is actively
21 being collected.  Dr. Gloeckner replied that, only after the
22 first round of SanDisk cards are returned by shrimpers, will the
23 Science Center know which devices are not working and will need
24 to be replaced.  Dr. Gloeckner confirmed that the Science Center
25 does have replacement units available, if needed.
26
27 Ms. Bosarge asked Dr. Gloeckner to speak broadly about the
28 permit renewal process, in light of the SanDisk cards needing to
29 be returned with effort data.  Dr. Gloeckner replied that it
30 still needs to be determined how quickly shrimpers need to
31 return the cards once letters have been sent, for purposes of
32 compliance and permit renewal.  Ms. Bosarge responded that, at a
33 minimum, a three to six-month period for cards to be returned
34 should be considered.  Mr. Swindell asked how many vessels are
35 involved in the process, and Dr. Gloeckner responded that's
36 around 600 vessels.
37
38 Pilot Program Using P-Sea WindPlot, Dr. Gallaway provided an
39 overview of the transmittal issue with the current 3G cELBs and
40 the industry-led solution for monitoring shrimping effort
41 through the use of the P-Sea WindPlot platform as a replacement,
42 which would record the same information as the existing 3G cELB
43 device, which is location data at ten-minute intervals.
44
45 Collected location data could be run through the effort
46 calculation programs with catch data simultaneously paired.  The
47 efficacy of the utilization of the P-Sea WindPlot program was
48 proven during Phase I of Dr. Galloway's project, which was

0003189

1  funded by the shrimp industry.
2
3  Two proposal alternatives were discussed as potential next steps
4  for the project.  One would expand the number of shrimp boats
5  running the P-Sea WindPlot with the ELB update.  The other would
6  develop a method to automatically transmit ELB data from P-Sea
7  WindPlot to a designated server.
8
9  Dr. Frazer inquired where the data would be transmitted to if
10 the Stennis servers are no longer available through the Science
11 Center.  Dr. Gallaway replied that they would transmit the data
12 to LGL to test the process until the Science Center servers are
13 prepared.
14
15 Mr. Strelcheck commented that two-way transmission was discussed
16 during the Shrimp Advisory Panel and that they would be prepared
17 to assist Dr. Gallaway and other vendors with the process of
18 meeting type approval of a VMS unit.
19
20 Mr. Swindell commented that another roughly $700,000 was needed
21 to carry out both of the proposed alternatives and asked if LGL
22 had received those funds yet.  Dr. Gallaway replied that those
23 funds are needed to proceed with the pilot program.  Ms. Bosarge
24 commented that there had been a previous council discussion of
25 assisting with the first of the two proposal alternatives, which
26 would expand the number of shrimp boats in the pilot program,
27 but, due to the requirement of automatic transmission, Dr.
28 Gallaway had since developed an additional proposal alternative
29 to meet that requirement.  Mr. Anson commented that the council
30 needed to ensure that other vendors would be included in
31 potential use for effort data collection.
32
33 Alternative Options for Consideration, Dr. Gloeckner discussed
34 the key characteristics of the cELB, cellular ELB, system that
35 need to be carried over to a new effort data collection program.
36 He then noted regulations that must be considered, including the
37 definitions of a vessel monitoring system (VMS) and enhanced
38 mobile transceiver unit, cellular-based (EMTU-C).  He also
39 reviewed the list for type approval and then covered the
40 reimbursement process for a NOAA Office of Law Enforcement type-
41 approval VMS unit.
42
43 Dr. Gloeckner's presentation provided some important definitions
44 and national regulations from 50 CFR Part 600 Subpart Q that
45 were published on August 7, 2020, regarding vessel monitoring
46 systems and cellular-based transmission requirements.
47 Specifically, an EMTU-C only needs to be capable of transmission
48 two ways when in the range of a cellular network (MTUs (one-way

0003190

1  transmission) are no longer approved for new installations on
2  VMS vessels) (§600.1502(a)(6)).
3
4  Dr. Gloeckner noted that there should be funds available to
5  accommodate reimbursement of hardware for permit holders that
6  install a type-approved VMS unit.  He also commented that NOAA
7  prefers to write specifications for type approval rather than
8  require specific vendors.
9
10 Ms. Bosarge noted that, previously, only a seventeen to
11 nineteen-dollar-per-month fee for service was required with 3G
12 cELBs, cellular ELBs, and noted that transmission costs
13 associated with satellite units for quick type approval had a
14 substantially greater monthly cost.  She then noted that the
15 cellular units would need to be in range to transmit data, and,
16 so while they would not be true real-time data, the transmission
17 costs were much lower.
18
19 Mr. Strelcheck stated that the council might need to consider a
20 few decision points, such as the number of vessels that would be
21 required to have an effort data collection device.  Mr. Diaz
22 stated that a framework action could take through spring of next
23 year for development and approval by the council and asked if
24 the current process of collecting effort data could be extended
25 through next year.  Dr. Gloeckner responded that the current
26 process likely could be extended until the new system is put in
27 place.
28
29 Ms. Bosarge commented that cost-sharing would need to be
30 addressed in a framework amendment, since platforms are
31 changing, but stated that the current regulation does not
32 specify cellular or satellite.  Mr. Strelcheck commented that
33 the council could decide to change the current selection process
34 of who is selected to participate in the reporting program.
35
36 Ms. Bosarge stated that, if the type of tool for collecting
37 effort data is a decision point, both cELBs and trip tickets
38 should be considered in the reasonable range of alternatives.
39 She also stated that where and whom the effort data is
40 transmitted to, as well as how it is intended to be used, should
41 be included in an amendment, since it has always been used for
42 scientific data, whereas VMS data in other fisheries is
43 typically transferred to the NOAA OLE, the Office of Law
44 Enforcement.  Ms. Levy stated that a motion is needed for
45 council staff to begin a document to address effort data
46 collection and that an IPT could then determine decision points
47 for the council to consider.
48

0003191

1  **With no opposition, the committee recommends, and I so move, to**
2  **direct staff to begin a framework action to set up reporting**
3  **requirements for the expiring 3G cELB program to transition it**
4  **to a new platform for effort reporting of the Gulf of Mexico**
5  **federal shrimp fishery.**
6
7  **CHAIRMAN FRAZER:**  Okay.  Thank you, Ms. Bosarge.  We have a
8  committee motion on the board.  Is there any further discussion
9  of this motion?  I am not seeing -- No hands.  Ms. Levy.
10
11  **MS. LEVY:**  Thank you.  Just, before you vote on the motion, I
12  wanted to address one point that was raised by Leann, which was
13  the fact any alternative developed should include trip tickets,
14  and I wanted to get the Science Center's perspective on that,
15  because it seems to me that that would be a big step backward
16  from where we are, and I'm not sure it's actually a reasonable
17  alternative, given how they need the data and how it's used, and
18  so I guess I would just like their perspective on that.
19
20  **CHAIRMAN FRAZER:**  Go ahead, Clay.
21
22  **DR. PORCH:**  Thank you for the question.  For us, it's really a
23  non-starter.  The trip ticket information is basically days
24  fished, and it doesn't match up with the types of effort that
25  were used in creating the regulation to begin with, which was
26  more net tow hours, and so there's just no way that we could
27  actually monitor whether the shrimp fishery is staying within
28  the parameters of the regulations using the trip tickets.
29
30  On top of that, as many of you know, trip ticket effort
31  estimations aren't really regarded as the most reliable.  A lot
32  of times, that sort of information is even filled out by the
33  someone in the fish house that may or may not have direct
34  knowledge of how long the trip was actually going out, but the
35  main issue is it's a completely different type of effort, and
36  there's no way to really scale it comparable to the effort that
37  was used, the effort units that were used, to develop the
38  regulations.  Thanks.
39
40  **CHAIRMAN FRAZER:**  All right.  Thanks, Dr. Porch.  Mr. Banks.
41
42  **MR. BANKS:**  Thank you, Mr. Chairman.  In response to that, are
43  there different regulations in the South Atlantic?  I mean, why
44  are trip tickets utilized there to obtain effort data, and it's
45  good enough there, but it's not good enough for the Gulf?  Help
46  me understand.  Are there different regulations surrounding the
47  gathering of effort data in the South Atlantic?  I'm not exactly
48  sure who I'm asking that question to, but maybe to Clay or to

0003192

1  Andy.  Thank you.
2
3  **DR. PORCH:**  I don't know, Andy, if you want to start.
4
5  **MR. STRELCHECK:**  I'm not familiar enough with what's done in the
6  South Atlantic, and so you can speak to it.
7
8  **DR. PORCH:**  Well, we don't have the same regulations in the
9  South Atlantic, and I know that, as we do in the Gulf of Mexico,
10 but it is an issue, and we would actually like effort
11 information similar to what we get for the Gulf of Mexico
12 fishery, and that's actually something that we're trying to move
13 towards.  Trip ticket information is not the most useful for
14 stock assessments and other applications, in terms of the
15 effort, and so, yes, we would actually like the South Atlantic
16 to adopt a system closer to what's going on in the Gulf.
17
18 I mean, this reaches a broader issue, that we really need to get
19 effort estimates from all of our fisheries, and that's one of
20 the things that is spurring all of this conversation about
21 universal electronic logbook coverage.
22
23 **MR. BANKS:**  To that point, Mr. Chairman?
24
25 **CHAIRMAN FRAZER:**  Go ahead, Mr. Banks.
26
27 **MR. BANKS:**  Clay, I appreciate that explanation, but do you, at
28 this time, get your effort information for the South Atlantic
29 shrimp fishery from trip ticket information?
30
31 **DR. PORCH:**  I believe that's all we have.
32
33 **MR. BANKS:**  Okay.  Thanks.  That's all I had.  Thanks.
34
35 **CHAIRMAN FRAZER:**  Okay.  Andy, is your hand back up?
36
37 **MR. STRELCHECK:**  Yes, and thank you, Mr. Chairman.  I do want to
38 remind the council that one regulatory requirement we have in
39 the Gulf of Mexico that is very pertinent to this is, obviously,
40 the monitoring of shrimp effort in the western Gulf related to
41 that ten to thirty-fathom zone for red snapper bycatch, and so
42 it's obviously very important to be able to have data on a
43 geographic scale to be able to monitor effort in that area to
44 determine compliance with our rebuilding plan for red snapper
45 and bycatch levels.
46
47 **CHAIRMAN FRAZER:**  Thank you, Mr. Strelcheck.  Ms. Bosarge.
48

0003193

1  **MS. BOSARGE:**   Thank you.   The reason that I wanted that trip
2  ticket in the reasonable range of alternatives is kind of
3  exactly for what Clay laid out right there.   It is the fact
4  that, right now, the shrimp fishery in the Gulf of Mexico
5  actually goes above and beyond, and we actually have moved a
6  step up the ladder, as far as our data collection is concerned,
7  and having that in the document allows stakeholders, the public,
8  the council, everyone, to realize that.
9
10 Without the trip ticket option in the document, you think that
11 the barebones minimum is this cellular electronic logbook, and
12 that is certainly not the case, and having it in the document
13 does not mean that's the route you're going down, and I think
14 that all the things that Clay brought up, as to why the cellular
15 electronic logbook program is just more efficient and more
16 effective for our purposes, that is most definitely a discussion
17 that would be brought forward as we go through the document and
18 choose a preferred alternative.
19
20 However, I don't think, at this time, it should eliminate a
21 device, which is trip tickets, that is being used in a shrimp
22 fleet in the Southeast to garner effort information, and it most
23 certainly is a reasonable option for that, because it is being
24 used, currently, and so that's all I have to say to that.   Of
25 course, this motion doesn't speak directly to that.   This motion
26 is just to start the framework action.
27
28 **CHAIRMAN FRAZER:**   Thank you, Ms. Bosarge.   Okay.   I am not
29 seeing any other hands at this point.   I am wondering if staff
30 feels like they have enough direction at this point to go ahead
31 and start the framework action.   Dr. Simmons.
32
33 **EXECUTIVE DIRECTOR SIMMONS:**   Yes.   Thank you, Mr. Chair.   I
34 think we have enough to move forward.   Thank you.
35
36 **CHAIRMAN FRAZER:**   Okay.   Thank you.   **Seeing no more hands, I**
37 **would ask if there is any opposition to this motion.   Hearing**
38 **none, and seeing no hands, the motion carries.**   Ms. Bosarge.
39
40 **MS. BOSARGE:**   Thank you, Mr. Chairman.   Continuing with the
41 report, Dr. Freeman discussed motions from the March 2021 Shrimp
42 AP meeting's summary report relevant to this agenda item.   The
43 first Shrimp AP motion requested that the council contribute
44 funds to the LGL proposed project to develop a method for
45 automatic transmission of ELB effort data from P-Sea WindPlot to
46 a designated server.
47
48 The second motion requested that the council write a letter to

0003194

1   NOAA OLE requesting exemption of the Gulf of Mexico shrimp
2   industry from the recently published VMS requirements, including
3   that of two-way transmission and reception and only be required
4   to have one-way transmission of effort data.  The third motion
5   requested that the council and NMFS work with LGL on type
6   approval for its P-Sea WindPlot pilot program.
7
8   Biological Review of the Texas Closure, Dr. Masi presented a
9   biological review of the Texas closure.  She noted that the
10  original Shrimp Fishery Management Plan was implemented in 1981,
11  with one of the goals being to increase the yield of brown
12  shrimp harvested from offshore Texas waters.  She also noted
13  that, historically, the closure has been from mid-May to mid-
14  July.  Since 1990, the nearshore, less than four fathoms, area
15  has also been closed in conjunction with the Texas closure.
16
17  Since the 1980s, there has been an overall decline in July for
18  offshore Texas brown shrimp landings, which corresponds to the
19  Texas closure. Since the mid-1990s, there has been an increase
20  in August landings overall, which corresponds with the
21  initiation of the nearshore closure.  For May through August
22  2020, catches are lowest in May and June, with the highest
23  catches in August.  The lowest amount of August catch is found
24  in that smallest market size category, the sixty-seven count,
25  suggesting that the Texas closure is successful in allowing
26  shrimp to grow to larger sizes before harvest.
27
28  Dr. Masi next reviewed the annual percentage of Texas total
29  shrimp landings from 1981 to 2020 by region, which is upper,
30  middle, and lower.  Proportional to 2019, the upper and lower
31  regions had a decrease in the percentage of total shrimp
32  landings, while the middle region had an increase.
33
34  Offshore Texas white shrimp catch for both July and August 2020
35  was highest in the fifteen to twenty count.  The distribution
36  shifts to the larger size count categories in August, compared
37  to July, showing the impacts of the Texas closure allowing the
38  shrimp to reach larger sizes.
39
40  **With no opposition, the committee recommends, and I so move, to**
41  **recommend to NMFS that federal waters be closed out to 200 miles**
42  **to run concurrent with the date that the State of Texas**
43  **recommends for the 2021 Texas shrimp closure in the Texas**
44  **Territorial Sea.**
45
46  **CHAIRMAN FRAZER:**  Thank you, Ms. Bosarge.  We have a committee
47  motion, and we'll put it on the board.  It looks like it's up.
48  Is there any further discussion of this motion?  **I am not seeing**

0003195

1   **any hands, or hearing any voices, and so is there any opposition**
2   **to the motion?   Hearing none, and seeing no hands, the motion**
3   **carries.**   Ms. Bosarge.
4
5   **MS.  BOSARGE:**    Thank you.   Gulf Shrimp Fishery Effort and
6   Landings, Tab D, Number 5, Dr. Masi reviewed the Gulf shrimp
7   fishery effort and landings from 2019.   She noted that the 2019
8   information is based on the 3G cELB data that was transmitted to
9   NOAA.
10
11   While Louisiana, Texas, and an area around the Dry Tortugas
12   showed high levels of fishing effort in 2019, total offshore
13   shrimp landings decreased in 2019 from the previous year and
14   were at the lowest levels in the 1981 through 2019 time series.
15   All  managed  shrimp  species  are  included  within  the  total
16   offshore shrimp landings and effort in the figures shown to the
17   Shrimp Committee.
18
19   While a slight decline was shown in the 2019 CPUE, it is
20   consistent with interannual fluctuations observed over the past
21   fifteen years.   The target reduction goal for the shrimp effort
22   threshold is 60 percent below the baseline effort in the years
23   2001 through 2003.   2019 had a 76.09 percent reduction, which
24   not only meets but exceeds the 60 percent reduction threshold.
25
26   2019 Royal Red Shrimp Index, Tab D, Number 6, Dr. Masi presented
27   the 2019 royal red shrimp index, with landings from 1994 through
28   2019.   The annual catch limit (ACL) was established in 2011 at
29   337,000 pounds of tails and is based on 1994 landings.   2019
30   landings showed a slight increase over 2018, by roughly 17,000
31   pounds of tails.
32
33   Remaining Items from Summary of the Shrimp Advisory Panel
34   Meeting, Tab D, Number 8, Dr. Freeman discussed remaining items
35   from the summary report and motions from the March 2021 Shrimp
36   AP meeting.   The AP requested that NMFS continue with the Texas
37   federal closure in the coming year, in conjunction with the
38   State of Texas Closure in 2021.
39
40   The AP made a motion for Dr. Masi to begin including information
41   in her future AP presentations on the number of active vessels
42   as well as valid and renewable permits in the Gulf of Mexico
43   from the years 2000 through current for white, brown, pink, and
44   royal red species.   The AP also requested that the council
45   consider comments from the Southern Shrimp Alliance to NOAA's
46   Office of Aquaculture on identifying aquaculture opportunity
47   areas in the Gulf of Mexico.   Lastly, the AP also requested the
48   council communicate support to NOAA for a new stock assessment

0003196

1  of the Kemp's ridley sea turtle population according to the
2  modelling approach presented by LGL Ecological Research
3  Associates.
4
5  Mr. Chairman, I would like to pause there.  We had that
6  presentation yesterday, and we were behind schedule, as you
7  know, and coming up on public testimony, and so I didn't stop
8  and make any motions at that point.  I didn't want to cut the
9  public short on their time, but, if you don't mind, I would like
10 to make that motion now.
11
12 **CHAIRMAN FRAZER:**  Go ahead, Leann.
13
14 **MS. BOSARGE:**  Okay.  Thank you, sir.  If staff is ready, and I
15 haven't sent this to you, but I will read it to you.  **To send a**
16 **letter to the Southeast Fisheries Science Center (SEFSC)**
17 **expressing our support for conducting an assessment of the**
18 **Kemp's ridley stock when time and funds allow, and that this**
19 **assessment consider the modeling approach presented by LGL**
20 **Ecological Research Associates.**
21
22 Mr. Chairman, I put "when time and funds allow in there", and,
23 obviously, this should not take precedent over our normal SEDAR
24 schedule, nor would I expect it to, and so, if and when day time
25 and funds allow, I hope this will be considered.
26
27 **CHAIRMAN FRAZER:**  Got it.  All right.  Thank you, Leann.  We
28 have a motion.  Is there a second for that motion?
29
30 **MR. RIECHERS:**  Second.
31
32 **CHAIRMAN FRAZER:**  It's seconded by Mr. Riechers.  Is there any
33 further discussion on the motion?  Mr. Diaz.
34
35 **MR. DIAZ:**  Thank you, Mr. Chair.  I mean, I speak in support of
36 the motion and I think the motion generally would help with some
37 of the issues that we discussed yesterday related to the
38 Executive Order discussion, and I think some of the information
39 from this new stock assessment, when it is done, would support
40 what's being asked for in that Executive Order.  Thank you.
41
42 **CHAIRMAN FRAZER:**  Good point, Mr. Diaz.  Mr. Riechers.
43
44 **MR. RIECHERS:**  Tom, thank you.  For some of the same reasons
45 that I didn't chime in yesterday after the presentation, but I
46 do recall, and some of you may recall, or can help me with this,
47 but I think a stock assessment was also completed in the 2016
48 timeframe, or something like that, and I think Gulf States had a

106

1  hand in supporting that, as I am recalling, and certainly Gulf
2  States has supported some of the work that's gone on regarding
3  turtles, and, of course, now there is some Deepwater monies that
4  have flowed to -- It's not necessarily on the science side, but
5  certainly there is some science that may come out of it as well,
6  but on the salvation and stranding networks and so forth.
7
8  What I guess my question is, it's, after that last assessment,
9  I'm assuming that this one will build on that, but how did the
10 Southeast Center and the Science Center incorporate that into
11 their discussions the last time around?  What I'm trying to get
12 a little thought here is how is it being incorporated into that
13 overall picture, as opposed to kind of something done over here
14 on the side, and maybe how does it play into that picture, is
15 what I'm trying to get at.
16
17 **CHAIRMAN FRAZER:**  Sure.  Clay, do you want to weigh-in on that?
18
19 **DR. PORCH:**  Actually, that's before my time as Center Director,
20 and so let me check with my folks and get back to you on that.
21 I certainly haven't heard too much about it in the last few
22 years.  However, we are interested in supporting an assessment
23 of Kemp's ridley turtles, and so I think this motion is
24 consistent with our intent.
25
26 **CHAIRMAN FRAZER:**  Thank you, Dr. Porch.  Is there any further
27 discussion?  I am not seeing any hands, nor am I hearing any
28 voices.  **Is there any opposition to this motion?  Seeing no
29 hands, and hearing no voices, the motion carries.**  Ms. Bosarge.
30
31 **MS. BOSARGE:**  Thank you.  Other Business, no other business was
32 brought up by the committee.  Mr. Chairman, this concludes my
33 report.
34
35 **CHAIRMAN FRAZER:**  Thank you, Ms. Bosarge.  It looks like we will
36 move right into the Mackerel Committee, if Mr. Riechers is
37 prepared.
38
39                **MACKEREL COMMITTEE REPORT**
40
41 **MR. RIECHERS:**  Yes.  Thank you, Chairman.  The committee was
42 called to order, the Mackerel Committee was called to order, on
43 April 12, 2021.  The committee adopted the agenda, Tab C, Number
44 1, and approved the minutes, Tab C, Number 2, of the January
45 2021 meeting as written.
46
47 Next on our agenda then was a review of Coastal Migratory
48 Pelagics Landings Update, Tab C, Number 4.  Mr. Peter Hood from

0003198

1  the NMFS Southeast Regional Office reviewed the recent landings
2  for the Gulf migratory groups of cobia, king mackerel, and
3  Spanish mackerel.
4
5  Recreational landings for 2020 are still incomplete, as a result
6  of the sampling limitations during the COVID-19 pandemic.  Mr.
7  Hood highlighted a potential discrepancy in the commercial data
8  for Gulf king mackerel in 2021.  The data will be reevaluated
9  and corrected if they are determined to be erroneous.  Ms.
10  Bosarge mentioned that the higher landings in 2021 could be a
11  reflection of reopening markets from the initial COVID-related
12  closures.
13
14  The commercial Southern Zone hook-and-line king mackerel season
15  was closed on February 22, 2021, as it was projected to meet the
16  annual catch limit.  However, landings stabilized, and the zone
17  was reopened for five consecutive fishing days from April 4
18  through 8 and closed on April 9 of 2021.
19
20  Next, the committee moved on to Amendment 32: Modifications to
21  the Gulf of Mexico Migratory Group Cobia Catch Limits,
22  Possession Limits, Size Limits, and Framework Procedure, Tab C,
23  Number 5.
24
25  Council staff presented a revised version of Chapters 1 and 2 of
26  Coastal Migratory Pelagic Amendment 32.  The revised document
27  includes a new action, Action 3, to modify sector allocations in
28  the Florida East Coast Zone along with preferred alternatives
29  from the South Atlantic Fishery Management Council and
30  recommendations from the CMP Advisory Panel.
31
32  Action 1 would modify the Gulf migratory group cobia catch
33  limits.  Both the council and the CMP AP currently recommend
34  Alternative 2 as the preferred alternative, and no additional
35  changes were made.
36
37  Action 2 would modify the apportionment between the Gulf and
38  FLEC Zone and update each zone's ACL based on the Gulf group
39  cobia ACL from Action 1.  Preferred Alternative 3 would modify
40  the zone apportionment to 63 percent for the Gulf Zone and 37
41  percent for the FLEC Zone and incorporate the transition to the
42  Marine Recreational Information Program's Fishing Effort Survey
43  (MRIP-FES) data currency.
44
45  Council staff and the committee discussed the large number of
46  combinations in the management actions included in this
47  document, and how this could complicate future analyses related
48  to combined and cumulative effects.  The committee considered

0003199

1   removing Alternative 4 from Action 2, since the difference in
2   zone apportionments between Alternatives 3 and 4 is only 1
3   percent.   Retaining Alternative 5 in the document still allows
4   for considerations of using a more recent time series for
5   calculating the apportionment.
6
7   **The committee recommends, and I so move, in Action 2 to remove**
8   **Alternative 4 to Considered but Rejected.   Alternative 4 is**
9   **modify the Gulf group cobia stock ACL apportionment at 62**
10  **percent to the Gulf Zone and 38 percent to the FLEC Zone, based**
11  **on the MRIP-FES average landings for Gulf group cobia for the**
12  **years 2001 to 2015, and use this apportionment to update the**
13  **zone ACLs based on the Gulf group cobia ACLs in Action 1.**   This
14  motion carried with no opposition.
15
16  **CHAIRMAN FRAZER:**   Thank you, Mr. Riechers.   We have a committee
17  motion on the board.   Let's make sure that it's up and legible
18  for everybody.   Is there any further discussion of the motion?
19  It looks like we have John Sanchez.   Go ahead, John.
20
21  **MR. SANCHEZ:**   Thank you.   It's not related to this.   It's at the
22  tail-end of the meeting.   Thank you.
23
24  **CHAIRMAN FRAZER:**   Thank you, John.   Is there any other hands?   I
25  am not seeing any other hands.   **Hearing no other voices with**
26  **regard to discussion, is there any opposition to the motion?**
27  **Hearing none, the motion carries.**   Mr. Riechers.
28
29  **MR. RIECHERS:**   Thank you, Mr. Chairman.   Next, we moved to
30  Action 3.   Action 3 proposes to modify the allocation between
31  the recreational and commercial sectors in the FLEC Zone.   The
32  Gulf Zone manages its cobia as a single stock.   Thus, it is not
33  included in this action.   The committee deferred selecting
34  alternatives until the South Atlantic Fishery Management Council
35  provides input on this action, as it falls within their
36  jurisdiction.
37
38  Action 4 proposes to update the established annual catch targets
39  for the Gulf and FLEC Zones.   In the FLEC Zone, only the
40  recreational sector has an annual catch target.   This action
41  also provides the opportunity to establish an annual catch
42  target for the FLEC Zone commercial sector.
43
44  The committee discussed the implications of using the Gulf of
45  Mexico Fishery Management Council ACL/ACT Control Rule to
46  calculate the FLEC Zone recreational ACT instead of proportional
47  standard error, as the error increased with the transition to
48  MRIP-FES.

109

1
2  The committee also discussed the implications of this action and
3  how it relates to season closures in each zone.  In the Gulf
4  Zone, the fishing season is closed once the zone's ACT is met or
5  projected to be met.  Preliminary closure analyses suggest that,
6  with no additional management changes, the Gulf Zone ACT is
7  expected to be met in August or September of 2021 under all ACL
8  and ACT alternatives being considered.
9
10 The FLEC Zone has a post-season accountability measure, such
11 that, once the combined ACL is met or exceeded, and, when I say
12 combined, that's recreational and commercial, the length of the
13 following fishing season is reduced by the amount necessary to
14 achieve the ACT.  Staff will continue working on the discussion
15 section in this action to update and refine the closure
16 analyses.
17
18 We moved then to Action 5.  Action 5 has been split into sub-
19 actions to address changes to possession, vessel, and trip
20 limits by zone.  For Action 5.1. the Gulf Zone, the committee
21 discussed removing the commercial sector from having a reduction
22 in the per person daily possession limit, as this action is not
23 expected to result in a significant reduction in fishing
24 mortality.
25
26 Members of the committee also commented about enforcing similar
27 regulations as those in Florida state waters.  In Florida state
28 waters, it's one per person or two per vessel per day, whichever
29 is less, for both sectors.  Ms. Guyas also mentioned that, given
30 the status of the stock, the Florida Fish and Wildlife
31 Conservation Commission may not consider making their
32 regulations less stringent.
33
34 **The committee recommends, and I so move, in Action 5.1, to**
35 **remove "Preferred" from Option 2b in Alternative 2.**  Mr. Chair,
36 I'm not going to read through all of that.  Just we're going to
37 now put the motion on the board, I assume, and, again, it's
38 removing the preferred portion on Option 2b, and it's shown as a
39 strike-out in the committee report, and we may want to make that
40 clear here in the motion.
41
42 **CHAIRMAN FRAZER:**  Sure.  Let's get it up on the board and see
43 how the --
44
45 **MR. RIECHERS:**  I'm sorry, but the motion did carry with one in
46 opposition.
47
48 **CHAIRMAN FRAZER:**  Let's get it formatted, and, as soon as we do
                                110

1  that, we will -- Mr. Riechers, your suggestion is that we, for
2  clarity, simply remove the strikeout in Option 2?
3
4  **MR. RIECHERS:**  No, it was -- I just want to make sure that it's
5  shown as a strikeout and that everyone is clear that what's on
6  the board is showing that, basically, the preferred portion, or
7  the preferred nomenclature, regarding Option 2b is being
8  referred, meaning it's not a preferred anymore.
9
10 **CHAIRMAN FRAZER:**  I am clear.  Thanks.  So, again, removing --
11 Or indicating clearly in this motion that Option 2b is not a
12 preferred.  Is there any further discussion of this motion?
13
14 **MS. BOGGS:**  Mr. Chair, I'm having a delay with my Adobe Connect,
15 and so I don't know if raising my hand is being affected as
16 well.
17
18 **CHAIRMAN FRAZER:**  That's okay.  I didn't see it, and so you go
19 ahead.
20
21 **MS. BOGGS:**  Well, I just would like to make the comment that I'm
22 a little bit mixed about this, but I think it would be, in my
23 mind, a little better if we stay consistent with what the State
24 of Florida is doing in state waters.
25
26 Apparently, in the FLEC Zone, it's included that the commercial
27 sector be limited to one fish per person, and I understand that
28 it has little to no effect.  However, a lot of these actions
29 that we've taken in this document, if you look at them, have
30 little to no effect, and I strongly believe that we need to
31 start trying to restrain some of these catches until we get a
32 real handle on what cobia is doing in the Gulf.  Thank you.
33
34 **CHAIRMAN FRAZER:**  Thank you, Ms. Boggs.  I am looking for other
35 hands.  Ms. Guyas.
36
37 **MS. GUYAS:**  Thank you.  I'm going to speak against this motion,
38 and I will not be supporting it.  I think we need to be
39 consistent across-the-board here.  In Florida, we already have a
40 one-fish-per-person, and that applies to everyone.
41
42 As I said in committee, I would not expect our commission to
43 back off of that, given everything that they're hearing about
44 cobia, and so I would prefer that we stick with the current
45 preferred and not change it, as described in this motion.
46
47 **CHAIRMAN FRAZER:**  Okay.  Thank you, Ms. Guyas.  I will wait just
48 a second, given the delay.  Ms. Bosarge.

0003202

1
2   **MS. BOSARGE:**  I appreciate the comments.  I will just maybe make
3   the point that, very rarely, if ever, do commercial and
4   recreational management match.   There just is two different
5   fisheries, and they are prosecuted in different ways, and what
6   fits one does not typically work for the other.  Very rarely do
7   we have bag limits.
8
9   We typically have poundage limits, and so it's already a little
10  strange that we have a fish limit, in numbers of fish, rather
11  than in pounds, and I don't know, and maybe that's what we need
12  to look at, is a poundage limit per day for the commercial
13  sector, to kind of put this in terms that we normally operate
14  under, but I will remind you that, at this point, the
15  regulations, both state and federal, have brought commercial
16  landings down from their peak by 90 percent.
17
18  I think we've probably done our part, and I think that reducing
19  any further doesn't give you really any biological savings.  I
20  mean, it's 3,000 pounds on a multi-million-pound landings, and
21  so I don't see where you're doing anything but really
22  constraining that commercial sector to a point where they can't
23  keep anything.
24
25  We have to have a market for these fish, and it's hard enough to
26  do that at two fish, much less at one, and I do see this on the
27  menu quite often at restaurants, and I hate to think that it's
28  coming in from overseas, and so we have a harvest that we're
29  allowed to take, biologically, and please allow us to take it in
30  a way that makes it economically feasible for us, and that's why
31  I ask that the preferred be removed.
32
33  **CHAIRMAN FRAZER:**  Thank you, Ms. Bosarge.  Mr. Riechers.
34
35  **MR. RIECHERS:**  Leann, I certainly understand your point.  I
36  think I'm looking at this more as an enforcement issue and a
37  consistency issue, as opposed to a reduction in landings,
38  because I don't think any of these are going to change the
39  overall landings picture very much, but, from that same
40  perspective, and this one could go to Martha, maybe, being more
41  familiar with that fishery over in your part of the woods.
42
43  Practically speaking, is removing the preferred here and still
44  having a preferred on a two-fish-per-trip vessel limit, is -- I
45  mean, from an equivalence standpoint, how many trips do we think
46  we're going to impact by changing this?  I'm not expecting you
47  to give me the number, but just a thought about a lot or a
48  little or some percentage kind of notion.

0003203

1
2   **MS. GUYAS:**  Let me make sure I understand your question.  Sorry,
3   Tom, and I think that was to me, but --
4
5   **CHAIRMAN FRAZER:**  Yes.
6
7   **MS. GUYAS:**  So you're saying what would be the impact if we have
8   a two-fish-per-person commercial limit and we have the two-fish-
9   per-vessel limit?
10
11  **MR. RIECHERS:**  No, and I guess I'm suggesting, or asking the
12  question, of, with a two-fish vessel limit, does this really do
13  anything, in effect, by removing it?
14
15  **MS. GUYAS:**  Okay.  I guess we would have to look at the analyses
16  in the back of the document, and I don't know if Natasha has
17  that at her fingertips, but, I mean, in Florida, it's already
18  one per person, two per vessel, and so, I mean, that's where we
19  are.  I would have to look at the breakdown between what's
20  caught in state versus federal waters, and I think there's a lot
21  coming out of state waters, certainly in the Panhandle.  In
22  other parts of the state, I'm not sure, off the top of my head.
23  That's probably not very helpful, but --
24
25  **MR. RIECHERS:**  I will go to the back of the document as well and
26  see if I can find what I'm looking for back there.  Thank you.
27
28  **CHAIRMAN FRAZER:**  Natasha.
29
30  **DR. NATASHA MENDEZ-FERRER:**  Thank you, Mr. Chair.  The
31  preliminary analyses that are included in the draft that is in
32  front of you have been updated, and we are including new
33  analyses in your draft in June, and so I'm kind of taking a look
34  at the rough numbers right now in the predicted percent
35  reduction in cobia landings from reducing the bag limit from two
36  to one in the commercial sector, and it's expected to have less
37  than a 1 percent, given that the majority of the trips are
38  catching one or less cobia.  I hope that answers your question.
39
40  **CHAIRMAN FRAZER:**  Does that help, Mr. Riechers?
41
42  **MR. RIECHERS:**  Yes, and, again, I'm trying to play with the
43  nuance of the vessel limit that still is a preferred, and that
44  certainly still helps with my question, yes.  Thank you.
45
46  **CHAIRMAN FRAZER:**  Okay.  Is there any further discussion?  I am
47  not seeing any.  We will certainly see this document again in
48  June, and I think we were trying to get things together for the

113

0003204

1  South Atlantic, so they would have an opportunity to do things
2  at their upcoming meeting as well, and so you will see this
3  again.  **Based on the analysis, if there is a change of heart,**
4  **perhaps, we can revisit this, but, for right now, I am going to**
5  **ask if there is any opposition to this motion on the board.**
6
7  **MS. GUYAS:**  Yes.
8
9  **UNIDENTIFIED:**  Yes.
10
11  **CHAIRMAN FRAZER:**  Two opposed.  **The motion carries with two**
12  **opposed.**  Mr. Riechers.
13
14  **MR. RIECHERS:**  Next, we moved to Action 5.2.  The committee also
15  approved the South Atlantic Fishery Management Council's
16  preferred alternatives associated with modifications in their
17  jurisdiction.
18
19  **The committee recommends, and I so move, in Action 5.2, to**
20  **select all the South Atlantic Preferred alternatives and**
21  **options.  Those were, for the record, South Atlantic Preferred**
22  **Alternative 2, South Atlantic Preferred Option 2a, South**
23  **Atlantic Preferred Option 2b, South Atlantic Preferred Option**
24  **3a, South Atlantic Preferred Alternative 4, and the South**
25  **Atlantic Preferred Option 4a.**  That motion carried with no
26  opposition.
27
28  **CHAIRMAN FRAZER:**  Thank you, Mr. Riechers.  We have, again, a
29  committee motion on the board.  Is there any further discussion
30  of the motion?  **Not seeing any hands, is there any opposition to**
31  **the motion?  Not hearing any, the motion carries.**  Mr. Riechers.
32
33  **MR. RIECHERS:**  Thank you, Mr. Chairman.  Next, we moved to
34  Action 6.
35
36  **MR. DIAZ:**  Mr. Chairman, I am having trouble raising my hand,
37  for some reason, before we go too far.
38
39  **CHAIRMAN FRAZER:**  Go ahead, Mr. Diaz.  I apologize.
40
41  **MR. DIAZ:**  I was trying to just mention something about Action
42  5.1 before we leave it too far.  I am having some mixed feelings
43  about the vessel limit.  I don't know that I am going to make a
44  motion right now to change it, but I am worried about a few
45  things.
46
47  I have had some input from people in this state that do not
48  support the two-fish vessel limit, and I know there's not a lot

0003205

1  to be gained on vessel limits, and the most to be gained, I do
2  understand, is with less fish, but cobia is kind of a unique
3  species.
4
5  There are term limits for cobia that are held in this part of
6  the Gulf, and I think there's some in Florida and Alabama also,
7  and I am just worried about choking that vessel limit down to
8  two and really encouraging high-grading, and I don't know if
9  that's factored into the analysis or not, but I am having some
10  doubt about sticking with that preferred, and, at this point,
11  the way I'm thinking right now, I would prefer a higher vessel
12  limit.  Thank you, sir.
13
14  **CHAIRMAN FRAZER:**  Thank you, Mr. Diaz, for those comments.  Mr.
15  Riechers, if you want to go ahead and move on.  Sorry again,
16  Robin.  There's a little bit of a delay on my end.  Ms. Guyas
17  has her hand up.
18
19  **MS. GUYAS:**  I just wanted to say, just so Dale is aware, there
20  are a lot of tournaments in Florida, and some have to be
21  cancelled recently, because of the state of cobia, and the
22  tournaments, at least out of Destin, they do not allow high-
23  grading, and they have all these measures to avoid that, and so
24  this vessel limit reduction came from the people that are
25  participating in those tournaments and organizing those
26  tournaments.
27
28  I mean, they came to us, a couple of years ago, and said please
29  help us, and this is a huge issue, and so this is their
30  initiative that we have supported, and they're really just
31  trying to rebuild this fishery, and we support that, of course,
32  and so at least that's how things have gone in the eastern Gulf
33  with this.  I mean, the people that are in these tournaments
34  recognize that this is a big issue, and they want to do their
35  part, and the vessel limit reduction is an easy way to do that.
36
37  This is a tricky fishery, with the size limit and all that, and
38  there's limited things that we can do to promote rebuilding,
39  and, to me, this is an easy one, and so that's all I'm just
40  going to say about that.
41
42  **CHAIRMAN FRAZER:**  Thank you, Ms. Guyas.  Ms. Boggs.
43
44  **MS. BOGGS:**  I will reiterate too what I said in committee, that
45  there are tournaments in this area that are being cancelled, and
46  one of them, I believe, had a fifty-pound minimum for cobia, and
47  they never got a fish brought to the weigh station that was
48  fifty pounds.  It's a real issue, I can tell you, in the

1  northern Gulf.   Pensacola and Alabama are all cancelling
2  tournaments.  Thank you.
3
4  **CHAIRMAN FRAZER:**  Thank you, Ms. Boggs.  Let's see if I have any
5  other hands.  Okay.  I am seeing no more hands.  Mr. Riechers,
6  if you want to continue.
7
8  **MR. RIECHERS:**   Thank you, Mr. Chairman.   Next, we turned to
9  Action 6.   Action 6 proposed an increase to the minimum size
10 limit.   The committee agreed preferred Alternative 2, which
11 would increase the size limit in the FLEC Zone from thirty-three
12 inches to thirty-six inches fork length, or the same as is in
13 the Gulf Zone.  The increase of the minimum size limit in the
14 Gulf Zone was implemented in March 2020, and the effects have
15 not been captured by recent landings data.
16
17 Action 7 proposes modifications to language in the CMP Framework
18 Procedure to allow the SAFMC to independently approve management
19 measures that affect fishing within their jurisdiction.   This
20 language only applies to actions that can be addressed through a
21 framework amendment.   Changes that would affect the entire
22 stock, such as catch limits, allocations, zone apportionment,
23 and the inclusion or exclusion of species in the CMP fishery
24 management plan still require the approval of both councils.
25
26 **The committee recommends, and I so move, in Action 7, to make**
27 **Alternative 2 the preferred.  That Alternative 2 is modify the**
28 **framework procedure to update the responsibility to each council**
29 **for setting regulations for the Gulf group cobia.**  The motion
30 carried with two in opposition.
31
32 **CHAIRMAN FRAZER:**  Okay, and so we have a committee motion on the
33 board.  That motion, again, just for the record, is, in Action
34 7, to make Alternative 2 the preferred, and Alternative 2 reads:
35 Modify the framework procedure to update the responsibility to
36 each council for setting regulations for the Gulf cobia group.
37 Is there further discussion of the motion?  I see, Ms. Boggs,
38 you have a hand up.  Is that a new hand?
39
40 **MS. BOGGS:**  It is.  I just have a quick question.  Number 2,
41 where it says the stock assessment indicates a different
42 boundary, and a portion of the ACL for one migratory group may
43 be apportioned to a zone in the other council's jurisdiction,
44 and I just want to make sure I'm clear who would make that
45 decision.
46
47 Would it just be based on where the catch -- I just want to be
48 clear who is going to make that decision and that's not

116

0003207

1  something that is going to take away from one zone or the other
2  because we're not specifying being more specific about that.  I
3  don't know that I'm being clear, but I'm a little unclear about
4  it to begin with.
5
6  **CHAIRMAN FRAZER:**  I think I might ask Natasha to weigh-in on
7  this one.  Natasha.
8
9  **DR. MENDEZ-FERRER:**  One second, Mr. Chairman.  I am referring
10  back to the text that Ms. Boggs is talking about.  Ms. Boggs,
11  can you remind me again which item?
12
13  **MS. BOGGS:**  It's in Alternative 2, Number 2, and you've got 1,
14  1a, 1b, and then you've got 2, and we're striking "the
15  appropriate zone, but management measures", and then I'm looking
16  at the proposed change, and I am just -- I want to just be clear
17  how that decision is going to be made.
18
19  **DR. MENDEZ-FERRER:**  When there is apportionment of migratory
20  groups, those are decisions that are made by both councils.  For
21  example, we have the Gulf group cobia, which the Gulf migratory
22  group part of it is apportioned to the South Atlantic for the
23  management, the same as like what happens with management of
24  king mackerel.  The Gulf Council manages portions of the king
25  mackerel that fall within the South Atlantic jurisdictions.
26  Those changes in who is going to manage what, those are
27  decisions that are made between both councils, and I think we're
28  just trying to make it a little clearer on the language here.
29  That's where Number 3 comes in, that both councils must concur
30  on recommendations that affect both migratory groups and
31  jurisdictions.
32
33  **MS. BOGGS:**  Thank you.
34
35  **CHAIRMAN FRAZER:**  Okay.  Ms. Bosarge.
36
37  **MS. BOSARGE:**  Thank you, Mr. Chair.  I think I'm going to oppose
38  this motion at this meeting.  I may change my mind in a future
39  meeting, but, for now, I think I'm going to oppose it.  It just
40  seems off.
41
42  The South Atlantic just went through a process where they
43  decided that they didn't want to manage Atlantic cobia anymore,
44  that it would be better to pass that to the Atlantic States
45  Commission, and yet now they want more management over Gulf
46  cobia, where there is not a joint amendment anymore with the
47  Gulf Council for a lot of things they do, anything they can do
48  through a framework.  I don't know, and it seems strange that

117

1  they want to -- They turned over management of Atlantic cobia,
2  but they want more management of Gulf cobia.   I mean, it's
3  probably fine, but something just doesn't sit right with me
4  about it, and so I'm going to oppose this motion for now.
5
6  **CHAIRMAN FRAZER:**  Okay.  Ryan, to that point?
7
8  **MR. RYAN RINDONE:**  There isn't anything that the South Atlantic
9  is being given the authority to do that would directly affect
10 how the Gulf fishes for cobia through this modification to the
11 framework procedure.
12
13 Anything that would result in any changes to catch limits,
14 allocations, stock boundaries, stock status determination
15 criteria, anything like that, it's still a joint fishery
16 management plan, and so the Gulf Council would have to agree
17 with anything that the South Atlantic Council proposed, and vice
18 versa, for any of those things to actually take effect, and so
19 both councils still have responsibility over the Gulf cobia
20 stock, which is still part of our joint CMP fishery management
21 plan.
22
23 The Atlantic group of cobia was removed from the CMP FMP,
24 because the majority of landings of Atlantic cobia occurred
25 within state waters in that species range, which was from the
26 Florida/Georgia line north, and a lot of it has to do with just
27 the way the water moves along those coastlines and the way that
28 those fish are fished by the different sectors up there, and so
29 that was the most appropriate decision for that migratory group.
30
31 The majority of Gulf cobia, both in the Gulf and on the Atlantic
32 coast of Florida, are still landed in federal waters, and this
33 is especially true for the Atlantic coast.  It's been a while
34 since I've looked at these data, but I think, the last time I
35 looked at it, it was over 70 percent of cobia that are landed
36 off the east coast of Florida are still landed in federal
37 waters, and so it's still very much a federal fishery, and the
38 South Atlantic Council has expressed no inclination, at this
39 point, to do anything differently with Gulf cobia with respect
40 to its management.
41
42 For the key things that would affect the stock and its
43 management, both councils still have to concur.  What this
44 framework procedure is allowing the South Atlantic Council to do
45 is simply to be able to be more nimble in things like bag
46 limits, size limits, seasons, closed areas and whatnot, as they
47 relate to the fishery as it's managed from south of the Florida
48 Keys up to the Florida/Georgia line.

118

0003209

1
2  It's affording them the same general framework flexibility that
3  we're able to use for the fish that occur within our waters,
4  but, again, anything that relates to ACLs or allocations or
5  apportionments or anything like that, it still has to be agreed
6  upon jointly.  Mr. Chair.
7
8  **CHAIRMAN FRAZER:**  Thank you, Mr. Rindone.
9
10 **MR. STRELCHECK:**  Did you call on me, Tom?  You were breaking up.
11
12 **CHAIRMAN FRAZER:**  I did.  I apologize.  Go ahead.
13
14 **MR. STRELCHECK:**  Just to add to this, and certainly Ryan or
15 staff can correct me if I'm wrong, but I don't view this as
16 really markedly different than how we manage a species like
17 yellowtail snapper.  Yes, we don't have a joint fishery
18 management plan for a species like yellowtail, but we do have an
19 apportionment between the South Atlantic and Gulf Councils, and
20 the South Atlantic Council, obviously, sets regulatory measures
21 for yellowtail snapper in their jurisdiction.
22
23 Obviously, the difference here is the migratory group boundary
24 goes all the way up to the Florida/Georgia border, but, at the
25 end of the day, that is, obviously, in South Atlantic waters,
26 where the South Atlantic has decision-making authority, and so I
27 don't see it as being in conflict or inappropriate for them to
28 manage, or at least provide input, on regulatory measures for
29 cobia in their part of the geographic area, especially when the
30 Gulf Council also has authority to, obviously, make sure that
31 they are in agreement with any recommendations for the South
32 Atlantic Council.
33
34 **CHAIRMAN FRAZER:**  Thank you, Andy.  Ms. Bosarge.
35
36 **MS. BOSARGE:**  Thanks, and it is just a little bit different
37 though, because this is a migratory species, and so it is a
38 little different than a yellowtail or something like that, and
39 that is pretty much -- Well, commercially anyway, a lot of it is
40 right there in south Florida, and those people fish on both
41 sides.
42
43 This is a species that migrates across a large body of water,
44 and it is a Gulf stock.  A small portion of our Gulf stock
45 happens to migrate over to the east coast of Florida, and so I
46 think we've been good to allow the South Atlantic Council some
47 input on how our Gulf stock is managed during the period when
48 it's migrating over there into their waters.

0003210

1
2  However, anything -- Any management measures that they may
3  change over there, bag limits or this or that, will affect us,
4  because that stock migrates back, and so, if they happen to fish
5  it harder while it's over there off of their coast, then it's
6  going to have an impact on what we can do over here in the
7  future.
8
9  I just think it's a good idea to keep us in tandem with them,
10 and we allow them to manage it over there, but it would be nice
11 if we could have input on what they're doing and we both come to
12 a consensus on it.  I understand they don't have to do that for
13 us, but it's a Gulf stock.  That's what it is, and so I can kind
14 of see that rationale, but it doesn't really go the other way,
15 and so I'm going to vote in opposition to this for now.  Maybe
16 we can flesh this alternative out a little bit more and make me
17 feel good about it at the next meeting.
18
19 **CHAIRMAN FRAZER:**  Okay.  Thank you, Ms. Bosarge.  I will note,
20 again,, that there was two opposed on the committee, and there
21 is -- **Clearly, Leann is on the record as being opposed in its
22 current form, and is there any other opposition to the motion?**
23
24 **MS. BOGGS:**  Yes.
25
26 **CHAIRMAN FRAZER:**  Any more?  **So the motion carries with two
27 opposed.**  Mr. Riechers.
28
29 **MR. RIECHERS:**  Thank you, Mr. Chairman.  The committee then
30 discussed the implications of the proposed catch limits and the
31 potential for in- season closures.  Ms. Guyas asked about how
32 these potential in-season closures might affect different Gulf
33 regions.  Council staff is continuing to work on updating the
34 analyses, including the development of a decision support tool.
35
36 Then we turned to Tab C, Number 6, which was the Coastal
37 Migratory Pelagics AP Recommendations, and we wanted to discuss
38 any of those that we hadn't discussed throughout the meeting.
39
40 Council staff went over the remaining items that were discussed
41 during the CMP AP meeting on March 24, 2021.  Mr. Martin Fisher,
42 Chair of the CMP AP, commented that the AP is not against
43 commercial electronic logbooks, but that the current proposal
44 could be simplified and improved.  The discussion was continued
45 during the Data Collection Committee.
46
47 Next, we went to Discussion of Individual Fishing Quota for Gulf
48 King Mackerel for the Gulf Southern Zone Gillnet, Tab C, Number

0003211

1    7.    Mr.  Sanchez  spoke  on  behalf  of  the  Gulf  king  mackerel
2    gillnet fishery in the Southern Zone.
3
4    A  letter  from  the  Florida  Keys  Commercial  Fishermen's
5    Association  was  distributed  to  the  committee.    The  discussion
6    focused  on  a  request  to  increase  the  quota  in  this  zone,  as
7    current  fishing  regulations  resulted  in  a  short  fishing  season,
8    and  it  starts  the  third  Monday  of  January  each  year,  compared  to
9    other commercial king mackerel zones in the Gulf.
10
11   The  initial  proposal  considered  the  implementation  of  a  catch-
12   share-type  program  (i.e.,  individual  transferable  quota  or
13   individual  fishing  quota),  but  the  majority  of  gillnet  permit
14   holders  have  not  agreed  to  this  change.    Mr.  Sanchez  also
15   proposed  an  exempted  fishing  permit  as  an  approach  to  experiment
16   with  more  efficient  ways  to  prosecute  the  Gulf  king  mackerel
17   gillnet fishery.
18
19   This  fishery  currently  has  payback  provisions  on  overages  as  a
20   post-season  AM,  is  mostly  self-regulated,  and  landings  are
21   reported  daily  to  SERO.    Mr.  Strelcheck  commented  that  EFPs  are
22   intended  for  limited  duration  and  as  a  tool  to  learn  new  ways
23   that  can  improve  management,  and  not  necessarily  as  a  tool  to
24   increase  industry  buy-in.    With  that,  Mr.  Chairman,  I  will  stop,
25   because I know Mr. Sanchez had his hand up here.
26
27   **CHAIRMAN FRAZER:**   Thank  you,  Mr.  Riechers,  and  you  are  exactly
28   right, and so, Mr. Sanchez, your turn.
29
30   **MR. SANCHEZ:**   I  just  heard  my  name.    I'm  sorry,  but  I  was  just
31   walking back.
32
33   **CHAIRMAN FRAZER:**   Sorry,  John,  and  so  we  are  at  the  end  of  the
34   Mackerel  Committee  Report,  and  I  wanted  to  give  you  an
35   opportunity to provide some comment.
36
37   **MR. SANCHEZ:**   Thank  you  for  that,  and  I'm  sorry  for  stepping
38   away  at  the  absolute  wrong  time.    What  I  wanted  to  do,  and  I
39   don't  know  if  I  need  to  make  a  motion  or  just  to  request,  and
40   you  all  can  advise  me,  but  I  would  like  to  make  a  request  that,
41   at  the  next  meeting  in  June,  that  we  place  Amendment  33  for  king
42   mackerel on the agenda.
43
44   **CHAIRMAN FRAZER:**   Okay.    Real  quick,  we're  going  to  look  at  the
45   action  guide  and  see  where  we  are  with  the  status  of  that
46   document.  Hold on one second, John.
47
48   **MR. SANCHEZ:**   Thank you.

0003212

```
 1
 2   CHAIRMAN FRAZER:   John, I'm having a discussion here with the
 3   staff, and we will give it an effort, to see if we can put a
 4   draft options document together, and we will do our very best to
 5   do that.  Okay?
 6
 7   MR. SANCHEZ:   I do appreciate it, because -- Two reasons.  One,
 8   we happen to be in the backyard of the people that are
 9   interested in this, in Key West, as well as it is my last
10   meeting, and it's been an issue that I've been speaking on for a
11   couple of years now, and so it would be nice to at least have
12   that be considered in the geographic area where the fishery
13   transpires, to a great extent, where there's a lot of interest
14   in this, and I would like to at least have some discussion, and
15   I appreciate staff's efforts on trying to put that together.
16   Thank you.
17
18   CHAIRMAN FRAZER:   Thank you, John.  I appreciate your comments
19   and your intent, and, as I said, the staff will make every
20   effort to try to do that.  Obviously, as we continue to work
21   through these meetings, the agenda is full, but, again, we'll
22   try to accommodate that, to the best of our ability.
23
24   MR. SANCHEZ:   Thank you.
25
26   CHAIRMAN FRAZER:   Natasha and then Mr. Anson.
27
28   DR. MENDEZ-FERRER:   I can let Mr. Anson go before me.  My
29   comment was a quick comment about cobia.  If Mr. Anson has
30   further discussion on king mackerel, I can allow him to go
31   first.
32
33   CHAIRMAN FRAZER:   Mr. Anson.
34
35   MR. ANSON:   Thank you, Mr. Chair.  Just a point of procedural
36   clarification, I guess.  John, I think -- John mentioned about
37   bringing a document together, and staff put up Amendment 33, and
38   then you mentioned something about putting together a draft
39   options paper, and so is it a document that the council has
40   already requested and staff had previously started, and that was
41   called Amendment 33, or is this like a brand-new request to
42   direct staff to put some ideas together to bring to the council,
43   because it's my understanding that, normally, we would have to
44   do a motion in order to have staff to do that.
45
46   I'm in support of it, if a motion is needed, but I'm just,
47   procedurally, again, trying to figure out where we are with what
48   John wants, or wants to see, and whether or not it's something
```

0003213

1  the staff has already put together or will be putting together,
2  and that's all.
3
4  **CHAIRMAN FRAZER:**  Thanks, Kevin.  I was looking at the action
5  schedule when I made those comments, but Mr. Rindone.
6
7  **MR. RINDONE:**  The council has already requested a document, and
8  so, whenever we have requests for that, or the South Atlantic,
9  for CMP species, we go ahead and stake our claim to an amendment
10  or framework number, and so this is a formal document.
11
12  The last time this was discussed, Dr. Mendez presented a scoping
13  presentation to you guys, to frame what it was that you guys had
14  requested us to take a look at, which are -- If I remember
15  correctly, it's updating the catch limits based on the last
16  SEDAR 38 update assessment, and also looking at sector
17  allocations, and there may have been one more thing in there,
18  and Dr. Mendez might remember that, that I'm missing.
19
20  We'll draw that stuff up and take a peek at what we received
21  from that scoping presentation that we gave you guys a while
22  back, and we'll put together an options paper for you to take a
23  look at and chew on a little bit.
24
25  **CHAIRMAN FRAZER:**  Thank you, Mr. Rindone.  Is that a
26  satisfactory answer, Kevin?
27
28  **MR. ANSON:**  That's great.  Thank you.
29
30  **CHAIRMAN FRAZER:**  Okay.  Natasha.
31
32  **DR. MENDEZ-FERRER:**  There were some really good discussions
33  during cobia, and I wanted to remind the council that I guess
34  the goal for the next meeting is to provide a public hearing
35  draft, and I do have to mention that, because the South Atlantic
36  has not been able to see Action 3, some of the analysis might be
37  limited, based on what changes might come into Action 3 and
38  Action 4, as it pertains to the FLEC Zone, but we're also going
39  to be including some of the revised possession limit analyses
40  that we weren't able to include in this draft, and so it's going
41  to be, hopefully, a document that will answer some of the
42  questions that were brought up today.
43
44  **CHAIRMAN FRAZER:**  Great.  Thank you, Natasha.  All right.  Is
45  there any other -- I am not seeing any hands, and so, Mr.
46  Riechers, thank you very much for your effort to lead us through
47  this.
48

123

1   We will go ahead and continue on with the Data Collection
2   Committee and Mr. Anson.
3
4                   **DATA COLLECTION COMMITTEE**
5
6   **MR. ANSON:**   Thank you, Mr. Chair.   The Data Committee met on
7   April 12, and the committee adopted the agenda, Tab F, Number 1,
8   as written and approved the minutes, Tab F, Number 2, of the
9   October 2020 meeting as written.
10
11   AP Recommendations for Proposed Commercial e-logbook
12   Requirements, Tab F, Number 4, council staff reviewed excerpts
13   from the Reef Fish and Costal Migratory Pelagic Advisory Panel
14   summaries regarding discussions on the proposed changes to the
15   commercial electronic logbook program.
16
17   Overall, the panels agreed that timely and accurate data
18   collection is important and were supportive of moving away from
19   paper forms.   However, the panels voiced a number of concerns
20   about duplicative and burdensome requirements, difficulty of
21   hail-in reporting on small open-console vessels and during
22   inclement weather, and the sharing of proprietary locational
23   information.   Mr. Martin Fisher, the CMP AP chair, echoed these
24   concerns to the council and questioned the scientific benefit of
25   the proposed increase in the number of reporting requirements.
26
27   Dr. John Walter asked Mr. Fisher what he advised for engaging
28   commercial stakeholders and proposed a workshop for addressing
29   the panel's concerns.   Mr. Fisher stated that he identified two
30   separate objectives for the program.   He recommended that a move
31   towards electronic reporting for the current paper logbooks
32   could happen quickly and would be an improvement.
33
34   However, the proposed newer real-time reporting requirements
35   would need to be modified and that more input from industry
36   would be beneficial for achieving program goals.   He was
37   amendable to having the panel work with Southeast Fisheries
38   Science Center staff, through the council process, to develop
39   program solutions.   Several committee members agreed that more
40   engagement was appropriate and strongly encouraged continued
41   transparent communication on the development of the program.
42
43   Then we took up Update on Southeast For-Hire Integrated
44   Electronic Reporting Program, Tab F, Number 5.   Mr. Rich
45   Malinowski provided an overview of the progress of the Southeast
46   For-Hire Integrated Electronic Reporting Program (SEFHIER).
47   Since the implementation of Phase I in early 2021, approximately
48   1,300 vessels have created accounts.

                                124

1
2  Program participants have identified some software issues, which
3  have been addressed by providers. Several instructional
4  webinars have been scheduled, and these will provide an
5  opportunity for fishermen to ask questions about the program.
6  An option for submitting an issues form is being contemplated to
7  allow for compliance, in the event of reporting equipment
8  failure. A tentative date for Phase II implementation has been
9  proposed for December 1, 2021.
10
11 A committee member inquired as to whether software developers
12 were planning on providing instructional videos to help captains
13 navigate the reporting software. Mr. Malinowski stated that
14 both VESL and eTRIPS were in the process of creating videos and
15 those would be made available on the SEFHIER web page.
16
17 Another committee member reported that fishermen had not been
18 aware of the program and were not likely to be exposed to online
19 resources and inquired when the dockside validation portion of
20 the program was expected to begin. Mr. Malinowski stated that,
21 when available to do so, more in-person outreach would be
22 considered and that the validation portion is tentatively
23 scheduled to begin in September.
24
25 Dave Donaldson added that the Gulf States Marine Fisheries
26 Commission was reaching out to the states to discuss the
27 feasibility of validation and were targeting September for
28 implementation.
29
30 A committee member asked for clarification about transmission of
31 data though the cellular reporting software. Mr. Andy
32 Strelcheck stated that the cellular unit logged positional
33 information and then transmitted data once in cellular range.
34 Addressing equipment malfunction, a committee member indicated
35 that reporting equipment failure was rare and that she had never
36 experienced an occasion where she was prohibited from completing
37 a trip for that reason.
38
39 Next, we moved on to Presentation on Methodology used for
40 Recreational and Commercial Discards, Tab F, Number 6. Dr.
41 Shannon Cass-Calay presented an overview on the methodology used
42 to quantify commercial and recreational dead discards data for
43 use in Southeast Fisheries Science Center assessments and
44 monitoring of annual catch limits, and how discards are
45 accounted for in assessment models.
46
47 Additionally, the presentation included information on
48 estimating uncertainty in the amount of estimated discards and

0003216

1  provided examples for red snapper, red grouper, and king
2  mackerel.
3
4  Recreational and commercial discard data are collected
5  differently. Recreationally-caught fish in the National Marine
6  Fisheries Services' Angler Access Point Intercept Survey that
7  are landed and observed by interviewers, the Type A records, are
8  summed with fish reported as harvested by fishers but
9  unavailable to dockside samplers, and those would be Type B1
10 records.
11
12 B1 fish include fish discarded dead at-sea, used for bait, or
13 part of landed catch that was not available for viewing by the
14 sampler. Fish released alive, the B2 records, are used in
15 calculating the number of fish that die after being released
16 alive, or release mortality. The A and B1 records are summed to
17 obtain recreational harvest, and the total is used to track
18 against the recreational ACL. The presenter noted that the
19 number of fish released dead is small.
20
21 B2 records are fit in the assessment model using species-
22 specific levels of uncertainty, the coefficients of variation
23 associated with release estimates, and post-release mortality is
24 calculated by multiplying number of released fish by a discard
25 mortality rate, which are generally species-specific and could
26 also be fishing-fleet-specific. B2 records are not included in
27 the calculation of catch limits.
28
29 For the commercial fishery, only fish landed and reported
30 through seafood dealers are counted against the commercial ACL.
31 Commercial fishing trips are sampled for the disposition of
32 released fish, those that are alive, dead, used for bait, et
33 cetera, using the Gulf of Mexico Reef Fish Observer Program, the
34 RFOP.
35
36 Southeast Fisheries Science Center staff provided the rates of
37 dead fish that were brought to the vessel and those fish used as
38 bait from 2007 to 2019 and indicated that the level of dead
39 discards using this method is small. However, it may
40 underestimate dead discards.
41
42 Southeast Fisheries Science Center staff also noted that reef
43 fish used for bait is currently prohibited. However, only a
44 small percentage, approximately less than 1 percent for the
45 example species presented, of observations met this criterion,
46 and Southeast Fisheries Science Center staff do not expect these
47 observations to have implications for management.
48

126

0003217

```
 1  Unlike for recreational ACLs, where B1s are included in the
 2  harvest estimate and deducted from the ACL, the similarly
 3  classified fish that are dead on arrival, released as dead, or
 4  used as bait during commercial fishing trips are not included
 5  with landings and tracked against the commercial ACL.  As with
 6  recreationally-caught fish, the release mortality associated
 7  with commercial live discards are not included in calculation of
 8  catch limits.  Due to time constraints, follow-up discussion was
 9  postponed until Full Council.  Mr. Chair, this concludes my
10  report.
11
12  CHAIRMAN FRAZER:  Thank you, Mr. Anson, and I believe, during
13  committee, I was going to give you an opportunity to share a
14  brief presentation with the council, if you would like to do
15  that now.
16
17  MR. ANSON:  I would like to do that, and I have given that to
18  staff previously, if they can pull that up.
19
20  CHAIRMAN FRAZER:  Okay.  Let's give them a second to that.
21  While we're getting it pulled up, it looks like we have a couple
22  of folks in the queue to talk.  Andy Strelcheck.
23
24  MR. STRELCHECK:  Thanks, Tom.  Two things.  The first is a
25  question.  Going back to the electronic reporting discussion, at
26  the tail-end of that, there was a reference to the potential for
27  an exception for equipment failures.  We also heard that several
28  times from charter captains during public testimony.
29
30  We, right now, are planning for a late 2021 rollout of the
31  electronic reporting devices, assuming we continue to get
32  approval for more cellular devices, and so I wanted to ask if
33  the council is interested in pursuing an exception, and, if so,
34  we would want a motion to go ahead and begin work on probably a
35  framework action, or even an abbreviated framework action, to
36  consider an exception for the for-hire industry.
37
38  CHAIRMAN FRAZER:  Thank you, Andy.  We will hold that for right
39  now, but we'll come back to that.  Mr. Banks.
40
41  MR. STRELCHECK:  Can I make a comment, Tom?  I know it's your
42  decision, obviously, as Chairman, to decide whether Mr. Anson
43  presents or not, and I would request that the presentation
44  either be done at the end of the day today, or potentially at
45  the next meeting.
46
47  I have concerns about council members just providing
48  presentations within the meeting,  and certainly that we can
```

0003218

```
 1  raise our points and bring our issues to the table, and that's
 2  obviously what we're here to do, but to drop a presentation on
 3  us without any full knowledge of that information beforehand I
 4  think is really detrimental to the transparency of the council
 5  process.  I would recommend that, procedurally, we think about
 6  how to approach presentations like this going forward, and
 7  reconsider, obviously, Mr. Anson presenting today.
 8
 9  CHAIRMAN FRAZER:  Thank you, Andy.  I will, again, also follow-
10  up on that.  Patrick.
11
12  MR. BANKS:  I don't need to make a comment.  Thank you, Mr.
13  Chairman.
14
15  CHAIRMAN FRAZER:  Okay, Mr. Banks.  Dr. Porch.
16
17  DR. PORCH:  I just wanted to emphasize the need for electronic
18  logbooks, and I fully support having a workshop, where we can
19  have a meeting of the minds and hammer these things out as soon
20  as possible, and I say that for two reasons.  One, as we saw
21  with red snapper, and we're increasingly seeing with other
22  species, there's a lot of spatial structure, and it's not just a
23  big washing machine in the Gulf, where everything randomly
24  intermixes instantaneously, and there's actually, most likely, a
25  series of local or metapopulations that are partially self-
26  recruiting, and so we really need to get the spatial structure
27  data from the fishery, and electronic logbooks with VMS-type
28  tracking would give us that information.
29
30  In fact, we've already put it to fairly good use with that
31  presentation we made to the SSC, in terms of where the fishing
32  is occurring, and the other reason we need that is that the
33  Center, as with many federal organizations, is actively
34  downsizing, as a consequence of having flat budgets, but
35  increasing costs.
36
37  Every time that Congress gives us a raise, but doesn't pay for
38  it, of course, that means, in the future, we have to hire fewer
39  people, and we have, generally, an average of a decrease of
40  three staff persons per year at the Center, and so the only way
41  to compensate for that is to automate a lot of the data
42  collection processes, including having electronic reporting
43  rather than trying to deal with things manually, and so it's
44  absolutely critical that we move into the twenty-first century
45  with regard to electronic reporting.  Thank you.
46
47  CHAIRMAN FRAZER:  Thank you, Dr. Porch.  I am going to go ahead
48  and see what Kevin would like to add to this discussion right
```

128

```
 1  now before I make a decision where we're going to go.  Kevin.
 2
 3  MR. ANSON:   Well, I would like to just make verbal comments
 4  then, and you don't have to show the presentation, but I would
 5  like the opportunity to follow-up with some of the points that I
 6  had.  We talk openly and bring points of discussion together
 7  kind of organically at each meeting, and so I would like the
 8  opportunity to do that.
 9
10  We ran out of time during Data Collection, and I had asked to
11  provide the presentation, and you said that you didn't want to
12  at the time, because of time, and so I know we're right at the
13  time to end Data Collection right now, but, again, we had some
14  technological issues, and we got a late start this morning of
15  about ten to fifteen minutes, and I would like to make my
16  points, because I think they have implications to our
17  discussions, again, as we take up some of these issues that
18  we'll be following in Reef Fish.  If I have a few minutes, Mr.
19  Chair, I would like to bring those points forward.
20
21  CHAIRMAN FRAZER:   We'll go back to the discussion that we had,
22  Mr. Anson, and I did agree -- Can you all hear me?  Every once
23  in a while, I lose my ability here to transmit.  Anyway, what I
24  was saying, Kevin, is that --
25
26  MR. DIAZ:  Your phone cut out again, Tom.
27
28  CHAIRMAN FRAZER:  Let me try again.  This is the best that I can
29  do, and so I will say it one more time.  I did agree, Kevin, to
30  give you an opportunity to share your presentation with the
31  council, and I would ask that you keep your comments short --
32
33  MR. RINDONE:  Just talk through mine.
34
35  CHAIRMAN FRAZER:   I'm not sure exactly what's up with the
36  microphone, but, Kevin, you can go ahead and make your points as
37  they relate to the discussion.  If you want to use the
38  presentation -- but I would like discussion limited, and so go
39  ahead.
40
41  MR. ANSON:  Can everyone hear me?
42
43  CHAIRMAN FRAZER:  I can hear you, Kevin.
44
45  MR. ANSON:   Okay.  Thank you.  I will be brief, but my main
46  point that I want to make is that the presentation that was
47  provided by NOAA staff during Data Collection showed some
48  differences in how dead discards are treated, and it's important
```

0003220

1  that we talk about Magnuson and we talk about National
2  Standards, and we'll be talking about National Standards here in
3  Reef Fish.
4
5  There is one section within National Standard 1 that explicitly
6  states that fisheries are to be managed through ACLs and ACLs
7  are to be tracked against catch, and "catch" is defined in that
8  section, and it's Section F in National Standard 1.  Basically
9  "catch" is defined as all those fish that are dead immediately
10  as a result of fishing activities, and so those would be fish
11  that are caught and put into an ice box and brought to shore, as
12  well as those fish that are released back into the water dead,
13  used for bait, potentially eaten by another fish or a mammal,
14  and, again, all catch that is associated with fishing
15  activities.
16
17  The presentation that was provided on Monday provided some
18  information about the quantity, or level, of potential dead
19  discards, but it did not provide the full picture, in my
20  opinion, and that is because fish that were only brought to the
21  vessel on the commercial side were counted in the analysis that
22  was provided, and so that leaves the other part of the action.
23
24  When you return a fish back to the water, it's got to come into
25  the vessel, and something has got to happen to get it off the
26  hook, and then it's got to be returned to the water, and so
27  there is some missing fish there, if you will, that were not
28  accounted for, as indicated in the presentation, and I have some
29  information that's available that suggests that the discard
30  mortality is much higher than what was offered in the
31  presentation, and folks can go research the 2019 IFQ report for
32  red snapper, and it was the update report that the Science
33  Center produced, and there is a table in there that describes
34  the level of discard mortality associated with the longline and
35  vertical line fisheries, and those percentages were
36  significantly higher than those that were presented to us for
37  the fish that were brought to the vessel.
38
39  When you analyze those, as I did, in the method that I used, it
40  essentially resulted in an overage in every year but one from
41  2007 to 2019, and that could be a high number, and I certainly
42  understand that, but, with the data that I had available, which
43  was gleaned from the last SEDAR assessment, as well as some
44  other publications, some articles, I came up with some pounds of
45  fish that were estimated to occur, or have occurred, based on
46  those discard mortalities that were in the IFQ report, and so I
47  just mention that, that there is a discrepancy.
48

130

1  There is a difference in how dead discards are treated.  They
2  should be counted against ACLs, and they are in the
3  recreational, and they are not in the commercial.  That is,
4  again, explicitly identified in National Standard 1, that it
5  should be that way, and then you start looking at other National
6  Standards, and is that fair and equitable, and so this is just
7  one more issue that is in this fishery, and I'm speaking
8  specifically to the red snapper fishery.
9
10  I am not familiar with the discards, nor did I look it up for
11  red grouper or king mackerel, of the three species that -- Or
12  two other species that were mentioned, but, again, this is
13  important as we move forward in these discussions and talk about
14  the distribution of fish based on the information that we know
15  at-hand with the Great Red Snapper Count and trying to move
16  forward so that we can be fair and equitable in the distribution
17  of fish, knowing how they were calculated -- The original ACLs
18  were calculated, and so, Mr. Chair, I do appreciate the little
19  bit of time, and I hope, in the future, that maybe this issue
20  will come up again, and I will have an opportunity to show my
21  slides, but that's, essentially, my summary of my presentation.
22  Thank you.
23
24  **CHAIRMAN FRAZER:**  Thank you, Mr. Anson, and I appreciate the
25  comments, and I understand that there is clearly a need,
26  perhaps, to look at some of the definitions, I guess, there and
27  try to rectify any differences, but this is my opinion, as I
28  think probably a much lengthier discussion, and in many ways
29  it's more general, even though it may have application to our
30  upcoming discussion, but I think we will go ahead and take your
31  comments into consideration for the time being and revisit this
32  at a later date, and so, again, thank you.
33
34  The next thing that I want to make sure that we tackle, real
35  quick, is Mr. Strelcheck wanted to get a motion from the council
36  to start a framework action that would allow us to deal with the
37  equipment failures and an exception to those, as they relate to
38  electronic reporting, and is there somebody willing to make that
39  motion?  I see, Susan Boggs, your hand is up.
40
41  **MS. BOGGS:**  Yes, sir, it is.  Not for that purpose, but I
42  certainly don't mind making the motion, because I did have a
43  couple of comments related to the SEFHIER, and I will be brief.
44  After our meeting on Tuesday, I actually attended the Alabama
45  Charter Fishing Association meeting, and they asked me for an
46  update, and we talked about what came out of the SEFHIER
47  meeting.
48

0003222

1   I had three specific items that I was asked to address with the
2   council, and I don't intend for them to be answered today, and I
3   hope that Rich is listening, because I intend to have
4   conversations with him as well.  There is still some concern
5   about what is the purpose of the socioeconomic data collection.
6   I gave my opinion for it, and they weren't satisfied with that.
7
8   Several owners, captains, own several vessels, and they're
9   having to use separate emails for each vessel to set up an
10  account, but this particular owner/captain would like to see all
11  of the vessels under one account, and I'm not sure how we do
12  that, and I know that, me personally, our vessels are under one
13  account, but I've had that account for so long that I can't
14  remember how I did it, which I can reach out, but they're trying
15  to simplify, is what they're trying to do, and that would be the
16  other thing.
17
18  A gentleman that has a center console expressed how difficult it
19  is to answer all the socioeconomic questions plus entering the
20  fish prior to landing of the fish, and they said they wish it
21  were a little more simple than what it is, and, quite frankly, I
22  can't speak to that, because I think they have a few more
23  questions on their survey, as opposed to the headboats, but they
24  have asked for it to be simplified, which I don't know that that
25  can be done, and then, of course, the concern of what happens
26  with equipment failure, and so I would certainly be happy to put
27  that motion before the council.  Thank you.
28
29  **CHAIRMAN FRAZER:**  Thank you, Ms. Boggs.  I am going to let you
30  maybe start to craft it in your mind a little bit while I get to
31  Dr. Porch and then Andy Strelcheck.  I will come back to you.
32  Dr. Porch.
33
34  **DR. PORCH:**  Thank you, Dr. Frazer.  I think there is still some
35  confusion about what we mean by discards, and it may be partly
36  due to the fact that everybody uses dead discards in a somewhat
37  different way, and we're not completely consistent in our
38  terminology.
39
40  The first thing that I want to emphasize is that released fish
41  that later die are not used against the ACL either in the
42  commercial or the recreational, and I think what Mr. Anson was
43  referring to as dead discards in the commercial fishery, when I
44  looked at the presentation, was including fish that were
45  released and later died, and, yes, there are a lot more of those
46  than fish that come up dead and are thrown back, but those are
47  not counted against the ACL.
48

0003223

1  Just to be absolutely clear, the recreational ACL includes the
2  so-called B1s, and so, of course, monitoring should also include
3  the B1s.  We could subtract out the B1s, but then that would
4  also lower the ACL, and so it's really a wash.  Remember that
5  the B1s are predominantly landed fish that the sampler did not
6  see.  It does include some fish that are thrown back dead and
7  various other things, but those are a very small fraction of the
8  total.
9
10 The recreational ACL, again, does not include B2s, and neither
11 does the commercial, and those are released fish that later die,
12 and I also wanted to emphasize that the commercial fishery does
13 not actually have the equivalent of B1s, because the observer is
14 there when the fish are caught, and remember that most B1s are
15 fish that are basically concealed from the port sampler, in one
16 way or another, whether it's intentional or someone is just in a
17 hurry and pulls out before they can see them.  Commercial
18 fishermen can't conceal their fish from observers, and so there
19 is no corresponding category to B1s, and I hope that clarifies
20 things.  Thank you.
21
22 **CHAIRMAN FRAZER:**  Thank you, Dr. Porch.  Mr. Strelcheck.
23
24 **MR. STRELCHECK:**  Thanks, Tom.  Two things.  I want to continue
25 to emphasize that, if the council wants an exception for
26 electronic reporting, it would be beneficial to have a motion at
27 this meeting, given the timeframe we're on for implementing VMS
28 requirements in the for-hire fishery.
29
30 I also just wanted to circle back to my comments regarding
31 Kevin's presentation and make it very clear that I am not
32 opposed to Kevin, or any other council member, providing their
33 perspective or opinions.  What I am opposed to was kind of the
34 process and how this was handled from a presentation standpoint,
35 and I think, with Clay's comments just now kind of making it
36 clear that there is still some confusion and misunderstanding,
37 and I would really encourage the Science Center and Kevin to
38 work with one another and kind of talk through this and make
39 sure we all have a common understanding of the issue going
40 forward, and so thanks.
41
42 **CHAIRMAN FRAZER:**  Thank you, Andy, and so I want to say a few
43 things about the process, and you're exactly right.  I think
44 that, moving forward, we'll be, certainly, more cognizant of the
45 type of information and the level of detail of information that
46 is being presented and how we allot time for that, and so point
47 taken there, but I also appreciate that Kevin -- We ran out of
48 time and didn't have enough time, during committee, to provide

133

1   some general points, which he did here today, and so I will
2   revisit that, and hopefully I won't make that mistake moving
3   forward.
4
5   With regard to the need for a motion to deal with the exception
6   for equipment failures, that's where we're at, and Ms. Boggs, I
7   believe, is going to go ahead and provide us with a motion for
8   consideration.  Ms. Boggs.
9
10  **MS. BOGGS:**  Okay.  I'm trying.  **I'm not good with this, and so**
11  **my motion would be to direct staff to begin a framework action**
12  **to address equipment failure for charter vessels and headboat**
13  **reporting.**  I don't know if, in the motion, I need to include --
14  I am just trying to think.
15
16  **CHAIRMAN FRAZER:**  I was going to just try to help you out here a
17  little bit more.  I think the motion is to -- The important
18  thing here is that we capture the intent and staff feels like
19  they have clear direction.  **The motion, as it reads now, is to**
20  **direct staff to begin a framework action to address equipment**
21  **failure for charter vessels and headboat reporting.  It might be**
22  **to address equipment failure and possible exceptions.**
23
24  **MS. BOGGS:**  There you go.
25
26  **CHAIRMAN FRAZER:**  Okay.  For charter vessels and headboat
27  reporting.  Andy, will that work for you?
28
29  **MR. STRELCHECK:**  Yes.
30
31  **CHAIRMAN FRAZER:**  Okay.  Thank you, Ms. Boggs.  Is there a
32  second to this motion?
33
34  **MR. DIAZ:**  I will second it.
35
36  **CHAIRMAN FRAZER:**  Thank you, Mr. Diaz.  I see, Ms. Levy, you
37  have your hand up, and we'll go right into discussion.
38
39  **MS. LEVY:**  I think it's okay.  I mean, I guess I would just note
40  that I think everyone understands this, even though the motion
41  doesn't say it, but we're talking about exceptions to the
42  reporting requirements and location tracking requirements,
43  right, and I guess that would be one of my questions.  Are we
44  looking at equipment failure meaning VMS failure, and so we're
45  looking at exceptions particularly for that, or are you also
46  looking for exceptions to actually submitting hail-outs and
47  logbooks, which can be done via a number of methods?
48

1  **CHAIRMAN FRAZER:**   Mr. Strelcheck, are you looking for a
2  particular definition here of the exceptions?
3
4  **MR. STRELCHECK:**   Well, my interpretation and understanding was
5  specific to the vessel monitoring system equipment.  If there's
6  concerns more broadly, then that would be beneficial for the
7  council to weigh-in on, but, as Mara indicated, we believe,
8  because of the multiple methods for reporting hail-outs and
9  logbooks, that that wouldn't require the exceptions as much as
10 the VMS probably would.
11
12 **MS. BOGGS:**  Tom, to that point?
13
14 **CHAIRMAN FRAZER:**  Yes, please.
15
16 **MS. BOGGS:**  So that was going to be my question later, and I
17 just want to make sure that, if there are various ways for the
18 hailing-out, that we make that very known to the fishermen,
19 because, right now, that's not very clear, and so, if it doesn't
20 need to be added to this, that's fine, and I just want to make
21 sure that, somehow, we get it clarified to the captains how they
22 can do that.  Thank you.
23
24 **CHAIRMAN FRAZER:**   Great.  My understanding is that the motion
25 will be directed specifically to the equipment, and we will seek
26 ways to clarify the hail-in and hail-out requirements.   Dr.
27 Simmons.
28
29 **EXECUTIVE DIRECTOR SIMMONS:**   Thank you, Mr. Chair.  I was just
30 wondering if there is other avenues, if there's other fallbacks,
31 that we already have in the regulations for hail-in and hail-out
32 if the VMS equipment does fail, and does that have to be a
33 regulatory change, or can we just fall back on that without
34 changing the regulations?   I'm just trying to get a better
35 understanding here.
36
37 **CHAIRMAN FRAZER:**  I think that's a question best directed to the
38 Regional Office.
39
40 **MS. LEVY:**  I guess what are you -- I'm not sure what you're
41 referring to that's already in the regulations, especially with
42 respect to the trip declarations and the actual logbook.
43
44 **EXECUTIVE DIRECTOR SIMMONS:**  I guess what I'm asking is, if the
45 VMS equipment fails, can it then follow the other regulations,
46 the hail-in and hail-out and use another device to report
47 landings?
48

135

0003226

1  **CHAIRMAN FRAZER:**  Ms. Levy.
2
3  **MS. LEVY:**  Well, I think -- I mean, I guess, and the Regional
4  Office can confirm, but I understand that one way to do these
5  things is potentially, if you have a VMS that has forms, but I
6  believe you can do these things through other web-based
7  applications, like eTRIPS and stuff, and so, if you have
8  multiple accounts -- I think there's a way to do that part of it
9  multiple ways, but I will let the Regional Office confirm.
10
11  **CHAIRMAN FRAZER:**  Okay.
12
13  **MR. STRELCHECK:**  Yes, that is correct.  If you had a VMS failure
14  and couldn't do hail-out or logbooks, there is still the option
15  of, obviously, reporting, through a cellular-based device, that
16  information, or through a computer for that matter.
17
18  **CHAIRMAN FRAZER:**  Thank you for that clarification.  Ms.
19  Bosarge.
20
21  **MS. BOSARGE:**  Thank you, Mr. Chair.  This is something that the
22  commercial fleet has brought up over the years too, with the
23  VMS, and so, if we move forward with this motion, I was
24  wondering if Susan would be okay with saying "charter vessels,
25  headboat, commercial vessel reporting", so that anything that --
26  Any exceptions it would provide there for the for-hire fleet
27  would also be allowed to apply for the commercial fleet to have
28  those units.
29
30  **MS. BOSARGE:  I am amenable to that.**
31
32  **CHAIRMAN FRAZER:**  Okay, and so we will add that, assuming that
33  the seconder is also okay with that.
34
35  **MR. DIAZ:**  I am okay with that.
36
37  **CHAIRMAN FRAZER:**  Okay.  Thank you, Mr. Diaz, and so we will go
38  ahead and modify this motion to -- **Where it says "and possible**
39  **exceptions for charter vessels, headboats, and commercial**
40  **reporting".**  Okay.  Does staff have enough direction for this?
41  Dr. Simmons.
42
43  **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Chair.  I believe
44  so.  I'm not sure -- Is this still going to be a framework
45  action?  I guess I would ask Ms. Levy, if commercial reporting
46  requirements are also added to this -- Because it involves the
47  reef fish IFQ program, I'm not sure if that becomes a full plan
48  amendment.  Thank you.

136

0003227

1
2  **CHAIRMAN FRAZER:**  Ms. Levy.
3
4  **MS. LEVY:**  I don't think it makes it a plan amendment, but I
5  think it makes it a lot more complicated, and I would also just
6  note that the stated reason for wanting an exception, at least
7  that I heard during public testimony and stuff for the for-hire
8  vessels, is because of how differently they operate than the
9  commercial vessels, and so I guess I would just caution putting
10  commercial vessels in here without much thought to that and why
11  we have the VMS on the commercial vessels like we do, and it's
12  been years, right, and it's an established VMS program, and, as
13  far as I know, the council hasn't heard a lot of issues with
14  equipment failure and the need for exceptions in that part of
15  the fishery.
16
17  **CHAIRMAN FRAZER:**  Thank you, Ms. Levy.  We'll go to John Sanchez
18  and then Martha Guyas.  John.
19
20  **MR. SANCHEZ:**  Thank you, Mr. Chair.  If Susan is agreeable, at
21  the end of the period, I would feel better if we were adding
22  some language, something along the lines of "to ensure the
23  ability to execute trips", and that would be for charter,
24  headboat, and commercial, just so that we're very clear in what
25  we're trying to accomplish here, the intent.
26
27  **CHAIRMAN FRAZER:**  Okay.  Thanks, John.  We'll come back to that
28  in just a minute.  Ms. Guyas.
29
30  **MS. GUYAS:**  I support what John just said.  I'm a little bit
31  wary about lumping commercial in here.  I kind of feel like that
32  might need to go in one of the IFQ amendments, and I don't know
33  if it's 36B or 36C, and I do think charter and headboat have
34  different considerations, like what came up yesterday, and they
35  only have so many days to run red snapper, and their ability to
36  re-book a trip has different and very limited constraints, or I
37  guess there's a lot of constraints, depending on their
38  availability and customers' availability, et cetera.
39
40  I guess, if we're going to look at all three of these in one
41  amendment, if that's the way we go here, I think the
42  charter/headboat need to be considered separately from
43  commercial, or at least break down the actions, or the
44  alternatives, and so that's just my thoughts here.
45
46  **CHAIRMAN FRAZER:**  Okay.  We'll take one more question, and then
47  I'm going to try to bring this one in for a landing.  Mr.
48  Swindell.

0003228

1
2   **MR. SWINDELL:**   Thank you, Mr. Chairman.   My concern is it's
3   going to take time, too much time, to get all this worked out
4   for staff to do and get back to the council and so forth.   I
5   mean, the charter/for-hire vessel, and any vessel, that has a
6   reporting system that fails needs to have an immediate, today,
7   way to report what has happened, so that they can have some
8   action somewhere so that they can go fishing.
9
10  You can't put this off for another couple of months.   I mean,
11  this is an immediate need, and I think we need to take some
12  immediate action as to who to call, or who can do it, and I
13  think NMFS needs to be able to work it out so that we can,
14  because this is absurd for us to have a system of reporting and
15  you cannot take a trip just because your system is not working.
16  This is not right, and so it needs to be immediate, and it
17  doesn't need to be waiting, and we need to have a formal
18  presentation for it later, but we need to have something done
19  today.   Thank you, sir.
20
21  **CHAIRMAN FRAZER:**   Thank you, Mr. Swindell.   I am going to point
22  out to folks here that -- All right.   I will take two more
23  questions from Andy and Susan, and then I'm going to shut it
24  down after that, because we have lots of things to accomplish,
25  and so Andy and then Susan.
26
27  **MR. STRELCHECK:**   Tom, to Ed's point, keep in mind, Ed, that
28  vessel monitoring system requirements for the commercial reef
29  fish fishery have been in place for well over a decade, and so
30  this would be a change to their current requirements, which
31  don't allow for an exception.
32
33  As far as the for-hire industry, these vessel monitoring systems
34  are not required at this point, and they would go into effect
35  sometime late this year, if we remain on track with our second
36  rulemaking, and so there's currently nothing that is preventing
37  vessels from going fishing, and we do have, obviously, some ways
38  for them to report, alternative means, if they have a failure
39  for hail-out or logbooks.   Thanks.
40
41  **CHAIRMAN FRAZER:**   Thank you, Mr. Strelcheck.   Ms. Boggs.
42
43  **MS. BOGGS:**   Okay.   Currently, the charter/for-hire and the
44  headboats have the ability to use their cellular device for all
45  of their reporting.   My intent with this is so that, when the
46  VMS becomes required, or the archivable GPS, and that equipment
47  fails, that the fishermen are still allowed to fish.   Some of
48  them will be using the cellular-based device, which this will

138

1  not be an issue.
2
3  This motion, in my mind, has really nothing to do with the hail-
4  out or the reporting.  That can be done from a computer, and you
5  can call it into your office or your wife or whatever, and you
6  can do it on your cellphone.  This, to me, is trying to get in
7  front of what might happen when we transfer or have the
8  requirements for the GPS and/or the VMS, but I see no reason,
9  other than a software issue, that a captain may not be able to
10 hail-out or file his report, and I think that is separate, and
11 that is something that doesn't need to be dealt with at the
12 council level, or maybe it does, but there just needs to be a
13 backup of who can I call, who can I email, to address that
14 issue, and so I hope I have clarified that.
15
16 As far as John Sanchez's comments about the ability to execute a
17 trip added to this, I don't have an issue with that.  Again, I
18 think -- At least my intent, mainly, is to address the failure
19 of your VMS or GPS, and that becomes a requirement.  I hope that
20 helps.  Thank you.
21
22 **CHAIRMAN FRAZER:**  I think that it does help, and I think we've
23 established a record of this discussion, and I think staff has
24 enough direction to begin the framework action, and I appreciate
25 that it may in fact become a bit complicated, as it relates to
26 commercial boats.  I think the direction is clear, and we'll
27 begin the document, and, if we run into problems, then we can
28 bring it back to the council for discussion.  **Having said that,**
29 **is there any opposition to the motion?  I am not seeing any**
30 **hands or hearing any, and so the motion carries.**
31
32 Is there any further business to come before or related to the
33 Data Committee?  I am not seeing any hands or hearing any
34 voices.
35
36 **MS. BOSARGE:**  Tom, my hand is up.
37
38 **CHAIRMAN FRAZER:**  Ms. Bosarge, go ahead.
39
40 **MS. BOSARGE:**  It's just quick, and I just wanted to mention, on
41 the record for staff, to make sure they understand, that
42 workshop on changes in collecting data from all our different
43 commercial fleets, if you look at the reef fish motion that the
44 Reef Fish AP made, and it included the shrimp industry, and it
45 included going back to also the shrimp industry as well, and I
46 know that we're kind of on our way to trying to set out the
47 parameters in our program, but I still would appreciate being
48 part of that workshop, just for the common themes that run

139

1  through all the different fisheries as we move forward on this
2  path.  Thank you.
3
4  **CHAIRMAN FRAZER:**  Thank you, Ms. Bosarge.  Okay.  I am not
5  seeing any other hands, and we will go ahead and conclude this
6  committee report.  We will take a break, and we will meet back
7  at 11:05.  Thank you.
8
9  (Whereupon, a brief recess was taken.)
10
11  **CHAIRMAN FRAZER:**  As I try to fix my technological difficulties,
12  we will continue on with the Habitat Protection and Restoration
13  Committee Report with Mr. Banks.  Go ahead, Mr. Banks.
14
15          **HABITAT PROTECTION AND RESTORATION COMMITTEE REPORT**
16
17  **MR. BANKS:**  Thank you, Mr. Chairman.  This is the Habitat
18  Protection and Restoration Committee Report.  We met on April
19  the 14th, 2021.  The committee adopted the agenda as written and
20  approved the minutes of the August 2019 meeting as written.
21
22  Presentation on the Development of Generic Essential Fish
23  Habitat Amendment was delayed, due to time constraints, until
24  the next Committee meeting.
25
26  We moved to the Discussion Session of President Biden's
27  Executive Order Number 14008, Section 216(c) titled *Tackling the*
28  *Climate Crisis at Home and Abroad.*  Dr. Paul Doremus of NOAA
29  provided an overview of the Executive Order, which aims to
30  address issues related to the climate crisis and fisheries
31  resiliency.
32
33  NOAA is working closely with partners to obtain input on
34  developing action plans that will focus on addressing the
35  effects of climate change on fishery sustainability and
36  protected species.  NOAA will continue to receive input
37  throughout 2021, and Dr. Doremus provided a website link where
38  comments on the EO could be submitted.  He encouraged the
39  Committee to provide any insight related to the objectives of
40  the Executive Order.
41
42  A committee member responded that it would be beneficial to have
43  access to a variety of physiochemical data, for example depth-
44  dependent water temperatures and pH, to better understand
45  climate change effects within the Gulf of Mexico.  She also
46  commented that fishery resiliency was related to economic
47  resiliency and that the influence of climate factors on the
48  stability would affect the next generation of fishermen.

                                  140

0003231

```
 1
 2   It was noted that the State of Louisiana strives to consider
 3   options to industry stakeholders to improve business resiliency,
 4   such as expanding areas to fishing and modifying marketing
 5   strategies to include more species.
 6
 7   Another committee member noted that the objective of the
 8   Executive Order was expansive and suggested that other
 9   committees should be able to consider the Executive Order. The
10   committee agreed that the public, during council public
11   testimony, other council committees, the Outreach and Education
12   Technical Committee, and the Ecosystem Technical Committee
13   should also have the opportunity to comment on the EO as well.
14
15   The committee recognized that specialized advice would be
16   required to properly comment on environmental effects, as
17   specialized biological processes, such as temperature-dependent
18   sex determination, are difficult to predict in a shifting
19   climate. Dr. Clay Porch stated that the Southeast Fisheries
20   Science Center had produced an ecosystem status report that
21   could inform comments from the various committees. Ms. Martha
22   Guyas replied that the Florida Fish and Wildlife Conservation
23   Commission had submitted a letter regarding the EO and would
24   distribute it to the group.
25
26   Dr. Carrie Simmons stated staff would develop a draft list of
27   considerations for the Executive Order that could be presented
28   to various committees, incorporate that feedback, and could then
29   be submitted. She indicated that a letter was sent to the U.S.
30   Department of Interior and Secretary of Commerce on March 12,
31   2021, which provided comments on both Sections 216(a)(ii) and
32   216(c) regarding creating a taskforce and providing information
33   on what the council had done in the past to manage sustainable
34   fisheries under the MSA and begin to address climate change.
35
36   Additionally, the Council Coordination Committee was scheduled
37   to discuss the Executive Order at their May 2021 meeting. She
38   inquired whether there was a deadline to provide further
39   comment, and Dr. Doremus answered that the comments on the
40   Executive Order would continue throughout 2021. He encouraged
41   written comment, as it could be easily added to the formal
42   record. Mr. Chair, this concludes my report.
43
44   CHAIRMAN FRAZER:   All right, and so I'm having a little
45   technical difficulty, and this is a lot of feedback through this
46   device. We're going to take a few-minute break, until I get
47   squared away. Hold on.
48
```

0003232

1   **EXECUTIVE DIRECTOR SIMMONS:**  Folks, we're going to take a five-
2   minute break, and so we'll be back at 11:20.
3
4   (Whereupon, a brief recess was taken.)
5
6   **CHAIRMAN FRAZER:**  I very much apologize for the technical
7   challenges, and so is there any other business to be brought
8   forth as it relates to the Habitat Protection and Restoration
9   Committee?  Peter Hood.
10
11  **MR. PETER HOOD:**  Thank you, Mr. Chair.  I just wanted to
12  emphasize the fact that our Headquarters was very much
13  interested in what the council had to say on EO 14008, and they
14  asked us to take notes during the meeting, which we did, and
15  then we submitted those up to Headquarters, and so, again,
16  they're interested in what you're thinking, and I'm sure that
17  they really want this dialogue to continue.  Thank you.
18
19  **CHAIRMAN FRAZER:**  Thank you, Peter.  Okay.  Is there any other
20  questions or comments?  I am not seeing any, and so thank you,
21  Mr. Banks, for that report, and we will begin with the Reef Fish
22  Committee.  Ms. Guyas.
23
24                    **REEF FISH COMMITTEE REPORT**
25
26  **MS. GUYAS:**  All right.  Thank you, Mr. Chair.  The committee
27  adopted the agenda, Tab B, Number 1, after adding an item about
28  the historical captain's permit under Other Business.  The
29  minutes, Tab B, Number 2, from the January 2021 meeting were
30  approved as written.
31
32  Status of NOAA Fisheries' MRIP 2020 Recreational Fisheries Catch
33  Estimation Process, Tab B, Number 4, Dr. Richard Cody from the
34  National Oceanic and Atmospheric Administration's Office of
35  Science and Technology presented the status of NOAA's evaluation
36  of recreational catch and effort for the 2020 fishing year in
37  the wake of COVID-19, as collected through its Marine
38  Recreational Information Program, or MRIP.
39
40  It is important to note that these data only apply to Florida,
41  Alabama, and Mississippi for the years of data presented of 2018
42  through 2020, since Louisiana and Texas do not report
43  recreational catch and effort data through MRIP.  MRIP's Access
44  Point Angler Intercept Survey was suspended in the Gulf of
45  Mexico during Wave 2, which is March and April of 2020.
46  Headboat sampling remains suspended.
47
48  These APAIS data gaps vary by state, but are known.  Imputation

0003233

1  using 2018 and 2019 data for commensurate time periods will be
2  down-weighted by a factor of two and imputed for these gaps.
3  The 2020 two-month data collection waves will then be available,
4  using these imputed data.
5
6  Other methods were considered to inform 2020 catch estimates.
7  However, MRIP's consultants thought the aforementioned approach
8  to be the best option.  NOAA OST will revisit the 2020 catch
9  estimates when complete APAIS data are available for 2021, and
10 they will evaluate the imputations to 2020 estimates using
11 records from 2019 and 2021, versus 2018 and 2019.
12
13 MRIP's Fishing Effort Survey, or FES, continued relatively
14 unimpeded during 2020, with little difference in the Gulf in
15 estimates when imputing missing data at the annual level.
16 Though not significantly different, private angling effort in
17 2020 is estimated to be similar to 2018 and higher than in 2019
18 for the Gulf.  Charter for-hire effort for 2020 was higher than
19 in 2018, but slightly less than in 2019.
20
21 NOAA OST has completed an initial review of 2020 recreational
22 catch and effort data, following up on a limited number of
23 cases.  MRIP's Internal Review Team, composed of NMFS Regional
24 Office and Science Center staff, has finished its review of the
25 2020 estimates, and OST will investigate any estimates flagged
26 by the IRT.  MRIP intends to release estimates from the 2020
27 fishing year by mid-April of 2021.
28
29 Committee members asked about the comparison of MRIP APAIS
30 intercept rates for 2020 against the mean for 2017 through 2019,
31 which showed the ratio of the two values across months for each
32 state.  Dr. Cody replied that, beginning mid-May of 2020, most
33 of the MRIP APAIS assignments were completed for Gulf states.
34 However, gaps in sampling still exist for the three Gulf states,
35 necessitating data imputation for these gaps in 2020 with
36 auxiliary information.
37
38 A committee member questioned using MRIP-synthesized data for
39 imputing missing 2020 catch and effort data, as opposed to using
40 the Gulf state data collection programs, especially for red
41 snapper.  Dr. Cody replied that Alabama and Mississippi state
42 surveys focus mostly on red snapper and operate in a different
43 way compared to MRIP's APAIS.  He added that MRIP has been peer-
44 reviewed and certified as the best scientific information
45 available, and that NOAA OST continues to assist the Gulf states
46 with the development and refinement of their respective surveys.
47
48 The committee asked about MRIP's compatibility with monitoring

143

0003234

1   recreational catch and effort at finer scales than the two-month
2   reporting waves.  Dr. Cody noted the review of MRIP's
3   appropriateness for in-season monitoring by the National
4   Academies of Science would be available in July 2021.  A
5   committee member asked about MRIP's appropriateness at small
6   spatial scales.  Dr. Cody replied that the MRIP transition team
7   would begin looking at these issues in the near future, and
8   would work with states with smaller coastlines to work on
9   resolving some of these issues.
10
11  Review of Reef Fish Landings and IFQ Program Landings, Mr. Peter
12  Hood from the Southeast Regional Office provided an update to
13  Gulf reef fish commercial landings, including species managed
14  under individual fishing quota programs.  All 2020 and 2021
15  fishing year landings are considered preliminary.
16
17  Gray triggerfish and greater amberjack commercial landings for
18  2020 were below the 2018 to 2020 average, and fishing remained
19  open through 2020.  Gray snapper, mutton snapper, and vermilion
20  snapper, all managed under stock annual catch limits without
21  sector allocations, remained open during the 2020 fishing year,
22  with landings below the 2018 through 2020 average.
23
24  For IFQ species, red snapper, gag, and red grouper landings all
25  remained below their commercial ACLs, with red snapper
26  commercial landings most closely matching the landings trend
27  observed for 2018 through 2020.  Both gag and red grouper
28  commercial landings followed the trend from 2018 through 2020.
29  However, commercial landings for both species were below their
30  respective commercial ACLs for 2020.
31
32  Review of the Great Red Snapper Count Project, Dr. Kai Lorenzen
33  from the council's Scientific and Statistical Committee
34  presented the peer review of the Great Red Snapper Count, which
35  took place from March 30 through April 1, 2021 between the co-
36  principal investigators of the GRSC, the non-PI members of the
37  SSC, and three independent reviewers.
38
39  In addressing the terms of reference, Dr. Lorenzen reviewed the
40  comments from the independent consultants.  Overall, the GRSC
41  design covered a large area of the Gulf appropriately.  However,
42  implementation of sampling methods sometimes differed from the
43  design.  The reasons and implications for possible bias and
44  variance related to these deviations were not always clear.
45
46  The use of different technologies in different strata was
47  unavoidable, but the paucity of intercalibration studies may
48  affect cross comparisons of data, and the combination of data

144

0003235

from different strata to generate abundance estimates.

The reviewers also noted limited comparability of calibration studies off Florida may indicate that the true observation error is likely much larger than the 11 percent total coefficient of variance derived from the stratified estimate. Also, the independent consultants identified the lack of data collection in some strata, such as for Louisiana, and the consequent need to infer mean densities in those strata as a source of underrepresented uncertainty.

Overall, the two independent analyses used in the GRSC were thought to be partially correct, with some issues arising from non-random cluster sampling and a lack of clarity about post-stratification decisions that resulted from differences between sample design and actual sampling activity. Estimated variances were thought to be low due to additional sources of variability not currently included in the variance estimation. While some of these can be estimated and included, others cannot.

The independent consultants stated that results of the GRSC, if corrected for noted statistical issues, can be useful, at least in a regional context. Reviewers did not think it appropriate to combine eastern and western Gulf estimates of absolute abundance into a single value, due to differences in survey technologies used and a lack of calibration between regions.

The eastern Gulf estimate, with a more credible variance, can be included as abundance estimate in a future stock assessment. However, the western Gulf estimate may be more appropriately considered as a lower-bound constraint for abundance in the western Gulf (i.e., Louisiana and Texas).

The review team expressed confidence in the abundance estimate for the uncharacterized bottom, or UCB, noting that the densities over the UCB are lower than in other habitats. In hindsight, the GRSC team thought the UCB was comparatively under-sampled. The assumptions made therein appeared appropriate and not likely to induce bias, except in the variance estimates. The independent consultants said that the stock-wide estimate may be an underestimate.

Dr. Lorenzen stated the review team's motion to consider the GRSC as a representative estimate of abundance for the eastern Gulf and a highly uncertain estimate for the Western Gulf. However, the review team also considered the true uncertainty in both estimates to be substantially larger than implied by the 11 percent CV stated in the GRSC report and that the estimate for

145

1   the UCB is particularly uncertain.
2
3   Dr. Lorenzen added that all stock assessments are uncertain to
4   some degree, and they often underestimate their true
5   uncertainty.   Both the SEDAR 52 2018 stock assessment and the
6   GRSC estimate of absolute abundance are estimates derived from
7   sampling and use statistical models to generate point estimates.
8   Integrating data from both SEDAR 52 and the GRSC should help to
9   reduce uncertainty and possible bias, improve management advice,
10  and help identify new options for sampling methods and analyses.
11
12  In addition to the absolute abundance estimate, Dr. Lorenzen
13  noted that the review team thought the GRSC provides novel
14  information on many aspects of red snapper ecology and
15  fisheries.
16
17  A committee member noted that the independent consultants did
18  not seem to be opposed to the point estimate of abundance, but
19  rather expressed concern about the biases in the estimate and
20  the underestimation of variance.   The committee discussed the
21  differences in the number of sampling sites included in the GRSC
22  versus       the       NMFS       bottom       longline       survey.
23
24  Dr. Clay Porch noted that the GRSC is a snapshot, compared to
25  the long time series of data represented by the NMFS bottom
26  longline survey.  Dr. Porch added that he thought the SSC viewed
27  the NMFS BLL as representative of trends in red snapper
28  abundance, considerate also of the fact that the NMFS BLL
29  samples the same areas as those classified as UCB in the GRSC.
30  He caveated that NMFS BLL data for 2020 did not have the same
31  sample coverage as previous years, due to COVID-19.
32
33  Also, because of the differences in the methods used by the GRSC
34  and the NMFS BLL, the surveys are not directly comparable.  The
35  GRSC was designed to generate an estimate of absolute abundance,
36  while the NMFS BLL is used to generate an index of relative
37  abundance.   The latter is used to examine trends in abundance
38  over time, while the former is used to determine the standing
39  biomass at a given point in time.
40
41  A committee member asked about the differences in the process of
42  the peer-review of the GRSC compared to the process typical of a
43  SEDAR assessment.  Dr. Lorenzen replied that the review of these
44  data and methods normally occurs through several workshops over
45  an extended period of time, allowing for some outstanding issues
46  with considered datasets to be resolved prior to their inclusion
47  in the stock assessment model.
48

0003237

1   The process for reviewing the GRSC was considerably shorter,
2   with the expectation of using the results of the GRSC for
3   reviewing catch advice immediately after the peer-review. Dr.
4   Greg Stunz added that the final report for the GRSC wasn't due
5   to the funding agency until June 2021 and that the research
6   results from the GRSC would continue to be submitted for
7   scientific publication in the future.
8
9   Dr. Stunz cautioned a comment made by Dr. Lorenzen about
10  managing expectations of congressional entities regarding the
11  results of studies on the horizon. Dr. Stunz thought that
12  working to manage expectations around the results of science was
13  out of bounds for the true practice of science. Another
14  committee member agreed, in that the SSC should operate in the
15  absence of political pressures. Dr. Lorenzen replied that these
16  projects should consider early on how the data collected and the
17  results generated may be used and that the research projects
18  should not establish any expectations of results prior to the
19  studies being completed.
20
21  Dr. Tom Frazer addressed the resignation of Dr. Joe Powers,
22  formerly the Chair of the SSC, after the SSC's March/April 2021
23  meeting. Dr. Frazer confirmed Dr. Powers' decision to resign.
24  Further, after reviewing the audio transcript, Dr. Frazer
25  clarified a misinterpreted comment by Dr. Powers during the SSC
26  meeting, which some committee members had interpreted as "...I
27  haven't read the report..." as in fact being "...in having read
28  the report...". The verbatim minutes were subsequently
29  corrected and made available in the updated briefing materials
30  on the council's website.
31
32  A committee member asked about the size frequencies by region of
33  red snapper in the Gulf observed by the GRSC. Dr. Stunz replied
34  that the length composition information collected by the GRSC
35  indicates that fish over the UCB are generally larger than those
36  found over natural and artificial reefs.
37
38  The GRSC team noted, in its report, that additional work needed
39  to be completed to evaluate the length composition of red
40  snapper over UCB. The committee member then asked about
41  differences between length composition in the eastern and
42  western Gulf. Dr. Stunz replied that fish in the western Gulf
43  were larger than in the eastern Gulf and that recolonization of
44  reefs in the eastern Gulf by red snapper was primarily by
45  smaller, younger fish. I will pause there, because I think
46  there's some people that want to raise their hands, but maybe
47  not.
48

0003238

1  **CHAIRMAN FRAZER:**  Martha, I am looking for hands at the moment,
2  and I do not see any, and so I would continue on, but I would
3  certainly understand if you would like to take a drink of water.
4
5  **MS. GUYAS:**  Yes, I will do that, if anybody -- If I have lulled
6  anyone to sleep that was planning on chiming in.  I see some
7  hands going up, and so, Mr. Chair, I will turn it over to you.
8
9  **CHAIRMAN FRAZER:**  Mr. Banks.
10
11  **MR. BANKS:**  Thank you.  It sounded like we needed a hand raised,
12  and so I decided to raise it.
13
14  **CHAIRMAN FRAZER:**  Excellent.
15
16  **MR. BANKS:**  I am just kidding, and so I did want to make the
17  point that there was quite a bit of discussion in the committee
18  about not understanding all of the rationale behind some of the
19  committee decisions on OFL and ABC, and so I would imagine we're
20  going to get more into that in the next part of the committee
21  report, but I just want to make sure that that's recorded.
22  Thanks.
23
24  **CHAIRMAN FRAZER:**  Thank you, Mr. Banks, and I anticipate that we
25  will discuss that in the next section of this committee report.
26  I am not seeing any other hands, Ms. Guyas, and so, if you want
27  to continue, go ahead.
28
29  **MS. GUYAS:**  All right.  Let's roll.  Final Action: Framework
30  Action: Modification of Annual Catch Limits for Gulf of Mexico
31  Red Snapper, Dr. Lorenzen described the circumstances
32  surrounding the SSC's recommendation for catch advice based on
33  interim analyses incorporating results of the GRSC or the NMFS
34  BLL.  These two data sources offer unique insights about red
35  snapper.  However, while the novel approaches used in the GRSC
36  generated an estimate of absolute abundance, the NMFS BLL index
37  provides a long-term trend in relative abundance which can be
38  used to derive management advice.
39
40  Dr. Lorenzen reviewed the Southeast Fisheries Science Center's
41  interim catch analysis using the GRSC.  The Southeast Fisheries
42  Science Center noted that the SEDAR 52 estimates of relative
43  abundance correspond to the GRSC estimates of absolute abundance
44  on structure, whereas, abundance on the uncharacterized bottom
45  represents cryptic biomass and was previously not quantified in
46  the SEDAR 52 assessment.
47
48  A proportion of this UCB biomass may be vulnerable to fishing

148

and can be added to the fishable abundance when determining allowable catch.  Dr. Lorenzen continued, adding that different assumptions can be made about the vulnerable proportion of UCB biomass, the necessary adjustment of the proxy for F at maximum sustainable yield (MSY, here F at a 26 percent spawning potential ratio or F SPR 40 percent) assuming a larger but less productive stock and many other factors.

Dr. Lorenzen stated that the GRSC interim catch analysis presents calculations based on various assumptions, but the sustainability implications of those assumptions cannot be readily assessed without the full integration of GRSC and other stock assessment information.

Dr. Lorenzen reviewed the catch projection scenarios presented to the SSC, which used a combination of UCB biomass fractions of zero percent, 13 percent, 15 percent, 22 percent, and 100 percent, at various FMSY proxies of F SPR 26 percent or F SPR 40 percent.  Ultimately, the SSC chose to set the overfishing limit at the three-year average of the projections, including 13 percent of the UCB biomass at F SPR 26 percent, resulting in an OFL equal to 25.6 million pounds whole weight for 2021.

The Southeast Fisheries Science Center then presented the interim analysis using the NMFS bottom longline.  In general, the NMFS bottom longline shows a declining trend in relative abundance from 2016, the terminal year for SEDAR 52, through 2019.  This decline continued in 2020, also.  However, the 2020 NMFS BLL data were not considered by the SSC for evaluating catch recommendations, due to the poor sample coverage and high uncertainty in that year's data.

Dr. Lorenzen said that the SSC recognized the NMFS BLL to be indicative of relative abundance trends for red snapper, noting that it also sampled the UCB area.  As such, the SSC used the NMFS BLL interim analysis to establish an acceptable biological catch recommendation for 2021 at 15.4 million pounds.  This ABC is represented by the NMFS BLL catch recommendation using a five-year average through 2019.

Several committee members inquired about the large disparity between the recommended OFL and ABC and asked why the SSC votes related to the motions on the OFL and ABC were so close.  Dr. Lorenzen responded that there were a variety of interpretations from the GRSC and the NMFS BLL among SSC members.  Some members advocated taking a more conservative approach, given the uncertainty surrounding the GRSC estimate of absolute abundance, along with the observed declining trend in abundance in the NMFS

0003240

1  BLL, while others thought differently.
2
3  He noted that the NMFS BLL does not sample in the UCB, with some
4  accounting for the habitat in the index leading to a
5  conservative approach by the SSC.  He stated that the SSC was
6  tasked with reviewing a lot of information in a short time
7  period, which was reflected in the SSC meeting report.
8
9  Mr. Anson asked what landings would be expected in Dr.
10 Lorenzen's presented simulation if one assumed a large and
11 highly-productive stock.  Dr. Lorenzen stated that, if the
12 simulated population was large and productive, that it would not
13 likely see the marked decrease in landings like those realized
14 in the red snapper stock, which could indicate that the red
15 snapper stock is not as productive as previously thought.
16
17 Additionally, it is difficult to quantify the percentage of red
18 snapper inhabiting the UCB that are vulnerable to harvest.  This
19 interpretation is further confounded by the lack of knowledge
20 regarding the metapopulation dynamics of the stock and creates a
21 situation where localized depletion could occur, which has
22 previously been documented for red snapper in various areas in
23 the Gulf.
24
25 Dr. Frazer acknowledged that conservative approaches can be
26 necessary, depending on how risk-adverse resource managers were
27 willing to be.  He continued that state data collection programs
28 could provide information that would detect localize depletion,
29 i.e., lower total catch in numbers, in a timely manner that
30 would allow for redirection in management measures, if
31 warranted.  These adaptive approaches should be examined in the
32 future.
33
34 A committee member asked for the rationale in calculating what
35 percentage, e.g., 13 percent and 22 percent, of the UCB would be
36 assumed vulnerable to fishing.  The 13 percent estimate was
37 generated by the random forest model that was used to calculate
38 the high probability of encountering red snapper in the GRSC
39 sample design.
40
41 The 22 percent estimate was developed by the Southeast Fisheries
42 Science Center staff by analyzing the commercial vessel
43 monitoring system tracks overlaid on the UCB, and with
44 recreational effort ascertained from iSnapper, to get a general
45 estimate of fishing in the UCB.
46
47 Another committee member asked what the next steps were for the
48 GRSC study.  Dr. Stunz indicated that the reviewers' comments

0003241

1  would be addressed before the final report is submitted in June
2  2021.  Dr. Lorenzen mentioned that it was not yet clear how
3  these independent broad studies would be directly implemented in
4  the management process.

5
6  Council staff reviewed the public comment related to the
7  framework action.  While only seven formal public comments were
8  received, several views were recorded on the council's blog
9  post, and several unofficial comments were received on the
10 council's Facebook page.

11
12 Official public comment was mixed and indicated that red snapper
13 was plentiful and encouraged adoption of the GRSC results in
14 modifying catch advice.  However, other comments advised caution
15 in interpreting the GRSC estimate, given the uncertainty in the
16 point estimates.

17
18 A number of written letters, comprising two individual form
19 letters, were also received.  One form letter suggested an
20 increase in allocation to commercial fishermen in the eastern
21 Gulf to allow for harvest of the recovering eastern red snapper
22 population, and the other requested an increase to the
23 commercial ABC to help the reduction of dead discards and allow
24 for more entry into the fishery.

25
26 Council staff reviewed the framework action that contains a
27 single action with two alternatives.  The no action alternative
28 would retain the current catch limits, while Alternative 2 would
29 implement the catch limits recommended by the SSC at its
30 March/April 2021 meeting.  These alternatives do not consider
31 state calibrations, as that consideration will be addressed in a
32 separate document, and see Tab B, Number 8.

33
34 **The committee recommends, and I so move, in Action 1, to make**
35 **Alternative 2 the preferred alternative.  Alternative 2 reads:**
36 **Modify the red snapper red snapper OFL, ABC, ACLs, and**
37 **recreational ACTs for 2021 based on the OFL and ABC**
38 **recommendation of the Scientific and Statistical Committee at**
39 **the March 30 through April 2, 2021 SSC meeting.  The OFL was**
40 **based on the interim analysis informed by the results of the**
41 **Great Red Snapper Count.  The ABC was based on the fishery-**
42 **independent NMFS bottom longline survey-based interim analysis.**

43
44 Then we have the table here with all of those values, and I
45 guess the ones to note would be the OFL, which is 25.6 million
46 pounds, and the ABC, which is 13.4.  That motion carried ten to
47 four with two abstentions and one absent, but I will turn it
48 over to you, Mr. Chair.

151

1
2  **CHAIRMAN FRAZER:**   Thank you, Ms. Guyas.   We have a committee
3  motion on the board.   Let's make sure we get it up there.   All
4  right.   So we can open the floor for discussion on the motion.
5  I will preface this by saying that I do intend to make a
6  substitute motion after some discussion, and so let's see where
7  the hands go.   Mr. Anson.
8
9  **MR. ANSON:**   Well, that was a little bit of a teaser, Tom.   I
10 don't know if I will ask my -- Well, I'll ask my question, and
11 it still probably will come into play for your substitute
12 motion.   This is for Dr. Porch.   Yesterday, at the Gulf States
13 Marine Fisheries Commission SEAMAP Bottom Longline Workgroup,
14 there was some information that was presented from some NOAA
15 staff that indicated the recent studies, from what I've been
16 told, and, obviously, I wasn't participating in it, but there
17 were some recent studies, or information, that was gathered,
18 using GoPro cameras on the bottom longline survey.
19
20 The results of those GoPro cameras, and I'm not familiar with
21 how many sets its covers and east Gulf and those types of
22 things, how long it was, but, essentially, the results of the
23 GoPro cameras indicated that the designated bottom time, or the
24 expected bottom time, that the bottom longline gear would be in
25 contact with the bottom was significantly lower than what the
26 target was, or what the protocols called for, for that survey,
27 in deeper water, and we're talking like 200 meters, edge of the
28 continental shelf, kind of what I've been told, and it reduced
29 so much from a one-hour set to as few as fifteen minutes, based
30 on the video of, again, set just above the weight and then
31 timing it when the weight hit the bottom, apparently.
32
33 Dr. Porch, do you have any additional information about that, as
34 to the specifics of that, and maybe the duration and number of
35 sets and time series and that type of thing?
36
37 **DR. PORCH:**   Sure.   Thank you for the question.   I think that
38 there's a bit of a misunderstanding that happened at that.   One,
39 we don't find any red snapper at 200 meters, and so the index
40 actually goes out to something like a maximum of 183 meters, but
41 I don't think we find red snapper below 148 meters, and so we're
42 not talking about using the really, really deep sets for the red
43 snapper index.
44
45 Second, I'm not sure where the fifteen minutes comes from.   It
46 takes a little bit longer for the gear to get to the bottom in
47 deeper water, but it spends the better part of the hour on the
48 bottom, and, in any case, we actually stratify our data by depth

152

1  zone, and then, when we do the index standardization, depth zone
2  is a factor in the model, and so any differences in soak time
3  would be accounted for, even though they're actually pretty
4  small.
5
6  There is other reasons that red snapper abundance may differ by
7  depth, and so it's still important to incorporate the depth zone
8  effect, but the bottom line is none of that would really
9  compromise the integrity of the index, because it's been done
10  the same way since 2000, and so, as long as you're consistent,
11  it provides a good relative index of abundance.  Does that help?
12
13  **CHAIRMAN FRAZER:**  Mr. Anson.
14
15  **MR. ANSON:**  Yes, it does help provide some context.  I guess I'm
16  just -- I certainly hear your comment about consistency in the
17  methods over the time series, but I guess I'm just concerned
18  then about the distribution of those sets, year-to-year, and
19  where those actual sets occurred, and the depth, and I
20  understand there is some partitioning there and stratification
21  going on.
22
23  Speaking to that, it was brought up at the Reef Fish Committee,
24  requesting kind of a breakdown of those sets by year, for
25  eastern and western Gulf, and were you able to get that
26  information together, and, if you did, can you distribute that?
27
28  **DR. PORCH:**  Yes, and that was sent out yesterday.  I think
29  Carrie sent it out in a document, and I do want to emphasize
30  that it's not the case that they only spend fifteen minutes on
31  the bottom.
32
33  Like I said, it takes a little bit longer for the gear to get to
34  the bottom in deeper sets, but it's a relatively minor effect,
35  and, in any case, if it were a substantial effect, it would be
36  picked up in the model, because we do have depth zone as an
37  effect, and, also, I would like to emphasize that we use a
38  random stratified sampling design, where the strata are depth
39  zones and area, and so that's a standard statistical technique.
40  In fact, parts of the Great Red Snapper Count use a random
41  stratified design, and so I think all of that is very
42  appropriate, and it's been reviewed multiple times.
43
44  **CHAIRMAN FRAZER:**  Thank you, Dr. Porch.  Dr. Stunz.
45
46  **DR. STUNZ:**  Thank you, Mr. Chairman.  I think that -- I wanted
47  to make some comments regarding some uncertainty, but I think
48  that I would like to hear the substitute motion first, but, just

153

0003244

1   quickly, to the point that was brought up by Kevin and Clay
2   Porch, I wanted to just -- Clay is right on index, or relative
3   index, of abundance like that, if it's done the same way, it's
4   still very useful, but it also points to some of the challenges
5   that we have in working in areas like this, which lead to
6   uncertainty, especially when you're calculating an absolute
7   abundance, where in fact it does begin to matter if you're not
8   fishing the same amount of time as you think your gear is
9   fishing and that sort of thing, but it's just one good example
10  of the challenges we face and why many of our assessments and
11  surveys and things have some level of uncertainty that are
12  difficult to capture when you start working in these far-shore
13  marine environments.
14
15  **CHAIRMAN FRAZER:**  Thank you, Dr. Stunz.  I will -- There is a
16  bunch of hands still.  Let me see.  Mr. Strelcheck.
17
18  **MR. STRELCHECK:**   Thanks, Tom.   I wanted to speak to the
19  alternative that was offered in committee and speak in favor of
20  it.  I know, obviously, that many council members are not happy
21  with the ACL, or ABC, that was recommended by the SSC, although
22  this does provide a modest increase.  It is an increase, and it
23  not only benefits the recreational private sector, but it
24  benefits the commercial sector as well as for-hire fishermen.
25
26  The agency certainly stands ready to be able to implement this
27  increase, but we also have clearly stated that any increase also
28  needs to ensure that data is calibrated with the private sector,
29  but I support this increase, and we can implement this between
30  now and the end of the year.
31
32  **CHAIRMAN FRAZER:**  Thank you, Mr. Strelcheck.  Okay.  We will go
33  ahead and put a substitute motion on the board.  We will send it
34  over to staff, and we'll get it up there.
35
36  **MS. BOGGS:**  Tom, you can't see the whole motion on the screen.
37  Is there a way to make it more visible?  Thank you.  It's small,
38  but at least --
39
40  **CHAIRMAN FRAZER:**   The table is not necessarily the important
41  here.   **The substitute motion is to add an Alternative 3 and
42  select it as the preferred.   The Alternative 3 would read:
43  Modify the red snapper OFL for 2021 based on the OFL
44  recommendation of the Scientific and Statistical Committee at
45  the March 30 to April 2, 2021 SSC meeting.   The OFL is based on
46  the interim analysis informed by the results of the Great Red
47  Snapper Count.**   If I can get a second, I will expand upon my
48  rationale.

154

0003245

1
2    **MR. WILLIAMSON:**   Second.
3
4    **CHAIRMAN FRAZER:**   It's seconded by Mr. Williamson.   I certainly
5    understand and appreciate Andy's comments, right, and it's a
6    slightly different -- We're proposing, in this alternative, to
7    accept the OFL from the ABC, and, if you think back about that
8    meeting, they actually did this in two parts as well.
9
10   What we've heard, and there's a tremendous amount of
11   uncertainty, obviously, surrounding the estimates of absolute
12   abundance in the Great Red Snapper Count, and the SSC,
13   understandably, adopted a fairly conservative, and
14   scientifically-defensible I would add, ABC recommendation.
15
16   It's my understanding, at this point, that there are additional
17   data available, and chief among those would be a fisheries-
18   independent video survey, with data through 2019, that was
19   provided as part of a working paper, and that working paper is
20   SEDAR 74-SID-03.
21
22   We expect, also, or anticipate, additional data to be provided
23   off the Louisiana coast in a report by the end of the month
24   to the Louisiana Department of Wildlife and Fisheries that will
25   help provide abundance and distribution data for red snapper.
26
27   We also understand and appreciate that there were a number of
28   comments provided in that committee to help revise the Great Red
29   Snapper Count report that should, or I might anticipate would,
30   provide a little more certainty in some of those estimates and
31   improvements moving forward.
32
33   One of the things that I was concerned about, when I sat in on
34   the SSC meeting, was the fact that there was not a lot of
35   consideration necessarily given to the socioeconomic factors of
36   this catch advice, and I would have liked to have heard a little
37   bit more of that.
38
39   I mean, I appreciate the decisions that were made, or the
40   recommendations that were made, based on the biological data,
41   and, again, I think that those are certainly defensible, but I
42   would like to see more conversation about the socioeconomic
43   implications and how that might factor into that advice, given
44   that, when we manage fisheries, it's not entirely based on
45   biology.   It certainly needs to inform our decisions, but we
46   have to consider also the socioeconomic implications and provide
47   optimal yield and do things that are consistent with the intent
48   of the National Standards.

0003246

```
1
2   Other  things  that  caused  me  to  think  about  this  substitute
3   motion,  or  for  the  alternative,  was  a  strong  range  of  opinions
4   that  were  voiced  by  the  various  stakeholder  committees  and  the
5   written  comment,  as  well  as  in  public  testimony,  and  so  we  heard
6   from  all  of  the  various  sectors,  as  well  as  all  of  the  various
7   states  that  might  be  affected  in  some  way  by  this  catch  advice.
8
9   I  also  realize  that  the  catch  data,  or  any  revised  catch
10  recommendations,  are  likely  to  come  late  in  the  year.   That,
11  obviously,  presents  challenges  in  and  of  itself,  and,  to  Mr.
12  Strelcheck's  point,  one  of  the  things  that  any  quota  resulting
13  from  this  catch  advice,  if  there  in  fact  is  a  catch  advice,  and
14  I'm  not  suggesting  if  there  will  or  will  not  be,  and  there's  a
15  big  emphasis  on  the  if  there,  right,  but  what  would  happen  --  I
16  heard  from  the  commercial  sector  that,  if  you  were  to  get  an
17  increase  in  quota  at  the  end  of  the  year,  late  in  the  season,
18  that  this  rocks  the  business  models  and  can  be  problematic.
19
20  I  think  that  we  could  possibly  handle  that,  much  like  we  were
21  thinking  about  doing  in  committee,  and  we  could  think  about  how
22  to  carry  forward  some  of  that  catch  increase,  so  that  it  didn't
23  disrupt  the  business  model,  or  the  business  operations,  of  the
24  commercial  industry.
25
26  I  also  heard  from  the  charter/for-hire  sector,  and  the
27  headboats,  that  one  way  to  --  They  would  also,  if  there  is  catch
28  advice  that  increases  the  quota,  that  would  be  available,  but  we
29  could  think  about  reducing  the  buffer  in  that  sector  as  well,
30  and  so  I  think  there's  a  lot  of  options,  moving  forward,  and  I
31  wouldn't  simply  send  this  back  to  the  SSC  for  reconsideration.
32
33  I  respect  the  decisions  that  were  made,  and  I  do  think  that
34  they're  scientifically  defensible,  and  I'm  not  asking  them  to
35  just  reconsider.   I  am  asking  them  to  reconsider  in  the  light  of
36  new  data,  and  I  have  outlined  the  various  sources  of  data  and
37  the  range  of  opinions  that  were  provided  in  our  responsibility
38  as  a  council  to  do  what's  in  the  best  interest  of  all  of  our
39  stakeholders,  as  well  as  the  fishery  itself,  and  so  I  think  I
40  will  stop  there,  for  right  now,  and  see  what  people  have  to  say.
41  All  right,  and  so  I  have  Patrick  Banks.
42
43  MR. BANKS:   Thanks,  Mr.  Chairman.   I  just  wanted  to  ask  you  for
44  some  clarification,  and  so  what  your  motion  is  to  do  is  to
45  accept  the  OFL  recommendation,  but  not  accept  the  ABC
46  recommendation,  and  is  that  --  It's  basically  leave  the  ABC
47  recommendation  alone,  or  leave  the  ABC  level  as  it  is  currently,
48  correct?
```

```
 1
 2  CHAIRMAN FRAZER:   That's correct, and so, again, I expect that
 3  we will get, at some point, revised ABC advice from the SSC,
 4  and, again, I'm not, at this point, necessarily leaning one way
 5  or the other.   They're going to get new data, and it could go
 6  up, and it could go down.   It may remain unchanged, but I would
 7  like to see that process work itself through.
 8
 9  MR. BANKS:   But your motion would not provide any more fish to
10  any of the sectors in this current fishing year?
11
12  CHAIRMAN FRAZER:  Not at this time.
13
14  MR. BANKS:   Okay.   Thank you.
15
16  CHAIRMAN FRAZER:   So it would default to the -- I mean, the
17  intent would be to try to get a revised ABC, if one is
18  warranted, and, as I said, I think that presents some challenges
19  for us being able to implement that in 2021, and so I would be
20  mindful of the fact that some people may want to keep the ABC as
21  it exists and just move forward with the exercise of asking the
22  SSC to consider new data, whether or not they would be willing
23  to offer revised catch advice, and so it could go either way,
24  Patrick.   Mr. Riechers.
25
26  MR. RIECHERS:   Tom, this just may be -- Please take a good look
27  at your table and how that reflects to your motion.   I'm a
28  little concerned that the -- I understand what you're trying to
29  do.   You're trying to accept the OFL and not the ABC, but the
30  N/A out there by the calculation of the OFL -- I don't know if
31  that correctly represents what you're really trying to do.
32
33  Now I will just speak to the motion, while you're reviewing
34  that, to make sure that however we can best place that in the
35  table there, and we'll let you and staff work through that, but,
36  as far as your motion goes, I too support the notion of
37  accepting the SSC recommendations for the OFL, and certainly
38  they put a lot of deliberation into that, and they took, one
39  could argue, depending on how you want to view all the
40  conversations that occurred, but a reasoned and an approach that
41  basically tries to account for the unconsolidated bottom and how
42  the fishery might now interact with that unconsolidated bottom,
43  where they were trying to use those two different methods that
44  came up with the 13 and the 22 percent.
45
46  Then, basically, they took a -- I am not going to suggest they
47  actually took one or the other there, but they took a three-year
48  average, and, if you're going to look at it, it's kind of close
```

0003248

1  to the 13 percent and the F SPR of 26 percent, when they did
2  that, and that may have been part of how they came up with that
3  number, but it seems like there was quite a bit of discussion
4  about those numbers and how they were derived and how that
5  fishery now interacts with that unconsolidated bottom.
6
7  Again, since they kind of split it and took it into two
8  different approaches, I certainly understand that, and I am
9  willing to accept their recommendation on OFL, and so I support
10 your motion, in that respect.
11
12 **CHAIRMAN FRAZER:**  Thank you, Mr. Riechers.
13
14 **MR. RIECHERS:**  Thanks to the team for clarifying what I think,
15 in the table better, what we're trying to do with the motion.
16
17 **CHAIRMAN FRAZER:**  I apologize for that.  That's my mistake.  Dr.
18 Stunz.
19
20 **DR. STUNZ:**  Thank you, Mr. Chairman.  I just wanted to briefly
21 talk about some uncertainty, but, first, I support the motion,
22 and I think, maybe to alleviate some concerns regarding some of
23 the uncertainty, and, if you would just give me a second to make
24 a couple of points, I would appreciate that.
25
26 My first one is that many, if not most, of the analyses we use
27 in this process have a high level of uncertainty, and that's
28 just the way it is with this type of data.  Ours is relatively
29 low, and that has concerned some, including some of us on the
30 team in fact, but we can't change that data.  I mean, the data
31 is what it is, and science says we've got to go with what we
32 have.
33
34 In fact, I would strongly argue that it is the best we have at
35 this point, and, as Clay mentioned about the homework from the
36 review team, we certainly can go back and do that homework and
37 re-look at some other models they suggested, or potentially
38 other analyses or ways to better capture that uncertainty, and
39 those were all good, way-down-in-the-weeds things, but all
40 really good points that will improve things, but I don't see
41 that changing things just a whole lot.  In fact, we've already
42 looked at some of that.
43
44 If you look at a state where we captured some of that
45 uncertainty probably the best, and one example would be Alabama,
46 and that CV is about 30 percent there, and, in fact, even if you
47 begin to look in our individual strata, or habitat, which, by
48 the way, we were charged to do, and not provide just an estimate
                                 158

1  overall, but look at individual regions within strata, within
2  habitat, that increases the variability the more you get down at
3  those finer, granular scales, but that CV there in Alabama is 30
4  percent, which I think is what many of us would think that's
5  probably what we thought it should be kind of going in, just
6  roughly speculating.
7
8  In fact, that's a lot of what's going on with the uncertainty
9  here, is opinions and speculation that it's higher than what we
10  reported, but, in reality, that's professional judgement, even
11  from our own team professional judgement, thinking that, yes, we
12  feel like it's probably higher, but, at the end of the day,
13  there is no analyses that really support that.
14
15  I mean, obviously, we have to base our work on the data at-hand,
16  and that's what we have. Now, hopefully, by doing some of this
17  homework, that will improve things, but, if you go back into the
18  record, or were listening to the meeting, our statisticians are
19  very clear in pointing out that, in many cases, the SSC was not
20  correct in their uncertainty interpretations in is it being as
21  large as it can.
22
23  Yes, it could be larger, but that wasn't really captured well in
24  what we heard today, unless you were really tuned into that
25  meeting, and, of course, then we were asked to leave that
26  meeting, in the sense of we could listen to it, but we weren't
27  contributing, when some of those other discussions came up that
28  we could have added some points to, but we weren't able, and, in
29  fact, we weren't recognized to be able to do that.
30
31  Part of the issue is that, when we had this review team, these
32  really unbiased providers of scientific review, it clearly
33  showed that there was some uncertainty there, but that estimate
34  was very much an underestimate, and we, obviously, haven't fully
35  incorporated that into the assessment so far, only 13 percent
36  getting us to that OFL, and so we're being relatively cautious
37  here by moving in, and that's one reason I think I am supportive
38  of this motion, is we're easing in a few of these fish and
39  increasing the OFL.
40
41  Certainly there is some uncertainty, but there's still a lot of
42  fish available, to leave me to conclude that there's not a big
43  issue with overfishing of this OFL limit, and so thank you, Mr.
44  Chairman, and I know that was long, and I just wanted to clarify
45  that, and I know a lot of people aren't scientists on this
46  group, obviously, but to really explain where we're at with this
47  uncertainty, and I will stop there.
48

0003250

1  **CHAIRMAN FRAZER:**  Thank you, Dr. Stunz, for that input.  Mr.
2  Diaz.
3
4  **MR. DIAZ:**  Thank you, Mr. Chairman.  I am trying to think about
5  some of our your rationale, and, if I heard you correctly, you
6  said that potentially we might send this back to the SSC to get
7  some more information, but, more than likely, that would be done
8  if there was new information available, and so that particular
9  part of your rationale does not lead me to want to support this
10 motion.
11
12 I think, with the motion that's the currently-preferred motion,
13 with the 15.4 million pounds, with new information, we could
14 send it back to the SSC and get it reevaluated then also, and am
15 I mischaracterizing your comments, Tom?
16
17 **CHAIRMAN FRAZER:**  I think so.  I do believe that there will be -
18 - There already is, and there will be, very shortly, additional
19 information that was not available to the SSC in their
20 March/April meeting, and so the short answer is, yes, new
21 information.  One of those would be a fisheries-independent
22 video survey that's a working paper that was released in March,
23 and so we can certainly make that available to folks as
24 background material, and I have provided a reference, for the
25 record, to that.
26
27 It's my understanding that the Louisiana Department of Fisheries
28 and Wildlife will oversee a report by the end of the month as
29 well that provides much more detailed information on the
30 abundance and distribution of red snapper off the Louisiana
31 coast, and that was not incorporated into the Great Red Snapper
32 Count, and it may decrease some of the uncertainty that was
33 associated with those estimates in that part of the world, and
34 they had to be imputed.
35
36 There were a number of recommendations also that were made in
37 the SSC -- In the peer review workshop, essentially, that should
38 provide better confidence, or, again, reduce uncertainty around
39 many of the point estimates, and so I'm not exactly sure when
40 those will be integrated into the Great Red Snapper report, and
41 I'm not suggesting that the SSC necessarily meet tomorrow to do
42 this, right, but at the earliest opportunity, with this
43 information in-hand.
44
45 I also believe, Mr. Diaz, that -- I listened to the whole entire
46 meeting, and there was no real consideration given to the
47 socioeconomic data that might bear on those catch advice, or
48 those recommendations, and I would like to see at least some

160

1  discussion of that, moving forward.  Those are just some of the
2  things, and so I would argue that there is new data available,
3  and will be shortly.
4
5  **MR. DIAZ:**  Tom, just to respond, real quick, while I've got the
6  floor, and I say this at the meetings all the time, and I don't
7  have a crystal ball, and none of us do, and I don't know if
8  these new sources of information will make a difference, and I
9  would love to see it revisited, and I would love to see some
10 stuff done that maybe would change the estimate, but I don't
11 know if that's going to happen, and I think, possibly, it might
12 happen next year.
13
14 I'm kind of anticipating that this is going to be something in
15 the January timeframe, or after.  At this point, I'm reluctant
16 to support the substitute motion, because of my unknowns, and so
17 thank you, Mr. Chair.
18
19 **CHAIRMAN FRAZER:**  I definitely understand that, and my intent
20 would be to try and move this forward certainly in this calendar
21 year, and I would expect a lot of that information -- They said
22 it should be available now, by the end of the month, and
23 certainly in May or June, but I do appreciate your opinion.  Mr.
24 Williamson.
25
26 **MR. WILLIAMSON:**  Thank you, Mr. Chair.  To your point regarding
27 the lack of consideration for National Standard 8, specifically
28 during the course of the meeting, towards the end of it, one of
29 the members made the statement that -- I am quoting, but there
30 are socioeconomic considerations we're supposed to take into
31 account as well.  This was not done during the course of this
32 SSC meeting.
33
34 Yesterday, we heard public comment, and, parsing aside the folks
35 who made comments that were not directly related, there were a
36 number of people from Alabama and Florida and Tennessee who gave
37 public comment about the adverse economic impacts due to this
38 low acceptable biological catch that was recommended by the SSC,
39 and certainly that is new evidence, as it falls under the
40 National Standard 8.
41
42 National Standard 8, and I am reading from the Act here,
43 provides that conservation and management measures shall take
44 into account the importance of fishery resources to fishing
45 communities by utilizing economic and social data that meet the
46 requirements of National Standard 2, in order to provide for the
47 sustained participation of such communities, and, to the extent
48 practicable, minimize adverse economic impacts on such

161

1   communities.
2
3   Now, if those comments didn't exactly fit that intent, I don't
4   know what would, and, in addition to that, the federal
5   regulations, NMFS' own guidelines, provide that, all other
6   things being equal, where two alternatives achieve similar
7   conservation goals, the alternative that provides the greater
8   potential for sustained participation of such communities and
9   minimizes the adverse economic impacts on such communities would
10  be the preferred alternative.
11
12  Now, the OFL is set so high, and the ABC is so conservative, and
13  I believe we have room for an alternative in there that would
14  provide that greater potential, and so I am in favor of your
15  motion, and I'm also in favor of sending the ABC back to the SSC
16  for further consideration, based on some of this new
17  information, and, with that, I thank you.
18
19  **CHAIRMAN FRAZER:**  Thank you, Mr. Williamson.  Mr. Strelcheck.
20
21  **MR. STRELCHECK:**   Thanks, Tom.   I certainly appreciate your
22  rationale and thoughts with regard to SSC considerations and
23  then kind of revisiting that, and I think the SSC, all along,
24  felt like that this would be something that would be coming back
25  to them, obviously, as information is completed and new analyses
26  are available, and I certainly don't object to, obviously, the
27  SSC taking a further look at this, and, in fact, during the SSC
28  meeting, they kind of made the point that this was advice for
29  2021 only, and that they would be advising on 2022, and that's
30  in a separate action down the road.
31
32  What I do want to speak to though is your motion, and I feel
33  like the logic is kind of contrary to the rationale that you
34  have offered up, and that many other people are offering up, and
35  I recognize that a 300,000-pound increase is very modest, but
36  your argument is that this essentially is to avoid kind of the
37  social and economic effects of where the ACL is set, and,
38  obviously, the SSC could have set it much higher, and they
39  didn't, but, by setting the ACL 300,000 pounds higher, we are,
40  obviously, providing social and economic benefits for this 2021
41  fishing season.
42
43  You also mentioned about the commercial quota increase and
44  potential challenges with implementing that and flooding the
45  market, and I will note that we have implemented quota increases
46  during the fishing year many, many times before.  The largest
47  quota increase late in the year was back in 2013, and that was
48  about 23 percent of the overall quota, and they still caught 97

162

1   percent of the quota that year.
2
3   It did have some impacts on ex-vessel prices, but, based on kind
4   of the timelines that we're talking about for implementing this
5   ACL, it's kind of in that general range, and we're only talking
6   a 2 percent increase in the commercial quota, and so I think we
7   need to keep that in mind with regard to impacts to the
8   commercial industry.
9
10  Certainly, this influences private recreational seasons, but,
11  also, we heard a lot from the for-hire industry about reducing
12  their buffer.  Well, we're not going to, obviously, reduce their
13  buffer this year, and so a way to, obviously, give them
14  additional fishing access is to provide them slightly higher
15  catch limits, and, in order to do that, the ACL would need to be
16  increased, and that goes towards, obviously, additional fishing
17  days sometime later in the season.  I certainly speak against
18  this, and I think we need to proceed with increasing the ACL in
19  conjunction with OFL.  Thanks.
20
21  **CHAIRMAN FRAZER:**  Thanks, Andy, and, again, I appreciate those
22  comments, right, and so that's certainly one way to go about
23  this.  My intent, really, was to -- I mean, part of the reason
24  that we're in the situation that we're are is we kept kicking
25  this down the road, for a very long time, and I did not want to
26  lose the momentum, and my intent is to try to get the SSC to
27  reevaluate, or incorporate new information, as soon as possible,
28  and so certainly, if we can get anything in 2021, that would be
29  great, and, like you said, the likelihood of that happening is
30  relatively low, but I do not want to have this council be in
31  this position in 2022.  Kevin Anson.
32
33  **MR. ANSON:**  Thank you, Mr. Chair.  A couple of thoughts, or
34  comments, that I had have been addressed already, or answered,
35  and I guess -- Just looking at the document, I guess, Tom, you
36  talked a little bit about timing and such, and we hear from
37  counsel that it's best to have more than just two options,
38  because one of those is remaining status quo, and so I think
39  maybe, from that side of things, I'm thinking of supporting this
40  motion, just to have it in the document, but I am, I guess,
41  still concerned as to getting this document approved and
42  whatever decision we make relative to OFL gets done in time, and
43  so I think I will support this as it stands right now, with just
44  having it as a motion, but not making it a preferred, but thank
45  you.
46
47  **CHAIRMAN FRAZER:**  Okay.  Thank you, Mr. Anson.  Mr. Spraggins.
48

0003254

1  **GENERAL JOE SPRAGGINS:**  Thank you, Mr. Chairman, and, first off,
2  I would like to thank each of you all for trying to work through
3  this as hard as you have.  I know that everybody has put a lot
4  of effort in it, and I thank you so much for your efforts too,
5  Tom, and for working hard on this.
6
7  I like your motion, and I like the idea of it, and I'm still up
8  in the air about whether to make it a preferred or not, and I
9  don't know 100 percent, but I do agree with what you're trying
10 to achieve here.  My question is, is there anything that we
11 might need to add to this motion as to whether it directs the
12 SSC to do this?  Maybe I am misreading it.  If I am, please
13 correct me, but it looks like it's a way that we can direct the
14 SSC to go back and look at it and be able to make sure that we
15 bring this up, or look at it different, and I guess what I'm
16 looking at is the ABC.
17
18 **CHAIRMAN FRAZER:**  I get your point, and so the intent would be
19 to follow this up, after we vote it up or down, to -- It's
20 looking to me like we would probably move forward with the OFL
21 in either case, whether or not we elect to move forward with the
22 ABC that was recommended or default to the existing ABC, and
23 that's a choice the council would have to make, but, in either
24 case, my intent would be to follow-up with a subsequent motion
25 that would direct the SSC to reevaluate new information that's
26 available to provide updated catch advice.
27
28 **GENERAL SPRAGGINS:**  Thank you so much.  I appreciate it.  That
29 answers what I was -- Thank you very much.
30
31 **CHAIRMAN FRAZER:**  Okay.  Ms. Levy.
32
33 **MS. LEVY:**  Thank you.  I just wanted to make a couple of points.
34 I wanted to address the idea and the comments about
35 incorporating social and economic considerations in the
36 recommendation of ABC, and I just wanted to point out that the
37 ABC is basically defined in the guidelines as the level of
38 annual catch, which is based on the ABC Control Rule that
39 accounts for scientific uncertainty in the estimate of OFL and
40 any other scientific uncertainty and the council's risk policy.
41
42 The risk policy comes in play with respect to having an ABC
43 Control Rule, which is also required by the guidelines, and that
44 part of the regulations says, when determining a risk policy,
45 councils could consider the economic, social, and ecological
46 tradeoffs between being more or less risk averse.
47
48 I guess my point is that it's ultimately the council's
                                  164

1  responsibility to articulate, in its ABC Control Rule, its risk
2  policy that should consider those factors, and we do have an ABC
3  Control Rule, and I don't think that it has an express
4  consideration of those factors in it, and I don't -- I think the
5  reason that the control rule itself wasn't really followed in
6  this case was because the way that this came to the SSC and what
7  they were considering was outside the normal process of review
8  of these things.
9
10 It was a totally different process, and it didn't follow what
11 was sort of anticipated in the ABC Control Rule, and I do want
12 to note that the council has a document, or an amendment,
13 potentially in progress to modify the ABC Control Rule, but
14 that's been on the back-burner for a really long time, and so, I
15 mean, I think that the way to get at the social and economic
16 stuff, if you want to, is to update your risk policy.
17
18 Then the other thing that I just wanted to note was that, if
19 this motion passes, I think you need to re-look at the purpose
20 and need of the document, because, right now, the purpose and
21 need is focused on updating all of the catch levels and such,
22 and then this isn't going to do that.  Thank you.
23
24 **CHAIRMAN FRAZER:**  Points well taken there, Ms. Levy.  Again, one
25 of the things that I think -- I talked about this in the SSC
26 meeting, right, and, from the council's perspective, it's always
27 helpful to at least get a range, if possible, of
28 recommendations, perhaps, and the SSC might ultimately make a
29 recommendation, but it would be good to have some narrative
30 surrounding alternatives that relate to risk, and I think we
31 should think about how we request things of the SSC moving
32 forward, and we probably need to be a little more explicit in
33 those requests, and I will take responsibility for not doing a
34 good job on that end.  Ms. Guyas.
35
36 **MS. GUYAS:**  Thanks, Tom.  I think I support where you're going
37 here.  Just a question, I guess, to staff.  You know you have
38 this new information that it sounds like will be completed very
39 soon, if it's not complete now, and I know we have an SSC
40 meeting in May, and I assume the agenda for that has already
41 been advertised, and when do we think we would have this in
42 front of the SSC for them to consider, and then, subsequently,
43 when would it come back in front of the council?  The reason I'm
44 asking is I'm just trying to think -- Are we really going to be
45 able to impact 2021 here, or is this really getting into 2022?
46
47 **CHAIRMAN FRAZER:**  Good question, Martha.  Let me sneak over and
48 ask Dr. Simmons.

0003256

```
 1
 2  EXECUTIVE DIRECTOR SIMMONS:    Thank you, Mr. Chair.    You are
 3  correct, Ms. Guyas, that the May SSC meeting has already been
 4  finalized and noticed, and so it would not occur in May.    We
 5  would really need the final, I think, Great Red Snapper report
 6  out to be ready to have another SSC meeting, as well as these
 7  other materials, and so I suspect the earliest we could do it is
 8  July, or have like a special meeting, if things could be ready
 9  earlier.  Thank you.
10
11  CHAIRMAN FRAZER:  Thank you.  Mr. Diaz.
12
13  MR. DIAZ:  Real quick, I just -- For a while, the screen on the
14  computer did not show that the substitute motion is to select
15  this alternative as the preferred, and a couple of speakers have
16  referenced not opposing adding it to the document, and I just
17  want to make sure that everybody is clear that this is to add it
18  to the document and make it the preferred.  Thank you.
19
20  CHAIRMAN FRAZER:  Thank you, Mr. Diaz.  Mr. Dugas.
21
22  MR. DUGAS:    Thank you, Mr. Chair.    I support your substitute
23  motion, and I'm looking forward to moving on and talking about
24  the ABC in a separate motion, and I think it's time we take a
25  vote on this one and move on.  Thank you.
26
27  CHAIRMAN FRAZER:    Thanks, J.D.  We have two more hands, and then
28  we can move forward, I think.  Ms. Bosarge and then Mr. Anson.
29
30  MS. BOSARGE:    Thank you, Mr. Chairman.    I think I'm going to
31  have to speak in opposition of this particular motion.  I think,
32  whether you -- I think you implement both of these together, an
33  OFL and an ABC, or you don't implement either, right?  It's an
34  all-or-none-type deal, and I am going to speak against this one,
35  because it does not implement the, albeit it small, an increase
36  that the scientists said that we could gather this year from the
37  fishery.
38
39  I think we just keep forgetting that there's more than private
40  recreational anglers in this fishery, and that increase in
41  poundage would be very worthwhile to the commercial fishery and
42  the charter/for-hire fishery, and I think, by implementing that
43  ABC, that does not preclude you from still going back to the SSC
44  in July, if you feel there's going to be new information, and I
45  don't think that precludes you from that at all.
46
47  If that new information leads to higher catch recommendations,
48  then they can send that back to the council, and we can have the
```

0003257

1  same discussion about implementing those as we would if we
2  didn't -- If we had not implemented this increase already, and I
3  don't think it changes those discussions at all, and so I'm
4  going to have to oppose this motion, and I can't see foregoing
5  yield that scientifically is okay to take in that increased ABC.
6  Thank you.
7
8  **CHAIRMAN FRAZER:**  Again, those comments were made and mirror
9  those of Mr. Strelcheck, and certainly my intent here, Leann,
10 was to keep the eye on the prize, in a bit, and, when I say
11 that, I would like to get this additional data incorporated into
12 the catch advice, if it warrants it, at the earliest
13 opportunity, and I just don't want to drag our feet, and so I
14 can certainly understand people's hesitancy, or reservation,
15 with this motion, but we're just going through the exercise, and
16 so no problem.  Mr. Anson and then Mr. Diaz, and then we'll vote
17 this one up or down.
18
19 **MR. ANSON:**  Thank you, Mr. Chair.  I didn't see, earlier, in the
20 substitute, your motion, where it says it's the preferred, and
21 so I think I'm kind of with Leann then at that point, and I
22 would prefer to have it in the document, but maybe not as a
23 preferred, and I had offered a similar motion in committee that
24 didn't get -- That didn't pass, and so, anyway, just for the
25 timing of the document.
26
27 Going back to the comment that Mara had about the council's risk
28 policy, and I'm just wondering, and is there any distinction,
29 Mara, in what role, or what the SSC would specifically be
30 evaluating and using in their risk policy and what the council
31 would be evaluating, specific to the socioeconomic data?
32 Obviously, we get input from the Socioeconomic SSC on certain
33 issues and such, but I guess, relative to setting the OFL, is
34 that implicit that they can look at the socioeconomic data, or
35 is that more of the council's purview, as far as how to
36 distribute the fish that are available when the ACL is set?
37
38 **CHAIRMAN FRAZER:**  Ms. Levy.
39
40 **MS. LEVY:**  At one point, I think you said ABC, and then you said
41 OFL, and are you talking about setting the ABC, the SSC's
42 recommendation as the ABC?
43
44 **MR. ANSON:**  Yes.
45
46 **MS. LEVY:**  Well, I mean, so we're supposed to have -- The
47 council is supposed to have an ABC Control Rule, right, and part
48 of that control rule is supposed to articulate how the ABC is
167

1  going to be set compared to the OFL, based on scientific
2  knowledge of the stock, and then also taking into account the
3  risk policies that the council incorporates into that ABC
4  Control Rule, and so, I mean, I don't -- I don't know how much
5  of an explicit discussion there was in the development of the
6  current ABC Control Rule, in terms of a risk policy and in terms
7  of social and economic and ecological tradeoffs.
8
9  I suspect there wasn't a lot of explicit discussion, and I don't
10 know if, moving forward in addressing changes to that ABC
11 Control Rule, the council wanted to be more explicit, but,
12 ultimately, that risk policy is supposed to be incorporated into
13 the control rule that the SSC follows, unless they articulate a
14 particular reason for not following it in some case.
15
16 I don't know if that really answers your question, but I don't -
17 - It's sort of hard to answer in the abstract, and maybe we need
18 to look in more detail with the National Standard 1 Guidelines
19 and what's in the control rule now and what was in there and
20 what was said when it was put in place.
21
22 **CHAIRMAN FRAZER:**  Mr. Rindone.
23
24 **MR. ANSON:**  If I can?
25
26 **CHAIRMAN FRAZER:**  Mr. Anson, go ahead.
27
28 **MR. ANSON:**  Just to quickly follow-up, and I don't have an
29 additional question, but it's just to follow-up.  I mean, Mara
30 said that we have a document that we should -- That's on the
31 docket, if you will, that kind of addresses this, and it would
32 give us an opportunity to clarify that more explicitly, and I
33 guess I just have the concern that whose role or how do we set
34 that up, and this might be a good case study as we go forward,
35 if there are opportunities for kind of further delineating that.
36
37 I look at localized depletion as more of an issue of how fish
38 are accessed, and you can have localized depletion and still the
39 overall stock is sustainable and healthy.  Those are more of, I
40 think, council decisions on how, again, the fish are
41 distributed.
42
43 It's kind of like growth overfishing.  With growth overfishing,
44 you can -- You can have growth overfishing, and that sounds bad,
45 but it doesn't necessarily mean that you've got an unhealthy
46 stock, whereas you can have recruitment overfishing, and that is
47 a bad situation, and that's more of a science issue of relating
48 to habitat and ecology and those types of things, and so, again,

0003259

1  this example of what went forward with the Great Red Snapper
2  Count could be a good way for us to help frame that particular
3  question, as we look at the risk policy again.  Thank you.
4
5  **CHAIRMAN FRAZER:**  Thank you, Mr. Anson.  Mr. Rindone.
6
7  **MR. RINDONE:**  Thank you, Mr. Chair.  For the ABC that was
8  recommended by the SSC, following the review of the Great Red
9  Snapper Count and the Great Red Snapper Count and the NMFS
10 bottom longline interim analyses, the ABC Control Rule was not
11 used in any way for the establishing that ABC.
12
13 The SSC's discussions about the uncertainty surrounding both the
14 Great Red Snapper Count and the NMFS bottom longline data
15 informed the SSC's decision for setting the ABC at 15.4 million
16 pounds.
17
18 **CHAIRMAN FRAZER:**  Thank you, Mr. Rindone.  Mr. Diaz, and then
19 we'll vote this up or down.
20
21 **MR. DIAZ:**  Just real quick, just to something that J.D. Dugas
22 said a minute ago, and he said that he wanted to dispense with
23 this motion so that we could go on and set the ABC, or the ACL,
24 and this motion does set the ABC and ACL, and that is included
25 in this motion, and I just wanted to make sure and bring that
26 out.  Thank you.
27
28 **CHAIRMAN FRAZER:**  Okay.  We'll go ahead and vote on the
29 substitute motion.  I imagine there's a wide range of opinions
30 on this, and we'll go ahead and do a roll call vote for this.
31 Dr. Simmons.
32
33 **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Chair.  Mr.
34 Strelcheck.
35
36 **MR. STRELCHECK:**  No.
37
38 **EXECUTIVE DIRECTOR SIMMONS:**  Dr. Shipp.
39
40 **DR. SHIPP:**  Yes.
41
42 **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Williamson.
43
44 **MR. WILLIAMSON:**  Yes.
45
46 **EXECUTIVE DIRECTOR SIMMONS:**  Ms. Guyas.
47
48 **MS. GUYAS:**  Yes.

169

0003260

1
2   **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Dyskow.
3
4   **MR. DYSKOW:**  Yes.
5
6   **EXECUTIVE DIRECTOR SIMMONS:**  General Spraggins.
7
8   **GENERAL SPRAGGINS:**  Yes.
9
10  **EXECUTIVE DIRECTOR SIMMONS:**  Ms. Bosarge.
11
12  **MS. BOSARGE:**  No.
13
14  **EXECUTIVE DIRECTOR SIMMONS:**  Dr. Stunz.
15
16  **DR. STUNZ:**  Yes.
17
18  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Diaz.
19
20  **MR. DIAZ:**  No.
21
22  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Anson.
23
24  **MR. ANSON:**  No.
25
26  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Banks.
27
28  **MR. BANKS:**  No.
29
30  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Riechers.
31
32  **MR. RIECHERS:**  Yes.
33
34  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Swindell.
35
36  **MR. SWINDELL:**  No.
37
38  **EXECUTIVE DIRECTOR SIMMONS:**  Ms. Boggs.
39
40  **MS. BOGGS:**  No.
41
42  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Sanchez.
43
44  **MR. SANCHEZ:**  No.
45
46  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Dugas.
47
48  **MR. DUGAS:**  Yes.

170

0003261

```
 1
 2   EXECUTIVE DIRECTOR SIMMONS:  Dr. Frazer.
 3
 4   CHAIRMAN FRAZER:  Where are we at?
 5
 6   EXECUTIVE DIRECTOR SIMMONS:  It's tied.
 7
 8   CHAIRMAN FRAZER:  Even though I made the motion, I really
 9   appreciate the comments made by Ms. Bosarge and Mr. Strelcheck,
10   and I will vote no on my own motion, but I will go ahead then
11   and we'll vote up the original motion.  Assuming that passes,
12   then we will go ahead and presumably make another motion to move
13   forward with making a request to the SSC.  Let's go back to the
14   original motion, and we'll take a roll call vote for that.
15
16   EXECUTIVE DIRECTOR SIMMONS:  Okay.  **So it failed eight to nine.**
17
18   CHAIRMAN FRAZER:  So let me read the motion that we're voting on
19   into the record.  **The motion is, in Action 1, to make
20   Alternative 2 the preferred alternative.  Alternative 2 is
21   modify the red snapper OFL, ABC, ACLs, and recreational ACTs for
22   2021 based on the OFL and ABC recommendations of the Scientific
23   and Statistical Committee at the March 30 to April 2, 2021 SSC
24   meeting.  The OFL was based on the interim analysis informed by
25   the results of the Great Red Snapper Count.  The ABC was based
26   on the fishery-independent National Marine Fisheries Service
27   bottom longline survey-based interim analysis.**  Dr. Simmons.
28
29   EXECUTIVE DIRECTOR SIMMONS:  Thank you, Mr. Chair.  Mr. Anson.
30
31   MS. BOSARGE:  Are we having discussion on this, Tom?
32
33   CHAIRMAN FRAZER:  We can certainly have some discussion.  I
34   apologize.  Ms. Bosarge.
35
36   MS. BOSARGE:  Thanks.  I just wanted to kind of make one thing
37   clear, and we had some discussion, and I don't know if it was in
38   this document or the other document, but there was this idea
39   about, as long as you don't exceed the OFL, everything is fine,
40   and we have this big OFL now, and so that's going to be great.
41
42   I just wanted to make it clear, for the record, that we're not
43   managing harvest towards the OFL of 25,600,000 pounds.  That is
44   set, and then an acceptable biological catch is set, and then an
45   ACL, an annual catch limit, is set, and we manage to our annual
46   catch limit and/or annual catch target, which would be lower
47   than that, and there are ramifications for exceeding those
48   levels, and so I just wanted to make that clear, that, even
```

0003262

1  though we may implement a very large OFL, we should not be
2  managing towards harvesting the OFL level.
3
4  **CHAIRMAN FRAZER:**  Point well taken, Ms. Bosarge.  Mr. Banks.
5
6  **MR. BANKS:**  I appreciate it, Mr. Chairman.  I'm going to support
7  this motion, but I want to make sure that I explain a little bit
8  about my thoughts on supporting this.  I certainly support going
9  up on the OFL, and I think there's adequate guidance from the
10  Great Red Snapper Count that shows that we have a lot more fish
11  out there.
12
13  I appreciate some of the hesitancy from the SSC members about
14  being unsure of exactly how much more of those fish we should
15  allow to be caught.  However, I disagree with them that that
16  level of uncertainty would only allow you to go up 300,000
17  pounds.  I feel that, based on the information at-hand, even
18  though the bottom longline survey may show that the relative
19  abundance seems to be going down, the fact that I think the
20  absolute abundance is so damn high -- So what if a very, very
21  high absolute abundance is going down a little bit?
22
23  I just feel like they erred on the side of being way too
24  conservative, and I would like to make sure that they revisit
25  this issue with all of this new information that you described,
26  because I think there's going to be some new information that
27  may help them get together and say, you know what, with all of
28  this new information, maybe we were a bit too conservative on
29  the catch advice.
30
31  Now, again, I disagree with the amount of their direction on the
32  increase in the ABC, but I don't disagree that the ABC should be
33  raised, and, for that reason, I'm going to support this motion,
34  because I don't want to leave the 300,000 pounds on the table,
35  and I certainly don't want to leave it on the table and make the
36  commercial and the charter sector sit by and not get any extra
37  fish while we try to sort this out, and so I would like to take
38  advantage of whatever the SSC recommends we can get and then
39  return this item back to them for consideration, like you
40  described, Mr. Chairman.  Thank you.
41
42  **CHAIRMAN FRAZER:**  Thank you, Mr. Banks.  General Spraggins.
43
44  **GENERAL SPRAGGINS:**  Mr. Chairman, just one question.  If we do
45  adopt this one, does that still allow us to put the subsequent
46  motion that you were talking about, about taking it back to the
47  SSC?
48

172

1    **CHAIRMAN FRAZER:**  That would be my intent, yes.
2
3    **GENERAL SPRAGGINS:**  Okay.  Thank you.
4
5    **CHAIRMAN FRAZER:**  Okay.  I am not seeing any other hands, and so
6    we will proceed to the vote.  Dr. Simmons.
7
8    **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Chair.  Mr. Anson.
9
10   **MR. ANSON:**  Yes.
11
12   **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Riechers.
13
14   **MR. RIECHERS:**  Yes.
15
16   **EXECUTIVE DIRECTOR SIMMONS:**  Dr. Shipp.
17
18   **DR. SHIPP:**  No.
19
20   **EXECUTIVE DIRECTOR SIMMONS:**  Ms. Boggs.
21
22   **MS. BOGGS:**  Yes.
23
24   **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Sanchez.
25
26   **MR. SANCHEZ:**  Yes.
27
28   **EXECUTIVE DIRECTOR SIMMONS:**  General Spraggins.
29
30   **GENERAL SPRAGGINS:**  Yes.
31
32   **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Diaz.
33
34   **MR. DIAZ:**  Yes.
35
36   **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Banks.
37
38   **MR. BANKS:**  Yes.
39
40   **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Dugas.
41
42   **MR. DUGAS:**  Yes.
43
44   **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Strelcheck.
45
46   **MR. STRELCHECK:**  Yes.
47
48   **EXECUTIVE DIRECTOR SIMMONS:**  Ms. Bosarge.

0003264

1
2   **MS. BOSARGE:**  Yes.
3
4   **EXECUTIVE DIRECTOR SIMMONS:**  Dr. Stunz.
5
6   **DR. STUNZ:**  Yes.
7
8   **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Dyskow.
9
10  **MR. DYSKOW:**  Yes.
11
12  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Williamson.
13
14  **MR. WILLIAMSON:**  Yes.
15
16  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Swindell.
17
18  **MR. SWINDELL:**  Yes.
19
20  **EXECUTIVE DIRECTOR SIMMONS:**  Ms. Guyas.
21
22  **MS. GUYAS:**  Yes.
23
24  **EXECUTIVE DIRECTOR SIMMONS:  The motion carried fifteen to one**
25  **with one abstention.**
26
27  **CHAIRMAN FRAZER:**  Thank you, Dr. Simmons.  To follow up on
28  General Spraggins' comment, if we can go ahead and put up a new
29  motion.  **We have a new motion on the board, and it's to request**
30  **that the SSC reconsider the Gulf red snapper ABC recommendation**
31  **for 2021 and beyond after the final Great Red Snapper Count is**
32  **published in June of 2021.**
33
34  That would, of course, incorporate a reconsideration, or
35  essentially asking them to take advantage of a revised document
36  and new information that wasn't available, in order to update
37  their catch advice, if needed, and so if I can -- I think that's
38  the intent, and hopefully it's clear in there.  Is there a
39  second to this motion?
40
41  **GENERAL SPRAGGINS:**  I will second it.
42
43  **CHAIRMAN FRAZER:**  It's seconded by General Spraggins.  Is there
44  any further discussion on the motion?  Ms. Boggs.
45
46  **MS. BOGGS:**  I just want to clarify the comments that I think you
47  just made, because I -- Not that I necessarily wanted to
48  reconsider the OFL, but I hope that they would just basically

                                    174

1  take a look at this in general, and you said that is your
2  intent?
3
4  **CHAIRMAN FRAZER:**  My intent would be, essentially, to send a
5  message back to the SSC that we think that there is new data,
6  and there is certain data that are available, or data that were
7  not considered, in the earlier discussions, we expect, and so a
8  couple of the examples that I gave were the fishery-independent
9  video survey, and there will be revisions as well to the point
10 estimates in the Great Red Snapper Count, and I had one more
11 written down, and sorry, but I just want to circle back.
12
13 The additional data that I expect to be provided to the
14 Louisiana Department of Wildlife and Fisheries, or Fish and
15 Wildlife, and so, again, what I want to make clear here is that
16 I am a strong defender of the science that underlies fisheries
17 management, and I am certainly understanding and appreciative of
18 the approach that the SSC took, but I also want them to
19 incorporate, to the greatest extent possible, all of the
20 available information to improve that catch advice, if it can be
21 improved.  I have --
22
23 **MS. BOGGS:**  May I follow-up, real quick, to that?
24
25 **CHAIRMAN FRAZER:**  Yes, you may.  Go ahead, Susan.
26
27 **MS. BOGGS:**  I guess, based especially on the verbiage you just
28 used, could we not say "red snapper catch advice", instead of
29 just restricting it to "ABC"?  Thank you.
30
31 **CHAIRMAN FRAZER:**  Sure.  So, again, what we're trying to do is
32 get the best available science to help us to most beneficially,
33 I guess, manage this fishery.  So I would modify the motion to
34 say "request the SSC provide -- How about this?  Sorry.  You can
35 erase that.  **"Request that the SSC consider new information and
36 revised report to provide catch advice for red snapper for 2021
37 and beyond."**  That revised report, it's implicit that that's the
38 Great Red Snapper Count.
39
40 **MS. BOGGS:**  Thank you.
41
42 **CHAIRMAN FRAZER:**  Again, I will read it into the record here.
43 **Request that the SSC consider new information and revised report
44 to provide catch advice for red snapper for 2021 and beyond.**  We
45 can add, in parentheses, after "revised report", "Great Red
46 Snapper Count", just for clarity.  Okay.  Do we have a second
47 for this motion?
48

0003266

1  **GENERAL SPRAGGINS:**  I will second it.
2
3  **CHAIRMAN FRAZER:**  Thank you, General Spraggins.  Ms. Bosarge.
4
5  **MS. BOSARGE:**  I think my concerns have been addressed.  Thank
6  you.  I just thought, if there is revised information in that
7  Great Red Snapper Count, that's what we used to set that OFL,
8  and so we would have to look at it, to make sure that it still
9  matches up, and so thank you.
10
11  **CHAIRMAN FRAZER:**  Thank you.  J.D. Dugas.
12
13  **MR. DUGAS:**  Thank you, Mr. Chair.  I would be in support of this
14  motion.    A  couple  of  points,  or  maybe  questions  or
15  recommendations to add, but there was some thoughts from other
16  members  about  National  Standard  8,  and  maybe  that  should  be
17  integrated  into  this  motion,  and,  also,  the  ABC  Control  Rule
18  should  be  considered.    I  don't  know  if  you  would  be  open  to
19  adding  that  in  this  motion  or  not,  but  I  just  wanted  to  put  it
20  out there.  Thanks.
21
22  **CHAIRMAN FRAZER:**  Okay.  Thanks, J.D.  I will think about that
23  for  a  minute,  and  I'll  take  a  couple  more  comments.    Kevin
24  Anson.
25
26  **MR. ANSON:**  My question has been answered.  Thank you.
27
28  **CHAIRMAN FRAZER:**  Dr. Stunz.
29
30  **DR. STUNZ:**  Thank you, Mr. Chairman.  I had the same comment as
31  J.D.,  about  considering  the  ABC  Control  Rule,  since  I  don't
32  think  that  that  was  fully  considered.    We,  obviously,  have  the
33  council's  control  rule  that  at  least  should  be  part  of  that
34  discussion,  and,  Mr.  Chairman,  I  have  a  point  not  directly  to
35  this  motion,  if  you  would  please  recognize  me  after  we  make  this
36  vote,  and  I  don't  want  to  bog  down  that  discussion,  but  it  is
37  important and related to what we're discussing here today.
38
39  **CHAIRMAN FRAZER:**  Okay.  Thank you, Dr. Stunz.  We'll come back,
40  and so I'm going to try to modify this motion slightly one more
41  time.  **Request the SSC consider new information and revised**
42  **report (Great Red Snapper Count) to provide catch advice for red**
43  **snapper for 2021 and beyond.  As part of the discussion, the SSC**
44  **should  consider  the  existing  ABC  Control  Rule  as  well  as  the**
45  **National Standard Guidelines.**  General Spraggins, are you okay
46  with those changes to the motion?
47
48  **DR. SPRAGGINS:**  I am.

0003267

1
2  **CHAIRMAN FRAZER:**   Okay.   I'm going to take a couple of quick
3  comments here.   Mr. Strelcheck and then Ms. Guyas.
4
5  **MR. STRELCHECK:**   Thanks, Tom.   For clarification, with regard to
6  new information, you rattled off, earlier, a lot of reasons for
7  kicking this back to the SSC.   We're referencing the Great Red
8  Snapper Count specifically here, but there was mention, for
9  instance, of a video index and some other information that might
10  be emerging from the research track assessment.   Is that the new
11  information you're referencing here, or are we explicit to the
12  Great Red Snapper Count?
13
14  **CHAIRMAN FRAZER:**   I think there's a couple -- It will be in the
15  record here, Andy, and so I am specifically interested in two
16  pieces of information.   one is the fishery-independent video
17  survey that is part of the SEDAR Working Paper 74-SID-03, and so
18  that has, essentially, survey data, or index data, through 2019
19  that I think would be of value.
20
21  The other piece of information that I was particularly
22  interested in is a report that will be provided to the Louisiana
23  Department of Wildlife Fisheries, and it's anticipated by the
24  end of the month, that provides more detailed information on the
25  abundance and distribution of red snapper off the Louisiana
26  coast, and so I think that will help, in many ways, perhaps,
27  with some revisions to the Great Red Snapper Count, but, in any
28  case, it should provide additional information, and so, again,
29  there may be more that comes out, but those are two that
30  immediately come to mind, and so they're on the record, and,
31  when we make the direction to the SSC, we'll make sure that
32  we'll be as specific as we possibly can.   Ms. Guyas.
33
34  **MS. GUYAS:**   Real quick, I support the motion.   Just one thing
35  that came to my mind, since we talked about it in committee, is,
36  depending on where we go with this, I don't know that we would
37  want to -- If we end up implementing new OFLs and ABCs, let's
38  say in August, or even October, I guess we're going to want to
39  think about whether we want to pursue getting an updated interim
40  analysis from the Science Center at the beginning of 2022,
41  because I think that was something that Clay mentioned that they
42  were planning on doing for us, but we can figure that out later,
43  but I'm just kind of flagging that as maybe something we need to
44  come back to, depending on where we go.
45
46  **CHAIRMAN FRAZER:**   Good point, and, again, I think we can
47  certainly keep that in mind, but I think that we can probably
48  move forward with this motion as it exists, and so I'm not

177

1  seeing any other hands.  I will give it just a second, and, when
2  we dispense with this motion, I think we're going to take a bit
3  of a break for lunch.  Ms. Bosarge.
4
5  **MS. BOSARGE:**  I just wanted to make sure I've got one thing on
6  the record.  You mentioned that new research that's going to
7  come out of Louisiana and hopefully aid in the estimates that
8  were in the Great Red Snapper Count, supplement those for
9  Louisiana, since some of those kind of had to be used based on
10  some Texas data, from what I understand, and I'm not a
11  scientist, and I just listened to the review, but I would also
12  like to make sure -- Because what if that gets delayed, or
13  something like that?
14
15  There were a few things brought up during the discussion that I
16  don't think it would take Greg and his team too much to address,
17  and I do want to make sure that those will be addressed before
18  it's presented back to the SSC, and those two items were the
19  pipeline data that was used, and, obviously, exposed pipelines
20  can be habitat for red snapper, and they found that in their
21  report.
22
23  However, I think the report assumed that pipelines in water
24  depths less than ninety feet were buried, and so, therefore,
25  everything else is unburied and is a habitat for snapper, and,
26  per the BSEE regulations, it's actually 200 feet, and so all
27  pipelines inside of 200 feet of water depth have to buried, and
28  so that affects their estimate of mileage of pipeline that was
29  used as habitat, and, therefore, that final estimate, although
30  minor, because that's really not where most of the snapper are.
31
32  Then the other thing that they could adjust, before the
33  Louisiana data comes out, if it doesn't come out in time, is the
34  actual rig count that they used, and I think like ninety-
35  something percent of the artificial habitat in Louisiana was
36  assumed to be rigs and platforms and caissons, or oil industry
37  infrastructure, and I think they had a number somewhere between
38  3,500 and 4,000 for that rig count, and, you know, depending on
39  when you pull the data, in federal waters at least, for the Gulf
40  of Mexico, currently, it's about eighteen-hundred-and-something
41  rigs, platforms, and caissons in the entire Gulf, and so that
42  Louisiana number would be a little high.
43
44  Yes, there could be some in state waters, but it wouldn't take
45  you to that number, and so if they could address those two
46  things for sure, before they bring it back, I think that would
47  be good, and I don't think -- Greg, I don't think that would be
48  overwhelming to you, right?
                                    178

0003269

```
 1
 2   CHAIRMAN FRAZER:  Dr. Stunz.
 3
 4   DR. STUNZ:  To that point, Mr. Chairman, my hand was up so that
 5   you didn't forget to recognize me after the vote, but, to that
 6   point, since Leann brought it up, yes, you're right, Leann.  It
 7   was very minor, but we can fix that relatively easy, but just
 8   another point that we struggle with on the pipelines is, just
 9   because they're supposed to be buried, it does not mean they're
10   buried.
11
12   In fact, it's common for them not to be buried sometimes, and we
13   have ways to estimate that, and our team is working on that.
14   That's a relatively low lift, but, as you pointed out, that's
15   not really where the fish are, and so it's not going to really
16   change much, in terms of the overall estimate.
17
18   MS. BOSARGE:  To that point, Mr. Chairman?
19
20   CHAIRMAN FRAZER:  Go ahead, Ms. Bosarge.
21
22   MS. BOSARGE:  A very small piece of that long pipeline may be
23   exposed, like maybe where a valve or where it intersects another
24   pipeline, where the oil industry has gone in to do some work or
25   something to it, and maybe that didn't get reburied, but, by and
26   large, the pipelines are buried inside of 200 feet, and the
27   shrimp industry played a large role in that, because, if they
28   weren't, we would hang up on them and tear our gear up all the
29   time, and, in fact, there's a fund that the oil industry has to
30   take care of for the times that we do hang up on their
31   pipelines, and they have to reimburse us for gear, and so they
32   do try and make sure that they are buried, because they don't
33   want to have to pay us.
34
35   CHAIRMAN FRAZER:  Okay.  I appreciate that discussion, and,
36   Greg, I know that you've had your hand up, and you may have some
37   other things to say, but do you recommend that we go ahead and
38   vote on this motion?
39
40   DR. STUNZ:  Mine would be after the motion, please.
41
42   CHAIRMAN FRAZER:  Okay.  Great.  We will go ahead and vote on
43   this motion.  **I am not sensing a great deal of hesitancy here,
44   and so I will risk saying, is there anybody opposed to this
45   motion?  I am not seeing any hands, or hearing any opposition,
46   and the motion carries.**  Dr. Stunz.
47
48   DR. STUNZ:  Thank you, Mr. Chairman.  I will be brief, since
```
179

1   we're running behind here.   One just interesting thing that I
2   think we need to consider as a council, and council staff in
3   general, with the SSC is all this consternation that we've been
4   discussing over these past few days, and this motion is why I'm
5   bringing it up here, was that this was over a very narrow vote
6   within the SSC, ten to eleven or something like that, and so
7   almost as many that supported it did not support it.
8
9   I don't know, and my understanding is that that body would work
10  better from a consensus standpoint, but I don't know what the
11  rules and legalities are, in terms of really coming to a
12  scientific consensus, other than just passing a motion based on
13  a narrow vote, where maybe not all the viewpoints are fully
14  captured in that scientific opinion and advice that's given back
15  to us.
16
17  I am not proposing that we solve that right here and right now,
18  but that's something that I think that we need to consider, that
19  all of that information is packaged together on many things that
20  comes back to us and not just this example.
21
22  **CHAIRMAN FRAZER:**   Okay.   Thank you, Dr. Stunz.   Mr. Banks.
23
24  **MR. BANKS:**   Real quick, Mr. Chairman, and I'm sorry that I
25  didn't make this point with my earlier comment, but this
26  increase in quota that's going to the commercial and charter
27  sector, especially on the commercial side, we need to bring
28  Amendment 36 back to the council, so that we can work on trying
29  to get these extra fish that are coming into the fishery in the
30  hands, or at least in the hands in a more reasonable way, to
31  fishermen who are actually in the fishery, who actually do the
32  fishing, who don't have quota and things like that, and so I
33  would like to request that of staff, to try to do that as soon
34  as we possibly can.   Thank you.
35
36  **CHAIRMAN FRAZER:**   Thank you, Mr. Banks.   Dr. Simmons, real
37  quick.
38
39  **EXECUTIVE DIRECTOR SIMMONS:**   Thank you, Mr. Chair.   I was just
40  going to go back to something that Dr. Stunz said.   We will work
41  on that peer review process again before the next meeting, and I
42  think you bring up some good points.   I do recall that Dr. Joe
43  Powers did try to get the committee to come to a consensus, and,
44  as you know, that did not happen, and so we can continue to work
45  towards that, but I don't think that we can require it of the
46  SSC, but I will work with Ms. Levy and staff on that.   Thank
47  you.
48

0003271

1   **CHAIRMAN FRAZER:**   Thank you, Dr. Simmons.   Two quick comments.
2   I will take Andy's and then Kevin's.
3
4   **MR. STRELCHECK:**   Tom, I know we're standing between now and
5   lunchtime, and I did want to remind the council that this is
6   final action, and we should vote this up for review and
7   submittal to the agency.
8
9   **CHAIRMAN FRAZER:**   I hadn't decided if I was going to try to
10  squeeze that in before lunch or right after, but we'll see here.
11  Kevin.
12
13  **MR. ANSON:**   Dr. Simmons kind of addressed my point, or question,
14  and that was just if there was going to be any additional
15  information or looking at that peer review process for the next
16  SSC vote, and it sounds like there will be an attempt to try to
17  either reevaluate and change, or at least make sure that the
18  information is publicly available and consistent well in advance
19  of the meeting.   Thank you.
20
21  **CHAIRMAN FRAZER:**   Okay.   Thank you, Mr. Anson.   I think what we
22  do is we will go ahead, because we're going to move into
23  calibration, and I consider those to be related, but certainly
24  separate, items, and we will go ahead and make sure -- Because
25  this is a final action item now, we will go through the
26  appropriate process to vote on that as well.   We will get the
27  standard language on the board.
28
29  **It's a final action item, and the motion is to approve the**
30  **Framework Action: Modification of Annual Catch Limits for Gulf**
31  **of Mexico Red Snapper and that it be forwarded to the Secretary**
32  **of Commerce for review and implementation and deem the codified**
33  **text as necessary and appropriate, giving staff editorial**
34  **license to make the necessary changes in the document.   The**
35  **Council Chair is given the authority to deem any changes to the**
36  **codified text as necessary and appropriate.**   We have a motion on
37  the board, and I'm assuming that we will need a second for that
38  as well.   Can I get a second for this motion?
39
40  **GENERAL SPRAGGINS:**   I will second it.
41
42  **CHAIRMAN FRAZER:**   It's seconded by General Joe Spraggins.   Is
43  there any further discussion of the motion?   Ms. Levy.
44
45  **MS. LEVY:**   I believe that NMFS had worked on the codified, and I
46  don't know if you have all had a chance to look at that, or
47  whether that was circulated, but the codified you had in
48  committee was just a placeholder, I believe, and now it should

181

1  have the actual values that are in the document, and so I just
2  wanted to let you know that.
3
4  **CHAIRMAN FRAZER:**  Yes, and so Dr. Froeschke was working with the
5  staff earlier to get that, and so the codified text changes are
6  recognized, and they're on the board, if people are interested.
7  Okay.  Are there any questions or concerns about the codified
8  text?  They're fairly straightforward.  Okay.  I am not seeing
9  any hands there, and so we can go back to the motion.  We will
10  proceed to the vote.  Dr. Simmons.
11
12  **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Chair.  Ms. Boggs.
13
14  **MS. BOGGS:**  Yes.
15
16  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Riechers.
17
18  **MR. RIECHERS:**  Yes.
19
20  **EXECUTIVE DIRECTOR SIMMONS:**  Dr. Stunz.
21
22  **DR. STUNZ:**  Yes.
23
24  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Strelcheck.
25
26  **MR. STRELCHECK:**  Abstain.
27
28  **EXECUTIVE DIRECTOR SIMMONS:**  Ms. Bosarge.
29
30  **MS. BOSARGE:**  Yes.
31
32  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Anson.
33
34  **MR. ANSON:**  Yes.
35
36  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Banks.
37
38  **MR. BANKS:**  Yes.
39
40  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Williamson.
41
42  **MR. WILLIAMSON:**  Yes.
43
44  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Dyskow.
45
46  **MR. DYSKOW:**  Yes.
47
48  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Swindell.

0003273

```
 1
 2   MR. SWINDELL:  Yes.
 3
 4   EXECUTIVE DIRECTOR SIMMONS:  Mr. Dugas.
 5
 6   MR. DUGAS:  Yes.
 7
 8   EXECUTIVE DIRECTOR SIMMONS:  Dr. Shipp.
 9
10   DR. SHIPP:  Yes.
11
12   EXECUTIVE DIRECTOR SIMMONS:  General Spraggins.
13
14   GENERAL SPRAGGINS:  Yes.
15
16   EXECUTIVE DIRECTOR SIMMONS:  Mr. Diaz.
17
18   MR. DIAZ:  Yes.
19
20   EXECUTIVE DIRECTOR SIMMONS:  Ms. Guyas.
21
22   MS. GUYAS:  Yes.
23
24   EXECUTIVE DIRECTOR SIMMONS:  Mr. Sanchez.
25
26   MR. SANCHEZ:  Yes.
27
28   EXECUTIVE DIRECTOR SIMMONS:  Dr. Frazer.
29
30   CHAIRMAN FRAZER:  Yes.
31
32   EXECUTIVE DIRECTOR SIMMONS:  The motion carries sixteen to zero
33   with one abstention.  Mr. Chair.
34
35   CHAIRMAN FRAZER:  Okay.  Thanks, everybody, for working through
36   this.  We are going to take a thirty-minute break for lunch, and
37   we'll come back at 1:45, and we'll pick up with another final
38   action item having to do with the framework action and
39   calibration, and so I will see you all in thirty minutes, at
40   1:45.  Thank you.
41
42   (Whereupon, the meeting recessed for lunch on April 15, 2021.)
43
44                              - - -
45
46                        April 15, 2021
47
48                  THURSDAY AFTERNOON SESSION
                              183
```

```
1
2                                - - -
3
4   The Full Council of the Gulf of Mexico Fishery Management
5   Council reconvened via webinar on Thursday afternoon, April 15,
6   2021, and was called to order by Chairman Tom Frazer.
7
8   CHAIRMAN FRAZER:   It looks like we're getting everybody up.
9   We'll wait just one second, and then Martha -- I think you're
10  good to go, actually.   Carry on.
11
12  MS. GUYAS:   Thanks, Mr. Chair.   That brings us to Final Action:
13  Framework Action: Gulf of Mexico Red Snapper Recreational Data
14  Calibration and Recreational Catch Limits, Tab B, Number 8.
15  Council staff presented the challenges of relating different
16  state data collection currencies in which they report their
17  catch and effort data for Gulf red snapper, using monetary
18  exchange rates between countries as an example.
19
20  The presentation detailed why differing currencies were not
21  additive and needed to be calibrated to a common currency in
22  order to be directly compared.   Council staff followed this
23  presentation with a review of written public comments received,
24  sixty-four, and noted that the YouTube video explaining the
25  document had thus far received 145 views.
26
27  Council staff reviewed the alternatives in the framework action.
28  Ms. Leann Bosarge asked about the effects of the 2017 extended
29  private angling fishing season for red snapper, which was
30  extended by the Secretary of Commerce by thirty-nine days, to
31  forty-two days in total.
32
33  Based on the definitions of overfishing, she said that she
34  thought red snapper experienced overfishing in 2017, as a result
35  of the extended fishing season.   Ms. Guyas reminded the
36  committee of the motion passed in consideration of the previous
37  agenda item, the Final Action: Framework Action: Modification of
38  Annual Catch Limits for Gulf of Mexico Red Snapper, Tab B,
39  Number 7, adding that this motion would increase the current OFL
40  considerably compared to the current OFL, 25.6 million pounds
41  versus 15.5 million pounds.
42
43  She then asked about the consequences of exceeding the ABC for
44  Gulf red snapper.   Ms. Mara Levy replied that NMFS cannot allow
45  fishing for red snapper to continue for a sector once that
46  sector's ACL is met.   Presently, the sum of the commercial and
47  recreational ACLs equals the stock ABC.
48
```

184

0003275

1  Further, the management of red snapper in the Reef Fish Fishery
2  Management Plan is currently not in compliance with the
3  Magnuson-Stevens Fishery Conservation and Management Act, in
4  that the current recreational ACL is being managed in a manner
5  that has resulted, and is expected to continue to result, in ACL
6  overages for that sector.
7
8  From a biological perspective, Dr. Porch stated that the effect
9  of exceeding the ABC depended on the accuracy with which the OFL
10 is thought to be known.  If the OFL is thought to be appropriate
11 for preventing overfishing, then just exceeding the ABC should
12 not result in overfishing in a given year.
13
14 Mr. Andy Strelcheck stated that NMFS has worked with the council
15 and the Gulf states to address the need for data calibration.
16 He noted that NMFS had lost federal lawsuits related to red
17 snapper recreational catch limits being exceeded in the recent
18 past, in 2014 and 2017.
19
20 Mr. Anson discussed the differences between the state surveys
21 and the MRIP program and how they provide timelier and more
22 precise catch and effort estimates for red snapper.  He also
23 detailed some of the effects of the differences in the state
24 surveys and MRIP-FES, stating that landings, as recorded for
25 currently fished habitat, would be substantially higher than
26 currently reported and would represent a large fraction of the
27 estimated biomass.
28
29 Mr. Strelcheck replied that the calibrations would not be
30 necessary if the state survey data were commensurate and could
31 be directly compared and incorporated into a stock assessment.
32 Mr. Anson then proposed a motion that would fix Alabama's state-
33 specific ACL at the level established in Reef Fish Amendment
34 50A, with the remaining four states receiving a proportional
35 increase based on the proposed increase to the ABC in the
36 document discussed under Tab B, Number 7.
37
38 Council staff advised the committee that the proposed motion was
39 in fact a reallocation among the states and could not be
40 included in a framework action and would require a plan
41 amendment.  Council staff also noted that the proposed motion
42 would result in the predicted landings for the private angling
43 component being exceeded, just as it would under Alternatives 1
44 and 5.  Ms. Levy echoed council staff and added that the
45 proposed alternative was more appropriate in Tab B, Number 7(d),
46 as it addresses revising the catch limits using the ABC used in
47 the proposed motion.
48

0003276

1  **The committee recommends, and I so move, in Action 1, to add a**
2  **new Alternative 6 that would change the state-specific red**
3  **snapper private angling component annual catch limits using**
4  **modified percentages from those identified in Amendment 50A in**
5  **state survey currencies through 2023. Alabama would retain the**
6  **ACL that was issued in Amendment 50A of 1,122,662 pounds.** I
7  don't know if we need to read the ACL percentages here in the
8  table.
9
10  **CHAIRMAN FRAZER:** I think you're good, Ms. Guyas. We have a
11  committee motion on the board. Martha just read it into the
12  record, and I don't think we need to do that again, but I will
13  entertain any discussion on this motion at this time.
14
15  **MS. BOGGS:** We need a second.
16
17  **DR. SHIPP:** I will second it.
18
19  **CHAIRMAN FRAZER:** Okay. I am looking for hands. I see Mr.
20  Anson.
21
22  **MR. ANSON:** I just -- To kind of follow back around to a few of
23  the things that I said during Reef Fish, I understand the
24  importance of the fisheries trying to stay within their ACL, and
25  certainly I would prefer not to do that, but we feel the data
26  that has been collected, particularly the recreational data,
27  from the federal surveys -- By the time it goes through the
28  scientific process and the model, we have not been getting an
29  appropriate share of those fish.
30
31  We've got a lot of fish off of Alabama, and the Great Red
32  Snapper Count is a good indication of that, and is that because
33  the habitat is that much better off of Alabama for red snapper?
34  Possibly. It might be more productive off of Alabama than they
35  are, and the recruitment might be higher, or is it an issue with
36  not having access to the resource and not allowing fishermen
37  equal access as they occur in other areas of the Gulf?
38
39  It could be a combination of the two, but our data, both on the
40  fishery-independent side, for eight years now, going on eight
41  years, with our independent survey, and then the point in time,
42  the point estimate, in the Great Red Snapper Count, and we have
43  a very good handle of the amount of fish, the abundance of fish,
44  off of Alabama.
45
46  Then, with Snapper Check, we're very comfortable with those
47  numbers, as they relate to not only that annual estimate that we
48  produce, but also the Great Red Snapper Count. We just feel

186

1   like we have got a system, and we are being penalized by the
2   system that generated the OFL and ABC, that is at least going to
3   be changed here, using that science that, again, just doesn't
4   accurately capture those fish that are off of Alabama, and,
5   again, we feel like it creates some issues for us.
6
7   We talk about allocation, and certainly there is allocation
8   issues amongst states, and anglers from various states, but
9   converting back to Snapper Check information for the federally-
10  permitted vessels over the time series, whether you're from 2014
11  to 2019 or if you're during the period for which MRIP certified
12  Snapper Check, which was from 2017 forward -- If you look at
13  those two time series, and the Snapper Check to MRIP estimates
14  are 0.95.
15
16  That's our calibration for federally-permitted vessels with
17  Snapper Check.  It's almost to the pound, and, when you talk
18  about 100,000, or 700,000, pounds, it's pretty darned good, and
19  so that is very comparable, but it's just this private
20  recreational effort.
21
22  Again, I mentioned, the other day during committee, that it's
23  hard, when you look at the information.  If you look at FES,
24  which, again, is -- I know we're talking about the Coastal
25  Household Telephone Survey calibration here, but FES estimated,
26  in 2017, that we harvested 34 percent, just the private
27  recreational and the charter, 34 percent of all the fish that --
28
29  The biomass that was estimated off of Alabama in that one year,
30  and yet, the following years, they were able to harvest 22 and
31  21, and, actually, FES went down in 2018 and 2019, partly
32  because we had stable seasons, and that is bearing fruit, not
33  only on the fish side, believe, but also on the access, and so,
34  again, I just offer this as to try to get to some point where we
35  could proceed as-is.
36
37  Again, I understand the issue with the currency and the impacts
38  on ACL, but we have been in a tough spot, and it is interesting,
39  speaking of FES, that here we have other sectors that have
40  voiced their concerns here recently about FES, as FES has
41  started to be used in other species assessments, and we'll be
42  talking about red grouper here later, and it is interesting to
43  hear the perspectives of those other sectors, individuals within
44  those sectors, within they -- On the one hand, we talk about
45  using FES to increase the ACL, but then, on the other hand, it's
46  not good for allocation, and so I know there's other deeper
47  issues on how that -- How you could use recreational surveys as
48  your basis for allocation, but -- If it's the best available

0003278

```
 1  science, then we ought to run with it everywhere.
 2
 3  You know, Alabama would come out looking pretty good if FES is
 4  used compared to the other states for private rec access going
 5  forward, and the survey would look Gulf-wide for the private
 6  recs against the federal for-hire, as we look at the 49 percent
 7  of the total Gulf ACL, if we use FES, and so I guess we can go
 8  that way and see how it shakes out, but that wouldn't be
 9  appropriate, because this totally skews the allocation of those,
10  within the sector as well as between the sectors, and so using
11  FES, and so, anyway, we just put this out there to try to let
12  you all know that we are -- If your management target is 0.1,
13  you have an exploitation rate of 0.1, if that's really what is
14  in the best interest for maintaining a sustainable harvest off
15  of Alabama, we are almost there, and so we're willing to pull
16  back a little bit.
17
18  One could still argue that maybe exploitation rate is a little
19  higher, particularly in our part of the Gulf, but, again, trying
20  to get to a point where we can -- Again, going back to the idea
21  of variations and contingencies in the National Standards and
22  Magnuson, that we have a bunch of data that indicates the
23  population is in a much better position than we think, and we're
24  just -- We just don't have time to evaluate it, and hopefully
25  the 2023 will allow us some time to go ahead, in combination, or
26  running concurrently, with the research track assessment, for a
27  more thorough analysis and comparison of state data to FES data,
28  as looking through the lens of the Great Red Snapper Count.
29  Thank you.
30
31  CHAIRMAN FRAZER:  Thank you, Mr. Anson.  Mr. Strelcheck.
32
33  MR. STRELCHECK:  Thanks, Tom.  I am going to start by saying
34  what I'm in agreement with, with regard to Kevin and his motion,
35  and that's that I have stated, at the past meeting, and I
36  believe we need to move forward in the future, with reevaluating
37  the state-by-state allocations.  That information that we used
38  to inform those allocations up to Amendment 50 and the
39  information we now have is different, and new information has
40  become available, and so I certainly hope that the council would
41  consider revisiting the allocations, going forward.
42
43  Where I disagree is that this is the amendment, or action, to
44  actually consider reallocation, and I will be a little bit of a
45  broken record here, but I will reiterate, obviously, many of the
46  points that are in our report itself that we just reviewed.
47
48  One is that the proposed alternative is really the same effect
```

188

```
 1  as no action.  Yes, we're tweaking the allocations, but it's
 2  really like taking no action, because we aren't calibrating.
 3  The alternative itself is inconsistent with the purpose and
 4  need, which is intended to, obviously, calibrate landings into a
 5  common currency for monitoring quotas and ensuring comparability
 6  across states, and, most importantly, reallocation should not be
 7  considered here, and it would have to be considered in a plan
 8  amendment, and so this requires then the council staff and NOAA
 9  Fisheries to overhaul this action, in order to start considering
10  allocation alternatives, and certainly I think a broader range
11  of allocation alternatives would need to be considered if this
12  alternative was adopted.
13
14  What I am going to recommend is, obviously, not adopting this as
15  an alternative and including it, and we'll continue to emphasize
16  that, obviously, calibration is not unforeseen, and we've been
17  talking about this for quite some time, and, as I stated during
18  committee, the states have been well aware of the need to
19  calibrate now for a number of years, and, unfortunately, with
20  the Great Red Snapper Count, we didn't get, obviously, a big
21  boost in the catch limit to offset some of the reductions that
22  might incur based on calibration.  Thanks.
23
24  CHAIRMAN FRAZER:   Thank you, Andy.   Next up is General
25  Spraggins.
26
27  GENERAL SPRAGGINS:  Thank you, Mr. Chairman.  Just looking at
28  it, I do agree with a lot of what Kevin is saying, and I
29  understand that -- I don't think that Mississippi or Alabama,
30  and I'm not sure 100 percent about Alabama, but I am with
31  Mississippi, that our evaluation is anywhere close to being what
32  it should be.
33
34  I think that we have a lot better system than what's been done,
35  and even our -- Before it was brought out, many a time, that
36  Mississippi shouldn't be involved in an MRIP calibration,
37  because it doesn't meet it.   It does not meet the
38  qualifications, and it does not fit what happens.  Small states
39  like this do not work in that.
40
41  I understand that we have to so some form of calibration, and I
42  have no problem with that, but I do also understand that
43  whenever -- If you give me something, and your calibration form
44  states that we would have had to have caught more fish in one
45  day -- In about three days than we had caught in five years, and
46  that's amazing.   It's just amazing that something like that
47  could ever happen.
48
```

0003280

1   I realize that Tails 'n Scales isn't five-year program qualified
2   yet, but I can tell you that we've got five years of data that's
3   probably as accurate, or more accurate, than what you're putting
4   out in front of us, and so I would just ask that you look at
5   that.
6
7   If I thought that Mississippi staying the same would make any
8   difference, I would be quickly to say that we would jump in
9   there with Alabama on that, but I don't think that 3,000 pounds
10  is going to make any difference in this qualification, but I do
11  appreciate it.  I just hope that everybody will look at it and
12  understand that, if it was something that felt was wrong, we
13  would definitely do something about it ourselves, and we would
14  not even take a chance of asking you all to help us, and so I
15  appreciate it, and I just wanted to get that on the record.
16
17  **CHAIRMAN FRAZER:**  Thank you, General Spraggins.  Mr. Rindone.
18
19  **MR. RINDONE:**    Thank  you,  Mr.  Chair.    Just  a  point  of
20  clarification in the motion.  The motion says that the change
21  the state-specific red snapper private angling ACL using the
22  modified  percentages  from  Amendment  50  in  state  survey
23  currencies  through  2023.    However,  the  numbers  that  were
24  provided in the motion were in MRIP-CHTS currency.
25
26  If those need to be converted into state currencies, then that
27  table would need to be updated.  Also, the ACL that's listed in
28  the last sentence says that Alabama would retain the ACL that
29  was issued in Amendment 50A, and that 1.122 million pounds is in
30  MRIP-CHTS currency and not in any calibrated state currency.
31
32  **CHAIRMAN FRAZER:**  Okay.  Ms. Guyas.
33
34  **MS. GUYAS:**  Thanks.  So it sounds like, from what Ryan said,
35  there's some, I guess, inherent issues with this motion, but I
36  appreciate,  Kevin,  what  you're  trying  to  do  here,  and  I
37  recognize that we're going to have to look at reallocation, not
38  just across the states, but across sectors, and components as
39  well, and the council did request staff work on a document to do
40  that, a few meetings ago, I think as a long-term project, but we
41  could discuss that.  I can't remember if it was at our last
42  meeting or one of the previous ones, but this past fall.
43
44  I am not going to support adding this to the document, for many
45  of the reasons that Andy talked about and what was in the
46  committee report, and it is a reallocation in a document that
47  doesn't have to do with reallocation.  This doesn't fit in the
48  framework, and, frankly, I think the motion was out of order in

0003281

```
 1  committee.
 2
 3  However, I would support, if you wanted to include -- I guess
 4  once the table is cleaned up and the motion is clarified,
 5  including something like this in that allocation amendment that
 6  we will be working on, and so, if you made another motion to add
 7  this to consideration for that allocation document that the
 8  council will be working on, I'm onboard for that, but I just
 9  wanted to explain where I'm coming from on this one.  Thank you.
10
11  CHAIRMAN FRAZER:  Okay.  Thank you, Ms. Guyas.  I am not seeing
12  any other hands at this point with regard to this motion.  Let's
13  go ahead to Dr. Simmons and take a roll call vote on this.
14
15  EXECUTIVE DIRECTOR SIMMONS:  Thank you, Mr. Chair.  Mr. Anson.
16
17  MR. ANSON:  Yes.
18
19  EXECUTIVE DIRECTOR SIMMONS:  Ms. Bosarge.
20
21  MS. BOSARGE:  No.
22
23  EXECUTIVE DIRECTOR SIMMONS:  Mr. Dugas.
24
25  MR. DUGAS:  Yes.
26
27  EXECUTIVE DIRECTOR SIMMONS:  General Spraggins.
28
29  GENERAL SPRAGGINS:  Yes.
30
31  EXECUTIVE DIRECTOR SIMMONS:  Dr. Shipp.
32
33  DR. SHIPP:  Yes.
34
35  EXECUTIVE DIRECTOR SIMMONS:  Mr. Sanchez.
36
37  MR. SANCHEZ:  No.
38
39  EXECUTIVE DIRECTOR SIMMONS:  Mr. Banks.
40
41  MR. BANKS:  No.
42
43  EXECUTIVE DIRECTOR SIMMONS:  Mr. Diaz.
44
45  MR. DIAZ:  Yes.
46
47  EXECUTIVE DIRECTOR SIMMONS:  Mr. Williamson.
48
```

0003282

1  **MR. WILLIAMSON:**  Yes.
2
3  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Strelcheck.
4
5  **MR. STRELCHECK:**  No.
6
7  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Riechers.
8
9  **MR. RIECHERS:**  No.
10
11 **EXECUTIVE DIRECTOR SIMMONS:**  Ms. Boggs.
12
13 **MS. BOGGS:**  No.
14
15 **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Swindell.
16
17 **MR. SWINDELL:**  No.
18
19 **EXECUTIVE DIRECTOR SIMMONS:**  Ms. Guyas.
20
21 **MS. GUYAS:**  No.
22
23 **EXECUTIVE DIRECTOR SIMMONS:**  Dr. Stunz.
24
25 **DR. STUNZ:**  Yes.
26
27 **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Dyskow.
28
29 **MR. DYSKOW:**  Yes.
30
31 **EXECUTIVE DIRECTOR SIMMONS:**  Dr. Frazer.
32
33 **CHAIRMAN FRAZER:**  I am going to have to just stick with some of
34 the arguments that were made.  I think this is a reallocation,
35 and it better belongs in a reallocation document, and it's
36 inappropriate for this one, and so I vote no.
37
38 **EXECUTIVE DIRECTOR SIMMONS:**  **The motion fails eight to nine.**
39 Mr. Chair.
40
41 **CHAIRMAN FRAZER:**  Thank you, Dr. Simmons.   I will turn it back
42 to you, Ms. Guyas.
43
44 **DR. SHIPP:**  Ms. Guyas, my raised hand is not showing.   I'm
45 sorry, but I would like to make a motion.
46
47 **CHAIRMAN FRAZER:**  Go ahead, Dr. Shipp.
48

192

1  **DR. SHIPP:   I would like to move that the council accept state**
2  **surveys of recreational red snapper catches as best available**
3  **science to be used for quota allocations.**
4
5  **CHAIRMAN FRAZER:**  Okay, and so we've got a motion on the board.
6  I will read it into the record here in just a second.  The
7  motion is from Dr. Shipp that the council accept state surveys
8  of recreational red snapper as best available science for quota
9  allocation.  Is there a second to this motion?
10
11  **GENERAL SPRAGGINS:**  I will second.
12
13  **CHAIRMAN FRAZER:**  It's seconded by General Spraggins.  Ms. Levy.
14
15  **MS. LEVY:**  Thank you.  I have one comment and one question, I
16  guess.  First, my comment is just that, ultimately, it's the
17  Secretary of Commerce and NMFS who make the determination about
18  whether anything is the best available science.
19
20  My second question is I don't understand, I guess, what it
21  means, even if I were to take out of the equation, and say for
22  quota allocation.  I guess I don't understand what it's getting
23  at, in terms of using the state survey data.
24
25  **CHAIRMAN FRAZER:**  Dr. Shipp, would you like to respond?
26
27  **DR. SHIPP:**  Yes.  For ten years, we've been arguing about
28  allocations state-by-state, and we have danced around the
29  subject, and this is an attempt, and, Mara, it could probably
30  use some better verbiage, but this is an attempt to use the
31  catch data to come up with the proper state-by-state allocation
32  of recreational red snapper harvest, and that's all.  I put the
33  motion out primarily for discussion, because we have not
34  directly addressed this issue.  We've always talked about in
35  other contexts, but I think it's time for the council to take a
36  stand.  Do we want to stand by the states, or do we not?  That's
37  the whole purpose of this.
38
39  **CHAIRMAN FRAZER:**  Bob, I'm going to also ask a quick question.
40  To Mara's point that the council doesn't -- That's not their
41  responsibility to determine the best available science, but,
42  even if you took that out of the equation, my question would
43  then be how does this differ from Alternative 1 that is in the
44  document already?
45
46  **DR. SHIPP:**  That I don't know.  I primarily introduced this so
47  that we could get some feedback from the states on how they feel
48  about their surveys, but it substantially probably doesn't
                                    193

1  differ that much.
2
3  **CHAIRMAN FRAZER:**   Okay.   Again, I think what you might have
4  heard, and I heard loud and clear, that, certainly in the
5  discussion over the past couple of days, is that there's a
6  strong feeling amongst the council members, and others involved,
7  that the state data collected is an excellent product, right,
8  and I think every state would stand by their data collection
9  programs.
10
11  To Mr. Banks' point just yesterday, there is -- Again, I don't
12  think people are questioning the quality of the data.   It's
13  simply an issue of you have to manage a stock, at present, that
14  was evaluated or assessed in a different currency, and, in order
15  to do that, there's a calibration required.
16
17  Until we actually incorporate state data into the assessment,
18  we're in a bit of a bind in that regard, and so I just want to
19  remind people of that, and so this is not about the states and
20  the quality of their data, and I think that we all recognize
21  that it's good data, and we look forward to being able to
22  incorporate it into the assessment, and I'm sure the Science
23  Center folks would agree with that.   Mr. Diaz.
24
25  **MR. DIAZ:**   Thank you, Mr. Chair.   My hand was up by mistake,
26  but, being as I do have the floor, I mean, I'm thinking through
27  this, and I'm not trying to speak for the State of Mississippi.
28  I used to be involved with DMR, and I was the Director of Marine
29  Fisheries, and I can tell you that I agree with what Dr. Shipp
30  is trying to do, because there is issues with small states.
31
32  At one of the data calibration workshops, it was mentioned that
33  there's some issues with small states that need to be looked
34  into, and that has not been done yet.   One of the issues, and
35  I've talked about this at this council, and anybody who has been
36  on here a long time has heard me talk about this before, but, if
37  you look back historically at landings in Mississippi, you will
38  see that they swing wildly.
39
40  When we were going over the state allocation, I brought this up
41  several times, but there would be some reasons when it reported
42  that we caught next to nothing, and that has never happened in
43  Mississippi, but you could have so few data intercepts, so few
44  of these shoreside, dockside, samplers going by and actually
45  encountering people, that it can show that there is almost next
46  to nothing in a small state.
47
48  Conversely, you can also have just a couple of data intercepts
                              194

1  that intercept some people that have caught a lot of fish, and
2  that occasionally happens, and it can skew things in the other
3  direction, and a lot of this is being based off of a very short
4  time series, and I just feel like the small state issues should
5  be figured out and sorted out and actually addressed.
6
7  I brought it up to Dr. Cody a couple of times, and he tells me
8  that there's an MRIP transition team that's going to be looking
9  at that issue, but that has not been done, and I really do
10  believe that some of these small state issues are one of the big
11  problems, and I believe that this motion is useful to help until
12  we get to that point.  Thank you.
13
14  **CHAIRMAN FRAZER:**  Thank you, Mr. Diaz.  General Spraggins.
15
16  **GENERAL SPRAGGINS:**  Thank you, Mr. Chairman.  In reference too,
17  I think, back when Secretary Ross was the Secretary of Commerce,
18  I think he did make a statement that he felt that the states
19  could manage this better than anybody else, when he signed
20  Amendment 50, and so whether that said best science or not, I
21  don't know that answer, but I would like to go back and just
22  talk to what Dale was saying just a few minutes ago, just to
23  give you a few things of for instance.
24
25  The calibration ratio was derived from only two years' worth of
26  I think grossly overestimated MRIP data, and that was 2018 and
27  2019, and, just to look at it in Mississippi, in 2018, September
28  and October, the MRIP wave estimated 204,767 pounds of red
29  snapper landed, and Mississippi was only open five days of that
30  time, and that means that we would have to land 40,000 pounds a
31  day, and that's where you're getting that overestimation that
32  you're talking about, and it's so grossly estimated.
33
34  If you look at it, conversely, the previous wave of May to June,
35  when we were open for thirty-seven days, we only caught an
36  estimated 213,000 by then, and so, to give you an idea, there's
37  something there, because it's not being used correctly in a
38  small state.
39
40  The July/August timeframe that same year, it was open for
41  thirty-three days, and there was only 231,917, and so it just
42  shows you that, because they're open for two months, and we were
43  open only five days in that two months, they picked a few
44  people, and it just grossly estimated what was there, and
45  there's no way.
46
47  In 2019, it was the same thing, and there was a wave that
48  estimated 344,984 pounds of red snapper, and we was only open

0003286

1  five days, and, I mean, it's just almost impossible.  I'll tell
2  you what.  I want somebody -- I would love for you all to show
3  me who in Mississippi could have caught that many fish.
4
5  On an average, we have never had, and that's on the 4th of July
6  is when I'm talking about, and, if we take our high data, and we
7  put maybe 450 boats out, and they are -- We would have had to
8  have somewhere in the neighborhood of 1,500 boats a day out, and
9  1,500 boats a day for seventy-nine days, and you would have had
10 to count every skiff in Mississippi to do that that is on the
11 water at any time.
12
13 I mean, it just does not calibrate.  It has nothing that makes
14 the calibration work, and to say that we caught 106,000, or had
15 106,000 trips, when we only had maybe 18,000 to 20,000, it's
16 just grossly overrated, and I think this might be a good idea,
17 to maybe set the council to say, hey, the states are doing the
18 best, and maybe we ought to look at it, and I appreciate your
19 time.
20
21 **CHAIRMAN FRAZER:**  Thank you, General Spraggins.  Ms. Guyas.
22
23 **MS. GUYAS:**  Thank you.  I am still trying to wrap my head around
24 exactly what this does, and so a question for Bob.  I certainly
25 agree with everybody here, in that states have really stepped up
26 to the plate with their data collection programs and made a lot
27 of improvements over MRIP.
28
29 My question is this, Bob, and so, I guess, currently, the state
30 quotas are in CHTS.  Are you trying to calibrate the other way?
31 In other words, converting the quota in the state survey
32 currencies, rather than trying to -- Rather than, I guess,
33 keeping the quotas in CHTS and calibrating landings to that, are
34 you trying to change the currency for each individual state's
35 quotas?  So Florida's quota, instead of being in CHTS, would be
36 SRFS, or State Reef Fish Survey, and so, in other words, like I
37 guess the best way to describe it is like a reverse calibration
38 from the way we're talking about it, and is that all you're
39 trying to do here?
40
41 **DR. SHIPP:**  No, Martha.  The most important thing I'm trying to
42 do is really that first line.  I want the council to accept the
43 state surveys as the best available science.  The next step, for
44 other people to address it, is the currency issue and what
45 General Spraggins talked about, and those would follow-up.  I
46 just want to be on the record that the states do accept their
47 own data as the best available science, and that's the purpose
48 of the motion.

0003287

1
2  **CHAIRMAN FRAZER:**  Okay.  Thank you, Dr. Shipp.  Mr. Riechers.
3
4  **MR. RIECHERS:**  Bob, I'm going to follow-up on what Martha was
5  hitting on just a little bit, because I too am -- While, in
6  spirit, I certainly understand exactly what you're attempting to
7  get at, and I support that, and I certainly respect the work
8  that my colleagues in other states and we did with iSnapper and
9  us all looking at ways to do different in-season-type
10 monitoring, along with our longer-term monitoring, and I
11 certainly understand the difficulties if you have a few number
12 of interviews and it can -- The expansion approach that you may
13 have to use can cause your estimates to vary widely, and we -- I
14 am not saying that one is better than the other, but it's just
15 that that can cause two different estimates to vary by a
16 considerable amount.
17
18 I guess what I am concerned about here in your motion, Bob, is
19 the "for quota allocation", because that, to me, would take us
20 back to those laborious discussions that we had in Amendment 50
21 regarding those allocation tables, and, just theoretically, if
22 your current landings get fed back into the bigger model, and
23 they are representing a lower level of landings than you past
24 had recorded, then that's going to impact the overall stock and
25 the stock assessment.
26
27 Then, if you're doing it for allocation, then that means you're
28 going back through that time series, and you're adjusting that
29 in the allocations as well, and I don't think that's what you're
30 intending to do here.
31
32 I think what you're intending to do is say the council accepts
33 state surveys of recreational red snapper as best available
34 science and either stop it there, or "for quota monitoring
35 purposes", and not allocation at this point, because, again,
36 allocation is a whole different, separate document that is going
37 to go on, and, certainly, Kevin, I appreciate your arguments
38 regarding -- Because you continue to make them, regarding a
39 biologically-based, off of your coast, estimate of mortality, or
40 extraction rate, and trying to manage to that.
41
42 That is a perfectly reasonable approach, but it's just not the
43 one that we all voted up in Amendment 50, and so that's the
44 whole notion of why we have to revisit that.  Bob, I will stop
45 there, because, like I said, I think you may want to adjust your
46 motion, and I'm not speaking on your behalf, but I'm just saying
47 that I think it has more implications than you might see on its
48 surface right there.

0003288

1
2   **DR. SHIPP:   Well taken, Robin, and I would be very agreeable to**
3   **delete those last three words, "for quota allocation", because**
4   **the principal intent of the motion, as I said before, is to get**
5   **the states onboard and committed to their science, and so I'm**
6   **going to leave it at that.**
7
8   **CHAIRMAN FRAZER:**   So I just want to make sure I got that, Bob.
9   So you want to go ahead and remove the last three words "for
10  quota allocation".   General Spraggins, I believe you were the
11  seconder.  Are you good with that friendly amendment?
12
13  **GENERAL SPRAGGINS:**   I'm okay with it.
14
15  **DR. SHIPP:**   That's right.
16
17  **CHAIRMAN FRAZER:**   Okay.  Mr. Strelcheck.
18
19  **MR. STRELCHECK:**   Thanks, Tom.   Based on the modification that
20  was just made, I think you've made the case for why we need to
21  calibrate,  because  the  whole  reason  we're  talking  about
22  calibration is the use of state surveys, and NOAA Fisheries is
23  not standing in the way of using the state surveys.
24
25  In fact, we want them to be used, and we support their use.
26  What we continue to contend is that the quotas in which they are
27  monitoring to need to be calibrated to those state surveys, and
28  so, to me, this motion does nothing but kind of reiterate our
29  current position and use of those state surveys and support for
30  those state surveys, and I would encourage -- Certainly you can
31  pass the motion, but I don't see it as really being any added
32  value.
33
34  **CHAIRMAN FRAZER:**  Mr. Williamson.
35
36  **MR. WILLIAMSON:**   Thank you, Mr. Chairman.   I guess I'm looking
37  at this from a different standpoint, and I certainly think that
38  the state data collection is accurate for each state, and
39  they've been doing it for a long time.   I guess where I get
40  confused,  and  I  have  frustration,  is  calibrating  this
41  information back to the MRIP recalibration, or whatever their
42  data is called, and they call it now the Fisheries Information
43  Survey, or the Fishing Effort Survey.
44
45  I was listening yesterday to public comment, and guys who have
46  been fishing for years and years have never received one of
47  these, have never been contacted, and we're now going from
48  Coastal Household Telephone Survey to the Fishing Effort Survey,

0003289

1  and I have never seen one of those things, and so I pulled it up
2  from NOAA's website, and their reasoning here is -- I am reading
3  from their website.
4
5  Because research indicates that both anglers and non-anglers are
6  more likely to respond to a survey that includes questions about
7  topics other than fishing, the FES is designed as a weather and
8  outdoor activities survey.  I pulled this thing up, and the
9  first five questions on it have nothing to do with fishing, and
10 it says how do members of this household obtain information
11 about weather, including current weather conditions, forecasts,
12 warnings, and mark all that apply.  Then they go through
13 television, radio, et cetera.
14
15 Then they go through four or five more questions about how many
16 times did you have to evacuate or seek shelter during a severe
17 weather event, yada-yada, and it gets down -- Then, finally,
18 Question 6 says, during the past twelve months, has anyone in
19 the household been saltwater fishing, and I guess they change
20 the state, and this one that I pulled up was Maryland.  Then it
21 goes on with four other questions.  Which best describes how
22 your household receives telephone calls?  Do you live in a house
23 with a mortgage, or do you live in a mobile home?
24
25 I guess my point being that, if this is the Fishing Effort
26 Survey that we are putting all of the confidence in to
27 recalibrate state data back to, I am confused, and so, with
28 that, I will sign off.
29
30 **CHAIRMAN FRAZER:**  Thank you, Mr. Williamson.  Ms. Bosarge.
31
32 **MS. BOSARGE:**  Thank you, Mr. Chair.  You know, I -- You can go
33 look at the record, and I have been a big proponent of the state
34 data collection systems, and I think they saw a need for
35 additional information that wasn't being collected, and they
36 went out there and did that, and I commend that.
37
38 Dr. Shipp, your motion legally is not something we can do.  I
39 mean, we don't -- We can't determine that something is the best
40 available science, and I think maybe what you could do,
41 possibly, is to ask the SSC to look at this.  Now, NMFS has made
42 a determine that MRIP is the best available science, and I don't
43 think that precludes you, probably, from asking the SSC to look
44 at this, and I don't know what their determination would be.
45
46 They have looked at it somewhat, in a roundabout way, several
47 times, and they -- As far as I know, they have not made a motion
48 specifically to MRIP-FES that says we believe MRIP-FES is the

199

1   best available science, nor have they made that motion for the
2   state data collection programs, but the motion, as it stands
3   right there, I'm not going to be able to support it, just
4   because it's not something the council can do.
5
6   **CHAIRMAN FRAZER:**  Mr. Rindone, would you like to clarify where
7   we are with regard to characterization of the best science
8   available?
9
10  **MR. RINDONE:**  Sure, Mr. Chair.  The SSC has not blanket accepted
11  any survey as being the best scientific information available,
12  not the state surveys and not FES.  The SSC has accepted stock
13  assessments using MRIP-FES recreational catch and effort
14  estimates as being the best scientific information available,
15  but I think it's important that the council understand that the
16  legal responsibility, the impetus for actually determining what
17  is in fact best science, isn't something that the SSC sets and
18  then is just blanket accepted.
19
20  That designation is established by NMFS, and they can consider
21  discussions like are happening right now at the council and
22  discussions and recommendations from the SSC, but, ultimately,
23  it's NMFS that determines what is in fact legally the best
24  scientific information available in keeping with National
25  Standard 2.  Mr. Chair.
26
27  **CHAIRMAN FRAZER:**  Thank you, Mr. Rindone, and I expect that Ms.
28  Levy wants to add a little bit to that.  Ms. Levy.
29
30  **MS. LEVY:**  Thank you.  Ryan covered one of my points, which is
31  that the SSC has accepted the MRIP-FES estimates in certain
32  assessments, thereby indicating that, for those purposes, that
33  group believe that it was the best available science.  I would
34  also say that the SSC looked at the calibration ratios and the
35  use of MRIP and calibrated to the states, and they indicated
36  that it was appropriate to use the ratios that were developed,
37  and so it's not like this hasn't been looked at.
38
39  I would also say that the calibrations are not related to FES,
40  and so we still have red snapper in CHTS units, and we haven't
41  done a stock assessment that incorporates the FES yet with
42  respect to red snapper, and so it seems that we're mixing, a
43  little bit, apples and oranges here and just sort of throwing
44  around different things without paying close attention to what
45  is actually happening with respect to red snapper and the catch
46  levels and the calibrations.  Thank you.
47
48  **CHAIRMAN FRAZER:**  Thank you, Ms. Levy.  Mr. Anson.

200

0003291

```
 1
 2  MR. ANSON:   Thank you, Mr. Chair.  I mean, it's an interesting
 3  discussion, and, Dr. Shipp, I appreciate the motion, and I
 4  appreciate what you're trying to do.  I mean, I will -- Although
 5  it may surprise some folks, I will err more to what Mara just
 6  stated, as well as the comments from Martha and Robin, that this
 7  goes a little bit outside what the council does, but, in spirit
 8  at least, it does attempt to try to get to where I think I am
 9  hearing will happen, and that is that --
10
11  Either beforehand, which I am hoping it will, and that's going
12  to be part of what I'm going to be talking about next, or after
13  at some point, but the state data is going to be used in the
14  research track assessment, is my understanding, because this was
15  discussed one or two meetings ago, and I think it was requested
16  from the council that the state data be used in that, and the
17  Science Center indicated that they would in fact use that data
18  and run the model with just the state data replacing the federal
19  data.
20
21  I am encouraged by that, and so, thinking ahead, and that's what
22  I tried to do with the other motion too, was to try to frame it
23  in some sort of timeline that, again, for sure we would have
24  state data reviewed, and maybe it might be prudent for us --
25  Bob, this is your motion, and I'm just throwing this out here,
26  but maybe it might be prudent for us to explicitly request that
27  the SSC review the state data in an as-soon-as-possible type
28  setting, so that they have the opportunity to review it, and
29  they're not rushed.
30
31  If they have questions, the states can go back and get the
32  information they need and go back to another meeting and really
33  allow them time to absorb and digest and, again, compare and
34  analyze and critique the state data, so that it's kind of
35  blessed on the frontend, when it goes through the model, making
36  sure that least it meets that threshold, or criteria, that the
37  SSC would want, and so I would probably be in favor of that, but
38  I'm not in favor of the motion, and, again, I appreciate your
39  attempts, but I'm not in favor of the motion, for the reasons
40  that other people have previously stated.  Thank you.
41
42  CHAIRMAN FRAZER:  Ms. Guyas.
43
44  MS. GUYAS:   I was going to go somewhere similar to what Kevin
45  was saying.  If this is -- I think what we really would like,
46  and I think we've talked about this in the past, is having the
47  SSC and/or the SEDAR panel, when they're taking up a red snapper
48  assessment, that this is part of that decision, so that we can
```

0003292

1  potentially be using these data in the assessment.
2
3  If, by passing this motion, this gets us there, then I'm
4  onboard, but it sounds like it could use some clarification, and
5  I don't know, Bob, if you would like to consider what Kevin just
6  put forward.
7
8  **DR. SHIPP:**  I appreciate, almost always, what Kevin puts
9  forward, and I think the intent and purpose of the motion,
10 whether it passes or fails, has satisfied my reason for doing
11 this, and I also think that, although you can't incorporate it
12 in the motion, the comments that Kevin made will be included in
13 the discussion, and I hope the SSC gets the message, because --
14 I don't want to go into it, but the SSC, in my opinion, has not
15 always considered the state data as comparable to theirs, and so
16 I will, again, leave it at that.
17
18 **CHAIRMAN FRAZER:**  Mr. Rindone.
19
20 **MR. RINDONE:**  Thank you, Mr. Chair.  Just for the council's
21 edification, the terms of reference for the SEDAR 74 research
22 track outline consideration for the state survey data to be
23 considered as part of that assessment process, and so, similar
24 to the motion that was passed at a previous council meeting,
25 just to reiterate to you guys that that's already going to be
26 done, and it was already going to be done for the SEDAR 74
27 research track, and so those state data collection programs are
28 going to be considered.  Thank you.
29
30 **CHAIRMAN FRAZER:**  Okay.  Mr. Anson.
31
32 **MR. ANSON:**  I appreciate the time, Mr. Chair.  To that point,
33 Ryan, I mean, I'm not totally familiar with the timeline,
34 particular as it relates to the research track, if it in fact is
35 modified from a normal SEDAR, and, I mean, is there a schedule
36 that's been produced that says, hey, come -- Pick a day or a
37 month, April of next year, or June of next year, this is when --
38 This is the workgroup that's going to pick up the state data
39 issue and discuss state data and, again, at that point, it will
40 -- As I understand it, if the workgroup approves it, then it
41 goes for SSC approval, kind of, before it's actually run through
42 the mill, and is that a fairly accurate representation of what
43 will go on, and is there a specific workgroup that has that on
44 their agenda to be completed?
45
46 **CHAIRMAN FRAZER:**  Mr. Rindone.
47
48 **MR. RINDONE:**  I'm looking at the schedule right now for SEDAR
                                    202

0003293

1   74, which I would be happy to provide to the council, and so we
2   are in the stock ID portion for red snapper right now, and that
3   process will conclude with the final report being generated by
4   that working group and delivered to SEDAR by about the end of
5   July.
6
7   Then we will start looking at the unprocessed data coming in,
8   and so like the lengths and the raw age data, et cetera, and all
9   of those data are due to SEDAR at like the end of September, and
10  the preliminary data products and all of that will be needed by
11  the end of October, and the data evaluation workshop is
12  currently scheduled for the first week of November, and so
13  November 1 through 5, in New Orleans, hopefully in-person, and
14  so fingers crossed there.
15
16  Then the assessment process picks up with webinars through 2022,
17  and the assessment report being delivered to the SEDAR staff by
18  the end of 2022, and the review workshop, hopefully in person,
19  again, being held in Miami in January of 2023, with the
20  completed assessment report delivered sometime in the spring of
21  2023, probably in April of 2023, to the council, SERO, and the
22  Science Center.
23
24  Just a reminder that this is a research track assessment, and so
25  this is -- We've been talking a lot about cars, and this is
26  tearing the car all the way down to the frame, and that's
27  exactly what's going to happen here for red snapper.  Now, after
28  that process, we'll have an operational assessment, and that
29  operational assessment will yield the management advice, and so
30  catch projections will come from that, and so, in April of 2023,
31  we still won't have a stock assessment, a new stock assessment,
32  at that point that's generating catch advice, and we'll have to
33  wait for the completion of that operational assessment, and that
34  will take at least a few more months, and so, sometime later in
35  2023, we would expect to receive that.
36
37  That means the SSC, depending on timing, might review it at the
38  end of 2023, or the very beginning of 2024, and then the council
39  could act on it, for management purposes, thereafter.  I will
40  send this to Meetings to be sent around, Mr. Chair.
41
42  **MR. ANSON:**  Mr. Chair, just one point of clarification?
43
44  **CHAIRMAN FRAZER:**  Go ahead, Mr. Anson.
45
46  **MR. ANSON:**  Ryan, I heard you say November, that workshop in New
47  Orleans, and you mentioned age and length information, is what I
48  thought I heard, but I didn't hear landings.  I didn't hear what
                                   203

0003294

1   the state survey stuff -- Is that included in that, as far as a
2   legitimate, or a clearly defined, TOR for that November
3   workshop?
4
5   **MR. RINDONE:** It's in the terms of reference for the assessment,
6   for the data portion for the state data programs, or the data
7   generated by the state data collection programs to be
8   considered, and so, to all the state folks who are listening,
9   you are expected to deliver those data products to SEDAR and the
10  Science Center by the 29th of October of this year, and I will be
11  sending the schedule to all the council members, and, those
12  council members who are state representatives, you can certainly
13  distribute the schedule, which is on the SEDAR website, as you
14  see fit.
15
16  **CHAIRMAN FRAZER:** Thank you. Okay. Ms. Bosarge.
17
18  **MS. BOSARGE:** I think Ryan just answered my question, because I
19  just wanted to make sure that that October deadline for the raw
20  data, essentially the biological data, the lengths and weights
21  and things like that, that would include the -- I mean, it
22  always, to some degree, includes the states, right, but,
23  essentially, you are getting that data from them and not
24  specifically for just MRIP-FES APAIS samples, but, if they have
25  additional samples, through their state data collection
26  programs, that you will be garnering that too, and I think that
27  would be, obviously, very important for states like Louisiana,
28  where MRIP has not been at all, and you're definitely going to
29  need those LA Creel samples, but it sounds like that is
30  happening, and all of that is going to be submitted, and so
31  that's good. Thank you.
32
33  **CHAIRMAN FRAZER:** Okay. Thank you, Ms. Bosarge. I think we've
34  had plenty of discussion here, and so we are going to go ahead
35  and vote this one up or down. I think we're just going to go
36  through the roll call again, Dr. Simmons.
37
38  **EXECUTIVE DIRECTOR SIMMONS:** Thank you, Mr. Chair. Mr. Sanchez.
39
40  **MR. SANCHEZ:** No.
41
42  **EXECUTIVE DIRECTOR SIMMONS:** Mr. Anson.
43
44  **MR. ANSON:** No.
45
46  **EXECUTIVE DIRECTOR SIMMONS:** Ms. Boggs.
47
48  **MS. BOGGS:** No.

0003295

1
2  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Banks.
3
4  **MR. BANKS:**  Because the motion does not specify for private
5  recreational catch monitoring, I'm going to have to vote no.
6
7  **EXECUTIVE DIRECTOR SIMMONS:**  Thank you.  General Spraggins.  I
8  will come back to him.  Mr. Swindell.
9
10  **MR. SWINDELL:**  No, ma'am.  I will have to vote no for this one.
11  Thank you.
12
13  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Strelcheck.
14
15  **MR. STRELCHECK:**  No.
16
17  **EXECUTIVE DIRECTOR SIMMONS:**  Dr. Stunz.
18
19  **DR. STUNZ:**  Yes.
20
21  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Diaz.
22
23  **MR. DIAZ:**  No.
24
25  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Williamson.
26
27  **MR. WILLIAMSON:**  Yes.
28
29  **EXECUTIVE DIRECTOR SIMMONS:**  Ms. Bosarge.
30
31  **MS. BOSARGE:**  No.
32
33  **EXECUTIVE DIRECTOR SIMMONS:**  Dr. Shipp.
34
35  **DR. SHIPP:**  Yes.
36
37  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Riechers.
38
39  **MR. RIECHERS:**  Yes.
40
41  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Dyskow.
42
43  **MR. DYSKOW:**  Yes.
44
45  **EXECUTIVE DIRECTOR SIMMONS:**  General Spraggins.
46
47  **GENERAL SPRAGGINS:**  Yes.
48

0003296

1   **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Dugas.
2
3   **MR. DUGAS:**  Yes.
4
5   **EXECUTIVE DIRECTOR SIMMONS:**  Ms. Guyas.
6
7   **MS. GUYAS:**  I am going to vote yes.
8
9   **EXECUTIVE DIRECTOR SIMMONS:**  Dr. Frazer.  It's eight to eight.
10
11  **CHAIRMAN FRAZER:**  Again, I am going to make a few comments
12  before I tell you what my vote is here, right.  I certainly
13  appreciate, Bob Shipp, what you're trying to do here, and eight
14  of the people that voted to move this way, and I think what
15  you're trying to do is, again, send a strong signal to a large
16  number of people that you have confidence in the state data
17  collection programs, and I do, too.
18
19  I have tremendous respect for what you all have been able to
20  accomplish, but, at the end of the day, it's not within the
21  council's purview to decide what is best available science, and,
22  however frustrating this process might be, it's this process
23  that has allowed us to move forward and rebuild this stock, and,
24  if we can make some improvements in the process, I would
25  certainly like that as much as anybody else, and so I think your
26  voices have been heard, but, in this particular case, I am going
27  to vote no. Ms. Guyas, back to you.  Excuse me.  Mr. Dugas.
28
29  **MR. DUGAS:**  Thank you, Mr. Chair.  I would like to make a
30  motion, and I sent it to staff.
31
32  **CHAIRMAN FRAZER:**  Go ahead, J.D.
33
34  **MR. DUGAS:  The motion is to defer action on the framework until
35  immediately after the Great Red Snapper Count report is
36  finalized and the SSC has met and revisited the ABC and the
37  common currency conversion concerns between Alabama and
38  Mississippi are scientifically vetted.  Implement this framework
39  in time for the 2022 season.**
40
41  **CHAIRMAN FRAZER:**  Okay.  Let me --
42
43  **DR. SHIPP:**  I will second it.
44
45  **CHAIRMAN FRAZER:**  It's seconded by Dr. Shipp.  I will read it
46  into the record.  The motion on the board is to defer action on
47  the framework until immediately after the Great Red Snapper
48  Count report is finalized, the SSC has met and revisited the

0003297

1  ABC, and the common currency conversion concerns between Alabama
2  and Mississippi are scientifically vetted.  Implement the
3  framework in time for the 2022 season.  It was seconded by Dr.
4  Shipp.  Is there any further discussion on the motion?

6  **MR. DUGAS:**  Mr. Chairman, I would like to speak.

8  **CHAIRMAN FRAZER:**  Go ahead and speak to that, J.D.

10  **MR. DUGAS:**  Thank you.  It's pretty self-explanatory, the
11  motion, and I think we all are trying our best to help Alabama
12  and Mississippi through this situation.  I guess I don't exactly
13  have all of the answers, but I feel like this could be one, and
14  I would hope that I would get enough support to move forward.
15  Thank you.

17  **CHAIRMAN FRAZER:**  Thank you, Mr. Dugas.  Ms. Guyas.

19  **MS. GUYAS:**  Just a question.  J.D., what do you mean by -- I
20  guess what does the conversion concerns between Alabama and
21  Mississippi being scientifically vetted look like?  I mean,
22  they've already been in front of the SSC, and I think Ryan
23  mentioned earlier that the SSC recommended that the council
24  implement the calibration ratios for those and all the other
25  states, and so I'm just curious if there's something else coming
26  that I don't know about in that regard.

28  **MR. DUGAS:**  No, ma'am.  I just wanted to cover all the bases.
29  That's it.

31  **CHAIRMAN FRAZER:**  Okay.  Ms. Levy.

33  **MS. LEVY:**  Martha covered part of my point, which was that the
34  SSC has already looked at this and it's been recommended that
35  the council implement the calibration.  I mean, the other thing
36  that I will just note, which I said before, is you took final
37  action on a framework that is going to change catch levels.  If
38  you don't address the calibration, then, potentially, NMFS isn't
39  going to implement that other framework, because there has to be
40  a finding that it's consistent with the Magnuson Act, and I
41  think we've already said that these calibrations are necessary
42  to complete that consistency.

44  **MR. DUGAS:**  Mr. Chair, may I?

46  **CHAIRMAN FRAZER:**  Go ahead, J.D.

48  **MR. DUGAS:**  Thanks, Mara.  I was -- I thought the word

0003298

1  "revisited" would have been sufficient after the SSC looks again
2  at the data for the ABC.  Previously, I thought we had a motion
3  to send it back, and that's what I was getting at.
4
5  **CHAIRMAN FRAZER:**  Let me ask a quick question to either Andy or
6  Mara.  Essentially, we have taken a final action on the catch
7  advice that was provided from the SSC, and so we will have an
8  OFL and an ABC in place, and, if the council fails to take
9  action, essentially, on this framework, then, in essence, they
10 are punting the decision to the agency to decide how they want
11 to implement a calibration or not, and is that correct?
12
13 **MS. LEVY:**  The fact that the council took action to submit the
14 framework to the Secretary of Commerce, or NMFS, for review and
15 implementation doesn't mean they're in effect, right, and so the
16 Magnuson Act requires that the agency initiate an evaluation and
17 determine whether those proposed regulations are consistent with
18 the FMP, the plan amendment, the Magnuson Act, and any other
19 applicable law.
20
21 During that determination period, NMFS is going to have to
22 decide whether what you submitted is acknowledging, right, that
23 there's no calibration that goes with it, and so you still have
24 catch levels that are expected -- You still have catch levels
25 that are expected to be exceeded.
26
27 I guess my point is that it's not clear whether NMFS is actually
28 going to be able to implement what you just approved in the
29 framework action, and then the other part of your question was
30 related to the calibration, and I will let Andy speak to that,
31 but, I mean, NMFS has various options with respect to that, and
32 he can speak to that more, if he wants to.
33
34 **CHAIRMAN FRAZER:**  Before he goes there, let me just then pose
35 another question, Ms. Levy.  What I am understanding is that the
36 agency isn't necessarily obligated to act on the council's
37 recommendation to accept the SSC's catch advice, recommended
38 catch advice, and, if they did not do that, then what we would
39 have in place is an existing OFL and an existing ABC, still
40 without a recommendation coming from this council on whether or
41 not to accept any particular calibration.
42
43 The decision, in any case, would be punted to the agency to
44 decide whether or not they're going to apply the calibration
45 ratios, whether it's with the existing OFL and ABC or whether
46 it's the new approved, or recommended, OFL and ABC, and is that
47 correct?
48

0003299

 1  **MS. LEVY:**  I mean, I guess so.  I mean, if the council fails to
 2  act on the calibration, then I think the agency has a number of
 3  options it could take, anything from secretarial action to not
 4  doing anything.  I mean, I just -- I don't -- That's not --
 5  That's something to be decided based on the council does and
 6  what NMFS decides they want to do.
 7
 8  **CHAIRMAN FRAZER:**  Sure, and, again, what I'm trying -- Go ahead,
 9  Andy.
10
11  **MR. STRELCHECK:**  Tom, thanks for the question, and I certainly
12  understand why you're asking it, and I'm a little frustrated
13  with the question, and not directed at you, but it's, obviously,
14  because of inaction by this council, and certainly NOAA
15  Fisheries strives to work with all of the fishery management
16  councils, and we don't want to be put in a position where we
17  have to potentially take action, separate and independent of the
18  councils, and I think our history and track record on that is
19  pretty clear that we've used our authority, outside of the
20  council process, fairly sparingly, with the exception of,
21  obviously, kind of congressional mandates and things that have
22  national implications.
23
24  Mara is correct, and, I mean, we do have authority, under
25  Magnuson, with regard to secretarial action or rulemaking, but
26  certainly the goal here is to work with the council to come up
27  with a decision that everyone can agree to and move forward
28  with, and so that's what we would hope to do today.
29
30  **CHAIRMAN FRAZER:**  Again, Andy, thank you for those comments, and
31  I guess what I'm trying to do, at this point, is to help express
32  the concerns of the council, and I think -- I hope that I am
33  speaking for the council, at least a majority of the folks here,
34  and there is limited options, moving forward, really that are
35  satisfactory, and, likewise, I feel that the agency is bound and
36  obligated to work under a legal framework, or process, right,
37  and so it's this process that has allowed us to manage fisheries
38  in a very sustainable manner that we're fighting against right
39  now.
40
41  It's a difficult thing, and I think what you're hearing is
42  frustration on behalf of a lot of the council members, and an
43  effort to try to move things forward in a more expeditious
44  manner, but we simply can't do it, because of the process in
45  place, and so part of this exercise is letting people know that
46  there's a level of frustration, and perhaps we need to find
47  ways, in the future, to move more expeditiously through these
48  types of processes, and so, again, this is not intended to be a

                                    209

1  negative against you or Mara or anybody else, right, the same
2  way that you said that it wasn't intended for me, but this is
3  where we are today, and I'm hoping that people are listening and
4  we can somehow move forward, and so I would not be surprised if
5  the council voted in favor of this motion, and I would
6  understand that it would put the agency in an awkward position,
7  but, again, I would hope they would understand why.  Dr. Stunz.
8
9  **DR. STUNZ:**  Thank you, Mr. Chairman.  I speak in favor of this
10 motion, but I just wanted to clarify at least my interpretation
11 of that last part about the common currency.  To me, it wasn't
12 about just a simple common currency calculation that we have,
13 and it was more speaking to the reconciliation, or really fixing
14 some of these major issues that General Spraggins and Kevin
15 brought out about the large discrepancies between MRIP and their
16 data collection programs, and, obviously, that would influence
17 not the calculation of the common currency, but the numbers that
18 are going into that, and that's how I am interpreting that
19 vetting process I think that J.D. is putting there.  It's not
20 just that direct calculation, but all of these major underlying
21 issues.  Thank you.
22
23 **CHAIRMAN FRAZER:**  Okay.  I am not seeing any more hands, and so
24 we will go ahead and vote on this motion.
25
26 **MR. STRELCHECK:**  Tom, can I make a comment?
27
28 **CHAIRMAN FRAZER:**  Please do, Andy.
29
30 **MR. STRELCHECK:**  This is kind of in response to Greg, and this
31 is one of the concerns that I have, at least with this motion,
32 and I certainly don't like the motion in its entirety, but the
33 common currency conversion concerns in particular, and so this,
34 to me, speaks to a scientific issue, and you're in search of an
35 answer, and the conversions that were adopted and used were
36 fairly consistent, in terms of their application across the five
37 states, or at least four states.
38
39 I know there are some differences in years, and kind of methods
40 with regard to the conversion, but it's still the same
41 applicability, and so to call out a couple of states because of
42 their conversions and not consider kind of everything as a whole
43 suite of considerations to me goes back to kind of picking and
44 choosing what answers you want, or don't want, and trying to
45 revisit them, and so, scientifically, I think that's a very bad
46 precedent, to be going in and voting on something like this.
47
48 **CHAIRMAN FRAZER:**  I think, Andy, that's an excellent comment,

210

1  and, as we take a few more comments here, J.D., you might -- I
2  would suggest that you might think about wordsmithing that
3  motion a little bit, and you're not obligated to, but I would
4  urge you to consider doing that.  Mr. Banks.
5
6  **MR. BANKS:  Mr. Chair, that's what I was thinking of, and I sent**
7  **a substitute motion to the staff, and I hope they have it.**
8
9  **CHAIRMAN FRAZER:**  We will look, real quick.
10
11 **MR. BANKS:**  I would be appreciative for anybody to help me with
12 the wording, but I was listening to Mara and Andy and their
13 concern about us -- If we took this original motion, it
14 basically says we're not doing anything, that we're not making a
15 decision.
16
17 If we took my substitute motion, it clearly says that we are
18 making a decision, but simply the implementation date wouldn't
19 occur until April 30, 2022, which I think is essentially the
20 timing of what J.D. just dealt with, but, this way, it at least
21 makes a decision, and I think one of the concerns that I heard
22 from Andy and Mara is that we are not making a decision, and my
23 substitute motion actually makes a decision to implement
24 calibration, but it has an implementation date, or a control
25 date, or whatever you want to call it, that gets us through this
26 season and gives us some time to get together with the SSC and
27 for them to consider all of that additional information.  If I
28 get a second -- Well, I guess I already gave my explanation, but
29 I appreciate it.
30
31 **CHAIRMAN FRAZER:**  That's okay.  Is there a second for this
32 motion?  I am looking for hands.
33
34 **MS. GUYAS:**  I will second.
35
36 **CHAIRMAN FRAZER:**  It's seconded by Ms. Guyas.  Okay.  Ms.
37 Bosarge, I think you're next.
38
39 **MS. BOSARGE:**  I am going to reserve my comments for just a
40 minute.  Let me take in this substitute motion.
41
42 **CHAIRMAN FRAZER:**  Okay.  Greg, did I skip you?  If I did, sorry,
43 and I didn't mean to.
44
45 **DR. STUNZ:**  My hand must have not gone down.  Sorry.
46
47 **CHAIRMAN FRAZER:**  Okay.  Thank you.  Mr. Diaz.
48

0003302

1  **MR. DIAZ:**  I just want to reiterate something that I said a
2  little while ago, and it doesn't really -- I don't know if it
3  applies to the substitute motion, or maybe it does, but, during
4  one of the meetings, where they were discussing calibration, it
5  was noted that there's issues in small states, and, to me, those
6  issues have not been looked at yet, and that is definitely one
7  of the things that I think comes to mind in J.D.'s motion about
8  scientifically vetting.  Thank you.
9
10  **CHAIRMAN FRAZER:**  Mr. Dugas.
11
12  **MR. DUGAS:**  Thank you, Mr. Chair.  I was just curious, and would
13  it help adding a date to my motion?  Does it have to be on
14  Patrick's sub-motion?
15
16  **CHAIRMAN FRAZER:**  Well, at this point, we have a substitute
17  motion on the board, and so we will have to dispense with that
18  first and then revisit your motion.
19
20  **MR. RIECHERS:**  A point of order, Mr. Chair.  You were going to
21  me anyhow, and I'm just going to ask you to look at the two
22  motions and decide truly whether it's a substitute, because one
23  is deferring action, or in some respects tabling for a time
24  certain, until those things are accomplished, and then the other
25  is actually taking an action in the alternatives, and so just I
26  would ask for you to review that and decide whether or not it's
27  a substitute or not.
28
29  **CHAIRMAN FRAZER:**  Thank you, Robin.  Let me look at these again.
30  The substitute motion is to choose Alternative 2 in Action 1 as
31  preferred with an implementation date -- Okay.  Can we go back
32  so that I can read the original motion by Mr. Dugas?  Defer
33  action -- I think they're both deferring action.  I am going to
34  actually lean on a little assistance, and I think it's pretty
35  close, but, Ms. Levy, if I could draw on your expertise here.
36
37  **MS. LEVY:**  I mean, I think it's a close call.  I mean, I think
38  the issue is one is to defer action and one is truly an action.
39  I mean, I guess you could argue that it's a substitute to
40  deferring, because, if you choose to defer, then you don't do
41  anything else, whereas this would be the doing of something
42  else, but I am not an expert in parliamentary procedure, and so
43  I think you could go either way.
44
45  **CHAIRMAN FRAZER:**  I think I am going to go ahead and entertain
46  it as a substitute, and the reason I am is because, in the
47  original motion, there is to defer, right, and they're both
48  essentially putting the date off, and the substitute motion

0003303

```
 1  actually gives a specific date, whereas the original motion, in
 2  time for the 2022 season, is a bit more vague, and so I will
 3  entertain this as a substitute motion.  Kevin Anson.
 4
 5  MR. ANSON:  Thank you, Mr. Chair.  I know it's getting late, and
 6  this is why everybody that showed up on the phone call is here,
 7  and so I would like to offer a second substitute motion.
 8
 9  CHAIRMAN FRAZER:  Okay.  Go ahead.
10
11  MR. ANSON:  That would be, in Action 1, to make Alternative 1
12  the preferred, with an implementation date of January 1, 2023.
13
14  CHAIRMAN FRAZER:  Okay.  We'll get that up on the board.  The
15  second substitute motion is, in Action 1, to make Alternative 1
16  the preferred, with an implementation date of -- I want to make
17  sure that date is right, January.
18
19  MR. ANSON:  That's correct.
20
21  CHAIRMAN FRAZER:  Okay.  January 1.
22
23  MR. ANSON:  January 1, 2023.
24
25  CHAIRMAN FRAZER:  Okay.  All right.  Is there a second for that
26  motion, substitute motion?
27
28  MR. DIAZ:  I will second for discussion.
29
30  CHAIRMAN FRAZER:  It's seconded by Mr. Diaz.  Kevin, do you want
31  to talk just a little bit about it?
32
33  MR. ANSON:  I will talk just a little bit.  You all heard me on
34  most of my points, and the previous motion that I offered was to
35  go to the 2023 season, and this is cutting that off a little
36  bit, and I'm trying, again, to -- It bridges the gap, if you
37  will, with the pain that is coming Alabama's way, and it's
38  trying to get one more year.
39
40  You know, we're monitoring the stock here, in real-time, nearly,
41  and not only in-season for those landings on the recreational
42  side, but also monitoring with our fishery-independent program,
43  and we use that information to help us in making comments like
44  we had made here at the council this week and how confident we
45  are in the status of the stock, and so I just look forward to
46  any opportunities we have to provide our data and give those
47  folks that are making the first cut in the decision-making
48  process on the SSC, those folks, the opportunity to take a look
```

1   at  the  data  and  to  become  more  familiar  with  it  and  be  more
2   comfortable with it, and so thank you.
3
4   **CHAIRMAN FRAZER:**   Okay.   Thank  you,  Mr.  Anson.   We've  got  a
5   couple  of  hands,  and  then  I'm  going  to  try  to  keep  this  to  maybe
6   four folks, and so General Spraggins and then Robin Riechers.
7
8   **GENERAL SPRAGGINS:**  Mr. Chairman, back  to  the  --  I  am  looking  at
9   the  second  substitute  motion,  which  I  understand  that,  but  if  I
10  could  go  back  to  the  first  substitute  motion.   The  question  I've
11  got  on  that  is,  Patrick,  is  there  any  chance  that  --  When  you
12  say  to  make  Alternative  2  the  preferred,  with  an  implementation
13  date  of  April  30,  2022,  the  only  thing  I  have  heartburn  with
14  that  is  the  fact  that  --  Could  you  say  that  the  SSC  has  to  meet
15  prior  to  then  and  give  us  the  update,  and  that  was  in  part  of
16  the  original  motion,  and  I'm  just  asking  the  question.   Maybe,
17  Patrick,  is  there  something  that  we  can  modify  that  a  little
18  bit,  and,  if  it's  not  possible  to  modify  it,  then  I  guess  I'm
19  totally out of line here.
20
21  **MR. BANKS:**   General  Spraggins,  I  don't  mind  that,  but  I  don't
22  think  we  can  do  anything  with  my  substitute  until  we  dispense
23  with  the  second  substitute,  and,  so,  after  that  occurs,  then  I
24  don't mind trying to wordsmith a little bit.
25
26  **GENERAL SPRAGGINS:**   Then  I'm  out  of  line  then.   Sorry,  Mr.
27  Chairman.
28
29  **CHAIRMAN FRAZER:**   That's  okay.   Thank  you,  Patrick.   Mr.
30  Riechers.
31
32  **MR. RIECHERS:**   Kevin,  I  need  a  little  clarification,  if  I  can.
33  In  Action  1,  we're  making  Alternative  1  the  preferred,  and  so
34  that  basically  is  the  no  action  alternative,  but  you're  not
35  implementing  it  until  January  1  of  2023,  and  so  help  me  out
36  there, if I'm reading that correctly.
37
38  **MR. ANSON:**   It  might  be  a  new  motion,  Robin,  and  you're  right,
39  and  so  looking  at  the  percentages,  and  they,  obviously,  don't
40  reflect  --  If  the  previous  document  gets  implemented  this  year
41  or  next,  then  it  wouldn't  reflect  that,  and  so  I  need  to
42  wordsmith it then.
43
44  **MR. RIECHERS:**   Kevin,  I  am  less  hung  up  on  the  percentages
45  underneath,  but  I  am  just  trying  to  figure  out  --  I  mean,  what  I
46  --  I  am  not  telling  you  how  to  create  the  substitute  motion,  but
47  I  think,  when  I  heard  you  talk  about  the  motion,  you  were  trying
48  to  basically  extend  the  timeframe  that  Patrick  had  put  in  his
                                    214

1  motion, maybe, of one season longer, or at least that's what it
2  sounded like, but, in this case, it sounds as if you're
3  basically taking the Action Alternative 1, which is the status
4  quo action, and you're saying it's good to -- Well, it doesn't
5  even implement until 2023, and so I don't know what we're doing
6  between now and 2023.
7
8  **MR. ANSON:**  You're right, Robin.  It's been a long day.
9
10  **MR. RIECHERS:**  No, I hear you.
11
12  **MR. ANSON:**  Perhaps then maybe it should read, in Action 1, to
13  make a new -- You might want to leave that one up there, staff,
14  but, maybe down below, add this new language, in case I butcher
15  it too much.  **In Action 1, to make a new Alternative 4, I think
16  is where we're at --**
17
18  **MR. RINDONE:**  It's 7, Mr. Anson, or it would be 6.
19
20  **MR. ANSON:**  6.  Good catch, Ryan.  Thank you.  **To make a new
21  Alternative 6 the preferred, which would extend the percentages
22  -- Well, use the percentages from 50A and the ACL of the one
23  that we just passed, the 15.3 or whatever the breakdown would
24  be, through 2022.**
25
26  **MS. GUYAS:**  Point of order.
27
28  **CHAIRMAN FRAZER:**  Excuse me.  Yes, Ms. Guyas.
29
30  **MS. GUYAS:**  I think this is the same as Alternative 1.
31
32  **CHAIRMAN FRAZER:**  I agree.
33
34  **MS. GUYAS:**  When we talked about this amendment, we talked about
35  how this would layer on top of whatever we do with the ABC
36  amendment.
37
38  **MR. ANSON:**  I guess the difference in Alternative 1 now in the
39  document, unless it's automatically updated, is that we've got
40  the different -- We've got the different units there, because,
41  potentially, the other -- Maybe we don't need to change it,
42  because the other one has not been approved by the Secretary,
43  and then just going back to the state currency issue, is all I
44  was trying to get, and it's, again, trying to extend out the
45  additional year, and so it is essentially Patrick's motion, but,
46  instead of the April 30, it would go through the 2022 season,
47  and then 2023 -- We're still going through the research track
48  assessment, and potentially we could have the -- The name
                              215

0003306

1   escapes me, but the other assessment where we get the catch
2   advice, as early as 2024, January or February or March or April.
3
4   In 2023, it's where we would revert back to the CHTS for 2023,
5   for a season, and then, in 2024, hopefully we would have the new
6   catch advice with whatever is approved through the SSC, based on
7   using the different analyses of the state data versus federal
8   data versus the fishery-independent data, as I understand it in
9   the TORs, and so all this does, or I am attempting to do, is
10  just to increase, for one more year, the way that things
11  currently are and how they have been run since the
12  implementation of the EFPs, and so from 2018 to 2020, is how I
13  would like to do that, and so I am running out of gas here, but
14  --
15
16  **CHAIRMAN FRAZER:**  That's okay, Kevin.  Can I make a suggestion?
17  I mean, in order for it to be a substitute motion, and if you
18  want it to parallel Patrick's motion, then I would simply
19  insert, where Patrick's motion says, in Action 1, to make
20  Alternative 2 the preferred, you're essentially saying, in
21  Action 1, make Alternative 1 the preferred, if that's truly your
22  intent.  Is that correct?
23
24  **MR. BANKS:**  I apologize, Mr. Chairman, but are you talking to
25  me?
26
27  **CHAIRMAN FRAZER:**  No, I'm talking to Kevin, and so Kevin said
28  this is essentially Patrick's motion, but with the intention of
29  moving forward with status quo, right, and so the 2022 season,
30  and so, if that's in fact the intent, then the language reads --
31  In order to be a substitute in this context, it would say, in
32  Action 1, to make Alternative 1 the preferred, with an
33  implementation date of April 30, 2022.  Is that correct, Mr.
34  Anson?
35
36  **MR. ANSON:**  Yes, and I'm trying to get there.  Well, but, as I
37  read it, Tom, the Alternative 2 is where you take the CHTS and
38  convert it.
39
40  **CHAIRMAN FRAZER:**  Yes, that's right, and that's Patrick's
41  motion.
42
43  **MR. ANSON:**  Yes.
44
45  **CHAIRMAN FRAZER:**  Right.  You want, in Action 1, to make
46  Alternative 1 the preferred.
47
48  **MR. ANSON:**  Yes, which would retain currently how things are,

216

```
 1  yes.
 2
 3  CHAIRMAN FRAZER:  That's what I am getting, and so, if that's
 4  the way you want to phrase it, I will entertain that as a second
 5  substitute motion, and so --
 6
 7  MR. ANSON:  That is.
 8
 9  CHAIRMAN FRAZER:  Okay.
10
11  MS. LEVY:  Can I just say -- There wouldn't be an implementation
12  date, and I think that's what is confusing.  If you have
13  Alternative 1 as the preferred, it is already implemented.
14
15  CHAIRMAN FRAZER:  Well, I think the intent, Mara, here is it's
16  trying to -- They anticipate that it will not be implemented
17  until 2022, and so, by the time this process actually makes it
18  through, it's likely that it will not show up until 2022, but
19  that -- In order to accomplish that, Mara -- I mean, you could
20  say, for example, in the second substitute motion, and I
21  apologize, Kevin, for talking around your motion, but, in Action
22  1, to make Alternative 1 the preferred, to take effect in 2022,
23  and would -- Is that fine or not?
24
25  MS. LEVY:  But it's currently in effect now.  I guess that's my
26  point.  I guess, if you choose Alternative 1, you're choosing no
27  action.
28
29  CHAIRMAN FRAZER:  Okay.  I understand.  Kevin, do you understand
30  that point?
31
32  MR. ANSON:  Yes, but, if I offered Alternative 1, then there
33  would be no sunset, essentially, and that's what I am trying to
34  get in here, is a sunset for the way things currently are, and
35  then as a transition to what they could be, and what they could
36  be is that, in 2023, my expectation is that we will -- If no
37  other changes -- Let's just assume no other changes come with
38  the ACL from the second visit by the SSC, based on the new Great
39  Red Snapper Count information, and if the 15.4 stays, whatever
40  comes down from that is we'll get the 0.48, the conversion, in
41  the 2023 season going forward.
42
43  Our hope is that the 2024 season -- That we'll have new stuff,
44  whether it's new ACLs or no more conversion units, whatever the
45  case may be, and I'm pinning my hopes on that, but, again, we've
46  talked about this for several meetings, and everybody is
47  probably at their last wits end, but all I'm doing is just
48  offering -- I just wanted to take Patrick's motion and tweak it
```

217

1  to add in, but the difference is, and it's not subtle, and I
2  understand that, is that I wanted to keep the percentages as
3  they are currently.
4
5  **CHAIRMAN FRAZER:**  Sure, and so I guess I'm going to try to help
6  again, and maybe I'm not helping, if I understand Mara's point,
7  but if your point is to limit the amount of time that this is in
8  place, and you actually want to sunset it, perhaps you could
9  say, in Action 1, to make Alternative 1 the preferred with a
10 sunset following the 2022 season.  Would that work?
11
12 **MS. LEVY:**  Mr. Chair, can I jump in here?
13
14 **CHAIRMAN FRAZER:**  Please do.
15
16 **MS. LEVY:**  What I heard, and correct me if I'm wrong, Kevin, is
17 that what you essentially want, or you're looking for, is
18 Patrick's motion, but his motion would make the calibration
19 effective in April of next year, and what you're saying is that
20 you don't want it effective until January of 2023, and so it's
21 his motion, but you want to push out the date that he has
22 proposed, and is that correct?
23
24 **MR. ANSON:**  Yes, Mara, I believe that is correct.  I am sorry
25 the journey took so long.
26
27 **CHAIRMAN FRAZER:**  Thank you, Mara.  Okay.  We're going to get
28 this up on the board for you, Kevin.
29
30 **MR. ANSON:**  Thank you.
31
32 **MS. LEVY:**  I think it's pretty much there in the second
33 substitute, except changing "to make Alternative 1" to say "to
34 make Alternative 2", because you already have the effective date
35 there as January 1, 2023, but, if Kevin is willing to do the
36 calibration to the Alternative 2, then you would just change
37 that, but you would need to have the right effective date that
38 he wants.
39
40 **CHAIRMAN FRAZER:**  That's what we're working on right now, Mara.
41 Dr. Froeschke is working to get the language right.  Okay.
42 Kevin, sorry to make your life so complicated, but is that --
43 Are we on the same page?
44
45 **MR. ANSON:**  If anyone should be apologizing, it's me.  I'm sorry
46 for that painful episode for everyone, but I will make it brief.
47 I have already pretty much commented how our take is on it, and
48 we just -- We feel strongly about our data, but, on the other

1  hand, there is a process that is there, and, granted, it's been
2  a couple or three years of going through a process that a lot of
3  people have argued is contrary to Magnuson, but, again, just we
4  have had a lot of recent new information that just changes the
5  perspective for everyone, whether you're on the science side or
6  the management side or the end user, and it's changed the
7  perspective for everyone, and so I'm just trying to get there.
8
9  I understand that it makes it easy for Alabama and Mississippi,
10 but that's all we're trying to do, is to realize that the
11 process is there, and we will try to comply with that, but, if
12 we could just have a little bit more time to help educate the
13 public and get prepared and hope that things go well, from our
14 perspective, as it goes through the research track and
15 operational assessment, and that's the word that I was looking
16 for earlier, in 2023, and hopefully not, but maybe early 2024.
17 Thank you.
18
19 **CHAIRMAN FRAZER:**  Thank you, Mr. Anson.  Mr. Rindone, did you
20 take your hand down?  Okay.  We will deal with two more
21 comments, and then, in the interest of time, I think we're going
22 to move forward.  Mr. Strelcheck.
23
24 **MR. STRELCHECK:**  Thanks, Tom.  I've had a lot of time to think
25 about my comment, and I think my comments have entirely changed
26 since I originally raised my hand, but I guess the two points
27 that I would raise -- One is I appreciate Kevin and Patrick for,
28 obviously, putting these alternatives on the table, and we've
29 certainly heard, obviously, additional time.  The agency and the
30 council is still in a very precarious position, obviously, with
31 the catch limits being exceeded if they're not calibrated, and
32 so certainly my preference is to implement those calibrations as
33 soon as possible, and I would prefer that it, obviously, be done
34 in 2021.
35
36 Kevin's motion kicks it farther down the road than Patrick's,
37 and so my preference really goes back then to, if we're not
38 going to do it in 2021, that we go to Patrick's motion, which
39 would be in effect for the 2022 season.
40
41 The other aspect to all of this is that I think one of the
42 things that is missing, and maybe we want to talk about then, is
43 the comments that I made earlier about the allocations
44 themselves and what we've learned based on the calibration, and
45 we have passed a motion to revisit the allocations at some point
46 to be determined, but I think this points out also the
47 importance of not only waiting for information from the Great
48 Red Snapper Count, but the council moving forward with

219

1 consideration of allocation alternatives amongst the states, and
2 it's going to be a lengthy discussion, but I think the council
3 really should move down that path and reconsider allocations
4 amongst the states, given this new information.  Thank you.
5
6 **CHAIRMAN FRAZER:**  Thank you, Andy, for those comments, and I
7 certainly agree.  Patrick.
8
9 **MR. BANKS:**  Thank you, Mr. Chairman.  I appreciate it.  I'm
10 going to speak against Kevin's motion, simply because I just
11 don't think that I can knowingly make a decision today that we
12 would knowingly allow this discrepancy in fishing to occur for
13 two more years, and my goal in all of this was always to try to
14 be fully informed by the Great Red Snapper Count before we make
15 this calibration decision.
16
17 After hearing what I heard from the SSC and our discussions, I
18 just don't feel like we've got the full information from the
19 Great Red Snapper Count that we need, and, once that final
20 report comes out, once some of this other information comes out,
21 and the SSC feels like that they've got a full, clear picture to
22 give us good catch advice, then I think we can make that
23 calibration decision.
24
25 That's why I felt like moving it past this season was
26 appropriate, and it gives them more time to consider all of that
27 information, but, as a flip side, I don't know that making the
28 decision now to give ourselves two full seasons to make that
29 decision is appropriate, because it's not fair to the other
30 sectors, where we're knowingly allowing more fish to be taken by
31 the recreational sector than we should, or private recreational
32 sector than we should, under the current ACLs and ABCs.  We're
33 not allowing the same thing for the charter guys and the
34 commercial guys, and so that's my rationale for being against
35 the current motion, or the second substitute.  Thank you.
36
37 **CHAIRMAN FRAZER:**  I have two more, and then that will be the end
38 of the discussion.  Dr. Stunz and Ms. Bosarge.
39
40 **DR. STUNZ:**  Thank you, Mr. Chairman.  I just wanted to remind
41 everyone, because it occurred to me as we were talking through
42 this, but there is appropriations language, 2021 appropriations
43 language, that is specifically specifying -- It's one sentence
44 here, Tom, and just let me read it, really quick, but that NMFS
45 is directed to address the question of which data collection
46 systems, referring to MRIP or the Gulf, the state systems, are
47 providing the best estimate of red snapper catch in the Gulf of
48 Mexico.

```
 1
 2   Obviously, that is before making any regulatory changes, and so,
 3   by having this time, no matter which one of these motions we
 4   pass, that gives some time to work through that as well, and so
 5   there is some justification from the congressional side as well
 6   to give us some time that we need to work through all of this.
 7
 8   CHAIRMAN FRAZER:  Ms. Bosarge.
 9
10   MS. BOSARGE:   Thank you, Mr. Chairman.   I wrote down -- I've
11   been kind of holding my comments, and so I wrote down a couple
12   here.   First, there was a comment made earlier about other
13   sectors not liking FES when it comes to allocation, but having
14   no problem with it when it comes to this document or catch
15   levels, and I don't know -- I will speak for me in that sense,
16   that, no, I -- If you remember, the only time, thus far, that we
17   have used FES to actually finalize a document and have catch
18   level recommendations and such in it was lane snapper, and I
19   went on the record then saying that I have big hesitation and
20   reservations about this, about tripling a quota.
21
22   I do not feel comfortable with those FES numbers, and I'm
23   worried that we're going to fish that stock down, and so I think
24   I have been consistent, and I'm saying the same thing in red
25   grouper.   This document does not deal with FES, and I have tried
26   to somewhat be quiet, because it's kind of a state thing, for
27   the most part, and I'm not in state government, and so I have
28   tried to keep my mouth shut.
29
30   I do sympathize with the small states, and I really enjoyed
31   General Spraggins' comments that he made earlier.   He actually
32   got down into some numbers, and he said these were the
33   intercepts, and this was the landings, and, the next year, this
34   was the intercepts, and this was the landings.   He started to
35   actually show us some of those fluctuations in that variability,
36   and that is exactly what I begged the states to do last year.
37
38   I said, you have biologists and statisticians on your staff, and
39   please have them look into the differences between MRIP-CHTS and
40   your surveys and find out where the differences are, and what's
41   driving the difference.   Once you bring that to us, then we have
42   something to work with to tweak your calibration to fit whatever
43   this variation is that we have found.   It has not been done, and
44   that frustrates me to no end, because that's what puts us in
45   this spot right here.
46
47   We don't have any quantitative data to go on to make some sort
48   of tweaks to those two calibrations for those two small states,
```

221

1  and so I'm in a hell of a position.  I know that overfishing
2  occurred in 2017, because we exceed the OFL.  I know that
3  overfishing occurred in 2019, and we exceeded the OFL.
4
5  Based on Dr. Cody's presentation for 2020, effort was up from
6  2019, and I know people like red snapper.  Unless the size went
7  down considerably on those red snapper, then, more than likely,
8  we overfished in 2020, and that's exactly what that bottom
9  longline survey is showing you.  It is showing you that we're on
10  a downward trend right now.  In fact, if you used enough of the
11  years of data -- If you used the last three years of data,
12  instead of the last five, which captured some really big biomass
13  -- If you used the last three years, we should have decreased
14  this ABC by 18 percent, and we should have taken a cut and not
15  an increase.
16
17  I have to take all of that into consideration when I vote on
18  this document.   Do I wish we would have tweaked those
19  calibrations for the two small states?  I sure do, but nobody
20  brought the danged data for us that we needed in order to be
21  able to quantitatively do that.
22
23  I cannot allow overfishing to continue to occur.  These are the
24  only calibrations I have to go on, and I have to vote to
25  implement this.  None of these options, of these motions that we
26  have on the board, will implement a danged thing for this year,
27  and so then there's a good possibility that we overfished for a
28  fourth year, four out of, what, the last five?  Guess who is
29  going to pay that back when that next assessment comes out?
30
31  The charter/for-hire and the commercial sector, in addition to
32  the private recs, and so, either way, there is pain, and I'm
33  sorry, but I am tired of paying back other people's overages,
34  and so I'm going to vote no for all three of these, and I
35  apologize if I frustrated anybody, but I guarantee you, when
36  that stock assessment comes back out, and you have lower
37  biomass, you won't be volunteering to say, hey, don't make those
38  commercial guys take a cut and don't make charter/for-hire take
39  a cut.  I'm going to have to stand my ground here, and I hope
40  that everybody else will stand theirs.  Thanks.
41
42  **CHAIRMAN FRAZER:**  Thank you, Ms. Bosarge.  Okay.  Dr. Simmons,
43  break out the roll call sheets.  We will vote on the second
44  substitute motion.
45
46  **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Chair.  This is the
47  second substitute motion.
48

0003313

1  **CHAIRMAN FRAZER:**  Hold on.  Let me read it, so people know what
2  they're doing.  This is the vote.  **The second substitute motion**
3  **in Action 1 is to make Alternative 2 the preferred with an**
4  **implementation date of January 1, 2023.**  Dr. Simmons.
5
6  **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Chair.  Mr.
7  Strelcheck.
8
9  **MR. STRELCHECK:**  No.
10
11  **EXECUTIVE DIRECTOR SIMMONS:**  Dr. Shipp.
12
13  **DR. SHIPP:**  Yes.
14
15  **EXECUTIVE DIRECTOR SIMMONS:**  Ms. Boggs.
16
17  **MS. BOGGS:**  No.
18
19  **EXECUTIVE DIRECTOR SIMMONS:**  Ms. Bosarge.
20
21  **MS. BOSARGE:**  No.
22
23  **EXECUTIVE DIRECTOR SIMMONS:**  Dr. Stunz.
24
25  **DR. STUNZ:**  Yes.
26
27  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Dugas.
28
29  **MR. DUGAS:**  Yes.
30
31  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Sanchez.
32
33  **MR. SANCHEZ:**  No.
34
35  **EXECUTIVE DIRECTOR SIMMONS:**  Ms. Guyas.
36
37  **MS. GUYAS:**  No.
38
39  **EXECUTIVE DIRECTOR SIMMONS:**  General Spraggins.
40
41  **GENERAL SPRAGGINS:**  Yes.
42
43  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Williamson.
44
45  **MR. WILLIAMSON:**  Yes.
46
47  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Diaz.
48

0003314

1  **MR. DIAZ:**  Yes.
2
3  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Riechers.
4
5  **MR. RIECHERS:**  Yes.
6
7  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Swindell.
8
9  **MR. SWINDELL:**  No.
10
11  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Anson.
12
13  **MR. ANSON:**  Yes.
14
15  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Banks.
16
17  **MR. BANKS:**  No.
18
19  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Dyskow.
20
21  **MR. DYSKOW:**  Yes.
22
23  **EXECUTIVE DIRECTOR SIMMONS:**  Dr. Frazer.
24
25  **CHAIRMAN FRAZER:**  What is the vote?
26
27  **EXECUTIVE DIRECTOR SIMMONS:  Nine to seven.  Dr. Frazer**
28  **abstains, and so the motion carries nine to seven.**
29
30  **CHAIRMAN FRAZER:**  Okay.  I guess that will lead us into the rest
31  of the document.  I just want to, again, make a comment to the
32  council, realizing that there was seven in opposition, and for
33  justifiable reasons, right, that this is something that is
34  probably not defensible, in my mind, but, again, it was a vote
35  nine to seven, and I will accept the council vote, but it
36  reflects a high degree of frustration, but I think the public
37  should know that, and the agency should know that.  Ms. Guyas.
38
39  **MS. GUYAS:**  Really quick, before I continue the Reef Fish
40  Report, I think Carrie wanted to jump in.  You all might have
41  seen, in your inbox, that a revised Reef Fish Report went out,
42  and, Dr. Simmons, do you want to explain the change?
43
44  **EXECUTIVE DIRECTOR SIMMONS:**  Yes.  Thank you, Ms. Guyas.  I
45  would like to go over the changes, briefly.  We found a
46  discrepancy on page 4 of the printed report, in the second
47  paragraph.
48

0003315

1  We have modified it to say: Dr. Stunz questioned a comment made
2  by Dr. Lorenzen in a different context, and that was added in,
3  about managing expectations of large fisheries research studies,
4  and so that was added in.   The "some congressional entities"
5  language was deleted, and the only other change was, after "Dr.
6  Lorenzen replied that he meant that these project should
7  consider", and so "he meant" was added in.
8
9  Dr. Lorenzen did not bring this deliberation to the council as
10 an SSC deliberation, and this was an outside context that was
11 discussed between Dr. Lorenzen and Dr. Stunz, and so we just
12 wanted to make that clear in the report, that this was not part
13 of the SSC deliberations or in his report to the council.   Thank
14 you, and I'm sorry about that.
15
16 **CHAIRMAN FRAZER:**  Okay.  Ms. Guyas.
17
18 **DR. GUYAS:**  All right.   Thanks, Dr. Simmons, and so we are, if
19 you're following along, on the top of page 9, I believe, of at
20 least the old version.   Dr. Frazer asked about the consequences
21 of allowing an uncalibrated catch on the management of red
22 snapper and acknowledged that NMFS would be required to
23 constrain catch, applying payback provisions to those states
24 that exceeded their state-specific private angling component
25 ACLs in 2021.
26
27 Dr. Porch stated that the Southeast Fisheries Science Center
28 would be able to examine the results of the NMFS BLL for a
29 change in trend in the abundance of the stock in January 2022.
30 Further, by the early 2022, the state-specific catch and effort
31 data would also be available for examination.
32
33 Mr. Strelcheck replied that adding the newly-proposed
34 Alternative 6 was tantamount to status quo, which would
35 necessitate a revision to the document's purpose and need, as
36 the alternative is equivalent to reallocation, delaying the
37 implementation of the framework action beyond the end of 2021.
38
39 Mr. Strelcheck again reviewed NMFS's vulnerability to litigation
40 under the status quo and that the states would remain vulnerable
41 to payback provisions for any overages to their respective ACLs.
42 Ms. Levy clarified that NMFS must determine whether proposed
43 management measures comply with the Magnuson-Stevens Act, noting
44 that knowingly exceeding the ABC would be very difficult to
45 defend as complying.
46
47 Ms. Boggs asked whether Alternatives 3 through 5, which use a
48 buffer to reduce state-specific catch limits to prevent
                                225

1   exceeding the combined total private angling component's ACL,
2   satisfy the necessity to calibrate the landings data.  Ms. Levy
3   replied that using the buffers would constrain the landings
4   appropriately under Alternatives 3 and 4, but not Alternative 5,
5   and would thereby prevent the component from exceeding its ACL.
6
7   Mr. Banks asked under what ACLs would the states would be
8   fishing if the council requests that the proposed management
9   measures not be implemented until 2022.  Ms. Levy replied that
10  the catch limits would apply in the year in which they are
11  implemented, unless NMFS can justify the council's request for
12  delayed implementation.
13
14  Ms. Bosarge reminded the committee that the same concessions
15  being considered to accommodate the private angling component of
16  the recreational sector would need to fairly and equitably be
17  considered for the for-hire component and the commercial sector,
18  also.
19
20  Revised Public Hearing Draft Amendment 53: Red Grouper
21  Allocations and Annual Catch Levels and Catch Targets, Dr. Cody
22  and Dr. Shannon Cass-Calay presented weight estimation methods
23  for determining recreational catch in pounds from catch reported
24  in numbers of fish.
25
26  Dr. Cody first presented on the MRIP-APAIS average weight
27  procedure. He noted that data collected by APAIS are used to
28  estimate catch rates and trip characteristics for two-month
29  waves.  He then discussed the APAIS design, sample weights, and
30  catch rate estimates.  He explained that total catch includes
31  landings and releases, as numbers of fish, with landings
32  including both observed and unobserved harvest.
33
34  Standard length-weight relationship models are used to impute
35  missing data, which can include missing length or weight data.
36  When both length and weight data are missing, observations are
37  imputed by a combination of hot deck and cold deck imputation.
38  Catch estimation is calculated from a weighted APAIS catch rate
39  and weighted FES effort.
40
41  Dr. Cass-Calay then presented the Southeast Fisheries Science
42  Center weight estimation procedure.  While MRIP provides
43  species-specific catch estimates by stratum in numbers of fish,
44  corresponding weight measurements are not always available, due
45  to sampling constraints or incomplete self-reporting.
46
47  However, ACL monitoring requires estimates in weight, and so a
48  standard methodology was needed to estimate missing recreational

226

1  weights.   In this process, average weights from the intercept
2  data for each strata are calculated, and then strata that meet a
3  minimum sample size threshold are identified.   Finally, an
4  estimate of landings in numbers is converted to landings in
5  weight by applying an appropriate average weight.
6
7  Three factors explain why predicted landings from the SEDAR 61
8  assessment model differ from landings estimates in the ACL
9  monitoring dataset: input data, uncertainty assumed in
10 assessment, and differences in weight estimation.
11
12 For SEDAR 61, recreational landings were input as numbers, and,
13 therefore, the assessment model was fitting to numbers and not
14 weight.   The assessment model also assumes a greater uncertainty
15 in recreational landings compared to commercial landings, which
16 results in predicted landings that are not identical to input
17 landings.
18
19 The assessment model coverts predicted landings in number into
20 weight units through use of the length-weight equation, whereas
21 MRIP estimates are based on stratified observations of average
22 weight.   Going forward, the Southeast Fisheries Science Center
23 can look into modeling recreational landings in weight instead
24 of numbers during ongoing research track assessments, but that
25 effort will require an assumption about the CV around these
26 weight estimates.
27
28 Dr. Simmons discussed management considerations for using
29 interim ABC analyses.   She noted that the interim analysis uses
30 a harvest control rule, whereby the sector allocations of 76
31 percent commercial and 24 percent recreational and corresponding
32 ABC of 4.9 million pounds gutted weight was used in conjunction
33 with the NMFS bottom longline index of relative abundance to
34 revise future catch projections.
35
36 The 4.9 million pound gutted weight ABC is not the council's
37 current preferred alternative in Reef Fish Amendment 53, and so
38 the Southeast Fisheries Science Center would have to run
39 additional analyses to update the interim analysis to include
40 the multitude of ABC recommendations for the SSC and then
41 council to consider.
42
43 As such, the interim analysis should not be used to modify ABC
44 catch advice until the council selects allocations and
45 corresponding ABC catch advice.   Thereafter, interim ABC
46 analyses could continue to be updated annually to consider new
47 catch advice for the SSC and council.
48

0003318

1  Dr. Freeman discussed a motion from the Reef Fish AP at its
2  February 2021 meeting to modify the Reef Fish and CMP Fishery
3  Management Plans to automate catch advice based on interim
4  analyses.
5
6  Dr. Freeman reviewed the actions and alternatives in Amendment
7  53 to the Reef Fish FMP and discussed potential next steps.  Dr.
8  Freeman discussed the OFL, ABC, total and sector ACLs resulting
9  from the new Alternative 6 for Action 1.  He also noted a new
10 table that shows the predicted closure date for the recreational
11 sector based on the recreational ACL.  Ms. Muehlstein discussed
12 plans to solicit public comment and hold virtual public
13 hearings.
14
15 Dr. Freeman discussed motions from the Reef Fish AP on the two
16 actions.  The Reef Fish AP selected Action 2, Alternative 3 as
17 its preferred, which is also the council's preferred
18 alternative.   The Reef Fish AP made a motion for a new
19 alternative for Action 1, which would set the commercial ACL at
20 three million pounds gutted weight.  Dr. Freeman noted that the
21 motion to make that new alternative the preferred failed for
22 lack of a second, as did a motion to make Alternative 4 the
23 preferred.   For the purpose of time, the committee chair
24 requested that questions and motions wait until Full Council.  I
25 am going to pause there, and I see hands.
26
27 **CHAIRMAN FRAZER:**  Martha, I'm going to ask a quick question.
28 Well, I'll go ahead and let Leann go first.
29
30 **MS. BOSARGE:**  No, that's all right, Dr. Frazer.  You can ask
31 your question.
32
33 **CHAIRMAN FRAZER:**  Well, I mean, this is going to go back to the
34 calibration, and so, if your question is related to this part, I
35 will wait.
36
37 **MS. BOSARGE:**  Mine about red grouper.
38
39 **CHAIRMAN FRAZER:**  Have at it then.
40
41 **MS. BOSARGE:**  Okay.  All right.  I would like to make a motion,
42 please.  **I would move that, in Action 1, we make Alternative 2**
43 **the preferred alternative.**  If I can get a second, I will
44 elaborate.
45
46 **MR. SANCHEZ:**  I will second.
47
48 **CHAIRMAN FRAZER:**  It's seconded by John Sanchez.

228

1
2  **MS. BOSARGE:** I'm a little frustrated that there's not an
3  alternative in there that reallocates from recreational to
4  commercial, and you all are probably shaking your head and
5  going, what the heck is she talking about, and what I'm talking
6  about is the fact that, in all these different stock
7  assessments, we have these larger rec landings, thirty years'
8  worth of higher rec landings, that are going into them and
9  leading the stock assessment to believe that the stock was
10 actually larger than we once thought.
11
12 Now, depending on how hard we fished it for the last thirty
13 years, we are seeing some decreases in quotas, depending on what
14 we've done to it in that time period, and so, if you believe the
15 rec landings, and that that stock was bigger, then what has
16 happened is the commercial sector has missed out on harvest for
17 the last thirty years.
18
19 The quotas overall, across-the-board, would have been higher,
20 and not only would the rec sector have been allowed to take
21 advantage of that, but so would the commercial sector, but we
22 weren't, because we have a highly effective and highly efficient
23 management system with a lot of enforcement in it and a data
24 collection program that is not a survey, but a census, with a
25 lot of checks and balances in it.
26
27 Now, because of that accountability and that robust data
28 collection program, we were forced to stay within our quota. In
29 the normal world, you would think that would be a good thing.
30 However, what it means in today's world is that, if you have a
31 slightly less robust data collection system, and management
32 that's not as efficient and effective as the commercial sector,
33 you will end up being able to fish off the radar, and you will
34 be rewarded for that by getting more fish in the end.
35
36 I cannot believe that we're even considering something like that
37 right now. What we're doing is discouraging accountability, and
38 that is exactly what we are doing in this document if you
39 transfer any allocation away from commercial into recreational,
40 because those higher landings from the past represent
41 overharvest, overharvest that one sector was allowed to do
42 through an inefficient management system and a data collection
43 system that was not robust enough, while the other one was
44 managed to the Nth degree and wanted accountability, the same
45 sector that came to us back in, what, 2014 or 2015, when we got
46 our last stock assessment, and said, hey, we think we've got a
47 problem with this fishery and, please, please don't raise these
48 quotas and fish this stock any harder. We need to be

229

1  conservative, and we need to make sure we have sustainable
2  fisheries for the future.
3
4  That's the sector that we're going to punish, and we're going to
5  tell them that, no, we've held you down all these years, and we
6  intend to put that in stone and hold you down for the future,
7  too.  You're never going to get above those catch levels that
8  you've had for the last thirty years, and we're going to keep
9  you down there, and I'm sorry, but I cannot tolerate that.  For
10 that reason, I move that we make Alternative 2 the preferred.
11 Thank you.
12
13 **CHAIRMAN FRAZER:**  Thank you, Ms. Bosarge.  I was having a
14 discussion with staff, and I just wanted to make sure that there
15 was a second to that motion.  John Sanchez seconded.
16
17 **MR. SANCHEZ:**  Yes.
18
19 **CHAIRMAN FRAZER:**  Sorry, John, that I didn't hear that.  Mr.
20 Banks, you're up.
21
22 **MR. BANKS:**  I just raised my hand because I wanted to remind
23 folks, back on the calibration issue, that we did not vote to
24 make it final, just so folks realize that, as much stuff as we
25 have to deal with at every one of these council meetings, we are
26 going to see this calibration issue again in June, if we don't
27 take final action.  Thank you.
28
29 **CHAIRMAN FRAZER:**  Patrick, sorry about that, and so I intend to
30 bring that back up here when we dispense with the red grouper
31 topic.  I recognize that we did not deal with the final action
32 component of calibration, and we'll go back, after we're done
33 discussing red grouper, okay?
34
35 **MR. BANKS:**  Okay.
36
37 **CHAIRMAN FRAZER:**  I have John Sanchez up next.
38
39 **MR. SANCHEZ:**  Thank you, Mr. Chair.  I want to echo some of the
40 concerns that Leann was alluding to, which is regarding the FES
41 calibrations, and it would appear to me that, going forward,
42 when we do FES calibrations, it results in an increase in ABC,
43 but, as she was mentioning, we don't recalculate the historical
44 ABCs to look at what those historical ABCs would have been in
45 the past, and, arguably then, the sector that was operating
46 under a very formalized accounting system, and all of their
47 landings were counted, they never had the opportunity to catch
48 fish from that arguably higher ABC, historically, and now we're
                                230

1  rewarding the sector that was operating with a less-robust data
2  collection system for basically having underestimated their
3  landings.
4
5  It doesn't seem right, and particularly in a fishery that the
6  history of it is we have these episodic, cyclical events in this
7  fishery, red tides and such, and it seems that we're coming out
8  of them, where we were on the downturn, and then we started to
9  see some smaller fish, the intro of a year class coming up, and,
10 as evidenced by the landings we saw this week, it looks like the
11 longline landings are up about 7 percent this time of the year
12 from where they were last year, and so I would seem to me that
13 it would be very, very premature, in a fishery that's just
14 coming off of a stressed situation, to be reallocating, for the
15 reasons mentioned, the foregone opportunity on the commercial
16 side as well as you've got to consider the increased discard
17 mortality with rec landings.
18
19 When you consider all of these factors, I think Alternative 2 is
20 the way to go, and we seem to be pumping the brakes on red
21 snapper, but we've got the pedal to the metal on this one, and I
22 don't know why.  Thank you.
23
24 **CHAIRMAN FRAZER:**  Thank you, Mr. Sanchez.  Ms. Levy.
25
26 **MS, LEVY:**  Thank you.  I just wanted to address a couple of
27 things.  I mean, I think this narrative started with red
28 snapper, about one accountable sector and one unaccountable
29 sector, and I feel like it's been just translating into other
30 areas, and I don't think that red grouper is exactly comparable
31 to red snapper.
32
33 If you look at the tables in the document, for example Table
34 2.1.3, it shows some of the landings, and, I mean, there was no
35 recreational catch limit in place before 2010, and there was a
36 commercial catch limit in place, which was exceeded twice, in
37 2004 and 2005, and so I don't think that it's exactly analogous.
38
39 The other thing that I wanted to say was that there wasn't at
40 least evidence at the time, when this allocation was put in
41 place, and -- It was believed the landings during those years
42 were represented by the best available science, and, since that
43 time, there has been a new understanding of what the rec totals
44 were, and, yes, they were higher, but it's not because there was
45 no accountability, meaning we were managing to some levels, and
46 there's no indication that they were exceeding those levels at
47 that time.  I guess I'm just trying to urge some caution when we
48 talk about unaccountable versus accountable, especially in

0003322

1  regard to red grouper and the time series used for this
2  allocation.
3
4  The other thing that I wanted to point out is that you can also
5  get the impact to both sectors based on closure dates and
6  changes in ACLs with respect to the commercial sector, but,
7  either way, under all of the alternatives, except Alternative 1,
8  the catch level for the recreational sector is going to go down,
9  when you look in comparable units, and the potential for a
10  closure earlier in the year increases, and so it's not like
11  there is no impact to the recreational sector, even though they
12  might be getting a different allocation, percentage-wise, and I
13  think that that needs to be considered, too.
14
15  If you want to choose preferred -- If you want to choose
16  Alternative 2 as preferred, obviously that's the council's
17  choice, but I think you need to reconcile some of those issues
18  with respect to closure dates and the actual decrease in the
19  catch level for the recreational sector when you're comparing
20  and stay in the same units.  Thank you.
21
22  **CHAIRMAN FRAZER:**  Thank you, Ms. Levy.  Mr. Strelcheck.
23
24  **MR. STRELCHECK:**  Thanks, Chairman.  Mara covered a lot of the
25  points that I was going to make.  The one other thing that I
26  guess I would state as well is that we determined allocations
27  historically based on landings data, and, obviously, if we knew
28  then what we know now, those allocation decisions might have
29  been different, and so how much one sector might have caught
30  versus another, based on higher ACLs or whatever information
31  from the FES would have been incorporated back then, could have
32  obviously changed, obviously, the kind of proportional
33  distribution of what's being caught.
34
35  We don't know, obviously, historically what things would have
36  looked like, because it's hard to retrospectively look back and
37  guess at what actually occurred.
38
39  What I do want to speak to is the motion, and, Leann, I am
40  appreciative of you putting a motion on the table today, and I
41  think my frustration is we spend so much time talking about red
42  snapper that we don't spend the time to talk about other species
43  like we should, and this is an important fishery, and I feel
44  like this is a discussion that needs far more conversation than
45  just the limited time we have available today.
46
47  There's a lot of complexities to allocation with regard to red
48  grouper, or with any species for that matter, and there's a

0003323

1  tradeoff, as I believe you discussed, Leann, during committee
2  about discards and yield levels and kind of transferring
3  allocation to the recreational sector results in a lower annual
4  catch limit, and we haven't really looked at the economic net-
5  benefit analysis and kind of tradeoffs between shifting
6  allocation from one sector to another, and then you brought up
7  weight estimation, and we had a really good conversation about
8  that and kind of shed some light on potential issues there.
9
10  I don't think that Clay is, unfortunately, on the line to speak
11  to this, but I did talk to the Center, and it is something that
12  the Center is going to look into, with regard to the weight
13  estimation, and be able to potentially bring to the SSC some
14  new, or additional, information and advice in May, based on the
15  conversation.
16
17  For all those reasons, my recommendation is we table, so to
18  speak, this discussion and make sure that this is a priority
19  discussion for our next council meeting, since we've cleared the
20  deck for red snapper, based on today's actions.  Thank you.
21
22  **DR. PORCH:**  Mr. Chair, can you hear me?
23
24  **CHAIRMAN FRAZER:**  I can.  Go ahead, Clay, and then I'm going to
25  actually let Dr. Simmons jump in right after you.
26
27  **DR. PORCH:**  Sorry, but I keep getting booted off the webinar for
28  internet problems, and so I'm calling in.  Andy is right that we
29  take a look at how the recreational weights are being computed,
30  and we do think that there is a better way, using the MRIP
31  weights directly, or our version of the calculation, and so we
32  will be prepared to give a revised ACL, both updating the
33  interim analysis and taking into account a better way to
34  calculate the average weights.
35
36  **CHAIRMAN FRAZER:**  Thanks, Clay, for jumping in.  Dr. Simmons.
37
38  **EXECUTIVE DIRECTOR SIMMONS:**  I guess we did not understand that
39  until now.  I mean, as far as the SSC meeting goes, I guess we
40  can try to get that information in there, but we were going to
41  look at the updated fishery-independent indices of abundance,
42  including the bottom longline survey, even though it's truncated
43  for 2020, and see if the SSC thought there should be new catch
44  advice.  I was also going to bring up some of the interim
45  analysis considerations that I brought to the council on
46  Tuesday, and so I'm not sure we knew that was going to occur,
47  and we've already submitted the FRN for this meeting.  Thank
48  you.

233

1
2   **CHAIRMAN FRAZER:**   Okay.   Thanks, Dr. Simmons.   Ms. Guyas and
3   then Mr. Diaz.
4
5   **MS. GUYAS:**   I will be quick.   I was going to bring up a lot of
6   the things that Mara and Andy brought up regarding Table 2.1.3
7   and commercial not being constrained, and just I completely
8   agree with the sentiment that we need to talk about this more,
9   although I don't know that I would say this document is rushed.
10
11  We received the assessment for red grouper at our meeting in
12  Destin, which I believe was June two years ago, and so this has
13  been hanging out there for a really long time.   We have touched
14  on it at several meetings, and, unfortunately, I feel like we
15  still need to talk about it more, but this is -- None of this is
16  new, and I speak against the motion, and I would prefer to stick
17  with the preferred we have now.
18
19  I do think we need to look more at how some of these impacts for
20  recreational -- It is likely, especially if the fishery is on an
21  upswing right now, that recreational will close early, and some
22  of these options, particularly this one, would have that fishery
23  close very early, and I think we need to understand the
24  implications of that better, including economic implications,
25  and including the even larger number of discards that will occur
26  if this fishery closes as early as late summer.
27
28  Anyway, just one last thing, just as a reminder, is we are at
29  the public hearing stage here, and so we're not going final, and
30  this is still a conversation that I am looking forward to
31  having, and I hope we can devote more time to on future agendas,
32  certainly, and, as far as John's comment about this being a
33  cyclical fishery, I think, to some degree, that's true, and, if
34  there's a way that we can work with the industry to be on top of
35  that, without negatively impacting the fishery, then I'm all
36  ears, and let's figure that out, but that's probably a
37  discussion for another document, perhaps an ecosystem one.
38  Anyway, I just wanted to put all of that out there on this
39  motion.   Thank you.
40
41  **CHAIRMAN FRAZER:**   Thank you, Ms. Guyas.   Mr. Diaz and then Ms.
42  Bosarge.
43
44  **MR. DIAZ:**   I don't want us to be in a hurry either.   However, I
45  agree with Martha that this has been out there for a long time.
46  I mean, the way I felt about this is I would like to take care
47  of this issue and bring us back as close to what we were before
48  FES was ever brought into the equation, and, when I read the

234

1  document, it talks about the recreational portion of the current
2  OFL, ABC, and ACL are based on MRIP Coastal Household Telephone
3  Survey Data, and the current recreational ACL of one million
4  pounds in MRIP-CHTS units is equivalent to 2.1 million pounds of
5  FES units.
6
7  Dr. Crabtree said this a couple of times during the meeting,
8  but, because of that, if you don't reallocate, you have
9  reallocated to the commercial side, and so I was in support of
10 Alternative 3 before, because it uses the same identical years
11 as Alternative 1, which is the no action, and I believe that's
12 as close as we can get to bringing it back to where we were if
13 FES was not in the equation.
14
15 I am trying to listen to everything that's being said, and I am
16 open-minded to hearing other points of views, but that's where I
17 want to go with most of these new stock assessments that we get
18 with FES, with the exception of mackerel, and I will think of
19 mackerel different, but, on the rest of them, the point of view
20 that I'm taking on this one is kind of where I'm thinking that
21 I'm going to stand on those, also.  Thank you.
22
23 **CHAIRMAN FRAZER:**  Thank you, Mr. Diaz.  I have Ms. Bosarge and
24 then John Sanchez, and then I think we'll vote this up.
25
26 **MS. BOSARGE:**  Thanks.  It was my understanding that we were
27 going to go out to public hearings before the next meeting and
28 that this document could potentially come back to this council
29 for final action at that point.
30
31 That is why I'm trying to push this issue, and I agree that we
32 have not dedicated the time to this document that we have to our
33 lovely red snapper, but this is very important to a lot of
34 people.  This is their fishery, and this idea that we're looking
35 at these allocations and going, well, the recreational sector
36 may have a closure, well, let me remind you that the assessment
37 said that this most recent stock assessment showed that red
38 grouper biomass was the lowest on record, and so we have to come
39 to a reality that a closure is probably what needs to happen.
40
41 If you want to rebuild this biomass to a healthy level again,
42 you're going to have to quit fishing on it so damned hard, and I
43 don't see where our logic gets confused in that and we think
44 that a closure is going to be the worst thing that can happen.
45 That is exactly what is going to have to happen.
46
47 In the commercial side, we don't have a closure, because of the
48 management structure we're on, but we essentially have the same

235

1  thing when you drop our quotas, which is what almost all of
2  these alternatives do, is decrease our commercial quota, and why
3  are we going to have to decrease the commercial quota?  Because
4  the stock is at a very low level.
5
6  Why is the stock at a very low level?  Well, we said that it was
7  a red tide that had a lot of effect on it, and I agree that it
8  probably did, but, when you go back and look at these historical
9  rec landings, common sense will tell you that we fished that
10  thing down, and the red tide was probably the straw that broke
11  the camel's back, but that large harvest has been occurring on
12  the recreational side for the last thirty years that fished it
13  down, and so then it becomes just another example of where the
14  commercial sector needs to pay back overharvest on the
15  recreational side.
16
17  It's our job to rebuild it, and other people have got to have
18  fun, and we get to pay the price and rebuild it, and I'm sorry,
19  and I know I am sounding tipsy, because I am at this point, but
20  I just cannot tolerate that, and so I would like to go ahead and
21  vote this motion up or down.
22
23  **CHAIRMAN FRAZER:**  Thank you, Leann.  We have two more people.
24  Dr. Porch, to that point, and then I'm going to end with John
25  Sanchez.
26
27  **DR. PORCH:**  It's indirectly to that point.  If we're talking
28  about calculating new ACLs and using the interim analysis, we
29  still can't do anything until a decision is made on the relative
30  allocation of commercial and recreational.  Basically, we're
31  still at the point where we have the stock status estimate, and
32  potentially an OFL from the last assessment, but it hasn't been
33  adopted yet, because we haven't made the decision on the
34  allocation issue, and so we can't really move forward with an
35  interim analysis and updated ACL advice until we have a decision
36  on that, because it makes a big difference in terms of what the
37  ACL would be.
38
39  **CHAIRMAN FRAZER:**  Okay.  Thank you, Dr. Porch.  John, you get
40  the final comments before we vote.
41
42  **MR. SANCHEZ:**  Thank you.  I will be brief.  As this document
43  gets fleshed out, and we go through it, I would, for one, like
44  to suggest that we have public hearings in the area where this
45  fishery is prosecuted.  We definitely need to have one in the
46  epicenter, which is Madeira Beach, and so I strongly encourage
47  the council to support that.
48

236

1  Some of these arguments about, okay, the higher FES landings
2  arguably result in negative quotas should have been different
3  historically, again, we're looking at past history and coming up
4  with ABCs going forward without going back and recalculating
5  historical ABCs, and, to that point, I really appreciate Dale's
6  comment about how this relates to king mackerel, because it's
7  kind of the opposite there, where that's part of exactly why we
8  need to revisit the king mackerel allocation, because none of
9  this seems to make sense.
10
11  It seems like the logic is applied in one fishery, and then it's
12  overlooked in another one, and so on and so forth, and it
13  becomes very frustrating to a council member.  If we were
14  uniform in our application of these things, then maybe you could
15  get your arms around it, and, if you win, you win.  If you lose,
16  you lose, but it becomes very frustrating.  Thank you.
17
18  **CHAIRMAN FRAZER:**  Okay.  **We've got a motion on the board, and**
19  **that motion is, in Action 1, to make Alternative 2 the**
20  **preferred.  Alternative 2 reads: Maintain the sector allocations**
21  **at the total ACL at 76 percent commercial and 24 percent**
22  **recreational.  Revise the OFL and ABC as recommended by the**
23  **Scientific and Statistical Committee based on the Southeast Data**
24  **Assessment and Review 61.  Set the stock ACL equal to the stock**
25  **ABC.  Dr. Simmons.**
26
27  **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Chair.  Mr. Sanchez.
28
29  **MR. SANCHEZ:**  Yes.
30
31  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Anson.
32
33  **MR. ANSON:**  No.
34
35  **EXECUTIVE DIRECTOR SIMMONS:**  Ms. Boggs.
36
37  **MS. BOGGS:**  No.
38
39  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Banks.
40
41  **MR. BANKS:**  Yes.
42
43  **EXECUTIVE DIRECTOR SIMMONS:**  General Spraggins.
44
45  **GENERAL SPRAGGINS:**  No.
46
47  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Swindell.
48

0003328

1   **MR. SWINDELL:**  Yes.
2
3   **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Strelcheck.
4
5   **MR. STRELCHECK:**  Abstain.
6
7   **EXECUTIVE DIRECTOR SIMMONS:**  Dr. Stunz.
8
9   **DR. STUNZ:**  No.
10
11  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Diaz.
12
13  **MR. DIAZ:**  No.
14
15  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Williamson.
16
17  **MR. WILLIAMSON:**  No.
18
19  **EXECUTIVE DIRECTOR SIMMONS:**  Ms. Bosarge.
20
21  **MS. BOSARGE:**  Yes.
22
23  **EXECUTIVE DIRECTOR SIMMONS:**  Dr. Shipp.
24
25  **DR. SHIPP:**  No.
26
27  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Riechers.
28
29  **MR. RIECHERS:**  No.
30
31  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Dyskow.
32
33  **MR. DYSKOW:**  No.
34
35  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Dugas.
36
37  **MR. DUGAS:**  No.
38
39  **EXECUTIVE DIRECTOR SIMMONS:**  Ms. Guyas.
40
41  **MS. GUYAS:**  No.
42
43  **EXECUTIVE DIRECTOR SIMMONS:  The motion failed four to eleven**
44  **with two abstentions.**  Mr. Chair.
45
46  **CHAIRMAN FRAZER:**  Thank you, Dr. Simmons.  At this point, there
47  is a couple of things that I think that we need to take care of
48  in the remaining time.  I want to go back and revisit the final

238

0003329

1  action item as it relates to calibration, and I would remind
2  folks that we probably need to do that, and, if there's somebody
3  that is willing to make a motion to that effect, now would be
4  the time.
5
6  **MS. BOSARGE:**  Sure.  **I will make that motion.**
7
8  **CHAIRMAN FRAZER:**  Okay.  Ms. Bosarge, let's get the motion up on
9  the board.  We are getting the staff to get that together, Ms.
10 Bosarge.  In the interim, is there a second to the motion?
11
12 **MR. DIAZ:**  I will second it.
13
14 **CHAIRMAN FRAZER:**  It's seconded by Mr. Diaz.  Okay.  We have a
15 final action motion on the board, and I will read it into the
16 record.  **It's to approve the Framework Action: Gulf of Mexico**
17 **Red Snapper Recreational Data Calibration and Recreational Catch**
18 **Limits and that it be forwarded to the Secretary of Commerce for**
19 **review and implementation and deem the codified text as**
20 **necessary and appropriate, giving staff editorial license to**
21 **make the necessary changes in the document.  The Council Chair**
22 **is given the authority to deem any changes to the codified text**
23 **as necessary and appropriate.**  Is there any further discussion
24 of the motion before we take a roll call vote?  I am not seeing
25 any hands.  Leann, is that an old hand?
26
27 **MS. BOSARGE:**  No, sir.  That's from earlier.
28
29 **CHAIRMAN FRAZER:**  Okay.  Thank you.  All right.  Dr. Simmons.
30
31 **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Chair.  Mr.
32 Riechers.
33
34 **MR. RIECHERS:**  Yes.
35
36 **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Diaz.
37
38 **MR. DIAZ:**  Yes.
39
40 **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Banks.
41
42 **MR. BANKS:**  No.
43
44 **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Anson.
45
46 **MR. ANSON:**  Yes.
47
48 **EXECUTIVE DIRECTOR SIMMONS:**  Ms. Guyas.

0003330

```
 1
 2   MS. GUYAS:  Yes.
 3
 4   EXECUTIVE DIRECTOR SIMMONS:  Ms. Bosarge.
 5
 6   MS. BOSARGE:  No.
 7
 8   EXECUTIVE DIRECTOR SIMMONS:  Dr. Shipp.
 9
10   DR. SHIPP:  Yes.
11
12   EXECUTIVE DIRECTOR SIMMONS:  Mr. Dugas.
13
14   MR. DUGAS:  Yes.
15
16   EXECUTIVE DIRECTOR SIMMONS:  Dr. Stunz.
17
18   DR. STUNZ:  Yes.
19
20   EXECUTIVE DIRECTOR SIMMONS:  Ms. Boggs.
21
22   MS. BOGGS:  No.
23
24   EXECUTIVE DIRECTOR SIMMONS:  Mr. Sanchez.
25
26   MR. SANCHEZ:  No.
27
28   EXECUTIVE DIRECTOR SIMMONS:  General Spraggins.
29
30   GENERAL SPRAGGINS:  Yes.
31
32   EXECUTIVE DIRECTOR SIMMONS:  Mr. Swindell.
33
34   MR. SWINDELL:  No.
35
36   EXECUTIVE DIRECTOR SIMMONS:  Mr. Strelcheck.
37
38   MR. STRELCHECK:  No.
39
40   EXECUTIVE DIRECTOR SIMMONS:  Mr. Dyskow.
41
42   MR. DYSKOW:  Yes.
43
44   EXECUTIVE DIRECTOR SIMMONS:  Mr. Williamson.
45
46   MR. WILLIAMSON:  Yes.
47
48   EXECUTIVE DIRECTOR SIMMONS:  The motion carried ten to six with
```

240

0003331

1  **one abstention.**
2
3  **CHAIRMAN FRAZER:**  Okay, and so we have some limited time, Ms.
4  Guyas, and I want to make sure that we tack off a few of these
5  remaining items that are essential, and I am going to suggest
6  that we give an opportunity to Mr. Strelcheck to provide some
7  discussion of the DESCEND Act of 2020, if he feels like he's
8  prepared to do that.
9
10  **MR. STRELCHECK:**  Thanks, Tom.  If we could bring up the
11  presentation, I will move through it very quickly, and we do
12  have at least one decision point that we would like the council
13  to weigh-in on.
14
15  **CHAIRMAN FRAZER:**  Okay, and we'll get that presentation up on
16  the board, and that would be Number 12.
17
18  **MR. ANSON:**  Mr. Chair, if I could interrupt very quickly.  My
19  name wasn't on the list, or at least the last time I saw it, and
20  so I just want to make sure it's for the record.
21
22  **CHAIRMAN FRAZER:**  Sure.
23
24  **MR. ANSON:**  Thank you.
25
26  **CHAIRMAN FRAZER:**  All right.  It was a yes vote for Mr. Anson.
27
28  **MR. ANSON:**  Correct.  Thank you.
29
30  **CHAIRMAN FRAZER:**  Go ahead, Andy.
31
32  **MR. STRELCHECK:**  Thanks, Tom.  Real quickly, the DESCEND Act was
33  approved, I believe, in January of this year.  It added a new
34  section to the Magnuson Act which requires commercial and
35  recreational fishermen to possess a venting tool or descending
36  device that's rigged for use when fishing in the Gulf of Mexico.
37
38  It requires the Department of Commerce to contract with the
39  National Academy of Sciences to conduct a study and produce a
40  report on discard mortality, and then, after completion of that
41  study, it requires us and the Gulf Council to develop guidance
42  for reporting discards and associated mortality and develop a
43  plan for that.
44
45  Today, I really am going to speak to kind of the first
46  component.  You can read the materials on the second and third
47  item on this list, but I think, due to time considerations, I
48  won't cover those in depth today.

0003332

1
2   There is specific language, obviously, in Section 321 speaking
3   to venting tools and descending devices.  As I mentioned, it
4   took effect on January 13, 2021, and there's also a sunset five
5   years after date of enactment and that the new kind of
6   requirements will be in place within one year of implementation
7   of the Act.
8
9   NMFS is planning on developing rulemaking to clarify definitions
10  for both descending device and venting tool.  Specifically, the
11  Act calls out a venting tool as defined by the council, and
12  that's the decision point that we need from the council today.
13
14  As I mentioned, the Act says that a venting tool is defined as a
15  meaning given to us by the Gulf of Mexico Fishery Management
16  Council, and so we have two possible definitions.  One is
17  already in the Code of Federal Regulations, and you can read it
18  there.  It's a fairly generic definition, but it states: Device
19  intended to deflate the abdominal cavity of a fish to release
20  the fish with minimal damage.
21
22  The other definition is actually in the council's policy on the
23  use of venting tools and descending devices, and I won't read
24  that in detail, but you can, obviously, see the definition
25  there, and so what we would like is the council's input on which
26  definition is most appropriate, since you were specifically
27  called out in the Act with regard to determining the meaning of
28  a venting tool, and we would then incorporate that into any
29  rulemaking, and so I will pause there, because this is really
30  the main decision point, and then we can talk about descending
31  devices next.
32
33  **CHAIRMAN FRAZER:**  Okay.  Let's see if there are any hands.  I
34  will wait just a second, because there's a bit of a delay on my
35  end.  Okay.  Andy, while we're waiting for hands, I see Martha.
36  Go ahead, Martha.
37
38  **MS. GUYAS:**  Just kind of like thinking off the cuff here, but I
39  guess the definition in the policy that we came up with -- I
40  know there was a lot of consideration that went into how to
41  define that, and I believe we got a lot of input from our O&E
42  Technical Committee, and probably others, and it's also pretty
43  specific, and so general people that are trying to understand
44  what venting tools are would probably appreciate that, and maybe
45  lawyers maybe would not, but just, like I said, at first blush,
46  I think I would prefer the council policy version, if I had to
47  choose right now.
48

0003333

1  **CHAIRMAN FRAZER:**  Okay.  Thank you, Ms. Guyas.  Is there any
2  other -- Mr. Dyskow.
3
4  **MR. DYSKOW:**  Thank you, Mr. Chair.  I think the second
5  definition is most consistent with what the Outreach and
6  Education Committee has been using.  It provides some necessary
7  additional detail, to clarify what is and what is not a venting
8  tool, and so I would recommend the second version.
9
10  **CHAIRMAN FRAZER:**  Thank you, Mr. Dyskow.  Ms. Levy.
11
12  **MS. LEVY:**  Thank you.  I just wanted to point out that -- As
13  Andy said, there's going to be rulemaking to do this, and so I
14  would expect that, at some point in the future, you might have
15  another opportunity to comment, if we line up the comments with
16  the rulemaking, potentially, and so I know it's rushed right
17  now, and so I don't think that anything is going to necessarily
18  get rushed through before the next meeting, and so I think NMFS
19  wants to start working on this, because we want this in place
20  before the law becomes effective next January, but, if folks
21  want to give further thought at the next meeting, we could
22  probably incorporate that.
23
24  **CHAIRMAN FRAZER:**  Okay.  Just to clarify there, and I will
25  address this through Andy, and you're not actually looking for a
26  motion at this point, but you're just looking for a suite of
27  opinions that will help you move forward, and is that correct?
28
29  **MR. STRELCHECK:**  Yes, that would be correct, and I agree with
30  Mara that we can bring this back to you at a later date.  We
31  just don't want to go down a path and then find out that the
32  council wanted us to use an alternative definition.
33
34  **CHAIRMAN FRAZER:**  All right.  Thank you.  I will wait a few more
35  minutes, to see if we have other hands.  Mr. Diaz.
36
37  **MR. DIAZ:**  Thank you, Mr. Chair.  I agree with Mr. Dyskow.  Out
38  of the two that's in front of us now, the second one is a lot
39  better, and I am thinking about the Law Enforcement Committee.
40  The first definition would be -- I think it would be very
41  difficult for law enforcement to enforce that effectively, and
42  so the second one would be a lot better, and I am in favor of
43  seeing some more information at the next meeting, to give us a
44  little bit more time to think this through.  Thank you.
45
46  **CHAIRMAN FRAZER:**  Thank you, Mr. Diaz.  Martha Guyas.
47
48  **MS. GUYAS:**  Thanks.  As we're talking about this, I am reminded

0003334

1  of testimony that we've gotten in the past, people like Dylan
2  Hubbard, and he has his own special device that he uses that
3  doesn't quite fit this definition, and so I'm glad to hear that
4  we'll have another bite at this and opportunities for some
5  public feedback, and so I'm just kind of putting that out there,
6  that we may want to take a harder look at this again next time
7  and think about how we can make this work for all the various
8  devices that are out there that people are using legitimately.
9
10 **CHAIRMAN FRAZER:**  Thank you, Martha.  Mr. Williamson.
11
12 **MR. WILLIAMSON:**  Thank you, Mr. Chair.  I agree with Phil and
13 Dale.  The second definition seems to capture what we're trying
14 to accomplish here.  I guess the having it in possession on the
15 boat doesn't mean that you're going to use it, unfortunately,
16 and I think the devil comes in trying to enforce this, but
17 that's true with a lot of things.  That's all.
18
19 **CHAIRMAN FRAZER:**  Okay.  Mr. Anson.
20
21 **MR. ANSON:**  I didn't think I had my name up, but I was going to
22 ask a question, but I was going to research it a little bit
23 first, but, since I'm on the spot, I will go ahead and ask the
24 question.  It pertains to the comments related to Dylan's tool
25 that he's come up with relative to this definition, and
26 potentially needing a bigger gauge, but should there not be a
27 reference or a maximum gauge that enforcement could use to help?
28
29 I mean, we don't want somebody taking -- Or at least I don't
30 think so, but we wouldn't want somebody taking a quarter-inch
31 diameter, or three-eighths-inch diameter tube, that is much
32 larger than a sixteen gauge, because that just physically leaves
33 a hole in the flesh without it being able to close in on itself,
34 and so I'm just wondering if there needs to be something in
35 there about that.
36
37 **CHAIRMAN FRAZER:**  Good comment there for consideration for Andy
38 moving forward.  Mr. Swindell.
39
40 **MR. SWINDELL:**  Does the venting tool have to meet both of these
41 definitions listed here or only one of them?
42
43 **CHAIRMAN FRAZER:**  I think that's the decision point, Mr.
44 Swindell, we're trying to figure out, which is the definition
45 that we might adopt moving forward.
46
47 **CHAIRMAN FRAZER:**  Andy, do you think you have enough information
48 to get started on this one?
                              244

1
2  **MR.  STRELCHECK:**   Yes,  this  is  helpful,  and  so  let  me  just
3  briefly  go  back  to  the  presentation,  and  I  will  cover  two  more
4  slides,  and  then  we  can  move  on.
5
6  **CHAIRMAN FRAZER:**  Okay.
7
8  **MR.  STRELCHECK:**   In  the  DESCEND  Act,  it  does  define  "descending
9  device",  and  you  can  read  the  definition  there,  but,
10  essentially,  it's  an  instrument  that  will  release  fish  at  a
11  depth  sufficient  for  the  fish  to  be  able  to  recover  from  the
12  effects  of  barotrauma.   It's  a  weighted  hook,  lip  clamp,  blah-
13  blah-blah,  lowered  to  a  depth,  or  another  device  determined  to
14  be  appropriate  by  the  Secretary  and  is  capable  of  releasing  the
15  fish  automatically,  releasing  the  fish  by  actions  of  the
16  operator  of  the  device,  or  the  fish  to  escape  on  its  own.
17
18  I  do  want  to  point  out  the  statement  of  "another  device
19  determined  to  be  appropriate  by  the  Secretary".   That,
20  obviously,  gives  our  agency  some  authority  and  discretion  with
21  regard  to  adding  to  this  definition,  and  we  can't  modify  the
22  definition.
23
24  This  is  my  last  slide,  and  so  we,  obviously,  intend  to  review
25  that  definition  more  carefully,  and  we  likely  will  add  more
26  detail  regarding  the  weight  used  and  the  length  of  line,  and  I
27  would  just  note  two  possibly  sources  for  kind  of  enhancing  that
28  definition.
29
30  One  comes  right  out  of  your  Gulf  Council  policy,  and  the  other
31  is  from  the  South  Atlantic  Council  and  codified  regulations  that
32  exist  there,  and  so  we're  not  asking  for  necessarily  input  from
33  the  council  today,  but  I  just  wanted  to  acknowledge  that  this
34  will  be  part  of  the  definition  and  considerations  as  we  develop
35  them,  and  we  certainly  can  bring  that  back  to  the  council  for
36  review  at  a  later  date.   That's  all  I  have,  Mr.  Chairman.
37
38  **CHAIRMAN FRAZER:**   Thank  you,  Andy.   We  look  forward  to  seeing
39  that  at  a  later  date.   Martha,  I  will  let  you  just  pop  right
40  into  Other  Business,  and  I  think  the  other  summary  reports  are
41  available,  and  folks  can  read  them  if  they  need  to,  or  wish  to,
42  and  I  would  hope  that  they  would,  but  do  you  want  to  pick  up
43  with  Other  Business?
44
45  **MS.  GUYAS:**   I  also  have  a  question  for  I  guess  the  group  on  red
46  grouper,  and  I  don't  know  which  one  you  want  to  cover  first.
47
48  **CHAIRMAN FRAZER:**  Let's  go  ahead  and  do  Other  Business.

0003336

1
2  **MS. GUYAS:**   Okay.   Other Business, Historical Captain Permits,
3  this item was postponed until Full Council on Thursday, April
4  15, 2021, and I believe this was Ms. Bosarge's item.
5
6  **MS. BOSARGE:**  Yes, ma'am.  Thank you.  I will be quick.  I was
7  just going to ask Andy if he could maybe bring us an update,
8  hopefully at the next meeting, and I don't think that it would
9  take too long, on how that's going.   We implemented that
10  amendment here a while back, where we were going to allow the
11  transfer of those historical captain's permits into regular
12  permits, and I just wanted to see how many people were taking
13  advantage of that.
14
15  Then the other thing we did in that document was we essentially
16  terminated, as of the date of implementation, the historical
17  captain letters, but we gave people an opportunity to do
18  something with those before then, and there were a lot of them,
19  and I just wondered how many people were able to take advantage
20  of that, and so just a quick update from Andy, maybe, at the
21  next meeting on that.
22
23  **MR. STRELCHECK:**  Sure, Leann.  We can get you that information.
24
25  **CHAIRMAN FRAZER:**  Thank you, Andy.  Kevin.
26
27  **MR. ANSON:**   Thank you, Mr. Chair.   This question is also for
28  Andy, and, Andy, I'm being sincere in the question, but I'm just
29  wondering if you can maybe give a timeline as to when the agency
30  might have a decision document to go to the Secretary for
31  signature, when they might be sending that up, for the
32  calibration.
33
34  **MR. STRELCHECK:**  Kevin, I can't give you something on the spot.
35  I can circle back with the council, but I need to talk to my
36  staff, based on, obviously, when we get it from the council and
37  some of the timelines that would move that forward.
38
39  **MR. ANSON:**  All right.  Thank you.
40
41  **CHAIRMAN FRAZER:**  Okay.  Ms. Guyas.
42
43  **MS. GUYAS:**   Just to come back to red grouper and the public
44  hearings really quick, Mr. Sanchez made a comment about wanting
45  to have an in-person hearing, I think in Madeira Beach, and I
46  just wanted to note that Ms. Muehlstein outlined a plan for
47  reaching out to the public on red grouper in committee, and I
48  believe it does not include in-person public hearings, and so

246

1  I'm wondering if we need to revisit that or confirm that the
2  staff plan is okay, given in light of where we are with the
3  status of COVID, et cetera.
4
5  I thought that Emily had a very thoughtful plan, with a lot of
6  different options for people, and there was several different
7  ways that she would be reaching out to people, but I just wanted
8  to hopefully get some clarification on that, so that the council
9  is receiving what they would like.
10
11  **CHAIRMAN FRAZER:** Sure. Ms. Muehlstein, if I could ask you to -
12  - She can't talk. I have stolen her earbuds. I'm going to give
13  them back to her.
14
15  **EXECUTIVE DIRECTOR SIMMONS:** Mr. Chair, we went through this
16  during committee, and I guess I'm not sure what we're asking.
17
18  **CHAIRMAN FRAZER:** I guess what I'm asking is just to, again,
19  briefly let people know that we've got a public hearing plan,
20  right, and so, if John, in particular, thinks that we need to
21  modify the plan, if I could hear from him briefly.
22
23  **MR. SANCHEZ:** I think this Amendment 53 is of utmost importance
24  to the Madeira Beach area, and I think we should have an in-
25  person hearing, if we're going to impact people's livelihoods.
26
27  **CHAIRMAN FRAZER:** Okay, and so I'm not opposed to that,
28  actually, and we have some constraints, perhaps, as they pertain
29  to COVID and how we actually deal with some of these issues, and
30  so I am going to ask Ms. Muehlstein if that's problematic for an
31  in-person public hearing meeting.
32
33  **MS. MUEHLSTEIN:** Honestly, I would probably defer to the Chair
34  and to the Executive Director on sort of whether or not we are
35  ready to do that, and so I think, as long as we can leave it to
36  staff discretion, with the understanding that we will try, I'm
37  comfortable with that.
38
39  **EXECUTIVE DIRECTOR SIMMONS:** Mr. Chair, if I might, I think the
40  bigger question is, is the council ready for us to take this out
41  for public hearings? We certainly want to have confidence that
42  the council is ready for us to do that and the proposed plan,
43  and, if we can, try to have an in-person meeting.
44
45  Certainly, we're working towards a hybrid meeting in June, if we
46  can, and we're sending another survey out to council members,
47  and I know some people are getting vaccines currently, and they
48  may be more comfortable traveling here in the near future, but I
247

1  think it's something that, internally, we need to discuss more,
2  regarding in-person public hearings.  Thank you.
3
4  **CHAIRMAN FRAZER:**  That's a good question.  So we're essentially
5  saying -- Are we prepared to continue on with the public hearing
6  schedule, is what I'm asking, or does the council have
7  reservation, or concern, about the status of this document that
8  we wait to kind of work through it, and again in June, and we
9  might be in a better position to conduct more traditional public
10 hearings.  I will take some input from folks.  J.D.
11
12 **MR. DUGAS:**  Thank you, Mr. Chairman.  Not so much to the
13 document, but I was going to wait until the end of the meeting
14 to bring this up, but, being that Mr. Sanchez is on the same
15 path, I personally am ready for in-person meetings, and I am
16 wondering, what do we have to do as a council to get there>
17
18 **CHAIRMAN FRAZER:**  J.D., that's a good question, and we continue
19 to kind of evaluate all of the logistics as they surround public
20 gatherings, and I think that many, many folks are anxiously
21 awaiting the opportunity to attend a meeting in-person, but
22 there are, nevertheless, still various restrictions, and we have
23 to be cognizant of that, both at the local and regional and
24 state levels, and it's possible, if folks want to push this as a
25 public hearing document out right after the June meeting --
26 That's one decision point, and, if you want us to try to
27 accommodate an in-person public hearing meeting in Madeira
28 Beach, again, we would have to look at -- I'm not opposed to
29 doing that, but we just certainly have to look at the logistics
30 involved.
31
32 If you are willing to leave that to the staff's discretion, and
33 myself and Dr. Simmons, we will certainly pursue every
34 opportunity to keep the affected stakeholders involved, but we
35 will have to adhere to any local regulations.  The bigger
36 question right now is do you want to move it forward for public
37 hearing, or do you want to sit for a while, until we revisit
38 this in June?  Ms. Guyas.
39
40 **MS. GUYAS:**  I mean, I think I'm comfortable taking it out.  I
41 mean, whether we wait or we take it now, I think the questions
42 are going to be the same.  I'm comfortable there, and I agree
43 with the approach of leaving it up to you and staff to kind of
44 hammer out whether doing something in-person is logistically
45 possible at this point.
46
47 I mean, as we all know from this situation, there's always a lot
48 up in the air, and, locally, if people are just not willing to

248

1  make that happen, then it kind of puts the council in a tough
2  place, and so those are my thoughts.
3
4  **CHAIRMAN FRAZER:**  Thank you.  Mr. Sanchez.
5
6  **MR. SANCHEZ:**  Thank you, Mr. Chair.  I'm comfortable leaving it
7  to you, Tom, and to staff.  I would ask that you act like we're
8  going to have an opportunity to meet in public on this issue,
9  and maybe do some reconnaissance and see if there is a place
10  that meets social distancing guidelines, or something along
11  those lines, available in the Madeira Beach area for this, but,
12  as far as I know, Florida is open for business, and so I think
13  we would be in good shape there, but, again, I will leave it to
14  you guys to do that.
15
16  **CHAIRMAN FRAZER:**  Okay.  Thank you.  I think what we'll do is
17  I'm leaning toward -- I tend to agree with Ms. Guyas that a
18  public comment period, whether it's virtually or in-person, is
19  going to yield some valuable input and discussion that will help
20  us inform our own discussions in June.  We will explore the
21  opportunity to have an in-person public hearing meeting in the
22  Madeira Beach area, and I will work with Carrie and the staff to
23  see if we can make that happen.  I think, Martha, it's back to
24  you.  Do you have more business?  Ms. Bosarge.
25
26  **MS. BOSARGE:**  Thanks.  I was just going to say, if you can't
27  make an in-person public hearing happen in Madeira Beach, then I
28  would sit on it and not do public hearings.  I feel that
29  strongly that it's important, for an allocation document, for
30  reallocations of this magnitude, that you go to the fishermen in
31  person.
32
33  **CHAIRMAN FRAZER:**  Okay.  Again, I think we have a bit of a plan,
34  and we're going to try our very best to have an in-person
35  meeting in Madeira Beach and see if, logistically, we can make
36  that happen.  If we are having an incredibly hard time with
37  that, we will circle back and see where we go from there, but I
38  think we'll be able to pull that off.  Okay.  Back to you, Ms.
39  Guyas.
40
41  **MS. GUYAS:**  Okay.  That was our last item of Other Business.
42  However, we did have two other items remaining from committee
43  that potentially we could cover now, if you wanted to, or people
44  could ask questions, and those were the Remaining Items from the
45  January 2021 SSC Summary Report and Remaining Items from the
46  February 2021 Reef Fish AP Summary Report.  I'm not even sure if
47  those people are on the line to go through those things at this
48  point, but those are in the briefing book.

0003340

```
 1
 2   CHAIRMAN FRAZER:   I'm going to weigh-in a little bit, in the
 3   interest of time, and say that those are certainly available in
 4   the briefing book, and people can certainly look at them, and
 5   they should look at them.  Okay.  So we do not have to do it
 6   here.
 7
 8   MS. GUYAS:  That concludes my report.
 9
10   CHAIRMAN FRAZER:   Thank you, Ms. Guyas.  You did an admirable
11   job, as usual.  We have a couple of other things that we need to
12   tackle here, and I think we might be able to quickly go through
13   some  of  the  liaison  reports,  and  there's  some  important
14   information in them, and so I will just go down the list.  Spud,
15   would  you  care  to  provide  a  liaison  report  from  the  South
16   Atlantic Council.
17
18                    SUPPORTING AGENCIES UPDATE
19                  SOUTH ATLANTIC COUNCIL LIAISON
20
21   MR. WOODWARD:   Thank you, Mr. Chair.  I know the hour is late,
22   and everybody is weary, and so I will certainly keep it very,
23   very short.  On the subject of South Atlantic red snapper, we're
24   still  awaiting  our  decision  from  NOAA  Fisheries  regarding
25   whether we'll have a recreational fishing season for this year.
26   Just as a refresher to everybody, we fish on a recreational ACL
27   of 29,656 fish, and, for the past couple of years -- We had a
28   four-day season in 2020 and a five-day season in 2019.
29
30   After five years, we are finally getting our Dolphin Wahoo Plan
31   Amendment  10  close  to  the  finish  line,  and  it's  had  its
32   challenges, FES recalibrations and a variety of other things,
33   and we've also had an opportunity to provide input to NOAA
34   Fisheries  leadership  regarding  the  Executive  Order  14008,
35   Section 216(c), in both verbal and written formats.
36
37   If possible, it would be good for the Gulf Council to look at
38   our letter, and it covers a lot of things, and there's at least
39   one excerpt out of it that I would like to just read, because I
40   think it captures some of what we're all facing.
41
42   That is: Climate change will likely increase the need for inter-
43   council cooperation and expand the range of constituent voices
44   the council may need to include in this process.  NOAA Fisheries
45   should work with the councils, within regions and nationally,
46   through  the  Council  Coordination  Committee,  to  identify  and
47   resolve  governance  restrictions  that  hinder  council  decision-
48   making and result in constituents feeling disenfranchised.  This
```

0003341

1   is particularly an issue for on the Atlantic coast, where we've
2   got fish moving in places where they typically haven't been in
3   great abundance.
4
5   Lastly, we have convened a private recreational reporting
6   workgroup, trying to grapple with some of the same issues that
7   the Gulf Council has been dealing with.  The goal of our
8   workgroup is to develop recommendations for consideration by the
9   council for coordinating state and federal data collection and
10  permitting programs to improve estimates of catch and effort in
11  private recreational snapper grouper fishing activities.
12
13  There is multiple objectives, but I would like to just point out
14  three that I think really capture what we're trying to
15  accomplish, and that is to outline the steps necessary for
16  state-collected data to be certified as acceptable by MRIP,
17  considered in the SEDAR stock assessment process, and used to
18  develop council management plans.  With that, Mr. Chair, I will
19  conclude my report.
20
21  **CHAIRMAN FRAZER:**  Thank you, Spud.  I appreciate the update.  I
22  am looking to see if there's any immediate questions.  I think
23  people are always appreciative of the information.  Okay.  We're
24  going to move forward, and I'm going to give the NOAA Office of
25  Law Enforcement an opportunity, and so Lieutenant Scarpa is on
26  the line.
27
28            **NOAA OFFICE OF LAW ENFORCEMENT**
29
30  **LT. JOE SCARPA:**  I will keep it short.  The council has our
31  report, and I just wanted to highlight some things.  SED created
32  a total of 234 incidents, and, out of those, 100 were in the
33  Gulf of Mexico, and that's referenced in pages 3 through 5 of
34  the report.
35
36  Page 7 is our summary of incidents referred by other agencies,
37  and you can see that Florida completed the most, followed by
38  Coast Guard District 8 and then Louisiana, and so good job to
39  them for patrolling federal waters.
40
41  Page 9, you will see incident dispositions.  One thing to note
42  there is you will see a high number of closed incidents with no
43  violations, and the reason for that is OLE, when they're out in
44  the field working, officers and agents, they maintain a presence
45  in their OAR, and so all their interactions are documented,
46  whether it be with industry or in the recreational sector, and
47  so we get a lot of incidents, and all those interactions are
48  documented as incidents, and not all of them result in

0003342

1  violations, and so that just explains that spike in large number
2  of incidents with no violations.   Incidents don't necessarily
3  align with violations there.
4
5  Moving on to operations and patrols, each of our districts does
6  either daily or weekly multi-agency patrols, according to their
7  milestones, their annual milestones.   Some of the highlighted
8  patrols did an operation, an operation in Texas, a week-long TED
9  operation.   Officers had a 100 percent TED compliance rate on
10 all the vessels that they inspected off of Texas, and that
11 included vessels in nearshore Galveston Bay all the way out to
12 forty nautical miles, and so that was encouraging to see a 100
13 percent TED compliance rate there.
14
15 The other notable operation was one down in the sanctuaries
16 called Operation Reefline, and officers documented quite a bit
17 of violations, covering many different laws and regs and
18 programs.   Even though the focus was on sanctuaries, they
19 stopped a lot of vessels that were in the EEZ, a lot of fishing
20 vessels, and documented everything from expired Gulf of Mexico
21 shrimp permit, no dive flags, discharging chum, or fishing
22 feeding in a SPA, and we had some out-of-season blueline
23 tilefish and out-of-season grouper and some fishing in Western
24 Sambo.   We even had a TED violation.   In that particular patrol,
25 the officers logged thirty patrol hours and stopped and boarded
26 twenty-six vessels.
27
28 Lastly, in other OLE items, SED has its first illegal charter
29 working group.   The update from that, one of the action items
30 for the liaison, compliance liaison, Matt Walia, was to create a
31 web story.   He did that, with the folks that assisted him, and
32 that story went out on Friday the 9th, and it's titled, "Making
33 Sure Your Charter Fishing Trip is Legal and Sustainable", and
34 you can find that on the SERO website, on Twitter, and some NOAA
35 stakeholder feeds.   I am advised that that was also shared with
36 the council members.
37
38 Other highlights, the SEFHIER group folks did a really good job
39 assisting law enforcement, both of the state and federal side,
40 with putting out a training PowerPoint and getting them up to
41 speed with SEFHIER regs, and so thank you to them.
42
43 Lastly, I just want to update you on the current OLE staffing
44 plan for the Southeast Division.   I will just highlight the two
45 most notable, and that is that Officer Matt Roach, and he's our
46 enforcement officer in Galveston, he has accepted a position, a
47 special agent position, in Honolulu, Hawaii, and so he'll be
48 leaving us at the end of May and reporting to Hawaii as a

252

1  special agent, and so we'll miss him.  He's been doing an
2  excellent job out there.
3
4  Lastly, in agent positions, Assistant Special Agent John
5  O'Malley officially replaced Charles Tyre, and, formerly, John
6  was a special agent with OLE in the Keys and in Corpus Christi,
7  and he's a former Texas game warden, and he's also currently a
8  U.S. Coast Guard special agent reservist.
9
10 On the officer side, we have a new officer that will be the
11 Galveston IUU position, and his name is Zach Salinas.  He's a
12 former Navy veteran, and he has graduated his twelve-week
13 program, and he graduated with the highest grade point average
14 of the entire academy, and he is currently in his twelve-week
15 field training and evaluation program.
16
17 The last officer update would be Corpus Christi, Texas.
18 Enforcement Officer Glenn Sheckles is a transfer from the Alaska
19 Division, and he reported yesterday.  That was his first day in
20 Corpus Christi, and so we're looking forward to work with him
21 and to the wealth of knowledge, and that's all I have.
22
23 **CHAIRMAN FRAZER:**  Thank you, Lieutenant Scarpa, for moving
24 through that so quickly, and it sounds like you've got some
25 really good folks on your team.  We're glad to hear that, and,
26 as always, I appreciate the work that you all do.  Ms. Bosarge
27 has a quick question, I think.  Leann, did you want to ask a
28 question?
29
30 **MS. BOSARGE:**  Yes, I had a quick question.  Thank you,
31 Lieutenant.  That was an excellent, excellent report.  I was
32 wondering, on kind of like the last page, page 22, of your
33 report, there's a lot of violations there for the area to be
34 avoided, and it says areas to be avoided activity, and is that
35 referring to that area, mainly, I guess, on the south side, or
36 the east side, depending on how you want to look at it, of the
37 Florida Keys National Marine Sanctuary, that area to be avoided
38 down there, and is that what that is?
39
40 **LT. SCARPA:**  Yes, you're correct, and thank you for bringing
41 that up.  I glossed over that, but, yes, the area to be avoided
42 in the Florida Keys National Marine Sanctuary is an area -- It's
43 generally the perimeter of the Atlantic side of the Keys, and
44 it's an area to be avoided by vessels over fifty meters in
45 length or tank vessels, and we have seen an increase in ATBA
46 violations this year, I think a pretty significant increase, and
47 so that is the area that is referring to.
48

0003344

1  **MS. BOSARGE:**  Okay, and I understand, and I've never heard this
2  second part of the regulation that you just talked about, and I
3  knew that it was the area to be avoided for vessels over fifty
4  meters, and so a 150-foot-long boat, right, which we don't
5  really have, that I know of, very many fishing boats in the Gulf
6  of Mexico that are over 150 feet, but what is this tank vessel
7  part?
8
9  **LT. SCARPA:**  That would be vessels carrying liquid chemicals,
10  oil, hazardous liquid chemicals, and that's also part of the
11  regulation.
12
13  **MS. BOSARGE:**  Okay, and so you weren't citing fishing vessels,
14  because you're allowed to fish in there, but you just can't have
15  a boat that's over 150 meters, and you were citing some other
16  kind of commercial vessels and not fishing vessels?
17
18  **LT. SCARPA:**  Well, they could be a fishing vessel, if it's over
19  fifty meters.  We do frequently cite recreational yachts that
20  are in excess of fifty meters that transit through the area, and
21  so it's both -- It's any vessel over fifty meters, irregardless
22  of what type it is, or that is hazardous-tanker-type vessels.
23
24  **MS. BOSARGE:**  Gotcha.  Thank you.
25
26  **LT. SCARPA:**  You're welcome.
27
28  **CHAIRMAN FRAZER:**  I am not seeing any more hands.  Again, I also
29  thank you, Lieutenant Scarpa, for your presentation.  Thank you
30  so much.
31
32  **LT. SCARPA:**  You're welcome.
33
34  **CHAIRMAN FRAZER:**  We will move on to the Mississippi Law
35  Enforcement Efforts and Sergeant Carron.
36
37  **SERGEANT CARRON:**  Good afternoon.  I'm here.
38
39  **CHAIRMAN FRAZER:**  All right.  Glad to have you.
40
41                **MISSISSIPPI LAW ENFORCEMENT EFFORTS**
42
43  **SERGEANT PATRICK CARRON:**  Thank you, and I will try and be brief
44  as well.  Our last presentation was given in April of 2019, and
45  we didn't give one in 2020, due to COVID, and so, moving right
46  into our enforcement effort, basically over the course of the
47  last two years, our man hours, our underway patrol hours, we're
48  looking at about 72 percent was spent underway in vessels and 28

0003345

1  dockside for the past two years.
2
3  We patrolled for a total of 4,204 man hours, and we also
4  performed almost 1,400 vessel hours of patrols. In the process,
5  we managed to make contact with 1,427 stakeholders, and that's
6  everyone across-the-board, whether it be dockside inspections or
7  underway boardings, commercial vessels and recreational vessels,
8  and also dealer inspections.
9
10 This will go into our enforcement priority summaries, and the
11 first one -- Our first priority is TED enforcement. Overall,
12 the observed compliance is 93 percent. We had twelve
13 enforcement actions over the past few years, and I don't have
14 the exact breakdowns in front of me, but that could be anything
15 from an actual TED violation that was referred to NOAA or a
16 written warning or a verbal warning for a slight issue with a
17 TED that was corrected on-site.
18
19 Moving forward to reef fish enforcement, we made contact with
20 598 recreational fishermen and seventeen commercial fishermen.
21 There were eight enforcement actions over the two years, with an
22 observed compliance of 99 percent.
23
24 Moving forward to IFQ landing enforcement, this is where we
25 visit the reef fish fishermen when they're unloading their catch
26 at the docks, and we don't have a tremendous amount of it in
27 Mississippi. Those that we have encountered, we haven't had any
28 issues, and we've got an observed compliance of 100 percent.
29
30 Moving forward to IUU and Lacey Act enforcement, 96 percent
31 observed compliance, and there were only two enforcement
32 actions, and this is a relatively new priority, and we're still
33 getting the feel of all the processes that we're going through
34 with it, but, generally, there's pretty good compliance.
35
36 Moving forward to HMS and general enforcement, this year -- I
37 noticed, when I was putting together this presentation that, the
38 last time we gave it, we had a prohibited shark species in the
39 presentation, and it seems to be fairly consistent that we're
40 having at least one occurrence of possession of prohibited
41 species of shark every year. That observed compliance of 95
42 percent is a fairly decent distribution between recreational and
43 commercial contacts, and there's a total of nineteen enforcement
44 actions.
45
46 If we advance to notable cases, we refer quite a few cases to
47 NOAA, running the gamut between minor violations to large, long-
48 term, complex investigations, and this is just press releases

                                 255

1  from two of our larger cases that were actually prosecuted by
2  the U.S. Attorneys Office that were worked through the JEA
3  program, or have a nexus because of the federal violations
4  involved, and so, with that, that will bring me to the final
5  slide and conclude the presentation.  Is there any questions?
6
7  **CHAIRMAN FRAZER:**  Okay.  Are there any questions for Sergeant
8  Carron?  I am not -- Leann.
9
10 **MS. BOSARGE:**  No question, but I just wanted to thank him for
11 all he does.  We appreciate your hard work, sir.
12
13 **SERGEANT CARRON:**  Thank you, Ms. Leann.
14
15 **CHAIRMAN FRAZER:**  Okay.  I am not seeing any more hands,
16 Sergeant Carron, and so, again, I also thank you for your
17 presentation and thank you for all the work that you do, you and
18 your team, and so we'll let you off the hook, and we'll move on
19 to the Gulf States Marine Fisheries Commission and Dave
20 Donaldson, if you're on.
21
22             **GULF STATES MARINE FISHERIES COMMISSION**
23
24 **MR. DONALDSON:**  Thank you, Mr. Chairman.  I just have a couple
25 of issues that I wanted to update you all on.  The first is the
26 CARES Act.  As of the end of March, we have distributed over
27 $7.4 million to over 2,000 applicants.  Mississippi and Alabama
28 have distributed all of their funds, and Louisiana is almost
29 complete with their first round, and they should be finalizing
30 that here in the next few weeks, and then, also, finalizing the
31 second-round final payments to everybody, and so, hopefully, in
32 the near future, Louisiana will be completed.
33
34 Texas closed their application process in the middle of last
35 month, and they are currently reviewing the applicants, and they
36 should be providing the commission with a list of approved
37 applicants soon after that.
38
39 Round two of the CARES Act, we have recently -- Myself and the
40 other two executive directors of the commissions met with NOAA
41 Fisheries.  As you are aware, there is an additional $255
42 million.  About $26 million is coming to the Gulf, excluding
43 Florida, because Florida is dealing with the Atlantic
44 Commission.  The eligibility and the approach are going to be
45 the same as the first round of the CARES Act.
46
47 One of the stipulations is these rounds of -- This round of
48 funding needs to be distributed by the end of September of this
                              256

                                                          0003347

1  year, and so we're hopeful that the money will be distributed in
2  a more timely manner, or a timelier manner.
3
4  The other issue is the barotrauma project that we're working
5  with the NOAA Restoration Center on.  We just recently awarded a
6  grant to Southwick Associates to conduct the human dimensions
7  survey, which is -- The purpose of that is to gather data to
8  measure the knowledge, behavior, attitudes, and perceptions
9  regarding handling and release practices of reef fish.  We're
10 hopeful that we'll actually start the survey later this year,
11 probably August or September.
12
13 Then we're also reviewing four proposals to conduct validation
14 studies to test the effectiveness of fish descending tools, and
15 the purpose of those proposals are to investigate the release
16 mortality estimates for reef fish and the effectiveness of
17 descending devices and how it relates to depredation, and so two
18 of those proposals hopefully will start in the August timeframe,
19 and the other two later in the year, in October or November,
20 but, with the four proposals, we'll have a complete Gulf-wide
21 coverage of this issue, and that is my brief report, and I will
22 gladly answer any questions, if there are any.
23
24 **CHAIRMAN FRAZER:**  Thanks, Dave, for making efficient work of
25 that report.  Let's see if there's any hands.  I am not seeing
26 any, and so, again, Dave, thanks for the report.  We will go
27 ahead to the U.S. Coast Guard and see if Lieutenant Giancola has
28 an update for us.
29
30                      **U.S. COAST GUARD**
31
32 **LT. GIANCOLA:**  Good afternoon.  I have a brief three-part update
33 to provide.  The first is regarding enforcement efforts for
34 domestic LMR.  Currently, this far this fiscal year, the Coast
35 Guard has had a total of twenty-three cases resulting in one or
36 more significant LMR violation, and, of those violations, 78
37 percent were due to gear, the TEDs and BRDs.
38
39 The second update is regarding other law enforcement, which is
40 our enforcement of the Mexican lancha threat of illegal,
41 unreported, and unregulated fishing in the U.S. EEZ.  The Coast
42 Guard has had a total of fifty-three interdictions and lancha
43 seizures thus far this fiscal year.  When compared to historic
44 trends, this is the largest -- We're on track to have the
45 largest number of seizures of actual lanchas this year, if
46 efforts keep at this current pace.
47
48 The last update that I will provide is in regard to mask
                              257

0003348

1  wearing.     At   the   last   Law   Enforcement   Technical   Committee
2  meeting,  questions  were  asked  on  what  the  Coast  Guard's  stance
3  was  on  the  Executive  Order  13998,  Promoting  COVID-19  Safety  in
4  Domestic   and   International   Travel,   and   the   CDC   order   that
5  expanded   the   mask   requirements   in   the   marine   transportation
6  system.
7
8  Since  that  time,  the  CDC  pushed  out  an  updated  FAQ,  frequently
9  asked  questions,  and  it  clarifies  what  that  means  for  the
10 maritime   industry,   and   specifically   the   commercial   fishing
11 industry,  and  this  is  what  the  Coast  Guard  is  going  off  of.
12 Under  Title  42  of  the  U.S.  Code,  Section  268,  the  Coast  Guard  is
13 changed  with  enforcing  CDC  quarantine  orders.
14
15 Onerous  operators  and  crew  of  vessels  that  fail  to  implement  the
16 mask  wearing  order  may  be  subject  to  civil  or  criminal  penalties
17 from  the  CDC.   Again,  the  FAQ  can  be  found  on  the  CDC's  website,
18 and  it  clearly  outlines  who  it  affects  and  what  it  applies  to.
19 Pending  any  questions,  that  includes  my  update  for  the  Coast
20 Guard.   Thank  you  for  your  time.
21
22 **CHAIRMAN  FRAZER:**    Thank   you,   Lieutenant.    Do   we   have   any
23 questions  regarding  the  Coast  Guard's  activities  or  the  mask
24 updates?   I  am  not  seeing  any  hands  up  on  my  screen,  and  so,
25 again,  I  just  want  to  say  thank  you,  Lieutenant,  for  that
26 update,  and  we  will  continue  to  move  on.
27
28 We  have  two  Other  Business  items.   The  first  one  has  to  do  with
29 the  USDA  dietary  guidelines  from  the  Department  of  Health  and
30 Human  Services.  Ms.  Bosarge,  if  you  want  to  take  a  few  minutes.
31
32                          **OTHER  BUSINESS**
33   **USDA  DIETARY  GUIDELINES  FROM  DEPARTMENT  OF  HEALTH  AND  HUMAN**
34                            **SERVICES**
35
36 **MS.  BOSARGE:**   I  will  be  quick.   I  have  been  spewing  negativity
37 for  a  while  now,  and  so  I've  got  to  balance  that  out,  and  this
38 is  my  positivity  segment  for  the  meeting.   I  wanted  to  just  kind
39 of  give  you  all  a  little  update.
40
41 The  Department  of  Agriculture  and  the  Department  of  Health  and
42 Human  Services  publish  dietary  guidelines  for  Americans  about
43 every  five  years,  and  they  just  published  some  new  dietary
44 guidelines,  which  highlighted  some  things  that  relate  to  what  we
45 do  around  this  council  table,  and  I  thought  I  would  just  take  a
46 moment  to  kind  of  step  back  and  hopefully  emphasize  why  we  do
47 what  we  do,  right?
48

0003349

1   The 2020 to 2025 dietary guidelines recommend two to three
2   servings of seafood per week as part of a healthy diet pattern
3   for all Americans over the age of six months, and so the two
4   kind of big things that came out -- Before, this had never been
5   recommended for children under twenty-four months, or two years,
6   of age, nor for breastfeeding women, and so pregnant women or
7   women that are breastfeeding after they have had a child, and so
8   this was pretty cool, I thought.
9
10  I think that there was a new recognition that seafood is an
11  essential, nutrient-dense, health-promoting dietary component as
12  early as six months old, and so I thought, wow, we need to shout
13  this to everybody, to the masses.
14
15  Now, the other thing that came out, which is probably not as
16  positive, was that about 90 percent of Americans are not getting
17  enough seafood in their weekly diets, and that's Americans of
18  all ages and not just infants, but all ages, and seafood is
19  important.
20
21  I am not a doctor, but I do know a little bit, just the basics,
22  and seafood contains omega-3 fatty acids, and that's known to
23  support brain health and functioning, and my mom -- She had
24  cancer, and she was diagnosed with cancer, I don't know,
25  probably three or four years ago now, and so one of the things
26  that I do in all my free time is read all these different health
27  journal articles, right, and it seems like, whether I'm reading
28  an article about cancer, or about heart disease, or ADHD,
29  there's this one word that seems to recur over and over and over
30  in all these articles that I read, and that's this chronic
31  inflammation and how that chronic inflammation is related to so
32  many different terrible health conditions in our society.
33
34  Those omega-3 fatty acids that are contained in seafood actually
35  have anti-inflammatory properties, and so I just wanted to take
36  a second, and sometimes we get so immersed in our day-to-day
37  activities in our respective fisheries and all that that entails
38  that we rarely have a chance to step back and see our efforts
39  from a broader vantage point, and I thought that these dietary
40  guidelines really highlighted the importance of seafood in the
41  daily lives and the health of the people that we love, our
42  children, our friends, our family, and just the citizens of this
43  country in general.
44
45  It was an opportunity for each of us to take a step back and
46  say, yes, that's why I do what I do, and it doesn't matter
47  whether you're the -- That applies if you're a commercial
48  fisherman out there on the water and working in the elements,

259

0003350

1  the hard, physical labor, a labor of love, to bring that fish or
2  that shrimp or that oyster to the plate for somebody else to
3  enjoy, or if you're a fisheries manager, like a lot of you state
4  representatives around this council, spending sleepless nights
5  pouring over briefing book documents for your next meeting, or
6  fisheries scientists working to unearth that data that helps us
7  to better understand our fisheries and then better manage them.
8
9  This is why we do it, and I think sometimes it's nice to hear
10 that the hard work that you do every day is actually making a
11 difference in the quality of other people's lives, and so that's
12 my positive note for the meeting.  Thanks, Mr. Chairman.
13
14         **BACKGROUND INFORMATION ON OTHER EXECUTIVE ORDERS FROM NMFS**
15                              **HEADQUARTERS**
16
17 **CHAIRMAN FRAZER:**   Thank you, Leann, for shining a little
18 sunshine on the end of our meeting.  All right.  The last item
19 in Other Business, and you guys can reference that at your
20 convenience, and it's background information on the various
21 Executive Orders coming from NMFS Headquarters that may, in one
22 way or another, involve the council and the things that we do.
23 I believe it was Mr. Diaz that asked for a compilation of those
24 at the last meeting, and so folks can go and review those at
25 their convenience, and certainly, if there's questions that come
26 up, don't hesitate to give staff a call, and we can track it
27 down, if you have a specific question about things.
28
29 Is there any other business to tackle before we adjourn this
30 meeting?  I am not seeing any.  Again, I would like to say to
31 everybody that I appreciate everybody hanging in there and
32 continuing to deal with virtual meetings that often are
33 technologically challenging, and you guys do a really good job,
34 and I appreciate your collegiality, and so I'm looking forward
35 to seeing you all in Key West in June, and I'm hoping that we
36 can pull that off without a hitch.  You guys have a good one,
37 and I will see you in a couple of months.  Take care.
38
39 (Whereupon, the meeting adjourned on April 15, 2021.)
40
41                              - - -

0003351

# ADMINISTRATIVE RECORD

# NO. 093

**Tab B, No. 5(d)**
**6/16/2021**

# Red Grouper Allocations and Annual Catch Levels and Targets



# Draft Amendment 53
## to the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico

**Including Final Environmental Impact Statement, Fishery Impact Statement, Regulatory Impact Review, and Regulatory Flexibility Act Analysis**

## June 2021




*This is a publication of the Gulf of Mexico Fishery Management Council Pursuant to National Oceanic and Atmospheric Administration Award No. NA15NMF4410011.*

0003447

This page intentionally blank

0003448

# COVER SHEET
# DRAFT AMENDMENT 53 TO THE FISHERY MANAGEMENT PLAN FOR THE REEF FISH FISHERY IN THE GULF OF MEXICO FINAL ENVIRONMENTAL IMPACT STATEMENT (DEIS)

**Abstract**:  This FEIS is prepared pursuant to the National Environmental Policy Act to assess the environmental impacts associated with a reasonable range of alternatives intended to modify the sector allocation, overfishing limit, acceptable biological catch**Error! Bookmark not defined.**, annual catch limits, and annual catch targets of red grouper in the Gulf of Mexico.

This FEIS is being prepared using the 1978 CEQ NEPA Regulations. NEPA reviews initiated prior to the effective date of the 2020 CEQ regulations may be conducted using the 1978 version of the regulations. The effective date of the 2020 CEQ NEPA Regulations was September 14, 2020. This review began on April 21, 2020, and the agency has decided to proceed under the 1978 regulations.

**Responsible Agencies and Contact Persons**

Gulf of Mexico Fishery Management Council (Council)     813-348-1630
4107 W. Spruce Street, Suite 200                       813-348-1711 (fax)
Tampa, Florida 33607                                   gulfcouncil@gulfcouncil.org
Matt Freeman (Matt.Freeman@gulfcouncil.org)            http://www.gulfcouncil.org

National Marine Fisheries Service (Lead Agency)        727-824-5305
Southeast Regional Office                               727-824-5308 (fax)
263 13th Avenue South                                  http://sero.nmfs.noaa.gov
St. Petersburg, Florida 33701
Peter Hood (Peter.Hood@noaa.gov)

**Type of Action**

(  ) Administrative                                     (  ) Legislative
(X) Draft                                              (  ) Final

**Filing Dates with Environmental Protection Agency (EPA)**
Notice of intent (NOI) to prepare EIS published:  April 21, 2020
Draft environmental impact statement (DEIS) filed with EPA:  May 7, 2021
DEIS comment period ended:  June 28, 2021
EPA comments on DEIS:

# FINAL EIS TABLE OF CONTENTS

Cover Sheet ........................................................................................................................ i

Draft Amendment 53 to the Fishery Management Plan for the Reef Fish Fishery in the Gulf of Mexico ............................................................................................................................. i

Final Environmental Impact Statement (DEIS) ............................................................... i

Final EIS Table of Contents ............................................................................................. ii

Abbreviations Used in this Document ............................................................................ iii

Table of Contents ............................................................................................................. v

List of Tables ................................................................................................................ viii

List of Figures ............................................................................................................... xii

Fishery Impact Statement ............................................................................................. xiii

Executive Summary ...................................................................................................... xvii

    Chapter 1. Introduction ............................................................................................. 1

    Chapter 2. Management Alternatives ....................................................................... 14

    Chapter 3. Affected Environment ............................................................................ 29

    Chapter 4. Environmental Consequences ................................................................ 90

    Chapter 5. Regulatory Impact Review .................................................................... 148

    Chapter 6. Initial Regulatory Flexibility Act Analysis .......................................... 155

    Chapter 7. List of Agencies, Organizations, and Persons to Whom a Copy of the EIS Is Sent ............................................................................................................................ 162

    Chapter 8. List of Preparers and Reviewers .......................................................... 163

    Chapter 9. References ............................................................................................. 164

    Chapter 10. Index .................................................................................................... 176

Appendix A. Other Applicable Law .............................................................................. 181

Appendix B. Bycatch Practicability Analysis ............................................................... 185

Appendix C. Gulf of Mexico Fishery Management Council – Allocation Policy ...................... 208

Appendix D. Allocation Triggers .................................................................................. 211

Appendix E. Allocation Factors .................................................................................... 228

Appendix F. Allocation Review Triggers ...................................................................... 244

Appendix G. ACL/ACT Control Rule for the Recreational Sector ................................ 247

Appendix H. ACL/ACT Control Rule for the Commercial Sector ................................ 248

Appendix I. Modification of Management for Red Grouper in the Gulf .................................. 249

# ABBREVIATIONS USED IN THIS DOCUMENT

| | |
|---|---|
| ABC**Error! Bookmark not defined.** | acceptable biological catch |
| ACL | annual catch limit |
| ACT | annual catch target |
| AM | accountability measure |
| APAIS | Access Point Angler Intercept Survey |
| BiOp | biological opinion |
| BLL | bottom longline |
| CEA | cumulative effects analysis |
| CEQ | Council on Environmental Quality |
| CFpA | Net Cash Flow per Angler Trip |
| CHTS | Coastal Household Telephone Survey |
| COI | certificate of inspection |
| Council | Gulf of Mexico Fishery Management Council |
| CS | consumer surplus |
| DLMTool | Data Limited Methods Tool |
| DPS | distinct population segment |
| DWG | deep water grouper |
| ELMRP | Estuarine Living Marine Resources Program |
| EEZ | exclusive economic zone |
| EFH | essential fish habitat |
| EIS | environmental impact statement |
| EJ | environmental justice |
| ESA | Endangered Species Act |
| F | fishing mortality rate |
| FES | Fishing Effort Survey |
| FGBNMS | Flower Garden Banks National Marine Sanctuary |
| FMP | fishery management plan |
| FWC | Florida Fish and Wildlife Conservation Commission |
| FWRI | Florida Fish and Wildlife Research Institute |
| GG | gag grouper |
| GGM | gag grouper multi-use |
| Gulf | Gulf of Mexico |
| GT | gray triggerfish |
| gw | gutted weight |
| HAPC | Habitat Area of Particular Concern |
| HCR | harvest control rule |
| IFQ | individual fishing quota |
| LNG | liquefied natural gas |
| Magnuson-Stevens Act | Magnuson-Stevens Fishery Conservation and Management Act |
| MFMT | maximum fishing mortality threshold |
| MMPA | Marine Mammal Protection Act |
| mp | million pounds |

| | |
|---|---|
| MRIP | Marine Recreational Information Program |
| MRFSS | Marine Recreational Fisheries Statistics Survey |
| MSST | minimum stock size threshold |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |
| NOS | National Ocean Service |
| OFL | overfishing limit |
| OLE | NOAA Office of Law Enforcement |
| OY | optimum yield |
| PAH | polycyclic aromatic hydrocarbons |
| PDF | probability distribution function |
| PS | producer surplus |
| PSE | proportional standard error |
| pw | product weight |
| Reef Fish FMP | Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico |
| RFFA | reasonably foreseeable future action |
| RG | red grouper |
| RGM | red grouper multi-use |
| RQ | regional quotient |
| RS | red snapper |
| Secretary | Secretary of Commerce |
| SEDAR | Southeast Data, Assessment and Review |
| SEFSC | Southeast Fisheries Science Center |
| SF | Sustainable Fisheries |
| SFA | Sustainable Fisheries Act |
| SOI | Segments of Interest |
| SPR | spawning potential ratio |
| SRHS | Southeast Region Headboat Survey |
| SSB | spawning stock biomass |
| SSC | Scientific and Statistical Committee |
| SWG | shallow-water grouper |
| TAC | total allowable catch |
| TF | tilefish |
| TL | total length |
| USCG | United States Coast Guard |
| VEC | valued environmental component |
| ww | whole weight |

# TABLE OF CONTENTS

Cover Sheet ................................................................................................................... i

Draft Amendment 53 to the Fishery Management Plan for the Reef Fish Fishery in the Gulf of Mexico ................................................................................................................... i

Final Environmental Impact Statement (DEIS) ............................................................ i

Final EIS Table of Contents ......................................................................................... ii

Abbreviations Used in this Document ......................................................................... iii

Table of Contents ......................................................................................................... v

List of Tables ............................................................................................................. viii

List of Figures ............................................................................................................ xii

Fishery Impact Statement ......................................................................................... xiii

Executive Summary ................................................................................................. xvii

Chapter 1. Introduction ................................................................................................ 1

1.1 Background .............................................................................................................. 1

1.2 Objectives of the Reef Fish Fishery Management Plan .......................................... 7

1.3 Purpose and Need .................................................................................................... 8

1.4 History of Management ........................................................................................... 9

Chapter 2. Management Alternatives ......................................................................... 14

2.1 Action 1 – Modify the Sector Allocations, OFL, ABC, and ACLs for Red Grouper ........ 14

2.2 Action 2 – Modify the Gulf Red Grouper Annual Catch Targets (ACT) .......... 24

Chapter 3. Affected Environment ............................................................................... 29

3.1 Description of the Fishery ..................................................................................... 29

3.2 Description of the Physical Environment .............................................................. 37

3.3 Description of the Biological/Ecological Environment ........................................ 40

3.4 Description of the Economic Environment ........................................................... 50

3.4.1 Commercial Sector ............................................................................................. 50

3.4.2 Recreational Sector ............................................................................................ 70

3.5 Description of the Social Environment ................................................................. 81

3.5.1 Commercial Sector ............................................................................................. 81

3.5.2 Recreational Sector ............................................................................................ 85

3.5.3 Environmental Justice Considerations ............................................................... 86

3.6 Description of the Administrative Environment ................................................... 88

3.6.1 Federal Fishery Management ............................................................................. 88

3.6.2 State Fishery Management ................................................................................. 89

Chapter 4. Environmental Consequences ................................................................ 90

4.1 Action 1 – Modify the Sector Allocations, Overfishing Limit (OFL), Acceptable
Biological Catch (ABC), and Annual Catch Limits (ACL) for Gulf of Mexico (Gulf) Red
Grouper ................................................................................................................... 90

    4.1.1 Direct and Indirect Effects on the Physical Environment .......................... 90

    4.1.2 Direct and Indirect Effects on the Biological Environment ....................... 92

    4.1.3 Direct and Indirect Effects on the Economic Environment ....................... 94

    4.1.4 Direct and Indirect Effects on the Social Environment ......................... 100

    4.1.5 Direct and Indirect Effects on the Administrative Environment ............ 104

4.2 Action 2 – Modify the Gulf Red Grouper Annual Catch Targets (ACT) ...................... 105

    4.2.1 Direct and Indirect Effects on the Physical Environment ........................ 105

    4.2.2 Direct and Indirect Effects on the Biological Environment ...................... 105

    4.2.3 Direct and Indirect Effects on the Economic Environment ..................... 106

    4.2.4 Direct and Indirect Effects on the Social Environment ......................... 117

    4.2.5 Direct and Indirect Effects on the Administrative Environment ............ 118

4.3 Cumulative Effects Analysis (CEA) ................................................................... 119

Chapter 5. Regulatory Impact Review ................................................................... 148

5.1 Introduction ..................................................................................................... 148

5.2 Problems and Objectives ................................................................................. 148

5.3 Description of Fisheries .................................................................................... 148

5.4 Impacts of Management Measures ................................................................... 148

    5.4.1 Action 1:  Modify the Sector Allocations, Overfishing Limit (OFL), Acceptable
Biological Catch (ABC), and Annual Catch Limits (ACL) for Gulf of Mexico (Gulf) Red
Grouper ................................................................................................................. 148

    5.4.2 Action 2 – Modify the Gulf Red Grouper Annual Catch Targets (ACT) .............. 151

5.5 Public and Private Costs of Regulations .......................................................... 153

5.6 Net Benefits of the Regulatory Action ............................................................. 153

5.7 Determination of Significant Regulatory Action .............................................. 154

Chapter 6. Initial Regulatory Flexibility Act Analysis ........................................... 155

6.1 Introduction ..................................................................................................... 155

6.2 Statement of the need for, objectives of, and legal basis for the rule............... 156

6.3 Description and estimate of the number of small entities to which the proposed action
would apply .......................................................................................................... 156

6.4 Description of the projected reporting, record-keeping and other compliance requirements
of the proposed rule, including an estimate of the classes of small entities which will be

subject to the requirement and the type of professional skills necessary for the preparation of the report or records ........................................................................................ 158

6.5 Identification of all relevant federal rules, which may duplicate, overlap or conflict with the proposed rule ........................................................................................ 158

6.6 Significance of economic effects on small entities ........................................................ 158

6.7 Description of significant alternatives to the proposed action and discussion of how the alternatives attempt to minimize economic impacts on small entities .................................. 161

Chapter 7. List of Agencies, Organizations, and Persons to Whom a Copy of the EIS Is Sent ........................................................................................................ 162

Chapter 8. List of Preparers and Reviewers ........................................................ 163

Chapter 9. References ........................................................................................ 164

Chapter 10. Index ........................................................................................ 176

Appendix A. Other Applicable Law ........................................................................ 181

Appendix B. Bycatch Practicability Analysis ........................................................ 185

Appendix C. Gulf of Mexico Fishery Management Council – Allocation Policy .................... 208

Appendix D. Allocation Triggers ........................................................................ 211

Appendix E. Allocation Factors ........................................................................ 228

Appendix F. Allocation Review Triggers ................................................................ 244

Appendix G. ACL/ACT Control Rule for the Recreational Sector ........................................ 247

Appendix H. ACL/ACT Control Rule for the Commercial Sector ........................................ 248

Appendix I. Modification of Management for Red Grouper in the Gulf .................................. 249

# LIST OF TABLES

**Table 1.** OFL, ABC, total and sector ACLs for **Alternatives 1-6**. ............................................ xix

**Table 2.** Commercial and recreational sector ACTs resulting from alternatives selected in Actions 1 and 2. ............................................................................................................... xxiii

**Table 1.1.1.** SEDAR 42 (2015) yield projections for red grouper at a constant catch level, averaged over the 2016-2020 time series. ................................................................................ 3

**Table 1.1.2.** Status determination criteria and stock status of red grouper based on SEDAR 61 (2019) and Amendment 44 (2017) ................................................................................................ 7

**Table 1.1.3.** Alternative yield projections accepted as scientifically valid by the SSC at its January 2020 meeting. ............................................................................................................... 7

**Table 2.1.1.** OFL, ABC, total and sector ACLs, and sector ACTs for **Preferred Alternative 3** and **Alternatives 1-2** and **4-6**. ................................................................................................ 15

**Table 2.1.2.** Commercial and recreational landings for red grouper in pounds gutted weight (gw) from SEDAR 12 (MRFSS) and the SEFSC ACL monitoring datasets (MRIP-FES) used to calculate sector allocations. ...................................................................................................... 19

**Table 2.1.3.** Commercial and recreational ACLs, ACTs, and landings for red grouper in pounds gutted weight (gw) in CHTS units for years in which an ACL and/or an ACT was in place. ..... 21

**Table 2.1.4** The predicted closure dates for each recreational ACL (mp gw) currently in Amendment 53 generated from predicted landings with 95% confidence intervals. ................... 22

**Table 2.2.1.** ACL/ACT Control Rule data inputs for **Alternative 2** of Action 2. ..................... 25

**Table 2.2.2.** Percentage (and weight in pounds [lbs]) of multi-use allocations used by fishermen for landing red grouper and gag. ...................................................................................................... 26

**Table 2.2.3.** Commercial and recreational sector ACTs resulting from alternatives selected in Actions 1 and 2. ............................................................................................................................. 26

**Table 2.2.4.** The predicted closure dates for each recreational ACT (mp gw) currently in Amendment 53 generated from predicted landings with 95% confidence intervals. ................... 27

**Table 2.2.5.** Red grouper private mode Florida landings (pounds whole weight) from GRFS, MRIP-CHTS, and MRIP-FES surveys. ........................................................................................ 28

**Table 3.1.1.** Number and percentage of vessels with a Gulf reef fish permit by state, final totals for 2018. ....................................................................................................................................... 31

**Table 3.1.2.** Red grouper landings in pounds gutted weight for the commercial sector. ............ 32

**Table 3.1.3.** Red grouper commercial discards (number of fish) by gear. .................................. 34

**Table 3.1.4.** Number and percentage of for-hire reef fish permits by state of mailing recipient (of permit). ................................................................................................................................... 35

**Table 3.1.5.** Red grouper landings in pounds gutted weight for recreational fleets. ................... 36

**Table 3.1.6** Red grouper recreational discards (number of fish). ............................................... 37

**Table 3.2.1.** Total Gulf greenhouse gas emissions estimates (tons per year) from oil platform and non-oil platform sources, commercial fishing, and percent greenhouse gas emissions from commercial fishing vessels of the total emissions*. .................................................................... 40

**Table 3.3.1.** Status of species in the Reef Fish FMP grouped by family. ................................... 45

**Table 3.4.1.1.** Number of valid or renewable commercial reef fish permits, 2008-2019. .......... 51

**Table 3.4.1.2.** Vessels and businesses with a commercial reef fish permit, end of year (EOY) 2018. ............................................................................................................................................. 51

**Table 3.4.1.3.** IFQ eligible vessels and businesses with a Gulf reef fish permit, EOY 2018. .... 52

**Table 3.4.1.4.**  Quota share statistics (in percent) for accounts with RG shares, Feb. 19, 2020.. 53
**Table 3.4.1.5.**  Quota share statistics (in percent) for businesses with RG shares and permitted vessels, Feb. 19, 2020. ........................................................................................................ 54
**Table 3.4.1.6.**  Quota share statistics (in percent) for businesses with RG shares and no permitted vessels, Feb. 19, 2020. .................................................................................... 54
**Table 3.4.1.7.**  Annual allocation (lb gw) statistics for accounts with RG shares, Feb. 19, 2020. ...................................................................................................................................... 55
**Table 3.4.1.8.**  Annual allocation (lb gw) statistics for businesses with RG shares and permitted vessels, February 19, 2020................................................................................... 55
**Table 3.4.1.9.**  Annual allocation (lb gw) statistics for businesses with RG shares and no permitted vessels, February 19, 2020. ........................................................................... 55
**Table 3.4.1.10.**  Quota share value statistics for accounts with RG shares (2019$). ................. 56
**Table 3.4.1.11.**  Average share prices by share category, 2015-2019 (2019$). .......................... 56
**Table 3.4.1.12.**  Quota share value statistics for businesses with RG shares and permitted vessels, February 19, 2020 (2019$). ........................................................................... 57
**Table 3.4.1.13.**  Quota share value statistics for businesses with RG shares but no permitted vessels, February 19, 2020 (2019$). ........................................................................... 57
**Table 3.4.1.14.**  Potential market value of annual allocation in 2020 for all accounts with RG shares (2019$). ....................................................................................................... 58
**Table 3.4.1.15.**  Average allocation prices by share category, 2015-2019 (2019$)................... 58
**Table 3.4.1.16.**  Allocation value statistics for businesses with RG shares and permitted vessels, ............................................................................................................................... 59
February 19, 2020 (2019$). .......................................................................................................... 59
**Table 3.4.1.17.**  Allocation value statistics for businesses with RG shares but no permitted vessels, February 19, 2020 (2019$). ........................................................................... 59
**Table 3.4.1.18.**  Potential ex-vessel value of annual allocation in 2020 for accounts with RG shares (2019$)........................................................................................................ 60
**Table 3.4.1.19.**  Average ex-vessel prices by share category, 2015-2019 (2019$)..................... 60
**Table 3.4.1.20.**  Landings and revenue statistics for vessels harvesting RG by year, 2014-2018 (2019$)........................................................................................................................ 61
**Table 3.4.1.21.**  Economic characteristics of RG trips 2014-2016 (2019$)................................ 64
**Table 3.4.1.22.**  Economic characteristics of RG vessels from 2014-2016 (2019$).................... 65
**Table 3.4.1.23.**  Dealer statistics for dealers that purchased RG landings by year, 2014-2018.  All dollar estimates are in 2019$. ...................................................................................... 66
**Table 3.4.1.24.**  Average annual economic impacts of red grouper in the commercial sector of the Gulf reef fish fishery. ...................................................................................... 69
**Table 3.4.2.1**. Recreational landings (lbs gw) and percent distribution of red grouper across all states by mode for 2014-2018. ............................................................................... 71
**Table 3.4.2.2.**  Number of red grouper recreational target trips, by mode and state, 2014-2018.* .............................................................................................................................. 72
**Table 3.4.2.3.**  Number of red grouper recreational catch trips, by mode and state, 2014-2018.* .............................................................................................................................. 73
**Table 3.4.2.4.**  Red grouper target trips by wave and mode, 2014 – 2018.*................................ 74
**Table 3.4.2.5.**  Red grouper catch trips by wave and mode, 2014 – 2018.* ............................... 75
**Table 3.4.2.6.**  Gulf headboat angler days and percent distribution by state (2014-2018). ......... 76
**Table 3.4.2.7.**  Number of valid or renewable for-hire Gulf reef fish permits, 2008-2019. ........ 77

**Table 3.4.2.8.** Trip economics for offshore trips by Gulf charter vessels and Southeast headboats in 2017 (2019$). .................................................................................................................. 79

**Table 3.4.2.9.** Estimated economic impacts from average annual Gulf red grouper recreational target trips by state and mode (2014-2018), using state-level multipliers. .................................... 80

**Table 3.5.1.1.** Number of vessels landing red grouper by top 10 county homeports. ................. 82

**Table 3.5.1.2.** Number of vessels landing red grouper by top 10 community homeports. ......... 83

**Table 3.6.2.1.** Gulf state marine resource agencies and web pages. .......................................... 89

**Table 4.1.3.1.** Expected change in landings for the red grouper commercial sector, expected change in revenue, and expected change in PS for **Preferred Alternative 3** and **Alternatives 2** and **4-6** relative to **Alternative 1**. ........................................................................................... 94

**Table 4.1.3.2.** **Preferred Alternative 3** and **Alternatives 2** and **4-6** - Proposed change in the red grouper commercial sector ACT (relative to **Alternative 1**) and associated estimated average price change ($/lb) and change in CS. ........................................................................................ 96

**Table 4.1.3.3.** **Preferred Alternative 3** and **Alternatives 2** and **4-6** – Total Expected Change in Net Economic Benefits for the Commercial Sector relative to **Alternative 1**. ........................ 96

**Table 4.1.3.4.** **Preferred Alternative 3** and **Alternatives 2** and **4-6** - Proposed change in the red grouper recreational sector ACL (relative to **Alternative 1**) and associated estimated annual change in CS. ............................................................................................................................... 97

**Table 4.1.3.5.** Wave in which predicted closure date occurs, canceled charter trips in the interrupted wave, and total canceled charter trips for **Preferred Alternative 3** and **Alternatives 2** and **4-6**. .................................................................................................................................... 98

**Table 4.1.3.6.** Short-term change in PS for charter vessels under **Preferred Alternative 3** and **Alternatives 2** and **4-6** relative to **Alternative 1**. ....................................................................... 99

**Table 4.1.3.8.** **Preferred Alternative 3** and **Alternatives 2** and **4-6** – Combined Total Expected Change in Net Economic Benefits for both the Commercial and Recreational Sectors relative to **Alternative 1**. ................................................................................................................ 100

**Table 4.1.4.2.** Recreational sector ACLs for **Alternatives 1-6** in MRIP-CHTS units and MRIP-FES units, based on the ratio in Alternative 1. ........................................................................... 103

**Table 4.2.3.1.** Expected change in landings for the red grouper commercial sector, expected change in revenue, and expected change in PS for Action 2 **Preferred Alternative 3** and **Alternatives 2** and **4-6**, relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**. ........ 107

**Table 4.2.3.2.** **Alternatives 1-2** and **Preferred Alternative 3** - Proposed change in the red grouper commercial sector ACT (relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**) and associated estimated average price change ($/lb) and change in CS. ............................... 110

**Table 4.2.3.3.** **Alternatives 1-2** and **Preferred Alternative 3** – Total Expected Change in Net Economic Benefits for the Commercial Sector, relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**. .......................................................................................................................... 111

**Table 4.2.3.4.** **Alternatives 1-2** and **Preferred Alternative 3** - Proposed change in the red grouper recreational sector ACT (relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**) and associated estimated change in CS. .............................................................................. 112

**Table 4.2.3.5.** Wave in which predicted closure date occurs, canceled charter trips in the interrupted wave, and total canceled charter trips for Action 2 **Alternatives 1-2** and **Preferred Alternative 3** paired with Action 1 **Preferred Alternative 3** and **Alternatives 2** and **4-6**. ..... 114

**Table 4.2.3.6.** Short-term change in PS (2019 dollars) for charter vessels under Action 2 **Alternatives 1-2** and **Preferred Alternative 3** paired with Action 1 **Preferred Alternative 3** and **Alternatives 2** and **4-6**. ................................................................................................................ 115

**Table 4.2.3.7.   Alternatives 1-2** and **Preferred Alternative 3** – Total Expected Change in Net Economic Benefits for the Recreational Sector relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**. .................................................................................................................... 115

**Table 4.2.3.8.   Alternatives 1-2** and **Preferred Alternative 3** – Combined Total Expected Change in Net Economic Benefits for both the Commercial and Recreational Sectors relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**. ............................................................. 116

**Table 4.3.1.**  The cause and effect relationship of fishing and regulatory actions for red grouper within the time period of the CEA. ........................................................................... 137

**Table 4.3.2.**  Valued environmental components (VEC) identified. ......................................... 139

**Table 4.3.3.**  Recreational landings of red grouper from 2010-2018, the recreational annual catch limit (ACL), and landings as a percent of the ACL.  Landings are in pounds gutted weight..... 143

# LIST OF FIGURES

**Figure 2.1.1.**  Gulf recreational landings by two-month wave and predicted future landings..... 22

**Figure 2.1.2.**  Cumulative predicted red grouper recreational landings with 95% confidence interval (dashed lines). ................................................................................................... 23

**Figure 3.2.1.**  Physical environment of the Gulf, including major feature names and mean annual sea surface temperature as derived from the Advanced Very High-Resolution Radiometer Pathfinder Version 5 sea surface temperature data set ............................................................... 39

**Figure 3.5.1.1.**  Red grouper regional quotient by top 10 homeport counties. ........................... 83

**Figure 3.5.1.2.**  Red grouper regional quotient by top 20 homeport communities. .................... 84

**Figure 3.5.1.3**.  Commercial fishing engagement and reliance of the top 15 red grouper homeports for 2017. ..................................................................................................................... 85

**Figure 3.5.2.1.**  Recreational fishing engagement and reliance for communities on Florida's west coast for 2017 ............................................................................................................................ 86

**Figure 3.5.3.1.**  Community social vulnerability indices for communities on Florida's west coast. .................................................................................................................................................... 87

# FISHERY IMPACT STATEMENT

The Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act) requires that a fishery impact statement (FIS) be prepared for all amendments to fishery management plans.  The FIS contains:  1) an assessment of the likely biological, economic, and social effects of the conservation and management measures on fishery participants and their communities; 2) an assessment of any effects on participants in the fisheries conducted in adjacent areas under the authority of another Fishery Management Council; and 3) the safety of human life at sea.  Detailed discussion of the expected effects for all proposed changes is provided in Chapter 4.  The FIS provides a summary of these effects.

The Southeast Data Assessment and Review (SEDAR) 61 (2019) assessment was completed in September 2019 using updated recreational data from the Marine Recreational Information Program (MRIP) Access Point Angler Intercept Survey (APAIS) and Fishing Effort Survey (FES), which collectively estimated greater catch and effort data for the recreational sector than previously calculated.  In January 2020, the Gulf of Mexico Fishery Management Council's (Council) Scientific and Statistical Committee (SSC) concluded that the SEDAR 61 (2019) assessment represented the best scientific information available.  The SSC reviewed various alternative sector allocation scenarios and recommended the projections in Table 1.1.3 as scientifically valid estimates of the overfishing limit (OFL) and acceptable biological catch (ABC).

Amendment 53 to the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico (Reef Fish FMP) considers alternatives that would modify the allocation of red grouper between the recreational and commercial sectors based on updated historical recreational harvest data.  Based on the allocation decision made in Action 1 (Section 2.1), this amendment further proposes modifications to the OFL, ABC, total and sector annual catch limits (ACLs), and sector annual catch targets (ACTs) for red grouper based on the stock assessment results and the resultant yield projections, considering the severity of the 2018 red tide event.

Amendment 53 consists of two actions.  Action 1 would modify the sector allocations, OFL, ABC, and ACLs for red grouper.  **Preferred Alternative 3** would revise the sector allocations of the total ACL between the recreational and commercial sectors using the average recreational landings with MRIP-FES adjusted data during the years 1986 through 2005, based on the Southeast Fisheries Science Center (SEFSC) ACL monitoring datasets.  The allocations for red grouper would be 59.3% commercial and 40.7% recreational.  The OFL and ABC would be revised as recommended by the SSC based on SEDAR 61 (2019) to 4.66 mp gw and 4.26 mp gw, respectively, and the stock ACL would be set equal to the stock ABC of 4.26 mp gw.  The commercial ACL would be 2.53 mp gw, and the recreational ACL would be 1.73 mp gw.

Action 2 would modify the red grouper ACTs.  **Preferred Alternative 3** would maintain the current buffer between the ACL and ACT for the commercial sector, and apply the ACL/ACT Control Rule to revise the buffer between the ACL and ACT for the recreational sector.  The commercial buffer would remain at 5% and result in a 2.40 mp gw commercial ACT, and the

recreational buffer would increase from 8% under **Alternative 1** to 9% under **Preferred Alternative 3** and result in a 1.57 million pounds (mp) gutted weight (gw) recreational ACT.

<u>Biological Effects</u>

The biological effects of changing allocation, ACLs, and ACTs mostly relate to the impacts of fishing on a species' population size, life history, and the role of the species within its habitat. Removal of fish from the population through fishing reduces the overall population size. Fishing gears have different selectivity patterns, which refer to a fishing method's ability to target and capture organisms by size and species. This would include the size distribution of fish caught by the gear as well as the number of discards, mostly sublegal fish or fish caught during seasonal closures, and the mortality associated with releasing these fish.

*Action 1* –Under **Preferred Alternative 3**, more fish would be allocated to the recreational sector, which would result in a shift in the number and size caught by that sector and results in a reduction in the resulting OFL, ABC, and stock ACL compared to keeping the current allocation. This is because total landings have to be constrained more to account for the greater numbers of dead discards from recreational red grouper fishing. As described in Appendix B, the recreational sector discards are an order of magnitude greater than the commercial sector. However, the purpose of the OFL and ACLs is to provide catch limits that constrain harvest and reduce the likelihood of overfishing, which protects the stock. The OFL is based on a fixed level of fishing mortality ($F_{30\%SPR}$), and thus is expected to manage the stock at $B_{30\%SPR}$, a level considered sustainable.

*Action 2* – **Preferred Alternative 3** would likely have little effect on red grouper biology. The commercial ACT buffer would not change from its current value of 5%. The recreational ACT would provide a little more protection to the stock because the buffer between the ACL and ACT would marginally increase from 8% to 9%. The small increase in the recreational buffer is not expected to substantially shorten the recreational fishing season.

<u>Economic Effects</u>

Compared with Action 1 **Alternative 1**, Action 1 **Preferred Alternative 3** would decrease the red grouper commercial ACL and ACT (when paired with Action 2 **Alternative 1**) by 0.63 mp gw and 0.60 mp gw, respectively. The decrease in the ACT is estimated to result in a decrease in revenue of $2,898,000 resulting in an expected change in producer surplus (PS) of -$695,520. The expected decrease in revenue is expected to result in a 16.51% decrease in red grouper purchases by dealers. In addition, the proposed decrease in the ACL with **Preferred Alternative 3**, when paired with Action 2 **Alternative 1**, would result in a decreased ACT, which would then decrease the availability of annual individual fishing quota (IFQ) allocation for sale, compared with Action 1 **Alternative 1**, and the allocation price would be expected to increase in response. **Preferred Alternative 3** would also be expected to result in an increase in red grouper share price, to reflect the expected supply of annual allocation available in the future. Changes in red grouper harvests, as a result of the change in ACT, could result in additional economic effects because of the potential effects on ex-vessel prices due to less (or more) red grouper available for sale in wholesale and retail markets. The decrease in the commercial ACT under **Preferred**

**Alternative 3** is expected to result in a positive average price change ($0.51/lb) and a decrease in consumer surplus (CS) of $1,235,707. Net economic benefits for the commercial sector from **Preferred Alternative 3**, relative to **Alternative 1**, would be expected to decrease by $1,931,227 in 2022.

Under **Preferred Alternative 3**, the red grouper recreational ACL would decrease by 0.37 mp gw (in MRIP-FES units) in comparison with **Alternative 1**. The red grouper recreational ACL under **Alternative 1** is 1.00 mp gw in MRIP-CHTS units and 2.10 mp gw in MRIP-FES units; the red grouper recreational ACL under **Preferred Alternative 3** is 1.73 mp gw in MRIP-FES units. The CS would be expected to decrease by $6,564,516 under **Preferred Alternative 3**, relative to **Alternative 1**. The for-hire component of the recreational sector, being comprised of charter vessels and headboats, would also be impacted under **Preferred Alternative 3** by an estimated decrease of 665 targeted trips, resulting in a short-term decrease in PS of $93,723.

Summing the annual changes in CS and PS for the recreational sector provides the net economic benefits for that sector in a given year. Net economic benefits for the recreational sector from **Preferred Alternative 3**, relative to **Alternative 1**, would be expected to decrease by $6,658,239 in 2022. Net economic benefits from the commercial and recreational sectors combined from **Preferred Alternative 3**, relative to **Alternative 1**, would be expected to decrease by $8,589,466 in 2022.

Action 2 **Preferred Alternative 3** would would retain the current commercial buffer of 5% between the ACL and ACT. Therefore, no additional economic effects to the commercial sector would be expected under **Preferred Alternative 3**, in comparison to **Alternative 1**.

**Preferred Alternative 3** would modify the recreational buffer between the ACL and ACT from 8%, currently, to 9%. Of note, any economic effects to the recreational sector from Action 2 would only be expected to result if the recreational sector's post-season accountability measure is triggered, requiring the recreational sector to be managed to the ACT instead of the ACL. When paired with Action 1 **Preferred Alternative 3**, the change in ACT under Action 2 **Preferred Alternative 3** compared to Action 2 **Alternative 1** is -0.02 mp gw. The expected change in CS under Action 2 **Preferred Alternative 3** compared to Action 2 **Alternative 1** is -$354,839. The for-hire component of the recreational sector, being comprised of charter vessels and headboats, would also be impacted under Action 2 **Preferred Alternative 3** when paired with Action 1 **Preferred Alternative 3** by an estimated decrease of 204 targeted trips resulting in a short-term decrease in PS of $28,838.

Summing the annual changes in CS and PS for the recreational sector provides the net economic benefits for that sector in a given year. When paired with Action 1 **Preferred Alternative 3**, net economic benefits for the recreational sector under Action 2 **Preferred Alternative 3** compared to Action 2 **Alternative 1** would decrease by $383,677 in 2022.

Social Effects

Action 1 would reduce the catch levels, update the recreational landings and data units from MRIP-CHTS units to MRIP-FES units, and adjust the sector allocation (**Preferred Alternative**

3).  Each of these changes are interrelated, but could result in different effects to one or both sectors.  Reducing the catch levels would be expected to result in negative effects for both sectors, but the extent of these effects would relate to whether and how much future landings are constrained by the lower catch levels.  Theoretically, updating the recreational data units from MRIP-CHTS to MRIP-FES should have no social effects as it is a conversion to a new data system for the recreational sector only.  Although direct effects would not be expected for the commercial sector from updating the recreational data units to MRIP-FES, this change, however, would have an indirect negative effect on the commercial sector and indirect positive effect on the recreational sector.  As a result of this change in data units, the sector allocation would realize a 16% adjustment from the commercial sector to the recreational sector.  Although this change would not reduce the amount of fish available to the commercial sector, the reallocation has negative socio-cultural impacts for the commercial sector, for which the red grouper has historically been the most important grouper stock.

For Action 2, the commercial ACT would not change, so additional effects would not be expected from **Preferred Alternative 3** for the commercial sector.  For the recreational sector, the ACT would increase 1%, creating a larger buffer between the ACL and ACT.  Alongside the reduction to the recreational sector ACL in Action 1, the increased ACT could be expected to further shorten the fishing season by an estimated four days (Table 2.2.4).  However, any in-season closure based on the ACT would not occur until the year following one in which the ACL is exceeded.  Thus, the earliest an in-season closure could occur would be in 2023, and would only occur if the recreational sector's landings exceed its ACL in 2022.

Effects on Participants in the Fisheries Conducted in Adjacent Areas Under the Authority of another Fishery Management Council

The Gulf red grouper stock is managed under the Council's Reef Fish FMP.  Therefore, the actions of this amendment are not expected to impact fishery participants in areas adjacent to the Gulf, such as fisheries managed under the Caribbean and South Atlantic Councils' jurisdiction.

Effects on Safety at Sea

Under the current preferred alternatives, the commercial sector's ACT would decrease by 0.60 mp gw.  However, the IFQ program and resulting allocation should mitigate any incentive to engage in red grouper commercial fishing under adverse weather or ocean conditions.  The recreational sector's ACL would decrease by 0.37 mp gw.  The recreational season is expected to end on December 19, whereas no closure is currently anticipated under the No Action alternatives.  This is expected to result in 665 canceled charter trips due to an expected shorter recreational season.  In order to avoid further effects on profit, some trips could potentially not be canceled due to adverse weather or ocean conditions during the recreational season.  Likewise, private anglers could face a similar decision when facing a shorter recreational season.  The recreational sector is constained by the sector ACT only when a post-season accountability measure is triggered, and that would be expected to result in an even shorter season. However, given the results of the assessment and the ABC recommendations, the catch levels provided in **Preferred Alternative 3** from Actions 1 and 2 would promote safety at sea to the extent practicable.

# EXECUTIVE SUMMARY

Amendment 53 to the Fishery Management Plan for Reef Fish Resources of the Gulf of Mexico (Reef Fish FMP) is being developed by the Gulf of Mexico Fishery Management Council (Council) to address the results of the Southeast Data Assessment and Review (SEDAR) 61 (2019) stock assessment and subsequent overfishing limit (OFL) and acceptable biological catch (ABC) recommendations from the Council's Scientific and Statistical Committee (SSC). Amendment 53 revises the red grouper allocation between the commercial and recreational sectors and modifies the OFL, ABC, the total and sector annual catch limits (ACLs), and sector annual catch targets (ACT).

The Gulf of Mexico (Gulf) red grouper stock was determined to be overfished and undergoing overfishing in 2000. A 10-year rebuilding plan was subsequently put in place to allow the stock to recover. In 2007, the National Marine Fisheries Service (NMFS) determined that the red grouper stock was rebuilt. The current OFL and ABC are based on the results of SEDAR 42, conducted in 2015. However, fishermen had expressed concern about the condition of the red grouper stock because recent harvests had been well below the ACLs. In 2018, the Council received a recommendation from their SSC to reduce the red grouper commercial and recreational ACLs and ACTs, effective for the 2019 fishing year. Because an ongoing SEDAR 61 would not be completed until later in 2019, the Southeast Fisheries Science Center (SEFSC) performed an interim analysis that used a harvest control rule to adjust the catch advice based on an index of relative stock abundance. The interim analysis suggested the stock might be in decline. The SSC found the analysis was sufficient to recommend a 2019 stock ACL of 4.60 million pounds (mp) gutted weight (gw). However, the Council decided to set a lower ACL equal to the 2017 landings that equaled 4.16 mp gw. When the Council approved this reduction, they also noted the severe red tide conditions that occurred in the summer and fall of 2018 off the Florida west coast as part of their reasoning to reduce the ACL. The red grouper stock has been shown to be adversely affected by red tide (*Karenia brevis*) events similar to what occurred in 2018. Through an emergency rule followed by rulemaking to implement a framework action, the Council and NMFS applied the current red grouper sector allocation of 76% commercial and 24% recreational, and the sector specific ACT buffers to set the commercial ACL and ACT to 3.16 mp gw and 3.00 mp gw, respectively, and the recreational ACL and ACT to 1.00 mp gw and 0.92 mp gw, respectively.

The most recent assessment, SEDAR 61 (2019), used updated recreational data from the Marine Recreational Information Program (MRIP) Access Point Angler Intercept Survey (APAIS) and Fishing Effort Survey (FES), which collectively have resulted in higher catch and effort estimates for the recreational sector compared to previous estimates based on the Coastal Household Telephone Survey (CHTS). The assessment concluded that red grouper in the Gulf is not overfished and overfishing is not occurring, but the stock remained below the spawning stock biomass (SSB) at 30% of the spawning potential ratio (SPR) in 2017, where SPR is the ratio of SSB to its unfished state. Because the impacts of the 2018 red tide event could not be directly accounted for in SEDAR 61, the SSC recommended that projections from the assessment assume the 2018 red tide event had impacts on the stock similar to the 2005 red tide event. The SEFSC's

results indicated that the allocation assumed during projections affected the OFL, and because the MRIP-FES estimated higher recreational landings and the current commercial-recreational allocation is based on historic landings, the Council requested the SSC provide OFL and ABC recommendations based on different allocation scenarios.

The purposes of Amendment 53 are to revise the red grouper allocation between the commercial and recreational sectors using the best scientific information available and to modify the allowable harvest of red grouper based on results of the recent stock assessment and subsequent OFL and ABC**Error! Bookmark not defined.** recommendations from the SSC.  The need is to use the best scientific information available to establish Gulf red grouper sector allocations, ACLs, and ACTs, ensuring that the historical participation by the recreational and commercial sectors is accurately reflected by the sector ACLs, and that recreational ACL is consistent with the data used to monitor recreational landings and trigger accountability measures (AM).

Amendment 53 has two actions.  Action 1 considers modifying the OFL, ABC, and ACLs for Gulf red grouper based on different allocation scenarios, and it examines six alternatives.  Action 2 would modify the Gulf red grouper ACTs based on the application of the ACL/ACT control rule and considers three alternatives.

**Action 1 – Modify the Sector Allocations, OFL, ABC, and ACLs for Red Grouper**

**Alternative 1** (No Action) and **Alternative 2** would maintain the sector allocations established in Amendment 30B of 76% commercial: 24% recreational (Table 1).  **Alternative 1** would maintain the current OFL, ABC, and ACLs while **Alternative 2** would revise the OFL, ABC, and ACLs based on SEDAR 61 (2019) and SSC recommendations.

0003466

**Table 1.**  OFL, ABC, total and sector ACLs for **Alternatives 1-6**.

|  | OFL* | ABC | Total ACL | Comm ACL | Rec ACL |
|---|---|---|---|---|---|
| Alternative 1** MRFSS data 1986-2005 (76% commercial:24% recreational) | 14.16 | 13.92 | 4.16 | 3.16 | 1.00 |
| MRIP-FES equivalent |  |  | (5.26) |  | (2.10) |
| Alternative 2*** Retain current percentages (76% commercial:24% recreational) | 5.35 | 4.90 | 4.90 | 3.72 | 1.18 |
| Preferred Alternative 3*** MRIP-FES data 1986-2005 (59.3% commercial:40.7% recreational) | 4.66 | 4.26 | 4.26 | 2.53 | 1.73 |
| Alternative 4*** MRIP-FES data 1986-2009 (60.5% commercial:39.5% recreational) | 4.70 | 4.30 | 4.30 | 2.60 | 1.70 |
| Alternative 5*** MRIP-FES data 1986-2018 (59.7% commercial:40.3% recreational) | 4.67 | 4.28 | 4.28 | 2.56 | 1.72 |
| Alternative 6*** MRIP-FES data but retain commercial ACL at 3.16mp (68.7% commercial:31.3% recreational) | 5.03 | 4.60 | 4.60 | 3.16 | 1.44 |

*Values for OFL, ACB, total ACL, commercial ACL, and recreational ACL are in mp gw.

**The recreational portion of the current OFL, ABC, and ACLs are based on MRIP-CHTS data.

***The recreational sector ACL is in MRIP-FES currency.

**Preferred Alternative 3** and **Alternatives 4-5** reflect recreational landings estimated using MRIP-FES from the SEFSC ACL monitoring datasets.  **Preferred Alternative 3** would base the commercial and recreational sector allocations of red grouper on landings from the same timeframe as used in Amendment 30B (1986 – 2005), but would use MRIP-FES landings from the SEFSC ACL monitoring dataset.  The resulting allocations are 59.3% commercial and 40.7% recreational and the OFL, ABC, and ACLs are shown in Table 1.  **Preferred Alternative 3** would revise the OFL and ABC based on SEDAR 61 (2019) and then set the stock ACL equal to the stock ABC.  **Alternatives 4** and **5** would base the commercial and recreational sector allocations on landings from the timeframes 1986 through 2009 and 1986 through 2018, respectively.  The resulting allocations from **Alternative 4** are 60.5% commercial:39.5% recreational and would revise the OFL and ABC based on SEDAR 61 (2019) and then set stock ACL equal to the stock ABC (Table 1).  For **Alternative 5**, the resulting allocations are 59.7% commercial:40.3% recreational and would also revise the OFL and ABC based on the stock assessment and then set the stock ACL equal to the stock ABC.

**Alternative 6** would base the sector commercial and recreational allocation by holding the commercial ACL at its current level (3.16 mp gw) and then base the recreational allocation as the

difference between the stock and commercial ACLs.  This provides an allocation of 68.7% commercial and 31.3% recreational.

Although the commercial and recreational allocations were in effect for the timeframe 2010-2018, the commercial ACL has never been exceeded and the recreational ACL was only exceeded in 2013, and was subject to in-season closures in 2014 and 2015.  The various time series under consideration in **Preferred Alternative 3** and **Alternatives 4-5** have relatively small differences in sector allocations (at most 1.2%).  The difference in the commercial and recreational allocations when **Alternatives 1-2** are compared to **Preferred Alternative 3** and **Alternatives 4-5** is, at most, 16.7%, due to shifting allocation from the commercial sector to the recreational sector to account for an increase in the estimated historical harvests attributable to the recreational sector.  The **Alternative 6** allocation is between the current allocation (**Alternatives 1-2**) and those derived from historical time series (**Preferred Alternative 3** and **Alternatives 4-5).**

In comparison to the MRIP-FES equivalent total ACL of 5.26 mp gw under **Alternative 1**, **Alternatives 2-6** would result in a decrease of the total ACL (Table 1).  In comparison to **Alternative 1**, **Alternative 2** would result in an increase of the commercial sector ACL; **Preferred Alternative 3** and **Alternatives 4-5** would result in a decrease of the commercial sector ACL; and **Alternative 6** would be equal.  In comparison to the MRIP-FES equivalent recreational sector ACL of 2.10 mp gw under **Alternative 1**, **Preferred Alternative 3** as well as **Alternatives 2 and 4-6** would result in a decrease of the recreational sector ACL.  The MRIP-FES equivalent of total ACL and recreational sector ACL under **Alternative 1** is used for comparison with **Preferred Alternative 3** as well as **Alternatives 2 and 4-6,** in order to have equivalent currency in recreational units.

In general, the effects on the physical environment from management actions primarily include changes to interactions of fishing gear with the habitat.  This action could affect the physical environment if changes in the allocation result in a shift in the use of fishing gear types used to harvest the stock ACLs.  Under **Alternatives 2-6**, all the yield streams that provide OFLs are based on a fixed level of fishing mortality ($F_{30\%SPR}$).  The difference is that the application of the sector fishing selectivities to the different allocations yields different OFLs, and subsequent ABCs.  Under the stock ACLs, **Alternative 1**, no action, would likely have the greatest effect on the physical environment.  This alternative is then followed by **Alternative 2**, **Alternative 6**, **Alternative 4, Alternative 5,** and **Preferred Alternative 3** in descending order of ACLs.  **Alternatives 3-5** have very similar stock ACLs (4.26-4.30 mp gw) and any effects would be expected to be very similar.  The effects from the recreational and commercial sectors on the physical environment would be opposite.  Where commercial ACLs are higher, recreational ACLs decrease.  Thus, the effects from the sectors on this environment likely offset each other to a certain extent.

Management actions that affect the biological environment mostly relate to the impacts of fishing on a species' population size, life history, and the role of the species within its habitat.  This action could affect the biological/ecological environment because changes in the allocation result in a shift in the amount of fish caught by each sector.  When this occurs, the sector selectivity patterns affect the numbers and sizes of fish caught and influences the resulting

estimates of OFL, ABC, and stock ACL.  **Alternative 1**, no action, would have the greatest adverse effect on the red grouper population as the commercial ACL and recreational ACL (using MRIP-FES units for comparison purposes) would allow for harvests above **Alternative 2**'s ABC even though both alternatives have the same allocation.  Thus, the likelihood of overfishing under **Alternative 1** would be greater than **Alternative 2**, assuming NMFS can constrain harvests to the sector ACLs.  The likelihood of overfishing under **Alternatives 2-6** would be similar as the management goal is the same.  Under **Alternatives 2-5**, all the OFLs are based on a fixed level of $F_{30\%SPR}$, and thus each of these alternatives would result in a similar stock size ($B_{30\%SPR}$).  The difference in the alternatives is where more fish are allocated to the recreational sector, total landings have to be constrained more to account for the greater dead discards from recreational red grouper fishing.

In addition to the OFL and ABC, Action 1 would modify sector allocations and the sector ACLs, and analysis of the economic impacts on the commercial and recreational sectors uses the current sector buffers between the ACLs and ACTs.  For the commercial sector, **Alternative 2** would result in a positive total expected change in net economic benefits due to the increase in the commercial ACL, while **Alternatives 1** and **6** would result in a zero total expected change, as they both retain the current commercial ACL.  **Preferred Alternative 3** and **Alternatives 4-5** would be expected to result in negative changes, as the commercial ACL decreases relative to current commercial ACL.  For the recreational sector, **Alternative 1** would be expected to result in a zero total expected change in net economic benefits.  The remaining alternatives would result in negative total expected changes, with **Alternative 2** resulting in the largest negative change, followed by **Alternative 6**.

In general, higher catch limits would be associated with fewer negative social effects as they would allow for more fish to be landed, while lower catch limits would be associated with greater negative social effects as they would allow for less fish to be landed.  Additional social effects would not be expected under **Alternative 1**, as the catch limits for both sectors would remain the same.  **Preferred Alternative 3 and Alternatives 2** and **4-6** would reduce the OFL and ABC, and set the stock ACLs equal to the respective ABCs, resulting in direct negative social effects as the sector ACLs are reduced from **Alternative 1**.  The proposed commercial ACLs under **Preferred Alternative 3** and **Alternatives 4-6** would result in negative social effects.  The commercial ACL would be the same under **Alternative 1** and **Alternative 6**.  Compared to **Alternative 1**, the commercial sector would realize an ACL increase under **Alternative 2**, suggesting positive effects would result.  For the recreational sector, the most negative social effects would be expected under **Alternative 2**.  **Preferred Alternative 3** and **Alternatives 4-6** would also result in negative social effects.  These direct negative social effects that may result for either sector in relation to an ACL reduction would be expected in the short-term as less fish are available to be landed.  In the long-term, these negative social effects would be mitigated by increasing protection for the stock, resulting in increased catch limits and positive effects in the future for both sectors.

Converting the recreational sector's ACL from MRIP-CHTS units to MRIP-FES units would directly affect the recreational sector only.  In theory, there should be no direct effects under any of the alternatives, as the change from MRIP-CHTS units to MRIP-FES units is intended to be a

conversion, such that the current recreational sector ACL of 1.00 mp gw in MRIP-CHTS units is equivalent to a recreational sector ACL of 2.10 mp gw in MRIP-FES units (Table 4.1.4.2). While no direct effects would be expected for the recreational sector, indirect effects of the conversion would result for both sectors, as the conversion affects the sector allocation.

The quality and nature of social impacts differs between the sectors in the long term, in that a loss of commercial access to red grouper could affect the livelihoods of commercial fishermen, especially small-scale owner-operators, hired captains and crew who do not own red grouper shares, and the well-being of commercial fishing communities. In addition, some negative social effects would be expected for red grouper consumers if decreased commercial access for the long term is associated with decreased availability. For the recreational sector, the gains in recreational allocation would provide additional recreational opportunities to retain red grouper, while a loss in the underlying amount of ACL would represent decreased opportunities to retain red grouper. For the for-hire component of the recreational sector, these effects would result in similar social effects as to the commercial sector.

By retaining the same allocation as **Alternative 1**, additional social effects would not be expected from **Alternative 2** in terms of the sector allocation. However, as discussed in the section above on revising the catch limits, the sector ACLs underlying the allocation for **Alternative 2** reflect a change in the amount of fish that would go to each sector compared to **Alternative 1**, with more fish going to the commercial sector and less fish going to the recreational sector. Compared to **Alternatives 1** and **2**, **Preferred Alternative 3** and **Alternatives 4-5** would result in negative effects for the commercial sector and positive effects for the recreational sector. Because **Preferred Alternative 3** and **Alternatives 4-5** all result in a shift in allocation from the commercial sector to the recreational sector, **Error! Bookmark not defined.**the types of effects on the social environment would be similar among the alternatives. By holding the commercial ACL at the same amount as under **Alternative 1**, **Alternative 6** would reallocate approximately 7% of the new stock ACL from the commercial sector to the recreational sector, resulting in intermediary negative social effects between **Alternatives 1-2** and **Preferred Alternative 3** and **Alternatives 4-5**.

Three potential impacts on the administrative environment under Action 1 alternatives include: 1) potentially managing recreational landings using MRIP-FES data, which would preclude the need to convert landings back to MRIP-CHTS for management; 2) in-season closures of the recreational sector to fishing because of the decrease in recreational ACL that occurs under all of the action alternatives (**Alternatives 2-6**); and 3) allocating a greater percentage of the ACL to a sector that has more uncertainty in landings, which is more likely to result in overfishing/overfished status for Gulf red grouper. Potential impacts 1 and 2 would have minor effects on the administrative environment, while implementation of a rebuilding plan would have major effects. **Alternative 1** would continue monitoring landings using MRIP-CHTS currency, which is not considered the best scientific information available. **Alternatives 2-6** would use MRIP-FES currency, which is the best scientific information available. Because the recreational ACL in **Alternative 2** is lower than in those for **Preferred Alternative 3** and **Alternatives 4-6**, there is a greater risk of an in-season closure of the fishery, which would result in a slight negative impact to the administrative environment. The increased chances of a closure are due to the higher percentage of the landings coming from the recreational sector, where data are more

uncertain and are based on estimates of catch.  The effects from **Alternative 6** would be intermediate to **Alternative 2**, **Preferred Alternative 3**, and **Alternatives 4-5** as that stock ACL falls midway between the stock ACLs.

## Action 2 – Modify the Gulf Red Grouper ACTs

**Alternative 1** (No Action) would maintain the current buffer between the ACL and ACT for the commercial and recreational sectors set in the April 2019 framework action.  The buffer between the sector ACLs and ACTs was determined by applying the Council's ACL/ACT Control Rule and used Marine Recreational Fisheries Statistics Survey (MRFSS) data for the recreational sector.  The buffers for this alternative applied to the ACLs in Action 1 to derive the respective ACTs are shown in Table 2.

**Table 2.**  Commercial and recreational sector ACTs resulting from alternatives selected in Actions 1 and 2.

| | | Action 2 | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | **Alt 1** | | **Alt 2** | | **Preferred Alt 3** | |
| | | Comm | Rec | Comm | Rec | Comm | Rec |
| **Action 1** | Alt 1 | 3.00 | 0.92** (1.93) | N/A | N/A | N/A | N/A |
| | Alt 2 | 3.53 | 1.09 | 3.72 | 1.07 | 3.53 | 1.07 |
| | Preferred Alt 3 | 2.40 | 1.59 | 2.53 | 1.57 | 2.40 | 1.57 |
| | Alt 4 | 2.47 | 1.56 | 2.60 | 1.55 | 2.47 | 1.55 |
| | Alt 5 | 2.43 | 1.58 | 2.56 | 1.57 | 2.43 | 1.57 |
| | Alt 6 | 3.00 | 1.32 | 3.16 | 1.31 | 3.00 | 1.31 |

* Values are in millions of pounds, gutted weight and in MRIP-FES currency.
**The recreational sector ACT for Action 1, Alternative 1 is in CHTS currency; the recreational sector ACT in MRIP-FES currency is in parentheses.

**Alternative 2** would use a buffer between the commercial ACL and ACT of 0%, and a buffer between the recreational ACL and ACT of 9%, based on the application of the Council's ACL/ACT Control Rule.  **Alternative 2** represents a strict application of the ACL/ACT Control Rule for the prescribed reference period, and does not account for multi-use provisions in the commercial gag IFQ program.  However, with a commercial buffer of 0%, the gag multi-use allocation would be zero, and therefore, only gag could be landed with gag allocation.  To allow for gag multi-use allocation while using current information to set an appropriate buffer for the recreational sector, **Preferred Alternative 3** would use a buffer between the commercial ACL and ACT of 5% to account for the multi-use provision in the gag commercial IFQ program, and a buffer between the recreational ACL and ACT of 9% would be based on the application of the Council's ACL/ACT Control Rule.

With respect to the physical environment, this action is expected to have minimal effects. **Alternative 1** would maintain the buffers between the respective commercial and recreational ACLs and ACTs.  For the commercial sector, this buffer allows for gag and red-grouper multi-use shares to be fished under the IFQ program.  Thus, the buffer is not used to constrain harvest and consequently fishing effort, but likely maintains fishing effort similar to if there were no buffer.  However, for the recreational sector, the buffer is used to account for management

uncertainty and decrease the likelihood the recreational ACL is exceeded if exceeded in the previous year. Thus, a greater buffer would be expected to result in lower recreational fishing effort from the sector. Under these circumstances, **Alternatives 2** and **Preferred Alternative 3** would likely have similar effects because the recreational buffer is the same at 9%. The recreational buffer for **Alternative 1** is 8% and so could result in slightly more adverse effects than the other two alternatives given it could allow for a minimal increase in effort.

Effects on the biological/ecological environment from fishing are described in Section 4.1.2, which describes how increasing fishing effort leads to increasing effects on this environment. The decision regarding Action 1 sets the overall OFL, ABC, and sector ACLs. This action sets the buffer between the ACL and ACT. The buffer is not used to constrain the commercial harvest and consequently fishing, but likely maintains fishing levels similar to if there were no buffer and no multi-use shares (e.g., **Alternative 2**). However, for the recreational sector, the buffer is used to account for management uncertainty and decrease the likelihood the recreational ACL is exceeded. Thus, the greater the buffer, the less recreational fishing would likely occur from the sector. Under these circumstances, **Alternative 2** and **Preferred 3** would likely have similar effects as the recreational buffer is equal at 9%. The recreational buffer for **Alternative 1** is 8% and so would likely be slightly more adverse than the other two alternatives given it could allow for a minimal increase in fishing.

Action 2 would modify the sector ACTs. The commercial sector harvest is capped by its sector ACT, while the recreational ACT is used only as a post-season AM for the recreational sector. For the commercial sector, **Alternatives 1** and **3** of Action 2 result in the same impact, as they use the same ACL/ACT buffer. When paired with a respective alternative from Action 1, Action 2 **Alternative 2** has a greater positive total expected change in net economic benefit and a lesser negative change, than Action 2 **Alternatives 1** or **3**.

For the recreational sector, **Alternatives 2** and **3** of Action 2 result in the same impact, as they use the same ACL/ACT buffer. When paired with a respective alternative from Action 1, Action 2 **Alternative 1** has a lesser negative total expected change in net economic benefit than Action 2 **Alternatives 2**-**3**.

No additional social effects would be expected to result for the commercial sector under **Alternative 1** or **Preferred Alternative 3**, as no change would be made to the commercial sector's ACT. Limited negative social effects would be expected under **Alternative 2**, which would decrease the commercial buffer to 0% and effectively remove the multi-use provision for red grouper allocation, requiring gag to be landed with gag allocation only. These negative social effects would be expected to accrue to those fishermen who use the multi-use provision for landing gag with red grouper allocation, as they would no longer be able to do so.

No additional social effects would be expected to result for the recreational sector under **Alternative 1**. Increasing the buffer to 9% (**Alternative 2** and **Preferred Alternative 3**) alongside any of **Alternatives 2**-**6** under Action 1 would be expected to shorten the length of the recreational fishing season in the year following a recreational sector ACL overage (Table 2.2.4), resulting in greater negative social effects compared to **Alternative 1**.

Action 2 would affect the administrative environment in two ways: 1) through in-season closures of the recreational fishery resulting from implementing AMs that are more likely to be triggered than under current management, and 2) by implementing an ACT that changes the likelihood of Gulf red grouper stocks being declared as overfished, which would require development and implementation of a rebuilding plan. In the commercial sector, there is no risk of an in-season closure and little risk of exceeding the ACL because this sector is managed under an IFQ system. The recreational buffer under **Alternative 1** is less than the buffer for **Alternative 2** and **Preferred Alternative 3**. Thus, **Alternative 1** would be most likely to result in exceeding the recreational ACL. However, the difference between **Alternative 1** and **Alternative 2** and **Preferred Alternative 3** is only 1 percent of the ACL. Given the constraints associated with monitoring recreational data to relatively small values, the increased chance of exceeding recreational component ACL is expected to be negligible. The impact to the administrative environment associated with implementing a recreational fishery closure is higher under **Alternative 1** than under **Alternative 2** and **Preferred Alternative 3** due to the lower ACT in **Alternative 1**. However, due to the relatively minor differences in these values among the alternatives coupled with the difficulty in monitoring the recreational component to small values, it is expected that the effect on the administrative environment due to a recreational component closure will be negligible.

With respect to cumulative effects, the effects from setting an allocation and setting the red grouper ACLs (Action 1) and ACTs (Action 2) on the biophysical environment are likely neutral because it should not have much effect on overall fishing effort. For the socioeconomic environment, depending on the sector, some effects would likely be positive and some negative. However, short-term negative impacts on the fisheries' socioeconomic environment may occur due to the need to limit directed harvest and reduce bycatch mortality. These negative impacts can be minimized for the recreational sector by using combinations of bag limits, size limits and closed seasons. For the commercial sector, these impacts can be minimized through individual fishing quota programs, size limits, and season-area closures.

# CHAPTER 1. INTRODUCTION

## 1.1 Background

Amendment 53 to the Fishery Management Plan for Reef Fish Resources of the Gulf of Mexico (Reef Fish FMP) is being developed by the Gulf of Mexico Fishery Management Council (Council) to address the results of the Southeast Data Assessment and Review (SEDAR) 61 (2019) stock assessment and subsequent overfishing limit (OFL) and acceptable biological catch**Error! Bookmark not defined.** (ABC**Error! Bookmark not defined.**) recommendations from the Council's Scientific and Statistical Committee (SSC).  Amendment 53 revises the red grouper allocation between the commercial and recreational sectors and modifies the OFL, ABC, the total and sector annual catch limits (ACL), and sector annual catch targets (ACT).

In October 2000, the National Marine Fisheries Service (NMFS) determined that the Gulf of Mexico (Gulf) red grouper stock was overfished and undergoing overfishing.  This determination was based on the results of a 1999 red grouper stock assessment (Schirripa et al. 1999), which assessed the status of the stock as of 1997, and several subsequent analyses by the NMFS Southeast Fisheries Science Center (SEFSC) and the Council's Reef Fish Stock Assessment Panel.  Secretarial Amendment 1 established a 10-year rebuilding plan for red grouper, based on a 3-year interval rebuilding strategy, with the initial ABC**Error! Bookmark not defined.** set for 2003-2005 at 6.56 million pounds (mp) gutted weight (gw).

Although Secretarial Amendment 1 set the initial ABC**Error! Bookmark not defined.** for 2003-2005, the recreational sector experienced large increases in red grouper catch in 2004, and so the total catch was held at 6.56 mp gw, with new regulations to control recreational harvest implemented in 2005 and 2006.  In 2007, NMFS determined that the red grouper stock was rebuilt, in part due to higher than average recruitment and modifications to how natural mortality is calculated (SEDAR 12 2006).  Consistent with the statutory requirement to achieve optimum yield (OY) from each fishery, Reef Fish Amendment 30B (GMFMC 2008c) set the red grouper total allowable catch (TAC) [1] at 7.57 mp gw, which was the constant catch level corresponding to fishing at equilibrium OY.

*Allocation of Red Grouper*

For grouper species in aggregate, an initial allocation between the commercial and recreational sectors was established in 1990 through Amendment 1 (GMFMC 1989) to the Reef Fish FMP.  The amendment specified a framework procedure for setting the total allowable catch (TAC) to allow for annual management changes.  A part of that specification was to establish a species' allocation, which were based on the percentage of total landings during the reference period of 1979-1987.  For grouper in aggregate, the commercial sector landed 65% and the recreational sector landed 35% over the reference period.

---

[1] The Generic ACL/Accountability Measures (AM) Amendment (GMFMC 2011a) established a mechanism for specifying annual catch limits, which replaced the use of TACs.

Noting that allocation procedures should be regularly reviewed, the Council examined the red grouper allocation in 2007.  Because grouper was not identified to the species level in commercial landings until 1986, the new red grouper allocation was based on the percentage of average red grouper landings from 1986 through 2005.  This resulted in a 76% commercial: 24% recreational allocation, which was set through the final rule for Reef Fish Amendment 30B (GMFMC 2008c) and remains in effect.  This was considered an interim allocation that would be in effect until the Council could implement a separate amendment to allocate grouper resources between recreational and commercial sectors, based on the recommendations of the Ad Hoc Allocation Committee.

The Council established the Ad Hoc Allocation Committee composed of Council members to assist in drafting an allocation policy that would streamline future allocation decisions.  The Council's allocation policy was adopted in early 2009 and provides principles, guidelines, and suggested methods for allocating fisheries resources between or within sectors (Appendix C).  In February 2012, NMFS released a technical memorandum on the principles and practice of allocating fishery harvests, which provides additional guidance to the Council (Plummer et al. 2012).  Additionally, NMFS and the Council Coordination Committee released further guidance through an Allocation Review Policy[2] (01-119) and two procedural directives (01-119-01 and 01-119-02, respectively as Appendix D and Appendix E) in 2016.  These documents were developed to provide relevant information for allocation decision-making as well as what factors should be considered.  In April 2019, the Council selected time-based criteria as its primary allocation review trigger bolstered by general monitoring of indicators for reallocation justification through the Council's general deliberative process including public input channels as a secondary trigger (Appendix F).  The review of the recreational and commercial allocations of red grouper has a time interval of 7 years, with the next scheduled review beginning in April 2026.  In addition to the allocation reviews scheduled based on the review triggers selected above, the Council may initiate supplementary allocation reviews at any time.

*Commercial IFQ Management Measures*

Reef Fish Amendment 29 (GMFMC 2008a) established an individual fishing quota (IFQ) program for grouper harvested by the commercial sector, which began January 1, 2010.  The IFQ program shifted away from a traditional command and control approach that resulted in an overcapitalized commercial grouper fishery.  Under the IFQ program, the red grouper quota is based on the commercial sector's red grouper ACT, and red grouper allocation is distributed on January 1 of each year to those who hold red grouper shares.  The amount of allocation distributed is based on the annual quota and the amount of shares possessed in each shareholder account (expressed as a percent of the quota).  By having the red grouper quota based on the commercial sector's red grouper ACT, the IFQ program provides flexibility to accommodate the multi-species nature of the grouper fishery and to reduce bycatch. As discussed in more detail in Section 2.2, both the red grouper and gag share categories have a multi-use provision that allows a portion of the red grouper quota to be harvested under the gag allocation, and vice versa.

---

[2] The Allocation Review Policy and two procedural directives may be accessed at https://www.fisheries.noaa.gov/national/laws-and-policies/fisheries-management-policy-directives.

For more information on the IFQ program, see the NMFS's Southeast Regional Office webpage on limited access programs.[3]

*Current Recreational Accountability Measures (AMs)*

Both in-season and post-season AMs apply to harvest by the recreational sector. The in-season AM for red grouper requires NMFS to close the recreational sector when red grouper landings reach or are projected to reach the ACL. If landings exceed the red grouper ACL in a fishing year, the post-season AM requires NMFS to shorten the length of the following fishing year by the amount necessary to ensure landings do not exceed the ACT. If the red grouper stock is overfished, NMFS must also reduce the ACL and ACT by the amount of the overage in the prior year.

*Overview of Stock Assessments and Stock Status*

Red grouper in the Gulf has been assessed four times through the SEDAR process: SEDAR 12 in 2006, SEDAR 12 Update in 2009, SEDAR 42 in 2015, and most recently SEDAR 61 in 2019. The current OFL and ABC**Error! Bookmark not defined.** are based on the results of SEDAR 42. The SSC reviewed the assessment results at its January 2016 meeting and agreed with the determination that red grouper was not overfished or experiencing overfishing. However, the OFL and ABC recommendations from the 2015 stock assessment (Table 1.1.1) would have increased catch limits in excess of the observed harvest levels over the management history of this species, and were largely driven by a computation error later identified in SEDAR 61 (2019). The projected yields from SEDAR 42 (2015) assumed recruitment levels equivalent to the long-term average; however, red grouper recruitment spikes are sporadic, and recent annual recruitment has been generally lower than that suggested by the long-term average (SEDAR 42 2015; NMFS 2018a).

**Table 1.1.1.** SEDAR 42 (2015) yield projections for red grouper at a constant catch level, averaged over the 2016-2020 time series. Recreational data used to create these projections include the Marine Recreational Information Program (MRIP) Coastal Household Telephone Survey (CHTS). OFL and ABC**Error! Bookmark not defined.** values are in mp gw.

| Year | OFL (mp gw) | ABCError! Bookmark not defined. (mp gw) |
|---|---|---|
| 2015 | 8.10 | 7.93 |
| 2016-2020(+) | 14.16 | 13.92 |

Fishermen expressed their concern about the health of the stock because they were unable to harvest the allowable quota based on the outcomes of SEDAR 42 (2015), suggesting that the stock size may be smaller than anticipated. In addition, 2017 landings were the second lowest since 2004, and a severe red tide occurred in 2018. The Council requested that the SEFSC conduct an interim analysis for developing updated harvest advice for 2019 (NMFS 2018a). The

---

[3] at http://portal.southeast.fisheries.noaa.gov/cs/main.html

SSC reviewed this analysis at its October 2018 meeting and recommended a 2019 ACL of 4.6 mp gw that would remain in place until the next stock assessment.  The Council began work on a framework action to reduce the red grouper ACL and requested that NMFS implement an emergency rule to specify a red grouper ACL for 2019 of 4.6 mp gw or the 2017 total (commercial and recreational) landings, whichever was lower, while the framework action was being developed.  The 2017 total landings were 4.16 mp gw; therefore, the 2019 red grouper stock ACL was temporarily set at 4.16 mp gw through the emergency rule and resulted in a commercial ACL and ACT of 3.16 mp gw and 3.00 mp gw, respectively, and a recreational ACL and ACT of 1.00 mp gw and 0.92 mp gw, respectively.  These values from the emergency rule were formally adopted through a framework action implemented in the fall of 2019 (GMFMC 2019a).

*Red Grouper Recreational Data and Recalibration*

NMFS created the Marine Recreational Fisheries Statistics Survey (MRFSS) in 1979.  In the Gulf, MRFSS collected recreational data on catch and effort, including red grouper, since 1981.  MRFSS included both offsite telephone surveys and onsite interviews at marinas and other points where recreational anglers fish.  In 2008, the MRIP replaced MRFSS to meet increasing demand for more precise, accurate, and timely recreational catch estimates.  Until 2013, recreational catch, effort, and participation were estimated through a suite of independent but complementary surveys:  telephone surveys of households and for-hire vessel operators that collected information about recreational fishing activity; and an angler intercept survey that collected information about the fish that were caught.

The MRIP Access Point Angler Intercept Survey (APAIS) began incorporating a new survey design in 2013.  This new design addressed concerns regarding the validity of the survey approach, specifically that trips recorded during a given time period are representative of trips for a full day (Foster et al. 2018).  The more complete temporal coverage with the new survey design provides for consistent increases or decreases in APAIS angler catch rate statistics, which are used in stock assessments and management, for at least some species (NOAA Fisheries 2019).

MRIP also transitioned from the legacy CHTS to a new mail survey (Fishing Effort Survey [FES]) beginning in 2015, and in 2018, the FES replaced the CHTS.  Both survey methods collect data needed to estimate marine recreational fishing effort (number of fishing trips) by shore and private/rental boat anglers on the Atlantic and Gulf coasts.  The CHTS used random-digit dialing of homes in coastal counties to contact anglers.  The new mail-based FES uses angler license and registration information as one way to identify and contact anglers (supplemented with data from the U.S. Postal Service, which includes virtually all U.S. households).  Because the FES and CHTS are so different, NMFS conducted side-by-side testing of the two methods from 2015 to 2017 to develop a calibration model.

In general, total recreational fishing effort estimates generated from the FES are higher — and in some cases substantially higher — than the CHTS estimates (NOAA Fisheries 2019).  This is because the FES is designed to more accurately measure fishing activity than the CHTS, not because there was a sudden rise in fishing effort.  NMFS developed a calibration model to adjust

historic effort estimates so that they can be accurately compared to new estimates from the FES. The new effort estimates alone do not lead to definitive conclusions about stock size or status in the past or currently.

Following the completion of SEDAR 61 (2019), an update to the weight estimation metrics for red grouper for the recreational sector was finalized.  This data update modifies the recreational data from what were used in SEDAR 61 (2019) but has no impact on the assessment results because the assessment model input recreational landings and discards as numbers of fish, not as weights.  Weight is estimated internally in the model, after the model results for the recreational sector are generated in numbers of fish.  This means that stock status is determined before the application of this weight estimation procedure.  In SEDAR 61 (2019; SEDAR 42 2015), the shore mode was excluded from recreational analyses in the assessment because of very sporadic landings throughout the time series combined with the exceptionally low probability of harvesting a legal size (20 inches total length [TL]) red grouper via that mode.  As such, the SEFSC has determined that the best scientific information available for updating sector allocations are the Accumulated Landings System/IFQ program data for the commercial landings and the FES-adjusted MRIP data, excluding the shore mode, for recreational landings.  These datasets are also used to monitor the quotas for all stocks, including red grouper, and are therefore referred to as the ACL monitoring datasets.

*Red Grouper Most Recent Stock Assessment (SEDAR 61 2019)*

The SEDAR 61 (2019) assessment was completed in September 2019 and used updated recreational data from the MRIP APAIS and FES, which collectively estimate larger than previously calculated catch and effort data for the recreational sector.

The assessment concluded that red grouper in the Gulf is not overfished and overfishing is not occurring, but the stock remained below the spawning stock biomass (SSB) at 30% of the spawning potential ratio (SPR) in 2017, where SPR is the ratio of SSB to its unfished state. Because of the unknown impacts of the 2018 algal bloom attributable to red tide (*Karenia brevis*) occurring off the west Florida shelf in summer and fall, SEDAR 61 (2019) provided projections for retained yield and associated depletion under assumed conditions (e.g., recent average recruitment and catch allocations of 76% commercial and 24% recreational) for five red tide scenarios (red tide-associated "mortality" noted in parentheses):  a) no red tide mortality in 2018; b) half 2014 magnitude (0.1285); c) same as 2014 (0.257); d) same as 2005 (0.339); and e) double 2005 magnitude (0.678).  The assessment indicated that maintaining landings at the levels observed in 2017 (and in the 2019 emergency action) resulted in a low probability of overfishing in 2020–2024 under all red tide scenarios with the exception of the most severe simulation of double the 2005 red tide mortality, which resulted in an 83% chance of overfishing.

After reviewing the full report at its September 2019 meeting, the SSC decided to treat the 2018 red tide event as similar to the red tide event observed in 2005 for the purpose of the projections. The SSC reviewed the assessment and the analyses of the 2018 red tide event at its September 2019 meeting.  The SSC accepted SEDAR 61 (2019) as the best scientific information available and indicated that the stock is not overfished and is not experiencing overfishing as of 2017 (Table 1.1.2).  The SSC further agreed that the 2018 red tide event (which persisted from

November 2017 through February 2019) was equivalent in severity to the event in 2005, and adjusted projections of future harvest accordingly (see Section 2.2).  A December 2019 interim analysis of red grouper abundance (SEFSC 2019), reviewed by the SSC in January 2020, provided support for the assumption that the 2018 red tide event was severe, and likely similar to the 2005 red tide event (outlined in "scenario d" above).  The SSC recommended an OFL of 5.35 mp gw and an ABC**Error! Bookmark not defined.** of 4.9 mp gw, but recommended that the decision table from the stock assessment presentation be conveyed to the Council to illustrate the probabilistic risk of a given catch level, based on various assumptions about the severity of the 2018 red tide.  This catch level recommendation assumed status quo sector allocations for red grouper, which were based on MRFSS data from 1986-2005.  At its October 2019 meeting, the Council reviewed the SSC's recommendations and requested that the SSC examine alternative sector allocation scenarios using MRIP-FES data and the resulting catch level projections.  The SSC reviewed these alternative sector allocation scenarios in January 2020 and, after affirming that the SEDAR 61 (2019) assessment, which uses MRIP-FES recreational landings, represented the best scientific information available, recommended the projections in Table 1.1.3 as scientifically valid estimates of OFL and ABC.

This amendment considers alternatives that would modify the allocation of red grouper between the recreational and commercial sectors based on updated historical recreational harvest data. Based on the allocation decision made in Action 1 (Section 2.1), this amendment further proposes modifications to the OFL, ABC, ACLs, and ACTs for red grouper based on the stock assessment results and the resultant yield projections, considering the severity of the 2018 red tide event.

**Table 1.1.2.** Status determination criteria and stock status of red grouper based on SEDAR 61 (2019) and Amendment 44 (2017).

| Criteria | Definitions | SEDAR 61 Values | Status |
|---|---|---|---|
| M | Avg M for Fully Selected Ages | 0.144 | |
| Steepness | | 0.99 | |
| Virgin Recruitment | 1,000s of fish | 20,443 | |
| SSB Unfished | Relative # of eggs | 2,494,130 | |
| **Mortality Rate Criteria** | | | |
| $F_{MSY}$ or proxy | $F_{SPR30\%}$ | 0.259 | |
| MFMT* | $F_{SPR30\%}$ | 0.259 | |
| $F_{CURRENT}$ | geometric mean ($F_{2015-2017}$) | 0.203 | |
| $F_{CURRENT}$/MFMT | | 0.784 | No overfishing |
| **Biomass Criteria** | | | |
| $SSB_{MSY}$ or proxy (relative # of eggs) | $SSB_{SPR30\%}$ | 748,241 | |
| MSST (relative # of eggs) @ (1-M) | (1-M)*$SSB_{SPR30\%}$ | 640,494 | |
| MSST (relative # of eggs) @ 50% | 0.50*$SSB_{SPR30\%}$ | 374,120 | |
| $SSB_{CURRENT}$ (relative # of eggs) | $SSB_{2017}$ | 613,517 | |
| $SSB_{CURRENT}$/$SSB_{SPR30\%}$ | $SSB_{2017}$ | 0.82 | |
| $SSB_{CURRENT}$/MSST @ 50% | MSST = 0.50* $SSB_{SPR30\%}$ | 1.64 | Not overfished |

*Maximum fishing mortality threshold (MFMT); fishing mortality (F); maximum sustainable yield (MSY); minimum stock size threshold (MSST).

**Table 1.1.3.** Alternative yield projections accepted as scientifically valid by the SSC at its January 2020 meeting.  Recreational data used to create these projections include MRIP-FES, which informs both the sector allocations and resulting yields.

| Landings Time Series | Comm % | Rec % | Million pounds gutted weight | |
|---|---|---|---|---|
| | | | OFL (P*=0.5) | ABCError! Bookmark not defined. (P*=0.3) |
| 1986-2005 | 59.3 | 40.7 | 4.66 | 4.26 |
| 1986-2009 | 60.5 | 39.5 | 4.70 | 4.30 |
| 1986-2018 | 59.7 | 40.3 | 4.67 | 4.28 |

# 1.2  Objectives of the Reef Fish Fishery Management Plan

At its August 2019 meeting, the Council last modified the objectives of the Reef Fish FMP. Through Reef Fish Amendment 51 (GMFMC 2019b), the Council adopted the updated objectives as shown below.  Any allocation or reallocation must be consistent with the Reef Fish FMP objectives.
The overall goal of the Reef Fish FMP is:

*To manage the reef fish fishery of the United States within the waters of the Gulf of Mexico Fishery Management Council jurisdiction to attain the greatest overall benefit to the nation with particular reference to food production and recreational opportunities on the basis of the maximum sustainable yield as reduced by relevant ecological, economic, or social factors.*

The new Reef Fish FMP objectives are as follows:

1. To prevent overfishing and rebuild overfished stocks.
2. To achieve robust fishery reporting and data collection systems across all sectors for monitoring the reef fish fishery, which minimizes scientific, management, and risk uncertainty.
3. To conserve and protect reef fish habitat.
4. To minimize conflicts between user groups.
5. To minimize and reduce dead discards.
6. To manage Gulf stocks at OY as defined in Magnuson-Stevens Conservation Management Act.
7. To revise the definitions of the fishery management unit and fishery to reflect the current species composition of the reef fish fishery.
8. To encourage and periodically review research on the efficacy of artificial reefs for management purposes.
9. To promote stability in the fishery by allowing for enhanced fisher flexibility and increasing fishing opportunities to the extent practicable.
10. To avoid to the extent practicable the "derby" type fishing season.
11. To provide for cost-effective and enforceable management of the fishery.
12. To promote and maintain accountability in the reef fish fishery.

## 1.3 Purpose and Need

The purposes are to revise the red grouper allocation between the commercial and recreational sectors using the best scientific information available and to modify the allowable harvest of red grouper based on results of the recent stock assessment and subsequent OFL and ABC**Error! Bookmark not defined.** recommendations from the SSC.

The need is to use the best scientific information available to establish Gulf red grouper sector allocations, ACLs, and ACTs, ensuring that the historical participation by the recreational and commercial sectors is accurately reflected by the sector ACLs, and that the recreational ACL is consistent with the data used to monitor recreational landings and trigger AMs.

## 1.4  History of Management

The following summary describes management actions that affect the management of red grouper in the Reef Fish FMP.  More information on the Reef Fish FMP can be obtained from the Council.[4]

**Amendments to the Reef Fish FMP**

**Amendment 1** was implemented in January 1990.  It set a 20-inch TL minimum size limit on red grouper; set a five-grouper recreational daily bag limit; set an 11.0 mp ww commercial quota for grouper, with the commercial quota divided into a 9.2 mp ww shallow-water grouper quota and a 1.8 mp ww deep-water grouper quota; and defined shallow-water grouper as black grouper, gag, red grouper, Nassau grouper, yellowfin grouper, yellowmouth grouper, rock hind, red hind, speckled hind, and scamp; and defined deep-water grouper as misty grouper, snowy grouper, warsaw grouper, and yellowedge grouper.  The amendment also allowed a two-day possession limit for charter vessels and headboats on trips that extended beyond 24 hours, provided the vessel has two licensed operators aboard as required by the United States Coast Guard (USCG), and each passenger can provide a receipt to verify the length of the trip.  In addition, the amendment limited fishermen fishing under a bag limit to a single day limit; established a longline and buoy gear boundary at the 50-fathom depth contour west of Cape San Blas, Florida, and the 20-fathom depth contour east of Cape San Blas, inshore of which the directed harvest of reef fish with longlines and buoy gear was prohibited, and limited the retention of reef fish captured incidentally in other longline operations (e.g., shark) to the recreational daily bag limit; limited trawl vessels to the recreational size and daily bag limits of reef fish; established fish trap permits, allowing a maximum of 100 fish traps per permit holder; prohibited the use of entangling nets for directed harvest of reef fish; limited retention of reef fish caught in entangling nets for other fisheries to the recreational daily bag limit; established the fishing year to be January 1 through December 31; and established a commercial reef fish vessel permit.

A **July 1991 regulatory amendment**, implemented in November 1991, provided a one-time increase in the 1991 quota for shallow-water grouper from 9.2 mp ww to 9.9 mp ww to provide the commercial fishery an opportunity to harvest 0.7 mp ww that was not harvested in 1990.

A **November 1991 regulatory amendment**, implemented in June 1992, raised the 1992 commercial quota for shallow-water grouper to 9.8 mp ww after a red grouper stock assessment indicated that the red grouper SPR was well above the Council's minimum target of 20%.

An **August 1999 regulatory amendment**, implemented in June 2000, prohibited commercial sale of red grouper each year from February 15 to March 15 (during the peak gag spawning season) and established two marine reserves (Steamboat Lumps and Madison-Swanson) that are closed year-round to fishing for all species under the Council's jurisdiction.

**Generic Sustainable Fisheries Act Amendment** was partially approved and implemented in November 1999.  This amendment set the MFMT for most reef fish stocks at a fishing mortality rate (F) corresponding to $F_{30\% \text{ SPR}}$.

---

[4] http://www.gulfcouncil.org/fishery_management_plans/index.php.

**Amendment 19**, also known as Generic Essential Fish Habitat Amendment 2, was implemented in August 2002.  This amendment established two marine reserves off the Dry Tortugas where fishing for any species and anchoring by fishing vessels is prohibited.

**Amendment 21** was implemented in July 2003, and continued the Steamboat Lumps and Madison-Swanson reserves for an additional 6 years, until June 2010.
**Secretarial Amendment 1** was implemented in July 2004.  It established a rebuilding plan for red grouper with a 5.31 mp gw commercial quota and a 1.25 mp gw recreational target catch level; reduced the commercial quota for shallow-water grouper from 9.35 to 8.80 mp gw; reduced the commercial quota for deep-water grouper from 1.35 to 1.02 mp gw; and reduced the red grouper recreational bag limit to two fish per person per day.

An **emergency rule**, published in February 2005, established a series of trip limit reductions for the commercial grouper fishery to extend the commercial fishing season.  The trip limit was initially set at 10,000 lbs gw.  By August 1, if the fishery had landed more than 50% of either the shallow-water or red grouper quotas, then a 7,500-lb gw trip limit would take effect; and if by October 1, if more than 75% of either the shallow-water or red grouper quotas had been landed, then a 5,500-lb gw trip limit would take effect.

An **interim rule**, published in July 2005, established a temporary reduction in the red grouper recreational bag limit from two to one fish per person per day.  The approved measure was subsequently extended through July 22, 2006.

An **October 2005 regulatory amendment**, implemented in January 2006, established a 6,000-lb gw aggregate deep-water grouper and shallow-water grouper trip limit for the commercial sector.

A **March 2006 regulatory amendment**, implemented in July 2006, established a red grouper recreational bag limit of one fish per person per day as part of the five grouper per person aggregate bag limit; prohibited for-hire vessel captains and crews from retaining bag limits of any grouper while under charter; and established an annual recreational closed season for red grouper from February 15 to March 15, beginning with the 2007 season.

**Amendment 18A** was implemented in September 2006.  It prohibited vessels from retaining reef fish caught under recreational bag/possession limits when commercial quantities of Gulf reef fish are aboard; adjusted the maximum crew size on charter vessels that also have a commercial reef fish permit and a USCG certificate of inspection (COI) to allow the minimum crew size specified by the COI when the vessel is fishing commercially for more than 12 hours; prohibited the use of reef fish for bait except for sand perch or dwarf sand perch; required devices for the safe release of endangered sea turtles and smalltooth sawfish; changed the permit application process to an annual procedure and simplified income qualification documentation requirements; and required electronic vessel monitoring systems aboard vessels with federal reef fish commercial and charter vessel permits (implemented May 6, 2007).

The majority of the regulatory actions in **Amendment 27** were implemented in February 2008.  However, the regulatory actions which addressed the use of non-stainless-steel circle hooks when using natural baits to fish for Gulf reef fish and also required the use of venting tools and

dehooking devices when participating in the commercial or recreational reef fish fisheries were effective June 1, 2008.

An **emergency rule** was implemented in May 2009 through October 2009 prohibiting the use of bottom longline (BLL) gear to harvest reef fish east of 85°30′ W longitude shoreward of the 50-fathom (91.4 m) contour as long as the 2009 deep-water grouper and tilefish quotas are unfilled. After the quotas have been filled, the use of BLL gear to harvest reef fish in water of all depths east of 85°30′ W longitude was prohibited.

**Amendment 30B** was implemented in May 2009. It set an interim allocation of red grouper between the recreational and commercial sectors; made adjustments to the red grouper TACs; established ACLs and AMs for the commercial and recreational red grouper sectors and the commercial aggregate shallow-water grouper fishery; adjusted recreational grouper bag limits and seasons; adjusted commercial grouper quotas; reduced the red grouper commercial minimum size limit; replaced the one-month commercial grouper closed season with a four-month seasonal area closure at the Edges; eliminated the end date for Madison-Swanson and Steamboat Lumps marine protected areas; and required that vessels with a federal charter vessel/headboat permit for Gulf reef fish must comply with the more restrictive of state or federal reef fish regulations when fishing in state waters.

An **emergency rule under the Endangered Species Act** was implemented in October 2009 that prohibited bottom longlining for Gulf reef fish east of 85°30'W longitude (near Cape San Blas, Florida) shoreward of a line approximating the 35-fathom depth contour. It restricted the number of hooks on board to 1,000 hooks per vessel with no more than 750 hooks being fished or rigged for fishing at any given time.

**Amendment 29** was implemented in January 2010 and established an IFQ program for the commercial harvest of grouper and tilefish species in the reef fish fishery.

**Amendment 31** was implemented in May 2010. It prohibited the use of BLL gear shoreward of a line approximating the 35-fathom contour from June through August; reduced the number of longline vessels operating in the fishery through an endorsement provided only to vessel permits with a history of landings, on average of at least 40,000 lbs of reef fish annually with fish traps or longline gear during 1999-2007; and restricted the total number of hooks that may be possessed onboard each reef fish BLL vessel to 1,000, only 750 of which may be rigged for fishing.

An **emergency rule**, implemented in May 2010, temporarily closed a portion of the Gulf exclusive economic zone (EEZ) to all fishing in response to the *Deepwater Horizon* oil spill. The initial closed area extended from approximately the mouth of the Mississippi River to south of Pensacola, Florida and covered an area of 6,817 square statute miles. The coordinates of the closed area were subsequently modified periodically in response to changes in the size and location of the area affected by the spill. At its largest size on June 1, 2010, the closed area covered 88,522 square statute miles, or approximately 37% of the Gulf EEZ. The size of the closed area was subsequently reduced in stages, and on April 19, 2011, all remaining waters that had been closed were reopened.

An **August 2010 regulatory amendment**, implemented in January 2011, reduced TAC for red grouper from 7.57 mp gw to 5.68 mp gw, based on the projections from the 2009 red grouper update assessment.  Based on the 76:24 commercial and recreational allocation of red grouper, the commercial quota was reduced from 5.75 to 4.32 mp gw, and the recreational allocation was reduced from 1.82 to 1.36 mp gw.

An **interim rule** was published in December 2010, suspending the use of red grouper multi-use IFQ allocation so it could not be used to harvest gag; and continuing the suspension of red grouper multi-use IFQ allocation from June 1, 2011, through November 27, 2011, and subsequently extended through June 12, 2012.

An **August 2011 regulatory amendment**, implemented in November 2011, increased the 2011 red grouper TAC to 6.88 mp gw with subsequent increases each year from 2012 to 2015; and increased the red grouper bag limit to four fish per person.

**Generic ACL/AM Amendment**, largely implemented in January 2012 with other elements implemented later in the same year, established in-season and post-season AMs for all stocks that did not already have such measures defined.  The AM states that if an ACL is exceeded, in subsequent years an in-season AM will be implemented that will close all shallow-water grouper fishing when the ACL is reached or projected to be reached.

**Amendment 32** was implemented in March 2012.  It set the red grouper commercial ACL at 6.03 mp gw and the recreational ACL at 1.90 mp gw; modified grouper IFQ multi-use allocations; added an overage adjustment and in-season measures to the red grouper recreational AMs to avoid exceeding the ACL; and added an AM for the red grouper bag limit that would reduce the four red grouper bag limit in the future to three red grouper, and then to two red grouper, if the red grouper recreational ACL is exceeded.

A **December 2012 framework action**, implemented in July 2013, eliminated the February 1 through March 31 recreational shallow-water grouper closed season shoreward of 20 fathoms (except for gag).  However, the closed season remained in effect beyond 20 fathoms to protect spawning aggregations of gag and other species that spawn offshore during that time.

**Amendment 38** was implemented in March 2013.  It revised the post-season recreational AM to reduce the recreational season the following fishing year of only the species for which the ACL was exceeded (to specify gag or red grouper); and modified the reef fish framework procedure to include the addition of AMs to the list of items that can be changed through the standard framework procedure.

A **December 2014 framework action**, implemented in May 2015, reduced the red grouper bag limit from four fish to two fish per person per day and eliminated the bag limit reduction AM.

A **June 2016 framework action**, implemented in October 2016, increased the commercial ACL to 8.19 mp gw and the commercial quota to 7.78 mp gw.  The recreational ACL was increased to 2.58 mp gw; and the recreational ACT to 2.37 mp gw.

**Amendment 44**, implemented in December 2017, standardized the MSST for certain reef fish species, including red grouper, to 50% of the biomass at MSY.

A **June 2017 framework action**, implemented in February 2018, removed the 1,000 total hook limit per BLL vessel, while maintaining the limit of 750 hooks which may be rigged for fishing.

**Amendment 36A** returned shares from non-activated accounts and provided the Regional Administrator the authority to withhold the amount of red snapper or grouper-tilefish allocation before distribution at the beginning of a year in which a commercial quota reduction is expected to occur. Withheld red snapper and grouper-tilefish annual allocation will be distributed to shareholders if the effective date of the final rule implementing the quota reduction has not occurred by June 1. These actions were implemented in July 2018. The amendment also implemented a requirement that all reef fish permitted vessels make an advance landing notification, which was implemented in January 2019.

A **December 2018 temporary rule**, implemented in January 2019, withheld a portion of the Gulf red grouper commercial quota from the IFQ for 2019 as a result of a proposed commercial quota reduction. NMFS withheld 59.4% of the red grouper IFQ allocation (4.78 mp gw) in anticipation of the reduction.

An **emergency rule**, implemented in May 2019, reduced the red grouper commercial and recreational ACLs and ACTs consistent with a stock ACL of 4.16 mp gw, to provide a temporary reduction in harvest levels while a framework action was developed to reduce catch limits on a long-term basis. The commercial ACL is 3.16 mp gw; the commercial quota is 3.00 mp gw. The recreational ACL is 1.00 mp gw; the recreational ACT is 0.92 mp gw.

An **April 2019 framework action**, implemented in October 2019, reduced the catch limits for red grouper consistent with the May 2019 emergency rule.

# CHAPTER 2. MANAGEMENT ALTERNATIVES

## 2.1  Action 1 – Modify the Sector Allocations, OFL, ABCError! Bookmark not defined., and ACLs for Red Grouper

Note:  This action considers modifying the overfishing limit (OFL), acceptable biological catch**Error! Bookmark not defined.** (ABC**Error! Bookmark not defined.**), and annual catch limits (ACL) for red grouper in the Gulf of Mexico (Gulf).

**Alternative 1:**  No Action – Maintain the sector allocations of the total ACL for red grouper between the commercial and recreational sectors.  The allocations for red grouper are 76% commercial and 24% recreational.  The allocation was derived from the average landings using Marine Recreational Fisheries Statistics Survey (MRFSS) data from the years 1986 through 2005, established in Reef Fish Amendment 30B.  Maintain the current OFL, ABC**Error! Bookmark not defined.**, and ACLs.

**Alternative 2:**  Maintain the sector allocations of the total ACL as 76% commercial and 24% recreational.  Revise the OFL and ABC**Error! Bookmark not defined.** as recommended by the Scientific and Statistical Committee (SSC) based on Southeast Data Assessment and Review (SEDAR) 61 (2019).  Set the stock ACL equal to the stock ABC.

**Preferred Alternative 3:**  Revise the sector allocations of the total ACL between the recreational and commercial sectors as the average landings using Fishing Effort Survey (FES)-adjusted Marine Recreational Information Program (MRIP-FES) data during the years 1986 through 2005, based on the Southeast Fisheries Science Center (SEFSC) ACL monitoring datasets.  The allocations for red grouper are 59.3% commercial and 40.7% recreational.  Revise the OFL and ABC**Error! Bookmark not defined.** as recommended by the SSC based on SEDAR 61 (2019).  Set the stock ACL equal to the stock ABC.

**Alternative 4:**  Revise the sector allocations of the total ACL between the recreational and commercial sectors as the average landings using MRIP-FES data during the years 1986 through 2009, based on the SEFSC ACL monitoring datasets.  The allocations for red grouper are 60.5% commercial and 39.5% recreational.  Revise the OFL and ABC**Error! Bookmark not defined.** as recommended by the SSC based on SEDAR 61 (2019).  Set the stock ACL equal to the stock ABC.

**Alternative 5:**  Revise the sector allocations of the total ACL between the recreational and commercial sectors as the average landings using MRIP-FES data during the years 1986 through 2018, based on the SEFSC ACL monitoring datasets.  The allocations for red grouper are 59.7% commercial and 40.3% recreational.  Revise the OFL and ABC**Error! Bookmark not defined.** as recommended by the SSC based on SEDAR 61 (2019).  Set the stock ACL equal to the stock ABC.

**Alternative 6:**  Revise the sector allocations of the total ACL between the recreational and commercial sectors, such that the commercial ACL is retained at 3.16 million pounds gutted weight.  The allocations for red grouper are 68.7% commercial and 31.3% recreational.  Revise the OFL and ABC**Error! Bookmark not defined.** to retain the commercial ACL.  Set the stock ACL equal to the stock ABC.

**Table 2.1.1.**  OFL, ABC**Error! Bookmark not defined.**, total and sector ACLs, and sector ACTs for **Preferred Alternative 3** and **Alternatives 1-2** and **4-6**.

| | OFL* | ABCError! Bookmark not defined. | Total ACL | Comm ACL | Rec ACL | Comm ACT | Rec ACT |
|---|---|---|---|---|---|---|---|
| **Alt 1**\*\* | 14.16 | 13.92 | 4.16 | 3.16 | 1.00 | 3.00 | 0.92 |
| **MRIP-FES equivalent** | | | (5.26) | | (2.10) | | (1.93) |
| **Alt 2**\*\*\* | 5.35 | 4.90 | 4.90 | 3.72 | 1.18 | 3.53 | 1.09 |
| **Preferred Alt 3**\*\*\* | 4.66 | 4.26 | 4.26 | 2.53 | 1.73 | 2.40 | 1.59 |
| **Alt 4**\*\*\* | 4.70 | 4.30 | 4.30 | 2.60 | 1.70 | 2.47 | 1.56 |
| **Alt 5**\*\*\* | 4.67 | 4.28 | 4.28 | 2.56 | 1.72 | 2.43 | 1.58 |
| **Alt 6**\*\*\* | 5.03 | 4.60 | 4.60 | 3.16 | 1.44 | 3.00 | 1.32 |

\*Values for OFL, ACB, total ACL, commercial ACL and ACT, and recreational ACL and ACT are in millions of pounds (mp) gutted weight (gw).  The sector ACTs are based on the No Action alternative from Action 2.
\*\*The recreational portion of the current OFL, ABC**Error! Bookmark not defined.**, and ACLs are based on MRIP-CHTS data.
\*\*\*The recreational sector ACL and ACT are in MRIP-FES currency.

**Discussion:**

At its October 2019 meeting, the Gulf of Mexico Fishery Management Council (Council) discussed the implications of the FES-adjusted MRIP recreational data on allocation.  Given that Amendment 30B to the Fishery Management Plan (FMP) for Reef Fish Resources in the Gulf of Mexico (Reef Fish FMP; GMFMC 2008c) used SEDAR 12 (2006) and the MRFSS data for the recreational sector in determining the sector allocations, the Council requested that the SSC review red grouper projections for the OFL and ABC**Error! Bookmark not defined.** using the best available landings data.  The Council also directed staff to begin work on a plan amendment to update the red grouper allocation and establish catch levels based on the best available landings data.  At the January 2020 SSC meeting, the SEFSC presented estimates of OFL and ABC associated with the time series of 1986-2005, 1986-2009, and 1986-2018; the SSC affirmed that those time series yield scientifically valid estimates of OFL and ABC as shown in Table

1.1.3.[5] The time series chosen directly affects the resulting sector allocations, which affects the yield projections for OFL and ABC. As more of the ACL is allocated to the recreational sector, the proportion of discards by that sector increases. Even though recreational discard rates are assumed to be lower than commercial discard rates, the magnitude of recreational discards is considerably greater than commercial discards, resulting in additional mortality and a lower annual projected yield.[6]

**Alternative 1** (No Action) would maintain the sector allocations established in Amendment 30B (GMFMC 2008c), with commercial and recreational allocation of the red grouper stock ACL divided 76% and 24%, respectively. **Alternative 1** would use MRFSS landings data from SEDAR 12 (2006) to set the allocation. When Amendment 30B was developed, the resulting sector allocations were based on all available years during which grouper were identified by species and also on the longest and most robust time series for landings at the time (1986-2005). A long time series reduces the influence of short-term shifts in landings resulting from changes in recruitment or regulations. As seen in Table 2.1.1, **Alternative 1** would also maintain the current OFL, ABC**Error! Bookmark not defined.**, and ACLs. The stock ACL in **Alternative 1** was set by the Council in 2019 through an emergency rule and subsequent framework action discussed in Chapter 1, and is equivalent to the landings from the 2017 fishing year (GMFMC 2019a). The framework action did not change the OFL and ABC, so those values provided in **Alternative 1** are based on recommendations by the SSC after reviewing the SEDAR 42 2015 stock assessment of red grouper. The recreational portion of the current OFL, ABC, and ACLs are based on MRIP Coastal Household Telephone Survey (CHTS) data, and the current recreational ACL of 1.00 million pounds in MRIP-CHTS units is equivalent to 2.10 million pounds in MRIP-FES units. **Alternative 1** is not legally viable because it is not based on the best scientific information available, and would retain the current OFL and ABC, which are above the values produced by the SEDAR 61 stock assessment and recommended by the SSC.

As in **Alternative 1**, **Alternative 2** would maintain the allocation established in Amendment 30B (GMFMC 2008c), with commercial and recreational allocation of the red grouper stock ACL divided 76% and 24%, respectively. However, **Alternative 2** would revise the OFL and ABC**Error! Bookmark not defined.** based on SEDAR 61 (2019) and SSC recommendations. The stock ACL is equal to the stock ABC.

While the allocations in **Alternatives 1-2** reflect recreational landings estimated using MRFSS, the allocations in **Preferred Alternative 3** and **Alternatives 4-6** reflect recreational landings estimated using MRIP-FES from the SEFSC ACL monitoring datasets. To compare recreational landings to the current recreational ACL and annual catch target (ACT), the SEFSC converted the MRIP-FES estimates into MRIP-CHTS units. If Amendment 53 is implemented, MRIP-FES units would be used to compare recreational landings to the recreational ACL and ACT. Therefore, although **Alternative 2** retains the current percentage allocation, it would result in a decrease in the recreational ACL when compared to the MRIP-FES equivalent of 2.10 million pounds in **Alternative 1,** and an increase in the commercial ACL. In effect, because the

---

[5] The OFL and ABC associated with **Alternative 2** was recommended at the September 2019 meeting; the OFLs and ABCs associated with **Preferred Alternative 3** and **Alternatives 4-5** were recommended at the January 2020 meeting, based on timeframes from a Council motion in October 2019.  http://gulfcouncil.org/meetings/ssc/archive/
[6] See SEDAR 61 (2019) for more information on the sector discard mortality rates and estimated sector discards.

recreational ACL would decrease compared to its MRIP-FES equivalent, and because the increase in estimated stock productivity is attributable to historic estimates of recreational catch and effort, not reallocating using the MRIP-FES data results in a *de facto* reallocation to the commercial sector.

**Preferred Alternative 3** would base the commercial and recreational sector allocations of red grouper on landings from the same timeframe as used in Amendment 30B (GMFMC 2008c), 1986 through 2005, but would use MRIP-FES landings from the SEFSC ACL monitoring dataset,[7] which is considered the best scientific information available (Table 2.1.2).  By using the SEFSC ACL monitoring dataset, **Preferred Alternative 3** best reflects the landings from each sector from 1986-2005.  The resulting allocations are 59.3% commercial and 40.7% recreational. **Preferred Alternative 3** would revise the OFL and ABC**Error! Bookmark not defined.** based on SEDAR 61 (2019) and then set the stock ACL equal to the stock ABC.  The

**Alternative 4** would base the commercial and recreational sector allocations on landings from the timeframe 1986 through 2009 (Table 2.1.2), ending the time series upon implementation of the commercial grouper-tilefish individual fishing quota (IFQ) program, which includes management of red grouper (GMFMC 2008a).  Beginning in 2010, the IFQ program has constrained the commercial sector from exceeding its red grouper quota, as a commercial vessel must have a sufficient amount of allocation before landing red grouper.  In contrast, the recreational sector could exceed its quota, which would trigger accountability measures (AMs), as landings are not monitored in-season and it may not be possible to close the fishing season before the quota is met.  The resulting allocations are 60.5% commercial and 39.5% recreational. **Alternative 4** would revise the OFL and ABC**Error! Bookmark not defined.** based on SEDAR 61 (2019) and then set the stock ACL equal to the stock ABC.

**Alternative 5** would base the commercial and recreational allocations on landings from the timeframe 1986 through 2018, which incorporates the longest time period of landings currently available (Table 2.1.2).  The *Deepwater Horizon* MC252 oil spill began in April 2010 and resulted in extensive fishery closures; therefore, landings from 2010 should be viewed with caution.  This timeframe also includes landings after implementation of the grouper-tilefish commercial IFQ program discussed in **Alternative 4**.  The resulting allocations are 59.7% commercial and 40.3% recreational.  **Alternative 5** would revise the OFL and ABC**Error! Bookmark not defined.** based on the stock assessment and then set the stock ACL equal to the stock ABC.

**Alternative 6** would revise the sector allocations of the total ACL between the recreational and commercial sectors, such that the commercial ACL is retained at 3.16 mp gw.  The resulting allocations are 68.7% commercial and 31.3% recreational.  **Alternative 6** would revise the OFL and ABC**Error! Bookmark not defined.** to retain the 3.16 mp gw commercial ACL and then set the stock ACL equal to the stock ABC.  The OFL and ABC for **Alternative 6** are within the range of the OFL and ABC values for **Preferred Alternative 3** and **Alternatives 2** and **4-5**, which were recommended by the SSC at its September 2019 and January 2020 meetings.

---

[7] Dates for when data sources were accessed are noted in Table 2.1.2.

Although the commercial and recreational allocations were in effect for the timeframe 2010-2018, the commercial ACL has never been exceeded, and the recreational ACL has only been exceeded in 2013, and was subject to in-season closures in 2014 and 2015.  Commercial and recreational ACLs, ACTs, and landings are displayed in Table 2.1.3.  The various time series under consideration in **Preferred Alternative 3** and **Alternatives 4-5** have relatively small differences in sector allocations (at most 1.2%; Table 2.1.2).  The difference in the commercial and recreational allocations when **Alternatives 1-2** are compared to **Preferred Alternative 3** and **Alternatives 4-5** is, at most, 16.7%, shifting allocation from the commercial sector to the recreational sector to account for an increase in the estimated historical harvests attributable to the recreational sector.  At its January 2020 meeting, the Council noted that **Preferred Alternative 3** would maintain the historical participation rate of the two sectors in the red grouper component of the reef fish fishery, when using MRIP-FES landings.

In comparison to the MRIP-FES equivalent total ACL of 5.26 mp gw under **Alternative 1**, **Alternatives 2-6** would result in a decrease of the total ACL, due to decreases in both the OFL and ABC under those alternatives, following SEDAR 61 (2019) as noted in Section 1.1.  In comparison to **Alternative 1**, **Alternative 2** would result in an increase of the commercial sector ACL; **Preferred Alternative 3** and **Alternatives 4-5** would result in a decrease of the commercial sector ACL.  The commercial sector ACL for **Alternatives 1** and **6** would be the same.  In comparison to the MRIP-FES equivalent recreational sector ACL of 2.10 mp gw under **Alternative 1**, **Preferred Alternative 3** as well as **Alternatives 2** and **4-6** would result in a decrease of the recreational sector ACL.  The MRIP-FES equivalent of total ACL and recreational sector ACL under **Alternative 1** is used for comparison with **Preferred Alternative 3** as well as **Alternatives 2** and **4-6** in order to have equivalent currency.

**Table 2.1.2.** Commercial and recreational landings for red grouper in pounds gutted weight (gw) from SEDAR 12 (MRFSS) and the SEFSC ACL monitoring datasets (MRIP-FES) used to calculate sector allocations.

| Year | SEDAR 12 Landings | | SEFSC ACL Monitoring Landings | |
|---|---|---|---|---|
| - | Comm | Rec | Comm | Rec |
| 1986 | 6,312,986 | 2,400,380 | 6,222,162 | 3,348,897 |
| 1987 | 6,717,890 | 1,464,710 | 6,567,225 | 2,495,130 |
| 1988 | 4,742,496 | 2,476,070 | 4,559,441 | 4,652,818 |
| 1989 | 7,367,911 | 2,761,150 | 7,270,424 | 7,632,792 |
| 1990 | 4,809,282 | 1,131,710 | 4,744,711 | 3,565,320 |
| 1991 | 5,094,501 | 1,775,110 | 5,071,083 | 3,755,576 |
| 1992 | 4,463,277 | 2,658,180 | 4,456,473 | 6,046,978 |
| 1993 | 5,379,626 | 2,091,160 | 6,364,065 | 4,057,934 |
| 1994 | 4,902,862 | 1,808,240 | 4,890,106 | 3,827,267 |
| 1995 | 4,746,140 | 1,862,570 | 4,652,487 | 3,496,544 |
| 1996 | 4,454,146 | 893,755 | 4,336,214 | 910,313 |
| 1997 | 4,848,486 | 562,328 | 4,673,786 | 1,142,958 |
| 1998 | 3,948,566 | 643,058 | 3,703,816 | 1,513,890 |
| 1999 | 5,974,706 | 1,152,810 | 5,800,592 | 3,428,553 |
| 2000 | 5,838,300 | 2,107,730 | 5,702,622 | 4,242,231 |
| 2001 | 5,964,506 | 1,327,770 | 5,802,442 | 2,435,456 |
| 2002 | 5,907,248 | 1,611,110 | 5,791,795 | 3,172,348 |
| 2003 | 4,937,970 | 1,275,830 | 4,832,294 | 2,201,496 |
| 2004 | 5,749,039 | 3,000,140 | 5,635,577 | 7,983,239 |
| 2005 | 5,410,594 | 1,630,140 | 5,380,603 | 3,081,979 |
| 2006 | | | 5,109,824 | 2,655,065 |
| 2007 | | | 3,650,777 | 2,031,867 |
| 2008 | | | 4,748,224 | 1,604,398 |
| 2009 | | | 3,698,227 | 1,600,063 |
| 2010 | | | 2,910,970 | 1,963,762 |
| 2011 | | | 4,783,668 | 1,534,113 |
| 2012 | | | 5,219,133 | 4,131,722 |
| 2013 | | | 4,599,001 | 4,990,310 |
| 2014 | | | 5,601,905 | 5,368,575 |
| 2015 | | | 4,798,007 | 3,790,614 |
| 2016 | | | 4,497,582 | 2,632,907 |
| 2017 | | | 3,328,271 | 1,692,513 |
| 2018 | | | 2,363,280 | 2,053,526 |
| 2019 | | | 2,037,046 | 1,638,076 |
| Alts 1 and 2 (1986-2005) | 76% | 24% | | |
| Preferred Alt 3 (1986-2005) | | | 59.3% | 40.7% |
| Alt 4 (1986-2009) | | | 60.5% | 39.5% |
| Alt 5 (1986-2018) | | | 59.7% | 40.3% |

Source:  SEDAR 12 (2006) (http://sedarweb.org/sedar-12).  1986-2009 landings, SEFSC Commercial ACL dataset (11/15/19) and 2010-2019 landings, the IFQ database (accessed 5/20/20).  SEFSC MRIP-FES Recreational dataset (5/18/20).

**Table 2.1.3.** Commercial and recreational ACLs, ACTs, and landings for red grouper in pounds gutted weight (gw) in CHTS units for years in which an ACL and/or an ACT was in place.

| Year | Commercial | | | | Recreational | | | |
|------|------|------|----------|--------|------|------|----------|--------|
| | ACL | ACT | Landings | % ACT | ACL | ACT | Landings | % ACL |
| 2004 | N/A | 5,310,000 | 5,635,577 | 106.1% | N/A | N/A | N/A | |
| 2005 | N/A | 5,310,000 | 5,380,603 | 101.3% | N/A | N/A | N/A | |
| 2006 | N/A | 5,310,000 | 5,109,824 | 96.2% | N/A | N/A | N/A | |
| 2007 | N/A | 5,310,000 | 3,650,777 | 68.8% | N/A | N/A | N/A | |
| 2008 | N/A | 5,310,000 | 4,748,224 | 89.4% | N/A | N/A | N/A | |
| 2009 | N/A | 5,750,000 | 3,698,227 | 64.3% | N/A | N/A | N/A | |
| 2010 | N/A | 5,750,000 | 2,910,970 | 50.6% | 1,850,000 | N/A | 635,680 | 34.4% |
| 2011 | N/A | 5,230,000 | 4,783,668 | 91.5% | 1,510,000 | N/A | 643,745 | 42.6% |
| 2012 | 6,030,000 | 5,370,000 | 5,219,133 | 97.2% | 1,900,000 | N/A | 1,752,930 | 92.3% |
| 2013 | 6,030,000 | 5,530,000 | 4,599,001 | 83.2% | 1,900,000 | N/A | 2,377,111 | 125.1% |
| 2014 | 6,030,000 | 5,630,000 | 5,601,144 | 99.5% | 1,900,000 | 1,730,000 | 1,600,475 | 92.5%* |
| 2015 | 6,030,000 | 5,720,000 | 4,797,159 | 83.9% | 1,900,000 | 1,730,000 | 1,847,573 | 97.2% |
| 2016 | 8,190,000 | 7,780,000 | 4,497,582 | 57.8% | 2,580,000 | 2,370,000 | 1,403,236 | 54.4% |
| 2017 | 8,190,000 | 7,780,000 | 3,328,271 | 42.8% | 2,580,000 | 2,370,000 | 807,085 | 31.3% |
| 2018 | 8,190,000 | 7,780,000 | 2,363,280 | 30.4% | 2,580,000 | 2,370,000 | 872,045 | 33.8% |
| 2019 | 3,160,000 | 3,000,000 | 2,037,046 | 67.9% | 1,000,000 | 920,000 | 764,985 | 76.5% |

*In 2013, a post-season AM was triggered for the recreational sector, and the recreational sector was managed to the ACT in 2014.  In Table 2.1.3, the landings are shown as a percentage of the ACT in 2014.  In 2015, an in-season closure was triggered for the recreational sector.

Source:  Commercial data from 2010 through 2019 were obtained from the Quotas and Catch Allowances, accessed December 3, 2020 (https://portal.southeast.fisheries.noaa.gov/reports/cs/CommercialQuotasCatchAllowanceTable.pdf), remaining years were obtained from the Gulf of Mexico Historical Commercial Landings and Annual Catch Limits (ACLs), updated November 7, 2018 (https://www.fisheries.noaa.gov/southeast/gulf-mexico-historical-commercial-landings-and-annual-catch-limit-monitoring).  Recreational data from 2010 through 2018 were obtained from recreational historical landings, updated October 13, 2020 (*https://www.fisheries.noaa.gov/southeast/recreational-fishing-data/gulf-mexico-historical-recreational-landings-and-annual-catch*), data from 2019 was obtained December 3, 2020 from *https://www.fisheries.noaa.gov/southeast/2019-and-2020-gulf-mexico-recreational-landings-and-annual-catch-limits-acls-and-annual*.

Changes in the recreational sector ACLs are predicted to impact the recreational sector's season length.[8]  Landings data for Gulf of Mexico red grouper were obtained from the SEFSC recreational ACL dataset obtained in May of 2020.  The current ACT is being tracked using MRIP-CHTS) equivalent landings.  However, this analysis uses MRIP-FES data to match the same currency as the most recent assessment (SEDAR 61).[9]  Future landings were determined from taking a three-year average of the three most recent years of complete MRIP-FES data, as the most recent data are assumed to be the best approximation of future harvest.  Additionally, the current 2-red grouper per angler bag limit became effective on May 7, 2015 precluding using landings prior to 2016 without adjusting for the previously higher bag limits.  Recreational landings are collected in two-month increments called waves (e.g., January and February = wave 1, March and April = wave 2, etc.).  Landings from 2017 through 2019 and a prediction of future landings (average landings from 2017-2019) by wave are shown in Figure 2.1.1.  Season lengths were projected with upper and lower 95% confidence intervals for each recreational ACL being

---

[8] This information is also displayed in Appendix I, which was provided at the April 2021 Council meeting.

[9] As noted in Section 1, in general, total recreational fishing effort generated from the FES are higher — and in some cases substantially higher — than the CHTS estimates (NOAA Fisheries 2019).

considered in Amendment 53 (Table 2.1.4).  The predicted closure dates for the ACL options span from August 8 to no closure (Table 2.1.4).  There is considerable uncertainty in the predictions since the confidence intervals range from mid-June to no closure needed (Table 2.1.4; Figure 2.1.2).



**Figure 2.1.1.**  Gulf recreational landings by two-month wave and predicted future landings.
Source: SEFSC MRIP-FES Recreational ACL Dataset (May 8, 2020).

**Table 2.1.4**.  The predicted closure dates for each recreational ACL (mp gw) currently in Amendment 53 generated from predicted landings with 95% confidence intervals.

| Action 1 Alternative | ACL | Predicted Closure Date | Season Length (95% Confidence Interval) |
|---|---|---|---|
| **Alt 1** | 2.10 | No Closure | October 25 - No Closure |
| **Alt 2** | 1.18 | August 8 | June 13 - No Closure |
| **Preferred Alt 3** | 1.73 | December 19 | August 15 - No Closure |
| **Alt 4** | 1.70 | December 13 | August 11 - No Closure |
| **Alt 5** | 1.72 | December 17 | August 14 - No Closure |
| **Alt 6** | 1.44 | October 11 | July 10 - No Closure |

Source: SEFSC MRIP-FES Recreational ACL Dataset (May 8, 2020).



**Figure 2.1.2.** Cumulative predicted red grouper recreational landings with 95% confidence interval (dashed lines).
Source:  SEFSC MRIP-FES Recreational ACL Dataset (May 8, 2020).

As with most predictions, the reliability of the results is dependent upon the accuracy of their underlying data and input assumptions.  The analyses have attempted to create a realistic baseline as a foundation for comparisons, under the assumption that projected future landings will accurately reflect actual future landings.  Uncertainty exists in this projection, as economic conditions, weather events, changes in catch-per-unit effort, fisher response to management regulations, and a variety of other factors may cause departures from this assumption.

## 2.2  Action 2 – Modify the Gulf Red Grouper Annual Catch Targets (ACT)

**Alternative 1:**  No Action – Maintain the current buffer between the ACL and ACT for each sector.  The commercial buffer is 5%, and the recreational buffer is 8%.

**Alternative 2:**  Apply the ACL/ACT Control Rule to revise the buffer between the ACL and ACT for each sector.  The commercial buffer is 0%, and the recreational buffer is 9%.

**Preferred Alternative 3:**  Maintain the current buffer between the ACL and ACT for the commercial sector, and apply the ACL/ACT Control Rule to revise the buffer between the ACL and ACT for the recreational sector.  The commercial buffer is 5%, and the recreational buffer is 9%.

<u>**Discussion**</u>:

**Alternative 1** (No Action) would maintain the current buffer between the ACL and ACT for the commercial and recreational sectors set in the April 2019 framework action (GMFMC 2019a).  The application of the ACL/ACT Control Rule was used to set the buffer between the sector ACLs and ACTs.  The recreational buffer in **Alternative 1** used MRFSS data, which are no longer in use for quota monitoring.  Data from the IFQ program for red grouper were used for the commercial sector.  Normally, a sector managed using an IFQ program without a quota overage during its reference period would yield a 0% buffer from the ACL/ACT Control Rule; however, this tool is advisory only and does not account for the overage allowance or gag multi-use provisions in the IFQ program.  As such, following the SEDAR 42 (2015) stock assessment, the Council set the buffer for the recreational sector using the ACL/ACT Control Rule at 8% and the commercial sector's buffer at 5% to account for the multi-use provision for the gag quota under the commercial IFQ program (GMFMC 2016a).  The recreational sector ACT is used as an AM in the subsequent year to one in which the recreational ACL has been exceeded.  Both the red grouper and gag share categories have a multi-use provision that allows a portion of the red grouper quota to be harvested under the gag allocation, and vice versa.  Each year, the program assigns a portion of each shareholder's red grouper and gag as a multi-use allocation category.  The intent of the multi-use provision is to provide for allocation if either gag or red grouper are landed as incidental catch.  The formulas for determining red grouper multi-use (RGM) and gag multi-use (GGM) allocation is as follows:

$$RGM\ allocation = 100 * \frac{(Gag\ ACL - Gag\ Commercial\ Quota)}{Red\ Grouper\ Commercial\ Quota}$$

$$GGM\ allocation = 100 * \frac{(Red\ Grouper\ ACL - Red\ Grouper\ Commercial\ Quota)}{Gag\ Commercial\ Quota}$$

The Council's ACL/ACT Control Rule is used to determine the buffer (if any) between the ACL and the ACT, using a 4-year reference period of recent landings from each sector.  The reference period selected for **Alternative 2** and **Preferred Alternative 3** was 2016 – 2019, with 2019

landings for the recreational sector still considered preliminary by the National Marine Fisheries Service (NMFS).  The ACL/ACT Control rule adjusts the buffer between the ACL and ACT based on a number of factors, including the number and magnitude of quota overages in the reference period, AMs in place to account for any quota overages, and the method by which the quota is monitored.  Considering that the SEFSC ACL monitoring dataset using MRIP-FES data more than doubles the MRIP-CHTS landings estimates, increases in the ACT of greater than 50% may be necessary to allow the fishery to continue at current effort and catch levels.

**Alternative 2** would use a buffer between the commercial ACL and ACT of 0%, and a buffer between the recreational ACL and ACT of 9%, based on the application of the Council's ACL/ACT Control Rule following SEDAR 61 in 2019.  The data used by year for applying the ACL/ACT Control Rule for **Alternative 2** are shown in Table 2.2.1, and the tool as applied to each fishing sector is shown in Appendices G (recreational) and H (commercial).  **Alternative 2** represents a strict application of the ACL/ACT Control Rule for the prescribed reference period, and does not account for multi-use provisions in the commercial gag IFQ program.  With a commercial buffer of 0%, the gag multi-use allocation would be zero, and therefore, only gag could be landed with gag allocation.  Table 2.2.2 displays the percentage of multi-use landings used for red grouper and for gag with the gag multi-use allocation from 2010 to 2019.  From 2016 to 2018, 0.3% to 2% of the GGM was used to land red grouper; however, the 2019 data show an increase to 19% of the GGM being used for landing red grouper.

**Table 2.2.1.** ACL/ACT Control Rule data inputs for **Alternative 2** of Action 2.

| Year | Sector | Landings (lbs gw)* | PSE** | ACL | Exceeded ACL? | Buffer | Data Used |
|------|--------|-----|-----|-----|-----|-----|-----|
| **2016** | Commercial | 4,497,582 | 0 - IFQ | 7,780,000 | No | | IFQ |
| **2017** | Commercial | 3,328,271 | 0 - IFQ | 7,780,000 | No | 0% | IFQ |
| **2018** | Commercial | 2,363,280 | 0 - IFQ | 7,780,000 | No | | IFQ |
| **2019** | Commercial | 2,037,046 | 0 - IFQ | 3,000,000 | No | | IFQ |
| Year | Sector | Landings (lbs gw)* | PSE** | ACL | Exceeded ACL? | Buffer | Data Used |
| **2016** | Recreational | 1,373,337 | 21.6 | 2,580,000 | No | | MRIP-CHTS |
| **2017** | Recreational | 739,073 | 21.0 | 2,580,000 | No | 9% | MRIP-CHTS |
| **2018** | Recreational | 913,978 | 21.5 | 2,580,000 | No | | MRIP-CHTS |
| **2019\*\*\*** | Recreational | 725,105 | 21.6 | 1,000,000 | No | | MRIP-CHTS |

Source:  SERO ACL Monitoring dataset and SEFSC Commercial ACL dataset, retrieved 8 May 2020.
*2019 recreational data are preliminary.
*Pounds (lbs) gutted weight (gw).
**"PSE" stands for proportional standard error, which is a measure of the precision of the estimated landings for a given year.
***2019 recreational data are preliminary.

**Table 2.2.2.** Percentage (and weight in pounds [lbs]) of multi-use allocations used by fishermen for landing red grouper and gag.

| Year | RGM | | GGM | |
|------|-----|-----|-----|-----|
| | Red Grouper (lbs) | Gag (lbs) | Red Grouper | Gag |
| **2010** | 73% (13,833) | 27% (5,091) | 28% (2,203) | 72% (5,654) |
| **2011** | NA* | NA | 14% (1,474) | 86% (8,700) |
| **2012** | NA | NA | 6% (1,928) | 94% (32,230) |
| **2013** | NA | NA | 1% (4,329) | 99% (376,528) |
| **2014** | NA | NA | 35% (103,151) | 65% (188,950) |
| **2015** | 82% (98,466) | 18% (20,998) | 26% (33,165) | 74% (92,661) |
| **2016** | 8% (11,441) | 92% (135,471) | 1% (1,665) | 99% (220,088) |
| **2017** | 11% (6,145) | 89% (51,137) | 2% (2,198) | 98% (116,163) |
| **2018** | 4% (1,656) | 96% (41,364) | 0.3% (344) | 99.7% (114,984) |
| **2019** | 38% (43,610) | 62% (71,349) | 19% (9,209) | 81% (39,266) |

*2011-2014 did not have an RGM allocation because gag was under a rebuilding plan.
Sources: NMFS 2020.

**Preferred Alternative 3** would use a buffer between the commercial ACL and ACT of 5% to account for the multi-use provision in the gag commercial IFQ program, and a buffer between the recreational ACL and ACT of 9%, based on the application of the Council's ACL/ACT Control Rule following SEDAR 61 in 2019. **Preferred Alternative 3** uses the same recreational buffer described in **Alternative 2,** but maintains the current commercial buffer as described in **Alternative 1**.

The commercial and recreational sector ACTs resulting from alternatives selected in Actions 1 and 2 are displayed in Table 2.2.3. The commercial buffer under **Alternative 2** of Action 2 would result in greater commercial ACTs than with the commercial buffers under **Alternative 1** and **Preferred Alternative 3**, for the corresponding alternative under Action 1 (across a given row in Table 2.2.3). The current recreational buffer under **Alternative 1** would result in greater recreational ACTs than with the recreational buffers under **Alternative 2** and **Preferred Alternative 3**, for the corresponding alternative under Action 1 (across a given row in Table 2.2.3).

**Table 2.2.3.** Commercial and recreational sector ACTs resulting from alternatives selected in Actions 1 and 2.

| | | Action 2 | | | | | |
|------|------|------|------|------|------|------|------|
| | | Alt 1 | | Alt 2 | | Preferred Alt 3 | |
| | | Comm | Rec | Comm | Rec | Comm | Rec |
| | **Alt 1** | 3.00 | 0.92** (1.93) | N/A | N/A | N/A | N/A |
| | **Alt 2** | 3.53 | 1.09 | 3.72 | 1.07 | 3.53 | 1.07 |
| **Action 1** | **Preferred Alt 3** | 2.40 | 1.59 | 2.53 | 1.57 | 2.40 | 1.57 |
| | **Alt 4** | 2.47 | 1.56 | 2.60 | 1.55 | 2.47 | 1.55 |
| | **Alt 5** | 2.43 | 1.58 | 2.56 | 1.57 | 2.43 | 1.57 |
| | **Alt 6** | 3.00 | 1.32 | 3.16 | 1.31 | 3.00 | 1.31 |

* Values are in millions of pounds, gutted weight and in MRIP-FES currency.

**The recreational sector ACT for Action 1, Alternative 1 is in CHTS currency; the recreational sector ACT in MRIP-FES currency is in parentheses.

Assuming the recreational sector's post-season AM has been triggered, changes in the recreational sector ACTs are predicted to impact the recreational sector's season length.[10] Landings data for Gulf of Mexico red grouper were obtained from the SEFSC recreational ACL dataset obtained in May of 2020. The current ACT is being tracked using MRIP-CHTS equivalent landings. However, this analysis uses MRIP-FES data to match the same currency (MRIP-FES) as the most recent assessment (SEDAR 61). Future landings were determined from taking a three-year average of the three most recent years of complete MRIP-FES data, as the most recent data are assumed to be the best approximation of future harvest. Additionally, the current 2-red grouper per angler bag limit became effective on May 7, 2015 precluding using landings prior to 2016 without adjusting for the previously higher bag limits. Recreational landings are collected in two-month increments called waves (e.g., January and February = wave 1, March and April = wave 2, etc.). Landings from 2017 through 2019 and a prediction of future landings (average landings from 2017-2019) by wave are shown in Figure 2.1.1. Season lengths were projected with upper and lower 95% confidence intervals for each recreational ACT being considered in Amendment 53 (Table 2.2.4). The predicted closure dates for the ACT options span from July 23 to no closure (Table 2.2.4). There is considerable uncertainty in the predictions since the confidence intervals range from early June to no closure needed (Table 2.2.4; Figure 2.1.2).

**Table 2.2.4.** The predicted closure dates for each recreational ACT (mp gw) currently in Amendment 53 generated from predicted landings with 95% confidence intervals.

| Alternatives (Action 2 – Action 1) | ACL | Buffer | ACT | Predicted Closure Date | Season Length (95% Confidence Interval) |
|---|---|---|---|---|---|
| **1-1** | 2.10 | 8% | 1.93 | No Closure | Sep 15 - No Closure |
| **1-2** | 1.18 | 8% | 1.09 | July 26 | June 5 - No Closure |
| **2-2; 3-2** | 1.18 | 9% | 1.07 | July 23 | June 3 - No Closure |
| **1-3** | 1.73 | 8% | 1.59 | November 20 | July 29 - No Closure |
| **2-3; 3-3*** | 1.73 | 9% | 1.57 | November 16 | July 26 - No Closure |
| **1-4** | 1.70 | 8% | 1.56 | November 14 | July 25 - No Closure |
| **2-4; 3-4** | 1.70 | 9% | 1.55 | November 12 | July 24 - No Closure |
| **1-5** | 1.72 | 8% | 1.58 | November 18 | July 27 - No Closure |
| **2-5; 3-5** | 1.72 | 9% | 1.57 | November 16 | July 26 - No Closure |
| **1-6** | 1.44 | 8% | 1.32 | August 27 | June 27 - No Closure |
| **2-6; 3-6** | 1.44 | 9% | 1.31 | August 25 | June 26 - No Closure |

Source: SEFSC MRIP-FES Recreational ACL Dataset (May 8, 2020).
*The combination of preferred alternatives from Actions 1 and 2 are highlighted.

As with most predictions, the reliability of the results is dependent upon the accuracy of their underlying data and input assumptions. The analyses have attempted to create a realistic

---

[10] This information is also displayed in Appendix I, which was provided at the June 2020 Council meeting.

baseline as a foundation for comparisons, under the assumption that projected future landings will accurately reflect actual future landings.  Uncertainty exists in this projection, as economic conditions, weather events, changes in catch-per-unit effort, fisher response to management regulations, and a variety of other factors may cause departures from this assumption.

*Data Currencies for Red Grouper Private Mode Landings*

Although the Southeast Regional Office monitors the sector ACTs through MRIP-FES, the Council requested, at its June 2020 meeting, that the red grouper private mode landings from Florida be provided in three currencies:  Gulf Reef Fish Survey[11] (GRFS), MRIP-CHTS, and MRIP-FES.  The request was based on the concept that the majority of private recreational landings of red grouper occur in Florida and that all landings data currencies should be considered to inform decisions on stock sustainability.  These landings are displayed in Table 2.2.5.  GRFS is conducted by the Florida Fish and Wildlife Conservation Commission (FWC), and is a catch and fishing effort monitoring program for 13 Gulf reef fish species (mutton snapper, yellowtail snapper, hogfish, red snapper, vermilion snapper, gag, red grouper, black grouper, greater amberjack, lesser amberjack, banded rudderfish, almaco jack, and gray triggerfish).  The program was certified by NMFS, indicating that the methodologies proposed for use by the program to monitor catch and effort were statistically appropriate, and has been in place since 2015.  GRFS uses dockside intercepts to monitor catch, and a mail survey to measure fishing effort, with the former augmenting APAIS and the latter FES.  GRFS is considered a supplemental survey to MRIP, increasing spatiotemporal sample coverage of catch and effort for the subject reef fish species.  GRFS was replaced on July 1, 2020, by the FWC's State Reef Fish Survey, which expanded the coverage area of GRFS to include the east coast of Florida.  The first full year of data from GRFS sampling was 2016, so MRIP landings (CHTS and FES) from 2016-2019 are included for comparison.

**Table 2.2.5.**  Red grouper private mode Florida landings (pounds whole weight) from GRFS, MRIP-CHTS, and MRIP-FES surveys.

| Year | GRFS | MRIP-CHTS | MRIP-FES |
|------|------|-----------|----------|
| **2016** | 907,291 | 962,299 | 2,273,809 |
| **2017** | 497,239 | 385,577 | 1,377,751 |
| **2018** | 747,082 | 548,205 | 1,736,801 |
| **2019** | 679,529 | 421,351 | 1,378,144 |

\*Landings exclude Monroe County and are in lbs ww.
Source:  GRFS data provided July 6, 2020; SEFSC MRIP-CHTS recreational ACL file (5/18/20); SEFSC MRIP-FES recreational ACL file (6/22/20).

---

[11] On July 1, 2020, the State Reef Fish Survey replaced the Gulf Reef Fish Survey, and the survey expanded to cover the Atlantic coast of Florida in addition to the Gulf coast.

# CHAPTER 3. AFFECTED ENVIRONMENT

## 3.1  Description of the Fishery

Detailed descriptions of the red grouper component of the Gulf of Mexico (Gulf) reef fish fishery can be found in Reef Fish Amendments 38 (GMFMC 2012a) and 44 (GMFMC 2017c) to the Fishery Management Plan (FMP) for the Reef Fish Resources in the Gulf of Mexico (Reef Fish FMP).  Additionally, Sections 3.4 and 3.5 provide information on the respective economic and social environments of the fishery.  Management of the commercial and recreational sectors fishing for reef fish in federal waters began in 1984 with the implementation of the Reef Fish FMP.  This FMP has been continuously updated through plan amendments and framework actions (also known as regulatory amendments).  Resultant regulatory measures are codified at 50 CFR 622.  A summary of reef fish management actions can be found on the Gulf of Mexico Fishery Management Council's (Council) web page.[12]  Management actions associated with red grouper can also be found in this document in Section 1.4.

The allocation between the commercial and recreational sector in the red grouper fishery is 76% and 24%, respectively.  Total landings of red grouper have ranged from 4.4 to 13.6 million pounds (mp) gutted weight (gw) between 2001 and 2018 (using Marine Recreational Information Program – Fishing Effort Survey [MRIP-FES] data for the recreational component; Table 2.1.2).[13]  The years with the lowest landings occurred in 2010 (4.9 mp gw - likely associated with the Deepwater Horizon oil spill) and 2018 (4.4 mp gw – likely associated with the large red tide event).  The highest landings in this series occurred in 2004 at approximately 13.6 mp gw. In general, annual landings have been between 5 and 10 mp gw (using MRIP-FES data for the recreational component).

Historically, relative spawning biomass (i.e. spawning potential ratio [SPR]) of red grouper was below the 30% management target from 1990 through 1996, gradually increased as the 1998 cohort matured, but declined considerably in 2005 following a severe red tide event that killed an estimated 29.5% of the red grouper population.  The spawning stock biomass (SSB) increased from 2006 and peaked in 2012, likely due to the large 2005 cohort moving through the population in combination with effective management measures (e.g., a reduction in the commercial size limit in 2009, implementation of the commercial individual fishing quota (IFQ) program in 2010, etc.).  Relative spawning biomass has been decreasing since 2012, and reached a low of 0.246 in 2017.  This decrease is due at least in part to the severe 2014 red tide event that killed an estimated 21.3% of the population (Southeast Data Assessment and Review [SEDAR] 61 Executive Summary 2019).

---

[12] http://gulfcouncil.org/fishery-management/

[13] Prior to 2013, red grouper recreational landings data were collected and monitored in Marine Recreational Fisheries Statistics Survey (MRFSS) currency.  Data referenced here have been converted to MRIP-FES currency for consistency and to match current collection and monitoring protocols.

Landings in both 2017 (~5.0 mp gw) and 2018 (~4.4 mp gw), were among the lowest in the time series presented in Table 2.1.2, and there was other evidence of declining Gulf red grouper stocks.  Some fishermen testified to the Council in 2018 that red grouper were harder to catch and stated that the current acceptable biological catch**Error! Bookmark not defined.** (ABC**Error! Bookmark not defined.**) of 13.92 mp gw was too high.  They expressed concern that the stock condition may be declining, citing an apparent lack of legal-size and larger individuals throughout the species' range on the West Florida shelf.  In addition, there were severe red tide conditions that occurred in summer and fall of 2014 and 2018 off the Florida west coast that could have adversely affected the red grouper stock.  Both the SEDAR 12 Update 2009 and SEDAR 42 2015 found that the large 2005 red tide event (likely similar in scope to the red tide events in 2014 and 2018) depressed the red grouper spawning stock biomass (SSB).

At present, it is not yet clear whether or to what extent the 2018 red tide event affected the red grouper stock, or why harvests have declined in recent years.  The Council requested the National Marine Fisheries Service (NMFS) take emergency action in 2019 to reduce the annual catch limit (ACL) and annual catch target (ACT) for both the recreational and commercial red grouper fisheries.  Based on the Council request, NMFS withheld distribution of the amount of IFQ allocation equal to the amount of anticipated reduction of the commercial quota (83 FR 64480).  In May 2019, NMFS issued an emergency rule (84 FR 22389) temporarily reducing the stock ACL until a final rule could be implemented.  In October 2019, NMFS implemented a framework action (84 FR 52036) setting the stock ACL at 4.16 mp gw -- equal to the 2017 combined red grouper commercial and recreational landings.

**Commercial Sector**

For the commercial sector, red grouper harvest is managed under an individual fishing quota (IFQ) program administered through the Southeast Regional Office (SERO) of NMFS.  Under the IFQ program, allocation is distributed annually on January 1 to IFQ shareholders with red grouper shares.  The amount of allocation distributed is based on the annual quota and shares possessed by an entity (expressed as a percent of the quota).  To harvest IFQ species, a vessel permit must be linked to an IFQ account and possess sufficient allocation for the species to be harvested.  IFQ accounts can be opened and valid permits can be linked to IFQ accounts at any time during the year.  Eligible vessels can receive allocation from other IFQ participants.  For more information on the IFQ program, see the SERO webpage on limited access programs.[14]

Commercial operators harvesting reef fish from the Gulf exclusive economic zone (EEZ) must have a Gulf reef fish permit, which is a limited access permit.  In 2018, a total of 845 vessels held Gulf commercial reef fish permits.  Over 99% of those permits have the mailing recipient in a Gulf state (Table 3.1.1).  These vessels combine to make up the federal Gulf reef fish fleet, and any vessel in the fleet must have a vessel monitoring system onboard.

---

[14] http://portal.southeast.fisheries.noaa.gov/cs/main.html

**Table 3.1.1.** Number and percentage of vessels with a Gulf reef fish permit by state, final totals for 2018.

| State | Gulf Reef Fish Permits | |
|---|---|---|
| | Number | Percent |
| **AL** | 38 | 4.5% |
| **FL** | 677 | 80.1% |
| **LA** | 43 | 5.1% |
| **MS** | 7 | 0.8% |
| **TX** | 74 | 8.8% |
| **Subtotal** | 839 | 99.3% |
| **Other** | 6 | 0. 7% |
| **Total** | **845** | **100.0%** |

Source: NMFS SERO PIMS.

The commercial red grouper fishery is open throughout the year to fishermen with Gulf commercial reef fish permits and red grouper allocation.  The minimum commercial size limit is 18 inches total length (TL), and there are no trip limits.  Primary commercial gear types used to harvest red grouper include vertical lines (handlines and bandit gear) and bottom longlines (BLLs) (GMFMC 2016a).  Traps are no longer a legally acceptable method for red grouper harvest.

Vessels fishing with BLLs off the coast of Florida generally target red grouper in shallower waters and yellowedge grouper, tilefish, and sharks in deeper waters.  Vessels that use BLL gear in the Gulf EEZ east of 85º30′W must have a valid Eastern Gulf longline endorsement in addition to their valid Gulf reef fish permit.  In 2018, 62 permit holders held the longline endorsement (61 valid and one renewable/transferrable), and all but one of the endorsement holders had a mailing address in Florida (1 in Texas).

**Table 3.1.2.** Red grouper landings in pounds gutted weight for the commercial sector.

| Year | Landings | Quota | Percent of Quota |
|------|----------|-------|------------------|
| 2000 | 5,702,622 | N/A | N/A |
| 2001 | 5,802,442 | N/A | N/A |
| 2002 | 5,791,795 | N/A | N/A |
| 2003 | 4,832,294 | N/A | N/A |
| 2004 | 5,635,577 | 5,310,000 | 106.1 |
| 2005 | 5,380,603 | 5,310,000 | 101.3 |
| 2006 | 5,109,824 | 5,310,000 | 96.2 |
| 2007 | 3,650,777 | 5,310,000 | 68.8 |
| 2008 | 4,748,224 | 5,310,000 | 89.4 |
| 2009 | 3,698,227 | 5,750,000 | 64.3 |
| 2010 | 2,910,970 | 5,750,000 | 50.6 |
| 2011 | 4,783,668 | 5,230,000 | 91.5 |
| 2012 | 5,219,133 | 5,370,000 | 97.2 |
| 2013 | 4,599,001 | 5,530,000 | 83.2 |
| 2014 | 5,601,905 | 5,630,000 | 99.5 |
| 2015 | 4,798,007 | 5,720,000 | 83.9 |
| 2016 | 4,497,582 | 7,780,000 | 57.8 |
| 2017 | 3,328,271 | 7,780,000 | 42.8 |
| 2018 | 2,363,280 | 7,780,000 | 30.4 |

Source.  2000-2009: SEFSC Commercial ACL dataset (11/15/19) and, 2010-2019: IFQ database (accessed 8/19/19).

Current regulations prohibit a longline vessel from having more than 750 hooks rigged for fishing at any given time.  In addition, longline vessels must abide by seasonal prohibitions as follows: 1) From June through August each year, bottom longlining for Gulf reef fish is prohibited in the portion of the Gulf EEZ east of 85°30' W longitude that is shoreward of rhumb lines as specified in 50 CFR 622.35(b)(1);  2) A person aboard a vessel that uses longline or buoy gear in the reef *longline and buoy gear restricted area* (as specified in Table 1 of Appendix B to §622) is limited on that trip to the bag limits for Gulf reef fish specified in §622.38(b) and, for Gulf reef fish for which no bag limit is specified in §622.38(b), the vessel is limited to 5 percent, by weight, of all fish on board or landed.

Estimates for longline sector characteristics and catch are based on a 2011 study of observer data (Scott-Denton et al., 2011). Average BLL trips in the Gulf are estimated to last 11.7 days. Longline vessels are estimated on average to set 5.6 nautical miles of mainline, and fish at a depth of 92 m (309 ft), with a soak time of 5.1 hours.  Sets generally occur over rocky bottoms during daylight hours.

Data from Scott-Denton et al. indicate that approximately 46% of the BLL fish catch is kept, while the rest is discarded.  Of the catch that is released alive, about 42% exhibit signs of stress including barotrauma symptoms (airbladder expansion and/or eyes protruding), while 46% exhibit a normal appearance.  In all, it is estimated that the immediate mortality for red grouper

is approximately 20% in the longline sector.  Data provided during the most recent red grouper stock assessment (SEDAR 61 2019) supported discard mortality estimates for red grouper captured on BLLs at 44.1% post-IFQ. For parsimony, the most recent red grouper stock assessment assumed a discard mortality rate of 41.5% for the commercial bottom longline fleet, following SEDAR 42 (SEDAR 61 2019 Executive Summary).

The species predominantly caught in the longline fishery include red grouper (56% of catch), yellowedge grouper (10%), and blueline tilefish (5%).  Red grouper, yellowedge grouper, golden tilefish, and blueline tilefish are the species most commonly kept (82% of total), while red grouper, Atlantic sharpnose shark, smooth dogfish, and red snapper are the most common species released alive (83%).  Red grouper, blueline tilefish, Atlantic sharpnose shark, and red snapper comprise about 81% of the catch that is discarded dead, and red grouper comprise 77% of the fish released in unknown condition (Scott-Denton et al., 2011).

The longline component's catch of red grouper is largely indiscriminate of size, ranging from below 10 to above 35 inches, with a mode of 18 inches.  Approximately 32% of red grouper captured are below the legal-size limit of 18 inches.  Of the 68% of red grouper catch that is of legal size, 62% is kept (Scott-Denton et al., 2011).

Red grouper are also a primary target species in the commercial vertical line sector.  Effort and catch in the red grouper vertical line sector are highest in the eastern Gulf.  Scott-Denton et al. found that 71% of the individual fish captured in the vertical line component are kept, with red snapper ranked highest in catch composition (31% of catch), followed by vermilion snapper (29%) and red grouper (16%).  Vermilion snapper, red snapper, red grouper, and red porgy comprise an estimated 86% of kept individuals.  Of fish that are released alive, approximately 35% exhibit visual signs of stress, including barotrauma.  Red snapper, vermilion snapper, and red grouper comprise 87% of the fish that is discarded dead, and the immediate mortality rate for red grouper for vertical line fishery is estimated at 11% (Scott-Denton et al., 2011).  The two most recent stock assessments assumed discard mortality for red grouper in the commercial vertical line sector at 19.0% (SEDAR 42 2015; SEDAR 61 2019).

Gauging the scope of discarding of captured fish is a vital element in predicting overall fishery impacts on the red grouper population.  Red grouper commercial dead discards were estimated beginning in 1990 with the implementation of federal minimum size limits. SEDAR 61 2019 assumed discard mortality rates of 41.5% for the commercial BLL fleet, 19.0% for the commercial vertical line fleet, and 10.0% for the trap fishery (no longer operational). Commercial longline fleet discards averaged about 465,000 fish from 1993-2017, with a low of 153,000 fish in 2009 and a peak of 878,000 fish in 1997. Commercial vertical line fleet discards of red grouper averaged about 134,000 fish from 1993-2017, with a low of about 49,000 fish in 1995 and a peak of over 290,000 fish in 2011 (Table 3.1.3).  Pulver and Stephen (2018) found that nearly 95 percent of reported red grouper discards were because of the minimum size limit.

**Table 3.1.3.**  Red grouper commercial discards (number of fish) by gear.

| Year | Vertical Line | Longline |
|------|--------------|----------|
| 1993 | 79,662 | 514,033 |
| 1994 | 94,368 | 668,159 |
| 1995 | 49,123 | 302,219 |
| 1996 | 112,944 | 667,938 |
| 1997 | 132,132 | 878,497 |
| 1998 | 127,683 | 718,051 |
| 1999 | 140,955 | 754,469 |
| 2000 | 142,683 | 633,778 |
| 2001 | 146,668 | 652,257 |
| 2002 | 151,052 | 579,902 |
| 2003 | 158,908 | 596,105 |
| 2004 | 151,788 | 567,853 |
| 2005 | 133,793 | 440,858 |
| 2006 | 146,203 | 506,568 |
| 2007 | 150,881 | 405,702 |
| 2008 | 127,661 | 480,530 |
| 2009 | 219,006 | 153,431 |
| 2010 | 198,729 | 177,525 |
| 2011 | 290,423 | 346,979 |
| 2012 | 178,703 | 402,936 |
| 2013 | 96,399 | 209,867 |
| 2014 | 59,449 | 324,659 |
| 2015 | 86,568 | 195,727 |
| 2016 | 96,899 | 242,272 |
| 2017 | 71,658 | 216,046 |

Source: SEDAR 61 Final Report (NMFS 2019)

**Recreational Sector**

For the recreational sector, red grouper harvest is managed with ACLs, ACTs, accountability measures (AMs), season/area closures, a minimum size limit, and a bag limit.  The primary gear type in the recreational sector is vertical line gear (rod-and-reel).  During the months of February and March, the possession of red grouper caught in waters beyond the 20 fathom (120 feet) contour is prohibited.  This closure is to protect red grouper and other grouper species that are in spawning condition.  Red grouper have a 20-inch TL recreational minimum size limit and are a part of the four-grouper aggregate recreational bag limit.  However, only two of the fish in that aggregate bag limit can be red grouper.  Private recreational fishing vessels are not required to have a federal permit to harvest individual species or species complexes in the reef fish fishery from the Gulf EEZ.  Anglers aboard these vessels, however, must either be federally registered or licensed in states that have a system to provide complete information on that state's saltwater anglers to the national registry.  Any for-hire fishing vessel that takes anglers into the Gulf EEZ to harvest species or complexes in the reef fish fishery must have a limited-access charter vessel/headboat (for-hire) permit for reef fish that is specifically assigned to that vessel.  State regulations are different from federal regulations in some cases.  In those circumstances (e.g., red grouper closed season outside 20 fathom contour), private anglers must obey the regulations for

the waters they are fishing in.  For charter vessels and headboats, if federal regulations for Gulf reef fish are more restrictive than state regulations, operators must comply with those federal regulations regardless of where the fish are harvested.  For federal waters, if landings meet or are projected to meet the red grouper ACL, then the season will be closed.

In 2018, there were 1,312 for-hire fishing vessels with a valid or renewable/transferrable for-hire permit for reef fish: 1,279 vessels with a for-hire permit and another 33 with a historical captain for-hire permit (Table 3.1.4).  Approximately 61% (806) of the 1,312 for-hire vessel reef fish permits have mailing recipients in Florida.  Texas recipients hold the second highest number of permits, with 16%.  Collectively, approximately 99% of the permits have mailing recipients in one of the Gulf States.

**Table 3.1.4.**  Number and percentage of for-hire reef fish permits by state of mailing recipient (of permit).

| State | For-Hire Reef Fish Permits by State of Recipient | |
|---|---|---|
| | Number | Percentage |
| **Alabama** | 137 | 10.4% |
| **Florida** | 806 | 61.4% |
| **Louisiana** | 121 | 9.2% |
| **Mississippi** | 32 | 2.4% |
| **Texas** | 206 | 15.7% |
| **Other** | 10 | 0.8% |
| **Total** | 1,312 | 100.0% |

Source: Permit Information Management System (PIMS) final data for 2018.

Recreational total red grouper landings (Table 3.1.5) peaked in the Gulf in 2004 (8.0 mp), but were also high in 2013 (5.0 mp) and 2014 (5.4 mp).  Recreational catch was low from 2007-2011 (range 1.6 mp – 2.0 mp) and again in 2017 (1.7 mp) and 2018 (2.1 mp).  From 2001-2018, private anglers landed 86.0% of the total recreational landings, while charter boats landed 12.6%, and headboats 1.4% (Table 3.1.5).

**Table 3.1.5.** Red grouper landings in pounds gutted weight for recreational fleets.

| Year | Charter | Headboat | Private | Total |
|------|---------|----------|---------|-------|
| **2001** | 334,963 | 30,181 | 2,070,312 | 2,435,456 |
| **2002** | 268,079 | 23,508 | 2,880,760 | 3,172,348 |
| **2003** | 269,853 | 38,489 | 1,893,154 | 2,201,496 |
| **2004** | 519,621 | 65,145 | 7,398,473 | 7,983,239 |
| **2005** | 513,070 | 75,009 | 2,493,900 | 3,081,979 |
| **2006** | 262,350 | 25,479 | 2,367,236 | 2,655,065 |
| **2007** | 145,391 | 24,674 | 1,861,802 | 2,031,867 |
| **2008** | 293,645 | 37,604 | 1,273,149 | 1,604,398 |
| **2009** | 193,864 | 29,583 | 1,376,617 | 1,609,247 |
| **2010** | 326,603 | 26,064 | 1,611,095 | 1,963,762 |
| **2011** | 244,092 | 36,697 | 1,253,324 | 1,534,113 |
| **2012** | 575,589 | 83,324 | 3,472,809 | 4,131,722 |
| **2013** | 796,929 | 77,542 | 4,115,840 | 4,990,310 |
| **2014** | 586,680 | 45,107 | 4,737,128 | 5,368,916 |
| **2015** | 500,305 | 50,621 | 3,239,928 | 3,790,853 |
| **2016** | 406,066 | 56,851 | 2,169,801 | 2,632,718 |
| **2017** | 342,871 | 21,423 | 1,328,134 | 1,692,428 |
| **2018** | 362,021 | 22,310 | 1,669,115 | 2,053,446 |

Source. SEFSC MRIP-FES (Fishing Effort Survey) Recreational dataset (11/26/19).

Red grouper recreational discards were derived from MRIP-FES estimates of live released fish between 1993 and 2017 and self-reported discards in the Southeast Region Headboat Survey (SRHS) logbook since 2007. Red grouper discards from headboats for years prior to 2007 in Florida were estimated using the MRIP Charter: SRHS discard ratio as a proxy. SEDAR 61 2019 assumed recreational discard mortality at 11.6%. Red grouper recreational discard estimates averaged 4.25 million fish from 1993 to 2017, with a low of 1.53 million fish in 1996 and a peak of 8.10 million fish in 2004 (Table 3.1.6).

**Table 3.1.6**.  Red grouper recreational discards (number of fish).

| Year | Charter | Headboat | Private | Total |
|------|---------|----------|---------|-------|
| **1993** | 86,379 | 78,702 | 3,158,040 | 3,323,121 |
| **1994** | 146,510 | 84,039 | 3,236,051 | 3,466,600 |
| **1995** | 236,720 | 107,149 | 3,835,677 | 4,179,546 |
| **1996** | 114,829 | 163,725 | 1,246,516 | 1,525,070 |
| **1997** | 127,887 | 78,504 | 2,014,957 | 2,221,348 |
| **1998** | 202,616 | 83,492 | 3,337,806 | 3,623,914 |
| **1999** | 375,157 | 180,087 | 5,405,117 | 5,960,361 |
| **2000** | 471,536 | 98,791 | 4,227,094 | 4,797,421 |
| **2001** | 272,157 | 72,878 | 3,502,720 | 3,847,755 |
| **2002** | 228,016 | 63,624 | 3,909,476 | 4,201,116 |
| **2003** | 343,210 | 136,745 | 3,752,560 | 4,232,515 |
| **2004** | 423,964 | 160,995 | 7,512,527 | 8,097,486 |
| **2005** | 248,419 | 92,489 | 2,701,327 | 3,042,235 |
| **2006** | 123,352 | 32,695 | 2,220,260 | 2,376,307 |
| **2007** | 111,913 | 17,365 | 1,599,693 | 1,728,971 |
| **2008** | 367,994 | 89,615 | 6,294,612 | 6,752,221 |
| **2009** | 398,022 | 153,829 | 6,276,296 | 6,828,147 |
| **2010** | 497,987 | 117,879 | 5,379,955 | 5,995,821 |
| **2011** | 433,964 | 134,114 | 6,021,306 | 6,589,384 |
| **2012** | 464,256 | 117,809 | 4,392,740 | 4,974,805 |
| **2013** | 620,479 | 112,266 | 4,895,361 | 5,628,106 |
| **2014** | 435,470 | 84,237 | 4,293,342 | 4,813,049 |
| **2015** | 326,901 | 74,376 | 2,550,817 | 2,952,094 |
| **2016** | 322,165 | 79,409 | 2,164,044 | 2,565,618 |
| **2017** | 299,920 | 73,658 | 2,202,611 | 2,576,189 |

Source: SEDAR 61 Final Report (NMFS 2019)

## 3.2  Description of the Physical Environment

**General Description of the Physical Environment**

The physical environment for Gulf reef fish and red drum is detailed in the Environmental Impact Statement for the Generic Essential Fish Habitat (EFH) Amendment (GMFMC 2004a), Generic Amendment 3 (GMFMC 2005), and the Generic ACL/AM Amendment (GMFMC 2011a), which are hereby incorporated by reference.

The Gulf has a total area of approximately 600,000 square miles (1.5 million km$^2$), including state waters (Gore 1992).  It is a semi-enclosed, oceanic basin connected to the Atlantic Ocean by the Straits of Florida and to the Caribbean Sea by the Yucatan Channel (Figure 3.2.1).

Oceanographic conditions are affected by the Loop Current, discharge of freshwater into the northern Gulf, and a semi-permanent, anti-cyclonic gyre in the western Gulf.  The Gulf includes both temperate and tropical waters (McEachran and Fechhelm 2005).  Gulf water temperatures range from 54º F to 84º F (12º C to 29º C) depending on time of year and depth of water.  Mean annual sea surface temperatures ranged from 73 º F through 83º F (23-28º C) including bays and bayous (Figure 3.1.1) between 1982 and 2009, according to satellite-derived measurements (NODC 2011)[15].  In general, mean sea surface temperature increases from north to south with large seasonal variations in shallow waters.

**General Description of the Reef Fish Physical Environment**

In general, reef fish are widely distributed in the Gulf, occupying both pelagic and benthic habitats during their life cycle.  A planktonic larval stage lives in the water column and feeds on zooplankton and phytoplankton (GMFMC 2004a).  Juvenile and adult reef fish are typically demersal and usually associated with bottom topographies on the continental shelf (less than 100 m) which have high relief, i.e., coral reefs, artificial reefs, rocky hard-bottom substrates, ledges and caves, sloping soft-bottom areas, and limestone outcroppings.  However, several species are found over sand and soft-bottom substrates.  For example, juvenile red snapper are common on mud bottoms in the northern Gulf, particularly off Texas through Alabama.  Also, some juvenile snapper (e.g., mutton, gray, red, dog, lane, and yellowtail snappers) and grouper (e.g., goliath, red, gag, and yellowfin groupers) are associated with inshore seagrass beds, mangrove estuaries, lagoons, and larger bay systems.

Red grouper are known to alter the offshore hard bottom areas.  They remove sand and other debris from limestone solution holes using their mouths and fins.  The removal of the sediment creates sites for organisms such as sponges and corals to colonize, which in turn provides shelter for small sessile creatures like shrimp and small fish.  Coleman et al. (2010) labeled red grouper as ecological engineers as their habitat modification increases biodiversity around the holes and depressions they associate with.

---

[15] NODC 2011:  http://accession.nodc.noaa.gov/0072888



**Figure 3.2.1.** Physical environment of the Gulf, including major feature names and mean annual sea surface temperature as derived from the Advanced Very High-Resolution Radiometer Pathfinder Version 5 sea surface temperature data set (http://accession.nodc.noaa.gov/0072888).

**Historic Places**

With respect to the National Register of Historic Places, there is one site listed in the Gulf.  This is the wreck of the *U.S.S. Hatteras*, located in federal waters off Texas.  Historical research indicates that over 2,000 ships have sunk on the Federal Outer Continental Shelf in the Gulf between 1625 and 1951; thousands more have sunk closer to shore in state waters during the same period.  Only a handful of these have been scientifically excavated by archaeologists for the benefit of generations to come[16].

**Northern Gulf of Mexico Hypoxic Zone**

Every summer in the northern Gulf, a large hypoxic zone forms.  It is the result of allochthonous materials and runoff from agricultural lands by rivers to the Gulf, increasing nutrient inputs from the Mississippi River, and a seasonal layering of waters in the Gulf.  The layering of the water is temperature and salinity dependent and prevents the mixing of higher oxygen content surface water with oxygen-poor bottom water.  For 2019, the extent of the hypoxic area was estimated to

---

[16] http://www.boem.gov/Environmental-Stewardship/Archaeology/Shipwrecks.aspx.

be 6,952 square miles and ranks as the eighth largest event over the past 33 years the area has been mapped.[17]  The hypoxic conditions in the northern Gulf directly affect less mobile benthic macroinvertebrates (e.g., polychaetes) by influencing density, species richness, and community composition (Baustian and Rabalais 2009).  However, more mobile macroinvertebrates and demersal fishes (e.g., gray snapper) are able to detect lower dissolved oxygen levels and move away from hypoxic conditions.  Therefore, although not directly affected, these organisms are indirectly affected by limited prey availability and constrained available habitat (Baustian and Rabalais 2009; Craig 2012).

**Greenhouse Gases**

The Intergovernmental Panel on Climate Change[18] has indicated greenhouse gas emissions are one of the most important drivers of recent changes in climate.  Wilson et al. (2014) inventoried the sources of greenhouse gases in the Gulf from sources associated with oil platforms and those associated with other activities such as fishing.  A summary of the results of the inventory are shown in Table 3.2.1 with respect to total emissions and from fishing.  Commercial fishing and recreational vessels make up a small percentage of the total estimated greenhouse gas emissions from the Gulf (2.04% and 1.67%, respectively).

**Table 3.2.1.**  Total Gulf greenhouse gas emissions estimates (tons per year) from oil platform and non-oil platform sources, commercial fishing, and percent greenhouse gas emissions from commercial fishing vessels of the total emissions*.  Data are for 2011 only.

| Emission source | $CO_2$ | Greenhouse $CH_4$ | Gas $N_2O$ | Total $CO_{2e}$** |
|---|---|---|---|---|
| Oil platform | 5,940,330 | 225,667 | 98 | 11,611,612 |
| Non-platform | 14,017,962 | 1,999 | 2,646 | 14,856,307 |
| **Total** | **19,958,292** | **227,665** | **2,743** | **26,467,578** |
| Commercial fishing | 531,190 | 3 | 25 | 538,842 |
| Recreational fishing | 435,327 | 3 | 21 | 441,559 |
| Percent commercial fishing | 2.66% | >0.01% | 0.91% | 2.04% |
| Percent recreational fishing | 2.18% | >0.01% | 0.77% | 1.67% |

*Compiled from Tables 6-11, 6-12, and 6-13 in Wilson et al. (2014).  **The $CO_2$ equivalent ($CO_2e$) emission estimates represent the number of tons of $CO_2$ emissions with the same global warming potential as one ton of another greenhouse gas (e.g., $CH_4$ and $N_2O$).  Conversion factors to $CO_{2e}$ are 21 for $CH_4$ and 310 for $N_2O$.

## 3.3  Description of the Biological/Ecological Environment

The biological environment of the Gulf, including the species addressed in this amendment, is described in detail in the Generic EFH Amendment (GMFMC 2004a), Generic ACL/AM Amendment (GMFMC 2011a), and Reef Fish Amendments 30B (GMFMC 2008c) and 32 (GMFMC 2011b) and is incorporated here by reference and further summarized below.

---

[17] http://gulfhypoxia.net
[18] https://www.ipcc.ch/srocc/

**Red Grouper Life History and Biology**

Larval red grouper are found in the plankton across the west-Florida shelf (SEDAR 42 2015). Juvenile red grouper are generally found in shallow waters around structures and patch reefs. When juveniles reach approximately 16 inches (40 cm), after they have become sexually mature, they move offshore (Moe 1969). Red grouper reach a maximum length and weight of 43 inches (110 cm TL) and 50.7 pounds. (23 kg) (Robins et al. 1986). Maximum age of red grouper in the Gulf of Mexico has been estimated at 29 years (SEDAR 61 2019). Clear determinations of size and age of maturity have been difficult for red grouper (Fitzhugh et al. 2006 and references cited therein). Fitzhugh et al. (2006) estimated the size and age at 50% maturity was 11 inches (27 cm fork length [FL]) and age 2. For SEDAR 42 2015, the values were approximated at 11.5 inches (292 mm FL) and 2.8 years following the addition of samples collected from the West Florida Shelf by Florida Fish and Wildlife Conservation Commission (FWC)/Fish and Wildlife Research Institute (FWRI) (Lowerre-Barbieri et al. 2014): however, the inclusion of 2014-2017 data led to a slightly younger age of 2.2 years in SEDAR 61 2016. Red grouper are protogynous hermaphrodites, transitioning from females to males at older ages, and form harems for spawning (Dormeier and Colin 1997). Age and size at sexual transition is approximately 10.5 years and 30 inches TL (76.5 cm TL) (Fitzhugh et al. 2006). Size and age at sexual transition was re-estimated both for SEDAR 42 2015 and SEDAR 61 (2019). These were estimated at 11.2 and 11.4 years and 707 and 708-mm FL, respectively. Red grouper spawn from February until mid-July with peak spawning occurring in the eastern Gulf of Mexico during March through May (Fitzhugh et al. 2006). Over the last 25-30 years, there has been little change in the sex ratio of red grouper, likely because they do not aggregate (Coleman et al. 1996).

**Status of the Red Grouper Stock**

A summary of the red grouper benchmark stock assessment (SEDAR 12 2006) and 2009 update stock assessment (SEDAR 12 Update 2009) can be found in GMFMC (2010a) and is incorporated here by reference. These assessments showed that the red grouper stock was neither overfished nor undergoing overfishing. The 2009 update stock assessment did suggest the stock had declined since 2005, much of which was attributed to an episodic mortality event in 2005 (most likely associated with red tide). In late 2010, the assessment was revised to incorporate new information on historical discards in the commercial sector and updated projections considering the reduction in the commercial size limit from 20 inches to 18 inches TL (Walter 2011). Given these changes, the assessment rerun resulted in a slightly improved estimate of the stock status for the last year of the assessment (2008) and indicated the total allowable catch in the near term could be substantially increased. Therefore, the SSC recommended that the overfishing limit (OFL) for red grouper be set at 8.10 mp (the equilibrium yield at the fishing mortality rate associated with harvesting the equilibrium maximum sustainable yield) and the ABC**Error! Bookmark not defined.** be set at 7.93 mp (the equilibrium yield at the fishing mortality rate associated with harvesting the equilibrium optimum sustainable yield).

*SEDAR 42 Assessment*

In October 2015, the SEDAR 42 2015 stock assessment for red grouper was completed using the Stock Synthesis model.  SEDAR 42 2015 found the red grouper stock was not undergoing overfishing and was not overfished.  Given this determination (as of 2013), SSC members determined that it was appropriate to provide OFL and ABC**Error! Bookmark not defined.** recommendations for a 5-year period beginning in 2016.  However, a decision was needed on how to handle landings for the years 2014-2015, which were not in the assessment.  For 2014, final landings were available and used, but for 2015, the SSC recommended that the assessment group use landings estimates based on the current quotas and ACLs.

The SSC recommended that the annual OFL for Gulf red grouper for years 2016-2020 be set at the 50th percentile of the OFL probability distribution function (PDF), assuming estimated landings for 2014 and 2015 fishing years.  This value was 14.16 mp gw.  The annual ABC**Error! Bookmark not defined.** for years 2016-2020 was computed as the 43rd percentile of the OFL PDF, which was 13.92 mp.

*2018 Red Grouper Interim Analysis*
The SEFSC conducted an interim analysis on red grouper to assist the Council in developing harvest advice for 2019 because red grouper was between assessments (NMFS 2018a).  The interim analysis prepared by the SEFSC developed a harvest control rule (HCR), which uses an index from a fishery-independent survey to compare where the stock seems to be now (observed index value) with where the stock should be (forecast index value).  The chosen HCR adjusts the ABC**Error! Bookmark not defined.** recommendation based on variation between projected and observed index values.  The SEFSC found that the fishery-independent BLL index was the best index for use in the HCR.

The SSC reviewed the SEFSC's interim analysis at its October 2018 meeting and concluded it was suitable for interim catch advice.  However, because the method had not been fully tested and required a number of assumptions, the SSC considered this method inappropriate to rely on to provide an ABC**Error! Bookmark not defined.** recommendation.  The SSC did determine the analysis could support a recommendation that the Council reduce the 2019 ACL to 4.6 mp gw.

*SEDAR 61 Assessment*
Similar to SEDAR 42 2015, SEDAR 61 2019 was completed using the Stock Synthesis model.  The base model time series began in 1986 with 2017 as the terminal year and length-based selectivity was modeled for fishing fleets and fishery-independent surveys.  Age composition data began in 1991.  Model fits to input data streams were similar to the SEDAR 42 2015 model, with some, such as commercial and recreational discard data, fitting better.  Recruitment remains highly variable for red grouper with strong recruitment events observed in 1995, 1998, 2001, 2005, and 2013.  In reviewing the assessment, the SSC noted that as of the end of 2017, the stock is not overfished ($SSB_{2017}$/ minimum stock size threshold (MSST) = 1.64; MSST = $0.5*B_{MSY}$) and is not undergoing overfishing ($F_{Current\ (2015-2017)}$/maximum fishing mortality threshold (MFMT) = 0.784; MFMT = $F_{30\%SPR}$).  However, this determination does not account for the 2018 red tide episodic mortality event, which was known to be a significant mortality event in the eastern Gulf.  The SSC also noted that under the old definition of MSST ($1-M*B_{MSY}$), the stock would have been considered overfished as of 2017 ($SSB_{2017}$/$MSST_{OLD}$ = 0.96).

**General Information on Reef Fish Species**

The National Ocean Service (NOS) collaborated with NMFS and the Council to develop distributions of reef fish (and other species) in the Gulf (SEA 1998).  The NOS obtained fishery-independent data sets for the Gulf, including Southeast Area Monitoring and Assessment Program and state trawl surveys.  Data from the Estuarine Living Marine Resources Program (ELMRP) contain information on the relative abundance of specific species (highly abundant, abundant, common, rare, not found, and no data) for a series of estuaries, by five life stages (adult, spawning, egg, larvae, and juvenile) and month for five seasonal salinity zones (0-0.5, 0.5-5, 5-15, 15-25, and greater than 25 parts per thousand).  NOS staff analyzed these data to determine relative abundance of the mapped species by estuary, salinity zone, and month.  For some species not in the ELMRP database, distribution was classified as only observed or not observed for adult, juvenile, and spawning stages.

Reef fish are widely distributed in the Gulf, occupying both pelagic and benthic habitats during their life cycle.  Habitat types and life history stages can be found in more detail in GMFMC (2004a).  In general, both eggs and larval stages are planktonic.  Larvae feed on zooplankton and phytoplankton.  Exceptions to these generalizations include gray triggerfish, which lay their eggs in depressions in the sandy bottom (Simmons and Szedlmayer 2012), and gray snapper whose larvae are found around submerged aquatic vegetation.  Juvenile and adult reef fish are typically demersal, and are usually associated with bottom topographies on the continental shelf (less than 328 feet; less than 100 m) which have high relief, i.e., coral reefs, artificial reefs, rocky hard-bottom substrates, ledges and caves, sloping soft-bottom areas, and limestone outcroppings.  However, several species are found over sand and soft-bottom substrates.  Juvenile red snapper are common on mud bottoms in the northern Gulf, particularly from Texas to Alabama.  Also, some juvenile snappers (e.g., mutton, gray, red, dog, lane, and yellowtail snappers) and groupers (e.g., goliath grouper, red, gag, and yellowfin groupers) have been documented in inshore seagrass beds, mangrove estuaries, lagoons, and larger bay systems (GMFMC 1981).  More detail on hard bottom substrate and coral can be found in the FMP for Corals and Coral Reefs (GMFMC and SAFMC 1982).

**Status of Reef Fish Stocks**

The Reef Fish FMP currently encompasses 31 species (Table 3.3.1).  Eleven other species were removed from the FMP in 2012 through the Generic ACL/AM Amendment (GMFMC 2011a).  The NMFS Office of Sustainable Fisheries updates its Status of U.S. Fisheries Report to Congress[19] on a quarterly basis utilizing the most current stock assessment information.  Stock assessments and status determinations have been conducted and designated for 14 stocks and can be found on the Council[20] and SEDAR[21] websites.  Of the 14 stocks for which stock assessments have been conducted and accepted by the SSC, the fourth quarter report of the 2020 Status of U.S. Fisheries classifies only one as overfished (greater amberjack) and two stocks undergoing

---

[19] https://www.fisheries.noaa.gov/national/population-assessments/fishery-stock-status-updates
[20] www.gulfcouncil.org
[21] http://sedarweb.org/

overfishing (cobia and lane snapper).  The status of both assessed and unassessed stocks, as of the writing of this amendment is provided in Table 3.3.1.

A stock assessment was conducted for Atlantic goliath grouper (SEDAR 47 2016).  The SSC accepted the assessment's general findings that the stock was not overfished nor experiencing overfishing.  Although the SSC determined Atlantic goliath grouper to not be experiencing overfishing based on annual harvest remaining below the OFL, the SSC deemed the assessment not suitable for stock status determination and management advice.

Stock assessments were conducted for seven reef fish stocks using the Data Limited Methods Tool (DLMTool; SEDAR 49 2016).  This method allows the setting of OFL and ABC**Error! Bookmark not defined.** based on limited data and life history information, but does not provide assessment-based status determinations.  Data were requested for almaco jack, lesser amberjack, snowy grouper, speckled hind, and yellowmouth grouper but it was determined not enough information was available to complete an assessment even using the DLMTool.  These stocks are not experiencing overfishing based on annual harvest remaining below the OFL, but no overfished status determination has been made (Table 3.3.1).  Lane snapper was the only stock with adequate data to be assessed using the DLMTool methods resulting in OFL and ABC recommendations by the SSC.

The remaining species within the Reef Fish FMP have not been assessed at this time.  Therefore, their stock status is unknown (Table 3.3.1).  For those species that are listed as not undergoing overfishing, that determination has been made based on the annual harvest remaining below the OFL.  Scamp is undergoing a research track assessment at this time.

**Table 3.3.1.** Status of species in the Reef Fish FMP grouped by family.

| Common Name | Scientific Name | Stock Status | | Most recent assessment or SSC workshop** |
|---|---|---|---|---|
| | | Overfishing | Overfished | |
| **Family Balistidae – Triggerfishes** | | | | |
| gray triggerfish | *Balistes capriscus* | N | N | SEDAR 43 2015 |
| **Family Carangidae – Jacks** | | | | |
| greater amberjack | *Seriola dumerili* | N† | Y | SEDAR 70 2020 |
| lesser amberjack | *Seriola fasciata* | Y | Unknown | SEDAR 49 2016 |
| almaco jack | *Seriola rivoliana* | Y | Unknown | SEDAR 49 2016 |
| banded rudderfish | *Seriola zonata* | Y | Unknown | |
| **Family Labridae – Wrasses** | | | | |
| hogfish | *Lachnolaimus maximus* | N | N | SEDAR 37 2014 |
| **Family Malacanthidae – Tilefishes** | | | | |
| tilefish (golden) | *Lopholatilus chamaeleonticeps* | N | N | SEDAR 22 2011a |
| blueline tilefish | *Caulolatilus microps* | N | Unknown | |
| goldface tilefish | *Caulolatilus chrysops* | N | Unknown | |
| **Family Serranidae – Groupers** | | | | |
| gag | *Mycteroperca microlepis* | N | N | SEDAR 33 Update 2016b |
| red grouper | *Epinephelus morio* | N | N | SEDAR 61 2019 |
| Scamp | *Mycteroperca phenax* | Unknown | Unknown | |
| black grouper | *Mycteroperca bonaci* | N | N | SEDAR 19 2010 |
| yellowedge grouper | *Hyporthodus flavolimbatus* | N | N | SEDAR 22 2011b |
| snowy grouper | *Hyporthodus niveatus* | N | Unknown | SEDAR 49 2016 |
| speckled hind | *Epinephelus drummondhayi* | N | Unknown | SEDAR 49 2016 |
| yellowmouth grouper | *Mycteroperca interstitialis* | Unknown | Unknown | SEDAR 49 2016 |
| yellowfin grouper | *Mycteroperca venenosa* | Unknown | Unknown | |
| warsaw grouper | *Hyporthodus nigritus* | N | Unknown | |
| *Atlantic goliath grouper | *Epinephelus itajara* | N | Unknown | SEDAR 47 2016 |
| **Family Lutjanidae – Snappers** | | | | |
| queen snapper | *Etelis oculatus* | N | Unknown | |
| mutton snapper | *Lutjanus analis* | N | N | SEDAR 15A Update 2015 |
| blackfin snapper | *Lutjanus buccanella* | N | Unknown | |
| red snapper | *Lutjanus campechanus* | N | N | SEDAR 52 2018 |
| cubera snapper | *Lutjanus cyanopterus* | N | Unknown | |
| gray snapper | *Lutjanus griseus* | N | N | SEDAR 51 2018 |
| lane snapper | *Lutjanus synagris* | Y | Unknown | SEDAR 49 Update 2019 |
| silk snapper | *Lutjanus vivanus* | N | Unknown | |
| yellowtail snapper | *Ocyurus chrysurus* | N | N | SEDAR 64 2020 |
| vermilion snapper | *Rhomboplites aurorubens* | N | N | SEDAR 67 2020 |
| Wenchman | *Pristipomoides aquilonaris* | N | Unknown | SEDAR 49 2016 |

Note:  *Atlantic goliath grouper is a protected grouper (i.e., ACL is set at zero), and benchmarks do not reflect appropriate stock dynamics.  Species status based on the NOAA Quarter 4 2020 FSSI report.  The most recent stock assessment is provided for reference, and the stock status determination may reflect more current information than reported in the latest stock assessment.  †The greater amberjack assessment (SEDAR 70) which determined the stock was overfished and undergoing overfishing was accepted by the SSC in January 2021.  However, the Quarter 4 2020 FSSI report does not include this update for greater amberjack.

**Bycatch of Managed Finfish Species**

Many of the reef fish species co-occur with each other and can be incidentally caught when fishermen target certain species.  In some cases, these fish may be discarded for regulatory reasons and thus are considered bycatch.  Bycatch practicability analyses have been completed for red snapper (GMFMC 2004b, GMFMC 2007, GMFMC 2014a, GMFMC 2015), grouper (GMFMC 2008a, GMFMC 20010b, GMFMC 2011a, GMFMC 2011b, GMFMC 2012a), vermilion snapper (GMFMC 2004c, GMFMC 2017a), greater amberjack (GMFMC 2008b, GMFMC 2012b, GMFMC 2015b), gray triggerfish (GMFMC 2012c), and hogfish (GMFMC 2016b).  These analyses examined the effects of fishing on these species.  In general, these analyses have found that reducing bycatch provides biological benefits to managed species as well as benefits to the fishery through less waste, higher yields, and less forgone yield.  However, in some cases, actions are approved that can increase bycatch through regulatory discards such as increased minimum sizes and closed seasons.  Under these circumstances, there is some biological benefit to the managed species that outweigh any increases in discards from the action.

Appendix B analyses the ten bycatch practicability factors.  The main benefits of reducing grouper bycatch are: 1) less waste and 2) increased yield in the directed fishery.  Reducing discards and discard mortality rates would result in less forgone yield.  Reducing red grouper ACLs is expected to reduce bycatch and discard mortality.  The benefits of the ACL reduction on red grouper bycatch in the recreational sector may be partially mitigated by the regulatory discards that would occur by fishermen that target other species and catch red grouper should AMs lead to closure of the fishery.  There are likely to be negative social and economic effects to the commercial sector, stemming largely from the expected reduction in income that is likely if the subject action is implemented.  The Council will have to weigh the benefits of reducing bycatch with the negative social and economic effects that the commercial sector would face.

**Protected Species**

NMFS manages marine protected species in the Southeast region under the Endangered Species Act (ESA) and the Marine Mammal Protection Act (MMPA).  A very brief summary of these two laws and more information is available on NMFS Office of Protected Resources website[22].  There are 21 ESA-listed species of marine mammals, sea turtles, fish, and corals that may occur in the EEZ of the Gulf.  There are 91 stocks of marine mammals managed within the Southeast region plus the addition of the stocks such as North Atlantic right whales, humpback, sei, fin, minke, and blue whales that regularly or sometimes occur in Southeast region managed waters for a portion of the year (Hayes et al. 2018).  All marine mammals in U.S. waters are protected under the MMPA.

Of the four marine mammals that may be present in the Gulf (sperm, sei, fin, and Gulf Bryde's), the sperm, sei, and Gulf of Mexico Bryde's whale are listed as endangered under the ESA.  Bryde's whales are the only resident baleen whales in the Gulf.  Manatees, listed as threatened under the ESA, also occur in the Gulf and are the only marine mammal species in this area managed by the U.S. Fish and Wildlife Service.

---

[22] https://www.fisheries.noaa.gov/topic/laws-policies#endangered-species-act

The gear used by the Gulf reef fish fishery is classified in the MMPA 2019 List of Fisheries as a Category III fishery (84 FR 22051).  This classification indicates the annual mortality and serious injury of a marine mammal stock resulting from any fishery is less than or equal to 1% of the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population.  Dolphins are the only species documented as interacting with the reef fish fishery.  Bottlenose dolphins prey upon bait, catch, and/or released discards of fish from the reef fish fishery.  They are also a common predator around reef fish vessels, feeding on the discards.  Marine Mammal Stock Assessment Reports and additional information are available on the NMFS Office of Protected Species website.[23]

Sea turtles, fish, and corals that are listed as threatened or endangered under the ESA occur in the Gulf.  These include the following: six species of sea turtles (Kemp's ridley, loggerhead (Northwest Atlantic Ocean distinct population segment (DPS)), green (North Atlantic and South Atlantic DPSs), leatherback, and hawksbill); five species of fish (Gulf sturgeon, smalltooth sawfish, Nassau grouper, oceanic whitetip shark and giant manta ray); and six species of coral (elkhorn, staghorn, lobed star, mountainous star, boulder star, and rough cactus).  Critical habitat designated under the ESA for smalltooth sawfish, Gulf sturgeon, and the Northwest Atlantic Ocean DPS of loggerhead sea turtles occur in the Gulf, though only loggerhead critical habitat occurs in federal waters.

The most recent biological opinion (BiOp) for the FMP was completed on September 30, 2011.  The BiOp determined the operation of the Gulf reef fish fishery managed under the Reef Fish FMP is not likely to adversely affect ESA-listed marine mammals or coral, and was not likely to jeopardize the continued existence of sea turtles (loggerhead, Kemp's ridley, green, hawksbill, and leatherback) or smalltooth sawfish.  Since issuing the opinion, in memoranda dated September 16, 2014, and October 7, 2014, NMFS concluded that the activities associated with the Reef Fish FMP are not likely to adversely affect critical habitat for the Northwest Atlantic Ocean loggerhead sea turtle DPS and four species of corals (lobed star, mountainous star, boulder star, and rough cactus).  On September 29, 2016, NMFS requested re-initiation of Section 7 consultation on the operation of reef fish fishing managed by the Reef Fish FMP because new species (i.e., Nassau grouper [81 FR 42268] and green sea turtle North Atlantic and South Atlantic DPSs [81 FR 20057]) were listed under the ESA that may be affected by the proposed action.  NMFS documented a determination that the operation of the fishery to continue during the re-initiation period is not likely to adversely affect these species.

On January 22, 2018, NMFS published a final rule (83 FR 2916) listing the giant manta ray as threatened under the ESA.  On January 30, 2018, NMFS published a final rule (83 FR 4153) listing the oceanic whitetip shark as threatened under the ESA.  In a memorandum dated March 6, 2018, NMFS revised the request for re-initiation of consultation on the Reef Fish FMP to address the listings of the giant manta and oceanic whitetip.  In that memorandum, NMFS also determined that fishing under the Reef Fish FMP during the extended re-initiation period will not jeopardize the continued existence of the giant manta ray, oceanic whitetip shark, Nassau grouper, or the North Atlantic and South Atlantic DPSs of green sea turtles.

---

[23]http://www.nmfs.noaa.gov/pr/sspecies/

NMFS published a final rule on April 15, 2019, listing the Gulf Bryde's whale as endangered.  In a memorandum dated June 20, 2019, NMFS revised the re-initiation request to include the Gulf Bryde's whale and determined that fishing under the Reef Fish FMP during the re-initiation period will not jeopardize the continued existence of any of the newly listed species discussed above.

**Climate Change**

Climate change projections predict increases in sea-surface temperature and sea level; decreases in sea-ice cover; and changes in salinity, wave climate, and ocean circulation.[24]  These changes are likely to affect plankton biomass and fish larvae abundance that could adversely affect fish, marine mammals, seabirds, and ocean biodiversity.  Kennedy et al. (2002) and Osgood (2008) have suggested global climate change could affect temperature changes in coastal and marine ecosystems that can influence organism metabolism and alter ecological processes such as productivity and species interactions, change precipitation patterns and cause a rise in sea level. This could change the water balance of coastal ecosystems; altering patterns of wind and water circulation in the ocean environment; and influence the productivity of critical coastal ecosystems such as wetlands, estuaries, and coral reefs.  The National Oceanic and Atmospheric Association (NOAA) Climate Change Web Portal[25] predicts the average sea surface temperature in the Gulf will increase by 1-3°C for 2010-2070 compared to the average over the years 1950-2010.  For reef fishes, Burton (2008) speculated climate change could cause shifts in spawning seasons, changes in migration patterns, and changes to basic life history parameters such as growth rates.  The smooth puffer and common snook are examples of species for which there has been a distributional trend to the north in the Gulf.  For other species, such as red snapper and the dwarf sand perch, there has been a distributional trend towards deeper waters.  For other fish species, such as the dwarf goatfish, there has been a distributional trend both to the north and to deeper waters.  These changes in distributions have been hypothesized as a response to environmental factors, such as increases in temperature.

The distribution of native and exotic species may change with increased water temperature, as may the prevalence of disease in keystone animals such as corals and the occurrence and intensity of toxic algae blooms.  Hollowed et al. (2013) provided a review of projected effects of climate change on the marine fisheries and dependent communities.  Integrating the potential effects of climate change into the fisheries assessment is currently difficult due to the time scale differences (Hollowed et al. 2013).  The fisheries stock assessments rarely project through a time span that would include detectable climate change effects.  However, some stocks have shown increases in abundance in the northern Gulf (Fodrie et al. 2010).  This may be a result of increasing water temperatures in coastal environments.

***Deepwater Horizon* MC252 Oil Spill**

The presence of polycyclic aromatic hydrocarbons (PAH), which are highly toxic chemicals that tend to persist in the environment for long periods of time, in marine environments can have detrimental impacts on marine finfish, especially during the more vulnerable larval stage of

---

[24] http://www.ipcc.ch/
[25] https://www.esrl.noaa.gov/psd/ipcc/

development (Whitehead et al. 2012).  When exposed to realistic, yet toxic levels of PAHs (1–15 µg/L), greater amberjack larvae develop cardiac abnormalities and physiological defects (Incardona et al. 2014).  The future reproductive success of long-lived species, including red drum and many reef fish species, may be negatively affected by episodic events resulting in high-mortality years or low recruitment.  These episodic events could leave gaps in the age structure of the population, thereby affecting future reproductive output (Mendelssohn et al. 2012).  Other studies have described the vulnerabilities of various marine finfish species, with morphological and/or life history characteristics similar to species found in the Gulf, to oil spills and dispersants (Hose et al. 1996; Carls et al. 1999; Heintz et al. 1999; Short 2003).

Increases in histopathological lesions were found in red snapper in the area affected by the oil, but Murawski et al. (2014) found that the incidence of lesions had declined between 2011 and 2012.  The occurrence of such lesions in marine fish is not uncommon (Sindermann 1979; Haensly et al. 1982; Solangi and Overstreet 1982; Khan and Kiceniuk 1984, 1988; Kiceniuk and Khan 1987; Khan 1990).  Red snapper diet was also affected after the spill.  A decrease in zooplankton consumed, especially by adults (greater than 400 mm TL) over natural and artificial substrates may have contributed to an increase in the consumption of fish and invertebrate prey – more so at artificial reefs than natural reefs (Tarnecki and Patterson 2015).

In addition to the crude oil, over a million gallons of the dispersant, Corexit 9500A®, was applied to the ocean surface and an additional hundreds of thousands of gallons of dispersant was pumped to the mile-deep wellhead (National Commission 2010).  No large-scale applications of dispersants in deep water had been conducted until the *Deepwater Horizon* MC252 oil spill.  Thus, no data exist on the environmental fate of dispersants in deep water.  The effect of oil, dispersants, and the combination of oil and dispersants on fishes of the Gulf remains an area of concern.

**Red Tide**

Red tide is a common name for harmful algal blooms caused by species of dinoflagellates and other organisms that cause the water to appear to be red.  Red tide blooms occur in the Gulf almost every year, generally in late summer or early fall.  They are most common off the central and southwestern coasts of Florida between Clearwater and Sanibel Island but may occur anywhere in the Gulf.  More than 50 species capable of causing red tides occur in the Gulf, but one of the best-known species is *Karenia brevis*.  This organism produces toxins capable of killing fish, birds and other marine animals.[26]

The effects of red tide on fish stocks have been well established.  In 2005, a severe red tide event occurred in the Gulf along with an associated large decline in multiple abundance indices for red grouper, gag, red drum, and other species thought to be susceptible to mortality from red tide events.  It is unknown whether mortality occurs via absorption of toxins across gill membranes (Abbott et al. 1975, Baden 1988), ingestion of toxic biota (Landsberg 2002), or from some indirect effect of red tide such as hypoxia (Walter et al. 2013).  In 2018, a severe red tide event occurred off the southwest coast of Florida from Monroe County to Sarasota County that

---

[26] http://myfwc.com/research/redtide/general/about/

persisted for more than 10 months; the impacts on fish stocks will likely be considered in future stock assessments.

## 3.4  Description of the Economic Environment

A description of the red grouper stock affected by the actions considered in this amendment is provided in Section 3.3.  Additional details on the economic environment of the recreational and commercial sectors of the red grouper component of the Gulf reef fish fishery are provided in the Framework Action to Modify Red Grouper Annual Catch Limits and Annual Catch Targets (GMFMC 2019b), Reef Fish Amendment 36A (GMFMC 2017b) and the Framework Action to Adjust Red Grouper Allowable Harvest (2016a).

This amendment contains management measures that would directly or indirectly affect Gulf red grouper dealers, and thus additional details on the economic environment of that component of the commercial sector are also provided.  Sections 3.4.1 and 3.4.2 contain additional information on the economic environment of the commercial sector and the for-hire and private recreational components of the recreational sector in the Gulf reef fish fishery, with a specific focus on the red grouper portion of the fishery.

### 3.4.1  Commercial Sector

**Permits**

Any fishing vessel that harvests and sells any of the reef fish species, including red grouper, managed under the Reef Fish FMP from the Gulf EEZ must have a valid Gulf commercial reef fish permit.  The commercial sector of the reef fish fishery has been managed under a limited access program since 1992, which in turn capped the number of commercial reef fish permits.  Therefore, new entrants must buy a permit in order to participate in the commercial sector.  As shown in Table 3.4.1.1, the number of permits that were valid or renewable in a given year has continually decreased in the years after the red snapper (RS)-IFQ program was implemented in 2007.  This decline has continued since the gray triggerfish (GT)-IFQ program was implemented in 2010, but at a slower rate.  As of February 27, 2020, there were 834 valid or renewable commercial reef fish permits, 763 of which were valid.  A renewable permit is an expired limited access permit that cannot be actively fished, but can be renewed for up to one year after expiration.

**Table 3.4.1.1.** Number of valid or renewable commercial reef fish permits, 2008-2019.

| Year | Number of Permits |
|------|------------------:|
| **2008** | 1,099 |
| **2009** | 998 |
| **2010** | 969 |
| **2011** | 952 |
| **2012** | 917 |
| **2013** | 895 |
| **2014** | 882 |
| **2015** | 868 |
| **2016** | 852 |
| **2017** | 850 |
| **2018** | 845 |
| **2019** | 842 |

Source:  NMFS SERO Sustainable Fisheries (SF) Access permits database.

A single permit is attached to a single vessel and many businesses only own one vessel. However, some businesses hold or own multiple permits and vessels.  Multiple vessels owned by a single business are often referred to as a "fleet."  Although each vessel is often legally organized under an individual corporate or other business name, for economic purposes, the fleet is treated as a single business because the same, or mostly the same, individuals are determining how those vessels operate.  A single business may include other types of operations that possess shares in addition to fishing vessels.

As illustrated in Table 3.4.1.2, at the end of 2018, which is essentially equivalent to Jan. 1, 2019, 94 businesses owned two or more valid or renewable reef fish permits.  Although these businesses represented only 14.8% of the businesses with permits, they held 35.5% of the permits, which illustrates some degree of concentration in the ownership of permitted vessels. The maximum number of permitted vessels held by a single business was 16.

**Table 3.4.1.2.**  Vessels and businesses with a commercial reef fish permit, end of year (EOY) 2018.

| No. of Vessels Owned by a Business | No. of Businesses | No. of Total Permitted Vessels | % of Businesses | % of Permitted Vessels |
|------|------:|------:|------:|------:|
| **1** | 543 | 543 | 85.2% | 64.5% |
| **2** | 60 | 120 | 9.4% | 14.3% |
| **3** | 15 | 45 | 2.4% | 5.3% |
| **4** | 8 | 32 | 1.3% | 3.8% |
| **5-6** | 3 | 17 | .5% | 2.0% |
| **7-10** | 6 | 53 | .9% | 6.3% |
| **15-16** | 2 | 32 | .3% | 3.8% |
| **Total** | **637** | **842** | **100%** | **100.0%** |

Source:  NMFS SERO permits and IFQ databases, March 23, 2020.

Although all permitted vessels may harvest non-IFQ reef fish species (e.g., vermilion snapper), not all permitted vessels are eligible to harvest red grouper (RG).  A permitted vessel must be linked to an active IFQ account in order to be eligible to harvest RG and IFQ species.[27]  Thus, because some vessels are not linked to an active IFQ account, fewer permitted vessels are eligible to harvest IFQ species and, in turn, fewer businesses may accrue revenue from the harvest of IFQ species.

**Table 3.4.1.3.**  IFQ eligible vessels and businesses with a Gulf reef fish permit, EOY 2018.

| No. of Vessels Owned by a Business | No. of Businesses | No. of Total Permitted Vessels | % of Businesses | % of Permitted Vessels |
|---|---|---|---|---|
| 1 | 450 | 450 | 84.6% | 63.1% |
| 2 | 52 | 104 | 9.8% | 14.6% |
| 3 | 13 | 39 | 2.4% | 5.5% |
| 4 | 6 | 24 | 1.1% | 3.4% |
| 5-6 | 3 | 17 | .6% | 2.4% |
| 7-10 | 6 | 48 | 1.1% | 6.7% |
| 15-16 | 2 | 31 | .4% | 4.3% |
| **Total** | **532** | **713** | **100%** | **100.0%** |

Source:  NMFS SERO permits and IFQ databases, March 23, 2020.

Table 3.4.1.3 shows that, at the end of 2018, only 713 permitted vessels were linked to an IFQ account, and these vessels were owned by 532 businesses.  Thus, 129 permitted vessels were not eligible to harvest IFQ species and 105 businesses with reef fish permits could not accrue revenue from the harvest of IFQ species.  The degree of concentration among IFQ-eligible permitted vessels is slightly greater than with all permitted vessels, as businesses owning multiple IFQ-eligible vessels represent only 15.4% of the businesses, but hold 36.9% of the permitted vessels that can harvest IFQ species.

**IFQ Accounts with RG Shares**

As of February 19, 2020, there were 684 IFQ accounts with shares in one or more share categories.  Of these accounts, 495 held red grouper shares.  The total percentage of RG shares held by accounts with RG shares does not sum to 100% in Table 3.4.1.4 because a small percentage of RG shares were reclaimed under Reef Fish Amendment 36A.[28]  The total percentages for other share categories also do not sum to 100% because some accounts with RG shares do not possess shares in other categories, though a small amount of shares in the other categories were also reclaimed under Reef Fish Amendment 36A.

On average (mean), each of these 495 accounts holds just over 0.2% of the RG shares.  However, as discussed in Reef Fish Amendment 36A, the distribution of shares within the RG share

---

[27] The vessel account must have a valid permit and be linked to an active IFQ account.  The vessel account must also have annual allocation in it in order for the permitted vessel to harvest IFQ species.  Vessel accounts are considered active when a permit is valid.  A renewable permit status is not an active status.  An IFQ account status is active if the account holder submitted an affirmative answer to the bi-annual citizenship requirement.
[28] Shares were reclaimed from accounts that had never been activated since the start of the GT-IFQ program.

category, and in fact all categories, is highly skewed.  In other words, some accounts have a relatively high percentage of the shares in a category while others have no or a very low percentage of the shares.  For accounts that hold RG shares, the largest or maximum percent of shares held by a single account in each category ranges from 2.33% for gag grouper (GG) to 4.265% for RG, 4.433% for other shallow-water grouper (SWG), 4.139% for RS, 12.212% for tilefish (TF), and 14.704% for deep water grouper (DWG).  The account that has the highest percentages of DWG and TF shares are at the share cap for those categories.  The account that has the highest percentage of RG shares is near the 4.331% share cap for RG.  Thus, in percentage terms, these estimates indicate there are some relatively large shareholders in the DWG and TF categories in particular.  This finding is consistent with findings in GMFMC (2018) which indicate the concentration of shares is greatest in the TF and DWG categories and least in the GG category.  Even though the concentration of shares is relatively high for TF and DWG, concentration levels in those and other categories, as well as for all categories combined, are still considered to be "unconcentrated" and thus quota share markets are considered to be competitive (i.e., no business or other entity has the ability to exercise market power by controlling an "excessive" amount of the shares and thereby share prices).[29]

**Table 3.4.1.4.**  Quota share statistics (in percent) for accounts with RG shares, Feb. 19, 2020.

| Statistic | DWG Shares | RG Shares | GG Shares | SWG Shares | TF Shares | RS Shares |
|---|---|---|---|---|---|---|
| Maximum | 14.704 | 4.265 | 2.330 | 4.433 | 12.212 | 4.139 |
| Total | 88.587 | 99.900 | 93.519 | 90.852 | 83.187 | 59.887 |
| Mean | 0.179 | 0.202 | 0.189 | 0.184 | 0.168 | 0.121 |

Source:  NMFS SERO IFQ database accessed 2/19/2020.

As with permitted vessels, although it is common for a single IFQ account with shares to be held by a single business, some businesses have multiple IFQ accounts with shares.  The 495 IFQ accounts with RG shares are owned by 436 businesses.

Further, although some IFQ accounts with RG shares are linked to a single permitted vessel, others are linked to multiple permitted vessels or are not linked to a permitted vessel at all.  The latter accounts are held by businesses that are likely to sell their annual allocation rather than harvest it.  Of the 495 IFQ accounts with RG shares, 290 accounts were linked to one or more permitted vessels, while 205 accounts were not linked to a permitted vessel.  The 290 accounts were linked to a total of 365 permitted vessels and these accounts and vessels were owned by 260 businesses.  Most businesses only own one or two accounts and permitted vessels.  But, one business has 12 accounts and 3 businesses own 10 or more permitted vessels.  The 205 accounts that were not linked to a vessel were owned by 176 businesses and all of these businesses only held one or two accounts with RG shares.

---

[29] These conclusions hold regardless of the measure of concentration (e.g., the Herfindahl-Hirschman Index (HHI), C5, or C3) or the unit of analysis (e.g., IFQ account, lowest known entity (LKE), and affiliated accounts/businesses). The Horizontal Merger Guidelines from the US Department of Justice and the Federal Trade Commission identify markets with an HHI below 1,500 to be Unconcentrated (no concerns over the exercise of market power), HHI between 1,500 and 2,500 to be Moderately Concentrated (possible concern with market power being exercised given a sufficient increase in concentration), and above 2,500 to be Highly Concentrated (exercise of market power is likely, particularly if concentration increases further).

As shown in Table 3.4.1.5, the 260 businesses that own RG shares and permitted vessels hold the vast majority of shares held by businesses that own RG shares in all share categories, ranging from a low of just over 50% of the RS shares to a high of over 84% of the RG shares.  On average, these 260 businesses own between 0.19%-0.32% of the shares in each category.  The maximum percentage of shares owned by a business varies considerably, ranging from about 3.86% of the GG shares to 19.7% of the DWG shares.[30]

As shown in Table 3.4.1.6, the 176 businesses that own RG shares, but do not own permitted vessels, own less shares in total compared to the businesses that own permitted vessels.  Specifically, these businesses own slightly more than 4% of the TF shares but just above 17% of the DWG shares.  These businesses own between 0.02% and 0.1% of the shares in each category on average.  The maximum percentage of shares owned by one of these businesses varies somewhat, ranging from about 1.14% of the TF shares to 2.33% of the GG shares.

In general, the information in Tables 3.4.1.5 and 3.4.1.6 can be used to determine the distribution of annual allocation, the market value of shares, the market value of annual allocation, and the potential ex-vessel value of annual allocation if used for harvesting between businesses with RG shares that own permitted vessels and businesses with RG shares that do not own permitted vessels. However, ex-vessel value would not accrue to businesses that do not possess a permit because a permit is needed to harvest IFQ species, including RG.

**Table 3.4.1.5.**  Quota share statistics (in percent) for businesses with RG shares and permitted vessels, Feb. 19, 2020.

| Statistic | DWG Shares | RG Shares | GG Shares | SWG Shares | TF Shares | RS Shares |
|---|---|---|---|---|---|---|
| **Maximum** | 19.719 | 6.262 | 3.857 | 5.136 | 14.743 | 5.076 |
| **Total** | 78.536 | 84.166 | 76.507 | 77.175 | 79.155 | 50.204 |
| **Mean** | 0.302 | 0.324 | 0.294 | 0.297 | 0.304 | 0.193 |

Source:  NMFS SERO IFQ database accessed 2/19/2020.

**Table 3.4.1.6.**  Quota share statistics (in percent) for businesses with RG shares and no permitted vessels, Feb. 19, 2020.

| Statistic | DWG Shares | RG Shares | GG Shares | SWG Shares | TF Shares | RS Shares |
|---|---|---|---|---|---|---|
| **Maximum** | 1.991 | 1.745 | 2.330 | 1.536 | 1.136 | 2.346 |
| **Total** | 10.051 | 15.734 | 17.012 | 13.677 | 4.032 | 9.683 |
| **Mean** | 0.057 | 0.089 | 0.097 | 0.078 | 0.023 | 0.055 |

Source:  NMFS SERO IFQ database accessed 2/19/2020.

The amount of annual allocation (quota pounds) that an account holder receives each year is not only conditional on the percentage of shares held in a category, but also the commercial quota applicable to that category.  The 2019 quotas for each share category were as follows: 6,937,838 lbs gw for RS, 3 mp gw for RG, 1.024 million lbs gw for DWG, 582,000 lbs gw for TF, and 525,000 lbs gw for SWG.  Table 3.4.1.7 presents statistics regarding annual allocation to IFQ

---

[30] Share caps are applied at the IFQ account and LKE levels, but not at the business level as defined here. Thus, it is possible for a business to control a share percentage above the cap.

accounts based on the share statistics in Table 3.4.1.4 and these quotas.  Based on this information, the average account holder with RG shares received 6,055 lbs gw of RG allocation in 2019, while the largest account holder received almost 128,000 lbs gw.  Across all categories, the average account holder with RG shares received about 20,000 lbs gw of allocation in 2019.

**Table 3.4.1.7.**  Annual allocation (lb gw) statistics for accounts with RG shares, Feb. 19, 2020.

| Statistic | DWG Allocation | RG Allocation | GG Allocation | SWG Allocation | TF Allocation | RS Allocation |
|---|---|---|---|---|---|---|
| Maximum | 150,572 | 127,945 | 21,879 | 23,275 | 71,076 | 287,124 |
| Total | 907,132 | 2,996,996 | 878,139 | 476,974 | 484,149 | 4,154,869 |
| Mean | 1,833 | 6,055 | 1,774 | 964 | 978 | 8,394 |

Source:  NMFS SERO IFQ database accessed 2/19/2020.

Table 3.4.1.8 provides statistics regarding the amount of allocation held by the 260 businesses that possess RG shares and at least one permit.  Information in this table reflects that these businesses control just over 84% of the RS allocation, or around 2.54 mp gw.  The largest amount of RG allocation controlled by a single business with RG shares and a permit is almost 180,000 lb gw, while the average amount of RG allocation held by a business with a permit is about 9,700 lb gw.

Table 3.4.1.9 provides statistics regarding the amount of allocation held by the 176 businesses that possess shares but are not associated with a permit.  Information in this table reflects that these businesses control almost 16% of the RG allocation, or around 472,000 lb gw.  The largest amount of allocation controlled by a single business with RG shares but without a permit is slightly more than 52,300 lb gw, while the average amount of RG allocation held by a business without a permit is almost 2,700 lb gw.

**Table 3.4.1.8.**  Annual allocation (lb gw) statistics for businesses with RG shares and permitted vessels, February 19, 2020.

| Statistic | DWG | RG | GG | SWG | TF | RS |
|---|---|---|---|---|---|---|
| Maximum | 201,920 | 187,868 | 36,216 | 26,965 | 85,803 | 352,131 |
| Total | 804,209 | 2,524,968 | 718,400 | 405,168 | 460,681 | 3,483,095 |
| Mean | 3,093 | 9,711 | 2,763 | 1,558 | 1,772 | 13,397 |

Source: NMFS SERO IFQ database accessed 2/19/2020).

**Table 3.4.1.9.**  Annual allocation (lb gw) statistics for businesses with RG shares and no permitted vessels, February 19, 2020.

| Statistic | DWG | RG | GG | SWG | TF | RS |
|---|---|---|---|---|---|---|
| Maximum | 20,386 | 52,359 | 21,879 | 8,064 | 6,613 | 162,774 |
| Total | 102,923 | 472,028 | 159,739 | 71,806 | 23,468 | 671,773 |
| Mean | 585 | 2,682 | 908 | 408 | 133 | 3,817 |

Source: NMFS SERO IFQ database accessed 2/19/2020).

Quota shares have value in multiple ways.  First, shares have value because they are an asset. The asset value of each account's shares is determined by the market price of the shares and the amount of shares it contains.  Statistics regarding the value of the shares held by accounts with RG shares are in Table 3.4.1.10.  The total value of all shares held by accounts with RG shares is

just over $212 million (2019$), with the bulk of that value coming from ownership of RS shares, which accounts for more than 80% of the combined total value. This is also true for the average account that holds RG shares. The average value of an account that holds RG shares is about $428,000, though only about 8% of that value is based on RG shares. The account with the largest asset value of shares is worth about $12.1 million, with RS shares representing the bulk of that value (98%).

**Table 3.4.1.10.** Quota share value statistics for accounts with RG shares (2019$).

| Statistic | DWG | RG | GG | SWG | TF | RS | All |
|---|---|---|---|---|---|---|---|
| Maximum | $1,376,230 | $728,007 | $208,945 | $130,804 | $675,221 | $11,820,887 | $12,100,160 |
| Total | $8,291,186 | $17,052,906 | $8,386,229 | $2,680,593 | $4,599,417 | $171,055,937 | $212,066,267 |
| Mean | $16,750 | $34,450 | $16,942 | $5,415 | $9,292 | $345,568 | $428,417 |

Note: Share value estimates are based on average 2019 share prices per pound.
Source: NMFS SERO IFQ database accessed 2/11/2020.

The information in Table 3.4.1.10 reflects the asset value of shares based on 2019 share prices. However, with the exception of RS shares, and TF shares to a lesser extent, average share prices for other share categories have continuously declined over the past 5 years, as illustrated in Table 3.4.1.11. Specifically, RG and GG share prices have declined by 59% during this time. The declines for DWG and TF prices have been less, but are still noticeable. TF share prices have been relatively steady, while RS share prices have increased by more than 14%. Compared to conditions in 2015, RG shares currently represent a far smaller percentage of an RG share account holder's IFQ asset portfolio, which was around 29% at that time. The same is true for the other GT share categories, with RS shares now dominating that portfolio.

**Table 3.4.1.11.** Average share prices by share category, 2015-2019 (2019$).

| Share category | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| RS | $36.07 | $32.56 | $36.27 | $36.90 | $41.17 |
| RG | $13.80 | $10.74 | $5.39 | $4.17 | $5.69 |
| GG | $23.58 | $15.18 | $16.55 | $9.95 | $9.55 |
| DWG | $13.67 | $13.25 | $13.16 | $11.11 | $9.14 |
| SWG | $7.23 | $6.20 | $9.06 | $4.96 | $5.62 |
| TF | $9.85 | $10.64 | $9.07 | $10.89 | $9.50 |

Source: IFQ database accessed 2/11/2020.

Table 3.4.1.12 provides statistics regarding the value of the shares held by the 260 businesses that possess RG shares and at least one permit. Information in this table again reflects that these businesses control just over 84% of the total RG share value. The largest RG share value controlled by a single business with a permit is almost $1.07 million, while the average value of RG shares held by a business with a permit is just over $55,200. RG shares only represent about 8% of the total share value held by these businesses, while RS shares represent about 80% of the total share value held by these businesses.

**Table 3.4.1.12.**  Quota share value statistics for businesses with RG shares and permitted vessels, February 19, 2020 (2019$).

| Statistic | DWG | RG | GG | SWG | TF | RS | All |
|---|---|---|---|---|---|---|---|
| Maximum | $1,845,546 | $1,068,972 | $345,865 | $151,544 | $815,125 | $14,497,248 | $18,724,299 |
| Total | $7,350,467 | $14,367,067 | $6,860,720 | $2,277,046 | $4,376,474 | $143,399,025 | $178,630,799 |
| Mean | $28,271 | $55,258 | $26,387 | $8,758 | $16,833 | $551,535 | $687,042 |

Note:  Share value estimates are based on average 2019 share prices per pound.
Source:  NMFS SERO IFQ database accessed 2/19/2020.

Table 3.4.1.13 provides statistics regarding the value of the shares held by the 176 businesses that possess RG shares but are not associated with a permit.  Information in this table again reflects that these businesses control about 16% of the total RG share value.  The largest RG share value controlled by a single business without a permit is about $298,000, while the average value of shares held by a business with RG shares but without a permit is just over $15,200. RG shares only represent about 8% of the total share value held by these businesses, while RS shares represent almost 83% of the total share value held by these businesses.

**Table 3.4.1.13.**  Quota share value statistics for businesses with RG shares but no permitted vessels, February 19, 2020 (2019$).

| Statistic | DWG | RG | GG | SWG | TF | RS | All |
|---|---|---|---|---|---|---|---|
| Maximum | $186,331 | $297,923 | $208,945 | $45,319 | $62,823 | $6,701,407 | $7,502,747 |
| Total | $940,718 | $2,685,839 | $1,525,509 | $403,547 | $222,943 | $27,656,913 | $33,435,468 |
| Mean | $5,345 | $15,260 | $8,668 | $2,293 | $1,267 | $157,142 | $189,974 |

Note:  Share value estimates are based on average 2019 share prices per pound.
Source:  NMFS SERO IFQ database accessed 2/19/2020).

In addition to their asset value, shares have value because they result in annual allocation, which can either be sold or used for harvesting purposes (i.e., landings).  Annual allocation that is sold results in revenue for the business holding the allocation.  This revenue likely represents an equivalent amount of profit as the business does not pay cost recovery fees when selling allocation and any other monetary costs associated with selling allocation are likely trivial. Statistics regarding the potential market value associated with the annual allocation for each account with RG shares are provided in Table 3.4.1.14.

The average market value of annual allocation should approximate the expected net revenue or economic profit of the annual allocation in the short-term (i.e., in a given year).  Thus, if the annual allocation held by accounts with RG shares was harvested, economic profits from those landings would be expected to be about $19.4 million, with the bulk of those profits (79%) arising from the harvest of RS while RG would only account for about 9%.  Although one account would be expected to earn about $1.1 million in short-term profits, if the account holders with RG shares retain their initial annual allocations, the average short-term profit per account would only be expected to be around $39,000.[31]  Realized value in the form of actual annual

---

[31] "Accounts" do not actually harvest landings and thus do not earn profits per se; rather, vessels and the businesses that own them do.  Further, annual allocation is often transferred, so the actual distribution of short-term profits would likely differ from the potential distribution based on the distribution of annual allocation at the beginning of the year.  The purpose of these estimates is to characterize the distribution of annual allocation and its value across accounts in the short-term.

revenue and profits is likely less from RG allocation and other allocation in the GT-IFQ program as quota utilization for those species is typically well below 100% in those categories (68% for RG in 2019).  Thus, annual profit from the sale of RG allocation is more likely to be around $1.24 million in total and $2,500 per business on average.

**Table 3.4.1.14.**  Potential market value of annual allocation in 2020 for all accounts with RG shares (2019$).

| Statistic | DWG | RG | GG | SWG | TF | RS | All |
|---|---|---|---|---|---|---|---|
| **Maximum** | $158,101 | $75,488 | $18,597 | $51,175 | $13,732 | $1,059,487 | $1,089,420 |
| **Total** | $952,488 | $1,768,227 | $746,418 | $348,587 | $281,415 | $15,331,465 | $19,428,601 |
| **Mean** | $1,924 | $3,572 | $1,508 | $704 | $569 | $30,973 | $39,250 |

Note:  Annual allocation market value estimates are based on average 2019 allocation prices.
Source:  NMFS SERO IFQ database accessed 2/11/2020)

The information in Table 3.4.1.14 reflects the potential market value of allocation based on 2019 allocation prices and commercial quotas.  However, with the exception of RS allocation, allocation prices for other share categories have declined over the past 5 years, as illustrated in Table 3.4.1.15.  Specifically, RG and GG allocation prices have declined by 49% and 58% during this time.  The decline in the RG allocation price is most likely due to the significant commercial quota increase in late 2016.  The declines for DWG and TF allocation prices have been less, but are still noticeable.  If these trends continue, then the estimate in Table 3.4.1.14 may overestimate the market value of these allocations in 2020.  Conversely, RS allocation price has increased by more than 14%.  Thus, if the upward trend in the RS allocation price continues, the estimated market value of RS allocation in Table 3.4.1.14 may underestimate actual market value in 2020.  Compared to conditions in 2015, RG allocation currently represent a far smaller percentage of an RG share account holder's allocation portfolio, which was around 29% at that time.  The same is true for the other GT-IFQ share categories, with RS allocation now dominating that portfolio.

**Table 3.4.1.15.**  Average allocation prices by share category, 2015-2019 (2019$).

| Share category | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| **RS** | $3.31 | $3.41 | $3.46 | $3.46 | $3.69 |
| **RG** | $1.15 | $0.95 | $0.44 | $0.33 | $0.59 |
| **GG** | $2.03 | $1.47 | $1.51 | $1.03 | $0.85 |
| **DWG** | $1.26 | $1.23 | $1.23 | $1.01 | $1.05 |
| **SWG** | $0.64 | $0.59 | $0.60 | $0.54 | $0.59 |
| **TF** | $0.83 | $0.71 | $0.75 | $0.73 | $0.72 |

Source:  IFQ database accessed 2/11/2020.

Similar to shares, annual allocation tends to be "unconcentrated" across accounts.  According to GMFMC (2018), concentration is low across all share categories combined and for most share categories, with the exception of TF which is typically "moderately concentrated."  Also, concentration of annual allocation is the lowest at the beginning of each year, when it is based on the distribution of shares.  Concentration in all categories is seasonal and increases as the year progresses or stabilizes in the 3rd or 4th quarter, but the markets are still largely "unconcentrated"

with the exception of TF.  But even at moderate levels of concentration, there is no evidence of market power being exercised in any of the markets for annual allocation (i.e., markets for annual allocation are competitive).

Table 3.4.1.16 provides statistics regarding the value of the allocation held by the 260 businesses that possess RG shares and at least one permit.  Information in this table again reflects that these businesses control just over 84% of the total value of RG allocation.  The largest RG allocation value controlled by a single business with a permit is worth almost $111,000, while the average value of RG allocation held by a business with a permit is just over $5,700.  Realized value in the form of actual annual revenue and profits is likely less from RG allocation as quota utilization is typically well below 100% (70% in 2019).  Thus, annual profit for these businesses from the sale of RG allocation is more likely to be around $1.04 million in total and $4,000 per business on average.

**Table 3.4.1.16.**  Allocation value statistics for businesses with RG shares and permitted vessels, February 19, 2020 (2019$).

| Statistic | DWG | RG | GG | SWG | TF | RS | All |
|---|---|---|---|---|---|---|---|
| Maximum | $212,016 | $110,842 | $30,784 | $15,909 | $61,778 | $1,299,365 | $1,334,171 |
| Total | $844,419 | $1,489,731 | $610,640 | $239,049 | $331,691 | $12,852,621 | $16,368,151 |
| Mean | $3,248 | $5,730 | $2,349 | $919 | $1,276 | $49,433 | $62,954 |

Note:  Allocation value estimates are based on average 2019 allocation prices per pound.
Source:  NMFS SERO IFQ database accessed 2/19/2020.

Table 3.4.1.17 provides statistics regarding the value of the allocation held by the 176 businesses that possess shares but are not associated with a permit.  Information in this table again reflects that these businesses control about 16% of the total value of RG allocation.  The largest allocation value controlled by a single business without a permit is worth almost $278,500, while the average value of allocation held by a business without a permit is almost $1,600.  Again, realized value in the form of actual annual revenue and profits is likely less from RG allocation as quota utilization is typically well below 100% (70% in 2019).  Thus, annual profit for these businesses from the sale of RG allocation is more likely to be around $195,000 in total and $1,100 per business on average.

**Table 3.4.1.17.**  Allocation value statistics for businesses with RG shares but no permitted vessels, February 19, 2020 (2019$).

| Statistic | DWG | RG | GG | SWG | TF | RS | All |
|---|---|---|---|---|---|---|---|
| Maximum | $21,406 | $30,892 | $18,597 | $4,758 | $4,761 | $600,636 | $603,859 |
| Total | $108,069 | $278,496 | $135,778 | $42,365 | $16,897 | $2,478,844 | $3,060,450 |
| Mean | $614 | $1,582 | $771 | $241 | $96 | $14,084 | $17,389 |

Note:  Allocation value estimates are based on average 2019 allocation prices per pound.
Source:  NMFS SERO IFQ database accessed 2/19/2020.

These same general findings regarding the market value of annual allocation also apply to the potential ex-vessel value of that annual allocation.  The markets for landed product largely have the same characteristics as the markets for annual allocation (i.e., unconcentrated overall and for most categories, except landings of TF which are "moderately concentrated").  Thus, markets for landed product of IFQ species are thought to be competitive.  Even if market power is not

detected in these markets, the Council may have distributional or "fairness" concerns as the distributions of shares, allocation, landings, and revenue in the Gulf IFQ programs are highly unequal.  In fact, they are the most unequal of any catch share program in the U.S. (GMFMC, 2018).

**Table 3.4.1.18.**  Potential ex-vessel value of annual allocation in 2020 for accounts with RG shares (2019$).

| Statistic | DWG | RG | GG | SWG | TF | RS | All |
|---|---|---|---|---|---|---|---|
| Maximum | $844,710 | $675,549 | $132,149 | $129,408 | $204,699 | $1,516,014 | $2,057,576 |
| Total | $5,089,010 | $15,824,137 | $5,303,960 | $2,651,974 | $1,394,349 | $21,937,706 | $52,201,137 |
| Mean | $10,281 | $31,968 | $10,715 | $5,358 | $2,817 | $44,319 | $105,457 |

Note:  Potential ex-vessel value estimates are based on 2019 average ex-vessel prices.
Source:  NMFS SERO IFQ database accessed 2/11/2020).

The information in Table 3.4.1.18 reflects the potential ex-vessel value of allocations in 2020 based on 2019 ex-vessel prices and commercial quotas in 2020.  Again, realized ex-vessel value will likely be less for RG and other species in the GT-IFQ program as quota utilization rates are typically well below 100%.  Only businesses with IFQ accounts that are linked to a permit are allowed to harvest IFQ species.  Therefore, estimates of ex-vessel value are not germane to businesses that do not possess permits.

As illustrated in Table 3.4.1.19, with the exception of TF, and RS to some extent, ex-vessel prices at the share category level have steadily increased from 2015 through 2019.  For example, ex-vessel prices for gag, SWG, DWG, and TF have increased by 11%, 12%, 13%, and 13%, respectively.  Although not shown here, this increase is also seen at the individual species level within the DWG, SWG, and TF categories, with the exception of yellowmouth grouper in the SWG category, which declined by 9%, and goldface tilefish in the TF category, which declined by 10%.  The ex-vessel price for RS has only increased by 2%, and that increase almost entirely occurred in 2019.  The ex-vessel price for RG has increased by almost 26%.  These trends are nearly the opposite of the trends for allocation prices, suggesting that it is likely becoming relatively more profitable for those with shares to harvest their allocation rather than sell it, all other things being equal.[32]

**Table 3.4.1.19.**  Average ex-vessel prices by share category, 2015-2019 (2019$).

| Share category | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| RS | $5.18 | $5.17 | $5.18 | $5.19 | $5.28 |
| RG | $4.23 | $4.26 | $4.45 | $4.83 | $5.31 |
| GG | $5.44 | $5.45 | $5.47 | $5.76 | $6.04 |
| DWG | $4.96 | $4.91 | $4.93 | $5.17 | $5.61 |
| SWG | $4.95 | $4.92 | $4.96 | $5.30 | $5.56 |
| TF | $3.11 | $3.12 | $3.10 | $2.87 | $2.88 |

Source:  IFQ database accessed 2/11/2020.

---

[32] Preliminary information suggests that the recent pandemic has caused ex-vessel prices for most IFQ species to decline, thus reversing the previous trend.  As effects on allocation prices have not yet been determined, whether it is currently more profitable for IFQ account holders to sell or use allocation for landings purposes is unknown.

**Vessels**

The information in Table 3.4.1.20 describes the landings and revenue for vessels that harvested RG in each year from 2014 through 2018, as well as their revenue from other IFQ species, Gulf non-IFQ fisheries, and South Atlantic non-IFQ fisheries.  Although a majority of these vessels' gross revenue came from harvesting IFQ species, a significant portion came from harvesting non-IFQ species in the Gulf, with a minor amount coming from harvests in the South Atlantic.

Some important trends can be seen in Table 3.4.1.20.  In general, vessel participation in the IFQ programs tends to be very fluid.  However, the number of vessels that harvested RG in each year from 2015 through 2018 was relatively stable, ranging between 374 and 384 vessels, with only a small decrease occurring from 2015 to 2016.  Contrary to the upward trends for the IFQ fisheries as a whole from 2011 through 2015 (GMFMC 2017b), RG landings and revenue have decreased significantly from 2014 through 2018, with landings falling by 57% and revenue decreasing by 49%.  The revenue decrease was slightly less because of the increase in ex-vessel price that occurred during this time.  However, not only did revenue from RG landings decrease, so did revenue from other IFQ species and even from non-IFQ species in the Gulf, which declined by about 23% and 26%, respectively.  As a result, total revenue for these vessels declined by almost 35% from 2015 through 2018.

**Table 3.4.1.20.** Landings and revenue statistics for vessels harvesting RG by year, 2014-2018 (2019$).

| Year | Number of Vessels | Statistic | RG Landings (gw) | RG Revenue | Other IFQ Revenue | Gulf Non-IFQ Revenue | South Atlantic Revenue | Total Revenue |
|------|------|------|------|------|------|------|------|------|
| **2014** | 384 | Maximum | 149,013 | $612,691 | $2,384,847 | $300,104 | $120,440 | $2,387,842 |
| | | Total | 5,497,993 | $22,461,241 | $24,116,831 | $7,903,415 | $581,764 | $55,063,252 |
| | | Mean | 14,318 | $58,493 | $62,804 | $20,582 | $1,515 | $143,394 |
| | | | | | | | | |
| **2015** | 376 | Maximum | 102,900 | $430,908 | $900,697 | $287,607 | $112,904 | $949,740 |
| | | Total | 4,665,528 | $19,690,531 | $21,836,770 | $6,111,639 | $530,598 | $48,169,538 |
| | | Mean | 12,408 | $52,368 | $58,077 | $16,254 | $1,411 | $128,110 |
| | | | | | | | | |
| **2016** | 375 | Maximum | 113,282 | $471,797 | $1,070,173 | $242,494 | $99,390 | $1,081,789 |
| | | Total | 4,484,476 | $18,899,691 | $21,676,244 | $7,403,384 | $568,194 | $48,547,514 |
| | | Mean | 11,959 | $50,399 | $57,803 | $19,742 | $1,515 | $129,460 |
| | | | | | | | | |
| **2017** | 374 | Maximum | 92,586 | $416,127 | $1,024,611 | $216,904 | $149,465 | $1,031,572 |
| | | Total | 3,319,928 | $14,675,817 | $18,159,067 | $6,717,016 | $606,509 | $40,158,409 |
| | | Mean | 8,877 | $39,240 | $48,554 | $17,960 | $1,622 | $107,375 |
| | | | | | | | | |
| **2018** | 376 | Maximum | 64,498 | $312,486 | $1,033,603 | $190,863 | $107,512 | $1,038,980 |
| | | Total | 2,361,280 | $11,367,060 | $18,456,902 | $5,809,073 | $440,279 | $36,073,314 |
| | | Mean | 6,280 | $30,232 | $49,088 | $15,450 | $1,171 | $95,940 |

Source:  NMFS SERO IFQ database accessed 2/19/2020 and SEFSC Socioeconomic Panel (Version 10).

It is counterintuitive that the fleet size would remain stable given such declines, and this result deserves further research.  Nonetheless, these findings reflect the interdependency between species harvested in the commercial sector of the reef fish fishery (i.e., biological or economic factors that affect the commercial harvest of one species can and often do affect the commercial harvest of other species).  Further, these declines occurred even though the RG commercial quota increased from 5.63 mp in 2014 to 7.78 mp by late 2016, and remained at that level through 2018.  Also, the RS commercial quota increased from approximately 5.054 mp gw in 2014 to 6.312 mp gw through mid-2017, and remained at that level through 2018.  Landings and revenue would be expected to increase, likely significantly, with such increases under stable biological and economic conditions.  Thus, it is clear that biological and/or economic conditions for red grouper, and the reef fish fishery as a whole, are not stable.

The maximum annual gross revenue earned by a single vessel during this time was about $2.39 million (2019$) in 2015, though the average gross revenue per vessel was only about $143,000 that year.  Similar to the trends in total revenue for RG vessels, these values had decreased to $1.04 million and about $96,000 by 2018, representing a 33% decline in total revenue per vessel.  Average red grouper landings and revenue per vessel also decreased from 14,318 lbs and $58,493 to 6,280 lbs and $30,232 per vessel or by about 56% and 45%, respectively.

Estimates of economic returns have not been available historically for the commercial sector of the Gulf reef fish fishery.  Recent reports (Overstreet, Perruso, and Liese 2017, Overstreet and Liese 2018a, and Overstreet and Liese 2018b) provided the first such estimates.  These estimates are specific to economic performance in 2014, 2015 and 2016, respectively.  Overstreet and Liese (2018b) also provides average estimates of economic returns across 2014-2016, which are the most useful for current purposes, and thus findings from that report are summarized below.  Given the declines in landings and revenue for RG vessels discussed above, it is quite likely that economic returns were likely different by 2018 than they were in 2016, and thus the estimates below should be used with some caution.  However, some of the findings for 2014-2016 seem to be consistent with the results above for 2014-2016.

Estimates in these reports are based on a combination of Southeast Coastal logbook data, a supplemental economic add-on survey to the logbooks, and an annual economic survey at the vessel level.  The economic surveys collect data on gross revenue, variable costs, fixed costs, as well as some auxiliary economic variables (e.g., market value of the vessel).  The report provides estimates of critical economic variables for the commercial sector of the Gulf reef fish fishery as a whole, but also provides estimates by "subsets" within this sector.  These subsets are referred to as Segments of Interest (SOI).  SOIs are generally defined at the individual species (e.g., red snapper), species group (e.g., Jacks), and/or gear-level (e.g., longline).  In addition, estimates are provided at the trip level and the annual vessel level for each SOI.  For current purposes, the most important results are those for vessels that harvested RG.

From an economic returns perspective, the two most critical results at the trip level are the estimates of trip net cash flow and trip net revenue.  Trip net cash flow is trip revenue minus the costs for fuel, bait, ice, groceries, miscellaneous, hired crew, and purchases of annual allocation from other allocation holders.  Thus, this estimate represents the amount of cash generated by a typical reef fish trip over and above the cash cost of taking the trip (i.e., variable costs of the trip)

and is a proxy for producer surplus (PS) at the trip level.  Trip net revenue is trip revenue minus the costs for fuel, bait, ice, groceries, miscellaneous, hired crew, and the opportunity cost of owner's time as captain.  By including opportunity cost of the owner's time and excluding purchases of annual allocation, trip net revenue is a measure of the commercial fishing trip's economic profit.

Table 3.4.1.21 illustrates the economic "margins" generated on red grouper trips, i.e., trip net cash flow and trip net revenue as a percentage of trip revenue.  As shown in this table, 30%, 18%, and 18% (or 67% in total) of the average revenues generated on RG trips were used to pay for crew costs, fuel/supplies costs, and purchases of annual allocation, while the remaining 33% was net cash flow back to the owner(s).  The margin associated with trip net revenue was higher at 44%. Thus, trip cash flow and trip net revenue were both positive on average from 2014 through 2016, generally indicating that red grouper trips were profitable during this time.

Table 3.4.1.22 provides estimates of the important economic variables at the annual level for all vessels that had RG landings from 2014 through 2016.  Similar to the trip level, the three most important estimates of economic returns are net cash flow, net revenue from operations,[33] and economic return on asset value.  Of these measures, net revenue from operations most closely represents economic profits to the owner(s).  Net cash flow is total annual revenue minus the costs for fuel, other supplies, hired crew, vessel repair and maintenance, insurance, overhead, loan payments, and purchases of annual allocation.  Net revenue from operations is total annual revenue minus the costs for fuel, other supplies, hired crew, vessel repair and maintenance, insurance, overhead, and the opportunity cost of an owner's time as captain as well as the vessel's depreciation.  Economic return on asset value is calculated by dividing the net revenue from operations by the vessel value.

---

[33] Net revenue from operations accrues to the vessel owner and, when applicable, the IFQ shareholder, who may not be the same entity.

**Table 3.4.1.21.**  Economic characteristics of RG trips 2014-2016 (2019$).

|  | 2014 | 2015 | 2016 | Average |
|---|---|---|---|---|
| Number of Observations | 829 | 1,066 | 1,228 |  |
| Response Rate (%) | 78% | 85% | 94% |  |
| **SOI Trip** |  |  |  |  |
| Owner-Operated | 68% | 62% | 64% | 64.7% |
| Fuel Used per Day at Sea (gallons/day) | 41 | 39 | 37 | 39 |
| **Total Revenue** | 100% | 100% | 100% | 100% |
| **Costs (% of Revenue)** |  |  |  |  |
| Fuel | 8% | 6.3% | 5.1% | 6.5% |
| Bait | 3.7% | 4% | 4.1% | 3.9% |
| Ice | 1.5% | 1.6% | 1.7% | 1.6% |
| Groceries | 3% | 3.2% | 4.1% | 3.4% |
| Miscellaneous | 2.2% | 3% | 3.5% | 2.9% |
| Hired Crew | 30% | 31% | 30% | 30.3% |
| IFQ Purchase | 15.4% | 21.8% | 17.7% | 18.3% |
| OC Owner-Captain Time | 7.5% | 6.9% | 8.1% | 7.5% |
| **Trip Net Cash Flow** | 36% | 29% | 34% | 33% |
| **Trip Net Revenue** | 44% | 44% | 43% | 44% |
| Labor - Hired & Owner | 37% | 38% | 38% | 37.7% |
| Fuel & Supplies | 18% | 18% | 19% | 18% |
| **Input Prices** |  |  |  |  |
| Fuel Price (per gallon) | $4.06 | $2.93 | $2.28 | $3.10 |
| Hire Crew Wage (per crew-day) | $313 | $292 | $257 | $288 |
| **Productivity Measures** |  |  |  |  |
| Landings/Fuel Use (lbs./gallon) | 11.9 | 10.5 | 9.7 | 11 |
| Landings/Labor Use (lbs./crew-day) | 183 | 160 | 140 | 161 |

Net cash flow and net revenue from operations at the annual vessel level were both positive from 2014-2016, generally indicating that RG vessels in the commercial sector were profitable, though some vessels earned much greater profits than others.  More specifically, net cash flow and net revenue from operations averaged 24% and 39%, respectively, while the economic return on asset value was approximately 40% during this time.

Overstreet and Liese (2018b) only provide estimates of economic returns from 2014 through 2016, and thus it cannot be used to assess how economic returns and related measures have changed since the implementation of the IFQ programs.  However, Liese (pers. communication, Nov. 22, 2017) has conducted an analysis that compares economic returns and related measures in 2006 and 2014, and thus examines how they have changed since the implementation of the GT and RS-IFQ programs.  Because of the years chosen, the changes in economic performance indicated by these results can only, at best, be attributed to the combination of the two IFQ programs as opposed to one or the other.  Also, these results apply to all trips that landed Gulf reef fish species as opposed to landings of species managed under one or both of the IFQ programs.  Further, as these results are preliminary, only a generally qualitative overview can be provided.

**Table 3.4.1.22.** Economic characteristics of RG vessels from 2014-2016 (2019$).

| | 2014 | 2015 | 2016 | Average |
|---|---|---|---|---|
| Number of Observations | 66 | 81 | 97 | |
| Response Rate (%) | 65% | 78% | 84% | |
| **SOI Vessel** | | | | |
| Owner-Operated | 75% | 66% | 79% | 73% |
| For-Hire Active | 6% | 19% | 11% | 12% |
| Vessel Value | $135,478 | $105,527 | $80.428 | $107,144 |
| **Total Revenue** | 100% | 100% | 100% | 100% |
| **Costs (% of Revenue)** | | | | |
| Fuel | 8.2% | 7.6% | 6.8% | 7.5% |
| Other Supplies | 10.6% | 11.1% | 13.2% | 11.6% |
| Hired Crew | 26.5% | 29.4% | 26.5% | 27.5% |
| Vessel Repair & Maintenance | 7.2% | 8.6% | 9.1% | 8.3% |
| Insurance | 0.5% | 1.1% | 0.9% | 0.8% |
| Overhead | 4.2% | 6.3% | 5.8% | 5.4% |
| Loan Payment | 0.9% | 1.8% | 1.3% | 1.3% |
| IFQ Purchase | 11.4% | 15.4% | 14.9% | 13.9% |
| OC Owner-Captain Time | 5.6% | 5.6% | 7.1% | 6.1% |
| **Net Cash Flow** | 30% | 19% | 22% | 24% |
| **Net Revenue for Operations** | 33% | 27% | 27% | 29% |
| Depreciation | 3.8% | 3.7% | 3.3% | 3.6% |
| Fixed Costs | 12% | 16% | 16% | 15% |
| Labor - Hired & Owner | 32% | 35% | 34% | 34% |
| Fuel & Supplies | 19% | 19% | 20% | 19% |
| **Economic Return (on asset value)** | 44.2% | 36% | 41% | 40.4% |

First, effort in the commercial sector of the fishery has decreased significantly according to multiple measures. Specifically, the number of vessels, trips, and days at sea decreased by 31%, 38%, and 28%, respectively, between 2006 and 2014. At the same time, landings of Gulf reef fish were relatively unchanged, decreasing by about 4% during that time. Thus, output per unit of input (one measure of productivity) has increased significantly since the IFQ programs were implemented. Further, even though landings have remained about the same, the average ex-vessel price of Gulf reef fish landings increased by 20% during this time, resulting in a 16% increase in total annual revenues from these landings.

Because productivity increased, costs decreased. Specifically, crew costs decreased by 6%, other variable costs (supplies, fuel, etc.) decreased by 33%, and fixed costs decreased by 19%. The decrease in crew costs was driven by a decrease in crew days of 26%, as crew compensation per day actually increased by 24% (i.e., the amount of labor used decreased somewhat significantly, but "wages" increased somewhat significantly as well). Similarly, even though fuel prices increased by 25%, a 49% decrease in fuel usage was the primary driver of the decline in other variable costs. In addition, the opportunity costs associated with the owner's labor time and capital invested in the vessel decreased by 16% and 31%, respectively.

Because costs decreased, significantly lower percentages of the total revenues had to be used to cover these costs, in turn resulting in much higher economic returns and margins. Net cash flow to the owner(s) increased by more than 300% while net revenue from operations increased by more than 400%. Trip net revenue as a percentage of total trip revenue increased by 94% while, at the vessel level, net revenue from operations as a percentage of total revenues increased by 180%. While such increases may appear to be exorbitant, it must be kept in mind that, in 2006, net cash flows were only slightly above the break-even point and net revenues from operations were negative (i.e., commercial reef fish levels were earning economic losses on average).

**Dealers**

The information in Table 3.4.1.23 illustrates the purchasing activities of dealers that bought RG landings from vessels from 2014 through 2018.[34] Like vessels, dealer participation in the RG component of the GT-IFQ program is fluid and not all dealers purchased RG in each year during this time. Unlike the number of vessels harvesting RG during this time, the number of dealers that purchased RG landings steadily decreased from 110 in 2014 to 89 in 2018, or by 19%, with an average of 101 dealers purchasing RG landings each year.

**Table 3.4.1.23.** Dealer statistics for dealers that purchased RG landings by year, 2014-2018. All dollar estimates are in 2019$.

| Year | Number Dealers | Statistic | RG Purchases | Other IFQ Purchases | Gulf Non-IFQ Purchases | South Atlantic Purchases | Total Purchases |
|------|------|------|------|------|------|------|------|
| **2014** | 110 | Maximum | $4,194,263 | $3,522,317 | $4,122,768 | $4,128,319 | $7,400,909 |
| | | Total | $22,771,884 | $22,999,036 | $39,753,737 | $16,730,832 | $102,255,489 |
| | | Mean | $207,017 | $209,082 | $361,398 | $152,098 | $929,595 |
| **2015** | 107 | Maximum | $3,342,217 | $7,737,791 | $3,651,599 | $3,406,249 | $8,412,438 |
| | | Total | $20,133,195 | $29,815,086 | $38,083,517 | $12,362,712 | $100,394,510 |
| | | Mean | $188,161 | $278,646 | $355,921 | $115,539 | $938,266 |
| **2016** | 101 | Maximum | $3,717,521 | $9,873,515 | $8,079,619 | $3,848,256 | $10,541,374 |
| | | Total | $18,874,947 | $32,555,979 | $44,293,742 | $16,839,568 | $112,564,236 |
| | | Mean | $186,881 | $322,336 | $438,552 | $166,728 | $1,114,497 |
| **2017** | 96 | Maximum | $2,794,976 | $8,060,687 | $6,374,817 | $5,151,898 | $8,741,043 |
| | | Total | $14,655,988 | $26,557,008 | $41,215,887 | $23,485,925 | $105,914,808 |
| | | Mean | $152,667 | $276,635 | $429,332 | $244,645 | $1,103,279 |
| **2018** | 89 | Maximum | $1,615,223 | $2,592,992 | $6,247,425 | $4,403,264 | $8,219,395 |
| | | Total | $11,343,604 | $19,471,016 | $42,731,861 | $20,120,140 | $93,666,621 |
| | | Mean | $127,456 | $218,775 | $480,133 | $226,069 | $1,052,434 |

Source: SEFSC Fishing Communities Web Query Tool, Version 1.

In addition, although the trend in purchases of RG landings by dealers necessarily mimics the trend in RG vessel revenues, the trends in purchases of other IFQ species as well non-IFQ species in the Gulf and South Atlantic do not mirror the trends for vessels. For example, purchases of other IFQ landings in the Gulf by RG dealers increased significantly (over 41%)

---

[34] The estimates in this table are based on Accumulated Landings System (ALS) data, which tends to produce slightly different estimates of ex-vessel landings and value for RG due to waterbody code assignment issues in the Keys.

from 2014 through 2016. Further, purchases of non-IFQ species in the Gulf also increased by 11% during this time. These increases generally reflect increases in the commercial quotas for other species. Thus, even though purchases of RG were declining, the value of all the RG dealers' purchases increased. However, these trends did not continue after 2016 as purchases of other IFQ and non-IFQ species in the Gulf declined in addition to the continuing decline of RG purchases. Greater purchases of landings from the South Atlantic partially offset these declines, but the total value of the RG dealers' purchases declined by 17% from 2016 through 2018. Still, this decline is less than the decline in revenues experienced by RG vessels, reflecting the greater diversity in the purchasing portfolios of RG dealers, which in turn allowed them to be more flexible and adaptive to changes in the RG component of the GT-IFQ program. In combination with the decline in the number of RG dealers, the average value of purchases per RG dealer actually increased by 13% from 2014 through 2018, unlike the RG vessels which experienced a noticeable decline in their average total revenue per vessel during this time.

**Imports**

Imports of seafood products compete in the domestic seafood market and have in fact dominated many segments of the seafood market. Imports aid in determining the price for domestic seafood products and tend to set the price in the market segments in which they dominate. Seafood imports have downstream effects on the local fish market. At the harvest level for red grouper, imports affect the returns to fishermen through the ex-vessel prices they receive for their landings. As substitutes to domestic production of reef fish, imports tend to cushion the adverse economic effects on consumers resulting from a reduction in domestic landings. The following describes the imports of fish products which directly compete with domestic harvest of red grouper. All monetary estimates are in 2019 dollars.

Total imports of snapper increased significantly (36%) from 2014 through 2016, increasing from about 33 mp product weight (pw) to 45 mp pw during this time. However, snapper imports declined slightly thereafter to about 43 mp pw in 2018. Revenue from snapper imports followed a similar pattern, increasing from almost $105 million in 2014 to $136 million in 2016, but then falling to about $134 million in 2018. Although the average price per pound fluctuated somewhat between 2014 and 2016, moving inversely to volume, it generally vacillated around $3.05/lbs. Imports of fresh snapper increased steadily from 23.6 mp pw in 2014 to 31.2 mp pw in 2017, before declining slightly to 31.2 mp pw in 2018. Total revenue from fresh snapper imports increased from $78 million in 2014 to an all-time high of $98.5 million in 2018. The average price decreased from $3.32/lbs. to $3/lbs between 2014 and 2017 as volume increased, but rose to $3.21/lbs in 2018 when volume declined. Imports of fresh snappers primarily originated in Mexico, Panama, and Nicaragua, and entered the U.S. through the port of Miami. Imports of frozen snapper were substantially less than imports of fresh snapper from 2014 through 2018. Frozen snapper imports ranged from 9.3 mp pw worth $26.5 million in 2014 to 14.4 mp pw worth $40.2 million in 2018. The average price fluctuated around $2.85/lbs during this time. Imports of frozen snapper primarily originated in Brazil. The majority of frozen snapper imports entered the U.S. through the ports of Miami and New York.

Total imports of grouper increased significantly (64%) from 10.4 mp pw in 2014 to 17.1 mp pw in 2018. Total revenue from grouper imports also increased significantly (43%) from $42.3

million to $60.3 million during this time period. Revenue from grouper imports did not increase as significantly as the volume due to a 15% decrease in the average price per pound of grouper imports. Imports of frozen grouper were minimal from 2014 through 2016, decreasing from 1.75 mp pw in 2014 to only 0.81 mp pw in 2016. However, frozen grouper imports increased significantly in 2018, up to 4.6 mp pw. As a result, frozen grouper composed 27% of total grouper imports in 2018 compared to only 17% in 2014. Further, the average price per pound of frozen imports decreased significantly, from $2.67/lbs to only $1.27/lbs between 2015 and 2018. Similarly, total revenue from frozen grouper decreased from $3.8 million to $1.5 million from 2014 to 2016, but then increased to $5.8 million in 2018. The decline in the average price of frozen grouper in combination with frozen product making up a higher proportion of total imports explains why revenue from grouper imports, frozen and in total, did not increase as significantly as volume from 2014 through 2018. The volume and revenue from fresh grouper imports also increased from 2014 through 2018, increasing from 8.6 mp pw and $38.5 million in 2014 to 12.5 mp pw and $54.5 million in 2018, respectively. Average price was relatively stable at around $4.38/lbs. Thus, the price premium attached to fresh grouper relative to frozen grouper is much greater than the premium attached to fresh snapper compared to frozen snapper. The bulk of fresh and frozen grouper imports originated in Mexico and entered the U.S. through Miami and Tampa.

**Economic Impacts**

The commercial harvest and subsequent sales and consumption of fish generates business activity as fishermen expend funds to harvest the fish and consumers spend money on goods and services, such as red grouper purchased at a local fish market and served during restaurant visits. These expenditures spur additional business activity in the region(s) where the harvest and purchases are made, such as jobs in local fish markets, grocers, restaurants, and fishing supply establishments. In the absence of the availability of a given species for purchase, consumers would spend their money on substitute goods and services. As a result, the analysis presented below represents a distributional analysis only; that is, it only shows how economic impacts may be distributed through regional markets and should not be interpreted to represent the impacts if these species are not available for harvest or purchase.

In addition to these types of impacts, economic impact models can be used to determine the sources of the impacts. Each impact can be broken down into direct, indirect, and induced economic impacts. "Direct" economic impacts are the results of the money initially spent in the study area (e.g., country, region, state, or community) by the fishery or industry being studied. This includes money spent to pay for labor, supplies, raw materials, and operating expenses. The direct economic impacts from the initial spending create additional activity in the local economy, i.e., "indirect" economic impacts. Indirect economic impacts are the results of business-to-business transactions indirectly caused by the direct impacts. For example, businesses initially benefiting from the direct impacts will subsequently increase spending at other local businesses. The indirect economic impact is a measure of this increase in business-to-business activity, excluding the initial round of spending which is included in the estimate of direct impacts. "Induced" economic impacts are the results of increased personal income caused by the direct and indirect economic impacts. For example, businesses experiencing increased revenue from the direct and indirect impacts will subsequently increase spending on labor by hiring more

employees, increasing work hours, raising salaries/wage rates, etc. In turn, households will increase spending at local businesses. The induced impact is a measure of this increase in household-to-business activity.

**Table 3.4.1.24.** Average annual economic impacts of red grouper in the commercial sector of the Gulf reef fish fishery. All monetary estimates are in thousands of 2018 dollars[35] and employment is measured in full-time equivalent jobs.

| Harvesters | Direct | Indirect | Induced | Total |
|---|---|---|---|---|
| Employment impacts | 382 | 59 | 79 | 520 |
| Income impacts | $9,241 | $1,716 | $4,149 | $15,106 |
| Total value-added impacts | $9,850 | $6,177 | $7,099 | $23,126 |
| Output Impacts | $17,116 | $13,925 | $13,781 | $44,822 |
| **Primary dealers/processors** | **Direct** | **Indirect** | **Induced** | **Total** |
| Employment impacts | 80 | 32 | 55 | 167 |
| Income impacts | $3,015 | $2,779 | $2,628 | $8,422 |
| Total value-added impacts | $3,214 | $3,546 | $4,948 | $11,708 |
| Output impacts | $9,705 | $7,310 | $9,672 | $26,687 |
| **Secondary wholesalers/distributors** | **Direct** | **Indirect** | **Induced** | **Total** |
| Employment impacts | 37 | 8 | 36 | 81 |
| Income impacts | $1,796 | $534 | $1,889 | $4,220 |
| Total value-added impacts | $1,915 | $896 | $3,227 | $6,038 |
| Output impacts | $4,811 | $1,754 | $6,276 | $12,841 |
| **Grocers** | **Direct** | **Indirect** | **Induced** | **Total** |
| Employment impacts | 158 | 18 | 35 | 211 |
| Income impacts | $3,695 | $1,228 | $1,855 | $6,777 |
| Total value-added impacts | $3,939 | $1,978 | $3,140 | $9,057 |
| Output impacts | $6,315 | $3,213 | $6,164 | $15,693 |
| **Restaurants** | **Direct** | **Indirect** | **Induced** | **Total** |
| Employment impacts | 986 | 66 | 161 | 1,213 |
| Income impacts | $14,822 | $4,495 | $8,490 | $27,808 |
| Total value-added impacts | $15,800 | $8,036 | $14,305 | $38,141 |
| Output impacts | $28,890 | $12,574 | $28,228 | $69,693 |
| **Harvesters and seafood industry** | **Direct** | **Indirect** | **Induced** | **Total** |
| Employment impacts | 1,643 | 183 | 366 | 2,191 |
| Income impacts | $32,570 | $10,752 | $19,011 | $62,333 |
| Total value-added impacts | $34,718 | $20,632 | $32,719 | $88,069 |
| Output impacts | $66,837 | $38,777 | $64,121 | $169,735 |

Estimates of the U.S. average annual business activity associated with the commercial harvest of red grouper in the Gulf were derived using the model developed for and applied in NMFS (2018)[36] and are provided in Table 3.4.1.24. Specifically, these impact estimates reflect the expected impacts from average annual gross revenues generated by landings of Gulf red grouper from 2014 through 2018. This business activity is characterized as jobs (full- and part-time),

---

[35] The commercial economic impact model has not been updated yet to produce estimates in 2019$.

[36] A detailed description of the input/output model is provided in NMFS (2011).

income impacts (wages, salaries, and self-employed income), value-added impacts (the difference between the value of goods and the cost of materials or supplies), and output impacts (gross business sales).  Income impacts should not be added to output (sales) impacts because this would result in double counting.

The results provided should be interpreted with caution and demonstrate the limitations of these types of assessments.  These results are based on average relationships developed through the analysis of many fishing operations that harvest many different species; specifically reef fish in this case.  Separate models for individual species such as red grouper are not available.  Between 2014 and 2018, landings of Gulf red grouper resulted in approximately $17.12 million (2018$) in gross revenue on average.  In turn, this revenue generated employment, income, value-added, and output impacts of 2,191 jobs, $62.3 million, $88.1 million, and $169.7 million per year, respectively, on average.

## 3.4.2  Recreational Sector

The Gulf recreational sector is comprised of the private and for-hire modes.  The private mode includes anglers fishing from shore (all land-based structures) and private/rental boats.  The for-hire mode is composed of charter boats and headboats (also called party boats).  Charter boats generally carry fewer passengers and charge a fee on an entire vessel basis, whereas headboats carry more passengers and payment is per person.  The type of service, from a vessel- or passenger-size perspective, affects the flexibility to search different fishing locations during the course of a trip and target different species since larger concentrations of fish are required to satisfy larger groups of anglers.

**Landings**

Private vessels accounted for the majority of red grouper landings on average (2014 through 2018), followed by charter vessels and headboats, with no recorded landings from shore (Table 3.4.2.1).  Charter vessels were responsible for an increasingly higher percentage of red grouper landings during this period, accounting for only 11% of the landings in 2014 but 20% and 18% of the landings in 2017 and 2018, respectively.  Although not shown in the table, approximately 99.7% of red grouper landings on average were recorded in the state of Florida.[37]  As a result, landings in some states may be confidential and landings by state and mode outside of Florida are confidential in most instances.  Therefore, landings by state or by state and mode are not presented.

Landings in the recreational sector largely mirror the downward trend seen in the commercial sector from 2014-2018, with the exception of a relatively small increase (21%) in 2018.  However, landings in 2018 were still 62% below their level in 2014, which is very similar to the reduction in the commercial sector.  Significant reductions were experienced in all modes, though the largest reduction in absolute and percentage terms was in the private angling mode (65%).  A portion of the decrease in landings over this time is due to the reduction in the bag

---

[37] Prior to 2013, Northwest Florida and Alabama headboat landings were reported together so it is not possible to disaggregate them.

limit from four fish to two fish per person per day in May 2015, but the at least some of the decrease is likely due to the declining health of the stock.

**Table 3.4.2.1**. Recreational landings (lbs gw) and percent distribution of red grouper across all states by mode for 2014-2018.

| | Landings (pounds gw) | | | | | Percent Distribution | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **Charter vessel** | **Headboat** | **Private** | **Shore** | **Total** | **Charter vessel** | **Headboat** | **Private** | **Shore** |
| **2014** | 586,714 | 45,107 | 4,737,128 | 0 | 5,368,949 | 11% | 1% | 88% | 0% |
| **2015** | 500,305 | 50,621 | 3,239,928 | 0 | 3,790,853 | 13% | 1% | 85% | 0% |
| **2016** | 406,088 | 56,851 | 2,169,801 | 0 | 2,632,740 | 15% | 2% | 82% | 0% |
| **2017** | 342,871 | 21,423 | 1,328,134 | 0 | 1,692,428 | 20% | 1% | 78% | 0% |
| **2018** | 362,101 | 22,310 | 1,669,115 | 0 | 2,053,526 | 18% | 1% | 81% | 0% |
| **AVG** | **439,616** | **39,262** | **2,628,821** | **0** | **3,107,699** | **14%** | **1%** | **85%** | **0%** |

Source: Southeast Fisheries Science Center MRIP-FES recreational ACL dataset (1/2/2020) and LA Creel.

**Angler Effort**

Recreational effort derived from the MRIP database can be characterized in terms of the number of angler trips as follows:

- Target effort - The number of individual angler trips, regardless of duration, where the intercepted angler indicated that the species or a species in the species group was targeted as either the first or the second primary target for the trip. The species did not have to be caught.
- Catch effort - The number of individual angler trips, regardless of duration and target intent, where the individual species or a species in the species group was caught. The fish did not have to be kept.
- Total recreational trips - The total estimated number of recreational trips in the Gulf, regardless of target intent or catch success.

Other measures of effort are possible, such as directed trips (the number of individual angler trips that either targeted or caught a particular species). All of the estimated target trips and almost all of the estimated catch trips for Gulf red grouper occurred in Florida from 2014 through 2018 (Table 3.4.2.2 and Table 3.4.2.3). The majority of estimated target and catch effort came from the private angling mode. Although there were a small number of red grouper target and catch trips estimated for the shore mode, there were no actual landings reported from 2014 through 2018, suggesting only discards were encountered. The trend in total target effort was very similar to the trend in total landings, decreasing by 44% from 2014 through 2018. However, target effort in the charter mode only fell by about 13%. Catch effort also consistently decreased in total and by mode from 2014 through 2016, but increased in the private angling mode in 2017 and 2018. Thus, the reduction in catch effort was relatively less (21%) from 2014 through 2018, though catch effort in the charter mode fell by 36%. Estimates of red grouper target or catch

effort for additional years, and other measures of directed effort, are available on the NOAA website.[38]

**Table 3.4.2.2.**  Number of red grouper recreational target trips, by mode and state, 2014-2018.*

| Mode | Year | Alabama | Florida | Total |
|------|------|---------|---------|-------|
| **Shore** | 2014 | 0 | 79,563 | 79,563 |
| | 2015 | 0 | 0 | 0 |
| | 2016 | 0 | 22,513 | 22,513 |
| | 2017 | 0 | 0 | 0 |
| | 2018 | 0 | 44,346 | 44,346 |
| | Average | 0 | 29,284 | 29,284 |
| | | | | |
| **Charter** | 2014 | 0 | 40,144 | 40,144 |
| | 2015 | 0 | 44,460 | 44,460 |
| | 2016 | 0 | 51,275 | 51,275 |
| | 2017 | 0 | 33,915 | 33,915 |
| | 2018 | 0 | 34,797 | 34,797 |
| | Average | 0 | 40,918 | 40,918 |
| | | | | |
| **Private** | 2014 | 0 | 703,390 | 703,390 |
| | 2015 | 0 | 493,326 | 493,326 |
| | 2016 | 0 | 443,244 | 443,244 |
| | 2017 | 1,470 | 281,783 | 283,253 |
| | 2018 | 0 | 380,124 | 380,124 |
| | Average | 294 | 460,373 | 460,677 |
| | | | | |
| **All** | 2014 | 0 | 823,098 | 823,098 |
| | 2015 | 0 | 537,786 | 537,786 |
| | 2016 | 0 | 517,032 | 517,032 |
| | 2017 | 1,470 | 315,699 | 317,169 |
| | 2018 | 0 | 459,267 | 459,267 |
| | Average | 294 | 530,576 | 530,870 |

Source: MRIP Survey Data available at https://www.fisheries.noaa.gov/recreational-fishing-data/recreational-fishing-data-downloads.
* Headboat information is unavailable.  Louisiana effort estimates are not currently available.  However, landings were negligible and thus target effort is likely zero.  No target effort occurred in Mississippi or Texas.

---

[38] https://www.st.nmfs.noaa.gov/recreational-fisheries/data-and-documentation/queries/index

**Table 3.4.2.3.** Number of red grouper recreational catch trips, by mode and state, 2014-2018.*

| Mode | Year | Alabama | Florida | Total |
|---|---|---:|---:|---:|
| **Shore** | 2014 | 0 | 12,246 | 12,246 |
| | 2015 | 0 | 33,439 | 33,439 |
| | 2016 | 0 | 18,563 | 18,563 |
| | 2017 | 0 | 38,470 | 38,470 |
| | 2018 | 0 | 15,177 | 15,177 |
| | Average | 0 | 23,579 | 23,579 |
| | | | | |
| **Charter** | 2014 | 124 | 134,904 | 135,028 |
| | 2015 | 2,083 | 125,388 | 127,471 |
| | 2016 | 2,053 | 141,114 | 143,167 |
| | 2017 | 1,762 | 102,737 | 104,499 |
| | 2018 | 187 | 86,800 | 86,987 |
| | Average | 1,242 | 118,189 | 119,430 |
| | | | | |
| **Private** | 2014 | 5,182 | 1,201,577 | 1,206,759 |
| | 2015 | 2,169 | 894,001 | 896,170 |
| | 2016 | 0 | 751,858 | 751,858 |
| | 2017 | 3,666 | 754,646 | 758,312 |
| | 2018 | 7,723 | 957,299 | 965,022 |
| | Average | 3,748 | 911,876 | 915,624 |
| | | | | |
| **All** | 2014 | 5,306 | 1,348,727 | 1,354,033 |
| | 2015 | 4,252 | 1,052,828 | 1,057,080 |
| | 2016 | 2,053 | 911,535 | 913,588 |
| | 2017 | 5,428 | 895,853 | 901,281 |
| | 2018 | 7,910 | 1,059,276 | 1,067,186 |
| | Average | 4,990 | 1,025,421 | 1,058,625 |

Source: MRIP Survey Data available at https://www.fisheries.noaa.gov/recreational-fishing-data/recreational-fishing-data-downloads.

* Headboat information is unavailable.  Louisiana effort estimates are not currently available.  However, landings were negligible and thus catch effort is likely negligible.  No catch effort occurred in Mississippi or Texas.

As shown in tables 2.4.2.4 and 2.4.2.5, across all modes, target and catch effort was the highest in the 4th (July-Aug) and 3rd (May-June) waves.  Target effort is the lowest in wave 6 (Nov-Dec) and wave 5 (Sept-Oct) while catch effort is the lowest in wave 1 (Jan-Feb) across all modes.  For the private mode, target effort was highest in wave 4 and lowest in wave 1.  For the charter mode, target effort was highest in wave 3 and lowest in wave 1.

**Table 3.4.2.4**. Red grouper target trips by wave and mode, 2014 – 2018.*

| | 1 (Jan-Feb) | 2 (Mar-Apr) | 3 (May-Jun) | 4 (Jul-Aug) | 5 (Sep-Oct) | 6 (Nov Dec) | Total |
|---|---|---|---|---|---|---|---|
| | | | **Shore** | | | | |
| **2014** | 0 | 32,901 | 8,659 | 38,003 | 0 | 0 | 79,563 |
| **2015** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **2016** | 0 | 0 | 0 | 0 | 0 | 22,513 | 22,513 |
| **2017** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **2018** | 0 | 0 | 0 | 44,346 | 0 | 0 | 44,346 |
| **Average** | 0 | 6,580 | 1,732 | 16,470 | 0 | 4,503 | 29,285 |
| | | | **Charter** | | | | |
| **2014** | 6,266 | 5,440 | 8,317 | 9,776 | 9,607 | 736 | 40,144 |
| **2015** | 6,926 | 10,765 | 14,007 | 10,016 | 2,277 | 469 | 44,460 |
| **2016** | 11,488 | 7,134 | 15,384 | 7,302 | 3,329 | 6,639 | 51,275 |
| **2017** | 5,826 | 3,155 | 9,327 | 8,646 | 1,615 | 5,345 | 33,915 |
| **2018** | 6,529 | 3,783 | 17,217 | 1,907 | 2,957 | 2,404 | 34,797 |
| **Average** | 7,407 | 6,055 | 12,850 | 7,530 | 3,957 | 3,119 | 40,918 |
| | | | **Private/Rental** | | | | |
| **2014** | 40,458 | 68,852 | 155,561 | 342,796 | 52,558 | 43,165 | 703,390 |
| **2015** | 73,196 | 47,748 | 135,343 | 181,621 | 40,374 | 15,044 | 493,326 |
| **2016** | 78,235 | 54,576 | 89,379 | 101,146 | 72,121 | 47,787 | 443,244 |
| **2017** | 15,120 | 33,740 | 59,038 | 86,551 | 30,233 | 58,570 | 283,253 |
| **2018** | 39,119 | 67,214 | 70,317 | 98,735 | 50,903 | 53,837 | 380,124 |
| **Average** | 49,226 | 54,426 | 101,928 | 162,170 | 49,238 | 43,681 | 460,668 |
| | | | **All** | | | | |
| **2014** | 46,725 | 107,193 | 172,538 | 390,575 | 62,166 | 43,901 | 823,098 |
| **2015** | 80,122 | 58,513 | 149,350 | 191,637 | 42,651 | 15,513 | 537,786 |
| **2016** | 89,722 | 61,710 | 104,763 | 108,448 | 75,450 | 76,939 | 517,032 |
| **2017** | 20,947 | 36,895 | 68,366 | 95,198 | 31,848 | 63,915 | 317,169 |
| **2018** | 45,648 | 70,996 | 87,535 | 144,988 | 53,859 | 56,241 | 459,267 |
| **Average** | 56,633 | 67,062 | 116,510 | 186,169 | 53,195 | 51,302 | 530,870 |

Source: MRIP Survey Data available at https://www.fisheries.noaa.gov/recreational-fishing-data/recreational-fishing-data-downloads

* Texas and headboat information unavailable. Louisiana effort estimates are not currently available. However, landings were negligible and thus target effort is likely zero.

**Table 3.4.2.5**.  Red grouper catch trips by wave and mode, 2014 – 2018.*

| | 1 (Jan-Feb) | 2 (Mar-Apr) | 3 (May-Jun) | 4 (Jul-Aug) | 5 (Sep-Oct) | 6 (Nov Dec) | Total |
|---|---|---|---|---|---|---|---|
| **Shore** | | | | | | | |
| **2014** | 0 | 2,585 | 0 | 0 | 0 | 9,661 | 12,246 |
| **2015** | 0 | 24,580 | 5,230 | 0 | 3,629 | 0 | 33,439 |
| **2016** | 0 | 0 | 16,658 | 0 | 1,906 | 0 | 18,563 |
| **2017** | 0 | 4,921 | 0 | 26,137 | 0 | 7,806 | 38,865 |
| **2018** | 0 | 15,177 | 0 | 0 | 0 | 0 | 15,177 |
| **Average** | 0 | 9,453 | 4,378 | 5,227 | 1,107 | 3,493 | 23,658 |
| **Charter** | | | | | | | |
| **2014** | 15,529 | 23,143 | 36,296 | 37,648 | 13,643 | 8,769 | 135,028 |
| **2015** | 10,565 | 37,494 | 36,151 | 28,297 | 8,560 | 6,405 | 127,471 |
| **2016** | 22,832 | 19,559 | 51,443 | 26,243 | 11,157 | 11,934 | 143,168 |
| **2017** | 22,274 | 12,394 | 24,913 | 17,482 | 5,243 | 22,193 | 104,499 |
| **2018** | 18,346 | 11,500 | 39,557 | 8,645 | 3,223 | 5,717 | 86,987 |
| **Average** | 17,909 | 20,818 | 37,672 | 23,663 | 8,365 | 11,004 | 119,431 |
| **Private/Rental** | | | | | | | |
| **2014** | 44,011 | 181,549 | 215,978 | 519,085 | 72,589 | 173,548 | 1,206,760 |
| **2015** | 93,354 | 75,375 | 178,400 | 272,836 | 142,895 | 133,309 | 896,170 |
| **2016** | 91,774 | 57,198 | 199,822 | 212,818 | 88,587 | 101,660 | 751,858 |
| **2017** | 48,708 | 84,566 | 222,760 | 157,890 | 45,657 | 198,293 | 757,874 |
| **2018** | 73,295 | 129,137 | 278,331 | 233,233 | 178,261 | 72,764 | 965,022 |
| **Average** | 70,228 | 105,565 | 219,058 | 279,172 | 105,598 | 135,915 | 915,537 |
| **All** | | | | | | | |
| **2014** | 59,540 | 207,277 | 252,274 | 556,733 | 86,232 | 191,978 | 1,354,034 |
| **2015** | 103,919 | 137,449 | 219,781 | 301,133 | 155,084 | 139,714 | 1,057,080 |
| **2016** | 114,606 | 76,757 | 267,923 | 239,061 | 101,650 | 113,594 | 913,589 |
| **2017** | 70,982 | 101,881 | 247,673 | 201,509 | 50,900 | 228,292 | 901,238 |
| **2018** | 91,641 | 155,814 | 317,888 | 241,878 | 181,484 | 78,481 | 1,067,186 |
| **Average** | 88,138 | 135,836 | 261,108 | 308,063 | 115,070 | 150,412 | 1,058,625 |

Source: MRIP Survey Data available at https://www.fisheries.noaa.gov/recreational-fishing-data/recreational-fishing-data-downloads

* Texas and headboat information unavailable. LA effort estimates are not currently available.  However, landings were negligible and thus catch effort is likely negligible.  No catch effort occurred in Mississippi or Texas.

Similar analysis of recreational effort is not possible for the headboat mode because headboat data are not collected at the angler level.  Estimates of effort by the headboat mode are provided in terms of angler days, or the number of standardized 12-hour fishing days that account for the different half-, three-quarter-, and full-day fishing trips by headboats.  The stationary "fishing for

demersal (bottom-dwelling) species" nature of headboat fishing, as opposed to trolling, suggests that most, if not all, headboat trips and, hence, angler days, are demersal or reef fish trips by intent.

Headboat angler days were fairly stable across the Gulf states from 2014 through 2018 (Table 3.4.2.6). There was, however, a noticeable peak in reported angler days in Florida in 2016 and modest fluctuations elsewhere. On average (2014 through 2018), Florida accounted for the majority of headboat angler days reported, followed by Texas and Alabama; whereas, Mississippi and Louisiana combined accounted for only a small percentage.

**Table 3.4.2.6**. Gulf headboat angler days and percent distribution by state (2014-2018).

|  | Angler Days | | | | Percent Distribution | | | |
|---|---|---|---|---|---|---|---|---|
|  | **FL** | **AL** | **MS-LA\*\*** | **TX** | **FL** | **AL** | **MS-LA** | **TX** |
| **2014** | 174,599 | 16,766 | 3,257 | 51,231 | 71.0% | 6.8% | 1.3% | 20.8% |
| **2015** | 176,375 | 18,008 | 3,587 | 55,135 | 69.7% | 7.1% | 1.4% | 21.8% |
| **2016** | 183,147 | 16,831 | 2,955 | 54,083 | 71.3% | 6.5% | 1.1% | 21.0% |
| **2017** | 178,816 | 17,841 | 3,189 | 51,575 | 71.1% | 7.1% | 1.3% | 20.5% |
| **2018** | 171,996 | 19,851 | 3,235 | 52,160 | 69.6% | 8.0% | 1.3% | 21.1% |
| **Average** | 176,987 | 17,859 | 3,245 | 52,837 | 70.5% | 7.1% | 1.3% | 21.1% |

Source: NMFS SRHS.
\*\*Headboat data from Mississippi and Louisiana are combined for confidentiality purposes.

**Permits**

There are no specific federal permitting requirements for recreational anglers to fish for or harvest reef fish, including red grouper. Instead, private anglers are required to possess either a state recreational fishing permit that authorizes saltwater fishing in general, or be registered in the federal National Saltwater Angler Registry system, subject to appropriate exemptions. As a result, it is not possible to identify with available data how many individual anglers would be expected to be affected by the actions in this amendment.

A federal charter/headboat (for-hire) vessel permit is required for fishing in federal waters for Gulf reef fish. Gulf reef fish for-hire permits are limited access permits. From a historical perspective, the number of permits that were valid in a given year has continually decreased over the past several years, as illustrated in Table 3.4.2.5. However, the rate of attrition with for-hire reef fish permits has been relatively slow and far less compared to commercial reef fish permits.

As of February 27, 2020, there were 1,270 valid or renewable for-hire reef fish permits, 1,179 of which were valid. A renewable permit is an expired limited access permit that cannot be actively fished, but is renewable for up to one year after expiration.

Although the for-hire permit application collects information on the primary method of operation,[39] the permit itself does not identify the permitted vessel as either a headboat or a charter vessel and vessels may operate in both capacities. However, if a vessel meets the selection criteria used by the SRHS and is selected to report by the Science Research Director of the SEFSC, it is determined to operate primarily as a headboat and is required to submit harvest and effort information to the SRHS.

**Table 3.4.2.7.** Number of valid or renewable for-hire Gulf reef fish permits, 2008-2019.

| Year | Number of Permits |
|------|------------------|
| **2008** | 1,458 |
| **2009** | 1,417 |
| **2010** | 1,385 |
| **2011** | 1,353 |
| **2012** | 1,336 |
| **2013** | 1,323 |
| **2014** | 1,310 |
| **2015** | 1,294 |
| **2016** | 1,282 |
| **2017** | 1,280 |
| **2018** | 1,279 |
| **2019** | 1,277 |

Source:  NMFS SERO SF Access Permits Database.

The number of federally permitted Gulf headboats in the SRHS ranged from 68 in 2014 and 2015 to 72 in 2018 (K. Fitzpatrick, NMFS SEFSC, pers. comm.).  Souza and Liese (2019) estimate that approximately 10% of all permitted Southeast (Gulf and South Atlantic) for-hire vessels determined to be headboats were not actively fishing in 2017.[40]  Further, of those that were active, 14% were not active in offshore waters.  Thus, approximately 23% of the permitted Southeast headboats were likely not active in the EEZ.  With respect to permitted Gulf charter vessels, they estimate that 24% were not active in 2017, while 10% of those that were active were not active in offshore waters.  Thus, approximately 34% of the permitted Gulf charter vessels were likely not active in the EEZ in 2017.

Information on Gulf charter vessel and headboat operating characteristics is included in Savolainen et al. (2012) and is incorporated herein by reference.  The average charter vessel operation took 46 full-day (9 hours) and 55 half-day (5 hours) trips per year, carried 4.8 and 4.6 passengers per trip type, respectively, targeted reef fish species on 64% of all trips, and took 68% of all trips in the EEZ.  The average headboat operation took 83 full-day (10 hours) and 37 half-day (6 hours) trips per year, carried 13.1 and 14.6 passengers per trip type, respectively, targeted reef fish species on 84% of all trips, and took 81% of all trips in the EEZ.

---

[39] In 2019, of the 1,277 vessels with valid for-hire permits, 90 were primarily used for commercial fihsish, 83 were primarily used as headboats, and 1,104 were primarily used as charter vessels.
[40] Sample sizes were too small to generate reliable estimates for Gulf and South Atlantic headboats separately.

**Economic Value**

Participation, effort, and harvest are indicators of the value of saltwater recreational fishing. However, a more specific indicator of value is the satisfaction that anglers experience over and above their costs of fishing. The economic value of this satisfaction is referred to as consumer surplus (CS). The value or benefit derived from the recreational experience is dependent on several quality determinants, which include fish size, catch success rate, and the number of fish kept. These variables help determine the value of a fishing trip and influence total demand for recreational fishing trips. For example, the estimated value of the CS for catching and keeping a second red snapper[41] on an angler trip is approximately $85 (2019$), and decreases thereafter (approximately $57 for a third red snapper, $42 for a fourth red snapper, and $34 for a fifth red snapper) (Carter and Liese 2012). In comparison, the estimated value of the CS for catching and keeping a grouper is approximately $110 for the second fish, $73 for the third fish, $54 for the fourth fish, and $43 for the fifth fish (Carter and Liese 2012).

Estimates of average annual gross revenue for charter vessels in 2009 are provided in Savolainen, et al. (2012). According to Savolainen, et al. (2012), the average annual gross revenue for a Gulf headboat is $271,794 while the average annual gross revenue for a Gulf charter vessel is $89,670 (2019$). More recent estimates of average annual gross revenue for Gulf headboats are provided in Abbott and Willard (2017) and D. Carter (pers. comm., March 15, 2018). Abbott and Willard (2017) suggest that Savolainen, et al.'s estimate of average annual gross revenue for headboats may be an underestimate as data in the former suggest that average gross revenue in 2009 for the vessels in their sample was about $480,000 (2019$). Further, their data suggests average annual gross revenue per vessel had increased to about $580,000 (2019$) by 2014. However, Abbott and Willard's estimates are based on a sample of 17 headboats that chose to participate in the Headboat Collaborative Program in 2014 while Savolainen, et al.'s are based on a random sample of 20 headboats. The headboats that participated in the Collaborative may be economic highliners, in which case Abbott and Willard's estimates would overestimate average annual gross revenue for Gulf headboats. D. Carter (2018) recently estimated that average annual gross revenue for Gulf headboats was approximately $427,600 (2019$) in 2017, while the maximum gross revenue for a single headboat was about $1.38 million. This estimate is likely the best current estimate of annual gross revenue for Gulf headboats as it is based on a relatively large sample of 63 boats, or more than 90% of the active fleet, and is more recent.

However, gross revenues overstate the annual economic value and profits generated by for-hire vessels. Economic value for for-hire vessels can be measured by annual producer surplus (PS). In general, PS is the amount of money a vessel owner earns in excess of variable (trip) costs. Economic profit is the amount of money a vessel owner earns in excess of variable and fixed costs, inclusive of all implicit costs, such as the value of a vessel owner's time as captain and as entrepreneur, and the cost of using physical capital (i.e., depreciation of the vessel and gear). In 2019$, Savolainen, et al. (2012) estimated the annual PS for Gulf headboats and charter vessels was approximately $190,167 and $58,990, respectively. Their best estimates of economic profit

---

[41] The study only considered trips with at least one fish caught and kept in its experimental design; thus, an estimate for the first caught and kept fish is not available.

were $79,340 and $26,514 (2019$), respectively.[42] Estimates of PS and economic profit for headboats is not available from Abbott and Willard (2017) or D. Carter (2018) as they did not collect comprehensive cost data at the vessel level.[43]

With regard to for-hire trips, economic value can be measured by PS per angler trip, which represents the amount of money that a vessel owner earns in excess of the cost of providing the trip.  Estimates of revenue, costs, and trip net revenue trips taken by headboats and charter vessels in 2017 are available from Souza and Liese (2019). They also provide estimates of trip net cash flow per angler trip, which are approximates of PS per angler trip.  As shown in Table 3.4.2.5, after accounting for transactions fees, supply costs, and labor costs, net revenue per trip was 42% of revenue for Gulf charter vessels and 54% of revenue for Southeast headboats, or $780 and $1,812 (2019$), respectively.  Given the respective average number of anglers per trip for each fleet, PS per trip is estimated to be $141 for charter vessels and $64 for headboats.

**Table 3.4.2.8.**  Trip economics for offshore trips by Gulf charter vessels and Southeast headboats in 2017 (2019$).

|  | Gulf Charter Vessels | Southeast Headboats |
|---|---|---|
| Revenue | 100% | 100% |
| Transaction Fees (% of revenue) | 3% | 6% |
| Supply Costs (% of revenue) | 27% | 19% |
| Labor Costs (% of revenue) | 27% | 22% |
| Net Revenue per trip including Labor costs (% of revenue) | 42% | 54% |
| Net Revenue per Trip | $780 | $1,812 |
| Average # of Anglers per Trip | 5.5 | 28.2 |
| Trip Net Cash Flow per Angler Trip | $141 | $64 |

**Economic Impacts**

The desire for recreational fishing generates economic activity as consumers spend their income on various goods and services needed for recreational fishing.  This spurs economic activity in the region where recreational fishing occurs.  In the absence of the opportunity to fish, the income would likely be spent on other goods and services and these expenditures would similarly generate economic activity in the region where the expenditure occurs.  As such, the analysis below represents a distributional analysis only.

Estimates of the economic impacts (business activity) associated with recreational angling for Gulf reef fish were calculated using average trip-level impact coefficients derived from the 2016 Fisheries Economics of the U.S. report (NMFS 2018b) and underlying data provided by the NOAA Office of Science and Technology.  Economic impact estimates were adjusted to 2018

---

[42] Although Savolainen, et al. (2012) account for all explicit variable and fixed costs, they do not account for implicit costs, and thus they over-estimate actual economic profits for these vessels.

[43] Abbott and Willard (2017) do report revenue net of fuel costs, but this ignores important costs such as processing fees, commissions, ice, bait, tackle, and labor.

dollars using the annual, not seasonally adjusted gross domestic product implicit price deflator provided by the U.S. Bureau of Economic Analysis.[44]

Recreational fishing generates economic impacts (business activity).  Business activity for the recreational sector is characterized in the form of jobs (full- and part-time), income impacts (wages, salaries, and self-employed income), value-added impacts (the difference between the value of goods and the cost of materials or supplies), and output impacts (gross business sales).  Estimates of the average red grouper target effort by mode and state (2014 through 2018) and the associated business activity are provided in Table 3.4.2.9.

**Table 3.4.2.9.**  Estimated economic impacts from average annual Gulf red grouper recreational target trips by state and mode (2014-2018), using state-level multipliers.  All monetary estimates are in thousands of 2018$ and employment is in full-time equivalent jobs.*

| Mode | | FL | AL |
|---|---|---:|---:|
| **Shore** | Target Trips | 29,284 | 0 |
| | Value Added Impacts | $1,040 | $0 |
| | Sales Impacts | $1,625 | $0 |
| | Income Impacts | $548 | $0 |
| | Employment (Jobs) | 15 | 0 |
| **Charter** | Target Trips | 40,918 | 0 |
| | Value Added Impacts | $13,879 | $0 |
| | Sales Impacts | $23,307 | $0 |
| | Income Impacts | $8,111 | $0 |
| | Employment (Jobs) | 221 | 0 |
| **Private** | Target Trips | 460,373 | 294 |
| | Value Added Impacts | $16,091 | $13 |
| | Sales Impacts | $24,940 | $20 |
| | Income Impacts | $8,443 | $5 |
| | Employment (Jobs) | 235 | 0 |
| **All** | Target Trips | 530,576 | 294 |
| | Value Added Impacts | $31,010 | $13 |
| | Sales Impacts | $49,872 | $20 |
| | Income Impacts | $17,102 | $5 |
| | Employment (Jobs) | 472 | 0 |

Source: MRIP Survey Data available at https://www.fisheries.noaa.gov/recreational-fishing-data/recreational-fishing-data-downloads.
* Headboat information is unavailable.  LA effort estimates are not currently available.  However, landings were negligible and thus target effort is likely zero.  No target effort occurred in Mississippi or Texas.

The estimates provided in Table 3.4.2.9 use state-level multipliers and thus only apply at the state-level.  For example, estimates of business activity in Florida represent business activity in

---

[44] The recreational economic impact model has not yet been updated to generate estimates in 2019$.

Florida only and not to other states (for e.g., a good purchased in Florida may have been manufactured in a neighboring state) or the nation as a whole.  The same holds true for each of the other states.  Income impacts should not be added to output (sales) impacts because this would result in double counting.  The results provided should be interpreted with caution and demonstrate the limitations of these types of assessments.  These results are based on average relationships developed through the analysis of many fishing operations that harvest many different species.

Addition of the state-level estimates to produce a regional (or national) total may underestimate the actual amount of total business activity because state-level impact multipliers do not account for interstate and interregional trading.  National-level multipliers must be used to account for interstate and interregional trading.  Between 2014 and 2018, and using national-level multipliers, red grouper target effort generated employment, income, value-added, and output (sales) impacts of 570 jobs, $27 million, $47.7 million, and $83.9 billion per year, respectively, on average.  These estimates are considerably less than the economic impacts in GMFMC (2016) based on target effort from 2011-2015, which reflects the significant decline in red grouper target effort after 2015.

Estimates of the economic impacts resulting from headboat target effort for reef fish are not available.  Headboat vessels are not covered in MRIP so, in addition to the absence of estimates of target effort, estimates of the appropriate business activity coefficients for headboat effort have not been generated.

## 3.5  Description of the Social Environment

This section provides community background and current descriptions of red grouper fishing for which the proposed actions will be evaluated in Chapter 4.  The following description focuses on both the commercial and recreational sector fishing communities that can be identified as having some relationship to the red grouper fishery.  Recent amendments, Reef Fish Amendment 36A (GMFMC 2017b) and the Framework Action to Adjust Red Grouper Allowable Harvest (2016), include additional detailed descriptions of both sectors.

### 3.5.1  Commercial Sector

As mentioned earlier, red grouper is one species in a multispecies IFQ program established through Amendment 29 to the reef fish management plan (GMFMC 2008a) which means that commercial red grouper is required to be landed through IFQ dealers only.  The commercial fishing community description is predicated on landings by vessel homeport which provide one perspective on the importance of the species within a community.  As mentioned, information on commercial fishing communities was included in the Reef Fish Amendment 36A (GMFMC 2017b) that includes community demographics and discussions of historic participation with the red grouper component of the reef fish fishery.

Another important factor in the harvest of commercial red grouper is the longline endorsement (Reef Fish Amendment 31, 2010) which requires reef fish BLL fishing to be restricted to outside

the 35-fathom depth contour from June – August without an endorsement. Some vessels switched gear types to use bandit reels to fish within the restricted area while others either sought to purchase the limited access endorsements or fished further offshore (see GMFMC 2010a for discussion of impacts).  Since most red grouper is harvested off the west coast of Florida, the majority of communities that are involved in the fishery are located there and will be discussed in the following description of the commercial sector.

Another recent factor that has affected red grouper harvest are the red tide events that have occurred over the past few years, with red tide affecting the Middle Grounds in 2015 and Southwest Florida in 2018. According to interviews conducted with fishermen (Karnauskas et al., 2019) red tide events seemed shorter and patchier in their appearance from year to year in the past.  More recently these events seem to be more widespread and occur for longer periods of time.  These events seem to affect red grouper more than other species and have forced fishermen to change fishing behavior by switching to other species or changing their fishing location.

**Vessels**

As mentioned earlier, the majority of red grouper landings are along the west coast of Florida.  That is reflected in Table 3.5.1.1 where the top ten counties with vessels having red grouper landings in 2018 are all in Florida.  Pinellas County has the most vessels with landings, while Bay County is second with less than half the number of vessels in Pinellas.  Lee County is third, with Franklin County fourth, followed by Manatee County.

**Table 3.5.1.1.**  Number of vessels landing red grouper by top 10 county homeports.

| State | County | Vessels |
|-------|--------|--------:|
| FL | Pinellas | 94 |
| FL | Bay | 43 |
| FL | Lee | 28 |
| FL | Franklin | 21 |
| FL | Manatee | 17 |
| FL | Monroe | 16 |
| FL | Okaloosa | 14 |
| FL | Wakulla | 13 |
| FL | Citrus | 10 |
| FL | Collier | 9 |

Source:  IFQ database accessed 2/20/2020 NOAA Fisheries, NMFS, SERO.

The number of vessels with red grouper landings by community (Figure 3.5.1.2) shows that Panama City has the most vessels, with Madeira Beach second.  Tarpon Springs is third, with Apalachicola fourth, and Key West follows within the top five communities.

**Table 3.5.1.2.**  Number of vessels landing red grouper by top 10 community homeports.

| State | Community | Vessels |
|-------|-----------|---------|
| FL | Panama City | 37 |
| FL | Madeira Beach | 23 |
| FL | Tarpon Springs | 18 |
| FL | Apalachicola | 14 |
| FL | Key West | 14 |
| FL | Cortez | 12 |
| FL | Destin | 10 |
| FL | Panacea | 8 |
| FL | Fort Myers | 8 |
| FL | Crystal River | 8 |

Source: IFQ database accessed 2/20/2020 NOAA Fisheries, NMFS, SERO.

In Figure 3.5.1.1 the regional quotient (RQ) for pounds of red grouper landed is provided for 2018 by county homeport.  The RQ is the amount of red grouper landed within a particular geographical location out of all red grouper landed within the region.  All of the top ten counties are in Florida as would be expected, in fact the top twenty counties are all in Florida.  Pinellas County remains the top county and has been throughout the recent history of the fishery.  Manatee County follows in second, with Lee County third, and Franklin and Sarasota rounding out the top five counties.



**Figure 3.5.1.1.**  Red grouper regional quotient by top 10 homeport counties.
Source: IFQ database accessed 2/20/2020 NOAA Fisheries, NMFS, SERO.

Madeira Beach and Cortez are the leading communities in terms of RQ for red grouper (Figure 3.5.1.2).  The communities of Largo, Redington Shores and Tarpon Springs are next in terms of RQ with nearly equal amounts.  The difference in terms of RQ and the number of vessels within a homeport is likely due to differences in predominant gear type used by the vessels within a

community, e.g. bandit reel vs longline.  The community of Cortez has fewer vessels and ranks sixth in number of vessels landing red grouper, but ranks second in terms of regional quotient.  This is likely due to the fact that most vessels in Cortez are longline vessels which make longer trips and land more red grouper per trip.  Other ports may have a mix of vessel types.



**Figure 3.5.1.2.**  Red grouper regional quotient by top 20 homeport communities.
Source: IFQ database accessed 2/20/2020 NOAA Fisheries, NMFS, SERO.

**Commercial fishing engagement**

Figure 3.5.1.3 is an overall measure of a community's commercial fishing engagement.  Most communities in Figure 3.5.1.3 would be considered to be highly or moderately engaged in commercial fishing as many are at or above 1 standard deviation of the mean factor score and all have been at ½ standard deviation at one point in time.  Redington Shores, Indian Shores, and Palmetto show the least amount of engagement in commercial fishing overall, while most of the others are highly engaged, having engagement scores over 1 standard deviation if not over ½ standard deviation.  Few communities are highly reliant, although communities like Panacea, Apalachicola and Cortez seem to exhibit fairly high reliance with moderate to high engagement.



**Figure 3.5.1.3**. Commercial fishing engagement and reliance of the top 15 red grouper homeports for 2017.
Source: Social Indicators Database, NOAA Fisheries, NMFS, SERO.

### 3.5.2  Recreational Sector

Although we do not have data that would allow for a recreational RQ, we do have an overall measure of recreational fishing engagement and reliance for communities along Florida's west coast.  The communities were chosen because of their location and likely participation in the red grouper component of the reef fish fishery.  These engagement and reliance measures consist of recreational permit and infrastructure counts (boat ramps and marinas) within a community to gauge absolute recreational fishing activity and relative to its population.   These measures are not specific to red grouper, but a measure of overall recreational fishing.  Figure 3.5.2.1 indicates that most of these communities have a high engagement in recreational fishing as most are at or above the 1 standard deviation threshold, with Destin having the highest engagement score and high reliance.  Cedar Key demonstrates high reliance on recreational fishing. This is likely due to its small population and probably a small amount of infrastructure related to recreational fishing, but substantial enough for a small community to depend on it for a good portion of its local economy.  Other smaller communities like Apalachicola, Carrabelle, Crystal River, Everglades City, Port St. Joe and Panacea also demonstrate high reliance on recreational fishing.



**Figure 3.5.2.1.** Recreational fishing engagement and reliance for communities on Florida's west coast for 2017.
Source: Social Indicators Database 2017, NOAA Fisheries, NMFS, SERO.

The brief description of fishing activities presented here highlights which communities may be most involved in red grouper fishing.  It is expected that the impacts from the regulatory action in this amendment, whether positive or negative, will most likely affect those communities identified above.  At this time, it is not possible to provide a more detailed description of vessel involvement at the community level.  It is likely that certain vessels within a community are more dependent upon red grouper than others, as are particular households.  Until those types of data become accessible, the impacts upon either vessels or households within communities cannot be determined.

### 3.5.3  Environmental Justice Considerations

Executive Order 12898 requires federal agencies conduct their programs, policies, and activities in a manner to ensure individuals or populations are not excluded from participation in, or denied the benefits of, or subjected to discrimination because of their race, color, or national origin.  In addition, and specifically with respect to subsistence consumption of fish and wildlife, federal agencies are required to collect, maintain, and analyze information on the consumption patterns of populations who principally rely on fish and/or wildlife for subsistence.  This executive order is generally referred to as environmental justice (EJ).

Commercial and recreational anglers and associated industries could be impacted by the proposed actions.  However, information on the race and income status for groups at the different participation levels is not available.  Although information is available concerning a community's overall status with regard to minorities and poverty (e.g., census data), such information is not available specific to anglers and those involved in the industries and activities,

themselves. To help assess whether any EJ concerns arise from the actions in this amendment, a suite of indices was created to examine the social vulnerability of coastal communities. The three indices are poverty, population composition, and personal disruptions. The variables included in each of these indices have been identified through the literature as being important components that contribute to a community's vulnerability. Indicators such as increased poverty rates for different groups, more single female-headed households and households with children under the age of five, disruptions such as higher separation rates, higher crime rates, and unemployment all are signs of populations experiencing vulnerabilities. Again, for those communities that exceed the threshold it would be expected that they would exhibit vulnerabilities to sudden changes or social disruption that might accrue from regulatory change.

Figure 3.5.3.1 provides the social vulnerability index scores of the top commercial and recreational communities that have been identified as having some association with red grouper. Some communities appear in both figures to allow comparison with other communities included in that sector. The communities of Carrabelle and Crystal River both exceed the threshold of 1 standard deviation for poverty, with Cedar Key close to that threshold, demonstrating some vulnerability when combined with other index scores. Several communities exceed the threshold of 1/2 standard deviation above the mean for more than one index (Carrabelle, Crystal River and Panama City). These fishing communities would be the most likely to exhibit vulnerabilities to social or economic disruption due to regulatory change. Most communities on Florida's west coast exhibit few vulnerabilities.



**Figure 3.5.3.1.** Community social vulnerability indices for communities on Florida's west coast.
Source: Social Indicators Database 2020 (ACS 2016), NOAA Fisheries, SERO.

Although no EJ issues have been identified or are expected to arise, information on the race and income status for groups at the different participation levels (for-hire captains and crew, and employees of associated support industries, etc.) is not available.  There is no known subsistence consumption of red grouper, nor are there any claims to customary subsistence consumption of red grouper by any indigenous or tribal group in the Gulf.  One aspect that should be noted is that the community of Cortez, Florida is recognized as being on the National Register of historic places.  The working waterfront where many fish houses and boat yards are located are within that historic district.

## 3.6  Description of the Administrative Environment

### 3.6.1  Federal Fishery Management

Federal fishery management is conducted under the authority of the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act) (16 U.S.C. 1801 *et seq*.).  It was originally enacted in 1976 as the Fishery Conservation and Management Act.  The Magnuson-Stevens Act claims sovereign rights and exclusive fishery management authority over most fishery resources within the EEZ, an area extending 200 nautical miles from the seaward boundary of each of the coastal states, and authority over U.S. anadromous species and continental shelf resources that occur beyond the EEZ.

Responsibility for federal fishery management is shared by the Secretary of Commerce (Secretary) and eight regional fishery management councils that represent the expertise and interests of constituent states.  Regional councils are responsible for preparing, monitoring, and revising management plans for fisheries needing management within their jurisdiction.  The Secretary is responsible for promulgating regulations to implement proposed plans and amendments after ensuring management measures are consistent with the Magnuson-Stevens Act and with other applicable laws summarized in Appendix A.  In most cases, the Secretary has delegated this authority to NMFS.

The Council is responsible for fishery resources in federal waters of the Gulf.  These waters extend to 200 nautical miles offshore from the seaward boundaries of the Gulf States of Alabama, Florida, Louisiana, Mississippi, and Texas, as those boundaries have been defined by law.  The length of the Gulf coastline is approximately 1,631 miles.  Florida has the longest coastline of 770 miles along its Gulf coast, followed by Louisiana (397 miles), Texas (361 miles), Alabama (53 miles), and Mississippi (44 miles).

The Council consists of seventeen voting members:  11 public members appointed by the Secretary; one each from the fishery agencies of Texas, Louisiana, Mississippi, Alabama, and Florida; and one from NMFS.  The public is also involved in the fishery management process through participation on advisory panels and through Council meetings that, with few exceptions for discussing personnel matters, are open to the public.  The regulatory process is also in accordance with the Administrative Procedures Act, in the form of "notice and comment" rulemaking, which provides extensive opportunity for public scrutiny and comment, and requires consideration of and response to those comments.

Regulations contained within FMPs are enforced through actions of NOAA's Office of Law Enforcement, the United States Coast Guard, and various state authorities.  To better coordinate enforcement activities, federal and state enforcement agencies have developed cooperative agreements to enforce the Magnuson-Stevens Act.  These activities are being coordinated by the Council's Law Enforcement Technical Committee and the Gulf States Marine Fisheries Commission's Law Enforcement Committee, which have developed joint enforcement agreements and cooperative enforcement programs.[45]

Reef fish stocks are assessed through the SEDAR process.  As species are assessed, stock condition and acceptable biological catch**Error! Bookmark not defined.** levels are evaluated.  As a result, periodic adjustments to stock ACLs and other management measures are deemed needed to prevent overfishing.  Management measures are implemented through plan or regulatory amendments.

### 3.6.2  State Fishery Management

The purpose of state representation at the Council level is to ensure state participation in federal fishery management decision-making and to promote the development of compatible regulations in state and federal waters.  The state governments of Texas, Louisiana, Mississippi, Alabama, and Florida have the authority to manage their respective state fisheries.  Each of the five Gulf States exercises legislative and regulatory authority over their respective state's natural resources through discrete administrative units.  Although each agency is the primary administrative body with respect to the states' natural resources, all states cooperate with numerous state and federal regulatory agencies when managing marine resources.  A more detailed description of each state's primary regulatory agency for marine resources is provided on their respective web pages (Table 3.6.2.1).

**Table 3.6.2.1.**  Gulf state marine resource agencies and web pages.

| State marine resource agency | Web page |
|---|---|
| Alabama Marine Resources Division | http://www.outdooralabama.com/ |
| Florida Fish and Wildlife Conservation Commission | http://myfwc.com/ |
| Louisiana Department of Wildlife and Fisheries | http://www.wlf.louisiana.gov/ |
| Mississippi Department of Marine Resources | http://www.dmr.ms.gov/ |
| Texas Parks and Wildlife Department | http://tpwd.texas.gov/ |

---

[45] www.gsmfc.org

# CHAPTER 4. ENVIRONMENTAL CONSEQUENCES

## 4.1  Action 1 – Modify the Sector Allocations, Overfishing Limit (OFL), Acceptable Biological Catch (ABCError! Bookmark not defined.), and Annual Catch Limits (ACL) for Gulf of Mexico (Gulf) Red Grouper

### 4.1.1  Direct and Indirect Effects on the Physical Environment

A brief summary of red grouper use of the physical environment is provided in Section 3.2.  A more detailed description is included in the Generic Essential Fishery Habitat (EFH) Amendment (GMFMC 2004a) and Amendment 32 (GMFMC 2011b) which are incorporated by reference.  The effects of fishing gears used in the reef fish fishery on the physical environment are also briefly described in Section 3.2 and in more detail in Amendment 32.

The degree to which a habitat is affected by fishing gear depends largely on the vulnerability of the affected habitat to disturbance, and on the rate that the habitat can recover from disturbance (Barnette 2001).  For example, the complex structure and vertical growth pattern of coral reef species makes reef habitat more vulnerable to adverse impacts from fishing gear and slower to recover from such impacts than sand and mud bottom habitat (Barnette 2001).  Red grouper is also associated with hard bottom habitat, but tend to prefer lower relief habitat than other grouper species such as gag.

The primary effects of grouper fishing on the physical environment generally result from fishing gear interactions with the sea floor.  Most grouper are caught with hook-and-line fishing gear, although some spearfishing does occur.  Fishing gear can damage or disturb bottom structures, and occasionally incidentally harvest such habitat.

*Longlines*

Commercial longline gear is deployed over hard bottom habitats when targeting red grouper using weights to keep the gear in direct contact with the bottom.  Its potential for adverse impact is dependent on the type of habitat it is set on, the presence or absence of currents, and the behavior of fish after being hooked.  In addition, this gear upon retrieval can abrade, snag, and dislodge smaller rocks, corals, and sessile invertebrates (Bohnsack in Hamilton, 2000; Barnette 2001).  Direct underwater observations of longline gear in the Pacific halibut fishery by High (1998) noted that the gear could sweep across the bottom.  Some halibut were observed pulling portions of longlines 15 to 20 feet over the bottom.  Although the gear was observed in contact with or snagged on a variety of objects including coral, sturdy flexible corals usually appeared unharmed while hard corals often had portions broken off.  However, another study that directly observed deployed longline gear (Atlantic tilefish fishery) found no evidence that the gear shifted significantly, even when set in currents.  This was attributed to anchors set at either end of the longline as well as sash weights along the line to prevent movement (Grimes et al. 1982).  Based on the direct observations, it is logical to assume that bottom longline gear would have a

minor impact on sandy or muddy habitat areas.  However, due to the vertical relief that hard bottom and coral reef habitats provide, it would be expected that bottom longline gear may become entangled, resulting in potential negative impacts to habitat (Barnette 2001).

*Vertical lines*

Concentrations of many managed reef fish species are higher on hard bottom areas than on sand or mud bottoms, thus vertical line gear fishing generally occurs over hard bottom areas (GMFMC 2004a).  Vertical lines include multi-hook lines known as bandit gear, handlines, and rod-and-reels.  Vertical-line gear is less likely to contact the bottom than longlines, but still has the potential to snag and entangle bottom structures and cause tear-offs or abrasions (Barnette 2001).  In using bandit gear, a weighted line is lowered to the bottom, and then the lead is raised slightly off the bottom (Siebenaler and Brady 1952).  The gear is in direct contact with the bottom for only a short period of time.  Barnette (2001) suggests that physical impacts may include entanglement and minor degradation of benthic species from line abrasion and the use of weights (sinkers).  Commercial or recreational fishing with rod-and-reel and handlines also puts gear on the bottom.  The terminal part of the gear is either lifted off the bottom like fishing with bandit gear, or left contacting the bottom.  Sometimes the fishing line can become entangled on coral and hard bottom outcroppings.  The subsequent algal growth can foul and eventually kill the underlying coral (Barnette 2001).  Researchers conducting studies in the Madison-Swanson Marine Protected Area reported seeing lost fishing line on the bottom, much of which appeared to be fairly old and covered with growth (A. David, pers comm), a clear indication that bottom fishing has had an impact on the physical environment prior to fishing being prohibited in the area (GMFMC 2003).  The National Fish and Wildlife Foundation, in issuing grants to remove marine debris, established monofilament fishing line is a priority marine debris issue.

Anchor damage is also associated with vertical-line fishing vessels, particularly by the recreational sector where fishermen may repeatedly visit well marked fishing locations. Bohnsack in Hamilton (2000) showed that "favorite" fishing areas such as reefs are targeted and revisited multiple times, particularly with the advent of global positioning technology.  The cumulative effects of repeated anchoring could damage the hard bottom areas where fishing for grouper occurs.

*Spear and Powerhead*

Spear guns and slings are used in both commercial and recreational grouper fishing but are a relatively minor component of both.  Barnette (2001) cited a study by Gomez et al. (1987) that concluded that spearfishing on reef habitat may result in some coral breakage, but damage is probably negligible. In addition, there could be some impacts from divers touching coral with hands or from resuspension of sediment by fins (Barnette 2001).  Such impacts should be negligible to non-existent for well-trained and experienced spear fishermen who stay in the water column and avoid contact with the bottom, but would be expected to occur among spear fisherman who are less experienced, which would include more recreational fishermen.

*Effects*

This action could affect the physical environment (directly and indirectly) if changes in the allocation result in a shift in the use of fishing gear types used to harvest the stock ACLs.  Under **Alternatives 2-6**, all the yield streams that provide OFLs are based on a fixed level of fishing mortality ($F_{30\%SPR}$).  The difference is that the application of the sector fishing selectivities to the different allocations yields different OFLs, and subsequent ABCs.  Under the stock ACLs, **Alternative 1**, no action, when compared to the other alternatives, would likely have the greatest effect on the physical environment (5.26 million pounds (mp) gutted weight (gw) using the recreational Fishing Effort Survey-adjusted Marine Recreational Information Program [MRIP-FES] equivalent units).  This alternative is then followed by **Alternative 2** (4.90 mp gw), **Alternative 6** (4.60 mp gw), **Alternative 4** (4.30 mp gw), **Alternative 5** (4.28 mp gw), and **Alternative 2** (4.26 mp gw) in descending order of ACLs and effects.  **Alternatives 3-5** have very similar stock ACLs (4.26-4.30 mp gw) and any effects would be expected to be very similar.

In general, the effects from the recreational and commercial sectors on the physical environment would be opposite.  Where commercial ACLs increase, recreational ACLs decrease.  Thus, the effects from the sectors on this environment likely offset each other to a certain extent because of the directionality of fishing effort.  Given longlines are a commercial gear type, where the commercial ACL is greater, the effects from longlines would be expected to be greater.  The recreational sector primarily uses vertical gear, so where recreational ACLs are greater, effects on the physical environment from this gear type would be expected to be greater.   With respect to the reef fish fishery in general, this action would likely not change the way the reef fish fishery is prosecuted because it targets multiple species providing options for fishermen should red grouper not be available for harvest.

## 4.1.2  Direct and Indirect Effects on the Biological Environment

Direct and indirect effects from fishery management actions have been discussed in detail in Amendments 30B (GMFMC 2008c) and 32 (GMFMC 2011b) as well as in several red grouper framework actions (GMFMC 2010b, 2012d, 2014b, 2016a, 2019a) and are incorporated here by reference.  Potential impacts of the 2010 *Deepwater Horizon MC252* oil spill and red tide on the biological/ecological environment are discussed in Section 3.3, the aforementioned references, and are incorporated here by reference.  These impacts may include recruitment failure and reduced fish health.  Management actions that affect this environment mostly relate to the impacts of fishing on a species' population size, life history, and the role of the species within its habitat.  Removal of fish from the population through fishing reduces the overall population size.  Fishing gears have different selectivity patterns which refer to a fishing method's ability to target and capture organisms by size and species.  This would include the size distribution of fish caught by the gear as well as the number of discards, mostly sublegal fish or fish caught during seasonal closures, and the mortality associated with releasing these fish.

Fishing can affect life history characteristics of reef fish such as growth and maturation rates.  For example, Lombardi-Carlson et al. (2006) found that the mean size of gag at age was larger

pre-1990 than in post-1990 years and suggests this decrease may be due to fishing.  In red snapper, Fischer et al. (2004) and Nieland et al. (2007) found that the average size-at-age of red snapper had declined and associated this trend with fishing pressure.  However, this trend has not been linked to fishing effort for Gulf red grouper (Lombardi-Carlson et al., 2008).  The reef fish fishery can also affect species outside the reef fish complex.  Section 3.3 discusses determinations by the National Marine Fisheries Service (NMFS) with how the fishery interacts with listed and endangered species.  Specifically, sea turtles have been observed to be directly affected by the longline component of the Gulf reef fish fishery resulting with some incidental captures and are summarized in GMFMC (2010a and 2019b).  The last biological opinion by the NMFS concluded the Gulf reef fish fishery as managed by the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico (Reef Fish FMP) is not likely to jeopardize the continued existence of sea turtles, smalltooth sawfish, or table coral species (NMFS 2011).  NMFS has requested a re-initiation of consultation on the Reef Fish FMP.

This action could affect the biological/ecological environment (directly and indirectly) because changes in the allocation result in a shift in the amount of fish caught by each sector.  When this occurs, the sector selectivity patterns affect the numbers and sizes of fish caught and influences the resulting estimates of OFL, ABC, and stock ACL.  **Alternative 1**, no action, would have the greatest adverse effect on the red grouper population as the commercial ACL and recreational ACL (using MRIP-FES units for comparison purposes) would allow for harvests above **Alternative 2**'s ABC even though both alternatives have the same allocation.  This is because the F under **Alternative 1** is greater and so the likelihood of overfishing under **Alternative 1** would be greater than **Alternative 2**, assuming NMFS can constrain harvests to the sector ACLs.  The likelihood of overfishing under **Alternatives 2-6** would be similar as the management goal is the same.  Under **Alternatives 2-6**, all the OFLs are based on a fixed level of fishing mortality ($F_{30\%SPR}$), and thus each of these alternatives would result in a similar stock size ($B_{30\%SPR}$).  The difference in the alternatives is where more fish are allocated to the recreational sector, total landings have to be constrained more to account for the greater dead discards from recreational red grouper fishing.  As described in Appendix B, although the recreational discard mortality rate is lower than the commercial rate, the recreational fishery discards an order of magnitude more fish than the commercial fishery.  This difference is especially pronounced in the most recent 5 years (2013-2017), where commercial discards (~320k/year) have been less than a tenth of recreational discard (~3.71 million/year).  Thus, despite a higher discard mortality rate in the commercial fishery (due largely to the bottom longline fishery), the recreational sector is responsible for more discards and more dead discards.

The relationships among species in marine ecosystems are complex and poorly understood, making the nature and magnitude of ecological effects difficult to predict with any accuracy.  It is possible that forage species and competitor species could increase or decrease in abundance in response to a decrease or increase in red grouper abundance.  However, the relationships between red grouper and non-target species caught on trips where red grouper are directly targeted are not fully understood.  Further, substantial changes in the prosecution of the reef fish fishery are not expected from this action because the fishery is comprised of many species and so fishermen have harvesting choices.  As a result, no additional effects to non-target species or protected resources (see Section 3.3) are anticipated.

### 4.1.3  Direct and Indirect Effects on the Economic Environment

**Commercial Sector**

**Alternative 1** (No Action) would maintain the current commercial sector allocation of 76% of the total ACL, as well as the current OFL, ABC**Error! Bookmark not defined.**, and recreational ACL.  **Alternative 1** would maintain a commercial sector ACL of 3.16 mp gw.  Therefore, changes in economic value would not be expected to result from this alternative.  While not legally viable as a preferred alternative, the landings expected to occur under **Alternative 1** and the associated economic value are still used in this analysis as the benchmark for changes in economic value for the other alternatives.  The changes in producer surplus (PS) estimated in Table 4.1.3.1 capture the annual potential changes in PS from the commercial sector and assumes that the commercial sector lands the entire allocated ACT.  The 5-year average (2015-2019) of commercial landings exceeds the current commercial annual catch target (ACT) from **Alternative 1** with the current 5% buffer between the ACL and ACT, so this analysis assumes the commercial sector will land the entire allocated commercial ACT, as **Preferred Alternative 3** and **Alternatives 2** and **4-6** either retain or decrease the current commercial ACL as shown in Table 2.1.1.  **Alternative 2** increases the current commercial ACL.  Still, the 5-year average of commercial landings (3.40 mp gw) is near the associated ACT (3.53 mp gw), with the current 5% buffer between the ACL and ACT, and the red grouper stock is expected to continue to rebound.

The economic impacts expected to result from **Preferred Alternative 3** and **Alternatives 2** and **4-6** are analyzed as a function of the ACT.  For Action 1, the current commercial buffer of 5% between the ACL and ACT is used to determine the ACT.  An average dockside price from 2018 of $4.83 (2019 dollars) is used from Table 3.4.1.19 to calculate the change in revenue, as displayed in Table 4.1.3.1.

**Table 4.1.3.1.**  Expected change in landings for the red grouper commercial sector, expected change in revenue, and expected change in PS for **Preferred Alternative 3** and **Alternatives 2** and **4-6** relative to **Alternative 1**.

| Alternative | Expected change in landings (mp gw) | Expected change in revenue | Expected change in PS (2019 dollars) |
|---|---|---|---|
| Alt 2 | 0.53 | $2,559,900 | $614,376 |
| **Preferred Alt 3** | -0.60 | -$2,898,000 | -$695,520 |
| Alt 4 | -0.53 | -$2,559,900 | -$614,376 |
| Alt 5 | -0.57 | -$2,753,100 | -$660,744 |
| Alt 6 | 0.00 | $0 | $0 |

**Alternative 2** would be expected to result in an increase in revenue of $2,559,900, compared to **Alternative 1**, due to the increase in ACT. **Preferred Alternative 3** and **Alternatives 4-5** would be expected to result in a decrease in revenue, relative to **Alternative 1**. Using the estimate of 24% as the average net cash flow from 2014-2016 in Table 3.4.1.22, **Alternative 2** would be expected to result in an increase in PS of $614,376, compared to **Alternative 1**. **Preferred Alternative 3** and **Alternatives 4-5** would be expected to result in a decrease in PS, relative to **Alternative 1**. **Alternative 6** would be expected to result in no change in PS, relative to **Alternative 1**.

The expected change in revenue in Table 4.1.3.1 also reflects the expected change in red grouper purchases by dealers. The average of the total red grouper purchases from 2014-2018 from Table 3.4.1.23 is $17,557,924. The expected change in revenue with **Alternative 2** would be expected to result in an increase of 14.58% of the average total red grouper purchases, compared with **Alternative 1**. The expected changes in revenue with **Preferred Alternative 3** and **Alternatives 4-5** would be expected to result in, respectively, a decrease of 16.51%, 14.58%, and 15.68% of the average total red grouper purchases, compared with **Alternative 1**. **Alternative 6** would be expected to result in no expected change in revenue and no change in the average total red grouper purchases, relative to **Alternative 1**.

With the current commercial buffer of 5% between the ACL and ACT, the proposed increase in the ACL with **Alternative 2** would increase the availability of annual IFQ allocation for sale, compared with **Alternative 1**. As the supply of annual IFQ allocation increases, the allocation price would be expected to decrease. As shares reflect the expected supply of annual allocation available in the future, **Alternative 2** would be expected to result in a decrease in red grouper share price. In contrast, the proposed decrease in the ACL with **Preferred Alternative 3** and **Alternatives 4-5** would decrease the availability of annual IFQ allocation for sale, compared with **Alternative 1**, and the allocation price would be expected to increase in response. **Preferred Alternative 3** and **Alternatives 4-5** would be expected to result in an increase in red grouper share price, to reflect the expected supply of annual allocation available in the future. **Alternative 6** would not change the availability of annual IFQ allocation for sale, compared with **Alternative 1**, so the allocation price would not be expected to change. No change in red grouper share price would be expected with **Alternative 6**.

Changes in red grouper harvests, as a result of the change in ACT, could result in additional economic effects because of the potential effects on ex-vessel prices due to less (or more) red grouper on the markets. The potential effects to the consumer surplus (CS) are based on work price flexibilities by Keithly and Tabarestani (2018). An average dockside price from 2018 of $4.83 (2019 dollars) is used from Table 3.4.1.12. An own-price flexibility of -0.533 is used from the Habit Formation model (Keithly and Tabarestani 2018) to derive the average price loss and change in CS for **Preferred Alternative 3** and **Alternatives 2** and **4-6** in comparison to **Alternative 1** as seen in Table 4.1.3.2.

**Table 4.1.3.2.  Preferred Alternative 3** and **Alternatives 2** and **4**-**6** - Proposed change in the red grouper commercial sector ACT (relative to **Alternative 1**) and associated estimated average price change ($/lb) and change in CS.

| Alternative | Change in ACT (mp gw) | Expected average price change ($/lb) | Expected change in CS (2019 dollars) |
|---|---|---|---|
| Alt 2 | 0.53 | -$0.45 | $1,605,475 |
| Preferred Alt 3 | -0.60 | $0.51 | -$1,235,707 |
| Alt 4 | -0.53 | $0.45 | -$1,123,378 |
| Alt 5 | -0.57 | $0.49 | -$1,188,596 |
| Alt 6 | 0.00 | $0.00 | $0 |

Under **Alternative 2**, the red grouper commercial sector ACT would increase by 0.53 mp gw, compared to **Alternative 1**.  As a result, the CS would be expected to increase by $1.605 million under **Alternative 2**, compared to **Alternative 1**.  **Preferred Alternative 3** and **Alternatives 4**-**5** result in decreases to the commercial sector ACT, relative to **Alternative 1**, resulting in decreases in CS.  Compared to **Alternative 1**, the red grouper commercial sector ACT would decrease by 0.60 mp gw under **Preferred Alternative 3**, resulting in a decrease of the CS by $1.236 million.  Under **Alternative 4**, the red grouper commercial sector ACT would decrease by 0.53 mp gw, compared to **Alternative 1**.  As a result, the CS would be expected to decrease by $1.123 million under **Alternative 4**, compared to **Alternative 1**.  Compared to **Alternative 1**, the red grouper commercial sector ACT would decrease by 0.57 mp gw under **Alternative 5**, resulting in a decrease of the CS by $1.189 million.  Compared to **Alternative 1**, the red grouper commercial sector ACT would not change under **Alternative 6**, and therefore result in no change in the CS.

The total expected change in net economic benefits for the commercial sector from **Preferred Alternative 3** and **Alternatives 2** and **4**-**6**, relative to **Alternative 1**, are displayed in Table 4.1.3.3.  These changes are the addition of the expected change in PS from Table 4.1.3.1 to the expected change in CS from Table 4.1.3.2.

**Table 4.1.3.3.  Preferred Alternative 3** and **Alternatives 2** and **4**-**6** – Total Expected Change in Net Economic Benefits for the Commercial Sector relative to **Alternative 1**.

| Alternative | Total Expected Change in Net Economic Benefits (2019 dollars) |
|---|---|
| Alt 2 | $2,219,851 |
| Preferred Alt 3 | -$1,931,227 |
| Alt 4 | -$1,737,754 |
| Alt 5 | -$1,849,340 |
| Alt 6 | $0 |

**Recreational Sector**

**Alternative 1** (No Action) would maintain the current recreational sector allocation of 24% of the total ACL, as well as the current OFL, ABC**Error! Bookmark not defined.**, and recreational ACL.  Alternative 1 would maintain a recreational sector ACL of 1.00 mp gw (MRIP-FES

equivalent of 2.10 mp gw). Therefore, changes in economic value would not be expected to result from this alternative. While not legally viable as a preferred alternative, the landings expected to occur under **Alternative 1** and the associated economic value are still used in this analysis as the benchmark for changes in economic value for the other alternatives. In addition, the 5-year average (2015-2019) of MRIP-FES equivalent recreational landings exceeds the current recreational ACL from **Alternative 1**, so this analysis assumes the recreational sector will land the entire allocated recreational ACL, as **Preferred Alternative 3** and **Alternatives 2** and **4-6** decrease the current MRIP-FES equivalent recreational ACL as shown in Table 2.1.1.

The economic impacts expected to result from **Preferred Alternative 3** and **Alternatives 2** and **4-6** are analyzed as a function of the ACL. The MRIP-FES equivalent of the recreational sector ACL for **Alternative 1** is used in this analysis, in order to be in the same currency as the recreational sector ACLs for **Preferred Alternative 3** and **Alternatives 2** and **4-6**. The evaluation of changes in economic value expected to result from ACL changes for the recreational sector is based on work by Carter and Liese (2012). The CS value per fish for a second red grouper kept is estimated at $110.00 (2019 dollars). A conversion factor of 1.05 between gutted weight and whole weight of red grouper is used (SEDAR 42 2015). Estimated increases in economic value are approximated by dividing the change in ACL by 6.51 lbs ww, which is the average weight of a Gulf recreationally landed red grouper from 2015-2017 (SEFSC Southeast Region Headboat Survey [SRHS]) data, accessed March 2018; MRIP Intercept data available at: https://www.st.nmfs.noaa.gov/st1/recreational/MRIP_Survey_Data/), to obtain the increase in number of red grouper, which is then multiplied by the CS value per fish of $110.00. The proposed changes in the recreational sector ACL and estimates of associated annual changes in economic values for **Preferred Alternative 3** and **Alternatives 2** and **4-6** are provided in Table 4.1.3.4.

**Table 4.1.3.4. Preferred Alternative 3** and **Alternatives 2** and **4-6** - Proposed change in the red grouper recreational sector ACL (relative to **Alternative 1**) and associated estimated annual change in CS.

| Alternative | Change in ACL (mp gw) | Expected annual change in CS (2019 dollars) |
|---|---|---|
| Alt 2 | -0.92 | -$16,322,581 |
| **Preferred Alt 3** | -0.37 | -$6,564,516 |
| Alt 4 | -0.40 | -$7,096,774 |
| Alt 5 | -0.38 | -$6,741,935 |
| Alt 6 | -0.66 | -$11,709,677 |

Under **Alternative 2**, the red grouper recreational sector ACL would decrease by 0.92 mp gw, compared to **Alternative 1**. As a result, the CS would be expected to decrease by $16.323 million (in 2019 dollars) under **Alternative 2**, compared to **Alternative 1**. Compared to **Alternative 1**, the red grouper recreational sector ACL would decrease by 0.37 mp gw under **Preferred Alternative 3**, resulting in an expected decrease in CS by $6.565 million (in 2019 dollars). Under **Alternative 4**, the red grouper recreational sector ACL would decrease by 0.40 mp gw, compared to **Alternative 1**. As a result, the CS would be expected to decrease by $7.097 million (in 2019 dollars) under **Alternative 4**, compared to **Alternative 1**. Compared to

**Alternative 1**, the red grouper recreational sector ACL would decrease by 0.38 mp gw under **Alternative 5**, resulting in an expected decrease in CS by $6.742 million (in 2019 dollars). Under **Alternative 6**, the red grouper recreational sector ACL would decrease by 0.66 mp gw, compared to **Alternative 1**. As a result, the CS would be expected to decrease by $11.710 million (in 2019 dollars) under **Alternative 6**, compared to **Alternative 1**.

The PS of the for-hire component of the recreational sector, being comprised of charter vessels and headboats, would be impacted by a change in the number of targeted trips. In the long run, factors of production such as labor and capital can be used elsewhere in the economy, and so only short-term changes to PS are expected. In the Gulf, headboat trips take a diverse set of anglers on a single vessel, generally advertising a diverse range of species to be caught. Therefore, an assumption that no headboat trips would be lost due to a change in ACL would be reasonable. However, charter vessel trips that are targeting red grouper may be subject to cancellation by anglers and are the focus of the recreational sector PS analysis.

Predicted closure dates based on recreational ACL are seen in Table 2.1.4. Charter vessel trips by 2-month wave from 2014-2018 targeting red grouper are seen in Table 3.4.2.4. Based on the predicted closure dates, **Alternative 1** would have no closure, **Alternatives 2** would close in the 4th wave (July/August), and **Preferred Alternative 3** and **Alternatives 4-5** would close in the 6th wave (November/December). **Alternative 6** would close in the 5th wave (September/October). The total number of canceled trips for **Alternatives 2** and **6** would therefore also include all of the targeted trips for the rest of year (waves 5 and 6 for **Alternative 2**; wave 6 for **Alternative 6**). The number of trips cancelled in the wave in which the predicted closure date would occur, along with the total number of canceled trips, is shown in Table 4.1.3.5. The number of trips cancelled in the interrupted wave is calculated using a ratio of the number of closed days in the wave and the total number of days in the 2-month wave, multiplied by the average trips for that wave from Table 3.4.2.4. This assumes that trips within a 2-month wave are evenly distributed among days.

**Table 4.1.3.5.** Wave in which predicted closure date occurs, canceled charter trips in the interrupted wave, and total canceled charter trips for **Preferred Alternative 3** and **Alternatives 2** and **4-6**.

| Alternative | Interrupted Wave | Canceled Charter Trips in Interrupted Wave | Total Canceled Charter Trips |
|---|---|---|---|
| Alt 2 | 4 | 2,915 | 9,991 |
| Preferred Alt 3 | 6 | 665 | 665 |
| Alt 4 | 6 | 971 | 971 |
| Alt 5 | 6 | 767 | 767 |
| Alt 6 | 5 | 1,362 | 4,481 |

The Net Cash Flow per Angler Trip (CFpA) from Souza and Liese (2019) of $136 (2017 dollars) is used to derive an upper bound for the short-term change in PS for charter vessels; Table 3.4.2.8 updates that estimate to $141 (2019 dollars). The CFpA accounts for the lost revenue, while recognizing that canceled trips do not have certain expenditures such as fuel, trip supplies, and labor. The short-term change in PS is displayed in Table 4.1.3.6. **Preferred Alternative 3**

and Alternatives 2 and 4-6 are all expected to result in a negative short-term change in PS.  As the earliest predicted closure date occurs with **Alternative 2**, the short-term change in PS is greatest (-$1,408,708), compared to **Alternative 1**.  Following **Alternative 2**, the next earliest predicted closure date occurs with **Alternative 6**, which results in the next greatest short-term change in PS (-$631,856), compared to **Alternative 1**.  The predicted closure dates for **Preferred Alternative 3** and **Alternatives 4-5** occur within 6 days of each other, and so the short-term changes in PS of those alternatives have a relatively close range from -$93,723 to -$136,980.

**Table 4.1.3.6.**  Short-term change in PS for charter vessels under **Preferred Alternative 3** and **Alternatives 2** and **4-6** relative to **Alternative 1**.

| Alternative | Short-term change in PS (2019 dollars) |
|---|---|
| Alt 2 | -$1,408,708 |
| Preferred Alt 3 | -$93,723 |
| Alt 4 | -$136,980 |
| Alt 5 | -$108,142 |
| Alt 6 | -$631,856 |

The total expected change in net economic benefits for the recreational sector from **Preferred Alternative 3** and **Alternatives 2** and **4-6**, relative to **Alternative 1**, are displayed in Table 4.1.3.7.  These changes are the addition of the expected annual change in CS from Table 4.1.3.4 to the short-term change in PS from Table 4.1.3.6.

**Table 4.1.3.7.**  **Preferred Alternative 3** and **Alternatives 2** and **4-6** – Total Expected Change in Net Economic Benefits for the Recreational Sector relative to **Alternative 1**.

| Alternative | Total Expected Change in Net Economic Benefits (2019 dollars) |
|---|---|
| Alt 2 | -$17,731,289 |
| Preferred Alt 3 | -$6,658,239 |
| Alt 4 | -$7,233,754 |
| Alt 5 | -$6,850,077 |
| Alt 6 | -$12,341,533 |

The total expected change in net economic benefits for both the commercial and recreational sectors are displayed in Table 4.1.3.8.  Relative to **Alternative 1**, **Preferred Alternative 3** would have the least negative expected change in net economic benefits, followed by **Alternatives 5**, **4**, **6**, and **2**.

**Table 4.1.3.8.  Preferred Alternative 3** and **Alternatives 2** and **4-6** – Combined Total Expected Change in Net Economic Benefits for both the Commercial and Recreational Sectors relative to **Alternative 1**.

| Alternative | Total Expected Change in Net Economic Benefits (2019 dollars) |
|---|---|
| Alt 2 | -$15,511,438 |
| **Preferred Alt 3** | -$8,589,466 |
| Alt 4 | -$8,971,508 |
| Alt 5 | -$8,699,417 |
| Alt 6 | -$12,341,533 |

## 4.1.4  Direct and Indirect Effects on the Social Environment

The purpose of this amendment is to revise the red grouper allocation between the commercial and recreational sectors based on the best scientific information available and to modify the catch limits based on the results of the recent stock assessment.  The Southeast Fisheries Science Center (SEFSC) has determined the Fishing Effort Survey (FES) adjusted Marine Recreational Information Program (MRIP) data represent the best scientific information available for recreational landings and should replace MRIP-Coastal Household Telephone Survey (CHTS) data.  Updating the units for monitoring recreational landings and calibrating historical landings affects the sector allocation when MRIP-FES data are applied to the same time series used for the current allocation (**Alternative 1**).  Thus, updating the MRIP-CHTS data with MRIP-FES data would also change the sector allocation at the same time; two interrelated things that would affect the social environment in different ways.  Further, this action modifies the catch limits.  In order to evaluate the interrelated changes that would result in different effects for the two sectors, the social effects are discussed and compared separately for each related change.

*Revise the OFL, ABC, and ACL for red grouper*

In general, higher catch limits would be associated with fewer negative effects as they would allow for more fish to be landed, while lower catch limits would be associated with greater negative effects as they would allow for less fish to be landed.  When catch limits are not met, it can be due to multiple factors and may relate to the stock size being smaller than estimated for the existing catch levels.  Fishermen had been reporting concerns with the health of the red grouper stock prior to the 2016 increase to the ACL.  Although the catch limits were increased from 2016 through 2018, landings for each sector actually decreased at the same time, providing support for the observations reported by fishermen.  Landings have remained well below each sector's ACT and ACL in recent years (Table 2.1.3), suggesting that the catch levels were not the factor constraining harvest.  However, the reduced ACLs proposed through this action would be expected to constrain harvest.

Additional effects would not be expected under **Alternative 1**, as the catch limits for both sectors would remain the same.  **Alternatives 2-6** would reduce the OFL and ABC, and set the stock ACL equal to the new ABC, potentially resulting in direct negative effects if a sector's ACL is

reduced from **Alternative 1**.  The ACLs under **Alternatives 2-6** are provided in Table 4.1.4.1, with the recreational sector ACLs provided in MRIP-CHTS units based on the ratio of MRIP-CHTS to MRIP-FES units provided for **Alternative 1** (Section 2.1), for the purpose of comparison.

**Table 4.1.4.1.**  Sector ACLs for **Alternatives 1**-**2**, **4**-**6**, and **Preferred Alternative 3** with the recreational sector ACLs provided in MRIP-CHTS units based on the ratio of MRIP-CHTS units to MRIP-FES units provided for **Alternative 1**.

| Alternative | Comm ACL | Rec ACL (CHTS) |
|-------------|----------|----------------|
| **1** (No Action) | 3.16 | 1.000 |
| **2** | 3.72 | 0.562 |
| **Pref. 3** | 2.53 | 0.824 |
| **4** | 2.60 | 0.810 |
| **5** | 2.56 | 0.819 |
| **6** | 3.16 | 0.686 |

Note:  The recreational ACLs in MRIP-CHTS are calculated using the ratio of 1.00:2.10, representing the conversion of the recreational ACL under Alternative 1 from MRIP-CHTS to MRIP-FES units.  Values in million pounds gutted weight.

The commercial sector's red grouper landings have decreased each year since 2014 (Table 2.1.2) and landings remain below both the ACT (Table 2.1.3), which is the quota and represents the amount of distributed allocation.  The ACT is used for the commercial sector to provide multi-use allocation, which can be used to land either red grouper or gag.  In recent years, most of the multi-use red grouper allocation was used to land gag, while most of the gag multi-use allocation was also used to land gag (Table 2.2.2).  This trend is likely due to the increased red grouper ACL in 2017 and 2018 and the higher ex-vessel price and ACL for gag compared to red grouper (NMFS 2020).  Except for landings in 2018 and 2019, the proposed commercial ACLs under **Preferred Alternative 3** and **Alternatives 4-5** are lower than the commercial red grouper landings since the GT-IFQ program was implemented (Table 2.1.2), suggesting negative effects are possible for the commercial sector if landings rebound to levels prior to 2018.  The greatest potential negative effects would be expected under **Preferred Alternative 3**, which would reduce the commercial sector's ACL the most among the alternatives, with slightly fewer negative effects expected under **Alternative 5**, followed by **Alternative 4**.  If commercial landings continue to remain below the ACT and ACL, no effects would be expected.  The commercial ACL would be the same under **Alternative 1** and **Alternative 6** and no effects would be expected.  Compared to **Alternative 1**, the commercial sector would realize an ACL increase under **Alternative 2**, suggesting positive effects could result.  Since the GT-IFQ program was implemented, commercial landings have been greater than 3.72 mp gw (**Alternative 2**) in 6 out of 10 years.  However, these effects may not be realized due to continuing issues with the stock size, which has likely been the limiting factor for landings, rather than the availability of IFQ allocation for the sector to reach its quota.

Similar to the commercial sector, recreational landings have remained well below the sector's ACL since it was increased in 2016, likely limited due to the availability of the stock rather than to effort.  However, in the years prior, recreational landings were meeting or even exceeded (in one year) its ACL (Table 2.1.3).  Compared to the commercial sector, the effects of modifying

the catch limits are nearly inverted for the recreational sector, such that the greatest negative effects would be expected under **Alternative 2**, which would reduce the recreational sector ACL by nearly half.  If red grouper landings remain at 2017-2019 levels, negative effects may not be expected; if red grouper landings return to levels seen in 2016 and years prior, negative effects would likely result as the ACL is met, triggering the ACT to be used to close the fishing season in the subsequent year.  **Preferred Alternative 3** and **Alternatives 4-5** represent a reduction of approximately 20% of the recreational sector's ACL, with the greatest negative effects expected under **Alternative 4**, followed by decreasing effects under **Alternative 5** then **Preferred Alternative 3**.  **Alternative 6** would represent a reduction of approximately 30% compared to **Alternative 1**, and thus be intermediary between **Alternative 2** and the approximate reductions under **Preferred Alternative 3** and **Alternatives 4-5**.

The direct negative effects that may result for either sector in relation to an ACL reduction would be expected in the short-term as less fish are available to be landed, and would only occur if the fish are available to be caught.  Although the alternatives for reducing the catch limits under **Alternative 2** compared to **Preferred Alternative 3** and **Alternatives 4-6** would negatively affect the recreational sector in the short term, it would be expected that for the long-term, these negative effects would be mitigated by increasing protection for the stock, resulting in increased catch limits and positive effects in the future for both sectors.  In turn, short term negative effects from reducing the commercial catch limits (**Alternatives 4, 6**, and **Preferred Alternative 3**) would be expected to be mitigated in the long term.  The effects for the commercial sector would be similar, with the order of effects inverted for the alternatives, corresponding to the sector allocation, further demonstrating the interrelation of effects due to the changes that would occur through this action.

*Adjust the recreational sector ACL from MRIP-CHTS to MRIP-FES units*

Converting the recreational sector's ACL from MRIP-CHTS units to MRIP-FES units would directly affect the recreational sector only.  In theory, there should be no direct effects under any of the alternatives, as the change from MRIP-CHTS units to MRIP-FES units is intended to be a conversion, such that the current recreational sector ACL of 1.00 mp gw in MRIP-CHTS units is equivalent to a recreational sector ACL of 2.10 mp gw in MRIP-FES units (Table 4.1.4.2).  Applying this conversion to the recreational sector ACLs under **Preferred Alternative 3** and **Alternatives 2, 4,** and **6** results in an equivalent amount of fish between the MRIP-CHTS and MRIP-FES derived units, meaning that the amount of harvest available to the recreational sector would not change under any of the alternatives. While no direct effects would be expected for the recreational sector, indirect effects of the conversion would result for both sectors, as the conversion affects the sector allocation.

**Table 4.1.4.2.**  Recreational sector ACLs for **Alternatives 1-6** in MRIP-CHTS units and MRIP-FES units, based on the ratio in Alternative 1.

| Alternative | Rec ACL (CHTS) | Rec ACL (FES) |
|---|---|---|
| **1** (No Action) | 1.000 | 2.10 |
| **2** | 0.562 | 1.18 |
| **Pref. 3** | 0.824 | 1.73 |
| **4** | 0.810 | 1.70 |
| **5** | 0.819 | 1.72 |
| **6** | 0.686 | 1.44 |

*Reallocate the red grouper ACL between the commercial and recreational sectors*

Allocation is an inherently controversial topic as competing user groups strive to obtain the largest share for their group.  Although reallocation is the primary purpose of this amendment, the reallocation between the commercial and recreational sectors would be an indirect effect from the conversion of the recreational sector's ACL from MRIP-CHTS units to MRIP-FES units.  Table 4.1.4.3 provides the resulting sector allocation under **Alternatives 1-6** and the basis for each allocation.  **Alternative 1** (No Action) would retain the current sector allocation for red grouper and would have no effect on either the commercial or recreational sector.  A sector allocation is a policy designation of the rights to access, but the reallocation of red grouper also has socio-cultural significance.  The current 76% commercial to 24% recreational allocation reflects the greater historical engagement with the red grouper stock by the commercial sector compared to the recreational sector.  For comparison, the sector allocation of gag reflects the greater historical engagement of that resource to the recreational sector (61%) compared to the commercial sector (39%).

**Table 4.1.4.3.**  Resulting sector allocations under **Alternatives 1-6** and the basis for the recreational sector allocation.

| Alternative | Commercial | Recreational | Basis for Allocation |
|---|---|---|---|
| **1** | 76% | 24% | No Action |
| **2** | 76% | 24% | Retain Alternative 1 |
| **Pref. 3** | 59.3% | 40.7% | 1986-2005 landings in MRIP-FES |
| **4** | 60.5% | 39.5% | 1986-2009 landings in MRIP-FES |
| **5** | 59.7% | 40.3% | 1986-2018 landings in MRIP-FES |
| **6** | 68.7% | 31.3% | Retain Commercial ACL under Alternative 1 |

By retaining the same allocation as **Alternative 1**, additional effects would not be expected from **Alternative 2** in terms of the sector allocation.  However, as discussed in the section above on revising the catch limits, the sector ACLs underlying the allocation for **Alternative 2** reflect a change in the amount of fish that would go to each sector compared to **Alternative 1**, with more fish going to the commercial sector and less fish going to the recreational sector.  Compared to **Alternatives 1** and **2**, **Preferred Alternative 3** and **Alternatives 4-5** would reallocate

approximately 16% of the new stock ACL from the commercial sector to the recreational sector, resulting in negative effects for the commercial sector and positive effects for the recreational sector. Because **Preferred Alternative 3** and **Alternatives 4-5** all result in a shift in allocation from the commercial sector to the recreational sector, the types of effects on the social environment would be similar among the alternatives. The direct effects from **Preferred Alternative 3** and **Alternatives 4-5** would vary in scope and strength relative to the amount of quota that is reallocated, which is within 1.2% among **Preferred Alternative 3** and **Alternatives 4-5**. That the different time series of recreational landings used for the allocations under **Alternatives 3-5** result in a narrow range of resulting allocations suggests that the effects between these alternatives would be smaller than between **Alternatives 1-2** and **Preferred Alternative 3** and **Alternatives 4-5**. By holding the commercial ACL at the same amount as under **Alternative 1**, **Alternative 6** would reallocate approximately 7% of the new stock ACL from the commercial sector to the recreational sector, resulting in intermediary negative effects between **Alternatives 1-2** and **Preferred Alternative 3** and **Alternatives 4-5**.

## 4.1.5  Direct and Indirect Effects on the Administrative Environment

Under **Alternative 1**, sector allocations would remain the same as in current management (76% commercial / 24 % recreational), which uses data based on average landings from MRIP-CHTS. **Alternative 1** would also retain the current OFL, ABC, and ACLs. Under **Alternatives 2-5**, sector allocations of the total ACL between the recreational and commercial sector would be revised based on average landings using MRIP-FES data. **Alternative 2** would result in an increase in the commercial ACL, while **Preferred Alternative 3** and **Alternatives 4 and 5** would result in a decrease in the commercial ACL, and vary only slightly among each other based on the data years used as the reference period. **Alternative 6** would result in the same commercial ACL as **Alternative 1**. Using the MRIP-FES equivalent recreational ACL in **Alternative 1** for comparison, all of the action alternatives would result in a decrease in the recreational ACL. **Alternative 2** would result in the largest decrease and **Preferred Alternative 3** and **Alternatives 4 and 5** vary only slightly from each other and would result in the least decrease. **Alternative 6** would result in a recreational ACL that is in between the ACL resulting from **Alternative 2** and the ACLs resulting from **Preferred Alternative 3** and **Alternatives 4 and 5**.

The potential impacts on the administrative environment depend on the action necessary to compare landings to the catch limits and the likelihood of needing to implement a recreational closure or take additional action to prevent overfishing. All alternatives, except **Alternative 1**, would result in beneficial effects because they would eliminate the need to convert landings back to MRIP-CHTS for management. However, all alternatives, except Alternative 1, would result in a decrease in recreational ACL, which may increase the likelihood of needing to implement an in-season closure. Alternatives that result in larger allocations to the recreational sector could increase the likelihood of overfishing because of the uncertainty in determining recreational landings. However, the recreational ACT is used to monitor landings in years after the ACL has been exceeded, which reduces the likelihood of successive years of overharvest by the recreational sector, and there has been an overall decreasing trend in total landings. Thus, it is

unlikely that any of the action alternatives will result in any significant increase in exceeding the OFL.

## 4.2  Action 2 – Modify the Gulf Red Grouper Annual Catch Targets (ACT)

### 4.2.1  Direct and Indirect Effects on the Physical Environment

Effects on the physical environment from fishing are described in Section 4.1.1, which describes how increasing fishing effort leads to increasing effects on this environment.  Action 1 sets the overall OFL, ABC, and sector ACLs.  This action sets the buffer between the ACL and ACT.  Action 1 would maintain the buffers between the respective commercial and recreational ACLs and ACTs.  For the commercial sector, this buffer allows for gag and red-grouper multi-use shares to be fished under the IFQ program.  Thus, the buffer is not used to constrain harvest and consequently fishing effort, but likely maintains fishing effort similar to if there were no buffer.  However, for the recreational sector, the buffer is used to account for management uncertainty and decrease the likelihood the recreational ACL is exceeded if exceeded in the previous year.  Thus, the greater the buffer, the lower recreational fishing effort would be from the sector.  Under these circumstances, **Alternatives 2** and **3** would likely have similar effects because the recreational buffer is the same at 9%.  The recreational buffer for **Alternative 1** is 8% and so could result in slightly more adverse effects than the other two alternatives given it could allow for a minimal increase in effort.

### 4.2.2  Direct and Indirect Effects on the Biological Environment

Effects on the physical biological/ecological environment from fishing are described in Section 4.1.2, which describes how increasing fishing effort leads to increasing effects on this environment.  Action 1 sets the overall OFL, ABC, and sector ACLs.  This action sets the buffer between the ACL and annual catch target (ACT).  Action 1 would maintain the buffers between the respective commercial and recreational ACLs and ACTs.  For the commercial sector, this buffer allows for gag and red-grouper multi-use shares to be fished under the IFQ program.  It is the IFQ program that limits the commercial catch to the ACL through the distribution of allocation and allocation reporting that acts as an accountability measure (AM) to ensure the ACL is not exceeded.  Thus, the buffer is not used to constrain harvest and consequently fishing, but likely maintains fishing levels similar to if there were no buffer and no multi-use shares (e.g., **Alternative 2**).  However, for the recreational sector, the buffer is used to account for management uncertainty and decrease the likelihood the recreational ACL is exceeded if exceeded in the previous year.  Thus, the greater the buffer, the less recreational fishing would likely occur from the sector.  Under these circumstances, **Alternatives 2** and **3** would likely have similar effects as the recreational buffer is equal at 9%.  The recreational buffer for **Alternative 1** is 8% and so could result in slightly more adverse effects than the other two alternatives given it could allow for a minimal increase in fishing.

Amendment 53 - Red Grouper
Allocations and Annual Catch Levels and Targets

105

Chapter 4.  Environmental
Consequences

0003578

## 4.2.3  Direct and Indirect Effects on the Economic Environment

**Commercial Sector**

**Alternative 1** (No Action) would maintain the current commercial buffer of 5% between the ACL and ACT.  Therefore, changes in economic value would not be expected to result from this alternative, only if paired with Action 1 **Alternative 1**.  As Action 1 **Alternative 1** is not legally viable as a preferred alternative, the landings expected to occur and associated economic values under alternatives from Action 2 must be analyzed with additional alternatives from Action 1.  However, the landings expected to occur from Action 2 **Alternative 1** under Action 1 **Alternative 1** (No Action) and the associated economic values are still used in this analysis as the benchmark for changes in economic value for the other alternatives.  Action 2 **Alternative 2** and **Preferred Alternative 3** are not examined under Action 1 **Alternative 1**, as they would not be legally viable or provide an economic benchmark.  The changes in producer surplus (PS) estimated in Table 4.2.3.1 capture the annual potential changes in PS from the commercial sector and assumes that the commercial sector lands the entire allocated ACT.  The 5-year average (2015-2019) of commercial landings exceeds the current commercial ACT, so this analysis assumes the commercial sector will land the entire allocated commercial ACT, as all combinations of Action 2 alternatives with Action 1 **Preferred Alternative 3** and **Alternatives 1** and **4**-**5** either retain or decrease the current commercial ACT.  Action 2 **Alternatives 1**-**2** and **Preferred Alternative 3** either retain or increase the current commercial ACT when paired with Action 1 **Alternative 6**.  Action 1 **Alternative 2** would increase the current commercial ACT when paired with any of the Action 2 alternatives, and the 5-year average of commercial landings (3.40 mp gw) is near the potential ACTs, as combined with Action 1 alternatives, with the current 5% buffer between the ACL and ACT (3.53 mp gw) or a new 0% buffer between the ACL and ACT (2.53 mp gw).  In addition, the red grouper stock is expected to continue to rebound.

The economic effects expected to result from **Alternatives 1**-**2** and **Preferred Alternative 3** are analyzed as a function of the ACT and compared with Action 2 **Alternative 1** paired with Action 1 **Alternative 1**.  An average dockside price from 2018 of $4.83 (2019 dollars) is used from Table 3.4.1.19 to calculate the change in PS, as displayed in Table 4.2.3.1.

As noted in Section 2.2., both the red grouper and gag share categories have a multi-use provision that allows a portion of the red grouper quota to be harvested under the gag allocation, and vice versa.  Under **Alternative 2**, with a commercial buffer of 0%, the gag multi-use (GGM) allocation would be zero, and therefore, only gag could be landed with gag allocation.  From 2016 to 2018, 0.3% to 2% of the GGM was used to land red grouper; however, the 2019 data show an increase to 19% of the GGM being used for landing red grouper.  Under Alternative 2, minor direct, negative economic effects would therefore result from the lack of red grouper landings, although some mitigation may occur as the poundage that would be used for GGM with red grouper might be instead used for landing gag.  As such, these effects are described qualitatively, rather than quantitatively.

**Table 4.2.3.1.**  Expected change in landings for the red grouper commercial sector, expected change in revenue, and expected change in PS for Action 2 **Preferred Alternative 3** and **Alternatives 2** and **4-6**, relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**.

| | | Action 2 **Alt 1** | |
|---|---|---|---|
| Action 1 | Expected change in landings (mp gw) | Expected change in revenue | Expected change in PS (2019 dollars) |
| **Alt 2** | 0.53 | $2,559,900 | $614,376 |
| **Preferred Alt 3** | -0.60 | -$2,898,000 | -$695,520 |
| **Alt 4** | -0.53 | -$2,559,900 | -$614,376 |
| **Alt 5** | -0.57 | -$2,753,100 | -$660,744 |
| **Alt 6** | 0.00 | $0 | $0 |
| | | Action 2 **Alt 2** | |
| Action 1 | Expected change in landings (mp gw) | Expected change in revenue | Expected change in PS (2019 dollars) |
| **Alt 2** | 0.72 | $3,477,600 | $834,624 |
| **Preferred Alt 3** | -0.47 | -$2,270,100 | -$544,824 |
| **Alt 4** | -0.40 | -$1,932,000 | -$463,680 |
| **Alt 5** | -0.44 | -$2,125,200 | -$510,048 |
| **Alt 6** | 0.16 | $772,800 | $185,472 |
| | | Action 2 **Preferred Alt 3** | |
| Action 1 | Expected change in landings (mp gw) | Expected change in revenue | Expected change in PS (2019 dollars) |
| **Alt 2** | 0.53 | $2,559,900 | $614,376 |
| **Preferred Alt 3** | -0.60 | -$2,898,000 | -$695,520 |
| **Alt 4** | -0.53 | -$2,559,900 | -$614,376 |
| **Alt 5** | -0.57 | -$2,753,100 | -$660,744 |
| **Alt 6** | 0.00 | $0 | $0 |

Action 2 **Alternative 1** and **Preferred Alternative 3** would result in the same expected change in revenue and in PS for the commercial sector as seen in Section 4.1.3, as Action 1 was also analyzed with the current 5% commercial buffer.  Therefore, Action 2 **Preferred Alternative 3** is not expected to have any effect on landings, revenue, or PS, relative to **Alternative 1**. Compared with Action 2 **Alternative 1** and **Preferred Alternative 3**, Action 2 **Alternative 2** results in a larger positive change in PS when paired with Action 1 **Alternatives 2** and **6**, due to a smaller commercial buffer.  As such, Action 2 **Alternative 2** would be expected to increase revenue by an additional $917,700 relative to Action 2 **Alternative 1**, if Action 1 **Alternative 2** is selected; Action 2 **Alternative 2** would be expected to increase revenue by an additional $772,800 relative to Action 2 **Alternative 1**, if Action 1 **Alternative 6** is selected.  In addition, when compared with Action 2 **Alternative 1** and **Preferred Alternative 3**, Action 2 **Alternative 2** results in a smaller negative change in PS when paired with Action 1 **Preferred Alternative 3** or **Alternatives 4-5**.  As such, revenue under Action 2 **Alternative 2** would be expected to decrease by $627,900 less than under Action 2 **Alternative 1**, if Action 1 **Preferred Alternative 3 or Alternatives 4-5** are selected.  This relative change in revenue is the same regardless of whether **Preferred Alternative 3** or **Alternatives 4-5** is selected under Action 1, as the relative expected change in landings, -0.13 mp gw, is the same between Action 2 **Alternative 1** and **Alternative 2**.

The expected change in revenue in Table 4.2.3.1 also reflects the expected change in red grouper purchases by dealers.  The average of the total red grouper purchases from 2014-2018 from Table 3.4.1.23 is $17,557,924.  Action 2 **Alternative 1** and **Preferred Alternative 3** would result in the same expected change in revenue and, therefore, expected changes in red grouper purchases by dealers as seen in Section 4.1.3, as Action 1 was also analyzed with the current 5% commercial buffer.  Action 2 **Preferred Alternative 3** is not expected to have any effect on red grouper purchases, relative to **Alternative 1**.   The expected change in revenue with Action 2 **Alternative 2** paired with Action 1 **Alternative 2** would be expected to result in an increase of 19.81% of the average total red grouper purchases, compared with Action 2 **Alternative 1** paired with Action 1 **Alternative 1**.  Similarly, the expected change in revenue with Action 2 **Alternative 6** paired with Action 1 **Alternative 2** would be expected to result in an increase of 4.40% of the average total red grouper purchases, compared with Action 2 **Alternative 1** paired with Action 1 **Alternative 1**.  The expected changes in revenue with Action 2 **Alternative 2** paired with Action 1 **Preferred Alternative 3** or **Alternatives 4-5** would be expected to result in, respectively, a decrease of 12.93%, 11.00%, and 12.10% of the average total red grouper purchases, compared with Action 2 **Alternative 1** paired with Action 1 **Alternative 1**.  Relative to Action 2 **Alternative 1**, Action 2 **Alternative 2** when paired with Action 1 **Alternative 2** would be expected to result in a 5.23% increase in total red grouper purchases.  Relative to Action 2 **Alternative 1**, Action 2 **Alternative 2** when paired with Action 1 **Alternative 6** would be expected to result in a 4.40% increase in total red grouper purchases.  Relative to Action 2 **Alternative 1**, Action 2 **Alternative 2** when paired with Action 1 **Preferred Alternative 3 or Alternatives 4-5** would be expected to result in a 3.58% less of a decrease in total red grouper purchases.

The proposed increase in the ACT with Action 2 **Preferred Alternative 3** or **Alternatives 1-2** paired with Action 1 **Alternative 2** would increase the availability of annual IFQ allocation for sale, as compared with being paired with Action 1 **Alternative 1**. As the supply of annual IFQ allocation increases, the allocation price would be expected to decrease. As shares reflect annual allocation, the expected decrease in allocation price under Action 2 **Preferred Alternative 3** or **Alternative 1-2** paired with Action 1 **Alternative 2** would be expected to result in a decrease in red grouper share price. In contrast, the proposed decrease in the ACL with Action 2 **Preferred Alternative 3** and **Alternatives 1-2** paired with Action 1 **Preferred Alternative 3** and **Alternatives 4-5** would decrease the availability of annual IFQ allocation for sale, compared with being paired with Action 1 **Alternative 1**, and the allocation price would be expected to increase in response. The expected increase in allocation price under Action 2 **Preferred Alternative 3** and **Alternatives 1-2** paired with Action 1 **Preferred Alternative 3** and **Alternatives 4-5** would be expected to result in an increase in red grouper share price.

The proposed increase in the ACT with Action 2 **Alternative 2** paired with Action 1 **Alternative 6** would increase the availability of annual IFQ allocation for sale, as compared with being paired with Action 1 **Alternative 1**. As the supply of annual IFQ allocation increases, the allocation price would be expected to decrease. As shares reflect annual allocation, the expected decrease in allocation price under Action 2 **Alternative 2** paired with Action 1 **Alternative 2** would be expected to result in a decrease in red grouper share price. Due to the commercial buffer of 5%, Action 2 **Preferred Alternative 3** or **Alternative 1** paired with Action 1 **Alternative 6** would result in no change in the ACL and no change in the availability of annual IFQ allocation for sale, as compared with being paired with Action 1 **Alternative 1**. Therefore, since the supply of annual IFQ allocation would not be expected to change, the allocation price would not be expected to change. As shares reflect annual allocation, the expected lack of change in allocation price under Action 2 **Preferred Alternative 3** or **Alternative 1** paired with Action 1 **Alternative 2** would be expected to result in no change in red grouper share price.

Changes in red grouper harvests, as a result of the change in ACT, could result in additional economic effects because of the potential effects on ex-vessel prices due to less (or more) red grouper on the markets. The potential effects to the consumer surplus are based on work on price flexibilities by Keithly and Tabarestani (2018). An average dockside price from 2018 of $4.83 is used from Table 3.4.1.12. An own-price flexibility of -0.533 is used from the Habit Formation model (Keithly and Tabarestani 2018) to derive the average price loss and change in CS for **Alternatives 1-2** and **Preferred Alternative 3** as seen in Table 4.1.3.2.

**Table 4.2.3.2.   Alternatives 1-2** and **Preferred Alternative 3** - Proposed change in the red grouper commercial sector ACT (relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**) and associated estimated average price change ($/lb) and change in CS.

| | Action 2 **Alt 1** | | |
| --- | --- | --- | --- |
| Action 1 | Expected change in landings (mp gw) | Expected average price change ($/lb) | Expected change in CS (2019 dollars) |
| **Alt 2** | 0.53 | -$0.45 | $1,605,475 |
| **Preferred Alt 3** | -0.60 | $0.51 | -$1,235,707 |
| **Alt 4** | -0.53 | $0.45 | -$1,123,378 |
| **Alt 5** | -0.57 | $0.49 | -$1,188,596 |
| **Alt 6** | 0.00 | $0.00 | $0 |
| | Action 2 **Alt 2** | | |
| Action 1 | Expected change in landings (mp gw) | Expected average price change ($/lb) | Expected change in CS (2019 dollars) |
| **Alt 2** | 0.72 | -$0.62 | $2,298,415 |
| **Preferred Alt 3** | -0.47 | $0.41 | -$1,020,402 |
| **Alt 4** | -0.40 | $0.34 | -$892,455 |
| **Alt 5** | -0.44 | $0.38 | -$966,598 |
| **Alt 6** | 0.16 | -$0.14 | $433,871 |
| | Action 2 **Preferred Alt 3** | | |
| Action 1 | Expected change in landings (mp gw) | Expected average price change ($/lb) | Expected change in CS (2019 dollars) |
| **Alt 2** | 0.53 | -$0.45 | $1,605,475 |
| **Preferred Alt 3** | -0.60 | $0.51 | -$1,235,707 |
| **Alt 4** | -0.53 | $0.45 | -$1,123,378 |
| **Alt 5** | -0.57 | $0.49 | -$1,188,596 |
| **Alt 6** | 0.00 | $0.00 | $0 |

Action 2 **Alternative 1** and **Preferred Alternative 3** would result in the same expected change in average price loss and in CS for the commercial sector as seen in Section 4.1.3, as Action 1 was also analyzed with the current 5% commercial buffer.  Therefore, Action 2 **Alternative Preferred Alternative 3** is not expected to have any effect on landings, average price loss, or CS, relative to **Alternative 1**.  Compared with Action 2 **Alternative 1** and **Preferred Alternative 3**, Action 2 **Alternative 2** results in a larger positive change in CS when paired with Action 1 **Alternatives 2** and **6**, due to a smaller commercial buffer.  For instance, Action 2 **Alternative 2** would be expected to increase CS by an additional $692,940 relative to Action 2 **Alternative 1**, if Action 1 **Alternative 2** is selected.  In addition, when compared with Action 2 **Alternative 1** and **Preferred Alternative 3**, Action 2 **Alternative 2** results in a smaller negative change in CS when paired with Action 1 **Preferred Alternative 3** or **Alternatives 4**-**6**.  For instance, CS under Action 2 **Alternative 2** would be expected to decrease by $215,305 less than under Action 2 **Alternative 1**, if Action 1 **Preferred Alternative 3** is selected.

The total expected change in net economic benefits for the commercial sector from **Preferred Alternative 3** and **Alternatives 2** and **4-6**, relative to **Alternative 1**, are displayed in Table

4.2.3.3.  These changes are the addition of the expected change in PS from Table 4.2.3.1 to the expected change in CS from Table 4.2.3.2.

**Table 4.2.3.3.  Alternatives 1-2** and **Preferred Alternative 3** – Total Expected Change in Net Economic Benefits for the Commercial Sector, relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**.

| | Action 2 **Alt 1** |
|---|---|
| Action 1 | Total Expected Change in Net Economic Benefits (2019 dollars) |
| **Alt 2** | $2,219,851 |
| **Preferred Alt 3** | -$1,931,227 |
| **Alt 4** | -$1,737,754 |
| **Alt 5** | -$1,849,340 |
| **Alt 6** | $0 |
| | Action 2 **Alt 2** |
| Action 1 | Total Expected Change in Net Economic Benefits (2019 dollars) |
| **Alt 2** | $3,133,039 |
| **Preferred Alt 3** | -$1,565,226 |
| **Alt 4** | -$1,356,135 |
| **Alt 5** | -$1,476,646 |
| **Alt 6** | $619,343 |
| | Action 2 **Preferred Alt 3** |
| Action 1 | Total Expected Change in Net Economic Benefits (2019 dollars) |
| **Alt 2** | $2,219,851 |
| **Preferred Alt 3** | -$1,931,227 |
| **Alt 4** | -$1,737,754 |
| **Alt 5** | -$1,849,340 |
| **Alt 6** | $0 |

**Recreational Sector**

**Alternative 1** (No Action) would maintain the current recreational buffer of 8% between the ACL and ACT.  Therefore, changes in economic value would not be expected to result from this alternative, only if paired with Action 1 **Alternative 1**.  As Action 1 **Alternative 1** is not legally viable as a preferred alternative, the landings expected to occur and associated economic values associated with alternatives from Action 2 must be analyzed with additional alternatives from Action 1.  However, the landings expected to occur and the associated economic value from Action 2 **Alternative 1** under Action 1 **Alternative 1** (No Action) is still used in this analysis as the benchmark for changes in economic value for the other alternatives.  Action 2 **Alternative 2** and **Preferred Alternative 3** are not examined under Action 1 **Alternative 1**, as they would not legally viable or provide an economic benchmark.  In addition, this analysis assumes the recreational sector will land the entire recreational ACT if the post-season AM was triggered, as all recreational ACTs resulting from combinations of alternatives of Action 1 with Action 2 fall below the 5-year average (2015-2019) of MRIP-FES equivalent recreational landings.

The economic effects expected to result from Action 2 **Alternatives 1**-**2** and **Preferred Alternative 3** are analyzed as a function of the ACT and would only be expected to result if the recreational sector's post-season AM is triggered.  The MRIP-FES equivalent of the recreational sector ACT resulting from Action 1 **Alternative 1** is used in this analysis, in order to be in the same currency as the recreational sector ACTs resulting from Action 1 **Preferred Alternative 3** and **Alternatives 2** and **4**-**6**.  The evaluation of changes in economic value expected to result from ACT increases for the recreational sector is based on work by Carter and Liese (2012).  The CS value per fish for a second red grouper kept is estimated at $110.00 (2019 dollars).  Estimated increases in economic value are approximated by dividing the change in ACT by 6.51 lbs ww, which is the average weight of a Gulf recreationally landed red grouper from 2015-2017 (SEFSC SRHS data, accessed March 2018[46]), to obtain the increase in number of red grouper, which is then multiplied by the CS value per fish of $110.00.  The proposed changes in the recreational sector ACL and discounted estimates of associated changes in economic values for **Alternatives 1**-**2** and **Preferred Alternative 3** are provided in Table 4.2.3.4.

**Table 4.2.3.4.  Alternatives 1**-**2** and **Preferred Alternative 3** - Proposed change in the red grouper recreational sector ACT (relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**) and associated estimated change in CS.

| Action 2 **Alt 1** | | |
|---|---|---|
| Action 1 | Change in ACT (mp gw) | Expected change in CS (2019 dollars) |
| **Alt 2** | -0.84 | -$14,903,226 |
| **Preferred Alt 3** | -0.34 | -$6,032,258 |
| **Alt 4** | -0.37 | -$6,564,516 |
| **Alt 5** | -0.35 | -$6,209,677 |
| **Alt 6** | -0.61 | -$10,822,581 |
| Action 2 **Alt 2** | | |
| Action 1 | Change in ACT (mp gw) | Expected change in CS (2019 dollars) |
| **Alt 2** | -0.86 | -$15,258,065 |
| **Preferred Alt 3** | -0.36 | -$6,387,097 |
| **Alt 4** | -0.38 | -$6,741,935 |
| **Alt 5** | -0.36 | -$6,387,097 |
| **Alt 6** | -0.62 | -$11,000,000 |
| Action 2 **Preferred Alt 3** | | |
| Action 1 | Change in ACT (mp gw) | Expected change in CS (2019 dollars) |
| **Alt 2** | -0.86 | -$15,258,065 |
| **Preferred Alt 3** | -0.36 | -$6,387,097 |
| **Alt 4** | -0.38 | -$6,741,935 |
| **Alt 5** | -0.36 | -$6,387,097 |
| **Alt 6** | -0.62 | -$11,000,000 |

The changes in ACT and CS under Action 2 **Alternative 2** and **Preferred Alternative 3** are identical, as they both consider a 9% recreational buffer between the ACL and ACT.  As the recreational buffer is greater under **Alternative 2** and **Preferred Alternative 3** than under

---

[46] MRIP Intercept data available at: https://www.st.nmfs.noaa.gov/st1/recreational/MRIP_Survey_Data/)

**Alternative 1**, a greater decrease is expected to result in the expected change in CS, under identical alternatives from Action 1. For instance, compared to Action 2 **Alternative 1** with Action 1 **Alternative 1**, the expected change in CS for Action 2 **Alternative 2** (or **Preferred Alternative 3**) is expected to result in an annual change in CS of -$15.258 million (in 2019 dollars), whereas the annual change in CS for Action 2 **Alternative 1** is expected to result in annual change in CS of -$14.903 million (in 2019 dollars). Additionally, under Action 2 **Alternative 2** and **Preferred Alternative 3**, the changes observed in Table 4.2.3.3 are identical if either Action 1 **Preferred Alternative 3** or **Alternative 5** are selected, as they would result in the same change in the recreational sector ACT, a decrease of 0.36 mp gw.

Compared with Action 2 **Alternative 1**, Action 2 **Alternative 2** and **Preferred Alternative 3** would be expected to result in a larger decrease in CS when paired with Action 1 **Preferred Alternative 3** and **Alternatives 2** and **4**-**6**, due to a larger recreational buffer. For instance, Action 2 **Alternative 2** and **Preferred Alternative 3** would be expected to decrease CS by an additional $354,839 relative to Action 2 **Alternative 1**, if Action 1 **Alternative 2** or **Preferred Alternative 3** is selected. Likewise, Action 2 **Alternative 2** and **Preferred Alternative 3** would be expected to decrease CS by an additional $177,419 relative to Action 2 **Alternative 1**, if Action 1 **Alternatives 4**-**6** is selected.

The PS of the for-hire component of the recreational sector, being comprised of charter vessels and headboats, would be impacted by a change in the number of targeted trips. In the long run, factors of production such as labor and capital can be used elsewhere in the economy, and so only short-term changes to PS are expected. In the Gulf, headboat trips take a diverse set of anglers on a single vessel, generally advertising a diverse range of species to be caught. Therefore, an assumption that no headboat trips would be lost due to a change in ACT would be reasonable. However, charter vessel trips that are targeting red grouper may be subject to cancellation by anglers and are the focus of the recreational sector PS analysis.

Predicted closure dates based on recreational ACT are seen in Table 2.2.4. Charter vessel trips by 2-month wave from 2014-2018 targeting red grouper are seen in Table 3.4.2.4. Based on the predicted closure dates, Action 2 **Alternatives 1**-**2** and **Preferred Alternative 3** would close in the 4th wave when paired with Action 1 **Alternatives 2** and **6**; Action 2 **Alternatives 1**-**2** and **Preferred Alternative 3** would close in the 6th wave with paired with Action 1 **Preferred Alternative 3 or Alternatives 4**-**5**. The number of trips cancelled in the wave in which the predicted closure date would occur, along with the total number of canceled trips, is shown in Table 4.2.3.5. The number of trips cancelled in the interrupted wave is calculated using a ratio of the number of closed days in the wave and the total number of days in the 2-month wave, multiplied by the average trips for that wave from Table 3.4.2.4. This assumes that trips within a 2-month wave are evenly distributed among days.

Action 2 **Alternative 2** and **Preferred Alternative 3** would result in the same change in total canceled charter trips. Compared with Action 2 **Alternative 1**, Action 2 **Alternative 2** and **Preferred Alternative 3** result in a larger total number of canceled charter trips when paired with Action 1 **Preferred Alternative 3** or **Alternative 2** or **4**-**6**, due to earlier predicted closure dates. As such, Action 2 **Alternatives 2** and **Preferred Alternative 3** would be expected to result in an additional 364 canceled charter trips relative to Action 2 **Alternative 1**, if Action 1

**Alternative 2** is selected.  Action 2 **Alternatives 2** and **Preferred Alternative 3** would be expected to result in an additional 204 canceled charter trips relative to Action 2 **Alternative 1**, if Action 1 **Preferred Alternative 3** is selected.  Action 2 **Alternatives 2** and **Preferred Alternative 3** would be expected to result in an additional 102 canceled charter trips relative to Action 2 **Alternative 1**, if Action 1 **Alternative 4** or **5** is selected.  Finally, Action 2 **Alternatives 2** and **Preferred Alternative 3** would be expected to result in an additional 243 canceled charter trips relative to Action 2 **Alternative 1**, if Action 1 **Alternative 6** is selected.

**Table 4.2.3.5.**  Wave in which predicted closure date occurs, canceled charter trips in the interrupted wave, and total canceled charter trips for Action 2 **Alternatives 1**-**2** and **Preferred Alternative 3** paired with Action 1 **Preferred Alternative 3** and **Alternatives 2** and **4**-**6**.

| Action 2 **Alt 1** | | | |
|---|---|---|---|
| Action 1 | Interrupted Wave | Canceled Charter Trips in Interrupted Wave | Total Canceled Charter Trips |
| **Alt 2** | 4 | 4,494 | 11,570 |
| **Preferred Alt 3** | 6 | 2,148 | 2,148 |
| **Alt 4** | 6 | 2,454 | 2,454 |
| **Alt 5** | 6 | 2,250 | 2,250 |
| **Alt 6** | 4 | 607 | 7,683 |
| Action 2 **Alt 2** | | | |
| Action 1 | Interrupted Wave | Canceled Charter Trips in Interrupted Wave | Total Canceled Charter Trips |
| **Alt 2** | 4 | 4,858 | 11,934 |
| **Preferred Alt 3** | 6 | 2,352 | 2,352 |
| **Alt 4** | 6 | 2,557 | 2,557 |
| **Alt 5** | 6 | 2,352 | 2,352 |
| **Alt 6** | 4 | 850 | 7,926 |
| Action 2 **Preferred Alt 3** | | | |
| Action 1 | Interrupted Wave | Canceled Charter Trips in Interrupted Wave | Total Canceled Charter Trips |
| **Alt 2** | 4 | 4,858 | 11,934 |
| **Preferred Alt 3** | 6 | 2,352 | 2,352 |
| **Alt 4** | 6 | 2,557 | 2,557 |
| **Alt 5** | 6 | 2,352 | 2,352 |
| **Alt 6** | 4 | 850 | 7,926 |

The CFpA from Souza and Liese (2019) of $136 (2017 dollars) is used to derive an upper bound for the short-term change in PS for charter vessels; Table 3.4.2.8 updates that estimate to $141 (2019 dollars).  The CFpA accounts for the lost revenue, while recognizing that canceled trips do not have certain expenditures such as fuel, trip supplies, and labor.  The short-term change in PS is displayed in Table 4.2.3.6.  Action 2 **Alternatives 1**-**2** and **Preferred Alternative 3** are all expected to result in a negative short-term change in PS, regardless of the Action 1 alternative selected.  The short-term change in PS for Action 2 **Alternative 1** was previously examined in Section 4.1.3, as the Action 1 alternatives were analyzed with the current recreational buffer of 8%.  Since both alternatives would set a 9% recreational buffer, Action 2 **Alternative 2** and

**Preferred Alternative 3** are expected to result in the same short-term change in PS, when paired with the same Action 1 alternative.  As compared to Action 2 **Alternative 1** with Action 1 **Alternative 1**, Action 2 **Alternative 2** and **Preferred Alternative 3** would be expected to result in larger short-term changes in PS compared to Action 2 **Alternative 1**, when paired with the same Action 1 alternative.  When paired with Action 1 **Alternative 2**, Action 2 **Alternative 2** and **Preferred Alternative 3** would be expected to result in the largest short-term change in PS, -$1,682,703.  When paired with Action 1 **Alternative 2**, Action 2 **Alternative 1** would be expected to result in the smallest short-term change in PS, -$302,799.

Action 2 **Alternative 2** and **Preferred Alternative 3** would result in the same short-term change in PS.  Compared with Action 2 **Alternative 1**, Action 2 **Alternative 2** and **Preferred Alternative 3** result in a larger short-term change in PS when paired with Action 1 **Preferred Alternative 3** and **Alternatives 2** and **4-6**, due to additional canceled charter trips.  As such, Action 2 **Alternatives 2** and **Preferred Alternative 3** would be expected to result in an additional decrease in PS of $51,374 relative to Action 2 **Alternative 1**, if Action 1 **Alternative 2** is selected.  Action 2 **Alternative 2** and **Preferred Alternative 3** would be expected to result in an additional decrease in PS of $28,838 relative to Action 2 **Alternative 1**, if Action 1 **Preferred Alternative 3** is selected.  Action 2 **Alternative 2** and **Preferred Alternative 3** would be expected to result in an additional decrease in PS of $14,419 relative to Action 2 **Alternative 1**, if Action 1 **Alternative 4** or **5** is selected.  Finally, Action 2 **Alternative 2** and **Preferred Alternative 3** would be expected to result in an additional decrease in PS of $34,249 relative to Action 2 **Alternative 1**, if Action 1 **Alternative 6** is selected.

**Table 4.2.3.6.**  Short-term change in PS (2019 dollars) for charter vessels under Action 2 **Alternatives 1-2** and **Preferred Alternative 3** paired with Action 1 **Preferred Alternative 3** and **Alternatives 2** and **4-6**.

|  | Action 2 **Alt 1** | Action 2 **Alt 2** | Action 2 **Preferred Alt 3** |
|---|---|---|---|
| Action 1 |  |  |  |
| **Alt 2** | -$1,631,329 | -$1,682,703 | -$1,682,703 |
| **Preferred Alt 3** | -$302,799 | -$331,637 | -$331,637 |
| **Alt 4** | -$346,056 | -$360,475 | -$360,475 |
| **Alt 5** | -$317,218 | -$331,637 | -$331,637 |
| **Alt 6** | -$1,083,339 | -$1,117,589 | $1,117,589 |

The total expected change in net economic benefits for the recreational sector from **Preferred Alternative 3** and **Alternatives 2** and **4-6**, relative to **Alternative 1**, are displayed in Table 4.2.3.7.  These changes are the addition of the expected annual change in CS from Table 4.2.3.4 to the short-term change in PS from Table 4.2.3.6.

**Table 4.2.3.7.**  **Alternatives 1-2** and **Preferred Alternative 3** – Total Expected Change in Net Economic Benefits for the Recreational Sector relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**.

| | Action 2 **Alt 1** |
|---|---|
| Action 1 | Total Expected Change in Net Economic Benefits (2019 dollars) |
| **Alt 2** | -$16,534,555 |
| **Preferred Alt 3** | -$6,335,057 |
| **Alt 4** | -$6,910,572 |
| **Alt 5** | -$6,526,895 |
| **Alt 6** | -$11,905,920 |
| | Action 2 **Alt 2** |
| Action 1 | Total Expected Change in Net Economic Benefits (2019 dollars) |
| **Alt 2** | -$16,940,768 |
| **Preferred Alt 3** | -$6,718,734 |
| **Alt 4** | -$7,102,410 |
| **Alt 5** | -$6,718,734 |
| **Alt 6** | -$12,117,589 |
| | Action 2 **Preferred Alt 3** |
| Action 1 | Total Expected Change in Net Economic Benefits (2019 dollars) |
| **Alt 2** | -$16,940,768 |
| **Preferred Alt 3** | -$6,718,734 |
| **Alt 4** | -$7,102,410 |
| **Alt 5** | -$6,718,734 |
| **Alt 6** | -$12,117,589 |

The total expected change in net economic benefits for both the commercial and recreational sectors are displayed in Table 4.2.3.8.  When paired with Action 1 **Preferred Alternative 3**, Action 2 **Alternative 1** would have the least negative expected change in net economic benefits for both sectors, followed by **Alternative 2** and **Preferred Alternative 3**.  However, this assumes the post-season AM has been triggered for the recreational sector.  If the post-season AM has not been triggered for the recreational sector and if the Council does not want to set the GGM allocation at zero (**Alternative 2**), then both **Alternative 1** and **Preferred Alternative 3** would result in similar expected net economic benefits based on the commercial sector in Action 2.

**Table 4.2.3.8.   Alternatives 1**-**2** and **Preferred Alternative 3** – Combined Total Expected Change in Net Economic Benefits for both the Commercial and Recreational Sectors relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**.

| Action 2 **Alt 1** | |
| --- | --- |
| Action 1 | Total Expected Change in Net Economic Benefits (2019 dollars) |
| **Alt 2** | -$14,314,704 |
| **Preferred Alt 3** | -$8,266,284 |
| **Alt 4** | -$8,648,326 |
| **Alt 5** | -$8,376,235 |
| **Alt 6** | -$11,905,920 |
| Action 2 **Alt 2** | |
| Action 1 | Total Expected Change in Net Economic Benefits (2019 dollars) |
| **Alt 2** | -$13,807,729 |
| **Preferred Alt 3** | -$8,283,960 |
| **Alt 4** | -$8,458,545 |
| **Alt 5** | -$8,195,380 |
| **Alt 6** | -$11,498,246 |
| Action 2 **Preferred Alt 3** | |
| Action 1 | Total Expected Change in Net Economic Benefits (2019 dollars) |
| **Alt 2** | -$14,720,917 |
| **Preferred Alt 3** | -$8,649,961 |
| **Alt 4** | -$8,840,164 |
| **Alt 5** | -$8,568,074 |
| **Alt 6** | -$12,117,589 |

## 4.2.4  Direct and Indirect Effects on the Social Environment

The ACT is used as an in-season AM to reduce the likelihood of exceeding the ACL.  In general, a smaller buffer between the ACL and ACT allows for more fish to be harvested before triggering an attending in-season closure.  For the commercial sector's harvest of IFQ-managed gag and red grouper, an ACT is used to allow for some gag allocation to be used to land red grouper, and for some red grouper allocation to be used to land gag (i.e., multi-use provision).  For the recreational sector's harvest of red grouper, the ACT is used to decrease the likelihood the recreational ACL is exceeded in the year following an overage of the ACL, when it would be used to trigger an in-season closure.

For the commercial sector, this action evaluates retaining the existing buffer of 5% (**Alternative 1** and **Preferred Alternative 3**) or decreasing it to 0% (**Alternative 2**).  In general, a stock managed under an IFQ program would not need to set an ACT, as the availability of annual allocation ensures that the ACL is not exceeded.  In this case, the ACT is used to specify an amount of red grouper allocation that may be used to land gag.  No additional effects would be expected to result for the commercial sector under **Alternative 1** or **Preferred Alternative 3**, as no change would be made to the commercial sector's ACT.  Limited negative effects would be expected under **Alternative 2**, which would decrease the buffer to 0% and effectively remove the multi-use provision for red grouper allocation, requiring gag to be landed with gag allocation only.  These negative effects would be expected to accrue to those fishermen who use the multi-use provision for landing gag with red grouper allocation, as they would no longer be able to do so.

For the recreational sector, this action considers retaining the current 8% buffer (**Alternative 1**) or increasing it to 9% (**Alternative 2** and **Preferred Alternative 3**).  In recent years, the recreational sector has not been catching its quota.  However, in addition to the conversion of the ACL to MRIP-FES units which estimates greater landings, the proposed quota reduction that would occur under Action 1 is large enough that recreational landings are likely to meet the new sector ACL.  The AM for the recreational sector states that in a year following an ACL overage, the ACT will be used to trigger an in-season closure.  Table 2.2.4 provides the predicted closure dates for the multiple combinations of preferred alternatives across Actions 1 and 2; these predicted closure dates represent the date the ACT for each alternative is predicted to be met, which would be used to trigger an in-season closure in the year after one in which the ACL was exceeded.  Thus, any effects from changing the recreational sector ACT would not occur until at least the year following the year this amendment is implemented, as the recreational sector ACL implemented through Action 1 would have to be exceeded before the recreational sector ACT is used to trigger an in-season fishing closure.

No additional effects would be expected from **Alternative 1** and the 8% buffer between the recreational sector ACL and ACT would remain in place.  Increasing the buffer to 9% (**Alternative 2** and **Preferred Alternative 3**) alongside any of **Alternatives 2-6** under Action 1 would be expected to shorten the length of the recreational fishing season in the year following a recreational sector ACL overage (Table 2.2.4) resulting in greater negative effects compared to **Alternative 1**.

## 4.2.5  Direct and Indirect Effects on the Administrative Environment

Action 2 would affect the administrative environment in two ways: 1) through in-season closures of the recreational fishery resulting from implementing AMs that are more likely to be triggered than under current management, and 2) by implementing an ACT that changes the likelihood of exceeding the recreational ACL and overfishing of the Gulf red grouper stock.  Closure of the recreation red grouper sector would have a minor effect on the administrative environment, while overfishing could have more significant effects.  However, the likelihood of overfishing is low given the use of an ACT to constrain landings in years following an ACL overage.

Each of the three alternatives in Action 2 would set ACTs which implement management buffers below the ACL with the exception of the commercial ACT for **Alternative 2** where the buffer equals zero.  These buffers include options for 0 percent and 5 percent for the commercial fishery, and 8 percent and 9 percent for the recreational sector.

In the commercial sector, there is no risk of an in-season closure and little risk of exceeding the ACL.  The IFQ system that is in place for regulating commercial landings is designed to prevent ACL overages by allocating quota to individual entities, and holding them accountable stay under that catch limit.  The intent of the commercial buffer is to allow for gag multi-use, which allows red grouper to be harvested incidentally when targeting gag.  Thus, the choice between a 0% and 5% buffer is not expected impact the likelihood of exceeding the ACL, or causing overfishing.

The recreational buffer under **Alternative 1** is the lowest of the alternatives.  In the year following a year in which catch exceeded the ACL, **Alternative 1** would be most likely to result in exceeding the recreational ACL.  Recreational landings are generated based on estimates of catch, and they have substantial uncertainty associated with them.  In addition, recreational landings are not timely, with lags often exceeding several months from when fishing takes place and landings estimates are generated.  Thus, implementing the lower ACT/buffer in **Alternative 1** in the recreational sector is more likely to result in exceeding the recreational and overall ACL (and potentially the OFL) than the higher buffers in **Alternatives 2** and **3**.  However, the difference between **Alternative 1** and **Alternatives 2** and **3** is only 1 percent of the ACL (11,800 lb to 17,300 lb depending on Action 1 decision).  Given the constraints associated with monitoring recreational data to relatively small values, the increased chance of exceeding recreational component ACL is expected to be negligible.  Thus, the recreational buffers proposed in the Action 2 alternatives are not likely to affect the administrative environment

Impact to the administrative environment associated with implementing a recreational fishery closure is higher under **Alternative 1** than under **Alternatives 2** or **3** due to the lower ACT in **Alternative 1**.  However, due to the relatively minor differences in these values among the alternatives coupled with the difficulty in monitoring the recreational component to small values, it is expected that the effect on the administrative environment due to a recreational component closure will be negligible.  Although the alternatives have different effects on the administrative environment, these effects are likely minor. Assessing the effects of management decisions on stock status are routine endeavors by NMFS. Actions to control harvest by the Gulf of Mexico Fishery Management Council (Council) and NMFS are mostly routine and conducted through the Council system established by the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act).

## 4.3  Cumulative Effects Analysis (CEA)

As directed by the National Environmental Policy Act (NEPA**Error! Bookmark not defined.**), federal agencies are mandated to assess not only the indirect and direct impacts, but cumulative impacts of actions as well.  Cumulative impact are defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions**Error! Bookmark not defined.** (RFFA**Error! Bookmark not defined.**) regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time" (40 C.F.R. 1508.7).  Cumulative effects can be either additive or synergistic.  A synergistic effect occurs when the combined effects are greater than the sum of the individual effects.

This section uses an approach for assessing cumulative effects that was initially used in Amendment 26 to the Reef Fish FMP**Error! Bookmark not defined.** and is based on guidance in the Council**Error! Bookmark not defined.** on Environmental Quality**Error! Bookmark not defined.**'s (CEQ**Error! Bookmark not defined.**) Considering Cumulative Effects handbook (CEQ 1997).  The report outlines 11 items for consideration in drafting a CEA**Error! Bookmark not defined.** for a proposed action.

1. Identify the significant cumulative effects issues associated with the proposed action and define the assessment goals.
2. Establish the geographic scope of the analysis.
3. Establish the timeframe for the analysis.
4. Identify the other actions affecting the resources, ecosystems, and human communities of concern.
5. Characterize the resources, ecosystems, and human communities identified in scoping in terms of their response to change and capacity to withstand stress.
6. Characterize the stresses affecting these resources, ecosystems, and human communities and their relation to regulatory thresholds.
7. Define a baseline condition for the resources, ecosystems, and human communities.
8. Identify the important cause-and-effect relationships between human activities and resources, ecosystems, and human communities.
9. Determine the magnitude and significance of cumulative effects.
10. Modify or add alternatives to avoid, minimize, or mitigate significant cumulative effects.
11. Monitor the cumulative effects of the selected alternative and adapt management.
Cumulative effects on the biophysical environment, socio-economic environment, and administrative environments are analyzed below.

**1. Identify the significant cumulative effects**Error! Bookmark not defined. **issues associated with the proposed action and define the assessment goals.**

The CEQ**Error! Bookmark not defined.** cumulative effects guidance states this step is accomplished through three activities as follows:

I. The direct and indirect effects**Error! Bookmark not defined.** of the proposed actions (Section 4.1 – 4.2);
II. Which resources, ecosystems, and human communities are affected (Chapter 3); and
III. Which effects are important from a cumulative effects perspective (information revealed in this CEA**Error! Bookmark not defined.**).

**2.     Establish the geographic scope of the analysis.**

The primary effects of the actions in this amendment would be to the social, economic, and administrative environments of the Gulf**Error! Bookmark not defined..**  The physical and biological/ecological environments would be less affected as described in Sections 4.1-4.2, Subsections 1 and 2.

The geographic scope affected by these actions, including red grouper, is detailed in the Generic Essential Fish Habitat (EFH**Error! Bookmark not defined.**) Amendment, Reef Fish Amendment 30B, and the Generic ACL**Error! Bookmark not defined.**/AM**Error! Bookmark not defined.** Amendment (GMFMC 2004a; GMFMC 2008c; GMFMC 2011a, respectively) which are incorporated by reference and further summarized in Section 3.2.  The Gulf**Error! Bookmark not defined.** has a total area of approximately 600,000 square miles (1.5 million km$^2$), including state waters (Gore 1992).  In general reef fish are widely distributed in the Gulf,

occupying both pelagic and benthic habitats during their life cycle.  A planktonic larval stage lives in the water column and feeds on zooplankton and phytoplankton (GMFMC 2004a). Juvenile and adult reef fish are typically demersal and usually associated with bottom topographies on the continental shelf (less than 100 m) which have high relief.

As noted in Section 3.3, larval red grouper are found in the plankton across the west-Florida shelf and juveniles are generally found in shallow waters around structures and patch reefs. Adult red grouper are mostly found in the eastern Gulf on hard substrate.  Adult red grouper are known as ecological engineers because they are able to sediment and debris from favored hard substrate habitat (see Section 3.3).  There are environmental sites of special interest that are relevant to red snapper management.  These include the longline/buoy area closure**Error! Bookmark not defined.**, the Edges Marine Reserve, Tortugas North and South Marine Reserves, the Florida**Error! Bookmark not defined.** Middle Grounds habitat area of particular concern (HAPC), and the Pulley Ridge HAPC.  These areas are managed with gear restrictions to protect habitat and specific reef fish species.

Commercial and recreational fishing for reef fish occurs throughout the Gulf; however, most red grouper fishing occurs on the west Florida Shelf (see Section 3.5.1)**Error! Bookmark not defined.**.  There were 845 vessels with commercial reef fish permits at the end of 2018 (Table 3.1.1) and approximately 80% of the commercial reef fish permits have mailing recipients in Florida**Error! Bookmark not defined.**.  Final data for 2018 showed 1,312 for-hire permits (Table 3.1.4) and approximately 64% of the permits had mailing addresses in Florida.  The distribution of commercial and for-hire permits from other states can be found in Tables 3.1.1 and 3.1.4.

### 3.   Establish the timeframe for the analysis.

The timeframe for this analysis is 1984 to 2022.  Red grouper have been managed in the Gulf**Error! Bookmark not defined.** since the implementation of the Reef Fish FMP**Error! Bookmark not defined.** in 1984, which put in place a 20-inch TL**Error! Bookmark not defined.** minimum size limit.  The red grouper stock has been assessed periodically since 1991. The most recent stock assessment**Error! Bookmark not defined.** (SEDAR**Error! Bookmark not defined.** 61 2019) used data through 2017.  The current allocation of 76% commercial: 24% recreational allocation was established through Reef Fish Amendment 30B (GMFMC 2008c).  In 2018, the effort survey for MRIP changed from a phone-based survey to a mail-based survey. Those calibrations were incorporated into the SEDAR 61 assessment.  ABC projections from the SSC generally go out three years, or in the case, cover 2020-2022.

The following is a list of reasonably foreseeable future management actions.  These are described in more detail in Step 4.  Should new regulations be needed for the management of the red grouper stock, they would likely not be implemented until 2022 at the earliest, the end of the timeframe discussed in this analysis.

- The next assessment for red grouper through SEDAR**Error! Bookmark not defined.** has not been scheduled yet.  The current SEDAR schedule shows assessments through 2024.

The SEFSC conducted a red grouper interim analysis in late 2020; however, the SSC has not reviewed it, as of March 31, 2021.

The Council**Error! Bookmark not defined.** is currently developing several actions that could affect the reef fish fishery.  Actions affecting red grouper include:

- A generic amendment to revise the ABC control rule and framework procedures.
- A generic amendment to carryover**Error! Bookmark not defined.** unharvested quota to subsequent fishing years.
- Amendments 36B and 36C to modify commercial individual fishing quota**Error! Bookmark not defined.** (IFQ) programs.
- Amendment 48 to establish or revise status determination criteria and optimum yield**Error! Bookmark not defined.** (OY**Error! Bookmark not defined.**) for reef fish.

**4.    Identify other actions affecting the resources, ecosystems, and human communities of concern.**

Past actions affecting reef fish and red grouper are summarized in Section 1.4 and on the Council's website[47] and are incorporated here by reference.

**a.  The following are red grouper specific related actions and activities.**

**i.      The following list identifies past actions affecting red grouper:**

From 2009 to 2019, the Council**Error! Bookmark not defined.** took actions to revise the red grouper stock ACL.  The ACL increased from 7.72 mp in 2009 to **Error! Bookmark not defined.**10.77 mp in 2016.  However, the Council reduced the ACL to 4.16 mp in 2019 for several reasons including decreases in harvests, input from fishermen, and an interim stock analysis as detailed in Section 1.1.  Details on changes to the recreational ACL and fishing seasons are provided in Sections 1.4 and 3.1.

In May 2009, Amendment 30B was implemented, which set the current red grouper allocation between the recreational and commercial sectors.  It also established red grouper ACLs and AMs for the commercial and recreational sectors, adjusted recreational grouper bag limits and seasons, and reduced the red grouper commercial minimum size limit.  See Section 1.4 for more details on this amendment.

In January 2010, Amendment 29 was implemented and established an IFQ program for the commercial harvest of grouper and tilefish species in the reef fish fishery.

In May 2010, Amendment 31 was implemented.  It prohibited the use of bottom longline (BLL) gear shoreward of a line approximating the 35-fathom contour from June through August, created a BLL endorsement, and restricted the number of hooks a BLL vessel could carry. The area closure and hook requirements were initially established through an emergency rule.

---

[47] https://gulfcouncil.org/fishery-management/

A regulatory amendment implemented in January 2011 reduced total allowable catch (TAC) for red grouper from 7.57 mp gw to 5.68 mp gw resulting in a 4.32 mp gw commercial quota and 1.36 mp gw recreational catch limit.

A regulatory amendment implemented in November 2011 increased the red grouper TAC to 6.88 mp gw with subsequent increases each year from 2012 to 2015.  It also increased the red grouper bag limit to four fish per person.

In March 2012, Amendment 32 was implemented and set the red grouper commercial ACL at 6.03 mp gw and the recreational ACL at 1.90 mp gw.  It also added an overage adjustment, in-season, and bag limit reduction process to the red grouper recreational AMs.

In March 2013, Amendment 38 was implemented that revised the post-season recreational AM and modified the reef fish framework procedure to include the addition of AMs to the list of items that can be changed through the standard framework procedure.

In May 2015, a framework action was implemented to reduce the red grouper bag limit from four fish to two fish per person per day and eliminated the bag limit reduction AM.

In October 2016, a framework action was implemented that increased the commercial ACL to 8.19 mp gw and the commercial ACT, also called a quota in the codified regulations at 50 CFR 622, to 7.78 mp gw.  The recreational ACL was increased to 2.58 mp gw; and the recreational ACT to 2.37 mp gw.

In December 2017, Amendment 44 was approved and set the red grouper MSST to 50% of the biomass at maximum sustainable yield (MSY).

On June 12, 2018, NMFS**Error! Bookmark not defined.** published a final rule to implement Amendment 36A that requires owners or operators of federally permitted commercial Gulf**Error! Bookmark not defined.** reef fish vessels landing any commercially harvested, federally managed reef fish from the Gulf to provide notification prior to landing and to land at approved locations.  It also requires shares from the red snapper IFQ**Error! Bookmark not defined.** program and the grouper-tilefish IFQ program that are in non-activated IFQ accounts to be returned to NMFS for redistribution, and allows NMFS to withhold a portion of IFQ allocation**Error! Bookmark not defined.** at the start of a fishing year equal to an anticipated commercial quota reduction.

A temporary rule implemented in January 2019 withheld 59.4% of the red grouper IFQ allocation (4.78 mp gw) as a result of a proposed quota reduction.

> **ii.     The following list identifies more recent and present actions affecting red grouper:**

A May 2019 emergency rule reduced the red grouper commercial and recreational ACLs and ACTs consistent with a stock ACL of 4.16 mp gw.

A framework action implemented in October 2019 reduced the catch limits for red grouper consistent with the May 2019 emergency rule.

A Reef Fish framework action was approved by the Council and currently undergoing rulemaking that would prohibit fishing year-round in the Madison-Swanson and Steamboat Lumps Marine Protected Areas and prohibit the possession of Gulf reef fish, with no exception for vessels in transit unless the vessel has an operating vessel monitoring system and a valid federal commercial Gulf reef fish permit.

A Reef Fish framework action was implemented in March 2019 that modifies the on-board multi-day possession limit of fish species so that a second bag-limit can be retained at any time after the vessel leaves the dock for fishing trips that are greater than 30 hours in duration on qualifying vessels.

### iii.    The following list identifies RFFAs and activities affecting red grouper.

The purpose of Reef Fish Amendment 36B is to limit IFQ share ownership in shareholder accounts without a valid or renewable commercial reef fish permit, thereby promoting share ownership by fishermen who have the ability to land reef fish within the red snapper and grouper-tilefish IFQ programs.

The purpose of Amendment 36C is to assist small participants and new entrants to the IFQ programs, to reduce discards, and to increase access to shares to actively fishing eligible commercial fishermen.

The purpose of a generic amendment to revise the ABC control rule and framework procedures is to revise or replace the current ABC control rule, and to consider incorporating provisions to allow carry-over of uncaught ACLs, phase-in of changes to ABCs, and to consider developing a process to evaluate "economic, social, or ecological trade-offs when determining the risk policy for an ABC control rule."

### b.  The following are reef fish and ecosystem related actions and activities that also affect red grouper.

### i.    The following list identifies past actions/events affecting red grouper:

In April 2010, the *Deepwater Horizon***Error! Bookmark not defined.** MC252 deep-sea drilling rig exploded and sank off the coast of Louisiana**Error! Bookmark not defined.**.  Because of the resulting oil spill, approximately one-third of the Gulf**Error! Bookmark not defined.** was closed to fishing for much of the summer months.  The direct loss of fishing opportunities due to the closure**Error! Bookmark not defined.**, plus the reduction in tourism throughout the coastal Gulf, resulted in a much lower catch than had been projected (NMFS 2010).  Additionally, deep-water corals are particularly vulnerable to episodic mortality events such as oil spills, since corals are immobile.

In 2005 and 2014, severe red tide events are thought to have negatively affected red grouper populations.  A red tide event also occurred in 2017-2018 and is described in the next section.  During these years, stock assessments showed declines in the spawning stock biomass.  These red tide events are most common off the central and southwestern coasts of Florida where red grouper are primarily found.  For 2020, the Florida Fish and Wildlife Conservation Commission (FWC) did not report any severe red tide events through September (https://myfwc.com/research/redtide/).  The effects of red tide on fish are discussed in Section 3.3.

Amendment 34, effective on November 19, 2012, eliminated the earned income qualification requirement for the renewal of Gulf**Error! Bookmark not defined.** commercial reef fish permits and increased the maximum number of crew members for dual-permitted (commercial and for-hire) vessels.  The Council**Error! Bookmark not defined.** determined the existing earned income requirement in the reef fish fishery was no longer necessary and increasing the number of crew on dual-permitted vessels increased the safety on commercial trips, particularly for commercial spear fishermen.

A framework action effective March 5, 2014, required headboats to report their logbooks electronically in the Gulf**Error! Bookmark not defined.** reef fish and coastal migratory pelagic fisheries.

On April 9, 2014, NMFS**Error! Bookmark not defined.** published a final rule to modify the permitting and reporting requirements for seafood dealers who first receive species managed by the Council**Error! Bookmark not defined.**.  These revisions created a single dealer permit for dealers who first receive fish managed by the Council, required both purchase and non-purchase reports to be submitted online on a weekly basis, prohibited dealers from first receiving fish from federally permitted vessels if they are delinquent in submitting reports, and changed the sale and purchase provisions based on the new dealer permitting requirements.

Effective June 17, 2019, Amendment 49 adds three new sea turtle release gear options and simplifies existing requirements for fishermen with federal commercial or charter/headboat permits.  The amendment also modified the FMP framework procedure to streamline future changes to release gear and handling requirements for sea turtles.

### ii.    The following list identifies more recent and present actions/events affecting reef fish and related ecosystems:

In February 2015, the National Oceanic and Atmospheric Administration**Error! Bookmark not defined.** (NOAA**Error! Bookmark not defined.**) published a Notice of Intent to consider possible expansion of the Flower Garden Banks National Marine Sanctuary**Error! Bookmark not defined.** (FGBNMS**Error! Bookmark not defined.**).  The preferred alternative establishes nine new areas and two areas that are expansions of existing sanctuary boundaries.  The potential impacts of the FGBNMS expansion are detailed in Chapter 5 of the FGBNMS Expansion draft environmental impact statement**Error! Bookmark not defined.** (EIS**Error! Bookmark not defined.**) and incorporated here by reference (Office of

National Marine Sanctuaries 2016).  Long-term beneficial impacts are anticipated if the proposed action is implemented.  The proposed alternatives limit some types of commercial fishing, but would not establish regional closures of fishing grounds or impact other fishery management activities arising from the review process by the Council**Error! Bookmark not defined.**.  The impacts on commercial fishing from the regulations were identified as minor.

In October 2017, Florida**Error! Bookmark not defined.** began to experience what would become one of the widest spread and most persistent red tide events on record.  As of November 2018, the red tide had spread to the western panhandle as well as the southeast coast of Florida.  It was reported as having dissipated in March 2019.  Its impacts on reef fish stocks are unknown, but may be taken into account in future stock assessments.

In 2018, the effort survey for MRIP**Error! Bookmark not defined.** changed from a phone-based survey to a mail-based survey.  On average, fishing effort estimates are higher with the new survey and calibrations between data from the old and new surveys have been completed.  Calibrations will be incorporated into future reef fish **Error! Bookmark not defined.**assessments as they are scheduled.  These calibrations were incorporated into SEDAR 61 (2019) to estimate landings.

In 2018, NMFS**Error! Bookmark not defined.** certified data collection programs for Alabama**Error! Bookmark not defined.**, Florida**Error! Bookmark not defined.**, and Mississippi**Error! Bookmark not defined.**.  Texas**Error! Bookmark not defined.** has its own sampling program and Louisiana**Error! Bookmark not defined.**'s has been used since 2013.  The Mississippi and Alabama programs are specific to red snapper, but the programs used by the other states collect information for other species, including red grouper.

In November 2018, NMFS**Error! Bookmark not defined.** published a proposed rule to modify charter vessel and headboat reporting requirements.  The modifications require the owner or operator of a vessel with a federal for-hire permit to electronically declare (hail-out) a fishing trip before leaving port; submit an electronic fishing report for each trip prior to the vessel offloading the fish; and install NMFS-approved hardware and software with GPS capabilities that at a minimum archive the vessels position data and transmit data to NMFS.  The final rule for this action published in July 2020 and NMFS expects to implement the reporting program in 2021

In 2020, NMFS**Error! Bookmark not defined.** expects to publish a final rule to implement the actions in Amendment 9 to the Fishery Management Plan for Coral and Coral Reefs of the Gulf**Error! Bookmark not defined.** of Mexico**Error! Bookmark not defined.**, U.S. Waters (Coral Amendment 9; GMFMC 2018).  The rule would establish 13 new HAPCs with prohibitions on bottom tending fishing gear, 8 new HAPCs without fishing regulations, and prohibit dredge fishing in all HAPCs in the Gulf.  While data showed little fishing occurs in a majority of these areas, any reduction would help prevent impacts to reef fish habitat.

    **iii.**     **The following list identifies RFFAs and activities affecting reef fish and related ecosystems:**

The Council is working on several actions affecting reef fish.  These include framework actions to address lane snapper ACLs and AMs; greater amberjack bag limits, fishing year, and season; vermilion snapper ACLs and bag limit; gray triggerfish ACLs and recreational fixed closed season; and red snapper conversion ratios between state and MRIP landing estimates.

The overall harvest of recreational red grouper will continue to be monitored by NMFS**Error! Bookmark not defined.**, and will also be monitored by Florida, Louisiana, and Texas under their respective landings monitoring program.  Florida**Error! Bookmark not defined.** uses MRIP**Error! Bookmark not defined.** catch estimates paired with their own effort estimates.  The programs used by Louisiana**Error! Bookmark not defined.**, Alabama**Error! Bookmark not defined.**, Florida, and Mississippi**Error! Bookmark not defined.** to estimate landings of some reef fish have been certified by MRIP as statistically and scientifically valid.

An abbreviated framework action has been developed to replace reef fish and coastal migratory pelagic historical captain endorsements held by approximately 32 for-hire operators in the Gulf**Error! Bookmark not defined.** with standard Gulf charter/headboat (for-hire) permits.  This would reduce the regulatory and potential economic burden on historical captain permit holders.

A generic amendment to carryover**Error! Bookmark not defined.** unharvested quota to subsequent fishing years is being developed.  This would implement provisions to allow carryover of portions of ACLs that were unused due to landings uncertainty and management limitations, and to modify the framework procedure to allow carryover and other changes to operate in a timely manner.  Since Amendment 50 has an action to address carryover specifically for red snapper, the effects of this action have been analyzed in this document.

In April 2017, the Council**Error! Bookmark not defined.** passed a motion to begin working on an amendment, subsequent to Coral Amendment 9 (GMFMC 2018), that would address the 24 areas proposed by the Coral Working Group that were not included in Coral Amendment 9.  The 24 areas encompass existing HAPCs that do not currently have fishing regulations, and include some areas under consideration for the FGBNMS**Error! Bookmark not defined.**.  Additional recognition of sensitive coral and coral reef habitat or actions to reduce impacts to those areas could be beneficial for reef fish.

The Florida**Error! Bookmark not defined.** Keys National Marine Sanctuary is in the process of finalizing the draft EIS**Error! Bookmark not defined.** for the sanctuary management plan.  At this time, NMFS**Error! Bookmark not defined.** does not anticipate that actions and activities outlined in that plan would directly affect the Gulf**Error! Bookmark not defined.** reef fish fishery.  If the sanctuary area is expanded, reef fish fishermen could be affected; on the other hand, additional recognition of sensitive coral and coral reef habitat or actions to reduce impacts to those areas could be beneficial for reef fish.

Climate change projections show increases in sea surface temperature and sea level; decreases in sea ice cover; and changes in salinity, wave climate, and ocean circulation

(Intergovernmental Panel on Climate Change[48]).  These changes are likely to affect plankton biomass and fish larvae abundance that could adversely impact fish, marine mammals, seabirds, and ocean biodiversity.  NOAA**Error! Bookmark not defined.**'s Climate Change Web Portal[49] indicates that the average sea surface temperature in the Gulf**Error! Bookmark not defined.** will increase by 1.2-1.4°C for 2006-2055 compared to the average over the years 1956-2005.  For reef fishes, Burton (2008)**Error! Bookmark not defined.** could cause shifts in spawning seasons, changes in migration patterns, and changes to basic life history parameters such as growth rates.  For species such as red grouper, there has been a distributional trend towards deeper waters.

Liquefied natural gas (LNG**Error! Bookmark not defined.**) facilities are being proposed in the western and northern Gulf**Error! Bookmark not defined.**.  These facilities can have a negative effect on species with pelagic larvae, like most reef fish species.  At this time, the effect of LNG facilities is unknown and is likely to be less for reef fish species than other more coastal species.  Other factors such as climate change**Error! Bookmark not defined.**, hurricanes, and oil and gas extraction could have detrimental effects on reef fish species, but these effects are poorly understood.

5.   **Characterize the resources, ecosystems, and human communities identified in scoping in terms of their response to change and capacity to withstand stress.**

This step should identify the trends, existing conditions, and the ability to withstand stresses of the environmental components.  According to the CEQ**Error! Bookmark not defined.** guidance describing stress factors, there are two types of information needed.  The first are the socioeconomic driving variables identifying the types, distribution, and intensity of key social and economic activities within the region.  The second are the indicators of stress on specific resources, ecosystems, and communities.

a.   **Socioeconomic driving variables identifying the types, distribution, and intensity of key social and economic activities within the region**

The socioeconomic driving variables identifying the types, distribution, and intensity of key economic and social activities within the region are described in detail in Sections 3.4-3.5.  As of February 27, 2020, there were 1,270 valid or renewable for-hire reef fish permits.  From 2014 through 2018, the majority of headboat angler days occurred in Florida, followed by Texas and Alabama.  Combined, Mississippi and Louisiana accounted for only a small percentage of headboat angler days.  From 2012 through 2016, the private angling component of the recreational sector took an average of at least 228,122 directed angler trips annually.  From 2014 through 2018, the private angling component of the recreational sector took an average of 460,677 red grouper target trips and an average of 915,624 catch trips.  By mode, the majority of charter trips and private angler trips occurred in Florida, followed by a small number of trips in Alabama.  Landings from the private angling component constituted 85% of the total recreational sector's landings from

---

[48] http://www.ipcc.ch/
[49] http://www.esrl.noaa.gov/psd/ipcc/ocn/

2014 through 2018.  As of February 27, 2020, there were 834 valid or renewable commercial reef fish permits.  The number of vessels commercially harvesting red grouper from 2015 to 2018 has been relatively stable, ranging between 374 and 384 vessels. Between 2014 and 2018, commercial red grouper landings have fallen by 57%, and revenue has fallen by 49%.  As of February 19, 2020, there were 495 IFQ accounts holding red grouper shares, and those IFQ accounts are held by 436 businesses.  The number of dealers purchasing red grouper landings decreased by 19% from 2014 to 2018, from 110 dealers to 89 dealers.  The majority of commercial red grouper landings occur along the west coast of Florida, and the top ten counties with commercial vessels with red grouper landings in 2018 are all in Florida.

**b. Indicators or stress specific resources, ecosystems, and communities**

**i.      Ecosystem**

With respect to stresses to the ecosystem from actions in this amendment, modifying sector allocations and setting ACLs and ACTs are not likely to create additional stress. Vertical-line gear, the primary gear used by the reef fish fishery, and longlines can damage habitat through snagging or entanglement; however, these impacts are minimal. Changes in the population size structure as a result of shifting red grouper fishing selectivities and increases in stock abundance could lead to changes in the abundance of other reef fish species that compete with red grouper for shelter and food.  Predators of red grouper could increase if red snapper abundance is increased, while species competing for similar resources as red grouper could potentially decrease in abundance if food and/or shelter are less available.  As described in Part 4 of this CEA**Error! Bookmark not defined.**, red tide, the *Deepwater Horizon***Error! Bookmark not defined.** MC252 and climate change**Error! Bookmark not defined.** have affected the Gulf**Error! Bookmark not defined.** overall.

**ii.      Reef Fish/Red Grouper**Error! Bookmark not defined. **Stock**

In the early 2000's major stresses to the red grouper stock have primarily come from the stock being overfished and experiencing overfishing**Error! Bookmark not defined.**, which was documented in the 2002 stock assessment (Schirrippa and Legault 2002). Subsequent assessments have shown the stock is neither overfished or undergoing overfishing.  Trends in landings and the status of the red grouper stock are based on NMFS**Error! Bookmark not defined.** and SEDAR**Error! Bookmark not defined.** stock assessments (summarized in Sections 3.1 and 3.3) and are incorporated here by reference.  It is likely the red grouper stock has been adversely affected by the red tide eventsas evidenced in dips in recruitment  following the red tide events in 2005, 2014, and 2017-2018.

As mentioned previously, natural events such as red tide could be a source of stress on reef fish, including red grouper.  However, the extent and magnitude of that impact is unknown, and may not be apparent for several years, until subsequent recruitment data are available.  Additionally, climate change**Error! Bookmark not defined.** is already

influencing red grouper.  For reef fishes, Burton (2008) speculated that climate change could cause shifts in spawning seasons, changes in migration patterns, and changes to basic life history parameters such as growth rates.  For red grouper, declines in biomass have been linked to large-scale and persistent red tide events (SEDAR 61 2019).

### iii.        Reef Fish Fishing Communities

Fisheries are subject to stress as a result of increases in fishing costs, increases in harvesting efficiency, more restrictive regulations (particularly for red grouper), and changes in the stock status of certain species (effort shifting).  Reductions in dollars generated would likely be felt in the fishery infrastructure (e.g., marinas, bait and tackle shops).  For the reef fish fishery, an indicator of stress would be a decline in the number of permitted vessels or a decrease in landings.

In the Gulf, red grouper is harvest primarily in Florida.  Total recreational and commercial landings for the years 1986 through 2005, based on SEDAR 12, and for the years 1986 through 2019, based on the SEFSC ACL monitoring dataset, are provided in Table 2.1.1.

Declines in fishing permits may be a signal of stress within the fishery.  The number of valid or renewable for-hire Gulf reef fish permits has declined gradually from 1,458 permits in 2008 to 1,277 permits in 2019.  Likewise, the number of valid or renewable commercial Gulf reef fish permits has gradually declined from 1,099 permits in 2008 to 842 permits in 2019.  The number of businesses in 2019 associated with the 1,099 commercial reef permits is 637, with 543 business (85.2% of the businesses) holding only one permit each (64.5% of the permits).  The number of commercial vessels harvesting red grouper has remained relatively stable at 384 in 2014 and at 376 in 2018, while red grouper landings have declined from 5,497,993 lbs gutted weight in 2014 to 2,361,280 lbs gutted weight in 2018.  In addition, the number of dealers that purchased red grouper landings steadily decreased from 110 in 2014 to 89 in 2018, or by 19%.  These declines may reflect the difficulties in maintaining participation in the fishery.

With a broad view for the reef fish fishery, effort in the commercial sector has decreased significantly according to multiple measures.  Between 2006 and 2014, the number of vessels, trips, and days at sea decreased by 31%, 38%, and 28%, respectively.  However, landings of Gulf reef fish were relatively unchanged, decreasing by about 4% during that time.  Thus, output per unit of input (one measure of productivity) has increased significantly since the IFQ programs were implemented.  Further, even though landings have remained about the same, the average ex-vessel price of Gulf reef fish landings increased by 20% during this time, resulting in a 16% increase in total annual revenues from these landings.

Because productivity increased, costs decreased, with crew costs decreasing by 6% and other variable costs (supplies, fuel, etc.) decreasing by 33%.  Even though fuel prices increased by 25%, a 49% decrease in fuel usage served as the primary driver of the decline in other variable costs.

Table 3.5.1.1 identifies the number of vessels landing red grouper by top 10 county homeports.  All 10 of those county homeports are located in Florida.

Several natural disasters have impacted coastal communities in the Gulf**Error! Bookmark not defined.** in recent years.  The effects of these events on fishing communities may take several years to understand and become fully apparent.  The Department of Commerce determined commercial fishery disasters for Hurricane Harvey (2017) in Texas,**Error! Bookmark not defined.** and Hurricanes Irma (2017) and Michael (2018) in Florida**Error! Bookmark not defined.**.  As of December 15, 2020, determinations are pending for Florida Red Tide Events (2015-2019), Gulf of Mexico Freshwater Flooding (2019) in Louisiana, Mississippi, and Alabama, and Hurricane Laura (2020) in Louisiana.  These determinations provide the basis for Congress to appropriate fishery disaster assistance for the new fiscal year in which it is declared.

### iv.        Administrative Environment

The stresses to the administrative environment from these actions would include: 1) converting landings from MRIP-CHTS data to MRIP-FES; 2) rulemaking for in-season fishing closures for the recreational sector due to managing to decreased recreational ACLs; 3) an increased potential for overfishing of red grouper if there is an increase in allocation the recreational sector, which is associated with more uncertainty in constraining harvest.  However, none of these stresses are likely to be significant.  Updating catch levels using MRIP-FES estimates for historical recreational landings would result in some beneficial impacts because NMFS would not be required to convert landings estimates to monitor harvest.  Shifting allocation to the recreational sector could increase the likelihood of overfishing because of the uncertainty associated with monitoring landings.  However, an ACT will remain in place to help ensure that the recreational ACL is not exceeded on a regular basis, which will reduce the likelihood of total red grouper landings exceeding the OFL.

**6.    Characterize the stresses affecting these resources, ecosystems, and human communities and their relation to regulatory thresholds.**

This section examines whether resources, ecosystems, and human communities are approaching conditions where additional stresses could have an important cumulative effect beyond any current plan, regulatory, or sustainability threshold (CEQ**Error! Bookmark not defined.** 1997).  Sustainability thresholds can be identified for some resources, which are levels of impact beyond which the resources cannot be sustained in a stable state.  Other thresholds are established through numerical standards, qualitative standards, or management goals.  The CEA**Error! Bookmark not defined.** should address whether thresholds could be exceeded because of the contribution of the proposed actions to other cumulative activities affecting resources.

Overall the purposes of this amendment are to revise the red grouper allocation between the commercial and recreational sectors using the best scientific information available and to modify the total and sector ACLs based on results of the recent stock assessment (SEDAR 61 2019) and

subsequent OFL and ABC recommendations from the SSC. These actions are not being implemented because a resource, ecosystem, or human community is approaching conditions where additional stresses could have an important cumulative effect beyond any current plan, regulatory, or sustainability threshold.

### i.     Ecosystem

The stresses associated with the proposed actions in relation to regulatory thresholds are not likely to cause beneficial or adverse effects on the ecosystem.  The actions would not change the way the reef fish fishery as a whole is prosecuted.  Actions in the amendment would directly affect red grouper fishing and not fishing for the other species in the fishery management unit with the possible exception of gag, which can be caught with red grouper multi-use IFQ allocation.  Thus, significant effects on the ecosystem are not expected.  The overall Gulf-wide fishing effort would remain constrained by actions that keep quotas and ACLs from being exceeded.  As described in Steps 4 and 5, red tide and climate change may affect red grouper.  Effects from red tide have been shown to have adverse effects on the red grouper population as described in SEDAR 61 (2019).  Effects from climate change are poorly understood as described in Section 3.3.

### ii. Reef Fish/Red GrouperError! Bookmark not defined. Stock

Amendment 1 to the Reef Fish FMP (GMFMC 1989), implemented in 1990 before the Sustainable Fisheries Act (SFA) was passed, established the minimum spawning stock biomass at 20% SPR for all reef fish species as well as established the shallow-water grouper quota, which included red grouper.  The commercial shallow-water quota was increased through two 1991 framework actions (GMFMC 1991a and 1991b).  The Generic SFA Amendment (GMFMC 1999) proposed SFA definitions for OY, MSST, and maximum fishing mortality threshold (MFMT) for reef fish species.  The red grouper definition of MFMT was $F_{30\%SPR}$.  Definitions for OY and MSST were disapproved because they were not biomass-based.  Due to over harvest, Secretarial Amendment 1 (GMFMC 2004) established a rebuilding plan, set OY and MSST, and established a red grouper quota within the shallow water grouper quota.  Amendment 30B (GMFMC 2008) established red grouper ACLs and AMs.  In 2017, the definition of MSST was revised from $(1-m)*B_{MSY}$ to $0.50*B_{MSY}$.

Prior to the SEDAR assessment process, red grouper was assessed by the SEFSC on a periodic basis.  A 1999 stock assessment (Schirripa et al. 1999) found the red grouper stock to be overfished, but a subsequent 2002 assessment (NMFS 2002) found the stock to no longer be overfished or undergoing overfishing.  Subsequently, the red grouper stock has been assessed through SEDAR stock assessments (SEDAR 12 2006, SEDAR 12 Update 2009, and SEDAR 42 2015) and these assessments have found the stock not to be overfished or undergoing overfishing.  However, the assessments have found declines in the population that are likely associated with large-scale red tide events.  A brief description of the stock and its status can be found in Section 3.3 and Step 5 of this CEA.  Measures proposed in this amendment are not likely to adversely affect the red grouper

stock status as long as landings do not exceed the OFL.  At this time, it is unclear how climate change may affect these regulatory thresholds (see Steps 4 and 5).

The actions in this amendment, particularly those to set the OFL, ACLs, and ACTs are likely to benefit the stock as they provide harvest limits not to be exceeded.  The actions are consistent with the Magnuson-Stevens Act**Error! Bookmark not defined.** and the Reef Fish FMP.**Error! Bookmark not defined.Error! Bookmark not defined.** Consistency with the Magnuson-Stevens Act and Reef Fish FMP requires, among other things, preventing overfishing**Error! Bookmark not defined.**, rebuilding declining reef fish stocks, monitoring the reef fish fishery, conserving and increasing reef fish habitats, and minimizing conflicts between user groups.  Under all alternatives, red grouper fishing would remain subject to a Gulf**Error! Bookmark not defined.**-wide closure**Error! Bookmark not defined.** if the recreational sector total ACL**Error! Bookmark not defined.** is projected to be met.  The commercial sector is managed under an IFQ program that limits harvest to the ACL due to strict management protocols commercial fishermen must follow.

### iii.    Reef Fish Fishing Communities

Regulatory thresholds for reef fish fishing communities would not be exceeded because of the combined effects of modifications to sector allocations, OFL, ABC, ACLs, ACTs and other activities affecting the fishery and fishing communities.  For specific information regarding the effects of actions in this amendment on the economic and social environment of fishing communities see Sections 4.1.3-4.1.4 and 4.2.3-4.2.4.  Fishing communities are subject to stress as a result of increases in fishing costs, increases in harvesting efficiency, more restrictive regulations (particularly for red grouper), and changes in the stock status of certain species (effort shifting).  Reductions in dollars generated would likely be felt in the fishery infrastructure.  The purposes of the actions in this amendment are to revise the red grouper allocation between the commercial and recreational sectors using the best scientific information available and to modify the total and sector ACLs based on results of the recent stock assessment and subsequent OFL and ABC recommendations from the SSC.  Lack of consideration of the best scientific information available would result in a de facto reallocation between the commercial and recreational sectors.

### iv.    Administrative Environment

Thresholds would likely not be exceeded because of the combined effects of reallocating red grouper catch among the commercial and recreational sectors are actions that fall within the confines of the Magnuson-Stevens Act.  For specific information regarding the effects of actions in this amendment on the administrative environment, see Sections 4.1.5 and 4.2.5.  The effects on the administrative environment for the federal government are expected to be positive, because they are less likely to result in exceeding thresholds, although there could be minor periodic increases in administrative burden due to closures necessitated by exceeding recreation catch limits.  However, federal entities have mechanisms in place to help address any increase in administrative impacts, such as

monitoring and enforcement programs. In addition, federal and state entities monitor the harvest of many species of fish and even if seasonal closures occurred with increased frequency, it would not significantly increase the existing burden.

Ultimately, if the actions in this amendment result in management using more accurate catch data, it should reduce stresses on the administrative environment because it would reduce the risk of overfishing and of the stock becoming overfished, which would necessitate implementation of a rebuilding plan.

**7.    Define a baseline condition for the resources, ecosystems, and human communities.**
The purpose of defining a baseline condition for the resource and ecosystems in the area of the proposed actions is to establish a point of reference for evaluating the extent and significance of expected cumulative effects.

### i.    Ecosystem

A baseline for analysis of the physical environment, as discussed in Section 3.2, was conducted in the EIS**Error! Bookmark not defined.** for the Generic EFH**Error! Bookmark not defined.** Amendment. The Gulf**Error! Bookmark not defined.** has a total area of approximately 600,000 square miles (1.5 million km$^2$), including state waters (Gore 1992). It is a semi-enclosed, oceanic basin connected to the Atlantic Ocean by the Straits of Florida**Error! Bookmark not defined.** and to the Caribbean Sea by the Yucatan Channel. Oceanographic conditions are affected by the Loop Current, discharge of freshwater into the northern Gulf, and a semi-permanent, anti-cyclonic gyre in the western Gulf. The Gulf includes both temperate and tropical waters (McEachran and Fechhelm 2005). Gulf water temperatures range from 54º F to 84º F (12º C to 29º C) depending on time of year and depth of water. Mean annual sea surface temperatures ranged from 73º F through 83º F (23-28º C) including bays and bayous between 1982 and 2009, according to satellite-derived measurements.[50] In general, mean sea surface temperature increases from north to south with large seasonal variations in shallow waters. In the Gulf, larval red grouper are found in the plankton across the west-Florida shelf (SEDAR 42 2015) and juvenile red grouper are generally found in shallow waters around structures and patch reefs. As red grouper mature, they move offshore to hard bottom areas (Moe 1969). Red grouper are known to alter the offshore hard bottom areas by removing sand and other debris from limestone solution holes using their mouths and fins. The removal of the sediment creates sites for organisms such as sponges and corals to colonize, which in turn provides shelter for small sessile creatures like shrimp and small fish (Coleman et al. 2010).

### ii.    Reef Fish/Red Grouper Stock

The biological environment of the Gulf**Error! Bookmark not defined.**, including that of red grouper, is described in Section 3.3 of this amendment. Red grouper demonstrate the typical reef fish life history pattern. Eggs and larvae are pelagic while juvenile red

---

[50] NODC 2012:  http://accession.nodc.noaa.gov/0072888

grouper are generally found in shallow waters around structures and patch reefs. Juveniles then migrate offshore to hard-bottom habitats. Red grouper are protogynous hermaphrodites, transitioning from females to males at older ages, and form harems for spawning.

Red grouper is not considered overfished or undergoing overfishing. Recruitment remains highly variable with strong recruitment events observed in 1995, 1998, 2001, 2005, and 2013. However, episodic red tide events have been linked to significant mortality events, such as the one in 2018. As such, SEDAR 61 estimated the stock size to be below $B_{30\% \, SPR}$, although above MSST.

### iii.    Reef Fish Fishing Communities

See Sections 3.4 and 3.5 for more information relative to fishing communities. Information on the social environment of the reef fish fishery is available, primarily for the commercial sector; information on the social environment for the recreational sector is general to reef fish and not specific to red grouper. Approximately 99.7% of red grouper recreational landings on average were recorded in Florida. However, as previously mentioned, red grouper landings for the recreational sector are not available at the community level, making it difficult to identify communities as dependent on recreational fishing for red grouper. Private vessels account for the majority of red grouper recreational landings on average (2014 through 2018), followed by charter vessels and headboats. In 2018, 376 commercial vessels harvested red grouper in the Gulf, and 89 dealers purchased red grouper landings. Also, see Section 5.b.iii in this CEA**Error! Bookmark not defined.** for more information about the baseline condition of the reef fish fishing communities.

### iv.    Administrative Environment

Federal fishery management is conducted under the authority of the Magnuson-Stevens Act**Error! Bookmark not defined.** (16 U.S.C. 1801 *et seq*.), originally enacted in 1976 as the Fishery Conservation and Management Act. The Magnuson-Stevens Act claims sovereign rights and exclusive fishery management authority over most fishery resources within the exclusive economic zone**Error! Bookmark not defined.**, an area extending 200 nautical miles**Error! Bookmark not defined.** from the seaward boundary of each of the coastal states, and authority over U.S. anadromous species and continental shelf resources that occur beyond the EEZ**Error! Bookmark not defined.**. State waters refer to the area from shore out to the seaward boundary of each state. The seaward boundary of Florida**Error! Bookmark not defined.** on the Gulf**Error! Bookmark not defined.** coast and Texas**Error! Bookmark not defined.** is 9 nautical miles (nm**Error! Bookmark not defined.**) from shore. The seaward boundary of Alabama**Error! Bookmark not defined.**, Mississippi**Error! Bookmark not defined.**, and Louisiana**Error! Bookmark not defined.** is generally 3 nm from shore. However, the 2016 Department of Commerce Appropriations Act extended the seaward boundary of Alabama, Mississippi, and Louisiana to 9 nm from shore for purposes of management activities under the Reef Fish FMP**Error! Bookmark not defined.**, which includes the management of red snapper. Responsibility for federal fishery management is shared by

the Secretary**Error! Bookmark not defined.** of Commerce**Error! Bookmark not defined.** and the Council**Error! Bookmark not defined.** for the federal waters of the Gulf.

Recreational red grouper landings in the Gulf**Error! Bookmark not defined.** are obtained through multiple sources (see Section 2.2).  The SRHS covers headboats in the Gulf and South Atlantic.  The MRIP**Error! Bookmark not defined.** provides private angling and charter vessel landings and effort data for Gulf states other than Texas**Error! Bookmark not defined.** and Louisiana**Error! Bookmark not defined.**.  Texas conducts its own sampling program (Marine Sport-Harvest Monitoring Program) and provides recreational landings, except for headboat landings, from Texas.  Data from Louisiana's sampling program (LA Creel) has been used since 2013.  The other Gulf states have developed sampling programs that have recently been certified by MRIP, which originated to monitor the harvest of red snapper, including Mississippi**Error! Bookmark not defined.** (Tails n' Scales), Alabama**Error! Bookmark not defined.** (Snapper Check), and Florida**Error! Bookmark not defined.** (Gulf Reef Fish Survey); however, Alabama and Mississippi do not track red grouper landings.  Commercial landings and effort are monitored through NOAA Fisheries' Grouper-Tilefish IFQ program and through trip ticket data.  All sampling programs track red snapper landings, and may not sample red grouper.

The Southeast Region issues several fishing permits and endorsements for fisheries activities in federal waters**Error! Bookmark not defined.**.  There are 41 permits and are as follows:  33 vessel permits and endorsements, 3 dealer permits, 1 operator permit, 1 high seas permit, 1 wreckfish permit, 1 aquaculture of live rock permit, and 1 Columbia treaty waters permit.  In addition, there is an endorsement required to be able to bottom longline with a commercial reef fish permit.  More details on the administrative environment can be found in Section 3.6.

8.  **Identify the important cause-and-effect relationships between human activities and resources, ecosystems, and human communities.**

Cause and effect relationships are presented in Table 4.3.1.

**Table 4.3.1.** The cause and effect relationship of fishing and regulatory actions for red grouper within the time period of the CEA**Error! Bookmark not defined.**.

| Time Period | Cause | Observed and/or expected effects |
|---|---|---|
| **1800-2022** | Climate Change | Changes in ocean acidity and temperature modifies fish and prey distributions and productivity; threaten fishing communities through sea level rise and changing weather patterns. |
| **1962-2004** | Growth and recruitment overfishing**Error! Bookmark not defined.** | Declines in mean size and weight |
| **1990** | 9.2 mp shallow-water grouper quota for commercial sector, 20-inch minimum size limit and 5-grouper fish bag limit**Error! Bookmark not defined.** | Slowed rate of fishing**Error! Bookmark not defined.** |
| **1991-1992** | 9.8 mp shallow-water grouper quota for commercial sector | Increased rate of fishing**Error! Bookmark not defined.** |
| **1999 - 2010** | Prohibit commercial sale of red grouper from February 15-March 15 | Slow commercial fishing and protect spawning stock |
| **2004 - 2009** | Establish 5.31 mp gw commercial quota and a 1.25 mp gw recreational target catch level, reduced the red grouper bag limit to two fish | Constrain harvest |
| **2005 - 2010** | Establish a series of trip limit reductions for the commercial sector's harvest of grouper; reduce recreational bag limit  to one fish | Constrain commercial and recreational harvest |
| **2006 - 2010** | Establish a 6,000-pound gw aggregate deep-water grouper and shallow-water grouper trip limit, prohibit for-hire vessel captains and crews from retaining bag limits | Constrain commercial and recreational harvest |
| **2007 – 2015** | Recreational closed season for red grouper from February 15 to March 15 | Slow commercial fishing and protect spawning stock |
| **2009 - present** | Establish ACLs and AMs for the commercial and recreational sectors, adjusted recreational grouper bag limits and seasons, reduced the red grouper commercial minimum size limit | Constrain commercial and recreational harvest |
| **2010 - present** | Prohibit the use of BLL gear shoreward of a line approximating the 35-fathom contour from June through August | Protect sea turtles |

| Time Period | Cause | Observed and/or expected effects |
|---|---|---|
| **2010** | Reduce the commercial quota from 5.75 to 5.23 mp gw, and the recreational catch limit from 1.82 to 1.65 mp gw | Constrain commercial and recreational harvest |
| **2010 - present** | Establish a grouper-tilefish IFQ program that includes red grouper | Manage the commercial grouper quotas so to stay within its ACLs |
| **2012 - 2015** | Increase the red grouper commercial ACL to 6.03 mp and the recreational ACL to 1.90 mp | Improved stock size allowing greater harvests**Error! Bookmark not defined.** |
| **2015 - present** | Reduce the red grouper bag limit from four fish to two fish per person. Revise fixed closed season of February 1 through March 31 to waters beyond the 20-fathom contour | Constrain recreational harvest of red grouper |
| **2016-2018** | Increase the red grouper commercial ACL to 6.19 mp and the recreational ACL to 2.58 mp | Improve stock size allowing greater harvests |
| **2019 - present** | Reduce the commercial ACL to 3.16 mp gw and the recreational ACL is 1.00 mp gw | Constrain commercial and recreational harvest and protect the stock spawning biomass |

9. **Determine the magnitude and significance of cumulative effects**Error! Bookmark not defined.**.**

The primary objectives of this amendment and associated EIS**Error! Bookmark not defined.** are to revise the red grouper allocation between the commercial and recreational sectors using the best scientific information available and to modify the total and sector ACLs based on results of the SEDAR 61 2019 stock assessment and subsequent OFL and ABC recommendations from the SSC.  The short and long-term direct and indirect effects**Error! Bookmark not defined.** of each these actions are provided in Sections 4.1-4.2.  The following discussion refers to the effects of past, present, and RFFAs on the various valued environmental components**Error! Bookmark not defined.** (VEC**Error! Bookmark not defined.**).  Important VECs were identified for the overall actions to be taken with this amendment.  VECs are "any part of the environment that is considered important by the proponent, public, scientists and government involved in the assessment process.  Importance may be determined on the basis of cultural values or scientific concern" (Environmental Information Partnership 1998).  For purposes of this analysis, an initial 22 VECs were identified, and the consequences of each alternative proposed in this amendment on each VEC were evaluated.  Some of these VECs were combined into a revised VEC because many of the past, current, and RFFAs were similar.  Based on this analysis, four VECs were determined to be the most important for further consideration.  The four VECs are shown in Table 4.3.2.

**Table 4.3.2.** Valued environmental components (VEC**Error! Bookmark not defined.**) identified.

| VECs considered for further evaluation | VECs consolidated for further evaluation | VECs not included for further evaluation |
|---|---|---|
| **Ecosystem** | Hard bottom/EFH**Error! Bookmark not defined.** Prey species Competitors Predators | Sharks Protected species |
| **Reef Fish/Red Grouper**Error! Bookmark not defined. **Stock** | Red grouper Other reef fish | |
| **Reef Fish Fishery** | Vessel owner Captain Crew Anglers Dealers Fishing Communities Fishing support businesses (ice and gear suppliers, marinas, fuel docks) | |
| **Administration** | Federal Rulemaking Federal Permitting Federal Education Federal Enforcement Federal Monitoring State Rulemaking State Education State Enforcement State Monitoring | |

VECs not included for further analysis were sharks, protected resources, and consumers. Many longline vessels that target reef fish also target sharks.  However, sharks were not considered as an important VEC**Error! Bookmark not defined.** because, as shark stocks have declined, the shark fishery has become more and more regulated, limiting the effects of this fishery and the stock on reef fish stocks.  Protected resources were also eliminated from further analyses in this section.  As described in Section 3.3, biological opinions have concluded the primary reef fish gear (longline and hook-and-line) were not likely to jeopardize listed species or their critical habitat.  Because actions considered in this amendment are not expected to change how reef fish fishing gear is used in the prosecution of the reef fish fishery, any take associated with reef fish fishing should not exceed that considered in biological opinions.  All other ESA**Error! Bookmark not defined.**-listed species heave been found not likely to be adversely affected or not affected by the reef fish fishery.  For marine mammals, gear used in the reef fish fishery were classified as Category III fisheries (see Section 3.3).  This means this fishery has minimal impacts on marine mammals.  Consumers were eliminated due to a lack of data for this aspect of the reef fish fishery.

  i.  **Ecosystem**

  EFH**Error! Bookmark not defined.**, as defined for the Reef Fish FMP**Error!**

Amendment 53 - Red Grouper  139  Chapter 4.  Environmental
Allocations and Annual Catch Levels and Targets  Consequences

0003612

**Bookmark not defined.** (GMFMC 2004a) consists of all Gulf**Error! Bookmark not defined.** estuaries; Gulf waters and substrates extending from the US/Mexico border to the boundary between the areas covered by the Gulf and South Atlantic Fishery Management Councils from estuarine waters out to depths of 100 fathoms.  Section 3.2 and GMFMC (2004a) describe the physical environment inhabited by red grouper as well as reef fish in general.  Red grouper is a carnivorous bottom dweller, generally associated (as adults) with hard-bottom substrates (GMFMC 2004a).  Eggs and larvae are pelagic while juveniles are found in shallow waters around structures and patch reefs.

From fishing, the most sensitive gear/habitat combinations include EFH**Error! Bookmark not defined.** for reef fish species.  These include fish otter trawls, shrimp otter trawls, roller frame trawls, and pair trawls over coral reefs; crab scrapes over coral reefs; oyster dredges over submerged aquatic vegetation, oyster reefs, or coral reefs; rakes over coral reefs; and patent tongs over submerged aquatic vegetation, oyster reefs, or coral reefs (GMFMC 2004a).  Some of these gear/habitat interactions are unlikely to occur in actual practice (e.g., shrimp trawls towed through hard bottom areas can destroy shrimp nets and so are avoided).  In general, gear that are actively fished by towing have the highest potential to alter habitats.  However, some habitats, such as coral reefs and hard bottoms are sensitive to interactions with passive gear (e.g., traps) as well.  Most directed reef fish fishing activities, as described previously in this document and CEA**Error! Bookmark not defined.**, use longlines and handlines, although a few fish are taken by spearfishing gear.  These have low levels of impacts compared to other gear types.

In the past, some fishing practices have had detrimental effects on the physical environment.  Gear such as roller trawls and fish traps damaged habitats while harvesting fish species.  Because of these effects, the Council**Error! Bookmark not defined.** developed stressed areas to reduce these impacts.  Further protections have been developed, primarily by either prohibiting fishing or limiting fishing activities that can occur within certain areas.  Detailed information on the closures and preserves is provided in Coral Amendment 9 (GMFMC 2018).  In addition, regulatory changes through Generic EFH**Error! Bookmark not defined.** Amendment 3 (GMFMC 2005; implemented in 2006) prohibited bottom anchoring and the use of trawling gear, bottom longlines, buoy gear, and all traps/pots to protect coral reefs in several HAPCs.  Generic EFH Amendment 3 also required a weak link in the tickler chain of bottom trawls on all habitats throughout the Gulf**Error! Bookmark not defined.** federal waters to minimize damage done to habitats should the chain get hung up on natural bottom structures.

Current allowable gear types can adversely affect hard bottom areas; however, these impacts are not considered significant (see Section 4.1.1).  Vertical-line gear and longlines used in the reef fish fishery can damage habitat through snagging or entanglement.  Longlines can also damage hard bottom structures during retrieval as the line sweeps across the seafloor.  Additionally, anchoring over hard-bottom areas can also affect benthic habitat by breaking or destroying hard bottom structures.  However, these gear types are not believed to have much negative impact on bottom structures and are considerably less destructive than other commercial gear, such as traps and trawls, which

are not allowed for reef fish fishing.

Damage caused from reef fish fishing, although minor, is associated with the level of fishing effort (see Section 4.1.1).  Therefore, actions reducing levels of effort would result in greater benefits to the physical environment, because fishing related interactions with habitat would be reduced.  Thus, actions described in Steps 3 and 4 of this CEA**Error! Bookmark not defined.** which have reduced fishing effort for some species, and possibly the fishery on the whole, have had a positive effect on hard bottom habitats.  RFFAs, such as Coral Amendment 9 (GMFMC 2018) and the FGBNMS**Error! Bookmark not defined.** management plan, should also benefit these habitats as they would also reduce or limit fishing effort.  As described in Sections 4.1-4.3, effects on the physical environment from the proposed actions would likely be minimal because prosecution of the fishery should not be changed.

Reef fish EFH**Error! Bookmark not defined.**, particularly coral reefs and submerged aquatic vegetation, are particularly susceptible to non-fishing activities (GMFMC 2004a).  The greatest threat comes from dredge-and-fill activities (ship channels, waterways, canals, and coastal development).  Oil and gas activities as well as changes in freshwater inflows can also adversely affect these habitats.  As described in Step 4.b.i of this CEA**Error! Bookmark not defined.**, the potential harm to reef fish habitat was highlighted by the *Deepwater Horizon***Error! Bookmark not defined.** MC252 incident.  Essential fish habitat and HAPC**Error! Bookmark not defined.** designations are intended to promote careful review of proposed activities that may affect these important habitats to assure that the minimum practicable adverse impacts occur on EFH.  However, NMFS**Error! Bookmark not defined.** has no direct control over final decisions on such projects.  The cumulative effects of these alternatives depend on decisions made by agencies other than NMFS, as NMFS and the Council**Error! Bookmark not defined.** have only a consultative role in non-fishing activities.  Decisions made by other agencies that permit destruction of EFH in a manner that does not allow recovery, such as bulkheads on former mangrove or marine vegetated habitats, would constitute irreversible commitments.  However, irreversible commitments should occur less frequently as a result of EFH and HAPC designations.  Accidental or inadvertent activities such as ship groundings on coral reefs or propeller scars on seagrass could also cause irreversible loss.

At this time, it is unclear what effects climate change**Error! Bookmark not defined.** will have on red grouper EFH**Error! Bookmark not defined.**.  Factors associated with climate change such as ocean acidification could negatively affect important biotic components of red grouper EFH such as corals (IPCC 2014).  Hollowed et al. (2013) has identified important ecosystem paths that deserve future study to determine climate change cause and effects.

Hypoxic events such as the Northern Gulf Hypoxic Zone and hypoxia associated with red tide can adversely affect fish including red grouper.  However, red grouper is not likely to be adversely affected by the Northern Gulf Hypoxic Zone as is most commonly found in the eastern Gulf.  Many marine species, including reef fish species, are adversely affected

by red tide not only through hypoxia associated with red tide, but from the toxins released by the red tide algae itself.  These adverse effects show themselves declines in stock abundance following events as shown for red grouper (see Section 3.3 and SEDAR 61 2019).

### ii.      **Reef Fish/Red Grouper**Error! Bookmark not defined. **Stock**

The Reef Fish FMP**Error! Bookmark not defined.** currently encompasses 31 species (Table 3.3.1).  Eleven other species were removed from the FMP in 2012 through the Generic ACL**Error! Bookmark not defined.**/AM**Error! Bookmark not defined.** Amendment (GMFMC 2011a).  Of the stocks for which stock assessments have been conducted, the fourth quarter report of the 2020 Status of Stocks classifies greater amberjack as considered overfished and two reef fish stocks are considered undergoing overfishing (lane snapper and the Gulf jacks complex).[51]

In the past, the lack of management of reef fish allowed many stocks to undergo both growth and recruitment overfishing**Error! Bookmark not defined.**.  This allowed some stocks to decline as indicated in numerous stock assessments.  Red grouper were considered overfished in 1999 (Schirripa et al. 1999); however, as described in subsequent stock assessments in Section 6(ii), have found the stock not overfished.  For red grouper, management measures including a minimum size limit, commercial quota, and aggregate bag limit**Error! Bookmark not defined.** were put in place as part of the initial Reef Fish FMP**Error! Bookmark not defined.** and Amendment 1 (Section 1.4).  None of these measures halted increases in landings.  However, over time, management measures have become more restrictive and held landings more closely to the quotas/ACLs.

The present red grouper ACLs are based on 2017 landings that are consistent with an interim stock assessment (SEFSC 2019).  However, these ACLs are greatly reduced from values recommended after review of the SEDAR 42 (2015) for reasons explained in Section 1.1.  The current recommendations for this action are based on SEDAR 61 (2019) would set the OFL, ABC, ACLs, and ACTs at a level of harvest that would reduce the likelihood of overfishing to occur.  With respect to other actions, the grouper tilefish IFQ**Error! Bookmark not defined.** program has successfully held landings by the commercial sector below its quota since implementation in 2010.  However, these measures, may have, at least for the commercial sector, redirected effort towards other non-IFQ managed reef fish species such as gray triggerfish and greater amberjack by fishermen without IFQ shares or allocation**Error! Bookmark not defined.**.  Landings of these non-IFQ managed species are closely monitored to prevent them from exceeding their ACLs and protect them from overharvest.  In fact, measures for gray triggerfish and greater amberjack allow the harvest to be closed if it is projected to meet their respective commercial and recreational quotas.  For the recreational sector, bag limits, size limits, and season closures are the primary tool to control harvest.  These measures have been

---

[51]  Note a recent stock assessment has determined greater amberjack are undergoing overfishing, but this occurred after the  fourth quarter report of the 2020 Status of Stocks was completed.

successful for red grouper with landings only exceeding the ACL in 2013 (Table 4.3.3). The red grouper bag limit has varied from one to four fish within the aggregate grouper bag limit with changes occurring in response to changes in the health of the stock.  Note that in 2014, the bag limit was reduced from four to three fish as a result of an AM implemented in 2011, which reduced the bag limit because the ACL was exceeded in 2013.  This AM was removed in 2015 when the bag limit was reduced to two fish as a result of rulemaking from a 2014 framework action (GMFMC 2014b).

**Table 4.3.3.**  Recreational landings of red grouper from 2010-2018, the recreational annual catch limit (ACL), and landings as a percent of the ACL.  Landings are in pounds gutted weight.

| Year | Landings* | ACL | Percent |
|------|-----------|-----|---------|
| **2010** | 635,680 | 1,850,000 | 34.36 |
| **2011** | 643,745 | 1,650,000 | 39.01 |
| **2012** | 1,752,930 | 1,900,000 | 92.26 |
| **2013** | 2,377,111 | 1,900,000 | 125.11 |
| **2014** | 1,600,475 | 1,900,000 | 84.24 |
| **2015** | 1,847,573 | 1,900,000 | 97.24 |
| **2016** | 1,403,236 | 2,580,000 | 54.39 |
| **2017** | 807,085 | 2,580,000 | 31.28 |
| **2018** | 872,045 | 2,580,000 | 33.80 |

*Recreational landings data from the Gulf of Mexico Historical Recreational Landings and Annual Catch Limit Monitoring webpage (https://www.fisheries.noaa.gov/southeast/recreational-fishing-data/gulf-mexico-historical-recreational-landings-and-annual-catch)

Fishery management RFFAs are expected to benefit managed species.  These actions are expected to manage the stocks at OY**Error! Bookmark not defined.** per National Standard 1 and are described in steps 3 and 4 of this CEA**Error! Bookmark not defined.**.  This amendment is intended to improve the management of the red grouper in ways that are likely to better keep harvests within the ACLs.  Other RFFAs described in steps 3 and 4 are intended to improve the management of reef fish stocks either through revising ACLs, improving data reporting, or allowing more flexibility in management.

Non-fishing activities are likely to adversely affect reef fish stocks as listed in Step 4. For example, severe red tide events are thought to negatively affect reef fish stocks including red grouper populations as described in Step 4.  In 2005, 2014, and 2017-2018, severe red tide events occurred in the western Gulf.  During these years, red grouper stock assessments showed declines in the spawning stock biomass.  Other factors such as climate change**Error! Bookmark not defined.**, LNG facilities, hurricanes, and oil and

gas extraction could have detrimental effects on reef fish species, but these effects are poorly understood.

### iii.  Reef Fish Fishing Communities

Adverse or beneficial effects of actions on vessel owners, captains, and crew are tied to the ability of a vessel to make money.  In commercial fisheries, these benefits are usually derived from shares awarded after fishing expenses are accounted for.  The greater the difference between expenses and payment (revenue) for harvested fish, the more profit is generated by the fishing vessel.  For-hire businesses generate revenue by selling trips either at the vessel level (charter businesses) or passenger level (headboats).

Current management measures have been effective in maintaining the red grouper stock as the stock is neither overfished nor experiencing overfishing, based on the results of SEDAR 42 and of SEDAR 61.  Beginning in 2010, the IFQ program has constrained the commercial sector from exceeding its red grouper quota, as a commercial vessel must have a sufficient amount of allocation before landing.  In contrast, the recreational sector could exceed its quota, which would trigger AMs, as landings are monitored in-season and it may not be possible to close the fishing season before the quota is met.  Although the commercial and recreational allocations were in effect for the timeframe 2010-2018, the commercial ACL has never been exceeded and the recreational ACL has only been exceeded in 2013, and was subject to in-season closures in 2014 and 2015.

*Commercial Sector*
Non-FMP factors have adversely affected the reef fish commercial fleets.  Factors that have had an adverse effect on the commercial fleet include hurricanes, oil spills, red tide events, and increases in fishing costs, which may have pushed marginal fishing operations out of business.  Hurricanes are unpredictable and localized in their effects.  Increases in fishing costs, unless accompanied by an increase in prices or harvest quality, decrease the profitability of fishing.  As described in Section 3.4.1, red grouper landings and revenue have decreased significantly from 2014 through 2018, with landings falling by 57% and revenue decreasing by 49%.  The revenue decrease was slightly less because of the increase in ex-vessel price that occurred during this time.  Still, the number of vessels harvesting red grouper in each year from 2015 through 2018 was relatively stable.

Current management measures may have had a negative, short-term impact on the commercial sector.  An April 2019 framework action reduced the annual catch limit for the commercial sector to 3.16 mp gw and the commercial quota to 3.00 mp gw.  This was in response to concerns about red grouper stock decline due to environmental conditions and low landings from both the commercial and recreational sectors.

*Recreational Sector*
As with the commercial sector, non-management-related RFFAs that could affect anglers include hurricanes, oil and gas extraction, and increases in fishing costs. Hurricanes are unpredictable and localized in their effects.  Oil spills, which are also unpredictable, can have extensive adverse impacts over large areas as evidenced by the Deepwater Horizon

spill.  Increases in fishing costs as well as lost fishing opportunities would likely reduce the amount of angler effort.

Current management measures may have had a negative, short-term impact on the recreational sector.  A December 2014 framework action reduced the red grouper bag limit from four fish to two fish per person per day, in an effort to extend the recreational red grouper season.  As detailed in Section 3.4.2, red grouper recreational target trips decreased from 40,144 to 34,797 for the charter component and from 703,390 to 380,124 for the private angling component from 2014 to 2018.  An April 2019 framework action reduced the annual catch limit for the recreational sector to 1.00 mp gw and the recreational ACT to 0.92 mp gw.  This was in response to concerns about red grouper stock decline due to environmental conditions and low landings from both the commercial and recreational sectors.

Infrastructure refers to fishing-related businesses and includes marinas, rentals, snorkel and dive shops, boat dockage and repair facilities, tackle and bait shops, fish houses, and lodgings related to the recreational fisheries industry.  This infrastructure is tied to the commercial and recreational sectors and can be affected by adverse and beneficial economic conditions in those fisheries.  Actions allowing the recreational and commercial sectors to expand have had a beneficial effect providing business opportunities to service the need of these industries.  However, actions which have constrained the recreational sector likely have had an adverse effect, because lower revenues generated from the fishery would be available to support the infrastructure.

### iv.    Administrative Environment

Administration of fisheries is conducted through federal (including the Council) and state agencies that develop and enforce regulations, collect data on various fishing entities, and assess the health of various stocks.  As more regulations are required to constrain stock exploitation to sustainable levels, greater administration of the resource is needed.  The NMFS Office of Law Enforcement (OLE), in cooperation with state agencies, would continue to monitor regulatory compliance with existing regulations and NMFS would continue to monitor both recreational and commercial landings to determine if landings are meeting or exceeding specified quota levels.  Further, stock status needs to be periodically assessed to ensure stocks are being maintained at proper levels.

Some recent actions have assisted the administration of fisheries in the Gulf.  In 2010, an IFQ program was implemented for the commercial sector's harvest of red grouper, requiring NMFS to monitor the sale of red grouper IFQ shares.  Recordkeeping requirements for IFQ shares have improved commercial quota monitoring and prevented overages from occurring.  A vessel monitoring system (VMS) was implemented for all permitted commercial reef fish vessels in 2007 that has helped OLE identify vessels violating various fishing closures.  The implementation of ACLs and AMs for most federally managed species has required careful monitoring of landings.  For red grouper, NMFS prohibits harvest upon projected that landings will exceed the ACL within that season.  In 2017, the Council approved new requirements for electronic reporting by for-

hire vessels, which are scheduled to become effective at the beginning of 2021. This is expected improve quota monitoring and help constrain harvest to the ACL.

Setting the recreational ACL in MRIP-FES rather than MRIP-CHTS is expected to reduce burden on the administrative environment. Currently, recreational landings for red grouper (as well as many other reef fish) are calculated in MRIP-FES, and must be converted to MRIP-CHTS for quota monitoring. This conversion would no longer be required. Although this conversion will still be necessary for other reef fish species and thus will not affect the short-term administrative burden, this is a step in eliminating this conversion for all reef fish species, which would reduce long-term administrative burden.

Overall, the proposed changes in this Amendment are likely to have low positive to neutral impacts on the administrative environment. ACT buffers proposed in Action 2 for the commercial and recreational sector are expected to have negligible impacts to the administrative environment, no matter the alternative chosen in Action 2 or in Action 1 (see Section 4.2.5 for discussion). In addition, the proposed change in the red grouper commercial and recreational allocation to more accurately reflect historic catch rates (based on NMFS and SSC has determination of best scientific information available) is not expected to affect administrative burden. This is because regardless of the allocation, no significant increase in risk of overfishing is expected. Each of the alternatives in Action 1 will result in ACLs that are below the OFL, and provisions are in place to decrease the chance of reaching or exceeding the OFL. However, Action 1 alternatives (coupled with any Action 2 alternative) may increase administrative burden in other ways. Each of the viable alternatives for Action 1 would result in reduced quota for the recreational sector, which is more likely to result in a minor administrative burden associated with seasonal closures. In addition, several alternatives in Action 1 would allocate a greater percentage of the ACL to the recreational sector, which has greater uncertainty with catch and landings than the commercial sector. Because these landings would not need to be converted back to MRIP-CHTS for management, this would reduce uncertainty and result in beneficial effects to the administrative environment. On the other hand, because most of the alternatives would result in a reduced recreational ACL (relative to the current ACL), this would increase the likelihood of needing to implement an in-season closure. Alternatives that result in larger allocations to the recreational sector could increase the likelihood of overfishing because of the uncertainty in determining recreational landings as discussed in Section 4.1.5. The ACL in each alternative is set below the overfishing limit (OFL) to decrease the likelihood of overfishing even if the ACL is exceeded or if recreational landings are higher than estimated. Previous estimates of recreational catch were lower (often by 2-3 times) than current estimates, and thus the likelihood of unknowingly overfishing the stock, and potentially approaching an overfished state, was higher. The risk of overfishing associated with an increase in recreational allocation, in spite of uncertainty in recreational landings, may be partially or fully mitigated by the use of more accurate landings data in quota monitoring.

10. **Modify or add alternatives to avoid, minimize, or mitigate significant cumulative effects.**

The primary objectives of this amendment and associated EIS are revise the red grouper allocation between the commercial and recreational sectors using the best scientific information available, modify the total and sector annual catch limits based on results of the SEDAR 61 2019 stock assessment and subsequent OFL and ABC recommendations from the SSC, and modify ACTs to reduce the likelihood the ACL would be exceeded.  The cumulative effects of revising the red grouper sector allocation and ACLs (Action 1) and ACTs (Action 2) on the biophysical environment are likely neutral because it should not have much effect on overall reef fish fishing effort (see Sections 4.1.1, 4.1.2, 4.2.1, and 4.2.2), but may influence red grouper fishing effort due to the influence of recreational fishing on ABCs.  For the socioeconomic environment, depending on the sector, some effects would be likely be positive and some negative (see Sections 4.1.3, 4.1.4, 4.2.3, and 4.2.4).  However, short-term negative impacts on the fisheries' socioeconomic environment may occur due to the need to limit directed harvest and reduce bycatch mortality.  These negative impacts can be minimized when actions are considered for the recreational sector by using combinations of bag limits, size limits and closed seasons and for the commercial sector through individual fishing quota programs, size limits, and season-area closures.

11. **Monitor the cumulative effects**Error! Bookmark not defined. **of the selected alternatives and adapt management.**

NMFS**Error! Bookmark not defined.** would continue monitoring the harvest of red grouper.  Monitoring the harvest is necessary to determine if the ACLs are exceeded and to prohibit further harvest to insure the OFL**Error! Bookmark not defined.** is not also exceeded.  It is uncertain if the states would be able to constrain harvest within their allocation**Error! Bookmark not defined.** and whether the monitoring data would provide timely data to prevent overages.  The timing of the data may be critical for NMFS to determine if the quota has been met.  The effects of the proposed actions are, and will continue to be, monitored through collection of landings data by NMFS and the Gulf states, stock assessments and stock assessment updates, life history studies, economic and social analyses, and other scientific observations.  Landings data for the recreational sector in the Gulf is collected through MRIP, NMFS' Headboat Survey, Florida's Gulf Reef Fish Survey, Louisiana's LACreel Survey, and the Texas Marine Recreational Fishing Survey.  In addition, red snapper landings are monitored through Alabama's Snapper Check program and Mississippi's Tails n' Scales program.  MRIP replaced the previous MRFSS program and this program has moved from the CHTS to the mailed FES.  Port sampling through MRIP is conducted through the Access Point Angler Intercept Survey.  Commercial data is collected through trip ticket programs, port samplers, and logbook programs.  Currently, no SEDAR assessments of Gulf red grouper are scheduled between the present and 2025, but if the need for an assessment in the short-term arises, an assessment or interim analysis could be scheduled.

# CHAPTER 5. REGULATORY IMPACT REVIEW

## 5.1  Introduction

The National Marine Fisheries Service (NMFS) requires a Regulatory Impact Review (RIR) for all regulatory actions that are of public interest.  The RIR does three things: 1) it provides a comprehensive review of the level and incidence of impacts associated with a proposed or final regulatory action; 2) it provides a review of the problems and policy objectives prompting the regulatory proposals and an evaluation of the major alternatives that could be used to solve the problem; and, 3) it ensures that the regulatory agency systematically and comprehensively considers all available alternatives so that the public welfare can be enhanced in the most efficient and cost-effective way.  The RIR also serves as the basis for determining whether the regulations are a "significant regulatory action" under the criteria provided in Executive Order (E.O.) 12866.  This RIR analyzes the impacts this action would be expected to have on the red grouper component of the Gulf of Mexico (Gulf) reef fish fishery.

## 5.2  Problems and Objectives

The problems and objectives addressed by this action are discussed in Section 1.3.

## 5.3  Description of Fisheries

A description of the red grouper component of the Gulf reef fish fishery is provided in Section 3.4.

## 5.4  Impacts of Management Measures

### 5.4.1  Action 1:  Modify the Sector Allocations, Overfishing Limit (OFL), Acceptable Biological Catch (ABCError! Bookmark not defined.), and Annual Catch Limits (ACL) for Gulf of Mexico (Gulf) Red Grouper

A detailed analysis of the economic effects expected to result from this action is provided in Section 4.1.3.   The following discussion analyzes the expected economic effects of the preferred alternative relative to the No Action alternative.

Under **Preferred Alternative 3**, the red grouper commercial ACL and ACT would decrease by 0.63 million pounds (mp) gutted weight (gw) and 0.60 mp gw, respectively.  Using an average dockside price from 2018 of $4.83 (2019 dollars), the expected change in revenue would be -$2,898,000.  Applying the average net cash flow from 2014-2016 of 24% to the expected change in revenue provides the expected change in producer surplus (PS); for **Preferred Alternative 3**, the expected change in producer surplus (PS) would be -$695,520.  The expected change in revenue also reflects the expected change in red grouper purchases by dealers.  The expected

change in revenue from **Preferred Alternative 3** would be a decrease of 16.51% compared to the average of the total red grouper purchases from 2014-2018 ($17,557,924).  In addition, the proposed decrease in the ACL with **Preferred Alternative 3** would result in a decrease in ACT, when paired with Action 2 **Alternative 1**, and would then decrease the availability of annual individual fishing quotient (IFQ) allocation for sale, compared with **Alternative 1**, and the allocation price would be expected to increase in response.  **Preferred Alternative 3** would also be expected to result in an increase in red grouper share price, to reflect the expected supply of annual allocation available in the future.

Changes in red grouper harvests, as a result of the change in ACT, could result in additional economic effects because of the potential effects on ex-vessel prices due to less (or more) red grouper on the markets.  The potential effects to the consumer surplus (CS) are based on work on price flexibilities by Keithly and Tabarestani (2018).  The decrease in commercial ACL under **Preferred Alternative 3** would result in a decrease in commercial ACT, when paired with Action 2 **Alternative 1**, and is expected to result in a positive average price change ($0.51/lb) and a decrease in CS of $1,235,707.

Summing the annual changes in CS and PS for the commercial sector provides the net economic benefits for that sector in a given year.  Net economic benefits for the commercial sector from **Preferred Alternative 3**, relative to **Alternative 1**, would be expected to decrease by $1,931,227 in 2022.

Under **Preferred Alternative 3**, the red grouper recreational ACL would decrease by 0.37 mp gw.  The MRIP-FES equivalent of the recreational sector ACL for **Alternative 1** is used in this analysis, in order to be in the same currency as the recreational sector ACL for **Preferred Alternative 3**.  The evaluation of changes in economic value expected to result from ACL changes for the recreational sector is based on work by Carter and Liese (2012).  The CS value per fish for a second red grouper kept is estimated at $110.00 (2019 dollars).  A conversion factor of 1.05 between gutted weight and whole weight of red grouper is used (SEDAR 42 2015).  Estimated increases in economic value are approximated by dividing the change in ACL by 6.51 lbs ww, which is the average weight of a Gulf recreationally landed red grouper from 2015-2017 (SEFSC SRHS data, accessed March 2018; MRIP Intercept data available at: https://www.st.nmfs.noaa.gov/st1/recreational/MRIP_Survey_Data/), to obtain the increase in number of red grouper, which is then multiplied by the CS value per fish of $110.00.  The CS would be expected to decrease by $6,564,516 (2019 dollars) under **Preferred Alternative 3**, relative to **Alternative 1**.

The PS of the for-hire component of the recreational sector, being comprised of charter vessels and headboats, would be impacted by a change in the number of targeted trips.  In the long run, factors of production such as labor and capital can be used elsewhere in the economy, and so only short-term changes to PS are expected.  In the Gulf, headboat trips take a diverse set of anglers on a single vessel, generally advertising a diverse range of species to be caught.  Therefore, an assumption that no headboat trips would be lost due to a change in ACL is reasonable.  However, charter vessel trips that are targeting red grouper may be subject to cancellation by anglers and are the focus of the recreational sector PS analysis.  Using the predicated closure date based on the recreational ACL seen in Table 2.1.4 and the charter vessel

trips by 2-month wave from 2014-2018 target red grouper in Table 3.4.2.4, **Preferred Alternative 3** would be expected to result in 665 canceled charter trips.  The Net Cash Flow per Angler Trip (CFpA) from Souza and Liese (2019) of $136 (2017 dollars) is used to derive an upper bound for the short-term change in PS for charter vessels; Table 3.4.2.8 updates that estimate to $141 (2019 dollars).  The short-term change in PS expected to result from **Preferred Alternative 3** would be -$93,723.

Summing the annual changes in CS and PS for the recreational sector provides the net economic benefits for that sector in a given year.  Net economic benefits for the recreational sector from **Preferred Alternative 3**, relative to **Alternative 1**, would be expected to decrease by $6,658,239 in 2022.

Net economic benefits from the commercial and recreational sectors combined from **Preferred Alternative 3**, relative to **Alternative 1**, would be expected to decrease by $8,589,466 in 2022. Over a seven-year timeframe of 2022-2028, the expected change in the discounted net present value of economic benefits to both sectors would be -$55,120,248 using a 3% discount rate and -$49,531,496 using a 7% discount rate.  As an average annual net present value, these expected changes would be -$7,874,321 and -$7,075,928 with 3% and 7% discount rate, respectively. This analysis uses a seven-year timeframe in accordance with the time-based criteria for allocation review triggers in Appendix F, which lists a seven-year timeframe for commercial and recreational allocations of red grouper.

In addition to the cost-benefit analysis, **Preferred Alternative 3** in Action 1 is expected to result in reduced gross revenues in the commercial sector, which would be expected to reduce economic impacts in the onshore sector (e.g., dealers and processors) and related industries (e.g., grocers and restaurants).  More specifically, **Preferred Alternative 3** in Action 1 is expected to result in an annual gross revenue reduction of approximately $2.898 million in the Gulf of Mexico harvesting sector in 2019$, or $2.848 million in 2018$.[52]  Based on the model used to estimate the average annual economic impacts of the commercial sector for red grouper, as illustrated in Table 3.4.1.24, the expected decrease in annual gross revenue in the commercial sector is expected to decrease employment, income, total value added, and output by 365 jobs, $10.37 million, $14.65 million, and $28.24 million in 2018$, respectively.

**Preferred Alternative 3** in Action 1 is also expected to result in fewer target trips for red grouper by charter vessels, which would be expected reduce spending on various goods and services needed to conduct charter fishing trips and reduce the economic impacts resulting from those expenditures.  This assumes the income that would have been spent on red grouper target trips by charter vessels is not spent on other goods and services unrelated to charter fishing (e.g., tourists choose not to spend that income on other activities such as site-seeing tours).  **Preferred Alternative 3** in Action 1 is expected to result in a reduction of 665 red grouper target trips by charter vessels.  Based on the model used to estimate the average annual economic impacts of the recreational sector for red grouper, as illustrated in Table 3.4.2.9, the expected decrease in red grouper target trips by charter vessels is expected to decrease employment, income, total

[52] The commercial and recreational economic impact models have not yet been updated to generate estimates in 2019$.

value added, and output by 4 jobs, $132,000, $226,000, and $379,000 in 2018$, respectively. All of these impacts are expected to occur in Florida.

## 5.4.2  Action 2 – Modify the Gulf Red Grouper Annual Catch Targets (ACT)

A detailed analysis of the economic effects expected to result from this action is provided in Section 4.2.3.  The following discussion analyzes the expected economic effects of the preferred alternative relative to the No Action alternative.

**Preferred Alternative 3** would retain the current commercial buffer of 5% between the ACL and ACT.  Therefore, no additional economic effects to the commercial sector would be expected under **Preferred Alternative 3**, in comparison to **Alternative 1**.

**Preferred Alternative 3** would modify the recreational buffer between the ACL and ACT from 8%, currently, to 9%.  Of note, any economic effects to the recreational sector from Action 2 would only be expected to result if the recreational sector's post-season accountability measure (AM) is triggered, requiring the recreational sector to be managed to the ACT instead of the ACL.  The ACT that would result from Action 1 **Preferred Alternative 3** when paired with Action 2 **Alternative 1** would be 1.59 mp gw.  The ACT would further decrease when Action 1 **Preferred Alternative 3** is paired with Action 2 **Preferred Alternative 3** to 1.57 mp gw, and this shift from 1.59 mp gw to 1.57 mp gw is the focus of the Action 2 analysis.  When paired with Action 1 **Preferred Alternative 3**, the change in ACT under Action 2 **Preferred Alternative 3** compared to Action 2 **Alternative 1** is -0.02 mp gw.  The evaluation of changes in economic value expected to result from ACL changes for the recreational sector is based on work by Carter and Liese (2012).  The CS value per fish for a second red grouper kept is estimated at $110.00 (2019 dollars).  A conversion factor of 1.05 between gutted weight and whole weight of red grouper is used (SEDAR 42 2015).  Estimated increases in economic value are approximated by dividing the change in ACL by 6.51 lbs ww, which is the average weight of a Gulf recreationally landed red grouper from 2015-2017 (SEFSC SRHS data, accessed March 2018; MRIP Intercept data available at: https://www.st.nmfs.noaa.gov/st1/recreational/MRIP_Survey_Data/), to obtain the increase in number of red grouper, which is then multiplied by the CS value per fish of $110.00.  When paired with Action 1 **Preferred Alternative 3**, the expected change in CS under Action 2 **Preferred Alternative 3** compared to Action 2 **Alternative 1** is -$354,839.

The PS of the for-hire component of the recreational sector, being comprised of charter vessels and headboats, would be impacted by a change in the number of targeted trips.  In the long run, factors of production such as labor and capital can be used elsewhere in the economy, and so only short-term changes to PS are expected.  In the Gulf, headboat trips take a diverse set of anglers on a single vessel, generally advertising a diverse range of species to be caught. Therefore, an assumption that no headboat trips would be lost due to a change in ACL would be reasonable.  However, charter vessel trips that are targeting red grouper may be subject to cancellation by anglers and are the focus of the recreational sector PS analysis.  Using the predicated closure date based on the recreational ACL seen in Table 2.1.4 and the charter vessel trips by 2-month wave from 2014-2018 target red grouper in Table 3.4.2.4, when paired with

Action 1 **Preferred Alternative 3**, the expected change in cancelled trips under Action 2 **Preferred Alternative 3** compared to Action 2 **Alternative 1** is -204.  The CFpA from Souza and Liese (2019) of $136 (2017 dollars) is used to derive an upper bound for the short-term change in PS for charter vessels; Table 3.4.2.8 updates that estimate to $141 (2019 dollars). When paired with Action 1 **Preferred Alternative 3**, the short-term change in PS expected under Action 2 **Preferred Alternative 3** compared to Action 2 **Alternative 1** is -$28,838.

Summing the annual changes in CS and PS for the recreational sector provides the net economic benefits for that sector in a given year.  When paired with Action 1 **Preferred Alternative 3**, net economic benefits for the recreational sector under Action 2 **Preferred Alternative 3** compared to Action 2 **Alternative 1** would decrease by $383,677 in 2022.

Over a seven-year time frame of 2022-2028, the expected change in the discounted net present value of economic benefits to the recreational sector (as no change is expected for the commercial sector) would be -$2,462,129 using a 3% discount rate and -$2,212,489 using a 7% discount rate.   As an average annual net present value, these expected changes would be -$351,733 and -$316,070 with 3% and 7% discount rate, respectively.  This analysis uses a seven-year timeframe in accordance with the time-based criteria for allocation review triggers in Appendix F, which lists a seven-year timeframe for commercial and recreational allocations of red grouper.

In addition to the cost-benefit analaysis, **Preferred Alternative 3** in Action 2 would be expected to reduce the number of target trips for red grouper by charter vessels if the post-season AM is triggered.  Specifically, an additional 204 target trips are expected to be canceled under this alternative if the post-season AM is triggered.  This reduction in target trips would be expected to lead to additional decreases in employment, income, total value added, and output of 1 job, $40,000, $69,000, and $116,000 in 2018$, respectively.  Thus, in total, the combination of these alternatives could reduce target trips for red grouper by charter vessels by 869 trips, and thereby decrease employment, income, total value added, and output by $172,000, $295,000, and $485,000 in 2018$, respectively.  Again, all of these impacts are expected to occur in Florida.

**Preferred Alternative 3** in Action 1 and **Preferred Alternative 3** in Action 2 are not expected to reduce the number of target trips for red grouper taken by anglers in the private recreational and shore modes, and therefore are not expected to reduce employment, income, total value added, or output resulting from those trips.  Unlike charter vessels, whose fishing activity is determined by the demand of the anglers who book trips with them, in terms of both desired species and timing, private recreational anglers are better able to change when they take trips that target red grouper (i.e., it is relatively easier for them to take trips targeting red grouper before a potential closure occurs). Further, unlike federally permitted charter vessels in Florida that have relatively few good substitute species to target in December when the recreational sector is expected to be closed under these alternatives, it is assumed that private anglers will still have a number of species to target at that time of year, and therefore are much better able to change their target species if necessary.

## 5.5  Public and Private Costs of Regulations

The preparation, implementation, enforcement, and monitoring of this or any federal action involves the expenditure of public and private resources which can be expressed as costs associated with the regulations.  Costs to the private sector are discussed in Section 5.4. Estimated public costs associated with this action include:

Council costs of document preparation, meetings, public hearings, and information dissemination…………………………………………………………………………$81,140

NMFS administrative costs of document preparation, meetings and review …...........................................................................$22,537

TOTAL …...................................................................................................................$103,677

This action is not expected to result in any changes in law enforcement costs.  Any enforcement duties associated with this action would be expected to be covered under routine enforcement costs rather than an expenditure of new funds.  Council and NMFS administrative costs directly attributable to this amendment and the rulemaking process will be incurred prior to the effective date of the final rule implementing this amendment.

## 5.6  Net Benefits of the Regulatory Action

It is important to specify the time period being considered when evaluating benefits and costs. According to the Office of Management and Budget's Frequently Asked Questions regarding Circular A-4,[53] "When choosing the appropriate time horizon for estimating costs and benefits, agencies should consider how long the regulation being analyzed is likely to have resulting effects.  The time horizon begins when the regulatory action is implemented and ends when those effects are expected to cease.  Ideally, analysis should include all future costs and benefits. Here as elsewhere, however, a 'rule of reason' is appropriate, and the agency should consider for how long it can reasonably predict the future and limit its analysis to this time period.  Thus, if a regulation has no predetermined sunset provision, the agency will need to choose the endpoint of its analysis on the basis of a judgment about the foreseeable future.  For most agencies, a standard time period of analysis is 10 to 20 years."

For current purposes, the reasonably "foreseeable future" is considered to be the next 7 years (2022-2028).  The reason that this analysis uses a seven-year timeframe is to serve in accordance with the time-based criteria for allocation review triggers in Appendix F, which lists a seven-year timeframe for commercial and recreational allocations of red grouper.  Therefore, it stands to reason that a review of the commercial and recreational allocations of red grouper will commence in 2028.

---

[53] See p. 4 at https://obamawhitehouse.archives.gov/sites/default/files/omb/assets/OMB/circulars/a004/a-4_FAQ.pdf

For Action 1, net economic benefits from the commercial and recreational sectors combined from **Preferred Alternative 3**, relative to **Alternative 1**, would be expected to decrease by $8,589,466 in 2022.  Over a seven-year timeframe of 2022-2028, the expected change in the discounted net present value of economic benefits to both sectors would be -$55,120,248 using a 3% discount rate and -$49,531,496 using a 7% discount rate.  As an average annual net present value, these expected changes would be -$7,874,321 and -$7,075,928 with 3% and 7% discount rate, respectively.  When paired with Action 1 **Preferred Alternative 3**, net economic benefits for the recreational sector under Action 2 **Preferred Alternative 3** compared to Action 2 **Alternative 1** would decrease by $383,677 in 2022.  Over a seven-year timeframe of 2022-2028, the expected change in the discounted net present value of economic benefits to the recreational sector (as no change is expected for the commercial sector compared to Action 2 **Alternative 1**) would be -$2,462,129 using a 3% discount rate and -$2,212,489 using a 7% discount rate.  As an average annual net present value, these expected changes would be -$351,733 and -$316,070 with 3% and 7% discount rate, respectively.

The non-discounted public costs resulting from the regulation are $103,677.  The $103,677 in costs resulting from the amendment and the associated rulemaking process should not be discounted as they will be incurred prior to the effective date of the final rule.

Based on this information, this regulatory action is expected to decrease net benefits to the Nation.

## 5.7  Determination of Significant Regulatory Action

Pursuant to E.O. 12866, a regulation is considered a "significant regulatory action" if it is likely to result in:  1) an annual effect of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local, or tribal governments or communities; 2) create a serious inconsistency or otherwise interfere with an action taken or planned by another agency; 3) materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights or obligations of recipients thereof; or 4) raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in this executive order (E.O). Based on the information in Sections 5.4-5.5, the costs and benefits resulting from this regulatory action are not expected to meet or exceed the $100 million threshold, and thus this action has been determined to not be economically significant for the purposes of E.O. 12866.

# CHAPTER 6. INITIAL REGULATORY FLEXIBILITY ACT ANALYSIS

## 6.1 Introduction

The purpose of the Regulatory Flexibility Act (RFA) is to establish a principle of regulatory issuance that agencies shall endeavor, consistent with the objectives of the rule and of applicable statutes to fit regulatory and informational requirements to the scale of businesses, organizations, and governmental jurisdictions subject to regulation. To achieve this principle, agencies are required to solicit and consider flexible regulatory proposals and to explain the rationale for their actions to assure such proposals are given serious consideration. The RFA does not contain any decision criteria; instead the purpose of the RFA is to inform the agency, as well as the public, of the expected economic effects of various alternatives contained in the regulatory action and to ensure the agency considers alternatives that minimize the expected economic effects on small entities while meeting the goals and objectives of the applicable statutes (e.g., the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act)).

With certain exceptions, the RFA requires agencies to conduct an initial regulatory flexibility analysis (IRFA) for each proposed rule. The IRFA is designed to assess the effects various regulatory alternatives would have on small entities, including small businesses, and to determine ways to minimize those effects. An IRFA is primarily conducted to determine whether the proposed regulatory action would have a significant economic effect on a substantial number of small entities. In addition to analyses conducted for the Regulatory Impact Review (RIR), the IRFA provides: 1) a description of the reasons why action by the agency is being considered; 2) a succinct statement of the objectives of, and legal basis for, the proposed regulatory action; 3) a description and, where feasible, an estimate of the number of small entities to which the proposed regulatory action will apply; 4) a description of the projected reporting, record-keeping, and other compliance requirements of the proposed regulatory action, including an estimate of the classes of small entities which will be subject to the requirements of the report or record; 5) an identification, to the extent practicable, of all relevant federal rules, which may duplicate, overlap, or conflict with the proposed rule; and 6) a description of any significant alternatives to the proposed regulatory action which accomplish the stated objectives of applicable statutes and would minimize any significant economic effects of the proposed regulatory action on small entities.

In addition to the information provided in this section, additional information on the expected economic effects of the proposed action is included in the RIR.

Amendment 53 - Red Grouper                155        Chapter 6.  Initial Regulatory Flexibilty
Allocations and Annual Catch Levels and Targets                              Act Analysis

0003628

## 6.2  Statement of the need for, objectives of, and legal basis for the rule

A discussion of the reasons why action by the agency is being considered is provided in Section 1.1.  The purposes of this proposed regulatory action are to revise the red grouper allocation between the commercial and recreational sectors using the best scientific information available and to modify the allowable harvest of red grouper based on results of the recent stock assessment and subsequent overfishing limit (OFL) and allowable biological catch (ABC)**Error! Bookmark not defined.** recommendations from the Gulf of Mexico Fishery Management Council's (Council) scientific and statistical committee (SSC).  The objective of this proposed regulatory action is to use the best scientific information available to establish Gulf red grouper sector allocations, annual catch limits (ACLs), and annual catch targets (ACTs), thereby ensuring that the sector ACLs accurately reflect the recreational and commercial sectors' historical participation and the recreational ACL is consistent with data used to monitor recreational landings and trigger accountability measures (AM).  The Magnuson-Stevens Act serves as the legal basis for the proposed regulatory action.  All monetary estimates in the following analysis are in 2019 dollars.

## 6.3  Description and estimate of the number of small entities to which the proposed action would apply

This proposed regulatory action would revise the sector allocations of the total ACL for Gulf of Mexico (Gulf) red grouper from 76% for the commercial sector and 24% for the recreational sector to 59.3% for the commercial sector and 40.7% for the recreational sector.  The current OFL, ABC, and total ACL are 14.16 million pounds (mp) gutted weight (gw), 13.92 mp gw, and 4.16 mp gw, respectively.  The recreational portion of these values are based on Marine Recreational Information Program (MRIP) Coastal Household Telephone Survey (CHTS) data.  This proposed regulatory action would change the OFL and ABC to 4.66 mp gw and 4.26 mp gw, consistent with the results of the most recent stock assessment and the recommendations of the Council's SSC, and set the total ACL equal to the ABC of 4.26 mp gw.  The recreational portion of these values are based on MRIP Fishing Effort Survey (FES) data.  Applying the new sector allocations would reduce the commercial ACL from 3.16 mp gw to 2.53 mp gw and the recreational ACL from 2.1 mp gw in MRIP-FES units (or 1 mp gw in MRIP-CHTS units) to 1.73 mp gw in MRIP-FES units.  This proposed regulatory action would retain the current 5% buffer between the commercial ACL and ACT (quota), resulting in a reduction of the commercial ACT (quota) from 3 mp gw to 2.4 mp gw.  It would also increase the buffer between the recreational ACL and ACT from 8% to 9%, and thereby reduce the recreational ACT from 1.59 mp gw to 1.57 mp gw given the proposed reduction in the recreational ACL.  As a result, this proposed regulatory action is expected to directly regulate commercial fishing businesses that possess Gulf red grouper (RG) shares in the Grouper-Tilefish (GT) Individual Fishing Quota (IFQ) program and for-hire fishing businesses that target red grouper.

The commercial red grouper quota is allocated annually based on the percentage of RG shares in each IFQ account (e.g., if an account possesses 1% of the RG shares and the commercial quota is

1 mp, then that account would receive 10,000 pounds of commercial red grouper quota). Although it is common for a single IFQ account with RG shares to be held by a single business, some businesses have multiple IFQ accounts with RG shares. As of February 19, 2020, 495 IFQ accounts held RG shares. These accounts and RG shares were owned by 436 businesses. Thus, it is assumed this proposed regulatory action would directly regulate 436 commercial fishing businesses.

A valid charter-headboat (for-hire) Gulf reef fish vessel permit is required to legally harvest red grouper in the Gulf of Mexico (Gulf). NMFS does not possess complete ownership data regarding businesses that hold charter-headboat (for-hire) Gulf reef fish vessel permits, and thus potentially harvest red grouper. Therefore, it is not currently feasible to accurately determine affiliations between vessels and the businesses that own them. As a result, for purposes of this analysis, it is assumed each for-hire vessel is independently owned by a single business, which is expected to result in an overestimate of the actual number of for-hire fishing businesses directly regulated by this proposed regulatory action.

NMFS also does not have data indicating how many for-hire vessels actually harvest Gulf red grouper in a given year. However, in 2019, there were 1,277 vessels with valid charter-headboat Gulf reef fish vessel permits. Further, Gulf red grouper is only targeted and almost entirely harvested in waters off the west coast of Florida. Of the 1,277 vessels with valid charter-headboat Gulf reef fish vessel permits, 799 were homeported in Florida. Of these permitted vessels, 60 are primarily used for commercial fishing rather than for-hire fishing purposes and thus are not considered for-hire fishing businesses. In addition, 48 of these permitted vessels are considered headboats. Headboats take a relatively large, diverse set of anglers to harvest a diverse range of species on a trip, and therefore do not typically target a particular species. Therefore, it is assumed that no headboat trips would be canceled, and thus no headboats would be directly affected as a result of this proposed regulatory action. However, charter vessels often target red grouper. Of the 799 vessels with valid charter-headboat Gulf reef fish vessel permits that are homeported in Florida, 691 vessels are charter vessels. Souza and Liese (2019) reported that 76% of charter vessels with valid charter-headboat permits in the Gulf were active in 2017 (i.e., 24% were not fishing). A charter vessel would only be directly affected by this proposed regulatory action if it is fishing. Given this information, our best estimate of the number of charter vessels that are likely to harvest Gulf red grouper in a given year is 525, and thus this proposed regulatory action is estimated to directly regulate 525 for-hire fishing businesses.

On December 29, 2015, NMFS issued a final rule establishing a small business size standard of $11 million in annual gross receipts (revenue) for all businesses primarily engaged in the commercial fishing industry (NAICS code 11411) for RFA compliance purposes only (80 FR 81194, December 29, 2015). In addition to this gross revenue standard, a business primarily involved in commercial fishing is classified as a small business if it is independently owned and operated, and is not dominant in its field of operations (including its affiliates). NMFS does not collect revenue data specific to commercial fishing businesses that have IFQ accounts; rather, revenue data is collected for commercial fishing vessels. It is not possible to assign revenues earned by commercial fishing vessels back to specific IFQ accounts and the businesses that possess them because quota is often transferred across many IFQ accounts before it is used by a vessel for harvesting purposes, and specific units of quota cannot be tracked. However, from

Amendment 53 - Red Grouper                    157        Chapter 6.  Initial Regulatory Flexibilty
Allocations and Annual Catch Levels and Targets                            Act Analysis

0003630

2014 through 2018, the maximum annual gross revenue earned by a single vessel during this time was about $2.39 million in 2015.  The average gross revenue per vessel was about $143,000 in that year.  By 2018, the maximum and average gross revenue per vessel had decreased to about $1.04 million and $96,000, respectively.  Based on this information, all commercial fishing businesses directly regulated by this proposed regulatory action are determined to be small entities for the purpose of this analysis.

For other industries, the Small Business Administration (SBA) has established size standards for all major industry sectors in the U.S., including for-hire businesses (NAICS code 487210).  A business primarily involved in for-hire fishing is classified as a small business if it is independently owned and operated, is not dominant in its field of operation (including its affiliates), and has annual receipts (revenue) not in excess of $8 million for all its affiliated operations worldwide.  The maximum annual gross revenue for a single headboat in the Gulf was about $1.38 million in 2017 (D. Carter, pers. comm.).  According to Savolainen, et al. (2012), on average, annual gross revenue for headboats in the Gulf is about three times greater than annual gross revenue for charter vessels, reflecting the fact that businesses that own charter vessels are typically smaller than businesses that own headboats.  Based on this information, all for-hire fishing businesses directly regulated by this proposed regulatory action are determined to be small businesses for the purpose of this analysis.

## 6.4  Description of the projected reporting, record-keeping and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for the preparation of the report or records

This proposed regulatory action would not establish any new reporting or record-keeping requirements.

## 6.5  Identification of all relevant federal rules, which may duplicate, overlap or conflict with the proposed rule

No duplicative, overlapping, or conflicting federal rules have been identified.

## 6.6  Significance of economic effects on small entities

<u>Substantial number criterion</u>

If implemented, this proposed regulatory action is expected to directly regulate 436 of the 532 businesses with IFQ accounts, or approximately 82% of those commercial fishing businesses.  Further, this proposed regulatory action is expected to directly regulate 525 of the 1,187 for-hire fishing businesses valid charter/headboat permits in the Gulf reef fish fishery, or approximately

Amendment 53 - Red Grouper                    158            Chapter 6.  Initial Regulatory Flexibilty
Allocations and Annual Catch Levels and Targets                              Act Analysis

0003631

44% of those for-hire fishing businesses.  All directly regulated commercial and for-hire fishing businesses have been determined, for the purpose of this analysis, to be small entities.  Based on this information, the proposed regulatory action is expected to affect a substantial number of small businesses.

Significant economic effects

The outcome of "significant economic impact" can be ascertained by examining two factors: disproportionality and profitability.

Disproportionality:  Do the regulations place a substantial number of small entities at a significant competitive disadvantage to large entities?

All entities directly regulated by this regulatory action have been determined to be small entities.  Thus, the issue of disproportionality does not arise in the present case.

Profitability:  Do the regulations significantly reduce profits for a substantial number of small entities?

Because revenue and cost data are not directly collected for commercial fishing businesses that own RG shares are expected to be directly regulated by this proposed regulatory action, direct estimates of their economic profits are not available.  However, economic theory suggests that annual allocation (quota) prices should reflect expected annual economic profits, which allows economic profits to be estimated indirectly.  The 436 commercial fishing businesses that own RG shares, and therefore receive RG quota at the beginning of each calendar year, also own shares and receive quota in the other IFQ share categories i.e., red snapper (RS), gag grouper (GG), shallow water grouper (SWG), deep-water grouper (DWG), and tilefish (TF).  These businesses earn economic profits because of their ownership of these shares as well their RG shares.  However, economic profits are only realized if the quota allocated to these businesses with shares is actually used for harvesting purposes (i.e., no economic profits will accrue unless the quota results in the production and sale of seafood).  Because the average annual commercial landings of RG from 2014-2018 and the proposed RG commercial quota are almost identical, it is assumed that all of the RG commercial quota will be harvested in the foreseeable future.  Similarly, practically all of the commercial RS quota has been used for harvesting in recent years, and so it is assumed that all of the commercial RS quota allocated to these businesses will be harvested in the foreseeable future.  However, based on 2015-2019 data, it is expected that only 84% of the DWG commercial quota, 50% of the GG commercial quota, 35% of the SWG commercial quota, and 78% of the TF commercial quota allocated to these businesses will be used for harvesting in the foreseeable future.  Given these quota utilization rates in combination with average annual allocation prices in 2019 and annual commercial quotas in 2020 by share category (see Table 3.4.1.14), total economic profits for commercial fishing businesses with RG shares are estimated to be at least $18.61 million.  This estimate does not account for any economic profits that may accrue to commercial fishing businesses that own RG shares and also harvest non-IFQ species.  Such profits are likely to be small because harvest of IFQ species accounts for around 85% of commercial IFQ vessels' average annual gross revenue, and economic profits from the harvest of non-IFQ species tend to be much smaller than those from

Amendment 53 - Red Grouper                      159          Chapter 6.  Initial Regulatory Flexibilty
Allocations and Annual Catch Levels and Targets                              Act Analysis

0003632

IFQ species (C. Liese, pers. communication, April 9, 2019).  Given that there are 436 commercial fishing businesses that own RG shares, the average annual expected economic profit per commercial fishing business is at least $42,700.

However, most of these economic profits (82%) are the result of owning RS shares.  Only approximately $1.77 million (or 9.5%) of their economic profits are due to the ownership of RG shares.  This proposed regulatory action is only expected to affect economic profits from the ownership of RG shares.  Specifically, the action that proposes to reduce the OFL, ABC, total ACL, and the commercial sector allocation of the total ACL results in a reduction of the red grouper commercial ACL from 3.16 mp gw to 2.53 mp gw and the commercial red grouper ACT (quota) from 3 mp gw to 2.4 mp gw.  Given an annual allocation price of $.59/lb in 2019 for RG, this reduction in the commercial red grouper quota is expected to reduce economic profits to these commercial fishing businesses by $354,000, or about $812 per business.  Thus, economic profits are expected to be reduced by no more than 1.9% on average per commercial fishing business.

According to Savolainen, et al. (2012), which contains the most recent estimates of economic returns in the for-hire sector, average annual economic profits are $26,514 per charter vessel.  The action that modifies the sectors allocations and the OFL, ABC, and total ACL, results in a reduction of the red grouper recreational ACL from 2.1 mp gw in MRIP-FES units to 1.73 mp gw in MRIP-FES units.  The ACL reduction is expected to reduce the recreational season length by 12 days, and thereby cause the number of trips targeting red grouper on charter vessels to decrease by 665 angler trips.  Net Cash Flow per Angler Trip (CFpA) is the best available estimate of profit per angler trip by charter vessels.  According to Souza and Liese (2019), CFpA on charter vessels is estimated to be $141 per angler trip.  Thus, the estimated reduction in charter vessel profits from this action is expected to be $93,723, or $179 per vessel.

The action that proposes to increase the buffer between the recreational ACL and recreational ACT from 8% to 9% would decrease the recreational ACT from 1.59 mp gw to 1.57 mp gw.  The ACT reduction is only germane if the recreational sector exceeds its ACL in the future, as that would trigger the post-season AM, causing the recreational sector to be constrained to the recreational ACT rather than the recreational ACL.  Average annual landings in the recreational sector from 2016 through 2019 are greater than the proposed recreational ACL, and so it is possible that the post-season AM may be triggered, causing the recreational sector, including the for-hire component, to be constrained to the ACT.   If the post-season AM is triggered, the additional reduction in the recreational season length caused by this action is estimated to be 4 days, which would be expected to cause the number of trips targeting red grouper on charter vessels to decrease by an additional 204 angler trips.  Thus, if the post-season AM is triggered, the estimated reduction in charter vessel profits from this action would be $28,764, or $55 per vessel.

Based on the above, the total reduction in profits for charter vessels from this proposed regulatory action is expected to be no more than $122,487, or $234 per charter vessel.  Thus, profits would potentially be reduced by approximately 0.9% on average per for-hire fishing business.

Amendment 53 - Red Grouper                    160        Chapter 6.  Initial Regulatory Flexibilty
Allocations and Annual Catch Levels and Targets                          Act Analysis

0003633

## 6.7  Description of significant alternatives to the proposed action and discussion of how the alternatives attempt to minimize economic impacts on small entities

**To be completed after Council takes final action**

Amendment 53 - Red Grouper                    161            Chapter 6.  Initial Regulatory Flexibilty
Allocations and Annual Catch Levels and Targets                              Act Analysis

0003634

# CHAPTER 7. LIST OF AGENCIES, ORGANIZATIONS, AND PERSONS TO WHOM A COPY OF THE EIS IS SENT

## AGENCIES and ORGANIZATIONS CONSULTED

National Marine Fisheries Service
- Southeast Fisheries Science Center
- Southeast Regional Office
- Office for Law Enforcement
National Oceanic Atmospheric Administration General Counsel
Environmental Protection Agency (Region 4 and 6)
United States Coast Guard
United States Fish and Wildlife Services
Department of Interior, Office of Environmental Policy and Compliance
Department of State, Office of Marine Conservation
Marine Mammal Commission
Texas Parks and Wildlife Department
Alabama Department of Conservation and Natural Resources/Marine Resources Division
Louisiana Department of Wildlife and Fisheries
Mississippi Department of Marine Resources
Florida Fish and Wildlife Conservation Commission

# CHAPTER 8. LIST OF PREPARERS AND REVIEWERS

**PREPARERS**

| Name | Expertise | Responsibility | Agency |
|------|-----------|----------------|--------|
| Matthew Freeman | Economist | Co-Team Lead – Amendment development, economic effects, Regulatory Impact Review, cumulative effects analysis | GMFMC |
| Peter Hood | Fishery biologist | Co-Team Lead – Amendment development, biological environment, cumulative effects**Error! Bookmark not defined.** analysis | SERO |
| Ava Lasseter | Anthropologist | Social effects | GMFMC |
| Mike Travis | Economist | Economic environment | SERO |
| Mike Jepson | Anthropologist | Social analyses | SERO |
| Daniel Luers | Fishery biologist | Biological environment, biological effects, administrative environment, administrative effects, cumulative effects analysis | SERO |
| Jeff Pulver | Fishery biologist/data analyst | Data analyst | SERO |
| Skyler Sagarese | Fishery biologist | Assessment analyst | SEFSC |

**REVIEWERS** (Preparers also serve as reviewers)

| Name | Expertise | Responsibility | Agency |
|------|-----------|----------------|--------|
| Noah Silverman | Natural resource management specialist | National Environmental Policy Act**Error! Bookmark not defined.** review | SERO |
| Mara Levy | Attorney | Legal review | NOAA GC |
| John Froeschke | Fishery biologist | Review | GMFMC |
| Assane Diagne | Economist | Review | GMFMC |
| Ryan Rindone | Fishery biologist | Review | GMFMC |
| Jennifer Lee | Protected resource specialist | Protected resources review | SERO |
| Scott Sandorf | Regulatory writer | Regulatory preparation and review | SERO |
| Carrie Simmons | Fishery biologist | Review | GMFMC |
| Larry Perruso | Economist | Review | SEFSC |
| John McGovern | Fishery biologist | Review | SERO |

GMFMC = Gulf of Mexico Fishery Management Council; NOAA GC = National Oceanic and Atmospheric Administration General Counsel; SEFSC = Southeast Fisheries Science Center; SERO = Southeast Regional Office of the National Marine Fisheries Service

Amendment 53 - Red Grouper   163   Chapter 8.  List of
Allocations and Annual Catch Levels and Targets   Preparers and Reviewers

0003636

# CHAPTER 9. REFERENCES

Abbott, B, A. Siger, and M. Spiegelstein. 1975. Toxins from the blooms of *Gymnodinium breve*. In:  LoCicero, V.R. (ed). Proceedings of the first international conference on toxic dinoflagellate blooms. Massachusetts Science and Technology Foundation, Wakefield, Massachusetts

Abbott, J. and D. Willard. 2017. Rights-based management for recreational for-hire fisheries: Evidence from a policy trial.  Fisheries Research, 196: 106-116.

Baden, D. 1988. Public health problems of red tides. In: Tu, A.T. (ed) Handbook of natural toxins, book 3. Marcel Dekker, New York, p 259–277

Barnette, M. C. 2001. A review of the fishing gear utilized within the Southeast Region and their potential impacts on essential fish habitat**Error! Bookmark not defined.**. NOAA Technical Memorandum. NMFS-SEFSC-449. National Marine Fisheries Service. St. Petersburg, Florida.

Baustian, M. M. and N. N. Rabalais. 2009. Seasonal composition of benthic macroinfauna exposed to hypoxia in the northern Gulf of Mexico. Estuaries and Coasts. 32:975–983.

Burton, M. 2008. Southeast U.S. Continental Shelf, Gulf of Mexico, and U.S. Caribbean. In Osgood, K. E. (ed). Climate Impacts on U.S. Living Marine Resources: National Marine Fisheries Service Concerns, Activities and Needs. U.S. Dep. Commerce, NOAA Tech. Memo. NMFSF/ SPO-89, pp 31-43.

Carls, M. G., S. D. Rice, and J. E. Hose. 1999. Sensitivity of fish embryos to weathered crude oil: Part I. Low-level exposure during incubation causes malformations, genetic damage, and mortality in larval Pacific herring (*Clupea pallasi*). Environmental Toxicology and Chemistry 18(3): 481–493.

Carter, D.W. and C. Liese. 2012. The Economic Value of Catching and Keeping or Releasing Saltwater Sport Fish in the Southeast USA. North American Journal of Fisheries Management, 32:4, 613-625. http://dx.doi.org/10.1080/02755947.2012.675943

Coleman, F.C., C.C. Koenig, and L.A. Collins.  1996.  Reproductive styles of shallow-water groupers (Pisces: Serranidae) in the eastern Gulf of Mexico and the consequences of fishing on spawning aggregations.  Environmental Biology of Fishes 47: 129-141.

Coleman, F. C., C. C. Koenig, K. M. Scanlon, S. Heppell, S. Heppell, and M. W. Miller.  2010. Benthic habitat modification through excavation by red grouper, *Epinephelus morio*, in the Northeastern Gulf of Mexico.  The Open Fish Science Journal, 3:1-15

Craig, J. K. 2012. Aggregation on the edge: effects of hypoxia avoidance on the spatial distribution of brown shrimp and demersal fishes in the Northern Gulf of Mexico. Marine Ecology Progress Series 445: 75–95.

Fischer, A. J., M. S. Baker, Jr., and C. A. Wilson. 2004. Red snapper (*Lutjanus campechanus*) demographic structure in the northern Gulf of Mexico based on spatial patterns in growth rates and morphometrics. Fishery Bulletin 102:593–603.

Fitzhugh, G.R., H.M. Lyon, W.T. Walling, C.F. Levins, and L.A. Lombardi-Carlson. 2006.  An update of Gulf of Mexico red grouper reproductive data and parameters for SEDAR 12.  Draft working document for SEDAR 12 Data Workshop. 17p.  SEDAR 12-DW-04.

Fodrie, F. J., K. L. Heck, Jr., S. P. Powers, W. M. Graham, and K. L. Robinson.  2010.  Climate-related, decadal-scale assemblage changes of seagrass-associated fishes in the northern Gulf of Mexico.  Global Change Biology, 16(1):48-59.

Foster, J., F.J. Breidt, and J.D. Opsomer. 2018. APAIS data calibration methodology report. 10 pp. https://www.fisheries.noaa.gov/webdam/download/68183814

Gomez, E.D., A.C. Alcala, and H.T. Yap. 1987. Other fishing methods destructive to coral. pp. 65-75 in Human Impacts on Coral Reefs: Facts and Recommendations. Antenne Museum, French Polynesia.

GMFMC. 1981. Environmental impact statement and fishery management plan for the reef fish resources of the Gulf of Mexico and environmental impact statement. Gulf of Mexico Fishery Management Council, Tampa, Florida. 328 pp. https://gulfcouncil.org/wpcontent/uploads/FISHERY%20MANAGEMENT/REEF%20FISH/RF%20FMP%20and%20EIS%201981-08.pdf

GMFMC. 1989. Amendment 1 to the reef fish fishery management plan includes environmental assessment, regulatory impact review, and regulatory flexibility analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 356 pp. https://gulfcouncil.org/wpcontent/uploads/FISHERY%20MANAGEMENT/REEF%20FISH/RF%20Amend-01%20Final%201989-08-rescan.pdf

GMFMC. 2003. Corrected amendment for a charter/vessel headboat permit moratorium amending the fishery management plans for: reef fish (Amendment 20) and coastal migratory pelagics (Amendment 14) including environmental assessment, regulatory impact review, and initial regulatory flexibility act. Gulf of Mexico Fishery Management Council, Tampa, Florida. http://www.gulfcouncil.org/Beta/GMFMCWeb/downloads/CBamendmentFINAL-corrected.pdf

GMFMC. 2004a. Final environmental impact statement for the generic essential fish habitat amendment to the following fishery management plans of the Gulf of Mexico: Shrimp fishery of the Gulf of Mexico, red drum fishery of the Gulf of Mexico, reef fish fishery of the Gulf of Mexico, stone crab fishery of the Gulf of Mexico, coral and coral reef fishery of the Gulf of Mexico, spiny lobster fishery of the Gulf of Mexico and South Atlantic, coastal migratory pelagic resources of the Gulf of Mexico and South Atlantic. Gulf of Mexico Fishery Management Council. Tampa, Florida. 682 pp. https://gulfcouncil.org/wp-content/uploads/March-2004-Final-EFH-EIS.pdf

GMFMC. 2004b. Final amendment 22 to the reef fish fishery management plan to set red snapper sustainable fisheries act targets and thresholds, set a rebuilding plan, and establish bycatch reporting methodologies for the reef fish fishery, includes final supplemental environmental impact statement and regulatory impact review. Gulf of Mexico Fishery Management Council. Tampa, Florida. 291 pp. https://gulfcouncil.org/wpcontent/uploads/FISHERY%20MANAGEMENT/REEF%20FISH/Amend%2022%20Final%2070204.pdf

GMFMC. 2004c. Final amendment 23 to the reef fish fishery management plan to set vermilion snapper sustainable fisheries act targets and thresholds and to establish a plan to end overfishing and rebuild the stock, including a final supplemental environmental impact statement and regulatory impact review. Gulf of Mexico Fishery Management Council. Tampa, Florida. 296 pp. https://gulfcouncil.org/wpcontent/uploads/FISHERY%20MANAGEMENT/REEF%20FISH/VS%2023%20Oct%20Final%2010-21-04%20with%20Appendix%20E.pdf

GMFMC. 2005. Final ggeneric amendment 3 for addressing essential fish habitat requirements, habitat areas of particular concern, and adverse effects of fishing in the following fishery management plans of the Gulf of Mexico: Shrimp fishery of the Gulf of Mexico, United States waters, red drum fishery of the Gulf of Mexico, reef fish fishery of the Gulf of Mexico, coastal migratory pelagic resources (mackerels) in the Gulf of Mexico and South Atlantic, stone crab fishery of the Gulf of Mexico, spiny lobster fishery of the Gulf of Mexico and South Atlantic, coral and coral reefs of the Gulf of Mexico. Gulf of Mexico Fishery Management Council, Tampa, Florida. 106 pp. https://gulfcouncil.org/wp-content/uploads/March-2005-FINAL3-EFH-Amendment.pdf

GMFMC. 2007. Final amendment 27 to the reef fish fishery management plan and amendment 14 to the shrimp fishery management plan, including supplemental environmental impact statement, regulatory impact review, and regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 480 pp. https://gulfcouncil.org/wpcontent/uploads/FISHERY%20MANAGEMENT/REEF%20FISH/Final%20RF%20Amend%2027-%20Shrimp%20Amend%2014.pdf

GMFMC. 2008a. Amendment 29 to the reef fish fishery management plan – effort management in the commercial grouper and tilefish fisheries, including final environmental impact statement and regulatory impact review. Gulf of Mexico Fishery Management Council. Tampa, Florida. 88 pp. https://gulfcouncil.org/wpcontent/uploads/FISHERY%20MANAGEMENT/REEF%20FISH/Final%20Reef%20Fish%20Amdt%2029-Dec%2008.pdf

GMFMC. 2008b. Final reef fish amendment 30A: Greater amberjack – revise rebuilding plan, accountability measures; gray triggerfish – establish rebuilding plan, end overfishing, accountability measures, regional management, management thresholds and benchmarks, including supplemental environmental impact statement, regulatory impact review, and

regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 346 pp.
http://www.gulfcouncil.org/docs/amendments/Amend-30A-Final%20208.pdf

GMFMC. 2008c. Final amendment 30B: gag – end overfishing and set management thresholds and targets. Red grouper – set optimum yield, TAC, and management measures, time/area closures, and federal regulatory compliance including environmental impact statement, regulatory impact review, and regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 462 pp.
https://gulfcouncil.org/wpcontent/uploads/FISHERY%20MANAGEMENT/REEF%20FISH/Final%20Amendment%2030B%2010_10_08.pdf

GMFMC. 2010a. Final amendment 31 to the fishery management plan for reef fish resources in the Gulf of Mexico (revised) addresses bycatch of sea turtles in the bottom longline component of the Gulf of Mexico reef fish fishery, includes revised final environmental impact statement and regulatory impact review. Gulf of Mexico Fishery Management Council. Tampa, Florida. 305 pp.
https://gulfcouncil.org/wpcontent/uploads/FISHERY%20MANAGEMENT/REEF%20FISH/Final%20Amendment%2031%20-%20revised%20-%2002-2010.pdf

GMFMC.  2010b.  Regulatory amendment to the reef fish fishery management plan to set 2011 total allowable catch**Error! Bookmark not defined.** for red grouper and establish marking requirements for buoy gear.  Gulf of Mexico Fishery Management Council, Tampa, Florida.  125 p.

GMFMC. 2011a. Final generic annual catch limits/accountability measures amendment for the Gulf of Mexico Fishery Management Council's red drum, reef fish, shrimp, coral and coral reefs fishery management plans, including environmental impact statement, regulatory impact review, regulatory flexibility analysis, and fishery impact statement. Gulf of Mexico Fishery Management Council, Tampa, Florida. 406 pp.
https://gulfcouncil.org/wp-content/uploads/Final-Generic-ACL-AM-Amendment-September-9-2011-v.pdf

GMFMC. 2011b. Final reef fish amendment 32 – gag grouper – rebuilding plan, annual catch limits, management measures, red grouper – annual catch limits, management measures, and grouper accountability measures, including final environmental impact statement, regulatory impact review, regulatory flexibility analysis, and fishery impact statement. Gulf of Mexico Fishery Management Council, Tampa, Florida. 406 pp.
http://www.gulfcouncil.org/docs/amendments/Final%20RF32_EIS_October_21_2011[2].pdf

GMFMC. 2012a. Final amendment 38 to the fishery management plan for the reef fish resources of the Gulf of Mexico: Modifications to the shallow-water grouper accountability measures, including an environmental assessment, fishery impact statement, regulatory impact review, and regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 94 pp.
http://www.gulfcouncil.org/docs/amendments/Final%20Amendment%2038%2009-12-2012.pdf

GMFMC. 2012b. Final amendment 35 to the fishery management plan for the reef fish resources of the Gulf of Mexico:  Modifications to the greater amberjack rebuilding plan and adjustments to the recreational and commercial management measures, including an environmental assessment, fishery impact statement, regulatory impact review, and regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 226 pp. https://gulfcouncil.org/wpcontent/uploads/FISHERY%20MANAGEMENT/REEF%20FISH/Final_Amendment_35_Greater_Amberjack_Rebuilding_8_May_2012.pdf

GMFMC. 2012c. Final amendment 37 to the fishery management plan for the reef fish resources of the Gulf of Mexico: Modifications to the gray triggerfish rebuilding plan including adjustments to the annual catch limits and annual catch targets for the commercial and recreational sectors. Gulf of Mexico Fishery Management Council, Tampa, Florida. 193 pp. http://www.gulfcouncil.org/docs/amendments/Final_Reef_Fish_Amend_37_Gray_Triggerfish_12_06_12[1].pdf

GMFMC. 2012d. Framework action to set the 2013 gag recreational fishing season and bag limit and modify the February-March shallow-water grouper closed season. Gulf of Mexico Fishery Management Council, Tampa, Florida. 111 p. http://www.gulfcouncil.org/docs/amendments/2013GagRecreationalSeason.pdf

GMFMC. 2014a. Final amendment 40 to the fishery management plan for the reef fish resources of the Gulf of Mexico Recreational red snapper sector separation, including final environmental impact statement, fishery impact statement, regulatory impact review, and regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 304 pp. http://www.gulfcouncil.org/docs/amendments/RF%2040%20-%20Final%2012-17-2014.pdf

GMFMC. 2014b. Framework Action to Modify the Red Grouper Recreational Management Measures of the Reef Fish Management Plan for the Reef Fish Resources of the Gulf of Mexico. Gulf of Mexico Fishery Management Council, Tampa, Florida. 97 p.

GMFMC. 2015a. Final amendment 28 to the fishery management plan for the reef fish resources of the Gulf of Mexico: Red snapper allocation, including final environmental impact statement, fishery impact statement, regulatory impact review, and regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 328 pp. http://gulfcouncil.org/docs/amendments/Final%20Red%20Snapper%20Allocation%20-RF%20Amendment%2028.pdf

GMFMC. 2015b. Modifications to greater amberjack allowable harvest and management measures. Framework action to the fishery management plan for the reef fish resources of the Gulf of Mexico including environmental assessment, regulatory impact review, and regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council. Tampa, Florida. 145 pp. http://gulfcouncil.org/docs/amendments/Greater%20AJ%20FINAL%20VERSION%207-10-15.pdf

GMFMC. 2016a. Framework action to the fishery management plan for reef fish resources in the Gulf of Mexico, including environmental assessment, fishery impact statement, regulatory impact review, and regulatory flexibility act analysis. Adjust red grouper allowable harvest. Gulf of Mexico Fishery Management Council, Tampa, Florida. 117 pp.
http://gulfcouncil.org/docs/amendments/Red%20Grouper%20Allowable%20Harvest%20Framework%20Action%20060716%20final.pdf

GMFMC. 2016b. Final amendment 43 to the fishery management plan for the reef fish resources of the Gulf of Mexico, including environmental assessment, fishery impact statement, regulatory impact review, and regulatory flexibility act analysis. Hogfish stock definition, status determination criteria, annual catch limit, and size limit. Gulf of Mexico Fishery Management Council, Tampa, Florida. 164 pp.
http://gulfcouncil.org/docs/amendments/Final%20Amendment%2043%20-%20Hogfish_10-11-2016.pdf

GMFMC. 2017a. Final amendment 47 to the fishery management plan for the reef fish resources of the Gulf of Mexico: Establish a vermilion snapper MSY proxy and adjust the stock annual catch limit, including environmental assessment, fishery impact statement, regulatory impact review, and regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 146 pp.
http://gulfcouncil.org/wp-content/uploads/Final-Amendment-47-Vermilion-snapper-ACL-and-MSY-proxy.pdf

GMFMC. 2017b. Final amendment 36A to the fishery management plan for the reef fish resources of the Gulf of Mexico: Modifications to commercial individual quota programs, including environmental assessment, fishery impact statement, regulatory impact review, and regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 193 pp.
http://gulfcouncil.org/wp-content/uploads/RF36A-Post-Final-Action-5-25-2017-with-bookmarks.pdf

GMFMC. 2017c. Final amendment 44( revised) to the fishery management plan for the reef fish resources of the Gulf of Mexico: Minimum stock size threshold (MSST) revision for reef fish stocks with existing status determination criteria, including environmental assessment and fishery impact statement. Gulf of Mexico Fishery Management Council, Tampa, Florida. 124 pp.
http://gulfcouncil.org/wp-content/uploads/Final-Amendment-44-revised-MSST-GOM-Reef-Fish-update-2.pdf

GMFMC. 2018. Coral habitat areas considered for habitat area of particular concern designation in the Gulf of Mexico. Final Amendment 9 to the Fishery Management Plan for the Coral and Coral Reefs of the Gulf of Mexico, U.S. Waters including environmental impact statement. Gulf of Mexico Fishery Management Council, Tampa, Florida.  289 pp.

GMFMC. 2019a. Final framework action to the fishery management plan for the reef fish fishery of the Gulf of Mexico: Modification of Gulf of Mexico red grouper annual catch limits and annual catch targets, including environmental assessment, regulatory impact review, and

regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 87 pp.
http://gulfcouncil.org/wp-content/uploads/FINAL-Red-Grouper-2019-ACL-Modification-042919-1.pdf

GMFMC. 2019b. Final amendment 51 to the fishery management plan for the reef fish resources of the Gulf of Mexico: Establish gray snapper status determination criteria and modify annual catch limits. Gulf of Mexico Fishery Management Council, Tampa, Florida. 122 pp.
https://gulfcouncil.org/wp-content/uploads/RF-Amendment-51-Gray-Snapper-11132019.pdf

GMFMC. 2019c. Draft environmental assessment for an emergency rule to the fishery management plan for reef fish resources of the Gulf of Mexico: Modification of Gulf of Mexico red grouper annual catch limit, including regulatory impact review and regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 106 pp.
https://www.fisheries.noaa.gov/action/emergency-rule-modify-gulf-mexico-red-grouper-annual-catch-limit

GMFMC. 2020. Framework Action to the Fishery Management Plan for Reef Fish Resources in the Gulf of Mexico Modifications to Gulf of Mexico Greater Amberjack Commercial Trip Limits. Gulf of Mexico Fishery Management Council, Tampa, Florida. 67 pp.

GMFMC and SAFMC. 1982. Fishery Management Plan for Coral and Coral Reefs in the Gulf of Mexico and South Atlantic Fishery Management Councils. Gulf of Mexico Fishery Management Council, Lincoln Center, Suite 881, 5401 W. Kennedy Boulevard, Tampa, Florida; South Atlantic Fishery Management Council, Southpark Building, Suite 306, 1 Southpark Circle, Charleston , South Carolina, 29407. 332 p.
https://gulfcouncil.org/wp-content/uploads/Coral-FMP.pdf

Gore, R. H. 1992. The Gulf of Mexico: A treasury of resources in the American Mediterranean. Pineapple Press. Sarasota, Florida.

Haensly, W. E., J. M. Neff, J. R. Sharp, A. C. Morris, M. F. Bedgood, and P. D. Beom 1982. Histopathology of *Pleuronectes platessa* from Aber Wrac'h and Aber Benoit, Brittany, France: long-term effects of the Amoco Cadiz crude oil spill. Journal of Fish Disease 5:365-391.

Hamilton, A. N., Jr. 2000. Gear impacts on essential fish habitat**Error! Bookmark not defined.** in the Southeastern Region. NOAA, NMFS, SEFSC, 3209 Frederick Street, Pascagoula, Mississippi 39567. 45 pp.

Hayes SA, Josephson E, Maze-Foley K, Rosel PE, Byrd B, Chavez-Rosales S, Col TVN, Engleby L, Garrison LP, Hatch J, Henry A, Horstman SC, Litz J, Lyssikatos MC, Mullin KD, Orphanides C, Pace RM, Palka DL, Soldevilla M, Wenzel FW. 2018. TM 245 US Atlantic and Gulf of Mexico Marine Mammal Stock Assessments - 2017. NOAA Tech Memo NMFS NE-245; 371 p.

Heintz, R. A., J. W. Short, and S. D. Rice. 1999. Sensitivity of fish embryos to weathered crude oil: Part II. Increased mortality of pink salmon (*Oncorhynchus gorbuscha*) embryos incubating downstream from weathered Exxon *Valdez* crude oil. Environmental Toxicology and Chemistry 18(3):494–503.

Hollowed, A. B., Barange, M., Beamish, R., Brander, K., Cochrane, K., Drinkwater, K., Foreman, M., Hare, J., Holt, J., Ito, S-I., Kim, S., King, J., Loeng, H., MacKenzie, B., Mueter, F., Okey, T., Peck, M. A., Radchenko, V., Rice, J., Schirripa, M., Yatsu, A., and Yamanaka, Y. 2013. Projected impacts of climate change on marine fish and fisheries. ICES Journal of Marine Science 70: 1023–1037.

Hose, J.E., M.D. McGurk, G.D. Marty, D.E. Hinton, E.D Brown, and T.T. Baker. 1996. Sublethal effects of the (Exxon Valdez) oil spill on herring embryos and larvae: morphological, cytogenetic, and histopathological assessments, 1989–1991.  Canadian Journal of Fisheries and Aquatic Sciences 53: 2355-2365.

Incardona, John P., L.D. Gardner, T.L. Linbo, T.L. Brown, A.J. Esbaugh, E.M. Mager, J.D. Stieglitz, B.L. French, J.S. Labenia, C.A. Laetz, M. Tagal, C.A. Sloan, A. Elizur, D.D. Benetti, M. Grosell, B.A. Block, and N.L. Scholz. 2014. Deepwater Horizon crude oil impacts the developing hearts of large predatory pelagic fish. Proceedings of the National Academy of Sciences Apr 2014, 111 (15) E1510-E1518.

Karnauskas, M., M. McPherson, S. Sagarese, A. Rios, M. Jepson, A. Stoltz and S. Blake. 2019. Timeline of severe red tide events on the West Florida Shelf: insights from oral histories.  White paper submitted to SEDAR 61. Southeast Fisheries Science Center. https://sedarweb.org/docs/wpapers/S61_WP_20_Karnauskasetal_red_tide.pdf

Keithly W.R., Jr. and M. Tabarestani. 2018. The Gulf of Mexico grouper/tilefish fishery after introduction of an individual fishing quota program:  the impact on ex-vessel prices.

Kennedy, V. S., R. R. Twilley, J. A. Kleypas, J. H. Cowan, and S. R. Hare. 2002. Coastal and marine ecosystems & global climate change: Potential effects on U.S. resources. Pew Center on Global Climate Change, Arlington, Virginia. 52 pp. https://www.c2es.org/site/assets/uploads/2002/08/marine_ecosystems.pdf

Khan, R. A. and J. W. Kiceniuk. 1984. Histopathological effects of crude oil on Atlantic cod following chronic exposure. Canadian Journal of Zoology 62:2038-2043.

Khan R.A. and J.W. Kiceniuk. 1988. Effect of petroleum aromatic hydrocarbons on monogeneids parasitizing Atlantic cod, *Gadus morhua*. Bulletin of Environmental Contamination and Toxicology 41: 94-100.

Khan, R. A. 1990. Parasitism in marine fish after chronic exposure to petroleum hydrocarbons in the laboratory and to the Exxon *Valdez* Oil Spill.  Bulletin of Environmental Contamination and Toxicology 44:759-763.

Kiceniuk J. W. and R. A. Khan. 1987. Effect of petroleum hydrocarbons on Atlantic cod, *Gadus morhua*, following chronic exposure. Canadian Journal of Zoology 65:490-494.

Landsberg, J.H. 2002. The effects of harmful algal blooms on aquatic organisms. Reviews in Fisheries Science 10(2):113-390

Lombardi-Carlson. L.A., G.R. Fitzhugh, B.A. Fable, M. Ortiz, C. Gardner. 2006. Age, length and growth of gag from the NE Gulf of Mexico 1979-2005. NMFS Panama City Lab Contribution 06-03.57 p. SEDAR10-DW2.

Lombardi-Carlson, L., G. Fitzhugh, C. Palmera, C. Gardner, R. Farsky, and M. Ortiz. 2008. Regional size, age and growth differences of red grouper (*Epinephelus morio*) along the west coast of Florida. Fisheries Research 91(2–3): 239-251.

Lowerre-Barbieri, S., L. Crabtree, T.S. Switzer, and R.H. McMichael, Jr. 2014. Maturity, sexual transition, and spawning seasonality in the protogynous red grouper on the West Florida Shelf. SEDAR42-DW-7. SEDAR, North Charleston, SC. 21 pp.

McEachran, J.D. and J.D. Fechhelm. 2005. Fishes of the Gulf of Mexico, Vol. 2. University of Texas Press. Austin, Texas.

Mendelssohn, I. A., G. L. Andersen, D. M. Baltz, R. H. Caffey, K. R. Carman, J. W. Fleeger, S. B. Joye, Q. Lin, E. Maltby, E. B. Overton, and L.P. Rozas. 2012. Oil impacts on coastal wetlands: Implications for the Mississippi River Delta ecosystem after the *Deepwater Horizon* oil spill. BioScience 62: 562–574.

Moe, M.A. 1969. Biology of the red grouper *Epinephelus morio* (Valenciennes) from the eastern Gulf of Mexico. Professional Papers Series Number Ten. Florida Department of Natural Resources, Marine Research Laboratory, St. Petersburg, Florida. 95 pp.

Murawski, S. A., W. T. Hogarth, E. B. Peebles, and L. Barbieri. 2014. Prevalence of external skin lesions and polycyclic aromatic hydrocarbon concentrations in Gulf of Mexico fishes, post-Deepwater Horizon. Transactions of the American Fisheries Society 143(4):1084-1097.

National Commission. 2010. The use of surface and subsea dispersants during the BP *Deepwater Horizon* oil spill. National Commission on the BP *Deepwater Horizon* Oil Spill and Offshore Drilling (National Commission). Staff Working Paper No. 4. 21 pp. https://cybercemetery.unt.edu/archive/oilspill/20130215212124/http://www.oilspillcommission.gov/sites/default/files/documents/Updated%20Dispersants%20Working%20Paper.pdf

NMFS. 2002. Status of red grouper in United States waters of the Gulf of Mexico during 1986-2001. Sustainable Fisheries Division Contribution SFD-01/02-175. NMFS, Southeast Fisheries Science Center, Miami, FL. 47 p.

NMFS. 2011. Biological opinion on the continued authorization of reef fish fishing under the Gulf of Mexico reef fish fishery management plan. September 30, 2011. Available at:

http://sero.nmfs.noaa.gov/pr/esa/Fishery%20Biops/03584%20GOM%20Reef%20Fish%20BiOp%202011%20final.pdf

NMFS. 2018a. Red grouper interim analysis update to the SSC. PowerPoint presentation to the Gulf of Mexico Fishery Management Council's Scientific and Statistical Committee. October 2, 2018. 18 pp.

NMFS. 2018b. Fisheries Economics of the United States, 2016. U.S. Dept. of Commerce, NOAA Tech. Memo. NMFS-F/SPO-187, 243 p.

NMFS. 2020. Gulf of Mexico 2019 grouper-tilefish individual fishing quota annual report. SERO-LAPP-2020-3. NMFS Southeast Regional Office, St. Petersburg, Florida. 80 pp.

NOAA Fisheries. Office of Science & Technology; Southeast Fisheries Science Center; Southeast Regional Office. 2019. Recommended use of the current Gulf of Mexico surveys of marine recreational fishing in stock assessments. 32 pp.

NODC (National Oceanographic Data Center). 2011. 4 km NODC/RSMAS AVHRR Pathfinder v5 Seasonal and Annual Day-Night Sea Surface Temperature Climatologies for 1982-2009 for the Gulf of Mexico (NODC Accession 0072888). Version 3.3. National Oceanographic Data Center, NOAA.  https://data.nodc.noaa.gov/cgi-bin/iso?id=gov.noaa.nodc:0072888

Nieland, D. L., C. A. Wilson III, and A. J. Fischer. 2007.  Declining size-at-age among red snapper in the Northern Gulf of Mexico off Louisiana, USA: recovery or collapse? Pages 329-336 in W. F. Patterson, III, J. H. Cowan, Jr., G. R. Fitzhugh and D. L. Nieland, editors. Red snapper ecology and fisheries in the U.S. Gulf of Mexico. American Fisheries Society, Symposium 60, Bethesda, Maryland.

Osgood, K. E. (ed.) 2008. Climate impacts on U. S. living marine resources: National Marine Fisheries Services concerns, activities and needs. Silver Spring, Maryland, National Oceanic and Atmospheric Administration, 118pp. (NOAA Technical Memorandum NMFS-F/SPO, 89).

Overstreet, E., L. Perruso, and C. Liese. 2017. Economics of the Gulf of Mexico reef fish fishery - 2014. NOAA Technical Memorandum NMFS-SEFSC-716. 84 pp.

Overstreet, E. and C. Liese. 2018a. Economics of the Gulf of Mexico Reef Fish Fishery - 2015. NOAA Technical Memorandum NMFS-SEFSC-724. 78 p.

Overstreet, E. and C. Liese. 2018b. Economics of the Gulf of Mexico Reef Fish Fishery -2016. NOAA Technical Memorandum NMFS-SEFSC-725. 116 p.

Plummer, M.L., W. Morrison, and E. Steiner. 2012. Allocation of fishery harvests under the Magnuson-Stevens Fishery Conservation and Management Act:  Principles and practice. U.S. Dept Commer.. NOAA Tech. Memo. NMFS-NWFSC-115. 84 p.

Robins, C. R., G. C. Rey, and J. Douglass. 1986. A field guide to Atlantic coast fishes. Houghton Mifflin Co., New York City, NY.  354 p.

Savolainen, M. A., R. H. Caffey, and R. F. Kazmierczak, Jr. 2012. Economic and attitudinal perspectives of the recreational for-hire fishing industry in the U.S. Gulf of Mexico. Center for Natural Resource Economics and Policy, LSU AgCenter and Louisiana Sea Grant College Program, Department of Agricultural Economics and Agribusiness, Louisiana State University, Baton Rouge, LA. 171 pp. Available at:
http://www.laseagrant.org/wp-content/uploads/Gulf-RFH-Survey-Final-Report-2012.pdf

Schirripa, M.J., C.M. Legault, and M.Ortiz. 1999. The red grouper fishery of the Gulf of Mexico: assessment 3.0 (with corrected tables). NMFS/SEFSC, Miami Laboratory, Sustainable Fisheries Division Contribution. No. SFD-98/99-56. 121 pp.

Scott-Denton, E., Cryer, P.F., Gocke, J.P., Harrelson, M.R., Kinsella, D.L., Pulver, J.R., Smith, R.C., Williams, J.A., 2011. Descriptions of the U.S. Gulf of Mexico reef fish bottom longline and vertical line fisheries based on observer data. Marine Fisheries Review, 73(2), 1–26.

SEDAR 12. 2006. Stock assessment report of Gulf of Mexico red grouper. Southeast Data, Assessment, and Review. North Charleston, South Carolina.
http://sedarweb.org/docs/sar/S12SAR1%20Gulf%20Red%20Grouper%20Completev2.pdf

SEDAR 12 Update.  2009.  Stock assessment of red grouper in the Gulf of Mexico – SEDAR update assessment.  Report of assessment workshop, Miami, FL.
http://sedarweb.org/docs/suar/Red_Grouper_2009_Assessment_Update_Report.pdf

SEDAR 42. 2015. Stock assessment report of Gulf of Mexico red grouper. Southeast Data, Assessment, and Review. North Charleston, South Carolina. http://sedarweb.org/sedar-42

SEDAR 47. 2016. Final stock assessment report: Southeastern U.S. goliath grouper. Southeast Data, Assessment, and Review. North Charleston, South Carolina. http://sedarweb.org/sedar-47

SEDAR 49. 2016. Stock assessment report for Gulf of Mexico data-limited species: red drum, lane snapper, wenchman, yellowmouth grouper, speckled hind, snowy grouper, almaco jack, lesser amberjack. Southeast Data, Assessment, and Review. North Charleston, SC.
http://sedarweb.org/sedar-49-final-stock-assessment-report-gulf-mexico-data-limited-species

SEDAR 61. 2019. Stock assessment report of Gulf of Mexico red grouper. Southeast Data, Assessment, and Review. North Charleston, South Carolina. http://sedarweb.org/sedar-61

Short, J. 2003. Long-term effects of crude oil on developing fish: Lessons from the Exxon Valdez oil spill. Energy Sources 25(6):509-517.

Siebenaler, J.B**Error! Bookmark not defined.**., and W. Brady.  1952.  A high speed manual commercial fishing reel.  Florida Board of Conservation Tech. Series No. 4.

Simmons, C. M., and S. T. Szedlmayer. 2012. Territoriality, reproductive behavior, and parental care in gray triggerfish, *Balistes capriscus*, from the northern Gulf of Mexico. Bulletin of Marine Science 88:197-209.

Sindermann, C.J. 1979. Pollution-associated diseases and abnormalities of fish and shellfish: a review. Fisheries Bulletin 76: 717-749.

Solangi, M.A. and R.M. Overstreet. 1982. Histopathological changes in two estuarine fishes, *Menidia beryllina* (Cope) and *Trinectes maculatus* (Bloch and Schneider), exposed to crude oil and its water-soluble fractions. Journal of Fish Disease 5: 13-35.

Souza, Philip M., Jr. and Christopher Liese. 2019. Economics of the Federal For-Hire Fleet in the Southeast - 2017. NOAA Technical Memorandum NMFS-SEFSC-740, 42 p.

Tarnecki, J.H. and W.F. Patterson III. 2015. Changes in Red Snapper Diet and Trophic Ecology. Marine and Coastal Fisheries: Dynamics, Management, and Ecosystem Science 7: 135–147.

Walter, J. 2011. Rerun of Gulf of Mexico red grouper assessment and projections with observer-derived discard estimates.  NOAA National Marine Fisheries Service, Southeast Fisheries Science Center, Miami, Florida. 19 p.

Walter, J, M.C. Christman, J.H. Landsberg, B. Linton, K. Steidinger, R. Stumpf, and J. Tustison. 2013.  Satellite derived indices of red tide severity for input for Gulf of Mexico gag grouper stock assessment. SEDAR33-DW08. SEDAR, North Charleston, SC, 43 pp.

Whitehead, A., B. Dubansky, C. Bodinier, T. Garcia, S. Miles, C. Pilley, V. Raghunathan, J. L. Roach, N. Walker, R.B. Walter, C. D. Rice, F. Galvez. 2012. Genomic and physiological footprint of the Deepwater Horizon oil spill on resident marsh fishes. Proceedings of the National Academy of Sciences Dec 2012, 109 (50) 20298-20302

Wilson, D., R. Billings, R. Chang, H. Perez, and J. Sellers. 2014. Year 2011 Gulf wide emissions inventory study. US Dept. of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region, New Orleans, LA. OCS Study BOEM 2014-666.

# CHAPTER 10. INDEX

ABC   iii, xvii, xviii, xix, xxi, xxiv, 1, 3, 6, 7, 8, 13, 14, 15, 16, 17, 28, 39, 40, 42, 88, 91, 92, 94, 98, 102, 103, 119, 122, 129, 130, 135, 139, 143, 145, 153, 183, 196, 197, 199, 201

acceptable biological catch                                              i, iii, xvii, 1, 13, 28, 87

Access Point Angler Intercept Survey                                      iii, xvii, 4, 144

accountability measures                                          xviii, 16, 141, 153, 163, 164, 196

ACL  iii, xiii, xvii, xviii, xix, xx, xxi, xxii, xxiii, xxiv, xxv, 1, 3, 5, 6, 8, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 28, 30, 32, 35, 38, 40, 41, 43, 44, 69, 87, 88, 90, 91, 92, 93, 94, 95, 96, 98, 99, 100, 101, 102, 103, 104, 107, 109, 110, 115, 116, 117, 118, 120, 121, 122, 124, 126, 127, 128, 129, 130, 134, 135, 138, 139, 140, 141, 142, 143, 144, 145, 146, 148, 153, 164, 166, 167, 183, 195, 196, 197, 198, 199, 200, 201, 202, 243, 244, 245, 246, 247, 248

ACT   iii, xiii, xiv, xvii, xviii, xxi, xxiii, xxiv, xxv, 1, 3, 4, 6, 8, 12, 13, 16, 17, 19, 22, 23, 24, 25, 26, 28, 32, 92, 93, 94, 102, 103, 104, 107, 108, 109, 110, 111, 115, 116, 117, 121, 126, 128, 130, 139, 141, 142, 143, 146, 153, 183, 195, 196, 197, 199, 200, 243, 244, 245, 247

Alabama                        33, 36, 41, 68, 70, 71, 74, 86, 87, 124, 126, 128, 132, 133, 144, 159, 178

allocation   xiii, xviii, xix, xx, xxi, 1, 2, 5, 6, 7, 8, 12, 13, 14, 15, 16, 17, 18, 24, 53, 55, 56, 57, 58, 88, 90, 101, 102, 126, 130, 141, 143, 145, 153, 170, 196, 200, 204, 205, 206, 207, 224, 240

Allocation  i, xiii, xvii, xviii, xix, xx, xxii, xxiii, xxiv, xxv, 1, 2, 6, 7, 8, 11, 12, 13, 15, 16, 17, 22, 23, 24, 27, 28, 29, 50, 51, 52, 53, 55, 56, 57, 58, 60, 61, 90, 91, 92, 93, 94, 98, 100, 101, 103, 104, 107, 115, 119, 120, 121, 128, 129, 130, 135, 139, 141, 143, 144, 153, 165, 182, 187, 191, 193, 196, 197, 198, 200, 201, 204, 205, 206

AM   iii, xviii, xxv, 1, 3, 11, 12, 32, 35, 38, 41, 115, 116, 118, 120, 121, 124, 129, 134, 138, 142, 153, 164

annual catch limit                    i, iii, xvii, 1, 13, 28, 140, 141, 143, 164, 165, 166, 167, 183

annual catch target                      i, iii, xvii, 1, 16, 28, 103, 165, 166, 183

APAIS                                          iii, xiii, xvii, 4, 5, 26, 162, 243

buffer   xxiii, xxiv, xxv, 22, 23, 24, 25, 92, 93, 103, 104, 106, 107, 108, 109, 110, 111, 112, 115, 116, 117, 196, 197, 198, 200, 243, 244, 247

bycatch                                          44, 182, 184, 188, 191, 199, 202

Bycatch   xxv, 2, 44, 143, 163, 164, 182, 185, 190, 191, 192, 193, 194, 195, 196, 197, 198, 199, 201, 202

CEA                        iii, 117, 118, 126, 129, 130, 132, 134, 137, 138, 140

CEQ                                          iii, 117, 118, 125, 129

CHTS     iii, xvi, xvii, xix, xxi, xxii, xxiii, 3, 4, 14, 15, 16, 19, 23, 25, 26, 99, 100, 101, 102, 128, 142, 143, 153, 196, 200, 245

closure     xx, xxii, xxv, 11, 16, 17, 20, 25, 32, 44, 90, 96, 97, 102, 111, 112, 115, 116, 117, 119, 120, 122, 123, 128, 130, 131, 137, 139, 141, 142, 143, 144, 164, 182, 193, 194, 195, 202, 245, 247

Coastal Household Telephone Survey                        iii, xvii, 3, 15, 144, 196, 245

consumer surplus                                          iii, 76, 93, 107, 146

Council   i, iii, xvii, xviii, xxiii, 1, 2, 3, 6, 7, 8, 9, 15, 19, 22, 23, 24, 25, 26, 27, 28, 40, 41, 44, 58, 86, 87, 117, 119, 120, 121, 123, 124, 125, 133, 137, 138, 142, 164, 167, 180, 182, 190, 191, 194, 195, 202, 205, 206

Council on Environmental Quality                                          iii, 117

CS                          iii, 76, 93, 94, 95, 97, 107, 108, 109, 110, 111, 113, 146, 148, 172
cumulative effect            iii, xxv, 89, 117, 118, 128, 129, 131, 135, 138, 143, 144, 160
cumulative effects           iii, xxv, 89, 117, 118, 131, 135, 138, 143, 144, 160
cumulative effects analysis                                                        iii, 160
Cumulative Effects Analysis                                                            117
Deepwater Horizon        11, 16, 27, 46, 47, 122, 126, 138, 141, 168, 169, 172
direct effect                                                    xxi, xxii, 100, 102
discard mortality          15, 31, 34, 44, 91, 183, 184, 188, 192, 194, 197, 202, 206
discards     xxi, 5, 8, 15, 31, 32, 34, 35, 39, 44, 45, 69, 90, 91, 122, 182, 183, 184, 185, 186, 187,
           188, 192, 193, 194, 195, 196, 197, 198, 199, 201, 202
distinct population segment                                              iii, 45, 189
DPS                                                                         iii, 45
E.O.                                                                178, 180, 181
economic benefit                                    xxi, xxiv, 94, 97, 108, 113, 201
EEZ                                    iii, 11, 28, 29, 30, 32, 44, 48, 75, 86, 132
EFH                          iii, 35, 38, 88, 118, 131, 136, 137, 138, 162, 163
EIS                          i, ii, iii, 123, 125, 131, 135, 143, 159, 162, 164
EJ                                                                iii, 84, 85, 86
Endangered Species Act                                          iii, 11, 44, 178
endorsement                              11, 29, 79, 120, 133, 190, 195
endorsements                                              80, 124, 133
environmental impact statement         i, iii, 123, 162, 163, 164, 165, 166
environmental justice                                                iii, 84
ESA                                    iii, 44, 45, 136, 180, 189
essential fish habitat                          iii, 161, 162, 163, 167
exclusive economic zone                          iii, 11, 28, 132, 178
Executive Order                                          84, 180, 181
FES iii, xiii, xvii, xix, xx, xxi, xxii, 4, 5, 6, 13, 15, 16, 17, 19, 25, 26, 27, 100, 101, 102, 128, 142,
           196, 245
FGNMS                                              iii, 123, 125, 138
fishery impact statement                                  164, 165, 166
fishery management plan     iii, 162, 163, 164, 165, 166, 167, 169, 178, 179, 205
Fishing Effort Survey            iii, xiii, xvii, 4, 13, 27, 34, 90, 144, 245
fishing mortality          iii, xx, 5, 7, 9, 39, 90, 91, 182, 191, 192, 198, 199
fishing season                          xxiv, 8, 10, 16, 116, 120, 141, 165
Florida i, iii, xvii, 5, 9, 11, 26, 28, 29, 33, 34, 35, 39, 47, 68, 69, 70, 71, 74, 78, 80, 81, 83, 84, 85,
           86, 87, 119, 122, 123, 124, 125, 126, 127, 128, 131, 132, 133, 144, 159, 161, 162, 163, 164,
           165, 166, 167, 168, 169, 170, 171, 172, 178, 184, 186, 203
Flower Garden Banks National Marine Sanctuary                    iii, 123, 181
FMP iii, xvii, 1, 7, 8, 9, 15, 27, 41, 42, 43, 45, 46, 48, 91, 117, 119, 123, 129, 130, 132, 136, 138,
           139, 141, 167, 190, 204, 206
for-hire component                                  xv, xxii, 96, 111, 146, 148
framework procedure                          1, 12, 119, 121, 122, 123, 124
Gulf  1, i, iii, xvii, xviii, xxii, xxiii, xxv, 1, 3, 4, 5, 8, 10, 11, 13, 15, 19, 20, 22, 25, 26, 27, 28, 29,
           30, 31, 32, 33, 35, 36, 37, 38, 39, 40, 41, 44, 45, 46, 47, 48, 50, 58, 59, 60, 62, 63, 64, 67, 68,
           69, 74, 75, 76, 77, 78, 86, 87, 88, 91, 95, 96, 103, 110, 111, 116, 117, 118, 119, 121, 122, 123,

124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 136, 137, 138, 139, 140, 142, 144, 145, 146, 148, 153, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 179, 180, 181, 183, 184, 188, 189, 190, 191, 193, 194, 195, 198, 202, 203, 204, 205, 245, 246, 248

Gulf of Mexico 1, i, iii, xvii, 1, 8, 13, 15, 19, 25, 27, 37, 39, 44, 88, 117, 124, 128, 140, 145, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 180, 181, 184, 194, 198, 202, 203, 204, 205, 245, 246, 248

Gulf of Mexico Fishery Management Council  1, i, iii, xvii, 1, 8, 15, 27, 117, 160, 162, 163, 164, 165, 166, 167, 170, 204, 205

habitat area of particular concern                                                                    166

HAPC                                                        iii, 119, 124, 125, 137, 138, 181

IFQ  iii, xxiii, xxv, 2, 3, 5, 11, 12, 13, 16, 19, 22, 23, 24, 27, 28, 30, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 61, 62, 63, 64, 79, 80, 81, 82, 93, 103, 107, 115, 116, 119, 120, 121, 122, 126, 128, 129, 130, 133, 135, 139, 140, 142, 154, 182, 183, 184, 185, 187, 188, 191, 192, 193, 194, 200, 203, 244

indirect effect                                                xxii, 47, 100, 101, 118, 135

individual fishing quota                            iii, xxv, 2, 16, 27, 119, 144, 168, 170, 182

liquefied natural gas                                                                              iii

LNG                                                                            iii, 125, 140

Louisiana          33, 70, 71, 72, 74, 86, 87, 122, 124, 126, 128, 132, 133, 144, 159, 170, 171, 174

Magnuson-Stevens Act                                iii, 86, 87, 117, 130, 131, 132, 178, 179

Magnuson-Stevens Fishery Conservation and Management Act          iii, 86, 117, 170, 178

Marine Mammal Protection Act                                                iii, 44, 45

Marine Recreational Information Program                        iv, xvii, 3, 13, 27, 90, 153, 186

maximum sustainable yield                                                      7, 8, 39, 121

million pounds                                                iii, 1, 14, 15, 16, 27, 185

minimum stock size threshold                                                    iv, 7, 40

Mississippi          11, 33, 37, 70, 71, 73, 74, 78, 86, 87, 124, 126, 128, 132, 133, 144, 159, 167, 169, 178, 190

mortality  xxv, 1, 5, 7, 30, 31, 39, 40, 44, 45, 47, 90, 122, 132, 143, 161, 167, 182, 183, 184, 188, 189, 190, 191, 192, 194, 195, 196, 197, 198, 199, 202, 206

mp   iii, xvii, xix, xx, xxii, 1, 3, 6, 9, 10, 11, 12, 13, 14, 17, 20, 25, 27, 28, 33, 39, 40, 52, 53, 60, 65, 90, 92, 94, 95, 100, 105, 106, 108, 110, 111, 120, 121, 134, 135, 141, 185, 186, 187, 195, 197, 247

MRFSS                                                iv, xix, xxiii, 4, 6, 13, 15, 16, 18, 22, 27, 144

MRIP iv, xiii, xvi, xvii, xix, xx, xxi, xxii, xxiii, 3, 4, 5, 6, 7, 13, 14, 15, 16, 17, 18, 19, 20, 21, 23, 24, 25, 26, 27, 34, 69, 70, 71, 72, 73, 78, 79, 90, 91, 94, 95, 99, 100, 101, 102, 110, 116, 119, 123, 124, 128, 133, 142, 143, 144, 146, 186, 196, 200, 243, 245, 246, 247, 248

MRIP-FES   xiii, xvi, xviii, xix, xx, xxi, xxii, xxiii, 6, 7, 13, 14, 15, 16, 17, 18, 19, 20, 21, 23, 24, 25, 26, 27, 34, 69, 90, 91, 94, 95, 99, 100, 101, 102, 110, 116, 128, 142, 146, 196, 200, 245, 246, 247, 248

MSST                                                iv, 7, 12, 40, 121, 129, 132, 166

MSY                                                                    7, 12, 121, 166

multi-use      iii, iv, xxiii, xxiv, 2, 12, 22, 23, 24, 103, 104, 115, 116, 129, 193, 196, 197, 198

National Environmental Policy Act                                              i, 117, 160

National Marine Fisheries Service          i, iv, 1, 23, 28, 159, 160, 161, 170, 172, 178, 202

National Oceanic and Atmospheric Administration                1, iv, 123, 160, 170

nautical miles                                                        30, 86, 132
NEPA                                                                        117
NMFS  iv, xvii, xxi, 1, 2, 3, 4, 13, 23, 24, 26, 28, 29, 32, 35, 40, 41, 44, 45, 46, 49, 50, 52, 53, 55,
    57, 59, 67, 74, 75, 77, 80, 81, 82, 83, 84, 86, 91, 117, 121, 122, 123, 124, 125, 127, 128, 130,
    138, 142, 143, 144, 161, 167, 169, 170, 171, 172, 178, 179,180, 181, 183, 184, 188, 189, 190,
    192, 193, 195, 202, 203
NOAAiv, 4, 19, 43, 46, 70, 77, 80, 81, 82, 83, 84, 85, 87, 123, 125, 133, 160, 161, 167, 170, 172,
    178, 180, 203, 243, 244
OFL     iv, xvii, xviii, xix, xxi, xxiv, 1, 3, 6, 7, 8, 13, 14, 15, 16, 17, 39, 40, 42, 88, 91, 92, 94, 98,
    102, 103, 117, 128, 129, 130, 135, 139, 143, 144, 145, 153, 183, 196, 199
optimum yield                                                          iv, 1, 120, 164
overfished  xvii, xxii, xxv, 1, 3, 5, 7, 8, 39, 40, 41, 42, 43, 126, 130, 131, 132, 139, 140, 143, 191,
    198, 199
Overfished                                                                  43
overfishing i, iv, xvii, xxi, xxii, 1, 3, 5, 7, 8, 13, 39, 40, 41, 42, 43, 87, 88, 91, 102, 116, 126, 128,
    130, 131, 132, 134, 139, 140, 143, 145, 163, 164, 183, 191, 198, 199, 201
Overfishing                                                                  43
overfishing limit                                       i, iv, xvii, 1, 13, 39, 143, 183
OY                                              iv, 1, 8, 120, 129, 140, 204, 206
private angling component                                              126, 141
producer surplus                                                      iv, 61, 92, 104
proportional standard error                                              iv, 23
PS       iv, 61, 76, 77, 92, 93, 94, 96, 97, 104, 105, 106, 109, 111, 112, 113, 146, 147, 148, 149
PSE                                                              iv, 23, 243, 244
quota    2, 3, 5, 9, 10, 11, 12, 13, 16, 19, 22, 23, 28, 30, 40, 51, 52, 53, 54, 55, 56, 57, 58, 60, 65,
    102, 104, 116, 119, 120, 121, 124, 129, 134, 135, 139, 140, 141, 142, 143, 144, 166, 182, 193,
    195, 196, 197, 200, 202, 205, 206
Quota                                                                       102
reasonably foreseeable future actions                                      117
rebuilding                    xvii, xxii, xxv, 1, 10, 24, 129, 130, 131, 163, 164, 165, 191
regional quotient                                                      iv, 81, 82
Regulatory Impact Review                                                    160
rq iv, 81, 83
Scientific and Statistical Committee                          iv, xvii, 1, 13, 170
sea turtle                         10, 44, 45, 91, 123, 134, 164, 184, 188, 189, 190
Season                                                          20, 25, 245, 247
Secretary                                                        iv, 86, 133, 178
Secretary of Commerce                                          iv, 86, 133, 178
SEDAR iv, xiii, xvii, xviii, xix, 1, 3, 5, 7, 13, 14, 15, 16, 18, 19, 22, 23, 24, 25, 27, 28, 31, 32, 34,
    35, 39, 40, 41, 42, 43, 87, 95, 119, 123, 127, 129, 130, 131, 132, 135, 138, 139, 140, 143, 144,
    146, 148, 162, 168, 169, 171, 172, 183, 184, 185, 186, 187, 191, 192, 194, 198, 199, 202, 203,
    245
SERO     23, 28, 29, 49, 50, 52, 53, 55, 57, 59, 75, 80, 81, 82, 83, 84, 85, 160, 170, 189, 203, 243
size limit       xxv, 9, 11, 27, 29, 31, 32, 39, 119, 120, 134, 139, 143, 166, 182, 184, 187, 191, 192,
    194, 203
Southeast Data Assessment and Review                          xvii, 1, 13, 27

Southeast Fisheries Science Center   iv, xiii, xvii, xix, 1, 3, 5, 6, 14, 15, 16, 18, 19, 20, 21, 23, 25, 26, 30, 34, 40, 59, 64, 75, 95, 110, 119, 127, 130, 139, 146, 148, 160, 161, 167, 170, 171, 172, 185, 188, 192, 202, 203, 244, 245, 246, 247, 248

Southeast Region Headboat Survey                                                                    iv, 34

Southeast Regional Office                     i, 3, 26, 28, 159, 160, 170, 189, 193, 245

SRHS                                         iv, 34, 74, 75, 95, 110, 146, 148, 186

SSC    iv, xvii, xviii, 1, 3, 5, 7, 8, 13, 14, 15, 17, 39, 40, 41, 42, 43, 119, 129, 130, 135, 143, 170, 196, 199

stock assessment        xiii, xvii, xviii, xix, 1, 3, 4, 6, 8, 9, 15, 16, 22, 31, 39, 41, 42, 43, 46, 48, 98, 119, 122, 123, 127, 129, 130, 135, 138, 139, 140, 143, 144, 153, 170, 171, 172, 182, 183, 184, 198

TAC                                            iv, 1, 11, 12, 120, 164

Texas    29, 33, 36, 37, 41, 70, 71, 72, 73, 74, 78, 86, 87, 124, 126, 128, 132, 133, 144, 159, 169, 178, 180, 203

valued environmental components                                                                  135

VEC                                                                          iv, 135, 136

whole weight                                                          iv, 26, 95, 146, 148

ww                                         iv, 9, 26, 41, 87, 95, 110, 146, 148

# APPENDIX A.   OTHER APPLICABLE LAW

The Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act) (16 U.S.C. 1801 et seq.) provides the authority for management of stocks included in fishery management plans in federal waters of the exclusive economic zone.  However, management decision-making is also affected by a number of other federal statutes designed to protect the biological and human components of U.S. fisheries, as well as the ecosystems that support those fisheries.  Major laws affecting federal fishery management decision-making include the Endangered Species Act and Marine Mammals Protection Act (Section 3.3), E.O. 12866 (Regulatory Planning and Review, Chapter 5) and E.O. 12898 (Environmental Justice, Section 3.5.2).  Other applicable laws are summarized below.

## Administrative Procedure Act

All federal rulemaking is governed under the provisions of the Administrative Procedure Act (5 U.S.C. Subchapter II), which establishes a "notice and comment" procedure to enable public participation in the rulemaking process.  Under the Act, the National Marine Fisheries Service (NMFS) is required to publish notification of proposed rules in the *Federal Register* and to solicit, consider, and respond to public comment on those rules before they are finalized.  The Act also establishes a 30-day waiting period from the time a final rule is published until it takes effect.

## Coastal Zone Management Act

Section 307(c)(1) of the federal Coastal Zone Management Act of 1972 (CZMA), as amended, requires federal activities that affect any land or water use or natural resource of a state's coastal zone be conducted in a manner consistent, to the maximum extent practicable, with approved state coastal management programs.  The requirements for such a consistency determination are set forth in National Oceanic and Atmospheric Administration (NOAA) regulations at 15 CFR part 930, subpart C.  According to these regulations and CZMA Section 307(c)(1), when taking an action that affects any land or water use or natural resource of a state's coastal zone, NMFS is required to provide a consistency determination to the relevant state agency at least 90 days before taking final action.

Upon submission to the Secretary of Commerce, NMFS will determine if this plan amendment is consistent with the Coastal Zone Management programs of the states of Alabama, Florida, Louisiana, Mississippi, and Texas to the maximum extent possible.  Their determination will then be submitted to the responsible state agencies under Section 307 of the CZMA administering approved Coastal Zone Management programs for these states.

## Data Quality Act

The Data Quality Act (Public Law 106-443) effective October 1, 2002, requires the government to set standards for the quality of scientific information and statistics used and disseminated by

federal agencies.  Information includes any communication or representation of knowledge such as facts or data, in any medium or form, including textual, numerical, cartographic, narrative, or audiovisual forms (includes web dissemination, but not hyperlinks to information that others disseminate; does not include clearly stated opinions).

Specifically, the Act directs the Office of Management and Budget to issue government wide guidelines that "provide policy and procedural guidance to federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information disseminated by federal agencies."  Such guidelines have been issued, directing all federal agencies to create and disseminate agency-specific standards to:  (1) ensure information quality and develop a pre-dissemination review process; (2) establish administrative mechanisms allowing affected persons to seek and obtain correction of information; and (3) report periodically to Office of Management and Budget on the number and nature of complaints received.

Scientific information and data are key components of fishery management plans (FMPs) and amendments and the use of best available information is the second national standard under the Magnuson-Stevens Act.  To be consistent with the Act, FMPs and amendments must be based on the best information available.  They should also properly reference all supporting materials and data, and be reviewed by technically competent individuals.  With respect to original data generated for FMPs and amendments, it is important to ensure that the data are collected according to documented procedures or in a manner that reflects standard practices accepted by the relevant scientific and technical communities.  Data will also undergo quality control prior to being used by the agency and a pre-dissemination review.

## Fish and Wildlife Coordination Act

Fish and Wildlife Coordination Act of 1934 (16 U.S.C. 661-667e) provides the basic authority for the United States Fish and Wildlife Service's (USFWS) involvement in evaluating impacts to fish and wildlife from proposed water resource development projects.  It also requires federal agencies that construct, license or permit water resource development projects to first consult with the Service (and NMFS in some instances) and State fish and wildlife agency regarding the impacts on fish and wildlife resources and measures to mitigate these impacts.

The fishery management actions in the Gulf are not likely to affect wildlife resources pertaining to water resource development as the economic exclusive zone is from the state water boundary extending to 200 nm from shore.

## National Historic Preservation Act

The National Historic Preservation Act (NHPA) of 1966, (Public Law 89-665; 16 U.S.C. 470 *et seq.*) is intended to preserve historical and archaeological sites in the United States of America. Section 106 of the NHPA requires federal agencies to evaluate the impact of all federally funded or permitted projects for sites listed on, or eligible for listing on, the National Register of Historic Places and aims to minimize damage to such places.

Typically, fishery management actions in the Gulf of Mexico are not likely to affect historic places with exception of the *U.S.S. Hatteras*, located in federal waters off Texas, which is listed in the National Register of Historic Places.  Reef fish fishing does occur off Texas; therefore, the proposed actions are a part of the normal fishing activities that occur at this site.  Thus, no additional impacts to the *U.S.S. Hatteras* would be expected.

## Executive Orders (E.O.)

### E.O. 12630:  Takings

The E.O. on Government Actions and Interference with Constitutionally Protected Property Rights that became effective March 18, 1988, requires each federal agency prepare a Takings Implication Assessment for any of its administrative, regulatory, and legislative policies and actions that affect, or may affect, the use of any real or personal property.  Clearance of a regulatory action must include a takings statement and, if appropriate, a Takings Implication Assessment.  The NOAA Office of General Counsel will determine whether a Taking Implication Assessment is necessary for this amendment.

### E.O. 12962:  Recreational Fisheries

This E.O. requires federal agencies, in cooperation with states and tribes, to improve the quantity, function, sustainable productivity, and distribution of U.S. aquatic resources for increased recreational fishing opportunities through a variety of methods including, but not limited to, developing joint partnerships; promoting the restoration of recreational fishing areas that are limited by water quality and habitat degradation; fostering sound aquatic conservation and restoration endeavors; and evaluating the effects of federally-funded, permitted, or authorized actions on aquatic systems and recreational fisheries, and documenting those effects.  Additionally, it establishes a seven-member National Recreational Fisheries Coordination Council (NRFCC) responsible for, among other things, ensuring that social and economic values of healthy aquatic systems that support recreational fisheries are considered by federal agencies in the course of their actions, sharing the latest resource information and management technologies, and reducing duplicative and cost-inefficient programs among federal agencies involved in conserving or managing recreational fisheries.  The NRFCC also is responsible for developing, in cooperation with federal agencies, States and Tribes, a Recreational Fishery Resource Conservation Plan - to include a five-year agenda.  Finally, the E.O. requires NMFS and the USFWS to develop a joint agency policy for administering the ESA.

### E.O. 13089:  Coral Reef Protection

The E.O. on Coral Reef Protection requires federal agencies whose actions may affect U.S. coral reef ecosystems to identify those actions, utilize their programs and authorities to protect and enhance the conditions of such ecosystems, and, to the extent permitted by law, ensure actions that they authorize, fund, or carry out do not degrade the condition of that ecosystem.  By definition, a U.S. coral reef ecosystem means those species, habitats, and other national resources associated with coral reefs in all maritime areas and zones subject to the jurisdiction or control of the United States (e.g., federal, state, territorial, or commonwealth waters).

Regulations are already in place to limit or reduce habitat impacts within the Flower Garden Banks National Marine Sanctuary. Additionally, NMFS approved and implemented Generic Amendment 3 for Essential Fish Habitat (GMFMC 2005), which established additional habitat areas of particular concern (HAPCs) and gear restrictions to protect corals throughout the Gulf of Mexico. There are no implications to coral reefs by the actions proposed in this amendment.

### E.O. 13132:  Federalism

The E.O. on Federalism requires agencies in formulating and implementing policies, to be guided by the fundamental Federalism principles. The E.O. serves to guarantee the division of governmental responsibilities between the national government and the states that was intended by the framers of the Constitution. Federalism is rooted in the belief that issues not national in scope or significance are most appropriately addressed by the level of government closest to the people. This E.O. is relevant to FMPs and amendments given the overlapping authorities of NMFS, the states, and local authorities in managing coastal resources, including fisheries, and the need for a clear definition of responsibilities. It is important to recognize those components of the ecosystem over which fishery managers have no direct control and to develop strategies to address them in conjunction with appropriate state, tribes and local entities (international too).

No Federalism issues were identified relative to the action to modify the management of mutton snapper and gag. Therefore, consultation with state officials under Executive Order 12612 was not necessary. Consequently, consultation with state officials under Executive Order 12612 remains unnecessary.

### E.O. 13158:  Marine Protected Areas

This E.O. requires federal agencies to consider whether their proposed action(s) will affect any area of the marine environment that has been reserved by federal, state, territorial, tribal, or local laws or regulations to provide lasting protection for part or all of the natural or cultural resource within the protected area. There are several marine protected areas, HAPCs, and gear-restricted areas in the eastern and northwestern Gulf of Mexico. The existing areas are entirely within federal waters of the Gulf of Mexico. They do not affect any areas reserved by federal, state, territorial, tribal or local jurisdictions.

# APPENDIX B.   BYCATCH PRACTICABILITY ANALYSIS

Background/Overview

Bycatch is defined as fish harvested in a fishery, but not sold or retained for personal use.  This definition includes both economic and regulatory discards.  Economic discards are generally undesirable from a market perspective because of their species, size, sex, and/or other characteristics.  Regulatory discards are fish required by regulation to be discarded, but also include fish that may be retained but not sold.

Guidance provided at 50 CFR 600.350(d)(3) identifies ten factors to consider in determining whether a management measure minimizes bycatch or bycatch mortality to the extent practicable.  These are:

1. Population effects for the bycatch species.
2. Ecological effects due to changes in the bycatch of that species (effects on other species in the ecosystem).
3. Changes in the bycatch of other species of fish and the resulting population and ecosystem effects.
4. Effects on marine mammals and birds.
5. Changes in fishing, processing, disposal, and marketing costs.
6. Changes in fishing practices and behavior of fishermen.
7. Changes in research, administration, and enforcement costs and  management effectiveness.
8. Changes in the economic, social, or cultural value of fishing activities and non-consumptive uses of fishery resources.
9. Changes in the distribution of benefits and costs.
10. Social effects.

The Fishery Management Councils are encouraged to adhere to the precautionary approach outlined in Article 6.5 of the Food and Agriculture Organization (FAO) of the United Nations Code of Conduct for Responsible Fisheries when uncertain about these factors.

The red grouper fishery is currently regulated through a commercial individual fishing quota (IFQ) program, as well as measures such as quotas, size limits, bag limits, and seasonal/area closures.  These measures are intended to protect red grouper during spawning and limit fishing mortality, while also specifying the size of fish that may be kept.  However, these management tools have the unavoidable adverse effect of creating regulatory discards, which reduce yield from the directed fishery.

In this amendment, the Gulf of Mexico Fishery Management Council (Council) is considering adjusting the red grouper allocation between commercial and recreational sectors to more accurately reflect historical recreational catch levels based on the best scientific information available, which was used in the 2019 stock assessment.  In addition, the Council is considering

Amendment 53 - Red Grouper                    185                    Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                    Practicability Analysis

0003658

revisions of the overfishing limit (OFL), allowable biological catch (ABC), annual catch limits (ACL), and annual catch targets (ACT) based on the results of the 2019 stock assessment.

**Red Grouper Release Mortality Rates**

Discard mortality rates for red grouper in the most recent stock assessment (SEDAR 61 2019) were updated using National Marince Fisheries Service (NMFS) observer data through 2017. SEDAR 61 (2019) estimated commercial discards using a weighted mean discard mortality rate based on the number of fishing sets in each depth bin.  This method was previously employed in SEDAR 42 (2015).

In Southeast Data Assessment and Review (SEDAR) 61 (2019), the commercial discard mortality in the Post-IFQ bottom longline fishery was estimated at 44.1% (+0.5% from SEDAR 42 2015), while the Pre-IFQ estimate remained at 41.5%.  These values were calculated based on assumptions that 100% of fish that floated at the surface upon release suffer immediate mortality and 20% latent mortality for discards that re-submerge for each 10-m depth bin (i.e. 20% of fish that re-submerge in each depth bin are assumed to die).  The discard mortality rates for each depth bin were combined using the weighted mean average based on the number of fishing sets in each bin.

In the commercial vertical line fishery, estimated discard mortality remained the same as in SEDAR 42 2015 at 19.0%.  This value was based on the recreational hook-and-line gear depth-dependent discard mortality function from the 2014 Florida Fish and Wildlife Conservation Commission (FWC) study (Sauls et al.) for live red grouper discarded in fishing depths between 41 meters and 50 meters, where the vertical line fishery primarily operates.  This estimate assumes vertical line gear is fished similar to recreational hook-and-line gear (with regards to retrieval and handling time).  Commercial observer data were used to select the mean fishing depth range for vertical line gear that is representative of the Gulf-wide fishery.  Thus, this single mortality percentage was applied to estimated discards across regions in the Gulf.

The discard mortality rate used in SEDAR 61 (2019) for recreational discards was 11.6%, which remained unchanged from SEDAR 42 (2015).  This estimate included all sources of latent discard mortality for fish that were able to re-submerge and those that were alive and floating after release.  Dead discards were included in recreational landings estimates, and therefore, no immediate mortality was applied to recreational discards.

Estimates of red grouper release mortality used in SEDAR 61 (2019) were collected in a variety of ways, and mirrored the methods used in SEDAR 42 (2015).  An ad-hoc panel convened during the SEDAR 42 (2015) Data Workshop to specifically discuss discard mortality and review new data and results from studies available since SEDAR 12 (2006), with the intent to formulate recommended mortality percentages to apply to estimated discards.  Participants included data providers, analysts, and professionals from the fishing industry representing both commercial and private recreational sectors.  For SEDAR 12 (2006), 10% discard mortality was recommended for both recreational hook-and-line gear and commercial vertical line gear, and 40% discard mortality was recommended for commercial bottom long-line gear.  Two data sources that were explored between SEDAR 12 (2006) and SEDAR 42 (2015) are summarized here.

A Florida FWC/Florida Fish and Wildlife Research Institue (FWRI) (detailed by Sauls et al., 2014) study found that red grouper that re-submerged with assistance from venting (fair condition), and that demonstrated difficulty re-submerging or suffered internal hook injuries or gill injuries (poor condition) survived at lower rates (survival 82.7% and 60.9%, respectively) compared to fish that re-submerged on their own immediately without the need for venting (good condition).  Point estimates for overall discard mortality across all depths fished were 10.4% and 12.9% in the charter fishery (for areas fished adjacent to Tampa Bay and the northwestern panhandle, respectively), and were comparable to the headboat fishery (9.7% to 13.8%, respectively per area).  Confidence intervals for all four-point estimates overlapped, indicating that a single mean value may be applied across fleets and areas.

Pulver (2015) showed that red grouper retention rates in the commercial sector increased after implementation of the IFQ program in 2010, most likely due to the lowering of the commercial size limit to 18 in TL.  Since 2006, NMFS has placed fishery observers on commercial vessels fishing with vertical line and bottom longline gears.  Beginning in February 2009, increased observer coverage levels were directed at the bottom longline fishery in the eastern Gulf due to concerns regarding sea turtle interactions.  Additionally, in 2011, increased funding allowed enhanced coverage of both the vertical line and bottom longline fisheries through 2014.  The immediate discard mortality rate for red grouper was estimated by combining fish that were dead on retrieval or that were unable to re-submerge following release as a percentage of overall fish discarded (not including discards with unknown conditions).  In the vertical line fishery, the mean immediate discard mortality rate (weighted based on the number of fishing sets for each depth bin) was 13.8%.  Immediate discard mortality was higher in the bottom longline fishery (27.0% pre-IFQ; 29.5% post-IFQ), likely because these vessels typically fish in deeper depths than the vertical line fishery, and tend to have longer soak times.

## Magnitude of Red Grouper Bycatch

Commercial discards are available by gear for trap, vertical line, and longline.  Red grouper commercial dead discards were estimated beginning in 1990 with the implementation of federal minimum size limits.  The numbers of discards for the commercial trap fishery were taken from red grouper stock assessments prior to SEDAR 61 (2019), since fish traps were banned in the Gulf of Mexico (Gulf) beginning in 2006.

During the SEDAR 42 (2015) Data Workshop, commercial red grouper discards for vertical line and longline were calculated using discard rates as reported by fisheries observers, with the discard rates multiplied by year-specific total effort reported to the coastal logbook program to estimate total discards.  However, additional analyses were conducted post-SEDAR 42 (2015) due to concerns over the reliability of the logbook effort data, and as a result, commercial discards were re-estimated based on observed discard and kept rates from the NMFS Observer Program database.  Even with the modifications during SEDAR 42 (2015), estimated commercial discards received considerable attention as they were substantially higher than previous assessments, but were maintained at the time due to anecdotal information supporting high discard fractions.

Prior to SEDAR 61 (2019), additional research was undertaken to investigate the methodology for calculating commercial discards, specifically by exploring available effort units for

Amendment 53 - Red Grouper                    187                    Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                    Practicability Analysis

0003660

estimating commercial discards.  The general approach for estimating discards uses the Southeast Fisheries Science Center's (SEFSC) Reef Fish Observer Program (RFOP) and the Supplemental Discard Logbook (self-reported discard information).  Catch per unit effort has been determined from the coastal observer program in which scientific observers on commercial fishing vessels recorded detailed information on catch and effort for a subset of trips.  This investigation utilized data from the complete calendar years 2007-2017.  RFOP observer coverage levels were not consistent through the years, with coverage levels ranging between 1% and 5% of sea days.

Total effort was determined from the commercial logbook program in which fishers reported basic information on effort and catch by species for every trip (complete calendar years 1993-2017).  Logbook effort metrics were recorded at the trip level, whereas observer effort metrics were recorded at a finer scale (usually individual 'sets' within a trip).  A suite of effort metrics recorded on commercial logbooks and collected by onboard observers were evaluated to identify unbiased and consistent effort variables between the two programs for carrying out the catch expansion.

In 2020, Pulver updated data (where available) from SEDAR 61 (2019) to further examine bycatch/discard patterns from 2012-2018 in IFQ fisheries (Grouper/Tilefish and Red Snapper).  Despite the variations in coverage levels, RFOP data (accessed May 2019) are the best and most recent data available for the fishery.  Commercial discards in numbers of red grouper are summarized in Table B.1.

**Table B.1.** Commercial vertical line and longline discards (number of red grouper) using the SEDAR 61 recommended approach.

| Year | Vertical Line | Longline | Total | Year | Vertical Line | Longline | Total |
|------|------|------|------|------|------|------|------|
| **1993** | 79,662 | 514,033 | 593,695 | **2006** | 146,203 | 506,568 | 652,771 |
| **1994** | 94,368 | 668,159 | 762,527 | **2007** | 150,881 | 405,702 | 556,583 |
| **1995** | 49,123 | 302,219 | 351,342 | **2008** | 127,661 | 480,530 | 608,191 |
| **1996** | 112,944 | 667,938 | 780,882 | **2009** | 219,006 | 153,431 | 372,437 |
| **1997** | 132,132 | 878,497 | 1,010,629 | **2010** | 198,729 | 177,525 | 376,254 |
| **1998** | 127,683 | 718,051 | 845,734 | **2011** | 290,423 | 346,979 | 637,402 |
| **1999** | 140,955 | 754,469 | 895,424 | **2012** | 178,703 | 402,936 | 581,639 |
| **2000** | 142,683 | 633,778 | 776,461 | **2013** | 96,399 | 209,867 | 306,266 |
| **2001** | 146,668 | 652,257 | 798,925 | **2014** | 59,449 | 324,659 | 384,108 |
| **2002** | 151,052 | 579,902 | 730,954 | **2015** | 86,568 | 195,727 | 282,295 |
| **2003** | 158,908 | 596,105 | 755,013 | **2016** | 96,899 | 242,272 | 339,171 |
| **2004** | 151,788 | 567,853 | 719,641 | **2017** | 71,658 | 216,046 | 287,704 |
| **2005** | 133,793 | 440,858 | 574,651 | | | | |

Amendment 53 - Red Grouper                    188                      Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                          Practicability Analysis

0003661

Commercial longline fleet discards averaged 0.45 million pounds (mp) gutted weight (gw) from 1990-2017, with a low of 0.08 mp gw in 2009 and a peak of 0.85 mp gw in 1993 (Figure B.1.). Commercial vertical line fleet discards averaged 0.08 mp gw from 1990-2017, with a low of 0.02 mp gw in 2016 and a peak of 0.21 mp gw in 1990. Commercial trap fleet discards averaged 0.04 mp gw from 1990-2006, with a low of 0.01 mp gw in 1998 and a peak of 0.05 mp gw in 1995. Note that reef fish traps were banned in 2007.



**Figure B.1.** Red Grouper dead discard estimates from SEDAR 61 (2019) assessment for commercial (left panel, by fleet) and recreational (right panel) fisheries in millions of pounds, 1986-2017.

Red Grouper recreational discards were derived from Marine Recreational Information Program (MRIP) Fishing Effort Survey (FES) estimates of live released fish between 1986 and 2017 and self-reported discards in the Southeast Region Headboat Survey (SRHS) logbook since 2007 (Table B.1). Red Grouper discards from headboats for years prior to 2007 in Florida were estimated using the ratio of MRIP Charter to SRHS discards as a proxy. Red Grouper recreational dead discard estimates averaged 0.87 mp gw from 1986 to 2017, with a low of 0.22 mp gw in 1987 and a peak of 1.92 mp gw in 2004 (Figure B.1.). This equates to about 15 % of the recreational removals and 27 % of the total dead discards of red grouper.

Amendment 53 - Red Grouper                    189                    Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                    Practicability Analysis

0003662

**Table B.1.** Recreational discards (number of Red Grouper) by fishing mode (using SEDAR 61 recommended approach).

| Year | Charter | Headboat | Private | Total | Year | Charter | Headboat | Private | Total |
|------|---------|----------|---------|-------|------|---------|----------|---------|-------|
| **1986** | 86,363 | 46,587 | 813,907 | **946,857** | **2002** | 228,016 | 63,624 | 3,909,476 | **4,201,116** |
| **1987** | 50,123 | 43,031 | 690,377 | **783,531** | **2003** | 343,210 | 136,745 | 3,752,560 | **4,232,515** |
| **1988** | 70,652 | 79,240 | 1,932,133 | **2,082,025** | **2004** | 423,964 | 160,995 | 7,512,527 | **8,097,486** |
| **1989** | 196,089 | 540,610 | 5,872,992 | **6,609,691** | **2005** | 248,419 | 92,489 | 2,701,327 | **3,042,235** |
| **1990** | 196,883 | 72,542 | 4,374,994 | **4,644,419** | **2006** | 123,352 | 32,695 | 2,220,260 | **2,376,307** |
| **1991** | 215,954 | 104,719 | 5,426,844 | **5,747,517** | **2007** | 111,913 | 17,365 | 1,599,693 | **1,728,971** |
| **1992** | 204,602 | 66,174 | 5,157,606 | **5,428,382** | **2008** | 367,994 | 89,615 | 6,294,612 | **6,752,221** |
| **1993** | 86,379 | 78,702 | 3,158,040 | **3,323,121** | **2009** | 398,022 | 153,829 | 6,276,296 | **6,828,147** |
| **1994** | 146,510 | 84,039 | 3,236,051 | **3,466,600** | **2010** | 497,987 | 117,879 | 5,379,955 | **5,995,821** |
| **1995** | 236,720 | 107,149 | 3,835,677 | **4,179,546** | **2011** | 433,964 | 134,114 | 6,021,306 | **6,589,384** |
| **1996** | 114,829 | 163,725 | 1,246,516 | **1,525,070** | **2012** | 464,256 | 117,809 | 4,392,740 | **4,974,805** |
| **1997** | 127,887 | 78,504 | 2,014,957 | **2,221,348** | **2013** | 620,479 | 112,266 | 4,895,361 | **5,628,106** |
| **1998** | 202,616 | 83,492 | 3,337,806 | **3,623,914** | **2014** | 435,470 | 84,237 | 4,293,342 | **4,813,049** |
| **1999** | 375,157 | 180,087 | 5,405,117 | **5,960,361** | **2015** | 326,901 | 74,376 | 2,550,817 | **2,952,094** |
| **2000** | 471,536 | 98,791 | 4,227,094 | **4,797,421** | **2016** | 322,165 | 79,409 | 2,164,044 | **2,565,618** |
| **2001** | 272,157 | 72,878 | 3,502,720 | **3,847,755** | **2017** | 299,920 | 73,658 | 2,202,611 | **2,576,189** |

Annually, the commercial sector dead discards averaged 0.6-0.9 mp gw of red grouper prior to IFQ implementation in 2009, and have been considerably lower since. Estimated red grouper discards for both commercial gears for the most recent years available (2012 through 2017) were some of the lowest of the time series. The number of discards dropped substantially beginning in 2013 with vertical line discards estimated under 100,000 fish through 2017. The lowest total number of discards in the entire time series was recorded in 2015. Some of the reduction in estimated discards from 2012 through 2017 is likely due to the reduction in the commercial minimum size limit from 20 to 18 inches total length (TL) in May 2009. The RFOP listed red grouper as the most common IFQ species observed with a relatively high percentage of 35% discarded compared to other IFQ species (0-20.2%; Table B.2.). Data from the RFOP (2019) used to calculate the discard ratio (number discarded:one landed) stratified by year and gear found that less than one fish was being discarded for each fish being retained for almost all the time series, except in 2017 for longline and 2018 for both gears.

Amendment 53 - Red Grouper
Allocations and Annual Catch Levels and Targets
190
Appendix B. Bycatch
Practicability Analysis
0003663

In addition to the number of self-reported discards per trip, the discard logbook attempts to quantify the reason why discarding occurs using four categories: 1) not legal size, 2) other regulation, 3) market conditions, and 4) out of season.  For IFQ species, other regulation could include a lack of allocation.  Using these categories, discard logbooks reported 97% of self-reported discards of red grouper were due to the minimum size limit from 2012-2018.  Length data collected by the RFOP supports that the current minimum size limit is the principal reason discards were occurring from 2012-2018, although a small amount of discarding may have occurred due to lack of allocation.

The recreational fishery discards substantially more fish than the commercial fishery, averaging 4.14 million fish per year, versus approximately 600,000 fish/year in the commercial fishery.  This difference is especially pronounced in the most recent 5 years (2013-2017), where commercial discards (~320k/year) have been less than a tenth of recreational discard (~3.71 million/year).  Thus, despite a higher discard mortality rate in the commercial fishery (due largely to the bottom longline fishery), the recreational sector is responsible for more discards and more dead discards.

**Table B.2.**  The number of captures and percentage for each disposition observed by the RFOP from 2012-2018 for IFQ species.

|  | Number Observed | Kept | Discarded |
|---|---|---|---|
| **Red Grouper** | 283,879 | 64.9% | 35.1% |
| **Gag Grouper** | 14,570 | 79.8% | 20.2% |
| **Shallow-water Grouper** |  |  |  |
| **Scamp** | 11,344 | 94.5% | 5.5% |
| **Black Grouper** | 298 | 87.6% | 12.4% |
| **Yellowmouth Grouper** | 83 | 91.6% | 8.4% |
| **Yellowfin Grouper** | 11 | 90.9% | 9.1% |
| **Deep-water Grouper** |  |  |  |
| **Yellowedge Grouper** | 19,672 | 98.7% | 1.3% |
| **Snowy Grouper** | 3,268 | 98.7% | 1.3% |
| **Speckled Hind** | 1,205 | 88.0% | 12.0% |
| **Warsaw Grouper** | 205 | 100% | 0.0% |

Source: SEFSC RFOP (2019)

**Other Bycatch**

U.S. fisheries are classified under the Marine Mammal Protection Act (MMPA) according to the level of interactions that result in incidental mortality or serious injury of marine mammals.  In the most recent List of Fisheries (84 FR 22051; May 16, 2019), the Gulf commercial reef fish fishery is listed as a Category III fishery under the MMPA.  Category III contains fisheries where annual mortality and serious injury of a marine  mammal  stock  resulting  from  any  fishery  is less  than  or  equal  to  1%  of  the  maximum number of animals, not including natural

mortalities, that may be removed from a marine mammal stock, while allowing that stock to reach or maintain its optimum sustainable population. The risk of serious injury or mortality to marine mammals resulting from the recreational sector of the reef fish fishery, which uses similar gear (i.e., handlines, rod and reel, spears, etc.), is also expected to be low, although interactions with dolphins are known to occur when dolphins prey on discarded fish (Powell and Wells, 2011).

NMFS has conducted specific analyses ("Section 7 consultations") evaluating potential effects from the Gulf reef fish fishery, including the directed red grouper fishery, on sea turtles (as well as on other Endangered Species Act [ESA]-listed species and critical habitat) as required by the ESA. On September 30, 2011, the Southeast Regional Office (SERO) completed a biological opinion (BiOp), which concluded that the authorization of the Gulf reef fish fishery is not likely to jeopardize the continued existence of any sea turtles (loggerhead, Kemp's ridley, green, hawksbill, and leatherback) (NMFS 2011). An incidental take statement was issued specifying the amount and extent of anticipated take, along with reasonable and prudent measures and associated terms and conditions deemed necessary and appropriate to minimize the impact of these takes. The BiOp concluded that NMFS capture estimates produced using the NMFS (2005a) approach with updated data (i.e., 125 annual sea turtle captures or 375 sea turtles over any three-year period) is the most reasonable estimate of sea turtle captures in the recreational vertical line component of the Gulf reef fish fishery. In the commercial vertical line fishery, interactions are believed to be much lower, with an estimate 114 captures over any three-year period. The bottom longline fishery has a higher estimated sea turtle take, with NMFS estimating that in 2011 and subsequent years, a total of 208 turtles (204 loggerhead, 1 green, 1 hawksbill, 1 Kemp's ridley, 1 leatherback) would be taken on a yearly basis. On September 29, 2016, NMFS reinitiated consultation on the authorization of the Gulf reef fish fishery because new species (Nassau grouper and green sea turtle North Atlantic and South Atlantic distinct population segments) have been listed under the ESA that may be affected by the fishery. Since the consultation was reinitiated, three additional species that may be affected by the fishery have been listed under the ESA. These include the giant manta ray (2018), oceanic white tip shark (2018) and Bryde's whale (2019). This consultation is currently being conducted and results are not yet available.

Smalltooth sawfish are also adversely affected by the Gulf reef fish fishery, but are interacted with to a much lesser extent than sea turtles. Although the long, toothed rostrum of the smalltooth sawfish causes this species to be particularly vulnerable to entanglement in fishing gear, incidental captures in the commercial and recreational hook-and-line components of the reef fish fishery are rare events. Only eight smalltooth sawfish are anticipated to be incidentally caught every 3 years in the entire reef fish fishery, and none are expected to result in mortality (NMFS 2011). In the 2011 BiOp, NMFS concluded that the authorization of the Gulf reef fish fishery is not likely to jeopardize the continued existence of smalltooth sawfish. An incidental take statement was issued specifying the amount and extent of anticipated take, along with reasonable and prudent measures and associated terms and conditions deemed necessary and appropriate to minimize the impact of these takes. Participants in this fishery are required to follow smalltooth sawfish safe handling guidelines.

Amendment 53 - Red Grouper                    192                    Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                    Practicability Analysis

0003665

NMFS determined that the following reasonable and prudent measures were necessary and appropriate to minimize stress and increase survival of sea turtles and smalltooth sawfish:

*Avoiding and Minimizing Take Through Outreach and Education*
Most, if not all, sea turtles and smalltooth sawfish released after capture experience some degree of physiological injury from forced submergence and/or abrasions/lacerations caused by hooking or entanglement. The ultimate severity of these events is dependent not only upon the actual capture, but the amount of gear remaining on the animal at the time of release. The handling of an animal also greatly affects its chance of recovery. Therefore, the experience, knowledge, ability, and willingness of fishers to remove gear is crucial to the survival of sea turtles and smalltooth sawfish following release. Certain behavior by fishermen may also help to reduce the likelihood of takes. For these reasons, NMFS shall conduct outreach and education to ensure that takes are avoided to the extent practicable and sea turtles and smalltooth sawfish are handled in a way that minimizes adverse effects from incidental take and reduces the likelihood of mortality.

*Minimizing Future Gear Impacts through Research*
Fishing gear and fishing behavior may influence the frequency and severity of interactions with sea turtles and smalltooth sawfish. However, fishing characteristics and behavior vary from vessel to vessel. To achieve a better understanding of how these characteristics, differ and how these differences may affect sea turtles and smalltooth sawfish, NMFS shall conduct research to better characterize the fishery and its interactions with sea turtles and smalltooth sawfish.

*Monitoring the Frequency, Magnitude, and Impact of Incidental Take*
Monitoring and tracking both the level of take occurring specific to the reef fish fishery and the status of listed species are important aspects of sustainable management of protected species. NMFS shall ensure that monitoring and reporting of any sea turtles or smalltooth sawfish encountered: (1) detect any adverse effects resulting from the Gulf reef fish fishery; (2) provide an assessment that confirms the ITS has not been exceeded, and if the ITS may have been exceeded, determine the actual level of incidental take in comparison with the anticipated incidental take, and (3) collect improved data from individual encounters.

The Council originally addressed protected species bycatch in Amendment 18A to the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico (Reef Fish FMP) (GMFMC 2005b), which established regulations to minimize stress to endangered species incidentally caught in the reef fish fishery. Since then, the Council and NMFS have implemented several other actions aimed at reducing sea turtle bycatch and enhancing survival of captured turtles including:
- Reef Fish Amendment 31 (75 FR 21512, 4/26/2010)- Established a longline endorsement requirement; restricted fishing to outside the 35-fathom depth contour from June – August; and limited vessels to 1000 hooks onboard, of which only 750 could be rigged at any time. The 1000 hook limitation was removed in a 2018 framework action (83 FR 5210, 2/26/2018), but the limitation on the 750 hooks rigged at any time remains in place.
- Reef Fish Amendment 49 (84 FR 25009, 5/30/2019)- Added three new sea turtle release and handling devices; updated requirements for several previously approved devices for

clarity; and allowed changes to handling/release gear requirements to be made through the Council's Framework process.

There are three primary orders of seabirds present in the Gulf including Procellariiformes (petrels, albatrosses, and shearwaters), Pelecaniformes (pelicans, gannets and boobies, cormorants, tropic birds, and frigate birds), and Charadriiformes (phalaropes, gulls, terns, noddies, and skimmers) (Clapp et al., 1982; Harrison, 1983). Several other bird species also occur in the Gulf, and are listed as threatened or endangered by the U.S. Fish and Wildlife Service, including piping plover, roseate tern, and brown pelican (the brown pelican is endangered in Mississippi). Human disturbance of nesting colonies and mortalities from birds being caught on fishhooks and/or entangled in monofilament line are primary factors affecting seabirds. Oil or chemical spills, erosion, plant succession, hurricanes, storms, heavy tick infestations, and unpredictable food availability are other threats. There is no evidence that the directed grouper fishery adversely affects seabirds.

Other species of reef fish are also incidentally caught and often intentionally targeted when targeting red grouper. Gag or black grouper may be targeted or incidentally captured on trips targeting red grouper. In the eastern Gulf, scamp and other shallow-water grouper (SWG; grouping includes black grouper, scamp, yellowfin grouper, and yellowmouth grouper), red snapper, greater amberjack, and vermilion snapper are also caught when targeting red grouper. Neither black grouper nor gag are overfished or are undergoing overfishing (SEDAR 19, 2010 and SEDAR 33 Update, 2016, respectively). Vermilion snapper are not overfished or undergoing overfishing (SEDAR 67, 2020) and bycatch is not expected to jeopardize the status of this stock. Greater amberjack (SEDAR 33 Update 2016) are overfished but are not undergoing overfishing. Greater amberjack release mortality is estimated to be fairly low, ranging from 10% to 20%. Discards are slightly higher for commercially caught greater amberjack than they are for recreationally caught greater amberjack because of differences in minimum size limits (36 inches fork length [FL] commercial vs. 34 inches FL recreational). Because greater amberjack are pelagic and grouper are bottom fish, bycatch of greater amberjack is relatively low when fishing for red grouper and likely not greatly affected by changes in grouper management measures. Red snapper are not overfished or undergoing overfishing, but are under a rebuilding plan because stocks are below targeted population levels (SEDAR 52, 2017). Red snapper have been increasing in abundance in the eastern Gulf over the past two decades and fishermen have indicated they are discarding more red snapper. Most commercial grouper fishermen in the eastern Gulf were allocated few red snapper IFQ shares and therefore are unable to retain large quantities of red snapper when fishing for grouper (GMFMC, 2008c). Bycatch is a significant source of mortality in the red snapper fishery, resulting in the Council approving actions in Amendment 27/14 to reduce directed fishery bycatch such as the requirement to carry dehooking devices and venting tools as well as use circle hooks (note the venting tool requirement was rescinded in a 2013 framework action). The status of other shallow-water grouper species are unknown. Bycatch is not known to be significant for other SWG and deep-water grouper species, since many (e.g., yellowmouth grouper, rock hind, scamp, and red hind) have no or small minimum size limits (e.g. scamp – 16 inches TL).

Amendment 53 - Red Grouper                    194                    Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                       Practicability Analysis

0003667

**Practicability of current management measures in the directed red grouper fishery relative to their impact on bycatch and bycatch mortality.**

Bycatch and bycatch mortality can negatively affect a stock by reducing the number of fish that survive and become susceptible to harvest.  Fishery management regulations are intended to constrain effort and control fishing mortality, but in some cases increase bycatch or bycatch mortality.  When proposing fishing regulations, managers must balance the competing objectives of maximizing yield, ending overfishing, and reducing bycatch to the extent practicable.

The following describes current management measures and their relative impact on bycatch and bycatch mortality in the directed red grouper fishery.  The commercial red grouper fishery is managed under an IFQ program, whereby catch shares are allocated among shareholders with measures to prevent fishermen from harvesting more than their individual allocation.  The fishery also has gear restrictions and requirements, seasonal management measures (requirement for longline vessels to fish outside 35 fathom contour from June through August and outside 20 fathom contour for the rest of the year), and minimum size limits.  The recreational red grouper fishery is managed with size limits, bag limits (four grouper aggregate bag limit of which two can be red grouper), gear restrictions, and a closed season from February 1 through March 31 where SWG cannot be possessed if captured in waters beyond the 20-fathom contour.  There are also several restricted fishing areas intended to protect reef fish (in particular gag) spawning aggregations.

Size limits
Size limits are the greatest factors contributing to bycatch in the red grouper IFQ fishery (Pulver & Stephen, 2019).  Currently, there is an 18-inch TL commercial and a 20-inch recreational red grouper minimum size limit.  There are also minimum size limits for gag (24-inch TL minimum size limit for both the recreational and commercial), black grouper (24- inches TL), yellowfin grouper (20-inches TL), and scamp (16-inches TL).  Recent analysis of observer data from 2012-2018 indicate that over 99% of all commercially discarded red grouper and gag are discarded due to regulations.  The minimum size limit is the primary regulatory reason cited for discarding red grouper (97.0% of discards), gag (54.3%), and other SWG (46.4%-89.2%) in the commercial sector.  Size limits are also the primary reason for red grouper discards in the recreational red grouper sector.  Size limits are intended to protect immature fish and reduce fishing mortality.  The red grouper minimum size limit in the commercial sector is similar to the size at 50% maturity (~16- 20 inches; Moe 1969; Collins et al. 2002).  Gag minimum size limits are at or slightly above the size at 50% maturity (~21 inches; SEDAR 33 Update 2016).  Sizes at maturity for black grouper, yellowfin grouper, and scamp are 33 inches TL (NMFS 2005), 20 inches TL (Cummings, 2007), and 14 inches TL (NMFS 2005), respectively.   Size limits for yellowfin grouper and scamp are at or above the size at 50% maturity, while the size limit for black grouper is below the size at 50% maturity.

SEFSC conducted analyses (Ortiz 2007; Walter 2007) for gag and red grouper to identify the sizes that best balance the benefits of harvesting fish at larger sizes against losses due to natural mortality.   Walter (2007) found that yield per recruit (YPR) would increase as minimum size decreased for the red grouper commercial sector, but that there would be a corresponding decrease in spawning per recruit (SPR).  By reducing the red grouper size limit from 20 to 18

Amendment 53 - Red Grouper                    195                    Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                    Practicability Analysis

0003668

inches, the study predicted an increase in YPR of 2.6%, and a corresponding decrease in SPR of 1.5 percent.  Observer data collected onboard reef fish vessels during 2006 and 2007 supported the findings of Walter (2007), suggesting that red grouper longline discards would be reduced by approximately 38%, and handline discards would be reduced by approximately 33 percent upon reduction of the size limit to 18-inches TL.  Other analyses indicated that a reduction in size limit would reduce discard mortality by reducing the number of fish released after catch.  Coggins et al. (2007) found minimum size limits did not help fisheries for long-lived low-productivity species, such as groupers, achieve sustainability if discard mortality exceeded five percent.  Rudershausen et al. (2005) also concluded minimum size limits are only moderately effective for reef fish caught in shallower portions of their depth ranges, and nearly ineffective in deep waters.

A comparison of discards in the five years prior to the reduction in the commercial size limit from 20 to 18 inches (2004-2008) to the most recent 5 years available (2013-2017) reveals a vast decrease in discards in both the vertical line fishery (average decrease from 142,100 to 82,200 fish) and the longline fishery (480,300 to 237,700 fish).  The reduced minimum size is believed to be the primary reason behind this decrease.

**Closed Seasons and Quota Closures**

The commercial sectors of the Gulf reef fish fishery for groupers (including deep water grouper (DWG) and SWG) is managed under an IFQ program composed of four share categories:  red grouper, gag, DWG (which includes yellowedge grouper, warsaw grouper, snowy grouper, speckled hind, and scamp) and SWG (which includes black grouper, scamp, yellowfin grouper, yellowmouth grouper, warsaw grouper, and speckled hind).  IFQ shares are assigned to shareholders in percentages of the annual commercial quotas for DWG, red grouper, gag, and Other SWG, based on their applicable historical landings.  Shares determine the amount of IFQ allocation for Gulf groupers (in pounds gutted weight) a shareholder is initially authorized to possess, land, or sell in a given calendar year.  Fishing is open to shareholders throughout the fishing year, provided they have allocated quota available to them.  For more information on the IFQ program, see the NMFS's Southeast Regional Office Catch Shares webpage at http://portal.southeast.fisheries.noaa.gov/cs/main.html.

Discards by individual fishermen who have exhausted their red grouper annual allocation are not thought to be significant in the commercial sector, as several measures are available that may allow catch after a shareholder has exhausted their annual allocation (Pulver & Stephen, 2019).  Both red grouper and gag have a "multi-use allocation," which allows for, under certain conditions, continued harvest of either species after an IFQ account holder's allocation for that species has been landed and sold, or transferred.  This allocation is intended to reduce bycatch of both red grouper and gag by allowing fishermen to retain catch that they would otherwise be required to release as bycatch.  In addition, shareholders that have exhausted their annual allocation are permitted to purchase additional annual allocation from other entities with annual allocation.  This provision allows fishermen to retain catch that would otherwise be required to be released as bycatch.

The recreational SWG fishery is closed from February 1 through March 31 in waters beyond the 20-fathom contour (the recreational gag fishery is closed in Gulf waters from January through

Amendment 53 - Red Grouper                196                Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                Practicability Analysis

0003669

May).  This closed season was originally implemented for the recreational sector in all Gulf waters, but was modified in a 2012 framework to apply only in waters deeper than 20 m as specified by NMFS.  The closure is intended to protect SWG (especially gag, black, and red grouper) during spawning.  The closure is intended to reduce bycatch, since these species are commonly caught in the same areas and habitat.  Closed season discards are not believed to be significant in the recreational red grouper sector, as closures of other species that often occupy similar habitats (e.g. other SWG, gag) occur simultaneously.  Anglers are more likely to fish in other areas (i.e. less likely to be occupied by red grouper and other SWG) when the red grouper season is closed.

**Bag and Trip Limits**

The recreational SWG fishery is regulated by a 4-grouper aggregate bag limit, which may not include more than 1 speckled hind, more than 1 warsaw grouper, more than 2 red grouper, or more than 2 gag.  Recreational red grouper discards are primarily the result of the capture of undersized fish prior to reaching the bag limit, and the targeting of other reef fish in areas where red grouper are present after the red grouper bag limit has been reached.  In addition, some fishers may discard legally sized fish in effort to catch larger fish of the same species (high-grading).  High-grading is thought to be underreported in fisheries worldwide (Batsleer et al., 2016), and its prominence in the Gulf red grouper fishery in unknown.  However, discards of legal-size grouper occur less frequently at larger sizes, indicating that high-grading may occur.

**Allowable Gear**

Vertical hook-and-line gear (bandit rigs, manual handlines) and bottom longlines are the primary gears used in the commercial grouper sector.  Fish traps accounted for a small portion (generally 10-15%) of grouper catch prior to 2007, when they were prohibited in federal waters of the Gulf of Mexico.  In 2008, regulations were implemented requiring commercial and recreational fishermen to use circle hooks, venting tools, and dehooking devices when harvesting reef fish in the Gulf.  Circle hooks were commonly used in the commercial grouper industry prior to implementation of this new regulation.  In a 2013 framework, the venting tool requirement was rescinded.  It is unknown how extensively dehooking devices were used prior to these new gear requirements.

Longlines account for a majority of the red grouper commercial discards.  From 2013 through 2017, approximately 74 percent of red grouper commercial discards were from the bottom longline fishery (see Table B.2 above).  In addition, the bottom longline has a higher estimated discard mortality rate at 44.1 percent (post-IFQ; SEDAR 61 2019), so this fishery contributes to a proportionally higher percentage of red grouper dead discards, as well as to dead discards of other reef fish species.

Recreational discards are primarily due to the recreational size limit, but allowable gears can affect release mortality rates.  Rod-and-reel is the primary gear used in the recreational sector.  Circle hooks are required gear for all hook and line anglers to harvest grouper and other reef fishes.  Brulé et al. (2015) found that larger circle hooks caught significantly larger sizes of red grouper.  Garner et al. (2020) also projected that larger circle hooks could modestly increase retained catch while drastically reducing the number of discarded fish.  We don't currently have

Amendment 53 - Red Grouper                          197                          Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                                        Practicability Analysis

0003670

adequate information on the size of circle hooks used by anglers in the Gulf or on the affect that has on bycatch of undersized species. Recreational anglers also use spears to capture grouper. Spearfishing does not affect release mortality since all fish caught are killed. Only undersized grouper mistakenly killed while spearfishing would contribute to dead discards.

No gear restrictions are proposed in this amendment to further limit bycatch or bycatch mortality of reef fishes, including grouper.

**Time/Area Closures**

The Council created two restricted fishing areas to specifically protect spawning aggregations of gag in 2000. The Madison-Swanson and Steamboat Lumps marine restricted fishing areas are located in the northeastern Gulf at a depth of 40 to 60 fathoms. Both areas prohibit bottom fishing and possession of Gulf reef fish (except during transit under certain conditions). The Council and NMFS are currently considering more stringent regulations in these areas that would prohibit trolling (except for highly migratory species [HMS] species) and possession of reef fish at all times. All fishing is also prohibited in the Tortugas marine reserves in the southern Gulf near the Dry Tortugas. Marine reserves and time/area closures benefit fish residing within reserve boundaries by prohibiting their capture during part or all of the year. Within marine reserves, fish that are undersized potentially have an opportunity to grow to legal size without the threat of being captured by fishing gear. If these fish emigrate from the marine reserve (i.e., spillover effect), then they may be caught as legal fish outside the reserve, thereby reducing bycatch. However, anglers and commercial fishermen may redistribute their effort to areas surrounding the marine reserve. If fishing pressure in these areas is increased, then any benefits of reduced bycatch of fish in the marine reserve may be partially or fully offset by increases in bycatch of fish residing outside the marine reserve.

In addition, the Council created several seasonal restrictions to protect red grouper. Commercial fishermen with a bottom longline endorsement must fish outside the 35-fathom contour from June – August (must fish outside 20 fathom contour the rest of the year). The recreational red grouper fishery has a seasonal closure each year from February 1 through March 31.

**Alternatives being considered to minimize bycatch**

No measures are proposed in this amendment to directly reduce the bycatch of red grouper and other species. However, the choice of alternatives in Action 1 is likely to impact the amount of bycatch. **Alternative 2** would result in an increase in the commercial ACL and a decrease in the recreational ACL. A decrease in the recreational red grouper ACL (as proposed in Action 1, **Alternative 2**) is likely to indirectly reduce bycatch, as it is expected to result in reduced effort in the recreational sector. The recreational sector is responsible for higher levels of bycatch and bycatch mortality than the commercial sector, and thus the reduced effort and catch in this sector is expected to reduce bycatch and mortality. Although the commercial ACL would increase under **Alternative 2**, the increase is outweighed by the larger decrease in the recreational sector ACL (where bycatch is higher), and thus **Alternative 2** is expected to result in a net decrease in bycatch and bycatch mortality. **Alternatives 3-5** in Action 1 would result in a decrease in both the recreational and commercial ACL, which is expected to reduce bycatch and bycatch

Amendment 53 - Red Grouper                     198                     Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                     Practicability Analysis

0003671

mortality.  **Alternative 6** would implement an ACL that is in between **Alternative 2** and **Alternatives 3**-**5**.  The commercial ACL would remain the same as it is currently (3.16 mp), and the recreational ACL would be higher than **Alternative 2**, but lower than **Alternatives 3**-**5**.  Because the commercial ACL would not change, there is expected to be no change in impact on bycatch species in the commercial fishery.  The decrease in recreational quota under **Alternatives 2**-**6** is expected to result in a corresponding decrease in overall bycatch and bycatch mortality, although this decrease may be partially mitigated by an increase in regulatory discards by reef fishermen targeting other species.

The alternatives in Action 2, which set the ACT for the commercial and recreational sector, are expected to have only minor impacts on bycatch.  Alternative 1 (no action), which would maintain the buffers currently in place, would have no impact beyond that discussed above in Action 1.  **Alternative 2** would have the largest impact of the three alternatives, as it would eliminate the commercial buffer (from 5%).  Elimination of the 5% buffer would in effect negate the multi-use provision in which red grouper can be captured and kept while fishing for gag.  If this buffer is eliminated, then all red grouper captured in the gag fishery (by those without available red grouper shares) would be required to be released.  This would result in greater bycatch of and mortality of red grouper.  Both **Alternatives 2** and **3** would increase the recreational buffer from 8% to 9%, but the relatively small scope of the additional buffer is expected to have minor to negligible impacts on bycatch.

## Practicability Analysis

### Criterion 1: Population effects for the bycatch species

Measures being considered in this action would 1) modify the allocation of red grouper catch among the recreational and commercial fisheries and set the OFL, ABC, and ACLs (Action 1), and 2) set the ACTs for the commercial and recreational sectors (Action 2).  These actions are intended to ensure that the historical participation by the recreational and commercial sectors are accurately reflected and that recreational catch levels are consistent with the data used to monitor recreational landings and trigger accountability measures.

The impact on populations of red grouper as a result of the measures considered in this action are likely to be both positive and negative.  Action 1 includes alternatives that either maintain current sector allocations percentages (**Alternatives 1** and **2**) or decrease the commercial allocation percentage with a corresponding increase in recreational sector allocation percentage (**Alternatives 3**-**6**).  **Alternative 1** (No Action) is not a legally defensible option, so will not be analyzed here.  **Alternatives 2**-**6** would update the recreational ACL to MRIP-FES units as opposed to MRIP-Coastal Household Telephone Survey (CHTS) units.  The MRIP-FES dataset is a more accurate representation of actual catch by the recreational sector.  Because recreational catch estimates are higher under MRIP-FES than they were under MRIP-CHTS, there is a resultant increase in recreational and decrease in commercial sector allocation percentages under **Alternatives 3**-**6**, which would likely affect red grouper bycatch rates and totals.

**Alternative 2** would maintain the current percentages used for sector allocations, but would update the OFL, ABC, and ACL based on the Council's Scientific and Statistical Committee

Amendment 53 - Red Grouper                    199                    Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                                      Practicability Analysis

0003672

(SSC) recommendations, which are derived from the projections that use the MRIP-FES time series of recreational landings.  Therefore, **Alternative 2** would implement a slightly higher total ACL and a substantially higher commercial ACL than any other alternative (including the no action), while also resulting in the largest decrease in the recreational ACL.  Because the recreational sector is responsible for greater red grouper bycatch/mortality than the commercial sector, **Alternative 2** would have more positive impacts on the populations of red grouper than the other alternatives.  Because the recreational quota would be substantially reduced (by ~44%), it is expected to result in a reduction in recreational fishing effort for red grouper, and thus a decrease in bycatch/mortality of red grouper.  This beneficial impact could be partially offset by an increase in regulatory discards that could occur when red grouper are captured by fishermen targeting other species.  Although the commercial ACL would increase (by ~15%), the increase would be small relative to the decrease in the recreational ACL, and would still be expected to result in a net reduction in bycatch from the current rate.  In addition, when compared to other recent years, the ACL (and thus expected bycatch) will be substantially lower, and would be expected to result in greatly reduced bycatch of red grouper when compared to levels from the recent past.

**Alternatives 3-5** in Action 1 are very similar (a 1.2% difference in quota allocation is the largest disparity), and differences between them are likely insignificant in how they would affect populations of bycatch species.  However, each of the three action alternatives would likely result in a decrease in bycatch and in dead discards of red grouper when compared to current management.  Each of these alternatives would have a lower ABC and ACL due to the higher discard and discard mortality in the recreational fishery.  A decrease would occur because the action alternatives would decrease both the recreational ACL (by 0.37-0.40 mp) and the commercial ACL (by 0.56-0.63 mp).  The decreases in both quotas are expected to result in a corresponding decrease in red grouper bycatch and bycatch mortality.

**Alternative 6** would implement an ACL that is in between **Alternative 2** and **Alternatives 3-5**.  The commercial ACL would remain the same as it is currently (3.16 mp), and the recreational ACL would be higher than **Alternative 2**, but lower than **Alternatives 3-5**.  Because the commercial ACL would not change, there is expected to be no change in impact on red grouper bycatch in the commercial fishery.  The decrease in recreational quota under **Alternative 6** is expected to result in a corresponding decrease in red grouper bycatch and bycatch mortality, although this decrease may be partially mitigated by an increase in regulatory discards by reef fishermen targeting other species.

All alternatives in Action 2 are likely to have similar and negligible impacts on red grouper bycatch in the recreational sector.  All of the Action 2 alternatives would either maintain or slightly increase the recreational buffer (by 1%, or 11,800-17,300 lb).  In spite of relatively high bycatch rates in the recreational sector, the potential increase in the buffer is small relative to the ACL, especially when compared to the higher red grouper ACLs in recent years.  Thus, none of the recreational buffers in the Action 2 alternatives are likely to appreciably impact the populations of red grouper.

The alternatives in Action 2 are likely to have impacts on red grouper populations in the commercial sector that range from negligible to slightly negative.  **Alternatives 1** and **3**, which

Amendment 53 - Red Grouper                    200                    Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                    Practicability Analysis

0003673

would maintain the current 5% buffer in the commercial sector, are expected to have negligible impacts on red grouper bycatch as they are not expected to increase bycatch compared to current levels.  **Alternative 2**, which would eliminate the 5% commercial buffer, is likely to have negative impacts on bycatch, but more so for gag grouper than red grouper.  Both the red grouper and gag share categories have a multi-use provision that allows a portion of the red grouper quota to be harvested under the gag allocation, and vice versa.  Each year, the program assigns a portion of each shareholder's red grouper and gag as a multi-use allocation category, which is equal to the difference between each species' ACL and the ACT.  The intent of the multi-use provision is to provide for allocation if either gag or red grouper are landed as incidental catch. If this buffer is eliminated, then all gag grouper captured in the red grouper fishery (by those without available gag grouper shares) would be required to be released.  This would result in greater bycatch of and mortality of gag grouper.

**Criterion 2: Ecological effects due to changes in the bycatch of red grouper (effects on other species in the ecosystem)**

The relationships among species in marine ecosystems are complex and poorly understood, making the nature and magnitude of ecological effects difficult to predict with any accuracy. The most recent red grouper stock assessment (SEDAR 61 2019) indicates that although the red grouper stock in the Gulf of Mexico is not overfished nor undergoing overfishing, it remains below the target spawning stock biomass (SSB) in 2017.

Alternatives in Action 1 of this amendment vary, but all of the alternatives are expected to have a similar impact on fishing mortality for red grouper.  Increases in the recreational ACLs in **Alternatives 3-6** relative to **Alternative 2** are only due to how catch is estimated in the recreational sector, and none of the alternatives is expected to result in greater landings of red grouper.  However, as explained in criterion 1 above, **Alternative 2** is likely to result in lower bycatch because of the higher allocation to the commercial sector over the recreational sector, and the decrease in allocation to the recreational sector.  However, this may be partially offset by regulatory discards of red grouper by fishermen targeting other species during the closed season. **Alternative 2** does increase the commercial ACL from current management, but the increased bycatch expected from the higher ACL is expected to be outweighed by the decrease in the recreational bycatch associated with that lower ACL.  In addition, when compared to the substantially higher ACLs in the red grouper fishery (and likely bycatch totals) in the recent past, any impacts of **Alternative 2** are expected to be relatively minor.  **Alternatives 3-6** are expected to decrease fishing effort and catch/mortality for bycatch species by decreasing the ACL to both the recreational and commercial sectors of the fishery.

With regard to recreational fishing, all alternatives in Action 2 are likely to have similar and negligible ecological impacts.  These alternatives would either maintain or slightly increase the recreational buffer.  Although the recreational sector has high bycatch, the 1% increase in the recreational buffer (**Alternatives 2** and **3**) is small relative to the ACL, especially when compared to the higher ACLs in the red grouper fishery in recent years.  The recreational buffers in the Action 2 alternatives are likely to maintain or nominally reduce fishing effort, and are unlikely to have appreciable ecological effects.

Amendment 53 - Red Grouper                              201                              Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                              Practicability Analysis

0003674

With regard to commercial fishing, the alternative in Action 2 are likely to have ecological impacts that range from negligible to slightly negative. **Alternatives 1** and **3**, which would maintain the current 5% buffer in the commercial sector, are expected to have negligible ecological impacts as they are not expected to increase catch, bycatch, or alter fishing practices (beyond the potential impacts discussed in Action 1). **Alternative 2**, which would eliminate the 5% commercial buffer, is likely to have slightly negative ecological impacts. This is because elimination of the 5% buffer would in effect negate the multi-use provision in which gag grouper can be captured and kept while fishing for red grouper. If this buffer is eliminated, then all gag grouper captured in the red grouper fishery (by those without available red grouper shares) would be required to be released. This would result in greater bycatch of and mortality of gag grouper, which may have slightly negative ecological impacts.

SEDAR 61 (2019) projected that biomass for red grouper is estimated to increase until 2020, after which the stock may decline due to the diminishing size of the large 2013 recruitment year class. Additionally, much is unknown about the effect that the 2018 red tide event had on red grouper populations. The model that the SSC used for projections assumed a red tide mortality rate similar to the 2005 event. However, another scenario that was modelled in the assessment that assumed higher mortality in the 2018 red tide event resulted in a greatly increased probability of overfishing. In spite of this, the best science available supports that the proposed alternatives for OFL, ABC, ACL, and ACT would result in stable or increased red grouper stocks. Because red grouper stocks are currently lower than recent and historic high levels, it is unlikely that any population increases resulting from this amendment would be substantively detrimental to other species. However, it is possible that forage species and competitor species could decrease in abundance in response to an increase in grouper abundance. Changes in the bycatch of red grouper is not expected to directly affect other species in the ecosystem. Although birds, dolphins, and other predators may feed on grouper discards, there is no evidence that any of these species rely on grouper discards for food.

**Criterion 3: Changes in the bycatch of other species of fish and invertebrates and the resulting population and ecosystem effects**

Population and ecosystem effects resulting from changes in the bycatch of other species of fish and invertebrates are difficult to predict. Other SWGs, gag, snappers, greater amberjack, gray triggerfish and other reef fishes are commonly caught in association with red grouper (Scott-Denton et. al, 2011). Most of these species are not undergoing overfishing and are not overfished, with the exception of greater amberjack (overfished/undergoing overfishing). Because greater amberjack are pelagic, they are uncommonly captured when fishing for demersal species such as SWG and red grouper. Regulatory discards significantly contribute to fishing mortality in all of these reef fish fisheries, except gray triggerfish and vermilion snapper.

No measures are proposed in this amendment to directly reduce the bycatch of other reef fish species. However, changes in the commercial red grouper ACL and ACT are likely to indirectly affect bycatch totals. Each alternative in Action 1 is likely to result in reduced overall bycatch due to decreased recreation fishing effort for red grouper. However, this reduction may be partially mitigated be regulatory discards of red grouper that are captured by fishermen targeting other reef fish species. Likewise, alternatives in Action 2 are expected to result in decreased bycatch, except that **Alternative 2** is likely to result in greater bycatch/mortality of red grouper.

Amendment 53 - Red Grouper                202                Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                Practicability Analysis

0003675

However, none of the alternatives in Action 2 are likely to result in increased bycatch/mortality of other fish or invertebrates. In any case, due to the relatively modest proposed changes in ACL and ACT in any of the alternatives, the effect of any alternative on bycatch and bycatch mortality of other species of fish and invertebrates, and resulting population and ecosystem effects, are expected to be minimal and positive.

**Criterion 4: Effects on marine mammals and birds**

The effects of current management measures on marine mammals and birds are described above. Bycatch minimization measures evaluated in this amendment are not expected to significantly affect marine mammals and birds. There is no information to indicate marine mammals and birds rely on grouper for food.

**Criterion 5: Changes in fishing, processing, disposal, and marketing costs**

If the red grouper commercial sector allocation is reduced relative to the recreational sector, it would result in a reduction in allocation for commercial fishermen and is thus expected to result in economic loss. However, the economic loss to commercial fishermen may be partially offset by increased market prices as a result of the decrease in domestic harvest and supply. Recreational anglers would be allotted similar or slightly decreased levels of catch through this action, so it is unlikely to have a substantive negative effect on that sector. In general, changes to the ACTs in Action 2 are small in scope relative to current management levels, and are unlikely to result in appreciable economic loss or gain. However, **Alternative 2** of Action 2, which would eliminate the commercial buffer, would result in reduced revenue for gag fishers who do not have red grouper annual allocation because they would be required to release all captured red grouper. For a more complete discussion of the changes in fishing costs associated with the various management actions, see Section 3.4 of this document.

**Criterion 6: Changes in fishing practices and behavior of fishermen**

Measures proposed in this action are expected to have negative impacts on fishing practices for recreational red grouper anglers. All of the alternatives in Action 1 (except for the No Action-which is not legally viable) would set recreational catch limits that are reduced from current measures. Each of these alternatives would require monitoring the recreational landings in MRIP-FES currency. As explained previously in Section 1.1 of this document, this currency is more than double MRIP-CHTS currency which is currently used in management. Thus, even though the recreational ACL values would increase over the No Action alternative, it would equate to a reduction in recreational ACL no matter the alternative selected. **Alternative 2** would result in the greatest reduction to recreational component (~44%) while **Alternatives 3-6** would result in more modest reductions (~21-31%). Thus, any of the alternatives are likely to reduce fishing opportunities, effort, and landings in the recreational sector.

Measures proposed in this action could also result in changes to fishing practices and behavior of commercial fishermen. **Alternative 6** would maintain the current commercial allocation, and thus is not expected to impact commercial fishing practices or behavior. **Alternative 2** would increase the commercial ACL, and would provide larger IFQ shares for the commercial sector. This increase would potentially result in greater fishing effort and increased landings. However,

Amendment 53 - Red Grouper                    203                    Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                            Practicability Analysis

0003676

because the increase would be small in scope, it is not expected to appreciably change fishing practices and behavior beyond a modest increase in effort.  The reduced allocations for the commercial sector proposed in **Alternatives 3-5** are expected to result in reduced annual allocation for those with IFQ shares.  These shareholders would have a smaller quota which is expected to reduce effort and may affect decisions about when and where to fish.  These shareholders are likely to spend additional time targeting other fish species.  In addition, these shareholders may choose to fish only when red grouper market prices are high in attempt to maximize profits from their reduced allocation.  While all impacts of the reduced commercial allocation are not known, these are a few of many potential changes in fishing practices and behaviors that could occur.

### Criterion 7: Changes in research, administration, and enforcement costs and management effectiveness

Proposed measures are not expected to significantly impact administrative costs.  The impetus for implementing changes in allocation between the recreational and commercial sectors is to more accurately reflect what has been occurring in the fishery.  None of the actions are expected to diminish regulatory effectiveness.

### Criterion 8: Changes in the economic, social, or cultural value of fishing activities and non-consumptive uses of fishery resources

Constraining red grouper catch to the ACLs is expected to positively benefit the red grouper stock by reducing the likelihood of overfishing and increasing the ABC and ACL in the future.  However, if allocation to the commercial sector is reduced, it is likely to reduce profits and potentially shift fishing effort to other species and fisheries.  Any reduction in bycatch may result in an increase in the red grouper stock, which will positively affect the social and economic value of fishing activities.  For a more complete discussion, see sections 3.4 and 3.5 and sections 4.1.3, 4.2.3, 4.1.4, and 4.2.4 of this document.

### Criterion 9: Changes in the distribution of benefits and costs

Currently, the red grouper ACL is split between the commercial sector (76% of the allocation) and the recreational sector (24%) of the allocation.  This ratio was developed based on historical catch from each sector using the best data available at the time.  However, new data collection techniques in the recreational sector, have resulted in revised estimates of recent and historic recreational catch.  This action would consider revising the commercial/recreational allocation ratio based on this new technique.

Alternative 2 is expected to result in net long-term economic benefit to the commercial fishery and reduced benefits to the recreational sector, while Alternatives 3-5 are expected to result in net long-term economic reductions in benefits to both the commercial and recreational sector, although the reductions to the recreational sector would be less than under Alternatives 2.  Alternative 6 would result in no change in economic benefit to the commercial fishery, but would reduce economic benefits to the recreational sector (the reduction in benefits would be about midway between that of Alternative 2 and that of Alternatives 3-5).  The recreational

sector discards a much larger amount of red grouper as bycatch, but the increases in recreational allocation are accompanied by a decrease in overall ACL to mitigate the effects of the increased bycatch. The allocation splits proposed in **Alternatives 3-5** (and to a lesser extent **Alternative 6**) are more representative of tradition and recent fishery harvest.  If the change in allocation results in an increase in the red grouper stock relative to the current population level, there would be longer-term economic benefits to both the recreational and commercial sectors.  However, Alternatives 3-5 may be perceived by the commercial sector as inequitable, since the total commercial sector ACL would be reduced (thus decreasing pounds of allocation for shareholders) relative to the recreational sector.  This is likely to reduce profits in the commercial sector, especially in the short-term, and may result in a shift in focus to fishing for other species.

**Criterion 10: Social effects**

Bycatch is considered wasteful because it reduces overall yield obtained from the fishery. Because this action is expected to indirectly reduce bycatch and mortality, it will increase efficiency, reduce waste, and benefit stocks, thereby resulting in net social benefits.   Higher recreational catch limits should have positive social effects, while reduced commercial catch limits, and the resulting economic loss to the commercial sector, are likely to have negative social effects.

## CONCLUSIONS

Analysis of the ten bycatch practicability factors indicates there would likely be neutral to low positive biological impacts associated with reallocating catch among the recreational and commercial sectors by further reducing bycatch and bycatch mortality in the directed grouper fishery.  This reallocation is intended to more accurately follow historical catch rates, and the implementation of new catch levels will reduce overall catch in the fishery, including both targeted catch and bycatch. The main benefits of reducing grouper bycatch are: 1) less waste and 2) increased yield in the directed fishery. Reducing discards and discard mortality rates would result in less forgone yield.  Reducing red grouper ACLs is expected to reduce bycatch and discard mortality.  The benefits of the ACL reduction on red grouper bycatch may be partially offset by the regulatory discards that would occur by fishermen that target other species and catch red grouper after the closure.  There are likely to be negative social and economic effects to the commercial sector, stemming largely from the expected reduction in income that is likely if this Amendment is implemented.  The Council will have to weigh the benefits of reducing bycatch with the negative social and economic effects that the commercial sector would face.

**Additional Citations**

Thierry Brulé, T., J. Montero-Muñoz, N. Morales-López and A. Mena-Loria.  2015.  Influence of Circle Hook Size on Catch Rate and Size of Red Grouper in Shallow Waters of the Southern Gulf of Mexico, North American Journal of Fisheries Management, 35:6, 1196-1208, DOI: Batsleer J., K. G. Hamon, H. M. J. van Overzee, A. D. Rijnsdorp & J. J. Poos. High-grading and over-quota discarding in mixed fisheries. *Rev Fish Biol Fisheries* **25,** 715–736 (2015). https://doi.org/10.1007/s11160-015-9403-0

Amendment 53 - Red Grouper                    205                    Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                    Practicability Analysis

0003678

Coggins, L.G., M.J. Catalano, M.S. Allen, W.E. Pine, and C.J. Walters. 2007. Effects of cryptic mortality and the hidden costs of using length limits in fishery management. Fish and Fisheries 8:196-210.

Collins, L. A., G. R. Fitzhugh, L. A. Lombardi-Carlson, H. M. Lyon, W. T. Walling, and D. W. Oliver. 2002. Characterization of red grouper (Serranidae: *Epinephelus morio*) reproduction from the eastern Gulf of Mexico: 1992-2001. NMFS SEFSC Panama City Lab Contrib. Ser 2002-07.

Cummings, N.J. 2007. Important aspects of the life history of the yellowfin grouper, *Mycteroperca venenosa*, with emphasis on populations in the Caribbean. SEDAR 14. National Marine Fisheries Service, Southeast Fisheries Science Center, Sustainable Fisheries Division, Miami, FL. Sustainable Fisheries Division Contribution SFD 2007-005 (SEDAR14-DW-01). 20 pp.

Garner, S.B., W.F. Patterson III, J.F. Walter, and C.E. Porch, 2020. Simulating effects of hook-size regulations on recreational harvest efficiency in the northern Gulf of Mexico red snapper fishery. *Fisheries Research* **228**, 105561 (2020). https://doi.org/10.1016/j.fishres.2020.105561

Moe, M.A., Jr. 1969. Biology of red grouper (*Epinephelus morio* Valenciennes) from the eastern Gulf of Mexico. Prof. Pap. Ser. Mar. Lab. Fla. 10, 95 p.

NMFS (2005). Stock Assessment and Fishery Evaluation for the Snapper Grouper Fishery of the South Atlantic. NOAA, NMFS, SERO, 263 13th Ave. South, St. Petersburg, Florida. 130pp.

Ortiz, M. 2007. Analysis on the effects of yield per recruit of alternative minimum size limit regulations for the fisheries of gag grouper Gulf of Mexico. NOAA Fisheries Service, SEFSC, Miami, Florida. SFD Contribution No. SFD-2007- 030. 10 pp.

Powell, J.R. and Wells, R.S. 2011. "Recreational fishing depredation and associated behaviors involving common bottlenose dolphins (Tursiops truncatus) in Sarasota Bay, Florida". Publications, Agencies and Staff of the U.S. Department of Commerce. 308. https://digitalcommons.unl.edu/usdeptcommercepub/308

Pulver, J.R., and J.A. Stephen. 2019. Factors that influence discarding in the Gulf of Mexico commercial grouper-tilefish IFQ reef fish fishery. Fisheries Research 218 (2019), 218-228. https://doi.org/10.1016/j.fishres.2019.05.018

Pulver, Jeffrey Robert (2015). Modeling Community Structure and Abundance Using Observer Data for the U.S. Gulf of Mexico Deepwater Reef Fishery. Master's thesis, Texas A & M University. Available electronically from http : / /hdl .handle .net /1969 .1 /155417.

Rudershausen, P.J., A. Ng, and J.A. Buckel. 2005. By-catch, discard composition, and fate in the snapper/grouper commercial fishery, North Carolina. NC Sea Grant 04-FEG-08.

Sauls, B. 2005. Headboat at-sea sampling protocols. Florida Fish and Wildlife Conservation Commission Internal Report. 8 pp.

Amendment 53 - Red Grouper                206                Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                Practicability Analysis

0003679

Scott-Denton, E., Cryer, P. F., Gocke, J. P., Harrelson, M. R., Kinsella, D. L., Pulver, J. R., Smith, R. C. & Williams, J. A. (2011). Descriptions of the U.S. Gulf of Mexico reef fish bottom longline and vertical line fisheries based on observer data. *Marine Fisheries Review* **73**, 1– 26.

SEDAR 33 Update Report. 2016. SEDAR 33 Update Report Gulf of Mexico Gag Grouper. NOAA Fisheries Service, SEFSC, Miami, Florida. 123 pp.

Walter, J. 2007. Yield per recruit analysis for red grouper. NOAA Fisheries Service, SEFSC, Miami, Florida. 21 pp.

Amendment 53 - Red Grouper                    207                    Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                    Practicability Analysis

0003680

# APPENDIX C.   GULF OF MEXICO FISHERY MANAGEMENT COUNCIL – ALLOCATION POLICY

**Gulf of Mexico Fishery Management Council**
**Fishery Allocation Policy**
(http://gulfcouncil.org/wp-content/uploads/GMFMC-SOPPs-Fishery-Allocation-Policy.pdf)

The allocation policy presented herein was developed by the Gulf of Mexico Fishery Management Council to provide principles, guidelines, and suggested methods for allocation that would facilitate future allocation and reallocation of fisheries resources between or within fishery sectors.

Issues considered in this allocation policy include principles based on existing regulatory provisions, procedures to request and initiate (re)allocation, (re)allocation review frequency, tools and methods suggested for evaluating alternative (re)allocations.

1.  Principles for Allocation

    a.  Conservation and management measures shall not discriminate between residents of different states.

    b.  Allocation shall:

        (1)  be fair and equitable to fishermen and fishing sectors;
             • fairness should be considered for indirect changes in allocation
             • any harvest restrictions or recovery benefits be allocated fairly and equitably among sectors

        (2)  promote conservation
             • connected to the achievement of OY
             • furtherance of a legitimate FMP objective
             • promotes a rational, more easily managed use

        (3)  ensure that no particular individual, corporation, or other entity may acquire an excessive share.

    c.  Shall consider efficient utilization of fishery resources but:

        (1)  should not just redistribute gains and burdens without an increase in efficiency

        (2)  prohibit measures that have economic allocation as its sole purpose.

    d.  Shall take into account: the importance of fishery resources to fishing communities by utilizing economic and social data in order to:

      (1)    provide for the sustained participation of fishing communities

      (2)    minimize adverse economic impacts on fishing communities.

  e.    Any fishery management plan, plan amendment, or regulation submitted by the Gulf Council for the red snapper fishery shall contain conservation and management measures that:

      (1)    establish separate quotas for recreational fishing (including charter fishing) and commercial fishing

      (2)    prohibit a sector (i.e., recreational or commercial) from retaining red snapper for the remainder of the season, when it reaches its quota

      (3)    ensure that the recreational and commercial quotas reflect allocation among sectors and do not reflect harvests in excess of allocations.

2.  Guidelines for Allocation

  a.    All allocations and reallocations must be consistent with the Gulf of Mexico Fishery Management Council's principles for allocation.

  b.    An approved Council motion constitutes the only appropriate means for requesting the initiation of allocation or reallocation of a fishery resource.  The motion should clearly specify the basis for, purpose and objectives of the request for (re)allocation.

  c.    The Council should conduct a comprehensive review of allocations within the individual FMPs at intervals of no less than five years.

  d.    Following an approved Council motion to initiate an allocation or reallocation, the Council will suggest methods to be used for determining the new allocation. Methods suggested must be consistent with the purpose and objectives included in the motion requesting the initiation of allocation or reallocation.

  e.    Changes in allocation of a fishery resource may, to the extent practicable, account for projected future socio-economic and demographic trends that are expected to impact the fishery.

  f.    Indirect changes in allocation, i.e., shifts in allocation resulting from management measures, should be avoided or minimized to the extent possible.

3.  Suggested Methods for Determining (Re)Allocation
  a.    Market-based Allocation

      (1)    Auction of quota
      (2)    Quota purchases between commercial and recreational sectors

- determine prerequisites and conditions;
  - quota or tags or some other mechanism required in one or both sectors
  - mechanism to broker or bank the purchases and exchanges
  - annual, multi-year, or permanent
  - accountability for purchased or exchanged quota in the receiving sector.

b.   Catch-Based (and mortality) Allocation

(1)   historical landings data
- averages based on longest period of credible records
- averages based on a period of recent years
- averages based on total fisheries mortality (landings plus discard mortality) by sector
- allocations set in a previous FMP
- accountability (a sector's ability to keep within allocation)

c.   Socioeconomic-based Allocation

(1)   socio-economic analyses
- net benefits to the nation
- economic analysis limited to direct participants
- economic impact analysis (direct expenditures and multiplier impacts)
- social impact analysis
- fishing communities
- participation trends
- "efficiency" analysis
  - lowest possible cost for a particular level of catch;
  - harvest OY with the minimum use of economic inputs

d.   Negotiation-Based Allocation

(1)   Mechanism for sectors to agree to negotiation and select representatives

(2)   Mechanism to choose a facilitator

(3)   Negotiated agreement brought to Council for normal FMP process of adoption and implementation.

# APPENDIX D.   ALLOCATION TRIGGERS

Department of Commerce * National Oceanic & Atmospheric Administration * National Marine Fisheries Service

**NATIONAL MARINE FISHERIES SERVICE PROCEDURAL DIRECTIVE 01-119-01**

**July 27, 2016**

**Fisheries Management**

**Criteria for Initiating Fisheries Allocation Reviews.  Council Coordinating Committee Allocation Workgroup Guidance Document.**

**NOTICE:**  This publication is available at:  http://www.nmfs.noaa.gov/op/pds/index.html

**OPR:** F/SF (CCC Allocation Workgroup)                    **Certified by: F/SF (A. Risenhoover)**
**Type of Issuance:** Initial

**SUMMARY OF REVISIONS:**

Signed

Alan Risenhoover
Director, Office of Sustainable Fisheries

## Criteria for Initiating Fisheries Allocation Reviews
## Council Coordinating Committee Allocation Workgroup
## Guidance Document
## Approved by the CCC June 24, 2015

### Introductory Comments

Fishery allocations can occur at a variety of levels:  among countries, communities, sectors within a fishery, gear types within a sector, across seasons, and among individual participants.  While allocations between commercial and recreational sectors often figure prominently in fisheries allocations, this guidance document is intended to apply to any type of allocation review Regional Fishery Management Councils (councils) may consider.  This Council Coordination Committee (CCC) working group report explores several potential mechanisms for allocation reviews, including criteria based on fishery indicators, time, or public interest. Although the alternatives are not mutually exclusive, the effective implementation of one alternative may ameliorate the need for others.

U.S. marine fisheries and the human interactions with those fisheries are dynamic. Populations in U.S. coastal shoreline counties increased by 34.8 million from 1970 through 2010 (stateofthecoast.noaa.gov). Despite the dynamic nature of these interactions, fisheries allocations are difficult to review and amend.

At the same time, demands for fishery allocation reviews have been increasing. Consider that the ten highest priority recommended actions to improve saltwater recreational fisheries management at the 2014 NMFS Recreational Fisheries Summit included two council-related priorities relevant to the review of allocations: 1) Achieving more equitable council representation and 2) Readjust recreational and commercial allocations.

A number of factors contribute to the challenges in allocation review. Allocation reviews are demanding with respect to the technical work necessary to analyze complex social and economic tradeoffs associated with existing or prospective allocations.  In addition, while fishery resources are public trust resources, allocation discussions are inherently politically challenging since they are viewed in zero-sum terms by stakeholders.  Despite these challenges, careful consideration of allocation decisions is necessary to meet the mandates of the Magnuson Stevens Fishery Conservation and Management Act (MSA).

The MSA defines optimum yield as "the amount of fish which—
"(A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities,..." Allocation is immediately relevant to achieving optimum yield.

Allocation review mechanisms should provide transparent processes for adequate reviews of allocations to ensure that U.S. fisheries are managed to achieve National Standard 1.  While the demographic composition of some regional councils closely mirrors that of the commercial and recreational fisheries within a specific region, some councils do not have significant recreational representation among their political appointees. Asymmetrical council compositions further underscore the need for well-defined and transparent processes to ensure fairness and responsiveness to the issue of allocation.

Regardless of the mechanism ultimately used to trigger an allocation review, councils may benefit from developing and maintaining a prioritized schedule for review of allocation issues. Such an effort could provide for a more orderly consideration of this topic and help manage expectations among stakeholders and managers.

In order to address the above issues the CCC Allocation Working Group proposes a protocol based on adaptive management consisting of three separate steps:  (a) Triggering an allocation review; (b) the allocation review; (c) and if deemed necessary by the review, a reallocation action to amend the FMP.  Critical aspects are the decision threshold for initiating an allocation review and the subsequent  reallocation action.  The focus of the CCC working group's exploration is the first of those steps – triggering an allocation review. Therefore, the remainder of this document is organized as follows:

    A.  Adaptive Management
       1.  Introduction
       2.  Goals and objectives of the allocation decision as criteria for triggering allocation review

2

NMFSPD-01-119-01 July 27, 2016

   3.  Defining the management action for potential review
   4.  Monitoring the achievement of management goals and objectives and the effects of the allocation
   5.  Evaluating the achievement of management goals and objectives and the impacts of the allocation
   6.  Adapting in response to evaluation and learning
   7.  Reconsidering management goals and objectives
 B.  Definitions
   1.  Statement of Purpose
   2.  What are the steps involved in adaptive management of allocation decisions?
   3.  What is an allocation review?
   4.  What is a reallocation action?
 C.  Three approaches to triggering allocation reviews
   1.  Public interest-based criteria
      a.  Ongoing public input on fishery performance
      b.  Solicitation of public input on fishery performance
      c.  Formal petitions
   2.  Time-based criteria
   3.  Indicator-based criteria
      a.  Economic criteria
      b.  Social criteria
      c.  Ecological criteria

## Adaptive Management

### Introduction

The concept of adaptive management –evaluating successful attainment of management objectives and adjusting strategies in response – has been thoroughly explored in natural resource management literature. While the discussion of requiring a review of allocation decisions by councils has emerged more recently, it is one that contemplates an adaptive approach to one of the most challenging and controversial aspects of federal fisheries management. This section characterizes important considerations in identifying the need to review allocation decisions in the context of adaptive management and its process components.

The working group notes the importance of a common understanding regarding what is meant by "review." To this end, the working group clarifies that "review" is the evaluation described in the preceding paragraph that leads to the decision of whether or not the development and analysis of new alternatives is warranted, and is not, in and of itself, an implicit trigger to consider new alternatives. Instead, the identification of purpose and need for an action and the development of action alternatives (re-allocation) should occur in response to allocation review findings that a re-allocation is warranted.

### Establishment of management goals and objectives

The foundation of the active adaptive management process described in this section is the articulation of management goals and objectives upon which management measures

3

are based, monitoring is designed and implemented, and analysis is focused. This assumes, however, that the goals and objectives on which the original allocation decision was based remain relevant and that ecological, social, and economic conditions do not indicate consideration of different goals and objectives.

A council should consider the contemporary relevance of previously stated goals and objectives and revise its goals and objectives for the fishery and the allocation as appropriate. New goals and objectives or significant revisions to existing ones may necessitate an allocation review, even if those identified at the time of the original action have been met.

It should be made very clear that updating and maintaining contemporary fishery management plan objectives is essential and will likely require considerable effort. The selection of the proper management objectives is critical because they are the "indicators" that are to be used when ascertaining that the current allocation is appropriate. This is important for two reasons. First, it will ensure that the proper criteria are used to judge success and it will narrow the range of inquiry that staff will have to focus on to support the decision.   To be specific, the material in both the CCC document and the NMFS document on possible indicators to consider will be very useful in framing the discussion on the selection of management objectives but they should not be viewed as a mandatory list of needed research. The research should focus on the indicators relevant to the selected fishery including its management objectives.

### Goals and objectives of the allocation decision as criteria for triggering allocation review

Clearly articulated goals and objectives for an allocation action as informed by broader FMP goals and objectives are the foundation upon which to base allocation decisions and serve as essential criteria for evaluating whether or not a review of such decisions is warranted. The original record of a council decision should therefore be closely examined and thoroughly understood by a council considering an allocation review, as should any expression of expected outcomes (improvements or changes in the social, economic, and ecological performance of the fishery) resulting from the allocation. To the extent that the original record does not include a description of expected outcomes of the allocation decision, the council should consider identifying potential outcomes that logically flow from the action for use as criteria in reviewing the need for an allocation review.

It is important to note that a council's goals and objectives associated with an allocation decision may reach beyond the simple intent to make an orderly division of access to the resource and could reflect or reinforce broader management objectives as detailed in an FMP. Management objectives could include issues such as achievement of optimum yield, maintaining equity among states, providing for the sustained participation of coastal communities, etc. that can be addressed through allocation.

4

NMFSPD-01-119-01 July 27, 2016

**Defining the management action for potential review**

When considering the need for allocation review it is important to clearly identify the action or actions that represent the "allocation decision." In some cases this may be straightforward, as with an action that allocates percentages of a resource to two or more long-established fishery sectors.

More often it is the case that allocation actions include multiple decision points —rather than a single, well-defined action – such as identifying and defining specific fishery users or sectors, limiting access to other fisheries by allocation recipients, managing effects of incidental bycatch on other sectors or fisheries, and other measures intended to support implementation of the allocation and mitigate unintended impacts. In these instances, councils should carefully consider the scope of decision elements that comprise the "allocation" for which a review is being considered. A failure to address the appropriate scope of management components and to ensure that the set of included decision elements represent "the allocation" could result in misguided conclusions regarding the need to review an allocation.

Impacts and outcomes of allocation decisions can be observed at a variety of levels within the fishery, from individual participants, to subsets of participants and stakeholders, to sectors, communities, states, etc. For purposes of establishing indicator and public interest-based criteria for allocation review, careful attention should be given to the scope of consideration or standing; triggering review of an entire allocation decision in response to an isolated or small-scale challenge may prove destabilizing to a fishery at large.

Many management actions have, indirectly, some allocative impacts and effects. Closure of near shore fishing grounds to protect habitat may, for example, constrain access to a fishery by small vessels while favoring access by larger vessels capable of fishing further from shore. While such outcomes should come under review by councils and may warrant a management response, these indirect effects are not the focus of this document.

**Monitoring the achievement of management goals and objectives and the effects of the allocation**

Active adaptive management requires the design and use of monitoring systems that will collect data useful for evaluating the outcomes of management decisions. The quantity and quality of data available for analysis to inform the review of an allocation decision should be carefully assessed and is an important criterion for triggering an allocation review; it is challenging at best to evaluate the achievement of management goals and objectives without reliable data from the fishery and communities. To the extent that existing data collection programs are not contributing to the monitoring of allocation decision outcomes and impacts, efforts should be made to design and implement an effective monitoring system.

5

NMFSPD-01-119-01 July 27, 2016

**Evaluating the achievement of management goals and objectives and the impacts of the allocation**

In the multi-step process described in this document, this evaluation is achieved through the consideration of indicators to trigger an allocation review and, if indicated, the allocation review itself. Evaluating the extent to which allocation and broader FMP goals and objectives have been met through an allocation's implementation and ecological, social, and economic impacts associated with the action is the critical component of an adaptive approach to management and of any consideration of the need for allocation review. It is the process through which a council might identify the need to initiate a formal review of an allocation decision or find that implementation of an allocation was successful in meeting its goals and did not result in unanticipated negative impacts.

**Adapting in response to evaluation and learning**

This component of active adaptive management would be the potential result of an allocation review and would therefore occur only if previous analytical steps indicated the need for such a review. It represents the consideration of reallocation alternatives when indicated by an allocation review.

**It is important to note that the recommendations contained herein are based on the assumption that a council's management goals and objectives as related to an FMP, specific management actions, or otherwise, are subject to periodic review and adaptation and are relevant and/or contemporary at the time of consideration for triggering an allocation review, of conducting an allocation review, and of taking a reallocation action.**

## Definitions

**Statement of purpose:**

In order to keep to keep allocation policy and decisions responsive to social, economic, and ecological change it is necessary to consider those polices and decisions from time to time.

**What are the steps involved in adaptive management of allocation decisions?**

Adaptive management of allocation decisions is a sequence of up to three steps consisting of (a) triggering an allocation review according to time-based, public interest-based, or indicator-based criteria; (b) an allocation review; and (c) if the results of the review so indicate, an reallocation action. The working group addressed (a), the criteria for triggering an allocation review.

6

**What is an allocation review?**

An allocation review is a structured review of current allocations based on adaptive management (i.e., evaluating successful attainment of management objectives) to determine if further action is required.  The purpose is to determine if current management objectives are being achieved through the existing allocation, with the caveat that management objectives are up to date and address the relevant operational, economic, social and ecological aspects of the fishery, including new and expected changes in such things as climate, demography, technology, etc.  If it is determined that minimum threshold criteria for meeting management objectives are not being achieved under the existing allocation, then a Reallocation Action should be initiated and new allocation alternatives identified. Otherwise, no further action is required until an allocation review is triggered once again.

**What is a reallocation action?**

A reallocation action is a formal procedure to amend a FMP to allow for a reallocation of access to fishery resources that follows normal amendment procedures such as scoping, developing a statement of purpose and need for action, developing alternatives (one of which is a no action alternative), assessing the effects of implementing different alternatives, and selecting a preferred alternative.

## Three approaches to triggering allocation reviews

This document identifies considerations associated with the design and application of three types of allocation review triggers: 1) public interest-based triggers; 2) time-based triggers; and 3) indicator-based triggers.  It is important to note that while this document offers guidance on what aspects of fishery indicators might be considered in triggering an allocation review, monitoring, evaluating, and responding to fishery performance is foundational to adaptive management and the council process. Use of public interest or time-based criteria for triggering allocation review is not mutually exclusive to ongoing formal and informal evaluation of fishery performance and outcomes. This points out as well some inter-relatedness among review trigger criteria options. For example, some forms of public interest criteria are driven and informed by the public's perception of fishery performance.

It is unlikely that one type of criterion serves as the best allocation review trigger for all fisheries. Councils should carefully consider the attributes, dynamics, and relationships of and among various trigger criteria and choose approaches that best fit a specific fishery. Councils may choose to establish different criteria at the species, fishery, or FMP level. This includes species that are managed internationally, but for which a council may have authority for a domestic quota allocation.  When applying time-based criteria to a number of fisheries, intervals between reviews of specific allocations may reflect prioritization for review based on specific fishery attributes where the size, variability, or inter-sector dynamics of a fishery may indicate more or less frequent review.

7

It should be noted that in some instances review trigger criteria are complementary. This is a particularly important dynamic when considering the use of some public interest-based trigger criteria. When considering the use of ongoing or council initiated public comment, the elements identified in the indicator-based criteria may be useful in the council's determination of need of an allocation review.

Within three years of the issuance of this guidance, or as soon as practicable, it is recommended that councils establish transparent criteria for triggering allocation review for all fisheries that have allocations between sectors (e.g. commercial, recreational, for-hire, gear-specific, international, etc.) In the case of fisheries managed under catch shares, councils may choose not to review allocations made to individual fishery participants, but rather consider review of allocations between sectors.

In addition to determining the trigger or triggers that a council will use for initiating review of specific allocations, councils should also develop a structured and transparent process by which allocation reviews will be conducted, including consideration of current council priorities, other actions under deliberation, and available resources.

8

NMFSPD-01-119-01 July 27, 2016

Steps in the Adaptive Management of Allocations

May 29, 2015

| | Trigger basis | Timing | Decision Criteria | Outcome | Source of Guidance | Comments |
|---|---|---|---|---|---|---|
| | | | Step 1: What triggers an allocation review? | | | |
| Public interest | Ongoing public input on fishery performance | Ongoing – decision to initiate review may occur at any time | See indicators – is review indicated? | If indicated, allocation review initiated. If not, continue Step 1. | CCC Working Group Paper | From a timing standpoint, this approach is similar to status quo. |
| | Solicitation of public comment regarding allocation review | Ongoing – decision to solicit public comment may occur at any time | See indicators – is review indicated? | If indicated, allocation review initiated. If not, continue Step 1. | CCC Working Group Paper | Public comment regarding the need for allocation review may be triggered by early indicators that FMP or management objectives are not being met. |
| | Public interest: Formal petitions | Ongoing – public may submit petition at any time | Does public petition have standing? | Public petition with standing may trigger review. | CCC Working Group Paper | This approach requires an allocation review without consideration of timing or indicators. |
| | Time | Specific time intervals (7-10 years) | None – response to scheduled review non-discretionary | Allocation review automatically triggered | CCC Working Group Paper | This approach requires an allocation review without consideration of indicators. |
| | Indicators | Ongoing – Indicators may be evaluated at any time | Is review indicated per social, economic, or ecological criteria? | If indicated, allocation review triggered. If not, continue Step 1. | CCC Working Group Paper | From an evaluation standpoint, this approach is similar to status quo. |
| | | | Step 2: Allocation Review: Is consideration of new allocation alternatives justified? | | | |
| | See above | See above | Are the FMP and allocation objectives still relevant? Are they being met? What's changed? | If objectives not being met, then a reallocation is initiated | NMFS Working Group Paper | It is assumed that that a council's management goals and objectives are current at the time of consideration for triggering an allocation review, of conducting an allocation review, and of taking a reallocation action. |
| | | | | If objectives are relevant and are being achieved, then no further action. Continue Step 1. | | |
| | | | Step 3: Initiating consideration of new allocation alternatives: should there be a reallocation and what needs to be considered? | | | |
| | Conclusion through allocation review that reallocation is warranted | See above | What alternatives will meet FMP and allocation objectives? | Selection of a preferred alternative | NMFS Working Group Paper | |

9

## Public interest-based criteria

If a council develops effective indicator or time-based allocation review mechanisms, then a public-interest review trigger mechanism may not be necessary. However, if those review mechanisms are not established, or if they are not responsive to changing conditions within a fishery, then a public-interest review mechanism could be used to trigger an allocation review.

The U.S. regional fishery management council system is transparent and open to public input throughout the process. Councils implement extensive work plans throughout the year, and manage some regulatory initiatives, including plan amendments, over the span of several years. Managing to meet the councils' statutory requirements and other competing priorities requires effective planning, which typically includes an annual priority-setting process. Ideally, public input on the need to review a specific fishery allocation would feed into this process to enable an orderly consideration of the question, in the context of competing priorities and organizational resources.

This guidance addresses the solicitation or consideration of statements of public interest at three different levels within the regional fishery management council process:

1. Ongoing public input on fishery performance
2. Solicitation of public comment regarding allocation review
3. Formal initiatives

### Ongoing public input on fishery performance

As noted above, the council process is open, transparent, and offers frequent opportunities for public comment and input. This dynamic establishes a feedback loop between the council and the public in regard to both the specific issues under the council's consideration and broader indicators of fishery performance. Given the extent to which the impacts of allocation decisions are associated by the public (both through direct observation and perception) with fishery performance, public interest in allocation review is likely to be expressed at many points within the council process and in reference to a variety of fisheries management issues.

This feedback loop of ongoing public comment is a valuable opportunity for the public to express interest in allocation review, and for the council to gauge how effectively allocation objectives are being met. It also serves as an opportunity for the council to understand and evaluate the extent to which allocation lies at the root of fisheries management challenges, and the need to initiate allocation review may be indicated through this process.

### Solicitation of public comment regarding allocation review

Councils may choose to engage in allocation review "scoping discussions" with stakeholders and other interested parties. Unlike the collection of feedback through ongoing public comment described above, this process is deliberate and specifically

10

targets public input on the need for allocation review. Councils rely on outreach and information-gathering mechanisms to achieve public input including the solicitation of written comments, scoping discussion at council meetings, and port meetings and other community engagement strategies.

One of the benefits of this approach to consideration of triggering allocation review is that it is focused directly on the allocation and the necessity for potential review rather than on the secondary and tertiary impacts of the allocation. An additional benefit to this strategy is the council's ability to dictate a schedule. While more demanding of time and resources than identification of allocation review triggers in the course of ongoing public comment, the process for soliciting, receiving, and considering public input can be designed by the council and scheduled in a manner that does not conflict with other council initiatives and priorities.

When considering the solicitation of public input regarding allocation review, councils should be aware of, and sensitive to, the expectations among stakeholders that could develop as a result of the council indicating interest. The council should carefully consider its ability (resources and capacity) and willingness to follow through with an allocation review if warranted before reaching out to the community for focused input.

**Formal petition mechanism**

The first two approaches to gathering, evaluating, and responding to public input are already possible within the current regional fishery management council system. In both cases, the decision to initiate the review would rest with the council. A stronger public-interest review mechanism could include a provision for a stakeholder request or petition requesting review, together with a requirement for a Council to initiate an allocation review within a reasonable period of time. Such a provision would have more potential to impose a cost on a council's established work plan and priorities but would provide another mechanism to ensure that allocations receive due consideration in response to public concern. If such a mechanism is established, it may be appropriate to incorporate indicator-based criteria to establish a minimum threshold for initiating review.

Any petition-based review process should establish requirements that identify specific conditions or outcomes upon which such requests may be based. In addition, councils should include establishment of guidelines for petitions. While a council has discretion to determine whether or not to move forward with an allocation review as per the requirements it establishes under a petition-based process, it should at least respond to the *request* for a review under this process. This response could be a simple as a letter to the petitioner(s), explaining the council's rationale for its decision (e.g., petition did not meet conditions for consideration, lack of standing by petitioners, etc).

**Time-based criteria**

Establishment of a time-based trigger has figured prominently in recent discussions regarding allocation review, including provisions for periodic allocation review in

11

several MSA re-authorization drafts. In several respects periodic allocation review on a set schedule is the most simple and straightforward criterion for triggering an allocation review; the approach is unambiguous and less vulnerable to political and council dynamics. That said, the attributes of simplicity and the mandate of a strict schedule render time-based criteria less sensitive to other council priorities and the availability of time and resources to conduct an allocation review.

Time-based triggers for initiating allocation review might be most suitable for those fisheries or FMPs where the conflict among sectors or stakeholder groups make the decision to simply initiate a review so contentious that use of alternative criteria is infeasible. In such a situation, a fixed schedule ensures that periodic reviews occur regardless of political dynamics or specific fishery outcomes. Given the inflexible nature of time-based triggers, however, it is recommended that they be used only in those situations where the benefit of certainty outweighs the costs of inflexibility.

The inflexible nature of time-based triggers can impact both the work and effectiveness of the council as well as the outcomes of the allocation process itself. As noted above, fixed, time-based triggers for review may conflict with other council priorities. To the extent that those priorities include consideration of actions to mitigate significant social, economic, or conservation concerns, adherence to a fixed review schedule may prevent a council from achieving significant and beneficial management outcomes while achieving at best marginal improvements through allocation review. Given the fact that there is potentially no relationship between the pace at which fishery performance evolves and a fixed schedule for allocation review, use of such a trigger creates the potential of a significant expenditure of council time and resources with little need for review or likely improvement in fishery performance.

Time-based triggers for review may impede stability in subject fisheries. To the extent that reviews are conducted on a regularly scheduled basis, there is an incentive for sectors receiving allocations to continuously employ operational and political tactics to improve their allocation at the next review. The assurance of a "new" allocation review may as well encourage speculative entry into subject fisheries. When considering the adoption of a time-based review trigger, care should be taken to identify if and to what extent the process is likely to be manipulated or "gamed", and measures to minimize that activity should be considered.

The selection of review intervals using time-based triggers should be informed by fishery characteristics, data availability, and council resources. Newly developed or rapidly changing fisheries may warrant more frequent review, while established fisheries with stable participation and performance can likely be reviewed less frequently. Whether following an initial allocation or a re-allocation, the timing of further review should accommodate the collection and analysis of a data series from which meaningful and accurate review and analysis can be achieved. The five-year initial review and subsequent reviews every (up to) seven years of limited access privilege programs (LAPPs) as required under Section 303A of the MSA may indicate a desirable minimum interval between reviews. Similarly, the 10-year durability of LAPP permits may suggest a maximum interval for time-based review triggers.

12

## Indicator-based criteria

The MSA requires that fisheries be managed for Optimum Yield (OY), which is Maximum Sustainable Yield (MSY) as reduced by relevant social, economic and ecological factors.  In defining OY, the NS1 guidance provides that these factors should be "quantified and reviewed in historical, short term and long term contexts." Furthermore, it recommends that each FMP should contain a mechanism for periodic review of the OY specification, in order to respond to changing conditions in the fishery. In establishing indicator-based metrics for review of allocations – whether among sectors (e.g., commercial, recreational, for-hire, gear, international, etc.), within a sector (e.g., among catch share recipients), or for purposes such as bycatch accounting – it is logical to apply similar parameters to an allocation review as to an OY review, particularly if the goals and objectives of an FMP specifically address these items.  In support of such an approach, the NS4 guidance states that allocation decisions should be "rationally" linked to attaining OY, and/or to the objectives of an FMP. It follows that selection of indicator-based criteria to trigger an allocation review should inherently be linked to those same objectives.  In the interest of public transparency and clarity, councils may even consider establishing an objective that is specific to allocation within an FMP.

A time component is inherent in any indicator-based criteria for review of allocations, whether explicitly included (e.g., achieving a desired economic efficiency within XX years) or not.  Evaluating a criterion used in establishing an allocation, particularly if it requires the addition of ensuing years of data to a quantitative analysis, indirectly applies a timeframe for review.

There are several categories of indicator-based criteria to consider as triggers for initiating review of allocations, all stemming from the definition of OY: social, economic and ecological.  Ideally, the rationale for an initial allocation decision would consider a mix of criteria from all categories, although data limitations may preclude quantitative consideration.  This could impact the ability to set an objective, specific review trigger for a particular criterion.

It follows that use of several criteria, either singly or in combination, and across multiple categories, may be optimal when using indicator-based criteria as a trigger for an allocation review.  For example, a council may select one social, one ecological and one economic criterion as indicators, and define the "trigger" for review as any two of the three criteria meeting predetermined limits. This clearly defines the minimum threshold to trigger an allocation review. Taking this example to Step 2 (as per Table 1), consideration of allocation alternatives may occur if the selected indicators meet established limits within a particular timeframe, effectively combining indicator- and time-based triggers in order to ensure an adaptive management approach.  As noted above, it may be difficult to set measurable values as triggers for  indicator-based criteria, and use of quantitative thresholds is likely to be more the exception than the norm.  In such cases, qualitative triggers should be considered to ensure that FMP goals and objectives are addressed.

13

In selecting indicator-based criteria, it is important to recognize there are factors that are not in and of themselves measurable metrics for a particular criterion or set of criteria; however, they may impact selected criteria and thus influence the "triggering" of a review. These factors may include acquisition of new data, natural disasters, etc. that are not necessarily measurable on their own, but can impact measurable criteria from any of the three categories.

Finally, while there is overlap in the discussion of indicator-based criteria in this document with the NMFS guidance document, the purpose of the two documents is different. The latter document refers to the indicators below as "factors" (in addition to many others) to be considered by councils in the context of establishing initial allocations, or if a re-allocation action is undertaken. The CCC document discusses their use as one of three possible types of triggers for an allocation review. While some overlap is inevitable, the context in which that overlap occurs is important.

**Economic Criteria**

While the quality and quantity of fisheries economic information has improved over the years, there may be instances in which a disparity exists in the available data for one or more industry sectors, user groups or communities impacted by an allocation decision. This should be explicitly noted and accounted for should quantitative economic criteria be selected by councils as a trigger for allocation review. Because economic outcomes are often closely tied to social outcomes, links between economic and social triggers should also be acknowledged (Jepson and Colburn 2013).

The NS5 regulations prohibit the establishment of allocations for economic purposes alone, however, economic efficiency "shall" be considered where practicable. Multiple economic tools are available to assist in establishing indicator-based triggers for review: cost-benefit analysis, economic impact analysis, and economic efficiency (Edwards 1990; Plummer et al. 2012). However, public understanding of the differences between and proper use of these tools is often limited[1]. Whatever the economic triggers for allocation review, it will be of utmost important to explain the tool(s) used in plain language that stakeholders can understand. Although not all sectors of the public may agree with the criteria or trigger value, public understanding of the tool is critical to its acceptance as a means of informing both an initial allocation decision and its subsequent review. Failure to achieve a desired economic efficiency within a particular timeframe, and unanticipated or greater than anticipated/analyzed costs (e.g., outside of a certain error level) are examples of triggers for initiating a review of allocation decisions.

---

[1] For example, constituents often cite the results of economic impact analyses as justification for allocation of resources to a particular user group. However, the peer-reviewed economic literature clearly states that cost-benefit analyses, not economic impact analysis, are the appropriate tool for informing allocation decisions.

14

**Social Criteria**

As noted above, social and economic impacts are often linked, and changes in social criteria may lead to changes in economic criteria and vice versa. National Standard 8 requires that management measures account for social and economic impacts to communities, as well as provide for "sustained participation." This is defined in the NS8 guidelines as "continued access" to the resource, depending on resource condition.

A number of studies and technical memoranda have been published detailing the development and measurement of social metrics such as community resilience, vulnerability and well-being. Jepson and Colburn (2013) describe categories of indices -- social, gentrification, fishing dependence-- that can be used to estimate social impacts of management decisions at the community level. Councils may choose to select several indices among the above categories or an entire category of indices as indicator-based criteria to trigger an allocation review. The methods used in Jepson and Colburn provide a quantifiable means of tracking the potential social impacts of an allocation decision. As alluded to earlier, setting a minimum threshold (e.g., a 0.5 standard deviation change in a social index score, etc.) or a timeframe (e.g., every three or five years) for undertaking a review of selected criteria will ensure that a fishery is not in a constant state of "allocation flux," again illustrating the inter-relationship of the various criteria discussed in this document. While councils may lack a quantitative means of developing social criteria, use of public-interest based criteria may provide a means for doing so (e.g., public input regarding loss of processing capacity or tackle shops in a community), or for establishing qualitative criteria.

Finally, for many communities, social change can be closely linked to ecological change (i.e. a sudden harvest moratorium as a result of a stock assessment; Jepson and Colburn 2013). While ecological criteria for allocation review are addressed in the following section, this relationship is worth noting as it further demonstrates that the categories of indicator-based criteria do not exist independent of one another.

**Ecological Criteria**

Ecological criteria may be considered some of the most self-evident criteria for triggering an allocation review. Changes in fishery status resulting from a stock assessment, undocumented sources of mortality (fishing or otherwise), increases in discards, changes in species distribution and food web dynamics are all examples of factors that may influence an allocation review. However, as noted previously, not all of these factors are necessarily measurable, indicator-based metrics that the councils have any control over. Measureable criteria that could be considered are failure to end overfishing within a specified timeframe, failure to achieve or rebuild to a certain level of abundance, a significant increase in discard mortality from a particular sector, significant changes in landings (e.g., an increase/decrease greater than one to two standard deviations within a three-year timeframe, etc.). As with social metrics, public-interest based criteria may at least provide a means of establish qualitative ecological criteria (e.g., anecdotal evidence of changes in distribution, discards, size of fish, etc.).

15

## References

Edwards, Steven F. 1990. An Economics Guide to Allocation of Fish Stocks Between Commercial and Recreational Fisheries. U.S. Dept. of Commerce, NOAA Technical Report NMFS 94, 29 p.

Jepson, Michael and Lisa L. Colburn 2013. Development of Social Indicators of Fishing Community Vulnerability and Resilience in the U.S. Southeast and Northeast Regions. U.S. Dept. of Commerce., NOAA Technical Memorandum NMFS-F/SPO-129, 64 p.

Plummer, M.L., W. Morrison, and E. Steiner. 2012. Allocation of fishery harvests under the Magnuson-Stevens Fishery Conservation and Management Act: Principles and practice. U.S. Dept. Commerce, NOAA Tech. Memo. NMFS-NWFSC-115, 84 p.

16

Filename:         CCC Allocation Procedural Directive 7.27
Directory:        G:\SF3\National Standard 4\Workgroup - Policy\Final Versions
Template:
                  C:\Users\tara.scott\AppData\Roaming\Microsoft\Templates\Normal.do
          tm
Title:
Subject:
Author:           Wendy_Morrison
Keywords:
Comments:
Creation Date:    7/27/2016 4:31:00 PM
Change Number:    4
Last Saved On:    7/27/2016 5:27:00 PM
Last Saved By:    Tara_Scott
Total Editing Time: 12 Minutes
Last Printed On:  7/27/2016 5:38:00 PM
As of Last Complete Printing
    Number of Pages:  16
    Number of Words:  6,385 (approx.)
    Number of Characters:     36,401 (approx.)

# APPENDIX E.   ALLOCATION FACTORS

Department of Commerce * National Oceanic & Atmospheric Administration * National Marine Fisheries Service

**NATIONAL MARINE FISHERIES SERVICE PROCEDURAL DIRECTIVE 01-119-02**

**July 27, 2016**

**Fisheries Management**
**Fisheries Allocation Review Policy**

**RECOMMENDED PRACTICES AND FACTORS TO CONSIDER WHEN REVIEWING**
**AND MAKING ALLOCATIONDECISIONS**

**NOTICE:** This publication is available at: http://www.nmfs.noaa.gov/op/pds/index.html

**OPR:** F/SF (W. Morrison)
**Type of Issuance:** Initial

**Certified by:** F/SF (A. Risenhoover)

**SUMMARY OF REVISIONS:**

Signed
Alan Risenhoover
Director, Office of Sustainable Fisheries

**Recommended practices and factors to consider when reviewing[1] and making allocation decisions**

**Background**

An allocation (or assignment) of fishing privileges is defined by the National Oceanic and Atmospheric Administration's (NOAA) National Marine Fisheries Service (NMFS) as "a direct and deliberate distribution of the opportunity to participate in a fishery among identifiable, discrete user groups or individuals" 50 CFR 600.325(c)(1)[2]. The Magnuson-Stevens Fishery Conservation and Management Act (MSA)[3] as well as other guidance or policy documents written by NOAA or NMFS include provisions, guidance, or information relevant to allocation decisions (see Appendix A for details). The guidance provided here does not modify or supersede any guidance associated with the National Standards, other provisions of the MSA or other applicable laws; rather, it is intended to help the Councils and NOAA review and update allocations under the MSA. Allocation can be across jurisdictions (e.g., state, regional), across sectors (e.g., commercial, for-hire, private anglers, tribal, research), and within sectors (e.g., individual fishermen, gear types). Allocation of fishery resources is a complex issue facing

---

[1] For the purposes of this document "review" is the evaluation that leads to the decision of whether or not the development and analysis of alternative allocations is warranted, and is not, in and of itself, an implicit trigger to consider alternative allocation.

[2] www.nmfs.noaa.gov/sfa/laws_policies/national_standards/documents/national_standard_4_cfr.pdf

[3] www.nmfs.noaa.gov/sfa/laws_policies/msa/documents/msa_amended_2007.pdf

fishery managers because of the history and tradition of access to fishery resources, the perceptions of equity that arise with allocation decisions, and differences in the economic and social values competing user groups place on those resources. In addition, fisheries management is not static and should be adaptable as environmental, ecological, social, and economic influences change. Therefore, allocation decisions need to be considered in the context of adaptive management.[4]

In 2011, NMFS issued a contract for an outside entity to interview stakeholders about allocation issues. The report (Lapointe, 2012)[5] is the first comprehensive compilation of fisheries allocation issues. NMFS commissioned the report to facilitate a productive discussion about allocation decisions and socio-economic objectives for fisheries management. It summarizes input from discussions with a wide range of stakeholders and suggests five steps NMFS can take to address allocation issues: 1) increase stakeholder engagement in allocation decisions, 2) increase biological and social science research and data, 3) periodically review allocation decisions, 4) compile a list of past allocation decisions, and 5) create a list of factors to guide allocation decisions.

This document addresses the fifth recommendation by providing a summary of recommended practices and guidance on allocation factors that a Regional Fishery Management Council (Council)[6] should consider when making allocation (initial or reallocation) decisions. The factors are drawn from, or are relevant to, MSA provisions and other legal mandates and thus should already be considered in the fisheries management process. The recommended practices are ideas that could improve the allocation process by increasing transparency and minimizing conflict. The Council Coordinating Committee created a companion document[7] that describes triggers that can be used to determine when to review allocation decisions, addressing the Lapointe report's third recommendation. For the other three recommendations, NMFS has published two technical memorandums that contain a list of past allocation decisions[8, 9] and is continuing to work to increase stakeholder engagement and biological and social science research.

---

[4] We describe adaptive management as the on-going process of evaluating if management objectives have been met and adjusting management strategies in response. We do not include large scale scientific manipulations aimed at answering scientific questions.

[5] Lapointe, GD. 2012. Marine Fisheries Allocation Issues: Findings, Discussions and Options. George Lapointe Consulting LLC.58 pgs. External Assessment Completed for NMFS (December 2012). Available: www.nmfs.noaa.gov/stories/2013/01/docs/lapointe_allocation_report_final.pdf

[6] Throughout this document, guidance for Fishery Management Councils also pertains to Atlantic High Migratory Species Secretarial actions.

[7] NMFS Procedural Directive 01-119-01, Criteria for Initiating Fisheries Allocation Reviews, Council Coordinating Committee Allocation Working Group Document. http://www.nmfs.noaa.gov/op/pds/documents/01/119/01-119-01.pdf

[8] Morrison, W.E., T.L. Scott. 2014. Review of Laws, Guidance, Technical Memorandums and Case Studies Related to Fisheries Allocation Decisions. U.S. Dept. of Commerce. NOAA Technical Memorandum NMFS-F/SPO-148, 32 p. www.nmfs.noaa.gov/sfa/laws_policies/national_standards/documents/morrison_scott_nmfs_f_spo_148.pdf

[9] Plummer, M.L., Morrison, W., and E. Steiner. 2012. The Allocation of Fishery Harvests under the Magnuson-Stevens Fishery Conservation and Management Act: Principles and Practice. U.S. Department of Commerce, NOAA Tech. Memo NMFS-NWFSC-115, 84 p. www.nmfs.noaa.gov/sfa/laws_policies/national_standards/documents/plummer_allocationfishharvests_tm115_web_final.pdf

2

NMFSPD 01-119-02 July 27, 2016

<u>Recommended Practices When Reviewing and Making Allocation Decisions</u>

**Several recommended practices would improve the allocation process by increasing transparency and minimizing conflict. A list of recommended practices is below, although it should not be considered comprehensive and may not be applicable to all circumstances.**

    a.  **Evaluate and Update Council and Fishery Management Plan (FMP) Objectives.**
Council fishery management decisions often involve trade-offs (e.g., between management objectives within a fishery, or between two fisheries under the Council's jurisdiction). For example, maintaining employment may be in conflict with improving economic efficiency. Similarly, long-term goals related to rebuilding stocks may also be in conflict with short-term goals of minimizing impacts on fishery-dependent communities. Updated and measurable objectives help clarify decisions about these trade-offs within and between FMPs. If FMP objectives are not current, clear, or measurable, a Council should re-assess the FMP objectives prior to or concurrent to initiating the allocation discussion.[10] In addition, the Council should use a transparent process for analyzing and determining trade-offs between FMP objectives and/or FMPs.

    b.  **Identify User Needs**.
The specific needs and interests of the different types of fishery participants or sectors within a fishery may vary. For example, recreational fishermen may be more interested in stable fishing opportunities than absolute numbers of fish retained. Therefore, articulating the needs of each type or sector should be completed near the beginning of the allocation discussion to facilitate identification of alternatives, which may reduce conflict. Once user needs are identified through a public process, those needs should be communicated and publicly available.

    c.  **Minimize Speculative Behavior.**
To limit situations which may lead to speculative behavior or practices[11] whenever allocations are being considered, the Council should consider announcing a control date for a given fishery, by sector as appropriate, which is published by NMFS as an advance notice of proposed rulemaking. The control date provides notice that, if an allocation decision is made in an FMP or FMP amendment, there is no assurance that any entrance or increased effort into a fishery beyond said date will be used to determine allocations. Announcing a control date is common practice when creating limited access and catch share programs, but could also be used for allocation decisions between gear types, sectors, or groups.

    d.  **Plan for Future Conditions.**
To plan for future conditions, Councils may consider adopting in an FMP or FMP amendment mechanisms for implementing actions in an expedited manner, where

---

[10] For general information on FMP objectives in the National Standard Guidelines, *see* 50 C.F.R. § 600.305(b): http://www.fisheries.noaa.gov/sfa/laws_policies/national_standards/documents/national_standards_general_cfr.pdf.
[11] For example, if fishermen expect future allocations to be based on catch history, they may decide to increase catch in order to improve their catch history, etc.

3

Amendment 53 - Red Grouper            230            Appendix E. Allocation Factors
Allocations and Annual Catch Levels and Targets
0003703

appropriate and as consistent with the MSA, Administrative Procedure Act, National Environmental Policy Act, Executive Order 13653, and other applicable law. [12] For example, the Bering Sea and Aleutian Islands FMP includes pre-arranged "if/then" allocations for yellowfin sole between two sectors depending on the total allowable catch (TAC).  If the TAC for the two sectors is greater than 125,000 metric tons (mt), then the first sector is allocated 60 percent; if the TAC for the two sectors is less than 125,000 mt, then the first sector receives an increasing apportionment.[13]  The Mid-Atlantic bluefish FMP provides an example of a mechanism that incorporates more discretion than the example provided above.  The Mid-Atlantic bluefish allocation is currently set as 83% recreational and 17% commercial.[14]  However, the FMP states that if the recreational sector is not projected to land its harvest limit for the upcoming year, then the commercial catch limit may be increased for that year as long as the combination of the projected recreational landings and the commercial quota does not exceed the total allowable landings.

A pre-arranged management response may be one option for allocating catch of a species that is expected to rebuild or shift distribution due to climate change, for example. Identifying, upfront, specific conditions that may result in changes in allocations could decrease controversy.  We note that not all circumstances may be amenable to pre-arranged responses.  For example, if external factors change significantly, the original analysis of impacts may no longer be considered adequate because the analysis would not capture the complete range of potential impacts or outcomes.

---

[12] Some of these types of mechanisms are referred to by regions as "frameworks".  *See* Appendix 3 of the NMFS Operational Guidelines at p. 3 at http://www.fisheries.noaa.gov/sfa/management/councils/operational_guidelines/og_append.pdf.  As the Guidelines explain, frameworking is not intended to circumvent standard FMP/amendment and rulemaking procedures, and must be done consistent with the MSA and other applicable law. To the extent that MSA and other statutory requirements can be addressed up front when establishing such a mechanism, this may result in less analysis and process being needed when individual actions are executed under that mechanism. What analysis and process (including public comment) is required for each individual action will depend on the specific facts and circumstances of that action. *Id.*
[13] Northern Economics, Inc. *Five-Year Review of the Effects of Amendment 80 to the Bering Sea and Aleutian Islands Groundfish Fishery Management Plan.* Prepared for North Pacific Fishery Management Council. April 2014.
[14] Amendment 1 to the FMP for the Atlantic Bluefish Fishery, 65 FR 45844 (January 26, 2000).

4

**Factors to Consider When Reviewing and Making Allocation Decisions**

**Typically allocation decisions are closely aligned with historical use of the resource because the government[15] is hesitant to limit historically established privileges and access (Rolph, 1983).[16] While historical use may (or in some instances, shall) be taken into consideration when reviewing and making an allocation decision,[17] the MSA requires achieving on a continuing basis the optimum yield (OY) from each fishery, which encompasses a broader range of considerations.[18] Recognizing this, below is a list of different factors to consider when reviewing and making an allocation decision.**

**The list of factors is not all-inclusive, as there may be other appropriate factors to consider. The factors do not prescribe any particular outcome with respect to allocations, but rather, are intended to provide a framework for the allocation analysis. Factors should be compared between groups for which an allocation decision is relevant. The priority and weight afforded each factor will vary depending on the time horizon of the decision,[19] the objectives of the allocation decision, the objectives of the FMP, and the overarching Council[20] goals. If a factor is determined not applicable or unimportant for the allocation decision in question, the Council should clearly document its rationale for the determination for the record. Such documentation is necessary to produce a strong record demonstrating that the factor has been considered. Analysis of an allocation decision under these factors is not a substitute for documenting compliance with MSA mandates, although there may be overlap between certain factors and MSA mandates. Of particular note, National Standard 4, discussed under Social Factors below, has explicit requirements pertaining to allocations of fishing privileges.**

1. **Ecological Factors**

   Weakened or damaged marine ecosystems support a lower abundance and diversity of fish species, and may have a harder time adjusting to acute (e.g., hurricane) or long-term (e.g., climate change[21]) impacts than healthy ecosystems. Because different fishing practices

---

[15] Rolph includes a wide range of resources in his analysis (forests, air waves, etc.). However, in most marine fisheries, Councils and Commissions in coordination with federal and state governments make the allocation decisions.

[16] Rolph, E.S. 1983. Government allocation of property rights: Who gets what? Journal of Policy Analysis and Management 3:45-61.

[17] For example, for limited access privilege programs, historical harvests and historical participation of fishing communities are among the required considerations for establishing procedures for allocations. 16 U.S.C. § 1853a(c)(5)(A).

[18] 16 U.S.C. § 1851(a)(1) (National Standard 1). "'[O]ptimum', with respect to the yield from a fishery, means the amount of fish which— (A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems; (B) is prescribed as such on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant economic, social, or ecological factor; and (C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery". 16 U.S.C. § 1802(33).

[19] For example, factors may be weighed differently when considering in-season allocation changes versus longer term changes such as decisions that last years.

[20] Whenever Fishery Management Councils are mentioned, this guidance also pertains to Atlantic High Migratory Species Secretarial actions.

[21] Climate change impacts could be positive or negative for individual species or systems.

5

(locations fished, gear types used, etc.) can have varied impacts on the marine ecosystem, decisions that determine the allocation between different sectors or groups should take into consideration the potential ecological impacts of allocation alternatives.  When making allocation decisions, relevant ecological questions could include, but are not limited to:

**a.   What are expected ecological impacts on target species?**
Sectors can differ in their impacts on the target species.  For example, sectors may target different stocks, sizes, or age classes, which could impact the productivity, distribution, yield, and/or recovery potential of the species.

**b.   What are the expected ecological impacts on other fisheries?  What is the status of non-target species[22]?  What are the expected impacts on bycatch and bycatch mortality of both non-target species and protected species?**
Ecological impacts can overlap among fisheries.[23]  Some ways ecological interactions occur are through bycatch, habitat, predator-prey dynamics, etc.  For example, target species in one fishery can be incidental catch or bycatch in another.  In addition, if the allocation of one species decreases, fishermen may increasingly target another species. Managers should assess the potential ecological impacts of a change in allocation to other fisheries when making allocation decisions.  For example, if reducing bycatch is a priority then lowering allocations to sectors or gear types that have high bycatch could be considered.

**c.   What are the impacts on the marine ecosystem?[24]  What are the impacts on habitat?  What are the impacts on the ecological community (e.g., relevant predator, prey, or competitive dynamics)?**
Fishing can change an ecosystem through both direct and indirect effects.  Direct effects include mortality of target and non-target stocks, interactions with marine mammals or other protected species, and disturbance of marine habitat.  Indirect impacts to the ecosystem include removal of predators, prey, competitors, or structure that could result in shifts in the ecological community.  Managers should consider the direct and indirect impacts of different allocation alternatives to the ecosystem when making allocation decisions.  For example, decreasing allocations to gears that have high impacts on biotic hard-bottom habitats could be considered.


2.  **Economic Factors**
Allocation of a fishery resource has economic consequences for affected user groups that should be considered.  Councils should be very specific in articulating what economic questions they want to consider when making allocation decisions.  When making allocation decisions, relevant economic questions could include, but are not limited to:

**a.   Can economic efficiency be improved?**
Councils should consider if the current or preferred allocation results in the most economically efficient[25] use of resources.  Cost-benefit analyses should be used to

---

[22] For the purpose of this document, non-target species are the species that were retained but were not the primary target species.
[23] *See* 16 U.S.C. §§ 1853(a)(7) (requiring that FMP measures minimize, to the extent practicable, adverse effects on essential fish habitat caused by fishing) and (9) (requiring fishery impact statement) and 1851(a)(9) (requiring under National Standard 9 that FMP measures minimize to the extent practicable bycatch and bycatch mortality).
[24] *See supra* note 22.

6

NMFSPD 01-119-02 July 27, 2016

estimate how a proposed allocation would change consumer and producer surplus (i.e., net economic benefits). From an economic analysis perspective, economic efficiency refers to how well resources are utilized in production and consumption[26]; economic efficiency is achieved when all resources are allocated to their most productive use.[27] Analyses that estimate the monetary value individuals or sectors place on the marginal value of their share of the harvest (i.e., "willingness to pay") can inform how allocation changes could improve economic efficiency. However, if use within each sector is not allocated according to those who value the resource most, then information about access to the resource in each sector may also be necessary to determine the efficient allocation among sectors (Holzer and McConnell, 2014)[28]. Methods for estimating the economic efficiency of an allocation decision are being continually improved.[29]

**b. What are the economic impacts of potential changes in allocation?**

Changes to sales, income, and employment levels as measured by economic impact analyses (i.e., input-output models) should only be used to understand the potential short-term distributive effects of allocation decisions on the affected communities[30], states, or regions (see social impacts below). Analyses should be completed at the finest scale possible, given available data and models. Unlike economic efficiency, economic impact – from an economic analysis perspective – does not measure social welfare. An allocation that maximizes economic impacts could reward the highest spender or highest cost producer, and thereby promote inefficient practices and processes and reduce economic efficiency relative to alternative allocations. Additionally, those affected by a change in allocation will likely adjust their behavior in response to a different allocation. For example, when recreational fishermen spend money on other recreational alternatives under a reduced allocation, it is difficult to determine whether the economic impacts of an alternative allocation on the economy will be positive or negative after those behavioral adjustments have occurred.

---

[25] *See* 16 U.S.C. § 1851 (a)(5) (requiring under National Standard 5 that FMP measures "shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose."). According to the National Standard 5 Guidelines, "[t]his standard prohibits only those measures that distribute fishery resources among fishermen on the basis of economic factors alone, and that have economic allocation as their only purpose." 50 C.F.R. § 600.330(e). "Given a set of objectives for the fishery, an FMP should contain management measures that result in as efficient a fishery as is practicable or desirable." 50 C.F.R. § 600.330(b)(1).

[26] *Op. Cit.* Plummer et al. 2012.

[27] The National Standard 5 Guidelines explain: "In theory, an efficient fishery would harvest the OY with the minimum use of economic inputs such as labor, capital, interest, and fuel. Efficiency in terms of aggregate costs then becomes a conservation objective, where 'conservation' constitutes wise use of all resources involved in the fishery, not just fish stocks." 50 C.F.R. § 600.330(b)(2). The Guidelines further explain that "[a]n FMP should demonstrate that management measures aimed at efficiency do not simply redistribute gains and burdens without an increase in efficiency." 50 C.F.R. § 600.330(b)(2)(i).

[28] Holzer, Jorge, and Kenneth McConnell. 2014. "Harvest Allocation without Property Rights." *Journal of the Association of Environmental and Resource Economists* 1: 209-232

[29] NMFS is developing technical guidance on best practices that will clarify emerging issues and the appropriate implementation and use of economic impact and economic efficiency analyses.

[30] *See* 16 U.S.C. §§ 1851(a)(8) (requiring under National Standard 8 that FMP measures take into account the importance of fishery resources to fishing communities and, to the extent practicable, minimize adverse economic impacts on such communities) and 1853 (a)(9) (requiring fishery impact statement).

7

3. **Social Factors**

Allocation of a fishery resource can have social consequences on individuals and communities. For example, updating geographically-based allocations could impact the surrounding community by changing the demand for processing facilities, boats, and supplies such as bait and ice. When making allocation decisions, relevant questions on social factors could include, but are not limited to:

a. **Is an allocation fair and equitable?**

Equity is an important issue in fisheries management. National Standard 4 requires, in relevant part, that if an allocation is made "among various United States fishermen, such allocation shall be…fair and equitable to all such fishermen…"[31] Methods exist to gather information on the impacts of an allocation alternative, though assigning labels of "fairness" will remain subjective and the perception of "fair and equitable" will vary among individuals and sectors.[32] Social impact analyses can point to potential disproportionate impacts of allocation decisions. Relevant sectors and sub-groups may include, among others, vessels of different size categories, target species, or gear; communities of different sizes and different levels of social vulnerability and fisheries dependence; large versus small businesses[33]; or groups of fishermen from different states.

"Well-being" can also inform equity. Two broad principles of equity may be considered: vertical equity and horizontal equity. The former refers to different treatment of entities that are not alike while the latter refers to equal treatment among equal entities. Horizontal equity means that the distribution of well-being before and after a change in allocation is preserved. This might be the case for allocations that are primarily based on historical landings records. Vertical equity means that the distribution of well-being before and after a change in allocation has changed. Creating set-asides for entities that may have been disadvantaged by history-based allocations is an example of a measure that would affect vertical equity. In this case, vertical equity would become more even as a result of the set-aside.

b. **Are there disproportionate adverse effects on low income and/or minority groups?**

Consistent with Executive Order 12898 and guidance from the Council on Environmental Quality[34], NEPA analyses should continue to assess proposed actions for disproportionate and adverse effects on low-income and/or minority groups, including federally recognized tribes. Environmental justice assessments should include a review

---

[31] 16 U.S.C. § 1851(a)(4). *See* National Standard 4 Guidelines, 50 C.F.R. § 600.325(c) (addressing analysis of allocations and factors to be used in making allocations, including fairness and equity).

[32] *Op. cit.* Lapointe 2012.

[33] *See* 5 U.S.C. §§ 601 et seq. (requiring agency to review impacts of proposed regulations on small businesses and entities) and Executive Order 13272 (setting forth requirements for agencies when considering impacts on small businesses and entities).

[34] *See* Council on Environmental Quality, Environmental Justice Guidance Under the NEPA (Dec. 10, 1997): http://www.energy.gov/sites/prod/files/nepapub/nepa_documents/RedDont/G-CEQ-EJGuidance.pdf (providing guidance to Federal agencies on considering environmental justice in the NEPA process).

8

of impacts on both directly and indirectly affected entities[35] (e.g., minority processing workers whose jobs might change due to fisheries allocation decisions that impact the amount and/or timing of fish processing).

**c.   What is the importance of fishery resources to fishing communities?**

National Standard 8 requires that "[c]onservation and management measures shall, consistent with the conservation requirements of this Act…, take into account the importance of fishery resources to fishing communities…in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities".[36]  When making allocation decisions, relevant fishing community questions could include, but are not limited to:

   i.   **What is the individual, local, and regional dependence and engagement in each sector[37, 38]?**

   What is the current dependence and engagement and how are these expected to change in the future (both under the status quo and under the allocation alternatives being considered)?  Fishing dependence and engagement analyses should include potential impacts to commercial, for-hire, private angler, and subsistence fishing, as well as shoreside support industries, and should consider impacts at the local level (and could expand to regional/national level) if data are available.  For example, dependence and engagement may decrease locally based on decreased opportunities in a particular fishery, but increase on a regional level based on greater opportunities in a different fishery.  In addition, the importance of a given species or fishing activity to a culture should be considered when making allocation decisions.

   ii.   **What is the community's vulnerability and adaptive capacity?**

   Some communities may be more negatively impacted by changes to fishing production or fishery access than others.  Social indicators have been developed that describe the vulnerability of a fishing community to "disruptive events" (Jepson and Colburn 2013)[39], such as a change to a group or sector's access to a fishing resource.  For example, a community's current and historical dependence on a fishery can suggest a community's vulnerability and possible response to a change in commercial or recreational fishing access.[40]  Similarly, understanding a community's ability to adapt to changes may be useful (e.g., the adaptive capacity metric developed by Mathis et al. 2014[41]).

---

[35] *Op.cit.* Council on Environmental Quality, Environmental Justice Guidance Under the NEPA, page 8; *see also* 40 C.F.R. § 1508.8 (defining "effects" under NEPA to include direct and indirect effects).

[36] 16 U.S.C. § 1851(a)(8).  *See also id.* § 1802(17) (defining "fishing community") and 50 C.F.R. § 600.345 (setting forth requirements for analyses under National Standard 8 Guidelines).

[37] NMFS, Guidance for Social Impact Assessment: www.nmfs.noaa.gov/sfa/laws_policies/economic_social/index.html

[38] Sepez, J., K. Norman and R. Felthoven. 2007. A quantitative model for ranking and selecting communities most involved in commercial fisheries. *NAPA Bulletin* 28, 43-56. 160.

[39] Jepson, M., and L. L. Colburn 2013. Development of Social Indicators of Fishing Community Vulnerability and Resilience in the U.S. Southeast and Northeast Regions.  U.S. Department of Commerce, NOAA Tech. Memo NMFS-F/SPO-129, 64p, available at spo.nmfs.noaa.gov/tm/TM129.pdf.

[40] *Ibid.*

[41] Mathis, J. T., S. R. Cooley, N. Lucey, S. Colt, J. Ekstrom, T. Hurst, C. Hauri, W. Evans, J. N. Cross, R.A Feely. 2014. Ocean acidification risk assessment for Alaska's fishery sector.  Progress in Oceanography.

9

NMFSPD 01-119-02 July 27, 2016

    **iii.   Are there other social impacts?**

Changes to how fisheries are managed can have other social impacts.  For example, reducing an allocation may decrease safety if access to a fishery is restricted to a limited number of days (e.g., shortened season) and fishermen must decide whether to fish despite unsafe conditions or miss the year's landings of that fishery (referred to as "derby" fishing).[42]  Another example is potential impacts to non-consumptive uses of the resource, such as tourism or the intrinsic beauty of the ecosystem.  Will other groups (e.g., beach goers, whale watchers, birders) be negatively impacted by a change in allocation?

**4.  Indicators of Performance and Change**

Councils should assess the current conditions of a fishery and document changes to the fishery that may indicate the need for updated allocations.  When making allocation decisions, questions on performance and change could include, but are not limited to:

    **a.  What are the trends in catch/landings?**

Historical and current catch and landings data[43] can provide important information about demand, after accounting for changes in annual catch limits and quotas.  Past overages or underages should not be used to penalize or reward a group or sector; however, short-term, in-season adjustments based on expected underages could be used to ensure full utilization of resources.  Paybacks (reducing a catch limit in a subsequent year to account for an overage in the previous year) have been instituted as a mechanism to account for the biological impacts of overages; however, similar to in-season adjustments, they represent short-term fixes and not long-term changes to the allocations specified in fishery management plans.  If there is a perpetual need for paybacks, this could indicate the need to reassess and change allocation, recognizing that there could also be monitoring or other management changes that need to be addressed.  Caution should be exercised to avoid creating a perverse incentive system in the fishery and in its management.  It is important to consider the reasons behind the overages or underages, such as lag time between catch and reporting, poor prediction of catch, ineffective effort controls, misreporting by fishermen, or intentional underages (e.g., for the purpose of maintaining higher catch rates).

    **b.  What is the status of fishery resources?**

A Council should consider the status of a stock (e.g., stock is undergoing overfishing, not undergoing overfishing, overfished, approaching an overfished condition, rebuilding, or rebuilt)[44] when determining allocations.  The MSA clarifies that harvest restrictions and recovery benefits must be allocated "fairly and equitably among the commercial, recreational, and charter fishing sectors in the fishery"[45]; therefore, the costs and benefits

---

[42] *See* 16 U.S.C. § 1851(a)(10) (requiring under National Standard 10 that FMP measures shall, to the extent practicable, promote the safety of human life at sea) and 50 C.F.R. § 600.355 (National Standard 10 Guidelines).

[43] *See* 16 U.S.C. § 1853 (a)(13) (requiring that FMP describe sectors which participate in the fishery and, to the extent practicable, quantify trends in landings of the managed fishery).

[44] *See* 16 U.S.C. § 1853 (a)(10) (requiring that FMP specify objective and measurable criteria for identifying when fishery is overfished) and 50 C.F.R. § 600.310(e)(2) (providing under National Standard 1 Guidelines for specification of criteria for determining overfishing and overfished status of stock or stock complex).

[45] 16 U.S.C. § 1853 (a)(14).

10

Amendment 53 - Red Grouper          237          Appendix E. Allocation Factors
Allocations and Annual Catch Levels and Targets
0003710

to individuals and/or sectors should be considered when updates to stock status result in increases or decreases in allocations.

**c.   Has the distribution of the species changed?**

The distributions of species alter over time for reasons such as climate change (Nye et al., 2009)[46] or natural fluctuations in abundance (Bell et al., 2014)[47], among others.  This may create jurisdictional disputes when the distribution crosses international, state, or council boundaries.  Where the spatial distribution of the species does not match the spatial distribution of the allocation or geographic location of the fishermen, the allocation may need to be updated, recognizing that there could also be other management changes that need to be addressed.[48]  If a stock moves and it is financially viable for fishermen to follow the stock/species, then there can be conflict because fishermen in an area who are historically dependent on the stock will catch fish as well as fishermen new to the area, creating potential for overfishing and reducing the sustainability of the stock.  Conversely, if a stock moves and it is not financially viable to follow the stock, there may be less potential for conflict if allocations can be updated to match the new distribution.  For stocks expected to change geographic distribution, determining pre-arranged management responses is recommended (see above, "Recommended Practices When Reviewing and Making Allocation Decisions," Section d – Planning for Future Conditions).

**d.   What is the quality of information available for each sector or group?**

In order to properly manage a fishery, scientists need information on stock specific catch rates, abundance, and biology (age, growth, mortality, etc.), as well as data on social and economic aspects of the fishery[49].  Information can be compiled through fishery-dependent and fishery-independent data sources.  Fishery dependent data may be collected through use of dockside monitors, at-sea observers, logbooks, electronic monitoring and reporting systems, telephone surveys, and vessel-monitoring surveys.  Fishery-dependent data collected varies between sectors.  Improvements in the data collected through a fishery can result in a better understanding of the species and the appropriate management actions.[50]

Councils should consider the quality and availability of fishery dependent data collected through each sector when making allocation decisions.  Lack of detailed data should not be used to penalize a sector or a group; however, increased allocations could be

---

[46] Nye, J. A., Link, J. S., Hare, J. A., and Overholtz, W. J.  2009.  Changing spatial distribution of fish stocks in relation to climate and population size on the Northeast United States continental shelf.  Marine Ecology Progress Series 393: 111-129.

[47] Bell, R.J, J.A. Hare, J.P. Manderson, and D. E. Richardson.  2014.  Externally Driven Changes in the Abundance of Summer and Winter Flounder.  ICES Journal of Marine Science. doi: 10.1093/icesjms/fsu069.

[48] Changes in stock distribution implicate other MSA mandates, such as National Standards 1 (preventing overfishing and achieving optimum yield) and 3 (management of stocks as a unit, to extent practicable).  For example, reference points and catch targets may need to be updated if stock productivity changes with the shifting distribution.

[49] *See* 16 U.S.C. § 1853(a)(5) (requiring that FMP specify pertinent data to be submitted to agency with respect to commercial, recreational, charter fishing, and fishing processing in the fishery).

[50] For example, due to scientific uncertainty, data poor stocks are often managed more conservatively than data rich stocks.  Increasing an allocation to a group or sector that provides better biological information may allow for higher retainable catch (due to less of a buffer for uncertainty) in the future.

11

considered as an incentive to improving data quality. Where appropriate, allocation decisions which incentivize cooperative research or improvements in self-reported data could also be considered in data poor situations, consistent with relevant MSA requirements.

**Summary**

Allocation of fishery resources is a complex issue facing fishery managers. Because fisheries management, and the conditions surrounding fisheries, are not static, allocation decisions need to be considered in the context of adaptive management. This document provides recommended practices and guidance on allocation factors that a regional fishery management council should consider when making allocation decisions. The Council Coordinating Committee created a companion document that describes triggers that can be used to determine when to review allocation decisions. NMFS is committed to working with the Councils to assist them in their allocation decisions.

12

**Appendix A:  Existing National Policy**

**1. Magnuson-Stevens Fishery Conservation and Management Act (MSA)[51]**
Language relevant to allocation decisions is found throughout the MSA, most significantly in
National Standards 1, 4, 5, 8, and 9 concerning optimum yield, allocation, economic efficiency,
communities, and bycatch, respectively.  MSA sections 303A(c)(3) and (c)(5) specify
requirements for determining initial allocations and fishing community allocations for Limited
Access Privilege Programs (LAPPs)[52].  MSA sections 303(a)(14), 303(b)(6), 303(b)(11), and
304(e)(4)(b) also detail considerations for allocation decision making.[53]

    a.  **National Standard 1[54]:**  "Conservation and management measures shall prevent
overfishing while achieving, on a continuing basis, the optimum yield from each fishery
for the United States fishing industry."

    b.  **National Standard 4[55]:**  "Conservation and management measures shall not discriminate
between residents of different States.  If it becomes necessary to allocate or assign fishing
privileges among various United States fishermen, such allocation shall be
        (A) fair and equitable to all such fishermen;
        (B) reasonably calculated to promote conservation; and
        (C) carried out in such manner that no particular individual, corporation, or other
entity acquires an excessive share of such privileges."

    c.  **National Standard 5[56]:**  "Conservation and management measures shall, where
practicable, consider efficiency in the utilization of fishery resources; except that no such
measure shall have economic allocation as its sole purpose."

    d.  **National Standard 8[57]: "**Conservation and management measures shall, consistent with
the conservation requirements of this Act (including the prevention of overfishing and
rebuilding of overfished stocks), take into account the importance of fishery resources to
fishing communities by utilizing economic and social data that meet the requirements of
[National Standard 2], in order to
        (A) provide for the sustained participation of such communities, and
        (B) to the extent practicable, minimize adverse economic impacts on such
communities."

    e.  **National Standard 9[58]:**  "Conservation and management measures shall, to the extent
practicable,
        (A) minimize bycatch and
        (B) to the extent bycatch cannot be avoided, minimize the mortality of such
bycatch."

    f.  **LAPP: Eligibility of fishing communities to participate in a LAPP[59]:**  "To be eligible
to participate in a limited access privilege program to harvest fish, a fishing community
shall—

---

[51] www.nmfs.noaa.gov/sfa/laws_policies/msa/documents/msa_amended_2007.pdf
[52] 16 U.S.C. § 1853a.  Limited Access Privilege Programs are a subset of Catch Share Programs.
[53] 16 U.S.C. §§ 1853(a)(14), (b)(6), (b)(11); 16 U.S.C. § 1854(e)(4)(b).
[54] MSA 301(a)(1) [16 U.S.C. § 1851(a)(1)].
[55] MSA 301(a)(4) [16 U.S.C. § 1851(a)(4)].
[56] MSA 301(a)(5) [16 U.S.C. § 1851(a)(5)].
[57] MSA 301(a)(8) [16 U.S.C. § 1851(a)(8)].
[58] MSA 301(a)(9) [16 U.S.C. § 1851(a)(9)].

13

Amendment 53 - Red Grouper        240        Appendix E. Allocation Factors
Allocations and Annual Catch Levels and Targets
0003713

(I) be located within the management area of the relevant Council;

(II) meet criteria developed by the relevant Council, approved by the Secretary, and published in the Federal Register;

(III) consist of residents who conduct commercial or recreational fishing, processing, or fishery-dependent support businesses within the Council's management area; and

(IV) develop and submit a community sustainability plan to the Council and the Secretary that demonstrates how the plan will address the social and economic development needs of coastal communities, including those that have not historically had the resources to participate in the fishery, for approval based on criteria developed by the Council that have been approved by the Secretary and published in the Federal Register."

g. **LAPP: Requirements for allocation**[60]:  "In developing a limited access privilege program to harvest fish a Council or the Secretary shall—

(A) establish procedures to ensure fair and equitable initial allocations, including consideration of— (i) current and historical harvests; (ii) employment in the harvesting and processing sectors; (iii) investments in, and dependence upon, the fishery; and (iv) the current and historical participation of fishing communities;

(B) consider the basic cultural and social framework of the fishery, especially through— (i) the development of policies to promote the sustained participation of small owner-operated fishing vessels and fishing communities that depend on the fisheries, including regional or port-specific landing or delivery requirements; and (ii) procedures to address concerns over excessive geographic or other consolidation in the harvesting or processing sectors of the fishery;

(C) include measures to assist, when necessary and appropriate, entry-level and small vessel owner-operators, captains, crew, and fishing communities through set-asides of harvesting allocations, including providing privileges, which may include set-asides or allocations of harvesting privileges, or economic assistance in the purchase of limited access privileges;

(D) ensure that limited access privilege holders do not acquire an excessive share of the total limited access privileges in the program by—(i) establishing a maximum share, expressed as a percentage of the total limited access privileges, that a limited access privilege holder is permitted to hold, acquire, or use; and (ii) establishing any other limitations or measures necessary to prevent an inequitable concentration of limited access privileges; and

(E) authorize limited access privileges to harvest fish to be held, acquired, used by, or issued under the system to persons who substantially participate in the fishery, including in a specific sector of such fishery, as specified by the Council."

h. **LAPP: Authorization of the use of Auctions**[61]:  "In establishing a limited access privilege program, a Council shall consider, and may provide, if appropriate, an auction system or other program to collect royalties for the initial, or any subsequent, distribution of allocations in a limited access privilege program if—

---

[59] MSA 303A(c)(3)(A)(i) [16 U.S.C. § 1853a(c)(3)(A)(i)].
[60] MSA 303A(c)(5) [16 U.S.C. § 1853a(c)(5)]; for programs established after the 2007 MSA reauthorization.
[61] MSA 303A(d) [16 U.S.C. § 1853a(d)].

14

(1) the system or program is administered in such a way that the resulting distribution of limited access privilege shares meets the program requirements of this section; and

(2) revenues generated through such a royalty program are deposited in the Limited Access System Administration Fund established by section 305(h)(5)(B) and available subject to annual appropriations."

**i.   Other Applicable Sections:**

**MSA 303(a)(14)**[62] stipulates that, when harvest reductions are required, the harvest restrictions and recovery benefits must be allocated "fairly and equitably among the commercial, recreational and charter fishing sectors."

**MSA 303(b)(6)**[63] provides that a Council may establish a "limited access system" provided that it takes into account present and historical participation in the fishery, dependence on the fishery, the economics of the fishery, the capability of the vessels to engage in other fisheries, the cultural and social framework relevant to the fishery, the fair and equitable distribution of access privileges, and any other relevant considerations.

**MSA 303(b)(11)**[64] authorizes setting aside a portion of the total quota "for use in scientific research."

**MSA 304(e)(4)(B)**[65] provides that rebuilding programs must allocate "overfishing restrictions and recovery benefits fairly and equitably among sectors of the fishery."

**2.   Select Relevant NMFS Documents.  For additional documents, see Morrison and Scott (2014).**[66]

**a.   National Standard Guidelines.**[67]

NMFS provides official guidance on what the National Standards mean for fisheries management.  Guidance for NS4 and NS5 were revised in 1998, NS8 and NS9 were revised in 2008, and NS1 were revised in 2009 and proposed to be revised again in 2015.

**b.   NOAA Catch Share Policy.**[68]

The NOAA Catch Share Policy provides guidance on making initial allocation decisions for catch share[69] programs.  In addition, the policy states that all allocation decisions should be revisited on a regular basis under a catch share program or other management approach.

---

[62] 16 U.S.C. § 1853(a)(14).
[63] 16 U.S.C. § 1853(b)(6).
[64] 16 U.S.C. § 1853(b)(11).
[65] 16 U.S.C. § 1854(e)(4)(B).
[66] Morrison, W.E., T.L. Scott. 2014.  Review of Laws, Guidance, Technical Memorandums and Case Studies Related to Fisheries Allocation Decisions. U.S. Dept. of Commerce. NOAA Technical Memorandum NMFS-F/SPO-148, 32
p.www.nmfs.noaa.gov/sfa/laws_policies/national_standards/documents/morrison_scott_nmfs_f_spo_148.pdf.
[67] www.nmfs.noaa.gov/sfa/laws_policies/national_standards/index.html
[68] www.nmfs.noaa.gov/sfa/management/catch_shares/about/documents/noaa_cs_policy.pdf
[69] "Catch share" is a general term for several fishery management strategies that allocate specific portions of a fishery's total allowable catch to individuals, cooperatives, communities, or other entities. Each recipient of a catch share is directly accountable to stop fishing when its exclusive allocation is reached.  The term includes specific programs defined in law such as "limited access privilege" (LAP) and "individual fishing quota" (IFQ) programs, and other exclusive allocative measures such as Territorial Use Rights Fisheries (TURFs) that grant an exclusive privilege to fish in a geographically-designated fishing ground.

15

NMFSPD 01-119-02 July 27, 2016

    c.  **NMFS Economic and Social Impact Assessment Guidance.**[70]
NMFS has created guidance for completing economic and social impact analyses for fishery regulations.  These documents provide guidance on completing these analyses for any fishery management decision, including allocation decisions.

    d.  **NOAA Fisheries National Saltwater Recreational Fisheries Policy.**[71]
As explained in the policy, "this policy identifies goals and guiding principles to be integrated into NMFS' planning, budgeting, decision-making, and activities, and includes examples of implementation concepts and strategies supported by NMFS."  The policy establishes six guiding principles, and under the second principle, one example of an implementation strategy is the "recurring evaluation of fishery allocations to facilitate equitable distribution of fishing opportunities as fisheries develop and evolve."

    e.  **NOAA Fisheries Climate Science Strategy**.[72]
The strategy is part of a proactive approach to increase the production, delivery, and use of climate-related information in fulfilling NMFS mandates.  The Strategy identifies seven objectives which will provide decision-makers with the information they need to reduce impacts and increase resilience in a changing climate.  It is designed to be customized and implemented through Regional Action Plans that focus on building regional capacity, partners, products and services to address the seven objectives.

---

[70] www.nmfs.noaa.gov/sfa/laws_policies/economic_social/index.html
[71] www.nmfs.noaa.gov/sfa/management/recreational/documents/noaa_recfish_policy.pdf
[72] www.st.nmfs.noaa.gov/Assets/ecosystems/climate/documents/NCSS_Final.pdf

16

# APPENDIX F.  ALLOCATION REVIEW TRIGGERS

006763APR2019

 **Gulf of Mexico Fishery Management Council**
*Managing Fishery Resources in the U.S. Federal Waters of the Gulf of Mexico*

4107 West Spruce St Suite 200
Tampa, Florida  33607  USA
Phone: 813.348.1630 • Toll free: 888.833.1844 • Fax: 813.348.1711
www.gulfcouncil.org

April 23, 2019

Mr. Chris Oliver
Assistant Administrator
NOAA Fisheries
1315 East-West Highway
Silver Spring, MD 20910

Dear Mr. Oliver

The Fisheries Allocation Review Policy (NMFS Policy Directive 01-119) and the associated Procedural Directive on allocation review triggers (NMFS Procedural Directive 01-119-01) request that Regional Fishery Management Councils establish review triggers and present three types of triggers: indicator-based, public interest-based, and time-based criteria.  Councils are expected to identify their allocations subject to the policy and establish review triggers, i.e., select the criteria for initiating fisheries allocation reviews, by August 2019.

The Gulf of Mexico Fishery Management Council (Council) initially reviewed a discussion paper introducing the allocation review policy and procedural directive during its August 2018 meeting.  Follow-up discussions during the October 2018 meeting included an evaluation of the types of triggers considered in the policy and procedural directives and a preliminary identification of Gulf allocations that would be subject to the policy.  Additional discussions, including the formal selection of triggers for relevant Gulf of Mexico allocations and the adoption of the policy on allocation reviews detailed below were held in January 2019 and finalized during the April 2019 Council meeting.  For relevant fisheries in the Gulf of Mexico, the Council adopted the following policy on allocation reviews:

> The Council selects time-based criteria as primary allocation review triggers bolstered by general monitoring of indicators for reallocation justification through the Council's general deliberative process including public input channels as a secondary trigger.  Consistent with the adaptive management process suggested in the Allocation Review Policy (referenced above), the incorporation of the Council's public input process as secondary public interest-based review triggers will include the consideration of relevant social, economic, and ecological indicators as an intermediate step before determining whether an allocation review is triggered.  For example, economic tools that might contribute to the development of indicator-based review triggers could include cost-benefit analysis, economic impact analysis, economic efficiency, and others.  Social indicators could include a range of social metrics such as community resilience, vulnerability and well-being.  Examples of ecological criteria include changes in fishery

status resulting from a stock assessment, undocumented sources of mortality, increases in discards, or changes in species distribution and food web dynamics. Allocations included are:

- red snapper allocations within the recreational sector, i.e., between the federal for-hire and private angling components (with a 4-year timeframe);

- red snapper allocations between the five Gulf states (with a 5-year timeframe);

- gray triggerfish and greater amberjack allocations between the commercial and recreational sectors (with a 6-year timeframe);

- Gulf of Mexico group king mackerel allocations between the recreational and commercial sectors, zones, and gear types (with a 6-year timeframe);

- recreational and commercial allocations of red snapper, gag, red grouper, shallow water grouper IFQ aggregate, deep water grouper IFQ aggregate, and tilefish IFQ aggregate (with a 7-year timeframe);

- black grouper, mutton snapper, yellowtail snapper allocations between the Gulf and South Atlantic Councils (with a 7-year timeframe).

The Council will publish this policy on allocation reviews on its website and looks forward to working with the Southeast Regional Office and Science Center staff to set the schedule for the allocation reviews. The table appended to this letter lists the time intervals to be used with the time-based allocation review triggers and provides anticipated start dates for the initial allocation reviews. In addition to the allocation reviews scheduled based on the review triggers selected above, the Council may initiate supplementary allocation reviews at any time. For example, the Council could initiate an allocation review should relevant new information, e.g., data recalibration, be made available.

Sincerely,

Thomas K. Frazer

Thomas Frazer, Ph.D.
Council Chair


cc: Alan Risenhoover
    Regional Fisheries Management Councils
    Roy Crabtree, Ph.D.
    Andy Strelcheck
    Jack McGovern, Ph.D.
    Mara Levy
    Clay Porch, Ph.D.

Timeframes for the time-based allocation review triggers and expected starts of initial reviews

| Allocations | Time Intervals | Expected start of the first review |
|---|---|---|
| Recreational red snapper ACL allocation between the private angling and federal for-hire components | 4 years | April 2023 |
| Red snapper allocations between the Gulf states | 5 years | April 2024 |
| Gray triggerfish and greater amberjack allocations between the recreational and commercial sectors | 6 years | April 2025 |
| Gulf of Mexico group king mackerel allocations between the recreational and commercial sectors, zones, and gear types | 6 years | April 2025 |
| Recreational and commercial allocations of red snapper, gag, red grouper, shallow water grouper IFQ aggregate, deep water grouper IFQ aggregate, and tilefish IFQ aggregate | 7 years | April 2026 |
| Black grouper, mutton snapper, yellowtail snapper allocations between the Gulf and South Atlantic Councils | 7 years | April 2026 |

# APPENDIX G.   ACL/ACT CONTROL RULE FOR THE RECREATIONAL SECTOR

| | | | | | | |
|---|---|---|---|---|---|---|
| As of 05/21/2020 | | | | | Red Grouper | |
| **ACL/ACT Buffer Spreadsheet** | | version 4.1 - April 2011 | | | Sector: **Recreational** | |
| sum of points | 2 | | | | Data: **2016-2019** | |
| max points | 5.0 | | Buffer between ACL and ACT (or ABC and ACL) | | Unweighted | 8 |
| **Min. Buffer** | 0 | min. buffer | User adjustable | | Weighted | 9 |
| Max Unw.Buff | 19 | max unwt. Buff | | | | |
| **Max Wtd Buff** | 25 | max wtd. buffe | User adjustable | | | |

| | Component | Element score | Element | | Selection | Element result |
|---|---|---|---|---|---|---|
| | Stock assemblag | 0 | This ACL/ACT is for a single stock. | | x | 0 |
| | | 1 | This ACL/ACT is for a stock assemblage, or an indicator species for a stock assemblage | | | |
| | | | | | | |
| | Ability to | 0 | Catch limit has been exceeded 0 or 1 times in last 4 years | | x | 0 |
| | Constrain Catch | 1 | Catch limit has been exceeded 2 or more times in last 4 years | | | |
| | | | | | | |
| | | | For the year with max. overage, add 0.5 pts. For every 10 percentage points (rounded up) above ACL | | 0.0 | |
| | | | Not applicable (there is no catch limit) | | | |
| | | | | | | |
| | | | Apply this component to recreational fisheries, not commercial or IFQ fisheries | | | |
| | Precision of | 0 | Method of absolute counting | | | 2 |
| | Landings Data | 1 | MRIP proportional standard error (PSE) <= 20 | | | |
| | Recreational | 2 | MRIP proportional standard error (PSE) > 20 | | x | |
| | | | Not applicable (will not be included in buffer calculation) | | | |
| | | | | | | |
| | Precision of | 0 | Landings from IFQ program | | | not applicabl |
| | | 1 | Landings based on dealer reporting | | | |
| | Landings Data | 2 | Landings based on other | | | |
| | Commercial | | Not applicable (will not be included in buffer calculation) | | x | |
| | | | | | | |
| | Timeliness | 0 | In-season accountability measures used or fishery is under an IFQ | | x | 0 |
| | | 1 | In-season accountability measures not used | | | |
| | | | | | Sum | 2 |

| | Weighting factor | Element weight | Element | | Selection | Weighting |
|---|---|---|---|---|---|---|
| | Overfished statu | 0 | 1. Stock biomass is at or above $B_{OY}$ (or proxy). | | | 0.2 |
| | | 0.1 | 2. Stock biomass is below $B_{OY}$ (or proxy) but at or above $B_{MSY}$ (or proxy). | | | |
| | | 0.2 | 3. Stock biomass is below $B_{MSY}$ (or proxy) but at or above minimum stock size threshold (M | | x | |
| | | 0.3 | 4. Stock is overfished, below MSST. | | | |
| | | 0.3 | 5. Status criterion is unknown. | | | |

*2016-2019 landings data from NOAA Fisheries ACL Monitoring Dataset.  Accessed May 8, 2020.

| ACL/ACT Control Rule Data | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Year** | **Sector** | **Landings** | **PSE** | **ACL** | **Exceeded ACL?** | **Buffer** | **Data Used** |
| 2016 | Recreational | 1,373,337 | 21.6 | 2,580,000 | No | | MRIP-APAIS |
| 2017 | Recreational | 739,073 | 21 | 2,580,000 | No | 9% | MRIP-APAIS |
| 2018 | Recreational | 913,978 | 21.5 | 2,580,000 | No | | MRIP-APAIS |
| 2019* | Recreational | 725,105 | 21.6 | 1,000,000 | No | | MRIP-APAIS |

Source:  Source:  SERO ACL Monitoring dataset, retrieved 8 May 2020 (recreational).  *2019 recreational data are preliminary.

# APPENDIX H.   ACL/ACT CONTROL RULE FOR THE COMMERCIAL SECTOR

| | | | | | | | Red Grouper | |
|---|---|---|---|---|---|---|---|---|
| As of 05/21/2020 | | | | | | | | |
| **ACL/ACT Buffer Spreadsheet** | | | version 4.1 - April 2011 | | | | **Sector: Commercial** | |
| sum of points | 0 | | | | | | **Data: 2016-2019** | |
| max points | 5.0 | | | | Buffer between ACL and ACT (or ABC and ACL) | Unweighted | 0 | |
| **Min. Buffer** | **0** | min. buffer | User adjustable | | | **Weighted** | | **0** |
| Max Unw.Buff | 19 | max unwt. Buff | | | | | | |
| **Max Wtd Buff** | **25** | max wtd. buffe | User adjustable | | | | | |

| | Component | Element score | Element | | | Selection | Element result |
|---|---|---|---|---|---|---|---|
| | Stock assemblage | 0 | This ACL/ACT is for a single stock. | | | x | 0 |
| | | 1 | This ACL/ACT is for a stock assemblage, or an indicator species for a stock assemblage | | | | |
| | | | | | | | |
| | Ability to | 0 | Catch limit has been exceeded 0 or 1 times in last 4 years | | | x | 0 |
| | Constrain Catch | 1 | Catch limit has been exceeded 2 or more times in last 4 years | | | | |
| | | | | | | | |
| | | | For the year with max. overage, add 0.5 pts. For every 10 percentage points (rounded up) above ACL | | | 0.0 | |
| | | | Not applicable (there is no catch limit) | | | | |
| | | | | | | | |
| | | | Apply this component to recreational fisheries, not commercial or IFQ fisheries | | | | |
| | Precision of | 0 | Method of absolute counting | | | | not applicabl |
| | Landings Data | 1 | MRIP proportional standard error (PSE) <= 20 | | | | |
| | Recreational | 2 | MRIP proportional standard error (PSE) > 20 | | | | |
| | | | Not applicable (will not be included in buffer calculation) | | | x | |
| | | | | | | | |
| | | | Apply this component to commercial fisheries or any fishery under an IFQ program | | | | |
| | Precision of | 0 | Landings from IFQ program | | | x | 0 |
| | Landings Data | 1 | Landings based on dealer reporting | | | | |
| | Commercial | 2 | Landings based on other | | | | |
| | | | Not applicable (will not be included in buffer calculation) | | | | |
| | | | | | | | |
| | Timeliness | 0 | In-season accountability measures used or fishery is under an IFQ | | | x | 0 |
| | | 1 | In-season accountability measures not used | | | | |
| | | | | | | | |
| | | | | | | Sum | 0 |

| | Weighting factor | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Element weight | Element | | | Selection | Weighting |
| | Overfished statu | 0 | 1. Stock biomass is at or above $B_{OY}$ (or proxy). | | | | 0.2 |
| | | 0.1 | 2. Stock biomass is below $B_{OY}$ (or proxy) but at or above $B_{MSY}$ (or proxy). | | | | |
| | | 0.2 | 3. Stock biomass is below $B_{MSY}$ (or proxy) but at or above minimum stock size threshold (M | | | x | |
| | | 0.3 | 4. Stock is overfished, below MSST. | | | | |
| | | 0.3 | 5. Status criterion is unknown. | | | | |

\*2016-2019 landings data from NOAA Fisheries ACL Monitoring Dataset.  Accessed May 8, 2020.

| ACL/ACT Control Rule Data | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Sector | Landings | PSE | ACL | Exceeded ACL? | Buffer | Data Used |
| 2016 | Commercial | 4,497,582 | 0 - IFQ | 7,780,000 | No | | IFQ |
| 2017 | Commercial | 3,328,271 | 0 - IFQ | 7,780,000 | No | 0% | IFQ |
| 2018 | Commercial | 2,363,280 | 0 - IFQ | 7,780,000 | No | | IFQ |
| 2019 | Commercial | 2,037,046 | 0 - IFQ | 3,000,000 | No | | IFQ |

Source:  SEFSC Commercial ACL dataset, retrieved 15 November 2019 (commercial).

# APPENDIX I.   MODIFICATION OF MANAGEMENT FOR RED GROUPER IN THE GULF

**Modification of Management for Red Grouper in the Gulf of Mexico: Amendment 53**

Jeff Pulver; March 23, 2021

LAPP/DM Branch

Southeast Regional Office

**Modeling Season Length for the Recreational Sector**

Landings data for Gulf of Mexico red grouper were obtained from the Southeast Fisheries Science Center (SEFSC) recreational Annual Catch Limit (ACL) dataset obtained in May of 2020.  The current annual catch target (ACT) is being tracked using Marine Recreation Information Program (MRIP) Coastal Household Telephone Survey (CHTS) equivalent landings.  However, this analysis uses MRIP Fishing Effort Survey (FES) data to match the same currency (MRIP-FES) as the most recent assessment (SEDAR 61).  Future landings were determined from taking a three-year average of the three most recent years of complete MRIP-FES data, as the most recent data are assumed to be the best approximation of future harvest.  Additionally, the current 2-red grouper per angler bag limit became effective on May 7, 2015 precluding using landings prior to 2016 without adjusting for the previously higher bag limits.  Recreational landings are collected in two-month increments called waves (e.g., January and February = wave 1, March and April = wave 2, etc.).  Landings from 2017 through 2019 and a prediction of future landings (average landings from 2017-2019) by wave are shown in Figure 1.  Season lengths were projected with upper and lower 95% confidence intervals for each recreational ACL and ACT being considered in Amendment 53 (Tables 1 and 2).  The predicted closure dates for the ACL and ACT options span from July 23 to no closure (Tables 1 and 2).  There is considerable uncertainty in the predictions since the confidence intervals range from early June to no closure needed (Table 1; Figure 2).



**Figure 1.** Gulf of Mexico recreational landings by two-month wave and predicted future landings.  Source: SEFSC MRIP-FES Recreational ACL Dataset (May 8, 2020).

**Table 1**. The predicted closure dates for each recreational ACL (million pounds [mp] gutted weight [gw]) currently in Amendment 53 generated from predicted landings with 95% confidence intervals.

| Action 1 Alternative | ACL | Predicted Closure Date | Season Length (95% Confidence Interval) |
|---|---|---|---|
| Alternative 1 | 2.10 | No Closure | October 25 - No Closure |
| Alternative 2 | 1.18 | August 8 | June 13 - No Closure |
| Alternative 3 | 1.73 | December 19 | August 15 - No Closure |
| Alternative 4 | 1.70 | December 13 | August 11 - No Closure |
| Alternative 5 | 1.72 | December 17 | August 14 - No Closure |
| Alternative 6 | 1.44 | October 11 | July 10 - No Closure |

Source: SEFSC MRIP-FES Recreational ACL Dataset (May 8, 2020).

**Table 2**. The predicted closure dates for each recreational ACT (mp gw) currently in Amendment 53 generated from predicted landings with 95% confidence intervals.

| Alternatives (Action 2 – Action 1) | ACL | Buffer | ACT | Predicted Closure Date | Season Length (95% Confidence Interval) |
|---|---|---|---|---|---|
| 1-1 | 2.10 | 8% | 1.93 | No Closure | Sep 15 - No Closure |
| 1-2 | 1.18 | 8% | 1.09 | July 26 | June 5 - No Closure |
| 2-2; 3-2 | 1.18 | 9% | 1.07 | July 23 | June 3 - No Closure |
| 1-3 | 1.73 | 8% | 1.59 | November 20 | July 29 - No Closure |
| 2-3; 3-3 | 1.73 | 9% | 1.57 | November 16 | July 26 - No Closure |
| 1-4 | 1.70 | 8% | 1.56 | November 14 | July 25 - No Closure |
| 2-4; 3-4 | 1.70 | 9% | 1.55 | November 12 | July 24 - No Closure |
| 1-5 | 1.72 | 8% | 1.58 | November 18 | July 27 - No Closure |
| 2-5; 3-5 | 1.72 | 9% | 1.57 | November 16 | July 26 - No Closure |
| 1-6 | 1.44 | 8% | 1.32 | August 27 | June 27 - No Closure |
| 2-6; 3-6 | 1.44 | 9% | 1.31 | August 25 | June 26 - No Closure |

Source: SEFSC MRIP-FES Recreational ACL Dataset (May 8, 2020).



**Figure 2.** Cumulative predicted Gulf of Mexico red grouper recreational landings with 95% confidence interval (dashed lines).  Source: SEFSC MRIP-FES Recreational ACL Dataset (May 8, 2020).

As with most predictions, the reliability of the results is dependent upon the accuracy of their underlying data and input assumptions.  We have attempted to create a realistic baseline as a foundation for comparisons, under the assumption that projected future landings will accurately reflect actual future landings.  Uncertainty exists in this projection, as economic conditions, weather events, changes in catch-per-unit effort, fisher response to management regulations, and a variety of other factors may cause departures from this assumption.

# ADMINISTRATIVE RECORD

# NO. 097

```
 1              GULF OF MEXICO FISHERY MANAGEMENT COUNCIL
 2
 3                  REEF FISH MANAGEMENT COMMITTEE
 4
 5  Opal Key Resort & Marina and Virtual          Key West, Florida
 6
 7                         June 23, 2021
 8
```

**9  VOTING MEMBERS**
```
10  Martha Guyas (designee for Jessica McCawley)..............Florida
11  Kevin Anson (designee for Scott Bannon)..................Alabama
12  Patrick Banks..........................................Louisiana
13  Susan Boggs.............................................Alabama
14  Leann Bosarge.......................................Mississippi
15  Dale Diaz...........................................Mississippi
16  Jonathan Dugas........................................Louisiana
17  Phil Dyskow.............................................Florida
18  Tom Frazer.............................................Florida
19  Robin Riechers............................................Texas
20  John Sanchez...........................................Florida
21  Bob Shipp..............................................Alabama
22  Joe Spraggins......................................Mississippi
23  Andy Strelcheck...........................................NMFS
24  Greg Stunz................................................Texas
25  Ed Swindell..........................................Louisiana
26  Troy Williamson...........................................Texas
27
```

**28  NON-VOTING MEMBERS**
```
29  Dave Donaldson...........................................GSMFC
30
```

**31  STAFF**
```
32  Assane Diagne.........................................Economist
33  Matt Freeman..........................................Economist
34  John Froeschke...................................Deputy Director
35  Beth Hager...............................Administrative Officer
36  Lisa Hollensead................................Fishery Biologist
37  Ava Lasseter......................................Anthropologist
38  Mary Levy.................................NOAA General Counsel
39  Jessica Matos.........Document Editor & Administrative Assistant
40  Natasha Mendez-Ferrer..........................Fishery Biologist
41  Emily Muehlstein......................Public Information Officer
42  Kathy Pereira.............Meeting Planning - Travel Coordinator
43  Ryan Rindone.................Lead Fishery Biologist/SEDAR Liaison
44  Bernadine Roy..................................Office Manager
45  Carrie Simmons...............................Executive Director
46  Carly Somerset.....................Fisheries Outreach Specialist
47
```

**48  OTHER PARTICIPANTS**
```
49  Chester Brewer..........................................SAFMC
```

0003735

```
 1   Shannon Calay..............................................SEFSC
 2   Alisha Gray.................................................NMFS
 3   Peter Hood..................................................NMFS
 4   David Krebs...................................................FL
 5   Kai Lorenzen................................................SSC
 6   Kelli O'Donnell.............................................NMFS
 7   Clay Porch................................................SEFSC
 8   Jeff Pulver.................................................NMFS
 9   Chris Schieble...............................................LA
10   Jessica Stephen.............................................NMFS
11   Mike Travis.................................................NMFS
12
13                            - - -
14
```

2

0003736

TABLE OF CONTENTS

Table of Contents...............................................3

Table of Motions................................................4

Adoption of Agenda and Approval of Minutes and Action Guide and
Next Steps......................................................5

Review of Reef Fish Landings and Review of Reef Fish ACL Figures
................................................................5

Final Action: Reef Fish Amendment 53: Red Grouper Allocations
and Annual Catch Levels and Targets............................12
     SSC Review of the Red Grouper Catch Analysis..............13
     Public Comments...........................................15
     Presentation and Committee Discussion.....................29
     Review of Codified Text...................................64

Presentation on Greater Amberjack Historical Landings and
Potential Management Actions and Table of Greater Amberjack
Landings.......................................................65

Overview and Discussion of Individual Fishing Quota Programs
Review.........................................................80
     Presentation..............................................80
     SSC Recommendations......................................106
     Ad Hoc Reef Fish IFQ AP Recommendations..................106

Reef Fish Amendments 36B and 36C: Modifications to Individual
Fishing Quota Programs........................................109

Adjournment...................................................126

- - -

3

0003737

```
 1                    TABLE OF MOTIONS
 2
 3  PAGE 48:   Motion  in  Action  1  to  make  Alternative  2  the
 4  preferred.   The motion failed on page 64.
 5
 6  PAGE 73:  Motion to request SEFSC run an analysis for greater
 7  amberjack which  shows  what  the  historical ABCs and ACLs would
 8  have been with FES back in time.   The motion carried on page 74.
 9
10  PAGE 109:  Motion to make the red snapper and grouper-tilefish
11  IFQ program  review  final  and  available  for  publishing  on  the
12  council's  website,  www.gulfcouncil.org.   The motion carried on
13  page 109.
14
15                            - - -
16
```

4

```
 1  The Reef Fish Management Committee of the Gulf of Mexico Fishery
 2  Management Council convened on Wednesday morning, June 23, 2021,
 3  and was called to order by Chairman Martha Guyas.
 4
 5                        ADOPTION OF AGENDA
 6                       APPROVAL OF MINUTES
 7                  ACTION GUIDE AND NEXT STEPS
 8
 9  CHAIRMAN MARTHA GUYAS:  Good morning, everyone.  We have a very
10  dense agenda today.  If you want to go ahead and open that up,
11  it's Tab B, Number 1.  Our first order of business is to adopt
12  the agenda, and so, before we do that, is there any other
13  business that we need to add to this agenda?  I have one thing,
14  and that is goliath grouper.  Anybody else?  Robin, Greg, and
15  Bob, just shout it out if I don't hear you.  I will do my best
16  to keep up with what's on the screen, but you know how that
17  goes.
18
19  All right, and so, seeing no other business, is there a motion
20  to adopt the agenda as modified?  All right.  We have a motion
21  by Mr. Banks, and it's seconded by Mr. Swindell.  Thank you very
22  much.  Any opposition to that motion?  Seeing none, the motion
23  carries.
24
25  Next, we've got Tab B, Number 2, the April minutes.  Are there
26  any changes to the minutes?  Any opposition to adopting the
27  minutes, or approving the minutes, as written?  Seeing none, we
28  will dispense with the minutes.
29
30  As usual, we will go through our action guide before each item,
31  if we can, and so that will take us to the Review of Reef Fish
32  Landings, Tab B, Number 4, and Peter is going to present those.
33  I'm not sure which tab you would like to have up, and I assume
34  it's the presentation with the graphs.
35
36  MS. KELLI O'DONNELL:  Hi, Madam Chair.  This is Kelli O'Donnell,
37  and I'm going to be going over the figures.
38
39  CHAIRMAN GUYAS:  Okay.  Great.  Thanks, Kelli.
40
41                  REVIEW OF REEF FISH LANDINGS
42
43  MS. O'DONNELL:  The first one we have on here is gray
44  triggerfish commercial landings, and we can see that the sector
45  has routinely gotten pretty close, if not to, their ACT, in the
46  past couple of years, and have had to have a closure.  Exciting
47  news, the framework has passed through Headquarters review, and
48  so we are just waiting for it to finally publish, and so we will
```

5

1  see that increase in the ACT and ACL for both sectors, probably
2  in time by the end of their seasonal closure at the end of July.
3
4  We can see, with the recreational sector, they have gone over
5  their ACL the past couple of years, and so this extra poundage
6  that they will have will hopefully have that not happen, even
7  with their seasonal closure, and, last year, 2020, there were
8  some concerns that they had not caught that much, but, once we
9  got the adjusted 2020 landings in, we did see that they ended up
10  exceeding the ACL.
11
12  Greater amberjack, they have stayed below their ACT and ACL the
13  past couple of years, and that could be, in part, to what we're
14  seeing with the stock status of them still be overfished and
15  undergoing overfishing.  They have not had any management
16  changes, such as a longer seasonal closure added, and they did
17  have the commercial trip limit step-down implemented, although,
18  due to the 2020 fishing year having low landings, that was never
19  initiated, and so they stayed with their full trip limit for the
20  full year and still did not close.
21
22  Greater amberjack recreational landings, they have stayed below
23  their ACT the past couple of years, and this could also be in
24  part due to the stock status, although it's hard to tell how the
25  change in the fishing year and the change in seasonal closure
26  has affected the stock, because the SEDAR 70 terminal year was
27  actually 2018, and that is the year that the new seasonal
28  closure and fishing year took effect.
29
30  Gray snapper commercial, we see they have stayed pretty much on
31  track the past couple of years, and, again, keep in mind that
32  2021 is still preliminary, and, again, these are a stock, and
33  so, while it shows the commercial landings don't look like
34  they're close to the ACT, if we go to the next slide, once we
35  combine that with the recreational sector, we have seen that
36  they do get a little bit closer up to their ACT, which was
37  increased this year with the new amendment that was put into
38  place.
39
40  Lane snapper, we see that they have also been pretty regular
41  over the past couple of years, as far as what their landings
42  have been, and, again, we see the commercial doesn't look like
43  it's that close to the stock ACL, but, when we go to the next
44  slide, when we add in the recreational landings, they have
45  routinely gone over their ACL the past couple of years, and that
46  document is currently in the rulemaking stage as well, and that
47  will increase their ACL and ACT, and so that is on track to be
48  implemented before the end of this year.

0003740

1
2  Vermilion, we're still seeing the same thing, and there's not
3  too much variation in the past couple of years.  2021, again, is
4  still preliminary, and so we would expect that to kind of move
5  up a little bit as we get in the final landings next year.  When
6  combined with the rec sector, we see that the landings are a
7  little bit closer up to their stock ACL, although they have not
8  had a closure at all, because they only exceed the ACL in
9  2018, and their accountability measure just has -- It's a
10 closure projection the next year, which there was not a
11 projection that showed a closure was needed for 2019.
12
13 Yellowtail, they have a different fishing year, August to July,
14 and so we can see that we have almost all of the 2021 landings
15 for them in.  They're just still preliminary right now, for the
16 January to May timeframe so far, and so we'll expect a little
17 bit of change in that as we get those final landings as well,
18 although, when added, even with the recreational sector, we
19 still see that they have been below their stock ACL, which has
20 been implemented since 2013.  I think that is my last slide.
21
22 **CHAIRMAN GUYAS:**  All right.  Thanks, Kelli.  Are there any
23 questions about this presentation?  Leann.
24
25 **MS. LEANN BOSARGE:**  Kelli, great presentation.  Thank you.  I
26 really love your graphs.  I'm not sure, Kelli, if this is for
27 you, or maybe for Andy, on the gray trigger, when we look at
28 that, and it was a pretty decent overage, but I think there's
29 also a pretty decent buffer between our ACL and our OFL, but we
30 didn't exceed the OFL, did we, in 2020?
31
32 **MS. O'DONNELL:**  I do not think we did, because, as you
33 mentioned, the OFL buffer has been a lot higher than what the
34 total ACL is, and I would have to look to see what it is for
35 sure, but I know that there has been a really large buffer
36 between that, and I think it's still -- Even with the increased
37 ACL and ACT for each sector, it will still be a pretty large
38 buffer between the OFL and the total ACL, which equals the ABC
39 as well.
40
41 **MR. ANDY STRELCHECK:**  Leann, I will double-check that, and we'll
42 get back to you.  My recollection is consistent with Kelli's.
43
44 **CHAIRMAN GUYAS:**  Okay.  Great.  Any other questions?  Dr.
45 Simmons.
46
47 **EXECUTIVE DIRECTOR CARRIE SIMMONS:**  Thank you, Madam Chair.
48 Thank you, Kelli, for the presentation.  Just a question on the

0003741

1  recreational 2020 landings.  Are those considered final now, or
2  are there still imputations being done?  That was one question I
3  had, and then the other question was regarding triggerfish.   I
4  believe the OFL is like 1.2 million pounds, but I thought there
5  was payback measures for each sector for overages of the ACT,
6  and is that only if it's designated as overfished?  Thank you.
7
8  **MS. O'DONNELL:**  Let me answer that second question first.  There
9  is always a payback for the commercial gray trigger.  For the
10 recreational, there is only a payback on the ACL overage if the
11 stock is determined to be overfished, and Amendment 44 changed
12 the calculation for how overfished was determined, and the stock
13 status changed at that time to not overfished, and we have not
14 had a full stock assessment since then to look at what the stock
15 status is.  Can you repeat your first question again, Carrie?
16
17 **EXECUTIVE DIRECTOR SIMMONS:**  Thanks.  Are the recreational, the
18 2020 recreational, landings, are those considered final now, or
19 are there still imputations being completed, due to the closures
20 in the early part of 2020, and I think it was like March, April,
21 and May.  Thank you.
22
23 **MS. O'DONNELL:**  I know the 2020 landings are still considered
24 preliminary, because we don't have all of Texas's landings yet,
25 and I would have to let somebody else answer, as far as if
26 there's any additional calculations being made on the MRIP, LA
27 Creel, and headboat landings.
28
29 **CHAIRMAN GUYAS:**  Anyone from the NMFS side?  Andy.
30
31 **MR. STRELCHECK:**  I believe headboat landings are final at this
32 point, and I know we've received the Texas landings, but we're
33 still processing those landings for incorporation into the
34 monitoring.  In terms of MRIP, my understanding is that the 2020
35 calculations and the imputations done, at least for this year,
36 are complete, but may be subject to change going forward, with
37 some additional information.
38
39 **CHAIRMAN GUYAS:**  Patrick.
40
41 **MR. PATRICK BANKS:**  The LA Creel landings, we always say it's
42 preliminary, because we're always looking at the data, but, for
43 the most part, they're final.
44
45 **CHAIRMAN GUYAS:**  Leann.
46
47 **MS. BOSARGE:**  Did we go over red grouper in this, or is that
48 going to be in a different presentation?

0003742

1
2  **CHAIRMAN GUYAS:**  We did not, and I was wondering --
3
4  **MS. BOSARGE:**  Well, I think, before -- I see it in our briefing
5  book, but it's on like the -- It's where we have tables, instead
6  of graphs and such.  Can we go through that a little bit?
7
8  **MS. O'DONNELL:**  I had that in IFQ species, because I was not
9  sure if we going to have a separate IFQ landings from Alisha,
10  and she may be able to answer that, if she's going to be going
11  over that during the IFQ presentation at all.
12
13  **CHAIRMAN GUYAS:**  Well, there's still the recreational component
14  too, and so it would be nice to just walk through those tables,
15  if we can.  I would say for all the groupers.
16
17  **MS. O'DONNELL:**  Okay, and so I just got a note saying that we
18  will not have a separate IFQ presentation, and so if you wanted
19  to scroll down.  For commercial, I pulled the current as of June
20  10 landings for gag, red grouper, and red snapper from the IFQ
21  site, which, just to remind everybody, that is the place to go
22  if you want to see up-to-date landings.
23
24  Those are updated in real time, and so, if you wanted to ever
25  see what the landings are for the IFQ species, the IFQ website
26  would be the best place to go, and that also provides the
27  information for what the final previous years' landings were
28  that you can use to compare to.  About halfway through the year,
29  we're almost at 30 percent for gag, and right around 50 for red
30  grouper and red snapper.
31
32  I just got a note that, if you're looking for the historical
33  data for the IFQ species, you would have to go under the
34  additional information to see that, because it won't be on the
35  home page.  We can keep scrolling down to grouper, because we
36  did go over greater amberjack in the figures, and so if you want
37  to scroll down a little bit more.
38
39  This shows what we have for 2021 so far, which isn't much, and
40  we just got in the Wave 1 landings, and so, as we can see, the
41  landings are still pretty low, and, for red snapper for-hire,
42  they pretty much just opened, and we have posted, on this table,
43  what we have so far.
44
45  With 2020, it's, like we mentioned before, still considered
46  preliminary, although you can see gag was right around 50
47  percent, and red grouper was almost 85, and then we can see what
48  that overage was specifically for gray triggerfish, and red

0003743

1  snapper for-hire still stayed under their ACL.  I think that
2  would be it in these tables, because all the other species on
3  there is stocks, and we went over those in the figures as well.
4
5  **CHAIRMAN GUYAS:**  Thanks, Kelli.  We've got another question from
6  Leann.
7
8  **MS. BOSARGE:**   Thanks.  I see, on red grouper, both sectors
9  landed about upper-something seventy-something percent of their
10 quota last year, but I see where the commercial guys are already
11 at 50 percent this year, and so I'm guessing they're going to
12 get closer to 100, and that may be true for rec too, and I don't
13 know, and it's hard to tell, because you don't have much info,
14 but they were open all year last year.
15
16 My question though, if you will go scroll -- Let's see.  Scroll
17 back up just a hair, to the table before that.  Red snapper for-
18 hire, in January and February, is that coming out of -- I didn't
19 understand where that was coming from.
20
21 **MS. O'DONNELL:**   Actually, I don't know if Jeff Pulver is
22 attending the meeting, or Mike Larkin, and they could answer
23 where those numbers came from, or maybe Andy, if neither one of
24 them are on.
25
26 **MR. STRELCHECK:**  I don't know if Mike or Jeff are on the line.
27 My experience, having run this data in years past, is that
28 that's likely headboat landings out of Texas state waters that
29 removed their federal permit.
30
31 **MR. JEFF PULVER:**  Those are headboat landings.
32
33 **MS. O'DONNELL:**  All right.  Thanks, Jeff.
34
35 **MS. BOSARGE:**  So Texas is reporting their red snapper landings
36 much more frequently, I guess, than they are the other species,
37 because they told us that we didn't have Texas landings from
38 last year yet for the other species.
39
40 **MR. STRELCHECK:**   They are reporting landings through our
41 Southeast Headboat Survey, which is run by NMFS.
42
43 **CHAIRMAN GUYAS:**  Susan.
44
45 **MS. SUSAN BOGGS:**  Thank you, Madam Chair, and thank you, Kelli,
46 for the presentation.  I have kind of the same question under
47 the gray triggerfish, the landings in January, July, and August.
48 Well, I know part of the August, because we had an open season,

0003744

1  but the January and February numbers, and those landings are
2  outside of the season, and July and August.  Thank you.
3
4  **MS. O'DONNELL:**  I don't know specifically where those come, but,
5  yes, that is usually what happens, is somebody landed one, and
6  they happened to be the person that got interviewed, and I'm not
7  sure if Andy or Clay, if they want to speak more to that.
8
9  **CHAIRMAN GUYAS:**  Go for it, Andy.
10
11 **MR. STRELCHECK:**  I mean, we would have to check the data source,
12 whether this is also Texas headboat landings for gray
13 triggerfish in state waters or it's an MRIP survey estimate that
14 has been reported based on illegal catch out of season.
15
16 **CHAIRMAN GUYAS:**  Go ahead.
17
18 **MS. BOSARGE:**  So I see we have recreational landings for 2020
19 for almost every species except red snapper private rec.
20
21 **MS. O'DONNELL:**  We did not add the private rec in here, and
22 Peter may want to speak more to that, due to just it being
23 managed under the states now, and I have not had anything to do
24 with that, and so Peter would probably be the better person to
25 talk to about why we didn't have the red snapper.
26
27 **CHAIRMAN GUYAS:**  Peter, would you like to come to the
28 microphone?
29
30 **MR. PETER HOOD:**  I mean, we do get the landings, and they do get
31 -- Our folks in the data branch work on those, and they provide
32 reports.  We generally have not been putting it here, because
33 you used to have a state landings page, and so I think this is a
34 good thing to talk about, and maybe we need to try to figure out
35 a way to incorporate how we present that information.
36
37 **CHAIRMAN GUYAS:**  It sounds like that might be something we would
38 like to have.  Leann, go ahead.
39
40 **MS. BOSARGE:**  This is half of 2021, and we don't have any 2020
41 landings, and so it sounds like a technical deal, but, I mean, I
42 know all the states have their landings, and they have these
43 great data collection programs, and so we can just not figure
44 how to convert everything and get it on the report?
45
46 **CHAIRMAN GUYAS:**  Andy.
47
48 **MR. STRELCHECK:**  It's not the case to say we do not have 2020

0003745

1    landings.  We do have 2020 landings, and we don't have them
2    summarized in this table for you, in part because of what we
3    talked about at the last meeting, which is the landings aren't
4    additive across the state surveys, and so they can't be summed
5    into a single column in this table.  We should be posting, and
6    we, I guess, haven't posted them on our webpage, and we
7    certainly can post what we have available to us.
8
9    **CHAIRMAN GUYAS:**  At least, in our case, we've been in contact
10   with Peter, and we've been posting them on our website, but he's
11   right that they have not been posting on theirs anymore, but we
12   can -- We'll see what we can do for the next meeting to pull
13   something together, just with the caveat that, until calibration
14   is done, it's a glimpse of where each state is relative to their
15   quota, but not, I guess, the overall.
16
17   **MS. BOSARGE:**  I guess I was hoping, if we had the numbers, that
18   we could post them before the end of this meeting, and that
19   would be great, even if they're not calibrated.  I mean, we have
20   the numbers.
21
22   **CHAIRMAN GUYAS:**  Okay.  Are you good, Susan?  Okay.  Thanks.
23   All right.  Anybody else have questions or comments on landings?
24   All right.  Thanks, Kelli and NOAA company for joining us and
25   helping us out and answering questions.
26
27   **MS. O'DONNELL:**  All right.  Thank you, Madam Chair.
28
29   **CHAIRMAN GUYAS:**  Okay.  Let's go to our next item, which is red
30   grouper.  Dr. Freeman, do you want to walk us through what we
31   are to accomplish today?
32
33       **FINAL ACTION: REEF FISH AMENDMENT 53: RED GROUPER ALLOCATIONS**
34              **AND ANNUAL CATCH LEVELS AND TARGETS**
35
36   **DR. MATT FREEMAN:**  Certainly.  Looking at the action guide,
37   staff will review the actions and alternatives in the revised
38   public hearing draft.  The council selected preferred
39   alternatives and directed staff to begin public hearings at the
40   January 2021 meeting.
41
42   The committee will hear a summary of written and oral and public
43   comment received with respect to the document and will review
44   the codified text.  The committee should discuss the actions and
45   public comment and then determine if any modifications are
46   needed.  Further, if the committee considers the proposed
47   management measures to be necessary and appropriate, they may
48   recommend as much to the council and that the management

12

0003746

1  measures be implemented by the Secretary of Commerce.
2
3  **CHAIRMAN GUYAS:**  Okay.  Thanks, Dr. Freeman.  It looks like our
4  first item of business, under red grouper, is the SSC review of
5  the red grouper catch analysis, and I believe Dr. Lorenzen is
6  here to present that to us.  Come on up.
7
8  **SSC REVIEW OF THE RED GROUPER CATCH ANALYSIS**
9
10 **DR. KAI LORENZEN:**  Thank you, Madam Chair.  I have a
11 presentation, Red Grouper Catch Analysis, SSC Recommendations,
12 and so, as a little background, as you know, commercial and
13 recreational red grouper fisheries have not reached their catch
14 limits in recent years.  The council has requested regular
15 interim assessments for red grouper, as basically a health check
16 for the stock, and to adjust catch limits as may be needed.
17
18 Simultaneously, the council is reviewing sector allocations,
19 under Amendment 53, and so we were specifically asked not to do
20 catch level recommendations based on an interim assessment,
21 because that would be predicated on the sector allocations that
22 the council decides, and so we reviewed the interim assessment
23 as a health check, but we did not go to the step of making catch
24 level recommendations.
25
26 Basically, what the interim analysis does is it uses a
27 representative fishery-independent index of abundance evaluated
28 against the catch limits determined in the last stock assessment
29 to update the catch level recommendations, and trends in the
30 fishery-independent index of abundance are useful in their own
31 right, as a health check, and the full interim assessment
32 updates the catch limits, as determined in the last stock
33 assessment, and that's based on the sector allocations that were
34 used to make the predictions, following from the stock
35 assessment.
36
37 Generally speaking, when sector allocations are revised, the
38 catch limits will have to be recalculated, based on the new
39 allocation, and the reason for that is that the sectors have
40 different selectivities and retention rates, and so the catch
41 figures will not be the same as the sector allocations are
42 changed.
43
44 What we had in front of us, as an index of abundance, was the
45 bottom longline index for red grouper, and what you can see here
46 is the index fit from the last full stock assessment, SEDAR 61
47 in 2019, and two interim updates, or two indices of abundance
48 that would feed into the interim analysis, and one is what we

13

1  call the full area, and so this is an index constructed for the
2  full area normally covered by the bottom longline survey, and
3  the reduced area index is an index for the area that was
4  actually covered by the bottom longline survey in 2020, and so
5  there were some issues, and I will show you what that coverage
6  looks like in a moment, related to COVID and several other
7  issues that basically meant the bottom longline index was only
8  carried out for -- The survey was only carried out for a sub-
9  area of the area that it is normally carried out for.
10
11  If you go to the next slide, we can see that, and I will return
12  to this, and so on the left are all the observations that feed
13  into the index from somewhere in the 1990s to 2020, or before
14  2020, and then you can see the 2020 coverage on the right, and
15  so you can see it's missing that northern area, and, in that
16  northern area, we have a lot of places, basically as it goes to
17  the Florida Panhandle, where there are zero catches, and so you
18  can imagine that, if you have a truncated index, or an index
19  that is for a smaller area in the south, it will produce a
20  slightly higher average index of abundance, because it misses
21  those parts of that area where we could have fewer counts.
22
23  That is why the Science Center decided to produce two indices,
24  one for the whole area and one for the smaller area, and, if we
25  can go back one slide, that's -- Those are these two indices,
26  and you can see that, on the whole, they're not too different,
27  but the reduced area index is more or less stable from 2019 to
28  2020, and the full area index shows an increasing signal.
29  However, if you look at the confidence limits on these, you can
30  see those are well within the same sort of overall confidence
31  limits.
32
33  Basically, both of those bottom longline indices indicate stable
34  or slight increases in abundance, and I think there is an
35  overall preference, given the area issues, to work with the
36  reduced area index, but the overall impact of those survey
37  constraints is not huge, and a full interim analysis to update
38  catch recommendations would require recalculation of the initial
39  catch limits coming out of the assessment using the new sector
40  allocations.
41
42  I would add here that we do have the figures more or less in
43  front of us for the current allocation, and that is 76/24, and
44  so those figures are in the report on the interim analysis, but
45  those -- We did not take those forward by then picking a --
46  Making actual catch level recommendations, but they are largely
47  there, and, if the council decides to reallocate and do the
48  interim analysis on that basis, of course, we will have to have

14

1  new projections and that analysis, and that's all for me.
2  Thanks.  Any questions?
3
4  **CHAIRMAN GUYAS:**  Questions for Dr. Lorenzen?  I am not seeing
5  any hands.  Leann looks like she maybe wants to put her hand up.
6
7  **MS. BOSARGE:**  No, and just -- If you'll go back to that graph,
8  it's really just to point something out, and maybe the fishermen
9  can explain it to me later.  I know we had some red tide events,
10  and I remember the last assessment that came out before this
11  one, and we did some big increases, and the fishermen asked us
12  not to, and then they came in and said, okay, you've really got
13  to bring this thing down now, and we brought it down, and it is
14  -- I see that uptick.  We're starting to uptick some, and I see
15  that in the landings.
16
17  Man, it sure does seem like we're still pretty far below some of
18  those peaks, and I just -- Maybe, later on, the fishermen can
19  give me some insight into how far around, or how far back, are
20  we really coming, and how far do we have to go.
21
22  **CHAIRMAN GUYAS:**  All right.  I don't see any other questions,
23  and so thanks, Dr. Lorenzen.  Okay.  Next on our list are the
24  public comments on 53.  Is that what you want to go through
25  next?  Okay, and so I see we've got Ms. Muehlstein and Mr. Hood
26  for those.
27
28                          **PUBLIC COMMENTS**
29
30  **MS. EMILY MUEHLSTEIN:**  Okay.  Thank you, Madam Chair.  I'll go
31  ahead and get started.  Just to remind everybody of what we sort
32  of decided to do, in order to get public comment during this
33  public hearing time period, is we did create our regular public
34  hearing video that we put out online, and that video had 209
35  views.
36
37  We also decided to do a little extra effort.  By using Fish
38  Rules, and we use the Fish Rules mobile app to communicate our
39  regulations, and it has a lot of users, and so we did two things
40  over Fish Rules.  One, we created a banner ad, and that banner
41  ad popped up anytime anybody looked for red grouper regulations
42  in the Gulf, and so that banner ad, which directed people to our
43  website with information on the red grouper public hearings,
44  received 33,670 views across 18,000 unique users, and so 18,000
45  people were exposed to that banner ad, some of them multiple
46  times.
47
48  We also created a pop-up message that sort of was in your face

                                    15

```
 1   that you had to close for people who were looking specifically
 2   at federal red grouper regulations in the Gulf of Mexico, and
 3   that was clicked through 200 times, and then that banner ad was
 4   clicked through 107 times, and so we did, from that Fish Rules,
 5   get about 300 people that came to our website as a result of us
 6   advertising this through the Fish Rules mobile app.
 7
 8   We did go out to three in-person hearings, and we hosted two
 9   webinars, and what I will do is I will start with a summary of
10   those meetings themselves, and then I will move on to the public
11   comments that we received through our online comment form, or
12   just through email.
13
14   We started in Madeira Beach, Florida, on June 7, and we had
15   eighty members of the public attend that meeting.  It was a
16   clear majority of commercial fishermen at that meeting who
17   mostly supported Action 1, Alternative 2, with some secondary
18   support for Alternative 6.  We also had a few charter operators
19   attend that meeting who supported the Preferred Alternative 3 in
20   Action 1, and I will quickly sort of go through some of what we
21   heard at that meeting before moving to the next one.
22
23   We heard, from commercial fishermen, that the quota is harder to
24   find than usual and that this year has been a better year for
25   grouper fishing than it has been in past years.  We heard
26   support for Action 1, Alternative 2, and we heard that the
27   preferred alternative will hurt the state's commercial fishermen
28   financially.
29
30   We heard that the council can fix the red grouper issue if it
31   has the willpower to not follow the law like it does for red
32   snapper.  We heard that it's not fair to reward the recreational
33   sector with more red grouper based on historical overfishing.
34   We heard that Alternative 2 should be selected, because it
35   retains the current allocation, and that calibration can happen,
36   but it doesn't mean that we have to reallocate.
37
38   We heard that about half of the red grouper quota has been
39   caught so far this year, but quota can't be found by fishermen
40   anymore, and so, if fishermen are leasing quota, they can't find
41   it.   We heard, from commercial fishermen, that their entire
42   businesses are on the line.  I think what we kept hearing is
43   that central Florida, and south Florida, is the epicenter for
44   grouper  fishing,  and  so  this  action  really  impacts  the
45   commercial fishermen in that area.
46
47   We heard that the current preferred alternative creates systems
48   of have and have-nots, by supporting recreational fishermen over
```

0003750

1  seafood consumers, and we also heard that the Young Fishermen
2  Act is trying to create new commercial fishermen, but they can't
3  be recruited into a fishing industry if the commercial quota is
4  reduced.
5
6  We heard that Preferred Alternative 3 in Action 1 would increase
7  discards and take fish away from an accountable sector and give
8  them to a sector that has never been held accountable.  We heard
9  that it's bad precedent to set, and it will encourage
10 mismanagement of other species down the line.  We also heard
11 that small operators can't access quota already, and this will
12 put them out of business and make it even harder.
13
14 We heard, as a theme, that recalibration can occur without
15 reallocation.  We heard that Action 1, Alternative 2, creates
16 the greatest overall benefit to the United States, and we heard
17 that Alternative 3, which is the current preferred, would
18 transfer 600,000 pounds of fish to an unaccountable fishery and
19 that we shouldn't forget that the commercial sector and the
20 American consumer have already lost species like redfish.
21
22 We heard that Alternative 3, the preferred, undermines the IFQ
23 program, new entrants, and young fishermen, and that it also
24 increases discards from the recreational sector.  We heard that
25 the council is essentially asking commercial fishermen to take a
26 20 percent pay cut and a 20 percent reduction in their business.
27
28 We heard that the fishery is expanding and that the red grouper
29 stock is coming back.  We heard that the fishery is cyclical in
30 nature and that the interim analysis needs to be automated to
31 smooth over those effects on the fishery.  We heard that the
32 charter sector, which is limited access, is a highly regulated
33 fishery and has been striving to be more accountable and that
34 it's shame that they're being lumped in with the private sector.
35
36 We heard that red grouper has always been a staple to the for-
37 hire industry, while other species have short seasons.  We
38 heard, from these charter fishermen, support for the Preferred
39 Alternative 3.  We also heard that everyone's access is
40 shrinking and that there is an opportunity to work together
41 here, and, also, that the Charter Fishing Association supports
42 Alternative 3.
43
44 We heard that it's rare to see the Southeastern Fishing
45 Association, Fish for America, SOFA, and the Shareholders
46 Alliance all be on the same page.  We heard that it's unfair
47 that these businessmen and women are being penalized as a result
48 of reallocation that literally takes money out of their pockets.

17

1   We heard that taking commercial quota and giving it to the
2   recreational side is a false promise, because it will not
3   provide a longer season, because the recreational season is open
4   access.
5
6   We heard that, during the council's SSC meeting, the SSC talked
7   about the fact that the scientists were very uncomfortable with
8   reallocation discussions using MRIP-FES.  We heard that they
9   like FES, and the methodology, but they were not comfortable
10  with reallocation based on this.
11
12  We also heard that the science needs to get better before the
13  council reallocates, and we heard that Action 1, Alternative 2
14  is not a good option for charter captains, because a year-round
15  business for red grouper is necessary, and Alternative 2, which
16  was supported mostly by commercial fishermen, would bring the
17  charter sector down from a twelve-month season to a seven-month
18  season.  We heard that there are a lot of for-hire permit
19  holders in the central Florida area that live off of red
20  grouper.
21
22  We heard that there is not enough red grouper allocation to last
23  the year and that it can't be found.  We heard that a PFQ system
24  would work in the for-hire industry and that tags would work in
25  the private fishery.  We also heard that the council should
26  consider slightly reducing the 5 percent multiuse gag buffer.
27  Since it was built into the IFQ, it shouldn't be removed
28  completely, and so that talks to Action 2 in the document.
29
30  Next, I will move on to a summary of the Fort Myers meeting.  we
31  held that meeting on June 8, and sixty members of the public
32  attended.  The composition of this meeting, or the attendees,
33  was very similar to that that we had in Madeira, and it was a
34  majority of commercial fishermen that was supportive of Action
35  1, Alternative 2, and we also had some members of the for-hire
36  sector show up, and they supported the preferred alternative.
37
38  Again, I will just give a brief sort of overview of what we
39  heard at that meeting.  We heard that smaller commercial
40  operators can't find quota, and, if they can find it, it's too
41  expensive.  We heard that there is not a red grouper population
42  issue in the area.
43
44  We heard that the Gulf Council is very lopsided right now, and
45  it was asked what folks would do when the commercial fishermen
46  can't provide fish for those who can't fish for themselves.  We
47  heard that the council should consider removing the for-hire
48  component from the recreational sector, like they did with red

1  snapper, and we heard support for Action 1, Alternative 3.
2
3  We heard that Action 1, Alternative 2 is the best option,
4  because it would otherwise be a slippery slope of reallocation
5  based on FES.  We heard that sector separation should be pushed
6  forward to separate private anglers from the for-hire component,
7  which is the only user group that is growing exponentially
8  without accountability.
9
10 We heard that there is always an issue with red grouper, where
11 it cycles up and down, and that the council is always lagging
12 behind in management of what fishermen are seeing on the water.
13
14 We heard that the council has to use the best scientific
15 information available, but it does not have to reallocate based
16 on MRIP-FES.  We heard that fishermen are unable to find quota,
17 because people who have it are keeping it for themselves, and we
18 heard that the recreational bag limit should be dropped to one
19 fish per person, which would allow the recreational season to be
20 open year-round.
21
22 We heard that businesses would go under as a result of the
23 preferred alternative, and we heard that the commercial sector
24 has a huge investment in the fishery and that recreational
25 anglers can get a license for twenty-dollars, but commercial
26 fishermen have to pay a lot more to get a business going, and
27 that impact is missing from the analysis in the document.
28
29 We heard that private anglers who can afford expensive boats
30 should be able to afford VMS systems, or vessel tracking
31 systems, to make them more accountable, and we heard that there
32 are commercial entities that have bought lots of quota and are
33 just sitting on it.
34
35 We heard that red grouper is primarily a Florida fishery, and
36 taking away more from the commercial sector will cripple the
37 industry and put small operators out of business.  We heard that
38 commercial fishermen had one of the toughest years in 2020 and
39 had to navigate through unprecedented circumstances, and
40 reallocating to an unaccountable recreational sector would take
41 away from the community's food security and from American food
42 security.  It would also take away from job security as well.
43
44 We heard opposition for the preferred alternative.  Commercial
45 fishermen asked what would happen to small commercial operators
46 when quota is taken away and questioned how anyone could justify
47 that socioeconomic destruction that the preferred alternative
48 would have on the commercial sector.

0003753

1
2   We heard that the recreational sector is overharvesting and not
3   venting fish that they throw back.  We had fishermen question
4   how private anglers have expensive boats, but they can't report
5   their landings.   We also heard proposals for separating the
6   charter component out from the private angling component.
7
8   We heard from commercial fishermen that don't own any quota and
9   lease all of their allocation that say that they have struggled
10  to find allocation for not only red grouper, but for red
11  snapper, tilefish, and deepwater grouper, and we heard that
12  reallocation would increase the price of leasing allocation.
13
14  Next, we held a webinar on June 10.  We did have some for-hire
15  and private anglers attend that webinar, and I will give you a
16  quick overview of what we heard on that webinar on June 10.  We
17  heard that anything that is taken away from the charter side
18  will affect their business.
19
20  We heard support for Preferred Alternative 3, because charter
21  vessels are lumped in with the private recreational sector, and
22  we would like to see consideration for separation in the future.
23  In central Florida, red grouper needs to be open year-round, and
24  he doesn't want to see a bag limit change, because two red
25  grouper is an ideal number.  We did hear that a December closure
26  for the recreational sector would be okay, because gag fishing
27  is good in the winter.
28
29  We also heard support for the preferred alternative.  We heard
30  that the recreational anglers don't want to see a season
31  closure, and they would actually prefer an increase in the size
32  limit over a change in the bag limit.  We heard that a twenty-
33  inch red grouper isn't ideal anyways and that a twenty-four-inch
34  red grouper would be more appropriate, because charter fishermen
35  need a year-round season.
36
37  Our last in-person meeting was held in Panama City on June 14,
38  and we had sixteen members of the public attend that meeting.
39  The majority of those attendees were commercial fishermen who
40  supported the Action 1, Alternative 2.  We also had some
41  restauranteurs and charter operators that came to that meeting.
42
43  At that meeting, we heard that the recreational component of the
44  fishery expands every year and there is no effort cap and that
45  the council should consider managing red grouper with three
46  sectors or require tags in the recreational sector.
47
48  We heard that arbitrarily shifting the current allocation based

20

```
 1  on FES is a mistake and that system changes -- That recreational
 2  system changes regularly, because of its shortcomings, and every
 3  time changes to date have to be calculated back in time.
 4
 5  We heard that, in the recreational sector, the discards are so
 6  high that shifting allocation in favor of the recreational
 7  sector would increase discards.  The preferred alternative would
 8  actually shift allocation and benefit no one, including the
 9  stock.
10
11  We heard that Action 2, Alternative 3, to allow for the multiuse
12  grouper shares to be preserved and increase the recreational
13  buffer.  We also heard that the recreational sector has come out
14  of the woodwork to support allocation in the past, but none of
15  them are advocating the change to the allocation for red
16  grouper, but the commercial sector is asking for allocation to
17  remain as it is and that the recreational community must not see
18  the benefit of it.
19
20  We heard that there has been very few recreational anglers at
21  the meetings that are advocating for this reallocation.  If it
22  is such an urgent issue to reallocate, then where is the
23  recreational sector?
24
25  We also heard that reallocation shouldn't be done without
26  recreational accountability.  We heard that, unlike other reef
27  fish species, which are severely regulated, red grouper has a
28  year-round season, with a two-fish limit for the recreational
29  sector, and, if there is any concern for closures, the council
30  should consider a step-down from a two-fish bag limit to a one-
31  fish bag limit.
32
33  We heard that the recreational fishing for red grouper causes
34  nine-times the discards and that a 20 percent reduction is
35  devasting to the commercial industry, including fish houses,
36  restaurants, and transport trucks, who all contribute to the
37  economy.
38
39  We heard advice that the council table this amendment and forget
40  about it until the data is believable.  We heard that the
41  commercial industry has shrunk, because more laws have led to
42  less commercial fishermen, and the recreational industry has
43  skyrocketed.  We heard that the recreational sector does not
44  care about grouper, and that's why there is no recreational
45  representatives at the meeting.
46
47  We heard that cutting the commercial annual catch limit impacts
48  tourism and the working class, and, if you cut quota, it will
```

21

0003755

1   have a ripple effect that will cause them to cut employees and
2   that we should maintain the current allocations.
3
4   We heard a suggestion that the council doesn't close the season
5   and instead that anglers should keep the first two fish they
6   catch, whether it's two inches or two feel long, and we heard
7   that it is a waste of time and the council is not considering
8   restaurants and what an economic disaster reallocation would
9   have on the State of Florida.
10
11  We heard that the alternatives in the document all move away
12  from data by allocating to an unaccountable sector, and we heard
13  that you can put whatever economic impact you want into the
14  analysis, but taking away from the commercial sector takes away
15  jobs, like fish cutters, restaurant employees, processors, and
16  truck drivers.  We heard that the commercial industry is begging
17  for recreational accountability.
18
19  Finally, we hosted a webinar on June 16, and there were six
20  members of the public that attended that webinar.  There were
21  private representatives and commercial representatives at that
22  webinar, and we heard support for the Preferred Alternative 3 in
23  Action 1, because the council should consider increasing the
24  recreational size to twenty-four inches, which would keep
25  smaller spawners in the stock and hopefully help avoid a season
26  closure, which would benefit private anglers and the charter
27  industry.
28
29  We also heard that, while the council is bound by the best
30  scientific information available, it does not need to take
31  action on reallocation.   Action 1, Alternative 2 would
32  accomplish the necessary data calibration, while legally
33  avoiding reallocation.  We heard that the council needs to push
34  for an interim assessment.   This extra work on the Science
35  Center staff could allow the industry to avoid the negative
36  economic impacts of this amendment.
37
38  We also heard that the interim assessment is necessary before
39  any management changes are pushed and that the fishery is in
40  good shape, and it doesn't make sense that the Magnuson-Stevens
41  Act requires the council to incorporate new information
42  currently.
43
44  We also received 105 written comments, and what I've done here
45  is a little bit different than how I summarized the public
46  hearing meetings.  You will notice that, here, I have organized
47  these based on action and alternative, and so I'm just going to
48  go through each action and alternative and touch on the points

22

1  that we heard in support of or against those alternatives.
2
3  In Action 1, we did hear support for no action, and that was for
4  Alternative 1, and the rationale that we received in support of
5  the no action alternative is that the current regulations are
6  working fine and that there are tons of red grouper.  We heard
7  that there are few boats targeting red grouper and the annual
8  catch limits are fine and there are plenty of small fish.
9
10 We heard that no one should be rewarded for overfishing.  We
11 heard that it's too difficult to fish with all the rules and
12 regulations.  We heard that the red grouper stock is healthier
13 than ever, with plenty of small fish, and that it doesn't make
14 sense to lower the catch limits with so many red grouper.
15
16 We heard that the Gulf Council and the public should have a
17 chance to review an updated analysis to determine if there is an
18 any change since SEDAR 62 and before further action is taken on
19 Amendment 53.  We heard the red grouper stock numbers are wrong.
20
21 We also heard support for Alternative 2 in our written comments,
22 and I will give you the rationale that we heard here.  We heard
23 that the proposed reallocation relies heavily on the recent
24 landings
25
26 The proposed reallocation relies heavily on the recent landings
27 data recalibration, but recalibration does not necessarily
28 indicate that a reallocation is appropriate. We heard that using
29 the current MRIP-FES recalibration estimates as the basis for
30 reallocation is premature before completion of research into
31 potential bias within the FES.
32
33 We heard that, if the council were to reallocate red grouper,
34 the resulting change to the size and age composition of the
35 catch could necessitate a quota reduction.  We heard that
36 adjusting that allocation by simply plugging revised landings
37 estimates into the existing formula needs much more analysis
38 before the Gulf Council could rationally conclude that the
39 change meets the same requirements and objectives.
40
41 We heard that both National Marine Fisheries and the Gulf
42 Council have recently devoted substantial time and effort into
43 developing allocation policies and that a recent Government
44 Accountability Office report on Allocations in Mixed Use
45 Fisheries also describes ways to improve allocations, but it
46 doesn't appear that the Gulf Council followed the allocation
47 policy or guidelines in developing Amendment 53.
48

0003757

1   We heard that reallocation harms commercial fishermen twice,
2   that, first, from the overall reduction in catch limits required
3   to account for disproportionate recreational sector impacts,
4   and, second, from the percentage reduction in their sector ACL.
5   We heard that the recreational sector already has as many
6   species of fish as they want to catch and that reductions to the
7   commercial fleet have already negatively impacted the industry.
8
9   We heard that results of Florida State Reef Fish Survey casts
10  doubt on the accuracy of FES and estimates and that FES landings
11  are three times higher than those reflected by SRFS program.
12  All fishery-dependent data systems should be incorporated into
13  the assessment before we make changes.
14
15  We heard that the red grouper spawning stock biomass is at its
16  lowest point in thirty years.  Therefore, shifting a greater
17  portion of the allocation to a less accountable sector of the
18  fishery with a considerably greater magnitude of discards could
19  have negative impacts on an already depressed stock.
20
21  We heard that, given the complicated and controversial nature of
22  recalibration and reallocation, the Gulf Council should split
23  Amendment 53 into two documents, a framework action to adjust
24  the overfishing limit based on SEDAR 61 and then an amendment
25  that analyzes red grouper allocations.
26
27  We heard that reallocating to the recreational sector unfairly
28  hurts commercial fishermen, who already had a difficult year due
29  to the pandemic.  We heard that reallocating takes fish away
30  from the non-fishing public.  We heard that, for non-share
31  owning commercial fishermen, it is already a struggle to secure
32  allocation and reallocating would make it even harder.
33
34  We heard that the fixed cost of commercial fishing is high, but
35  the income isn't.  Cutting 20 percent of their pay will unfairly
36  hurt commercial fishermen.  We heard that increasing allocation
37  to the recreational sector will increase discards.  We heard
38  that Amendment 53 will drive foreign fish market dependency and
39  destroy local fisheries jobs.
40
41  We also heard that, regardless of the time span used to allocate
42  to a non-accountable fishery from an accountable sector is wrong
43  and that it rewards the recreational sector for overfishing
44  their allocation.
45
46  We also heard that Alternative 2 is the only legally-viable
47  alternative, because it does not change the allocation
48  percentages between sectors.  It adheres to the objectives of

24

1   the FMP, especially Objectives 5 and 12, and that the National
2   Standards in the Magnuson-Stevens Act would then not be violated
3   based on Alternative 2.
4
5   We heard that giving a larger percentage of the quota to the
6   recreational sector means that overall discards and discard
7   mortality would increase and that National Standard 4 requires
8   that allocations must promote conservation.   We heard that
9   reallocation will not guarantee a longer recreational season.
10
11  We heard that reallocation through recalibration will set a
12  dangerous precedent.   We heard that Amendment 53 would
13  reallocate a significant portion of the red grouper quota from
14  the commercial sector to the recreational sector and that the
15  action alternatives in the document would reduce the commercial
16  sector's quota by up to 32 percent, or approximately 1.2 million
17  pounds.   This action would reduce the supply available for our
18  restaurant customers to enjoy.
19
20  We heard that a slight increase to the recreational sector
21  proposed does not offset the huge number of grouper that would
22  be taken the table for the American consumer.   We heard that the
23  IFQ program was supposed to bring stability to the industry.
24  However, it harms small operators.
25
26  We also heard that red grouper IFQs are becoming a commodity,
27  due to speculation.   We heard that it is impossible to find red
28  grouper allocation as is and reducing the catch limit would make
29  the problem worse.
30
31  We heard that taking fish away from the commercial sector takes
32  away their livelihood.   We heard that the commercial sector is
33  accountable and should not be punished.   We heard that the Gulf
34  Council's own SSC has cautioned against accepting these MRIP-FES
35  estimates.
36
37  We heard that reallocating fish between sectors based on
38  incomplete data and only a single factor is a not fair and
39  equitable way to manage the fisheries.   Finally, in support of
40  Alternative 2, we heard that, if the cost of domestic seafood
41  increases exponentially, we will not be able to offer the
42  product at a reasonable price to our customers.   Instead, they
43  will have to look at a commercially-imported product to remain
44  profitable, and the restaurant industry has already suffered
45  greatly during the global pandemic, and businesses are fighting
46  to stay alive.
47
48  We also heard support for the council's current Preferred

25

1  Alternative 3, and some of the rationale provided for that
2  Alternative 3 are as follows.  We heard that shortening the
3  recreational season would put tons of for-hire fishermen out of
4  business.
5
6  We heard that the economic benefits gained by the recreational
7  sector far outweigh the commercial industry's loss.  We heard
8  that red grouper is the primary target of the for-hire fleet for
9  half the year and they should remain open.  We also heard that
10 commercial fishermen have a lot more options to catch and make
11 money than the charter fleet.  Finally, we heard that the stock
12 is healthy and any closure is unhealthy and would impact for-
13 hire captains negatively.
14
15 Next, we did hear some support for Alternative 6, and the
16 rationale provided there was that the commercial sector should
17 not be negatively impacted by recreational overfishing.
18
19 In our written comments, we did receive a little bit of comment
20 that pertained to Action 2, which discusses the annual catch
21 targets, and we heard that eliminating the multiuse allocation
22 will increase the price of allocation.  This will hurt smaller
23 operators and new entrants, and they may be very dependent on
24 the multiuse to avoid discards.
25
26 Finally, some of the comments that we heard online and through
27 our email did sort of give more general comment that was not
28 pertaining to any specific action or alternative in the
29 document.  What we did hear from a lot of the recreational
30 anglers that came out to the meetings, as well as provided
31 written comment is that, in lieu of shortening the season, the
32 council should consider some different potential management
33 alternatives, like changes to bag limits or step-downs or size
34 limit changes, and so I think that's important to point out.
35
36 Otherwise, I don't think it's germane for me to go through that
37 general comment right now, and suffice it to say that it is in
38 your briefing materials, and I suggest that everybody read over
39 not only the meeting summaries, because those meetings were
40 packed with a number of very passionate anglers, and so please
41 take the time to look at those and then red sort of that general
42 comment that didn't make it into the actions and alternatives.
43 With that, that's going to conclude my overview, and I am happy
44 to take any questions.
45
46 **CHAIRMAN GUYAS:**  All right.  Thanks so much, Emily.  Are there
47 any questions about this report on public comments?  It looks
48 like everybody is good.  Peter, do you want to come up and talk

0003760

1 about the DEIS comments, which I noticed there was an updated
2 version emailed around to everyone this morning?
3
4 **MR. HOOD:**  Yes, and that updated version is because we got a
5 comment in after I sent the comments to you for the last
6 briefing book.  This is a little bit different, I think, in
7 terms of comments, from what you're used to.
8
9 Normally, we do an environmental assessment for amendments, but,
10 because this amendment is sort of the first one to take an
11 assessment that has FES data in it, and that there are
12 allocation issues surrounding that, the IPT, while they were
13 working on this, we decided we needed to do a more involved
14 environmental assessment, which is called an environmental
15 impact statement.
16
17 As part of that process, we do a draft environmental impact
18 statement, and it has a forty-five-day comment period.
19 Normally, we try to sync that up with the public hearing comment
20 period, and we were close.  Our comment period ends this coming
21 Monday, and, if any other comments come in between now and then,
22 I will certainly make sure to share those with you.
23
24 We received a total of nine comments to-date, and I just checked
25 about a half-hour ago, and there is still nine comments.  We got
26 five from recreational fishermen, one from a commercial
27 fisherman, and one that didn't identify with a sector, and then
28 we got two comments from fishing organizations.  We had the
29 Southern Offshore Fishing Association and the American
30 Sportfishing Association.
31
32 Just to summarize what the recreational fishermen were saying,
33 they were supportive of the amendment, and they supported
34 Preferred Alternative 3 in Action 1, and there were no comments
35 regarding Action 2.  Within those comments, they expressed
36 various concerns that were similar to what Emily had talked
37 about, that cutting the recreational quota can have some
38 negative effects, because it will affect local economies,
39 tourism and those sorts of things.
40
41 Then they also advocated taking other actions, such as
42 increasing the commercial minimum size limit, putting in a slot
43 limit, move commercial red grouper fishing out beyond fifty
44 miles from shore, and split the management between the for-hire
45 and private angling components for red grouper.
46
47 The commercial fisherman who sent in some comments, she was
48 against changing the allocation, and she felt that the

27

0003761

1  commercial sector has faced many challenges over the past few
2  years, and she was concerned that this was just one more hit for
3  the sector.
4
5  The comment from the individual who really didn't identify
6  themselves with a sector, he was concerned that there was not
7  enough information in the document about protected areas and
8  wanted to see some maps, and that's certainly something that we
9  can entertain and add to the document.  He also felt that the
10 condition of the stock needs to be taken into account when
11 setting fishing seasons.
12
13 From the Southern Offshore Fishing Association, they were
14 concerned about the data used to support the actions in the
15 amendment and questioned that data correctness.  They had
16 concerns about the recreational FES data and expressed that they
17 didn't have confidence in that information.  They also said that
18 members were seeing more smaller fish, and the feeling amongst
19 their members was that the stock was in better shape now than it
20 was in recent years, and then, also, they noted that recent
21 catches were much higher than observed in 2018 through 2020.
22
23 They were against changing the allocation, because it would
24 cause more harms to the commercial sector, and, two, they felt
25 that it might create overfishing by the recreational sector,
26 and, again, they supported the current allocation.
27
28 From the American Sportfishing Association, they were concerned
29 that some may perceive this amendment was brought to the council
30 by the recreational sector, when, in reality, any change to the
31 allocation is really a technical correction, using the FES data.
32 They noted, in the purpose and need, that, really, what this
33 action was doing was ensuring historical participation and
34 preserving that participation.
35
36 For Action 1, they did not support Alternatives 1, 2, and 6, but
37 they did support Alternatives 3 to 5, and so, certainly, they
38 were supporting Preferred Alternative 3, and then, in Action 2,
39 they supported Alternative 3, but they didn't object to
40 Alternatives 1 or 2, if those were selected, and those were the
41 comments, and I would be happy to take any questions, if anybody
42 has any.
43
44 **CHAIRMAN GUYAS:**  All right.  Thanks, Peter.  Any questions?  I
45 am not seeing any, Peter, and so thank you very much.  Okay.  I
46 think we've made it to the Tab B, Number 5(c), the presentation.
47 Are you ready?
48

0003762

1       **PRESENTATION AND COMMITTEE DISCUSSION**
2
3   **DR. FREEMAN:**  Certainly.  Several of these slides the council
4   has seen at previous meetings, and so, these first few, I will
5   just spend a little bit of time on.  As a reminder, the council
6   had requested the SSC to examine alternative sector allocation
7   scenarios, considering FES-calibrated MRIP data, and the SSC
8   reviewed these back in January of 2020 and affirmed that SEDAR
9   61 represented BSIA.
10
11  I will note, as well, that SEDAR 61 shows the spawning stock
12  biomass at the lowest recorded level, and that's reflected
13  later, and I will mention this when we get to the specific
14  table, that the OFL and ABC, under all of the current
15  alternatives, 2 through 6, are a reduction from Alternative 1,
16  the no action.
17
18  A reminder that the purpose statement is to revise red grouper
19  allocation between the commercial and recreational sectors using
20  the best scientific information available and to modify the
21  allowable harvest of red grouper based on results of the recent
22  stock assessment and subsequent OFL and ABC recommendations from
23  the SSC.
24
25  The need is to use BSIA to establish those red grouper sector
26  allocations, as well as ACLs and ACTs, ensuring that the
27  historical participation by the recreational and commercial
28  sectors is accurately reflected by those sector ACLs and that
29  the recreational ACL is consistent with the data used to monitor
30  recreational landings and to trigger accountability measures.
31  Leann has already got a question for me.
32
33  **CHAIRMAN GUYAS:**  Go ahead, Leann.
34
35  **MS. BOSARGE:**  Thanks.  We just went through a document that is,
36  generally speaking, looking at the same thing, yesterday, and
37  that was king mackerel, where we have new FES landings, and we
38  were going to look at a new ABC and OFL and change allocations.
39
40  In the purpose and need statement for that document, it
41  mentioned a reference to prevent overfishing while achieving OY
42  on a continuing basis, or striving to achieve OY on a continuing
43  basis, and I think that is important, because that's something
44  that we always have to consider as we implement new catch levels
45  and/or look at allocations, and so I really think that should be
46  referenced in this purpose and need statement as well, and in
47  any purpose and need statement, as we go through these documents
48  where we'll be switching from CHTS, MRIP-CHTS, to MRIP-FES.  I

0003763

1 just wanted to make sure that doesn't slow this document down,
2 if we can add that language to this.
3
4 **CHAIRMAN GUYAS:**  Thanks, Leann.
5
6 **DR. FREEMAN:**  Certainly, and we can discuss that with other
7 members of the IPT and make sure that language is appropriately
8 captured.  Okay.  Action 1 is the larger of the two actions, and
9 this is looking at modifying the sector allocations, the OFL,
10 ABC, and ACLs for red grouper.
11
12 Alternative 1, again, is no action, and it would maintain the 76
13 percent commercial and 24 percent recreational allocations, and
14 it would maintain the current OFL, ABC, and ACLs.  Alternative 1
15 is not legally viable, because it is not based on the best
16 scientific information available, and it would retain the
17 current OFL and ABC, which are above the values produced by
18 SEDAR 61, as well as those recommended by the SSC.
19
20 Alternative 2 would maintain the current sector allocations, the
21 76 percent commercial and 24 percent recreational, while
22 revising the OFL and ABC, as recommended by the SSC based on
23 SEDAR 61, and it would then set the stock ACL equal to the stock
24 ABC.
25
26 Preferred Alternative 3 uses the same time period that was used
27 to set the allocations in Alternative 1, 1986 through 2005,
28 using the FES-adjusted MRIP landings that results in a 59.3
29 percent commercial and 40.7 percent recreational.  Again, the
30 OFL and ABC would be revised, as recommended by the SSC, based
31 on SEDAR 61, with the stock ACL set equal to the stock ABC, and
32 that is currently the council's preferred alternative.
33
34 Alternative 4, similar to Alternative 3, also uses the MRIP-FES
35 data.  However, the timeframe is expanded, and so, starting in
36 1986 and ending in 2009, which is prior to the grouper-tilefish
37 IFQ program being implemented, the allocations would then become
38 60.5 percent commercial and 39.5 percent recreational, with,
39 again, the OFL and ABC being revised and the stock ACL being set
40 equal to the stock ABC.
41
42 Alternative 5, again, uses MRIP-FES data.  Here, again,
43 beginning at 1986 and going through 2018, which is the longest
44 timeframe of landings we had when the document was being
45 developed, and the allocations would be 59.7 commercial and 40.3
46 percent recreational.  Again, the OFL and ABC would be revised,
47 with the stock ACL being set equal to the stock ABC.
48

0003764

1   The last alternative, here, the sector allocations were revised
2   with the commercial ACL being retained at 3.16 million pounds
3   gutted weight, which is what they are at currently.    The
4   resulting allocations would be 68.7 commercial and 31.3 percent
5   recreational, and the OFL and ABC would be revised to retain
6   that commercial ACL, with the stock ACL, again, being set equal
7   to the stock ABC.
8
9   If we could look at the next two tables, or three tables, before
10  we go to Action 2, and then I will pause, if there's any
11  questions about Action 1, and so this table is in the document,
12  and it shows the OFL, ABC, total ACL, and sector ACLs that would
13  result under each of the alternatives, and this has been before
14  the committee previously.    As a reminder, that second line,
15  under Alternative 1, where it shows the MRIP-FES equivalent, we
16  start under the rec ACL, and it shows that the MRIP-FES
17  equivalent of the rec ACL would be 2.1 million pounds gutted
18  weight.
19
20  The total ACL, which is in parentheses, that is simply taking
21  the 2.1 from the rec ACL and adding it to the 3.16 commercial
22  ACL and arriving at 5.26.   As mentioned previously, the OFL and
23  ABC under Alternatives 2 through 6 are all reduced, and, in
24  comparison to that 5.26 total ACL with Alternative 1, the total
25  ACL is reduced for Alternatives 2 through 6, and so, again, just
26  reflecting, in essence, that total pie is shrinking, and that's
27  reflected in several of the sector ACLs.
28
29  This shows the predicted closure dates for the recreational
30  sector under the various alternatives, and, currently, with
31  Alternative 1, there is no closure expected for the recreational
32  sector.   With the current Preferred Alternative 3, the predicted
33  closure date would be December 19, and then there are various
34  other closure dates for the other alternatives.
35
36  This table is also included in the document, but I did want to
37  highlight here, and this shows the combined total expected
38  change in net economic benefits for both the commercial and
39  recreational sectors when compared to Alternative 1, and so, as
40  mentioned, that total ACL is decreasing for all of the
41  alternatives, and so, unfortunately, Alternatives 2 through 6,
42  there is a negative impact for those combined sectors, and,
43  again, they are listed there in comparison to Alternative 1.
44
45  We can go ahead and go to the next slide, which is the start of
46  Action 2.   Before I go through Action 2, Ms. Guyas, do you want
47  me to stop and see if there's any questions, or would you like
48  for me to cover both actions first?

0003765

1
2   **CHAIRMAN GUYAS:**  Let's do this.  Let's cover both actions, and
3   then we're going to take a break, and then we're going to come
4   back and have discussion, because it might take us a little bit,
5   and we'll probably need a break.  Is that cool?
6
7   **DR. FREEMAN:**  Sounds perfect.
8
9   **CHAIRMAN GUYAS:**  All right.
10
11  **DR. FREEMAN:**  Okay.  Action 2 is a little bit shorter.  Here, we
12  are modifying the ACTs.  Alternative 1, which is our no action,
13  would maintain the current buffers between the ACL and ACT for
14  each sector.   For the commercial, that buffer would be 5
15  percent.  For the recreational, it would be 8 percent.
16
17  Alternative 2 applies the ACL/ACT Control Rule to revise those
18  buffers for each sector, and the resulting commercial buffer
19  would be zero percent, and the recreational buffer would be 9
20  percent.
21
22  As pointed out previously, given the multiuse allocation, the
23  council previously suggested looking at Alternative 3, which is
24  the current preferred.  Here, the current buffer between ACL and
25  ACT would be maintained for the commercial sector at 5 percent,
26  while applying the ACL/ACT Control Rule for the recreational
27  sector, resulting in a 9 percent buffer.
28
29  It's mentioned on another slide, but I will go ahead and mention
30  it in here, that the ACT is what sets the quota for the
31  commercial sector.  In this case, for the recreational sector,
32  they are allowed to harvest at their ACL.  The ACT comes in as a
33  post-season  accountability  measure,  and  so,  should  the
34  recreational sector have any overages, then, the following year,
35  they would be harvesting at their ACT.
36
37  This  shows  the  combinations  from  Action  1  and  Action  2
38  alternatives and the resulting ACTs for the sectors.  Sort of in
39  the middle right inside of this table, you look at the current
40  preferred alternatives, and that would be a 2.4-million-pound
41  gutted weight ACT for the commercial sector and a 1.57-million-
42  pound gutted weight ACT for the recreational sector.
43
44  This  is  the  predicted  closure  dates,  again  combining  the
45  alternatives from Action 2 and Action 1.  In that first column,
46  Action 2 is listed first, followed by the alternative from
47  Action 1.  Given the council's current preferred, the predicted
48  closure data for the recreational sector would be November 16.

1  However, again, that would be only if that post-season
2  accountability measure was triggered and they were harvesting to
3  their sector ACT.
4
5  The current status is, as mentioned, the council has selected
6  preferred alternatives for both actions.  Council staff held
7  three in-person and two virtual public hearing meetings in early
8  to mid-June, which Ms. Muehlstein covered those summaries of
9  comments, and we will go ahead to the next slide, which is
10 simply questions.
11
12 Before we take the break, I did want to mention, as well, that
13 the Ad Hoc Red Snapper Grouper-Tilefish IFQ AP met on June 2,
14 and, while not on the initial agenda, there was an item added
15 under Other Business to discuss this document, and there was a
16 motion made by that AP.
17
18 The motion there was that the Ad Hoc Red Snapper Grouper-
19 Tilefish IFQ AP supports, in Reef Fish Amendment 53, Action 1,
20 Alternative 2, which would maintain the sector allocations of
21 the total ACL at 76 percent commercial and 24 percent
22 recreational and revise the OFL and ABC as recommended by the
23 SSC.  That motion carried with no opposition.
24
25 I did -- Given that I was going to mention that, I did, as well,
26 want to just mention that the Reef Fish AP previously, and this
27 was provided at the last council meeting, met in February of
28 this year, and, among other things, they discussed Reef Fish 53,
29 and it was the second time they did discuss that document, and
30 the Reef Fish AP, obviously, having members from both sectors,
31 they were not able to select, or recommend, a preferred for
32 Action 1, and there was much, much discussion, but there was
33 nothing selected.
34
35 However, they did make a motion to consider the proposed Action
36 2, Alternative 3 the preferred, which is the council's current
37 preferred for Action 2, and so I did want to mention that AP's
38 motions as well.  I will pause there, Ms. Guyas.
39
40 **CHAIRMAN GUYAS:**  All right.  Thanks, Dr. Freeman.  Let's take
41 our break of fifteen minutes.
42
43 **DR. TOM FRAZER:**  Until 10:15.  See you all then.
44
45 (Whereupon, a brief recess was taken.)
46
47 **CHAIRMAN GUYAS:**  I think we can go ahead and go back to that
48 presentation and have some -- We'll start with questions, and

33

0003767

1 then we can have some discussion here, and we can open up the
2 full document, if need be, if people have questions about what's
3 going on in there. Are there any questions on Dr. Freeman's
4 presentation? Patrick.
5
6 **MR. BANKS:** I just have a question about -- One of the public
7 comments indicated that we didn't have to look at reallocation
8 until 2026, and can Dr. Freeman maybe give us some background on
9 that public comment, and is that the case? I know it's in this
10 document for us to reallocate, but there was a public comment
11 that came through that said we didn't have to reallocate until
12 2026. Can you give us some background, please?
13
14 **DR. FREEMAN:** Certainly, and I may also, if there's any
15 additional, may refer to Ms. Muehlstein as well, if it's a
16 public comment, but, in terms of the allocation triggers that
17 the council had reviewed previously, there was a time trigger
18 that was selected. However, it's still within the council's
19 purview to examine allocation prior to that.
20
21 **CHAIRMAN GUYAS:** All right, and so I've got a question. Can we
22 back up to the slide under Action 1 that has Table 4.1.3.8,
23 that's got the economic benefits? Dr. Freeman, can you break
24 this down a little bit more and explain where these numbers are
25 coming from, since I think this is the first time we've seen
26 this, right?
27
28 **DR. FREEMAN:** Certainly. I will put on my economist hat and try
29 to put it in plain language, and, if I still don't, please let
30 me know. In the Chapter 4 analysis of all of our documents, we
31 will look at the commercial sector impacts and the recreational
32 sector impacts. Within both of those sectors, there are two
33 sort of broad categories that we look at, one being what we call
34 producer surplus and one being consumer surplus.
35
36 For instance, on the commercial side, with the producer surplus,
37 we're looking at the impacts, for instance of like owner-
38 operators, whereas, on the consumer surplus, we're considering
39 some of the impacts of the consumers of that commercial sector's
40 landings, and then, on the recreational side, when we look at
41 the producer surplus, primarily we look at the for-hire impacts,
42 which are operating as a business, and then, on the consumer
43 surplus, we tend to look a little bit more at the impacts of
44 private anglers.
45
46 In taking all those calculations together, and we do it very
47 step-by-step, this particular table in the presentation is
48 taking, again, sort of a combined overall effect of all those

0003768

1  impacts, and so that was my TED talk on the economic aspect,
2  and, if there's anything additional, please let me know.
3
4  **CHAIRMAN GUYAS:**  Ms. Bosarge.
5
6  **MS. BOSARGE:**  So you have to put a dollar value on each one of
7  those, right, and so are you looking at lease prices, or are you
8  looking at dockside prices on commercial, and then how are you
9  putting a value on it on the private rec consumer side?  Is that
10 still based sort of like, the last time I saw this, it was based
11 on a survey that went out to the private anglers that said what
12 is catching this fish worth to you, and is that where we're
13 getting a dollar value on this?
14
15 **DR. FREEMAN:**  I will start with the latter part, which was the
16 private angler dollar value, and, yes, ma'am, we are using
17 information from a peer-reviewed study to incorporate into the
18 analysis, and then, actually, I suppose we could pull the
19 document up, if that would be --
20
21 **CHAIRMAN GUYAS:**  So you want to look at the actual document?
22
23 **DR. FREEMAN:**  Correct.
24
25 **CHAIRMAN GUYAS:**  All right.  While we're getting that on the
26 board -- Okay.  It looks like we've got it up, if you can shout
27 out a page number for us.
28
29 **DR. FREEMAN:**  Okay.  If we can go to 4.1.3, and that would be
30 the section.
31
32 **CHAIRMAN GUYAS:**  If you're like me and you have a hard copy,
33 that's on page 93.
34
35 **DR. FREEMAN:**  Okay.  Perfect.  There should be a table at the
36 bottom of that page, and so, here, on the commercial side, we're
37 looking at the expected change in landings compared to
38 Alternative 1, and so, Ms. Bosarge, I believe, to answer your
39 question, in this particular table, we're looking at a change in
40 quota itself and translating that into landings and change both
41 in revenue and in producer surplus.  Ms. Bosarge, if there's
42 something that I missed with your previous question, please let
43 me know.
44
45 **MS. BOSARGE:**  I don't want to harp on this too long, but so you
46 have a change in landings in pounds, but you convert that to a
47 dollar, and are you applying the average lease price to get to
48 that dollar value, or are you applying the dockside price?

0003769

1
2  **DR. FREEMAN:**  Certainly, and so we're using the average dockside
3  price.  In this case, the paragraph right prior to this table
4  note it's the average dockside price from 2018 to calculate the
5  revenue.  I will note that we do adjust it though, and, in this
6  case, it was to 2019 dollars, which is what we were using
7  throughout the document.
8
9  **CHAIRMAN GUYAS:**  Patrick.
10
11  **MR. BANKS:**  But is the economic impact of the lease price
12  factored in anywhere?
13
14  **DR. FREEMAN:**  It is discussed qualitatively, but the impacts are
15  not looked at quantitatively.
16
17  **MS. BOSARGE:**  Did the SSC review this particular economic
18  analysis for red grouper?  I am guessing the answer is no, Matt.
19
20  **DR. FREEMAN:**  No, ma'am, they did not.
21
22  **MS. BOSARGE:**  Right, but I do remember they did examine
23  something similar, many years ago, for red snapper, and I
24  remember the same survey went out and asked the private anglers
25  what is that red snapper worth to you, and, when they reviewed
26  that piece of work, it seems to me that their conclusion was
27  that the methodology used was okay, and they were all right with
28  the methodology.
29
30  However, the actual results, they chose not to comment on, one
31  way or the other, and so the analogy being that the way you
32  cooked the data was okay, right, and the cooking is the method.
33  How did you cook it, and you had some meat, and did you sear it
34  on both sides and call it a day, and probably so if it was a
35  filet mignon, or did you have some short ribs that you braised
36  for four hours, so that they would be edible, right, and not
37  break your teeth chewing them.
38
39  So they said, yes, given the data you had, I think you cooked it
40  the right way, and the methodology is really pretty good, but I
41  don't have a lot of faith in that survey, as far as being the
42  best data that's actually accurate data without a lot of
43  uncertainty around it.
44
45  It's very qualitative, right, and it's a feel-good kind of
46  survey.  What does it feel like it's worth to you, versus you
47  actually have quantitative, market-driven numbers on the
48  commercial side.  So, you know, if you start with rotten meat,

36

0003770

```
1   it doesn't really matter how you cook it, and it's still rotten
2   meat when you're done, and so that would be my comments for
3   that.
4
5   CHAIRMAN GUYAS:  Patrick.
6
7   MR. BANKS:  Just a clarifying question.  On one of the tables,
8   and also in your presentation, you used the words "economic
9   benefits" rather than "economic impacts", and is there a nuance
10  reason there that you can explain?
11
12  DR. FREEMAN:  Certainly, and so the impacts -- Again, I am going
13  to talk in very sort of broad terms.  If we're looking at
14  impacts, we would be looking, like on the commercial side, along
15  like the entire supply chain and not necessarily just like the
16  direct consumers of landed fish, and we would be looking at
17  impacts on ice suppliers, like, again, all of the impacts,
18  whereas, here, it's more sort of immediate benefits surrounding
19  the red grouper.
20
21  CHAIRMAN GUYAS:  All right.  Any other questions for Dr.
22  Freeman?  Clay.
23
24  DR. CLAY PORCH:  Thank you for this, Dr. Freeman.  I have a
25  question about if any consideration was given to the observation
26  that the long-term yield, and actually even the short-term OFL,
27  would be higher under Alternative 2 than say Alternative 3,
28  since it's based on results from the assessment, and so was that
29  figured in at any point, or this is based on the recent average,
30  I think, like five-year average, historical average data, or was
31  there an account of the fact that the OFL and ABC would go up
32  with the higher commercial allocation, because of the
33  selectivity issue?
34
35  DR. FREEMAN:  If I understood your question correctly, and, if
36  not, just let me know, but, here, we are looking at, on the
37  commercial side, what the ACT would be, and, in this document,
38  the ACT under each of the alternatives is set -- I know, in
39  other documents, sometimes we may have a change from one year to
40  the next, and so, in this analysis, we held the ACT constant for
41  the years that we analyzed, and that was based on the stock
42  assessment.
43
44  DR. PORCH:  Okay, and so then there is that additional nuance
45  that, if you look at the stock assessment, and you calculate,
46  quote, the long-term yield, and so the optimum yield for the
47  OFL, it would be higher.  The total poundage would be higher
48  with the higher commercial allocation than with Alternative 3
```

0003771

1  with the lower commercial allocation and higher recreational
2  allocation, because the commercial tends to select larger fish.
3
4  **DR. FREEMAN:**  Yes, sir, and so the ACTs in the document, under
5  the alternatives, reflect that selectivity, and so, again, given
6  that there were different ACTs under the various alternatives,
7  that was what we used to base our landings off of for this
8  analysis.
9
10  **CHAIRMAN GUYAS:**  Okay.  Robin.
11
12  **MR. ROBIN RIECHERS:**  Matt, but it is fair to say, and I just
13  want to follow-up there, that it is fair to say that, if you had
14  yield streams, you could basically do that, if there were
15  different yield streams that had been produced, but, of course,
16  what we're doing with ACTs is typically -- I don't know how many
17  years you went out here, but we typically are looking at a
18  projection of two or three years on most of these stocks, when
19  we do them as we get our recommendations now, but, with a yield
20  stream, you could have gone further out and made that
21  adjustment, correct?
22
23  **DR. FREEMAN:**  Yes, sir.  In the -- I see Mike Travis is coming
24  to my assistance, and so I'm also going to defer to him in a
25  second, but just to briefly comment that, in the RAR section of
26  the document, we examined the impacts over a seven-year
27  timeframe, and so, projecting forward, at least like, for
28  instance, on the commercial side, we looked at the impacts of
29  the changes to the ACT from 2022 through 2028, and, at this
30  point, I will see what Dr. Travis has to add.
31
32  **CHAIRMAN GUYAS:**  Go ahead, Dr. Travis.
33
34  **DR. MIKE TRAVIS:**  Thank you very much, and I think Matt has
35  addressed that last question, and we can attempt to follow-up if
36  necessary, but I kind of wanted to provide a little bit of a
37  roadmap to the council members, to help them better understand
38  the last set of numbers that were in the presentation, and so,
39  just to clarify, Table 4.1.3.1 provides the estimates of the
40  effects on the commercial harvesters.  4.1.3.2 provides the
41  estimates of the effects on consumers, and so seafood consumers.
42
43  We combine those two to get your estimates in Table 4.1.3.3, to
44  get the total effects on the commercial sector.  Similarly,
45  4.1.3.4 gives you the effects on the recreational anglers.
46  4.1.3.6 gives you the effects on the for-hire sector.  When you
47  combine those, you get 4.1.3.7 estimates, which is the total
48  effects on the rec sector.

0003772

1
2  When you combine Tables 4.1.3.3 and 4.1.3.7, that gives you the
3  table that Matt had in his presentation, which is the total
4  effects on commercial plus recreational, and so I just wanted to
5  make that clear, because I got the sense that folks were not
6  following this and that we were looking at effects on all the
7  sectors within commercial and recreational.
8
9  The other comment I wanted to make is back to Leann's comment on
10 the estimates that we use regarding the recreational value of
11 red grouper to the recreational anglers, and so I will say that
12 those numbers were published in peer-reviewed papers, and so
13 peer-reviewed published estimates, and that's what we used, and
14 that is the best scientific information available, and I am
15 happy to answer any other questions as well.
16
17 **CHAIRMAN GUYAS:**   All right.   Thank you.   Are there other
18 questions for Dr. Travis?  We mentioned a number of tables that
19 are in this section, and I don't know if we want to go through
20 them a little bit slower.  I don't know if people are interested
21 in seeing all of those, for those that don't have the document
22 in front of them.  Maybe we could back up a little bit.
23
24 **DR. FREEMAN:**   If staff could go to the beginning of Section
25 4.1.3, and I can just sort of lead us through those tables.   If
26 you can scroll down, this is that first table that I mentioned,
27 and so, on the commercial side, as you recall, I mentioned that,
28 for both sectors, commercial and recreational, we consider the
29 producer surplus and the consumer surplus.   In this table, we
30 are calculating what the producer surplus would be within the
31 commercial sector.
32
33 If we scroll down, that shows, again for the commercial sector,
34 what the expected change in the consumer surplus would be, and
35 so, as Dr. Travis commented, in essence, the seafood consumers,
36 and they're the consumer side within the commercial sector.
37
38 If we scroll down to 4.1.3, that shows the combined overall for
39 the commercial sector, when we consider the producer surplus and
40 the consumer surplus, and, again, I will just toss this out,
41 just for comparison.  In Alternative 6, for instance, there is a
42 zero there because, if you recall, Alternative 6 held the
43 commercial ACL and resulting ACT constant, and so there would be
44 no expected change if there is no change to the ACL and ACT.
45
46 Now, if we keep scrolling to the recreational sector, that first
47 table right there, similar to what we saw on the commercial
48 side, for the recreational side, we will look at the expected

0003773

1   change in consumer surplus.  The table immediately -- I'm sorry.
2   Not table, but paragraph immediately above shows sort of the
3   nitty-gritty of how we calculate that.
4
5   In this case, one of the things we have to do is work with ACL,
6   because, obviously, our ACL and ACT is in pounds, but anglers
7   value fish, and so we always have to convert the pounds, looking
8   at an average weight, to what that means in terms of number of
9   fish, and then base that with what they value each fish, to
10  figure out what that impact would be.
11
12  If we can scroll down -- I can see a couple of council members
13  chuckling, and I can tell they're like, man, I'm glad that I'm
14  not an economist.
15
16  On the producer surplus side, one of the things here is we
17  looked -- When I mentioned when the predicted seasonal closures
18  would be, we have to look -- Because there is two-month waves of
19  recreational data, and we look at what wave would be impacted,
20  and then, even within that wave, the number of days within that
21  month, to figure out the number, in this case, of cancelled
22  charter trips that could be expected.
23
24  Then we use that, if we keep scrolling to the next table,
25  3.1.3.6, to figure out the change in producer surplus, and then
26  the table right below it combines, again similar to what we did
27  for the commercial sector, the impacts, again, from producer
28  surplus with consumer surplus.  If we scroll just a touch
29  further, that very last table, that's what Dr. Travis referred
30  to, and this is what's in the presentation.
31
32  Once we add all of that together, producer surplus and consumer
33  surplus from the commercial sector to producer and consumer
34  surplus from the recreational sector and look at it as an
35  overall fishery, this is where we wind up with this table, and
36  this what I included in that presentation.
37
38  **CHAIRMAN GUYAS:**  Okay.  Any questions on all that?  Thanks for
39  going through those.  Leann.
40
41  **MS. BOSARGE:**  Thanks, Matt, and it's an excellent analysis.  My
42  criticism earlier was not of the analysis.  I think you and
43  Mike, and anybody else involved, did a great job with that.  You
44  worked with what you had to work with, and I guess my beef is,
45  unfortunately, what you were given to work with.
46
47  I own a house, right, and I can get an appraisal on that house,
48  and that's going to be based off of market value, because it's

40

1  going to look at what other willing buyers and sellers of a
2  house similar to mine were willing to pay, and there's going to
3  be a value on my house, based on that, or you can ask me, Leann,
4  what do you think your house is worth, and I guarantee you that
5  my number is going to be higher than that appraisal, five times
6  out of six, because I think my house is worth more, right,
7  because I am the seller.
8
9  Well, in this analysis, you use prices, for the commercial side,
10 that are the market prices.  There is a willing buyer and a
11 seller, and efficient markets generate efficient prices, if you
12 believe you have an efficient market, and so say it's five-
13 dollars a pound, right, the dockside price on that red grouper
14 between the dealer and the fisherman.  However, if you send a
15 survey out to that commercial fisherman and say, well, what you
16 do you think your red grouper is worth, I bet you that he would
17 say more than five-dollars a pound.
18
19 He would probably say that's about a seven-dollar-a-pound fish,
20 in my opinion, and I think I'm getting ramrodded over here,
21 because there's an inherent bias, right, when you only ask one
22 side of the equation, the seller.
23
24 When we look at it on the private angler side, you're only
25 asking one side of the equation.  You don't have that efficient
26 market to drive the actual price, and so there is an inherent
27 bias to the high side when you look at the private angling piece
28 component of this, and I think that probably has a lot to do
29 with the numbers that we see on the screen, but that's just my
30 two-cents.
31
32 **CHAIRMAN GUYAS:**  Dr. Freeman.
33
34 **DR. FREEMAN:**  I appreciate that comment.  I will add just a few
35 quick comments.  The reference for the study that we relied on,
36 Carter and Liese, in the list of references, there is a link to
37 their paper.  Just to explain sort of the methodology there,
38 and, again, I will be brief, and I won't bore you all too much
39 from the econ side.
40
41 Rather than just simply asking them like what would you pay to
42 be able to catch an extra fish, the way it's designed in that
43 survey is what's called a choice experiment, and so they're
44 given a variety, under different scenarios, of choices, and like
45 it might be additional fish, but there might be a difference in
46 the bag limit or size limit, and so they are provided with a
47 suite of different sort of choices related to a fishing trip,
48 and so, by combining various choices, it avoids, or reduces,

0003775

1  that potential sort of bias to say simply here's what we would
2  pay for an extra fish, where people may inflate that price, and
3  so it helps to reduce that bias, and so I just wanted to add
4  that in and sort of explain a little bit of sort of that
5  methodology.
6
7  **CHAIRMAN GUYAS:** Tom.
8
9  **DR. FRAZER:** To that point, Matt, in thinking about this a
10 little bit, when you actually look at the tables, it's expressed
11 as the value per fish that was actually landed, and we often
12 have this discussion about it's not about what you land, but
13 it's about the opportunity to access a fish, and so, if you went
14 through an exercise, and you simply said you can't land anything
15 -- This is just extreme for an argument here, but you can fish
16 all the red grouper that you want, but you can't land any, and
17 how would you arrive at that value?
18
19 **DR. FREEMAN:** That's an excellent point, and it's something for
20 consideration. You may have a day where you might just have bad
21 luck and not catch anything, and that doesn't mean that a
22 private angler still didn't enjoy being out on the water, and,
23 again, we're using simply the numbers that are in the document,
24 recognizing that, again, at least based off of the comment you
25 made, it could potentially be an underestimate. We're assuming
26 that they have landed that fish, and so, if they've gone out and
27 not landed that fish, that's not considered in this document,
28 but they still had value and still enjoyed that day out there.
29
30 **DR. FRAZER:** So but it doesn't consider the potential, moving
31 forward, for alternative in-season type of management measures,
32 like reductions in bag limits and things like that, and so, for
33 example, if you move forward and you said, well, the bag limit
34 is two, but, when you implement this, perhaps the bag limit is
35 one, and is that going to scale immediately? Is that going to
36 be cut in half?
37
38 **DR. FREEMAN:** You're putting me on the spot. I usually have
39 more time to mull over these econ questions. I would say, and
40 I'm waiting to see a hand raised from Dr. Travis, and so I would
41 say, on the consumer side, that makes sense.
42
43 On the producer side, producer surplus side, of the recreational
44 sector, where we're looking at the for-hire component, I would
45 have to, unfortunately, give that a little bit more thought,
46 because there's trips involved, and we have information on
47 directed trips, where people are targeting certain species, and
48 so, given that not every trip is a targeted trip, the impacts

0003776

1  there would be a little different than what you would see,
2  perhaps, on the private angling side.
3
4  **DR. FRAZER:**  I apologize, and I didn't mean to put you on the
5  spot, but what I'm trying to get at is trying to capture some
6  dynamics that might come into play here when you kind of look at
7  the yield streams moving forward and what other options might
8  be, and, I mean, this is kind of just like this is the way it
9  is, but it's not really completely the way it is, or it might
10 be.
11
12 **DR. FREEMAN:**  I enjoyed the thought exercise, and so thank you.
13
14 **CHAIRMAN GUYAS:**  Patrick.
15
16 **MR. BANKS:**  Just clear this up for me, Dr. Freeman.  The
17 consumer surplus in the commercial model is considering the
18 price paid by the dealer to the fisherman?  When I think of the
19 word "consumer", I think of the person eating the fish at the
20 restaurant, and that's not the consumer surplus that you're
21 talking about, and is that correct?
22
23 **DR. FREEMAN:**  Yes, sir.  That's correct, and that was a point
24 that I tried to mention earlier, and I probably sort of skimmed
25 over it.  When we look at, for instance, the entire supply
26 chain, and part of that is all the econ jargon where we would
27 look at what's called value added products, and so there may be
28 additional value as it moves along the supply chain, and so,
29 yes, there is certainly additional impacts, and so, again, these
30 are sort of more immediate benefits from landing that, and
31 that's -- What you're saying is that, yes, certainly, if we look
32 at the big scale, there would be additional numbers added into
33 this.
34
35 **MR. BANKS:**  To that point, the reason why I wanted to clarify
36 that is because, if you look at the recreational side of this,
37 we're using the value to the end user, and, on the commercial
38 side, we're not using the value to the end user.  Now, maybe we
39 don't have the right information, and I don't know, but is there
40 any way to compare those two?  I know you would have to go all
41 the way through the supply chain, but it does seems like it is a
42 bit of a difference there and we're sort of looking at apples to
43 oranges.
44
45 **DR. FREEMAN:**  That's a good point.  Again, in an ideal world, if
46 we had all that data -- Well, if we had all that data, it would
47 probably take me another year to work through it, but I will
48 say, even like for instance on the private angler side, there is

0003777

1  additional -- This is why we use the different term of benefits
2  versus impacts.
3
4  Private anglers, we aren't capturing things like if they're
5  staying at a hotel or a campsite, and there is additional
6  things, for instance, not included on their side either, and so,
7  again, we're using, as Mike Travis said, the -- Gosh, now his
8  hand and Mara's hand came up too, and there is additional
9  impacts that could be examined, and we're using the best data
10 and the available data, and so, Ms. Guyas, I don't know if you
11 want to turn to Ms. Bosarge or see if Dr. Travis wanted to add
12 to that comment first, and I will leave that up to you.
13
14 **CHAIRMAN GUYAS:**  Let's go to Dr. Travis first, and then I've got
15 you, Leann.
16
17 **DR. TRAVIS:**  I think that I want to provide a clarification to
18 part of Matt's response.  The estimates of effects on consumer
19 surplus, on the commercial side, what it's estimating is effects
20 on consumers of that seafood, and so, yes, it does go up the
21 chain, but folks need to keep in mind that you may think that
22 there are these huge effects on the consumers of that particular
23 species, but remember those consumers have lots of choices.
24
25 They can pick red grouper harvested from the South Atlantic, and
26 they can pick imports, and they can pick other species harvested
27 from the Gulf, and they can pick other sources of protein, for
28 that matter.  The large effects that you may think might occur
29 probably will not, because of the availability of these other
30 substitutes that they can switch to at will, but those effects
31 are in there, and that is based on recent research conducted by
32 one of your own SSC members, that being Walter Keithly.
33
34 **DR. FREEMAN:**  Again, just to pile on, a question that was raised
35 earlier was, for instance, on the private anglers, if the bag
36 limit was reduced from two to one, thinking again of the
37 impacts, again, the value that we're using in here from this
38 study was the willingness to pay for a second red grouper, and
39 there are diminished values as you catch additional grouper, and
40 so it's still -- Going back to your question, we would still
41 have to modify some of the analysis, because certainly someone
42 values the first red grouper they catch a lot more than the
43 second or the third and the tenth.  That value diminishes as
44 they catch additional fish, and so, again, talking about the
45 dynamics, there's a lot that would go into that.
46
47 **CHAIRMAN GUYAS:**  All right.  I'm going to go to Ms. Bosarge, and
48 then, Mara, I see your hand, and I'll get you next.

0003778

```
1
2   MS. BOSARGE:    I just wanted to mention that this whole
3   conversation that we're having here was actually referenced in
4   that GAO report on allocations in the Gulf of Mexico and looking
5   at these economic benefits, and they noted, in that, that it's
6   essentially -- I'm paraphrasing here, but that it's not really
7   comparing apples to apples, because you are using -- On the
8   commercial side, as you said, you're not looking at distribution
9   to the consumer.
10
11  You're looking at distribution to the dealer, and you're not
12  taking those net benefits throughout that supply chain until you
13  finally get to the end consumer into account, and, to me, that's
14  the most obvious, when you actually have to apply a dollar value
15  to it.  I realize you have choices, and you could switch from
16  red grouper to this or to that, but, if you apply a dockside
17  price there of five-dollars a pound, that's a whole lot
18  different than -- The consumer can't get that.  He doesn't buy a
19  five-dollar-a-pound grouper.  That is what the dealer gives to
20  the boat.
21
22  In my world, the consumer doesn't get boat price, right, and you
23  don't walk up and get shrimp for $1.50 a pound, do you?  No, not
24  most times.  That is boat price, and so that end consumer price
25  is how you actually encompass the rest of the benefit for the
26  supply chain.  It's all those other processes in it, the other
27  steps in the supply chain, that the consumer has to pay for,
28  but, anyway, that's it.  I am leaving this one alone, and I'm
29  ready to move on.
30
31  CHAIRMAN GUYAS:    All right, and so I've got a few hands.  I'm
32  going to go to Mara, and then, Kevin and John, I see you, and
33  I'll come around to that.  Go ahead, Mara.
34
35  MS. LEVY:    Thanks.  I mean, I think Matt and Mike covered it,
36  but just the point that on both sides not going down the whole
37  chain and all of the potential economic impacts on either side,
38  and not just that -- The points they made well, and so I will
39  not make it anymore.  Thanks.
40
41  CHAIRMAN GUYAS:    Thanks, Mara.  Kevin.
42
43  MR. KEVIN ANSON:    This is a good discussion that we're having, I
44  think, and it is -- The timing of it, as we're dealing with
45  allocation, is appropriate, obviously, and I just have a couple
46  of points, or a point and then a question.
47
48  Some of those things you bring up, Leann, I mean, those things
```

45

0003779

1  are applied to the recreational side, and you asked whether or
2  not there was a fair market, I guess, or the market is being
3  applied, I guess, on the recreational side, and, no, not in the
4  same sense as the IFQ program, but certainly, if you look at the
5  type of vessels that are being purchased now to go access like
6  the reef fish fishery, as far as having two or three or four
7  engines on them, and larger vessels and the amount of money that
8  it takes to buy that vehicle to get access to the resource, it
9  has changed quite dramatically in the last five or so years.
10
11 That's a willingness-to-pay-type thing, and a value, I guess, of
12 those fish, and so there's a limited, or finite, number of fish
13 those anglers are able to get, and yet they do put more money
14 and investment into the vehicle that they're using to access
15 those fish, and so it is interesting, and so that brings me to
16 my question, and, Dr. Freeman, you mentioned that you have
17 limited data, and I understand that you're applying changes, due
18 to inflation, to the values that were estimated at the time of
19 the paper, but are there any other research projects that you
20 are aware of that are going on that address fish values and such
21 that is coming down the pipe?
22
23 **DR. FREEMAN:**  I believe there is some work being done with the
24 Science Center, for instance.  The specifics, I wouldn't be able
25 to comment on, and it's not confidentiality, but it's just not
26 being up-to-date on every specific project they're working on,
27 but I will leave it open-ended, but I'm certain that there are
28 additional evaluation studies being conducted.
29
30 **CHAIRMAN GUYAS:**  John.
31
32 **MR. JOHN SANCHEZ:**  I will be brief.  I have the same similar
33 concerns I've heard around the table, that commercial values are
34 always looked at with dockside value, and it doesn't have all
35 the multipliers that we see in other economic assessments, say
36 recreationally and what have you, and, I mean, just looking at
37 some of these numbers, if you look at say a retail price per
38 pound, for let's say nineteen-bucks for a fillet, and you
39 multiply one of these options, 600,000 pounds moving in the
40 other direction, you've got four-and-a-half-million dollars
41 there.
42
43 Then, if you were to subdivide that pounds to restaurant size,
44 eight or nine-ounce serving, you would probably double it right
45 there, to nine-and-a-half-million dollars, and these things kind
46 of don't enter, and it's kind of troubling that, historically,
47 whenever we talk about commercial, we look at dockside value,
48 and that just doesn't tell the whole story of where that fish is

0003780

1  going.
2
3  **CHAIRMAN GUYAS:**   Okay.   I  think  we've  had  a  pretty  good
4  discussion  of  all  this  economic  information,  and  I  appreciate
5  Dr. Freeman and Dr. Travis for jumping on the line to help break
6  this  down  for  us.   All  right.   We  do  have  some  codified  text,
7  but  this  document  --  We  can  get  to  that,  but  I  just  wanted  to  up
8  for  other  questions  or  comments  or  whatever  on  this  document.
9  It  is  on  our  agenda  for  final  action,  and  so  this  is  the  meeting
10  to  hash  this  stuff  out.   Andy,  and  then  I've  got  you,  John.
11
12  **MR.  STRELCHECK:**   Thanks,  Martha.   Matt,  can  you  bring  up  the
13  slide  that  shows  the  alternative  ACLs  for  Action  1?   A  few
14  points  and  a  question,  and  then  maybe  a  few  more  points.   Just
15  to  acknowledge,  and  you  did  comment  on  this,  but  I  want  to  make
16  sure  it's  clear  that  all  the  alternatives,  after  Alternative  1,
17  result  in  a  reduction,  and  it  appears  that  it  would  be  an
18  increase,  but,  in  reality,  it's  a  reduction,  because  we're  now
19  converting  to  the  FES  equivalent,  and  so  you  really  want  to
20  compare  everything  to  that  second  row,  and  not  the  first  row,
21  when  you're  looking  at  the  ACLs.
22
23  It  was  alluded  to  by  Clay,  in  terms  of  optimizing  yield,  and
24  there  is,  obviously,  this  interchange  between  shifting  the
25  allocation  and  how  much  yield  occurs  because  in  the  fishery,
26  because  of  selectivities.   There  is,  I  think,  an  order  of
27  magnitude  difference  in  discards  between  the  two  sectors,  and  so
28  my  question  is  --  It  doesn't  appear,  in  the  document,  that  there
29  is  kind  of  any  reference  discussion  of  impacts  to  either  fishery
30  based  on  a  reduction  in  the  catch  limit  potentially  triggering
31  either  closures  or  reduced  quota  for  the  commercial  sector  that
32  could  result  in  discards,  and  so  that  seems  to  be  something  that
33  we  should  at  least,  or  acknowledge,  could  affect,  obviously,
34  kind  of  the  ultimate  number  of  discards  in  the  fishery,  but,
35  Matt,  can  you  comment  on  that?
36
37  **DR.  FREEMAN:**   That  was  a  little  bit  of  a  lengthy  question,  and,
38  if  you  don't  mind,  could  you  restate  that  for  me?
39
40  **MR.  STRELCHECK:**   Sorry.   I  rambled  on  a  little  bit,  and  so
41  there's  an  interchange  here  between,  obviously,  the  yield  levels
42  and  the  discards  that  occur  in  the  fishery,  and,  the  more
43  allocation  that  is  shifted  towards  the  recreational  sector,  the
44  lower  the  yield  level  becomes,  because  of  the  selectivity  and
45  higher  levels  of  discards,  but  what  it  doesn't  seem  to
46  acknowledge  in  the  document  is  that  there  could  be  discards  that
47  result  from  early  closures  if  the  catch  limit  is  set  very  low
48  for  the  recreational  sector,  or,  on  the  commercial  side,  if  the

47

1  catch limit is reduced, they may have more discards, because of
2  less quota available.
3
4  **DR. FREEMAN:**  In Chapter 3, there is some discussion of historic
5  discards.  Beyond that, I wouldn't be able to respond,
6  unfortunately, to your question at this moment, but it's always
7  something that I can look and check into.
8
9  **MR. STRELCHECK:**  Okay, but I think the point I'm making is I
10  think there's a more dynamic situation that could occur going
11  forward in the future, just because of changes in catch limits,
12  and the discards estimated in the assessment don't necessarily
13  account for those management dynamics.
14
15  The other, I guess, comment that I wanted to make is, with
16  optimum yield, it's not just the yield level that we're looking
17  at in these tables, and it, obviously, has to account for
18  conservation and management, as well as socioeconomic factors,
19  and so we have heard, this morning, whether you agree or
20  disagree with the economic analysis, the net economic benefits
21  are lessened with the preferred alternative, relative to the
22  other alternatives.
23
24  That, obviously, is traded off with lower optimum -- Excuse me.
25  Lower yield levels and potentially higher discard estimates, and
26  so we have some national standards that are kind of intersecting
27  with one another, and you really can't achieve all of them at
28  the same time, and so I guess I wanted to acknowledge that as
29  the situation and maybe hear more on the record with regard to
30  anything with regard to the preferred alternative, especially
31  given that it is the lowest of the yield levels that we're
32  considering today.
33
34  **CHAIRMAN GUYAS:**  Thanks, Andy.  John and then Leann.
35
36  **MR. SANCHEZ:**  For what I wanted to get into, if we could bring
37  up the action items.
38
39  **DR. FREEMAN:**  Do you mean Action 1, I assume?
40
41  **MR. SANCHEZ:** Yes.  Thank you.
42
43  **DR. FREEMAN:**  Mr. Sanchez, do you want to see them in the
44  presentation, because, unfortunately, they're kind of split
45  across slides, or would you like to see them in the document?
46
47  **MR. SANCHEZ:**  You know, it really doesn't matter.  **I wanted to**
48  **make a motion, and, if I get a second, I will elaborate.  To**

48

1  **make, in Action Item 1, Alternative 2 the preferred.**
2
3  **MS. BOGGS:**  Second.
4
5  **MR. SANCHEZ:**   Thank you.   The reason for the motion is we have
6  the biology of this fishery, and, historically, it's -- There's
7  a long history of these episodic events, red tides and such, and
8  all the ingredients are there always in Florida for a possible
9  red tide event.
10
11  To reallocate now, when we're coming off of the assessment that
12  says, and the document that says, we're coming off of probably
13  the smallest size we've seen, in terms of biomass, in a while,
14  and it seems to be on the uptick now, based on what we're
15  hearing, but to reallocate now to a sector that there is a lot
16  of uncertainty in the landings, and the document also says that
17  that uncertainty will probably result in an increase in
18  allocation and overfishing, and that's in the document, too.
19
20  There is discards to consider, and you shift over ACL to the
21  recreational, and they don't even get the full benefit of it,
22  because we have to address the discards.  To do these things, it
23  doesn't make conservation sense, to me, to do this in a fishery
24  that, again, we've seen some issues with it, with red tides and
25  such.
26
27  The public hearings, we overwhelmingly heard from the commercial
28  sector that they would -- This is what they want, and they want
29  this Alternative 2, and, when you have that kind of an
30  outpouring of public comment, it's because somebody's ox is
31  getting gored, and they come out in droves, and that is what
32  they did.
33
34  I think there is other ways to do things that we need to look at
35  in this fishery without clearly hurting the commercial sector.
36  If the concern is having a year-round season recreationally, I
37  mean, maybe, like we heard in public testimony, you throttle
38  back on the bag limit at some point in the season, to get you to
39  your twelve months.
40
41  This alternative gets you, according to the document, at least
42  until August, and maybe a down-step, an in-season adjustment to
43  the bag, gets you all the way across the finish line, and maybe
44  a size limit increase, in some subsequent action we can take,
45  but one thing too that's troubling for me is -- This is just a
46  businessperson's decision, but here we are and we're going to
47  make a decision that's going to impact people, and we have an
48  interim assessment that conceivably maybe gives us a million

49

0003783

```
 1  pounds  that  we  can  play  with,  to  make  a  bitter  pill  for
 2  everybody  a  little  sweeter,  but  we've  got  to  decide  on  the
 3  allocation before we can get into the assessment.
 4
 5  To me, that's kind of the cart before the horse, and it doesn't
 6  make sense, from a business perspective.  If you're going to get
 7  into  a  negotiation,  a  mediation,  you  put  everything  out  there
 8  that benefits your argument, and then you have it, and you let
 9  the chips fall where they may, and that seems kind of backwards,
10  to  me,  a  little  bit,  and  so  that's  my  motion,  and  that's  my
11  rationale,  and  I  hope  you  all  can  support  it,  because  there's
12  goings to be some impacts to the others.  Thank you.
13
14  CHAIRMAN GUYAS:  All right.  Leann and then Patrick.
15
16  MS. BOSARGE:  Thank you, John.  I support your motion.  I guess
17  one of my big issues is the preferred alternative, when you look
18  at  it,  the  one  we  have  right  now,  it  looks  at  historical
19  landings,  right,  and  we  just  recalibrated  those,  and  they  went
20  up, historically, but why did they change?
21
22  It is because we were using a data collection system that was
23  not as accountable as the one that we used for the other sector.
24  For  the  commercial  sector,  you  have  census-level  reporting,
25  rather  than  sample,  and  that  census  of  the  fishermen  is
26  mandatory reporting, with fines involved if you don't, and there
27  is reporting by the fishermen, and there is also reporting by
28  the dealer, and so it's a two-party system.  It has checks and
29  balances.
30
31  There is a tracking device on the boat, so that you can see when
32  that boat leaves to go out fishing, so that you know that he's
33  out fishing and that he better report his landings to you.  He
34  has to hail-out and tell you before he leaves, and I wish my
35  husband would do that.  He has to call you three hours before
36  he's going to get back and tell you he's going to be back, and I
37  certainly don't get that from him, and then enforcement meets
38  him at the dock, and I don't meet him at the door either.
39
40  So,  I  mean,  the  accountability  there  is  outstanding,  and  it's
41  through the roof, versus the other side, and this all comes back
42  to landings, because we use all of that to make sure we have
43  accurate  landings,  which  is  what  we're  using  for  these
44  allocation  decisions,  and  now,  grant  you,  I  am  talking  about  the
45  private angling component, right, because I realize the for-hire
46  component  has  taken  massive  steps  recently  to  increase  their
47  accountability  on  their  data  collection  system,  and  so  let  me
48  clarify.  I'm speaking to the private angling component.
```

0003784

1
2  For the private angling component, it's a survey and not a
3  census, and so it's a sample, right.  It's a portion of the
4  anglers that get sampled.  If you're chosen in that sample, you
5  still don't have to comply with it.  It's voluntary, and you can
6  tell them to buzz off and I don't want to tell you what I caught
7  or whether I went fishing, and so there is no enforcement piece
8  to it, because it's voluntary.
9
10 We took steps, MRIP did, and they realized they had room for
11 improvement in their data collection system, and they weren't
12 staying at the boat ramp long enough, and they were using a
13 telephone survey for landlines, which people were starting to
14 phase-out, and so they made some changes, smart changes, and
15 they said that I think we'll get better data this way.
16
17 Now, that meant that the recreational sector was actually
18 catching a lot more fish for the last thirty years than what we
19 realized.  Now, as we were managing them for those thirty years,
20 had we known that they were exceeding catch levels that were
21 reasonable catch levels, that were healthy catchy levels, as
22 managers, we would have taken steps to throttle them in, but we
23 didn't, because we had a data system that wasn't accountable
24 enough, and we didn't even know, and so we didn't take steps to
25 rein them in, and we're going to use all those overages and
26 landings all those years to now justify why they should get more
27 of the stock, and, to me, you have to factor in accountability.
28
29 If you have an accountable system, a more accountable system,
30 because Mara hates when I say no accountable, not accountable,
31 and so we are more accountable on the commercial side, which
32 kept us within our quotas, which did not allow us to fish above
33 and beyond the quota given to us.  However, on the other side,
34 there was less accountability, which allowed fishing to occur
35 off the radar and landings to occur over and above the quota
36 that was given, and we will now reward that by using that as
37 your historical landings, even though we would have reined you
38 in, had we known about it, and you will now get to catch more of
39 the stock, going forward.
40
41 That is de facto allocation, and that lack of acknowledgement of
42 the accountability in one sector, the increased accountability
43 in one sector, versus the lesser accountability in another, and
44 using lesser accountability to reward and justify a reallocation
45 to that sector, to me, is not fair and equitable.
46
47 **CHAIRMAN GUYAS:**  Thanks, Leann.  Next, I have Patrick, and then
48 Mara.  I see your hand.  You're good?  Okay.  Andy, did you have

0003785

1  your hand up?  Okay.  Got you.  Then Troy.  Thank you.
2
3  **MS. LEVY:**  Thank you.  I mean, just a couple of comments with
4  respect to Alternative 2.  The first is that, although the
5  percentages would stay the same, it really is a reallocation,
6  and just I want to be clear about that.  When you look at what
7  the total ACL is in MRIP-FES equivalency, it's going down, but
8  this would increase the commercial sector's quota, or catch
9  limits, and so to say that it's not reallocating, just because
10 you kept the percentages the same, is not really an accurate
11 description.  If you're looking to keep the commercial sector at
12 status quo, that would be Alternative 6, right, because they
13 would be getting the same quota.
14
15 The other thing I just wanted to mention is the accountability
16 issue, and I appreciate Leann modifying the term, but I also
17 wanted to point out that, I mean, red grouper was not in an IFQ
18 system until 2010, right, and the landings data that's used for
19 the allocation, as it currently is, is from the 1980s until
20 2005, and, if you look at Table 2.1.3, I mean, there were even a
21 couple of years in there, 2004 and 2005, that the commercial
22 sector did exceed what its quota was at the time, and so, to
23 kind of use the same language that we do with red snapper, which
24 is under a much different management regime, for many, many more
25 years, I think is not entirely accurate either, and so I just
26 wanted to make those points with respect to this particular
27 alternative.  Thanks.
28
29 **CHAIRMAN GUYAS:**  Thanks, Mara.  Leann, is it to that point?
30 Okay.
31
32 **MS. BOSARGE:**  Yes.  Thanks, Mara, but, if you look at those
33 years where we did have overage, the accountability comes in in
34 the management measures that we took to rein them in after that.
35 If you go back and look, we took measures, and sometimes we took
36 measures -- Like, before the IFQ, we would change trip limits
37 and have step-downs and do this and do that, to make sure that
38 the next year we didn't let them exceed it again.
39
40 We never did that on the private angler side, because there was
41 such a lesser accountability in the data collection system that
42 we didn't even realize that they were exceeding those quotas all
43 the time, and so we did rein them in, and we did keep them from
44 continuing to fish harder, which would have been great for their
45 allocation right now, if we had let them do that.  We did allow
46 the other side, the private angler side, to do that, but we did
47 not on the commercial.  We took steps to rein them whenever we
48 saw that they were going to go over.

0003786

1
2  **CHAIRMAN GUYAS:**  Andy.
3
4  **MR. STRELCHECK:**  Mara made several of my points, and so I won't
5  reiterate those.   I do want to speak to the issue of
6  accountability, and I think it's really unfair to characterize
7  the way it has been, with regard to the recreational sector.
8  They're operating within the data collection system that we have
9  provided at this point, and, to me, that's not an accountability
10  issue as much as a need to improve the data collection system.
11
12  If we use that as the metric, we would never reallocate from the
13  commercial sector to the recreational sector, because the
14  standard would be set too high, until such time the recreational
15  sector has an equivalent data collection system.
16
17  Then, to Leann's point about not holding the recreational sector
18  accountable, I was going to state also, obviously, that there's
19  been overages on both sides.  I was involved in writing the 2005
20  interim rule that reduced the bag limit and closed the season
21  for red grouper, which was holding this sector accountable, and
22  then, in 2014, we had a post-season accountability measure, and
23  so I think that's also unfair to characterize it that there was
24  nothing done on the recreational side.
25
26  I think both sectors have actually done a very good job of
27  actually being constrained to the catch limits that we have
28  provided them over the years, for a variety of reasons, and so I
29  just wanted to note that.
30
31  **CHAIRMAN GUYAS:**  Thanks, Andy.  Troy.
32
33  **MR. WILLIAMSON:**  We've heard a lot of criticism this morning by
34  laypersons of the scientific methods used by the SSC to arrive
35  at the best scientific information available.  You know, we
36  spent a day, almost, choosing people to give us scientific
37  recommendations on the SSC, and our charge, as a council, is to
38  accept that recommendation, and they have made it clear that the
39  Preferred Alternative 3 is the best science available.  Quoting
40  public comment from interested parties I'm not sure is the best
41  science available, and I would speak against choosing
42  Alternative 2 as the preferred.
43
44  **CHAIRMAN GUYAS:**  Thanks, Troy.  Patrick and then Susan.
45
46  **MR. BANKS:**  Troy makes an excellent point.  We need to follow
47  the guidance of the science, but that's also an interesting
48  argument for this council to make, considering that we didn't do

0003787

```
1    that at the last meeting for another species, and so I love the
2    argument.  The argument is exactly right, but, to the public, I
3    think we look a little bit odd by making these arguments to
4    follow the science today, when we didn't at the last meeting,
5    and that's just my point.
6
7    CHAIRMAN GUYAS:  Susan.
8
9    MS. BOGGS:  Thank you, Madam Chair.  I kind of want to go back
10   to John's comments.  I mean, this is almost a business
11   transaction, and I understand the council is asked to look at
12   the best scientific information available, but sometimes
13   commonsense has to play into this, and this is a business
14   transaction, and we're affecting both the commercial and both
15   the recreational sides.
16
17   To Kevin's comments about the recreational fishermen, yes, their
18   boats are getting bigger and faster with more engines, but, just
19   like that, they're not necessarily targeting red grouper, and
20   you would have to look at the economics of that and the red
21   snapper and all the other species that they're going out to
22   catch.  These are a lot of good arguments, but I think we need
23   to look at the science, and I think we need to put a little
24   commonsense into our decisions today.  Thank you.
25
26   CHAIRMAN GUYAS:  Tom and then Leann.
27
28   DR. FRAZER:  I just want to clarify the role of the SSC.  They
29   certainly do provide catch advice with regard to overfishing
30   limit and ABC, and those are the two primary ones, right, but
31   they do not play a role in saying which of those alternatives is
32   supported by any particular science, and that's the role of the
33   council, and so I want to make sure that people understand that.
34   They didn't pick preferreds.
35
36   CHAIRMAN GUYAS:  Leann.
37
38   MS. BOSARGE:  So the National Standard 1, which is the one that
39   I was focusing on when I talked about the purpose and need and
40   the need to prevent overfishing, while also striving to achieve
41   OY, and so I would say, when you look at this document, and you
42   look at the alternatives that allocate more to the recreational
43   sector, which has a greater uncertainty in their landings, as
44   well as greater bycatch, you do in fact appreciably increase the
45   risk of overfishing.
46
47   I don't see how you can get around that, and so, for that
48   reason, I certainly wouldn't support any of the alternatives
```

54

1   that transfer allocation to that sector, to the recreational
2   sector, since National Standard 1 does clearly state that we
3   must strive to prevent overfishing while achieving -- On the
4   achieving OY aspect, yes, you can take into -- OY takes into
5   account economic and social factors and things of that nature,
6   but it's hard for me to get around the fact that a yield, right,
7   the yield that we're going to be putting in consumers' hands,
8   under all of these alternatives, other than Alternative 2, is
9   decreasing, and it's decreasing because, as you shift more to
10  the recreational sector, because of their selectivity and their
11  bycatch, you actually decrease the overall number of pounds that
12  can be landed and provided to the consumer.
13
14  Many of those fish are going to float off dead, and you have to
15  account for that, and so, in that effort, if staff -- I just
16  wanted to show -- We talk a lot about the bycatch, and I just
17  want to show you the numbers.
18
19  Staff, I sent you an email, and it has the red grouper.  It
20  shows commercial and recreational, and I think it's important to
21  actually look at the numbers, because this was presented to us
22  by the agency -- Oh, heck, let's see.  A year-and-a-half ago, I
23  guess.  Do you see the email with the attachment?  Go to page
24  21.
25
26  Red grouper, commercial, Gulf-wide, and just take the last year,
27  for example, on that chart, and it's 2017, and so 287,704 fish,
28  because this is in fish, numbers of fish, for the commercial,
29  and that's both longline and handline, and then, in the
30  recreational, and most of the recreational fishery is in the
31  east, and that's why it says recreational east, it's 2.5 million
32  fish, and so there is orders of magnitude difference here, and
33  this is not little differences.
34
35  Now, you have to take into account how many of these are going
36  to die, and I will grant you that the commercial fishery has a
37  higher discard mortality rate, right, than the recreational
38  fishery, but, because the recreational fishery has orders of
39  magnitude greater bycatch than the commercial fishery, it's
40  still -- Once you've applied the discard mortality rate to it,
41  the recreational sector still has about three-times the dead
42  discards that the commercial sector does.
43
44  That is part of the reason that, as you reallocate to them,
45  everyone has to land fewer fish, because you have more dead
46  discards, and so I don't see how we're achieving that OY and
47  achieving the national standards by choosing any of these
48  allocations, other than Alternative 2 that John has suggested.

0003789

1
2   **CHAIRMAN GUYAS:**  Thanks, Leann.  Patrick.
3
4   **MR. BANKS:**  Unfortunately, I can't seem to find it now, and Tom
5   is right that they didn't give us -- The SSC didn't give us a
6   recommendation on alternatives, but they did make a statement,
7   and I can't find it now, that said certain alternatives followed
8   the best science available.
9
10  **CHAIRMAN GUYAS:**  That was like -- It was basically Alternatives
11  2 through 5, and is that right?
12
13  **MR. BANKS:**  Yes, and so Tom is right, but they did make the
14  statement that certain alternatives follow the best science.
15
16  **CHAIRMAN GUYAS:**  But they were clear not to select or do this or
17  do that.
18
19  **MR. BANKS:**  Right.
20
21  **CHAIRMAN GUYAS:**  I think they were just saying they were valid,
22  more or less, right?
23
24  **DR. FRAZER:**  Kai, do you want to address that, real quick?
25
26  **DR. LORENZEN:**  Yes, that's correct.  I mean, basically, any
27  alternative that correctly uses the latest assessment and the
28  yield streams based on that and the MRIP-FES would be in
29  compliance with BSIA, and so, basically, 2 to 5, and I don't
30  think we've looked at 6, but I presume that, as long as that's
31  done correctly, the same would apply to that, and so the only
32  one that would not be in compliance with BSIA would be 1,
33  because it's not feasible with the current assessment.  Other
34  than that, we have no preference.
35
36  **DR. FRAZER:**  Thank you, Kai.
37
38  **CHAIRMAN GUYAS:**  All right.  Andy.
39
40  **MR. STRELCHECK:**  I just wanted to expand upon the comments by
41  Tom and Patrick and what Kai just mentioned, in terms of kind of
42  following the science here, and we certainly have scientific
43  data that indicates the economic benefits for the preferred
44  alternative would be why we would choose the preferred
45  alternative, but it's certainly within the council's purview,
46  based on our National Standard 1 Guidelines, to look at optimum
47  yield and make sure it's ensuring conservation and management
48  and preventing overfishing and taking into account social and

56

 1   economic factors, and so I think we have that flexibility within
 2   the range of alternatives, Alternatives 2 through 6, to be able
 3   to determine that, as long as a sufficient record is built.
 4
 5   I also wanted to comment about the prevention of overfishing and
 6   the increased likelihood of overfishing.  What I would say to
 7   that is we do have a system of annual catch limits, catch
 8   targets, and accountability measures that we've implemented for
 9   both sectors in this fishery, and, based on those, those are
10   intended to constrain harvest to those catch limits, or catch
11   targets, and so, to the extent that catch targets, or catch
12   limits, are exceeded, however they are defined by us, we then
13   trigger accountability measures to ensure that we're mitigating
14   for those impacts and preventing overfishing going forward, and
15   so I think it's a tenuous argument to say that, just by shifting
16   allocation from one sector to another, we're increasing the risk
17   of overfishing, because of the catch limit system we have in
18   place for managing the fishery and the track record.
19
20   Looking at the track record of the recreational sector for the
21   last six years, they haven't exceeded their catch limits, and
22   those have been in place, and so I just wanted to acknowledge
23   that.
24
25   **CHAIRMAN GUYAS:**  Thanks, Andy.  Is it to that point?  Okay.  Go
26   ahead, Leann.  Mara, then I see you, and I'll get you next.
27
28   **MS. BOSARGE:**  Yes, but it goes straight to the uncertainty in
29   their data, and do we really know what they're catching or do we
30   not, and I would say that FES proved to us that we -- If you
31   believe FES, that we didn't know what they were catching all
32   those years, right, and so to say that our ACTs and ACLs
33   constrain them, no, it's all about the system that we have in
34   place to correct their data and how much faith do we have in
35   that.
36
37   If you look at CHTS and the uncertainty around the MRIP-CHTS,
38   the old MRIP, versus the new MRIP-FES, it actually has greater
39   uncertainty than the old MRIP did, and so we may have made
40   improvements to the system, but the PSEs went up, and so, the
41   more and more that you allocate to that sector that has the much
42   larger uncertainty surrounding their data, I would have to say
43   that your likelihood of overfishing would increase.  You are
44   increasing the likelihood that you could overfish, versus having
45   that allocation sitting in a sector where you have a mandatory
46   reporting system, and, even before IFQ, we still had a mandatory
47   reporting system.
48

0003791

1  We've had trip tickets for a long time, long before the IFQ.
2  Now, they came online state-by-state, and I will grant you that,
3  but we have had mandatory reporting for a long time in the
4  commercial sector.
5
6  **CHAIRMAN GUYAS:**  Mara.
7
8  **MS. LEVY:**  Thank you.  I guess I just had a question about the
9  discards, and I understand everything that's been said about
10 them, and maybe I should know this, and I just haven't read
11 enough, but do we know, or have any information, about how
12 discards relate to the catch levels that are set, meaning do we
13 know that, if we increase the recreational catch level, that
14 somehow that's going to increase recreational discards, or the
15 opposite?  I guess I'm just curious about that.  Thanks.
16
17 **CHAIRMAN GUYAS:**  I don't know who would like to take that one.
18 Clay.
19
20 **DR. PORCH:**  The way the assessment is set up, yes, increasing
21 catch levels would increase discards, but it's hard to determine
22 what exactly would happen in reality, and that's always been one
23 of the tricky things in stock assessment, is, when you have a
24 shorter season, open season, do you end up having more discards
25 because of a longer closed season, and it's very difficult to
26 quantify.
27
28 **CHAIRMAN GUYAS:**  I think that was Andy's point earlier with his
29 question, right, and think about Atlantic red snapper, where
30 there is a three-day season recreationally, and the discards are
31 just off the charts, because it's only open for three days.  Any
32 other hands?  Can we get that motion back on the board, please?
33 Patrick.
34
35 **MR. BANKS:**  I will just ask one more question, and I apologize
36 for belaboring the point, and maybe Dr. Lorenzen will have to
37 answer this for me, but I'm pretty sure that you guys have
38 determined that FES, calibrated FES, data is the best science
39 available, correct?  Could you confirm that for us, please?
40
41 **DR. LORENZEN:**  Yes, that's correct.
42
43 **CHAIRMAN GUYAS:**  Thanks, Kai.  Dale.
44
45 **MR. DALE DIAZ:**  I just wanted to comment, and, I mean,
46 sometimes, being on the council, we have to make decisions when
47 all the options before us are not great, and this is kind of one
48 of those times, and so I've been -- I try to think through these

0003792

1  things and make a good, fair decision, and this is a tough one.
2
3  The pie is shrinking, and that's something that people need to
4  take into consideration.  No matter where you're at, it's
5  shrinking, and I believe that every option has some type of a
6  decrease for most everyone, and I guess some of the good things,
7  I guess, to look at in the future, which I don't have a crystal
8  ball to know what the future holds, but we are going to get a
9  new interim assessment on this, and the picture could change,
10 and I can't tell you that it's going to change for the better,
11 but, from what we're hearing on the water, there's a chance it
12 might.  Anyway, that's all I wanted to say.  Thank you, Madam
13 Chair.
14
15 **CHAIRMAN GUYAS:**  Thanks, Dale.  I think a lot of us share that
16 sentiment, in general, and so one more?  Go for it, Patrick.
17
18 **MR. BANKS:**  I'm sorry.  I definitely share that sentiment, Dale.
19 None of this is good, and maybe Dr. Freeman can help me
20 understand, and so it seems like we have -- What we're seeing in
21 the data, in terms of landings, on the commercial side doesn't
22 seem to be matching up with what we're hearing from the
23 commercial guys.
24
25 They're worried about losing quota, and they're worried about
26 losing their business, and that concerns me, but then, when we
27 look at landings, we're not landing the full quota as it is
28 right now, and so what's the disconnect there?  Can somebody
29 help me?  Martha, maybe you know what the disconnect is.
30
31 **CHAIRMAN GUYAS:**  Give it a shot.
32
33 **DR. FREEMAN:**  All right.  I was hoping that I was out of the hot
34 seat after my economic lecture.  Based off of what was conveyed
35 at public hearings, time and time again, and this is something
36 that both SERO and the Science Center is looking into, and this
37 may be some of the disconnect that you were asking about, is
38 that it does appear to be an issue with some folks holding
39 quota, and the amount of allocation transfer may be contributing
40 to some of that, in terms of the quota being landed, and that's
41 sort of speculative on my part.
42
43 Like I said, this is just coming from what I heard at the public
44 hearings for this, and, like I said, it's potential -- I know
45 there's going to be part of the five-year IFQ review during the
46 Reef Fish Committee, and it's possible that there might be
47 something there that could shed some light as well, and so, like
48 I said, I'm just hazarding a guess at this point.

0003793

1
2  **CHAIRMAN GUYAS:**   I don't know that I can fully answer your
3  question, but, I mean, I can -- It's pretty apparent, if you
4  look at the tables in the document and the graphs, I mean, the
5  way that commercial has run in this fishery, since before the
6  IFQ program, they generally don't meet their quota, and, if you
7  look at it long-term, it's like 70 percent of their quota.
8  Recreational has exceeded it I think in 2013 and 2014, and that
9  was the last time in the very recent past, and it might be the
10 only time, and I guess 2004 and 2005, but, typically, they are
11 bumping up against their quota a little bit more frequently than
12 commercial.
13
14 Why commercial isn't catching that quota, and hasn't, I don't
15 know, but, I mean, this is a long-term trend.  Now, we've been
16 hearing, in the recent time, that there's been some maybe shift
17 in who owns, or who is leasing, or whatever, and that is maybe
18 tying up the quota, and now we've gotten to the point where we
19 have made cuts in this fishery, and we potentially are looking
20 at  making  more,  where  we're  getting  to  a  point  where
21 recreational and commercial are going to be bumping up, if not
22 meeting, quotas, and so, if you looked at --
23
24 I just did some back-of-the-napkin numbers for recreational for
25 2020, and, if we applied some options that we would forward in
26 this document, we're over the ACT, and over the ACL in some
27 cases, or we're going to be there, and so I suspect, for this
28 year, we'll be -- We could have an early closure, if this gets
29 implemented on that side, and I think commercial was seventy-
30 something last year, and, this year, they're on track to maybe
31 meet their quota, but, you know, it all depends, because it's
32 IFQ, and so they get to choose when is the time that they want
33 to catch the fish and make their landings based on what the
34 market price is and when their customers are wanting to buy
35 fish, and so it's complex, and I don't have all the answers, but
36 maybe we'll get some light on that in public testimony.  Leann.
37
38 **MS. BOSARGE:**   To that point about the closure, I think that the
39 --  The  rationale,  a  lot  of  the  rationale,  that  has  been
40 discussed for choosing Alternative 3, 4, or 5 has been looking
41 at that table that talks about the recreational sector possibly
42 having a closure, and I guess it's a little frustrating that we
43 see  allocation  as  the  way  to  solve  an  issue  with  a  season
44 length, and that's not the track that we have taken with other
45 species.
46
47 We've had a lot of discussion lately on amberjack, right, and we
48 were  talking  about,  well,  should  we  have  vessel  limits,  or

60

1  should we go to half a fish per person, all sorts of different -
2  - Should we have a season in the east and a season in the west,
3  and should we have, you know, different -- Divide up the Gulf,
4  and it was all within the recreational sector.
5
6  I don't remember seeing anything in that document that said, uh-
7  oh, the rec season is too short and go take some commercial
8  quota and give it to them, and so I am frustrated that that's
9  been most of the rationale for this whole allocation discussion,
10 and, if we choose this, then the rec sector might have a
11 closure.
12
13 There are ways to address a closure, and it's an incremental
14 approach, where you look at lots of different facets, like bag
15 limits and size limits and spawning season closures, all sorts
16 of things, but, yet, in this document, we have looked at a table
17 that says, if we don't give them more allocation, they may have
18 a closure, and, to me, that's a very limited analysis and the
19 wrong way to go about looking at rationale for an allocation
20 decision.
21
22 **CHAIRMAN GUYAS:**  That's not the point I was trying to make.  My
23 point was more that we're getting to the point where both
24 sectors are going to be hitting their quotas here, with whatever
25 we do with this document.  Recreational is going to have a
26 closure.  I think, wherever we fall on this, they're going to
27 have a closure, and so I'm not trying to pass judgment on that
28 right now, but I'm just -- This is the way it's going to be.
29 This is the way it is.  Right?  Anyway, are there any other
30 questions or comments on this motion?  Okay.  Let's go ahead and
31 take a vote then, and clearly we're going to need to do hands.
32
33 **The motion on the board is to make Alternative 2 the preferred**
34 **alternative in Action 1.  All in favor of this motion, please**
35 **raise your hand.**
36
37 **DR. GREG STUNZ:**  Martha, this is Greg, real quick.  We raise our
38 hand, and I'm trying to figure out how we do that, because you
39 want us to raise -- I don't know.  You tell me how you want us
40 to vote, for those of us that are remotely tuning in.
41
42 **CHAIRMAN GUYAS:**  Hang on, Greg.  I think you have a hand raise,
43 but I'm going to let Bernie --
44
45 **DR. STUNZ:**  Well, we do have a hand raise, but it's just at what
46 point do you raise it?  Is it when you say in favor, or I guess
47 wait until -- I'm not in favor of this motion, and so that's why
48 I'm asking.  I don't want to raise it prematurely.

0003795

```
1
2   CHAIRMAN GUYAS:  All right.  Well, we'll do a roll call vote.
3   There you go, Greg.  Give it a minute.
4
5   DR. STUNZ:  Okay.  Thanks.  Sorry to be trouble here, but it's a
6   little confusing.
7
8   CHAIRMAN GUYAS:  I will read it one more time.  Our motion,
9   again, is, in Action 1, to make Alternative 2 the preferred.
10
11  EXECUTIVE DIRECTOR SIMMONS:  Thank you, Madam Chair.  Mr.
12  Sanchez.
13
14  MR. SANCHEZ:  Yes.
15
16  EXECUTIVE DIRECTOR SIMMONS:  Mr. Anson.
17
18  MR. ANSON:  No.
19
20  EXECUTIVE DIRECTOR SIMMONS:  Ms. Boggs.
21
22  MS. BOGGS:  Yes.
23
24  EXECUTIVE DIRECTOR SIMMONS:  Mr. Banks.
25
26  MR. BANKS:  No.
27
28  EXECUTIVE DIRECTOR SIMMONS:  General Spraggins.
29
30  GENERAL JOE SPRAGGINS:  No.
31
32  EXECUTIVE DIRECTOR SIMMONS:  Mr. Swindell.
33
34  MR. ED SWINDELL:  Yes.
35
36  EXECUTIVE DIRECTOR SIMMONS:  Mr. Strelcheck.
37
38  MR. STRELCHECK:  No.
39
40  EXECUTIVE DIRECTOR SIMMONS:  Dr. Stunz.
41
42  DR. STUNZ:  No.
43
44  EXECUTIVE DIRECTOR SIMMONS:  Mr. Diaz.
45
46  MR. DIAZ:  No.
47
48  EXECUTIVE DIRECTOR SIMMONS:  Mr. Williamson.
```

0003796

1
2   **MR. WILLIAMSON:**  No.
3
4   **EXECUTIVE DIRECTOR SIMMONS:**  Ms. Bosarge.
5
6   **MS. BOSARGE:**  Yes.
7
8   **EXECUTIVE DIRECTOR SIMMONS:**  Dr. Shipp.
9
10  **DR. BOB SHIPP:**  No.
11
12  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Riechers.  I will come back.
13  Mr. Dyskow.
14
15  **MR. PHIL DYSKOW:**  No.
16
17  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Dugas.
18
19  **MR. J.D. DUGAS:**  No.
20
21  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Riechers.
22
23  **CHAIRMAN GUYAS:**  I guess Robin has stepped away from his
24  computer.
25
26  **EXECUTIVE DIRECTOR SIMMONS:  The motion failed four to ten.**
27
28  **MR. SWINDELL:**  You have me down for a no, and I voted yes.
29
30  **CHAIRMAN GUYAS:**  Thanks for catching that.
31
32  **EXECUTIVE DIRECTOR SIMMONS:**  I have you down for a yes, and so
33  the motion failed four to ten with one absent and two
34  abstentions.
35
36  **MR. ANSON:**  Mine needs to be corrected.  It had a Y, and it
37  should be an N.
38
39  **EXECUTIVE DIRECTOR SIMMONS:**  Okay.  I have the roll call vote
40  here, and I have it correct.  John double-checked me, and I have
41  four to ten with two abstentions and one absent.  Madam Chair.
42
43  **CHAIRMAN GUYAS:**  We've got multiple people counting and
44  accounting, and so we do need to get it straight on the board,
45  and so thanks everybody for --
46
47  **MR. ANSON:**  I just wanted to make sure it was right.
48

0003797

1   **CHAIRMAN GUYAS:**  Okay.  All right.  **So that motion fails.**  Okay.
2   I am just doing a quick scan here.  I'm going to suggest -- It's
3   11:44, and we're going to break in about ten minutes, and so
4   let's go ahead and look at that codified text, and we've got to
5   get that out of the way, right, and who was going to present
6   that for us?  Peter.  You have been nominated to present the
7   codified text.
8
9                            **CODIFIED TEXT**
10
11  **MR. HOOD:**  I mean, you can take a look at it.  It basically is -
12  - Can you put it up on the screen?
13
14  **CHAIRMAN GUYAS:**  I think that's Tab B, Number 5(e), for folks
15  trying to navigate to that.  Okay.  We've got it up on the board
16  now.  Go ahead, Peter.
17
18  **MR. HOOD:**  It basically is putting in place what is in the
19  document for our red grouper commercial quota.  Then, if you
20  scroll down to the annual catch limits, these would be based off
21  of Preferred Alternative 3.  Is that it, or is there more in
22  there?  I guess that's it, and so that's it.
23
24  **CHAIRMAN GUYAS:**  Okay.  It's pretty straightforward, but does
25  anybody have any questions or comments on this?  Okay.  Thanks,
26  Peter.  All right.  We're a little bit behind, but I think we've
27  had some pretty good discussion, and we needed to talk about
28  this and get a lot of this out on the table, and so I'm
29  guessing, since we've got ten minutes, you don't want to start
30  amberjack, right?
31
32  Do you just want to break for lunch now, or I guess I should ask
33  if anybody wants to make a motion to recommend that the council
34  take this final at this meeting, because we're potentially at --
35  This is on the agenda for final action, and so we can do that
36  now, or we can discuss that at Full Council.
37
38  **DR. FRAZER:**  I think we're just going to go ahead and break for
39  lunch, and we'll be back at 1:30.
40
41  **CHAIRMAN GUYAS:**  Okay.
42
43  (Whereupon, the meeting recessed for lunch on June 23, 2021.)
44
45                            - - -
46
47                        June 23, 2021
48

0003798

```
1                    WEDNESDAY AFTERNOON SESSION
2
3                              -  -  -
4
5    The Reef Fish Management Committee of the Gulf of Mexico Fishery
6    Management Council reconvened on Wednesday afternoon, June 23,
7    2021, and was called to order by Chairman Martha Guyas.
8
9    CHAIRMAN GUYAS:  I will turn it over to Dr. Froeschke to get us
10   started on amberjack.
11
12      PRESENTATION ON GREATER AMBERJACK HISTORICAL LANDINGS AND
13     POTENTIAL MANAGEMENT ACTIONS AND TABLE OF GREATER AMBERJACK
14                             LANDINGS
15
16   DR. JOHN FROESCHKE:    SEDAR 70 was the stock assessment for
17   amberjack, and it was completed earlier this year, and it was
18   reviewed by the SSC and accepted as BSIA.   Similar to red
19   grouper and other stocks, it's going to be the first assessment
20   for amberjack that is in FES, and so we're going to be switching
21   from the CHTS to the FES currency.
22
23   Also, similar to red grouper, the amberjack has a sector
24   allocation, and so that may or may not be updated based on this
25   information, and so I'm going to give you a presentation and
26   summarize a little bit of the recent management history, kind of
27   where we're at with the stock, discuss some potential ideas that
28   you're interested in, may be interested in, exploring,
29   alternatives for landings-based allocation scenarios and things,
30   and the idea is that we could get this and get updated
31   projections and things for you to review at a subsequent council
32   meeting.   If there are no questions, I will go through the
33   presentation and hopefully address any questions.
34
35   This is just a table of half-a-dozen amberjack stock assessments
36   since 2000, and the most recent, SEDAR 70, was completed last
37   year, and, unfortunately, each of these stock assessments --
38   SEDAR 70 continues as overfished and overfishing, which is
39   consistent with the result of the previous stock assessment, and
40   so, unfortunately, we have not been as successful in rebuilding
41   this stock as we would like to.
42
43   This slide just summarizes the findings of the SEDAR 70.  Again,
44   this is the most recent stock assessment reviewed by the SSC.
45   Based on the modification of the minimum stock size threshold,
46   the MSST, which sets the threshold for the overfished status at
47   50 percent of the biomass at MSY, at 0.5, and so it's below
48   that, and so that, essentially, indicates that the stock is
```

0003799

1  overfished, and then, based on the maximum fishing mortality
2  threshold, the stock is undergoing overfishing, and so these
3  results -- The council will need to take action to end
4  overfishing and rebuild the stock.
5
6  As I mentioned earlier, the stock has essentially been in a
7  constant overfished state since 1988, and the SSC did provide
8  some projections, based on a 2027 rebuilding date, which was
9  part of the assessment.
10
11  The current catch levels are summarized in this table, and this
12  was recently set in a 2017 framework action, and so I'm sure
13  you're all familiar, and we've been quite active in various
14  frameworks and doing seasons and trip limits and bag limits and
15  various measures, and then these are the catch limits, and so
16  they have been increasing in recent years.   In 2020 and
17  currently, it's 1.794 million pounds, and it's split 73/27
18  between the recreational and the commercial sectors.
19
20  This is, like I mentioned, a stock with sector allocations, and
21  so 73 percent recreational and 27 percent commercial, and this
22  was established in Amendment 30A, and the methodology was
23  informed, I will say, by the 1981 to 2004 historical landings,
24  although that calculation, at the time, resulted in a 71/29 and
25  then was subsequently modified to 73/27.
26
27  To inform the landings-based scenario, we have the available
28  data in FES for recreational, and then the commercial landings
29  information is in your briefing material, if you want to look at
30  that, and the data extend from 1981 to 2019, with just a few
31  caveats.   The commercial jacks data were not separated by
32  amberjack, by species, prior to 1992, and then amberjack was not
33  officially part of the FMU, and it was added through Amendment
34  1.
35
36  Reef Fish Amendment 54 will be the vehicle to integrate the
37  SEDAR 70 results into management, and, again, to end overfishing
38  and rebuild the stock.   As typical with these assessments that
39  convert from CHTS to FES, we'll be changing currencies and
40  perhaps modifying the allocations, and there will be a change
41  required for the catch levels.
42
43  The presentation, and what I kind of wanted you to get some
44  guidance on, is, similar to red grouper, the OFL and ABC is
45  contingent upon the allocations used in the projections of the
46  assessment, and so, if the council would like to modify or look
47  at different alternatives, or percentages, either percentages or
48  years used as a baseline to calculate the percentages, I would

66

0003800

1  like to get some feedback on that.
2
3  Ava and I worked to just sketch out some potential years that
4  may be useful, and they are not hard-coded in any way, but it's
5  just to kind of get the conversation going, and I'll just give
6  you a little bit of background of why we put these in here, and
7  I would like to get your feedback, if there's things that you're
8  not interested in, if there are other things that you are
9  interested in.
10
11 The point being that, once we can kind of get that information,
12 we can make a formal request to the Science Center to run new
13 projections based on the allocation scenarios you're interested
14 in, and we would then take those back to the SSC and get OFLs
15 and ABCs contingent upon each of those, and then bring that back
16 to you as draft options in a document.  That's the general
17 process, and that's why we're here.
18
19 Alternative 1 essentially would retain the current allocations,
20 again informed by the historical landings data that were set in
21 MRFSS and CHTS, and Alternative 2 would use the same time
22 series, but it would use the FES information.  Alternative 3
23 would use the longest time series available, essentially 1981
24 through 2019, and we did talk about 1981 through 2018 as a
25 possibility, and that was sort of the time period covered by the
26 stock assessment, and 2019 is not in there.
27
28 Then Alternative 4 -- 1992, again, is the period in which, in
29 the commercial data, the jacks were landed by species and coded
30 in that way, and so there is perhaps more certainty in the
31 amberjack-specific landings in there.  Prior to this, in the
32 stock assessments, this was treated and separated into greater
33 amberjacks and the others based on a formulaic process.  That is
34 certainly -- We have that formula and that process and those
35 data, but that just an alternative.  Then Alternative 5 would
36 essentially convert the CHTS to FES but not change the
37 allocation, and so those are the range of those.
38
39 If you go to the next slide, similar to red grouper and others,
40 the historical shift from CHTS to FES increased our estimates of
41 recreational landing back in time and currently, and so, if you
42 compute allocations based on historical landings, it would
43 increase the relative percentages to the recreational sector.
44
45 Again, Alternative 1 maintains the 73/27, and then as would
46 Alternative 5.  Alternatives 2, 3, and 4 would modify this based
47 on a time series, and you can see those are generally between 84
48 percent and 81 percent, depending on the time series that you

0003801

1  select, all increasing allocation to the recreational sector.
2
3  In terms of catch levels that we're going to see, it's going to
4  be a reduction across-the-board, given the overfished and
5  overfishing condition.  If you look at the left column, the
6  values that you will see there are the current values, noting
7  that the values in the SSC recommendation reflect the FES
8  recreational data currencies, and so we would expect, at least
9  on the recreational side, those landings to accumulate faster,
10  and so you would need essentially more pounds to get the same
11  length of season as like that.
12
13  Then a second action, again similar to red grouper, would be an
14  action to modify the ACT.  We currently have a 13 percent buffer
15  for the commercial and a 17 percent for the recreational ACT,
16  based on the control rule, and the Alternative 2 would be to
17  update this procedure.  The control rule uses recent landings
18  and the PSE associated with that for the various sectors to
19  calculate a buffer from the -- I have not done this for the
20  commercial side.
21
22  On the recreational side, in general, the FES, the PSEs are
23  increasing relative to the CHTS, and so it's likely that that
24  recreational buffer would go up, relative to the 17 percent, but
25  we could update that.  If there's a different process, or
26  procedure, you would like us to consider, we're happy to do
27  that, but, in general, that's keeping in form with what we
28  typically do.
29
30  I kind of just want to go through the next steps here.  Again,
31  the OFL and the ABC recommendations that we need to get from the
32  SSC are conditional upon the sector allocations, but we do have
33  recommendations, based on the 73/27, but any other ones will
34  need to go back to that, and so staff are seeking some guidance
35  on things that you might be interested in doing, and then we can
36  write a letter to request the updated projections.  We would
37  take those back to the SSC and get new OFL and ABC
38  recommendations and then bring it back to you in draft options.
39  I think that's the last slide.
40
41  We do have -- Bernie, would you go back to that slide, and I
42  don't know which one it is, that has the percentages based on
43  the time series?  That one.  If you just leave it there, and we
44  do have the actual landings available in Tab B, Number 6(b), I
45  believe, if you want to look at those, and I will just open the
46  floor for discussion.
47
48  **CHAIRMAN GUYAS:**  All right.  Thanks, Dr. Froeschke.  Are there

0003802

1  any questions about this, first?  Then I think staff is looking
2  for a little bit of direction here, in terms of what we would
3  like to consider for potential alternatives.  Susan.
4
5  **MS. BOGGS:**  I don't have a question, and I don't know if this is
6  the appropriate time to ask this, but I believe it was in
7  January, and it was postponed, but we were looking at a white
8  paper for sector separation for the other four species of red
9  grouper, gag grouper, amberjack, and triggerfish.  I mean, we
10 just had a discussion about red grouper, and now we're talking
11 about amberjack, and we looked at triggerfish earlier, and it
12 seems like this might be a good time for the council to maybe
13 start looking at that as an option for managing these other
14 species.  Thank you.
15
16 **CHAIRMAN GUYAS:**  We're just kind of chatting about where that
17 is, and so it was on the agenda, and we ran out of time in the
18 meeting, and so I don't know, but we did we have a plan for
19 bringing that back?
20
21 **DR. FRAZER:**  Whenever people want to put it back on the agenda,
22 we can do that.
23
24 **CHAIRMAN GUYAS:**  Susan.
25
26 **MS. BOGGS:**  So do I request that?  Do I make a motion for that?
27 I think we need to look at that sooner than later, being that
28 we're having all these discussions, and, with the new FES
29 numbers, I mean, I think it would be helpful in some of our
30 decisions that we go forward making.  Thank you.
31
32 **CHAIRMAN GUYAS:**  Dr. Simmons, do you want to weigh-in here?
33
34 **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Chair and Madam
35 Chair.  I would suggest that we kind of dispense with this
36 first, and then we could come back to that.  I mean, keep in
37 mind that we did receive a letter from the Regional Office
38 regarding the SEDAR 70 stock assessment for greater amberjack,
39 and we do have to end overfishing and rebuild the stock, and so
40 I understand that sector separation is something that you guys
41 wanted to look at for amberjack, but I do think we need to focus
42 here kind of a little bit on the issue at-hand, and get a good
43 idea on what we're asking the Science Center to do, and then the
44 SSC, so that, when we bring these draft options back to you,
45 we're pretty prepared to move forward with the document, and we
46 don't have to keep going back to the SSC and the Science Center,
47 would be my goal, and my suggestion would be to wait until this
48 item is completed, please.

0003803

1
2   **CHAIRMAN GUYAS:**   Thanks, Dr. Simmons.  I've got Susan, to that.
3
4   **MS. BOGGS:**   Well, to that point, I was just thinking that maybe
5   it would save some steps if we kind of looked at all of this in
6   conjunction, because it seems like we keep doing one thing and
7   coming back and doing another, but I will take your advice, but
8   I would like for the council to please keep that on the radar
9   and not lose track of it.  Thank you.
10
11  **CHAIRMAN GUYAS:**   Thanks, Susan.  J.D.
12
13  **MR. DUGAS:**   Thank you.  I would like to add an action for state
14  management.
15
16  **DR. FRAZER:**   So, J.D., I just want to clarify.  So this probably
17  falls outside of the scope of the current document, and so I'm
18  not sure, in the timeframe that we're working with, whether we
19  could accommodate that, and I'm not suggesting that we don't,
20  but I am just trying to make sure that -- I'm going to actually
21  look at staff, to see, one, if it's appropriate to even do that,
22  or would that require a separate document.
23
24  **DR. FROESCHKE:**   I think it could.  I think, as Carrie mentioned,
25  our obligation to end overfishing within a year and all that I
26  think would likely be challenging to roll that all into state
27  management.   I mean, regardless of whether we were to do
28  separate sector separation or state management, or any of those
29  things, we still have to update the catch levels, and so, for
30  all those processes, this needs to proceed that anyway.
31
32  **CHAIRMAN GUYAS:**   Okay.  Leann.
33
34  **MS. BOSARGE:**   J.D. is always hard to follow.  When he speaks,
35  it's usually earth-shattering.  I think -- I mean, I think both
36  of them made valid comments, and I don't think either one of
37  them was wanting -- Well, I don't want to speak for you, but it
38  didn't seem to me like you were wanting that to precede any
39  rebuilding plan or anything like that that we have to do to end
40  overfishing, and both of those, to me, seem like different
41  documents that we might be pursuing in tandem with this or
42  directly following this, and I don't know how our staff wants to
43  handle it, but we could always add an extra day to the next
44  meeting and stay Friday.
45
46  Anyway, but I did actually want to respond to staff about things
47  that they might want to see in this.  Although we haven't been
48  formally presented that analysis that the Science Center did for

0003804

1  king mackerel, I would like to see that same sort of analysis
2  done for amberjack, where they essentially went back to the last
3  two assessments and to rerun it, holding things constant, except
4  for FES, so that they could tell us what the ACLs, historically,
5  and ABCs would have looked like, had we had FES numbers, because
6  that really helps us understand where we would have been at,
7  bumping up against ACLs or not.  If they were able to do it for
8  king mackerel, I assume that they could probably do it for
9  amberjack, too.
10
11 **CHAIRMAN GUYAS:**  I can't see if Clay is down there and if he
12 wants to say anything about that.  Andy, go ahead.
13
14 **MR. STRELCHECK:**  Shannon Calay is filling in for Clay.  She's on
15 the line, and I think she's looking into whether the assessment
16 contains that information or not already.
17
18 **CHAIRMAN GUYAS:**  Okay.  Great.  Thank you, Shannon.  I guess,
19 when you have the answer, we'll have you weigh-in on that, but
20 we'll give her a minute to research.  Okay.  I agree that
21 probably would be helpful information. All right.  Dale.
22
23 **MR. DIAZ:**  If it's possible for the staff to let us know when
24 they report to us again, but I basically looked at the last one,
25 and I think we're almost in the same situation here, and the
26 percent reduction that each side was looking at, and that helped
27 me kind of work through it, and both of them were about the 18
28 or 19 percent range, and it's just another way to try to sort
29 through this data and figure out where this all is at with the
30 FES in the mix, and so thank you.
31
32 **CHAIRMAN GUYAS:**  Dr. Froeschke.
33
34 **DR. FROESCHKE:**  We could certainly work on that, but, just to
35 kind of frame your -- For frame of reference, if you look on
36 Slide 9, this is Slide 9, and I will just kind of orient you
37 here, but, if you look on the row of 2022, and, for example, the
38 ABC, the 1.794, the SSC recommendation based on the current
39 allocation is essentially a third cut, and then that doesn't
40 include the change from CHTS to FES, which is going to --
41 Essentially, those recreational landings are going accumulate
42 faster, and that quota will be met faster, and so you're
43 probably looking at at least a 50 percent cut.  We can just look
44 at it in that way to get us started, but we can work on that.
45
46 **CHAIRMAN GUYAS:**  Thanks.  Okay, and so more tough decisions
47 ahead on this one.  Andy.
48

0003805

1    **MR. STRELCHECK:**  I would like to make a comment, and then Mara I
2    know is trying to raise her hand as well and make a comment.  We
3    just looked at red grouper, and there was an alternative to hold
4    the commercial allocation the same, or the same amount, and then
5    allocate the remainder of the recreational, and I think that's a
6    reasonable alternative to consider here.
7
8    I did want to ask John -- I mean, you mentioned the problems
9    with commercial identification of jacks pre-1992, and we also
10   have catch limits that went into place around 2010, and we've
11   heard a lot of concerns about overages related to catch limits
12   and how they're considered, and so is using that later data
13   really a reasonable range, or, for that matter, even using the
14   earlier data a reasonable range, given the uncertainties in the
15   jack composition?
16
17   **DR. FROESCHKE:**   I don't know that I could say if it was
18   reasonable.  I mean, I think that's up to the council, but there
19   certainly are complications with those data, and I think both
20   sectors have paybacks in these later years, and there were a
21   number of overages and paybacks, and we've had a very
22   complicated management history, particularly in the last five
23   years, because we've had changes to the fishing year and the
24   seasons and the trip limits and those things, and so it gets
25   very dicey in trying to partition that information out, and so I
26   guess, if you're looking for a suggestion, I would tend to stay
27   away from those data, at least.
28
29   **CHAIRMAN GUYAS:**  Okay.  Before I go to Shannon and Mara, the one
30   concept that Andy brought up of adding an option that holds
31   commercial constant, is there any opposition to doing that,
32   adding that in here to look at?  To that, Susan?
33
34   **MS. BOGGS:**  Well, this may not be the place, but, I mean, what I
35   struggle with, with all of these things that we're looking at,
36   especially amberjack and cobia and king mackerel on the
37   recreational side, is we're not catching these fish.  I mean, I
38   just looked at the landings for last year, and recreational only
39   landed 48 percent, and so, I mean, the whole holding the other
40   sector constant -- I mean, I'm not saying I'm against it, but I
41   don't know how to fix the problem, but, obviously, the fish are
42   not there, and reallocating and doing things like that, when
43   we're trying to figure out what the fishery is doing, I just
44   don't understand why we're doing that.
45
46   I think we've got the new FES numbers that are coming out, that
47   a lot of us are not real comfortable with, and, I mean, we want
48   to make all these changes in reallocation, and I don't care one

0003806

1  way or the other, but I think it's just wrong to be looking at
2  that right now, until we get some comfort level there and
3  rebuild some of these stocks.  Thank you.
4
5  **CHAIRMAN GUYAS:**  Okay.  Leann.
6
7  **MS. BOSARGE:**  To your question, I think I actually made that
8  motion to have that in this document, and then, at that same
9  meeting, I made it to have it put in the red grouper document,
10 and so that was probably in January, and it may be April, but I
11 think maybe January, but I passed a motion to have that, where
12 you hold it constant on the commercial side, and it passed, for
13 amberjack and red grouper, and so maybe we can go back and look
14 at that.  I would have thought that it would have been in --
15 Maybe in this presentation already.
16
17 **CHAIRMAN GUYAS:**  Okay.  Well, we can certainly go look at that,
18 and there's no harm in looking at it more.  Okay.  Shannon.
19
20 **DR. SHANNON CALAY:**  In response to the question about the
21 effects of FES versus the CHTS units for greater amberjack, that
22 was an analysis that was conducted during SEDAR 70, and it is in
23 the SEDAR 70 stock assessment report.  It's actually tabulated
24 in Table 28 of that report, and, if the group prefers, I can
25 pass on some of that information, perhaps, to Carrie.
26
27 **CHAIRMAN GUYAS:**  Yes, that sounds great.  Thank you, Shannon.
28
29 **DR. CALAY:**  All right.  Thank you.
30
31 **MS. BOSARGE:**  She said the ABCs and ACLs are in that report?
32
33 **CHAIRMAN GUYAS:**  She said that they did that analysis as part of
34 SEDAR 70 that you're asking for.
35
36 **DR. CALAY:**  It's not done in exactly the same way that was done
37 for king mackerel.  It's essentially done to look at the
38 equilibrium yield that is produced, and the spawning stock
39 biomass reference points, and so, essentially, it shows you the
40 effect of the change in the unit.  If you would like to see an
41 analysis conducted like it was done with king mackerel, it is
42 possible, but it would require a request.
43
44 **CHAIRMAN GUYAS:**  So I think Leann would like to make that
45 request, right?  Go ahead.  Let's make it as a motion.
46
47 **MS. BOSARGE:**  Probably the easiest way to do this is just to ask
48 for -- **To request that the Science Center run an analysis for**

0003807

1  amberjack, which shows what the historical ABCs and ACLs would
2  have been with FES back in time.  Well, I guess for whatever
3  time period the stock assessment was for, and I'm going to leave
4  that up to Shannon, in case one stock assessment has a different
5  period in time that it went back to, versus another, but,
6  essentially, as far back as that stock assessment -- Whatever
7  period of years the stock assessment used.
8
9  I want to look at Carrie and make sure that that's clear enough,
10 and that would be very similar to the king mackerel analysis
11 that the Science Center did that staff forwarded to the council
12 on April 7.
13
14 **CHAIRMAN GUYAS:**  All right.  Is there a second to this motion?
15 It's seconded by Dale.  Thank you.  Any discussion?  **Is there**
16 **any opposition to this motion?  People on the webinar, just**
17 **shout it out, if you do opposed this.  Hearing none, the motion**
18 **carries.**  Mara.
19
20 **MS. LEVY:**  Thank you.  I think one of my comments is way past
21 the discussion, but it's just that adding anything regarding
22 sector separation would significantly -- It really wouldn't be
23 possible.  I mean, if you think about how much time those
24 documents took to go through the system, I wouldn't expect it to
25 take any less time with this particular stock.
26
27 Then just a response to what Susan said about why you're looking
28 at allocation in red grouper and in this document, and then I
29 think we've talked about it before, that the allocation affects
30 the outcomes of the assessment, and, because we're changing to
31 FES, even if you don't change the percentages, you are still
32 reallocating, and so they're tied together, and you certainly
33 are going to have an option in there to keep the same
34 percentage, and various other options, but you need to at least
35 acknowledge that and examine it and then have some sort of
36 reasonable rationale with whatever decision you make with
37 respect to allocation.  Thanks.
38
39 **CHAIRMAN GUYAS:**  Dale.
40
41 **MR. DIAZ:**  Mara just responded to exactly what I was hoping,
42 that she would answer Susan's question, and so this is like red
43 grouper, and we couldn't really move forward on the interim
44 analysis until we did allocation, and we're probably in the same
45 situation here, and so thank you.
46
47 **CHAIRMAN GUYAS:**  All right.  Thanks, Dale.  Okay.  Andy.
48

0003808

1 **MR. STRELCHECK:**  I believe, John, you said that these were kind
2 of just initial thoughts on allocation scenarios, and I guess
3 what I would want to recommend is the IPT come back to us with
4 some recommendations on time series, and we've had a lot of
5 management changes with greater amberjack in that 2008 kind of
6 forward timeframe, and so we really need to take into
7 consideration how those may influence allocation decisions and
8 whether or not time series beyond those that have been presented
9 would be reasonable to consider.
10
11 **CHAIRMAN GUYAS:**  I think that's a really good point, and so that
12 would be great, if you can do that, provide how management
13 changes may influence some of our options, especially recent
14 ones.  Okay.
15
16 Maybe we want to go back the presentation.  I guess the Action 1
17 slide, just to make sure, the potential alternative slide, Slide
18 8, just to make sure, because we talked about a couple of things
19 to add here, but is there anything else that the committee is
20 interested in having analyzed at this point?  I'm sure, once we
21 dig into this a little bit more, we'll come up with some other
22 stuff.  John.
23
24 **DR. FROESCHKE:**  A comment and a question.  We will certainly add
25 what would be I guess the Alternative 6 from Ms. Bosarge, to
26 keep the commercial quota.  I guess my question is, if we go
27 back to the IPT and push these around, there's that, and then
28 the analysis from the Science Center, the king mackerel
29 analysis, do you want to see all of that again, before we make
30 some sort of request from the Science Center to update the OFLs
31 and ABCs conditional on these, or do you want us to add the
32 additional one from Ms. Bosarge to this list and send these off,
33 or something else?
34
35 **CHAIRMAN GUYAS:**  How much time do we have?  I mean, we have a
36 deadline here, right, and so when did our clock start?  Maybe
37 that's an Andy question, since you probably signed that letter,
38 right?
39
40 **MR. STRELCHECK:**  Yes, but I'm going to look to Peter.  Do you
41 remember when we sent the letter?  We'll look into that.
42
43 **CHAIRMAN GUYAS:**  All right.  Thanks.  Let's, I guess, hold that
44 thought.
45
46 **DR. FROESCHKE:**  Just so everyone is aware, once we get the
47 request back from the Science Center, then we should take it to
48 the SSC and have them review it prior to coming back, and so I'm

0003809

1  just trying to make sure we have all the steps in a row.
2
3  **MS. BOSARGE:**  So are you going to go ahead and take that king
4  mackerel one to them too, and let them look at it, that analysis
5  that we got in April?
6
7  **DR. FROESCHKE:**  As soon as it's available, we would certainly
8  provide that to the SSC for their review and comment.
9
10  **CHAIRMAN GUYAS:**  Dr. Simmons.
11
12  **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Madam Chair.  Is Dr.
13  Shannon Cass-Calay still on?  You mentioned, Shannon, that, in
14  the amberjack stock assessment, SEDAR 70, and I think you said
15  Table 28 had something similar to what we requested for king
16  mackerel, and can you give us an estimate of how long you think
17  this request would take the Science Center to complete, because
18  I believe the king mackerel took some time, but I know we had
19  other competing priorities, and so I don't know if you could
20  help us a little bit with that, in addition to what we may be
21  asking you all to do in a memo regarding the changes in sector
22  allocations and then the corresponding catch advice that we
23  would need for the SSC to review.
24
25  **DR. CALAY:**  The challenge with the king mackerel request was
26  that the first request we received we could not implement,
27  because the stock assessment model did not converge, and so the
28  results that were produced were not particularly informative,
29  and so we had to go back and try another approach, and so that's
30  what's took the additional time.
31
32  I think that we could easily apply the king mackerel approach,
33  which is essentially to take the SEDAR 70 assessment, the most
34  recent one, and truncate the last years off of it, and
35  essentially run it with the charter estimates and with the FES
36  estimates, and then we would have a step-by-step comparison then
37  of the SEDAR 33 assessment and then basically the assessment --
38  SEDAR 70 parametrization, with CHTS units, truncated, the SEDAR
39  70 truncated with FES units, which will tell you the difference
40  just between CHTS and FES, and then, finally, the entire SEDAR
41  70 assessment.  That way, you can do a step-wise comparison of -
42  - Basically, isolate the change in CHTS and FES and then the
43  change from the updated data, which are two separate differences
44  in the outcome.
45
46  I think that we could do that pretty quickly, and I think that
47  we could certainly have that within a few weeks.  The analyst
48  that would conduct this work is also leading SEDAR 80, but it

0003810

1  shouldn't be too difficult.
2
3  **CHAIRMAN GUYAS:**  All right.  Thanks, Dr. Cass-Calay.  Okay.
4  Anything else on Action 1 potential alternatives at this point?
5  Okay.  Let's flip to the Action 2 slide, just to see if there's
6  any ideas on that one.  There's still some work to do in terms
7  of the ACL/ACT Control Rule, but, if there are any other wild
8  ideas out there right now, now is the time to put them out
9  there.  Leann.
10
11 **MS. BOSARGE:**  Remind me on this one, and so, in our last
12 discussion, we said, for commercial for grouper, we would push
13 out the quota action, and then we would talk about ACT.  Now,
14 this is not an IFQ, and so it's a little different.  What gets
15 pushed out here?  Are we actually managing both sectors, because
16 we weren't managing both sectors for the ACT on grouper.  We
17 were managing one to the ACL and one to the ACT, and what do we
18 do here?  Tell me a little more about it, and that would help me
19 understand what other options.
20
21 **CHAIRMAN GUYAS:**  So, in other words, like what are the
22 accountability measures tied to these ACTs, and what are these
23 used for, for amberjack?
24
25 **DR. FROESCHKE:**  There are paybacks, and I might have to ask
26 Peter if they're associated with the ACT or the ACL.  Do you
27 know?
28
29 **MR. STRELCHECK:**  I will throw him a lifeline, and I will let him
30 delay here for a minute.
31
32 **CHAIRMAN GUYAS:**  Thanks, Andy.
33
34 **MR. STRELCHECK:**  We sent the letter on April 7.
35
36 **CHAIRMAN GUYAS:**  Wonderful.  Well, not really, but --
37
38 **MR. STRELCHECK:**  We said that rebuilding is on track, but we
39 need to end overfishing.
40
41 **MR. HOOD:**  For AMs, the in-season AM is to the ACT for both
42 sectors, and there is a payback for both sectors if an overage
43 of the ACL occurs, and so I think it's the total ACL.
44
45 **CHAIRMAN GUYAS:**  Thanks, Peter.  John.
46
47 **DR. FROESCHKE:**  Let me just kind of lay out my draft workplan
48 here and see how it goes.  For now, we would request, from the

0003811

1   Science Center, a king-mackerel-like analysis.  Hopefully they
2   could have that done by our August SSC meeting, and so we would
3   have that.  For the August council meeting, I presume we would
4   bring that analysis and the SSC recommendations, and perhaps a
5   presentation   summarizing   that,   along   with   the   IPT
6   recommendations for potential time series.
7
8   Then we would bring all that back in August, and then, at that
9   time,  we  would  request  --  We  would  get  some  allocation
10  alternatives fleshed out and make the request for the OFL and
11  ABC projections, based on those.  That would be reviewed in
12  September and then brought back to the council in October as
13  draft options.
14
15  **CHAIRMAN GUYAS:**  If that works for you all, it sounds good to
16  me.   I mean, that's about as fast as we can go, and so is
17  everybody good?  Okay.  Dale, is your hand up?
18
19  **MR. DIAZ:**  So, from the time the letter was sent, we have one
20  year to implement an action, and is that how it works?
21
22  **CHAIRMAN GUYAS:**  Andy, is that right.   Is it a year to end
23  overfishing, more or less, or is the rebuilding plan that is the
24  quicker deadline?
25
26  **MR. STRELCHECK:**  I might need a lifeline from Mara.  It says
27  immediately, and I am not sure if we have defined immediately in
28  the National Standard Guidelines.
29
30  **CHAIRMAN GUYAS:**  Mara, I see your hand is up.  Thank you for
31  saving us.
32
33  **MS. LEVY:**  Thank you.  It is really hard to be on the computer
34  when you are all there.  Yes, and so, I mean, the Act basically
35  says  that  you're  supposed  to  end  overfishing  immediately.
36  Clearly, immediately does not mean tomorrow, given the process
37  that this has to go through, but, I mean, we are in the middle
38  of 2021, and I think it's reasonable to say to implement
39  something that could have an effect in 2022, and so I guess I
40  would say there's not a strict timeline, but I would urge you to
41  proceed as quickly as possible to get something done so that
42  2022 doesn't also go by without addressing the overfishing
43  issue.
44
45  **CHAIRMAN GUYAS:**  Okay.  Fair enough.  Well, it sounds like we're
46  on as fast of a timeline as we probably can push at this point,
47  and so it sounds like we're doing the right thing.  Okay.
48  Leann.

0003812

1
2  **MS. BOSARGE:**  So, for this action, I guess it's hard to really
3  say, because I don't have the quotas and the landings in front
4  of me at this point, but, just looking at those numbers, the 13
5  percent and the 17 percent, especially on the commercial side, a
6  13 percent buffer, I would wonder, have we been going over it a
7  lot  on  the  commercial  side,  and  that's  a  pretty  substantial
8  buffer  for  us,  when  you  have  the  mandatory  census-level
9  reporting.
10
11  That's  a  decent,  really,  buffer  on  the  recreational  side  too,
12  and so I guess what I'm saying is I think we should give staff
13  some  flexibility,  if  we  have  not  been  habitually  exceeding
14  something,  to  maybe  ratchet  down,  if  possible,  but
15  conservatively.
16
17  **CHAIRMAN GUYAS:**  Okay.  That makes sense.  Off the top of my
18  head,  I  know  recreational  has  had  some  overages,  and  I  think
19  commercial has too, but -- Go ahead, Leann.
20
21  **MS. BOSARGE:**  Then the last on data requests, and so the other
22  background  document  we  have  here  for  this  conversation  shows  us
23  the  historical  landings  by  sector,  in  pounds  whole  weight,  and
24  there  is  some  numbers  on  there  that  I  would  hope  the  Science
25  Center, or someone, could explain to us a little better.
26
27  If  you  look  at  the  rec  numbers,  and  I  ballparked  it,  it  looks
28  like they probably catch somewhere between two and four million,
29  on  average,  probably,  and  maybe  five  million,  and  I'm  just
30  looking at it, and, yet, we have some years in there, like 1982,
31  where  it  says  they  caught  fourteen  million  pounds,  and  then
32  we've  got  1987  that  it's  eighteen  million  pounds,  and  the  next
33  year it's three million, and there are some outliers in there,
34  right,  and  I  would  like  somebody  to  explain  to  us  what  these
35  outliers  are  and  how  we  arrived  at  those  kind  of  historical
36  numbers.   There  is  an  eleven,  almost  twelve,  million-pound  year
37  too, and so I would like a little bit of insight as to what that
38  is and how we determined that that's reasonable.
39
40  **CHAIRMAN GUYAS:**  Thanks, Leann.  Mara, is your hand still up?
41
42  **MS. LEVY:**  No.  Thank you.
43
44  **CHAIRMAN GUYAS:**  Okay.  Just checking.  Dr. Simmons.
45
46  **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Madam Chair.  I think we
47  probably need Shannon again for this, and I apologize, and so I
48  think,  when  we  ask  for  this,  my  understanding,  from  the  stock

0003813

1 assessment, is we are still in the overfished condition, at
2 below 50 percent maximum sustainable yield, and so we aren't on
3 track to rebuild, and so we do need to modify the rebuilding
4 plan.    That means, once we figure out the various sector
5 apportionments, we would have to rerun those projections to
6 rebuild within the 2027, and is that correct, Shannon?

7
8 **DR. CALAY:**  That's correct.

9
10 **CHAIRMAN GUYAS:**   Thanks, Shannon.   Okay.   Anything else on
11 amberjack?  Are we good for now?  Mara.

12
13 **MS. LEVY:**  I mean, the letter that NMFS just sent you did say
14 that it's still overfished, but it's in a rebuilding plan that
15 goes until 2027, and that letter did say that it was still on
16 track to rebuild by then, and so I don't know -- I don't know
17 where the disconnect is, but, just because we're still
18 overfished, it doesn't necessarily mean that it's not rebuilding
19 as scheduled, and so I guess I would want to make sure that
20 everyone is on the same page about that.

21
22 **CHAIRMAN GUYAS:**  Right.  Andy.

23
24 **MR. STRELCHECK:**   Just to put I guess a finer point on that,
25 certainly, if we stay the course without reducing yield, we
26 would not meet our rebuilding target, but, in our letter, we
27 clearly think, by reducing yields, we could meet our rebuilding
28 target, and so that's why we're saying we're still on track.  We
29 have some room to adjust management measures in order to meet
30 the rebuilding target before the end of the time period.

31
32 **CHAIRMAN GUYAS:**   Okay.   Thanks for that clarification.   All
33 right.  Anything else on amberjack?  Okay.  We'll see this
34 again, with some updated information, at our next meeting, it
35 sounds like.  All right.

36
37 Let's switch gears to our next item, which is the overview and
38 discussion of the IFQ programs review.  It looks like -- Who is
39 going to be the lead for this one?  Is it Assane?  All right.
40 Well, let's start with our action guide on that one, because
41 there's a lot to unpack here.  Everybody grab some coffee too,
42 because there's a lot of information with this one, and I'm just
43 saying.  Dr. Diagne, whenever you're ready.

44
45    **OVERVIEW AND DISCUSSION OF INDIVIDUAL FISHING QUOTA PROGRAMS**
46                             **REVIEW**
47                          **PRESENTATION**
48

80

1   **DR. ASSANE DIAGNE:**   Good afternoon, everyone.   We are going to
2   discuss the joint review of the grouper and red snapper IFQ
3   programs.   Just looking at the action guide quickly, potentially
4   we -- When I say "we", it is myself and Alisha Gray from SERO,
5   and we are going to present this to the committee, and, in
6   addition to that, you will receive SSC comments and
7   recommendations, as well as the comments that were offered by
8   the Ad Hoc IFQ AP.
9
10  At the end of this, the committee would, of course, discuss the
11  information presented, evaluate it, and, if warranted, approve
12  this review and allow us to finish it up and put it on our
13  website, and so that's the plan, if you would, for today.   We
14  can move to the presentation.
15
16  Essentially, the presentation is in two parts, and the first
17  part will be covered by Ms. Gray, and so I will just turn it
18  over to her, if she's ready.   Alisha, if you are ready, just
19  take it away.
20
21  **MS. ALISHA GRAY:**   Thank you.   As Assane mentioned, I'm Alisha
22  Gray, and I'm with SERO, and I'm going to through the first part
23  of this review today, and so, to start, the NMFS guidance for
24  conducting review of catch share programs was established in
25  April of 2017, and it requires that specific elements be
26  analyzed.
27
28  Specifically, it's that we evaluate the progress in meeting
29  goals and objectives and that reviews be evaluated within the
30  first five years of implementation and then every five to seven
31  years thereafter.
32
33  We have two IFQ programs in the Gulf, including the red snapper
34  IFQ, which was established in January of 2007, and then, three
35  years later, the grouper-tilefish IFQ was established, in
36  January of 2010, and both of those programs have already gone
37  through their initial reviews, and both of those reviews were
38  really to compare pre and post-IFQ implementation, and, for the
39  second review that we're doing today, we are going to consider
40  both programs jointly, and we'll be covering the period of 2012
41  to 2018.
42
43  The goals that were identified through these programs was to
44  rationalize effort and reduce overcapacity of the fishing fleet,
45  to achieve and maintain optimum yield, and then, in both
46  programs, some of the anticipated benefits and additional
47  objectives was to increase market stability, eliminate season
48  and quota closures, increase flexibility for fishing, improve

0003815

 1  the  safety-at-sea,  as  well  as  profitability  for  commercial
 2  fishermen,  and  also  to  reduce  discards  and  improve  cost-
 3  effective  and  enforceable  management,  and  then,  finally,  to
 4  balance social, economic, and biologic aspects.
 5
 6  We're  going  to  dive  into  the  review,  and,  as  Madam  Chair
 7  mentioned,  there  is  a  lot  of  information,  and  so  bear  with  me.
 8  We're doing to start the first element, which is data collecting
 9  and reporting, and so the IFQ programs use an online electronic
10  system, and, on this website, that is where all the transactions
11  and  activity  occurs,  and  so  that  includes  allocation  and  share
12  transfers,  landing  notifications  and  transactions,  the
13  registration  of  new  landing  locations,  and  it's  also  where
14  participants can view and pay cost recovery fees.
15
16  For  this  review,  we  analyzed  all  of  this  data,  and  one  of  the
17  first  areas  that  we  look  for  is  to  identify  areas  of
18  improvement,  and  a  specific  data  gap  that  we  identified,  which
19  was  also  identified  in  the  first  reviews  for  each  program,  are
20  our share and allocation prices.
21
22  The  first  one  we're  going  to  go  over  is  share  prices,  and  so,
23  with  each  share  transfer,  a  share  price  is  reported,  and  it's
24  been  mandated,  as  of  2010,  that  the  transferor,  and  so  the
25  person  submitting  the  transfer,  provide  a  price  with  every
26  transfer,  and  then,  as  of  2013,  the  transferee,  or  the
27  recipient,  of  those  shares  was  also  required  to  provide  a  price,
28  upon  receipt,  and  this  was  really  to  gather  a  representative
29  share  price  and  helping  mandate  some  of  these  reportings  was  to
30  improve the data that we were receiving.
31
32  Using  methodology  that  was  established  by  the  SSC  during  the
33  initial  reviews,  we  identified  those  share  prices  that  are
34  within  an  expected  range,  and  which  we  therefore  call  a  valid
35  share  price,  so  that  we  can  get  a  representative  average  and
36  annual  price,  and,  here,  you  can  see  that  the  share  price
37  portion  that  we  receive  that  are  within  that  valid  range  are
38  between 30 and 70 percent.
39
40  There's  been  some  improvement,  like  I  mentioned,  when  we
41  mandated  the  transferee  to  provide  a  price,  and  then  we  also
42  require  transfer  reasons,  but  it  still  remains  an  area  for
43  improvement.
44
45  This  is  broken  down  by  share  category,  and  I  also  want  to
46  mention,  before  we  move  on,  that  you  do  see  that  there  is  a  bit
47  of  a  downturn  in  2018.   We  have  looked  at  that,  and  it  has  since
48  rebounded  a  bit,  to  more  expected  levels,  and  that  seems  to  be

0003816

1  possibly a response to the very active hurricane season in 2017,
2  and we also just had a lower sample size in 2018.
3
4  This is a program-by-program comparison, and you can see that
5  both programs are operating pretty similarly, with a 50 to 60
6  percent range of share prices reported are considered valid, and
7  so, again, it's an area that we hope to see some improvement.
8
9  One of the additions that we added to the share transfer process
10 was to include share transfer reasons, and this is to get an
11 idea of the different reasons that transfers are occurring and
12 also try to elucidate some of that data that was outside of the
13 expected range, and, here, this is for grouper-tilefish, and you
14 can see that the most commonly reported transfer reason is sale
15 to another shareholder, which is as was expected, and then the
16 second-most commonly reported transfer reason was no comment.
17
18 That doesn't help us work out some of the data that we're
19 receiving that are outside of the expected ranges, and,
20 interestingly, also, it typically correlates pretty closely with
21 the precent that fall outside of expected ranges, and so, again,
22 this is an area that we're hoping to see some improvement, and
23 maybe more outreach would be helpful here.
24
25 Then I do want to point out the third-most reported reason that
26 share transfers are occurring is it's being transferred to a
27 related account, and so we are aware that there is a lot of
28 relatedness in these programs, and it's something to keep in
29 mind and will keep showing and reappearing as we go through the
30 rest of this presentation.
31
32 Then I realized that I failed to mention some of the reasons
33 that we have found that we get some share prices that are
34 outside of the expected range can be a variety of reasons,
35 including misreporting, or mistyping, and so a decimal place is
36 placed in the wrong spot, and sometimes shares are sold with a
37 vessel or a permit, and that total value was given, and so then
38 we see these very large numbers, because it was a package deal.
39 Sometimes we get very low values, because, again, they are
40 related accounts, and so, whether it's a familial or a business
41 relationship, they are providing lower numbers, or it just might
42 be a hesitancy to report, but, regardless, it's an area for
43 improvement.
44
45 This shows red snapper IFQ transfer reasons, and both programs,
46 as I mentioned before, are operating pretty similarly, and you
47 can see that this is telling a very similar story to the
48 grouper-tilefish, and so sale to another shareholder, no

83

1  comment, and related being the most commonly reported transfer
2  reasons.
3
4  Just like we do for the share prices, in order to come up with a
5  representative price, we do a very similar methodology to
6  identify allocation prices that are within a valid range as
7  well, and, right off the bat, you can notice that these data,
8  the portion that we can consider valid, are even lower than they
9  are for the share prices, and so it ranges from 25 to 55
10 percent.
11
12 There has been a somewhat improvement over time that we're happy
13 to see, and interestingly too, with allocation prices, is that
14 it was actually very recently that the price was mandated during
15 a transfer, and so just as recently as December of 2020 did we
16 start requiring a price be reported with every transfer, and so
17 we hope to see still some improvement, especially following that
18 rule change, but, again, it's an area for improvement.
19
20 While that is broken down by share category, the next slide will
21 show a program-by-program comparison, and so here we are, and
22 you can see, again, the proportion of prices that we receive are
23 much lower for the allocation prices, and red snapper is
24 performing a little bit better, with fifty-percent-ish within
25 the valid range, and then grouper-tilefish is closer to 40, or
26 45, percent.
27
28 Then, at the same time that we introduced a transfer reason and
29 then mandated the transfer reason, which was 2013 for
30 introduction and then 2015 for mandating that it be reported, we
31 also did the same for allocation transfer reasons.  Here though,
32 you can see, again, related accounts and sale to another
33 shareholder is a common response, but the definite biggest
34 transfer reason that we receive is no comment, and so that's --
35 Definitely allocation transfers and transfer reasons are our
36 biggest data gap that we have in the programs.  That was
37 grouper-tilefish, and now we're looking at red snapper, which,
38 again, is a very similar story.
39
40 Moving on, now we're going to talk about eligibility and
41 participation, and I'm about to throw some data at you, and so
42 be prepared.  People who wish to participate must contact IFQ
43 staff to obtain an account within the program, and, for the
44 first five years, a commercial reef fish permit was required to
45 obtain a shareholder account.
46
47 The dealer permit was, and is still, required to obtain a dealer
48 account.  However, after the first five years of each program,

0003818

1  which would have been 2012 for red snapper and 2015 for grouper-
2  tilefish, any participant who wished to participate in the
3  programs could do so without a permit, by simply submitting an
4  application with all of their relevant information.
5
6  If we move to the next slide, we will start really breaking down
7  the activity in the programs, and so here we generated some
8  graphs to show the total number of accounts that held shares,
9  and we broke it down first by share category, and the number
10 that runs along the top of the bars is the total number of
11 accounts for each year, and you can see, for all share
12 categories, the general trend is that there has been a
13 decreasing trend in the total number of accounts that held
14 shares, and we broke those into bins of how many shares those
15 accounts are holding.
16
17 In blue, those are accounts that hold a small proportion of the
18 shares, which is less than 0.05 percent, and those make up the
19 bulk of the accounts, which is what we were expecting, and is
20 not dissimilar to what was before the IFQs were implemented, in
21 terms of fishing histories.
22
23 You can see that the downward trend that we're seeing -- That
24 most of that attrition is occurring in this small bin, and that
25 makes sense, just that there was less shares for them, that they
26 were holding, and so they're either selling out or rolling up
27 into the medium accounts, and, generally, across the time
28 series, the medium accounts and the large accounts were
29 relatively stable, and so most of that attrition is occurring in
30 the small accounts.
31
32 This is just a program-by-program comparison, and you can just
33 see the overall trend, that the number of accounts with shares
34 is decreasing in time, and, overall, grouper-tilefish has a
35 higher number of accounts with shares, and that makes sense,
36 just that there are more share categories within that program.
37
38 Then, thinking about accounts that hold shares, we really wanted
39 to look into how many of them held one or multiple share
40 categories, and, here, you can see, on the left, the 1 through
41 5, and this is just grouper-tilefish right now, and that could
42 be any combination of share categories, but, unsurprisingly, the
43 majority of accounts that do hold shares hold between three and
44 five different share categories within them. Given that a lot
45 of these species coexist, this is exactly what we would expect
46 to see.
47
48 We do notice that the accounts that hold only a single share

0003819

1    category have been increasing a bit, and so that's a trend that
2    we're going to keep an eye on, but there was definitely a shift
3    in 2015, when grouper-tilefish became open for public
4    participation, and, again, that's something that we're going to
5    continue to see from here on.
6
7    If we go to the next slide, we re-did the analysis with red
8    snapper incorporated, and it tells a very similar story.  Most
9    accounts that hold shares hold shares in multiple share
10   categories, but, once you incorporate red snapper, the
11   proportion that hold a single-share category does go up,
12   although it remains pretty stable from 2015 to 2018.  Around 21
13   to 22 percent of the accounts hold just one share category.
14
15   Then this was an interesting analysis, and much what we expected
16   to see as well, and so we looked at, of the vessels that land
17   grouper-tilefish, how many of them also land red snapper, and
18   here you can see that the majority of the vessels landing
19   grouper-tilefish will also land red snapper, but, more
20   interestingly, it's just that it's been a growing overlap, and
21   so this really demonstrates that it's appropriate to analyze and
22   review these programs jointly at the same time.
23
24   Now to break down some of that activity a little bit more, and
25   we're looking at accounts with shares, and we wanted to see what
26   the distribution was between those with and without a permit,
27   and so those with a permit are in blue, and you can see that the
28   majority of accounts that hold shares are also associated with a
29   permit.
30
31   For most share categories, or, well, all of these share
32   categories, actually, it's about a 70/30 split, but there isn't
33   a trend of an increasing number of the proportion of accounts
34   with shares that are not associated with a permit, which is in
35   green, but I do want to point out that, one, there is a shift in
36   2015, which is pretty consistent across all of the grouper-
37   tilefish species, and that's when that program went open for
38   public participation.
39
40   Then red snapper, on the other hand, which was open for public
41   participation through the entirety of this time series, was
42   about a 70/30 split throughout the entire timeframe, and so
43   that's an interesting thing to see there.
44
45   I do want to point out, and we're going to get to it a little
46   bit later, but this does seem to tell a story that there is a
47   growing disconnect of the accounts with shares and those that
48   hold a permit, but we are aware that there is a relatedness in a

0003820

1  lot of these programs, and there is public participation playing
2  a role, and we're aware, in the industry, that it's common
3  practice to separate the shares from the working vessel, which
4  would help tell this story a bit, and we're going to get there.
5
6  We did accounts with shares by permit status, and now what is
7  the volume of shares that is being held by permit status, and,
8  here, you can see the majority of shares are in accounts that
9  also hold a permit, which is blue.  For most of the share
10 categories, there is an 80/20 split, roughly.  Again, there was
11 a bit of a shift in 2015, particularly for the grouper-tilefish
12 share categories, and deepwater grouper is moving closer to a
13 70/30 split, which is also where red snapper is, and that's an
14 interesting thing to keep an eye on.
15
16 Here again, this is a program-by-program analysis of accounts
17 with shares by permit status, and you can see that the programs
18 are pretty similar, with a 70/30 split, as of 2018, for those
19 shareholding accounts with a permit versus those without.
20
21 Now we're going to look at some allocation, and so the
22 proportion of accounts that held allocation, at one point in
23 time in the year at least, we wanted to see how many of those
24 were receiving at least a portion of that allocation, if not
25 all, from shares, versus those that were receiving all of the
26 allocation via a transfer, and those accounts that received at
27 least a portion of the allocation via shares is in blue, and you
28 can see that the majority of accounts are receiving at least
29 part of that allocation via shares, but, again, there does seem
30 to be a little bit of an increasing trend of accounts that are
31 receiving it through transfers.
32
33 Again, if we take a look, there is a bit of a shift,
34 particularly in the grouper-tilefish share categories, in 2015,
35 when public participation was opened up, and most of them are
36 roughly a 70/30 split.  Red snapper is, again, nearing the 60/40
37 split, but I want to remind us, again, of the same story, that
38 there's a little bit of some evidence of the splitting of the
39 shares and the working vessel, and this plays into that story
40 just as much.  If the shares are removed from the working
41 vessel, then, obviously, there will have to be more transfers of
42 allocation to get that allocation to the working vessel.
43
44 If we go to the next slide, here is a program-by-program
45 comparison, and, like I mentioned, most of the grouper-tilefish
46 share categories are at the 70/30 split, and so the overall
47 program is a 75/25 split, and then red snapper is closer to a
48 60/40 split of those accounts receiving their allocation through

0003821

1    shares.
2
3    We kept mentioning public participation, and so 2012 for red
4    snapper and 2015 for grouper-tilefish, and, obviously, we wanted
5    to look into this, and what are the proportion of accounts in
6    the programs that are publicly participation, and, really, what
7    that means is those that are publicly participating are all
8    those accounts that are not associated with a permit.
9
10   Here you can see the proportion of accounts that are associated
11   with a permit, of 2018, was 64 percent, and public, meaning you
12   were not associated with a permit, was 36 percent, and there has
13   been a growing trend to having a greater portion of all of the
14   accounts that are publicly participating, and then, of course,
15   we wanted to take that one step further.
16
17   Actually, real quick, before we move on, I will mention here
18   that you can see that, even in 2010 and 2011, there was still
19   some public participation, which preceded both the red snapper
20   and grouper-tilefish going public, and I want to point out that
21   there has always been some amount of public participation,
22   before you could actually open an account without a permit, and
23   the reason that you're seeing those accounts is there was a
24   permit name change, for instance, and so, if they wished to
25   change the name on the permit, you have to have the IFQ account
26   match that name exactly, and so that permit would be moved to a
27   new account, and the original account would remain open, and it
28   could have also been just that they sold off the permit, but
29   maintained their IFQ accounts.
30
31   Then we took it a step further, and we wanted to look at related
32   accounts, of course, and, here, you can see that, just like
33   public participation, we are seeing a growing proportion of our
34   accounts are related, and the way that we defined related
35   accounts was that we identified who the underlying entities were
36   for each account, and, if there was at least one entity in
37   common, we assigned those as related accounts.
38
39   For the purposes of this analysis, we did not include any
40   accounts that self-identified as related using a transfer
41   reason, and we didn't include those in this analysis, because
42   sometimes there are true relatedness between those accounts,
43   but, other times, it's just a business relationship, and so we
44   wanted to keep this strictly to a more conservative value, which
45   is just that there is a true entity in common. As of 2018, you
46   can see that 61 percent of the accounts in the IFQ programs are
47   related to one other account, at least.
48

0003822

1   Then we now have identified that there's a growing number of
2   public accounts, which you can see in the second column, and
3   there's a growing number of related accounts, which you can see
4   in the third column, and, overall, there's an increasing total
5   accounts as well, but how many of those are public and related,
6   and so we looked to identify those that were public and related
7   and you also can tell, in the fourth column from the left, that
8   there is also a growing number of public and related accounts.
9
10  Then, breaking that down into proportions, on the right, you can
11  see that, of all accounts, 33 percent of those are public and
12  related, and so that is that 320 against that 984, as of 2018.
13  Then, of public participating accounts, 91 percent of those were
14  public and related, which we thought was a very interesting
15  point, and, really, it drives at that story that, when
16  additional accounts are being opened, they are typically being
17  opened by people that already have an account in the program.
18
19  Then the last column is, of all the related accounts, 53
20  percent, as of 2018, were public and related as well, and so
21  these were some interesting data that we received, or that we
22  requested.
23
24  Moving on, this is looking at dealers.  This is a count of the
25  number of dealers, specifically for the grouper-tilefish, that
26  processed a grouper-tilefish species during the year, and you
27  can see that there's been a very slow and gradual increase in
28  the number of dealers, and then we broke those dealers into
29  three bins of small, medium, and large, based on the total
30  amount of landings that they process.
31
32  You can see the majority of dealers fall within the small bin,
33  and so they process less than 1 percent of the total landings,
34  and they, obviously, as you can see here, make up the majority
35  of the dealers, and so 82 percent of the dealers are within that
36  small bin, and a lot of that growth is seen in that small bin,
37  and that coincides with some of what we've been hearing from the
38  industry, that some participants are becoming their own dealer.
39
40  If we go to the next slide, it's the same story for red snapper.
41  There's a slow, gradual increase, and the majority of that
42  increase is occurring in the small bin.
43
44  Now we're looking at landings by share status, and we then
45  wanted to look at, of the accounts that are doing the landings,
46  how many of those hold or do not hold the shares, and, here, you
47  can see that there is about a 50/50 split across all of the
48  share categories of the accounts that are doing the landings

0003823

1   that hold shares versus that that don't, and this is pretty much
2   in line too with the story that they are separating shares from
3   the working-class, and so this isn't outside of what we would
4   expect, to be honest.
5
6   If we move to the next slide, this is annual landings, and we
7   wanted to look at quota utilization, and so we included all of
8   the quotas for each share category across the years.  For those
9   that are highlighted in red, that indicates that there was an
10  in-season increase in the quota that year.
11
12  Just off the bat, you can see that there's a wide range of quota
13  utilization across the different share categories, and some
14  share categories, like deepwater grouper and red snapper, of
15  course, have the very high utilization, and red snapper,
16  particularly, even despite the fact that it has had many in-
17  season increases, sometimes even late in the year, they still
18  tend to be able to land most of the quota.
19
20  Then there is some other share categories that have variability
21  throughout the time series, and a lot of that change that we're
22  seeing throughout the years could be a variety of conditions,
23  including market conditions, fishing conditions, catchability
24  rates, and quota changes definitely have an impact, and,
25  speaking of, if you look at red grouper, red grouper,
26  interestingly, had a very high quota utilization from 2012 to
27  2015, and then, in 2016, that started going down, when there was
28  a pretty large quota increase, and then it has consistently
29  declined through 2018, while it was still at that high quota.
30
31  I do want to mention, before we move on, that red grouper, if
32  you take note, has a quota that is much larger than the other
33  share categories in the grouper-tilefish programs, and, also, it
34  has a pretty low quota utilization, and so, when we go to the
35  next slide, we did a program-by-program comparison, and, here,
36  you can see that grouper-tilefish is very heavily influenced by
37  the red grouper, just because the quota is so high, and you can
38  really see that it really kind of follows the red grouper quota
39  utilization there, and then, of course, red snapper has high
40  quota utilization.
41
42  One of the flexibilities that we have in our program to aid with
43  discarding, and just the fact that there's a lot of overlap with
44  these species when fishing, is we have a red grouper and gag
45  multiuse allocation, and so, at the beginning of the year, some
46  of the red grouper and gag allocation is automatically
47  designated for multiuse allocations, so that it can be used to
48  land either red grouper or gag.

0003824

1
2  We create those values based on a calculation that the SSC
3  developed, and the top table shows you what that portion of the
4  total allocation is allocated to these multiuse allocations, and
5  the quota differences really is a big part of those differences
6  that you're seeing there, and, for red grouper multiuse, you can
7  see there was no multiuse in 2012 through 2014, and that's
8  because gag was in a rebuilding plan.
9
10 Then, below, in the table below, you can see that, once these
11 multiuse are used to land, like which species do they typically
12 use them for, and, with the exception of 2015 multiuse, both red
13 grouper and gag multiuse, are predominantly used to land gag.
14 Again, though, because there is such a disparity between the
15 quotas, that's something that we're not very surprised to see.
16
17 Keeping all of this activity in mind, we do want to remind you
18 that there are ownership cap, and so, in both programs, there is
19 a  share  cap  for  each  category,  and  that  is  the  maximum
20 percentage of shares that can be held by any entity or account,
21 and so that is not account level, and that is -- When you go
22 down to the entity level, in the bottom-right table that you
23 see, those are the share caps.
24
25 The  way  that  those  were  defined  is  that,  at  the  time  of
26 implementation, whatever the distribution that was given out at
27 that time, it was what set that cap for that share category, and
28 those distributions were decided upon using landing histories.
29
30 Then,  in  addition  to  these  share  caps,  we  also  have  an
31 allocation cap, and this should read across all grouper-tilefish
32 categories, and so there is an allocation cap in the grouper-
33 tilefish program, and the reason that it wasn't in place for the
34 red snapper was just simply that that wasn't a requirement of
35 the catch share program when red snapper was implemented, but,
36 at least in the grouper-tilefish, there is a total amount of
37 pounds that can be held at a point in time, and it corresponds
38 to the allocation equal to all share caps combined, and so a
39 given account at one point in time cannot hold more than the
40 equivalent pounds to the share caps.
41
42 Now we're going to look at some price data, and so here we list
43 the total number of share transfers that we received, regardless
44 of  whether  it  reported  a  valid  price  or  not,  and  then  the
45 average annual share price, but those have been truncated to
46 only the data that was within a reasonable and valid range, and
47 so, not only are they more representative, using only those
48 valid share prices, but I have also adjusted them for inflation,

91

1  using 2018 as a base year, and you can see that there is a big,
2  wide range of share prices, depending on what share category
3  you're considering, with, of course, red snapper having the
4  highest share price.
5
6  Again, there's a lot of variability throughout the time series,
7  and that's going to be related to quota changes, market
8  conditions, fishing conditions, catchability rates, and there's
9  lots of variables that play into this, and I do want to mention
10 that these are just annual averages and snapshots.  Dr. Diagne
11 will be going over more economic analysis in the second portion
12 of this review, but this is at least a glimpse for us to look at
13 right now.
14
15 Now we're going to compare allocation and ex-vessel prices, and
16 so we really compare these against each other when reviewing the
17 programs, because, as that margin tightens, it leads to a
18 tighter margin for the participants, and so, again, you can see
19 there is some variability throughout the years, and there is
20 definitely differences depending on the share category, and
21 then, as expected, red snapper has the tightest margin of
22 allocation to ex-vessel value.
23
24 Speaking of allocation, we just wanted to point out, again, that
25 the number of allocation transfers for all of the share
26 categories is pretty high, and there's always allocation moving,
27 and you can see here that the pounds being transferred, many
28 times for most of the share categories, exceeds the quota, and
29 so what that really means is that the pounds are being moved and
30 transferred more than once before they are being landed, which
31 is in line with some of the business practices that we know that
32 is occurring in the programs, but this is just to really show
33 that there's a lot of allocation movement, especially in
34 deepwater grouper, which is consistently above 200 percent of
35 the quota is transferred every year.
36
37 Now we're going to look at discard ratios, and so the IFQ
38 program does not itself collect discard information and so we
39 look to the Science Center's Reef Fish Observer Program, and we
40 looked at gag, red grouper, and red snapper, and gear is
41 typically a big variable when looking at discard and discard
42 ratios, and so we looked at it that way, and here you can see
43 that red grouper and red snapper have higher discard ratios,
44 typically, with the longlines, and then gag, on the other hand,
45 has a higher discard ratio with the vertical line.
46
47 We keep an eye on these, but I do want to note that the Reef
48 Fish Observer Program is a reef-fish-wide survey, and so it

0003826

1   isn't necessarily IFQ specific, and it may not be totally
2   representative of what's happening in the IFQ program, but it's
3   something that's still good to keep an eye on, and, also, we
4   have been having a lower sample size in this program in more
5   recent years, and so keep that in mind when we're reviewing
6   these numbers.
7
8   Then we also keep an eye on discard reasons, and it's something
9   that's interesting to look at, and so these are all IFQ species
10  and the reasons that they are being discarded, according to the
11  Science Center's supplemental discard logbook.  You can see that
12  the most commonly reported reasons are not a legal size and
13  other regulations.
14
15  When we're talking about IFQ species, this may be -- This other
16  regulation may be referring to a lack of allocation, and so some
17  species, like gag, it's a pretty 50/50 split, where individual
18  fish are being released for not legal-size reasons, and then,
19  otherwise, other regulations is the other most reported reason.
20
21  Then there are species like red grouper, where the majority of
22  discards are happening, according to this anyway, for not legal-
23  sized reasons, and then, on the flip side, there are some
24  species, like speckled hind, which is being reportedly discarded
25  for other regulations, which, again, may be a lack of
26  allocation.
27
28  Much like the Reef Fish Observer Program, again, we keep an eye
29  on this data, but we are cognizant that this is a reef-fish-wide
30  survey, and it's not IFQ specific, and sometimes sample size can
31  be a bit of an issue too, and so we keep that all in mind.
32
33  Another element that we consider for the review is monitoring
34  and enforcement, which is, obviously, very important, and, here,
35  we're showing the number of enforcement cases and that those
36  that result in seizures, and you can see that we have had a bit
37  of an increase in the number of cases, but we have been seeing a
38  downward trend in the number of cases that result in seizures,
39  which we're really happy to see, including that it was zero as
40  of 2017 and 2018, and then, also, a really awesome improvement
41  that we saw was, as of June of 2019, the Southeast Region
42  summary settlement schedule added penalties for grouper-tilefish
43  and red-snapper-IFQ-specific violations, and so this was a great
44  improvement, because it allowed enforcement to really streamline
45  those lower-level offenses.
46
47  This is the last bit that I am going to go over today, and so we
48  then also look at our administration cost recovery, and we

0003827

1  aggregated the IFQ program expenses from 2012 to 2018, and we
2  looked at how are we using the cost recovery fees, and the bulk
3  of the cost recovery fees are being used for management of the
4  program, and so labor costs, and that you can see in purple, and
5  then the second-most used for expense is the enforcement, which
6  is in blue.
7
8  Overall, I just want to say that, when you consider the programs
9  together, the cost recovery fees pay for the program in full,
10 and, also, at the end of the year, many times we have a little
11 bit of excess cost recovery fees that we have been rolling over
12 throughout the years, and those excess funds have allowed us to
13 do a much-needed modernization of the online system in 2019
14 through 2020, and so our system was actually end of life as of
15 2020, and so it was absolutely necessary for us to update the
16 software, in order to avoid disrupting reporting.
17
18 Along with modernizing it, which was very necessary, it also
19 allowed us to make a lot of improvements that we were really
20 excited about, including we went to a cloud-based, and so that
21 can reduce outage time during hurricanes or outages, and it also
22 allowed us to improve our security requirements on the online
23 platform, and we were able to have mobile functionality, which
24 was a very wanted improvement, and then, finally, we were also
25 able to add a loan module into the online program, or the online
26 system, and so that was really great, because we were able to
27 finally process federal loans, so that IFQ participants could
28 start using federal loans for their IFQ expenses and get their
29 IFQ needs funded, and so that was a lot of great things that
30 came out of that modernization.
31
32 This is the end of my portion of the review, but I will gladly
33 take questions if we want to stop here, or, if we want to
34 continue, let me know.
35
36 **CHAIRMAN GUYAS:**  Okay.  Are there any questions for Alisha on
37 the slides you've seen so far?  Kevin.
38
39 **MR. ANSON:**  Thank you for the presentation.  I am just curious
40 as to how the spreadsheet that is on the SERO's website for FOIA
41 requests -- How those number of share accounts correlates to the
42 number that's here, and I understand, today, if you look at it,
43 it's as of today, and we're looking at the data from 2018 prior,
44 but there's a little bit of a difference, or a discrepancy, and
45 I am just curious whether or not that spreadsheet gets to the
46 information that we have here or not.
47
48 **MS. GRAY:**  Thank you for that, and so the -- I believe you mean

94

1  the FOIA shareholders page and whether those numbers match.
2
3  **MR. ANSON:**  Yes.
4
5  **MS. GRAY:**  Here, we will have slightly different numbers, just
6  depending on how you're looking at it, if you're looking at as
7  accounts with shares, or if you're looking at it by program, and
8  so you're going to get different numbers, and so that FOIA page
9  doesn't take into account the program, for instance, and so, if
10  a lot of these accounts are holding red snapper and grouper-
11  tilefish, they will only be reported once in that sheet,
12  whereas, here, if I am considering them separately, those
13  numbers will look like two separate accounts, and do you know
14  what I mean?
15
16  Those numbers aren't going to match, depending on whether you're
17  looking at it by share category or not, and, also, the FOIA page
18  is always live, and these are captures in time as well, and the
19  movement of accounts is always very dynamic.
20
21  **MR. ANSON:**  Thank you.
22
23  **CHAIRMAN GUYAS:**  Robin.
24
25  **MR. RIECHERS:**  So this isn't necessarily the purpose of your
26  analysis, but I'm wondering whether or not you might have seen
27  some of these trends or can speak to at least some of the claims
28  that we continue to hear, and one is the difficulty in getting
29  red snapper shares, or allocation, in certain parts of the Gulf,
30  and then, more recently, hearing about movement of red grouper
31  into the western Gulf, and I am just wondering whether, in your
32  analysis, did you even look at that, or you might have seen some
33  notion of that, and, like I said, again, I realize that your
34  analysis wasn't really designed to do that.
35
36  **MS. GRAY:**  Thank you.  This analysis did not take geographic
37  location into account, and the data gets a bit muddy when you
38  start teasing it out, and it's quite sparse in some areas, but I
39  did not look at that specifically for this review, and I know,
40  for some of the amendments, like 53, they might have looked at
41  it a little bit more, but not for this review, and I know that
42  Jessica Stephen might have a little bit more on that, but I
43  can't speak to it right now anyway.
44
45  **MR. RIECHERS:**  That's fine.  Like I said, I understood that that
46  really wasn't what your purpose is, but I appreciate you at
47  least sharing that, and so thank you.
48

0003829

1  **CHAIRMAN GUYAS:**  Tom.
2
3  **DR. FRAZER:**  Just a real quick question.  On the slide, a couple
4  of slides before this, that has to do with discard reasons, I'm
5  trying to -- Is that from a single year, or are those data
6  compiled over multiple years?
7
8  **MS. GRAY:**  Actually, I would have to see if Jeff Pulver is on,
9  and I did not generate these numbers, but I would imagine that
10 these would be like -- Typically, we do a three-year average,
11 and so it probably is a five or three-year average, and I feel
12 like, most often, we do a three-year average, and so, if this
13 was based on 2019 logbook data, then I assume it was 2017 to
14 2019, possibly, but I am not 100 percent on that, and it might
15 even be 2016 to 2018, if he didn't include 2019 here.
16
17 **DR. FRAZER:**  Right, and so I'm particularly interested in the
18 red grouper row, where 97 percent of the discards were due to
19 the small size, and whether or not a gear or a restriction might
20 work and help with that, and so I guess I will talk to the
21 council about it.
22
23 **MS. GRAY:**  To speak to that, if you don't mind, red grouper,
24 2016 to 2018, like I showed, had a pretty high quota, and so
25 they probably wouldn't have issues such as other regulations, if
26 that's referring to allocation, for instance, and that would
27 have been a less likely reason to discard, especially during
28 that timeframe, and so I think that that probably is playing at
29 least a part in what we're seeing here.
30
31 **DR. FRAZER:**  Okay.  Thank you.
32
33 **CHAIRMAN GUYAS:**  Okay.  Any other questions for Alisha right
34 now?  I am not seeing any, and so let's do this.  Jeff, please,
35 jump in.
36
37 **MR. JEFF PULVER:**  These analyses, they use data from 2012
38 through 2018, to coincide with the rest of the analysis, if that
39 answers Tom's question.
40
41 **CHAIRMAN GUYAS:**  Can you say that again?  It was a little
42 jumbled.
43
44 **MR. PULVER:**  Sorry.  It's from 2012 through 2018, and that's the
45 year range for the discards in the table.
46
47 **DR. FRAZER:**  Okay.  Thanks, Jeff.
48

0003830

1  **CHAIRMAN GUYAS:**  Okay.  Seeing no other hands for questions for
2  Alisha right now, Alisha, I hope you can stay on the line, but
3  I'm thinking, before we move into Assane's other presentation,
4  we will take a little break, and so that will put us at 3:25.
5
6  (Whereupon, a brief recess was taken.)
7
8  **CHAIRMAN GUYAS:**  While Assane is getting ready here, we've got a
9  hard stop at 5:00, and so we will continue on with this
10  presentation, and we've got a couple other items under this, and
11  then we'll cover as much of 36B and C as we can, but we will cut
12  it off at 5:00, and so maybe we'll get through 36B.  Tom.
13
14  **DR. FRAZER:**  Just remember, folks, that, at 5:00, we have the
15  open Q&A, and so that's the reason for the hard stop.
16
17  **CHAIRMAN GUYAS:**  All right.  Dr. Diagne, whenever you're ready.
18  I think we've got your slides up now.
19
20  **DR. DIAGNE:**  All right.  Thank you very much.  I will continue
21  the presentation, and I will start with discussing the impact of
22  IFQ programs on ex-vessel prices.  Essentially, we looked at
23  several studies that were conducted, and the conclusions, the
24  main conclusions, would be that, for the grouper and tilefish
25  IFQ program, that program does not appear to have had a
26  significant, statistically significant at least, increasing
27  impact on grouper prices, essentially, and that's for the
28  grouper and tilefish program, and we have several studies that
29  came to the same conclusions.
30
31  As far as the red snapper IFQ program, for that IFQ program, the
32  studies that we reviewed show evidence of statistically-
33  significant increases in price, ex-vessel prices, of red
34  snapper, due to the implementation of the red snapper IFQ.
35
36  In addition to that, one of the studies determined that the red
37  snapper IFQ program is responsible for stabilizing the prices,
38  essentially decreasing the variability observed in the price,
39  ex-vessel price, of red snapper.
40
41  In terms of market power determinations, for the grouper and
42  tilefish allocation, as well as the grouper and tilefish and red
43  snapper, the share cap did not limit landings.  Based on our
44  review, there is no evidence in market power in any of the
45  markets that we looked at, and we looked at three markets, the
46  landings market, the shares market, as well as the annual
47  allocation market for each share category, and, in all of those,
48  there is no evidence of market power, but we have to take this

0003831

1  conclusion with caution, because the estimates that we have do
2  not account for vertical integration.
3
4  What we see in these programs is that dealers are acquiring
5  shares, and essentially controlling those shares, and directing,
6  therefore, the harvest to their dealership.  NMFS has begun
7  collecting data to be able to study vertical integration and
8  look at its potential impact on market power.  Therefore, the
9  market concentration conclusions that we offered have to be, at
10 least for the time being, looked at with caution until we have
11 more information concerning the vertical integration and until
12 we see the trends in the future.
13
14 We also looked at the inequality of distribution, and, here, to
15 measure that, the accepted metric is what is known as the Gini
16 coefficient, and, essentially, it's a coefficient that ranges
17 between zero and one, or, if one prefers, from zero percent to
18 100 percent, and 100 percent, or one, being a maximum
19 inequality. For example, if you have one entity that controls
20 the entirety of the quota, meaning 100 percent of it, then then
21 Gini coefficient would be equal to one.
22
23 Here, we can say that the distribution of shares is highly
24 unequal in every share category for our IFQ programs, and the
25 coefficients that were computed were relatively stable during
26 this review period, which covers 2012 to 2018.  The most unequal
27 distributions, when it comes to share, were observed for the
28 deepwater groupers, tilefish, as well red snapper.
29
30 We looked at studies evaluating Gini coefficients and inequality
31 across IFQ programs around the country, and, based on the
32 findings, the effects of implementing the red snapper and the
33 grouper-tilefish IFQ are similar to the effects seen in other
34 catch share programs.  The major difference here is that, prior
35 to the implementation of our IFQ programs, we had, in the Gulf,
36 fairly unequal revenue distributions across vessels before that.
37
38 Therefore, even though we still have high inequality, when it
39 comes to the distribution, we cannot say that the IFQ programs
40 are responsible for that, because we had fairly unequal
41 distributions to start with.  For example, if you were just to
42 think about red snapper prior to the IFQ, we had Class 1 and
43 Class 2 permits, and Class 1 permits were allowed to harvest
44 2,000 pounds per trip, if I remember correctly, and Class 2 was
45 only 200, and so, obviously, if the distribution of shares is
46 based on historical landings, it will be highly unequal going in
47 favor of those that had Class 1 permits.
48

98

1  Now touching on safety-at-sea and the impact of the IFQ on
2  safety-at-sea, the main conclusion here is that the
3  implementation of IFQ programs improved safety-at-sea
4  significantly, and the improvement was more marked once the
5  grouper and tilefish IFQ went onboard, and part of the reason
6  here is the fact that, and Ms. Gray touched on that, the overlap
7  between the two programs, and so, when you expand and look at
8  the multispecies nature of both programs combined, then that
9  would explain the more significant reduction in fatalities,
10 meaning the larger improvement in safety-at-sea once the grouper
11 IFQ program came onboard.
12
13 One interesting result here is that, following the
14 implementation of IFQ programs, captains gave more, and are
15 still giving more, weight to weather conditions when planning
16 trips. Essentially, their attitudes toward risk has evolved.
17
18 We have included definitions for fishing capacity and
19 overcapacity, just for reference. In terms of changes in
20 capacity and technical efficiency, the results here rely on a
21 study conducted by Doctors Agar, Horrace, and Parmeter, and this
22 study was reviewed by the SSC at a previous meeting, and they
23 looked at fleet dynamics based on two models, and they looked at
24 it based on a model concentrating on the red snapper IFQ, and
25 the main finding is that technical efficiency increased by 6
26 percent post-IFQ.
27
28 For the reef-fish-wide model, which would account for the
29 grouper and tilefish IFQ, technical efficiency improved by 5
30 percent post-IFQ.
31
32 Now I will just go through some of the conclusions of the
33 review, and some of the points that I will make will be repeats
34 from Ms. Gray's presentation. The overall conclusion is that
35 both IFQ programs have been relatively successful in making
36 progress towards achieving their stated objectives, and, in
37 saying that, we have to keep in mind that, when these programs
38 were developed, most of the objectives were, and still are, of a
39 qualitative nature, for example, reduce capacity or improve
40 safety-at-sea.
41
42 There is one exception to that, which is the elimination of
43 season and quota closures, because we can measure the number of
44 days where fishing is available, and both programs are now
45 offering the opportunity for year-round fishing, provided that
46 the participant has the quota to land the fish.
47
48 In terms of data collection and reporting, this is still a

99

1  challenge, although the collection of allocation, as well as
2  share prices, has greatly improved since NMFS started requiring
3  transfer reasons, but this is an area where improvement could be
4  made.
5
6  In terms of participation and operational changes, overcapacity
7  has declined, and capacity utilization has increased.  We have
8  also seen a consolidation and efficiency gain within the bottom
9  longline as well as the longline sector.  The number of dealers
10 buying IFQ species is on an increasing trend, and it has been on
11 an increasing trend during the review period, and part of the
12 idea here is a lot of commercial fishermen are essentially
13 trying to cut out the middleman, if we could put it that way, by
14 becoming their own dealers.
15
16 In terms of shares and allocation caps, the distribution of
17 shares and landings have changed very little since the programs
18 were established.  Based on the evidence we have so far, market
19 power does not exist in any of the markets that we looked at,
20 landings, share, or annual allocation, and, here again, we need
21 to take this with caution, given the vertical integration that
22 we see, and so we will see more later on, once we have more
23 data.
24
25 The share and allocation caps are not constraining landings,
26 and, as we mentioned earlier, when we looked at the distribution
27 inequalities, landings, as well as revenues, were highly unequal
28 in these fisheries prior to the implementation of the IFQs.
29 Despite that, there are still concerns about unfairness and
30 distributional inequities.
31
32 As far as prices, ex-vessel prices, share and allocation prices,
33 the collection of share and allocation prices, as mentioned
34 earlier, continues to be a challenge, and, therefore, an
35 analysis of those prices is very difficult, if you would,
36 because analysis is hindered by erroneous data.
37
38 The red snapper IFQ program appears to have increased the ex-
39 vessel price for red snapper, as well as increased the stability
40 in those prices, but, for the grouper and tilefish IFQ, we did
41 not see a similar impact, and the program does not appear to
42 have had a significant impact on the ex-vessel price of grouper.
43 The flexibility that these programs afford the participants has
44 improved the profitability of fishing operations, because
45 fishermen are able to reduce their operating costs.
46
47 The programs do provide year-round fishing opportunities,
48 assuming that one has the quota, and the multiuse shares were

0003834

1  not particularly effective, because the bulk of it is used to
2  harvest gag grouper.  The primary reason for discarding IFQ
3  species is minimum legal size and other regulations, and, within
4  the IFQ context, other regulations could be the lack of annual
5  allocation.
6
7  Safety-at-sea, as we mentioned, the programs have improved the
8  safety-at-sea, and they have resulted in significant decreases
9  in the number of fatalities, and the risk profile, if you would,
10 or the attitude towards risk of captains has changed, especially
11 the risks associated with poor weather conditions.
12
13 To talk about new entrants, in general, when we say that a
14 program is promoting new entrants, that may seem inconsistent
15 with a limited-access privilege program.  However, this fishery,
16 all fisheries, need replacement fishermen to maintain
17 sustainable and viable fisheries in the long term, and so,
18 therefore, when we talk about new entrants, we have to primarily
19 think about replacement fishermen.
20
21 Many new entrants are already participating in the IFQ programs
22 in some capacity.  For example, we have crew members and hired
23 captains who currently do not own shares, or didn't own shares,
24 and then started buying little by little and then became full
25 participants, if you would, in the IFQ program.
26
27 For those reasons, access by new entrants, and keeping in mind
28 particularly replacement fishermen, would be consistent with the
29 objectives of both the red snapper as well as the grouper and
30 tilefish IFQ program.
31
32 This was also mentioned by Ms. Gray.  During the review period,
33 the cost recovery fees collected have fully funded the IFQ
34 program, including all enforcement activities and salaries of
35 staff working on the programs as well as the migration and
36 modernization of the online system.
37
38 The IFQ has implemented changes that have improved the
39 stakeholders' experience, as well as the performance of the
40 system.  Improvements in outreach efforts are also noted, and,
41 for example, now, the catch share section publishes brief
42 newsletters to address stakeholder requests, and that would
43 include in-season prices as well as landings data.  That would
44 be the last one, and I will try to answer questions, if you have
45 any.
46
47 **CHAIRMAN GUYAS:**  All right.  Thanks, Dr. Diagne.  We've got a
48 couple of hands up already, and I'm going to go to Jessica

0003835

1  Stephen first.
2
3  **DR. JESSICA STEPHEN:**  I did not have my hand up.
4
5  **CHAIRMAN GUYAS:**  Okay.  Sorry.  Greg.
6
7  **DR. STUNZ:**  Well, thank you, Martha, and thanks, Assane and Ms.
8  Gray, for the presentations.  I had a couple of questions, and,
9  Assane, I don't know if the first one is for you or for Ms.
10  Gray, because it was kind of in her presentation, but you
11  concluded with it there, and it had to do with the cost recovery
12  fees, and I'm sure you recall that was quite a bit of contention
13  over that, and I seem to recall, in the past, that the program
14  did not meet its expenses, and, in fact, there was a net, I
15  guess, loss, or whatever you want to call it, in terms of the
16  administrative costs to the program and to run it.    Did
17  something change, or I guess you said that's recently, or why
18  did it switch from in the red to in the black, all of a sudden?
19
20  **DR. DIAGNE:**  Thank you, Dr. Stunz, and, yes, absolutely.  In the
21  beginning, as, if you recall, in the beginning, we only had one
22  IFQ program, red snapper, and so, at that time, for the first
23  review of the red snapper IFQ program, the cost recovery fees
24  collected were insufficient, and they did not cover all the
25  costs of running the programs, but, by the mere fact of adding a
26  second program, essentially, you would have a larger scope, more
27  participants, and a much larger base from which to collect the
28  cost recovery.
29
30  That is the main reason, if you would, because you have the
31  single online platform that is running both programs, and it's
32  the same staff, and so, essentially, that is the main reason why
33  cost recovery fees collected now are sufficient to cover all the
34  expenses of the program.
35
36  **DR. STUNZ:**  Okay, and when was that inflection point, Assane?
37  When did it start to --
38
39  **DR. DIAGNE:**  Well, the grouper and tilefish program came online
40  in 2010, and so, as soon as you have that second program, the
41  cost recovery fees were multiplied, if I can say it that way,
42  because it is based on 3 percent of the ex-vessel value of the
43  fish landed.  Obviously, by the time you add the red snapper
44  quota to all of the quotas of the five share categories that we
45  have under grouper and tilefish, you have a much wider base to
46  collect from.
47
48  Just another note is the review presented here covers 2012 to

102

0003836

1   2018, and so, for the entirety of the review period, collected
2   cost recovery fees were sufficient to cover all the costs of the
3   IFQ program.
4
5   **DR. STUNZ:**   Okay.  Thank you, Assane.  If I may, Madam Chairman,
6   I have one more question.  Back in the early fifty slides, and I
7   don't recall exactly which one you were talking about, but
8   market power, and I am certainly not an economist, and so this
9   is coming from a layperson perspective, but you talked about
10  there wasn't market power, and my understanding of market power,
11  I guess, is that you're artificially maintaining a price that
12  wouldn't be there if there wasn't some type of other controlling
13  factor or something, but, in that same sort of slide, or in your
14  conclusion slide, you are obviously saying that there's concerns
15  about inequities and other sort of issues by people, maybe, that
16  don't have the shares.
17
18  That doesn't seem -- When we hear the testimony, and, for
19  example, the grouper longline fleet comes to mind, that we
20  recently heard over the past several meetings, I think they are
21  clearly arguing that there is some market power going on there
22  that's not allowing them to either get the shares they need or
23  enter that fishery to buy the shares and that sort of thing,
24  that they're inflated above what they can actually make from
25  doing the fishing.
26
27  I am wondering, is that just back to you not having the data
28  that you talked about you needed and more research, but it seems
29  like we're, at least at the council level, and I'm not an
30  economist, we're getting two stories, depending upon who you're
31  talking to here.
32
33  **DR. DIAGNE:**   Thank you for the question, and I think it's the
34  same story, but let's start and take this, if I may, piece by
35  piece.  The first part of your question refers to market power.
36  If we wanted to define market power, we would say that market
37  power is the ability to increase prices above the marginal
38  costs, if I could put it that way.
39
40  For example, if you think about let's say a farmer in the middle
41  of Iowa, or someplace, he or she has really no ability to
42  influence prices on the international market for whatever
43  commodity, and let's say corn, for example.
44
45  The more market power one has, the higher, or the wider, the
46  gap, or the distance, between the price and the marginal cost of
47  the product in question, and one last thing I will say, in terms
48  of I guess economics, is that, if you look at a perfectly

0003837

1  competitive market, there is zero market power over there, and
2  so the price is going to be equal to the marginal cost of the
3  product.
4
5  At the other extreme, if you were to look at a monopoly, there
6  is a lot of daylight between the price of the product and the
7  marginal costs, because, well, that entity has market power, has
8  the ability to influence the price of the product, and so we can
9  just consider market power as one's ability to influence the
10 price of the product and put it above the marginal cost, and so,
11 when we look at the three markets, the landings market, the
12 shares market, as well as the allocation market, the studies
13 that we have looked at, and the estimates that we have, indicate
14 that, for the time being, we do not have market power in any one
15 of those markets.
16
17 That said, I believe that I mentioned that we have to take that
18 conclusion with caution, because something that would, or
19 possibly could, result in market power is the vertical
20 integration that we are seeing in this fishery, and, by that, I
21 mean having the dealers control the share and the annual
22 allocation and essentially then controlling the harvest for the
23 product, and being in control of the chain as you move up, and,
24 hence, the term "vertical integration".
25
26 NMFS has begun collecting data to better study that.  It is
27 possible that, in the future, when we come back, one of the
28 conclusions would be, given vertical integration, we are
29 beginning to see evidence of market power in this or that
30 market, and that is possible.
31
32 The third part of what I understood from your question has to do
33 with people who cannot find shares, at least as they related to
34 you or in discussions to all of us, and, for that, I mean, the
35 first thing that I would say is that these programs are called
36 IFQs, right, individual fishing quotas, or catch shares, or
37 rights-based management, but there is another name that perhaps
38 sometimes we forget, and these programs are also called limited
39 privilege programs, right, and limited access privilege
40 programs, or LAPPs, in short.
41
42 Part of their main objective is to limit access, and, if you
43 were to do that, then anybody that would want to come in would
44 essentially have to, I guess, follow market conditions and pay
45 the asking price, if you would.  It is not that shares and
46 allocation are not available, but it may be the case that they
47 are too pricey for some, but that is, in essence, something
48 that, the minute you design an IFQ program, or a LAPP, that

0003838

1  comes with it, if you would.  I don't know if I missed a portion
2  of your question or if I answered it.
3
4  **DR. STUNZ:**  Thank you, Assane.  No, that was a very thorough
5  answer, but, I mean, I guess I would just say -- Madam Chair, I
6  will end here, so you can further the discussion, but what I'm
7  hearing from the people -- I understand LAPPs and the purpose of
8  limiting access, but they're willing to buy in, but they just
9  can't buy in at that marginal rate where they can actually make
10  money, based upon their costs.
11
12  To me, that signals that there must be some type of market power
13  there that is driving this above what it really costs them to go
14  out and get the fish and make a reasonable profit kind of thing.
15  I don't know, and I'm just trying to reconcile, and maybe it is
16  this vertical integration, and I don't know, but it's hard to
17  really pin down what is happening here.
18
19  **DR. DIAGNE:**  I mean, further studies are certainly warranted,
20  but, if we looked across the Gulf and nobody was buying
21  allocation, nobody, zero, then you would think that, well,
22  people cannot make money, but the fact of the matter is, when we
23  look at the allocation transfers, and I think Ms. Gray
24  mentioned, that, you see that the transfers, both shares and
25  annual allocation, are very, very dynamic, if you would, and, in
26  fact, the amount transferred exceeds the quota, in several
27  occasions.
28
29  I mean, the margin between I guess the selling price of an
30  annual allocation and the expected ex-vessel price appears to be
31  thin for some operators, and so I guess those operators are not
32  going to buy annual allocation, but you have, around the Gulf, a
33  lot of operators whose business model is to buy annual
34  allocation and harvest the fish and take the difference, and so
35  I guess further studies are warranted, but, for the time being,
36  those are the observations that I can offer.
37
38  **CHAIRMAN GUYAS:**  Thanks, Greg, and thanks, Assane.  Tom.
39
40  **DR. FRAZER:**  Greg, I was listening to what you had to say with
41  regard to some of the most recent observations, and the same
42  question came up to me earlier, and this review was actually
43  carried out on data only through 2018, and so a lot of the
44  comments that we are hearing about are based on 2019, 2020, and
45  2021, and so there's a little bit of a mismatch there, likely.
46
47  **CHAIRMAN GUYAS:**  Kevin.
48

0003839

1  **MR. ANSON:**  Thank you.  Great presentation, Dr. Diagne.  I tried
2  to look in the document, the current review document, and was
3  there any analysis, or any study, that was done directly with
4  the red snapper or grouper-tilefish participants regarding
5  operating costs prior to the implementation of the IFQ program
6  and at any time after the IFQ programs were implemented?
7
8  **DR. DIAGNE:**  A study on the operating costs prior and then
9  directly after?  I am not aware of a study looking at operating
10 costs prior to the implementation of these IFQ programs, and so
11 let's say, for red snapper, that would be in 2005 and so forth,
12 but, after the IFQ programs were implemented, and especially as
13 we move closer to current time periods, Dr. Liese of the Science
14 Center has spent a lot of time looking at operating costs.
15
16 Some of that is included in the description of the economic
17 environment within the review, and, if you look, you will see
18 segments of interest, or SOI, as the acronym, and, over there,
19 it is essentially subdivided in groups, and one could look at
20 the operating costs for different segments of interest,
21 including the red snapper and IFQ programs and so forth, as well
22 as the rate of returns, but, prior to the implementation of the
23 IFQ programs, I am not aware of studies that essentially look at
24 operating costs for the fleet itself.
25
26 **MR. ANSON:**  All right.  Thank you.
27
28 **CHAIRMAN GUYAS:**  Any other questions for Assane?  Okay.  I am
29 not seeing any right now, and we do have a couple of other items
30 to cover under this agenda item.  Let's go next to Dr. Lorenzen
31 for the SSC recommendations.
32
33                        **SSC RECOMMENDATIONS**
34
35 **DR. LORENZEN:**  The SSC reviewed the material with respect to the
36 joint red snapper and grouper-tilefish IFQ and finds it
37 acceptable for review by the AP panel and the council.  The
38 motion carried with no objection, and that concludes my
39 presentation.
40
41 **CHAIRMAN GUYAS:**  Thanks, Kai.  Are there questions for Kai?
42 Okay.  In that case, let's go to the Ad Hoc Reef Fish IFQ AP
43 recommendations.  I think, Dr. Diagne, it sounds like you're up
44 again.
45
46          **AD HOC REEF FISH IFQ AP RECOMMENDATIONS**
47
48 **DR. DIAGNE:**  Thank you.  The AP met on June 2 and discussed the

0003840

1   IFQ review, and it was a joint review of both the IFQ programs.
2   They had long discussions on several of these items, and I will
3   just point out some of the comments made by the AP, and, also, I
4   will talk about the motions that they approved.
5
6   When we discussed the challenges of collecting valid prices for
7   the transfers of shares, as well as annual allocation, the AP
8   members did suggest that the price data collected could be
9   improved by going directly to the websites that are now
10  essentially advertising IFQ shares and allocation for sale, and
11  so, over there, more relevant, if you would, prices could be
12  collected to supplement the data collection program that we
13  have.
14
15  The IFQ members did discuss public participation, and one of the
16  observations they made was that, when these programs were being
17  developed, most commercial fishermen were opposed to public
18  participation, but, at the end of the day, that was a decision
19  that the council made.
20
21  AP members did discuss the increasing trends that we see in the
22  number of dealers, and they commented that several fishermen
23  have decided to become their own dealer, to essentially handle
24  their own landings, but some AP members still felt that a small
25  number of large dealers control, or, if you would, handle most
26  of the fish landed.
27
28  Although most of the multiuse shares are devoted to harvesting
29  gag, the panel noted its appreciation for the multiuse shares
30  and the added flexibility it affords, and they passed a motion,
31  which is on the board right now, for the grouper and tilefish
32  IFQ program that we maintain all flexibility measures associated
33  with the red and gag multiuse and shallow-water grouper and
34  deepwater grouper, and that motion carried without any
35  opposition.
36
37  When they discussed prices of annual allocation and shares, the
38  AP noted that the high prices observed for annual allocation
39  were simply a reflection of market conditions, in their
40  estimation.
41
42  We did mention, in our conclusions, that the grouper and
43  tilefish IFQ program does not appear to have resulted in a
44  significant increase in the ex-vessel price of groupers, and AP
45  members did express some skepticism towards that conclusion, but
46  we did discuss and note that this conclusion comes from two
47  peer-reviewed studies, independent studies.
48

0003841

```
 1   We did talk about the absence of market power, which was part of
 2   Dr. Stunz's question, and, here, we reemphasized the caution
 3   that, until we have time to look at vertical integration in-
 4   depth, one should take the conclusion with caution, when it
 5   comes to the absence of market power, and, again, the agency has
 6   begun collecting ownership data to better track and study this
 7   issue of vertical integration, its impact on concentration, and
 8   which, in turn, how it would impact market power.
 9
10   As far as the review itself, these were the main comments
11   offered by the AP, but, in Other Business, the AP also discussed
12   the red grouper reallocation, as well as a potential expansion
13   of IFQ to other reef fish species.
14
15   If we go down to Other Business, there is a motion at the very
16   end.  Essentially, the Ad Hoc Red Snapper and Grouper-Tilefish
17   IFQ AP supports Reef Fish 53, Action 1, Alternative 2, which
18   would maintain a de facto allocation.   What the AP members
19   commented on was the fact that red grouper is a key species to
20   the survival of several fishermen.
21
22   Finally, AP members discussed a potential expansion of IFQs to
23   other reef fish species, and their recommendation, in the form
24   of a motion, is to have the council establish an ad hoc advisory
25   panel to develop an IFQ program for the remaining reef fish
26   species, and which species would be included in such a potential
27   program would be determined and discussed when that AP gets
28   underway, and that motion also carried without opposition.
29
30   I would stop here, and these were the comments, the main
31   comments, from the AP, and, if you have questions, we will try
32   to answer, or maybe the chair of the AP, Mr. Krebs, would also
33   have answers to your questions.
34
35   CHAIRMAN GUYAS:  Thanks, Assane.  Yes, David Krebs is here in
36   person, if anyone wants to ask him questions.  Thanks for being
37   here, David.  Are there any questions about this report, the AP
38   report?  Are you good?
39
40   MS. BOSARGE:  Yes, and I think I will have some questions maybe
41   as we get into specific actions in the document, and I think
42   that would be a better time for me to ask.
43
44   CHAIRMAN GUYAS:  All right.  For the IFQ program review, are we
45   going to go through the action document, or is that it?  Leann,
46   at least for the IFQ review, if that's what you're talking about
47   -- Okay.  We have this IFQ review, and I think the council staff
48   is looking for us to recommend approval and publication of this
```

0003842

1 review, and, basically, they are ready to put it on the website,
2 right?  Would you like a motion for that then?
3
4 **EXECUTIVE DIRECTOR SIMMONS:**  Yes.  That would be great.
5
6 **CHAIRMAN GUYAS:**  All right.  At this point, if we have
7 recommendations or updates to this report, or changes, now would
8 be the time to bring those up.  Otherwise, we're looking for a
9 motion to mark this as final and disseminate.  Kevin.  Thank
10 you.
11
12 **MR. ANSON:  I was waiting for somebody, if they wanted to add**
13 **anything to the document, and so I will make a motion to make**
14 **the red snapper and grouper-tilefish individual fishing quota**
15 **program review as final and available for posting to the**
16 **council's website.**
17
18 **CHAIRMAN GUYAS:**  You might need to say that again, Kevin, a
19 little slower.
20
21 **MR. ANSON:  I will make a motion to make the red snapper and**
22 **grouper-tilefish individual fishing quota program review final**
23 **and available for posting to the council's website.**
24
25 **CHAIRMAN GUYAS:**  Okay.  Is there a second to that motion?  It's
26 seconded by Dale.  Thanks.  Any discussion?  **Is there any**
27 **opposition to this motion?  Seeing and hearing none, the motion**
28 **carries.**  Okay.  That will take us to --
29
30 **DR. DIAGNE:**  Madam Chair, if I may, and thank you, we will just
31 add -- We appreciate the motion, and thank you very much.  We
32 will add to the review just a little summary of the points that
33 the council has made today, and, with that, it will be final,
34 and so we take this motion as also giving us the editorial
35 license to reflect today's discussions before we publish on the
36 website.
37
38 **CHAIRMAN GUYAS:**  Okay.  10-4.
39
40 **DR. DIAGNE:**  Okay.  Thank you very much.
41
42 **CHAIRMAN GUYAS:**  All right.  Let's move into our next item,
43 which is Reef Fish Amendments 36B and C.  We have that hard stop
44 at 5:00, and so we'll see how far we get, but I'm going to turn
45 it over to Dr. Lasseter.
46
47      **REEF FISH AMENDMENTS 36B AND 36C: MODIFICATIONS TO INDIVIDUAL**
48                    **FISHING QUOTA PROGRAMS**

109

1
2  **DR. AVA LASSETER:**   Thank you, Madam Chair.   With forty-five
3  minutes, let me touch on the action guide first, and then we can
4  make a decision.   What I intend to do is, since we have not seen
5  these documents in quite a while, is I was going to review the
6  history and the actions, starting with Amendment 36A and then go
7  through B and C.
8
9  We brought you a public hearing draft for Amendment 36B to the
10 August 2020 meeting, which we were not able to review, and you
11 last looked at Amendment 36C in January of 2020, and so it has
12 been some time.   At that time, we still have not had a chance to
13 provide you with the recommendations from the Reef Fish AP,
14 their last meeting, and now the remaining recommendations from
15 the Ad Hoc IFQ AP.
16
17 There is a public hearing draft for Amendment 36B, and so, if we
18 do approve the document, we have a few questions for you, and it
19 would be ready for public hearings, if you directed us to do so,
20 and we have had already had discussion that we would conduct
21 public hearings through a mail-out and two webinars, and I don't
22 think we're going to get to Amendment 36C today, and so we'll
23 probably have to push that to another meeting.
24
25 The question to pose to you now is the IFQ AP report.   Because
26 we have the chairman of the AP, David Krebs, here, it might be
27 better to review those first.   In the presentation, I have
28 incorporated all of the motions by action, and maybe it would be
29 a little easier to discuss then, because your memories may not
30 be -- My memory of the last time we reviewed this, I had to
31 really go back and read some minutes, and it might help to get
32 into the documents more first before we review the AP motions,
33 but is there a preference?
34
35 **DR. FRAZER:**   Well, I mean, it's your committee, Martha, and I
36 will defer to you, but there's probably some preference here to
37 get into the document.
38
39 **CHAIRMAN GUYAS:**   Yes, and I was just opening the presentation,
40 and maybe we can, like you mentioned, hit some of those AP
41 recommendations as we move through, and I think that's probably
42 the most efficient way.
43
44 **DR. LASSETER:**   That sounds good, and what I will do is I will
45 try and keep an eye on the time, and, at like ten minutes before
46 5:00, we'll just wrap up the presentation and hit the rest of
47 the AP recommendations.   Okay.   Let's move into the
48 presentation.

0003844

```
 1
 2  Because we have been working on this for so long, we added a
 3  history of the whole document for Amendment 36 to Appendix A,
 4  and so Appendix A has your alternatives considered but rejected,
 5  and, in the full version of 36B, if you look at Appendix A,
 6  there is a quite lengthy summary of the history of what has
 7  happened with all these amendments, and here is a brief outline
 8  of that.
 9
10  As you heard in the last presentation, the beginning of 2007 is
11  when the red snapper program was implemented, and the beginning
12  of 2010 was grouper-tilefish, and then each of the programs
13  opened up at the first of the year five years later, and so
14  we're talking the beginning of 2012 for red snapper and 2015 for
15  grouper-tilefish.
16
17  In August of 2011, and so that's just two meetings before it
18  went open to the public for red snapper, the council actually
19  initiated this Amendment 36 with a single action, which would
20  have stopped the opening for public participation, and it would
21  have maintained the requirement for shareholder to have a
22  permit.  That was driven by public comment at the time from
23  commercial fishermen.
24
25  We were beginning the process for the initial five-year review
26  for the red snapper program, and we did not go final on that
27  original Amendment 36, and we postponed it at that time, to get
28  the five-year review conclusions and then to consider additional
29  changes.
30
31  You reinitiated 36 in April of 2014, and, at that time, the
32  council reviewed a list of potential changes, and you began to
33  work on a document with multiple potential actions, until
34  January of 2016, when you divided 36A and 36B and moved forward
35  with A, and I will touch on those actions in just a moment,
36  going final on that in April of 2017.
37
38  You continued working on the remaining actions in Amendment 36B
39  until August of 2019, when you then split B and C, and so B has
40  only the permit requirement and a supporting action, and then,
41  last August, and so nearly a year ago, we did bring you a public
42  hearing draft for 36B, but we were unable to review the document
43  at that time.
44
45  36A had three actions in it, and it reclaimed shares that were
46  held in accounts that had never been activated since 2010, or
47  when the grouper-tilefish program had come onboard, and it also
48  gave NMFS the authority to withhold IFQ allocation at the
```

0003845

1  beginning of a year in which a quota reduction was anticipated.
2  Both of those actions were effective in the middle of 2018, and
3  the final action required all reef fish vessels, including those
4  without IFQ species, to hail-in three to twenty-four hours
5  before landing and to land at an approved landing location, and
6  that became effective at the beginning of 2019.
7
8  We do still have these reclaimed shares, and that action is
9  Amendment 36C, and I just wanted to highlight that, since we may
10 not get to that this afternoon.
11
12 36B, the purpose statement in 36B is currently to limit IFQ
13 share ownership in shareholder accounts without a valid or
14 renewable commercial reef fish permit, thereby promoting share
15 ownership by fishermen who have the ability to land reef fish
16 within the IFQ programs.
17
18 In this action, there are two related actions, and the first one
19 is requiring shareholders to have a permit, requiring some or
20 all shareholder accounts to be associated with a commercial reef
21 fish permit, and the second action is titled Share Divestment,
22 but it is the process for actually implementing that
23 requirement.
24
25 Those who are unable to meet the permit requirement, those
26 shareholder accounts that are not associated with a permit,
27 would need to do so by such a date, and there are options
28 provided, and then there's also an alternative that addresses
29 accounts in the future.  Should they not have a permit, how much
30 time would they be allowed, be provided, to get their account in
31 compliance before having NMFS reclaim those shares.  Ms.
32 Bosarge.
33
34 **MS. BOSARGE:**  Dr. Lasseter, it seems like, the last time we went
35 through this amendment, you kind of felt like our purpose and
36 need maybe didn't really fit the action items that we have in
37 the document, and I don't remember what the purpose and need
38 statement said then, and do you still feel like it needs a
39 little bit of tweaking, or are you comfortable with it?
40
41 **DR. LASSETER:**  I'm guessing that you're referring to Amendment
42 36C, and that's where we're talking about the new entrants and
43 the small participants and reducing discards.
44
45 **MS. BOSARGE:**  No, I was referring to this one, and let me read
46 you something.  The purpose, and you tell me if you're
47 comfortable with what you have or if you think this links it
48 better, and it doesn't matter to me either way.  The purpose of

112

0003846

1  this action is to promote a stronger relationship between share
2  ownership and federally-permitted commercial fishermen, thereby
3  increasing the likelihood that benefits on the IFQ fishery flow
4  to those directly involved in it.
5
6  **DR. LASSETER:**  I'm afraid I would have to kind of look at that
7  written down.  I mean, I'm happy if you wanted to provide --
8
9  **MS. BOSARGE:**  You just think about it, and we'll talk about it
10 later.
11
12 **DR. LASSETER:**  Okay.  That sounds great.  It was a lot of words
13 just listening.
14
15 **CHAIRMAN GUYAS:**  It's 4:30, folks, and it's been a long day.
16
17 **DR. LASSETER:**  Okay.  Let's go to the next slide, and here are
18 our alternatives for Action 1, and so always our Alternative 1
19 is no action, which would not establish new requirements to
20 obtain or maintain shares, and, in the interest of fitting all
21 of these on one slide, all of the following alternatives pertain
22 to the ability to obtain or to maintain, keep, shares that are
23 held in an account.
24
25 Alternative 2 would require all shareholder accounts to be
26 associated with a valid or renewable commercial reef fish
27 permit, and the note at the bottom also applies to all of these
28 alternatives, which defines what that means, and a shareholder
29 account is considered to be associated with a permit if the
30 permit has the same entity listed on both the shareholder
31 account and the permit.
32
33 Back to Alternative 2, all shareholder accounts would be
34 required to have a permit, and Alternatives 3 through 5 would
35 exempt some accounts.  Alternative 3 would allow shareholder
36 accounts established after December 31, 2014, and that are still
37 active -- I'm sorry.  Accounts after that date must be
38 associated with a commercial reef fish permit, and that date is
39 the five years after implementation of the grouper-tilefish
40 program, and that's seven years after the red snapper program,
41 and that's when public participation was then opened for both
42 programs.
43
44 Alternative 4 would establish that exemption date of
45 grandfathering in accounts at the date of a Reef Fish AP meeting
46 in 2019, October 2, and so all accounts established after that
47 date would need to be associated with a reef fish permit, and so
48 all accounts established before that date would be grandfathered

113

1  in and would not be required to get a permit.
2
3  Then Alternative 5 would set the date at the time when this
4  amendment is implemented, and so it's still in the future from
5  now, and that's why we don't have specific numbers for this one,
6  because -- In terms of what number of accounts would be
7  affected, because people could continue to open accounts until
8  this amendment is implemented, and all of those would be
9  grandfathered in and would not be required to have a reef fish
10 permit.
11
12 We do have some recommendations from both APs on this, and we
13 have those in a subsequent slide, and I wanted to talk a little
14 bit more about this action before we go into those, and so, to
15 give you a sense of the numbers we're talking here, if we look
16 at the next slide, both of these tables are provided in the
17 document.
18
19 These provide the number of accounts, and here we're talking
20 active, initial, and suspended accounts, and these numbers were
21 valid on February 25, 2020, and, of course, new accounts could
22 be created or closed all the time, and so the numbers can change
23 somewhat, and, on the left side, you can see accounts with and
24 without a permit, those that are associated with a permit and
25 those that are not associated with a permit on the right, and
26 then the top row being those accounts with shares and the bottom
27 without shares.
28
29 You have 369 accounts with shares that also have a permit, and,
30 here, we're talking red snapper and grouper-tilefish, and, at
31 the same time, you have 314 accounts that did not have a permit,
32 but did hold some amount of shares in at least one share
33 category.  This 314 number is what you would be talking about in
34 this action.  These are the accounts that, under Alternative 2,
35 if you required all shareholder accounts to have a permit, you
36 would be talking 314 accounts that currently would be affected
37 on that date.  They have shares, but they don't have a permit.
38
39 Now, if you remember back to the presentation that Ms. Gray just
40 gave, she talked about related accounts, and I believe the
41 number is about 90 percent they think are actually related to
42 another account, and that means there is some entity held in
43 common across these accounts, and many people may have their
44 shares held in one account and then a separate account where
45 they don't hold shares, but that's where they have their vessel
46 account, and so this 314 doesn't mean there's just going to be
47 314 needed permits.  It would be a number less than that under
48 Alternative 2.

114

0003848

1
2    On the table on the right, you can see, for each of the
3    alternatives, from that date, the number of accounts that would
4    be required to be associated with a permit and then the number
5    that would be exempt under each of those alternatives, and so
6    there is that Alternative 2 again, requiring all accounts, and
7    there is that 314, and the fewer accounts as you move forward in
8    time, and so, if you grandfather in everybody that opened an
9    account before public participation went final for the grouper-
10   tilefish program, there would be sixty-four accounts that would
11   be required to be associated with a permit, which is Alternative
12   3.
13
14   Picking that Reef Fish AP date in 2019 would require four
15   accounts to be associated with a permit by that date, and then
16   Alternative 5 is not any accounts at this time, but additional
17   accounts could even be created.
18
19   This is another table that is in the document that looks at the
20   number of reef fish permits in relation to landings and IFQ
21   accounts, and we have the data for 2015 and 2018, just as a
22   comparison, and the number of reef fish permits in 2018 is 845
23   valid or renewable reef fish permits.  Of those, 528 made at
24   least one pound of landings of any reef fish during that year,
25   and so this idea of how many permits would possibly be available
26   that are not being used, if we want to say latent permits, would
27   have been around 317 that no landings were made of any reef fish
28   in 2018.
29
30   At the bottom, you can see the number of IFQ accounts that were
31   associated with permits that had an active IFQ in 2018, over
32   700, and those with IFQ landings of, again, any share category
33   is about 450.  That's just to kind of give you some numbers of
34   permits available and accounts that could potentially be
35   affected under the different alternatives.
36
37   We would expect shareholders with an account that does not have
38   a permit to respond in different ways to a potential requirement
39   to get a permit.  Some would likely obtain a permit, and some
40   could possibly sell their shares, and we would expect that many
41   would consolidate related accounts or potentially form new
42   business partnerships.
43
44   We would not expect that many shares would be reclaimed by NMFS.
45   We would not expect that many would be available in accounts
46   that would be subject to divestment.  People would either --
47   They would most likely take care of them in some way.  However,
48   we don't know what would be done and who would do what, and

115

1  potentially public hearings could provide more insight.
2
3  Then one more note that this is in terms of accounts with shares
4  being able to maintain or obtain more shares, and accounts
5  without shares could continue to transfer allocation without
6  having a permit associated with them.
7
8  The next several slides, we're going to have some questions, and
9  let's kind of go through all of them before we answer them, so
10 you can be thinking about them, but, under those three
11 alternatives, 3, 4, and 5, there would be a new -- There would
12 be a group of accounts that would be exempt from the permit
13 requirement, and so there are some additional questions to
14 address of those.
15
16 What is the committee's intent for how those accounts could be
17 used, and would they be different than all the other accounts
18 that would be required to have a permit, and so, here again,
19 we're talking about, if you total up all of those accounts on
20 the left-hand-side table, you end up with 1,024 accounts, and
21 hang on to that for a moment.
22
23 This is the number of active initial accounts, which are those
24 that have been created that have not actually been used yet and
25 accounts that have been suspended, and there's various reasons
26 for that, like they need to update their citizenship
27 information, et cetera, and let's go on to the next slide.
28
29 Those are the three accounts that I just explained, and there's
30 one more, which is closed, and so closed accounts are still in
31 the system, and they can be reopened.  The names on the
32 accounts, however, may not be changed.  If you need to make a
33 name change, NMFS would create a new account for you.
34
35 Based on the account's creation date, these closed accounts
36 could be exempt from the permit requirement, if you intended
37 that, and so the question would be, to the committee, should
38 closed accounts that are potentially reopened later -- Would
39 they be considered exempt from the permit requirement?  To give
40 you a sense of how many closed accounts you're talking, the
41 total accounts from the previous slide, 1,024, you've got an
42 additional 800-plus accounts that are closed.
43
44 More questions about how can these exempted accounts -- Which
45 accounts would be exempt, and how could they be used.  Can an
46 exempt account that's not required to have a permit increase the
47 amount of shares in that account, or is that exempted account,
48 the amount of shares, is that capped at the time this amendment

0003850

1  is implemented?
2
3  If an exempted account then sells some of its shares, does that
4  become the new share cap for that account, or can they then
5  again further increase their amount of shares?  Then just a note
6  for the first five years of each program, before participation
7  began, we did have some -- You had some accounts that no longer
8  maintained their permit, but they did keep their shares, and
9  those accounts were allowed to maintain the amount of shares
10 that they had, but they could not increase their shareholdings.
11 They had to obtain a permit.
12
13 Additional questions, currently, accounts that have been closed,
14 as noted, can be reopened, and it retains that original date of
15 creation.  As I noted, changing the name for an account would
16 require a new account.  However, changing the ownership behind
17 an account that's in the name of a business would not require
18 the creation of a new account, and so some accounts that are
19 names of businesses, once they're exempt, they could be changing
20 ownership behind them, and they would maintain that exempt
21 status, but we want to know, would it be the committee's intent
22 to allow closed accounts to be reopened and be considered exempt
23 from the permit requirement and to be able to reopen their
24 account and obtain shares without getting a permit?
25
26 Now I am going to come to the AP recommendations, and they are
27 very similar to the Alternative 4, which provided an AP date as
28 a more updated date after the five-year public participation
29 date for when the council would be grandfathered in.
30
31 From the Reef Fish AP's October 6, 2020 motion, and so a year
32 after their Alternative 4 motion, they passed another one to add
33 an Alternative 6.  For shareholder accounts established after
34 that date of that October 6, 2020 AP meeting date, and then the
35 remaining text of that alternative.
36
37 The recent Ad Hoc IFQ AP, that met on June 2, 2021, passed a
38 similar motion as well, to add an alternative grandfathering in
39 all shareholder accounts established before the date of that AP
40 meeting.   Thus,  all  accounts  after  June  2,  2021  would  be
41 required to be associated with a reef fish permit, and they also
42 recommended this alternative -- The ad hoc AP recommended this
43 as -- That the council select this as their preferred.
44
45 Here is all the alternatives, and I included the AP motions at
46 the bottom there, and so, for each alternative, accounts with
47 shares, and that's the number that would be required to have a
48 permit, those accounts opened before each respective date that

0003851

1  would not be required to have a permit, and, on the right
2  column, you can see the number of accounts with shares, but no
3  permit, as of a year ago, that would fall under each of those
4  alternatives, and so there is that 314 number that we looked at
5  before for Alternative 2, and that's all accounts from that date
6  that would be required to have a permit, and then backing off.
7
8  For five years, you're talking about sixty-four accounts that
9  are going to have to either align with another account or get a
10 permit or sell their shares.  Then four as of the October 2019
11 AP, and to be determined for the current AP motions.  I am going
12 to stop there for a moment.
13
14 **CHAIRMAN GUYAS:**  Ed and then Leann.
15
16 **MR. SWINDELL:**  Do all Reef Fish Advisory Panel members hold
17 accounts?
18
19 **DR. LASSETER:**  I believe they all hold shareholder accounts.  I
20 don't know if Mr. Parker owns -- I'm sorry.  The Reef Fish AP,
21 or did you say the IFQ AP?  The Reef Fish AP is made up of
22 private recreational, charter captains, and commercial
23 fishermen, and so not all Reef Fish AP members are involved in
24 the IFQ program and have an account, no.
25
26 **CHAIRMAN GUYAS:**  Leann.
27
28 **MS. BOSARGE:**  Ava, is it our intention to send this out for
29 public hearings after this meeting?
30
31 **DR. LASSETER:**  That is at the discretion of the committee and
32 the council, if you feel you wish to pursue this and send this
33 out for public hearings.
34
35 **MS. BOSARGE:**  Okay.  Then I'm going to make a motion, in order
36 to start some discussion, and let's try and pick a preferred, if
37 that's okay with you, Madam Chair.  Do you want some discussion
38 first?  I can hold on.
39
40 **CHAIRMAN GUYAS:**  Well, theoretically, I'm good with that, but we
41 have twenty minutes, and we have David here, and so I was
42 wanting to at least get through the AP stuff, so that at least
43 folks can conference with him on the side, or staff can
44 facilitate conversations with him, if there are people that are
45 on the phone, but that's where I'm at, and so I would say we
46 kind of just need to get through this presentation, honestly,
47 but, Dale.
48

0003852

1  **MR. DIAZ:**  I don't know what Leann's motion was, but, without
2  having to make a motion, I would like to see one of the AP
3  motions added into the document, and we've got two advisory
4  panels giving us advice, and I don't want to load the document
5  up with too much stuff that's got to be analyzed either, and so
6  we might have to pull some stuff out, but I am in favor of
7  putting some stuff in, but we don't have to do it right now.
8
9  **CHAIRMAN GUYAS:**  Let's do this.  Let's, to the extent that we
10  can, handle this at Full Council, if we can, so that we can at
11  least kind of get this stuff out there, and people can chew on
12  it for a couple of days, and then we'll do what we can in Full
13  Council, and then we may just need to see where we are.  We may
14  not be through enough of this to approve it for public hearing
15  at this meeting.  Susan, do you have a question?
16
17  **MS. BOGGS:**  Yes, ma'am.  Ava, thank you for the presentation so
18  far.  Based on some of the dates that we're hearing, and not
19  making a motion, but hearing some dates, control dates, of like
20  June 2, 2021, how would it change this with the number of
21  accounts, as of February 25, 2020, that we're looking at for
22  account holders, and would it change 10 percent or 50 percent,
23  or do you have a clue?
24
25  **DR. LASSETER:**  I do not have a clue.  We will have to request
26  that information, and we will.  We did not update the data in
27  this, except a couple of little tables, since we brought it to
28  you in the public hearing draft, because we really weren't sure
29  if you were going to go forward with a public hearing draft and
30  what might happen with 36C, and so we do need to do -- If you do
31  send this out for public hearings, we intend to update the draft
32  with more recent data and then potentially go to public hearings
33  between August and October, would kind of be our broad plan.
34
35  I don't expect -- Like looking at these numbers though, I mean,
36  only four accounts since January of 2020, and I wouldn't think
37  it would be that many with shares, but I really don't know.
38
39  **CHAIRMAN GUYAS:**  Okay.
40
41  **DR. LASSETER:**  I will just review Action 2, and then we'll
42  finish the rest of the AP motions for 36C, and then we'll call
43  it a day.  Okay.  Action 2, this action addresses, pretty much
44  implements, or makes effective, the previous action.  Thus, the
45  Alternative 1 is written such that shareholders must be in
46  compliance by the effective date of the final rule implementing
47  this amendment, or NMFS would reclaim the shares from those
48  accounts.

0003853

1
2   Alternative 1 here is essentially saying all accounts that the
3   council would select as needing a permit would have to have
4   gotten that permit by the time this amendment goes final, or
5   else those shares will be reclaimed.
6
7   The alternatives here provide grace periods, essentially, and it
8   allows time for accounts beyond the date that this amendment is
9   being implemented to get into compliance.  Alternative 2 is kind
10  of like the immediate effect.  NMFS will reclaim all shares in a
11  shareholder account that is not associated with a commercial
12  reef fish permit in one year, three years, or five years
13  following the effective date of the final rule implementing this
14  amendment, and there's more detail in the discussion that
15  describes this as this is what happens in the short term, and
16  this is reaction to this immediate implementation of this.
17
18  Alternative 3 refers to after implementation of this amendment,
19  in the future, should accounts later on no longer be in
20  compliance with this requirement, and how much time would they
21  have to get their accounts in order, and the same options are
22  provided there of one year, three years, or five years, and we
23  have it termed "following the transfer or termination of the
24  permit".
25
26  When the IPT was developing this, we were considering what would
27  be future reasons that an account might not be in compliance,
28  that we needed to have this covered, and that was, okay, you
29  didn't maintain your permit, for some reason, but another issue
30  came up and was pointed out to us by the IFQ AP, and so they --
31  I see this as aligned with this particular action, and so let's
32  go to the next slide there.
33
34  The IFQ AP recommendation at the bottom, this was part of one of
35  their alternatives asking for this different control date, and
36  they added there "inherited shares from a death in the family
37  are exempt from this requirement for a period of three years".
38
39  There was quite a bit of discussion amongst the AP members about
40  having this kind of a provision, and so, until now, there would
41  be no need for a provision like this, because there is no
42  restriction on share transfers, right, and so you don't need to
43  say, well, you get to inherit them, because there is no
44  prohibition on doing so, but this would be an initial
45  requirement restriction.  To get a restriction on transfer of
46  shares, you must have a permit, and so the AP is recommending
47  that you add this as a type of exemption and you provide three
48  years.

0003854

```
 1
 2    There is a process in the regulations that NMFS follows if
 3    somebody does pass away, and it's under the closed accounts
 4    section, and so somebody would contact -- It is incumbent on the
 5    individuals to contact NMFS and let them know that, hey, I am
 6    the heir of this person, and this person has died, and so you do
 7    have to go through NMFS and through this process to provide
 8    documentation.
 9
10    Another point here is that these requirements are not on the
11    individual.  They are on the accounts, and so, just because
12    somebody dies, NMFS does not know that they have passed away,
13    and that account is still there, and so somebody would have to
14    take action and open a new account and contact NMFS and provide
15    the documentation and then have shares transferred over.
16
17    We need to discuss that with the IPT still, and we have not had
18    a chance to meet since the AP, but this sounds like this action
19    could be expanded to address this issue of inherited shares with
20    the same range of time periods, one, three, and five years, or
21    you could potentially intend there to be a different grace
22    period for someone to settle their estate, versus someone who
23    let their permit expire.  I will pause there.
24
25    CHAIRMAN GUYAS:  I've got Leann and then Troy.
26
27    MS. BOSARGE:  I think, honestly, that exemption is really -- We
28    didn't plan for it to be that, but it's already in the document.
29    If you look at that second action item that you have, Ava, it
30    seems to me like we would be choosing two preferreds there, when
31    we get ready to choose preferreds, and the first would be --
32    Well, let's look straight at Alternative 3, because it speaks to
33    what the AP was talking about.
34
35    It says, after implementation of this amendment, if a
36    shareholder account no longer has a valid or renewable reef fish
37    permit, and so, first, let me back up.  If I had made the
38    motion, I was going to say that this would not -- This would
39    only apply at implementation, okay, and any account opened after
40    implementation of this amendment would be required to have a
41    reef fish permit, all right, and so, when this was implemented,
42    it would be my prerogative to give them three years, and I would
43    choose that three-year option, and this is why I wanted to pick
44    preferreds, and it would be easier to understand if I was making
45    motions, but, anyway, to pick the three-year option.
46
47    After we implement this, if you didn't have a permit associated,
48    and you open a new account, and you don't have a permit
```

0003855

```
 1  associated with it, you've got three years, right?  Then, if you
 2  have an account, and somehow the permit gets disjoined from it,
 3  right, which could happen in this thing about death and things
 4  like that, you have -- The way this alternative reads is, if a
 5  shareholder or an account no longer has an associated valid or
 6  renewable reef fish permit, i.e., the permit is transferred or
 7  not renewed or something, the shareholder must divest of the
 8  account shares, which means you've going to have to sell them or
 9  open a new account or something, in order to meet the
10  requirements of Action 1, or the shares will be reclaimed by
11  NMFS.
12
13  My intent was to choose that three years following the transfer
14  or termination of the permit, and so that essentially, in that
15  death scenario, gives you three years, again, to have time to do
16  something before NMFS would take back the shares, and so I just
17  thought I would throw that out there, so that, if we are going
18  to get some public testimony on this, you would know at least my
19  thought process and you could give us some feedback.
20
21  While I have the mic, the reason that I was going to choose to
22  have this apply, this requirement of having a permit associated
23  with the shareholder account, the reason I was going to have it
24  apply upon implementation of this document was actually because
25  of the discussion that the IFQ AP had.
26
27  Personally, I was hoping to go backwards in time with this,
28  right, but, after I listened to them, I thought they made some
29  good points, and I felt like some of them wanted it back in time
30  and some of them wanted it out into the future, and I think they
31  kind of came to a good landing spot on that, and so I didn't
32  feel the need to fall on my sword and go back in time if we
33  could just get this established going forward, and I thought
34  that would be a big step, and so David Krebs is in the audience,
35  and he was the chairman of that AP, if he wanted to add anything
36  that maybe I misinterpreted or didn't catch in that meeting.
37
38  CHAIRMAN GUYAS:  Troy.  David, you're coming up?  Okay.
39
40  MR. DAVID KREBS:  Leann, I think you captured our concerns,
41  because it was a departure from the original advisory panel
42  recommendation of what to do after death, and so it was a
43  concern of ours, because nobody that I know of had prepared for
44  it.
45
46  We had the individual option, as an heir, to sell the shares or
47  to keep them, in the original premise of the AP, and then,
48  because it got opened up to the public after five years, and now
```

0003856

1   you guys want to close that, and we did too, and we never wanted
2   an investor fishery, but now that changes the whole parameters,
3   as you try to limit this stuff down, and it gets really
4   interesting, because it's the double conundrum.  You said here
5   half the day and talked about more people wanting to get shares
6   and get in, and, by doing these things, we're actually forcing
7   more people out, but you got it.
8
9   **CHAIRMAN GUYAS:**  Thanks, David.  Troy and then Andy, or, Andy,
10  is it a question for David?
11
12  **MR. WILLIAMSON:**  I guess my question is can the shareholders
13  transfer their shares into a private corporation?
14
15  **DR. LASSETER:**  There are private corporations that hold shares.
16  You open an account, and you go through the process of opening
17  an account, and so, yes, many accounts are held in the name of a
18  business entity name, and many accounts are held in the name of
19  an individual or more than one individual.
20
21  **MR. WILLIAMSON:**  So, in the event of -- Corporations don't die,
22  and so there is no issue regarding a shareholder who has
23  transferred his shares into a corporation, the death of one,
24  because they don't have to -- In other words, if it's in a
25  corporation, and they have a permit, then they don't have to do
26  anything, right?
27
28  **DR. LASSETER:**  NMFS does maintain ownership of accounts, and so
29  the -- If somebody dies and is the sole owner of the
30  corporation, somebody, at some point, will notify NMFS and
31  update the ownership, whoever has access to that account.
32
33  **MR. WILLIAMSON:**  So we've got a corporation that never dies, and
34  we've got -- That owns shares of a public resource in
35  perpetuity.
36
37  **DR. LASSETER:**  Technically, the shares are permits that are
38  endured ten years, I believe, and then it's just they are
39  continually renewed unless the council changes it, and I think
40  that's the way it was set up in Magnuson.
41
42  **CHAIRMAN GUYAS:**  David, go ahead.
43
44  **MR. KREBS:**  I like the way Troy is thinking, but that was not
45  our interpretation, and so, in my case, my shares were qualified
46  under a corporation, and so the shares went -- The boats are in
47  a corporation, and they qualified for the permits, and so the
48  permits and shares came into the corporation as well, and so

123

```
 1  there is still a reef fish permit associated with the
 2  corporation, and so they are still tied together, even though
 3  there's a corporation, and I like the way you're thinking, if I
 4  could get away with not having a permit and keep the shares in a
 5  corporation, and so, I mean, that's something you may want to
 6  define as well.
 7
 8  There are people that are corporations after the five years that
 9  bought as private investors and put it in a corporation, but,
10  for the majority of us, I think, that have corporations when we
11  were qualifying from 1993 to 2004, I think that we qualified as
12  corporations, and the shares were issued in the corporation's
13  name, if that helps any.
14
15  MR. WILLIAMSON:  I guess, David, that I think it's a great way
16  to do business, and, if I were your attorney, I would be
17  recommending the same thing, but I guess my concern is about
18  getting these shares back into the marketplace, and, if they're
19  in a corporation -- Like I said, it's a public resource that's
20  in a corporation in perpetuity, and that just doesn't seem right
21  to me.
22
23  MR. KREBS:  Well, again, being as we're on opposite sides of the
24  fence with recreational, commercial fishing is a tough business.
25  We on the AP, and I was on the original AP that designed it --
26  Alaska allowed for processor shares, and Bill Horn from Buck
27  Seafood and I were the only dealers that I remember being on the
28  AP, and we said, well, are you guys going to put processor
29  shares, or how do you maintain a fish house if you have no fish?
30
31  Throughout the whole derby years, everybody needed the fish for
32  fish houses, and now, as you're hearing today, fishermen are
33  getting their own dealer permits and becoming their own dealers.
34  Well, I've got a substantial investment, and I had it back then,
35  and I've got it now, and what keeps my fish house alive?  That's
36  why Alaska has processor shares, to make sure that investment
37  continues, because it does take the mechanism of people to move
38  the wholesale fish through the supply chain.
39
40  As much as I appreciate what you're saying, you can look at it
41  from the recreational side too, of, if only one person can sell
42  hooks, or boats or whatever, but it's just commerce, and so I
43  wonder, long term, as we keep whittling this stuff down, how are
44  the fish houses going to survive, honestly, and it takes a lot
45  of product to pay bills, and so I am not as concerned about this
46  perpetuity -- I mean, I would love for my kids to take over my
47  fish house, and I think Captain Guindon would love for his kids,
48  and, I mean, we've put our whole life and blood into supplying
```

0003858

1  American with fish, and so we would like to see it keep going.
2
3  **CHAIRMAN GUYAS:**  Thanks, David, and thanks, Troy.  We've got a
4  time check, and it is 4:57, and I have one more hand, and so I'm
5  going to go to Andy, and I think you're going to be it.
6
7  **MR. STRELCHECK:**  Wow.  The last word.  Leann, I like the way you
8  were thinking earlier, when you started talking about the
9  purpose, and I feel like 36B and C have really struggled to get
10 off the ground, because we've been trying to figure out, well,
11 what problem are we trying to resolve, or what problem are we
12 trying to answer.
13
14 I still am struggling, I think, with the purpose and need, in
15 some respects because of information we saw this morning, which
16 is the system is dynamic and public participant accounts are
17 related to accounts with permit holders, and it's just kind of
18 hard to tell exactly kind of all those interconnections within
19 the system.
20
21 One of the things that I guess that I wanted to comment on, with
22 regard to the need statement, is we talk about optimizing yield
23 in the fishery as kind of the basis for this decision, but, if
24 you look at red snapper, we're catching 99.5 percent of the
25 quota, right, and so we're optimizing the yield, at least coming
26 out of the commercial portion of the red snapper fishery, and I
27 would argue, for the grouper-tilefish fishery, there's probably
28 not a lot of public participation that's really limiting what's
29 being caught, and that's more conditions of the fishery itself.
30
31 I think we need to think about the purpose and need a little bit
32 more carefully here, and I go back to, Leann, your comment
33 earlier about, if the desire is to ensure quota shares are in
34 the hands of those fishermen, and that's kind of a goal or
35 objective of ours, then that purpose and need statement should
36 reflect that accordingly.
37
38 The other, I guess, statement I would make is, given the range
39 of options here and the amount of people that could be exempted
40 from this, to me, I really struggle with seeing those large
41 numbers that would be exempted as really accomplishing the
42 purpose and need as written currently, right, because, if we are
43 truly trying to put it either in the hands of fishermen or
44 optimize yield, then, ideally, those would be the ones linked to
45 reef fish permits, and so food for thought.
46
47 **CHAIRMAN GUYAS:**  Tom says yes, and it's 5:00.
48

125

0003859

 1  **MS. BOSARGE:**  All right, and so, Andy, I'm going to get with
 2  staff, because I did also revamp the need statement, based on
 3  what you said, and, just to kind of paraphrase, in that need
 4  statement, yes, there is this need to achieve OY, but, balanced
 5  with that need, you have to balance the need for ensuring that
 6  sustained participation from those fishing communities, and so,
 7  to me, that's what this whole premise is about, is when you
 8  start having the public participation kind of disjoining the
 9  fish from the fish house and the fishermen, and so I will get
10  with staff and see if they like it.
11
12  **CHAIRMAN GUYAS:**  We will call it there.
13
14  (Whereupon, the meeting adjourned on June 23, 2021.)
15
16                              - - -

0003860

# ADMINISTRATIVE RECORD

# NO. 099

GULF OF MEXICO FISHERY MANAGEMENT COUNCIL

285TH MEETING

FULL COUNCIL SESSION

Opal Key Resort & Marina and Virtual   Key West, Florida

June 24-25, 2021

**VOTING MEMBERS**
Kevin Anson (designee for Scott Bannon)...................Alabama
Patrick Banks............................................Louisiana
Susan Boggs.............................................Alabama
Leann Bosarge.........................................Mississippi
Dale Diaz.............................................Mississippi
Jonathan Dugas........................................Louisiana
Phil Dyskow..............................................Florida
Tom Frazer...............................................Florida
Martha Guyas (designee for Jessica McCawley).............Florida
Robin Riechers..............................................Texas
John Sanchez.............................................Florida
Bob Shipp...............................................Alabama
Joe Spraggins........................................Mississippi
Andy Strelcheck............................................NMFS
Greg Stunz................................................Texas
Ed Swindell..........................................Louisiana
Troy Williamson...........................................Texas

**NON-VOTING MEMBERS**
Dave Donaldson..........................................GSMFC
LCDR Lisa Motoi.........................................

**STAFF**
Assane Diagne.........................................Economist
Matt Freeman..........................................Economist
John Froeschke..................................Deputy Director
Beth Hager.................................Administrative Officer
Lisa Hollensead............................Fishery Biologist
Ava Lasseter.......................................Anthropologist
Mary Levy..................................NOAA General Counsel
Jessica Matos..........Document Editor & Administrative Assistant
Natasha Mendez-Ferrer..........................Fishery Biologist
Emily Muehlstein.....................Public Information Officer
Kathy Pereira...............Meeting Planning - Travel Coordinator
Ryan Rindone................Lead Fishery Biologist/SEDAR Liaison
Bernadine Roy.......................................Office Manager
Carrie Simmons...............................Executive Director

1

0003867

```
 1   Carly Somerset.....................Fisheries Outreach Specialist
 2
 3   OTHER PARTICIPANTS
 4   Karen Bell.............................................Cortez, FL
 5   Charles Bergmann..............................................MS
 6   Ryan Bradley..................................................MS
 7   Eric Brazer...............................Shareholders Alliance
 8   Catherine Bruger..........................Ocean Conservancy
 9   Rick Burris...................................................MS
10   Chester Brewer.............................................SAFMC
11   Frank Chivas..................................................FL
12   Bubba Cochrane.................................Galveston, TX
13   Scott Daggett...............................Madeira Beach, FL
14   Jason DeLaCruz................................................FL
15   Blake Dorchak..............................Fort Myers, FL
16   Bob Dorchak................................Fort Myers, FL
17   Pam Dorchak................................Fort Myers, FL
18   Katie Fischer...............................Matlacha, FL
19   Jim Green.......................................Destin, FL
20   Buddy Guindon.................................Galveston, TX
21   Ken Haddad...................................................ASA
22   Chad Hanson.......................Pew Charitable Trusts
23   Sean Heverin..................................................
24   Scott Hickman.................................Galveston, TX
25   Peter Hood..................................................NMFS
26   Dylan Hubbard.................................................FL
27   Rick Kilgore................................Islamorada, FL
28   Randal Kramer.................................................
29   David Krebs.....................................Destin, FL
30   Randy Lauser................................Madeira Beach, FL
31   Ed Mancini.................................................SOFA
32   Jack McGovern..............................................NMFS
33   Jay Mullins...................................................
34   ASAC John O'Malley.........................NOAA OLE
35   Captain Scott Pearce.........................................FL
36   Clay Porch.................................................SEFSC
37   Kellie Ralston...............................................ASA
38   Charlie Reiner..............................Madeira Beach, FL
39   Paul Reeves...............................Steinhatchee, FL
40   Casey Streeter..............................Matlacha, FL
41   Matt Tevlin...................................................
42   David Walker..................................................AL
43   Wayne Werner.................................Alachua, FL
44   Ted Venker...................................................CCA
45   Bob Zales, II.................................Panama City, FL
46
47                              - - -
48
                                2
```

TABLE OF CONTENTS

Table of Motions....................................................4

Call to Order, Announcements, and Introductions...................6

Adoption of Agenda and Approval of Minutes.......................10

Presentations....................................................11
        NOAA Office of Law Enforcement...........................11
        Commercial Fish Rules App Overview.......................14

Public Comment...................................................21

Committee Reports................................................72
        Red Drum Committee Report................................72
        Habitat Protection and Restoration Committee Report......79
        Migratory Species Committee Report.......................82
        Shrimp Committee Report..................................87
        Administrative/Budget Committee Report...................96
        Mackerel Committee Report...............................106
        Data Collection Committee Report........................128
        Sustainable Fisheries Committee Report..................135

Supporting Agencies Update......................................138
        South Atlantic Council Liaison..........................138
        Florida Law Enforcement Efforts.........................143
        Gulf States Marine Fisheries Commission.................148

Committee Reports (Cont.).......................................151
        Reef Fish Committee Report..............................151

Adjournment.....................................................213

- - -

0003869

```
 1                        TABLE OF MOTIONS
 2
 3   PAGE 89:  Motion to modify the purpose of the document to read:
 4   The purpose of this action is to transition from the expired 3G
 5   cellular electronic logbook program to a system that would
 6   maintain the council's and NMFS's scientific ability to estimate
 7   and monitor fishing effort in the Gulf of Mexico shrimp fishery
 8   while minimizing the economic burden on the industry to the
 9   maximum extent practicable.  The motion carried on page 89.
10
11   PAGE 89:  Motion in Action 1 to revise Alternative 2 to read:
12   Alternative 2. Modify the method to collect vessel position
13   data.  If selected, the owner or operator of a shrimp vessel
14   with a valid or renewable moratorium permit would be required to
15   install an approved vessel monitoring system (VMS) that archives
16   vessel position and automatically cellularly transmits that data
17   to the NMFS.  The motion carried on page 91.
18
19   PAGE 92:   Motion in Action 1 to add an Alternative 3:
20   Alternative 3. Modify the method to collect vessel position
21   data.  If selected, the owner or operator of a shrimp vessel
22   with a valid or renewable moratorium permit would be required to
23   install an approved electronic logbook that archives vessel
24   position and automatically cellularly transmits that data to the
25   NMFS.  The motion carried on page 94.
26
27   PAGE 96:  Motion to approve the final funded 2021 budget.  The
28   motion carried on page 97.
29
30   PAGE 97:  Motion to fund the expanded sampling and ageing study
31   on Gulf of Mexico gray triggerfish, with SSC recommendations.
32   The motion carried on page 97.
33
34   PAGE 99:   Motion to fund a call for proposals for expanded
35   sampling of the fleet for effort monitoring in the Gulf of
36   Mexico federally-permitted shrimp industry as presented in
37   agenda item Tab G, Number 5(b).  The motion carried on page 105.
38
39   PAGE 108:   Motion in Action 3 to make Alternative 3 the
40   preferred alternative.  The motion carried on page 112.
41
42   PAGE 112:   Motion in Action 4 to make Alternative 2 the
43   preferred alternative.  The motion carried on page 112.
44
45   PAGE 113:  Motion in Action 5.1 to make Alternative 2, Option 2b
46   the preferred alternative.  The motion carried on page 113.
47
48   PAGE 114:  Motion in Action 7 to make the amended Alternative 2
```

4

0003870

1  the preferred alternative.  The motion carried on page 114.
2
3  PAGE 131:  Motion to convene the Data Collection AP to recommend
4  options for electronic reporting due to equipment failure.  The
5  motion carried on page 134.
6
7  PAGE 155:   Motion in Action 1 to create a new Preferred
8  Alternative 7 to read as follows: Preferred Alternative 7.
9  Revise the sector allocations of the total ACL between the
10 recreational and commercial sectors as the average landings
11 using the Fishing Effort Survey adjusted Marine Recreational
12 Information Program data during the years 1986 through 2005,
13 based on the Southeast Fisheries Science Center ACL monitoring
14 datasets with an implementation date of January 1, 2023,
15 maintaining the allocations for red grouper at 76 percent
16 commercial and 24 percent recreational until January 1, 2023, at
17 which time the sector allocations will change to 59.3 percent
18 commercial and 40.7 percent recreational.  Revise the OFL and
19 ABC as recommended by the SSC, based on SEDAR 61.  Set the stock
20 ACL equal to the stock ABC.  The motion failed on page 173.
21
22 PAGE 173:  Motion to approve Reef Fish Amendment 53: Red Grouper
23 Allocations and Annual Catch Levels and Targets and that it be
24 forwarded to the Secretary of Commerce for review and
25 implementation, and deem the codified text as necessary and
26 appropriate, giving staff editorial license to make the
27 necessary changes in the document.  The Council Chair is given
28 the authority to deem any changes to the codified text as
29 necessary and appropriate.  The motion carried on page 180.
30
31 PAGE 181:  Motion to request SEFSC run an analysis for Greater
32 Amberjack which shows what the historical ABCs and ACLs would
33 have been with FES back in time.  The motion carried on page
34 182.
35
36 PAGE 185:  Motion to make the Red Snapper and Grouper-Tilefish
37 IFQ Program Review final and available for publishing on the
38 council's website, www.gulfcouncil.com.  The motion carried on
39 page 185.
40
41 PAGE 186:  Motion in Action 1 to make Alternative 5 the
42 preferred alternative.  The motion carried on page 195.
43
44 PAGE 195:  Motion in Action 2 to make Alternative 3, Option 3b
45 the preferred alternative.  The motion carried on page 200.
46
47                          - - -
48

0003871

1  The Full Council of the Gulf of Mexico Fishery Management
2  Council convened on Thursday afternoon, June 24, 2021, and was
3  called to order by Chairman Tom Frazer.
4
5              **CALL TO ORDER, ANNOUNCEMENTS, AND INTRODUCTIONS**
6
7  **CHAIRMAN TOM FRAZER:**  Welcome to the 285th meeting of the Gulf
8  Council.  My name is Tom Frazer, and I'm the chair of the
9  council.  If you have a cellphone or similar device, we ask that
10 you place it on silent or vibrating mode during the meeting.
11 also, in order for all of us to be able to hear the proceedings,
12 we ask that you have any private conversations outside.  Please
13 be advised that alcoholic beverages are not permitted in the
14 meeting room.
15
16 The Gulf Council is one of eight regional councils established
17 in 1976 by the Fishery Conservation and Management Act, known
18 today as the Magnuson-Stevens Act.  The council's purpose is to
19 serve as a deliberative body to advise the Secretary of Commerce
20 on fishery management measures in the federal waters of the Gulf
21 of Mexico. These measures help ensure that fishery resources in
22 the Gulf are sustained, while providing the best overall benefit
23 to the nation.
24
25 The council has seventeen voting members, eleven of whom are
26 appointed by the Secretary of Commerce and include individuals
27 from a range of geographical areas in the Gulf of Mexico with
28 experience in various aspects of fisheries.
29
30 The membership also includes the five state fishery managers
31 from each Gulf state and the Regional Administrator from NOAA's
32 Southeast Fisheries Service, as well as several non-voting
33 members.
34
35 Public input is a vital part of the council's deliberative
36 process, and comments, both oral and written, are accepted and
37 considered by the council throughout the process.  We will
38 welcome public comment from in-person and virtual attendees.
39 Anyone joining us virtually that wishes to speak during the
40 public comment should have already registered for comment
41 online.
42
43 Virtual participants that are registered to comment should
44 ensure that they are registered for the webinar under the same
45 name they used to register.  In-person attendees wishing to
46 speak during public comment should sign in at the registration
47 kiosk located outside the meeting room.  We accept only one
48 registration per person.

0003872

```
 1
 2  A digital recording is used for the public record, and,
 3  therefore, for the purpose of voice identification, we will call
 4  attendance for the council members attending virtually first.
 5  After this is completed, members in the room should identify him
 6  or herself, starting on my left.
 7
 8  MS. BERNADINE ROY:  Robin Riechers.
 9
10  MR. ROBIN RIECHERS:  Robin Riechers, Texas.
11
12  MS. ROY:  Greg Stunz.
13
14  DR. GREG STUNZ:  Greg Stunz, Texas.
15
16  MS. ROY:  Bob Shipp.
17
18  MR. DALE DIAZ:  Dale Diaz, Mississippi.
19
20  MS. LEANN BOSARGE:  Leann Bosarge, Mississippi.
21
22  GENERAL JOE SPRAGGINS:  Joe Spraggins, Mississippi.
23
24  MR. DAVE DONALDSON:  Dave Donaldson, Gulf States Marine
25  Fisheries Commission.
26
27  MR. ED SWINDELL:  Ed Swindell, Louisiana.
28
29  MR. PATRICK BANKS:  Patrick Banks, Louisiana.
30
31  MR. J.D. DUGAS:  J.D. Dugas, Louisiana.
32
33  MR. KEVIN ANSON:  Kevin Anson, Alabama.
34
35  MS. SUSAN BOGGS:  Susan Boggs, Alabama.
36
37  MR. CHESTER BREWER:  Chester Brewer, South Atlantic Fishery
38  Management Council.
39
40  DR. CLAY PORCH:  Clay Porch, Southeast Fisheries Science Center.
41
42  MR. ANDY STRELCHECK:  Andy Strelcheck, NOAA Fisheries, Southeast
43  Regional Office.
44
45  MR. TROY WILLIAMSON:  Troy Williamson, Texas.
46
47  MR. PHIL DYSKOW:  Phil Dyskow, Florida.
48
```

7

0003873

1   **MR. JOHN SANCHEZ:**  John Sanchez, Florida.
2
3   **MS. MARTHA GUYAS:**  Martha Guyas, Florida.
4
5   **EXECUTIVE DIRECTOR CARRIE SIMMONS:**  Carrie Simmons, council
6   staff.
7
8   **CHAIRMAN FRAZER:**  All right.  Thank you, everybody.  Before we
9   get into the meat of all of this, with regard to our agenda,
10  we've got a couple of items to take care of, a couple of
11  announcements and other things.
12
13  First, I would like to recognize John Sanchez, and so, John, get
14  on up here for a minute.  I think most people realize that this
15  is the end of John's third term as a council member.  He's a
16  special part of the group, and he has served his community well,
17  and I'm going to miss him, and I know that most people here will
18  as well, but we've got a couple of things for him, and, Carrie,
19  if you want to share with him our gift.
20
21  **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Chair.  We have a
22  clock and a thermometer here for you, in honor of your dedicated
23  service to the Gulf of Mexico Fishery Management Council from
24  2012 to 2021.
25
26  **MR. SANCHEZ:**  Thank you, everyone.  It's very humbling.  The
27  best part of this process is getting to meet people that I
28  otherwise would never have had the opportunity to meet.  It's
29  been a pleasure and an honor, and I'm going to miss it.  Thank
30  you, all, very much.
31
32  **CHAIRMAN FRAZER:**  We're all definitely going to miss you, John.
33  I know you're not going to go far though.  I've got a couple
34  other announcements, and I would like to invite Jack McGovern to
35  say a few words about Mike Jepson, who is also retiring from
36  many, many years of service with the agency, and so, Jack, if
37  you're around, or on the line here.
38
39  **DR. JACK MCGOVERN:**  I just wanted to let you all know that Dr.
40  Mike Jepson, who is the Social Science Branch Chief at our
41  Sustainable Fisheries Division, he's retiring at the end of next
42  week, and I think many of you know Mike, and he's an
43  anthropologist, and he's been with the Southeast Regional Office
44  for over twelve years, and he's been studying fisheries in
45  various capacities since the early 1980s.
46
47  His career includes serving as a fishery cultural anthropologist
48  on the South Atlantic Council, and he was also a program

8

0003874

```
 1  director of the Gulf and South Atlantic Fisheries Foundation.
 2  In addition, Mike is a veteran, and he served in the U.S. Navy
 3  in the 1970s.
 4
 5  Mike is very well published, and he has a lot of accomplishments
 6  over the years, and he has also served on a lot of committees of
 7  graduate students, and I believe he's on the faculty at the
 8  University of Florida.  Some of his notable students have been
 9  Dr. Ava Lasseter, who you all know, Dr. Kari Buck, who used to
10  be a staff member of the South Atlantic Council, and Brittany
11  Levine, who works with us on the IFQ program.
12
13  In addition to all of Mike's accomplishments, he's a very kind
14  person, and we wish him very well in retirement, and so thank
15  you, Mr. Chairman, for allowing me to say a few words about
16  Mike.
17
18  CHAIRMAN FRAZER:  Thanks, Jack, for taking the time to share
19  those words about Mike, and, again, so many people here
20  appreciate the work that he's done for the agency and his
21  contributions to the field, and so we'll miss him, and good
22  luck, Mike, in retirement.
23
24  We also have a little bit sadder news, and so, in the past year,
25  we've lost a couple of folks that are important members of the
26  fisheries community, and the first one is Neil Gryder, and I
27  would just like to say a few words about Neil.
28
29  Neil's ambition and passion for the fishery made him stand out.
30  Neil has a lifelong passion for fishing, and he began his career
31  as a charter captain in the Florida Keys, eventually returning
32  to the northern Gulf, where he started Relentless Sportfishing,
33  a charter business out of Venice, Louisiana that specialized in
34  tuna and swordfish.  Neil also developed True Sportsmen, a
35  mobile app designed to help anglers who traveled to download all
36  the spatially different fishing regs and licenses and report
37  their catches all in one place.
38
39  He was a true innovator, and he was highly specialized in the
40  fishing and hunting world.  He was also a member of our Coastal
41  Migratory Pelagic Advisory Panel, and Neil was a young and
42  vibrant individual that was just getting involved in the
43  fisheries management process with the Gulf Council.
44
45  He is an incredible loss to the Mississippi community and Gulf
46  fisheries, for which he was an extremely strong advocate, and
47  so, again, we just appreciate the time that Neil was able to
48  spend with us.
```

9

1
2   I would also like to say a few words about Walt Jaap.  Walt was
3   an incredibly kind and giving man.  Professionally, he worked
4   for many years as a coral reef specialist in the Florida Fish
5   and Wildlife Conservation Commission.  He also worked at the
6   University of South Florida College of Marine Science, where he
7   mentored numerous marine scientists and advised the scientific
8   diving program.
9
10  He was instrumental in establishing the coral reef evaluation
11  and monitoring program for the Florida Keys reef tract, and he
12  was also an active volunteer in his personal life.  He delivered
13  Meals on Wheels for fifteen years, and he was involved with the
14  Boy Scouts and organized and participated in numerous marine
15  cleanup events.
16
17  Walt served on our Coral SSC from 1979 to 2018, almost forty
18  years, and he also contributed to our interrelationships between
19  corals and fisheries work, and he dedicated himself to marine
20  science and education, and his loss is profound for the marine
21  science community, not only in Florida, but in the Gulf of
22  Mexico more broadly, and so, again, it's a tough time when you
23  say goodbye to friends like that, but their contributions will
24  be missed, but we mostly miss their friendship.  Thank you,
25  everybody, for taking a few minutes.
26
27              **ADOPTION OF AGENDA AND APPROVAL OF MINUTES**
28
29  We will get into the agenda itself.  The first item of business
30  would be Adoption of the Agenda, that would be Tab A, Number 3
31  in your briefing materials, and so if I could get a motion to
32  either adopt the agenda or modify it.  I've got a motion to
33  approve the agenda by General Joe Spraggins.  Is there a second?
34  It's seconded by Mr. Swindell.  Okay.  Any other potential
35  additions or modifications of the agenda?  I am not seeing any,
36  and so is there any objection to approving the agenda as
37  written?  Seeing no objections, we will consider the agenda
38  approved.
39
40  The next item is the Approval of the Minutes, Tab A, Number 4.
41  Can I get a motion for approval of the minutes?  It's moved by
42  Ms. Bosarge.  Is there a second?  It's seconded by Mr. Anson.
43  Any objections to approving the minutes as written?  Seeing
44  none, we will consider the minutes approved.
45
46  We're going to go ahead and have two quick presentations.  The
47  first is from the NOAA Office of Law Enforcement, and if could
48  get Officer O'Malley up, we'll get that presentation loaded, and

0003876

 1  I look forward to hearing from you.
 2
 3                      **PRESENTATIONS**
 4          **NOAA OFFICE OF LAW ENFORCEMENT**
 5
 6  **ASAC JOHN O'MALLEY:**   Good afternoon.  I will introduce myself.
 7  For those of you that don't know me, I'm the new Assistant
 8  Special Agent in Charge in League City, Texas, and so I
 9  supervise the agents, special agents, that cover the Gulf of
10  Mexico.
11
12  Today's report will be our OLE Quarter 2 report, which covers
13  the period of January 1 to March 31 of this year.  Starting with
14  our incidents investigation, the SED created a total of 378
15  incidents.  Of those, 211 were in the Gulf of Mexico, across all
16  regulations and programs.  As a reminder, our incidents are
17  self-generated by OLE agents or officers, or they can be
18  referred by other agencies, referred by the OLE hotline, or by
19  NOAA programs, such as VMS or observer.
20
21  Of those 211 incidents, 130 of them were related to the Magnuson
22  Act, with Florida having the most.  Fifty-nine of our incidents
23  in the Southeast Division came from referrals from our joint
24  enforcement agreements and the United States Coast Guard
25  partnership.  Florida, which includes both Gulf and Atlantic,
26  referred the most, followed by the U.S. Coast Guard District 8.
27
28  We issued fifty-four summary settlement offers in Quarter 2, of
29  which eighteen were from the Gulf region, and included in those
30  eighteen were six for turtle excluder device, bycatch reduction
31  device requirements, and one for illegal charter activity.
32  Fourteen were issued from the Keys, including another one for
33  illegal charter activity and five for retention during a
34  closure.
35
36  Eleven cases were referred to the NOAA Office of General
37  Counsel.  Of those, five occurred in the Gulf of Mexico, three
38  in the Keys, including two cases for illegal charter activity.
39  Some notable actions, Magnuson and ESA actions, would include we
40  had a shrimp vessel who received a NOVA for shrimping with non-
41  compliant TEDs, and we had an HMS vessel who received a NOVA for
42  unlawful use of hooks on a trip where the special research-
43  limited permit had a lower number of hooks.  We had two reef
44  fish vessels that received NOVAs for failing to have an
45  operational VMS.
46
47  We also had a Lacey Act case against a Louisiana dealer for
48  violating the Lacey Act, in which they violated an underlying
                              11

1  State of Louisiana law and put that product into interstate
2  commerce.
3
4  Another incident we had, which is a little different, but it's
5  interesting, is we got a compliant, via the Be Whale Wise,
6  concerning a video of a fishing vessel operator out of Galveston
7  operating near a pod of killer whales in the Gulf, and so that
8  created a little bit of a stir, because we had a lot of social
9  media on that, especially since a lot of people don't know that
10 there are killer whales in the Gulf of Mexico.
11
12 We had an agent look into it, and it turns out that the captain
13 did everything right who saw the pod.  He reduced speed and let
14 the whales go around him, but we did use that as an opportunity
15 to do some outreach and education to other operators in the
16 area, because usually the pod is seen way, way offshore, and
17 this was a little bit closer, but a lot of people just refuse to
18 believe there is killer whales in the Gulf, but they are there.
19
20 Moving on to operations and patrols, this quarter, there were
21 117 documented patrols, including two operations, Operation Reef
22 Line in the Keys and operation Palm City on the Florida west
23 coast that also concentrated on federally-permitted charter
24 vessel compliance within the sanctuary and within the Gulf.  No
25 one from any vessels were found during these operations.
26
27 Also, I will give you an update on our Southeast Division
28 Illegal Charter Working Group update.  I am reminding everybody
29 of a web story that was released on April 9 of this year called
30 "Make Sure Your Charter Fishing Trip is Legal and Sustainable",
31 and it's on the Southeast Regional Office website, Twitter, and
32 NOAA HQ's page.  It comes up immediately through Google with
33 "make sure your charter fishing trip is legal", and those are
34 the words that come up on a Google search.
35
36 OLE also assisted the SEFHIER group and was hosting multiple
37 training sessions, to try to make sure there was one OLE
38 representative on each of those training sessions, to answer any
39 questions that arose and to give a small portion of the brief.
40
41 I wanted to let you all know that illegal charter operations are
42 being incorporated into all patrols, and we are making them a
43 priority.  In addition, we continue to do our outreach and
44 compliance assistance.
45
46 Most recently, OLE assisted FWC in Operation Red Karma, which
47 targeted illegal charter operations on the Florida west coast,
48 and also the U.S. Coast Guard and CBP participated.  There was a
                                    12

1  lot of violations documented, which I'm pretty sure of you have
2  heard about, and so related to that.
3
4  Moving on to our staffing, we just hired a new agent for League
5  City, Texas, and he will be starting with us on July 18.   He
6  comes over to us from NCIS, and we also announced a new agent
7  position in Slidell, Louisiana, and that just recently closed,
8  and, for those of you that knew Charles Tyre, I am now him, and
9  so I'm the ASAC in League City.
10
11  For enforcement officers, Key West EO Justin Powell has been
12  reassigned up to Key Largo, effective June 6, and another
13  candidate has been tentatively selected for the Key West
14  position.   The same with Fort Myers, and there's been another
15  candidate that has accepted the job offer, and he's working
16  through the process.  Niceville, Florida also has an enforcement
17  office candidate that has accepted and is working through the
18  process.
19
20  Our Houston/Galveston IUU officer, Zack Salinas, has completed
21  his FTO training, and he will be in the field full time, and
22  there is a League City supervisor enforcement officer who has
23  been selected and is going through the hiring process.   Corpus
24  Christi enforcement, we have Officer Glen Sheckles from Alaska
25  who is onboard, and we still have vacancies in St. Petersburg,
26  two in Harlingen, and Enforcement Officer Matt Roach, who was in
27  Galveston, accepted a special agent position in Hawaii,  and so
28  he has left us, and his position will be backfilled.   That
29  concludes my report, and there's a whole lot more information in
30  the brief, and I will be happy to answer any questions.
31
32  **CHAIRMAN FRAZER:**  All right.  Well, thank you, Special Agent
33  O'Malley.  It's good to have you here.
34
35  **ASAC O'MALLEY:**  Thank you, sir.
36
37  **CHAIRMAN FRAZER:**  Is there any questions?  Mr. Diaz.
38
39  **MR. DIAZ:**  I just have a comment.  I want to thank you, Special
40  Agent O'Malley.  I like you all's focus on illegal charters and
41  making that a priority, and we're fixing to have public comment
42  here in just a minute, but, over time, we have had a lot of
43  public comments about the problems that illegal charters create,
44  and so thank you all for listening to those public comments and
45  focusing your effort towards it.  We appreciate it.  Thank you.
46
47  **ASAC O'MALLEY:**  Thank you, and I would like to reiterate though
48  that we can't be everywhere, and so we do encourage people to

13

0003879

1  provide us information, if there's a problem in your area.
2  Please let us know, so we can address it, especially when it
3  comes to this situation, which actually impacts you all's
4  livelihood, and so we are working on it.
5
6  **CHAIRMAN FRAZER:**  All right.  We've got a couple more questions,
7  I think, Special Agent O'Malley.  Andy Strelcheck.
8
9  **MR. STRELCHECK:**  Thanks, Agent O'Malley, for being here.
10 Expanding on Dale's comments, I was noticing, in the summary
11 settlements, there was four cases referred for illegal charter
12 activity, and they were fairly minimal, in terms of the
13 settlement costs, being $500 and I think up to about $3,000.
14 Does that include charters that are operating without a permit,
15 or is there other illegal kind of charter activity that goes
16 along with that?
17
18 **ASAC O'MALLEY:**  It can, and it depends, and that's the range we
19 use on the violations, and so it's within the -- I would have to
20 look at the summary settlement schedule, to see exactly what it
21 says, but it's usually fairly specific on what would apply, and,
22 if it doesn't fit within that parameter, then it has to go
23 through a full case package to General Counsel.
24
25 **CHAIRMAN FRAZER:**  Okay.  I don't think I'm seeing any more
26 questions.  I'm making sure that we don't have any questions
27 from the folks online.  Okay.  Thanks for the presentation.
28
29 **ASAC O'MALLEY:**  Thank you.
30
31 **CHAIRMAN FRAZER:**  Next up, we're going to have an overview of
32 the commercial Fish Rules app by Ms. Emily Muehlstein.
33
34                **COMMERCIAL FISH RULES APP PRESENTATION**
35
36 **MS. EMILY MUEHLSTEIN:**  While that presentation is being brought
37 up on the screen, I just wanted to remind everybody that the
38 council is an official sponsor of the recreational Fish Rules
39 app, which is just sort of Fish Rules, as it's referred to,
40 because there was not a commercial app before now.
41
42 We are responsible for keeping the regulations in federal waters
43 in the Gulf of Mexico on that app, and so it is the most
44 accurate and up-to-date place to get fishing regulations.  We
45 also list them on our website, of course, but you guys might
46 remember, a couple of years ago, we decided that it would be a
47 good idea to create a Fish Rules app that is specific to
48 commercial fishermen.
                                    14

1
2  Just a little bit about the regular Fish Rules app, to give you
3  a little bit of the rationale for why we decided to go down this
4  road and create a commercial fishing regulations app with Fish
5  Rules, and so the regular Fish Rules app has 565,000 users, and
6  five-million regulation views have occurred in the first half of
7  this year so far, and the top species that we get views for are
8  gag grouper, greater amberjack, red drum, black grouper, and red
9  snapper.
10
11  This app is pretty pervasive in the recreational sector, and
12  it's a really well-known app, and so we decided to contract with
13  the Fish Rules folks to create our own commercial app.  Some of
14  you may remember that we were hosting the commercial app in the
15  recreational regulations.  I'm sorry.  We were hosting the
16  commercial regulations within the recreational app, and it was
17  kind of in supplementary material, and it just wasn't tailored
18  to commercial anglers and sort of what the information is that
19  they're actually looking for.
20
21  Instead, we decided to develop a stand-alone app for commercial
22  anglers that is tailored to the needs of those fishermen.  It
23  will give you near real-time quota monitoring information, which
24  is one of the things that we found is really important for the
25  commercial fishery, and then another thing that's really
26  complicated for commercial fishermen is navigating all those
27  permit conditions, and so what we've done is rewritten them in
28  plain English, while still trying to maintain the legality of
29  them, so commercial fishermen can look at those permit
30  conditions for the permits they have.
31
32  Myself and another staff member, Carly Somerset, worked along
33  with the South Atlantic Fishery Management Council and the staff
34  from Fish Rules to develop this app, which hosts regulations for
35  commercially-permitted species in both the Gulf and South
36  Atlantic, and so this works for both jurisdictions.  So far, we
37  don't have the state regulations in there, but we'll talk about
38  that in a little bit.
39
40  We contracted to start this project in 2019, and we began work
41  last summer.  We beta tested with a number of commercial
42  fishermen, as well as agency personnel, in May of this year, and
43  then we launched it in mid-May of this year.
44
45  Some of the features of the commercial app, and why we're really
46  excited about it, is it's actually based on your permits, and so
47  what you would do, when you open the app, is you select the
48  permits that are relevant to you.  As you know, your fishing

15

1  regulations change with whichever permits you have, and so this
2  will populate the regulations based on the permits that you have
3  on your vessel.
4
5  It will immediately display, for each species, the season, the
6  trip limits, the size limits, and the progress of the quota, and
7  then, like I said, it will also have all the conditions for
8  those permits that are on your vessel, and it also shares
9  managed area information. It's also important to know that this
10 can be used offline, and so, if you get an update, or if the app
11 is updated while you are offshore, it will not come through,
12 but, if you update it right before you go offshore, all of those
13 regulations will be as up-to-date as you can get them.
14
15 This is just a couple of screenshots of what the app looks like.
16 Walking you from left to right here, like I said, you would
17 choose your permits, as you open up the app, and so you can
18 populate the app and the regulations with the permits that are
19 relevant to you, and this is an example of what one of the
20 species might look like, and so this is for king mackerel, and
21 you can see there's that quota monitoring area in blue.
22
23 If it gets close to being closed, it will turn yellow, and then,
24 once it's closed, it will turn red, and so, if you're going to
25 go do an amberjack trip, and you want to see -- You're going to
26 be gone for two weeks, and make sure that you're hedging your
27 bets that you're not going to come back and the season will have
28 closed, that's a really good spot to look at.
29
30 Again, there's a list of all the permit conditions, and they're
31 broken down into sort of the different relative categories for
32 the permit conditions, and then, as I mentioned, we do host all
33 of the closed areas on this app as well.
34
35 Part of developing the app is, and you don't really think of the
36 backend of how things get managed, is actually improving the way
37 that we keep the regulations on the backend, and so we had to
38 develop a whole software program that would allow us to update
39 the app sort of with as much ease as possible.
40
41 I also just want to make everybody aware that this does produce
42 that's called an API, and, if you're sort of tech savvy, you can
43 understand that it will give the language, and so, if anybody
44 else wanted to host these regulations and have them updated
45 real-time, using our API, they could, and so it would basically
46 -- If you wanted to put them on your website, or something like
47 that, you could get the API from Fish Rules, and it will update
48 the regulations as I update them in real time, and so that's

16

0003882

1   kind of a neat feature.
2
3   Again, it's sort of a central place where we can manage all the
4   regulations, and there's version control, and so myself and my
5   South Atlantic counterpart really get to have control and see
6   how the regulations have been updated and have a record of that.
7
8   Just some stats, and we did launch in mid-May.  So far, we've
9   had 21,000 views of the app, like screen views, and so that
10  could be one user looking at five different pages or something,
11  but, overall, 21,000 views so far of the screens.  We've had 422
12  active users, and, if you think about sort of the commercial
13  fishery and the number of permits, 422 is pretty good so far,
14  since we just started using this app, and then the average
15  engagement time is three minutes, and so it looks like people
16  are really digging into the app when they're getting on there.
17
18  Finally, there's a couple of things that we're sort of planning
19  for in the future.  One is -- Part of the reason that I wanted
20  to present this app today is because we're hoping for more
21  commercial anglers to download it and use it.
22
23  We're also hoping that law enforcement will begin to use this
24  for a tool.  I know a lot of the law enforcement officers use
25  the recreational app to help them keep track of the regulations,
26  and so I would encourage law enforcement and commercial anglers
27  to really use this app if you think that it would be useful to
28  you.
29
30  Another thing is the recreational app allows for integration of
31  the state regulations as well as the federal regulations, and so
32  there's a lot of state agency personnel in the room and around
33  the table.  If you think that jumping on the commercial
34  regulations bandwagon is for you, let me know, and I will put
35  you in touch with the Fish Rules folks, because we are
36  definitely open to the idea of adding commercial fishing
37  regulations from the states into this app as well, so that we
38  can integrate.
39
40  Some of the improvements that we're hoping to make within the
41  app -- Right now, that quota monitoring, I actually manually
42  update it after the folks at the Regional Office update the
43  website.  They send me an email, and that triggers me to
44  manually do this.
45
46  A, because I want to have to do it, and, B, because I think
47  there's a smarter way to do it, since the Science Center folks
48  are in the room, and the NOAA Regional Office folks are in the

17

0003883

1  room, what I plan to do is work with you guys to see if there's
2  a way that we can automate this, so that, when the Science
3  Center produces those quota monitoring estimates, we can take
4  your API and have it automatically populate into this app, to
5  sort of try and take out that human aspect of it, and so just
6  keep in mind that I will probably be bothering you for that.
7
8  I know that the Science Center is working on improving the way
9  that they communicate the quota monitoring stuff, and so, Clay,
10 just put me on your radar, because I'm going to knock on your
11 door for that one.
12
13 The next thing is we do want to improve the functions of the
14 maps.   Right now, it's just a bunch of static pictures, and
15 that's not my ideal.   We are actually currently working, in the
16 background, to try and create a mapping tool that is more
17 dynamic, and it's not just a bunch of pictures, and so you could
18 choose to enable your GPS location, and it would show you all of
19 the closed areas and the regulations associated with them
20 wherever you are.
21
22 Then, finally, there might be some option for real-time
23 communication channels with anglers themselves.   The Fish Rules
24 recreational app has really started to push reporting and
25 citizen science things, and so there might be some opportunities
26 for that in the future with this commercial app.   If anybody has
27 some ideas, or some thoughts, about how we could utilize this
28 platform for things like that, we are totally open to that.
29
30 That's it, and so that concludes it.   Fish Rules commercial is
31 there.   Please download it, and please -- If you hate something
32 about it, or love something about it, that you want to keep
33 seeing, please get in touch with me and let me know, because we
34 own this app, and so we get to make it as good as we want to,
35 and so I would rely on your help and your suggestions to make
36 sure that happens.
37
38 **CHAIRMAN FRAZER:**   All right.   Thanks, Emily, for the fine
39 presentation and your continual efforts to improve our
40 communication efforts.   You do a great job.   Patrick.
41
42 **MR. BANKS:**   You may have said this, Emily, and I missed it, but
43 what was the cost of developing this commercial app?
44
45 **MS. MUEHLSTEIN:**   Beth might know off the top of her head, but I
46 think our initial development fee, which is including sort of
47 that software development and the backend for the management,
48 was around $30,000, and there's an annual fee here of $8,000.

18

1   That annual fee would apply to the state, if they wanted to sign
2   on.  The recreational app is less expensive, on an annual basis,
3   and I think it's $5,000, and that's because there is ad revenues
4   from that app that offset.  We don't expect to have the volume
5   of commercial users as we do for recreational, and that's why
6   the annual fee is more.
7
8   **CHAIRMAN FRAZER:**  All right.  Susan.
9
10  **MS. BOGGS:**  Thank you, Mr. Chair.  Emily, I'm just curious.  How
11  much state participation do you have, and how accurate is the
12  state information?  Thank you.
13
14  **MS. MUEHLSTEIN:**  That's a great question, and so, on the
15  recreational app, we do have state participation from --
16  Formally, from the FWC, in the Gulf region, and I think the east
17  coast and some of the other areas have pretty good state
18  participation.  Correct me if I'm wrong, any of the other
19  states, but I think Florida might be the only state that is
20  officially signed on to the recreational app.
21
22  That doesn't mean though that the other states don't, A, support
23  the app or have somebody behind the scenes that is helping to
24  update that information.  However, as an official tool, the
25  State of Florida and then the Gulf Council are the two agencies
26  that are the ones that are actually in the backend doing the
27  updates, and then, in the commercial app, we don't have any yet.
28  We developed the app just for the federal Gulf Council and South
29  Atlantic jurisdiction species, but we are hoping to entertain
30  the idea of adding other states, if they would be interested.
31
32  **CHAIRMAN FRAZER:**  Okay.  Are there any other questions for Ms.
33  Muehlstein?  Ms. Levy.
34
35  **MS. MARA LEVY:**  Thank you, and maybe I missed this, but I'm just
36  wondering, and is there some sort of disclaimer of the beginning
37  of people opening this, that these aren't the official
38  regulations, just in case there is some discrepancy that ends up
39  happening?
40
41  **MS. MUEHLSTEIN:**  Yes, that information is in both the
42  recreational and commercial apps, as well as on the website, and
43  we really do our best to be as accurate as possible, but, yes,
44  to your point, the official regulations are the codified federal
45  regulations, but, yes, we do have disclaimers in both apps,
46  Mara.
47
48  **CHAIRMAN FRAZER:**  Okay.  I am not seeing any more hands up from

                                    19

```
 1   our virtual folks, and no hands up around the table, and so,
 2   again, thank you, Ms. Muehlstein, for the presentation.  We're
 3   going to go ahead and take ten minutes, as we transition into
 4   the public comment period, to make sure that we're all squared
 5   away, from a technological side of things, and so it's now 3:13,
 6   and, just a little bit before 3:25, we'll get started.
 7
 8   (Whereupon, a brief recess was taken.)
 9
10   CHAIRMAN FRAZER:  Good afternoon, everyone.  Public input is a
11   vital part of the council's deliberative process, and comments,
12   both oral and written, are accepted and considered by the
13   council throughout the process.
14
15   The Sustainable Fisheries Act requires that all statements
16   include a brief description of the background and interest of
17   the persons in the subject of the statement.  All written
18   information shall include a statement of the source and date of
19   such information.
20
21   Oral or written communications provided to the council, its
22   members, or its staff that relate to matters within the
23   council's purview are public in nature.  Please email any
24   written comments to the staff, as all written comments will also
25   be posted on the council's website for viewing by council
26   members and the public, and it will be maintained by the council
27   as part of the permanent record.
28
29   Knowingly and willfully submitting false information to the
30   council is a violation of federal law.  We will welcome public
31   comment from in-person and virtual attendees.  Anyone joining us
32   virtually that wishes to speak during public comment should have
33   already registered for comment online.
34
35   Virtual participants that are registered to comment should
36   ensure that they are registered for the webinar under the same
37   name that they used to register to speak.  In-person attendees
38   wishing to speak during public comment should sign-in at the
39   registration kiosk located outside the meeting room.  We accept
40   only one registration per person.
41
42   Each speaker is allowed three minutes for their testimony.
43   Please note the timer lights on the podium or on the webinar.
44   They will be green for the first two minutes and yellow for the
45   final minute of testimony.  At three minutes, the red light will
46   blink, and a buzzer may be enacted.  Time allowed to dignitaries
47   providing testimony is extended at the discretion of the Chair.
48
```

0003886

1  If you have a cell phone or similar device, we ask that you keep
2  them on silent or vibrating mode during the meeting.  Also, in
3  order for all of us to be able to hear the proceedings, we ask
4  that you have any private conversations outside, and please be
5  advised that alcoholic beverages are not permitted in the
6  meeting room.  We've got a couple of things that we want to take
7  care of first, and I'm going to let Ms. Muehlstein say a few
8  words.
9
10  **MS. MUEHLSTEIN:**  I just wanted to say a couple of words, because
11  this is the first time that we have attempted to do an in-person
12  and hybrid-style public testimony, and so the plan is that we're
13  going to choose every other format, and so we're going to start
14  with somebody in-person, and then we'll go to somebody online,
15  and then we'll bounce back and forth, and so we always display
16  the list of names on the screen, and so keep an eye out for your
17  name, because, once you're the next speaker, you will know, but
18  we may have somebody that is either in-person or virtually that
19  goes before you.
20
21  Also, if you are here in-person, we are broadcasting this list
22  out on the display in the hallway, if you do not feel
23  comfortable being in the room, and I just wanted to let
24  everybody know that, up at the podium, we do have sanitizing
25  spray and anything you might need or want before you testify,
26  since a lot of people will be kind of going up to that podium.
27  That's all I have.
28
29  **CHAIRMAN FRAZER:**  All right.  Thank you, Emily.  Again, I will
30  just reiterate that I appreciate everybody's patience as we try
31  to accommodate comments both kind of in-person here and as well
32  as those that are coming over the computer, and so we are going
33  to start off with folks on the computer, and, as Emily said,
34  we'll alternate, and so our first speaker will be Catherine
35  Bruger.
36
37                          **PUBLIC COMMENT**
38
39  **MS. CATHERINE BRUGER:**  Thank you very much.  I am Catherine
40  Bruger, Policy Analyst for Ocean Conservancy.  I would like to
41  begin with the topic of the Executive Order Tackling the Climate
42  Crisis At-Home and Abroad.
43
44  We applaud the council's list of recommendations and agree that
45  the stated recommendations are important for building a
46  foundation for the Gulf Council to address climate issues.  In
47  addition to those you have listed, we recommend some additional
48  elements for your consideration.

                                21

First, we know you have already contracted, and we support the development of a robust fishery ecosystem plan which addresses the multifaceted needs of the Gulf ecosystem.  We encourage the council to learn from other regions with FEPs and their processes as you develop the Gulf's FEP.

Second, building on the theme of water quality and environmental covariates, we encourage the council to request annual ecosystem status reports for the integrated ecosystem assessment program. Dead zones, red tides, hurricanes, and the loop current make the need for ecosystem status reports all the more meaningful.  In other regions, ecosystem status reports are updated regularly, often on an annual basis.

Increasing the frequency of these snapshots of the state of the ecosystem will allow the council to better understand how the Gulf of Mexico is responding to climate and other environmental changes and inform how and when the council should adapt management approaches to this new reality.

Moving to Amendment 53, the red grouper stock biomass is at an all-time low.  Though red grouper was determined not be overfished nor undergoing overfishing, the SSC noted that, under the previous definition of MFMT, this stock would have been considered overfished as of 2017.  Although the projections do, the stock status determination does not account for the 2018 red tide mortality event, the impact of which was known to be severe, and we are currently experiencing a new potentially as-severe event in 2021.

Given the yet unknown mortality due to the 2018 event, lack of clarity surrounding pulse-driven recruitment events, and historically low biomass, we encourage the council to proceed with the transition to in-season monitoring in MRIP-FES currency as a necessary step to reduce management uncertainty and focus on the consistent and continuous monitoring of stock status. The reliability of the calibration between FES and CHTS is already several years old, and it will continue to degrade.

That said, allocation changes will result in subsequent modifications to management uncertainty.  We encourage the council to assess how the cumulative impacts of shifting allocations, selectivity, and discard rates may increase uncertainty in the management of red grouper, a stock with an extremely thin margin of error.  All sectors, and the businesses and communities that rely on this fishery, will suffer if a rebuilding plan becomes necessary.

22

0003888

1
2  Given the significant management uncertainty surrounding red
3  grouper, we encourage the council to take very precautionary
4  approaches to ensure the stock's future resilience.  Thank you,
5  Mr. Chair.
6
7  **CHAIRMAN FRAZER:**  All right.  Thank you, Ms. Bruger.  We have a
8  question from Mr. Banks.
9
10  **MR. BANKS:**  Thank you, Ms. Bruger, for those comments.  I would
11  like to ask you what your suggestion is that we do for red
12  grouper.  You talk about taking a precautionary approach, and
13  what did you guys have in mind with that?  Thank you.
14
15  **MS. BRUGER:**  Thank you for that question.  Well, one
16  recommendation that I would make is that the council reconsider
17  and revise looking at some of the SDCs that were set in
18  Amendment 44, and I think some of those recommendations were to
19  revise MSST, or, excuse me, all of the SDCs at levels that were
20  actually the lowest legally allowable, and I think that we've
21  just set up a very thin margin of error, for a number of reef
22  fish stocks, by putting our SDCs at those very, very
23  precariously low levels.
24
25  It gives us a very narrow window of margin of error, in case we
26  do need to -- It could potentially result in a rebuilding plan
27  for these stocks if we're wrong about some of the things that
28  we're doing, and so my primary recommendation would be that we
29  should probably reopen that and look at those SDCs and consider
30  revising them to higher levels.  I should clarify, and I'm
31  sorry, that they aren't all higher, and it depends on which SDC
32  you're looking at, but more precautionary levels, rather than
33  higher.  Excuse me.
34
35  **CHAIRMAN FRAZER:**  Okay.  Thank you, Ms. Bruger.  We are going to
36  alternate to our speakers in the room, and we inadvertently
37  deleted one of the individuals, and so we're going to start with
38  that individual, and I apologize.  Mr. Ed Mancini.
39
40  **MR. ED MANCINI:**  My name is Ed Mancini, and I'm President of
41  Southern Offshore Fishing Association, and we are for Action 1,
42  Alternative 2, for the following reasons.  Number 1, any
43  reduction in the allocation would have a severe impact on the
44  following groups.  Number 1, and probably most important, is the
45  American consumer.  If you reduce the allocation by some 69
46  percent, they're going to have that much less chance of enjoying
47  a grouper dinner, whether it's at a restaurant or at home.
48

23

```
 1  Second up is the commercial fishermen.  As you know, at the end
 2  of next week, the first six months, our landings will be
 3  identical to the landings last year after nine months, and so we
 4  can see the increase, and we definitely don't need a decrease.
 5
 6  The third group that is going to be affected is the young
 7  fishermen, and we have this Young Fishermen's Act, and we want
 8  to introduce new blood into an aging fishery, and reducing the
 9  allocation is just not the way to go.  Another question that I
10  have is the way the data was gathered for the recreational side,
11  and I understand that the mailout was more successful than the
12  telephone, but I am not seeing great response.
13
14  Then, with the dockside checks, in 2018, FWC said there were
15  forty-two million saltwater trips.  Of those forty-two million,
16  24,000 were checked at the dock for the fish, and that's 0.056
17  percent.  That's not a real healthy data sample.
18
19  One other thing that I would like to bring up, if I have time,
20  is the way the two sectors are regulated, when effort is
21  increased.  In the 1980s, when longlines increased effort, the
22  first thing that happened was we put up the twenty-fathom curve
23  and a size limit, and that reduced the size of the fleet,
24  obviously, and reduced the effort, and we went along.  Okay.
25
26  Then the longliners ended up setting longer lines and more
27  hooks.  What did we do about that?  I've got an idea.  We'll
28  have a longline endorsement, when they did the IFQ program, and
29  so that cut the fleet by more than half.  Then we had the turtle
30  issue, and so we limited the amount of hooks, and so, every time
31  that there is an increased effort on the commercial side, the
32  council seems to find a way to reduce that effort, and, on the
33  recreational side, they have exploded since the 1980s.
34
35  There's a whole different generation out there, and, obviously,
36  the effort is increasing, and I don't see any plans to reduce
37  the effort, and so, in summary, I know that commonsense is at a
38  premium in society today, and I just hope that there's enough in
39  this room to vote for Alternative 2, and thank you very much.
40
41  CHAIRMAN FRAZER:  Thank you, Mr. Mancini.  All right.  We'll
42  rotate back to our online participants.  Next up is Dylan
43  Hubbard.
44
45  MR. DYLAN HUBBARD:  On red grouper, Amendment 53, I would
46  encourage the council to look at some of the issues here of
47  specifically it's disappointing that the attempt to improve the
48  data among the private recreational sector precipitates
```

24

1  discussions, like the one we're having today, and it also -- The
2  fishery is incredibly expanding, with exponential numbers of
3  smaller fish being moved into this fishery, and this fishery's
4  cyclical nature must be smoothed over by utilizing the IAs that
5  are coming out every year and automating those IA's catch-level
6  advice into the fishery and into our ACLs.
7
8  It's really frustrating as well that a small portion of limited-
9  access recreational fleet members, like the for-hire fleet, is
10 moving to an extremely accountable system, like our commercial
11 partners, yet we're being tied to this expanding effort and
12 discard numbers of the private recreational sector.  We've been
13 asking for and working towards more accountability for years and
14 trying to remove buffers, to more fully utilize the small
15 portion of this fishery, or of this sector.
16
17 We need to look more current at the science, and the IA has been
18 sitting there since the beginning of the year, and I really wish
19 the IA information was incorporated into this Amendment 53
20 discussion, because our fisheries are prosecuted differently, as
21 many commercial anglers stated.  We care more about the numbers
22 of days at-sea and the season length, and, if that IA
23 information was incorporated, we could perhaps look at, and
24 maybe even accept, a smaller ACL amount, if it still allowed
25 access with higher catch levels from that IA.
26
27 Red grouper is a staple fishery along Florida's west coast,
28 while other Gulf states don't necessarily have a red grouper
29 fishery, and it's been upsetting to see that IA and so much
30 council information and time dedicated to other fisheries that
31 are more Gulf-wide, while red grouper have been dragged along,
32 and that IA hasn't been addressed in this document.
33
34 I have tried, at the Reef Fish AP, to try to come up with a
35 compromise that maybe both sectors could agree to, and,
36 unfortunately, we haven't gotten anywhere, and so, at this time,
37 I would encourage the council to stick to their current
38 preferred of Alternative 3.
39
40 As far as the SEFHIER program rollout, everybody has been
41 working really hard on that, and I have some suggestions on the
42 way forward with the options when electronic reporting -- When
43 you have equipment failure, and one of those options could be
44 like an automated phone system that you call, and it gives you a
45 confirmation number, and that would be open 24/7 and just a
46 voice mail, or you send an email, and you get the email
47 confirmation, through an auto reply, and you could use an email
48 that's already set up, and it would be free to set up, and then,

25

1  when you're interdicted, or when your VMS isn't working, and
2  someone calls you, you would be able to reference that
3  information. I also have some more suggestions, but I'm out of
4  time, and so I will email them over to you guys.
5
6  **CHAIRMAN FRAZER:** All right. Thank you, Dylan. We've got a
7  question from Ms. Boggs.
8
9  **MS. BOGGS:** Thank you for your time, Dylan. You didn't touch on
10 this, but I would like to ask you if you fish for cobia, king
11 mackerel, or amberjack, and, if you do, what are you seeing in
12 this fishery, or fisheries?
13
14 **MR. HUBBARD:** I apologize, and I'm having some sound issues
15 here, and I'm repeating myself in my ear, and so it was a little
16 tricky to hear the first part, but I think you asked about
17 cobia, kingfish, and amberjack.
18
19 **MS. BOGGS:** Yes, sir.
20
21 **MR. HUBBARD:** We fish for kingfish and amberjack and cobia, and
22 cobia has never really been that big, and it's definitely not a
23 directed fishery, and we have seen less cobia, overall, in my
24 opinion, but, recently, we've seen quite a few of them in Tampa
25 Bay, and we've had some good catches, but, overall, I would say
26 the size is down, and the numbers of fish is down.
27
28 Amberjack is worrisome. They are just not around, and I am not
29 very old myself, and I'm not quite as salty as some, but
30 everybody is concerned about amberjack in our area. Even in my
31 lifetime, I have seen the dramatic downturn in that fishery.
32 Kingfish, in my opinion, there's nothing wrong there, and we've
33 seen plenty of kingfish. We catch plenty of kingfish, and I
34 think that's pretty healthy.
35
36 **MS. BOGGS:** Thank you.
37
38 **CHAIRMAN FRAZER:** Okay. Thanks, Dylan. We're going to go ahead
39 to our next in-person speaker. The next speaker is Scott
40 Hickman.
41
42 **MR. SCOTT HICKMAN:** Hello. It's been a long time. Captain
43 Scott Hickman from Galveston, Texas. It's good to see everybody
44 here again, and it's great to be in Key West and not be
45 completely sober.
46
47 First off, I would like to thank John Sanchez for his service.
48 Folks that are listening in, or folks that are sitting here on

26

1  the council, probably need to look at John's service here on the
2  council. I've known a lot of you for a long time, and I've
3  known people that have served here, and one thing about John
4  Sanchez that makes him a great council member is he always reads
5  his materials.
6
7  His questions are always knowledgeable, and he knows what people
8  have going on all over the Gulf, whether it be recreational or
9  charter folks or commercial folks, and he always makes his
10 decisions with the best available science, what is best for
11 conservation, what's best for the sustainability of the
12 resource, and that's what makes a good council member.
13
14 In saying all that, John, thank you. Not only are you a great
15 friend, but you've been an incredible person to serve on this
16 body and do the right thing for our resources that my children's
17 children will get to enjoy with leadership like yours. Thank
18 you very much.
19
20 Amendment 53, I would like to say that, currently, Alternative 2
21 is probably the best choice, and, that being said, increasing
22 discards by three-times in any fishery, from a fisherman's
23 standpoint, is not the best way to conserve a resource. Until
24 you can fix some of those issues and get better assessments,
25 interim assessments whatever you all have got to do, don't make
26 a decision on reallocating or recalibrating or any of this until
27 you can fix the issues like that. It's not good for the
28 resource.
29
30 I don't support having a reef fish permit on IFQ accounts, even
31 though I'm an IFQ shareholder and I do have a reef fish permit
32 attached to my account. The system was designed to reduce
33 overcapacity, and the system works well, and the system
34 currently is working perfectly. It's been good for the
35 resource, and it's helped to rebuild the fishery. The American
36 consumer that relies on these commercial fish is winning. They
37 are getting the fish. That's what the commercial sector does,
38 is provides fish to plates across America, and the system works
39 for those people, just like the current system for charter boats
40 works.
41
42 The electronic logbook system is working and being implemented
43 well, and people are learning how to use it. We implement
44 things to work for those folks that make a living and enjoy
45 these resources, the charter boat customer.
46
47 I would like for the council to move forward, in August, with
48 the CFA white paper, getting the rest of the reef fish and the

27

```
 1   charter/for-hire amendment for it, and keep working on Coral
 2   Amendment 10.   Habitat, more habitat, healthy coral habitats,
 3   means more fish, and we need more fish, and that's it.   Thank
 4   you, all.   I look forward to seeing you in San Antonio, Texas,
 5   and I appreciate everybody being here.
 6
 7   CHAIRMAN FRAZER:   Thank you, Scott.   Ms. Boggs.
 8
 9   MS. BOGGS:   Scott, you touched on it, but what are you seeing in
10   the cobia, king mackerel, and amberjack fishery, and, I mean, do
11   you fish those fisheries, and how do you see them at?
12
13   MR. HICKMAN:   I wear a couple of different hats.   I commercial
14   king mackerel fish and charter boat fish.   I have thirty-five
15   years of charter boat fishing.   There was a point we didn't have
16   red snapper, and we had lots of kingfish, and now we have lots
17   of red snapper, and the kingfish are definitely on the decline,
18   especially large kingfish.   This is probably the first year that
19   I can ever remember, on the commercial side, having excess
20   allocation past early fall, and we're still hoping.   Our king
21   fishing was horrible this year, and last year it wasn't great.
22
23   I used to catch, on average, on my charter boat, about 250 cobia
24   a year, because I love to cobia fish, and I will be lucky to
25   catch twenty or thirty a year now.   Cobia are in trouble, and
26   we've been up here saying it over and over and over again, and
27   we're fighting on this other stuff, and we're not paying
28   attention to cobia, amberjack, and king mackerel.
29
30   I used to -- As a young captain, I could catch keeper
31   amberjacks, and they were smaller sized, but they were plentiful
32   forty miles out of Galveston.   To catch nice amberjacks now, I
33   go around seventy-five miles, and there's parts of the Gulf that
34   maybe have it a little better.   In central Louisiana, there's
35   not a lot of fishermen, and they've got a great amberjack
36   fishery.   They're a nuisance, but areas where you have large
37   ports, we have pushed those fish out to seventy, eighty, ninety
38   miles offshore, and I don't agree with some of the assessments,
39   especially on cobia.   Cobia are in real trouble.
40
41   MS. BOGGS:   Thank you.
42
43   CHAIRMAN FRAZER:   Mr. Anson.
44
45   MR. ANSON:   Thanks, Scott, for coming to provide your testimony
46   all the way from Texas.   How far off do you normally fish for
47   kingfish, or have you fished for kingfish, how much offshore?
48
```

28

0003894

1  **MR. HICKMAN:**  Well, normally, twenty to forty miles is our best
2  king mackerel fishing.  Of course, this year, we've had this big
3  freshwater rain event off of Texas that, obviously, keeps those
4  fish from coming closer, but, even the days that I run in June,
5  which is one of our better months for charter fishing for
6  kingfish, we're running around sixty miles just to catch a
7  handful of fish.
8
9  Traditional areas, where we've always had big numbers, big
10 concentrations of king mackerel, those fish haven't been there,
11 and, really, even baitfish have been fewer in the last few
12 years, for whatever reason, but, in central Louisiana, there
13 seems like plenty of king mackerel, but, off of Texas, it's been
14 tough.
15
16 **MR. ANSON:**  Thank you.
17
18 **MR. HICKMAN:**  Thank you.  I appreciate you all.
19
20 **MR. HICKMAN:**  Thanks, Scott.  Our next speaker is online, Mr.
21 Chad Hanson.
22
23 **MR. CHAD HANSON:**  Good afternoon, everybody.  My name is Chad
24 Hanson, and I'm with the Pew Charitable Trusts.  Thanks for the
25 opportunity to speak in this format today.  We appreciate the
26 opportunity to comment on the council's letter in response to
27 the Executive Order on tackling climate change.
28
29 Red tides, and other episodic events, already affect fisheries
30 that the council manages.  These problems can be addressed with
31 well-thought-out management strategies.  Additionally, emerging
32 issues should be anticipated and monitored, with a game plan
33 ready to go.  Fortunately, the council will soon have the tools
34 to identify and address these complex issues.  A framework for a
35 fishery ecosystem plan is now under development and is expected
36 to be completed next year.  We urge the council to use that FEP
37 as the primary vehicle for addressing climate and ecosystem
38 issues.
39
40 The FEP should be a stakeholder-driven plan where issues are
41 identified and analyzed.  Then management strategies, or other
42 actions, are developed to tackle those issues.  Together with
43 frequent updates on the Science Center's ecosystem plan,
44 ecosystem indicators for those issues can be closely monitored,
45 to know if any actions should be taken.
46
47 In our letter to the council, we identified several ecosystem
48 issues to monitor and anticipate, and we look forward to

29

0003895

1  participating in the development of the FEP and share ideas on
2  how to incorporate and address those issues, as we described.
3
4  On another topic, we encourage the council to work with the SSC
5  to set up region-specific protocols for reviewing third-party or
6  independent science outside of the normal stock assessment
7  process, following the general guidelines of National Standard
8  2.   This has been done in other regions, for example in the
9  South Atlantic, to provide greater transparency and objectivity
10 in the process.
11
12 Having specific protocols in place will benefit the researchers,
13 the SSC, stakeholders, and, ultimately, will lead to better
14 scientific advice to you on using that science.   This is
15 especially important as new research is developed specifically
16 for management use.
17
18 Lastly, a big thanks to John Sanchez for his many years of
19 service to the council and the State of Florida.   John, we
20 appreciate all your work and wish we could be there to have a
21 beer with you, but, other than that, I look forward to seeing
22 everybody in-person out in San Antonio in August, and so thank
23 you very much.
24
25 **CHAIRMAN FRAZER:**  Thank you, Chad.  I am not seeing any hands up
26 around the table, and so we'll go to our next speaker in the
27 room, and that will be Mr. Buddy Guindon.
28
29 **MR. BUDDY GUINDON:**  Thank you.  Thanks for a lot of things, for
30 being here through the COVID and keeping this thing going.   I
31 wasn't very involved, because I'm not very good at computer
32 communications, but I thank you for all of your hard work and
33 what you did to keep this going.
34
35 I think the lack of this public process has caused a little bit
36 of a delay in some of the things we need to get done, and so I
37 hope we move forward in a really diligent way in the near
38 future, but I thank all of you for that.
39
40 I wanted to thank John for his service to the council.  He's
41 been a very stalwart supporter of all sectors of the fishery,
42 and I enjoy his company, personally.
43
44 Amendment 53, it causes me great pain to see the direction the
45 council wants to move in recalibrating.   I think that the
46 sensible thing to do is probably what you did with red snapper.
47 Let's put this off for a little while and see what the stock
48 assessment says and get a few years of this kind of data behind

                                  30

1   us and understand where we're going to end up, but, right now,
2   if you look at the effect of what reducing the red grouper stock
3   that's available to the industry out there would do -- I
4   actually have to order red grouper from Florida to come to Texas
5   to sell at my fish market and restaurant, because there are
6   times when deepwater grouper, when we make two-week trips,
7   aren't coming in.
8
9   I'm sure I'm a part-time guy buying fish over there, and I'll be
10  the first one cut out of that little circle of friends, once
11  they have to reduce to their very important customers, and so
12  consider that as you think about reducing the quota, especially
13  when we're at the lowest position we've been in for many years.
14
15  I would like to just make sure that we think about all the
16  sectors of the fishery as we move forward, and I know that the
17  recreational guys really need to have a better way of moving
18  forward, and the things you're trying to implement right now are
19  very complicated.  As we do that, consider that's not the only
20  important thing here.  There's a lot of user groups out there.
21  The folks that eat a fish from a retail market and a restaurant
22  have just as much right to access this fishery as anyone else.
23  Thank you.
24
25  **CHAIRMAN FRAZER:**  Thank you, Mr. Guindon.  Okay.  Our next
26  speaker will be from the virtual list, Ryan Bradley.
27
28  **MR. RYAN BRADLEY:**  Thank you.  I'm Ryan Bradley, and I'm from
29  Mississippi, and I wear many different hats.  I am --
30
31  **CHAIRMAN FRAZER:**  I am not sure if you can hear me or not, but
32  we are unable to hear you, and so I'm just going to do a quick
33  check to make sure that your audio is squared around on your
34  end.  Okay.  Unfortunately, I don't think we're going to be able
35  to accommodate your testimony at this time, and we'll try to
36  circle back at the end, and so we'll go ahead to our next
37  speaker.  Our next speaker would be Mr. Ken Haddad.
38
39  **MR. KEN HADDAD:**  Thank you, Mr. Chairman.  My name is Ken Haddad
40  with the American Sportfishing Association.  Our membership
41  comprises sportfishing manufacturers, distributors, retailers,
42  and anglers, and I too would like to congratulate John for his
43  service and thank you.  We don't always see eye-to-eye.  In
44  fact, I don't think we ever see eye-to-eye, but it's a good
45  relationship, and thank you.
46
47  I am not going to talk about red grouper.  My colleague, Kellie,
48  will, and so I don't want you to think that I'm neglecting red
                                    31

1   grouper.  I want to talk about mackerel.  We basically have the
2   same comments for king mackerel as we do red grouper, and this
3   is a recalibration of historic data and allocation to put it in
4   the MRIP-FES currency.
5
6   The allocation adjustment is, or was supposed to be, technical,
7   I thought, and not a full-blown reallocation review.  Madam
8   Bosarge has requested that OY accountability be put into the
9   purpose and need statement, and that has prompted me to voice a
10  little bit of concern, or at least ask for some accommodations
11  as you go through and develop this amendment.
12
13  Unlike reef species, mackerel are fished differently by the
14  recreational sector, and we practice a good amount of a catch-
15  and-release, and, thus, abundance of fish in the water plays a
16  big role in the encounter rate and experience, and I thought
17  should be accounted for in OY, or some other measure in the
18  recreational component of the fishery.  We have consistently
19  argued for this inclusion, but we have not been able to overcome
20  the perspective that a fish left in the water is a free fish
21  that shouldn't be left in the water.
22
23  We have two requests.  One -- Florida has been able to do this,
24  by the way, by increasing the SPR.  That's a little different
25  when you have a two-sector fishery, and I know there are some
26  complications there.  Our request is to determine a way in the
27  mackerel amendment to allow the recreational sector to leave a
28  portion of its allocation in the water without it being
29  considered overfished.  Do not include OY in the purpose and
30  need, if it means that the recreational fishery cannot leave
31  fish or some of its quota in the water without them being
32  considered underfished.
33
34  I want to speak, real quickly, on MRIP-FES calibrations, kind of
35  more as a whole, and we understand there is no choice, at this
36  point, but to apply the new FES stock updates in full
37  assessments, unless somehow state data plays a bigger role,
38  which it hasn't to date.  For most species, MRIP is now the only
39  data available in the timeframe.  Since MRFSS-CHTS expires, it
40  precludes doing things, I think, like what was done with red
41  snapper.  There is a greater space between the two.
42
43  We ask that the council look at the difference between a
44  calibration adjustment that involves allocation and doing your
45  full-blown assessment for allocation of a fishery, and I think
46  those are getting confused.  You have policies and procedures in
47  place, as do the NOAA Fisheries, and they have policies, and you
48  have them, and I don't know if they're being applied in this
                                    32

1   process, and so I just wanted to say please take a look at that.
2   Thank you.
3
4   **CHAIRMAN FRAZER:**  Thank you, Ken.  Ms. Boggs.
5
6   **MS. BOGGS:**  Thank you, Ken.  Back to the king mackerel, and what
7   are your constituents, I guess, seeing in the mackerel fishery?
8   You say you're doing catch-and-release, and you want to leave
9   some in the water, and not consider them overfished, and so are
10  you all seeing an abundance of king mackerel?
11
12  **MR. HADDAD:**  I think -- I can't give a full pulse of the
13  fishery.  For a lot of the recreational, private recreational,
14  it's a hit-or-miss fishery, and you're not always targeting
15  them, but you get into them, or you're going to target them for
16  other reasons, and they are moving up and down the coast, and so
17  it's just not a commercial view of how we look at it.  I haven't
18  heard that there's any big decrease in the areas that at least
19  I'm familiar with, the Panhandle part of Florida, and I haven't
20  heard of any significant changes there.
21
22  **CHAIRMAN FRAZER:**  Thank you, Ken.  All right.  We're going to go
23  back to Mr. Ryan Bradley.  We've got him on the phone, and we're
24  going to try to accommodate him through the staff.  Go ahead,
25  Ryan.
26
27  **MR. BRADLEY:**  All right.  Thank you, council members.  Again,
28  I'm Ryan Bradley.  I'm a federally-permitted commercial reef
29  fish fisherman and seafood dealer.  I would like to say, on
30  behalf of Mississippi Commercial Fisheries United, over here in
31  Mississippi, that we stand with the commercial sector on the red
32  grouper situation.
33
34  It's very concerning, the way the council is looking to move
35  here on that, and I think that certainly sets a bad precedent.
36  I would say to you, council members, to ask yourselves if the
37  actions that you're taking are going to increase certainty or
38  increase uncertainty in some of these landings for this red
39  grouper.  I think we can get a hold of some of the landings data
40  better, and I think we could revisit this and provide more
41  clarity.
42
43  Also, any of those that know me, that have been around the
44  council, knows that we've been speaking on Amendment 36B for
45  about the past five years now, and I've come to feel like I've
46  just been talking to a brick wall, and so hopefully you folks
47  will really listen to what I have to say here, and that is I
48  hope that we can continue looking at 36B, but I would like to

33

0003899

1   see the council include alternatives in the framework document,
2   and, essentially, what I've been proposing is that, instead of
3   looking to require shareholders to have a permit to maintain
4   shares, I think we could achieve what we want to do by just
5   asking that they need to have a permit to obtain shares, and
6   that would not forcibly take from anybody, and it would have us
7   marching back in the direction we want to go.
8
9   As you can see in the five-year review, the fishery is clearly
10  trending away from the actual fishermen and what's being termed
11  public participation, and I would say that this is really a big
12  travesty for the commercial fishing industry and the commercial
13  fishermen and these fishing communities.  I think we need to
14  work toward getting that trend going in the opposite direction,
15  and so I think you should consider just making it to where a
16  permit would be needed to obtain shares after the implementation
17  date.
18
19  Also, I would like to see the council look at including an
20  alternative to look at bringing back the income qualifying
21  provisions for these commercial reef fish permits.  I think
22  that's a big issue that we lost when we went to this IFQ
23  program, and I think this would -- We need to revisit that, and
24  I think those two actions together would get us going back in
25  the direction we want to go for this sector, while not forcibly
26  taking away from anybody.
27
28  We have been working on this for many years, and talking to many
29  people throughout the fishery, and I encourage the council
30  members to please reach out to me, and I'm glad to answer any
31  questions about what we're thinking around this 36B, and so
32  that's what we've got for today.  Thank you for your time, and I
33  apologize for the audio issues.  I've been cutting in and out
34  this afternoon, and so you all enjoy your stay in Key West, and
35  I look forward to seeing you all in person in Texas.  Thank you
36  and have a good day.
37
38  **CHAIRMAN FRAZER:**  All right.  Thank you, Ryan, and there's no
39  need to apologize for the technical difficulties.  We're all
40  trying to work through this as we get back to some sense of
41  normalcy.  In any case, Ryan, I don't see any hands up here
42  around the table, and so, again, thank you for your time.  We're
43  going to go our next speaker, and that will be Mr. Bob Zales.
44
45  **MR. BOB ZALES:**  Bob Zales, II, fishery management consultant
46  with SOFA and also President of the National Association of
47  Charter Boat Operators, representing the Gulf members.  I am
48  kind of in a unique position, because I'm representing

34

1   commercial guys and also charter guys, and, right now, we are
2   all on the same page with this, with pretty much about 95
3   percent of the comments that I've read on this red grouper
4   issue, that Action 1, Alternative 2 is the only option for us.
5
6   As you all have seen through the multiple emails that I have
7   provided to you all with comments that I've made over the past
8   couple of years, since this FES issue first came to light to us,
9   at the October meeting in Galveston two years ago, or three
10  years ago now, we've got serious concerns about that data.
11
12  I've got a long history involved in this fishery management
13  game, and it essentially started with king mackerel back in the
14  late 1980s, and recreational data, under the old MRFSS system,
15  was a problem.  I was able, and I'm stupid at that, but I was
16  able to find the mistakes in it, and, eventually, we got it
17  corrected.
18
19  There's been several changes to recreational data over the
20  years.  When the NRC did their study in 2006, where we had been
21  contending all along that that data was fatally flawed, they
22  agreed with us, and, in all the changes that have been made to
23  recreational data, there's never been such a substantial change
24  in the data as what this FES is producing.
25
26  FES has changed data 200 to 300 to 400 percent.  In addition to
27  that, you've got states -- The State of Florida has got serious
28  concerns, and Luiz Barbieri, and everybody knows him, he's got
29  serious concerns.  At the SSC meetings that I've attended, most
30  of those scientists had concerns.  If you look at your votes,
31  you don't have a unanimous vote on anything that has to do with
32  FES, and we would argue, and I have argued, that, until you get
33  the FES system fully vetted, to see where it is, because,
34  clearly, it makes no sense to anybody, and it's just completely
35  unreasonable, and you need to leave the allocation as it is.
36
37  The document that you have in front of you now still is not
38  totally complete on the economic analysis, and there's no
39  information in there about what impact is going to happen to
40  restaurants, fish houses, consumers, and all of you that go to a
41  grocery store or fish house to buy fish are going to be affected
42  by this, and there's no accounting of that in this document.
43
44  All of that needs to be vetted out, and so Alternative 2 in
45  Action 1 is what we support.  Alternative 3 in Action 2 is what
46  we support, and we would encourage you all to do that, and so
47  any questions?
48

35

1   **CHAIRMAN FRAZER:**  Ms. Boggs.
2
3   **MS. BOGGS:**  I am going to ask you to put your NACO hat on for a
4   minute, and so what are your constituents seeing in the cobia,
5   king mackerel, and amberjack fishery?
6
7   **MR. ZALES:**  Everybody knows that cobia has got serious issues.
8   Anybody in our area -- I mean, when we started in business as a
9   twelve-year-old in 1965, you would see pods of cobia, with
10  multiple numbers of cobia, and we don't see those anymore.
11  You're lucky to see -- It's been that way for several years.
12  There's probably a number of theories as to why, but clearly
13  there's got to be an issue with cobia.
14
15  With amberjack, there's a serious problem, and amberjack is an
16  enigma to me, because, whenever king mackerel were closed, we
17  started fishing amberjack, and there were a bunch of them there,
18  and then, as the regulations came into play, both the commercial
19  and the recreational sectors made suggestions on how to reduce
20  the harvest.
21
22  Everything that has been done to amberjack, the fishery has not
23  responded to any of it, and I don't understand why, because all
24  the people that have tried to help me understand fisheries --
25  Nothing makes sense with amberjack, and it should have responded
26  a long time ago, but it hasn't, and so there's clearly an issue
27  with them.
28
29  King mackerel is another cyclical fishery, like red grouper.
30  Red grouper goes in cycles, and it's been that way ever since
31  management started.  King mackerel goes into like a six or
32  seven-year cycle, and it does really well, and, all of a sudden,
33  one year it's nothing.
34
35  Last year was a problem, and all of this has to do with bait.  I
36  think somebody earlier said something about bait.  The bait
37  situation, for the past couple of years -- We've had a couple of
38  good days of fishing kingfish, but, before coming up here, the
39  week before I came up here, we couldn't hardly find any at all,
40  and so what the situation is with them, I don't know, but I
41  think it's more of a bait situation than it is a problem with
42  the stock.
43
44  **CHAIRMAN FRAZER:**  All right.  I'm not seeing any more hands.
45  Bob, thank you very much.
46
47  **MR. ZALES:**  Thank you.
48

0003902

1  **CHAIRMAN FRAZER:**  All right, and so our next speaker is Rick
2  Kilgore, who is online.
3
4  **MR. RICK KILGORE:** I'm Captain Rick Kilgore from Islamorada, and
5  I'm calling about the concern of self-reporting with not just
6  Gulf of Mexico charter boat and headboat, but also South
7  Atlantic self-reporting of fishing.  I ran into this problem
8  with the Everglades National Park, and I had long discussions
9  with James Tilmont, the head biologist of all of the National
10  Parks.
11
12  I've been fishing these resources since the 1960s, and I started
13  professionally fishing charter boats and headboats in 1978, and
14  I've been here in Islamorada since 1995 fishing, and I'm
15  originally from Miami.
16
17  What I came across is that you have fatally-flawed information
18  being reported by the guides, and that is overreporting and
19  underreporting, underreporting because it's very time consuming
20  to do this, even though you all have worked very hard for this
21  app, and you still have a large segment of the charter boat and
22  headboat people that will not be reporting accurately, and,
23  also, the main biologist there at NMFS explained to me that
24  they're also trying to track how many fish you catch per time of
25  effort instilled in this.
26
27  To be completely honest, I specifically never catch my
28  recreational limits for my clients.  If I did, I would be
29  filleting fish for hours and hours.  If I had a four-person
30  group out and caught forty dolphin and forty snappers, I would
31  be until midnight, and so what I do is I catch what I deem is an
32  hour of filleting, forty-five minutes, just whatever they need
33  for a few meals, one to go out to the restaurants, and, if they
34  want to take an excessive amount of fish, and catch more than
35  that, I come in early, but, I mean, 99 -- I have only had one
36  trip like that in twenty-five years here, where people wanted to
37  take a hundred pounds of fish home.
38
39  That there also is fatally flawed in regulating what our success
40  rate is for how much fish are out there, and so I just want you
41  all to be aware that there is a lot of potential erroneous
42  information, data, going into your method of trying to
43  understand what the resources are out there.
44
45  I think a much better way would be for people out in the field,
46  if you just ride along with some of the charter boat guys and do
47  actual surveys that way, and then also walk the docks and see
48  what the catches are and then interview the captains and see

                                    37

1  what the fishing was like that day for the season.  Thank you.
2
3  **CHAIRMAN FRAZER:**  All right.  We're going to have Ms. Bernie Roy
4  tell Captain Kilgore thank you.
5
6  **MR. KILGORE:**  You're welcome, and I might write something to you
7  more concise, because this is just off the top of my head.
8
9  **CHAIRMAN FRAZER:**  All right.  We're going to move to our next
10 speaker in the room, and our next speaker is Mr. Charles
11 Bergmann.
12
13 **MR. CHARLES BERGMANN:**  Hi there.  My name is Charlie Bergmann,
14 and I'm an angler from Mississippi, and I'm retired from the
15 National Marine Fisheries Service.  I was a former member of the
16 Mid-Atlantic Fishery Council, and I commercial fished for a lot
17 of years.  John, thank you, buddy.  It's been fun.
18
19 I would like to address Amendment 53 a little bit, if I can.  I
20 went to the public hearing in Panama City, and I don't know what
21 happened in the other two in-person meetings, and I strongly
22 support Alternative 2 in Action 1.  One of the things that came
23 out in the meeting in Panama City, and it hasn't been brought up
24 too much amongst the folks here around the table, are the small
25 businesses that are affected by this type of a policy.
26
27 Every one of these fishing boats is a small business, and every
28 one of the crew members on those fishing boats are small
29 businesses.  Your restaurants that rely on fresh grouper, or
30 fresh seafood, are going to suffer because of the allocation
31 shift, and they are small business owners.  I don't think any
32 thought has been given to the effects of small business with
33 this potential regulation.  Again, thank you very much.  Any
34 questions?
35
36 **CHAIRMAN FRAZER:**  All right.  Charlie, thank you.  We're going
37 to go to our next speaker online, Jim Green.
38
39 **MR. JIM GREEN:**  Hello, council members and staff.  I'm Jim
40 Green, President of the Destin Charter Boat Association and
41 President of the Charter Fishermen's Association.  I'm speaking
42 on behalf today of both.
43
44 First, I want to thank John Sanchez for his years of commitment
45 to our fisheries and making it sustainable and better for all of
46 us.  I certainly appreciate John.
47
48 Pertaining to equipment failure and electronic reporting, the

0003904

1  CFA and the DCBA think it's important the regional councils have
2  a lot of direct input on what the repair and replace protocol
3  should look like, and I know that both associations will push
4  back hard on the implementation of the monitoring portion until
5  we get these items set up.
6
7  We have worked hard, for years, to get this in place, and it's
8  important that we get it right, no matter how long it takes, and
9  that does not do the fishery and the agency and the council and
10 the for-hire sector or our anglers any good to roll out
11 something that does not work for all involved.
12
13 I'm part of the Ocean Conservancy and CFA Port Ambassador
14 Program, and I can tell you that we will do what is necessary to
15 help develop a repair and replace protocol and get it in place.
16 This is inherently different than the commercial sector.  The
17 fact that people travel hundreds of miles and spend thousands of
18 dollars to access the fishery and to step on a boat for a
19 scheduled day, or half-day, trip makes it unique.
20
21 A simple web form that is filled out and attested to and time
22 stamped and submitted online, to start whatever timeframe is
23 decided, will reduce costs and the burden, and it will allow for
24 the vessel to continue to fish legally and allow the managers in
25 the program to handle it as it happens, and the port ambassadors
26 of the CFA are willing to work ahead of the next meeting with
27 staff to help figure out how this can be efficiently added to
28 the SEFHIER program.
29
30 Red grouper, the CFA and the DCBA support Alternative 3, because
31 it gives us the longest season.  The for-hire industry is
32 looking at the same problem here as we incurred with the red
33 snapper fishery, the black hole of uncertain data in the
34 recreational sector.  None of these options gives us more
35 opportunity and only selects how deep the cut goes.  This thing
36 was really cart before the horse on making decisions that are
37 risk-averse and contentious, without using all the tools in the
38 box.
39
40 The fact that the decisions are made with the interim assessment
41 just waiting to be used seems counter intuitive.  This kind of
42 situation really puts us at odds at being cut out of the
43 fishery, when we know more quota is coming, or setting a bad
44 precedent of reallocating fish to a subsector that has not
45 pushed for a higher level of accountability.
46
47 We urge the council to decide on a path that would not make the
48 for-hire sector a sacrificial lamb and get the interim

0003905

1  assessment in the works immediately after.   For these very
2  reasons, you will hear us pushing for the development of the CFA
3  plan for several of -- The other four major reef fish species
4  under another chapter of sector separation, and these types of
5  situations bring to light the glaring differences and the
6  willingness of the subsectors of the recreational fishery.
7
8  The needs of the for-hire sector are stability in what fisheries
9  we can offer to our anglers.   Most of the industry understands
10 that, through securing historical allocations, we can execute
11 the fishery in an accountable and sustainable way.   Thank you
12 for the opportunity to speak today.
13
14 **CHAIRMAN FRAZER:**   Thank you, Jim.   I think we have a question
15 from Ms. Susan Boggs.
16
17 **MS. BOGGS:**   Good afternoon, Jim.   Thank you for taking the time
18 to call in today.   I was curious.   With cobia, king mackerel,
19 and amberjack, what are you seeing in those fisheries in the
20 Destin area?
21
22 **MR. GREEN:**   Ms. Boggs, can you repeat what you said?
23
24 **MS. BOGGS:**   Absolutely.   Jim, thank you for taking the time.
25 Cobia, king mackerel, and amberjack, what are you all seeing in
26 Destin with those fisheries?
27
28 **MR. GREEN:**   Recently, the mackerels have started to come in more
29 and more, but it's definitely not what we've seen historically,
30 in the last ten years, and this is probably one of the worst
31 years I've seen of king mackerel being pushed in.   I think a lot
32 of it has to do with all the rain that we got in the spring and
33 wintertime here.   We had an abnormal amount of rain, which
34 dropped a lot of cold water out of our tributaries, and I think
35 that that has a lot to do with it, but we're starting to see
36 more and more king mackerel show up.
37
38 **MS. BOGGS:**   And cobia?
39
40 **MR. GREEN:**   Cobia, we've started to see some of them push back
41 through, when they're on their migration back, but still not
42 what we're used to seeing, and it's definitely a depleted stock.
43
44 **MS. BOGGS:**   Finally, amberjack.
45
46 **MR. GREEN:**   Amberjack has been few and far between.   Most of our
47 guys are going anywhere from fifty to sixty miles to be able to
48 catch any jacks of any size.
                              40

0003906

1
2   **MS. BOGGS:**  Thank you.
3
4   **CHAIRMAN FRAZER:**  All right.  Thank you, Jim.  I'm not seeing
5   any other hands, and so I appreciate your testimony.  Our next
6   speaker is Mr. Casey Streeter.
7
8   **MR. CASEY STREETER:**  How are you guys doing?  Thanks for having
9   me.  I'm a commercial fisherman, Casey Streeter, and, obviously,
10  I've been coming to these meetings for the last three years, and
11  I've had a chance to speak with several of you, and I've not had
12  a chance to speak with many of you though, and I was wanting to
13  explain my situation and how I came to the fishery.
14
15  Seven years ago, my wife and I, outsiders and not involved with
16  this fishery in any way, shape, or form, bought a bankrupt fish
17  business, a retail shop, and we bought a boat, and we bought
18  shares, and we worked tirelessly, seven days a week for seven
19  years, to build this business to where we are now, with tens of
20  thousands of annual customers based in our community.
21
22  Our model is different than most.  We catch our fish, and it
23  comes directly to our community, and so, during that time of
24  growth and hard work, we have bought now five boats, and we have
25  brought back fishing in our area, and now we have over ten
26  fishermen fishing for us who are independent owner-operators.
27
28  In this reallocation battle, it will be financially devastating
29  to my business, and I hear a lot of talk in the past about new
30  entrants and bringing guys in and the pathways that we have and
31  what we need to do to help them, but I'm here now, and where is
32  the help?
33
34  These issues, moving forward, and giving it to an unaccountable
35  sector to increase discards and hurt my future chance of being
36  able to make a living in this industry is real, and the sixty
37  fishermen that showed up to the Fort Myers meeting that I
38  brought there are all owner-operator independent guys, and 85
39  percent of the fish I land is on a lease.  100 percent of what
40  they land is on a lease.
41
42  When we lose this fish, we will lose our small-boat fleet, and
43  we will lose our community's access south of Tampa.  Marco
44  Island, Naples, Fort Myers, Pine Island, I mean, these are
45  places that have historic history in fishing, and it will be
46  gone and never come back again, and so, if consolidation is the
47  plan to move this forward, well, that's going to work, because I
48  will be done.

0003907

```
 1
 2    We are an American success story, to come from -- I'm from
 3    Michigan, and I grew up on a farm.  I came into an industry that
 4    was wide open, and I found my way, through hard work and
 5    dedication to it, to be where I'm at now, and it will be lost,
 6    and this $2 million that doesn't seem like much is what my
 7    livelihood depends on, what the guys that I see and talk to
 8    everyday depend on, and it's catastrophic to them, and we will
 9    not recover from it.
10
11    I have done everything you have asked me to do.  I have bought
12    shares, and I have bought boats, and I went to MREP.  I come to
13    these meetings to fight for what I know is right for my
14    community, and it falls on deaf ears.  I understand that this
15    matters, and I understand the importance of a recreational
16    fishery, but the culture and the access to the American public
17    will be gone.
18
19    I live in the fast-growing city in the fastest-growing county in
20    the country, and people want access to this fish.  Tom saw
21    pictures of a hundred people lined up down the road waiting to
22    come in during the peak of COVID, because we had one person at a
23    time to get access to the food, and regional food security is
24    important.
25
26    We will not start these things back up once they're gone, and
27    this is the direction that they're going.  Consider that, and
28    understand it, and do what you said.  You want to support new
29    entrants?  Then do what it takes, because a new entrant without
30    an ability to make money is nothing.  Thank you.
31
32    CHAIRMAN FRAZER:   Thank you, Casey.  We've got a couple of
33    questions.  J.D. Dugas.
34
35    MR. DUGAS:  Do you land any red snapper?
36
37    MR. STREETER:   We absolutely land red snapper, if we can get
38    allocation.
39
40    MR. DUGAS:  That was my next question.
41
42    MR. STREETER:  We cannot -- Right now, the current situation in
43    the fishery, we cannot find fish.  Money doesn't buy fish.
44    Hopefully maybe I've found some access here.  I have 700 pounds
45    a month for each one of my boats.  For young guys, who are all
46    under thirty, that I said this is a good industry, and you can
47    be in it, but, basically, I lied to them, because I can't even
48    find fish to make them profitable, and so we have challenges.
```

0003908

1  This puts us farther back.
2
3  **CHAIRMAN FRAZER:**  Patrick Banks.
4
5  **MR. BANKS:**  The 700 pounds you're talking about for each boat,
6  is that poundage you're leasing, or that's shares that you own?
7
8  **MR. STREETER:**  My 28,000 pounds of red grouper that I originally
9  purchased was cut by 60 percent, and soon to be potentially 80
10  percent.  We catch our fish early, of what we've got, but now
11  the situation is you better lease every bit of fish that you
12  need for a whole year at the beginning of the year, and, first
13  of all, that financial burden for a small business is
14  impossible.
15
16  We lease right now, and I had no problem leasing the first
17  couple of months of the year.  Come around March, it shut off,
18  and, again, it has nothing to do with money, because it's not
19  available.  I can't find red snappers, and I can't find
20  deepwater, and, I mean, there's no access.  These are going to
21  create -- Guys are going to try to fish, try to do what they
22  can, and you're going to create more discard issues in our
23  fishery, and we do not need that, and so that's the road this is
24  going.
25
26  **CHAIRMAN FRAZER:**  Thank you, Casey.  Okay.  Our next speaker is
27  Ted Venker.
28
29  **MR. TED VENKER:**  Thank you, Tom, and thank you, everybody.
30  Again, my name is Ted Venker, and I'm with the Coastal
31  Conservation Association.  I really appreciate the opportunity
32  to speak today.
33
34  On the really complex matter of Amendment 53, CCA asks that the
35  council adopt Preferred Alternative 3 in Action 1 and Action 2.
36  I think it's important to keep pointing out that this amendment
37  should be a relatively simple technical fix to historical data.
38
39  As you look at it, it is basically correcting an allocation that
40  was set incorrectly in the first place.  It was based on
41  historical catch, and that historical catch was found to have
42  errors in it, and, when those errors were corrected, it
43  indicated that the allocation should change, and the only
44  logical thing to do is to change the allocation to reflect that.
45  Now, having said that, CCA would also fully support reexamining
46  that allocation in a true reallocation process that looks at
47  economics and bycatch and any other factors, to make it as fair
48  as possible.

43

1
2  We have always said that basing allocations only on catch
3  history is probably the worst way to manage a public natural
4  resource.   Setting a backward-looking allocation and not
5  reviewing it fully for decades is probably a huge disservice to
6  public resource management.
7
8  There's no doubt that commercial grouper fishermen have some
9  very compelling reasons to change the allocation, and those
10 should all be heard in a structured process that is designed to
11 look at specific criteria other than past catch history.   We
12 look forward to working with the council, and with the
13 commercial grouper fishermen for that matter, in an open,
14 formalized reallocation process.
15
16 If I understand correctly, that's not scheduled until 2026,
17 which seems like a long way away to do that, but I would assume
18 it's in the council's purview to move that date up, if it would
19 like to address this sooner, but, for this week, the council's
20 decision should be to simply change the allocation as a result
21 of a peer-reviewed guidance showing that the old allocation was
22 set incorrectly.
23
24 That is a starting place.   If there are concerns over the health
25 of the stock, then, as Andy Strelcheck said earlier this week,
26 this council has the ability to put new regulations in place to
27 ensure that overfishing does not occur.   Personally, I would
28 encourage the council to look at things, regulations, that avoid
29 harvest on spawning aggregations, since this species seems to be
30 particularly vulnerable to that kind of pressure, but I'm sure
31 there's many options that can be looked at.   That is all I have,
32 and I really appreciate the opportunity to address the council
33 today, and I look forward to seeing everyone in Texas in August.
34
35 **CHAIRMAN FRAZER:**   Thank you, Ted, for your comments.   I am not
36 seeing any hands around the table, and so, again, thank you for
37 your time, and we're going to move on to our next speaker.   The
38 next speaker is Mr. Scott Daggett.
39
40 **MR. SCOTT DAGGETT:**   I am an owner-operator out of Madeira Beach,
41 Florida, and I'm a member of SOFA, and I support the second
42 option there.   Like Casey said earlier, at the beginning of the
43 year, me and my partner, we scratch a pretty good-sized check
44 for allocation, or quota, whatever you want to call it, and
45 we'll probably have to absorb that cost, because the quota is
46 going to -- The price for quota is going to double, and we're
47 going to get the quota this year, and we're going to reach it,
48 and it will probably go double in price.

44

1
2  We will probably absorb that in the longline industry, but, when
3  you look at the little guys, the rod-and-reel, the profit margin
4  is not that great.   You know, you're talking, traditionally,
5  maybe 2,000 to 4,000 pounds of fish, leased on top of that, and
6  the lease is probably going to double.
7
8  For us, I'm having the best year that I've ever had, the best
9  year I've ever had, and I haven't had to go as far as I usually
10 do, and the fishing has been phenomenal, and, years ago, you
11 give us fish that we could never catch, and then, this year, and
12 you would think, after COVID and red tide and the terrible year
13 last year, and everything is going good since November, and now
14 you're going to take it away, and I don't know.
15
16 It's kind of demoralizing to come here and spend your money to
17 come to these things, when you really feel like the deck is just
18 stacked against you.   You know, it isn't cheap to come down
19 here.  I'm sure you guys -- I don't want to say have got better
20 things to do, but I could be out fishing right now, but I'm
21 here, and I know, if I don't show up, it's just going to get
22 worse, and that's about all I've got to say.   Thanks.
23
24 **CHAIRMAN FRAZER:**  All right.  Thank you, Scott.  We're going to
25 go to Ms. Kellie Ralston.
26
27 **MS. KELLIE RALSTON:**   Thank you, Mr. Chairman.   I'm Kellie
28 Ralston, representing the American Sportfishing Association.  I
29 really appreciate the opportunity to speak to the council
30 remotely today.   ASA has submitted comments on Red Grouper
31 Amendment 53 that explain our support of the current preferred
32 alternative, but I did want to highlight a few issues as you
33 continue your deliberations tomorrow.
34
35 As a reminder, the recreational sector did not bring this
36 amendment to the council.  The amendment is simply a result of
37 the recalibration from the MRIP Coastal Household Telephone
38 Survey to MRIP-FES and the subsequent corrections of historical
39 recreational landings.
40
41 This process is either happening, or going to happen, for many
42 species in the near future for the council to address, and NMFS
43 has repeatedly stated that not adjusting the current allocation,
44 as a result of incorporating the new best scientific information
45 available, and that's MRIP-FES, per the SSC, is in fact
46 reallocation from the recreational sector to the commercial
47 sector.
48

0003911

 1   To do anything other than simply adjust or correct the
 2   allocation based on the reassessment of the historical
 3   recreational data is a de facto reallocation that needs to be
 4   addressed in a separate reallocation amendment that follows the
 5   policy guidelines of NOAA and the council.
 6
 7   Part of the document that you have on Amendment 53, the
 8   allocation alternatives, especially for Action 2, is what I have
 9   based these numbers on, has the following approximate effect on
10   recreational fishing, and so, for fishing days for Alternative
11   2, the recreational sector loses 159 fishing days, based on ACT
12   calculations, versus the current condition.  Alternatives 3
13   through 5, the recreational sector loses roughly forty-three
14   fishing days, versus the current situation.
15
16   Alternative 6, the recreational sector loses 127 fishing days,
17   and so that's a big loss, and so, across-the-board, the
18   recreational sector is going to take a hit in their opportunity
19   and access, regardless of which alternative is selected.
20
21   Economically, Alternative 2 has a $15 million negative impact.
22   Alternatives 3 through 5 have a six-and-a-half, approximately,
23   negative impact.  Alternative 6 has an $11 million negative
24   impact to the recreational sector, and so, the way we interpret
25   it, the document points to Alternatives 3 through 5 as having
26   the least economic impact and decrease in fishing days for the
27   recreational sector, with Alternatives 2 and 6 significantly
28   reducing the fishing days available to the entire recreational
29   community, and that's private and charter, with significantly
30   higher economic impacts, and Alternative 2 impacts those the
31   most.
32
33   We ask that you keep the preferred alternative, Alternative 3,
34   for both Actions 1 and 2, and we also recommend that you
35   consider looking at unfished red grouper IFQ shares and how they
36   may be brought back into the existing commercial fishery, to
37   help mitigate impacts to that sector, and that you look at how
38   to shift or make red snapper IFQ shares available to the red
39   grouper commercial fishery, to better account, or be able to
40   address, their red snapper bycatch, and, with that, I will
41   close.  Thank you.
42
43   **CHAIRMAN FRAZER:**  All right.  Thank you, Kellie.  I am not
44   seeing any hands up here in the room, and so, again, thank you
45   for your time, and we're going to go ahead and move on to our
46   next speaker.  Our next speaker is Mr. Randy Lauser.
47
48   **MR. RANDY LAUSER:**  My name is Randy Lauser, and I've been

1  fishing the Gulf of Mexico since 1985 commercially, longlining.
2  Me and my partner, Scott Daggett, we own two boats together, and
3  I strongly support Alternative 2, strongly, and I want to talk
4  about the new participants.
5
6  I just recently turned over my captain's chair to my first mate,
7  and he's been fishing the boat for eight months now, and he
8  wants to do what I did twenty years ago, when I first bought my
9  boat, and he wants to be that guy, but, the way it's going now,
10 if we lose 600,000 pounds of our quota, I'm going to have to go
11 back to Madeira Beach and tell him that he's going to be
12 demoted.  He's going to go back to first mate, and I'm going to
13 have to fire my baiter, and yada, yada, yada, but, with being
14 here and hearing all the data, all the science, and you say it's
15 the best available science, and we say it's the worst available
16 science, because it just doesn't add up with commonsense.  It's
17 just not there.
18
19 With the number of discards from the recreational to the
20 commercial sector, and then, right now, it's getting harder to
21 fish with IFQs, and we can't find them.  Everybody is waiting
22 for the council to reallocate 600,000 pounds of quota, and
23 they're going to jack the price up two or three times, and
24 they're holding onto it, because it's not there.  They're
25 holding onto it, to wait to see what happens at the Gulf
26 Council.  That's pretty much it.  Thank you, John Sanchez, for
27 your service.  Thank you very much, council.
28
29 **CHAIRMAN FRAZER:**  All right.  Thank you very much.  I am not
30 seeing any hands, and so we're going to go ahead and move to our
31 next speaker.  Mr. Paul Reeves.
32
33 **MR. PAUL REEVES:**  Good afternoon.  My name is Paul Reeves, and
34 I'm a red grouper commercial fisherman from Steinhatchee,
35 Florida.   Amendment 53, as proposed, with the preferred
36 alternative, is detrimental to the small, family-run fisheries.
37
38 We've been through a 60 percent reduction in red grouper
39 allocation in 2019, a pandemic last year, and now you want to
40 take 20 percent more of our fish, and another 600,000 pounds off
41 the top, with the recreational discards.
42
43 You're asking the commercial fishermen to pay for the
44 recreational sector's overfishing without addressing the root
45 problem of overfishing and high discards.  Taking from the
46 commercial sector is unsustainable, and it destroys our
47 livelihood.  This must be addressed from within the recreational
48 sector.

47

```
1
2   Reallocation based off of recalibration is not fair or
3   equitable, and you are rewarding the recreational sector's
4   overfishing, while the commercial sector was held at hard
5   limits.  We can all understand that the new FES needs to be
6   implemented and adjustments made, and then let's wait until the
7   interim stock assessment comes out to see where we are.
8   Recalibration and reallocation have nothing to do with each
9   other.  Please support Alternative 2.  Thank you.
10
11  CHAIRMAN FRAZER:  All right.  Thank you, Paul.  Not seeing any
12  hands, we'll go ahead and move to our next speaker, Charlie
13  Reiner.
14
15  MR. CHARLIE REINER:  I'm a second-generation fisherman, and my
16  dad started fishing in the 1950s out of Key Largo, and he was a
17  lobster fisherman and a gillnet fisherman.  Growing up as a kid,
18  that's all I wanted to do, was fish.  I watched my dad, seeing
19  what he did, and I learned, and that was my whole life.  I could
20  have went to college and got scholarships, and I wanted to go
21  catch fish.
22
23  In doing this my whole life, I have seen lobster fishermen put
24  out of business, and I have seen crabbers put out of business.
25  The gillnetters from the Spanish industry, Spanish mackerel, is
26  gone, and I still own a kingfish endorsement, which, I mean,
27  there's only seventeen of them left.  I've got a fish house here
28  on Stock Island that I started in the early 1990s, which is
29  still doing great, and we have a lot of restaurants, and we've
30  got lobster and crabs, and we still handle all the shrimp that
31  come out of Stock Island.  I still handle that.
32
33  In the 1990s, I moved to Madeira Beach and bought a fish house
34  over there, because what happened was, when you all went with
35  the longline endorsements, I had seventeen or eighteen
36  longliners that fished for me here, and they didn't get
37  endorsements, or some of them did, but the majority of the boats
38  moved to Madeira Beach, and that's where the longline boats
39  ended up, and so we needed the grouper to go with everything
40  else that we had, and so I moved up there, and I bought a fish
41  house and a boatyard, and the whole business has been running
42  fine.
43
44  About four years ago, I started reinvesting in boats again, and
45  I've got lobster and crab boats here still, and, in the last
46  four years, I have bought eight longline boats and three bandit
47  boats.  Since then, we've probably spent $3 or $4 million buying
48  shares, and I probably spend another $2 or $3 million a year
```

48

 1  leasing shares for all the boats that fish for me.
 2
 3  We've got a great business, and our fishermen are doing
 4  fantastic, as you've heard.  This year is amazing, and they all
 5  survive all the time.  Fishermen are weird.  We can change, and
 6  we can survive, but we're constantly fighting, and, everything
 7  you all tell us to do, we do, and, I mean, we survive, and we go
 8  on.  We want our kids to do it, and I want -- My daughters just
 9  graduated with business degrees, and I want them to come run my
10  fish company.
11
12  This 600,000 pounds of red grouper that you're going to take,
13  I'm going to tell you exactly what it's going to do.  This year,
14  the way we're going, we'll catch every fish that we're allotted.
15  Next year, if you take 600,000 pounds, we'll be done in October.
16  Our fishermen will tie their boats up in October, November, and
17  December.
18
19  Now, I sell to grocery chains, and I sell to processing plants,
20  and I sell directly to restaurants.  I sell seafood everywhere,
21  and I sell a lot of seafood, and they're all going to be out of
22  seafood, and I keep hearing this is for the best of the people,
23  that what you all are doing is for the greater good.  Well, I'm
24  looking at some recs that are killing a lot of discards, and I
25  don't blame them for wanting to go catch fish.  I understand
26  that, and they should get to go catch fish, but we feed millions
27  of people around this country.
28
29  You can go out to Chicago, and, if you want to eat a grouper,
30  more than likely, it's coming from us.  If you go to New York,
31  and you want to have a grouper, it's coming from us.  Anywhere
32  in this country, if you want a domestic fish, it's coming from
33  us, and I think that's something you all need to think about.
34
35  We'll survive, and we'll go on.  My heart goes out to Casey,
36  because I was where he was at one time, and to do what he's
37  doing and start off and fight this battle now is terrible, but
38  we all make an honest living, and we would just appreciate it if
39  you would all think about it and help us go on, because we're
40  there.  Everything you tell us to do, we do.
41
42  We cut our longlines down, and we cut the number of hooks, and
43  we don't fish in the closed zones.  We do everything you all
44  say, and it's almost like now we're getting punished for obeying
45  the laws and doing what we're doing, and, if you take 20 percent
46  of our quota, it's like we're getting fined for this.  I mean,
47  we're buying grouper quota right now, and you're going to take
48  20 percent of it that we've been buying.  It just doesn't feel
                                    49

1  fair at all, and that's all I want to say.  Thanks.
2
3  **CHAIRMAN FRAZER:**   Thank you, Charlie.  All right.  Our next
4  speaker is Mr. Wayne Werner.
5
6  **MR. WAYNE WERNER:**  Wayne Werner, Alachua, Florida, owner of the
7  Fishing Vessel Sea Quest.  First off, John, thank you.  I hate
8  to see you go, and good luck.  All right.  Too much to talk
9  about.
10
11  Amendment 53, I'm going to support 2 in Action 1, just like
12  everybody else in the commercial industry.  I feel like no one
13  is looking at the recreational sector and giving these other
14  fish out I believe is going to create overfishing for the
15  future.  I believe you're going to see a lot more fish being
16  killed as you stretch it out.  All right.  My subjects.
17
18  King mackerel, we've had five hurricanes in the last year that
19  has really knocked back the fishery, but, the last five years in
20  the western zone, it's taking longer and longer and longer to
21  catch a fish.
22
23  We have a few different things happening though.  We have the
24  fact, since the oil spill, that the fish will not go there and
25  stay on Grande Isle.  If you back up thirty-two miles, to what
26  we call the Head of the Hole, right there by the Mississippi
27  Canyon, where the water is a lot clearer, and they will not stay
28  where they spawned for forty years, fifty years, sixty years,
29  ever since I have known about it.  Like I said, they're spawning
30  in a different place.
31
32  Now, the removal of oil rigs, these fish that have migrated up
33  from the west to the east or wherever, the biggest gap we had is
34  six or eight miles between the fields, and now you go thirty
35  miles without seeing an oil platform.  Believe it or not, these
36  lights attract bait, and these fish kind of follow that bait up
37  through the pattern, and it's no longer happening, and so I
38  don't know what kind of effect you're going to see out of this
39  over the long term, but we saw mackerel this winter, but we
40  didn't have a lot of boats fishing them.  We caught plenty of
41  fish, but there just weren't the boats.
42
43  I want to talk a little bit about the red snapper count that you
44  all are doing, and I think you will be able to run the fishery a
45  lot different once you realize that there are several million
46  hard spots out there with a couple of adult snappers on them
47  reproducing.  There's not 100,000, or 200,000, but there's
48  millions of them, in all depths of water.  Those fish pair off
                                    50

```
 1  and spawn, and, at some point, you'll realize that, the more we
 2  let those fish go, the better off we'll be to harvest a lot more
 3  smaller fish, which has always been my stance anyway.
 4
 5  Let the people keep what they're catching, and then they'll have
 6  a few more fish, and some of the stuff that I read about the
 7  survey, to where you took camera comparisons with the eastern
 8  and western zone, where you couldn't go through the stuff on
 9  them, in the western zone, almost everywhere I catch snappers, I
10  notice a lot more air bubbles coming up, gas bubbles from the
11  bottom, and I never saw that in eastern zone like I do in the
12  west.
13
14  These fish, when you're reading them, a lot of times you're
15  reading the areas in the fish is what you're reading with the
16  fathometers, and so thinking that comparison would be one-to-one
17  I don't believe is good.  I don't agree with it, because -- I'm
18  sorry, but sometimes I have just ran across it where I said, oh,
19  we're going to kill them here, and you catch four or five fish,
20  and you never, ever catch a bunch of fish on it, but, after a
21  while, you notice all the air bubbles coming up, and so there's
22  a lot of ways of looking at things differently, and my time is
23  up, and so I will leave you all alone.  Thank you.
24
25  CHAIRMAN FRAZER:   Thank you, Wayne, for your comments.   I
26  appreciate it.  Ms. Bosarge has a question.
27
28  MS. BOSARGE:   I was just -- I want to make sure I was
29  understanding what you were saying, and so you were talking
30  about I think what they refer to as that uncharacterized bottom
31  and the structure and the hard -- The small pieces of the
32  hardbottom that's out there and the fish that pair off to spawn
33  there.
34
35  MR. WERNER:   Right, and it's two different things though.
36
37  MS. BOSARGE:   But then you were referencing catching the smaller
38  fish, and essentially keeping that fishery the way it's been,
39  and so I'm just trying to figure out -- Are you saying that we
40  should catch a whole lot more fish or that we should kind of
41  maintain the levels we've been fishing at?
42
43  MR. WERNER:   I didn't say we should -- I believe that the amount
44  of fish that we're wasting over the time could be harvested if
45  you ran it differently, by allowing people to catch more smaller
46  fish and leaving the bigger fish in the water.   I mean, it
47  doesn't matter if you set a quota at twenty million or ten
48  million, but, if you kill another ten million, it doesn't
```

0003917

1  matter, but, if you utilize those fish -- Like our fishery
2  today, we love it so much more than before, because everything
3  that comes over the rail goes over the scale, and we don't have
4  any waste in our sector, in our area.
5
6  **CHAIRMAN FRAZER:**  All right.  Thanks, Wayne.  The next speaker
7  is Mr. David Krebs.
8
9  **MR. DAVID KREBS:**  Thank you, Mr. Chairman.  David Krebs, owner
10 of Ariel Seafoods in Destin, Florida, and also the Fishing
11 Vessel Dreamcatcher Inc.  I'm proud to be here today to see
12 everybody again, because it's hard to do this when you're not
13 in-person.
14
15 I want to first thank John Sanchez.  I met John twenty-something
16 years ago, and he didn't realize what a shared spirit we are.
17 We both have a passion for doing it right.  I don't know how
18 many in this room woke up at three o'clock this morning worried
19 about their business and worried about the future of this
20 fishery with heartburn like I did, and I can tell you that guy
21 did.
22
23 We've talked, over the years, and this is twenty-five-years-plus
24 that we've been coming to these podiums, about legacy.  What is
25 your legacy?  The unfortunate side of the makeup of the council,
26 which is the fatally-flawed component of fisheries management,
27 is over half of you are here because it's a job to get something
28 done that doesn't affect your livelihood.
29
30 All these adverse actions affect everybody in this room.  When
31 we go start fiddling with recalibration, because we didn't like
32 something that happened a long time ago, because we want more
33 fish, and the math doesn't work, that's a ridiculous exercise.
34 Yesterday, Mr. Troy, my good friend, even though we sat on the
35 opposite side of the table, he said something about the IFQ, and
36 he said, well, that's the people's fish.  Well, he was exactly
37 right.  It was the 350 million people's fish and not the four
38 million private anglers' fish.
39
40 We need to share these fish.  We have asked for that forever.
41 In twenty years, I have not heard one recreational
42 recommendation that will help that fishery.  Why are we fishing
43 on a size limit, to Wayne's point?  Why are we encouraging
44 recreational discards that you know are dying, and they're going
45 to write a white paper that says, oh, we're going to require
46 descending devices, but we can't make sure that everybody is
47 using it.
48

0003918

```
 1  Let's stop with the games.  Let's fix the fishery and let them
 2  explode and put people out on the water and quit fighting a
 3  division that doesn't need to exist.  You're expanding the
 4  recreational opportunities every day.  They're selling another
 5  boat, and that's good for ASA.  It's good business, and we've
 6  got more hooks we can sell, more monofilament, but people in
 7  this country want to eat domestic fish.  They don't want to eat
 8  basa or whatever that's coming from a farm in Vietnam.  If you
 9  all do, I'll send you some.  Not from my fish house though.
10
11  So, in closing, please get some -- You know what you're doing
12  with 53 is wrong, and we've got to wait on this recalibration,
13  and nobody trusts it.  Maybe somebody has been told to trust it,
14  but I can't imagine it.  Thank you.
15
16  CHAIRMAN FRAZER:  Thank you, Mr. Krebs.  David, Mr. Diaz has a
17  question for you.
18
19  MR. DIAZ:  Thank you, Mr. Krebs.  I know you know a tremendous
20  amount about king mackerel, because you were involved in that
21  fishery, and I have heard some conflicting things on king
22  mackerel, and it's probably different areas of the Gulf, but
23  some folks have said it's not that great this year, and other
24  people have said it's pretty good in their area, and what's your
25  thoughts about the overall status of king mackerel across the
26  Gulf?
27
28  MR. KREBS:  As Wayne and Captain Zales have pointed out, we did
29  have -- We won't call it episodic, but, when you put that much
30  fresh water that the western zone and Texas had from all those
31  storms last year, and the season stretched out, not because we
32  couldn't find fish, and we could fish, but it was rough.  Every
33  ten days, you got another hurricane, or another tropical system,
34  that kept folks from fishing.
35
36  I think, when I look at what I heard from the guys, it is bait
37  related.  If you put a bunch of fresh water into the estuaries,
38  it's going to affect the bait.  The bait moving offshore affects
39  what the kingfish are coming to eat.  We just harvested the best
40  -- So we had all this carryover quota in the northern sub-zone
41  in Florida, and I think we've pulled close to 300,000 pounds out
42  since January in the Big Bend area.
43
44  The fish look healthy, and they're nice, big, fat fish, and I'm
45  not seeing anything other than weather as being a problem, and
46  there is a shark problem on the east coast, that Jupiter area,
47  that the sharks are so bad that they're three to four fish to
48  keep one, just because the sharks are there, and so it appears,
```

53

1  from my perspective, because I have always looked at the size of
2  the fish and the effort that goes into it, as to how healthy a
3  stock is.
4
5  I think you heard me five or six years ago, and we had got into
6  some -- We were seeing a lot of four and five-pound kingfish,
7  and we're not seeing that this past year, and it's just we
8  haven't had the ability to harvest the fish, due to weather.
9
10  **MR. DIAZ:**  Thank you.
11
12  **MR. KREBS:**  Thank you.
13
14  **CHAIRMAN FRAZER:**  Okay, and so our next speaker is Mr. Eric
15  Brazer.
16
17  **MR. ERIC BRAZER:**  Thank you very much, Mr. Chair.  I'm Eric
18  Brazer, Deputy Director for the Gulf of Mexico Reef Fish
19  Shareholders Alliance.  We have members in all five Gulf states,
20  and we represent grouper and snapper fishermen, a range of
21  businesses from the smallest owner-operators to some of the
22  larger vertically-integrated businesses.
23
24  First, I would like to thank John for his service.  It's been
25  real.  It may not have been fun, but you've been a great leader
26  and manager and friend, and all these guys and women in the back
27  of the room are better off because of your service.
28
29  Now on to the matter at hand.  It's probably no surprise that my
30  testimony today is going to focus on Amendment 53, and I want to
31  refer you to our written testimony that we submitted on this
32  document, including, and especially, the supplementary comment
33  letter that we submitted this week.
34
35  It's also not going to be a surprise when I say that we support
36  Alternative 2 in Action 1.  It's the alternative that promotes
37  the strongest conservation measures and minimizes economic harm
38  to commercial fishermen and is the most fair and equitable of
39  the alternatives.  Its very existence proves that you can
40  recalibrate without reallocating.
41
42  You know, we can't just stand by while the council attempts to
43  reward recreational overharvest, penalizing commercial fishermen
44  for documenting their landings with a scale, rather than
45  extrapolating using a voluntary survey, and we can't just stand
46  by while the council actively chooses to reduce everyone's
47  quota, everybody's quota, by shifting a portion of the
48  commercial sector's quota to the recreational sector, and we

54

1   can't just stand by while the council takes this red grouper
2   quota away from the businesses that need it and will effectively
3   use it to subsidize an open access recreational fleet that
4   discards between two million and six million red grouper a year.
5
6   I know many of you are struggling with this decision, because
7   there is fundamental concerns with the FES methodology, and you
8   have heard clearly this week that there are critical data gaps
9   and missing economic analyses in the Amendment 53 document, but
10  reallocation is inherently unfair, and it does not promote
11  conservation, and we all know that reallocation is not going to
12  get the charter fleet the longer season that they deserve.  It's
13  not going to guarantee a longer season for the private anglers
14  that deserve a longer season themselves.
15
16  The impacts of 53 are far-reaching, well beyond the fishermen
17  themselves, deep into the supply chain to the consumers
18  themselves, as you've heard Charlie and others talk about.
19
20  Nobody says this is a simple decision.  It's a complex problem,
21  but there is a path forward.  There is a better way forward, a
22  holistic way forward, and it's bigger than Amendment 53.  Number
23  one, choose Alternative 2 in Action 1.  Do not reallocate.
24  Recalibrate, but commit to fixing the fundamental flaws in FES.
25  Number two, prioritize implementation of the interim assessment
26  results and use this tool for its intended purpose.  Number
27  three, show the charter fleet that you're serious about working
28  with them on a management solution that gives them the stability
29  they need without taking anything from the commercial fleet.
30  Listen to what Captain Hickman and Captain Green both said about
31  prioritizing work on the white paper.
32
33  In conclusion, and I know I'm running over, if you do take final
34  action tomorrow, we ask that you adopt Action 1, Alternative 2,
35  for all the reasons we've provided since we started talking
36  about this amendment, and, frankly, for many of the same reasons
37  that we brought up during the Amendment 28 debates.  It's the
38  only legally-viable alternative that you have allowed yourselves
39  in the document.  Thank you.
40
41  **CHAIRMAN FRAZER:**  Thank you, Eric.  Andy, do you have a question
42  for Eric?
43
44  **MR. STRELCHECK:**  Apologies if I mischaracterize what you said,
45  and I want to make sure that I understand it, but I believe you
46  said something along the lines of stop penalizing the commercial
47  fishermen for the recreational fishermen overharvesting, and is
48  that -- Am I understanding you correctly?

55

```
 1
 2   MR. BRAZER:  Yes.
 3
 4   MR. STRELCHECK:  Okay.  Can you explain that further?  Are you
 5   talking about overharvest in comparison to the new FES numbers
 6   to the quotas that were set not based on those FES numbers?
 7
 8   MR. BRAZER:  We're talking about, yes, the FES landings based on
 9   those calibrated quotas, going back in time.  We've had a very
10   difficult time trying to combine this data out of Amendment 53,
11   and it's been challenging to match up different datasets with
12   different currencies, and some of the guys feel like it's a bit
13   misleading, that this information isn't clearly shown, but it
14   would be years -- I think it's sixteen out of eighteen years, or
15   something   like   that,   where   the   recreational   sector
16   overharvested, using the ACL dataset, and it's an inherent
17   problem, and reallocation, through this document, would reward
18   that overharvest.
19
20   CHAIRMAN FRAZER:  Thank you, Eric.  The next speaker is Randy
21   Kramer.  Okay.  Then we will move to Pam Dorchak.
22
23   MR. PAM DORCHAK:  Hi there.  I'm Pam Dorchak, and I appreciate
24   the time to be up here to speak.  This is my first meeting.  My
25   husband retired, not too long ago, from the corporate world, and
26   our son approached us and asked him to help him start his own
27   business,   his   own   commercial   fishing   business.   He   had
28   previously been the first mate with a captain out of Naples,
29   Florida.
30
31   We are from Fort Myers, and he fishes out of Matlacha, and we
32   strongly support Action 1, Alternative 2, and we actually -- My
33   whole family, we represent recreational, charter, and commercial
34   fishing.
35
36   I do want to say it's a sideline on the recreational part.  I've
37   been reading all these things for years, and I've only been
38   approached maybe one time to do any survey for recreational
39   fishing, and I just wanted to throw that out there, when you all
40   are doing the numbers, because, in my head, I am wondering how
41   are these numbers coming up.  We do not own shares, and so we
42   lease.  I'm in the wrong spot.  Wait a minute.
43
44   The red grouper catch has been good so far for this year, and we
45   don't own our shares, and so we lease.  Like Casey said, we
46   purchase our shares, as many as we can, at the beginning of the
47   year, and then we have to go on an as-we-can basis.  Right now,
48   the possible reduction of this red grouper has already affected
```

56

1  our ability to purchase red grouper.  Right now, we cannot go
2  fishing, and he does not have enough shares, or allocation, in
3  his account to do so.
4
5  Our business plan has been put on hold, because, without
6  leasing, we don't have any -- We can't catch anything.  This
7  will be catastrophic for our business, and our fish do stay in
8  our community as well, and so we're asking you to please adopt -
9  - Under Action 1, please consider Alternative 2.  Thank you.
10
11  **CHAIRMAN FRAZER:**  All right.  Thank you.  Ms. Dorchak, we're
12  going to ask you back to the podium, if we can.  I know it was
13  your first time, but you're doing wonderfully.  I think Mr.
14  Banks has a question for you.
15
16  **MR. BANKS:**  You mentioned that you fish only off of leased
17  quota.  Are you talking about red grouper quota?
18
19  **MS. DORCHAK:**  And red snapper, which we don't have any red
20  snapper either right now.
21
22  **MR. BANKS:**  That was my question.
23
24  **MS. DORCHAK:**  The red snapper, we purchase normally between
25  $4.00 and $4.25 a share, but we only get paid -- We only make
26  actually $2.00 on it when we resell it.
27
28  **MR. BANKS:**  Thank you very much.
29
30  **CHAIRMAN FRAZER:**  Thank you again.  Our next speaker is Blake
31  Dorchak.
32
33  **MR. BLAKE DORCHAK:**  Thank you, council, for taking our comments,
34  and I hope you all can understand what we are going through.  It
35  is absurd to me the idea of taking 600,000 pounds away from the
36  commercial fishing sector.  As of now, I mean, I can't even go
37  fishing, because I can't find red grouper allocation, and so
38  pretty much the month of June, which is the start of summer,
39  which is the best time to go fishing, or historically the best
40  time to go fishing, I can't even go fishing, because I can't
41  find red grouper allocation anywhere, and now, if we do find it,
42  it's going to cost $1.25 a pound, maybe, and, if you get 1,000
43  pounds, that's $1,000.
44
45  Red snapper, you can get red snapper allocation for $4.25, and
46  that gives us $2.00 a pound, and, at $4.25, another 500 pounds,
47  that's $1,600, and so I'm already in the hole $2,500 before I
48  even go on a fishing trip, and so, I mean, I think giving this

0003923

1   600,000 pounds is a bad idea, and it's probably going to crush
2   my business, which is through my parents' investment, and it is
3   a struggle, and thank you for the time.
4
5   **CHAIRMAN FRAZER:**  Thank you, Blake.  I appreciate the time.  Our
6   next speaker is Sean Heverin.
7
8   **MR. SEAN HEVERIN:**  My name is Sean Heverin, and I'm a fisherman
9   and fish dealer, and I fish out of Louisiana and Madeira Beach,
10  Florida.  I want to say that I'm opposed to Alternative 3, and I
11  am for Alternative 2.
12
13  As many people have spoke before, taking away the red grouper
14  from the commercial side and giving it to the recreational side
15  is a couple of things.  Number one, it's unfair for us on the
16  commercial side, with staying within our limits, and I feel like
17  we're getting penalized.  Two, it's going to hurt us, because,
18  right now, the fishing has been very good for red grouper, and
19  allocation in Florida is really hard to find, and so it's going
20  to be even harder.  Number three, as a fish dealer, we're
21  selling fish to processors and restaurants and the markets, and
22  it's going to take those fish away from the American people.
23
24  I was watching Deadliest Catch last night, and, this most recent
25  season, they were very concerned about their season closing,
26  because of different COVID restrictions, and they were going to
27  leave their market share to Russia, and Russia was going to
28  catch their king crab, but, if you take these fish away from us,
29  maybe we might lose our market share to other countries
30  producing red grouper and, maybe further down the line, maybe
31  red snapper.
32
33  Just an outside point of view, from the recreational side right
34  now, it seems like, with the current ACL right now, business is
35  booming for the recreational side.  They're building boats left
36  and right, and people are on waitlist to buy a boat and motors,
37  or their outboards, and increasing the recreational ACL and
38  taking it away from our commercial side doesn't seem like it's
39  really going to affect their business that much, the
40  recreational side.
41
42  I think they're still going to build the boats, and still build
43  motors, and maybe they catch maybe one extra red grouper per
44  day, or they might get a few extra days of fishing for red
45  grouper, but I think that, for a little bit of gain on their
46  side, it's going to hurt us much harder on the commercial side,
47  because there's a lot less people on the commercial side, and
48  you're taking a greater percentage of our fish away from us, and

58

1  so it's going to make it harder for us to do our job, when it
2  already is pretty difficult, when you're working on leased fish
3  and finding allocation to go fishing.
4
5  You're taking fish out of restaurants and supermarkets that are
6  domestically caught in the U.S., and you replace them with
7  imported grouper, or imported snapper, and I think that we
8  really need to get the recreational side kind of in check and
9  make them more accountable, so we can better manage the fish
10 that are out there.
11
12 **CHAIRMAN FRAZER:**  All right.  Thank you, Sean.  I appreciate it.
13 The next speaker is Frank Chivas.
14
15 **MR. FRANK CHIVAS:**  Hello, everyone.  I appreciate you guys
16 taking the time to listen to the public testimony.  My name is
17 Frank Chivas, and I'm from the Tampa Bay area, and I own
18 multiple boats, rod-and-reel boats, which helps support the next
19 generation of young fishermen.
20
21 I'm going to stop here, and I also want to thank all the guys
22 that have snapper shares, allocations, that support the guys
23 like me in Florida, and they lease us shares, and we lease them
24 to Casey and all the guys like him, and the same thing with
25 grouper allocation, and it's a real close-knit community, and
26 the reason they do that, they lease us the snapper shares, is
27 because of discards.
28
29 We're catching red grouper, and we're catching gag grouper, and,
30 if we catch a snapper, we don't have to throw it back, and so a
31 lot of these boats get a couple hundred pounds every trip, and,
32 growing up in the Tampa Bay area, we didn't get a chance to
33 catch snapper, because they weren't there.  At least these guys
34 have enough sense to lease us the red snapper, and I don't want
35 to name names, but it's everybody that has an abundant amount of
36 red snapper, and the same thing happens with grouper for these
37 small boats, these rod-and-reel boats.
38
39 That's who is going to get hurt if we take that 20 percent away,
40 is these small boat owners, rod-and-reel, who we got into the
41 fishery, people like Casey, and there's probably forty or fifty
42 rod-and-reel folks, guys, that lease allocation.  They don't own
43 it, but they have a boat, and all that fish stays in one place.
44 It stays in the community, because retail shops want that fish.
45 It doesn't go to a guy like me.  I have a fish house, and I can
46 cut the fish, and I can sell it in my restaurants and whatnot.
47
48 By the way, I have thirteen restaurants, and I have a wholesale
                                     59

1  seafood company that opened in 1976 that specializes in Gulf
2  fish, and my wholesale company supports not only my own
3  restaurants, but many others, including the retail markets,
4  throughout the State of Florida.
5
6  We also buy fresh fish from many local rod-and-reel boats in the
7  Tampa Bay area, and, if we lose this 20 percent, the ones that
8  are going to get hurt are these young guys that we all are
9  promoting and supporting to get into the fishery.  It's not
10 going to hurt me, but it's going to hurt these young guys, and
11 that's who you need to think of.
12
13 While I'm there, I mean, I just -- I did a little research, and
14 I know that none of you guys own shares, and, if I'm wrong, let
15 me know I'm wrong.  I want you to imagine this.  If my wife -- I
16 own shares, and a lot of other guys in here, they own shares,
17 and my wife is my partner, and, if I told her that someone was
18 taking 20 percent of the 100 acres of land that I've got, the
19 government is coming in to take it, twenty acres of it, and give
20 it to someone that didn't earn it and abuses it, and that's what
21 the recreational fishermen are doing.
22
23 They abuse it, and I have a son that's a recreational fisherman,
24 and I have a son that's a commercial fisherman, and I know what
25 goes on.  I look at Facebook.  If you look at Facebook, you will
26 see the pictures.  They're not commercial fishermen.  They're
27 recreational fishermen, and so it's there, if you want to look
28 for it, and that's easy to do.
29
30 Now, how would you like -- How would you feel if someone come in
31 and took 20 percent of your land and you had to tell your wife,
32 or your husband, that, hey -- You know what I call it?
33 Communism.  Okay.  All right.
34
35 What I'm telling you is reallocation is wrong, and it's
36 communism.  It's unfair, and it hurts the commercial businesses.
37 It rewards recreational overfishing and increases discards.
38 Discards is -- That's what we don't want.  Just like Mr. Werner,
39 who is a pioneer in the fisheries, he says let them keep the
40 poundage and not go by the fish, and that's what he was trying
41 to make the point.  Do you understand?  So we don't have these
42 discards.  We would end up with a lot more fish.
43
44 I just think it's unfair, taking shares away from commercial
45 fishermen who, over the last twenty years, have earned it.  I
46 could tell you story after story about guys that were seventy-
47 two years old that sold their red snapper for $300,000.  Well,
48 some of us are approaching seventy-two, and think about that.

60

```
 1
 2  Before the catch share program, they got out of the fishing
 3  business and they had nothing but some broken-down boats that
 4  their wives couldn't sell.  With the catch share program, you
 5  can sell those shares and have a decent retirement.  We'll leave
 6  that there.
 7
 8  Reallocation hurts my business and unfairly penalizes commercial
 9  fishermen who stay within our quotas, and it will increase
10  recreational discards.  Reallocation will take dollars out of
11  the commercial fishery, and I didn't want to put $3 million or
12  $4 million, because I'm a restaurateur, and I have a fish house,
13  and it's lots of money.  He has a boatyard, and, I mean, you can
14  go on and on and on what it's going to hurt.
15
16  Recreational will hurt commercial fishermen twice by taking away
17  the commercial quota and reducing everyone's quota because of
18  the recreational discards, and I don't know if I said that
19  again, but I don't mind saying it.
20
21  The council should implement the results of the interim
22  assessments before Amendment 53.  It would increase the quota
23  for everyone.  Recreational fishermen, as it stands right now,
24  they've got 68 percent of the king mackerel, 61 percent of the
25  gag, 73 percent of the amberjack, 79 percent of the triggerfish,
26  and 100 percent of the redfish and many billfish.
27
28  Alternative 2 is the only alternative that wouldn't penalize the
29  commercial sector, because it changes to the estimates of what
30  recreational fishermen are catching.  Alternative 2 is the most
31  fair and equitable alternative, because it doesn't punish the
32  commercial sector, who, for years, everybody in this room has
33  been preaching that we need to get young fishermen involved in
34  it.  Look at them young fishermen.  That's what we're going to
35  lose.  We're going to lose a whole generation of young
36  fishermen, and so think about that.
37
38  CHAIRMAN FRAZER:  Mr. Chivas, I'm going to ask you if you could
39  please wrap it up.
40
41  MR. CHIVAS:  I will wrap it up.  I want to thank you guys.  I
42  want to thank you, number one, for creating the Fish Rules for
43  commercial.  That app is great.  My wife enjoys it, and all the
44  people that I sit around having cocktails with that are
45  recreational fishermen, and they say, damn, you've got to go
46  through all of that, and is say, yes.  Also, I want to thank --
47  I don't know John Sanchez, but I have a lot of friends that know
48  him, and you are very well respected, sir, and so thank you for
```

1   your services, and I hope the hell you get out of what you're
2   doing today.
3
4   **CHAIRMAN FRAZER:**   Mr. DeLaCruz, you're up.   I'm sorry.   Mr.
5   Chivas, we've got a question from Mr. Swindell.
6
7   **MR. SWINDELL:**   I would like to ask you -- Do you buy fish from
8   recreational?
9
10  **MR. CHIVAS:**   No, sir.   We do not buy any fish from recreational,
11  but, if I find a good recreational fisherman, I tell you what I
12  do.   I go look for a reef permit, number one, for him, and I
13  have found that the best fish come from guys who go out on the
14  weekend and catch fish, but, a guy like me, they would fine me a
15  half-a-million dollars.   Did you hear what I said?   NOAA is
16  right here.   They would fine me a half-a-million dollars if I
17  was to do something like that.
18
19  **MR. SWINDELL:**   Okay.   My reason for asking --
20
21  **MR. CHIVAS:**   I don't live in Louisiana, where you guys write
22  your own laws.
23
24  **MR. SWINDELL:**   I just want you to know that I was on the council
25  from the beginning, back in the 1970s, and we have put in a
26  recreational -- I don't know if it has changed, but you couldn't
27  -- A sport fisherman could not sell a fish unless he has a
28  commercial license.
29
30  **MR. CHIVAS:**   Right.
31
32  **MR. SWINDELL:**   So I just wanted to make certain that you're not
33  buying fish from a person that is not clearly commercial.   Thank
34  you.
35
36  **CHAIRMAN FRAZER:**   I think we've established that he's not doing
37  that, Mr. Swindell.   Thank you, Mr. Chivas.   Jason, take it
38  away.
39
40  **MR. JASON DELACRUZ:**   Thank you, Mr. Sanchez, for your service.
41  Man, I should have signed up sooner.   Real quick, and I
42  apologize for getting into the weeds, as I usually do, just
43  because I'm a details guy, but, obviously, on Amendment 53,
44  Action 1, the preferred doesn't make any sense, and I stand to
45  benefit from that.   I own a marina that's recreational, and I
46  sell a lot of fuel, but the truth of it is, in the long run,
47  this is going to hurt the fishery, and we know this.
48

62

0003928

1  One of the things that I've been challenged with this entire
2  time, every time I stand at this podium, is that we manage this
3  recreational fishery for the absolutely wealthiest members of
4  the recreational fishery.  We never come up with any adjustments
5  or any way that we can manage this to help a guy who owns a
6  single-engine boat that looks forward to those days, and we only
7  manage to these guys with triples and quads, and I know these
8  guys, and I'm friends with these guys, but the truth of it is
9  that we just don't manage like that, and I think it's really
10 unfair.
11
12 I think, when we talk about what's the value of the fishery, and
13 we have the economic conversations about willingness to pay,
14 they miss so many important details, and they become the best
15 available because we accept that, but nobody talks about the
16 fact that the same triple-engine boat that this guy supposedly
17 was using just to go catch red grouper will also go catch
18 kingfish, and that's an underutilized species, and you know what
19 I mean, and so the boat has nothing to do, and the money they
20 spend isn't about harvesting fish.  It's about changes to
21 recreate.
22
23 You are standing here, in this position, making an argument that
24 somehow we manage to take FES and figure it out, after we've
25 played it with it for a long time, and say it's reallocating the
26 fishery back in time, because that's what it was, but, like
27 Leann said, the truth of it is, if we knew what they were
28 catching back then, they would be over, and we would have
29 throttled that back, and we would have told them no, but, yet,
30 the good -- Not the good science, and that's not the way -- The
31 people that I have friendly relationships with that are in the
32 science world, most of them in the State of Florida, they have a
33 lot of really skeptical questions about this.
34
35 I listened to the SSC, and I really don't trust that.  FES
36 confuses the way it is, and, because we stamp this as
37 potentially best available, and I say "potentially" because is a
38 state survey that actually is showing different results,
39 preliminarily, and would basically overturn what we do if it
40 gets stamped best available, yet we're going to do this.  We're
41 going to reallocate from one fishery that actually has a
42 reasonably solid discard number to one that's a magnitude order
43 and then the dead discards are insane.
44
45 To me, this makes no sense to do this.  It makes no sense to do
46 it where we look at this economic model that is somehow better,
47 and, as one or two have said up here already, and you have to
48 look at it in perspective.  You are actually taking money out of
63

1  all of these guys' pockets, and it's just really not fair, and
2  now I'm just rambling, but, anyway, thank you very much.
3
4  **CHAIRMAN FRAZER:**  All right.  Thank you, Jason.  I'm not seeing
5  any questions, and so I will move to Ms. Karen Bell.
6
7  **MS. KAREN BELL:**  Good afternoon.  I'm Karen Bell with A.P. Bell
8  Fish Company in Cortez, Florida.  It's kind of hard to follow-up
9  after all these guys.  I agree with most of what I've heard
10 today, but I thought what I would do is just talk to you a
11 little bit about what we do at my fish house, which was my
12 grandfather's fish house, and then my dad and his brothers, and
13 today I run it.
14
15 We have a number of boats there, longline and inshore, inshore
16 hook-and-line boats, and, when we had the 61 percent reduction,
17 I was able to go and source enough allocation to work last year,
18 and, obviously, with COVID, things were weird, and we had to
19 sort of shift from restaurants, where we normally would ship to
20 New York, Atlantic, New Orleans, and we kind of switched into
21 grocery stores, and we were lucky enough to be able to do that,
22 because the year was, obviously, just really odd, and people
23 were cooking at home and going to grocery stores and markets.
24
25 Well, now what's going to happen, or, in my head, what I'm
26 trying to wrap my hands around, or figure out what to do, is --
27 So, if it's reduced again, and, by the way, I prefer Alternative
28 2, which is no reallocation, but, if our allocation is reduced
29 that much, I have choices that I am going to have to make, and
30 they involved all these people that work with me.
31
32 Should I -- I can't send the longline boats out with half the
33 allocation that they're accustomed to having.  It's not cost
34 effective, and we just can't do it, and so do tie up half the
35 boats?  Do I just fire these people?  These are all the things
36 that are running through my head.
37
38 Other than that, I feel really grateful to the dealers that
39 ended up helping us through 2020.  I mean, without certain
40 people that helped us move product, I would have had to tie our
41 boats up last year, and we never closed down.  We fished, and
42 the markets were tough, but we were able to do what we normally
43 do, but just on a constrained level.
44
45 I owe those people big-time, and so now, if, again, we get a
46 reduced allocation, next year, what do I do?  Do I tell them --
47 Because restaurants now are gearing up, and so I'm starting to
48 get calls back from them, and what do I do?  Do I tell the ones

0003930

1   who helped me in 2020 that I'm sorry, but I'm going to have to
2   go back?  I'm not someone who just goes up to the highest price,
3   and I'm real big about loyalty.  My family taught me that, and I
4   work with the people who work with me.
5
6   Anyway, those are things I thought that I would just bring to
7   the table today, to ask you what would you do?  Would you tie up
8   half your boats?  Do you send those people home?  It's not just
9   the captains, but it's his family, it's his crew, and it's their
10  family.  All of that is just kind of spinning around my head,
11  and so that's what I wanted to share with you.
12
13  **CHAIRMAN FRAZER:**   Thank you, Ms. Bell.   I appreciate the
14  comments.
15
16  **MS. BELL:**  You're welcome.
17
18  **CHAIRMAN FRAZER:**  The next speaker is Matt Tevlin.
19
20  **MR. MATT TEVLIN:**  Good afternoon.  My name is Matt Tevlin, and
21  I'm an owner-operator for about twenty years now, and I think
22  that, if you guys are going to give a percentage of our quota
23  away, you guys should at least know what you're giving it to,
24  how much they're going to be catching, and all that data is not
25  available, or your percentage estimate is so small, and I don't
26  understand how you guys could want to do that, and so that's it.
27  That's all I have to say.
28
29  **CHAIRMAN FRAZER:**  Thank you, Matt.  Bubba.
30
31  **MR. BUBBA COCHRANE:**    Bubba Cochrane, Galveston, Texas,
32  commercial fisherman.  Pretty much like every other commercial
33  fisherman that's going to testify today, I'm against any
34  reallocation that takes fish away from our businesses and the
35  American seafood consumers.
36
37  These fish that the council is in charge of managing are not
38  strictly a recreational resource.  These fish are a federal
39  resource, and access should be divided fairly.  The idea that
40  one group should have more than another seems to always fall in
41  favor of the recreational fishermen.
42
43  This country already has a domestic seafood deficit, and I
44  believe around 90 percent of the seafood consumed in the U.S. is
45  imported, and so taking more access to domestic seafood away
46  from consumers is not the way to fix this deficit, but the fish
47  in question today is red grouper, and I don't even fish for red
48  grouper.   I fish for red snapper, but I can see the council

                                    65

1  leading toward action that would set a dangerous precedent for
2  future reallocation of other reef fish species.  This must not
3  be allowed to happen, because it wouldn't be good for any of us.
4  Thank you.
5
6  **CHAIRMAN FRAZER:**  Thank you, Mr. Cochrane.  The next speaker is
7  Katie Fischer.
8
9  **MS. KATIE FISCHER:**  Hello, everybody.  It's good to see
10 everybody again in person.  It's been a long time.  My name is
11 Katie Fisher, and I'm from Matlacha, Florida.  Casey and I, we
12 own a fish house that has a retail market, and also a federal
13 boat.
14
15 I want to start off by thanking the council members yesterday
16 who tried to vote Alternative 2 in, and they used commonsense,
17 and we appreciate that, and they had the American consumer in
18 mind when they did that, because the commercial sector -- That's
19 who we represent.  You represent the non-fishing American public
20 in this country.
21
22 I know, in the State of Florida, that's twenty million people,
23 and, although we are outnumbered, in terms of fishermen, to the
24 recreational sector, we are not outnumbered by who we represent,
25 and so thank you all for trying to stand up for us yesterday in
26 doing the right thing.
27
28 I wanted to talk today about the view of the consumer in all of
29 this.  Casey and I have a retail market, like I mentioned
30 earlier.  Last year was a tough year for everybody, and
31 everybody had to think on their feet and adjust their business
32 practices, and everybody learned a lot, and I will tell you the
33 most important thing that we learned was how important American
34 commercial fishermen are to food security.
35
36 When there was no food in the supermarkets or shelves, our
37 community came to us, and we were able to offer them food
38 security, that peace of mind, because that is a commercial
39 fisherman's job in this country, right?  American commercial
40 fishermen harvest American fish for the American people, and so
41 reallocating this red grouper to the recreational sector takes
42 away my community's food security.
43
44 That takes away the American people's food security, and I just
45 -- I don't understand how this can be for the better of our
46 country.  It makes absolutely no sense, especially after the
47 year that we just all survived through with the pandemic.
48

66

```
 1  My second point that I want to bring up is the importance of the
 2  small-boat fleet in the Gulf of Mexico.  A lot of these guys
 3  behind me, when the pandemic happened, they were tied up, and
 4  they didn't have anywhere for their fish to go, and they have a
 5  different business model than Casey and I do.  We weren't tied
 6  up.
 7
 8  We fished more, because the American people, our customers,
 9  needed us, and we were doing our job, and so not only does
10  reallocation of red grouper take fish away from the American
11  people, but it will also destroy the small-boat fleet in the
12  State of Florida.  We are important.  That small-boat fleet,
13  especially south of Tampa, where our business is, it's all
14  mostly new entrants and mostly young guys, who are just --
15  They're working their ass off to be the future of this industry,
16  yet we come up here and this council just cuts them off at the
17  knees, time and time again.
18
19  It's like we do every single thing that you ask us to do, and we
20  come to this meeting and it's never like, oh, how is the council
21  going to help us, but it's like how bad is it going to be.
22  Commercial fishermen in this country as a whole deserve to be
23  respected again.  We feed this country.  Farmers and ranchers,
24  they all get respect, and we don't.  We just continually get
25  beat up up here and just taken away, when, really, we're the
26  constant in this whole rec sector and commercial sector.  Our
27  numbers of fishermen stay the same, and we can tell you
28  everything that we catch, and we have been the constant in this.
29  It's the rec sector that's been the variable.
30
31  I hope, moving forward -- By the way, I support Alternative 2,
32  obviously, but I hope, when you start talking about this, I hope
33  you don't cram this through.  I hope you do not cram this
34  Amendment 53 through in its current state, because, if you do,
35  your vote will stand for taking fish out of the hands of the
36  American public, and this is their resource too, by the way, and
37  I think we forget that, time and time again.  It is not mine,
38  and it's not his, and it's the American people's fish.  Nobody
39  owns anything.  The American people own the right to harvest.
40
41  A vote for this would also be a vote to destroy the small-boat
42  fleet in the State of Florida, and it will destroy the future of
43  this industry, because we're loaded with young kids down there,
44  and you need to take this into effect.
45
46  Your actions around this U-shaped table have real-life
47  implications, and I think some of you forget that, and so,
48  tomorrow, or when you guys are deliberating on this, please use
```

67

1  commonsense.  Check the special interests at the door.  Check
2  your political whatever you've got to do out the door and start
3  thinking about the American people as a whole and not just the
4  top 0.5 percent of this country who can afford to go out and
5  harvest these fish on their own.  Thank you, guys, for your time
6  today.  I really appreciate it.
7
8  **CHAIRMAN FRAZER:**  Thank you, Ms. Fischer.  The next speaker is
9  Mr. David Walker.
10
11  **MR. DAVID WALKER:**  Good afternoon, council.  I'm David Walker
12  from Walker Fishing Fleet, commercial fishing, and I would first
13  like to thank John Sanchez for your service.  It was a pleasure
14  to serve with you during your time.
15
16  First, as all the other commercial red grouper gentlemen have
17  spoken, Alternative 2.  I would not support any kind of
18  reallocation, and you've heard much testimony today about the
19  small fleet have distresses and harms, and they're small
20  businesses, and the seafood supply chain and nation's consumer
21  access is being threatened, and I don't see how that's fair and
22  equitable to allocate to an unaccountable plan.
23
24  It seems like, a lot of times, we're only looking in one
25  direction, and we never see any alternatives where it looks in
26  the other direction for the commercial industry.  As Jason said,
27  and he made some good comments about the economics.  Not a lot
28  of factors are added in that would give us the dockside value,
29  and I think that should be something we look at.  I actually
30  mentioned that in Silver Spring, when Chester was there, when we
31  went to orientation years ago.
32
33  Like red snapper, you're looking at -- We're probably running an
34  eighteen-to-one ratio.  For all you state directors, I would
35  just like to make sure you make that known to your governors,
36  that, for every one constituent you make happy, you have the
37  potential to make constituents unhappy, and that's your seafood
38  consumers.  I would just like thank all the commercial industry
39  for their testimony today, and thank you for your time.
40
41  **MR. WALKER:**  Thank you, Mr. Walker.  I appreciate it.  The final
42  speaker today is Captain Jay Mullins.
43
44  **MR. JAY MULLINS:**  Good afternoon, council.  I'm Captain Jay
45  Mullins, an eastern Gulf longline endorsement holder or
46  qualifier or high-liner or whatever kind of title you want to
47  put on it, and I don't really care.  I'm a fisherman.
48

68

0003934

```
 1  I grew up, from diapers, on the docks.  I have pictures of me
 2  with Dylan's grandfather, Captain Wilson Hubbard, and I used to
 3  stand next to him when he used to direct traffic down at Johns
 4  Pass when he held his Big Gulp full of Captain Morgan and Coke.
 5
 6  I've got pictures of me in diapers lying next to giant cabarita,
 7  true black grouper, firebacks, muttons, the whole nine yards,
 8  when the fishermen used to leave the dock and go fish the Middle
 9  Grounds and come back.  I don't think anyone has caught them
10  fish in a long time.
11
12  Today, I've come to speak about the MSA.  In the MSA, there's
13  what they call due process and allocation review.  Anytime you
14  head to a court and see a judge, the prosecutor has to make sure
15  he has his ducks in a row, and I definitely understand that,
16  seeing as I've been in front of a lot of judges in my time.
17  Hey, I lived right.
18
19  Due process states that there is criteria that you have to meet
20  and follow guidelines, and I was very ashamed yesterday at an
21  economist who put up numbers on a board that do not represent
22  the commercial industry, and I was very let down that he has not
23  done his due diligence in doing his job, as I do my due
24  diligence in my job, bringing in as much fresh fish to the dock
25  as possible to feed the American consumer.  I am very let down.
26  As we all know, there is reports out there.
27
28  To reallocate, or make any decision about reading or having all
29  the true evidence, the socioeconomic and coastal impacts,
30  coastal community impacts, you know you're asking for trouble.
31  It's against Magnuson-Stevens, the MSA in particular.
32
33  I don't know if Alternative 2 is the correct alternative.  I
34  don't know that.  Nobody has laid out the full evidence, and
35  it's all bits and pieces.  It's a he-said-she-said game coming
36  from supposedly a professional council, and what kind of -- I
37  really hope you realize that you're messing with human lives,
38  industries, working families, those who got to work during COVID
39  to support and feed the American public.
40
41  I mean, we have to look at all the evidence.  That's your job.
42  That's your job under Magnuson-Stevens, and you're going to
43  blatantly violate that?  That is wrong.  That is wrong to
44  everybody, the recreational person, the commercial fishermen,
45  the American public, and that's just blatantly violating a
46  federal mandate.
47
48  Please do your due diligence.  I don't know what is the correct
```

1  answer, and, of course, I support Alternative 2, but the
2  evidence isn't out there to reallocate. Until you put the full
3  evidence on the board, I don't know what you're suggesting or
4  what you're going to do, and I really don't understand where
5  you're going to go with it. It's put you between a rock and a
6  hard place.
7
8  Hell, it's been eleven years since the discards in the eastern
9  Gulf has been addressed, and there ain't nobody that's done
10 nothing in eleven years. Eleven years, but, in six months, you
11 want to rush a reallocation through? You've got a lot bigger
12 fish to fry.
13
14 Red grouper has been mismanaged my whole life, my whole life,
15 and not a portion of it, but my whole life, and it's impossible
16 to catch up with something. The only way is to keep up with
17 something, and that's an interim analysis, but this thing was
18 just brought forward.
19
20 If you guys -- I mean, I'm just a dumb fisherman, and you guys
21 are supposed to be all these rocket scientists, or I think, but
22 eleven years of a discard issue that just keeps on impounding,
23 and now you want to create another discard issue? Where is
24 Standard 1 at? It's a clear and blatant violation of it.
25
26 I do everything I can for a discard program, and I try to
27 decrease discards, and there are hook sizes, and there's all
28 kinds of things that can be done that nobody, nobody on this
29 council, has thought about, and so, when it comes to not having
30 a PhD, as some of you do, and maybe I have multiple PhDs in
31 reality.
32
33 I just pray that this council, or NOAA in particular, the
34 Department of Commerce, would put some real cooperative research
35 into the eastern Gulf, the most current science looked at in the
36 Gulf, and somebody has to do their due diligence and not care
37 about red snapper twenty-four/seven and start paying attention
38 to the eastern Gulf, because we have an extremely complex
39 ecosystem. Thank you.
40
41 **CHAIRMAN FRAZER:** Thank you, Jay. Ms. Bosarge has a question.
42
43 **MS. BOSARGE:** Jay, I feel your pain about some things, most
44 definitely, especially about things being rushed. I have a
45 question, because we have a chart in the document, and it talks
46 -- Where we're actually trying to look at landings and when each
47 sector may have exceeded its quota, and it's hard for me to
48 follow, and I'm sure that I can go back and read all the history

1  of your fishery, but it would be a lot easier if I just ask you.
2
3  This chart kind of shows like a quota for the recreational
4  sector, starting in 2010, and it shows one for the commercial
5  sector starting in 2004, and surely you all had a quota before
6  2004, right?  You all had quotas that you have been managed to,
7  and your fishery has been shut down, long before 2004, when you
8  met your quotas, right?
9
10  **MR. MULLINS:**  Yes, ma'am.  Yes, ma'am, and that was the issue
11  that me and Roy discussed back and forth multiple times, and
12  then he thought it was a great idea and whatnot to shut down the
13  shallow-water fishing for us, and there we go with another
14  discard issue, because I know I can diversify and go catch
15  mutton snapper and line them up on the rail and discard your
16  carbos and everything else, and then, all of a sudden, come 2012
17  or 2013, we're catching twenty-year-old fish again.
18
19  Like I told Roy, they didn't grow that big in three years, and
20  so let's try to understand the biology of what we're working
21  with in this eastern Gulf.
22
23  **MS. BOSARGE:**  Thank you.
24
25  **MR. MULLINS:**  Thank you.
26
27  **CHAIRMAN FRAZER:**  All right, and so we've come to the end of the
28  speaker list, and I want to thank everybody for their time.  We
29  appreciate you making the effort to come out and spend the
30  afternoon and share your thoughts about the various issues that
31  we're dealing with up here, and it's all important input, but
32  we're going to take a little ten-minute break right now.  We're
33  scheduled to go to 5:30, J.D.  I saw the look, man.  We're going
34  to knock out a few committee reports.
35
36  (Whereupon, a brief recess was taken.)
37
38  **CHAIRMAN FRAZER:**  If we can get folks back to the table, we're
39  going to knock out a few committee reports.  We are going to try
40  to knock out three committee reports, if we can, and so if I can
41  ask folks in the back of the room to keep it down.  Thanks,
42  guys.  All right.
43
44  We're going to start off with the Red Drum Committee Report,
45  and, if it's okay, General Joe Spraggins had to head back to
46  Mississippi, but Rick Burris is stepping in.  Rick, if you're
47  willing to read the General's report, we would appreciate it.
48

0003937

1                    COMMITTEE REPORTS
2               RED DRUM COMMITTEE REPORT
3
4  **MR. RICK BURRIS:**   Thank you, Mr. Chairman.   The Red Drum
5  Committee met on June 22, and it was chaired by General
6  Spraggins.
7
8  The Committee adopted the agenda and the minutes from the
9  October 2014 meeting, and they were approved as written. Then
10 we went over the process to modify red drum management out to
11 nine miles. There was a presentation by Mr. Rindone. Council
12 staff gave a presentation on the options available to the
13 council to modify red drum management out to nine miles, as was
14 requested by the council in 2020.
15
16 After reviewing past management measures, including the
17 prohibition of all retention of red drum in the EEZ in 1988,
18 staff noted that the Gulf states currently manage red drum based
19 on juvenile escapement rate targets.  The calculation of
20 juvenile escapement varies by state in both method and frequency
21 of assessment, and the methods used by the five Gulf states are
22 not directly comparable.
23
24 Options for extending state management of red drum out to nine
25 nautical miles for Alabama, Mississippi, and Louisiana were
26 discussed next.  Delegation to the states is not a viable
27 option, since delegation requires the establishment of an annual
28 catch limit, which in federal waters is currently fixed at zero.
29 Because the data are unavailable to conduct a Gulf-wide stock
30 assessment at this time, the ACL in federal waters cannot
31 currently be updated.
32
33 Another option discussed was the conservation equivalency plan.
34 However, this approach requires that the states ensure that
35 management measures are consistent with the Magnuson-Stevens
36 Fishery Conservation and Management Act and with the Red Drum
37 Fishery Management Plan.  This approach may also be inhibited by
38 the current federal ACL of zero.  Further, the conservation
39 equivalency plan approach would require substantial changes to
40 the manner in which red drum is managed by the three subject
41 Gulf states.
42
43 A committee member asked about the cost requirements for
44 conducting a Gulf-wide stock assessment on red drum.  The
45 Southeast Fisheries Science Center noted that a comprehensive
46 age composition dataset would be necessary to compare to the
47 last assessment, conducted in 2000, to determine the age
48 composition and health of the stock.

                              72

                                                            0003938

Sampling proposals have been presented to the council and it's in the past, and an estimate using purse seines could also be attempted on a distributed, Gulf-wide scale.  Such a study would be expected to cost, at a minimum, $500,000.

During its January 2021 meeting, the council received a presentation detailing the costs for a Gulf-wide abundance estimation of the red drum stock which, depending on the survey coverage, was estimated at approximately $5.7 million and $7.6 million.

Committee members discussed research being conducted by Dr. Sean Powers at the University of South Alabama and Dr. Barbieri with the Florida Fish and Wildlife Conservation Commission.  The Southeast Fisheries Science Center added that acquiring age composition data off Louisiana, where the majority of the fishery exists, is essential to the completion of a Gulf-wide assessment of the species.

A committee member asked about the objective of extending management.  Other committee members noted the desire to reduce dead discards offshore and to provide an opportunity to harvest red drum out to nine nautical miles.  A committee member remarked on a recreational perspective from Florida, that being the offshore harvest moratorium protecting the brood stock and the poor table fare represented by the larger, adult red drum.

Another Committee member added that federal law enforcement officers enforce federal laws over state laws between three and nine nautical miles off Alabama, Mississippi, and Louisiana, which may create confusion for stakeholders accessing fishery resources in the northern Gulf.

A committee member asked whether, under the conservation equivalency plan approach, the escapement rates for the three subject Gulf states would need to be comparable.  Staff replied that, for NMFS to evaluate whether the CEPs are resulting in management that complies with the Red Drum Fishery Management Plan and with the MSA, it is likely that the states would need to provide annual and comparable assessments of juvenile escapement.

The committee questioned the administrative burden described under the CEP approach and whether that burden was commensurate with the benefits expected from any action on red drum.  A committee member asked whether the data between three and nine nautical miles off Florida and Texas could be used to inform

0003939

1  management off Alabama, Mississippi, and Louisiana.  Staff
2  replied that using the data from Florida and Texas in such a way
3  would require using assumptions, which are unlikely to be
4  supportable, given that the stock structure in the EEZ is
5  largely unknown.
6
7  A committee member discussed asking the council's SSC to
8  evaluate whether the data available at present are sufficient to
9  recommend a non-zero ABC for red drum in federal waters.  The
10 committee noted that establishing a non-zero ACL would be
11 necessary to allow the council to change management measures in
12 any meaningful way in federal waters.
13
14 A committee member supported extending fishery management
15 authority for the three northern Gulf states out to nine
16 nautical miles, but cautioned against shifting fishing effort to
17 portions of the offshore stock, which could have detrimental
18 effects on the currently prolific inshore red drum fishery.
19
20 A committee member from Louisiana indicated that the Louisiana
21 Department of Wildlife and Fisheries has data on offshore red
22 drum and asked whether those data could be helpful.  The
23 Southeast Fisheries Science Center stated that a data-limited
24 assessment of red drum was attempted under SEDAR 49, and the
25 species was found to be too data poor to assess.
26
27 If the five Gulf states expanded their assessments beyond
28 juvenile escapement rate, to include comparable age composition
29 information from the offshore portion of the population, then
30 those data may be contributory to a Gulf-wide assessment.  The
31 committee agreed to pause further discussion on extending
32 management out to nine nautical miles for Alabama, Mississippi,
33 and Louisiana until the January 2022 meeting.  There was no
34 other business was brought before the committee, and, Mr. Chair,
35 this concludes the report.
36
37 **CHAIRMAN FRAZER:**  Thank you, Rick.  I appreciate you taking the
38 time to read that.  We've got a question from J.D.
39
40 **MR. DUGAS:**  Thank you.  My question is -- I don't recall, and
41 did we decide January of 2022?  Did we choose that date?
42
43 **CHAIRMAN FRAZER:**  Dr. Simmons.
44
45 **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Chair.  I don't
46 think you made a motion or anything like that to select that
47 date, but that is the date that I wrote down from General
48 Spraggins.  We can change it right now, if you would like.

74

```
 1
 2  MR. DUGAS:  I was just curious how we got to that date, and I
 3  didn't recall.
 4
 5  CHAIRMAN FRAZER:  The intent was just to give it a little bit of
 6  time and collect some information and bring it back, and that
 7  would be the earliest time, without causing too much
 8  consternation to the staff.  Go ahead, Phil.
 9
10  MR. DYSKOW:  Thank you, Dr. Frazer.  If I understand what you
11  said correctly, and perhaps I misunderstood, but, during the
12  committee meeting, and I'm a member of this committee, there
13  were essentially two issues here.  One is extending the zone out
14  to nine miles, to be consistent with several of the other Gulf
15  states, and I don't believe we have the authority to do that,
16  but that's a Congress issue, and so bringing it up again would
17  be wonderful, because we could talk about it, but that's not
18  within our authority.
19
20  The other part of this, which was whether or not it's
21  appropriate to prosecute this offshore fishery, was not
22  discussed in a positive manner.  In other words, we agree, in
23  essence, that it would be appropriate for those states, your
24  state and the other one was, I believe, Alabama?
25
26  MR. DUGAS:  Alabama and Louisiana.
27
28  MR. DYSKOW:  Yes, and it would be fine to pursue that, but not
29  through this body.  As far as whether or not it's appropriate to
30  prosecute this fishery, this offshore fishery, I don't believe
31  there was any consensus for that.
32
33  CHAIRMAN FRAZER:  I would concur with that, and so there were in
34  fact two issues that were brought up, one which the General
35  alluded to, right, and he said that recognizing that simply
36  extending the limit, the state limit, from three nautical miles
37  to nine nautical miles was beyond the purview of this council,
38  and they were, in fact, pursuing some discussions with their
39  legislative delegation, and they would bring any resulting
40  conversation or discussion, if appropriate, back to the council
41  later.
42
43  In the interim, I think that there was some discussion related
44  to what type of information might be generated and brought back
45  to the council, at some later time, and the General, I think,
46  specified January might be a reasonable time to look at what
47  type of data might be available out there, or what might be
48  possible, but it wasn't a pressing issue.  Go ahead, Mr. Diaz.
```

                                    75

1
2  **MR. DIAZ:**  Tom, I am trying to really -- As I think through what
3  Mr. Dyskow just said, I agree this council doesn't have the
4  authority to change, necessarily, jurisdiction, but, if anything
5  was ever done with the concept the way that it was being
6  approached, it would be -- Andy can correct me if I'm wrong, but
7  it would be similar to state management.
8
9  For red snapper, we give states the authority to manage red
10 snapper out to 200 miles, and it was done -- It wasn't done
11 through a conservation equivalency, I don't think, and this
12 would be a conservation equivalency, and it would be the same
13 type of approach, but we would only be asking for authority out
14 to nine miles instead of 200 miles, and so I think it would be
15 the same basic principle, and that's the way, if it was ever
16 approached that way, and I do agree that we did not reach
17 consensus on really anything in the committee, and so thank you.
18
19 **CHAIRMAN FRAZER:**  Mr. Banks.
20
21 **MR. BANKS:**  I would agree with what you just described, Dale,
22 and we certainly didn't reach consensus, and the only thing they
23 would delegate would be if there was an ACL, and there's not
24 one, because we don't have a stock assessment, and that's why
25 one is needed.
26
27 We talk about the price of a stock assessment too, which I don't
28 remembering mentioning the report, but I went back and looked at
29 that report that Carrie presented to us a while ago, and it was
30 a $5 to $7 million project, and so it's probably more money than
31 any of us can find.  Thank you.
32
33 **CHAIRMAN FRAZER:**  Okay.  Any other further discussion?  Andy.
34
35 **MR. STRELCHECK:**  Thanks, Mr. Chairman.  I guess I'm struggling
36 with this, in terms of bringing it back in January.  Obviously,
37 we can bring the committee back at any time, but I don't feel
38 like the direction to staff is very clear.  We have a report
39 that has a lot of committee member comments, but I don't think
40 we've really reached agreement on what are we bringing back the
41 committee for, and what are we trying to accomplish, and you
42 mentioned maybe some data and additional information.
43
44 I don't know if we want to have some conversation about that,
45 but it seems to me that it would be helpful to give the staff a
46 little bit more direction before we wrap this committee
47 description up.
48

0003942

1  **CHAIRMAN FRAZER:**   Mr. Rindone, you're the staff member
2  responsible for this particular item.
3
4  **MR. RYAN RINDONE:**  Patrick hasn't give me my $5 to $7 million
5  allowance, and so I cannot produce anything.  As far as bringing
6  this back, we know that research is being conducted, but it's
7  not a Gulf-wide comprehensive effort, and we can't ensure that
8  the research is comparable.  We would assume that there are
9  probably facets of it that are.  Like Dr. Porch had mentioned,
10 under SEDAR 49, a data-poor assessment of red drum was examined
11 for feasibility, and it was found to not be feasible.
12
13 I can't tell you what I'm going to be able to bring back to you
14 in January of 2022, and we know that a lot of this research is
15 nearing completion, but we don't know that it will be available
16 to present at that time, and so I don't know what -- I cannot
17 guarantee what I can bring back, and that's all I can say.
18
19 **CHAIRMAN FRAZER:**  Okay.  J.D., go ahead, real quick.
20
21 **MR. DUGAS:**  Well, from what I'm hearing, it seems like there's
22 no reason to revisit this.
23
24 **CHAIRMAN FRAZER:**  All right, and so, based on the discussion
25 around the table right now, there's certainly not a compelling
26 reason to schedule it for a January committee meeting.  I would
27 think that, any time that people might have the information, or
28 a compelling reason to reconvene the red drum committee and
29 discuss it, then we could do that, but you're right that I don't
30 think that there's a compelling reason, at this point, to
31 schedule a January meeting, but we'll just leave it at that.  I
32 guess I feel that's the best action, moving forward.  Patrick.
33
34 **MR. BANKS:**  I am just going to agree with that.  In order to
35 bring this back, we've got to have something to put in a
36 document that could be delegated to the states, and, again, we
37 don't have anything to delegate to the states, because we don't
38 have a stock assessment, and so, until the time when we have a
39 stock assessment and the SSC says it's the best available
40 science, I don't know what we can put in a document.
41
42 **CHAIRMAN FRAZER:**  So there we have it.  Until we have that
43 information and a compelling reason to move forward, we will
44 probably not convene the Red Drum Committee.  All right.  Is
45 there any further information or discussion related to this?
46 Mr. Swindell.
47
48 **MR. SWINDELL:**  Mr. Chairman, as you know, I've been a proponent

0003943

1   of trying to do something with the red drum, and I still think
2   that it's absurd for the council to be sitting there with a
3   resource that is not being utilized whatsoever, and we don't
4   really know the reason why not.
5
6   We don't have any good reason not to at least try to find out
7   what's there, and is there anything we can do, and I don't know
8   if we have to try to find some money in order to do a complete
9   stock assessment, whether that's the key to the whole process,
10  and, if we can, fine.  If we can't, well, then I guess we'll
11  just have to tell the general public out there that you can
12  never harvest red drum, and you can never use it and eat it in a
13  restaurant unless you buy it yourself, or unless you catch it
14  yourself. Excuse me.
15
16  You know, you've got a resource that is continuing to grow out
17  there, and I can tell you that from spotter pilots that are
18  spotting fish out there for menhaden, and they see huge schools
19  of menhaden, and they are getting more and more, and they're
20  bigger and bigger, and so the resource is growing, and it's
21  bigger, and I think we're doing a disservice to the people of
22  the nation not to at least find out what the heck is going on
23  there, and that is the whole purpose of this fishery management
24  council, is to manage the fisheries, and we can't manage it if
25  we don't do some research on it, and that's all I'm saying.
26  Let's research it, some way or another, and I don't know how to
27  go about getting the money for it, and that I don't know.  Thank
28  you, sir.
29
30  **CHAIRMAN FRAZER:**  Ed, I think you're right.  As a management
31  council, it's our responsibility to try to manage various
32  fisheries, but, in this particular case, we don't have the
33  information that would allow us to manage it, and the fact of
34  the matter is that resources are limited, and we're stretched
35  pretty thin, and, unless somebody is able to make a very
36  compelling argument and convince the people that hold the purse
37  strings to release those dollars, we're in a no-go situation,
38  and so I understand where you're coming from, but, until we can
39  actually identify those resources, I don't think we have any
40  other option.  Mr. Dyskow.
41
42  **MR. DYSKOW:**  Thank you, Chairman Frazer.  I don't want to beat
43  this to death.  There is a lack of information, and that's part
44  of the issue.  The other important thing is there is no
45  commercial fishery for red drum, and, as far as recreational
46  activities, as I understand it, most of these fish are over
47  slot, and at a high level of toxicity that would indicate that
48  they wouldn't be good table fare anyway, and so, other than

78

1  going out and poking them with a stick, there doesn't seem to be
2  any good reason for prosecuting this fishery.
3
4  **CHAIRMAN FRAZER:**  Again, I don't think -- I will just clarify
5  that I don't believe there's a -- There is not a fishery for red
6  drum in the federal system, right, but there are certainly
7  commercial fisheries that are in state waters.  Patrick.
8
9  **MR. BANKS:**  Well, just on the table fare, because we've made a
10 lot of statements here at the council about the opportunity to
11 catch a fish and that being worth something, and so I think
12 that's where the General was going, with the opportunity for his
13 charter captains to have that trophy fish that he caught, and so
14 I think that's where he was going, and I don't know that it had
15 anything to do with going on the table.
16
17 **CHAIRMAN FRAZER:**  All right, and so, again, I think we've had
18 some pretty decent discussion there, but the fact of the matter
19 is we don't have the information to pursue this, and, until we
20 do, we're going to move on and try and make a little more
21 productive use of our time.   Okay.   Is there any other
22 discussion?  Go ahead, Ms. Bosarge.  I need a little humor.
23
24 **MS. BOSARGE:**  Just a little humor at the end.  Well, there is
25 one commercial fishery for it, at least, in Mississippi, but we
26 don't have to worry about those fish out there in federal
27 waters, Ed, and the commercial fishermen out there catching
28 them, although we used to, because now we're going to take tax
29 dollars, and we're going to grow red drum out in federal waters
30 instead, using aquaculture, and the free-swimming fish out there
31 are just laughing at us all the way.
32
33 **CHAIRMAN FRAZER:**  Okay.  I think that's all we have for the Red
34 Drum Committee.   Thank you, Ms. Bosarge.   We're going to go
35 ahead and move on to the Habitat Protection and Restoration
36 Committee.  Mr. Banks.
37
38            **HABITAT PROTECTION AND RESTORATION COMMITTEE REPORT**
39
40 **MR. BANKS:**  Thank you, Mr. Chairman.  The committee met on June
41 22 and adopted the agenda as written and approved the minutes.
42 The first thing we discussed was Draft Options for the Generic
43 Essential Fish Habitat Amendment.   Council staff provided a
44 presentation to review the definition and concepts of essential
45 fish habitat.
46
47 After the completion of the council's five-year review in 2016,
48 the SERO Habitat Division provided several recommendations to

0003945

1  the council's EFH policy, including updating the identifications
2  and descriptions of EFH using more contemporary data sources.
3  EFH for all managed species has not been modified since 2006.
4
5  Council staff reviewed the current method used to identify and
6  describe EFH and introduced two other modeling approaches that
7  could be used to describe EFH for species and life stages where
8  sufficient data were available.  Council staff also provided an
9  overview of the proposed draft action and alternatives to update
10 EFH for all managed species.  Efforts to complete the amendment
11 and fulfill the requirements for the 2021 five-year review will
12 be combined with the goal of finalizing the document in late
13 2022.
14
15 A Committee member inquired as to what data sources would be
16 used to generate the benthic habitat maps described in
17 Alternative 2.  Council staff indicated that those data sources
18 had not been finalized yet, and further discussion with the IPT
19 and input from the SSC would be required before making a final
20 determination.
21
22 The committee asked for clarification about considering
23 establishing habitat areas of particular concern, or HAPCs, in
24 the document.  Mr. David Dale stated that the council has
25 traditionally only considered HAPCs for coral.  Mr. Andy
26 Strelcheck inquired if exploration of more comprehensive
27 modeling approaches for describing EFH could be completed within
28 the proposed timeline.
29
30 Dr. John Froeschke stated it would be helpful to have continued
31 guidance from SERO regarding the proposed timeline for the
32 document.  He also stated that identifying appropriate habitat
33 data sources and generating habitat maps would serve as a
34 starting point for investigating the different approaches.  The
35 committee instructed council staff to present the proposed
36 methodologies to the SSC at its next meeting and continue
37 working with SERO and its Habitat Division on the document.
38 Council staff will provide a progress report to the committee at
39 the August council meeting.
40
41 The next item was Discussion Session of President Biden's
42 Executive Order 14008 Entitled "Tackling the Climate Crisis at
43 Home and Abroad".  Mr. Sam Rauch gave a presentation providing
44 an overview of a recently completed preliminary report
45 addressing Executive Order 14008 titled "Conserving and
46 Restoring America the Beautiful".
47
48 The overarching goal of the initiative is to conserve 30 percent

80

0003946

1  of U.S. lands and waters by 2030.  Mr. Rauch introduced the
2  project's core principles, areas of focus, collaborators, and
3  reviewed the proposed next steps.
4
5  A committee member commented that considerations for conserving
6  lands is not directly analogous to conserving waters, as human
7  development on the water is considerably less relative to land.
8  Ms. Bosarge suggested that considerations for conserving waters
9  focus on access between land and waters.  She reported that
10 areas where large commercial vessels can dock is dwindling and
11 that this access is important for supporting often underserved
12 stakeholders in the Gulf of Mexico.
13
14 The committee inquired as to why a conservation goal of 30
15 percent was set.  Mr. Rauch stated that percentage was close to
16 a previously published estimate of 40 percent from an
17 international study of conservation needs.  He also stated that
18 the International Union for Conservation of Nature had reported
19 that the U.S. was currently conserving approximately 26 percent
20 of U.S. waters.  However, he stressed that 30 percent was not
21 reflective of an idealized accomplishment, but rather an
22 actionable objective that will help spur progress towards
23 conservation by engaging a variety of stakeholders.
24
25 The committee was interested in whether established and
26 enhanced, for example artificial reefs, areas would be included
27 in the calculation of the 30 percent goal.  Mr. Rauch indicated
28 that a definition for "conservation" had not yet been determined
29 for the initiative.  He stated it would be possible for
30 previously identified and restored conservation areas to be
31 included.
32
33 The Council Coordination Committee has established an Area-Based
34 Management Subcommittee to address the E.O.  Dr. Froeschke
35 provided an update on the subcommittee's first meeting.  He
36 stated that the subcommittee has begun developing terms of
37 reference and compiling a list of conservation areas.  This list
38 would be used to generate a reference atlas and would mostly
39 report areas within the EEZ, rather than state closures and
40 migratory corridor areas.  Mr. Rauch commented he was happy that
41 the CCC would be involved in the process, but he was not sure
42 how the timing for the outcomes of the CCC subcommittee and the
43 NMFS timeline would align.
44
45 The next item was Section 216(c): Conserving our Nation's Lands
46 and Waters.  Council staff reviewed the results of solicited
47 public comment on the Executive Order Section 216(c) and
48 presented a draft recommendation letter that will be submitted

0003947

1  in response to the E.O.
2
3  The draft letter highlighted recurring themes on conserving
4  waters and considerations for socioeconomic factors from the
5  previous committee meeting, other fishery management regions,
6  state agencies, and the general public. The committee requested
7  some time to evaluate the draft and provide feedback to the
8  staff before formal submission. Mr. Chair, this concludes my
9  report.
10
11 **CHAIRMAN FRAZER:** Thank you, Mr. Banks. Is there any other
12 business related to the Habitat Protection and Restoration
13 Committee? I am not seeing any. Thank you again, Patrick.
14 We're going to read one more short report this evening. Dr.
15 Stunz, if you're on the line, if you want to go ahead and take
16 care of the Migratory Species Committee, that would be great.
17
18              **MIGRATORY SPECIES COMMITTEE REPORT**
19
20 **DR. STUNZ:** Yes, sir, Mr. Chairman. I'm ready if everyone else
21 is. The Migratory Species Committee met on June 25, 2021. The
22 committee adopted the agenda, Tab M, Number 1, as written and
23 approved the minutes, Tab M, Number 2, of the November 2020
24 meeting as written.
25
26 Highly Migratory Species Amendment 13, a three-year review of
27 the individual bluefin quota program that addressed the directed
28 fisheries for bluefin tuna and the incidental catch of bluefin
29 by the pelagic longline fishery, Tab M, Number 4(a) and 4(b),
30 Mr. Thomas Warren from the Highly Migratory Species office
31 provided an overview presentation on HMS Amendment 13.
32
33 The amendment would modify measures to the individual bluefin
34 quota program, with active vessels with a valid permit receiving
35 IBQ shares based on a contemporary three-year average. Regional
36 allocations between the Gulf of Mexico, the Gulf, and the
37 Atlantic would change annually as fishing location of the fleet
38 changes, and the Gulf IBQ share would be capped at no more than
39 35 percent.
40
41 Addressing the recent inactivity of the purse seine fishery,
42 allocation for purse seining would be entirely redistributed to
43 hand gear categories, the general, harpoon, angling, and
44 reserve. Mr. Warren covered other considerations in the
45 amendment and reviewed the bluefin quota percentage changes that
46 would result should the proposed changes be implemented.
47
48 Ms. Susan Boggs asked for clarification about the make-up of the
                              82

1   general  fishing  category  for  bluefin  tuna,  and  Mr.  Warren
2   replied  that  this  category  mostly  encompassed  commercial  hook-
3   and-line  activity,  which  is  focused  off  North  Carolina  and  New
4   England.
5
6   Mr. Andy Strelcheck asked for procedural clarification regarding
7   quota allocation from inactive vessels.  Mr. Warren stated that
8   a  review  indicated  30  percent  of  the  quota  was  allocated  to
9   inactive  vessels.    Amendment  13  would  use  a  contemporary
10  shifting three-year average of bluefin landings to assign shares
11  and  create  a  dynamic  system  that  reflects  the  most  recent
12  fishing activity of participating vessels.
13
14  Mr.  Kevin  Anson  and  Dr.  Tom  Frazer  asked  about  how  the
15  determination  of  a  35  percent  share  cap  was  allotted  to  the
16  Gulf.    Mr.  Warren  indicated  that  the  current  35  percent  cap
17  would  be  retained  and  the  amendment  would  allow  for  a  potential
18  decrease  in  that  percentage.    However,  he  indicated  that  the
19  bluefin  fishery  in  the  Gulf  is  mostly  incidental  and  did  not
20  anticipate  landings  would  approach  the  35  percent  cap  in  the
21  future.
22
23  During the discussion of Other Business, Ms. Leann Bosarge, Mr.
24  J.D.  Dugas,  and  Ms.  Boggs  spoke  of  the  continued  issues
25  regarding  shark  depredation.    They  highlighted  problems  with
26  sharks inflicting damage to shrimp net gear, which was expensive
27  to  repair,  angler  safety  when  landing  sharks,  and  loss  of  target
28  catch during charter trips.  Mr. Warren indicated his office was
29  aware  of  the  increasing  shark  predation  issue  and  would  pass
30  along  the  committee's  concerns  to  the  appropriate  colleagues.
31  Mr. Chair, this concludes my report.
32
33  **CHAIRMAN  FRAZER:**    Thank  you,  Dr.  Stunz.    Is  there  any  other
34  business related to the Highly Migratory Species Committee?  Mr.
35  Banks.
36
37  **MR. BANKS:**  At a previous council meeting, we had asked for some
38  update  presentations  about  the  shark  stock  assessments.    Can
39  staff  give  us  any  idea  of  whether  the  HMS  folks  are  able  to  do
40  that  or  whether  they're  working  on  stock  assessments  for  like
41  bull sharks and blacktips and things like that?
42
43  **CHAIRMAN  FRAZER:**    We're  going  to  have  Dr.  Hollensead  come  up  and
44  chat with us.
45
46  **DR. LISA HOLLENSEAD:**  If you recall, and this was right before
47  the world ended, we had a presentation from HMS staff, sort of a
48  general here's some species of note, and here's the trends and

83

0003949

1  things like that, nothing specific to SEDAR or that process.
2
3  As far as I know right now, the only SEDAR action for sharks, at
4  the moment, is the hammerhead complex, and I believe that is all
5  that's ongoing right now.  I do not believe that anything is on
6  the docket for bull sharks any time in the near future.
7
8  On our task list that we have, we have been tasked with having a
9  presentation to the SSC about the SEDAR process for sharks, and
10 so that is on that ongoing task list, and so, yes, staff is
11 aware, and that's something we continue to work on.
12
13 **CHAIRMAN FRAZER:**  Ms. Bosarge.
14
15 **MS. BOSARGE:**  That sounds good, and I think, whenever that next
16 shark assessment does come out, and I forgot what you said it
17 was already, but, anyway, if it's a shark species that is here
18 in the Gulf, is prevalent in the Gulf, we were going to also
19 have that presented to our SSC, for informational purposes, and
20 so that our fishermen could hear that presentation, right?
21
22 **CHAIRMAN FRAZER:**  Yes, that's correct, and so, again, I think
23 what we're just trying to is make sure that we get looped-in a
24 little bit more to the most recent shark-related information.
25 Kevin Anson,
26
27 **MR. ANSON:**  Thank you, Mr. Chair.  I know there's a division
28 between HMS species and other species that exist, at least in
29 the Gulf of Mexico, and I am just curious if there's any way --
30 If there's any synergies that might exist, I guess, to make sure
31 that, for our purposes, for managing like reef fish species, for
32 instance, how well, or if there is formal process that exists
33 within the Science Center, and I guess Silver Spring,
34 Headquarters, regarding making sure that we are getting
35 appropriate data for the HMS folks, your stock assessment
36 scientists, Dr. Porch.
37
38 Is that something that could come back to the council, to make
39 sure that there's more, I guess, open discussion about the types
40 of data that are being collected and maybe piggyback, if you
41 will, on some of the data collection that exists for non-shark-
42 related programs that could assist with the assessment?
43
44 **DR. PORCH:**  Yes, and, in fact, if you wanted a presentation
45 where we talk about the types of data that are available, we
46 could certainly give that.  Sharks are generally data limited in
47 a couple of ways.  One, we only have a few surveys that cover
48 some species of sharks, and, of course, they are very long-lived

84

1  animals, and so a lot of the dynamics happen slowly, and it's
2  not that we have time series that go back fifty years or
3  anything like that, but we could give a presentation of what is
4  available.
5
6  We have a small staff for sharks, and they do assessments every
7  year, but there is something -- I forgot how many there are now,
8  thirty sharks in the FMPs now, and we've never done a bull shark
9  assessment, and I'm not even sure we would have the data to
10 actually do one that is defensible, but we have done small
11 coastal sharks in aggregate, and so that would include -- I'm
12 not sure if we did blacktip by itself, but it would have been
13 wrapped up, probably, in small coastal, and I'm just looking at
14 the list of ones that we have done.
15
16 We have done blacktip separately, and I take that back.  It's
17 just that, with so many sharks and a small team, we can't do
18 them that often, and so there is long gaps between assessments,
19 but that's all on the SEDAR website.
20
21 **CHAIRMAN FRAZER:**  All right.  Thank you, Dr. Porch.  Ryan, did
22 you want to add anything about the SEDAR schedule?
23
24 **MR. RINDONE:**  Sure.  Thank you, Mr. Chairman.  There's a
25 hammerhead research track assessment that's being conducted
26 through SEDAR, and that is currently underway and will conclude
27 in late 2023 with the operational assessment for that species.
28
29 **CHAIRMAN FRAZER:**  Okay.  Thank you, Ryan.  Mr. Anson.
30
31 **MR. ANSON:**  Dr. Porch offered a presentation, and I don't know
32 if it needs to be like a formal motion to the council, or, I
33 mean, I can take his word on it, but I just -- How do you want
34 to proceed?
35
36 **CHAIRMAN FRAZER:**  Dr. Simmons.
37
38 **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Chair.  I believe in
39 January, and I know it seems like a long time ago, but, the last
40 time we had an in-person meeting, I believe, in 2020, in
41 January, we received a presentation from the Highly Migratory
42 Species Division in the Regional Office, and they did talk about
43 the various gears and information they have on several shark
44 species, and so I guess, if you're looking for more detailed
45 information, perhaps a motion would be good.
46
47 **MR. ANSON:**  I am looking for, I guess, a little bit more detail,
48 and I guess it's not so much just the data that exist, but it's

85

0003951

1  just what the process is for -- What are the data needs, and,
2  again, do they overlap, or is there an opportunity, in our
3  normal data collection activities, like us and the states,
4  through the commission, that the states could be a little bit
5  more active in trying to get some better data, more specialized
6  data, and, again, the money may not be available to go through
7  that route, but I'm just saying that that's kind of where I was
8  looking, was what data is available.
9
10  Obviously, we need to know where to start from, but then, again,
11  trying to overlay what is currently being collected for the
12  recreational fisheries, for reef fish and such, and, again,
13  where might there be some opportunities there to kind of merge
14  those two things together.
15
16  **CHAIRMAN FRAZER:**  Dr. Porch.
17
18  **DR. PORCH:**  I would be very happy to give a presentation that
19  talks about the data gaps that we have for sharks and where we
20  think there could be some useful investments, and then the
21  states can take from that where they can help out or advocate
22  for more resources.
23
24  **CHAIRMAN FRAZER:**  Thank you, Clay.  Dr. Simmons, do you just
25  want to informally arrange a time with Dr. Porch to have a short
26  presentation about sharks and data gaps, or data needs?
27
28  **EXECUTIVE DIRECTOR SIMMONS:**  Absolutely.
29
30  **CHAIRMAN FRAZER:**  Are you satisfied with that, Kevin?
31
32  **MR. ANSON:**  That would be great.
33
34  **CHAIRMAN FRAZER:**  All right.  Is there any other business to
35  come before this particular committee?  All right.  I am not
36  seeing any.  Sorry I took you guys a little longer, but we'll be
37  better off for tomorrow.  You guys have a nice evening.
38
39  (Whereupon, the meeting recessed on June 24, 2021.)
40
41                            - - -
42
43                        June 25, 2021
44
45                    FRIDAY MORNING SESSION
46
47                            - - -
48

0003952

1 The Full Council of the Gulf of Mexico Fishery Management
2 Council reconvened on Friday morning, June 25, 2021, and was
3 called to order by Chairman Tom Frazer.
4
5 **CHAIRMAN FRAZER:** We're going to get going. We will go in order
6 to finish up the committee reports. We'll start off with
7 Shrimp, and then we'll go to Admin/Budget, Mackerel, Data
8 Collection, Sustainable Fisheries, and then, finally, Reef Fish,
9 and so, Ms. Bosarge, if you wanted to get started with the
10 Shrimp Committee Report, it's all yours.
11
12                    **SHRIMP COMMITTEE REPORT**
13
14 **MS. BOSARGE:** Thank you, Mr. Chairman. The Shrimp Committee met
15 on June 21, 2021, with myself, Leann Bosarge, as Chair. The
16 committee adopted the agenda, Tab D, Number 1, with the addition
17 of a brief discussion regarding a recent Executive Order under
18 Other Business. The committee approved the minutes, Tab D,
19 Number 2, of the April 2021 meeting as written.
20
21 Update on Effort Data Collection for 2021, Tab D, Number 4 and
22 4(a) through (b). Dr. Gloeckner presented on the shrimp
23 cellular electronic logbook (cELB) interim data collection
24 process. The cELB units ceased transmitting in December 2020.
25 However, the cELB units are still collecting data. The data
26 will be manually collected by the Southeast Fisheries Science
27 Center, aka Science Center, via SD cards.
28
29 Dr. Gloeckner reviewed the steps and timeline for maintaining
30 the data collection. He added that the process of replacing bad
31 cELB units has already begun and would continue in the fall,
32 after reviewing the data collected by the cELB units. He noted
33 that the process of manual data collection via SD cards would be
34 repeated in the fall and thereafter as needed.
35
36 Ms. Bosarge commented that the process was going well and being
37 conducted in a timely fashion, including the postcard mailed in
38 May to notify shrimpers of the manual data collection process
39 and having the SD cards mailed to shrimpers this summer. Ms.
40 Bosarge offered a suggested edit on the SD card removal
41 instructions mailer that would explain to shrimpers how they
42 would know if the cELB was powered up again properly. Ms.
43 Bosarge inquired how many SD cards were in stock with the
44 Science Center, and Dr. Gloeckner will provide the requested
45 information later, and I will turn to Dr. Freeman, because I
46 think he has that information now.
47
48 **DR. MATT FREEMAN:** Thank you, Ms. Bosarge. I got a response
                                 87

0003953

1  from Dr. Gloeckner, in terms of some questions that were raised
2  during the Shrimp Committee.  The first is that they are putting
3  together directions to indicate the need of the light indicators
4  of the back of cELBs, so that shrimpers will know if the unit is
5  operating, and those will go out with the next mailing.
6
7  The Science Center was instructed to clip all of the items
8  together in the next mailer, so that shrimpers know that they
9  got everything that should have been included, and, again, staff
10 were advised to make this change.
11
12 The next item, he said that they will not have enough SD cards
13 to cover the next mailing, and they will be purchasing 500 of
14 those cards to cover that next mailing.  Then, lastly, as of
15 Tuesday afternoon, to serve as a status update, they have
16 received twenty-seven of the SD cards back.  I did inquire this
17 morning of how many they did mail out, and he said that they
18 mailed 493 chips on June 2, and so, again, as of Tuesday
19 afternoon, they have received twenty-seven back so far.
20
21 **MS. BOSARGE:**  All right.  Thanks for that update, Matt, and
22 that's what I was kind of worried about, that we might not have
23 enough chips in inventory right now to do this continuously, but
24 I'm glad to hear that they're ordering some, and hopefully these
25 particular chips aren't in too high demand, but hopefully we'll
26 hold off on mailing any more out until we get some more in, so
27 that, if we need to do this once a year, going forward, we can
28 make that determination.  Let's see.  That's the end of that
29 section.
30
31 The next section is Draft Framework Action: Modification of the
32 Vessel Position Data Collection Program for the Gulf of Mexico
33 Shrimp Fishery, Tab D, Number 5 and 5(a) through 5(c).  Dr.
34 Freeman reviewed the draft purpose and need statements.  Mr.
35 Dugas inquired why the satellite automatic identification system
36 (AIS) was not considered.  Ms. Bosarge noted that was a good
37 point and may become clearer as the alternatives are discussed.
38
39
40 Ms. Bosarge noted that the purpose statement should be clarified
41 to refer to the expired 3G cELB program and that a similar
42 change should be made throughout the rest of the document.  She
43 also noted that the scientific needs of the data collection
44 program have to be balanced with the financial burden on
45 fishermen and, while noted in the document, it should be
46 included in the purpose statement.
47
48 Mr. Banks inquired if the phrase "to collect vessel position
                                    88

data" is needed.  Mr. Diaz responded that reduction metrics for red snapper rely on effort estimation, which uses vessel position data.  Mr. Diaz commented that the reason for data collection is for science and not for law enforcement and asked if that could be reflected in the purpose statement.

**The committee recommends, and I so move, to modify the purpose of the document to read: The purpose of this action is to transition from the expired 3G cellular electronic logbook program to a system that would maintain the council's and NMFS's scientific ability to estimate and monitor fishing effort in the Gulf of Mexico shrimp fishery while minimizing the economic burden on the industry to the maximum extent practicable.**  The motion carried without opposition.

**CHAIRMAN FRAZER:**  All right.  Thank you, Ms. Bosarge.  We have a committee motion on the board.  **Is there any opposition to that motion?  Seeing none, the motion carries.**

**MS. BOSARGE:**  Dr. Freeman next reviewed the alternatives under Action 1 and noted that "3G" would be added to the language of Alternative 1.  Ms. Bosarge stated that Alternative 2 uses the technical specifications for devices already approved by NMFS for other fisheries and would apply them to the shrimping industry.  The devices currently in place for the shrimp industry are cellular, while the vessel monitoring system type-approved list includes both cellular and satellite-based devices.

If cellular-based VMS devices are discontinued in the future, the shrimp industry would be required to use satellite transmission, which is far too costly for the industry.  Ms. Bosarge recommended removing the reference to satellite devices from Alternative 2, as it is not a viable option for the shrimp industry at this time.  Mr. Strelcheck responded that the intent is to include all possible options for the shrimp industry.  Ms. Bosarge reiterated that satellite transmission would be too costly for the industry.

Ms. Levy noted that, for the for-hire component, the phrase "at a minimum" meant that fishermen could use a device that cellularly transmits at a minimum and that satellite transmission would be above the minimum.  Ms. Bosarge responded that satellite-transmission-related language should not be considered in the alternative.

**The committee recommends, and I so move, in Action 1, to revise Alternative 2 to read: Alternative 2.  Modify the method to**

89

0003955

1  **collect vessel position data.  If selected, the owner or**
2  **operator of a shrimp vessel with a valid or renewable moratorium**
3  **permit would be required to install an approved vessel**
4  **monitoring system that archives vessel position and**
5  **automatically cellularly transmits that data to the National**
6  **Marine Fisheries Service.**  The motion carried with one in
7  opposition.
8
9  **CHAIRMAN FRAZER:**  Okay, and so we have a committee motion on the
10  board, and there was one in opposition, and so is there any
11  further discussion of this motion?  Mr. Strelcheck.
12
13  **MR. STRELCHECK:**  I will just make the same point that I did in
14  committee, and I just think this is narrowing our range of
15  options.  I totally agree with what Leann is saying, that it's
16  likely not to be the preferred option by shrimpers, but we have
17  a whole suite of VMS units, whether satellite, cellular, or
18  hybrid-based, and they would be available for use and
19  consideration by the shrimp industry.
20
21  I recognize that costs would likely be prohibitive, but I did
22  check with our Permits Office, and we have 162 rock shrimpers
23  that also have a shrimp permit in the Gulf of Mexico, and we
24  also have nine vessels in the Gulf of Mexico with a shrimp
25  permit and a reef fish permit, and so those are vessels that are
26  already using a satellite-based VMS, and just including it in
27  there does not harm anything, and it's certainly not something
28  that they have to select as their preferred method for
29  reporting.
30
31  **MS. BOSARGE:**  Thank you, Andy.
32
33  **CHAIRMAN FRAZER:**  Is there any further discussion?  Peter.
34
35  **MR. PETER HOOD:**  Thank you.  Just about satellite technology, I
36  know that, the way it's used in reef fish, is they ping once an
37  hour, and it is possible for the collection unit to get ten-
38  minute pings, but then bundle that into one ping that goes up to
39  every hour, and so you would have six positions, or six
40  locations, in it, and so that's a way that it would get there.
41  The cost would be more than one ping an hour, because it does --
42  The VMS providers charge by how much data is being transmitted,
43  but it might be less than pinging once every ten minutes.
44
45  **CHAIRMAN FRAZER:**  All right.  Thanks, Peter.  Ms. Bosarge.
46
47  **MS. BOSARGE:**  One of them actually emailed me about this the
48  other day, and I don't remember who it was, but, essentially,

90

1  that  carrier,  or  provider,  they  actually  charge  by  the
2  character,  and  so,  whether  you  send  the  data  in  one  bundle  or
3  six  times,  it's  the  same  number  of  characters,  and  so  you're
4  still  going  to  have  a  substantial  cost.
5
6  I  would  still  advise  that  we  take  this  out  of  there.   I  think
7  there's  too  much  room,  given  what  we  see  right  now  in  our
8  industry,  where  our  cellular  product  is  not  supported,  and  the
9  cellular  products  that  have  seen,  that  are  either  approved  or  in
10  the  process  of  being  approved,  I  think,  when  you  put  them  on  a
11  shrimp  boat  to  test  them,  you  will  find  where  we  have  some
12  issues.   At  that  point,  we  would  be  pigeon-holed  into  a  $300  a
13  month  device,  because  we  wanted  to  provide  the  shrimp  fleet  with
14  that  option,  and  I  don't  want  to  end  up  at  that  option.
15
16  **CHAIRMAN  FRAZER:**   All  right.   Thank  you,  Leann.   All  right.   I
17  am  looking  around.   Is  there  anybody  online  that  wants  to
18  contribute  to  this  discussion?   Not  hearing  any  voices  online,
19  and  so,  again,  we  had  one  in  opposition,  and  so  we'll  go  ahead
20  and  start  this  way.   **How  many  people  are  opposed  to  this  motion?**
21  **Raise  your  hand.**   All  right.   **Is  there  any  opposition  then?   Not**
22  **seeing  any,  and  the  motion  carries.**   Ms.  Bosarge.
23
24  **MS.  BOSARGE:**   All  right,  and  so  Mr.  Strelcheck  noted  that
25  additional  devices  are  currently  being  considered  for  VMS  type-
26  approval,  and  other  devices  are  in  the  development  phase  and  may
27  be  certified  in  the  future  for  use  in  the  shrimp  industry.   He
28  noted  that  having  a  VMS  type-approval  process  that  varies  across
29  fishing  sectors  would  defeat  the  purpose  of  having  a
30  standardized  list.   However,  exceptions  to  current  requirements
31  for  a  particular  industry  could  be  explored.
32
33  Ms.  Bosarge  commented  that  the  requirements  were  not  written
34  with  the  shrimp  industry  in  mind.   She  stated,  for  instance,
35  that  the  storage  requirement  of  1,000  position  fixes  would
36  provide  only  a  week  of  data  for  the  shrimp  industry,  whereas  it
37  would  provide  more  than  a  month  of  data  for  the  reef  fish
38  industry.   Mr.  Strelcheck  recommended  taking  these  concerns  and
39  revised  technical  specifications  to  the  Office  of  Law
40  Enforcement,  instead  of  trying  to  incorporate  them  into  the
41  framework  action.
42
43  Mr.  Diaz  stated,  again,  that  the  shrimp  industry  operates  very
44  differently  from  other  fisheries  and  therefore  needs  different
45  technical  specifications.   Dr.  Porch  noted  that  the  technical
46  specifications  are  minimum  requirements,  as  with  storage  for
47  position  fixes.   Ms.  Levy  stated  that  the  language  of
48  Alternative  2  currently  is  not  overly  restrictive  and  that,

0003957

1  instead of adding another alternative, the agency needs to take
2  into consideration the suggested changes to the technical
3  specifications.
4
5  Mr. Strelcheck noted that there was not information in front of
6  him to comment on the proposed alternative.  Ms. Bosarge noted
7  that, by adding an alternative which references technical
8  specifications designed to collect shrimp effort data via a
9  cellular electronic logbook, it would allow the council to
10  compare the requirements and potential ramifications of the two
11  options in an open and transparent manner, garnering feedback
12  from the council and stakeholders as the process continues.
13
14  **The committee recommends, and I so move, in Action 1, to add an**
15  **Alternative 3.   Alternative 3. Modify the method to collect**
16  **vessel position data.  If selected, the owner or operator of a**
17  **shrimp vessel with a valid or renewable moratorium permit would**
18  **be required to install an approved electronic logbook that**
19  **archives vessel position and automatically cellularly transmits**
20  **that data to the NMFS.**   The motion carried with one in
21  opposition.
22
23  **CHAIRMAN FRAZER:**  Okay.  Again, we have a committee motion on
24  the board.  Is there any further discussion of the motion?  Mr.
25  Strelcheck.
26
27  **MR. STRELCHECK:**  Thanks, Tom.  A point of clarification with
28  regard to the minutes.  It states "However, exceptions to
29  current requirements for a particular industry could be
30  considered."  I guess "could" seems more definitive than the
31  agency is willing to look at those and consider them, right, and
32  so I would like to just clarify that, because I think the
33  statement below that is much better written, in terms of
34  recommending taking the concerns and revised technical
35  specifications to the Office of Law Enforcement.
36
37  With regard to the motion on the board, Mara made this point
38  during committee, and, at least as written, I don't think it's
39  any different than the definition we have for a vessel
40  monitoring system currently in the regulations, and I will read
41  that that states a VMS means a satellite or cellular-based unit
42  or system designed to monitor the location and movement of
43  vessels using onboard VMS units that send global position system
44  position reports to an authorized entity.  I just point this out
45  because I think, as written, the Alternative 3 is really the
46  same as Alternative 2.
47
48  **CHAIRMAN FRAZER:**  Ms. Bosarge.

92

0003958

1
2  **MS. BOSARGE:**  Thanks for that.  I will respectfully disagree
3  with him.  This VMS language calls it what we've always called
4  it, which is an electronic logbook, and that we will have
5  technical specifications that we can look at in the next
6  iteration of this document for shrimp electronic logbooks, as
7  opposed to strictly only looking at the VMS type-approval
8  specifications that are published for, currently, the IFQ fleet
9  and the for-hire fleet.  That's the difference, in my opinion,
10 in this motion.
11
12 **CHAIRMAN FRAZER:**  Thank you, Ms. Bosarge.  Ms. Levy.
13
14 **MS. MARA LEVY:**  Thank you.  I'm just going to say that I think
15 it's going to potentially add confusion to the public.  I mean,
16 I hear what you're saying, Leann, and, obviously, anybody can
17 have their opinion about what the regulations mean, but,
18 ultimately, if the agency decides that what you're trying to do
19 here meets the definition of VMS and that the VMS regulations
20 and approval process applies, then that's what the agency is
21 going to do, and I think it's a little bit confusing to try and
22 distinguish between, quote, a VMS and an electronic logbook,
23 because they're both collecting position data, and they're both
24 sending it automatically to NMFS.
25
26 I just think that the change in wording between the alternatives
27 is going to potentially indicate to people that there is
28 something different.  I get that the tech specs behind it
29 potentially could be different, but it's the same type of
30 device, and so that's my only concern.  Thank you.
31
32 **CHAIRMAN FRAZER:**  Thank you, Ms. Levy.  Dr. Porch.
33
34 **DR. PORCH:**  Thank you.  We also find it a little bit confusing,
35 and potentially misleading, to call it an electronic logbook,
36 because really all we're asking here is just a vessel position
37 recorder, and maybe we just use generic language.
38
39 **CHAIRMAN FRAZER:**  All right.  Thank you, Dr. Porch.  Before we
40 vote on this, Andy, I just want some clarification.  Are you
41 suggesting, with regard to the report itself, that the language
42 needs to be modified in one of those sentences?
43
44 **MR. STRELCHECK:**  I'm not suggesting the language needs to be
45 modified.  I'm just saying, whether you call it an electronic
46 logbook or a vessel monitoring system, the way it's worded is an
47 electronic logbook here fits the definition of a VMS, and so
48 you're calling it something else, but it's still something that

1  provides us position data and transmits its cellularly to the
2  agency, which is components, or key components, of that
3  definition for a VMS.
4
5  **CHAIRMAN FRAZER:**  I'm not speaking to the language in the
6  alternative motion, but the actual language in the report.  You
7  referenced that there was a particular sentence that you didn't
8  like.  I just want to make sure that staff can capture that.
9
10  **MR. STRELCHECK:**  So the last paragraph on page 2, the fourth
11  line, says: "However, exceptions to current requirements for a
12  particular industry could be considered."  I guess I would
13  probably have worded that as the agency is willing to explore
14  current requirements, exceptions for current requirements, and
15  that is captured then at the end of the last paragraph on that
16  page and the beginning of the next page, which talks about that
17  these concerns and revised technical specs can be taken to the
18  Office of Law Enforcement, which we plan to do after this
19  meeting.
20
21  **CHAIRMAN FRAZER:**  Okay, and so you're asking to replace the word
22  "considered" with "explored"?  Okay.  Matt, have you got that?
23
24  **DR. FREEMAN:**  Yes, sir.  We'll make that change.
25
26  **CHAIRMAN FRAZER:**  Okay.  We have, again, a committee motion on
27  the board, and I am not seeing any interest in further
28  discussion on that.  **All of those in favor of this motion, can
29  you raise your hand; folks online; all those opposed.  The
30  motion carries twelve to two.**
31
32  **MS. BOSARGE:**  All right.  Dr. Porch added that, if a unit
33  transmits vessel position data, it is considered a VMS unit.
34  Ms. Bosarge compared the electronic logbook devices currently
35  utilized in the shrimp fleet to the definition of a VMS unit and
36  noted, in her opinion, the current devices did not rise to the
37  level of a VMS unit as it is currently defined in the
38  regulations.  Dr. Freeman then reviewed additional options for
39  consideration, regarding to which vessels the requirements in
40  Action 1 would apply.
41
42  Update on P-Sea WindPlot Pilot Program, Tab D, Number 6.  Dr.
43  Putnam presented an update on the P-Sea WindPlot pilot program
44  and noted that this is an industry-led solution to the expired
45  3G cellular transmission problem.  LGL modified the P-Sea
46  WindPlot software to record the same information as the existing
47  cELB program and to be compatible with the current method of
48  calculating shrimping effort.

0003960

1
2  LGL also devised a method to pair effort data with landings data
3  for each trip, in an effort to provide more robust catch per
4  unit effort estimates.  Similar to the historical program, the
5  proposed program is designed to be a scientific data collection
6  tool and not an individual vessel enforcement tool.
7
8  Currently, LGL has tested the pilot program for at-sea
9  functionality and has shown that it would provide the same
10 effort information produced by the existing cELB program.  The
11 next steps would be to automatically transmit ELB data and pair
12 trip ticket information to a designated NMFS server and to
13 install the system on a subsample of the fleet.
14
15 Mr. Strelcheck noted that there had been concerns about aging
16 computers and systems and their ability to run the software and
17 asked if those concerns were being observed.  Dr. Putnam stated
18 that the older computer systems took longer to install the
19 modified P-Sea WindPlot software, but that they had been able to
20 get the software to run on all of the systems tested so far.
21
22 Other Business, the committee was out of time, so the other
23 business item regarding a recent Executive Order will be moved
24 to Full Council.  We took that other business item up, Mr.
25 Chair, during Patrick's committee, the Habitat Committee, and
26 that was simply I was hoping that, at some point in the future,
27 the council could be presented with Executive Order 14017 on
28 strengthening the resiliency of American's supply chain, as it
29 references specifically food production and food processing and
30 food distribution and markets and consumers.
31
32 It's very similar to the Executive Order that the council gave
33 feedback on during the last administration on strengthening the
34 resiliency and supply chain of the seafood industry, and so I
35 thought this one would also be a viable option for us to give
36 feedback on, and it's just a little broader, and it goes beyond
37 seafood and into other foods, and so, if, at some point in the
38 future, we have time on our agenda to look at that, that would
39 be nice, but I understand the agendas are constrained.
40
41 **CHAIRMAN FRAZER:**  Okay, and we'll kind of explore that and the
42 status of where there's going and, if we can find some time to
43 put it on the agenda at the coming meeting, we'll do that.
44
45 **MS. BOSARGE:**  All right.  Mr. Chair, this concludes my report.
46
47 **CHAIRMAN FRAZER:**  All right.  Thank you, Ms. Bosarge.  Is there
48 any other discussion related to this particular committee today?

0003961

1  All right.  Not seeing any, thank you again, Ms. Bosarge.  We
2  will  go  ahead  and  move  to  the  Administrative  and  Budget
3  Committee and Mr. Dyskow.
4
5              **ADMINISTRATIVE AND BUDGET COMMITTEE REPORT**
6
7  **MR. DYSKOW:**   Thank you, Mr. Chair.   This is the Admin Budget
8  Committee Report from June 21, 2021.  The committee adopted the
9  agenda as written and approved the minutes of the January 2021
10 meeting as written.
11
12 Review and approval of the Final Funded 2021 Budget, in Tab G,
13 Number  4,  staff  presented  the  initial  draft  2021  budget
14 alongside  the  draft  funded  2021  budget.   The  total  funding
15 received  for  the  second  year  of  the  five-year  award  was
16 $3,904,100.   The  total  received  is  $99,200  less  than  the
17 original  budget  estimate  and  included  the  reduction  of  the
18 $94,000 which was sent to the Southeast Region (SERO) in support
19 of the permit software update.
20
21 Most  of  the  costs  presented  in  the  initial  draft  budget  remain
22 unchanged,  other  than  lines  relating  to  meetings  and  contractual
23 services.   Meeting-related  costs  were  revised  to  account  for  the
24 meetings  which  have  been  held  virtually  to  date  and  a  slight
25 reduction  in  the  number  of  anticipated  public  hearing
26 activities, since travel is just being resumed.
27
28 In  addition  to  the  decreases,  allowances  were  increased,  due  to
29 the  considerable  uncertainty  in  the  actual  costs  that  may  be
30 realized  through  the  remainder  of  the  year  as  airfares,  rental
31 car  costs,  and  hotel  rates  are  surging  due  to  the  increased
32 demand.   The  stipend  and  meeting  room  cost  estimates  were
33 increased  to  adjust  for  anticipated  activity  and  rising  room
34 rental  costs,  as  in-person  meetings  are  resuming  and  space  costs
35 are increasing.
36
37 The  contractual  costs  were  adjusted  by  a  net  of  $68,000,  which
38 included  the  $94,000  that  was  removed  from  this  line,  since  it
39 was  funded  to  SERO  directly  from  the  Treasury  Department.   Added
40 to  this  line  were  the  stipends  for  contracting  independent
41 reviewers  involved  in  the  Great  Red  Snapper  Count  review  at  the
42 March  SSC  meeting,  and  that  was  $30,000,  and  $4,000  for
43 technology  services  to  help  ensure  the  council  can  meet  NOAA's
44 electronic  records  keeping  requirements  towards  the  end  of  the
45 year.   **The committee recommends, and I so move, to approve the**
46 **final funded 2021 budget.**  Mr. Chairman.
47
48 **CHAIRMAN FRAZER:**   All right.   Thank you, Mr. Dyskow, and so we
                                    96

0003962

```
 1  have a committee motion on the board, and that motion, again, is
 2  to approve the final funded 2021 budget.  **Is there any**
 3  **opposition to this motion?  I am not seeing any, and so the**
 4  **motion carries.**  Thank you, Mr. Dyskow.
 5
 6  **MR. DYSKOW:**  Expanded Sampling and Ageing Study on Gulf of
 7  Mexico Gray Triggerfish, with SSC Recommendations, and that
 8  would be in Tab G, Number 5(a), in response to the January 2021
 9  request from the council, staff presented a draft call for
10  proposals to obtain data which would decrease data gaps in the
11  research track assessment of Gulf of Mexico gray triggerfish
12  that is currently scheduled to begin in 2024.
13
14  The proposed project would require a contractor to evaluate
15  techniques to efficiently sample, process, and utilize different
16  ageing structures. i.e., spines and otoliths, for gray
17  triggerfish in the Gulf and would require funding of $250,000
18  from the 2020 unexpended funds.  The contractor would have
19  twenty-four months to complete the project to conduct the
20  expanded sampling and ageing study.
21
22  Staff reviewed a draft of the request for proposals for this
23  project and incorporated comments from the Science Center, the
24  Grant Coordinator, and the Scientific and Statistic Committee.
25  The committee was asked to review this revised draft to
26  determine if the funding amount and scope of work should be
27  approved for solicitation of a competitive call for proposals.
28
29  **The committee recommends, and I so move, to fund the expanded**
30  **sampling and ageing study on Gulf of Mexico gray triggerfish,**
31  **with SSC recommendations.  Dr. Frazer.**
32
33  **CHAIRMAN FRAZER:**  Thank you, Mr. Dyskow.  We have a committee
34  motion on the board, and the motion is to fund the expanded
35  sampling and ageing study on Gulf of Mexico gray triggerfish,
36  with SSC recommendations.  Is there any further discussion of
37  that motion?  I am not seeing any.  **Any opposition to the**
38  **motion?  I am not seeing, and the motion carries.**  Back to you.
39
40  **MR. DYSKOW:**  Thank you, Mr. Chairman.  Shrimp ELB Program, which
41  is Tab G, Number 5(b), in response to the January 2021 request
42  from the council, staff presented a draft request for project
43  proposals to select a contractor to organize and expand a vessel
44  effort monitoring system for the federally-permitted Gulf of
45  Mexico shrimp industry.
46
47  The intention of this study is to test a suitable software
48  program with a portion of the shrimp fleet in the near-term to
```

0003963

1  determine if it meets the needs of industry, council, and the
2  NMFS Science Center. All three.
3
4  The term of this work would be twelve to eighteen months and
5  would require funding up to $350,000, which would come from the
6  council's unexpended 2020 funds.  The committee did not vote on
7  this action and elected to continue discussions during the Full
8  Council session.
9
10  **CHAIRMAN FRAZER:**  Okay, and so is there any further discussion
11  of this issue?  Susan Boggs.
12
13  **MS. BOGGS:**  Thank you, Mr. Chair.  If I remember, in committee,
14  when we discussed this, this would be sent out for bid, and it
15  wouldn't necessarily go to Benny Gallaway's group, and it would
16  be put out for bid, to explore moving forward with some type of
17  program.
18
19  **CHAIRMAN FRAZER:**  So my recollection of the discussion was that
20  it wouldn't be a sole-source contract and that it would be
21  competitive.  Ms. Bosarge.
22
23  **MS. BOSARGE:**  I mean, obviously, I'm going to speak in favor of
24  this, and I think that this is a great option for my industry.
25  Obviously, in the last committee, we talked about the expired 3G
26  cellular electronic logbooks and the obvious willingness and
27  hopefulness of the industry to continue that program in a
28  cellular fashion, the way that we have before.
29
30  Right now, even if the council does go with NMFS's VMS type-
31  approval list, without altering the specifications for shrimp,
32  there is only one cellular option that is currently approved,
33  and so that's -- The whole point was not to sole-source things,
34  right, and force the industry under one particular vendor.
35  There's two, yes, that are currently being tested.
36
37  I will be honest that I've looked at two of these three devices,
38  and, as they are right now, I don't think they'll work on the
39  shrimp fleet.  I think it's going to take some physical
40  reconfiguration of the units to actually make it work and get
41  good data, and this device right here is already on the boats,
42  and so this is not an off-the-shelf device.  The bulk of the
43  fleet already has a computer with this P-Sea WindPlot software
44  on it, and the industry has already paid to make sure that it
45  will collect the data that NMFS wants in the fashion that they
46  want, and it's comparable to our old data.
47
48  The one final piece that has to be worked out for this is the

98

1  transmission piece.     Right now, it doesn't transmit
2  automatically, and we would have to mail the data to NMFS, and
3  so that's the big portion of this project, and so I think, to
4  hopefully have something in place when we finish that document,
5  this is very much a viable option, and it could be implemented
6  very quickly once the transition piece is worked out, and so I
7  hope the council will consider funding this.
8
9  **CHAIRMAN FRAZER:**  Thank you, Ms. Bosarge.  Susan, back to you.
10
11 **MS. BOGGS:**  It was kind of to that point, and Leann answered one
12 of my questions.   I mean, the industry has already invested a
13 lot of money in this, and I think -- I understand what the NMFS
14 staff is saying as well, but, if this is something that's
15 already on the vessels, and it's already pretty well been proven
16 to work, it seems to me like we would invest in moving forward
17 with this and make it a seamless transition.
18
19 **I would like to make a motion that we approve the expanded
20 sampling of the fleet for effort monitoring in the Gulf of
21 Mexico shrimp industry proposal, or we accept that proposal.**
22
23 **CHAIRMAN FRAZER:**  Okay.  Let's take a few minutes and make sure
24 that we get that captured on the board in the form of a motion,
25 and so let's make sure the staff gets caught up.   Sometimes I
26 run a little ahead of them, and I want to make sure that they
27 get time to write.  All right.   Do we want a little more
28 specificity in that motion, Susan?
29
30 **EXECUTIVE DIRECTOR SIMMONS:**  Bernie, could you say expanded
31 sampling of the fleet for effort monitoring, that title of the
32 draft call for proposals, please?
33
34 **CHAIRMAN FRAZER:**  Okay, and so, Susan, let's see what we've got
35 here.  The motion is to fund a call for proposals to organize
36 and expand a vessel effort monitoring system for the federally-
37 permitted Gulf of Mexico shrimp industry.  Phil, while they're
38 getting that up, what's up?
39
40 **MR. DYSKOW:**  As head of the Budget and Finance Committee, I
41 would be remiss if I didn't say that we should also include
42 wording of the funding up to $350,000.
43
44 **CHAIRMAN FRAZER:**  I think, once we get a skeleton up here, we're
45 going to craft it.  Susan.
46
47 **MS. BOGGS:**  Do I need to be as specific to lay out the terms of
48 the contract as well as the amount of the funding in this

99

0003965

1  motion, so that we know how long they have to complete the
2  project?
3
4  **CHAIRMAN FRAZER:**  Again, as soon as I feel comfortable that
5  we've got something that we can work with, then we will modify
6  it.
7
8  **DR. HOLLENSEAD:**  What if you put something in there about as
9  presented in Tab G, Number 5(b), and then you're referencing the
10 whole proposal, and so people will know to -- That might be
11 easier.
12
13 **CHAIRMAN FRAZER:**  Yes, I would agree with that.  **The motion on
14 the board reads: To fund a call for proposals for expanded
15 sampling of the fleet for effort monitoring in the Gulf of
16 Mexico federally-permitted shrimp industry, as presented in Tab
17 G, Number 5(b).**  Two points there.  Does Tab G-5(b) specify the
18 dollar amount, up to?  I just want to make sure.  Okay.  So
19 we've got that covered in there, and we've got all the other
20 things, and so we have a motion on the board.  Is there a second
21 for that motion?  It's seconded by Ms. Bosarge.  Is there
22 further discussion?  J.D., I cut you off earlier, and I just
23 wanted to make sure that I come back to you.
24
25 **MR. DUGAS:**  (Mr. Dugas' comment is not audible on the
26 recording.)
27
28 **CHAIRMAN FRAZER:**  Okay.  Thank you.  Ms. Guyas.
29
30 **MS. GUYAS:**  I'm going to support this motion.  I mean, I have to
31 commend this fishery, the industry, and they kind of got put in
32 a tough spot with the, I guess, technology change, and they've
33 come forward with a solution that I feel like, since we have
34 some extra funds on the table, I think it's worthwhile to try to
35 support looking at that, and having that as option, moving
36 forward, for this fishery, hopefully that will work for them,
37 and it will maybe give them a little bit more efficiencies and
38 not having to have multiple technologies on the vessel, and so I
39 just want to say thanks to them for coming forward and bringing
40 something to the table.
41
42 **CHAIRMAN FRAZER:**  Thank you, Martha.  Mr. Diaz.
43
44 **MR. DIAZ:**  I agree with everything that Martha said.  I do want
45 to comment the shrimp industry, and I like this option, because
46 most of the vessels have this on the boat, and it would be the
47 least impact, I think, to the shrimp fishery, and my only
48 concern is, and I would hope that folks from the Science Center

1  -- I know they're talking right now, but I would really like
2  them to hear what I have to say.
3
4  Dr. Porch and Andy, I would hope that folks from the Science
5  Center and NOAA -- If you all have any pause about whether this
6  is ultimately a viable end solution, to voice it now, because I
7  want to support the motion, and I like what the industry is
8  doing, and I see a lot of good reasons to do this, but we're
9  fixing to spend $350,000, and I want to make sure that it's a
10 viable option, and so, if you have any pause, I would rather
11 hear it before we vote than after, but, anyway, I will stop
12 there.
13
14 **CHAIRMAN FRAZER:**  Go ahead, Mr. Strelcheck.
15
16 **MR. STRELCHECK:**  First, I'm going to abstain from the vote, but
17 I will let you know my perspective on it.  Like you guys, I am
18 very appreciative of the industry's efforts in thinking outside
19 the box, and I think we've done a great job on that, and I
20 really think that that that's a great path to be going down.
21
22 My concern here is a couple of things.  One is that, by funding
23 this project, will it meet the standard requirements ultimately
24 approved by this council, or ultimately that is required by the
25 agency, for vessel monitoring system requirements, and that's a
26 big unknown right now.  We're still working on this action.
27
28 The other thing that I was just briefly talking to Clay about
29 was kind of timing of this proposal and when the results are
30 available, and then that can, obviously, influence management
31 and management changes, assuming that this is a viable path
32 forward, and so this potentially extends the timeframe in which
33 these 3G units would be in place and we're using the SD cards
34 for an extended period of time, and that's possible, if we think
35 we need to do that, to go that way, but those are at least some
36 of the reservations I have, but certainly I do not oppose this,
37 and I'm just going to abstain from consideration.
38
39 **CHAIRMAN FRAZER:**  Okay.  Mr. Anson.
40
41 **MR. ANSON:**  I was going to say the same thing as Andy did, his
42 second point there, regarding this other framework action that
43 we're doing and the regulation and how this proposal would match
44 up with what we end up with in that document and that
45 discussion, as we go forward, and I think it was brought up at
46 the last meeting, or maybe two meetings before, about the
47 concern that I had mentioned regarding the proprietorship of the
48 data, if you will, in that it will go to a single vendor, and

101

0003967

1   future access to this, as the program gets upgraded and such.
2
3   I'm not familiar with the P-Sea WindPlot and whether or not your
4   machine, after five years, is no longer good, or you can
5   continually receive updates, but I'm just making sure that,
6   whatever application that they come up with, it is available as
7   part of future units, or future upgrades, the software and those
8   kinds of things.  That's just a concern that I have, if we go to
9   the single-source proprietorship, and maybe, if we can provide
10  that in the language, or include that in the language proposed.
11
12  **CHAIRMAN FRAZER:**  Thank you, Mr. Anson.  Ms. Boggs.
13
14  **MS. BOGGS:**  To that point, if you look down in the proposed plan
15  of work, the proposed work should clearly define methodologies
16  meant for meeting the NMFS software and hardware requirements
17  approval process, and so I think, the way I read this, the
18  intent is that they work with NMFS and that work collaboratively
19  to come up with the way that this will work for both parties
20  involved.
21
22  **CHAIRMAN FRAZER:**  Dr. Porch.
23
24  **DR. PORCH:**  Thank you.  From the science perspective, we're not
25  particularly worried about vendors.  I mean, whatever vendor
26  meets the requirements is fine with us, and so, I mean, if it
27  ends up going to P-Sea WindPlot or whatever, that doesn't really
28  matter to us, and we just need the information, the vessel
29  position information, every ten minutes, as we talked about, so
30  it meets the requirements of the algorithm we have to figure out
31  what shrimping effort is.
32
33  We think it's very important to expand the effort reporting,
34  because, right now, it's just a big sub-sample of the fleet, the
35  same people, the same percentage of people, and that really
36  either has to be a change every year, in a representative random
37  stratified fashion, or it needs to be a sample of the entire
38  fleet, and, obviously, if it's not a sample, it should be a
39  census of the entire fleet, everybody reporting, and that would
40  be our preference.  That way, we're sure we have the best effort
41  data possible.
42
43  **CHAIRMAN FRAZER:**  Dr. Simmons.
44
45  **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Chair.  I have a
46  question, and I guess it would be for Mr. Strelcheck or Dr.
47  Porch.  How long after I guess the vendors -- How long does it
48  take the vendors to modify the software to meet the needs of the
                              102

1  shrimp industry?  Is that after the council takes final action
2  to implement these changes, or are you guys working on that now
3  and think that that will occur before the council takes action?
4  Thank you.
5
6  **MR. STRELCHECK:**  Carrie, I'm not fully clear, in terms of the
7  question, and so, in terms of the hardware, the VMS units
8  themselves, the type-approval standards we have in place
9  currently allow for adjustment in the ping rate, and so a VMS
10 box that's approved I think is required to meet a ping rate of
11 anywhere between five minutes and twenty-four hours, and that
12 may not be exact on those numbers, and so that's just an
13 adjustment with the actual hardware itself.
14
15 In terms of the software and the data formats, we will have to
16 meet the standards of the agency for submitting data to us and
17 ensuring that it's compatible, obviously, with the effort
18 software that the Science Center runs to estimate shrimp effort,
19 and so does that answer your question?
20
21 **EXECUTIVE DIRECTOR SIMMONS:**  So you're saying that the vendors
22 currently are able to adapt to the ten-minute pings and able to
23 hold this amount of data for thirty days at-sea, based on the
24 current hardware and software that we have that's approved by
25 NMFS?
26
27 **MR. STRELCHECK:**  So definitely, with regard to the change in
28 ping rate, yes.  With regard to the holding of data, I know Ms.
29 Bosarge raised that issue as part of her suggestion, in terms of
30 the standards that would best meet the shrimp industry, that it
31 would need to have a greater storage capacity.
32
33 The way our regulations are written is that the minimum
34 standard, but I can't confirm for you today whether or not the
35 cellular devices that are approved, or in the process of being
36 approved, are well above that minimum standard, but I expect
37 that that is the case, but, where that is relative to collecting
38 data for thirty days, I don't know.
39
40 **CHAIRMAN FRAZER:**  Ms. Bosarge.
41
42 **MS. BOSARGE:**  We're kind of getting off the topic of this
43 motion, but I think it's still a good time, and so, Andy, when
44 will you start taking at least the one vendor that's already
45 approved and taking their data and actually seeing if it is in
46 fact easily or able to be adapted or whatever to be compatible
47 with the shrimp effort algorithm, because, when they were
48 approved, what they were approved based on was that their data

103

1  would be compatible with the NOAA OLE VMS monitoring software,
2  and so when will we start that, because that's important to know
3  what vendors we actually have available to work with.
4
5  This will, and we know that, and we've already tested that with
6  P-Sea WindPlot, and so we know that it's compatible with the
7  shrimp effort algorithm software, but, for the other cellular
8  options, when will we start that?
9
10 **CHAIRMAN FRAZER:**  Andy.
11
12 **MR. STRELCHECK:**  Well, I mean, I can't speak for the Science
13 Center.  I know that, when we were communicating with other
14 industry members, we heard concerns along this very line, and
15 the agency did respond back that we were are willing to,
16 obviously, test these devices on shrimp vessels and ensure their
17 compatibility with our effort data collection system, and so, in
18 terms of the primary requirement, I can talk with Clay and the
19 Science Center, and we can come back to the council in August
20 with a more definitive answer for you.
21
22 **CHAIRMAN FRAZER:**  Dr. Porch.
23
24 **DR. PORCH:**  I mean, if we're just talking about whether they can
25 produce the information in ten-minute intervals and just give us
26 the lat-long is a format thing, and so it's rather simple, and
27 there's nothing really much to test.  We just need the lat-longs
28 at the appropriate intervals.  I am not quite sure what the
29 question is, but if it was an operational way to get the
30 hardware working and put it on the boat, that's one thing, but
31 just getting the information is a pretty simple process, and
32 there's not really anything to test.
33
34 **CHAIRMAN FRAZER:**  Ms. Bosarge and then Dr. Simmons.
35
36 **MS. BOSARGE:**  Well, so then can we just get a chunk of this
37 information and plug it into the shrimp algorithm, because it
38 seems like maybe there is nothing to test, but I would like to
39 know.
40
41 Sometimes it's not as easy as -- You know, I mean, we have lots
42 of different data collection program systems, and, when you go
43 to plug them into a model, for some reason, things don't always
44 jibe, and I would like to actually test it before we start
45 putting -- Saying it's approved and telling our fleet to install
46 this device and run it, and then we start receiving data, and
47 we're like, oops, well, I think we're going to have to hire some
48 IT people to work on this algorithm to actually get it to work,

104

1   and, Clay, I would just like to know, and I would like to test
2   it before we get there.   Just run it through there and show me
3   that it works.
4
5   **CHAIRMAN FRAZER:**   Okay.   I don't think we're going to resolve
6   this at this meeting, and so I'm going to see if there's any
7   more discussion that is directly related to the motion on the
8   board.
9
10  I will re-read the motion, to make sure everybody is clear and
11  it's in the record.   **The motion is to fund a call for proposals**
12  **for expanding sampling of the fleet for effort monitoring in the**
13  **Gulf of Mexico federally-permitted shrimp industry as presented**
14  **in Tab G, Number 5(b).**   We have had a second already, and a
15  substantial amount of discussion.   **All those in favor of the**
16  **motion, raise your hand, eleven in the room and on the call**
17  **three additional.   The motion carries with fourteen.   Andy**
18  **abstained.**   We are missing a vote, and so there's no opposition
19  right, other than the two abstentions?   Okay.   There is no one
20  opposed.   **It's fifteen to zero with two abstentions.   Again,**
21  **we'll move on.   This motion carried fifteen to zero with two**
22  **abstentions.**   Mr. Dyskow, I will turn it back to you.
23
24  **MR.   DYSKOW:**   Thank   you,   Mr.   Chair.   The   next   item   is
25  Modification of SOPPs for SSC Voting Practices.   This is Tab G,
26  Number 6.   Staff presented a draft document intended to address
27  the   peer   review   responsibilities   and   to   document   best   voting
28  practices for the SSC.
29
30  The committee reviewed the document.   A committee member offered
31  to share a document about the peer review process from the South
32  Atlantic   Council   for   consideration   of   additional   material   to
33  include.   Staff will continue to revise the document and plans
34  to discuss it with the SSC members during the August 3 through
35  5, 2021 meeting.
36
37  The   last   item   is   NMFS   Fishery   Management   Council   Financial
38  Disclosure and Recusal, which is Tab G, Number 7.   This was an
39  informational presentation of NMFS Draft Policy 01-116 and NMFS
40  Draft   Procedure   01-116-01.   These   documents   are   intended   to
41  provide   policy   guidance   on   the   review   of   financial   disclosures
42  submitted by members of the SSCs and by appointed members of the
43  fishery   management   councils,   as   well   as   the   preparation   and
44  issuance   of   recusal   determinations.   Responsive   to   these   new
45  procedures,   the   completed   statement   of   financial   interest   forms
46  of   the   SSC   members   will   now   be   posted   online   on   the   council
47  website.   Mr. Chair, this concludes my report.
48

1    **CHAIRMAN FRAZER:**  Thank you, Mr. Dyskow.  Mr. Diaz, do you have
2    a question?
3
4    **MR. DIAZ:**  I have a comment, but I don't think this requires a
5    motion, but I would ask that, the next time that the
6    Administrative Budget Committee meets, if we could get the
7    council to bring us an analysis of SSC pay.  I don't think we've
8    looked at it or done anything with it since 2014, and I would
9    like them to bring us a report on it and maybe let us know what
10   we pay our SSC as compared to what other councils pay their SSC.
11   If it requires a motion, I will put it in a motion, but
12   hopefully it's just a request that is followed up on.
13
14   **CHAIRMAN FRAZER:**  Dr. Simmons.
15
16   **EXECUTIVE DIRECTOR:**  Thank you, Mr. Chair.  Yes, we can
17   certainly do that, and we can bring some projections on how that
18   would influence the budget as well.  Thank you.
19
20   **CHAIRMAN FRAZER:**  Okay.  I don't think it actually needs a
21   motion, Dale.  We'll be good to go.  Is there any other matters
22   that need to be discussed related to administration or budget?
23   All right.  Not seeing any, thank you again, Mr. Dyskow.  We
24   will move forward with our next committee report, and that will
25   be the Mackerel Committee.  Kevin, are you going to read that
26   report?
27
28   **MR. ANSON:**  I believe so, yes.
29
30   **CHAIRMAN FRAZER:**  Okay.  Kevin Anson, take it away.
31
32                    **MACKEREL COMMITTEE REPORT**
33
34   **MR. ANSON:**  This the Mackerel Committee Report for the Mackerel
35   Committee meeting that was held on June 22, 2021.  The committee
36   adopted the agenda, Tab C, Number 1, as written and approved the
37   minutes, Tab C, Number 2, of the April 2021 meeting, as amended.
38
39   Coastal Migratory Pelagics Landings Update, Ms. Kelli O'Donnell
40   from the NMFS Southeast Regional Office reviewed the recent
41   landings for the Gulf migratory groups of cobia, king mackerel,
42   and Spanish mackerel.  Combined recreational and commercial 2020
43   preliminary landings for Gulf Zone cobia are lower than in 2017
44   through 2019.
45
46   Florida East Coast (FLEC) Zone cobia commercial landings for
47   2020 are lower than 2019, and preliminary landings for 2021 are
48   lower than those in 2020 for the same time period.  FLEC Zone

                                   106

0003972

1  recreational landings in 2020 fall within the average landings
2  from the years 2017 through 2020.
3
4  For the Gulf king mackerel commercial sector, the Northern Zone
5  has exceeded its quota, and a closure will be noticed.
6  Recreational Gulf king mackerel landings follow a similar trend
7  to that of recent fishing years and still remain below the
8  recreational ACL.  Preliminary data for the 2020/2021 fishing
9  year suggest lower landings compared to previous years.  Spanish
10 mackerel landings for the 2020/2021 fishing year suggest lower
11 landings when compared to 2017 through 2019.
12
13 Draft Amendment 32: Modifications to the Gulf of Mexico
14 Migratory Group Cobia Catch Limits, Possession Limits, Size
15 Limits, and Framework Procedure, and South Atlantic
16 Recommendations, Tab C, Number 5, council staff presented an
17 updated version of CMP Amendment 32, which examines Gulf
18 migratory group cobia (Gulf Group Cobia) catch limits,
19 possession limits, size limits and modifications to the CMP
20 framework procedure.
21
22 This draft includes revised data analyses pertaining to
23 modifications to the possession limits and the potential to meet
24 or exceed catch limits under the proposed range of actions and
25 alternatives.     Council staff also highlighted the
26 recommendations made by the South Atlantic Fishery Management
27 Council during its June 2021 meeting.
28
29 Action 1 would modify the Gulf group cobia catch limits.  Both
30 councils concur on selecting Alternative 2 as preferred.  A
31 committee member inquired about the catch limits that will be
32 put in place at the time of implementation.  Given the current
33 schedule of this amendment, it is likely that the catch limits
34 recommended for 2022 and 2023 and subsequent years would be
35 implemented during future rulemaking if the councils take final
36 action on CMP Amendment 32.
37
38 Action 2 explores the apportionment between the Gulf and FLEC
39 Zones.  Both councils concur on Preferred Alternative 3, which
40 would modify the Zone apportionment to 63 percent for the Gulf
41 Zone and 37 percent for the FLEC Zone, and incorporate the
42 transition to the Marine Recreational Information Program's
43 Fishing Effort Survey (MRIP-FES) data currency.  At its June
44 2021 meeting, the South Atlantic Fishery Management Council
45 concurred with the Gulf Council in moving Alternative 4 to
46 Considered but Rejected.
47
48 Action 3 proposes to modify the sector allocations in the FLEC

107

1   Zone.  The Gulf Zone manages its cobia as a single stock, and,
2   thus, it is not included in this action.  At its June 2021
3   meeting, the South Atlantic Fishery Management Council selected
4   Alternative 3 as preferred, as it is very close to Alternative
5   4, and it would retain the commercial quota close to the current
6   poundage held by that sector.
7
8   Under the proposed changes, the commercial sector is not
9   predicted to meet or exceed their annual catch limit (ACL).  As
10  this action pertains to the management of cobia within the South
11  Atlantic Fishery Management Council's jurisdiction, the
12  committee concurred with the South Atlantic Fishery Management
13  Council's preferred alternative.
14
15  **The committee recommends, and I so move, in Action 3, to make**
16  **Alternative 3 the preferred alternative.  Alternative 3 is**
17  **retain the FLEC Zone cobia ACL allocation of 8 percent to the**
18  **commercial sector and 92 percent to the recreational sector and**
19  **update the ACLs selected in Action 2 based on MRIP-FES landings.**
20  The motion carried without opposition.
21
22  **CHAIRMAN FRAZER:**  All right.  Thank you, Mr. Anson.  Again, we
23  have a committee motion on the board that carried without
24  opposition.  Is there any further discussion of the motion?  Mr.
25  Swindell.
26
27  **MR. SWINDELL:**  Yes, Mr. Chairman.  I am having a lot of trouble
28  here lately trying to understand the use of the FES system for
29  determining the recreational landings.  I have asked several
30  people, and has the SSC really approved the use of the FES
31  system, and what I think I'm understanding, perhaps, is that
32  that's the system that NMFS is providing, that the SSC has no
33  option but to accept it, because that's the system that is now
34  being used.
35
36  I would love to have the SSC really look into the details of
37  using the FES, versus the MRIP system that we were using prior
38  to, and it's my understanding that I don't think the SSC has had
39  a full discussion about the difference between the two and
40  whether they really recognize that this is indeed a better
41  system to use.
42
43  I think they've just had to accept the fact that NMFS is now
44  using it, and so we have to use that as the best data that's
45  available, and so I'm having trouble with anytime we're using
46  the FES landings to really come up and say this is indeed what
47  we should be doing, and so I'm going to vote against this
48  motion.  Thank you.

0003974

```
 1
 2  CHAIRMAN FRAZER:  Okay.  Dr. Porch.
 3
 4  DR. PORCH:  Thank you.  Just to clarify, the FES is actually the
 5  only viable option at this point.  The old Coastal Household
 6  Telephone Survey doesn't apply anymore, and the sampling frame
 7  has changed so much.  I mean, nobody uses their landlines
 8  anymore, and so it's just not viable, and the agency does not
 9  maintain the estimates from that system, and we're not doing the
10  telephone calls, and so you just can't even do, and it would be
11  very, very biased, and so it's not an option.
12
13  I will say that the FES is a response to the NRC review that
14  happened quite a few years ago, and the SSC has looked at that,
15  and that information is available, and just to reiterate that it
16  really is the only game in town at this point, because we're not
17  doing the Coastal Household Telephone Survey.
18
19  CHAIRMAN FRAZER:  Mr. Swindell, to that point?
20
21  MR. SWINDELL:  But has our SSC really taken any action that they
22  have said, yes, this is by far the best system of the data
23  collection that we have to use, or is it just being put out
24  there as this is now what we're using, people, and so you have
25  to use this, and you have no other way to have any other data
26  collection, and am I correct?
27
28  CHAIRMAN FRAZER:  Real quick, and I see a number of people want
29  to weigh-in on this, and so the SSC has determined that the FES,
30  data that are generated through the FES program, essentially,
31  are the best available information, and so, with that said, I
32  will go to Martha and then Andy.
33
34  MS. GUYAS:  I was just going to say that, and so this came up in
35  Reef Fish, and Dr. Lorenzen, you might remember, came up to the
36  mic and said they have determined that this is BSIA.  They have
37  -- Some of you all, I'm sure, were on that webinar during the
38  past -- I don't know, but this COVID window, and they had a
39  webinar about this, basically about FES, and they got into the
40  weeds a little bit, and so I feel like they have had that
41  review.
42
43  They did suggest some things that they wanted to look, or I
44  guess wanted the agency to investigate further, and I don't know
45  what the status of those projects are, but, I mean, we have that
46  determination from the agency, and we have that determination
47  from the SSC, and so this is where we're at.
48
```

0003975

1   **CHAIRMAN FRAZER:**  Mr. Strelcheck.
2
3   **MR. STRELCHECK:**  I was going to make a similar comment to Martha
4   and just note that the SSC did meet last July and specifically
5   had a workshop regarding FES, and they discussed this in much
6   more detail, and Martha is correct, and, obviously, there's a
7   meeting summary, and meeting minutes, and they made some
8   additional recommendations, but they did review this
9   extensively.
10
11  **CHAIRMAN FRAZER:**  Mr. Swindell and then Ms. Bosarge.
12
13  **MR. SWINDELL:**  Yes, and I have sat, just recently, in fact, last
14  night, going through the July verbatim minutes, and never did
15  the SSC come up and make a motion to say that we accept this as
16  the change.  I mean, they have maybe discussed it, but, again, I
17  think it is just being pushed down their throat as the system
18  that is available for use.  Thank you.
19
20  **CHAIRMAN FRAZER:**  Real quick, and I know you have your hand up,
21  Ms. Bosarge, but Mr. Rindone has staffed those meetings.  Ryan.
22
23  **MR. RINDONE:**  Sure.  Thank you, Mr. Chair.  Mr. Swindell, the
24  SSC, in reviewing the information for these different species
25  for these stock assessments -- Like Dr. Porch indicated, the
26  recreational data are provided through this program, and right
27  now only through this program, for the species that have been
28  reviewed so far, which include vermilion snapper, lane snapper,
29  red grouper, cobia, and king mackerel, and there isn't another
30  data collection system for the recreational data that is
31  comprehensive for the Gulf of Mexico to use for those species,
32  and so, as it pertains to those species, the SSC has passed
33  motions that say that those assessments, using the FES data,
34  represent the best scientific information available.
35
36  You're correct in that they haven't made an umbrella statement
37  about the program as a whole, but, every time the data have been
38  presented to them as part of a comprehensive stock assessment
39  for a species, they have accepted that assessment using those
40  data as BSIA.
41
42  **CHAIRMAN FRAZER:**  Okay.  Mr. Swindell.
43
44  **MR. SWINDELL:**  But did they have an opportunity and discussion
45  looking at both options of the two systems for that data, with
46  the data collected the only way or the data only presented in
47  that FES format?
48

1   **MR. RINDONE:**  Yes, sir, they did.  When they had that workshop,
2   they were presented with all of the information about the old
3   Coastal Household Telephone Survey and a comparison of that
4   system against the Fishing Effort Survey, and there was no real
5   question that the methods that are being used as part of the
6   Fishing Effort Survey are definitely superior to those that were
7   used for the Coastal Household Telephone Survey, because of
8   several biases that are addressed and fixed as part of the
9   Fishing Effort Survey, and Dr. Porch touched on a couple of
10  those.

12  **CHAIRMAN FRAZER:**  Ms. Bosarge.

14  **MS. BOSARGE:**  So I hear where everybody is coming from, and it's
15  really not to the motion on the board, Mr. Chairman, and so I
16  will be very brief, and so I think the SSC has had quite a few
17  meetings where they actually looked at, number one, CHTS versus
18  FES, and I think they agreed that FES was better than CHTS, but
19  that's MRIP compared to MRIP.

21  Then they have also had meetings where they looked at state data
22  collection programs for certain species, which we do have Gulf-
23  wide, versus FES, and, in those meetings, they did not make a
24  motion that said that FES was the best scientific information
25  available, in their opinion, when they had compared it to state
26  data, and so they have made motions where they accept a stock
27  assessment as BSIA, but they have had ample opportunity to make
28  and pass motions that MRIP-FES, in general, is BSIA, and they
29  have chosen not to do that.

31  I know it's a nuance, but does that mean it's not BSIA?  It just
32  means that our SSC has not declared it BSIA.  The agency has
33  reviewed FES, and obviously said, in their opinion, that it's
34  BSIA, and so that's just a little nuance there.

36  **CHAIRMAN FRAZER:**  To that point, and then we're going to wrap it
37  up.  Ryan Rindone.

39  **MR. RINDONE:**  Yes, sir, Mr. Chair.  The prerogative, the legal
40  prerogative, for determining whether it's BSIA falls to the
41  agency and not the SSC.  The SSC makes a recommendation that
42  something is or is not the best scientific information
43  available, but, ultimately, NMFS has to defend that, and so it's
44  their responsibility to make that final determination of what is
45  the best scientific information available.

47  **CHAIRMAN FRAZER:**  Thank you, Mr. Rindone.  Okay.  Again, we have
48  a motion on the board, a committee motion, and it passed without

0003977

1 opposition, but I understand that Mr. Swindell is likely to be
2 opposed. **All those in favor, raise your hand; those in the**
3 **virtual world; all those opposed, raise your hand, two opposed.**
4 **The motion carries.** Mr. Anson.
5
6 **MR. ANSON:** Action 4 explores updating the established annual
7 catch targets (ACT) for the Gulf and FLEC Zones. In the FLEC
8 Zone, only the recreational sector has an ACT. At its June 2021
9 meeting, the South Atlantic Fishery Management Council selected
10 Alternative 2 as preferred. This alternative proposes that the
11 Gulf Zone and recreational FLEC Zone ACT be calculated using the
12 Gulf Council's ACL/ACT Control Rule.
13
14 The South Atlantic Fishery Management Council recommended
15 consistency in the way the ACTs are calculated for both zones.
16 The South Atlantic Fishery Management Council did not select
17 Alternative 3 as a preferred, as the accountability measures for
18 the commercial sector in the FLEC Zone are not tied to an ACT,
19 thus requiring a new action to be included in this amendment.
20
21 Closure analyses suggest the FLEC Zone commercial sector
22 landings would remain below that sector's ACL. Under
23 Alternative 2, the ACT for the Gulf and recreational FLEC Zone
24 will be 90 percent of their respective ACLs. Under the current
25 preferred apportionment for the Gulf Zone, for example 63
26 percent Gulf Zone and 37 percent FLEC Zone, the ACT is not
27 predicted to be reached. The committee also selected
28 Alternative 2 as preferred.
29
30 **The committee recommends, and I so move, in Action 4, to make**
31 **Alternative 2 the preferred alternative. Alternative 2 is use**
32 **the Gulf Council's ACL/ACT Control Rule to calculate ACTs for**
33 **the Gulf Zone and the recreational sector in the FLEC Zone.**
34
35 **CHAIRMAN FRAZER:** Okay. Thank you, Mr. Anson. We have that
36 committee motion, and it is up on the board, and it carried
37 without opposition. Is there any further discussion of the
38 motion? I am not seeing any hands. **Is there any opposition to**
39 **the motion? I am not hearing or seeing any, and the motion**
40 **carries.** Mr. Anson.
41
42 **MR. ANSON:** Action 5 has been split into sub-actions to address
43 changes to possession, vessel, and trip limits by zone. At its
44 June 2021 meeting, the South Atlantic Fishery Management Council
45 maintained its current preferred alternatives, including
46 reducing the daily possession limit to one fish for the
47 commercial sector, Alternative 2, Option 2b. The Gulf Council
48 had de-selected this option as a preferred, due to the low

0003978

1  predicted reduction in cobia harvest by that sector.
2
3  The South Atlantic Fishery Management Council's preferred
4  alternatives for Action 5.1, the Gulf Zone, match those in
5  Action 5.2, the FLEC Zone, due to the overfishing status of the
6  stock and for consistency in regulations between the zones, as
7  well as consistency between federal and Florida state waters.
8
9  The committee discussed at length the possibility of adopting a
10  less-conservative alternative for the commercial sector, as the
11  data analyzed from 2017 to 2019 do not predict a large reduction
12  in cobia harvest.  The committee also mentioned that there is a
13  benefit in taking a conservative approach, since stakeholders
14  have mentioned the decline in opportunity to harvest cobia, and
15  the opportunity to catch this fish might change as the stock
16  recovers.
17
18  **The committee recommends, and I so move, in Action 5.1 to make**
19  **Alternative 2, Option 2b, the preferred alternative.  Preferred**
20  **Alternative 2 is reduce the daily possession limit to one fish**
21  **per person, regardless of the number or duration of trips.**
22  **Option 2b is for the commercial sector.**
23
24  **CHAIRMAN FRAZER:**  Thank you, Mr. Anson.  We have the committee
25  motion on the board.  Is there further discussion of the motion?
26  Anybody out there on the computer?  I am not seeing any there.
27  Okay.  **All of those in favor of this motion, raise your hand, we**
28  **have eleven yes in the room, three on the board; all those**
29  **opposed, one opposed.  The motion carries.**  Mr. Anson.
30
31  **MR. ANSON:**  In Action 6, both councils concur on retaining the
32  thirty-six-inch fork length minimum size limit in the Gulf Zone
33  and increasing the size limit in the FLEC Zone from thirty-three
34  inches fork length to thirty-six inches fork length.  Council
35  staff reminded the committee that, at this time, it is difficult
36  to determine, with much certainty, the effects of the recent
37  minimum size limit increase to thirty-six inches fork length in
38  the Gulf Zone, as this was just implemented in March 2020.
39
40  Action 7 proposes modifications to the language in the CMP
41  framework procedure to allow the South Atlantic Fishery
42  Management Council to independently approve certain management
43  measures that affect fishing within its jurisdiction for CMP
44  species.  The language included in this draft was modified for
45  clarity based on comments received from both councils.
46
47  At its June 2021 meeting, the South Atlantic Fishery Management
48  Council selected the amended Alternative 2 as its preferred

113

1  alternative.    The   language   in   this   alternative   outlined
2  additional  management  measures  that  the  South  Atlantic  Fishery
3  Management  Council  can  address  for  the  management  of  FLEC  Zone
4  cobia  via  framework  amendments.    The  committee  agreed  that  the
5  new   language   reduces   confusion   in   contrast   to   how   it   was
6  originally  drafted  and  approved  in  the  April  2021  version  of  the
7  draft.
8
9  **The  committee  recommends,  and  I  so  move,  in  Action  7  to  make  the**
10 **amended  Alternative  2  the  preferred  alternative.    Alternative  2**
11 **is  modify  the  framework  procedure  to  update  the  responsibilities**
12 **of  each  council  for  setting  regulations  for  the  Gulf  group**
13 **cobia.    The  responsibilities  of  each  council  would  be  modified**
14 **as  follows:  1.  Recommendations  with  respect  to  the  Atlantic**
15 **migratory  groups  of  king  mackerel  and  Spanish  mackerel  and  cobia**
16 **will  be  the  responsibility  of  the  South  Atlantic  Council  and**
17 **those  for  the  Gulf  migratory  groups  of  king  mackerel,  Spanish**
18 **mackerel,  and  cobia  will  be  the  responsibility  of  the  Gulf**
19 **Council,  with  the  following  exceptions:  a.  The  South  Atlantic**
20 **Council  will  have  the  responsibility  to  set  vessel  trip  limits;**
21 **closed  seasons  or  areas;  gear  restrictions;  per-person  bag  and**
22 **possession   limits;   size   limits;   in-season   and   post-season**
23 **accountability  measures;  specification  of  ACTs  or  sector  ACTs**
24 **for  the  east  coast  of  Florida,  including  the  Atlantic  side  of**
25 **the  Florida  Keys  for  Gulf  migratory  group  cobia,  for  example  the**
26 **Florida  East  Coast  Zone);  2.  Both  councils  must  concur  on**
27 **recommendations  that  affect  both  migratory  groups.**
28
29 CHAIRMAN  FRAZER:   Okay.   Thank  you,  Mr.  Anson.   That  was  a  long
30 motion.   I  am  not  going  to  repeat  it,  but  it's  up  on  the  board,
31 and  it  carried  without  opposition  from  the  committee.   Is  there
32 any  further  discussion  of  the  motion?   I  am  not  seeing  any.   **Is**
33 **there  any  opposition  to  the  motion?   I  am  not  seeing  any,  and**
34 **the  motion  carries.**   Mr.  Anson.
35
36 **MR.  ANSON:**   A  public  hearing  draft  of  this  amendment  is
37 scheduled  to  come  to  the  Gulf  Council  in  August  and  to  the  South
38 Atlantic  Fishery  Management  Council  in  September  2021.   The
39 council  should  discuss  the  need  for  in-person  public  hearings
40 and  identify  a  plan  at  this  meeting,  so  that  staff  can  work  on
41 logistics.
42
43 Draft  Amendment  33:  Modifications  to  the  Gulf  of  Mexico
44 Migratory  Group  King  Mackerel  Catch  Limits  and  Sector
45 Allocations,  Tab  C,  Number  6  --
46
47 **CHAIRMAN  FRAZER:**   Hold  on  real  quick,  Kevin.   There's  a  little
48 bit  of  a  question  here.   Martha,  did  you  have  a  --

114

1
2  **MS. GUYAS:**  We just probably need to pause here.  Based on the
3  last paragraph of the cobia section here, we need to talk about
4  logistics for public hearings.
5
6  **CHAIRMAN FRAZER:**  Go ahead, Dr. Simmons.
7
8  **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Chair, and so we've
9  been trying to plan about two meetings out.  If you want to
10  consider hold in-person public hearings, we would kind of need
11  to identify that information now, for us for planning, and, if
12  you do, where you would like to hold those, so we can start
13  planning.  Thank you.
14
15  **CHAIRMAN FRAZER:**  Okay.  Ms. Boggs.
16
17  **MS. BOGGS:**  I think, for the Northern Zone, up in our area,
18  maybe Pensacola would be good, and then you could attract Orange
19  Beach and Destin, and maybe even some of the Panama City folks,
20  but I am trying to think of the central locations, so you don't
21  have to have as many meetings and yet get a pretty good response
22  to the meetings, as opposed to Orange Beach, Destin, and Panama
23  City.  Thank you.
24
25  **CHAIRMAN FRAZER:**  Okay.  Thank you, Ms. Boggs, for that
26  suggestion.  Are there others?  Ms. Guyas.
27
28  **MS. GUYAS:**  I will jump in, and the other Florida folks feel
29  free to jump in too, but I think, if we did something like that
30  in Pensacola, that's probably fine.  I'm assuming that we'll do
31  virtual, like we always do, and have the video posted.  We
32  definitely need something around Tampa Bay, and I will leave it
33  up to you all to figure out what city is best.  It might be good
34  to do something in southwest Florida.  What do you think, Phil?
35
36  **MR. DYSKOW:**  Well, I'm not sure.  It would have to be Naples or
37  Fort Myers.  I don't think it would make sense to go any farther
38  south than that, and there's plenty of site options available.
39  We have good representation of commercial anglers in both of
40  those locations, and rec anglers, and so you should get a good
41  group at either one you pick.
42
43  **CHAIRMAN FRAZER:**  Thank you, Phil, for that input.  Any other
44  suggestions for the staff?  Okay.  Mr. Diaz.  Go ahead, Mr.
45  Burris.
46
47  **MR. BURRIS:**  Thank you, Mr. Chairman.  Is there any way that we
48  can do any meetings over towards the western Gulf, like Biloxi

0003981

1  or somewhere like that?
2
3  **CHAIRMAN FRAZER:**  I am just thinking about potential locations
4  that are going to be likely to attract an appropriate number of
5  folks, I guess, and it's relatively easy to access, and I will
6  leave it -- That's your neck of the woods, and is Biloxi the
7  best place for it?
8
9  **MR. BURRIS:**  Yes, Biloxi or Gulfport.
10
11  **CHAIRMAN FRAZER:**  Mr. Riechers.
12
13  **MR. RIECHERS:**  Thank you.  Well, obviously, and, Carrie, I will
14  leave this to you and your staff, to some degree, when you're
15  thinking about also having webinars, but, if you're going to
16  come to Texas, you've really got to go to two locations, just
17  because of the geographic distance between them.  Somewhere in
18  the neck of the woods of Galveston, and I don't want to make
19  Galveston proper the only location, but it would probably be a
20  good one, but, given size of rooms, and you're just going to
21  have to think through those things, and so I'm giving you some
22  flexibility there.  I know we've done them off the island as
23  well, up in the La Marque area, but then also something down in
24  the Corpus Christi/Port Aransas area.
25
26  **CHAIRMAN FRAZER:**  Okay.  Thank you, Robin.  So we've got a
27  number of potential in-person meeting locations, and I see J.D.
28  has his hand up as well.
29
30  **MR. DUGAS:**  I have a question.  The in-person meetings, will
31  they be via computer as well?
32
33  **CHAIRMAN FRAZER:**  Dr. Simmons.
34
35  **EXECUTIVE DIRECTOR SIMMONS:**  We typically do one or the other,
36  and then, when it's a Gulf-wide amendment, we do like a guide
37  for those hearings and a video that we put online, that you can
38  provide written comments on, but, no, we don't stream our in-
39  person public hearings.
40
41  **CHAIRMAN FRAZER:**  Mr. Banks.
42
43  **MR. BANKS:**  We recommend, in Louisiana, to have something in the
44  New Orleans/Kenner/Metairie area.  It's somewhat close to Biloxi
45  and Gulfport, but you're trying to gather folks from Venice as
46  well as Houma, and I think the Venice guys might go to Biloxi,
47  but the Houma guys are not going to go all the way to Biloxi,
48  and so I think that would be good.  The New Orleans area, and

116

1  not the Houma area.  I was trying to get my justification in
2  there.
3
4  **CHAIRMAN FRAZER:**  J.D.
5
6  **MR. DUGAS:**  I think, the last time, we had something up in
7  Kenner.
8
9  **CHAIRMAN FRAZER:**  Yes, and so it's that general geographic
10 region that we're thinking about.  Gotcha.  Ms. Boggs.
11
12 **MS. BOGGS:**  I was trying to ask Kevin something, and maybe
13 Mobile for Alabama, because those folks aren't going to drive --
14 They might go to Gulfport or Biloxi, but maybe Mobile.
15
16 **CHAIRMAN FRAZER:**  All right, and so this is about how I might
17 have expected, and so we're going to sit down with staff, and
18 we're going to kind of determine what the resources look like,
19 both financially and with regard to time, and we'll try to come
20 up with a plan that optimizes our ability to communicate with
21 the stakeholders.  Ms. Guyas.
22
23 **MS. GUYAS:**  Just so I'm clear on the timeline, so we're thinking
24 this would go out to public hearings in October, and is it like
25 before the October council meeting or after, do you think, given
26 that the South Atlantic is going to look at this in September?
27
28 **CHAIRMAN FRAZER:**  Dr. Simmons.
29
30 **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Chair.  We could try
31 to do them before the October council meeting, but, again, we
32 need to look at staffing and see if we'll be able to get that
33 all done, but that would be the goal, and so, if the council did
34 choose to take final action, we could, and, if we don't approve
35 it for public hearings in August and September, then that would
36 push it back.
37
38 **CHAIRMAN FRAZER:**  Okay.  I think we've got a good plan.  You're
39 good, Dr. Simmons?  All right.  Mr. Diaz.
40
41 **MR. DIAZ:**  Before we leave cobia, just a comment on the language
42 of the report.  We did have a lengthy discussion about modifying
43 the vessel limit, and I'm not proposing any motions here, but
44 it's really not referenced in the report, and if staff could add
45 a sentence or two that just said that a discussion did occur and
46 that no changes were made, and that's fine, but we did have a
47 lengthy discussion about that.  Thank you.
48

117

1  **CHAIRMAN FRAZER:**  Okay.  Is everybody agreeable to adding that
2  to the report?  Okay.  Good to go.  Kevin, sorry to cut you off,
3  but I think it was important.  Thank you, Martha, for bringing
4  that to our attention.
5
6  **MR. ANSON:**  Continuing on with Draft Amendment 33, council staff
7  presented options for management alternatives included in CMP
8  Amendment 33, which examines modifications to the Gulf migratory
9  group king mackerel catch limits and sector allocations.  The
10  committee requested that the IPT revise the purpose and need to
11  include a statement about achieving OY on a continuing basis.
12
13  The council's Scientific and Statistical Committee (SSC)
14  recommended revised values for the overfishing limit (OFL) and
15  acceptable biological catch (ABC) for 2021 through 2023 and
16  subsequent years based on the SEDAR 38 update stock assessment,
17  which was completed in 2020, which found the Gulf king mackerel
18  stock to be healthy as of 2017.
19
20  However, while the Gulf king mackerel stock is not overfished,
21  the spawning stock biomass (SSB) is below the SSB at maximum
22  sustainable yield (SSB MSY).  As such, the recommended catch
23  limits increase from 2021 to 2023.
24
25  A committee member noted that the recreational landings data in
26  the MRIP-FES data currency were approximately twice that of the
27  recreational landings data in the MRIP-CHTS data currency.
28  However, the recommended OFL and ABC levels are only slightly
29  higher than the current catch limits.  Staff noted that
30  recruitment for Gulf king mackerel has been lower over the last
31  ten years, which may be contributing to a somewhat depressed
32  observation of the SSB.
33
34  Despite this, the current SSB level is less than the SSB MSY,
35  suggesting the stock has been harvested at a level higher than
36  typical and that, if the recreational ACL had been harvested in
37  that time period, that the stock may have been more depressed
38  than presently observed.
39
40  A committee member asked whether the Southeast Area Monitoring
41  and Assessment Program (SEAMAP) groundfish trawl survey was used
42  as proxy for shrimp trawl bycatch.  The Southeast Fisheries
43  Science Center replied that shrimp bycatch data come from shrimp
44  observer coverage, which is approximately 1 percent of all trips
45  annually, and the SEAMAP groundfish trawl data.
46
47  In the SEDAR 38 update assessment, shrimp bycatch was fixed at a
48  median level for 1975 through 2017, a level which is

0003984

1   approximately three-times higher than estimated in the original
2   SEDAR 38 stock assessment that was completed in 2014.   The
3   increase in the median shrimp bycatch level from the last
4   assessment increased the estimate of virgin biomass for king
5   mackerel, but had less of an effect on the current SSB when
6   combined with other modifications within the update assessment.
7
8   The committee discussed how sector allocation decisions will be
9   biased by the existing allocations and how historic
10  underreporting of harvest makes the interpretation of landings
11  data more difficult.
12
13  A committee member identified discrepancies in the commercial
14  landings data between the previous stock assessment (SEDAR 38)
15  and the tables in CMP Amendment 33 and asked that clarification
16  be provided to the Committee about this discrepancy at the next
17  council meeting.   Differences in these commercial landings data
18  were stated to average approximately 800,000 pounds per year,
19  which the committee member noted could be having an effect on
20  the catch limit recommendations.
21
22  Committee members also expressed concern about the recreational
23  landings data and noted that the uncertainty in those data has
24  increased with the conversion to MRIP-FES.   A committee member
25  recounted that the committee started looking at sector
26  allocations a few years ago, which ultimately led to the
27  increase in the recreational bag limit to three fish per day to
28  increase recreational retention opportunities.   That increase in
29  the recreational bag limit did not appear to meaningfully
30  increase recreational landings since its implementation in May
31  2017.
32
33  An amendment examining an allocation sharing method, CMP
34  Amendment 29, which explored conditionally moving allocation
35  from the recreational sector to the commercial sector, was
36  tabled at the January 2017 council meeting.   The Southeast
37  Fisheries Science Center commented on an analysis provided to
38  the council in April 2021 which used MRIP-FES for recreational
39  landings data in SEDAR 38, which was completed in 2014.   This
40  analysis indicated that the acceptable biological catch (ABC)
41  recommendation from the projections would have been about 50
42  percent higher than that recommended using MRIP-CHTS data for
43  recreational landings.
44
45  **CHAIRMAN FRAZER:**   Mr. Anson, I'm sorry to cut you off, but Ms.
46  Bosarge has a question.
47
48  **MS. BOSARGE:**   Just before you go to the next paragraph in the

1  document, I wanted to make sure -- So John was talking about,
2  during committee, the differences in the historical commercial
3  landings, right, the last allocation document that we looked at
4  for king mackerel and this current document, and I have to admit
5  that I wasn't quite following John, and so I had to do a little
6  homework after that committee meeting, and so I wanted staff to
7  pull that up on the screen, just so that the agency and the
8  Science Center actually knows what our ask is there, because we
9  did ask them to bring us some information and help us understand
10 this.
11
12 They're going to pull up both of these tables side-by-side, and
13 I think, that way, it will be pretty clear on what we need to
14 understand.  We'll give them just a second.  They are going to
15 pull up -- While they're getting it up, they're going to pull up
16 paper page 14 of our current document, Amendment 33, which shows
17 historical commercial landings and recreational landings, and
18 then they're going to pull up paper page 42 of Amendment 26,
19 which was the last allocation amendment that we did on king
20 mackerel.
21
22 The easiest part of these two tables, and that's good.  That
23 gets you close enough.  As long as I can see those blue columns,
24 that will get us there, and so, if you look -- You see the two
25 blue columns, where it's the percent of sector ACL landed, and,
26 on the commercial side, for the current document, which is on
27 the left-hand side, it really looks like we have not been
28 landing the commercial ACL back in time, and it shows like
29 sixty-something percent, all the way until you get to the 2007-
30 type time period, and, even then, we don't get 90 percent until
31 the 2016/2017 season.
32
33 That was not my recollection of how that fishery had been
34 prosecuted, and I think that's what John was getting at during
35 committee, that my recollection was that the commercial sector
36 has been bumping up against their quota for quite some time now,
37 and so, if you look on the right-hand side of the screen, that's
38 the last allocation amendment, and, if you look at the two blue
39 columns, you will see, under the commercial, that it does in
40 fact show what my recollection says, that we're 90 percent or
41 100, or slightly over 100, most years, bumping up against our
42 allocation.
43
44 That is quite a change in our historical commercial landings,
45 and it paints a different picture, and I think we've got to
46 figure out which picture is the true picture, in order to
47 proceed in the right fashion moving forward, and so we would
48 like to know, I guess from Clay's shop, or Andy's shop, and I
                              120

 1  don't know who maintains these, honestly, but how do these
 2  numbers change?  What is the explanation for the change?
 3
 4  **CHAIRMAN FRAZER:**  I am going to first go to Mr. Rindone.
 5
 6  **MR. RINDONE:**  I can answer that, actually.  We've been digging
 7  around with this for the last couple of days, and I sent you
 8  guys a couple of Excel files that I will want you to bring up
 9  that will help clear up some of this.
10
11  Ms. Bosarge is correct that, prior to me, Ms. Sue Gerhart used
12  to curate a list of all the closure dates for all the different
13  commercial king mackerel zones for the Gulf and the Atlantic,
14  and I now curate that dataset, and so it was peculiar that we're
15  having quota closures, and that means the quota must be met, or
16  close to it, and so we dug into this, and, essentially, what you
17  guys were looking at in Amendment 33 originally was the
18  commercial landings data based on the current mixing zone and
19  jurisdictional boundaries, which did not include the Florida
20  east coast, which used to be included all the way up to Volusia
21  County for Gulf king mackerel, as part of the mixing zone.
22
23  Analysis of trip tickets during the SEDAR 38 assessment process
24  found that that mixing zone is actually much smaller, and,
25  basically, it's only occurring south of U.S. 1, from about the
26  council jurisdictional boundary to Dade/Monroe, and so a much
27  smaller area than previous, and it was only about 100,000 pounds
28  through the course of the year that was being split 50/50 in
29  that mixing zone between the councils.
30
31  That's where part of the difference came from, and so what I
32  have done is -- Having looked at the king mackerel ACL
33  percentages landed for a long time, this looks an awful lot more
34  familiar to me, as far as the percentages that were landed every
35  year, and so what I have done here is I have supplanted, for the
36  commercial landings, the landings data that came out of CMP 26,
37  which came from the Science Center, from a data request, when we
38  were doing that amendment, and that did not include the re-
39  delineation of the mixing zone, and so this would have been the
40  landings based on the way that the commercial sector ACL, which
41  there is the 3.456 million pounds, the way that that was set,
42  and so those are now matched, the landings and the ACL, for the
43  spatial area for which they apply.  As you can see, the
44  percentages line up a little bit better.
45
46  An outstanding question though, for the Science Center, would be
47  the difference between the SEDAR 38 and 38 update commercial
48  landings, which -- These can be circulated to you guys here.

0003987

1  This shows the differences in the commercial landings between
2  the SEDAR 38 and 38 update, and you can see that Column B is the
3  handline landings for the Gulf from SEDAR 38, and C is the
4  gillnet, and D is the total for SEDAR 38, and then, likewise,
5  Column E is the handline landings from the update, then gillnet,
6  and then the total, and the commercial landings, as provided for
7  SEDAR 38, are, in some cases, marginally different, and in other
8  cases considerably different, for the years listed.
9
10  I guess the question for the Science Center might be to try to
11  determine why those differences occurred, and I will admit that
12  these data don't include data from the new mixing zone, and
13  those data were listed in the assessment as confidential, due to
14  the number of dealers involved, et cetera, the typical things
15  that make the commercial data confidential, and so the Science
16  Center should have that data.   Given the scale of those
17  landings, I wouldn't expect those to be more than 50,000 to
18  75,000 pounds or so a year, and so, typically, based on the last
19  time that I looked at them.
20
21  **CHAIRMAN FRAZER:**  Okay.  Thank you, Ryan, for doing all of that
22  work behind the scenes.  Hopefully that clarifies some things.
23  Ms. Guyas.
24
25  **MS. GUYAS:**  I appreciate that.  Just given all the zones and the
26  changes in the zones for mackerel over the years on the
27  commercial side, it gets kind of tricky to follow, and so I
28  realize there is some data issues, but I guess, when we talk
29  about this again, and, I mean, I know you'll have this in the
30  document, but it probably would be good to kind of walk through
31  all that context again, just so we can kind of have this in the
32  back of our minds as we're thinking about how to move forward,
33  because mackerel gets complex, and so I feel like, every
34  opportunity where we can, just kind of understand what's
35  happened in the past, and I think it will help us.
36
37  I think we're in a good place, in terms of zone allocations,
38  based on what we did last time around, kind of with what you
39  were saying in committee, and our AP worked together and really
40  figured this out, but we just need to understand some of the
41  history and nuance and why quotas may or may not have been
42  caught based on how the fish are moving through the zones.
43
44  **CHAIRMAN FRAZER:**  Thank you, Ms. Guyas.  I am going to go to Mr.
45  Sanchez.  I think Patrick had his hand up at one point, but go
46  ahead, John.
47
48  **MR. SANCHEZ:**  Thank you.  Yes, this is very confusing, and do
                                    122

```
 1  all these recalculations during the meeting and what have you,
 2  and I would feel better about it if we had either, for the next
 3  meeting, or the next time this is on the agenda, the Science
 4  Center really take a look at this and not rush and give us some
 5  feedback, or the SSC, whoever is appropriate, but just to really
 6  sit down and look at this and explain some of these differences,
 7  and that would make me feel a whole lot better.
 8
 9  CHAIRMAN FRAZER:  Okay.  Ms. Bosarge.
10
11  MS. BOSARGE:  I would agree, especially when you look at it from
12  this angle, just because we did kind of think that the stock
13  assessment might show something a little bit higher, since we
14  had underfishing, and we were putting those higher FES numbers
15  in there, and it wasn't quite as high as what we thought.
16
17  However, I can see here where the numbers, at least what it
18  showed on this spreadsheet that went into the stock assessment,
19  in many cases were a little different than what the historical
20  landings stream is, which I know there is differences in how
21  they do things, but I think it would be good to just let the
22  Science Center or the SSC take a look at it and give us some
23  scientific feedback on, well, this didn't have an impact or it
24  did, whatever the case may be.
25
26  CHAIRMAN FRAZER:  Mr. Sanchez.
27
28  MR. SANCHEZ:  To that point too, and maybe look at, while we're
29  at it, if we're going to go back and look at things, why -- I am
30  not real clear on sometimes the ABC Control Rule is used and
31  other times it's not, and then the numbers kind of move around
32  to address some of the uncertainty, but the differences might be
33  a million pounds, and you know what I mean, and so I would feel
34  better with an understanding of a better in-depth explanation as
35  to we did not use the ABC Control Rule because of this, and be
36  very clear, or even establish that we're going to use it in
37  these instances, and establish some guidelines, or we're using
38  it more uniformly.
39
40  CHAIRMAN FRAZER:  Mr. Rindone, to that point?
41
42  MR. RINDONE:  Yes, sir.  The SSC, obviously, like Dr. Lorenzen
43  said, is looking at revising the ABC Control Rule to do a better
44  job of accounting for scientific uncertainty within the
45  assessments, and they make those determinations based on their
46  review of the assessments as well as input from the Science
47  Center on the translation of the uncertainty that the analysts
48  have identified through the assessment process and the degree to
```

0003989

1  which the analysts think that that has translated into the
2  projections.
3
4  Sometimes the projections don't quite pick up on all the
5  variation that's inherent in the assessment, and so that might
6  drive the SSC to make a recommendation outside of using the ABC
7  Control Rule, and so try not to set the council up for an
8  unrealistic use of their risk tolerance, and so hopefully the
9  SSC will be able to make some good progress over the next few
10 meetings, looking at the ABC Control Rule, and sort of be able
11 to better account for the separation and dual use of both
12 scientific uncertainty and the council's risk tolerance for
13 setting catch limits, but we'll make sure to do a good job of
14 documenting when it is and is not used and why.
15
16 **CHAIRMAN FRAZER:**  All right, and so -- Go ahead, Dr. Porch.
17
18 **DR. PORCH:**  I do want to thank Ryan for the detective work,
19 because the bulk of that difference that he brought up is
20 exactly that mixing zone change, and so the quotas that were set
21 back in time were with the different supposition about the
22 mixing zone and the location of the mixing zone, and so that's
23 right.
24
25 This difference that we're looking at here, I don't quite
26 understand either, because I don't think the assessment showed
27 that big of a difference between the SEDAR 38 and the update.  I
28 mean, they were basically on top of each other, the landings,
29 with very subtle differences, and so we will look into it and
30 see if we can understand where these numbers came from, but my
31 understanding is that, like I said, the SEDAR 38 and the update
32 were really, really close.
33
34 **CHAIRMAN FRAZER:**  All right, and so I think we're good to go
35 here.  What we're going to come back, ultimately, in this
36 document, is with perhaps a better description of the chronology
37 and try to make sure that it's accompanied by an appropriate
38 accounting of the landings as they relate to the ACL, to account
39 for all of that, and so, again, thank you, Ryan, for that work.
40 I really appreciate it.  Mr. Anson, back to you.
41
42 **MR. ANSON:**  The committee discussed Action 2, which examines
43 sector allocations.  The current commercial and recreational
44 sector allocations are based on the average landings from the
45 years 1975 through 1979.  This time period predates the
46 existence of a formal Gulf-wide recreational data collection
47 program, formerly the Marine Recreational Fisheries Statistics
48 Survey, MRFSS, and later MRIP.

                                    124

0003990

As such, landings data from this time period aren't able to be calibrated to MRIP-FES. Staff also noted that, unlike other species for which the council is considering modifying sector allocations, the projected yields for Gulf king mackerel are not dependent on the sector allocations chosen.

Staff added that the CMP Advisory Panel is scheduled to meet in July 2021 to provide advice to the council about approaches for reallocation.

A committee member expressed a desire to optimize yield and suggested some redistribution of allocation to the commercial sector, as appropriate, noting that some portion of the total ACL is still not being harvested, even when using MRIP-FES. The committee member asked to see allocation options to shift some or all of the average foregone yield to the commercial sector, using MRIP-FES calibrated recreational landings against the proposed ACLs in Action 1, and use the percentages of ACLs landed to inform allocation changes.

Draft Amendment 34: Atlantic King Mackerel Catch Levels and Management Measures, Tab C, Number 7, Ms. Christina Wiegand of the South Atlantic Fishery Management Council staff presented the changes being proposed in CMP Amendment 34, which addresses management measures for Atlantic migratory group king mackerel (Atlantic king mackerel).

The SEDAR 38 update, completed in 2020, indicated that the Atlantic king mackerel stock was not overfished and not undergoing overfishing, as of 2017. The updated stock assessment incorporated recreational landings and effort estimates using MRIP-FES.

The purpose of this amendment is to revise Atlantic king mackerel catch levels, increase the recreational bag limit and possession limit, reduce the minimum size limit, and modify the recreational requirements to land Atlantic king mackerel and Atlantic Spanish mackerel with head and fins intact.

Like CMP Amendments 32 and 33, this is a joint plan amendment and both councils must concur on the preferred alternatives before final action. Since the South Atlantic Fishery Management Council requested modifications to the analyses and alternatives listed in this amendment at its June 2021 meeting, the committee decided not to select preferred alternatives at this time and wait until those revisions are completed.

125

1   Ms. Wiegand noted that, historically, the commercial and
2   recreational landings have stayed well below their respective
3   ACLs.  Thus, the alternatives included in this amendment define
4   the ACL as optimum yield (OY).  In Action 1, the committee noted
5   the large increase in the proposed ACLs, as they are almost
6   double the current 12.7-million-pound ACL.  The South Atlantic
7   Fishery Management Council selected Alternative 3 as preferred,
8   which sets the ACL as 95 percent of the ABC.
9
10  The South Atlantic Fishery Management Council's Mackerel Cobia
11  AP recommended that the SAFMC set a buffer between ABC and ACL
12  to be conservative, given the large increase proposed in the
13  ABC.  A committee member asked about the definition of OY and if
14  any economic analyses had been performed to compare the value of
15  the fish between the recreational versus commercial sectors.  At
16  this time, those analyses are not available, but may be
17  possible.
18
19  Action 2 explores revising sector allocations for Atlantic king
20  mackerel.  At its June 2021 meeting, the South Atlantic Fishery
21  Management Council requested an additional alternative be
22  included and selected as preferred.  The new alternative
23  proposes an allocation of 37.1 percent for the commercial sector
24  and 62.2 percent for the recreational sector.  The alternative
25  would retain the current sector allocation, but the ACLs would
26  be updated to incorporate MRIP-FES data currency and the stock
27  ACL selected in Action 1.
28
29  A committee member asked about the landing trends for each
30  sector.  Ms. Wiegand mentioned that the ACL has not been met for
31  both sectors, for example no closures.
32
33  Action 3 would revise the recreational ACT for Atlantic king
34  mackerel.  The South Atlantic Fishery Management Council will
35  revisit this action at its September 2021 meeting, once the
36  analyses are completed based on the preferred alternatives
37  selected by the South Atlantic Fishery Management Council in
38  Actions 1 and 2.  A committee member inquired about the
39  proportional standard error associated with the calculation of
40  the ACT on the various alternatives.  Ms. Wiegand noted that
41  those numbers will be provided in the upcoming analysis.
42
43  Action 4 proposes an increase to the recreational bag limit and
44  possession limit for Atlantic king mackerel in the exclusive
45  economic zone off east Florida.  The SAFMC selected Alternative
46  2, which will increase the recreational bag limit from two to
47  three fish per person in that area.  This alternative was
48  selected to create consistency in the recreational bag limit

0003992

1  throughout the species range.
2
3  Action 5 proposes a reduction of the minimum size limit for
4  Atlantic king mackerel for both sectors.  The purpose of this
5  action is to increase recreational harvest and reduce discards
6  of Atlantic king mackerel.  At its June 2021 meeting, the South
7  Atlantic Fishery Management Council requested that this action
8  be split by sector and selected to reduce the recreational
9  minimum size limit to twenty-two inches fork length.  Comments
10 from the Mackerel-Cobia AP indicated that the commercial sector
11 may not be in support of a reduction in the minimum size limit,
12 as this may affect the value of the fish.
13
14 Action 6 would modify the recreational requirement for Atlantic
15 king mackerel and Atlantic Spanish mackerel to be landed with
16 heads and fins intact.  The purpose of this action is to
17 increase recreational harvest and address increases in shark and
18 barracuda depredation, as noted by the Mackerel Cobia AP.  The
19 commercial sector can already keep damaged fish that comply with
20 the minimum size limit.
21
22 At this time, no alternatives have been selected as preferred,
23 and the South Atlantic Fishery Management Council is considering
24 what conflicts this action may have with regulations in state
25 waters.  A committee member asked if the Law Enforcement AP had
26 raised any concerns regarding this action.  Ms. Wiegand
27 mentioned that the Law Enforcement AP had not raised any
28 concerns, but that more feedback is expected from state
29 agencies.
30
31 A public hearing draft of this amendment will be presented to
32 the South Atlantic Fishery Management Council at its September
33 2021 meeting, and, if approved, final action may take place in
34 December 2021 or March 2022.  An updated version of this
35 document will be presented at the Gulf Council's October 2021
36 meeting.  Mr. Chair, this concludes my report.
37
38 **CHAIRMAN FRAZER:**  Thank you, Mr. Anson.  Is there any further
39 discussion of matters related to the Mackerel Committee?  I am
40 not seeing any interest in pursuing that, and so we will go
41 ahead and take a fifteen-minute break.
42
43 (Whereupon, a brief recess was taken.)
44
45 **CHAIRMAN FRAZER:**  All right.  If we can get folks back to the
46 table, we'll try to knock out two more of these committee
47 reports prior to our lunchbreak.  We're going to go ahead and
48 pick up.  Mr. Anson, if you want to go ahead with the Data

0003993

1 Collection Committee Report.
2
3                   **DATA COLLECTION COMMITTEE REPORT**
4
5 **MR. ANSON:**  Thank you, Mr. Chair.  The Data Committee met on
6 June 24, 2021.  The committee adopted the agenda, Tab F, Number
7 1, as written and approved the minutes, Tab F, Number 2, of the
8 April 2021 meeting as written.
9
10 Update on Southeast For-hire Electronic Reporting (SEFHIER)
11 Program, Tab F, Number 4, Mr. Rich Malinowski from the Southeast
12 Regional Office (SERO) provided an update on the SEFHIER
13 program.  He updated the committee with the number of permit
14 holders that had signed up for the program in the Gulf of Mexico
15 (Gulf) and South Atlantic.
16
17 He indicated that permit holders that have not registered with
18 SEFHIER program would be unable to renew their permits.  Mr.
19 Malinowski indicated that he anticipates an increase in program
20 participation as renewal applications continue throughout the
21 year.
22
23 He also reviewed the schedule and involvement for several
24 outreach events for both the for-hire industry and law
25 enforcement (LE).  He outlined next steps for approving more
26 cellular-based vessel monitoring systems (VMS) to add to the
27 list of already approved satellite and cellular units, as
28 reporting of positional data will be required for Phase II
29 proposed to begin in December 2021.
30
31 Several committee members asked for clarification about
32 notification of enrolling in the program when submitting a
33 permit renewal application, the timeline of a grace period for
34 complying with program requirements, and when LE would be
35 ticketing non-compliant captains.  Dr. Jessica Stephen stated
36 that permit renewal letters are sent sixty days before the
37 expiration of the permit.  Ms. Mara Levy indicated that the
38 Permits Office would also mail a letter to captains, should
39 their application packet be found to be incomplete.
40
41 Captain Scott Pierce of Florida Fish and Wildlife Conservation
42 Commission LE indicated that several LE personnel from the state
43 had participated in the NOAA SEFHIER outreach events.  He
44 indicated that LE in Florida is currently focused on education,
45 and no citations have been issued yet, and they would continue
46 their supporting role as part of their joint enforcement
47 agreement with NOAA.
48

0003994

1    Assistant Special Agent in Charge John O'Malley from the NOAA
2    Office of Law Enforcement also reported that federal LE have
3    been focusing efforts on education and training and had not
4    begun issuing citations. Enforcement General Counsel, Mr. Duane
5    Smith, stated that not issuing citations to non-compliant
6    captains has been a courtesy since Phase I implementation in
7    January 2021, but he indicated violations will have to start
8    being reported to avoid a larger compliance issue. Mr. Smith
9    also stated that penalties for reporting non-compliance could
10   range from warnings to monetary consequences, depending on the
11   nature of the violation.
12
13   Ms. Martha Guyas inquired if any spatial patterns in program
14   participation were observed. Mr. Malinowski indicated that
15   permit holders residing in portions of southwest and northwest
16   Florida were slow to sign up for the program, but that
17   participation was generally good throughout the rest of the
18   Gulf.
19
20   Mr. Andy Strelcheck stated that, since SEFHIER was a very
21   comprehensive, fleet-wide initiative, that stakeholder buy-in
22   would be crucial for the program's success, rather than strict
23   enforcement. SERO staff anticipates that the Southeast Region
24   Headboat Survey will resume sometime in the coming weeks and
25   that port samplers can help with outreach, along with LE.
26
27   Ms. Leann Bosarge asked for clarification about the trip
28   declaration requirement for dually-permitted vessels. Mr.
29   Malinowski answered that commercial and for-hire trip
30   declarations are currently forwarded to different departments or
31   combination of departments, for example JEA partners, commercial
32   or for-hire port samplers, and NMFS is working towards
33   streamlining this process.
34
35   Draft Options for Electronic Reporting due to Equipment Failure,
36   Tab F, Number 5, council staff reviewed potential draft options
37   for the development of a document that would address an
38   exception to electronic reporting due to unforeseen equipment
39   failure in both the commercial and recreational sector.
40   Separate actions are proposed, one for each sector, to address
41   potential failure in VMS equipment, which is already required
42   for the commercial industry. Location tracking will be required
43   for the for-hire fleet after the implementation of Phase II of
44   the SEFHIER program.
45
46   The committee agreed that, while the failure rate of satellite
47   VMS equipment is low for both sectors, measures should be taken
48   to clarify what opportunities are available for captains to

129

1  remain in compliance should they experience equipment
2  malfunctions.
3
4  Ms. Boggs noted that, during a headboat pilot program that
5  required VMS equipment, she had never experienced an occasion
6  where she was unable to fish due to an equipment failure and
7  that a phone call or email to authorities was sufficient to
8  resolve any potential compliance issues. Ms. Levy indicated
9  that language in the rule states that, should a cellular or
10 satellite VMS unit become unresponsive, captains can contact
11 NMFS officials, follow their instructions, and maintain
12 communications to fully resolve any compliance issues.
13
14 The committee discussed concerns related to the length of time
15 to resolve issues related to equipment failure if exemptions are
16 granted. Specifically, it was noted that equipment repairs may
17 be lengthy, VMS installation technicians may be difficult to
18 schedule, or equipment failures may occur outside of traditional
19 business hours. Mr. Strelcheck acknowledged that those
20 situations present challenges. However, he stated that he
21 wanted to avoid the creation of loopholes that could be
22 exploited and undermine program objectives.
23
24 The committee and council staff discussed next steps for the
25 document and the implementation of Phase II of the SEFHIER
26 program. Ms. Bosarge advocated for keeping both recreational
27 and commercial considerations in the document for the next
28 draft, as there is considerable overlap in reporting issues
29 during the preliminary stages of document development.
30
31 Council staff indicated that continued communication with SERO
32 about their budget and the availability of personnel would be
33 imperative to formulating alternatives that are feasible and
34 actionable.
35
36 Ms. Boggs and Ms. Guyas indicated that a possible implementation
37 date of Phase II later than December 2021 may be advantageous.
38 Mr. Malinowski indicated that the implementation of Phase II
39 would have to account for the end-of-the-year holidays and
40 beginning of fishing seasons, but could start a month or two
41 later.
42
43 Ms. Emily Muehlstein informed the committee that approximately
44 $6,500 remains in the council's SEFHIER outreach budget, which
45 could be used to engage stakeholders regarding Phase II of the
46 program. It was suggested to focus more outreach on online
47 resources and consider in-person meetings if funds are
48 available. The committee directed staff to present a revised

130

1  version of the document at the August meeting.  Mr. Chair, this
2  concludes my report.
3
4  **CHAIRMAN FRAZER:**  Thank you, Mr. Anson.  Ms. Boggs.
5
6  **MS. BOGGS:**  Could this not be an opportunity to convene our Data
7  Collection AP to help with some suggestions and ideas of how to
8  resolve these issues with reporting?
9
10  **CHAIRMAN FRAZER:**  I am going to look around at the council
11  members and see if they might agree with that.
12
13  **MS. BOGGS:**  I am prepared to make a motion, if that's required.
14
15  **CHAIRMAN FRAZER:**  I think we would require one.
16
17  **MS. BOGGS:**  Are you ready?
18
19  **CHAIRMAN FRAZER:**  We'll get it up on the board.
20
21  **MS. BOGGS:  I would like to make a motion to convene the Data
22  Collection AP to make recommendations of options for equipment
23  failure concerns.**  I had a little trouble wording that, and I'm
24  sorry.  **To address equipment failure concerns.  Recommendations
25  of options to address concerns.  That's fine.  Options to
26  address equipment failure concerns.**  Thank you.
27
28  **CHAIRMAN FRAZER:**  Okay.  We might just say to convene the Data
29  Collection AP to recommend options, and that might make it
30  easier.
31
32  **MS. BOGGS:**  That's fine.  I was trying not to make it too wordy,
33  but I did.
34
35  **CHAIRMAN FRAZER:**  To recommend.  All right.  Are you happy with
36  that motion, Ms. Boggs?
37
38  **MS. BOGGS:  Yes.**  Thank you.
39
40  **CHAIRMAN FRAZER:**  Is there a second to that?  It's seconded by
41  Ms. Bosarge.  Go ahead, Mr. Anson.
42
43  **MR. ANSON:**  As I read this, I mean, it's specific to reporting
44  of equipment failure concerns, and not necessarily equipment
45  failure concerns, which would be the more technical aspect, I
46  would think, and so I just am wondering if maybe we might want
47  to clarify that in the motion.
48

131

1  **MS. BOGGS:**  That's absolutely fine.  We could say VMS equipment
2  failures  regarding  electronic  reporting  requirements.    The
3  intent here is to have the Data Collection AP provide options to
4  the  council  to  address  these  issues  that  we  discussed  about
5  electronic  reporting  due  to  equipment  failure  as  it  pertains  to
6  both  the  charter/for-hire  and  the  commercial  fleet,  if  we  want
7  to get very specific with it.
8
9  **CHAIRMAN FRAZER:**  I think that we should probably specify as it
10 relates to reporting in the motion.
11
12 **MS. BOGGS:**  May I amend it?  **To convene the Data Collection AP**
13 **to recommend options for electronic reporting due to equipment**
14 **failure.**  I mean, that's how we titled the documents.
15
16 **CHAIRMAN FRAZER:**  Yes,  I  think  that's  close.    That  will  get  us
17 where  we  need  to  go,  and,  again,  I  think  the  AP  is  a  fairly
18 broadly  populated  group,  with  representation  across  those
19 sectors.  Ms. Bosarge.
20
21 **MS. BOSARGE:**  That  was  going  to  be  my  question,  about  who  is  on
22 that  AP  and,  you  know,  did  you  want  to  word  it  slightly  more
23 generally  and  just  say  "the  appropriate  APs  or  ad  hocs",
24 because,  I  guess,  in  my  opinion,  I  know  we  have  an  IFQ  ad  hoc,
25 right,  and  all  those  guys  that's  in  it  all  have  a  permit,  and
26 they  would  have  to  adhere  to  this,  and  then  don't  we,  Susan,
27 still have a for-hire ad hoc, or no?
28
29 **MS. BOGGS:**  I don't think we do anymore.
30
31 **MS. BOSARGE:**  Then I would leave it.
32
33 **CHAIRMAN FRAZER:**  Okay.  Ms. Levy.
34
35 **MS. LEVY:**  Thank  you.    Just  one  thing  regarding  --  Well,  a
36 couple  of  things,  but  the  idea  that  it's  for  electronic
37 reporting  due  to  equipment  failure,  I  know  that's  what  is  on  the
38 presentation,  but,  during  the  IPT,  we  were  pretty  specific  that
39 this  was  just  related  to  VMS  failure,  meaning  we  didn't  think,
40 and  I  haven't  heard,  that  the  council  wants  to  address  something
41 that  goes  wrong  with  the  logbook.    I  mean,  there  are  many
42 options  about  how  to  report  to  the  logbook,  and  so  my
43 understanding  was  that  this  was  related  specifically  to  VMS  and
44 the  position  data,  and  so  I  would,  I  guess,  just  suggest  that
45 you  talk  about  that  and  make  this  more  specific,  if  that's  the
46 intent.
47
48 Then  the  other  thing  is  to  think  about  the  timing  of  this,
                                132

1   because one thing we talked about, during the committee meeting,
2   was NMFS's availability to do certain things and the budget to
3   do certain things, and the idea that we need to get a sense of
4   that, and I just would want to make sure, I guess, that the APs
5   don't start talking about things that the agency then determines
6   is not feasible, and so how those two things will coincide, I
7   guess.
8
9   **CHAIRMAN FRAZER:**  So, Ms. Levy, I just want to make sure -- I've
10  got a couple of questions.  There seems to be, in my mind
11  anyway, some inconsistency in when and where we want specificity
12  with regard to what's VMS and what that actually is, and so,
13  based on the discussions that I've heard this last week around
14  the table, I'm going to consider that electronic reporting to be
15  broad, and I just want to make sure that that is the intent of
16  the motion maker and the folks around this table.  Ms. Boggs.
17
18  **MS. BOGGS:**   To Mara's comments, I am very mindful that the
19  agency -- That there is limitations, but there were a lot of
20  ideas that were floated around the table yesterday, and I
21  thought, possibly, we have this Data Collection AP, and not to
22  make decisions, but just to bring recommendations, because we
23  have this options paper that's coming before us, and then we're
24  going to -- My understanding, from the conversations during
25  committee, were that we would work in conjunction with the
26  agency to verify what could and couldn't be done, but, right
27  now, we don't have any suggestions or options, and I was just
28  trying to -- Because we're having such a difficult time getting
29  industry buy-in, I was trying to include that industry in some
30  of these thought processes, so that they had some comfort level
31  when it comes back, saying, okay, this is what we're going to
32  do.  Thank you.
33
34  **CHAIRMAN FRAZER:**  Okay.  Thank you.  Ms. Guyas.
35
36  **MS. GUYAS:**  I guess I'll ask the question of is this the whole
37  thing, or just the location reporting part?  I mean, this is all
38  one piece of equipment, and am I right?  If it's down, it's
39  down, and so I think we'll actually need probably a back-up to
40  both things.
41
42  **CHAIRMAN FRAZER:**  Yes, and so that was kind of the intent of my
43  question.  Mr. Strelcheck, if you want to expand on that.
44
45  **MR. STRELCHECK:**  Well, there is certainly VMS units that you can
46  submit logbook reports through, but we also have online systems
47  that you can log in through a tablet or a smartphone, and so
48  there's other ways of reporting the logbook.   I agree with

133

1  Mara's comments that, to me, the issue before us is specific to
2  VMS and the equipment failure and the exceptions related to
3  that.
4
5  I guess I would also add that I think it's important to have a
6  law enforcement contribution to this discussion, and I don't
7  know if it would be a good idea to combine the Data Collection
8  and Law Enforcement AP, or have the Law Enforcement AP kind of
9  weigh-in after the fact on the Data Collection AP's
10 recommendations, but I think we need to hear from law
11 enforcement as well with regard to the enforceability of any
12 provisions that are recommended.
13
14 **CHAIRMAN FRAZER:**  Thank you, Andy.  I think that's probably a
15 very good suggestion.  Is there any other discussion?  Mara, I
16 see your hand is up.
17
18 **MS. LEVY:**  Andy covered it.  It's just to note that there are
19 other ways to submit a logbook, the actual catch data, and the
20 idea that the form on the VMS doesn't work, and therefore you
21 can't comply with the rest of it, just isn't correct.  The VMS
22 is the only way you're getting the location data, but there are
23 other ways to do a trip declaration and then to submit what
24 you've brought back.
25
26 **CHAIRMAN FRAZER:**  Ms. Bosarge.
27
28 **MS. BOSARGE:**  I'm going to support the motion as it stands right
29 now, simply because we had a discussion at the last meeting
30 where we were talking about changing the commercial requirements
31 for electronic reporting, and we were talking about having them
32 report things that they report when they get home from offshore,
33 and so that VMS is going to be used for a whole lot more than
34 just position data at that point, and they're going to be
35 putting all sorts of stuff in there, and so, if it goes down --
36 I think I like the way it is, and it keeps it broad enough that
37 we can have a discussion on all the different topics we need to
38 at that meeting.
39
40 **CHAIRMAN FRAZER:**  Okay.  Thank you, Ms. Bosarge.  Is there any
41 other discussion?  I am not seeing any in the room, and no hands
42 are up on the webinar.  **Is there any opposition to the motion?**
43 **Seeing no opposition, the motion carries.**  Ms. Bosarge.
44
45 **MS. BOSARGE:**  Just generally, as we convene our APs, can we keep
46 this in mind, that any AP that we happen to convene, like if
47 that Ad Hoc IFQ AP meets again or something, anybody this might
48 apply to, even CMP, because we're talking about applying some
                                134

1  things to them, but put this in front of them and let them give
2  us some feedback, if we're still working on this document.
3
4  **CHAIRMAN FRAZER:**  Okay.  We'll take that into consideration.
5  Mr. Diaz.  You're good?  Okay.  I think we will go ahead and
6  move on then to the Sustainable Fisheries Committee, and I will
7  hand it over to you, Mr. Diaz.
8
9               **SUSTAINABLE FISHERIES COMMITTEE REPORT**
10
11  **MR. DIAZ:**  Thank you, Mr. Chair.  The Sustainable Fisheries
12  Committee Report, the committee adopted the agenda and approved
13  the minutes of the January 2021 meeting as written.
14
15  Summary Report from the Joint Council Section 102 Workgroup,
16  council staff recounted the progress made by the Section 102
17  Joint Council Workgroup, which has met three times to-date.  The
18  workgroup has identified several alternative approaches already
19  in use by the councils and asked staff to outline these
20  approaches, and others proposed, for further discussion at an
21  in-person meeting later in 2021.
22
23  SSC Recommendations on Acceptable Biological Catch Control Rule,
24  Dr. Kai Lorenzen of the council's Scientific and Statistical
25  Committee (SSC) reviewed the SSC's progress during its first
26  discussion of reviewing the Acceptable Biological Catch Control
27  Rule, which has been in use by the council since 2011.
28
29  The ABC Control Rule creates a buffer between the overfishing
30  limit and the ABC to reduce the risk of overfishing attributable
31  to scientific uncertainty.  This requires separating the
32  characterization of scientific uncertainty from the definition
33  of a risk policy.  The latter is the prerogative of the
34  council.
35
36  The SSC aims to improve the ABC Control Rule by better
37  characterizing scientific uncertainty (P*).  The buffer between
38  the OFL and ABC would typically increase when the stock
39  abundance is low.  The SSC thinks the current ABC Control Rule
40  underestimates scientific uncertainty and is exploring metadata
41  analysis methods, such as the Ralston et al. method from the
42  Pacific, to better estimate this uncertainty.  The SSC also
43  recommends further exploration of other conceptually-different
44  approaches, such as F multipliers.
45
46  Dr. Lorenzen continued by discussing the application of harvest
47  control rules (HCR) as a component of the use of the ABC Control
48  Rule to recommend catch advice to the council following a stock
                              135

1  assessment.  He noted that the council's current definition of
2  the minimum stock size threshold allows a stock to be
3  considerably depleted compared to the biomass at maximum
4  sustainable yield (BMSY), which can create longer rebuilding
5  periods, under which fishing effort would need to be comparably
6  restricted.
7
8  An HCR could allow for the catch limits to be buffered in such a
9  manner to allow for ramping-down of catch limits when the
10 current biomass drops below BMSY, even though the stock is not
11 undergoing overfishing or overfished.
12
13 Southeast Fishery Science Center staff said simulations would be
14 needed to see if this approach using HCRs could supplant the
15 need for rebuilding plans, and the Southeast Regional Office
16 would need to explore whether this approach could
17 administratively serve that purpose.  Overall, the SSC favors
18 simplicity and robustness for HCRs.
19
20 The SSC has requested that the Southeast Fisheries Science
21 Center provide information to help evaluate the performance of
22 alternative ABC control rules, past performance of the council's
23 existing ABC Control Rule, past performance of deviations from
24 existing rule, and implications of alternative rules for the
25 ABCs of Gulf stocks.
26
27 The SSC will continue discussions with respect to information to
28 help the council consider its risk policy, such as the risk of
29 overfishing versus foregone fishing opportunities, the costs of
30 overharvesting to stocks and stakeholders, consideration of
31 phase-in of changes in catch limits, and social considerations
32 and management buy-in.
33
34 A committee member asked whether changes to data, such as
35 recreational catch and effort, would affect the determination of
36 scientific uncertainty.  Dr. Lorenzen replied that, ideally,
37 those changes would be comparable between stock assessments.
38 However, the same data are not always available from one
39 assessment to the next.  The Southeast Fisheries Science Center
40 added that the Ralston approach likely better accounts for
41 scientific uncertainty, particularly compared to the
42 southeastern U.S., since the Pacific stocks, upon which that
43 method is based on, assessments that use fewer data streams over
44 longer time periods.
45
46 Further, the analysis of risk related to overfishing has likely
47 not been properly characterized for the council in the past, and
48 considerations, moving forward, about changes to the council's

136

1  ABC Control Rule aim to directly address this.
2
3  Manna Fish Farms, Gulf of Mexico Update, Dr. Kelly Lucas of the
4  University of Southern Mississippi presented an update on the
5  activities of Manna Fish Farms, Gulf of Mexico.  Dr. Lucas noted
6  that, in 2019, she gave a presentation to the committee on this
7  topic.
8
9  Dr. Lucas provided an overview of her presentation and proceeded
10 to discuss a range of issues including site suitability, species
11 considered by the aquaculture project, data considered in the
12 siting model, and the suitability model methodology.  Dr. Lucas
13 reviewed the proposed Gulf sites and discussed the design of
14 storm-safe submersible cages.  Dr. Lucas indicated that the
15 project will reduce the number of planned cages from eighteen to
16 twelve.
17
18 Dr. Lucas discussed the deployment phases and discussed feed
19 information and a planned production timeline.  In discussing
20 next steps, Dr. Lucas indicated that permits applications have
21 not been filed and that a best management practices plan is in
22 development.
23
24 Committee members thanked Dr. Lucas for the presentation and for
25 considering shrimp trawl data in siting modelling.  The
26 committee inquired about buffers around the project, and Dr.
27 Lucas stated that discussions considering buffers are ongoing.
28
29 The committee asked about buoys to mark the project area.  Dr.
30 Lucas indicated that the buoys will be lighted and will be in
31 accordance with all Coast Guard requirements.  In response to a
32 committee question relative to feed, Dr. Lucas referred to the
33 feed specifications included in her presentation and noted that
34 cameras will be used to monitor feeding.
35
36 The committee asked about the other species under consideration
37 for the project and about the potential for polyculture.  Dr.
38 Lucas indicated that the project plans to start with red drum
39 and will later consider a range of species, including almaco
40 jack, striped bass, tripletail, and pompano.  Committee members
41 inquired about disease control.  Dr. Lucas stated that the
42 project plans to minimize sources of contamination and that a
43 health and safety plan is under development.
44
45 Standardized Bycatch Reporting Methodology, Mr. Dan Luers gave a
46 presentation on the review of standardized bycatch reporting
47 methodologies (SBRM) for the Gulf Council's Fishery Management
48 Plans.  The SBRMs are a set of established procedures used to
                              137

1  collect, record, and report bycatch data for each fishery
2  management plan.   A review of these procedures is required
3  every five years and is expected to be completed in 2022.
4
5  Mr. Luers reviewed the required components of the SBRM and
6  summarized the bycatch method reporting programs from each FMP
7  and component.   Specific to the reporting methods for the
8  private angling component, a committee member requested that
9  additional information is provided in the report, along with an
10 evaluation of the adequacy of the reporting methods for this
11 component.
12
13 Mr. Luers stated that a draft report is being developed that
14 will include this requested information, along with the other
15 required components of the review.   A draft report will be
16 provided to the SSC and the council at a future meeting for
17 review, prior to finalizing the document.   Mr. Chair, this
18 concludes my report.
19
20 **CHAIRMAN FRAZER:**  All right.  Thank you, Mr. Diaz.  Are there
21 any other discussion items related to the Sustainable Fisheries
22 Committee?  I am not seeing any, and so, again, thank you, Mr.
23 Diaz, for going over the report.
24
25 I think what we're going to do is, given where we are in time, I
26 would like to go ahead, if it's okay with the various liaisons
27 in the room, if we could go through those reports, and, in no
28 particular order, but, Chester, would you be able to go ahead
29 and give the South Atlantic report?
30
31              **SUPPORTING AGENCIES UPDATES**
32              **SOUTH ATLANTIC COUNCIL LIAISON**
33
34 **MR. BREWER:**  Well, I was going to do it off the top of my head,
35 and so I might as well do it now, and thank you for letting me
36 go a little early.  I really appreciate it.  You promised, and
37 you delivered.
38
39 I'm not going to get into cobia and mackerel.  That has been
40 covered extensively in the different committees and the
41 committee reports.  I do want to thank you, however, for the
42 concurrency and the spirit of cooperation that you showed in
43 your votes.  That was actually the one thing that we were
44 worried about, and so I came loaded for bear, with all kinds of
45 reasons and whatnot, and thankfully I didn't have to use a whole
46 bunch of them.
47
48 There are a couple of things though that are going on, and let's
                              138

1   see.   Man, let's get the bad one off the table first, and we
2   might as well get it over with, and it's kind of a bitter pill,
3   and we -- As you all probably know, there's an area off the east
4   coast of Florida that starts at about Fort Pierce and runs
5   north, I think about 170 kilometers or something like that.
6
7   It's known as the Oculina Bank, and it is an area that is of
8   high concern, and it is a coral bank that is almost -- I think
9   it may well be unique in the world, and, a number of years ago,
10  efforts were undertaken to protect that area, particularly from
11  bottom trawls and anchors and any kind of bottom gear.
12
13  In the mapping that was done to lay out the area that was
14  protected, there were some areas, or an area, particularly on
15  the east side of the bank and towards the northern edge, that
16  was included in the area to be protected.   The rock shrimp
17  folks, at the time, said, excuse us, but there is no coral
18  there, and we trawl through there, and they went round and round
19  and round, as to whether there was coral there or not, and,
20  finally, it was decided to go ahead with the plan as it was put
21  forth and the area -- That particular area that the rock shrimp
22  folks were concerned about would be considered in the near
23  future, and they agreed to wait and have it reconsidered.
24
25  What happened is nothing for years, and so it has come back up
26  now, and I thought that it was -- This is my personal opinion,
27  but I thought that it was going to sail through, because it was
28  something that we had promised that we would take a look at, and
29  we held them off for years, and not intentionally, but it's just
30  that we didn't get to it, and, apparently, there is no coral
31  there, and that now is the excuse, and so I thought we would
32  have the whole thing go through and we would get this corrected.
33
34  Well, about three weeks or a month or so ago, we started getting
35  letters and whatnot saying, no, there's still a problem with you
36  trawling in that area, because of the plumes that are created,
37  and so that's something that was new, and we're not exactly sure
38  what we're going to do with it, and I think we're going to have
39  to request some more research with regard to these plumes and
40  how much of a separation area you need to have, so that you can
41  protect the -- What do they call them?   Pillars, I think they
42  call them, but, anyway, these very, very high columns of coral,
43  and so that's one area.
44
45  The other area is, of course, red snapper, and we just had our
46  SEDAR, and I think it's 73, and I may be wrong about the
47  numbers, and I never do well on the SEDAR numbers, but it's the
48  red snapper SEDAR, and it found that our -- The biomass of red

139

0004005

1  snapper in the South Atlantic is as high as it has ever been in
2  recorded history, and the spawning stock biomass is still
3  depressed somewhat, although it is improving.
4
5  The SEDAR came out and said, no, you're still overfished and
6  undergoing overfishing, and that is a matter of concern, and it
7  was also a matter of concern that we got a SEDAR saying the
8  biomass is as high as it's ever been, which confirms what
9  everybody has been telling us for several years now, the folks
10 that are out on the water have been saying there are so many red
11 snapper out here that they're now a nuisance.
12
13 In response, and I guess just to kind of complicate things, and
14 kind of make us a little mad, a few days later, the season came
15 out, and it went from four days to three days, and so I'm sure
16 that we've not heard the last of that, and I don't know, and
17 maybe deservedly so, but, at any rate, our response is going to
18 be to ask the SSC, and particularly the ones involved with the
19 SEDAR, to take another look at some of the data points and
20 assumptions and whatnot that went into the new red snapper
21 SEDAR.
22
23 One of the things that hopefully will be done fairly soon is you
24 all may know that we're in a conundrum with regard to red
25 snapper, and that is the biomass is increasing very, very
26 rapidly.  As it increases, the folks' encounters, who are
27 fishing for other fish, their encounters with red snapper
28 increases, and there's a lot more bycatch, and the bycatch
29 mortality is such that it almost equals the quota, and that's
30 the reason that we have such short seasons.
31
32 We have implemented some requirements to try to deal with that
33 problem, and one of the biggest is descending devices.  People
34 are not required to use them, but they are required to have them
35 onboard, and so we're hoping that that will at least help
36 ameliorate some of the bycatch mortality and that can be
37 incorporated into the science that's being used and that
38 hopefully, at some point, maybe during my lifetime, we'll see a
39 meaningful red snapper season in the South Atlantic.  With that,
40 Mr. Chairman, thank you, and that concludes my report.
41
42 **CHAIRMAN FRAZER:**  Thank you, Chester.  Ms. Bosarge.
43
44 **MS. BOSARGE:**  Thanks, Chester.  I want you to take a message
45 back for me.  So that Oculina area, and this is what I had
46 referred to when we were in the Habitat Committee and using
47 modeling to determine what the seafloor looks like and what's
48 down there in that area, and so, Chester, when you all did that

0004006

1  Coral Amendment 1 in the South Atlantic, that's where you
2  originally established that Oculina, the original boundaries.
3
4  I know you know this, but, in that Coral Amendment 1, when you
5  read it, a lot of the scientific evidence that was used to close
6  it originally was anecdotal verbal information from coral
7  scientists, and that's fine, and then you closed it and you
8  said, you know, we're going to review it later, and we hope to
9  have some hard, published -- You know, more hard, published
10  scientific information on it.
11
12  In 2014, you reviewed that Oculina Bank, and you decided to
13  expand it, and you all did discuss the fact that, unfortunately,
14  you really didn't have the volume of hard, documented scientific
15  information that you were really wanting.  However, you now had
16  a computer model that modeled that area and said, hey, there's
17  coral further outside where we have these boundaries, and we
18  need to expand it, and the shrimpers came in with their computer
19  plotters, and albeit it was late in the process, and I will
20  grant you that, but they came in and they said here's our plot
21  sheet, and we're trawling through there with a net.
22
23  We don't trawl over coral, and it's not in our best interest,
24  and it would tear the nets up, and we would lose months, and so
25  we're not out there trying to destroy coral.  We're trawling in
26  and catching shrimp and please don't close it.
27
28  You closed it anyway, and so we didn't have scientific verified
29  information showing there was coral right there, but we closed
30  it.  I have to commend the State of Florida and Martha's boss.
31  She kept her word to the fishermen, and she said we're going to
32  look at this again, and hopefully we'll have more information
33  then, and so that's what you're doing now.
34
35  You now have information that shows there is no coral there, and
36  so all this mumbo-jumbo now about, well, we're going to get some
37  more information that says, even though there's not coral there,
38  we've still got to keep it closed, because you might have some
39  sort of other effect.  We've been waiting a long time, and we're
40  not a profitable industry, and so we don't have a lot of
41  lobbyists and shrimpers in the audience at every meeting during
42  public testimony, and so I'm speaking on behalf of my industry.
43
44  Please, please give us back our shrimp grounds.  We have waited
45  a long time, and that's a small fishery.  The area that you
46  closed off, or you all, and not you, Chester, but you all closed
47  off, in some years, that might be 75 percent of the rock shrimp
48  production in the South Atlantic.  It's a big deal, and it's

```
 1  very important.   It varies from year to year, but it's
 2  substantial, and so, if you could please entertain the idea of
 3  giving us back that shrimp ground, we would really appreciate
 4  it.
 5
 6  MR. BREWER:   Just in response to that, I'm a big fan of Dixie
 7  Crossroads, and I love rock shrimp.   I mean, I just love rock
 8  shrimp, and I want to do anything I can to see that there is a
 9  good supply of rock shrimp, and it's an economic engine, quite
10  frankly, and certainly in the Titusville area and the
11  surrounding, and it's not going to be as simple as we might
12  like, because there are some heavy-hitters that have lined up
13  now to say, nope, you're going to kill coral, and that area --
14  Well, that particular bank is of such high I will say value,
15  from the standpoint of ecological stuff, and that it's going to
16  be hard.
17
18  I was 100 percent.   I've got to tell you that I was 100 percent
19  behind opening that area up immediately until we got this, and,
20  again, it was late in the game, but we got information about
21  plumes and debris and all that, which I don't know at this
22  point.   We don't know right now if it's true or not, quite
23  frankly, but it's going to have to be looked at, and I bring it
24  up because it is going to be something that is, I think, a
25  fairly high ticket, and so at least you have moved from being
26  ignored to being a pretty high ticket, and people are going to
27  be looking at it, and so I think that's something.
28
29  CHAIRMAN FRAZER:   All right.   Thank you, Chester.   I guess what
30  I heard there, from Ms. Bosarge, is if you would convey to the
31  South Atlantic Fishery Management Council, at your next meeting,
32  that she would like to see some progress in that regard.   Mr.
33  Strelcheck.
34
35  MR. STRELCHECK:   Well, they take final action at the next
36  meeting, and so I guess that will amount to progress at that
37  point, whatever the decision is.   I wanted to just comment on
38  Chester's report, and, Chester, you did a fantastic job.
39
40  With regard to red snapper, he mentioned the highest biomass
41  ever, and it's actually the highest abundance ever, and he also
42  acknowledged that the spawning biomass isn't where it should be,
43  and I do want to also mention, like he had indicated, that we
44  have descending device requirements in the South Atlantic, but
45  we did, I thought, a very thoughtful process at the last
46  meeting, kind of going through some short-term and long-term
47  measures and things that we may need to explore with regard to
48  not just changing the catch limit and kind of standard actions,
```

142

1  but also looking at some long-term measures and how we reduce
2  discard mortality in the South Atlantic, because that's driving
3  a lot of the overfishing, and so I just wanted to acknowledge
4  that and thank Chester for his report.
5
6  **CHAIRMAN FRAZER:**  Thank you, Mr. Strelcheck.  Dr. Porch.
7
8  **DR. PORCH:**  Andy made one of my points, but the other point,
9  just to be clear, is the shortened season isn't associated with
10 the stock assessment.  The SSC actually didn't set any catch
11 limits based on the stock assessment, and so they carried over
12 the previous catch.  The SSC will reconsider that I think in a
13 month or two.
14
15 **MR. BREWER:**  Right, and you're exactly right, and I was just
16 talking about the timing being unfortunate.
17
18 **CHAIRMAN FRAZER:**  Okay.  Are there any more questions for
19 Chester?  I am not seeing any.  Chester, thank you for your
20 time.  I appreciate you being here this week.
21
22 **MR. BREWER:**  Well, thank you.  Believe it or not, I enjoy coming
23 to these meetings, and it's kind of like old home week for me.
24
25 **CHAIRMAN FRAZER:**  Okay.  We're going to go ahead now and move
26 on, and I know it's a little early, but, Captain Pearce, if
27 you're willing to give your report, that would be great.
28
29                **FLORIDA LAW ENFORCEMENT EFFORTS**
30
31 **CAPTAIN SCOTT PEARCE:**  Good morning, Dr. Simmons, Dr. Frazer,
32 and council members.  Thank you all for coming me the chance to
33 come down here to Key West and present to you all today.  It's
34 been a very entertaining week, and I have learned a lot from
35 this whole week of being here and being exposed to everything.
36 We will move through this fairly quickly, and I will be happy to
37 entertain any questions at the end.
38
39 As you all well know, this is encompassing all the patrol assets
40 we have in the Gulf of Mexico for JEA, and it does not include
41 the assets we have on the Atlantic side.  Within the Gulf of
42 Mexico, we have nine different vessels that are focused on JEA-
43 specific patrols, and we have two endurance-class vessels, which
44 basically are multiday platforms.  We have the Gulf Sentry out
45 of Tampa, and we have the Randall that's out of Marco Island,
46 and it's important to know that the Randall has just now
47 recently been decommissioned, and so we're looking to replace
48 that vessel with most likely something in the forty-one-foot

143

0004009

1   class range, probably a Safe boat class-type vessel, and so that
2   should be happening pretty soon.
3
4   We have four more endurance-class vessels, which are your long-
5   range single-day patrol vessels, capable of covering great
6   distances out of Tampa all the way to the Middle Grounds and
7   things like that, and we have the Guardian out of Carrabelle,
8   and the Vigilance is out of Destin, and we have the Interceptor
9   that's out of Key West, and then we have the Trident out of
10  Marathon.  These vessels are equipped to provide long-range,
11  single-day patrols covering great distances.
12
13  We also have three intermediate-class vessels.  We have two
14  Fincats, one out of Pensacola and one out of Crystal River.
15  Again, they're single-day patrol vessels, and they're a little
16  bit limited in their range.  We have the twenty-nine-foot
17  Intrepid that we keep in Carrabelle, but that vessel not only
18  works Carrabelle, but it's also a back-fill vessel, and so, if
19  we have a vessel that goes down somewhere, we can move the
20  Intrepid to that location and keep patrols focused.
21
22  Just to give you some of the things we've worked on, these stats
23  -- I basically went back all the way from January of 2020 to May
24  of 2021, to kind of get us caught up, because we didn't get to
25  do this last year.
26
27  During that time period, our combined patrol efforts in the Gulf
28  of Mexico, for just offshore patrol vessels, is going to be
29  3,040 hours of federal enforcement combined patrols.  We had
30  over 1,600 hours that were focused on reef fish enforcement, and
31  we had 607 hours that were focused on TED enforcement, and we
32  had over 108 TED boardings, and we had 798 hours of just any
33  other federal enforcement, any other requirements, and then,
34  overall, we had 748 enforcement actions.  349 were combined
35  warnings, and then 399 were based on citations, federal or state
36  citations that occurred in federal waters for the JEA.
37
38  Along with our offshore patrol vessel program, as I've spoken
39  about before, we also have all our regular regional assets that
40  go out and patrol every day, and so these are all the other
41  officers that are involved in everyday patrol that still conduct
42  patrols that are JEA related, and these are statewide numbers,
43  for Atlantic and Gulf, and I wasn't able to separate them down,
44  but those regional assets contribute over 1,300 hours of
45  dockside patrol, over 2,500 hours of single-officer midrange
46  patrol, and over 2,900 hours of two-officer midrange patrol.
47
48  They put in over 837 hours of administrative or outreach

144

1  efforts, and the total regional efforts for this time period is
2  over 7,600 hours of JEA-related patrol efforts, and so that's
3  just our regional stuff, outside of the --
4
5  Now we get into IFQ, IUU, and Florida Keys National Marine
6  Sanctuary.  For IFQ, we're required to be over 500 hours of
7  patrol, and we actually put in over 1,000 hours of patrol for
8  IFQ-related inspections during this time period.
9
10  For illegal, unregulated, and reported, we're required to
11  contribute 250 hours of inspection hours for IUU, and, so far,
12  to this date, we've accomplished 288, and that's going to be our
13  port investigators that are intercepting product that's coming
14  in from out of the country and looking for any of these IUU-
15  related-type violations.
16
17  Florida Keys National Marine Sanctuary, we're required to put in
18  over 1,200 hours of patrol, and we actually accomplished over
19  2,600 hours, and that's using assets either from the Gulf as
20  well as the Atlantic.  We have a patrol vessel that in Miami
21  that actually is a big Metal Shark, and those guys actually run
22  all the way down and stay at Port Jefferson for several days at
23  a time and do patrols there, and so we're combining efforts
24  between the Atlantic and the Gulf to accomplish the Florida Keys
25  National Marine Sanctuary, plus all the regional assets that
26  contribute to that.
27
28  Just to give you a few examples of case examples around the
29  state, for recreational boardings, out of the Big Bend region,
30  we had a case that involved a vessel that was boarded where they
31  found twelve undersized mango snapper, as well as three
32  undersized triggerfish.  In the same region, another vessel they
33  boarded where the guys were focusing on spearfishing activities,
34  they boarded a vessel where they found three undersized grouper
35  and three undersized hogfish onboard.
36
37  More recreational vessels out of the southwest region, and, as
38  John O'Malley spoke about yesterday, one of the big things, and
39  we've been working on it for years, but we're really trying to
40  get a grip on it, is all the illegal charter activity with the
41  vessels that can probably legally charter -- They can legally
42  charter in state waters, but they're going into federal waters
43  without a federal reef fish permit.
44
45  One example would be where you actually have a meeting to
46  discuss this issue with all the partners around the Gulf, and
47  our guys were offshore of Tampa and boarded a vessel that was
48  actively harvesting reef fish with charter guests onboard
                                    145

1  without a federal reef fish permit, and so that's just one
2  example of several of these things that we've been focusing on
3  what's going on with that recent detail that occurred in the
4  southwest region. I don't have the stats on that yet, but I
5  think it's a pretty big success.
6
7  The south region, or the Tortugas, officers boarded a vessel
8  where they found the vessel to be in possession of grouper and
9  hogfish out of season, as well as undersized mutton snapper and
10 wrung lobster tail.
11
12 For our commercial vessels, when we get down to the south
13 region, south of the pompano endorsement zone, officers boarded
14 a vessel that was a gillnet vessel, and they also were in
15 possession of pompano onboard, in conjunction with a gillnet,
16 and they were well south of Monroe County, outside of the
17 pompano endorsement zone, and so they issued a citation on that.
18
19 We've had -- Obviously, we're always working on our TED
20 enforcement, and one example would be vessels boarded where they
21 found the angles were out, at a prohibited angle on the TED, as
22 well as the bar spacing on the TED was too much of a gap between
23 the bar spacing, and that's just an example of some of the stuff
24 we're doing with TEDs. The southwest region, officers were
25 conducting an IFQ inspection. During the IFQ inspection, they
26 discovered forty-seven undersized red grouper.
27
28 Another one out in the southwest region, this was a shrimp
29 vessel that they boarded to do a gear inspection, and the gear
30 was all in compliance, but they went below, into the hold, and
31 they found fifty-seven undersized lane snapper, forty undersized
32 flounder, and three undersized red snapper.
33
34 Then, for another commercial vessel boarding in the southwest,
35 another shrimp vessel, again, they stopped the vessel to conduct
36 a gear inspection, and the gear was within compliance. When
37 they went below, they found 433 lane snapper, 219 of which were
38 undersized, and they had thirty-five shark fillets onboard, and
39 they had one snook head that they were saving for fish head stew
40 or something, and I'm not sure. They had no federal reef fish
41 permit onboard and no federal HMS permit for any possession of
42 reef fish in that quantity, and so they were cited as well.
43 That wraps it up. Any questions?
44
45 **CHAIRMAN FRAZER:** Thanks, Scott. We've got a couple of
46 questions, I'm sure. Mr. Diaz.
47
48 **MR. DIAZ:** Captain Pearce, thank you for being here, and thank
146

0004012

1   you for your report, and I did mention this yesterday, when the
2   federal report was given also, but I want to thank you all for
3   focusing on these illegal charters.   That's been mentioned at
4   our public comment several times, and it's an example of where
5   the public brings something to our attention and some action is
6   taken on it.
7
8   I know these are difficult cases to make, and it's time
9   consuming, and it takes a lot of effort to make these.   People
10  probably think it's very simple, but I realize that it's very,
11  very difficult to make these cases, and so thank you for putting
12  some focus on that and paying attention to our public comment
13  that has been brought forward.   We appreciate it, and I'm
14  impressed with all of your work, but I just wanted to note that
15  you all went over and above to try to help with that situation
16  for us.   Thank you.
17
18  **CAPTAIN PEARCE:**  Yes, sir.   Thank you.
19
20  **CHAIRMAN FRAZER:**  Ms. Bosarge.
21
22  **MS. BOSARGE:**  I wanted to thank you for the IUU work that you're
23  doing.   I was really excited to see that, and I don't know if it
24  was this quarter or what, but I seem to remember that you all
25  caught some shrimp coming into Miami, I think it was, that
26  shouldn't have been coming into this country, that either didn't
27  meet our standards or was coming from a company whose
28  authorization had been revoked, or whatever the case was, and I
29  appreciate that.   Thank you.
30
31  **CAPTAIN PEARCE:**  Yes, ma'am.
32
33  **CHAIRMAN FRAZER:**  I just wanted to follow-up on that, because I
34  know, in one of your slides, you had several hundreds of hours
35  that were related to IUU activities, and a lot of them involved
36  your port crews, but, aside from shrimp, what are the most
37  common types of violations that you're seeing?
38
39  **CAPTAIN PEARCE:**  Really, that's one of those things that we're
40  really getting ramped up on, and we're starting to get better
41  and better at detecting, but one of the prime examples would be
42  the shrimp case down south, and there's also an example where we
43  had quite a large quantity of lobster that was shipped in from
44  South America, but it all went into commerce in the State of
45  Florida, and so it wasn't being shipped through, but a good
46  majority of the lobster were undersized, and also egg-bearing,
47  and so that's another example of that illegal imported product
48  that's trying to go into our commerce in Florida, and so that

147

1  was a good case.
2
3  We've had a few instances where we had undersized fish that were
4  being shipped in from out of the country to other facilities
5  that we intercepted and we were able to deal with, and the
6  important part is that it's actually entering commerce in
7  Florida for us, and that's where we can engage in it.  If it's
8  going through under bond to another state that doesn't have
9  those regulations, or it doesn't violate our federal
10 regulations, then that's another issue altogether.
11
12 **CHAIRMAN FRAZER:**  I appreciate the bonding issue.  That kind of
13 really restricts your ability to kind of look at what's going
14 on.  Anyway, thank you again for the report.  That was great.  I
15 don't know if there's any other questions.  All right.  Again,
16 thank you, Captain Pearce, for your time.  All right.  We're
17 going to go ahead and move over to the Gulf States Marine
18 Fisheries Commission.  Dave, if you want to give us your report.
19
20              **GULF STATES MARINE FISHERIES COMMISSION**
21
22 **MR. DONALDSON:** Thank you, Mr. Chairman.  The commission has got
23 a variety of different activities, and I'm not going to report
24 on all of them.  A couple that I think will be interesting to
25 the council members are, as you know, we're working with Texas,
26 Louisiana, Mississippi, and Alabama with the CARES Act, and
27 Florida is working with the Atlantic Commission, but, as of June
28 of this year, we have distributed over $19 million in payments.
29
30 Louisiana, Mississippi, and Alabama have distributed all of
31 their funds for the first round of CARES, and Texas is reviewing
32 their applicants, and we anticipate getting a list from them in
33 the near future and begin distributing money to Texas
34 participants.
35
36 The second round of CARES is about $26 million to the four
37 states that I mentioned, and Texas, Louisiana, and Alabama have
38 approved spend plans.  Mississippi is currently reviewing their
39 plan, and we're in the process of reviewing it with NOAA, and it
40 hopefully will be approved soon.  We're awaiting NOAA Fisheries
41 to approve the commission funding document, so that we can start
42 distributing the money, but this money needs to be distributed
43 by the end of September of this year, and so I'm hopeful that,
44 in the next several weeks, we'll be able to start distributing
45 the second round of CARES funding.
46
47 The other project that I've mentioned is we're working with the
48 NOAA Restoration Center and working on a barotrauma project.  At
                              148

1  the last meeting, we were in the process of reviewing some
2  validation studies.  Since then, we have actually selected two
3  studies, the first being a determination of predation mortality,
4  barotrauma survival of catch-and-release red snapper, and it's
5  being conducted by Steven Szedlmayer.
6
7  The purpose is to better understand the survival rates of red
8  snapper released using descending devices, and then the second
9  is do descending devices increase opportunities for predation,
10 and that's being led by Dr. Marcus Drymon, and that is to
11 document whether hooked reef fish are eaten by predators and
12 which species are responsible for that predation, and so those
13 projects just started, but hopefully, towards the end of the
14 year, I'll have some preliminary results to be able to share.
15
16 Then the last issue that I wanted to talk about is our October
17 commission meeting.  It's scheduled for October 19 through 21 in
18 Florida, probably in the Panhandle, and we're still working on
19 securing a hotel.
20
21 It will be an in-person meeting, which I am excited about, and,
22 during each of our meetings, we have a general session, and we
23 haven't been able to do those, because of the virtual nature of
24 the meetings, but, on October 20, we will be having a general
25 session, and we'll be focusing on wind power.  It's becoming a
26 big issue in the Gulf, and we'll be inviting a variety of
27 different speakers to talk about that.  Hopefully, probably
28 later this summer, we'll be distributing a meeting notice with
29 the hotel and all the information about it, and so, with that, I
30 will answer any questions.
31
32 **CHAIRMAN FRAZER:**  All right.  Thank you, Dave.  There's a lot in
33 there, and so I'll go to Ms. Bosarge.
34
35 **MS. BOSARGE:**  It's not for Dave, but he brought up something
36 that I did want to touch on, and the wind energy thing is
37 starting to hit the Gulf and be discussed, and I'm going to be
38 on a -- Somebody asked me to be on a panel about it next week,
39 and so I'm going to be on a panel, whatever that means, but the
40 point is are we going to have this on an agenda for the council
41 to look at, fairly shortly, so that we can give them feedback
42 that might be relevant from our fishermen?
43
44 **CHAIRMAN FRAZER:**  Yes, and so I will go ahead and let Dr.
45 Simmons speak to that.  We did have a discussion with the folks
46 at BOEM.  Go ahead, Carrie.
47
48 **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Chair.  Yes, we're
                                149

1 planning to have a presentation in August.
2
3 **CHAIRMAN FRAZER:**   Again, hopefully we'll have some opportunity
4 to weigh-in there.   Any other questions for Dave?   I am not
5 seeing any.   Dave, I really appreciate that report.   Thank you
6 for taking the time.   All right.   We're a little bit early, but
7 a little bit too far along to get right into our Reef Fish
8 Committee report, and so we're going to take a break for lunch.
9 We're supposed to come back at 1:30, but, if folks are okay, why
10 don't we come back at 1:00?   Will that be all right and give
11 people enough time to eat?  All right.   See everybody at 1:00.
12
13 (Whereupon, the meeting recessed for lunch on June 25, 2021.)
14
15                                - - -
16
17                          June 25, 2021
18
19                     FRIDAY AFTERNOON SESSION
20
21                                - - -
22
23 The  Full  Council  of  the  Gulf  of  Mexico  Fishery  Management
24 Council  reconvened  on  Friday  afternoon,  June  25,  2021,  and  was
25 called to order by Chairman Tom Frazer.
26
27 **CHAIRMAN FRAZER:**   All  right,  everybody.   Thanks  for  taking  a
28 quick  lunch.   Before  we  get  started,  we  have  our  Coast  Guard
29 representative,  Lieutenant  Commander  Lisa  Motoi,  on  the  line
30 with  us,  and  I  just  wanted  to  take  a  few  minutes  for  her  to
31 introduce herself to the group.
32
33 **LCDR LISA MOTOI:**   Thanks, Mr. Chair.  Good afternoon, everyone.
34 I'm  Lieutenant  Commander  Lisa  Motoi,  and  --  (Part  of  LCDR
35 Motoi's comment is not audible on the recording.)
36
37 A  little  bit  about  me  is  I've  been  in  the  Coast  Guard  for
38 seventeen  years,  and  I've  had  two  tours  that  were  LMR-driven,
39 and  so  I'm  heading  down  the  Gulf  region,  and  I  know  it's  going
40 to  be  drinking  from  a  fire  hose,  but,  while  there  at  D8,  my  job
41 is  pretty  much  going  to  consist  of  overseeing  the  LMR  mission  of
42 our  four  Coast  Guard  sectors.   In  District  8,  we  also  have  four
43 fast-response  cutters,  and  we  get  visiting  Coast  Guard  cutters
44 that  also  do  the  LMR  mission.   Thank  you,  everyone,  and  I  look
45 forward to meeting you in person at the next council meeting.
46
47 **CHAIRMAN FRAZER:**   All  right.   Great.   Thank  you,  and  we
48 certainly  look  forward  to  seeing  you  in-person  as  well,  and  so

                                 150

1  thanks again for joining us on the call today, and we're going
2  to go ahead and pick up with our committee reports.  Ms. Guyas,
3  if you want to start the Reef Fish Committee, that would be
4  great.
5
6                    **COMMITTEE REPORTS (CONT.)**
7                    **REEF FISH COMMITTEE REPORT**
8
9  **MS. GUYAS:**  All right.   Thanks, Mr. Chair.   This committee
10 report is Tab B.   The committee adopted the agenda with the
11 addition of goliath grouper to Other Business, and the minutes
12 from the April 2021 meeting were approved as written.
13
14 Review of Reef Fish Landings and Review of Reef Fish ACL
15 Figures, Ms. Kelli O'Donnell from the NMFS Southeast Regional
16 Office reviewed Gulf reef fish landings.   Gray triggerfish
17 recreational fishing was reopened in September 2020.   An
18 increase in the ACL is expected to result in the recreational
19 landings remaining below the to-be-implemented increased
20 recreational ACL.
21
22 Gag, red grouper, greater amberjack, and red snapper for-hire
23 recreational landings for 2020 remained below their respective
24 2020 recreational ACLs.   For stock ACLs, gray snapper, vermilion
25 snapper, and yellowtail snapper 2020 landings remained below
26 their respective ACLs.   Lane snapper landings for 2020 remained
27 below the to-be-implemented increased ACL for that species.   At
28 this time, 2020 landings data are still considered preliminary.
29
30 Ms. O'Donnell also reviewed commercial individual fishing quota
31 program landings in 2020, which totaled 99 percent of the
32 commercial quota for red snapper, red grouper landings were
33 approximately 79 percent, and gag landings were approximately 51
34 percent of the commercial quota.
35
36 Committee members had questions about out-of-season landings for
37 a few species.   NMFS staff will investigate the origin of these
38 landings data.   The committee also asked to receive landings
39 updates on the red snapper private recreational landings by
40 state for 2020 and 2021 at the next meeting.
41
42 Final Action: Reef Fish Amendment 53: Red Grouper Allocations
43 and Annual Catch Levels and Targets, Dr. Kai Lorenzen presented
44 the Scientific and Statistical Committee's recommendations of
45 the red grouper catch analysis.   The SSC reviewed the interim
46 analysis as a health check of the stock.   He noted that,
47 generally, when sector allocations are revised, catch limits
48 need to be re-calculated contingent upon the new allocations.

0004017

The bottom longline index of abundance includes two indices, one based on the full geographic area and one based on a reduced area representative of the limited area surveyed in 2020 due to the COVID-19 pandemic.  The bottom longline index indicates a stable abundance or slight increase.  A full IA to update catch recommendations would require re-calculation of initial catch limits using the new sector allocations.

Council staff presented a summary of oral and written public comments.  SERO staff then reviewed written comments on the Draft Environmental Impact Statement.

Council staff presented the actions and alternatives for Reef Fish Amendment 53.  A committee member noted the language "to ensure overfishing does not occur" in the draft king mackerel document and requested similar language be incorporated into the need statements of Reef Fish Amendment 53.

Staff stated that the language could be incorporated as follows: The need is to base the Gulf red grouper sector allocations, ACLs, and ACTs on the best scientific information available and to prevent overfishing while achieving optimum yield on a continuing basis, while ensuring that the historical participation by the recreational and commercial sectors is accurately reflected by the sector ACLs, and that the recreational ACL is consistent with the data used to monitor recreational landings and trigger AMs.

Council staff reviewed the motion made by the council's Ad Hoc Red Snapper/Grouper-Tilefish IFQ Advisory Panel at its June 2, 2021 meeting recommending Action 1, Alternative 2 as the preferred alternative.  Council staff then reviewed the discussion by the Reef Fish AP at its February 24, 2021 meeting of Action 1 and noted that no motion passed for a recommended Action 1 alternative, but that a motion passed supporting Action 2, Preferred Alternative 3.

A committee member noted one of the public comments stated that a review of the allocation for red grouper did not need to occur until 2026.  Council staff responded that the council did select a time trigger for allocation review, but that it was within the council's purview to examine allocation of any species sooner than scheduled.

A committee member requested that staff lead the committee through the economic analysis in Chapter 4.  Council staff explained that both consumer surplus and producer surplus are

0004018

calculated for both the commercial and recreational sectors and
provided information on values used in the analysis. A
committee member noted that dockside prices were used in the
analysis, which is different than what seafood consumers would
pay at restaurants and at grocery stores.

A committee member inquired if additional economic valuation
studies for the Gulf are being conducted. Council staff stated
that, while uncertain what research the Southeast Fisheries
Science Center is conducting, that it was likely that economists
there were conducting such studies.

A committee member stated that the commercial sector can use
dockside prices, while the recreational sector relies on values
derived from subjective surveys. Even so, dockside prices are
very different from prices seen further along the supply chain.
SERO added that all of the alternatives, in comparison to
Alternative 1 in Action 1, lead to a reduction in the total
annual catch limit. A committee member asked if anyone knew why
the commercial sector was not catching its annual catch target.

A committee member stated that Action 1, Preferred Alternative 3
did not seem to support the conservation of the stock. He
stated that reallocation should not be conducted when the stock
is coming off the lowest stock biomass on record and when the
issue is further complicated by the uncertainty about stock
size, discards, and episodic events like red tide. He added
that at public hearings, there was tremendous support from the
commercial sector for Action 1, Alternative 2. He stated that
it seemed contradictory that an IA could not be considered until
a decision is made on allocation.

Another committee member stated that the commercial sector has
census-level reporting, whereas the recreational sector
reporting is estimated through a sampling process, and, as a
result, the committee member thought the commercial sector to be
more accountable than the recreational sector.

NOAA General Counsel commented that Action 1, Alternative 2 is
still a reallocation, in light of the Marine Recreational
Information Program's Fishing Effort Survey data, whereas
Alternative 6 would maintain a status quo ACL for the commercial
sector. She also noted that, in 2004 and 2005, the commercial
sector exceeded its sector ACT. SERO stated that the
recreational sector is operating within the established
management process, which is not an accountability issue, but a
demonstrated need for better data collection.

153

1  A committee member stated that there has been a lot of criticism
2  of the SSC and of its determination regarding the best
3  scientific information available.  Another committee member
4  thought the council needs to be consistent in either following
5  public comment or scientific guidance for management decisions.
6
7  Another committee member clarified that the role of the SSC is
8  to provide guidance on the overfishing limit and acceptable
9  biological catch, but not to recommend specific allocation
10 decisions, which is the role of the council.
11
12 Another committee member stated that reallocating to the
13 recreational sector increases the potential amount of bycatch.
14 A committee member inquired if the SSC had determined that the
15 MRIP-FES data is BSIA.  Dr. Lorenzen confirmed that the SSC had
16 made that determination.
17
18 Another committee member stated that the total ACL is shrinking
19 for the entire stock, as reflected by the total ACL in the
20 alternatives.  A committee member added that both sectors will
21 likely be reaching their catch limits, since the total stock ACL
22 is decreasing.  A motion to make Action 1, Alternative 2 the
23 preferred alternative failed.  SERO staff presented the codified
24 text and noted the text that would be modified if the council
25 changed its current preferred alternatives.  I am going to pause
26 there.
27
28 **CHAIRMAN FRAZER:**  Okay.  I will just start the ball here a
29 little bit, right, and so with a little bit of background here
30 and where we are.  The reason that this was scheduled, or
31 slated, for final action is, until we establish an ACL, then
32 we're not going to be in a position to benefit from the interim
33 analysis that may allow for an adjustment of both the ABC and
34 the related ACL, and so my preference would be to move this
35 forward, so that we can at least be able to take advantage of
36 that information in the early part of 2022, if not the latter
37 part of 2021.
38
39 Keep in mind that any decisions that are made today, with regard
40 to this document, will have no bearing on what happens in 2021.
41 We heard a lot of public testimony about what's happening in
42 2021, but that's not related directly to any of the decisions
43 that we are going to make, potentially, today, and so, again,
44 the way that the current situation is, we have a preferred, and
45 I understand that there may be an interest in entertaining an
46 alternative, and, if so, we should do that now.  Mr. Sanchez.
47
48 **MR. SANCHEZ:**  Thank you, Mr. Chair.  **Yes, I submitted to staff a**

0004020

1 **motion that I would like to make, which basically looks at the**
2 **preferred alternative and adds a few revisions to it, if we**
3 **could pull it up, and then, if I could get a second, I would be**
4 **glad to elaborate.**
5
6 **CHAIRMAN FRAZER:** Let's get it up on the board, so everybody can
7 see it in its entirety, before we ask for a second, John. John,
8 do you want me to go ahead and read that, or do you want to go
9 ahead and do it?
10
11 **MR. SANCHEZ:** Do you mind reading it?
12
13 **CHAIRMAN FRAZER:** All right. Here we go, John. **The motion on**
14 **the board is for Preferred Alternative 3, but to revise the**
15 **sector allocations of the total ACL between the recreational and**
16 **commercial sectors as the average landings using the Fishing**
17 **Effort Survey (FES) adjusted Marine Recreational Information**
18 **Program (MRIP-FES) data during the years 1986 through 2005,**
19 **based on the Southeast Fisheries Science Center's ACL monitoring**
20 **datasets with an implementation date of January 1, 2023,**
21 **maintaining the allocations for red grouper at 76 percent**
22 **commercial and 24 percent recreational until January 1, 2023, at**
23 **which time the sector allocations will change to 59.3 percent**
24 **commercial and 40.7 percent recreational. Revise the OFL and**
25 **ABC as recommended by the SSC, based on SEDAR 61 (2019). Set**
26 **the stock ACL equal to the stock ABC.** All right. Is there a
27 second to that motion? It's seconded by Ms. Bosarge. John, go
28 ahead.
29
30 **MR. SANCHEZ:** Thank you. What this is, it's basically an
31 attempt to -- I pitched Alternative 2, and it failed, and so,
32 after listening to everybody's testimony and all the concerns, I
33 tried to come up with a way where we kind of go with the
34 preferred alternative suggested by the committee, yet preserve
35 the status quo for a couple of years, until January 2023, much
36 like we did during the red snapper calibration discussions, and
37 maintain those percentages, and then proceed with the revision
38 of the OFL and ABC, as I guess required, in the hope that we can
39 not impact their season.
40
41 Not this year, and this year they're fine, but I'm assuming, if
42 you don't do something along these lines, the following year, we
43 would have to hold back some fish, before they fish, to address
44 the prior Preferred Alternative 3, and so this kind of gives a
45 little breathing room, and it gives us the time to assimilate
46 the economic data that we were presented at this meeting and
47 preserve the status quo for the industry, who this fishery is
48 just now rebounding back from when it was hit.

155

1
2  They are catching more fish than they did last year, and we're
3  coming off of COVID, where there was not a whole lot going on,
4  and this preserves some status quo, and we can digest the
5  interim assessment and perhaps have the benefit of those
6  additional fish down the road, giving the time to be able to get
7  down the road, to be able to assimilate all of this and
8  hopefully walk away where not everybody gets what they want, but
9  we all walk away and live to fight another day, kind of like a
10 mediator.
11
12 **CHAIRMAN FRAZER:**  Okay.  Thank you, John.  Anybody else?  Ms.
13 Boggs.
14
15 **MS. BOGGS:**  I would just like for someone to help me understand.
16 I mean, this committee voted down Alternative 2, but, in the
17 cobia document, we just supported Action 3, Alternative 3, which
18 is to retain the FLEC Zone cobia ACL allocation of 8 percent to
19 the commercial sector and 92 percent to the recreational sector,
20 and that takes the ACL selected in Action 2 based on MRIP-FES
21 landings, and so how is that any different than what we were
22 trying to in Action 1, Alternative 2?  I understand this is
23 dealing with the FLEC Zone, but we supported what the South
24 Atlantic did, and it doesn't seem any different than the
25 Alternative 2.
26
27 **CHAIRMAN FRAZER:**  Ms. Guyas.
28
29 **MS. GUYAS:**  I guess, to that, I can try.  Yes, I mean, that was
30 a South Atlantic action that we were supporting.  To me, we're
31 going to get a lot of these MRIP-FES assessments coming out,
32 where we have this new data, and we've got make a decision on
33 what to do with it, and I will go into the reasons why I'm going
34 to support Preferred Alternative 3, but I feel like we're going
35 to have to make each one of those decisions based on the merits
36 of what's in front of us.
37
38 Cobia is not red grouper, and, for that one, it was South
39 Atlantic, and maybe Chester -- Chester is gone.  I was going to
40 say that maybe Chester can speak to how they arrived at that
41 alternative, but, in my mind, what's happening on the east coast
42 -- That's their jam, and so that's their business.
43
44 **CHAIRMAN FRAZER:**  Ms. Boggs and then Mr. Banks.
45
46 **MS. BOGGS:**  To that point, I mean, I understand.  The point is
47 you're saying that we can't -- By taking Action 1, Alternative
48 2, we're de facto reallocating, and so my point is that's the
                              156

0004022

1   same thing you're doing over on the South Atlantic, and, so, in
2   the South Atlantic, it's okay that they can do it, but the Gulf
3   coast, or the Gulf of Mexico, can't do it?   I mean, is there
4   double standards, is what I am trying to figure out, and maybe
5   I'm wrong, but I'm trying to understand it.
6
7   **CHAIRMAN FRAZER:**   I think I will just weigh-in a little bit, and
8   I do think that the way that we're approaching these different
9   fisheries is unique.   Each one is unique, right, and so we do
10  not have, in place, a policy that establishes a standard policy,
11  and so you're correct that every one is slightly different.
12  Patrick.
13
14  **MR. BANKS:**   Well, certainly they're all different, but the way
15  we approach using data and implementing data should be at least
16  somewhat consistent, and so maybe what Susan is bringing up --
17  Maybe I am not seeing it correctly either, and so maybe staff
18  should help us.   The way Susan described it is the way I see it.
19
20  If you're blind to whether it's South Atlantic or here, or
21  you're blind to whether it's cobia or red grouper, and you just
22  look at the fact of are we going to use FES data to update catch
23  levels, and are we going to institute a reallocation based on
24  that, then these red snapper -- The cobia situation in the South
25  Atlantic and this situation seems to be all the same, to me, yet
26  we're treating them different, and maybe I'm seeing it wrong as
27  well, and so that's why I was hoping that maybe staff could help
28  me.   Is it all apples-to-apples, if you keep the South Atlantic
29  and the Gulf out of the equation and the species out of the
30  equation?
31
32  **CHAIRMAN FRAZER:**   I'm going to go ahead and let Andy Strelcheck
33  have a word here.
34
35  **MR. STRELCHECK:**   Similar to what Tom was saying, it is a council
36  decision.   You don't have a policy that says you have to do it a
37  certain way at this stage, and so you have to balance the
38  decision factors for each species that you're looking at to
39  reallocate and determine the appropriateness of that and justify
40  it on the record, and we talked a lot about that in the Reef
41  Fish Committee with regard to red grouper and the various
42  National Standards that are pulling and tugging at one another,
43  but, at the end of the day, we have to ensure, obviously, that
44  any allocation is fair and equitable and promotes conservation
45  and meets the standards of the Magnuson-Stevens Act.   If, under
46  cobia, it's determined one way, and, under red grouper, or some
47  other stock -- It's based on the record that the council builds
48  for that action.

157

1
2  While I have the mic, I guess I have a question about the motion
3  itself, and so I know it's been modified to say -- Modify the
4  preferred alternative, but I guess I'm viewing this as a new
5  alternative relative to our preferred alternative, and maybe it
6  should be stated as such, as a separate preferred alternative,
7  or new alternative added to the action.
8
9  **CHAIRMAN FRAZER:**   I would agree with that, Andy.   In fact, we
10 should   probably   make   that   --   Instead   of   where   it   says,
11 "Preferred   Alternative   3",   we   should   say,   "New   Preferred
12 Alternative 3".   Martha, while they're putting that up.   Well,
13 hold on.   Let's make sure, and I don't want to get ahead of
14 staff.   In Action 1, to create a new Preferred Alternative 3.
15 **Why   don't   we   just   call   that,   in   Action   1,   to   create   a   new**
16 **Preferred Alternative, and then it would be 7, actually, since**
17 **we have six already.**   Okay.   I am going to go to Martha, and
18 then Leann, and so I'm going to work around the table.
19
20 **MS. GUYAS:**   Okay.   Then maybe this will help explain, to me,
21 where this is a different situation than South Atlantic cobia.
22 Not having that document in front of me, I feel like the swing
23 between   recreational   and   commercial   I   think   was   quite   a   bit
24 smaller than what we're talking about here, and so let me just
25 explain where I'm coming from on this.
26
27 I am in this seat for FWC in Florida, right, and this is an
28 extremely   important   fishery   for   Florida.     This   is   Florida's
29 ballgame.   Recreational and commercial, people coming down, and
30 they  want  their  grouper  sandwich,  and  they're  coming  down  and
31 they want to go on a charter or a headboat or whatever to take
32 grouper, and we have people coming down on vacation, and people
33 move here because they want to fish for grouper and they want to
34 fish for other reef fish, other species.
35
36 Fishing is what Florida does, and so, with this amendment, we've
37 got two issues we need to deal with, right?  We have the lowest
38 stock biomass that we've had on record, and then we're also
39 dealing with the Fishing Effort Survey data and that transition,
40 which this is being used to monitor this fishery, and it is the
41 best   scientific   information   available,   whether   we   like   it   or
42 not, and that's kind of a moot point at this point.
43
44 I don't think anyone in this room would say that we need to go
45 back to the Coastal Household Telephone Survey, and so this is
46 where   we're   at.     In   Florida,   we   have   been   working   to   improve
47 recreational data for red grouper and a number of reef fish, and
48 I'm hopeful that, the next time we have an assessment for red

0004024

1  grouper, we are using the State Reef Fish Survey data for
2  Florida for that assessment instead of FES, for the assessment
3  and then for catch advice and for monitoring.
4
5  Unfortunately, the timing of this assessment, and the timing of
6  all this, that program is not ready for primetime.  We were not
7  certified, and we only had a couple of years' worth of data
8  under our belt, and so it is what it is, and so a couple of
9  things.
10
11 I'm going to support Alternative 3.  We're using what has been
12 deemed the best scientific information available, which is
13 something that we have to do, and it keeps the allocation
14 formula the same, but it plugs in using the recreational
15 numbers, and so what I think this alternative does is it keeps
16 the balance of what's been harvested between recreational and
17 commercial, and it's updating these numbers, and it's providing
18 stability to harvesters, as much as we can, given that we need
19 to make a cut, because we've got some stock issues, that
20 hopefully we're getting past, but we need the interim analysis
21 to tell us that.
22
23 Under this alternative, both sides are going to have to take a
24 haircut, about 20 percent, until we're able to raise the quotas
25 again.  Based on what Ton said, hopefully we get that in front
26 of us soon, and we can get that, hopefully, an increase in 2022,
27 and so the percentages that are in this document may even be
28 moved as soon as some point next year, and that would be great.
29
30 We are just plugging in these new numbers.  The catch trends
31 between the recreational and commercial fishery have been steady
32 for this fishery before the IFQ, after the IFQ, and it's pretty
33 remarkable actually, if you look at Alternatives 3 through 5,
34 which are all the time-based series ones, how close they are
35 together.   To me, that's just another signal that -- It's
36 another little piece of information that kind of tells us that
37 we're on the right track here to kind of keeping things stable,
38 but this is the way to go.
39
40 I guess another thing is the council -- The way that we've
41 really been talking about this, we have been talking about it in
42 terms of making adjustments based on this MRIP-FES information,
43 and we haven't really had discussions about values and what we
44 value for this red grouper fishery, and so that's kind of how
45 we've approached this document.
46
47 When I was at the Reef Fish AP meeting, one of them, and I can't
48 remember which one, where they discussed this document, I was

0004025

1   trying to ask them, okay, what is it that you all value in this
2   fishery, and forget about the numbers, because it's easy to get
3   wrapped around the numbers, and especially with the FES and all
4   that, but what should this fishery look like, and I've asked
5   this to other people too, and, basically, the response I'm
6   getting from people is we want to be able to keep things kind of
7   where they are.
8
9   All right.  I get that, and this alternative gets us the closest
10  to that, Preferred Alternative 3, which I guess is not this, and
11  this is 7, but it's based on it, and so, you know, again, it has
12  that cut, but this is the closest thing, I think.
13
14  I think I will stop for now, and I guess I will just say one
15  more thing.  We will get this interim analysis, and hopefully
16  that's going to give us an increase.  The next assessment, we're
17  going to need to be using Florida State Reef Fish Survey data,
18  and we're going to be facing this question of what to do with
19  FES many, many times, and we're going to be basing this question
20  about what to do with the charter electronic logbooks, when we
21  get there, and so we need to figure this out, and we need to
22  evaluate each of these situations, kind of on their own, and, to
23  me, this is the right -- Alternative 3 is the right way to go to
24  keep stability in this fishery.
25
26  **CHAIRMAN FRAZER:**  Thank you, Ms. Guyas.  Mara, I see your hand
27  is up, and is it to address something specifically that Martha
28  had to say?
29
30  **MS. LEVY:**  No, and I think Andy covered it, and so you can take
31  my hand down.  Thanks.
32
33  **CHAIRMAN FRAZER:**  Okay.  Ms. Bosarge.
34
35  **MS. BOSARGE:**  Thank you, Mr. Chairman.  I am going to support
36  this alternative.  I think one of my issues, at this point, is
37  the speed at which we have worked through this amendment.  For
38  the council to work through any kind of full-blown amendment in
39  less than a minimum of two years, that's warp speed for us, I
40  mean, unless it's a real barebones framework of some sort.
41
42  This is an allocation amendment, and that takes us multiple
43  years, typically, to work through any sort of allocation
44  decision, and the piece of this where we're instituting the new
45  OFL and ABC, the piece of this where we're looking at
46  accountability measures involving ACTs and stuff like that, a
47  year-and-a-half, that's reasonable for the council to work on
48  those.  The allocation piece of this is not, and I think you see

160

0004026

1  that.  If you just -- If you look at what was presented to us at
2  this meeting, we are taking final action, and we just saw, for
3  the first time, the economic analysis.
4
5  Because of the speed at which we've worked on this -- That
6  typically goes before our SSC, for them to review and give us
7  feedback on, and they haven't seen it at all.  If you look at
8  some of the tables in this document, we still have work to do on
9  these tables, and so we're looking at adjusting allocations
10 based on historical landings that have changed from CHTS to FES.
11 We don't even have the whole historical time series of CHTS rec
12 landings in this document.  What in the heck?
13
14 We have through 2005 in one table, and you can go and piecemeal
15 a few of the more recent CHTS numbers from another table, but we
16 don't have a table that's got all the numbers.  We're still
17 missing about five years of CHTS numbers, and that's the whole
18 rationale about why we're changing the allocation, and we don't
19 even have the data in the document.
20
21 If you go look at that table on page -- The table that has the
22 quotas for this document, to help us see -- On page 47, PDF page
23 47 in the document, if you can pull that up, that table is
24 missing information, and that table speaks directly to
25 accountability in the two sectors.
26
27 Most of my accountability discussion thus far has focused around
28 the data collection piece, because I don't even have the
29 information in this table to show the commercial accountability
30 all the way back to 1990.  The commercial sector, and I had to
31 go back to a council amendment for 2005 to pull this data, and
32 it should be in this document.
33
34 It should be in that table.  We had a commercial quota starting
35 in 1990, and that's why I asked Jay Mullins that question in
36 public testimony the other day, because, if you look at this
37 right here, you would say, well, okay, 2004, I guess the
38 commercial guys had something that they were managed to, and
39 they were cut off when they caught it, or got close to catching
40 it, and 2004 is not that long ago.
41
42 In fact, a decade-and-a-half before that, we had a quota that we
43 were cut off when we got to it.  If you look on the recreational
44 side, they had a quota, it looks like, starting in 2010.  That's
45 a big difference in accountability, 1990 versus 2010.  Twenty
46 years later, the council decided that we had better stop them
47 from fishing when they hit their quota, and yet those landings
48 histories are what we're using, and I'm sure that people will
                                161

1   argue, well, it's hard to pull out the quota for the commercial
2   sector in 1990, because it was a quota for shallow-water
3   groupers. I don't care. We had a quota that red grouper was
4   under, and we were cut off when we met it. There's lots of
5   stuff that still is not fleshed out in this document.
6
7   Compare that to how we just handled amberjack, and we're going
8   to do the same thing for amberjack. Before we even started a
9   document for amberjack, at this meeting, council staff, and I
10  love what they did for us, they presented the historical
11  landings time series for it, and they said, is there any
12  information that you are going to want to request on this shift
13  to FES, based on these landings, and it jumped out at me right
14  away, that, yes, there are some big outliers in there, and let's
15  look at this and understand how we came up with these fourteen
16  million pounds here versus three million pounds the next year.
17
18  We haven't done that for this. I tried to do it on my own,
19  because there's not a table in the document that gives me the
20  percentage increase every year when you went from CHTS to FES,
21  but there's certainly the same outliers in this data as well,
22  and I could give you an example. In 2015, the old CHTS said
23  that the recreational sector caught 1.8 million. When you
24  shifted that to FES, it went to 3.7 million. That's a change of
25  105 percent. That lines up pretty well with what we've been
26  told about the shift to FES.
27
28  If you go back one year prior, the rec sector actually landed
29  less fish than they did in 2015, and so, instead of 1.8 million
30  pounds, they landed 1.6 million. When they converted that to
31  FES, it ended up being 5.3 million pounds. They caught less
32  fish than they did the next year, and yet it was five million
33  pounds instead of three million, and it makes no sense. You
34  caught less fish, and it ended up being a 235 percent increase,
35  when you converted it to FES, versus, the next year, you had
36  originally caught more fish, and it only went by 105 percent.
37
38  There's lots of things that we haven't even gotten into, and
39  that's because of the speed with which we have worked through
40  this allocation document, and I really don't think that we're
41  ready for this. I'm certainly not.
42
43  When I am having to go back and forth from amendments from 2005,
44  to try and figure out what quotas would have been, because I
45  don't have them in my document, something is missing, and we
46  need to take a step back.
47
48  The other thing that I will go ahead and tell you that I have

162

0004028

1    issue with is, when I went back to that 2005 document, and I
2    looked at the commercial landings that were on record in that
3    document, as our historical landings, they are different than
4    what we have here, and, for almost every year, they're higher in
5    that old document than what we have in this document, typically
6    by 100,000 or 150,000 pounds a year.
7
8    You start multiplying that by several decades, and that's
9    millions and millions of pounds that somehow disappeared between
10   that document and this document, and so we just went through
11   that with king mackerel.  Things happen sometimes, and crap
12   happens, and you've got to go back and look at it again.  I'm
13   not ready to take final action on the allocation portion of this
14   document today.
15
16   **CHAIRMAN FRAZER:**  Thank you, Leann.  Who is next?  Dr. Simmons
17   and then J.D.
18
19   **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Chair.  Just a point
20   of clarification.  We don't normally take our documents, our
21   amendments, to the SSC to review.  If there are certain analyses
22   done that requires them to review it, then we put it on their
23   agenda to review it and provide feedback, such as certain bag
24   limits or maybe a new method of looking at things on the
25   socioeconomic side, and they might review it then, and so I just
26   wanted to let everyone know that.
27
28   Before we transmit a document, there is many players involved in
29   the IPT, in the interdisciplinary planning team.  It includes
30   biologists and anthropologists and economists from our staff and
31   the Regional Office staff, and we have the Science Center
32   involved, and they're all reviewing this document and writing
33   different pieces of it, and, before we transmit it, the Science
34   Center, with those various disciplines, reviews it and provides
35   a memo on things that we might need to change, review, edit,
36   amend, or whatever, and we do that before the document is
37   transmitted, and so I just wanted to let everyone know that
38   again, for those that might not.  Thank you.
39
40   **CHAIRMAN FRAZER:**  Leann, to that point.
41
42   **MS. BOSARGE:**  Carrie, I am not blaming this on staff at all, and
43   let me just be very clear about that.  You all have worked at
44   warp speed on this.  My beef is it's not done.  There is more
45   work to do.  There is changes that need to be made, and there's
46   information that is missing from the document that needs to be
47   in there.
48

163

1   I mean, that's one of our objectives in the reef fish fishery,
2   is this idea of accountability, and that plays into
3   conservation, which plays into allocation.  If you don't have
4   the full view of accountability for each sector over the history
5   of the sectors, how can you reasonably evaluate your allocation?
6   We have more work to do, in my opinion.
7
8   **CHAIRMAN FRAZER:**  Ryan, did you have something to add, real
9   quick?
10
11  **MR. RINDONE:**  Yes, sir.  Thank you, and it's just to speak to
12  the structure of the commercial quotas for the shallow-water
13  grouper species, including red grouper, and so a red-grouper-
14  specific quota did not exist until 2004.  Prior to that, red
15  grouper was included in the shallow-water grouper complex, which
16  -- So that quota began in 1990, and then were adjustments along
17  the way to accommodate things like goliath and Nassau and
18  changes to the shallow-water grouper complex, but, again, no
19  red-grouper-specific quota existed until 2004.
20
21  **CHAIRMAN FRAZER:**  Leann.
22
23  **MS. BOSARGE:**  It's still in the shallow-water grouper complex,
24  Ryan, and I will grant you that maybe it's easier to pull out
25  right now, but you had a quota that red grouper couldn't go
26  above a certain quota as a species in that complex.  When you
27  look at that table, it shows as if we were free fishing, it's a
28  free-for-all, that we don't have any limits, and there is no
29  stop.  There is more data that needs to go in there.
30
31  **CHAIRMAN FRAZER:**  Ryan, quickly, and then I'm going to move on
32  to J.D.
33
34  **MR. RINDONE:**  Sure, Mr. Chair.  Red grouper was included with
35  those other species, and there wasn't like a species-specific
36  quota within the shallow-water grouper quota prior to 2004, and,
37  currently, red grouper is not included in the shallow-water
38  grouper complex for IFQ management.  It's its own IFQ cap.
39
40  **CHAIRMAN FRAZER:**  Leann, I will give you one more.
41
42  **MS. BOSARGE:**  Ryan, we had a quota.  When you look at that
43  chart, it looks like we had no quotas, like we could catch as
44  many grouper, red grouper, as we wanted to catch.  It shows
45  nothing there.  There has to be more information.  Since 1990,
46  we have had a quota, and we were forced to stop fishing.
47
48  The layperson reading that document would think that we were

                                    164

1   hands-off fishery until 2004, where we were not managed to any
2   kind of quota.  If you want to call it the max quota, like 9.2
3   million pounds for shallow-water grouper in 1990, red grouper
4   was one of those.  If all shallow-water grouper was red grouper,
5   then 9.2 million pounds is the max we could have caught, and so
6   there is a quota there.
7
8   **CHAIRMAN FRAZER:**  All right, and so I think, again, we've had
9   some good back-and-forth, and I get the point here.  There needs
10  to be, perhaps, a clarification, or a caveat, in that table,
11  moving down the road, that there was an aggregate quota for a
12  number of grouper species, but there was not one specific for
13  red grouper.  I know I have J.D. and Patrick on the list, but,
14  Andy, did you -- You're good?  Okay.  J.D.
15
16  **MR. DUGAS:**  Thank you.  I have a couple of points.  I don't see
17  how we can compare the red grouper to red snapper, because I
18  thought we were waiting on the Great Red Snapper Count, to kick
19  it down the road to 2023.  My other question, or point, is the
20  interim assessment, wouldn't we be able to implement the new
21  data in the fall?  That way, the season ACL can change for 2022,
22  and I'm going to agree with Martha, and I am going to support
23  Alternative 3.
24
25  **CHAIRMAN FRAZER:**  Thank you, J.D.  I just want to ask a real
26  quick question.  In order to take advantage, again, of the
27  interim analysis, we have to establish an ACL.  In the absence
28  of that, we cannot carry out the interim analysis, and so that's
29  a bit of the discussion here.  Patrick.
30
31  **MR. BANKS:**  I just had a question for John, so I can try and
32  understand your motion here.  You're saying to go ahead and
33  calibrate the data for ACLs and ABCs, but just don't implement
34  the reallocation portion until January of 2023?
35
36  **CHAIRMAN FRAZER:**  Mr. Sanchez.
37
38  **MR. SANCHEZ:**  Thank you.  Yes, that would be correct, and,
39  again, the analogy here, to me, is we're waiting for a series of
40  things that I think need to be improved upon.  The economic
41  data, perhaps, we could get more insight into that, and
42  certainly the assessment, and, to me, that interim assessment is
43  analogous to the desire to drop back and punt in snapper, until
44  2023, waiting on the Great Red Snapper Count.  To me, we're not
45  applying the same approach and logic uniformly every
46  deliberation.
47
48  **CHAIRMAN FRAZER:**  Susan.

0004031

```
 1
 2   MS. BOGGS:   I'm going to come full circle, because I'm going to
 3   come back to my original comment, and Patrick did help me try
 4   and clarify, but what I understood yesterday, during the Reef
 5   Fish Committee, and Mara can correct me if I'm wrong, but Mara
 6   said what we -- Actually, Alternative 2 -- I am so confused now.
 7
 8   Action 1, Alternative 2, you could not do that, and that was not
 9   legally viable.   My whole point to this is, if that's not
10   viable, what the South Atlantic did and what we just supported
11   in the South Atlantic for cobia, and it doesn't matter if it's
12   cobia, red grouper, red snapper, and it doesn't matter what it
13   is, but it's the principle of what we just did.   We just set a
14   precedent, and we were told we can't do it here, but we were
15   able to do it over there.   Thank you.
16
17   CHAIRMAN FRAZER:   I want to clarify.   It's not Alternative 2
18   that was not legal, but it was the Alternative 1, the status
19   quo.   I will get Mara to clarify.   Mara.
20
21   MS. LEVY:   Thank you.   I didn't -- Well, if I didn't, I didn't
22   mean to say that Alternative 2 wasn't legally viable.   I was
23   only pointing out that it's the only alternative that allows the
24   commercial sector to increase its quota while everything,
25   including the total, is decreasing, and that, if you wanted to
26   do that, you would need to explain how that's appropriate, given
27   all of the National Standards and other things you need to
28   consider.   Can I ask a question?
29
30   CHAIRMAN FRAZER:   Go ahead.
31
32   MS. LEVY:   I am just -- I just want to make sure that I just
33   understand the way this would work, because it has the
34   percentages and such.   If this were to move forward, you would
35   be implementing the catch levels that are currently under
36   Alternative 2 for this year, which isn't really going to happen,
37   and next year, and then you would be implementing the catch
38   levels that are under Alternative 3, right?
39
40   CHAIRMAN FRAZER:   That's correct, and so, for 2022, you would
41   be, in essence, taking advantage of the ACL, the ABC and the ACL
42   equal to that ABC, that would allow the commercial sector to
43   harvest 3.72 million pounds, and the corresponding ACL for the
44   recs would be 1.18 million pounds, and that's in FES units.
45
46   In 2023, we don't know what that would look like, but -- In
47   large part because we would have a new interim analysis that
48   would likely adjust the catch advice, but it would certainly --
```

0004032

1  I am going to look at my own notes here for a minute.
2
3  If you went to, in 2023, that 59.3 to 40.7, and that was the
4  allocation split, and the quota remained -- It would be 4.9
5  without an adjustment. Excuse me. It would actually go down to
6  4.26 million pounds, and that would represent a reduction in
7  both of those sectors of approximately 20 percent. Of course,
8  that's unlikely, given the interim analysis would adjust the
9  quota up, but that's the way it looks now. Go ahead, Mr. Diaz.
10
11 **MR. DIAZ:** I understand what you just said, except maybe you
12 didn't state it like I'm thinking about it. If we went with the
13 motion that's on the board, we would do an interim analysis
14 based on 76/24, and we would get a new number, and that number,
15 I was thinking, would be available for 2022, but you said 2023.
16
17 Then, afterwards, we would have to recalculate everything, with
18 whatever interim analysis is available at the time, and we would
19 use the different percentages that were originally in the
20 preferred alternative, and is that correct?
21
22 **CHAIRMAN FRAZER:** Yes, that's what I think would happen, Dale.
23
24 **MS. LEVY:** Tom, can I ask a follow-up?
25
26 **CHAIRMAN FRAZER:** Go ahead, Ms. Levy.
27
28 **MS. LEVY:** Well, I hear what you're saying about what you think
29 is going to happen in the future, but, if this were to actually
30 be the alternative that moved forward, and, if you took final
31 action, the agency is going to have to implement something that
32 corresponds with this, in terms of telling people what would be
33 the catch limits if nothing happened, and so I guess that's what
34 I am getting at.
35
36 In my mind, if nothing else happened, then the agency would be
37 implementing the catch levels under Alternative 2 for the year
38 2022, but, starting in 2023, all the catch levels that are under
39 Alternative 3 would be what's implemented, and so I just want to
40 make sure that everyone is on the same page if there was nothing
41 happening after this.
42
43 **CHAIRMAN FRAZER:** That's exactly right, and that's what I was
44 trying to get at. In the absence of any adjustment in 2023,
45 then, when you revert to that Alternative 3 allocation, then it
46 would result in a 20 percent reduction in allocation to both
47 sectors.
48

167

1  **MS. LEVY:**  Well, not really, because the total goes down under
2  Alternative 3, right, but, compared to Alternative 2, the
3  commercial goes down, but the rec goes up.
4
5  **CHAIRMAN FRAZER:**  Yes, that's correct, and so you're moving from
6  one alternative to another.
7
8  **MS. LEVY:**  Okay.
9
10  **CHAIRMAN FRAZER:**  Yes, and so you're exactly right.  I am going
11  to Andy.
12
13  **MR. STRELCHECK:**  I know John spoke a little bit to the
14  rationale, in terms why allocate this way for 2022 but then
15  change it in 2023, and I think more discussion needs to be had
16  as to why we are increasing based on the FES numbers, yet the
17  commercial is essentially getting a bump-up in quota and
18  benefitting from that, relative to the recreational sector.
19
20  With all that said, I mean, I think there's another couple of
21  ways we can approach this, and one is we don't vote this
22  alternative up, and we move forward with the preferred
23  alternative that's in the document, and that then sets the stage
24  for an interim analysis, which comes back to the council
25  hopefully fairly quickly.  In the meantime, the agency moves
26  forward with rulemaking, and, assuming we approve the action, we
27  would implement this for 2022, but the quota could be changed,
28  based on the interim analysis, sometime in 2022.
29
30  One of the things that I do want to comment on, and I was going
31  to just say we were -- Because I felt like Leann wasn't speaking
32  to the motion, was the issue that this document isn't ready,
33  right, and, well, this goes through an extensive review process,
34  and I appreciate that the council, at times, may see documents
35  longer or shorter than they normally do, and we just voted up a
36  red snapper document in about a two-week period of working on it
37  at the last meeting, right, and so I think we're consistently
38  inconsistent, and so, if we want to be more cognizant of timing
39  and how long things come before the council and that data,
40  that's probably a council discussion that should be had, but
41  time doesn't always allow us to do that.
42
43  The other thing I will say is that, at least with regard to the
44  economic analyses in this document, yes, they haven't gone
45  before the SSC, and these are standardized fisheries economic
46  analyses, and they are reviewed by the Science Center, and
47  they're conducted regularly, and we're not dramatically changing
48  methods or information that goes into these documents, and so I

168

1  recognize there is concerns about the results of that
2  information, but they are consistent methods that are being
3  used.  Thank you.
4
5  **CHAIRMAN FRAZER:**  All right.  Thank you, Andy.  Ms. Bosarge.
6
7  **MS. BOSARGE:**  The other thing that we're missing from this
8  document is this analysis that we've had done for the king
9  mackerel, where not only do we get a historical time series of
10 recreational landings in FES, but we need to see what the
11 historical time series of catch limits would have been, ACLs and
12 ACTs and whatever, for that corresponding time series, and that
13 helps us understand how often were we actually overharvesting.
14
15 In other words, if you project back in time what the ACLs would
16 have been with those FES landings numbers, then you can
17 understand that, well, we thought the stock was probably bigger
18 than what we did back then, but, even given that bigger stock,
19 did we overharvest, and, if you look at the state of red grouper
20 at this point, where it is the lowest biomass on record in our
21 history of assessing the stock, yes, we have had some
22 environmental issues with red tide, but you would think that
23 there was probably some overharvest that also contributed to
24 that, and, if it's thirty years of overharvest, which is about
25 how far back this FES calibration goes, that becomes
26 substantial, and I'm not saying it is or it isn't.
27
28 We don't have the data in front of us to show us that, because
29 we haven't gotten that analysis the way that we have for king
30 mackerel and the way that we have requested it for amberjack, to
31 give us some better picture of what drove this stock down to the
32 point that it's at today, but, touching on that idea of stock
33 status for red grouper, the Mid-Atlantic is toying with this
34 idea of access being aligned to stock status.
35
36 If this motion fails, we're going to go back to the preferred
37 alternative that changes the commercial allocation and shifts it
38 down.  Staff, will you pull up that chart, please?  My chart is
39 going to show you what happens to access to the commercial
40 sector and the recreational sector when we have a stock that's
41 in a bad way right now.
42
43 There you go.  Look at the current preferred alternative,
44 Alternative 3.  The commercial access -- You see that commercial
45 quota change?  Decrease our commercial quota by 20 percent, and
46 that's our access, right?  We view access in pounds, quota,
47 because we don't have a season, per se.  We can catch it
48 whenever we want, because we work under the IFQ system.

169

1
2  The recreational sector sees access most of the time in the
3  number of days it's going to be -- The season it's going to get.
4  That season, for them, is predicted to close on December 19, and
5  so almost the entire year they will get to fish.  We're going to
6  take a 20 percent cut in access.
7
8  If you do theirs as a percentage, they get a percentage, and
9  their access, in days, is projected to decrease from either zero
10 or twelve days, because you see the no closure out there is a
11 possibility, and so, in percentage terms, the access, the most
12 access they're going to give up, is 3 percent, if they close on
13 that projected date, and possibly none, but the commercial has
14 to take a hit of 20 percent cut to their access, and so, to me,
15 that's not fair and equitable, given the history of what we're
16 looking at right now.
17
18 We've had a quota since the 1990s, and we now know that rec
19 landings were double what we thought they were for the last
20 several decades, and we have the lowest biomass in history, and
21 so how are we going to fix it?  We'll decrease commercial access
22 by 20 percent, and we'll decrease rec access somewhere between
23 zero and 3 percent.
24
25 **CHAIRMAN FRAZER:**  Okay.  I know that I see Martha and Andy, but
26 I just need to -- Before we go there, I am confused, Leann, by
27 the delta in the recreational quota under Alternative 3.  What
28 you have in Column 2 under that preferred is in FES units, 1.73
29 million pounds, and the status quota, in FES units, is 2.1
30 million pounds, and so the delta --
31
32 **MS. BOSARGE:**  That delta is compared to Alternative 1, which is
33 in CHTS, right, and so that's why I didn't use the delta for the
34 rec quota, because they don't judge their access based on
35 pounds.  They judge their access based on days, right?  How many
36 days, what season, and that's what our whole discussion has
37 been.  What will that do to their season, what will that do to
38 their season, and how long will they get to fish, and that's
39 what is important to them.
40
41 It's going to let them fish until December 19, and so, when you
42 look at the change in their access to this fishery, it changes
43 by a handful of days, which equates to about a 3 percent
44 reduction in their access, and that's the piece that is always
45 important to recreational fishermen, how many days will it get
46 them, but we get a 20 percent reduction, because we don't
47 measure things in days on the commercial side.  We can fish any
48 day of the year we want, and it's how many pounds can we catch.

                                  170

1
2  **CHAIRMAN FRAZER:**  Sure, and I understand the argument.  I'm just
3  -- There are two elements here, in my mind, and one is simply
4  math, and the other one deals more specifically with a broader
5  issue related to allocation and values.  I just want to make
6  sure, for Phase I, that we understand the math, and the math --
7  That is a bit misleading, right?  If we want to talk about days,
8  that's cool.  I get that, and I just want to make sure the
9  deltas are the same deltas.
10
11  **MS. BOSARGE:**  Yes, and so you notice I didn't reference a 73
12  percent increase in access, because I know it's not going to get
13  them a 73 percent increase in access, but, for consistency, both
14  columns are listed there, in comparison to Alternative 1.
15
16  **CHAIRMAN FRAZER:**  Sure.  I just wanted to make sure we're
17  transparent.  Andy.
18
19  **MR. STRELCHECK:**  Tom, you were making a similar point as I am,
20  and certainly, from my standpoint, when we're talking
21  allocation, how long a season is going to be, how much a certain
22  sector is going to be cut, can be considered, but it shouldn't
23  be part of the full equation here, right, and that's clear with
24  our allocation policy with the National Marine Fisheries Service
25  and the council's policy.
26
27  There are a lot of factors that go into allocation, and the hard
28  part about this is we're in disagreement about what those
29  factors should be, and what I heard, during the committee
30  discussion, which I think is directly to the commercial points
31  here, is that we are weighing the net economic benefits for this
32  sector and allocation toward shifting the allocation to the
33  recreational sector, and, in doing so, these are the outcomes
34  that come from that.
35
36  This is not surprising to me then that we would achieve that
37  result, based on trying to minimize the net economic effects, or
38  benefits, and ultimately balance all of those national standard
39  guidelines that we're weighing when we're deciding on
40  allocation.
41
42  **CHAIRMAN FRAZER:**  Ms. Levy.
43
44  **DR. STUNZ:**  Tom, sorry to interrupt, but are you seeing our
45  hands up online?  I've been sitting here patiently for quite a
46  while.  You might have a list, but I don't know.
47
48  **CHAIRMAN FRAZER:**  Sorry, Greg.  Your hand just showed up for me,

0004037

1  and I apologize for that.
2
3  **DR. STUNZ:**  Go ahead with Mara, but I've had it up for at least
4  ten minutes.
5
6  **CHAIRMAN FRAZER:**  Okay.  I apologize for that, and we'll go to
7  Mara and then to Greg.
8
9  **MS. LEVY:**  I think my hand might have been up falsely, and so,
10 Greg, you go ahead.
11
12 **CHAIRMAN FRAZER:**  Greg, your turn.
13
14 **DR. STUNZ:**  Okay.  Thanks, Mr. Chairman.  Sorry, and my hand had
15 been up, and I wasn't sure if you were just not seeing it, and
16 so part of my comments weren't related to just the last
17 discussion, but I wanted it to go back.
18
19 I mean, I support Alternative 3, and not what we're now calling
20 Alternative 7, for various reasons.  One, I want to comment
21 about the speed that we've been talking about, and, if anything,
22 I think we as a council could increase the speed, versus -- It's
23 hard to argue that we're being too fast, with as slow as we are
24 on most things, and I want to also say that I think the staff
25 and the IPT and others have done a great job putting this
26 together, and certainly all documents can always use
27 improvement, but we have what we need here in enough complete
28 form to clearly make this decision.
29
30 My hand was up some time ago, but the earlier point that Martha
31 made, and Andy, they largely made some of my points, but I feel
32 like we might be overcomplicating this some, and, in my mind,
33 Alternative 3 deals with that directly in its simplest form.  We
34 had an issue with the conversion, and we discovered that there
35 was the problem, and we corrected it, and now we're addressing
36 that with Alternative 3.
37
38 We keep talking about -- I mean, certainly this moves things
39 around, in terms of allocation, but it's not a real allocation,
40 in the sense that we're using the best scientific information
41 that we've got, including an economic analysis, to fix what we
42 didn't have right in the past because of the historical mix was
43 not what we thought it was.  That doesn't get -- The new
44 alternative doesn't address that as directly as Alternative 3,
45 and so my support is not in favor of Alternative 7 and going
46 with Alternative 3.
47
48 **CHAIRMAN FRAZER:**  Thank you, Greg.  Andy, did you have your hand

0004038

1   up again?
2
3   **MR. STRELCHECK:**   Yes, and I just wanted to make another point,
4   and it's in the document.   In terms of what Leann was sharing,
5   the kind of midpoint of the closure for the recreational is
6   estimated in December, there's a wide range as to when that
7   closure may actually occur, and so the math works, obviously, to
8   3 percent, as she presented, and that was correct, but that
9   closure could be far earlier, and it could be in August, based
10  on some of the calculations we have, or it could never close
11  during the year, and we don't lose any days of fishing, and so I
12  just wanted to note that there is uncertainty with regard to,
13  obviously, how we monitor the quotas and landings, and the
14  impacts to each of the sectors may -- Especially the
15  recreational sector could be greater or less than actually what
16  was shown.
17
18  **CHAIRMAN FRAZER:**   Thank you, Andy.   All right.   I am not seeing
19  any other hands.   We're going to go ahead and take a vote on
20  this particular motion to make a new Alternative 7 the
21  preferred.   I will ask for a show of hands.   **All those in favor,**
22  **there are five in the room.   As far as those on the web, any in**
23  **favor, zero.   The motion fails.**
24
25  Okay, and so are there any other motions to be made at this
26  point?   If not, we will continue with the report, and we will
27  certainly circle back on this.   Ms. Guyas.
28
29  **MS. GUYAS:   Well, I'm going to need from help from staff, but I**
30  **will make the motion that we take this final.**   I know there's a
31  long paragraph that goes along with that.
32
33  **CHAIRMAN FRAZER:**   Okay.
34
35  **MS. GUYAS:**   Once it's on the board, I will read it.   I will be
36  happy to.
37
38  **CHAIRMAN FRAZER:**   Okay.   We will get it on the board, and we
39  will sit patiently until that time.   Greg, while we're getting
40  all this up on the board, I noticed that you hand is up.
41
42  **DR. STUNZ:**   Yes, Mr. Chairman, and I was going to make the same
43  motion that Martha offered, and so, when she gets it up there,
44  you can have me second it, or I will second it.
45
46  **CHAIRMAN FRAZER:**   Okay.
47
48  **MS. GUYAS:   The motion is to approve Reef Fish Amendment 53: Red**

0004039

1 **Grouper Allocations and Annual Catch Levels and Targets and that**
2 **it be forwarded to the Secretary of Commerce for review and**
3 **implementation and deem the codified text as necessary and**
4 **appropriate, giving staff editorial license to make the**
5 **necessary changes in the document.  The Council Chair is given**
6 **the authority to deem any changes to the codified text as**
7 **necessary and appropriate.**
8
9 **CHAIRMAN FRAZER:**  Okay.  We have a motion, and it's seconded by
10 Dr. Stunz.  Is there further discussion on the motion?  We will
11 go first to Patrick and then John.
12
13 **MR. SANCHEZ:**  I'm just going to ask for a roll call.
14
15 **CHAIRMAN FRAZER:**  Okay.  There will certainly be a roll call
16 vote, when we get there.  Patrick.
17
18 **MR. BANKS:**  I don't think I can support the motion, mainly
19 because I'm just very uneasy about moving forward as final right
20 now with some of these unknowns that Leann brought up, and it
21 just seems like we need to give it at least one more meeting to
22 discuss and chew on and try to understand all of those things.
23 Maybe your concerns, Leann, won't be brought forward, and they
24 may not be valid, but at least give us some time to figure that
25 out.
26
27 I had a conversation with our economists back in Baton Rouge,
28 one of which is one of the authors on the paper that was heavily
29 cited in the economics section, and there is some concerns, when
30 they read the economics section, that their paper was applied
31 correctly, and so that gives me just a little bit of pause, and
32 I feel like that -- I don't think I can support this, and I
33 think we need to just hold off at least one more round.  Thank
34 you.
35
36 One other point that I wanted to make, and I'm sorry, but let me
37 bring it back up.  I got to looking at the FMP objectives for
38 reef fish, and I heard Martha say some things about stability
39 and about how this would maintain stability in this fishery, and
40 I don't know what we were listening to yesterday, but that
41 didn't sound stable to me.  I mean, that sounded like a fishery
42 that was about to become extremely unstable, at least on the
43 commercial side, and so it didn't seem like that's what we're
44 promoting there.
45
46 It doesn't seem like we're promoting and maintaining
47 accountability when we're continuing to use a system that has a
48 high degree of variability and put more fish to that system of

0004040

1    accountability    and    take    it    away    from    one    that's    very
2    accountable.
3
4    It   just   seems   like   we   need   to   look   at   some   of   those
5    accountability   issues,   and   so   there's   some   things   here   in   --   To
6    prevent   overfishing   and   rebuild   fish   stocks,   I   don't   think
7    John's   motion   --   I   think   John's   motion   handled   that,   because   we
8    were   going   through   the   calibration   process,   but   you   just   weren't
9    indicating   a   reallocation   at   this   time,   and   so   it   just   seems
10   like   that   we're   not   following   some   of   the   objectives   from   John's
11   motion.   It   seems   like   John's   motion   addresses   some   of   these   FMP
12   objectives   more   than   the   Alternative   3   at   this   time,   and   largely
13   because   of   the   instability   that   we   heard   yesterday,   and   so,
14   anyway,   thank   you.
15
16   **CHAIRMAN FRAZER:**  Ms. Guyas.
17
18   **MS. GUYAS:**   Thank   you.   Let   me   speak   to   that   a   little   bit   more.
19   I'm   talking   about   the   fishery   as   a   whole,   right,   and   so   the
20   Alternative   2,   because   that's   been   kind   of   the   other   one   that
21   we've   discussed   here,   other   than   John's   motion   here,   which   is
22   kind   of   a   hybrid   of   the   two,   I   guess,   if   you   will,   and   so,   if   we
23   did   Alternative   2,   we're   going   to   increase   the   commercial   by   I
24   think   it's   15   percent   or   so   and   decrease   recreational   by   40
25   percent.   Then   they're   looking   at   a   closure   potentially   in   like
26   August.
27
28   With   Alternative   3,   I   mean,   yes,   both   sectors,   based   on   the
29   state   we're   in   with   the   stock,   are   going   to   face   a   cut,   and   it's
30   about   20   percent   on   both   sides,   and   that's   really   the   best   that
31   we   can   do   here   at   this   point.   I   appreciate   what   John   was   trying
32   to   do   with   that   motion,   and   I   feel   like   there   are   also   a   lot   of
33   problems   that   we've   heard   about   with   the   commercial   that   people
34   are   experiencing,   like   not   being   able   to   find   quota   or   shares
35   and   allocation.
36
37   While   I   can   sympathize   with   those   problems,   and   I   think   they   are
38   real   problems,   reallocating   to   the   commercial   sector   I   don't
39   think   is   going   to   solve   those   problems,   and   we   know   this   from
40   red   snapper.   We   have   increased   that   allocation,   or   the   overall
41   quota,   where   both   sectors'   allocations   have   gone   up   millions   and
42   millions   of   pounds   over   the   past,   I   don't   know,   ten   years,   and
43   we   still   have   those   same   issues   with   availability   of   shares   and
44   quota,   despite   having   all   these   extra   pounds   on   the   table,   if
45   you   will.
46
47   It's   really   --   We   really   have   an   issue   with   the   system,   and,
48   again,   I'm   hoping,   I   guess   as   far   as   this   document   goes,

175

1   relative modest cuts to both sides, in the short term, we start
2   to see some gains, and we're able to get some interim analyses
3   in place, and maybe even as early as next year, with the new
4   interim analysis, not as steep of a cut for everybody.  I think,
5   really, this 3 is the most fair and equitable way to go, based
6   on this, and so I guess -- I think I've made my points.
7
8   **CHAIRMAN FRAZER:**  Patrick and then Mr. Diaz.
9
10  **MR. BANKS:**  I certainly wasn't advocating for Alternative 2, as
11  opposed to Alternative 3, and I voted against that motion
12  yesterday, and so that's not what I was saying at all.  I do
13  agree with you that Alternative 3 is more stable than
14  Alternative 2, overall for the fishery, but, if you look at
15  John's motion, I just don't see where that creates instability
16  on the recreational side, whereas Alternative 3 creates a
17  tremendous amount of instability on the commercial side, and
18  John's motion gives a little bit of time for that instability to
19  smooth out over the next eighteen months, it seems like, and it
20  just seems to be a little bit more stable way to move along, and
21  so that's all I was getting at, and I certainly wasn't
22  advocating for Alternative 2.
23
24  **CHAIRMAN FRAZER:**  Mr. Diaz.
25
26  **MR. DIAZ:**  Thank you, Mr. Chair.  Patrick's discussion on
27  delaying the document to another meeting to check more stuff
28  out, normally I would support your position, but we're in an
29  unusual situation right here that we really need to get an
30  interim analysis, because things are changing out there on the
31  water, and I'm hoping that some of that shows up in the interim
32  analysis, and we can't get the interim analysis until we get to
33  the point where we pick an allocation, so we can get the ACL.
34
35  If we do put it off for another meeting, I think we're pushing
36  back on getting the interim analysis started, and, ultimately,
37  some numbers from the interim analysis, and so I'm struggling
38  with that right now, and I just wanted to bring that up as
39  something for people to think about as they make up their minds
40  about what to do.  Thank you.
41
42  **CHAIRMAN FRAZER:**  John.
43
44  **MR. SANCHEZ:**  I just wanted to ask a question.  Are you all
45  going to miss me?
46
47  **CHAIRMAN FRAZER:**  Mr. Swindell.
48

0004042

1   **MR. SWINDELL:**  Yes, John, they will.  I still have a problem
2   with the FES being such a major change and the catch that is
3   being proposed being all the recalibration stuff.  I am just not
4   comfortable that it is as good, and, I mean, we've used the MRIP
5   calibration, and we have voted on it, and that's what we're
6   using, and we're suddenly now into a different system of using
7   the FES, and this is different.
8
9   If it was just a little bit or something, I could maybe go along
10  with it, but I am still not confident that I have a good feeling
11  for our SSC has even considered whether it is the right thing to
12  do, but, since the Science Center changed to the FES, they don't
13  have a choice, and we don't have another system.
14
15  I would just like -- Before I vote on something that is such a
16  drastic change, I would much rather have our SSC at least give
17  us some idea of whether or not they think that the system is a
18  good viable system, and that's all I'm asking, Mr. Chairman.
19
20  **CHAIRMAN FRAZER:**  I appreciate that, Mr. Swindell.  I'm just
21  going to reiterate though that Dr. Lorenzen, as part of the
22  report, indicated, with regard to this assessment, that the SSC
23  showed that the FES was the best available information.  Okay?
24
25  **MR. SWINDELL:**  And I truly understand, because that's the best
26  information that he has to use.
27
28  **CHAIRMAN FRAZER:**  In fact, it's the only information that he has
29  to use at this time.  Ms. Bosarge.
30
31  **MS. BOSARGE:**  I just wanted to say thank you for entertaining
32  all my comments.  I know that I should say things in a monotone
33  voice, and I don't, and I know I'm passionate about it, and I
34  probably come across as frustrated, but thank you for letting me
35  speak and listening to everything that I've had to say.  I will
36  try and keep this one monotone.
37
38  I am going to vote in opposition to this motion.  We're in
39  Florida, and, as Martha said, this is a Florida-centric fishery,
40  both recreationally and commercially, and we went out to public
41  hearings in Florida, in-person, which thank you to the staff.
42  They pulled that off and made that happen, and, if you look at
43  the makeup of public testimony, not just at this meeting, but,
44  at all those public hearings, it was overwhelmingly commercial,
45  with a small portion of for-hire participating as well.
46
47  The number of private anglers that have given testimony on this
48  at this meeting, and in those public hearings, you could

                              177

0004043

1  probably count them on two hands.  I mean, if you look at them
2  showing up to say, oh my gosh, you can't do this, this is going
3  to kill us, this is going to kill our access, it hasn't
4  happened, if you look at the numbers that have shown up to this
5  meeting, to show me that it's important to them.
6
7  However, on the commercial side, we have had overwhelming public
8  testimony that this is going to significantly impact them, and
9  so I just wanted to remind people of that and put that on the
10  record as we move forward.
11
12  **CHAIRMAN FRAZER:**  Martha, before I go to you, I apologize that,
13  Robin, I've seen your hand up there.  Robin, you can go ahead.
14
15  **MR. RIECHERS:**  Actually, my hand went up to tell John that I was
16  going to miss him, but I will go ahead and say something now.  I
17  am going to go back to what Martha had said originally and just
18  remind -- I will try not to go too long on this, since we aren't
19  really debating which alternative, but, with Alternative 3, it's
20  really the status quo alternative to what is going on in the
21  fishery today, as far as allocations.
22
23  Any of the other alternatives actually reallocate this fishery
24  in some way, and so what we're trying to do, or what we've said
25  we're trying to do here, is basically leave it in the same
26  place.  Yes, there's going to be cuts on both sides, as Martha
27  indicated, but, as Dale indicated, with the hope as well of
28  getting the interim analysis, so that, possibly, as quickly as
29  possible, if there is an interim analysis that suggests that
30  stock levels have been going up, that both sides will also
31  benefit from that.
32
33  As far as what happened in the past with ACLs and catch levels,
34  when we have these readjustments in data, they do make you
35  question a lot of those things, but they're really -- A lot of
36  those questions just really don't matter at this point, because
37  that data is basically -- We can't go back and incorporate it
38  into past assessments, because we've changed so many things in
39  the assessments, as we've moved through time, as well.  Again,
40  sorry, Mr. Chairman, for going on, but I will let you get the
41  vote done here soon.
42
43  **CHAIRMAN FRAZER:**  I am looking around the table.  Okay.  No more
44  discussion.  All right.  I'm going to say a couple of words
45  before we get started here.  I made a comment, the other day,
46  about public comment and whether or not we take that seriously,
47  and we do.  I saw a lot of people come up, and it's important
48  for me to convey that I heard those people.

0004044

1
2   The intent here is not to hurt anybody, and it's hard, and the
3   reason that I talk about math and values is because I truly
4   believe, in the short term, the math provides stability, because
5   I don't think we've found our way with regard to values, and so,
6   in the short term, I probably will vote for this, and it's not
7   because I didn't hear anybody, but it's because it provides some
8   stability, and I am compelled to ask everybody on this council
9   to figure out what their values are as move forward, and I'm
10  hopeful that there's an opportunity, in the late fall and early
11  January, to take advantage of that interim analysis, so we can
12  increase the catch and provide additional opportunities, at
13  least in a proportional way, without further hurting people's
14  livelihoods.  Okay.  Roll call vote.
15
16  **EXECUTIVE DIRECTOR SIMMONS:**  Thank you, Mr. Chair.
17
18  **MS. GUYAS:**  Yes.
19
20  **EXECUTIVE DIRECTOR SIMMONS:**  Ms. Bosarge.
21
22  **MS. BOSARGE:**  No.
23
24  **EXECUTIVE DIRECTOR SIMMONS:**  Ms. Boggs.
25
26  **MS. BOGGS:**  No.
27
28  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Swindell.
29
30  **MR. SWINDELL:**  No.
31
32  **EXECUTIVE DIRECTOR SIMMONS:**  Dr. Stunz.
33
34  **DR. STUNZ:**  Yes.
35
36  **EXECUTIVE DIRECTOR SIMMONS:**  Dr. Shipp.
37
38  **DR. SHIPP:**  Yes.
39
40  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Anson.
41
42  **MR. ANSON:**  Yes.
43
44  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Sanchez.
45
46  **MR. SANCHEZ:**  No.
47
48  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Burris.

0004045

1
2  **MR. BURRIS:**  Yes.
3
4  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Diaz.
5
6  **MR. DIAZ:**  Yes.
7
8  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Strelcheck.
9
10  **MR. STRELCHECK:**  Yes.
11
12  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Dyskow.
13
14  **MR. DYSKOW:**  Yes.
15
16  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Dugas.
17
18  **DR. DUGAS:**  Yes.
19
20  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Riechers.
21
22  **MR. RIECHERS:**  Yes.
23
24  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Williamson.
25
26  **MR. WILLIAMSON:**  Yes.
27
28  **EXECUTIVE DIRECTOR SIMMONS:**  Mr. Banks.
29
30  **MR. BANKS:**  No.
31
32  **EXECUTIVE DIRECTOR SIMMONS:**  Dr. Frazer.
33
34  **CHAIRMAN FRAZER:**  Yes.
35
36  **EXECUTIVE DIRECTOR SIMMONS:  The motion carried thirteen to**
37  **five.  Twelve to five.  Excuse me.**
38
39  **CHAIRMAN FRAZER:**  Ms. Bosarge.
40
41  **MS. BOSARGE:**  All right, and so about that interim analysis.
42  When are we going to get a number from the SSC on that, and how
43  fast can you bring us a document to try and get this allocation
44  up some?  I mean get this ACL up?
45
46  **CHAIRMAN FRAZER:**  Dr. Porch.
47
48  **DR. PORCH:**  About as soon as you can meet again.
                              180

1
2  **CHAIRMAN FRAZER:**  So we're going to see that in August.  I am
3  going to look to staff with regard to what we will actually be
4  able to bring to the council in August with regard to the
5  interim analysis and catch advice.
6
7  **EXECUTIVE DIRECTOR SIMMONS:**  We can put it in front of the SSC I
8  believe the first week of August, and I think the briefing book
9  deadline for that is July 19 or something?
10
11  **MR. RINDONE:**  Yes, July 19.
12
13  **EXECUTIVE DIRECTOR SIMMONS:**  I think the question is how much
14  we'll be able to get done by the council meeting, and so that
15  would require both staffs to do a lot of work in two weeks to
16  make the briefing book deadline.
17
18  **CHAIRMAN FRAZER:**  All right.  That's a priority.  Ms. Guyas,
19  continue with the report.
20
21  **MS. GUYAS:**  Thank you, Mr. Chair.  Presentation on Greater
22  Amberjack Historical Landings and Potential Management Actions
23  and Table of Greater Amberjack Landings, the recent greater
24  amberjack stock assessment, SEDAR 70, determined that the stock
25  remains overfished and is undergoing overfishing, requiring the
26  council to act to end overfishing and rebuild the stock by 2027.
27
28  SEDAR 70 incorporated MRIP-FES data, and the OFL and ABC
29  projections are provided in MRIP-FES currency, which has been
30  determined to be the best scientific information available.
31  Staff provided potential management alternatives that would
32  modify the catch levels to end overfishing and adopt the MRIP-
33  FES data currency.  This conversion could result in a
34  reallocation between the commercial and recreational sectors.
35
36  Committee members discussed the implications of MRIP-FES
37  conversions across managed species and expressed interest in
38  examining how past catch levels would have differed if set in
39  MRIP-FES.
40
41  **The committee recommends, and I so move, to request SEFSC run an**
42  **analysis for Greater Amberjack which shows what the historical**
43  **ABCs and ACLs would have been with FES back in time.**  Mr. Chair.
44
45  **CHAIRMAN FRAZER:**  Thank you, Ms. Guyas.  We have a committee
46  motion on the board.  That motion carried without opposition in
47  the committee meeting, and so is there any further discussion on
48  the motion?  **Seeing none, is there any opposition to the motion?**

181

1  **Seeing none, the motion carries.**  Ms. Guyas.
2
3  **MS. GUYAS:**   The committee discussed additional alternatives for
4  modifying the sector allocation and catch levels.   SERO
5  suggested that the IPT provide suggestions for reasonable years
6  to include an alternative time series given the changes in
7  management over time.   A committee member requested an
8  alternative be added that would hold the commercial ACL at its
9  current level.
10
11  Council staff will request the SEFSC to provide new OFLs and
12  ABCs for the allocations that result from the proposed
13  alternatives.   After receiving the projections, staff will
14  prepare a draft document for review at a future meeting.   NOAA
15  General Counsel encouraged the committee to proceed as quickly
16  as possible with development of the amendment, in order to end
17  overfishing.   A committee member requested further clarification
18  regarding how the MRIP-FES data were derived that could explain
19  some of the outlier years in the dataset.
20
21  Overview and Discussion of Individual Fishing Quota Programs
22  Review, the red snapper IFQ and grouper-tilefish IFQ programs
23  joint review presentation was a two-part presentation delivered
24  by SERO staff and council staff.
25
26  Ms. Alisha Gray noted that the review follows the April 2017
27  NMFS Guidance for Conducting Reviews of Catch Share Programs.
28  Ms. Gray reviewed the goals and objectives of the IFQ programs
29  and discussed the legal requirements for IFQ reviews.
30
31  Ms. Gray discussed IFQ data collection and reporting and
32  reminded the committee that the IFQ programs use an online
33  electronic system.   She discussed the percentages of valid share
34  and allocation prices for each program and noted that data gaps
35  still exist in the collection of shares and allocation prices.
36
37  Ms. Gray discussed the eligibility and participation in IFQ
38  programs and changes in the number of IFQ accounts by program
39  and share category and by permit ownership status.   She noted
40  the increasing trends observed in the percentages of public
41  participation accounts, accounts not associated with a
42  commercial reef fish permit, and related accounts.
43
44  Ms. Gray presented landings and quota utilization rates by share
45  category.   She discussed share and allocation ownership caps and
46  red grouper and gag multi-use shares.   Ms. Gray discussed
47  allocation transfers and ex-vessel, share and annual allocation
48  prices.

0004048

Ms. Gray discussed discard ratios by gear type and noted that minimum size limit requirements were the main reason reported for discarding fish.  Other reasons include a lack of annual allocation.  She presented the number of enforcement cases resulting in the seizure of fish and discussed the utilization of cost recovery funds.

Committee members inquired about differences between the information on tables presented and on Freedom of Information Act shareholders pages.  Ms. Gray answered that FOIA pages list information at the entity level, while tables presented are by program and by share category.  She also noted that FOIA pages are a live and dynamic feed, while the tables presented provide only snapshots.

The committee asked about challenges in obtaining shares and annual allocation in certain regions.  Ms. Gray indicated that, as in previous reviews, the joint review did not address regional differences, but evaluated allocation transfers Gulf-wide.  Committee members inquired about the time interval used in the evaluation of the reasons for discards.  Mr. Jeff Pulver indicated that tables presented include 2012 through 2018 averages.

Council staff discussed the impacts of IFQ programs on ex-vessel prices and noted that two separate studies have both found that the red snapper IFQ program caused a statistically-significant increase in the red snapper ex-vessel price.  However, additional studies concluded that the grouper-tilefish IFQ program did not cause a statistically significant increase in the ex-vessel price for species managed by that program.

Staff then discussed market concentration and market power for the IFQ share and annual allocation and landings markets.  Staff noted that the evidence suggests that markets are unconcentrated and that evidence of market power has not been uncovered in the markets studied.  However, staff stated that these findings do not account for vertical integration, where dealers may also own or control shares and harvesting operations. Therefore, market concentration and market power findings should be interpreted cautiously.

Staff discussed the inequality of distributions and indicated that the distribution of IFQ shares is highly unequal in every share category.  A study evaluating the distribution of vessel revenues for all U.S. catch share programs found that, relative to other U.S. catch share programs, vessel revenue distributions

183

1  in the Gulf of Mexico were highly unequal before the
2  implementation of the red snapper and grouper-tilefish IFQ
3  programs.
4
5  Staff discussed that research supported increased safety-at-sea
6  resulting from the Gulf IFQ programs. Staff also noted that,
7  following the implementation of IFQs, captains pay more
8  attention to weather conditions when making trip decisions.
9
10 Staff discussed operational changes based on a study that
11 evaluated fleet capacity dynamics in the Gulf of Mexico. The
12 study found that, for the red snapper fleet, technical
13 efficiency increased by 6 percent post-IFQ. For Gulf reef fish,
14 technical efficiency improved by 5 percent.
15
16 Staff indicated that, based on the joint IFQ review, the IFQ
17 programs have been successful in making progress towards meeting
18 their stated objectives. Staff then proceeded to summarize the
19 main conclusions of the joint review, covering a range of
20 issues, including trends in the number of dealers, concerns
21 about unfairness and distributional inequities, year-round
22 fishing opportunities, and new entrants.
23
24 Staff noted that, although the promotion of new entrants may
25 appear to be inconsistent with IFQ objectives, replacement
26 fishermen are needed for the long-term viability and
27 sustainability of the programs.
28
29 Committee members inquired about changes that resulted in the
30 collection of cost recovery fees sufficient to fully fund the
31 administration of the IFQ programs. Staff indicated that the
32 red snapper IFQ initial program review concluded that cost
33 recovery fees were insufficient to cover program costs.
34
35 However, once the grouper-tilefish program was implemented, the
36 significant increase in the base from which cost recovery fees
37 are collected, and the fact that both programs are run by the
38 same staff using the same online platform, resulted in a marked
39 increase in the funds collected and, therefore, allowed all
40 program administration costs, including the costs of modernizing
41 the online IFQ platform, to be covered.
42
43 The committee asked about market power in the IFQ programs in
44 relation to the reported challenges to acquire IFQ shares and
45 allocation. Staff defined market power and noted that studies
46 to-date have not found evidence of market power. Staff
47 reiterated the caution needed in interpreting these findings,
48 because of the potential impacts of vertical integration in

184

1  market concentration and market power.  Staff also noted that
2  NMFS has begun collecting data on share and allocation ownership
3  by seafood dealers to evaluate vertical integration in the IFQ
4  programs.
5
6  Committee members inquired about costs of operation in the IFQ
7  programs.  Staff indicated that costs of operation and rates of
8  returns have been evaluated by the Southeast Fisheries Science
9  Center and that some of those findings are included in the
10 review.
11
12 Dr. Lorenzen summarized SSC recommendations about the IFQ
13 programs.  Staff also summarized recommendations provided by the
14 Ad Hoc Red Snapper and Grouper Tilefish IFQ AP and noted that
15 the AP also recommended the creation of an AP to consider the
16 expansion of IFQs to other reef fish.  The committee granted
17 staff editorial license to include a summary of the June 2021
18 committee discussions in the review.
19
20 **The committee recommends, and I so move, to make the red snapper**
21 **and grouper-tilefish IFQ program review final and available for**
22 **publishing on the council's website, www.gulfcouncil.org.**  Mr.
23 Chair.
24
25 **CHAIRMAN FRAZER:**  Thank you, Ms. Guyas.  We have a committee
26 motion on the board, and that motion carried without opposition
27 in committee.  Is there any further discussion?  **Not seeing any,**
28 **is there any opposition to the motion?  Without opposition, the**
29 **motion carries.**  Ms. Guyas.
30
31 **MS. GUYAS:**  Reef Fish Amendments 36B and 36C: Modifications to
32 Individual Fishing Quota Programs, staff reviewed the actions
33 and alternatives in Amendment 36B, including the recommendations
34 from the Reef Fish AP and Ad Hoc Red Snapper and Grouper
35 Tilefish IFQ AP.
36
37 The committee discussed the purpose and need for the action.
38 Staff requested committee input regarding the accounts that
39 would be exempt from a requirement to be associated with a valid
40 or renewable commercial reef fish permit.  Due to time
41 constraints, the committee was not able to fully discuss the
42 amendment and address the remaining questions, but expressed
43 interest in continuing the discussion during Full Council, if
44 time allows.
45
46 Other Business, the committee did not have time to address the
47 only item of other business, which was goliath grouper.  I will
48 stop there.

0004051

1
2   **CHAIRMAN FRAZER:**  Ms. Bosarge.
3
4   **MS. BOSARGE:**   We had discussed taking 36B out for public
5   hearings in the near future, and I was ready to make some
6   motions to pick some preferreds in that document during
7   committee, but we didn't have time.  Can we do that now?  I
8   would like to have preferreds before we go out to public
9   hearings, and, even if we have one more meeting before we go out
10  to public hearings, and we've been working on this for several
11  years, and I'm ready to pick some preferreds.
12
13  **CHAIRMAN FRAZER:**  Okay.  Ava.
14
15  **DR. AVA LASSETER:**   It's always helpful to have preferred
16  alternatives selected, which gives the public an idea of the
17  direction you're thinking about.  I would also like to highlight
18  that the presentation included several questions that we would
19  really want feedback on, which would also support the direction
20  that you're intending to go, and this is specific to those new
21  group of accounts that would be accepted accounts, and what do
22  you see those being allowed to do, and so, if we discuss
23  preferred alternatives, it would be great if we return to the
24  presentation as well.
25
26  **CHAIRMAN FRAZER:**  Okay.  Ms. Bosarge.
27
28  **MS. BOSARGE:**  All right.  I will throw out a motion, and I think
29  that will start the discussion, probably, and maybe we can make
30  some progress here.  **My motion would be, in Action 1, to make**
31  **Alternative 5 the preferred alternative.  Alternative 5 is, in**
32  **order to obtain, which is transfer into a shareholder account,**
33  **or maintain shares, which is hold existing shares in a**
34  **shareholder account, shareholder accounts established following**
35  **implementation of this amendment must be associated with a valid**
36  **or renewable commercial reef fish permit.  A shareholder account**
37  **is considered to be associated with a permit if the permit has**
38  **the exact same entities listed on both the shareholder account**
39  **and the permit.**
40
41  **CHAIRMAN FRAZER:**   Okay, and so we have a preferred, and it's
42  seconded by Mr. Sanchez.  Is there further discussion?  Patrick.
43
44  **MR. BANKS:**  I have a question for staff, to remind me.  At the
45  most recent AP meeting, didn't the AP pass a motion to put a
46  certain date in this, and can somebody remind me of what that
47  was?  Is it reflected in any one of our alternatives?
48

186

0004052

1   **DR. LASSETER:**   No, and we had two AP recommendations for this
2   action, to add an alternative, and the Reef Fish AP that met --
3   Excuse me.   I'm trying to find the page.   The Reef Fish AP
4   recommended to add a new alternative that would exempt accounts
5   established before October 6, 2020, and the Ad Hoc Red Snapper
6   Grouper Tilefish IFQ AP passed a motion requesting an additional
7   alternative with a control date of June 2, 2021, and they also
8   indicated that as the suggested preferred.
9
10  **MR. BANKS:**   Thank you.
11
12  **CHAIRMAN FRAZER:**   Ms. Bosarge.
13
14  **MS. BOSARGE:**   Patrick, by choosing this alternative that's in
15  the document, I was trying to actually encompass their wishes
16  there, because, essentially, they wanted it at least that far
17  out in time.   This will push it slightly further out in time and
18  do it upon implementation, because it seems like each one of
19  those -- Each time each one of those groups meet, they want --
20  Well, at least until right now, everybody to right now, and so
21  we'll exempt everybody until it's implemented, and, at that
22  point, it would be my prerogative, in the next action item, to
23  give them three years to get their paperwork right and either
24  get a permit or just get rid of their shares, one of the two.
25
26  **CHAIRMAN FRAZER:**   Mr. Dyskow.   Sorry.   I went over you on that,
27  and I didn't mean to.
28
29  **MR. DYSKOW:**   That's perfectly all right.   I agree.   Of the
30  alternatives given, this is the one probably that makes the most
31  sense.   The overriding intent in 36B is to have fishermen
32  control the shares, not private investors to sell them at a
33  profit, and part of the disruption -- Again, I'm talking to red
34  grouper, but part of the disruption we saw is many of these
35  smaller fishing entities, commercial fishing entities, weren't
36  able to find quota, or quota could not be sold to them, and so,
37  the more quota we can put in fishermen's hands, probably the
38  better.
39
40  I have one idea to add to this preferred.   If that is our
41  intent, to really put the control of IFQ in the hands of
42  fishermen, people that are actively fishing, commercially
43  fishing, could we, in this -- We're giving as much flexibility
44  as we possibly can in this alternative, but could we add
45  language that says, by X date, whether it's ten years out or
46  whatever, they have to sell their shares, sell or surrender
47  their shares, that, basically, we want to go back to the
48  fishermen controlling the shares and not private investors, and

187

0004053

1  does that make sense?
2
3  **CHAIRMAN FRAZER:**  Yes, it does make sense.  You would certainly
4  have to go to the maker of the motion to accept that amendment.
5  I will do that now, and there's a couple of people, Patrick,
6  before I get to you.  Leann.
7
8  **MS. BOSARGE:**   That's what I think the next action in the
9  document will actually do, and the next action in the document
10  says, all right, if you can't comply with this, then you are
11  going to have to sell -- You're going to have to sell your
12  shares if you're not willing to get a permit, and what the next
13  action item asks us is how long do you want to give a fisherman,
14  or a business owner, whoever, to accomplish that and make that
15  decision and get its ducks in a row.
16
17  **CHAIRMAN FRAZER:**  Okay.  Are you good with that for right now,
18  Phil?
19
20  **MR. DYSKOW:**  I think so.  What I really would like to see as an
21  objective is we all started these discussions, and Leann and I
22  actually agreed on this initially, was that, to control quota,
23  you have to have a permit and be a fisherman, and where this
24  thing kind of got off track a little bit is with this idea of
25  investors deciding who gets quota and who doesn't, and all these
26  smaller fishermen that don't own quota are suffering right now
27  because they can't obtain quota.  This is an intent to put
28  control of the quota back in the fishermen's hands, and it's not
29  going to be a perfect program, but it's better than what we have
30  now, where outside investors control who wins and who loses in
31  this specific fishery.
32
33  **CHAIRMAN FRAZER:**  Okay.  Thank you, Phil.  I've got a couple of
34  folks in the queue here, and I'm going to go to Andy, Martha,
35  Patrick, and then Troy.
36
37  **MR. STRELCHECK:**  I emailed Ava about the purpose and need, after
38  our discussion, and had thrown out some ideas, and I think
39  that's where I'm struggling with even picking a preferred right
40  now, because I'm not sure we've really done a good job with
41  defining the need of what Phil just indicated.
42
43  It seems, to me, more along the lines of what we're trying to
44  accomplish, which is to put the quota in the hands of actual
45  fishermen that have the ability to use the fish, and my concern
46  about this alternative, as well as many alternatives, is we're
47  already at 30 percent public participation, and that's a pretty
48  high percentage.  The longer this amendment drags on, that

188

 1  percentage can continue to go up until we take action, and so
 2  I'm not sure that we're accomplishing the need that we're laying
 3  out, first and foremost.
 4
 5  Then, beyond that, I guess the challenge with the fishery here
 6  is we're trying to, I think, address social and economic
 7  impacts, and I'm not sure we've gotten a good indication as to
 8  whether or not this would actually resolve some of those.
 9
10  Yes, we've put it in the hands of fishermen, but I also hear
11  some of the positives of being able to have allocation and not
12  be tied up by shareholders, and I think some of the things we're
13  seeing with red grouper this year, in terms of limitations on
14  the amount of allocation available, is because those
15  shareholders are holding onto their own allocation and not
16  making it available to others, and so I would recommend not
17  selecting a preferred alternative at this point, and I think we
18  need to go back and refine the purpose and need, first and
19  foremost.
20
21  **CHAIRMAN FRAZER:**  Thank you, Mr. Strelcheck.  We're going to go
22  next to Martha.
23
24  **MS. GUYAS:**  Thanks, Mr. Chair.  Actually, I was going to say a
25  lot of the things that Andy said.  I think this alternative
26  makes a lot of sense, but it doesn't deal with the problems that
27  we maybe have now, though maybe I'm okay with making this a
28  preferred, because I want to hear from the people who are going
29  to have a problem with this and what they really see as the
30  solution here, but I do kind of struggle with that.
31
32  We do have 30 percent public participation, and I don't think
33  this is going to roll that back, and should it be rolled back,
34  and so, like what Andy said, and those are all pretty decent
35  questions.
36
37  I think, throughout the years that we've been working on this
38  amendment, and undergoing these IFQ reviews, we've heard
39  arguments from all different sides, and the people that
40  participate in this fishery in one way or the other, or used to
41  be, and now this is their retirement, and this is how they --
42
43  They lease it to folks that need it and all that, and so, you
44  know, most recently, talking to some of the folks that were here
45  at this meeting, some of them want to see something like this,
46  and then income requirements on top of that, and I know we've
47  talked about that in the past, but, anyway, I think this is
48  probably a step in the right direction, and I don't know that it
                                189

0004055

1  gets us exactly where we need to go, but I do think we do need
2  to hear --
3
4  It would be good to hear more and have, hopefully, some good
5  conversations with people, whenever we do go out to public
6  hearings with this, but I'm also not opposed to talking about
7  this at another meeting before we take it out, because it's kind
8  of what Ava is saying, and we certainly have some unresolved
9  issues that I don't know that we'll be able to chew on today.
10
11 **CHAIRMAN FRAZER:**  Thank you, Ms. Guyas.  Patrick.
12
13 **MR. BANKS:**  I had a question.  The permit that we're talking
14 about is tied to the vessel, and is that correct, Andy or staff?
15 Okay.  So then we're not necessarily talking about the
16 fishermen, and so, if our point is to get the shares into the
17 hands of the people who are actually landing the fish, then
18 that's what we need to concentrate on, are the individual
19 landers of the fish, and so let's just keep that in mind as
20 well.  Sometimes they're the same person that has the permit,
21 that owns the vessel has the permit, absolutely, but it's not
22 always that's the case.
23
24 **CHAIRMAN FRAZER:**  Thank you, Patrick.  Troy.
25
26 **MR. WILLIAMSON:**  I pointed out the other day, and the
27 shareholders are pointing out also, their concentration, to a
28 great degree, is to make sure that their shares are inherited,
29 and I don't believe they mean to natural persons.  They are
30 moving their shares into the corporations, where there is no
31 death from there, and they will -- The corporations will
32 continue to operate, and I believe we are perpetuating a system
33 that will be promoting public participation.
34
35 You're going to have, I believe, in the future, just like in
36 farming industries, and the kids leave the farm, and I think
37 most of the kids of these shareholders will be in such a
38 financial position that they will leave, and you will have
39 sharecropping situations, and so, without belaboring the point
40 too much further, as long as you have private corporations and
41 private individuals managing a public resource, you're going to
42 have a problem.
43
44 This resource needs to be managed by the agency that represents
45 the federal government or Commerce, NOAA and whatever.  As long
46 as we go down this road, you're going to have problems with
47 people being able to lease shares, and that's what it will
48 become.  It will become a lease operation, where people are
                                 190

1  holding shares, or market valuation.
2
3  I talked to some of the folks out in the hall the other day
4  regarding their comments that they couldn't get quota, and I
5  asked them, you know, why can't you get the quota, and why don't
6  you go to a public participant?  If the shareholders who are
7  actually fishermen will fish, that's one thing, but a public
8  participant should be someone who wants to lease the shares to
9  the parties that want it.
10
11  Their comments to me, and this is just one side of it, and
12  there's always two sides, was that the public participants were
13  holding onto it because they felt like that the quota would be
14  decreased, and, therefore, their price per share would be
15  increasing, and so I will stop there, and I think I'm just not
16  an advocate for the way this program is working, and I think it
17  should be the -- The federal government should be managing it
18  and not the Shareholders Alliance.
19
20  **CHAIRMAN FRAZER:**  Thank you, Troy.  Kevin Anson.
21
22  **MR. ANSON:**  I appreciate Mr. Dyskow's comments relative to
23  trying to make sure that we utilize this program, or the program
24  is set up such that it benefits the fishermen, and that's the
25  way I see it too, and all of your thought process too, Troy.  A
26  little bit that this is a public resource, and, to the extent
27  that this was originally set up to try to help fishermen, to
28  maintain their access and to maintain some of the benefits that
29  come along with IFQ programs, safety-at-sea and stability of
30  price and all those types of things, I think that has gotten
31  away from us a little bit.
32
33  Yes, the council made a mistake with allowing the general public
34  to have access to this, and the vehicle, or the mechanism, was
35  to not have the permit.  If they have shares, and they're using
36  them, they've got a permit, because you have to have a permit to
37  land the fish, and so I don't think this gets us anywhere where
38  we need to be.
39
40  We need to go back in time and utilize another alternative
41  that's in this action that gets us to that point in the
42  council's decision-making that kind of broke away from the
43  intended program and making sure, to the extent practical, that
44  the IFQ shares were being utilized by active fishermen.
45
46  We heard lots of testimony, and I know we're not in a democracy
47  here, but we heard lots of testimony from folks here at this
48  meeting, and certainly other meetings, that have problems

191

1   getting shares.   If they get shares, they have to pay 70
2   percent, or 80 percent, of what the fish is worth.  I mean, that
3   is -- You want to talk about impediments to business, and that's
4   a pretty big one, if you have to pony up 70 to 80 percent of
5   what the product is worth every time you want to go harvest it.
6
7   I think I'm not going to be in support of this motion, but, to
8   Martha's point earlier, we don't need to do anything today.   I
9   think you said, Leann, this has already been about two-and-a-
10  half years, and what's another few more months, or a couple of
11  months, and I will just go back to a prior comment that I made
12  earlier, and I know we had final action on one topic, but I
13  would request that we have this earlier in the agenda on Reef
14  Fish, 36B and 36C.  Thank you.
15
16  **CHAIRMAN FRAZER:**  I'm going to first go to Bob Shipp online, and
17  then Leann and then Susan Boggs.
18
19  **DR. SHIPP:**   Thank you, Mr. Chairman.  We have been, as Leann
20  said, discussing this, as well as 36C, for two-and-a-half years,
21  and, every time we decide not to have a preferred, we seem to
22  get bogged down.
23
24  I know we're really not at the point where we have strong
25  feelings for a particular preferred, but it's one of the only
26  times, I think, that almost the entire council feels the same
27  way, and that is we want the return to management of the fishery
28  to the fishermen, and so I speak against delaying choosing a
29  preferred.  Just because we choose a preferred, it doesn't mean
30  we have to use it at the subsequent meetings, but I think it
31  will keep us on track.
32
33  We need to move this whole issue of 36B and 36B up to the front
34  of Reef Fish, I think, at the next meeting.  A lot of what we've
35  discussed here with 36B is going to be addressed in 36C,
36  especially if we go the route of a quota bank, and so my
37  preference is to choose the preferred, and then let's go down
38  the road and quit kicking the can down the road.
39
40  **CHAIRMAN FRAZER:**  Thank you, Bob.  Leann.
41
42  **MS. BOSARGE:**  So, if you go back and you look at the makeup of
43  that IFQ AP that just took a look at this again and recommended
44  that we do institute a permit requirement, you have shareholders
45  that were original shareholders on there, and you have
46  shareholders that are very small shareholders on there, and we
47  put fishermen on that IFQ AP for red snapper that lease only,
48  that own zero red snapper, and so this is a very diverse AP, or

192

1  ad hoc advisory panel.
2
3  That advisory panel, all those different segments of this
4  management system, agree that we should have a permit
5  requirement, and all those things that you're talking about
6  doing in 36C are premised upon getting the fish to the men and
7  women that are landing it, and most of those action items are
8  based on that, and your whole idea of cyclical redistribution is
9  you're going to go back and look at landings again and try and
10 get it to the people that are actively landing it.
11
12 This is the first step to any of that.  If you don't require
13 that you have a permit which allows you to catch and land the
14 fish in order to own the resource, which is the share part, none
15 of  the rest of it makes a damn, and so I don't see why this is
16 such a huge ask.  This is the first step in linking those
17 things.
18
19 Yes, it's a long way to get to the rest of the items in 36C, but
20 you'll never get there if you don't do this, and I'm sorry if
21 I'm frustrated about talking about this at another meeting, but
22 this is exactly what I talked about the other day, where the
23 commercial things just take a back-burner to all the
24 recreational amendments that are in front of us.
25
26 We have time today, and we've looked at this document enough
27 times, and it's time to pick a preferred.  I started by picking
28 preferreds, instead of redoing the purpose and need, because I
29 thought that was going to take a while, but I certainly have
30 plenty of ideas on how to make that purpose and need better fit
31 the actions in this document, and so I am ready to pick a
32 preferred and go out to public hearing.  I don't want to go out
33 without a preferred.
34
35 **CHAIRMAN FRAZER:**  Thank you, Leann.  We're going to go Susan and
36 then Andy.
37
38 **MS. BOGGS:**  If am not mistaken, I heard yesterday, in public
39 comment, that the commercial sector did not ask for public
40 participation.  As a matter of fact, my understanding is they
41 asked the council not to do that.  They asked us not to
42 reallocate red grouper, and we did it anyway, and they fought us
43 on permits, and they now have agreed to do it, and now we won't
44 give it to them.
45
46 I mean, there are so many inconsistencies on this council that
47 it's just almost mind-boggling, but it's time, and I agree with
48 Leann.  The three years that I have been on this council, we've
                            193

0004059

1  been discussing this, and we've not made any traction or action
2  or anything with it, and, until you make a move, nothing is
3  going to happen, and she's correct that you can't do anything
4  with 36C until you resolve 36B.  Thank you.
5
6  **CHAIRMAN FRAZER:**  Okay.  We've got Andy and then Robin.
7
8  **MR. STRELCHECK:**  I guess I will remind folks that I ran this
9  program, and it's a highly-complicated program, and you've
10 gotten presentations on it, and what we think we understand we
11 often don't understand, and there is complex business
12 relationships, and there are vertically-integrated businesses.
13 Just because someone has a reef fish permit, it doesn't mean
14 they're going to be fishing it, right, and they can still lease
15 that, and it just creates a little bit higher bar, a little bit
16 higher hurdle, for them to overcome.
17
18 I think, to me, the challenge here is we have essentially two
19 alternatives that we should be considering.  One is either -- Or
20 three.  Status quo is we're not going to do anything, or
21 everyone is going to have a reef fish permit, and I guess those
22 would be the two.  Everyone has a reef fish permit or it's
23 status quo, right?
24
25 To me, I don't like this business of grandfathering in a large
26 subset of the industry, and, to me, if we want to go with a reef
27 fish permit, let's go with a reef fish permit, but then allow
28 for a period of divestment over a period of time, to ensure that
29 we get these shares in the hands of the fishermen.  We have --
30 That would be then, I believe, Alternative 2, with a choice then
31 in Action 2 for divestment.
32
33 **CHAIRMAN FRAZER:**  All right.  Thanks, Andy.  Robin.
34
35 **MR. RIECHERS:**  I am going to echo some of the comments that
36 other people have made, and partly the comments that Andy just
37 made.  You know, certainly, inside of these programs -- I mean,
38 a commercial reef fish permit, and, later on in the presentation
39 that Ava gave, she also talked about latent permits, and that's
40 not a huge hurdle, as people have shown already, that it's a
41 huge hurdle in sort of business relationships to do that.
42
43 I don't think that's the issue.  I mean, people can say that's
44 what we need to do to start on 36C, and I think we need to take
45 B and C and try to figure out really where we're heading with
46 this, because just requiring this is not going to get at the
47 problems that people have pointed out in the system, and, if we
48 wanted to do that, we would just go back to -- I understand the
194

1  frustration for not dealing with these documents, and I do too,
2  and part of that has been the council really probably tugging in
3  very different directions on these documents, and we probably
4  still will be tugging in different directions, and so we may not
5  really make a lot of headway, but the whole notion is, if we're
6  going to try to actually fix some of the business problems and
7  put it in people's hands who are actually on the water fishing,
8  this ain't going to do it.  I mean, none of this in Action 1 is
9  going to do it.
10
11  **CHAIRMAN FRAZER:**  Okay.  We've had a lot of discussion and a lot
12  of echoing, and so I think it's time to vote for this particular
13  motion.  **All those in favor of the motion, raise your hand,**
14  **those online; all those in opposition.  The motion passes.**  Ms.
15  Bosarge.
16
17  **MS. BOSARGE:**  All right.  Let's go to the next action item.  **In**
18  **Action 2, my motion would be, in Action 2, to make Alternative**
19  **2, Option 2b, the preferred alternative.**  I will stop there,
20  because there will be a second preferred alternative.  This will
21  be one of those action items where we have multiple preferreds,
22  but we can talk about this one and then move on to the next one,
23  and Option 2b is three years following the effective date of the
24  final rule implementing this amendment.  That's when NFMS would
25  reclaim all shares in a shareholder account that is still not
26  associated with a commercial reef fish permit.
27
28  **CHAIRMAN FRAZER:**  Ava, go ahead.
29
30  **DR. LASSETER:**  Thank you, Mr. Chairman.  If I understand your
31  previous motion, you selected Alternative 5 as preferred, which
32  would grandfather in every account until this amendment is
33  implemented, and that means, at the time this amendment is
34  implemented, there will be no accounts that need to get shares,
35  and every account would be grandfathered in, and so I don't know
36  that Alternative 2 is applicable, if you select Alternative 5.
37
38  Now, there is the issue with Alternative 3, which addresses in
39  the future, and it's the alternative we discussed in committee
40  that we also wanted to discuss the idea of the retention for
41  those who inherit shares, and you can start a new account.
42
43  **CHAIRMAN FRAZER:**  Leann.
44
45  **MS. BOSARGE:**  Thank you.  All right.  **Then keep the motion right**
46  **there, but change it to make Alternative 3, Option 3b, the**
47  **preferred, because Alternative 3 speaks to after implementation**
48  **of this amendment.  If the shareholder account no longer has an**

195

1   **associated valid or renewable reef fish permit, the shareholder**
2   **must divest of the account shares, as needed, to meet the**
3   **requirements set out in Action 1, or the shares will be**
4   **reclaimed by NMFS.    Option 3b is three years following the**
5   **transfer or termination of the permit.**
6
7   **CHAIRMAN FRAZER:**  Okay.  Let's give staff just a minute to pull
8   from the regular document and clean that up.  Okay.  Let's give
9   people just a second.  I know Leann read it into the record.
10  Okay.  Is there a second to the motion?  It's seconded by
11  Patrick Banks.  Leann, do you want to talk about it a little
12  more?
13
14  **MS. BOSARGE:**  Yes.  On this one, I really felt like five years
15  was a little too long, and one year seems like a long time, but
16  it might not be.  It's a lot of stuff to get lined up, and
17  you've got either divest of your shares, or, if something
18  happened to your permit, find another permit, which also means
19  making sure you have the vessel in the same name as the permit,
20  making sure you've got the VMS installed on the boat and
21  activated and pinging.  There's a lot of stuff that goes into
22  it.  I thought three years should definitely be sufficient, and
23  five was too much.
24
25  **CHAIRMAN FRAZER:**  Okay.  Is there any other discussion?  Robin.
26
27  **MR. RIECHERS:**  Leann, I mean, we heard, in public testimony, or
28  what was brought up in committee, was the issue of someone
29  passing away and attempting to do this, and what this shows --
30  As Ava was pointing out, it basically says that everyone will be
31  in compliance on the day that the amendment is signed by the
32  Secretary of Commerce, or it then goes into effect.  Would we
33  not want to go ahead and suggest that it's just in case of a
34  passing, in some way, of someone?
35
36  **CHAIRMAN FRAZER:**  Robin, can you repeat the last part of that?
37  I don't think we were able to hear you well.
38
39  **MR. RIECHERS:**  Sorry.  I'm just trying to figure out, because,
40  if everyone is in compliance the day it's signed, would we not
41  want to then just state, real plainly, that this is for a
42  deceased shareholder?
43
44  **CHAIRMAN FRAZER:**  Leann.
45
46  **MS. BOSARGE:**  Well, I can see where it would apply in that case,
47  Robin, but I guess I can see some other instances where you may
48  run into this, and so say you're ready to get a bigger boat, or

0004062

1  a different boat, right, and you're actively in the fishery, and
2  you own some shares, and you've got a boat, and you've got a
3  permit, and you're fishing it.
4
5  Every once in a while, fishermen buy a new boat, right, and it's
6  kind of like buying a new house.  To get all the timing of that
7  to line up just right, where you sell the house you're in and
8  buy your new house all on the same day, that's tough.
9
10 Most people really need to sell the house they're in before they
11 take on a mortgage on a new one.  Floating two notes at the same
12 time is tough, and so I can see where you might be in a
13 situation where you're going to sell your boat and permit,
14 possibly, or just the boat and hold the permit, but you're
15 trying to buy a new boat, and you get the new boat, but you
16 still have to get all the paperwork transferred over into your
17 name, and it's time to renew the permit, and you're still
18 waiting on the paperwork from the Coast Guard to get the new
19 boat in the right name to match the permit.  It's just a lot of
20 stuff that could go on.
21
22 It's more than just death, I think.  There's normal business
23 operations where you're going to have to change some things up
24 on your permit, or even transfer a permit, and so I would like
25 to have it apply not just in death.  No matter what the case is,
26 you've got three years to get your paperwork right.
27
28 **CHAIRMAN FRAZER:**  Okay.  Thank you, Leann.  Kevin Anson.
29
30 **MR. ANSON:**  I just question about termination of the permit, and
31 you mentioned earlier about the for-hire permits earlier that
32 may have one year after it expires to get it cleared up, and is
33 that the same thing that would hold here as well, and so,
34 actually, you would add a year, basically.  Thank you.
35
36 **CHAIRMAN FRAZER:**  Okay.  Any additional discussion?  Ava.
37
38 **DR. LASSETER:**  Thank you, Mr. Chairman.  I did want to clarify,
39 and, as long as we understand what your intent is, we can modify
40 the document accordingly, and it is a slightly different
41 situation.  The way the alternative is currently written is, if
42 an account already exists, and it is grandfathered, that is
43 supposed to have a permit, and then later on never does.
44
45 In the case of inheriting shares, a new account is going to need
46 to be created.  If it's the name of a corporation, and they're
47 just changing ownership behind it, then there would be no
48 change, because that follows forward with the same situation,

197

1  but say somebody inherits shares from an account and needs to
2  create a new account.  In order to create that new account and
3  put shares, it would be an initiation, and so it's a slightly
4  different situation.  It possibly might need to be written in a
5  little bit different.  As long as I understand that you are
6  concurring with whatever your decision is here, in terms of
7  time, we will work it into the document accordingly, to allow a
8  new account to be created under just those circumstances.
9
10 Okay, and so remember we talked about, if you pick one of the
11 alternatives, except Alternative 1 and 2, you're going to create
12 this body of exempted accounts.  Any account created after that
13 time is going to be required to have a reef fish permit.
14
15 Now somebody with say a grandfathered-in account passes away,
16 and they have designated their heir in their will, and their
17 heir contacts NMFS and goes through the whole process to verify
18 the federal regulations, where they have to provide the various
19 verification, and they get a new account set up.  That new
20 account is going to have a creation date that is going to be
21 after the grandfathered date, and so it's not a situation where
22 it's an account that no longer has a permit.  It's technically a
23 new creation date for a new account.
24
25 I have not discussed this with the IPT, to see if it would fall
26 under the same alternative, but, if we understood your intent,
27 when we go back to the IPT, we can ensure that the document
28 reflects your intent, and I don't know if, Andy, you want to
29 comment on -- Do I have it right, to create a new account?
30
31 **MR. STRELCHECK:**  I would probably want to have Jessica or
32 someone else answer that.  Thank you.
33
34 **CHAIRMAN FRAZER:**  Leann.
35
36 **MS. BOSARGE:**  Well, I would suggest let's vote on this, because
37 we know what this means, and then, after that, we can talk about
38 if we need an additional alternative, if that's okay, Ava,
39 because I've got to chew on what you said a little more.
40
41 **CHAIRMAN FRAZER:**  Susan and then J.D., and then we're going to
42 vote this up.
43
44 **MS. BOGGS:**  In thinking about what Troy has said and what Ava
45 just commented on, if it is a corporation, and I will just use
46 our business, for example.  God forbid Randy passes away, and
47 the structure of that corporation will change, and so would you
48 then have to create a new account, because you now have new

                                 198

1  officers and shareholders?
2
3  **DR. LASSETER:**  No, and that is the difference between accounts
4  that are held in the name of an individual and one in a business
5  entity name.  You can't change the name of an account.  If you
6  change the name that is officially on the account, you need to
7  create a new account.  The way you're talking about
8  grandfathering an account, a new account creation would likely
9  fall outside of your grandfathered-in date.
10
11  However, you can change the ownership behind business entities,
12  and you do need to do so.  You need to notify NMFS and provide
13  them that ownership information, but that does not require a new
14  account with a new creation date.  Therefore, you are
15  grandfathering in some or all accounts, and those accounts that
16  are held in the names of corporations are going to be able to
17  continue in perpetuity, or until you change your other
18  requirements to keep the shares in that account and be
19  grandfathered in and not have a permit.  Accounts in the name of
20  the individuals would fall under this issue with inherited
21  shares.
22
23  Keeping in mind also that your Alternative 5 is grandfathering
24  in all accounts into some date in the future, whenever this gets
25  implemented, probably in a year, and we would expect people to
26  be creating new accounts, just in case they need one in the
27  future, and it would be grandfathered in automatically, and we
28  have no idea how many people might do this, but there is the
29  potential for more unintended consequences by setting this date
30  somewhere in the future.
31
32  **CHAIRMAN FRAZER:**  Okay.  We actually have three people here in
33  line still, and so Robin, Kevin Anson, and then Mara Levy.
34
35  **MR. RIECHERS:**  Thank you, Tom.  In hearing what you're saying,
36  Leann, when you responded, and I do understand the whole notion
37  of vessels, and we deal with some of that in our limited
38  programs, but, in my mind, that's like a one-year term, but, if
39  you are thinking about other individuals who might be caught up
40  in probate and things like that, it can take longer, and so I
41  really think, at some point, and it may not be today, obviously,
42  but I think we're going to need to think about this in two
43  different ways.
44
45  **CHAIRMAN FRAZER:**  Thank you, Robin.  Kevin and then Mara.
46
47  **MR. ANSON:**  I was going to -- I had a similar thought as what
48  Robin just said about -- As Leann pointed out, that example of
                                    199

0004065

1   buying a boat and trying to get the boat on the new account, or
2   the new account established with the new boat, and that probably
3   wouldn't take a year, and then, as Andy indicated, you have the
4   extra year, and now you're really at an Option 3a, two years,
5   and 3b is four years, and 3c is six years.  I probably wouldn't
6   lean towards six years, but, in deference to Robin's comment
7   regarding probate issues and such, maybe Option 3b might be
8   better, and so that's all.
9
10  **CHAIRMAN FRAZER:**  All right.  Thank you, Kevin.  Mara.
11
12  **MS. LEVY:**  Thank you.  I was just going to suggest that you deal
13  with the two different issues in different alternatives, right,
14  and so this alternative can deal with existing accounts that
15  then become unassociated with the permit and the amount of time
16  people have to rectify that, or divest of their shares, and then
17  alternative that deals with shareholder accounts in which the
18  shareholder, or that account owner, becomes deceased.  Just
19  because they are different in different situations, and trying
20  to wrap them up into one alternative, it might create confusion.
21
22  **CHAIRMAN FRAZER:   Okay, and so we still retain that option
23  moving forward, but, with regard to this motion, all in favor,
24  we have eight in the room.  How many online are in favor of this
25  motion, one.  All those opposed.  The motion passes nine to
26  five.**  Ms. Bosarge.
27
28  **MS. BOSARGE:**  Do you want to do the purpose and need today?  Do
29  we have the stamina?
30
31  **MR. STRELCHECK:**  I would recommend not.  I do have a few other
32  thoughts though on this that I don't think we've considered.
33
34  **CHAIRMAN FRAZER:**  Go ahead, Andy.
35
36  **MR. STRELCHECK:**  Well, first, in terms of what we just did, I do
37  want to point out that we chose, in my view, relative to our
38  purpose and need, one of the most liberal approaches in terms of
39  how we're going to address it.  We are giving the maximum
40  flexibility, and we're grandfathering the most people into the
41  program, and that last alternative is giving a moderate amount
42  of time, and, obviously, not the maximum amount of time.
43
44  That's the tradeoff with the balance we're trying to figure out,
45  right, and is it -- Are we wanting to shift everyone into a reef
46  fish permit or not, and, obviously, the choice was or not.  To
47  me, I think the purpose and need does need to be strengthened on
48  that end, in order to kind of address this tradeoff that we're

                                200

0004066

1    considering.
2
3    The two things that I was thinking of with regard to at least
4    how we're approaching the preferred alternatives today, one is I
5    don't think there's anything in this amendment that talks about
6    the shareholdings that are held by public participants and
7    whether or not they could freely transfer those shareholdings to
8    other public participants, versus reef-fish-permitted
9    shareholders.
10
11   Obviously, once again, it kind of goes back to the purpose and
12   need.  What are we trying to accomplish?  Are we wanting
13   everyone that's kind of left in the program to be able to freely
14   trade those shares or not?  Then the same would be true of reef-
15   fish-permitted shareholders.  If we leave the grandfathered
16   public participants in, can they receive more shares at that
17   point or not?  Those are some things that I think need to be
18   addressed as part of the amendment, in addition to what we've
19   already discussed.
20
21   **CHAIRMAN FRAZER:**  Thanks, Andy.  Certainly good things for
22   consideration, moving forward.  Martha.
23
24   **MS. GUYAS:**  I am wondering -- I think maybe this came up in
25   committee, and do we need to pick hearing locations, just so
26   that we can start planning that, or is it too early?
27
28   **DR. LASSETER:**  You had discussed, at a previous meeting, and had
29   approved -- We were going to go mail-out and hold two webinars,
30   and so, if that is still acceptable, that is what our plan is.
31   Now, we brought you this public hearing draft initially last
32   August.  At that time, the data was recent, and we did not
33   update it for this meeting, because we were not sure, but we do
34   need to update the document.
35
36   The questions that Andy raised is one of the ones that was in
37   the presentation that we did not get feedback on, and there were
38   several other questions there as well, because you're going to
39   be creating a lot of accounts here that are exempt, and so we
40   need guidance from you as to what you want those accounts to do,
41   to be used for, and I guess we could do that at a subsequent
42   meeting, but those are kind of important also, to get the public
43   feedback on.
44
45   In terms of updating the document, I'm thinking that would take
46   -- I don't know if we need to bring it back in August, except
47   perhaps to answer some of these questions, but we do need some
48   time to update the document and then to prepare for these public

0004067

1  hearings.
2
3  **CHAIRMAN FRAZER:**  Leann.
4
5  **MS. BOSARGE:**  Ava had a lot there, and Martha was asking about
6  locations, and so I will say, from Mississippi, the bulk of our
7  reef fish landings and fishery goes in and out of Pascagoula,
8  and so somewhere in Jackson County, Pascagoula or otherwise,
9  would be good location for that.
10
11  **DR. LASSETER:**  Are we changing to hold in-person meetings?  Are
12  you now asking to hold in-person meetings?
13
14  **CHAIRMAN FRAZER:**  Sorry, Leann.  I recognize that you were
15  probably distracted, but, if you want an in-person meeting, feel
16  free to express that opinion.
17
18  **MS. BOSARGE:**  That's okay.  I mean, you know, we have a really
19  good ad hoc that has spoken on this, and I feel like, if we show
20  some initiative that we are looking at trying to wrap this
21  amendment up and going final on it, that we'll also get some
22  good feedback at our council meetings as well, and so I guess
23  I'm okay with webinar meetings on this.  I mean, it is a much
24  smaller fishery than a lot of things we deal with, I guess.
25
26  **CHAIRMAN FRAZER:**  Okay.  I see Greg's hand is up.
27
28  **DR. STUNZ:**  Mr. Chair, to that, sorry, and I guess I was
29  understanding too that there wasn't going to be in-person
30  hearings, and I don't know, Ava, is that was during the COVID
31  mindset we might have had back then.  These are pretty big
32  decisions, in my opinion, and, I mean, I don't feel that
33  strongly either way, but, because of the magnitude of those
34  decisions, I feel there probably should at least be somewhat of
35  some in-person hearings, but, if the group felt otherwise, it's
36  not that big of a deal.
37
38  **CHAIRMAN FRAZER:**  Ava, go ahead.
39
40  **DR. LASSETER:**  Let me better describe what we meant by mail-out.
41  I did this for 36A, and we have done it prior, and we're
42  intending to mail we feel like the little public hearing guide
43  to all permit holders and shareholders, and so it would be
44  anybody that would be potentially impacted.  Those participant
45  levels in the program would receive it.  Now, that doesn't get
46  at the crew and whatnot of vessels, but they're also not -- If
47  they're a shareholder, they're going to get the mailout as well,
48  and so we did feel that that was the best way to reach the
202

1 universe of participants that could potentially be affected.
2
3 **CHAIRMAN FRAZER:**   Okay.  I just have one question at this point,
4 and so we had a presentation, and so there is some appetite to
5 try to at least move this forward, but we know that we're going
6 to see this document most likely in August, to at least rework
7 the purpose and need, and my question really is do you need
8 input now on that presentation, to determine whether or not you
9 have to modify the document, or not?
10
11 **DR. LASSETER:**   I'm looking through.   In terms of the data,
12 you're not adding one of the alternatives with the different
13 control date.   The questions are really pertaining -- As Andy
14 mentioned, can these exempted accounts, these grandfathered
15 accounts, increase the shares, or are they capped, and so I
16 think that's what we need to discuss.
17
18 I think it would be helpful for the public to know the direction
19 you're going, but there are things that you could be providing
20 feedback, the public could be providing feedback, and so we
21 could highlight those questions in the mailout and during the
22 public hearings and then provide you that information, or we
23 could also cover this at the August meeting.
24
25 **CHAIRMAN FRAZER:**   Okay.  I think -- Andy, go ahead, real quick.
26
27 **MR. STRELCHECK:**   I feel like this issue of transferability to
28 and from public participant accounts is an important issue, and
29 can we give that as staff direction to incorporate a new action,
30 or do you need a new alternative for that, or, excuse me, a new
31 action for that?
32
33 **CHAIRMAN FRAZER:**   Ava.
34
35 **DR. LASSETER:**   I'm sorry.  For what, again, Andy?
36
37 **MR. STRELCHECK:**   The transfer to and from public participant
38 accounts, for those that are grandfathered into the program,
39 this issue of are we going to essentially allow anyone that is
40 grandfathered in to freely participate from that point forward,
41 or are we going to place limitations like you're talking about,
42 capping what they can hold based on when they're grandfathered
43 into the program and not being able to receive additional shares
44 and who they can transfer shares to.
45
46 **DR. LASSETER:**   Okay.  I understand.   So, accounts that are
47 currently public participant, you're suggesting that they be --
48 Like, if those accounts get the -- The grandfathered accounts.

203

0004069

1  Do you mean the grandfathered accounts that are still public
2  participant? Okay. Then an action to address what those can
3  do. Okay. Right now, we just have them kind of described as
4  questions for the council. What we could -- The IPT could draft
5  an action outlining what are the issues with that.
6
7  **MR. STRELCHECK:** Right, and so I guess I'm asking you, Tom, as
8  the Chair, is that sufficient for staff direction, or would you
9  like for me to make a motion?
10
11  **CHAIRMAN FRAZER:** I mean, I think we're good, Andy, and so we'll
12  go and try to incorporate it, and we'll give staff the latitude
13  to do that. Ms. Bosarge.
14
15  **MS. BOSARGE:** Just a question to Andy. Can you monitor that, I
16  guess is my question. Before we put it in the document, and so,
17  essentially, what we're saying is, on that implementation date,
18  you can see the decimal point of share ownership that that
19  entity has in all the different species that we manage under
20  IFQ, and, if the council said, well, the way we want this to
21  work is you can maintain that decimal of ownership, but you
22  can't increase it. Can you all actually do that, I guess is
23  what I'm saying. Can you monitor that? Can you prevent it? Do
24  you have the mechanisms in place that that's actually feasible,
25  if we decide to go that route?
26
27  **CHAIRMAN FRAZER:** Andy.
28
29  **MR. STRELCHECK:** Certainly we would want to talk to my IFQ and
30  IT team, but we do that with share caps currently, and so I
31  don't look at it as any different than share caps, and, based on
32  the motions that were just passed, there's a lot of
33  administratively-burdensome requirements that we're going to
34  have to evaluate to determine how we could implement those,
35  going forward.
36
37  **CHAIRMAN FRAZER:** Okay. Mara.
38
39  **MS. LEVY:** Thanks. I also just wanted to make sure that the
40  direction about deceased account holders was sufficient, that
41  you wanted staff to add something to address that, another
42  alternative or however the IPT thinks that could be best
43  addressed in the document.
44
45  **CHAIRMAN FRAZER:** Ava, do you feel good that you have enough
46  information?
47
48  **DR. LASSETER:** I am getting a sense, from the council, that,
                                    204

1  yes, we should add that to the document.  We'll add it as an
2  alternative.
3
4  **CHAIRMAN FRAZER:**  Okay.  Leann, did you have a question for
5  Mara?
6
7  **MS. BOSARGE:**  Mara, in an effort to make sure that we don't
8  overcomplicate things, if we add that to the document, are we
9  going to be going down a slippery slope, where -- Because, if
10 you have a live person owning it, right, a human being, and they
11 can die, and you end up in the deceased category that we're
12 talking about.
13
14 However, if it's a corporation that owns it, you can have
15 dissolution, and I just want to make sure we don't end up
16 overcomplicating things and just handling it the way we have it
17 now. Just let me know.  What do you think?
18
19 **CHAIRMAN FRAZER:**  Ms. Levy.
20
21 **MS. LEVY:**  I don't think you would overcomplicate it.  I guess I
22 was just getting to the point that Ava was making in your action
23 that deals with Action 2, share divestment, the one that deals
24 with current accounts and then losing a permit and how long they
25 have, and you might want to set up something that deals with new
26 accounts that are created to address a deceased account holder,
27 right, and I feel like we need to think about how that would
28 work, but it's slightly different than having a current account
29 that then doesn't have a permit, but I don't know, and maybe we
30 can talk about it as an IPT and figure it out, but I certainly
31 wasn't suggesting that you had to delve down into the corporate
32 piece.  I mean, that's up to you.
33
34 **CHAIRMAN FRAZER:**  Leann.
35
36 **MS. BOSARGE:**  So, Mara, I kind of feel like we're covering that
37 now, and so think about it.  If there's somebody dying, and they
38 had some sort of ownership that's going to pass to somebody
39 else, that means they had a shareholder account, right?  Now,
40 let's say it was grandfathered, and it didn't have a permit
41 associated with it.
42
43 Well, they're not going to close that account.  That account is
44 going to be sitting there, and so, until they get their ducks in
45 a row on the new account, they wouldn't close the old account
46 that has actually got the shares in it.  I guess you're right,
47 and I guess it could be a situation where it would apply, and
48 I'm thinking through it.  Okay.  I'm following you, Mara.  I'm
                                    205

 1  with you.  I'm good.
 2
 3  **CHAIRMAN FRAZER:**  All right.  Do you have enough direction, Ava,
 4  to move forward?  We will see 36B in the August meeting, and
 5  36C.  Okay.  Patrick left the room, but I know that Patrick had
 6  something he wanted to say, but, before we leave Reef Fish, I
 7  think, Martha, you wanted to talk about goliath grouper.
 8
 9  **MS. GUYAS:**  Yes, I did, and it will take about thirty seconds.
10  Our commission discussed goliath grouper at their last meeting
11  in June, and they have requested that staff prepare a draft rule
12  that they can consider to allow some sort of limited harvest for
13  goliath.
14
15  I am not sure exactly what the timing of that looks like at this
16  point, and it could be later this year, and we've got meetings -
17  - Not at our August meeting, which is next, but potentially
18  October, or potentially December, or potentially sometime in
19  2022, and we're working on what that would look like, but I just
20  wanted to give you all a heads-up, and we'll keep you posted as
21  it moves or does not move, but, yes, goliath.
22
23  **CHAIRMAN FRAZER:**  Thank you for keeping us updated.  I look
24  forward to the next iteration of goliath grouper.  Patrick.
25
26  **MR. BANKS:**  I've got a couple of items, real quick, and I don't
27  know if it takes a motion to do this, but, back in 2020, we had
28  talked about looking at a white paper for sector separation, and
29  the staff had developed one, and we had it on the agenda for one
30  of our past meetings, and I don't remember which one, but it was
31  fairly recent, but we just never got to it, and I was hoping
32  that we could try to get it back on the agenda, whenever you
33  guys have room for it.  The next meeting would be great, but I
34  just didn't want us to forget about it.
35
36  **CHAIRMAN FRAZER:**  We haven't forgotten about it.  Carrie and I
37  talked about it the other day, and do you know where it is on
38  the action schedule?  We'll try to put it on the agenda for
39  August, Patrick.  Go ahead.
40
41  **MR. BANKS:**  So the increase in the ACLs for red snapper that we
42  passed at the last meeting, rather than just moving that new
43  allocation to the existing way that the fishery is prosecuted,
44  is there any opportunity for us to use it, that increase, to
45  address the discard issue that we hear about in the eastern
46  Gulf, but also to address some of these folks who the only way
47  they can access red snapper is to lease allocation?
48

 1  I don't know if there's anything that can be done in such a
 2  short amount of time, but I want us to try to figure out how we
 3  can better use that increase in allocation.  That way, it
 4  doesn't take anything away from the folks who existing have it,
 5  but any increase -- I know it's only like 150,000 pounds, but at
 6  least use it for those two issues, and I don't exactly know how
 7  to address it, but I would like for us to talk about it.
 8
 9  **CHAIRMAN FRAZER:**  I mean, I would certainly, as would everybody
10  around this table, optimally allocate some of that red snapper,
11  to figure out how to allocate it to deal with the discard
12  issues, but I personally don't see a way around it without
13  straight up dealing with an allocation issue, and that would
14  involve an amendment of some kind.  Andy, correct me if I'm
15  wrong.
16
17  **MR. STRELCHECK:**  Patrick and I talked, three or four weeks ago,
18  and the only other route I could see is an exempted fishing
19  permit, but I can't imagine how we could make an exempted
20  fishing permit work in this instance, because, essentially, you
21  would be setting aside allocation that would otherwise be
22  distributed to fishermen based on current regulations.
23
24  **CHAIRMAN FRAZER:**  Ms. Guyas.
25
26  **MS. GUYAS:**  I guess, if you're talking about commercial
27  discards, I mean, I feel like this is one of the things we need
28  to talk about in 36C, and it has to be for a longer term, right,
29  because we're going to have a separate amendment, but should we,
30  after the next stock assessment, have additional quota on the
31  table, I think we really need to think critically about how we
32  want to spend that quota and where it goes, and so I feel like
33  that's one of the topics.  I mean, everybody has got a lot of
34  interest in whatever may come out in extra, but we need to
35  figure out really what it is that we want to do, and so 36C.
36
37  **CHAIRMAN FRAZER:**  Mr. Dyskow.
38
39  **MR. DYSKOW:**  I agree with what Patrick said.  A point of
40  clarification on recreational discards, and, Andy, tell me if
41  I'm off-base or wrong, but, if you look at the last few years,
42  it seems like there's an extraordinary amount of recreational
43  red snapper discards, and, as part of the Education and Outreach
44  Committee, we jumped onto this, about three-and-a-half years
45  ago, with this active program to educate and inform recreational
46  anglers about using venting tools and descending devices, and
47  we're not going to let that die, and that's going to be
48  continuing to gain momentum and grow over the years.

207

```
 1
 2   Just as a rec guy myself, that doesn't prosecute the red snapper
 3   fishery   specifically,   but   deals   with   this   all   the   time,
 4   recreational anglers deal with the regulations that they've been
 5   given.   We give them two pieces of information, how many days
 6   can they fish, and how many fish per day can they keep, and some
 7   of these seasons, in recent years, and not necessarily last
 8   year, but we've had three-day seasons, and we've had a number of
 9   short seasons.
10
11   If we have a lot of discards in those seasons, the anglers are
12   just doing what they're told to do, and they're told they can't
13   keep these fish, and so they have to release them.   A discard
14   and a dead discard are different things, and we have to sort
15   through that, but these high discards are more a function of the
16   regulations that they're trying to meet than anything else.   If
17   you give them a three-day season, that means there are 362 days
18   where they can't keep one, and so what is their option, other
19   than to discard the fish?
20
21   CHAIRMAN FRAZER:   It's a rhetorical question, and, I mean, it's
22   a difficult one.
23
24   MR. DYSKOW:   It's a rhetorical question that I would like some
25   clarification on.   I agree with you that it's rhetorical, but we
26   talk about these guys being bad operatives and bad participants,
27   because they do this, and the regulation requires them to do it,
28   and so that's part of the issue.   How do we control discards
29   when we have short seasons when we're telling them to discard
30   the fish?
31
32   CHAIRMAN FRAZER:   I mean, I will just provide a thought on that.
33   I mean, it's very difficult for this council to delve into the
34   depth and the complexity of all those iterations about how you
35   balance access and what means, as far as if you adjust the bag
36   limit and/or the number of days, how is that equated to
37   discards, and how do we value those discards, and does that
38   change   the   allocation   between   the   sectors,   and   so   it's
39   complicated, and we never seem to quite get there, Phil, but, at
40   some point, we're going to have to figure this out.   Andy.
41
42   MR. STRELCHECK:   Phil, I mean, this has been a growing problem
43   for quite some time, and you alluded to the last three or four
44   years for red snapper, and we've been talking about discards for
45   far longer than that.   It's going to be before this council
46   before we know it, and it's already here, but, in terms of
47   discards, I mean, you have gear solutions, and you talked about
48   descending devices, and we're going to have the DESCEND Act, and
```

0004074

1  they will be required from January of next year, and not
2  necessarily required to use them, but have them onboard with
3  venting tools.
4
5  You have less popular options, like spatial area closures,
6  right, where the fish are off-limits, but you have a complex
7  reef fish fishery, right, and people want to go out and fish for
8  all kinds of reef fish, but, in order to keep people off of
9  fish, you have to kind of shift them away from concentrations
10 where they might be discarding other species.
11
12 Then access limitation, and, of course, that's the 800-pound
13 gorilla in the room, and no one wants to talk about limits on
14 access, but, certainly, we have a very overcapitalized fishery,
15 both on the commercial side and the recreational side, and, in
16 order for us to have more efficient and effective fisheries,
17 it's going to take, I think, all of those things in order to
18 effectively reduce discards.  Thanks.
19
20 **CHAIRMAN FRAZER:**  Ms. Bosarge and then Ms. Boggs.
21
22 **MS. BOSARGE:**  All right.  Three things.  There was a discussion
23 here, a couple of people back, about large increases, or even
24 the increase we have on the table right now, commercially for
25 red snapper, and I wanted to mention that, when we thought there
26 was a possibility that we might get this extremely large
27 increase in the quota in red snapper, there were some commercial
28 fishermen that were very proactive in thinking outside the box
29 about that, and ways that we can handle it.
30
31 I'm not going to go into all the different ideas, but my
32 suggestion would be that, when we go back to that IFQ ad hoc
33 panel, that we pose that to them.  If you were to get a
34 substantial increase in red snapper quota, what would you see as
35 the ideal way to handle it?  Instead of handing them 36C, which
36 is all of our ideas, and we kind of get bogged down in details,
37 throw it out there and let them roundtable with it, and let them
38 brainstorm, and let them give us some feedback.
39
40 I have heard ideas about creating B shares, like considering the
41 shares that are out there now A shares and creating a new class
42 of shares which would be B shares, and some percentage of that
43 large increase would go to B shares, which may have different
44 rules that apply to them, and they're handled a little
45 different, and so just let them brainstorm and give us some
46 ideas.
47
48 The second thing is, at some point, and I'm not going to make a
209

1  motion, but I'm going to throw this out there, but, at some
2  point in the future, although we do not permit recreational
3  fishermen, and, therefore, we can't attach requirements for data
4  and this and that to them, because we don't have a permit for
5  them, we need to talk about at least taking the baby step of
6  making MRIP mandatory.
7
8  If you are chosen, it is not voluntary.  It is mandatory, and
9  that would be the first baby step in increasing, or decreasing,
10 hopefully, a little bit, of uncertainty, and maybe, if we have a
11 document that begins to look at that, we might find other small
12 tweaks that we can make that would start to decrease some of
13 that uncertainty, because it's that uncertainty I see as hurting
14 my side of the fishery at this point, on the commercial side.
15
16 There's that, and then the last thing is, Mr. Strelcheck, I
17 asked you about those 2020 red snapper landings, and I would
18 like to know what the landings were for last year,
19 recreationally, on red snapper, and did we exceed our OFL again.
20
21 **MR. STRELCHECK:**  I can forward a spreadsheet, or document, for
22 the council staff, and I guess, once it's ready to be shown on
23 the screen, we can talk about it.  How's that?  It would be
24 easier to do that.
25
26 **CHAIRMAN FRAZER:**  Okay.  Anything else, while we're waiting for
27 that?  All right.  I am going to go ahead and read the names of
28 the individuals that were selected for the various APs and the
29 SSCs in closed session, while that's getting put up on the
30 board.
31
32 I will read them in alphabetical order.  The following
33 individuals were appointed to the Reef Fish Advisory Panel:
34 Brenda Ballard, Charlie Bergmann, Jane Black-Lee, Douglass Boyd,
35 Steve Buckner, Patrick Cagle, Ronald Chicola, Harold Dauterive,
36 Jason DeLaCruz, Joshua Ellender, Martin Fisher, Troy Frady, John
37 Greene, Buddy Guindon, Dylan Hubbard, Chris Jenkins, Kyle
38 Johnson, John Marquez, Jr., Gregory Mercurio, Mike Prasek, Jr.,
39 and Ed Walker.
40
41 With regard to the Shrimp Advisory Panel, the following
42 individuals were appointed: Steven Bosarge, Wilburn "Ricky"
43 Brown, Thu Bui, Glenn Delaney, Gary Graham, Andrea Hance, Harris
44 Lasseigne, Lance Nacio, Frank Parker, Hunter Pearce, Corky
45 Perret, Laura Picariello, Randy Skinner, Phillip Tran, and John
46 Williams.
47
48 The following individuals were appointed to the Standing SSC, in

0004076

1  alphabetical order: Lee Anderson, Luiz Barbieri, Harry Blanchet,
2  Dave Chagaris, Roy Crabtree, Benny Gallaway, Doug Gregory, David
3  Griffith, Paul Mickle, Trevor Moncrief, James Nance, Will
4  Patterson, Sean Powers, James Tolan, Steven Scyphers, Richard
5  Woodward.
6
7  Appointed to the Red Drum Special SSC: Ed Camp, Jennifer Green,
8  and Susan Lowerre-Barbieri.  The following individuals were
9  appointed to the Reef Fish SSC: Jason Adriance, Mike Allen, and
10  John Mareska.  The following individuals were appointed to the
11  Socioeconomic SSC: Luke Fairbanks, Cynthia Grace-McCaskey, and
12  Jack Isaacs.  The following individuals were appointed to the
13  Ecosystem SSC: Mandy Karnauskas, Josh Kilborn, and Steven Saul.
14
15  The council will readvertise for the following Special SSCs:
16  Coral, Mackerel, and Shrimp.  The composition of those SSCs,
17  special SSCs, will be determined and repopulated at a later
18  date, and that will be the Spiny Lobster SSC.  All right.  If we
19  can get that spreadsheet.  Andy, did you email that?
20
21  **MR. STRELCHECK:**  I sent it to Bernie and Carrie and John.  While
22  we're waiting, Mara reminded me that, in Amendment 50A, we did
23  state that each state would provide an update to the council, as
24  requested, on the status of its management program, including,
25  but not limited to, it's most recent landings, red snapper
26  fishing season, and any other regulations in how it plans to
27  address any quota overruns.
28
29  I guess I wanted to note that, because NMFS was, obviously,
30  asked to provide you a summary table of the landings, but I
31  think we need to have this an annual kind of standing discussion
32  for state management going forward, with regard to the states
33  doing presentations on their red snapper management program, and
34  so these are the landings estimates that we have been provided
35  by each of the Gulf states.
36
37  You can see the landings and how they compare to the state
38  quotas, and I will note that Louisiana and Texas quotas were
39  reduced in 2020 and adjusted.  Right now, the Texas quota is
40  subject to litigation, with regard to how that quota reduction
41  was calculated and how we are estimating landings.  Those are
42  the best estimates, as they stand today, with regard to state
43  survey landings and how they compare to the state quotas.
44
45  **CHAIRMAN FRAZER:**  Leann.
46
47  **MS. BOSARGE:**  Thank you for that, Andy.  You make a good point,
48  because I remember distinctly saying I wanted that in that

0004077

```
 1  Amendment  50  document,  that,  essentially,  at  the  beginning  of
 2  each  year,  we  would  get  an  update  from  each  of  the  states  on  the
 3  prior  year's  season  and  landings  and  data  collection,  all  of  the
 4  above,  and  so  I'm  sure  you've  also  done  the  conversions,  the
 5  currency  conversions,  and  did  we  exceed  the  overall  OFL,  when
 6  you  put  commercial  and  for-hire  in  there?   Did  we  overfish  in
 7  2020,  based  on  those  landings?
 8
 9  MR.  STRELCHECK:   I  must  have  misunderstood  your  request,  because
10  I  thought  you  were  asking  for  the  state  survey  landings  relative
11  to  the  state  quotas.   We  just  received  Texas  landings  this  week,
12  and  so  we  can  take  a  look  at  that,  but  I  don't  believe  we
13  exceeded  the  OFL,  but  I  will  double-check  that.
14
15  CHAIRMAN  FRAZER:   Thank  you.   All  right.   Is  there  any  other  --
16
17  MR.  RIECHERS:   Tom,  I  have  my  hand  up.
18
19  CHAIRMAN  FRAZER:   Go  ahead.   I  didn't  see  your  hand,  Robin.
20
21  MR.  RIECHERS:   I  just  got  it  up,  but,  before  we  leave  this,
22  Andy,  just  out  of  curiosity,  is  this  --  I  mean,  I  realize  you
23  flagged  Louisiana  and  Texas,  and  what  currency  are  we  in  for
24  other  states  here?
25
26  CHAIRMAN  FRAZER:   Let  me  just  try  to  get  some  clarification,  and
27  so  the  units  that  are  being  shown  for  the  currency  that's  shown
28  in  this  table  is  --  These  are  state-collected  data,  right,  and
29  so  they're  in  state  currency.
30
31  MR.  STRELCHECK:   Correct.
32
33  CHAIRMAN  FRAZER:   The  quota,  I  guess  is  the  question,  is  in  FES,
34  CHTS  to  FES,  right?
35
36  MR.  STRELCHECK:   Correct.
37
38  CHAIRMAN  FRAZER:   Robin,  does  that  answer  your  question?
39
40  MR.  RIECHERS:   Yes,  it  does,  but  I  just  wanted  it  reflected  here
41  in  this  table.
42
43  CHAIRMAN  FRAZER:   Okay.   If  it's  not  reflected  in  the  table  --  I
44  mean,  we  can  take  a  quick  look  at  it,  but  I  think  that,  if  it's
45  not,  we  can  work  on  that.
46
47  MR.  STRELCHECK:   I  will  just  note  that,  underneath  the  table,  it
48  states  that.
```

0004078

1
2   **CHAIRMAN FRAZER:**  Okay.  Thank you, Andy.  All right.  Is there
3   any other business to come before the council?  Mr. Diaz.
4
5   **MR. DIAZ:**  I know we're at the end of the meeting, but there's a
6   couple of things that I want to say.  First off, a lot of times,
7   I'm the first one in the room in the morning, and sometimes
8   Robin is here, and sometimes John is here, and I don't really
9   have a life, and I'm not sure where the rest of you are in the
10  morning, but I want to mention that, because so all know that
11  the ladies back there in the back -- I come early all the time,
12  and I have never been here when the doors are closed.
13
14  Sometimes I get here an hour-and-a-half early, and I'm in here
15  as early as an hour-and-forty-five minutes, and they're here.
16  They're working, and they're getting ready for us during the
17  day, and so, as we go through things, it's seamless.
18
19  Then, at this meeting, and in the past year, they've had to
20  juggle all this new technology that we've had to take on, and I
21  think it's been running incredibly smoothly, considering how
22  difficult all the logistics are, and I just wanted these four
23  ladies back there to know that it's noticed, and it's
24  appreciated.  Thank you very much.
25
26  I've got one more thing that I want to say to Mr. Sanchez on the
27  record.  John, you're leaving some big shoes to fill.  Whoever
28  comes behind you, they've got big shoes to fill.  It's been an
29  honor to work with you, and I have enjoyed it.  I know you come
30  here prepared, and I respect you as a council member, and I want
31  you to know that you've always got a friend in Mississippi,
32  always.
33
34  **CHAIRMAN FRAZER:**  Dale, I agree with all of those things.  We've
35  got a great staff and a great set of people around the table,
36  and so, John, to answer your question earlier, I am going to
37  miss you, buddy.  All right.  Meeting adjourned.  You guys have
38  a safe trip back, and I look forward to seeing you in August.
39
40  (Whereupon, the meeting adjourned on June 25, 2021.)
41
42                                    - - -
43
44        **Council Chair Signature - June 2021 Council Meeting Minutes**
45
46
47  _____        _____
48  Dr. Thomas K. Frazer, Chair        Date
                                213