## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| A.P. BELL FISH COMPANY, INC., SOUTHERN OFFSHORE FISHING ASSOCIATION, INC., and GULF OF MEXICO REEF FISH SHAREHOLDERS' ALLIANCE, <br><br>                            Plaintiffs, <br><br>      v. <br><br> GINA M. RAIMONDO, in her official capacity as Secretary of the United States Department of Commerce; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION; NATIONAL MARINE FISHERIES SERVICE, <br><br>                           Defendants, <br><br>    and <br><br> COASTAL CONSERVATION ASSOCIATION and LOUISIANA, <br><br>                      Intervenor-Defendants. | Case No. 1:22-cv-01260-TJK <br><br> Hon. Timothy J. Kelly |

## JOINT APPENDIX VOLUME XIII

### Administrative Record Document Numbers

196
201
205
227

# ADMINISTRATIVE

# RECORD NO. 196

7/12/2021

# Red Grouper Allocations and Annual Catch Levels and Targets



# Draft Amendment 53
## to the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico

**Including Final Environmental Impact Statement, Fishery Impact Statement, Regulatory Impact Review, and Regulatory Flexibility Act Analysis**

## July 2021




*This is a publication of the Gulf of Mexico Fishery Management Council Pursuant to National Oceanic and Atmospheric Administration Award No. NA15NMF4410011.*

0009396

This page intentionally blank

0009397

# COVER SHEET
# DRAFT AMENDMENT 53 TO THE FISHERY MANAGEMENT PLAN FOR THE REEF FISH FISHERY IN THE GULF OF MEXICO FINAL ENVIRONMENTAL IMPACT STATEMENT (DEIS)

**Abstract**:  This FEIS is prepared pursuant to the National Environmental Policy Act to assess the environmental impacts associated with a reasonable range of alternatives intended to modify the sector allocation, overfishing limit, acceptable biological catch**Error! Bookmark not defined.**, annual catch limits, and annual catch targets of red grouper in the Gulf of Mexico.

This FEIS is being prepared using the 1978 CEQ NEPA Regulations. NEPA reviews initiated prior to the effective date of the 2020 CEQ regulations may be conducted using the 1978 version of the regulations. The effective date of the 2020 CEQ NEPA Regulations was September 14, 2020. This review began on April 21, 2020, and the agency has decided to proceed under the 1978 regulations.

**Responsible Agencies and Contact Persons**

Gulf of Mexico Fishery Management Council (Council)     813-348-1630
4107 W. Spruce Street, Suite 200     813-348-1711 (fax)
Tampa, Florida 33607     gulfcouncil@gulfcouncil.org
Matt Freeman (Matt.Freeman@gulfcouncil.org)     http://www.gulfcouncil.org

National Marine Fisheries Service (Lead Agency)     727-824-5305
Southeast Regional Office     727-824-5308 (fax)
263 13th Avenue South     http://sero.nmfs.noaa.gov
St. Petersburg, Florida 33701
Peter Hood (Peter.Hood@noaa.gov)

**Type of Action**

(  ) Administrative     (  ) Legislative
(X) Draft     (  ) Final

**Filing Dates with Environmental Protection Agency (EPA)**
Notice of intent (NOI) to prepare EIS published:  April 21, 2020
Draft environmental impact statement (DEIS) filed with EPA:  May 7, 2021
DEIS comment period ended:  June 28, 2021
EPA comments on DEIS:

# FINAL EIS TABLE OF CONTENTS

Cover Sheet ........................................................................................................................... i

Draft Amendment 53 to the Fishery Management Plan for the Reef Fish Fishery in the Gulf of
Mexico ................................................................................................................................ i

Final Environmental Impact Statement (DEIS) ................................................................. i

Final EIS Table of Contents .............................................................................................. ii

Abbreviations Used in this Document .............................................................................. iii

Table of Contents .............................................................................................................. v

List of Tables .................................................................................................................. viii

List of Figures ................................................................................................................. xii

Fishery Impact Statement .............................................................................................. xiii

Executive Summary ....................................................................................................... xvii

    Chapter 1. Introduction ................................................................................................ 1

    Chapter 2. Management Alternatives ......................................................................... 14

    Chapter 3. Affected Environment .............................................................................. 29

    Chapter 4. Environmental Consequences .................................................................. 90

    Chapter 5. Regulatory Impact Review ..................................................................... 148

    Chapter 6. Initial Regulatory Flexibility Act Analysis ............................................ 155

    Chapter 7. List of Agencies, Organizations, and Persons to Whom a Copy of the EIS Is Sent
    ..................................................................................................................................... 162

    Chapter 8. List of Preparers and Reviewers ............................................................ 163

    Chapter 9. References ............................................................................................... 164

    Chapter 10. Index ..................................................................................................... 176

Appendix A. Other Applicable Law ............................................................................... 181

Appendix B. Bycatch Practicability Analysis ................................................................ 185

Appendix C. Gulf of Mexico Fishery Management Council – Allocation Policy ........... 208

Appendix D. Allocation Triggers ................................................................................... 211

Appendix E. Allocation Factors ..................................................................................... 228

Appendix F. Allocation Review Triggers ...................................................................... 244

Appendix G. ACL/ACT Control Rule for the Recreational Sector ................................ 247

Appendix H. ACL/ACT Control Rule for the Commercial Sector ................................ 248

Appendix I. Modification of Management for Red Grouper in the Gulf ......................... 249

# ABBREVIATIONS USED IN THIS DOCUMENT

| | |
|---|---|
| ABC**Error! Bookmark not defined.** | acceptable biological catch |
| ACL | annual catch limit |
| ACT | annual catch target |
| AM | accountability measure |
| APAIS | Access Point Angler Intercept Survey |
| BiOp | biological opinion |
| BLL | bottom longline |
| CEA | cumulative effects analysis |
| CEQ | Council on Environmental Quality |
| CFpA | Net Cash Flow per Angler Trip |
| CHTS | Coastal Household Telephone Survey |
| COI | certificate of inspection |
| Council | Gulf of Mexico Fishery Management Council |
| CS | consumer surplus |
| DLMTool | Data Limited Methods Tool |
| DPS | distinct population segment |
| DWG | deep water grouper |
| ELMRP | Estuarine Living Marine Resources Program |
| EEZ | exclusive economic zone |
| EFH | essential fish habitat |
| EIS | environmental impact statement |
| EJ | environmental justice |
| ESA | Endangered Species Act |
| F | fishing mortality rate |
| FES | Fishing Effort Survey |
| FGBNMS | Flower Garden Banks National Marine Sanctuary |
| FMP | fishery management plan |
| FWC | Florida Fish and Wildlife Conservation Commission |
| FWRI | Florida Fish and Wildlife Research Institute |
| GG | gag grouper |
| GGM | gag grouper multi-use |
| Gulf | Gulf of Mexico |
| GT | gray triggerfish |
| gw | gutted weight |
| HAPC | Habitat Area of Particular Concern |
| HCR | harvest control rule |
| IFQ | individual fishing quota |
| LNG | liquefied natural gas |
| Magnuson-Stevens Act | Magnuson-Stevens Fishery Conservation and Management Act |
| MFMT | maximum fishing mortality threshold |
| MMPA | Marine Mammal Protection Act |
| mp | million pounds |

| | |
|---|---|
| MRIP | Marine Recreational Information Program |
| MRFSS | Marine Recreational Fisheries Statistics Survey |
| MSST | minimum stock size threshold |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |
| NOS | National Ocean Service |
| OFL | overfishing limit |
| OLE | NOAA Office of Law Enforcement |
| OY | optimum yield |
| PAH | polycyclic aromatic hydrocarbons |
| PDF | probability distribution function |
| PS | producer surplus |
| PSE | proportional standard error |
| pw | product weight |
| Reef Fish FMP | Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico |
| RFFA | reasonably foreseeable future action |
| RG | red grouper |
| RGM | red grouper multi-use |
| RQ | regional quotient |
| RS | red snapper |
| Secretary | Secretary of Commerce |
| SEDAR | Southeast Data, Assessment and Review |
| SEFSC | Southeast Fisheries Science Center |
| SF | Sustainable Fisheries |
| SFA | Sustainable Fisheries Act |
| SOI | Segments of Interest |
| SPR | spawning potential ratio |
| SRHS | Southeast Region Headboat Survey |
| SSB | spawning stock biomass |
| SSC | Scientific and Statistical Committee |
| SWG | shallow-water grouper |
| TAC | total allowable catch |
| TF | tilefish |
| TL | total length |
| USCG | United States Coast Guard |
| VEC | valued environmental component |
| ww | whole weight |

# TABLE OF CONTENTS

Cover Sheet .................................................................................................................................... i

Draft Amendment 53 to the Fishery Management Plan for the Reef Fish Fishery in the Gulf of
Mexico ........................................................................................................................................... i

Final Environmental Impact Statement (DEIS) ........................................................................... i

Final EIS Table of Contents ........................................................................................................ ii

Abbreviations Used in this Document ........................................................................................ iii

Table of Contents ......................................................................................................................... v

List of Tables ............................................................................................................................ viii

List of Figures ........................................................................................................................... xii

Fishery Impact Statement ......................................................................................................... xiii

Executive Summary .................................................................................................................. xvii

Chapter 1. Introduction ........................................................................................................... 1

1.1 Background ......................................................................................................................... 1

1.2 Objectives of the Reef Fish Fishery Management Plan ...................................................... 7

1.3 Purpose and Need ............................................................................................................... 8

1.4 History of Management ...................................................................................................... 9

Chapter 2. Management Alternatives .................................................................................... 14

2.1 Action 1 – Modify the Sector Allocations, OFL, ABC, and ACLs for Red Grouper ........ 14

2.2 Action 2 – Modify the Gulf Red Grouper Annual Catch Targets (ACT) .......................... 24

Chapter 3. Affected Environment .......................................................................................... 29

3.1 Description of the Fishery ................................................................................................. 29

3.2 Description of the Physical Environment .......................................................................... 37

3.3 Description of the Biological/Ecological Environment .................................................... 40

3.4 Description of the Economic Environment ....................................................................... 50

3.4.1 Commercial Sector ................................................................................................... 50

3.4.2 Recreational Sector .................................................................................................. 70

3.5 Description of the Social Environment .............................................................................. 81

3.5.1 Commercial Sector ................................................................................................... 81

3.5.2 Recreational Sector .................................................................................................. 85

3.5.3 Environmental Justice Considerations ..................................................................... 86

3.6 Description of the Administrative Environment ................................................................ 88

3.6.1 Federal Fishery Management .................................................................................... 88

3.6.2 State Fishery Management ........................................................................................ 89

Chapter 4. Environmental Consequences ................................................................................. 90

4.1 Action 1 – Modify the Sector Allocations, Overfishing Limit (OFL), Acceptable Biological Catch (ABC), and Annual Catch Limits (ACL) for Gulf of Mexico (Gulf) Red Grouper ................................................................................................................................. 90

4.1.1 Direct and Indirect Effects on the Physical Environment .................................... 90

4.1.2 Direct and Indirect Effects on the Biological Environment .................................. 92

4.1.3 Direct and Indirect Effects on the Economic Environment .................................. 94

4.1.4 Direct and Indirect Effects on the Social Environment ...................................... 100

4.1.5 Direct and Indirect Effects on the Administrative Environment ......................... 104

4.2 Action 2 – Modify the Gulf Red Grouper Annual Catch Targets (ACT) ........................ 105

4.2.1 Direct and Indirect Effects on the Physical Environment .................................. 105

4.2.2 Direct and Indirect Effects on the Biological Environment ................................ 105

4.2.3 Direct and Indirect Effects on the Economic Environment ................................ 106

4.2.4 Direct and Indirect Effects on the Social Environment ...................................... 117

4.2.5 Direct and Indirect Effects on the Administrative Environment ......................... 118

4.3 Cumulative Effects Analysis (CEA) .............................................................................. 119

Chapter 5. Regulatory Impact Review ................................................................................... 148

5.1 Introduction .................................................................................................................... 148

5.2 Problems and Objectives ................................................................................................ 148

5.3 Description of Fisheries .................................................................................................. 148

5.4 Impacts of Management Measures .................................................................................. 148

5.4.1 Action 1:  Modify the Sector Allocations, Overfishing Limit (OFL), Acceptable Biological Catch (ABC), and Annual Catch Limits (ACL) for Gulf of Mexico (Gulf) Red Grouper ................................................................................................................. 148

5.4.2 Action 2 – Modify the Gulf Red Grouper Annual Catch Targets (ACT) .............. 151

5.5 Public and Private Costs of Regulations ........................................................................ 153

5.6 Net Benefits of the Regulatory Action ........................................................................... 153

5.7 Determination of Significant Regulatory Action ............................................................ 154

Chapter 6. Initial Regulatory Flexibility Act Analysis ......................................................... 155

6.1 Introduction .................................................................................................................... 155

6.2 Statement of the need for, objectives of, and legal basis for the rule .............................. 156

6.3 Description and estimate of the number of small entities to which the proposed action would apply ............................................................................................................................ 156

6.4 Description of the projected reporting, record-keeping and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be

0009403

subject to the requirement and the type of professional skills necessary for the preparation of the report or records ........................................................................................................ 158

6.5 Identification of all relevant federal rules, which may duplicate, overlap or conflict with the proposed rule .................................................................................................................. 158

6.6 Significance of economic effects on small entities ......................................................... 158

6.7 Description of significant alternatives to the proposed action and discussion of how the alternatives attempt to minimize economic impacts on small entities .................................. 161

Chapter 7. List of Agencies, Organizations, and Persons to Whom a Copy of the EIS Is Sent ................................................................................................................................ 162

Chapter 8. List of Preparers and Reviewers .......................................................................... 163

Chapter 9. References .............................................................................................................. 164

Chapter 10. Index ..................................................................................................................... 176

Appendix A. Other Applicable Law .......................................................................................... 181

Appendix B. Bycatch Practicability Analysis ........................................................................... 185

Appendix C. Gulf of Mexico Fishery Management Council – Allocation Policy ....................... 208

Appendix D. Allocation Triggers .............................................................................................. 211

Appendix E. Allocation Factors ................................................................................................ 228

Appendix F. Allocation Review Triggers .................................................................................. 244

Appendix G. ACL/ACT Control Rule for the Recreational Sector ........................................... 247

Appendix H. ACL/ACT Control Rule for the Commercial Sector ............................................ 248

Appendix I. Modification of Management for Red Grouper in the Gulf .................................... 249

# LIST OF TABLES

**Table 1.** OFL, ABC, total and sector ACLs for **Alternatives 1-6**. ............................................ xix

**Table 2.** Commercial and recreational sector ACTs resulting from alternatives selected in Actions 1 and 2. ......................................................................................................... xxiii

**Table 1.1.1.** SEDAR 42 (2015) yield projections for red grouper at a constant catch level, averaged over the 2016-2020 time series. ............................................................................. 3

**Table 1.1.2.** Status determination criteria and stock status of red grouper based on SEDAR 61 (2019) and Amendment 44 (2017) ................................................................................. 7

**Table 1.1.3.** Alternative yield projections accepted as scientifically valid by the SSC at its January 2020 meeting. ............................................................................................... 7

**Table 2.1.1.** OFL, ABC, total and sector ACLs, and sector ACTs for **Preferred Alternative 3** and **Alternatives 1-2** and **4-6**. .......................................................................... 15

**Table 2.1.2.** Commercial and recreational landings for red grouper in pounds gutted weight (gw) from SEDAR 12 (MRFSS) and the SEFSC ACL monitoring datasets (MRIP-FES) used to calculate sector allocations. ....................................................................................... 19

**Table 2.1.3.** Commercial and recreational ACLs, ACTs, and landings for red grouper in pounds gutted weight (gw) in CHTS units for years in which an ACL and/or an ACT was in place. ..... 21

**Table 2.1.4.** The predicted closure dates for each recreational ACL (mp gw) currently in Amendment 53 generated from predicted landings with 95% confidence intervals. ................... 22

**Table 2.2.1.** ACL/ACT Control Rule data inputs for **Alternative 2** of Action 2. ..................... 25

**Table 2.2.2.** Percentage (and weight in pounds [lbs]) of multi-use allocations used by fishermen for landing red grouper and gag. ................................................................................... 26

**Table 2.2.3.** Commercial and recreational sector ACTs resulting from alternatives selected in Actions 1 and 2. ......................................................................................................... 26

**Table 2.2.4.** The predicted closure dates for each recreational ACT (mp gw) currently in Amendment 53 generated from predicted landings with 95% confidence intervals. ................... 27

**Table 2.2.5.** Red grouper private mode Florida landings (pounds whole weight) from GRFS, MRIP-CHTS, and MRIP-FES surveys. ............................................................................ 28

**Table 3.1.1.** Number and percentage of vessels with a Gulf reef fish permit by state, final totals for 2018. ................................................................................................................... 31

**Table 3.1.2.** Red grouper landings in pounds gutted weight for the commercial sector. ............ 32

**Table 3.1.3.** Red grouper commercial discards (number of fish) by gear. .................................. 34

**Table 3.1.4.** Number and percentage of for-hire reef fish permits by state of mailing recipient (of permit). ................................................................................................................ 35

**Table 3.1.5.** Red grouper landings in pounds gutted weight for recreational fleets. ................... 36

**Table 3.1.6.** Red grouper recreational discards (number of fish) ............................................. 37

**Table 3.2.1.** Total Gulf greenhouse gas emissions estimates (tons per year) from oil platform and non-oil platform sources, commercial fishing, and percent greenhouse gas emissions from commercial fishing vessels of the total emissions*. ............................................................. 40

**Table 3.3.1.** Status of species in the Reef Fish FMP grouped by family. .................................. 45

**Table 3.4.1.1.** Number of valid or renewable commercial reef fish permits, 2008-2019. .......... 51

**Table 3.4.1.2.** Vessels and businesses with a commercial reef fish permit, end of year (EOY) 2018. ........................................................................................................................ 51

**Table 3.4.1.3.** IFQ eligible vessels and businesses with a Gulf reef fish permit, EOY 2018. .... 52

**Table 3.4.1.4.**  Quota share statistics (in percent) for accounts with RG shares, Feb. 19, 2020.. 53

**Table 3.4.1.5.**  Quota share statistics (in percent) for businesses with RG shares and permitted vessels, Feb. 19, 2020. ........................................................................................................... 54

**Table 3.4.1.6.**  Quota share statistics (in percent) for businesses with RG shares and no permitted vessels, Feb. 19, 2020. ........................................................................................................... 54

**Table 3.4.1.7.**  Annual allocation (lb gw) statistics for accounts with RG shares, Feb. 19, 2020. ................................................................................................................................................. 55

**Table 3.4.1.8.**  Annual allocation (lb gw) statistics for businesses with RG shares and permitted vessels, February 19, 2020.......................................................................................................... 55

**Table 3.4.1.9.**  Annual allocation (lb gw) statistics for businesses with RG shares and no permitted vessels, February 19, 2020. .......................................................................................... 55

**Table 3.4.1.10.**  Quota share value statistics for accounts with RG shares (2019$). .................. 56

**Table 3.4.1.11.**  Average share prices by share category, 2015-2019 (2019$). ........................... 56

**Table 3.4.1.12.**  Quota share value statistics for businesses with RG shares and permitted vessels, February 19, 2020 (2019$). ............................................................................................ 57

**Table 3.4.1.13.**  Quota share value statistics for businesses with RG shares but no permitted vessels, February 19, 2020 (2019$). ............................................................................................ 57

**Table 3.4.1.14.**  Potential market value of annual allocation in 2020 for all accounts with RG shares (2019$). ............................................................................................................................ 58

**Table 3.4.1.15.**  Average allocation prices by share category, 2015-2019 (2019$).................... 58

**Table 3.4.1.16.**  Allocation value statistics for businesses with RG shares and permitted vessels, ................................................................................................................................................. 59

February 19, 2020 (2019$). ......................................................................................................... 59

**Table 3.4.1.17.**  Allocation value statistics for businesses with RG shares but no permitted vessels, February 19, 2020 (2019$). ............................................................................................ 59

**Table 3.4.1.18.**  Potential ex-vessel value of annual allocation in 2020 for accounts with RG shares (2019$). ............................................................................................................................ 60

**Table 3.4.1.19.**  Average ex-vessel prices by share category, 2015-2019 (2019$)..................... 60

**Table 3.4.1.20.**  Landings and revenue statistics for vessels harvesting RG by year, 2014-2018 (2019$)........................................................................................................................................ 61

**Table 3.4.1.21.**  Economic characteristics of RG trips 2014-2016 (2019$)............................... 64

**Table 3.4.1.22.**  Economic characteristics of RG vessels from 2014-2016 (2019$).................... 65

**Table 3.4.1.23.**  Dealer statistics for dealers that purchased RG landings by year, 2014-2018.  All dollar estimates are in 2019$. ...................................................................................................... 66

**Table 3.4.1.24.**  Average annual economic impacts of red grouper in the commercial sector of the Gulf reef fish fishery.............................................................................................................. 69

**Table 3.4.2.1.** Recreational landings (lbs gw) and percent distribution of red grouper across all states by mode for 2014-2018. .................................................................................................... 71

**Table 3.4.2.2.**  Number of red grouper recreational target trips, by mode and state, 2014-2018.* ................................................................................................................................................. 72

**Table 3.4.2.3.**  Number of red grouper recreational catch trips, by mode and state, 2014-2018.* ................................................................................................................................................. 73

**Table 3.4.2.4.**  Red grouper target trips by wave and mode, 2014 – 2018.*................................ 74

**Table 3.4.2.5.**  Red grouper catch trips by wave and mode, 2014 – 2018.* ............................... 75

**Table 3.4.2.6.**  Gulf headboat angler days and percent distribution by state (2014-2018). ......... 76

**Table 3.4.2.7.**  Number of valid or renewable for-hire Gulf reef fish permits, 2008-2019. ........ 77

**Table 3.4.2.8.** Trip economics for offshore trips by Gulf charter vessels and Southeast headboats in 2017 (2019$). ........................................................................................................ 79
**Table 3.4.2.9.** Estimated economic impacts from average annual Gulf red grouper recreational target trips by state and mode (2014-2018), using state-level multipliers. .................................. 80
**Table 3.5.1.1.** Number of vessels landing red grouper by top 10 county homeports. ................. 82
**Table 3.5.1.2.** Number of vessels landing red grouper by top 10 community homeports. ......... 83
**Table 3.6.2.1.** Gulf state marine resource agencies and web pages. ....................................... 89
**Table 4.1.3.1.** Expected change in landings for the red grouper commercial sector, expected change in revenue, and expected change in PS for **Preferred Alternative 3** and **Alternatives 2** and **4-6** relative to **Alternative 1**. ........................................................................................ 94
**Table 4.1.3.2. Preferred Alternative 3** and **Alternatives 2** and **4-6** - Proposed change in the red grouper commercial sector ACT (relative to **Alternative 1**) and associated estimated average price change ($/lb) and change in CS. ................................................................................ 96
**Table 4.1.3.3. Preferred Alternative 3** and **Alternatives 2** and **4-6** – Total Expected Change in Net Economic Benefits for the Commercial Sector relative to **Alternative 1**. ...................... 96
**Table 4.1.3.4. Preferred Alternative 3** and **Alternatives 2** and **4-6** - Proposed change in the red grouper recreational sector ACL (relative to **Alternative 1**) and associated estimated annual change in CS. ........................................................................................................................ 97
**Table 4.1.3.5.** Wave in which predicted closure date occurs, canceled charter trips in the interrupted wave, and total canceled charter trips for **Preferred Alternative 3** and **Alternatives 2** and **4-6**. .................................................................................................................. 98
**Table 4.1.3.6.** Short-term change in PS for charter vessels under **Preferred Alternative 3** and **Alternatives 2** and **4-6** relative to **Alternative 1**. ............................................................. 99
**Table 4.1.3.8. Preferred Alternative 3** and **Alternatives 2** and **4-6** – Combined Total Expected Change in Net Economic Benefits for both the Commercial and Recreational Sectors relative to **Alternative 1**. ............................................................................................... 100
**Table 4.1.4.2.** Recreational sector ACLs for **Alternatives 1-6** in MRIP-CHTS units and MRIP-FES units, based on the ratio in Alternative 1. ....................................................................... 103
**Table 4.2.3.1.** Expected change in landings for the red grouper commercial sector, expected change in revenue, and expected change in PS for Action 2 **Preferred Alternative 3** and **Alternatives 2** and **4-6**, relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**. ........ 107
**Table 4.2.3.2. Alternatives 1-2** and **Preferred Alternative 3** - Proposed change in the red grouper commercial sector ACT (relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**) and associated estimated average price change ($/lb) and change in CS. .............................. 110
**Table 4.2.3.3. Alternatives 1-2** and **Preferred Alternative 3** – Total Expected Change in Net Economic Benefits for the Commercial Sector, relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**. ............................................................................................................... 111
**Table 4.2.3.4. Alternatives 1-2** and **Preferred Alternative 3** - Proposed change in the red grouper recreational sector ACT (relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**) and associated estimated change in CS. .................................................................... 112
**Table 4.2.3.5.** Wave in which predicted closure date occurs, canceled charter trips in the interrupted wave, and total canceled charter trips for Action 2 **Alternatives 1-2** and **Preferred Alternative 3** paired with Action 1 **Preferred Alternative 3** and **Alternatives 2** and **4-6**. ..... 114
**Table 4.2.3.6.** Short-term change in PS (2019 dollars) for charter vessels under Action 2 **Alternatives 1-2** and **Preferred Alternative 3** paired with Action 1 **Preferred Alternative 3** and **Alternatives 2** and **4-6**. ............................................................................................. 115

**Table 4.2.3.7.   Alternatives 1-2** and **Preferred Alternative 3** – Total Expected Change in Net Economic Benefits for the Recreational Sector relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**. ................................................................................................................. 115

**Table 4.2.3.8.   Alternatives 1-2** and **Preferred Alternative 3** – Combined Total Expected Change in Net Economic Benefits for both the Commercial and Recreational Sectors relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**. ............................................................ 116

**Table 4.3.1.**  The cause and effect relationship of fishing and regulatory actions for red grouper within the time period of the CEA. ............................................................................ 137

**Table 4.3.2.**  Valued environmental components (VEC) identified. ......................................... 139

**Table 4.3.3.**  Recreational landings of red grouper from 2010-2018, the recreational annual catch limit (ACL), and landings as a percent of the ACL.  Landings are in pounds gutted weight..... 143

# LIST OF FIGURES

**Figure 2.1.1.**  Gulf recreational landings by two-month wave and predicted future landings...... 22

**Figure 2.1.2.**  Cumulative predicted red grouper recreational landings with 95% confidence interval (dashed lines). .................................................................................................................. 23

**Figure 3.2.1.**  Physical environment of the Gulf, including major feature names and mean annual sea surface temperature as derived from the Advanced Very High-Resolution Radiometer Pathfinder Version 5 sea surface temperature data set ............................................................... 39

**Figure 3.5.1.1.**  Red grouper regional quotient by top 10 homeport counties. ........................... 83

**Figure 3.5.1.2.**  Red grouper regional quotient by top 20 homeport communities. .................... 84

**Figure 3.5.1.3**.  Commercial fishing engagement and reliance of the top 15 red grouper homeports for 2017. ..................................................................................................................... 85

**Figure 3.5.2.1.**  Recreational fishing engagement and reliance for communities on Florida's west coast for 2017. .............................................................................................................................. 86

**Figure 3.5.3.1.**  Community social vulnerability indices for communities on Florida's west coast. .................................................................................................................................................... 87

# FISHERY IMPACT STATEMENT

The Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act) requires that a fishery impact statement (FIS) be prepared for all amendments to fishery management plans.  The FIS contains:  1) an assessment of the likely biological, economic, and social effects of the conservation and management measures on fishery participants and their communities; 2) an assessment of any effects on participants in the fisheries conducted in adjacent areas under the authority of another Fishery Management Council; and 3) the safety of human life at sea.  Detailed discussion of the expected effects for all proposed changes is provided in Chapter 4.  The FIS provides a summary of these effects.

The Southeast Data Assessment and Review (SEDAR) 61 (2019) assessment was completed in September 2019 using updated recreational data from the Marine Recreational Information Program (MRIP) Access Point Angler Intercept Survey (APAIS) and Fishing Effort Survey (FES), which collectively estimated greater catch and effort data for the recreational sector than previously calculated.  In January 2020, the Gulf of Mexico Fishery Management Council's (Council) Scientific and Statistical Committee (SSC) concluded that the SEDAR 61 (2019) assessment represented the best scientific information available.  The SSC reviewed various alternative sector allocation scenarios and recommended the projections in Table 1.1.3 as scientifically valid estimates of the overfishing limit (OFL) and acceptable biological catch (ABC).

Amendment 53 to the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico (Reef Fish FMP) considers alternatives that would modify the allocation of red grouper between the recreational and commercial sectors based on updated historical recreational harvest data.  Based on the allocation decision made in Action 1 (Section 2.1), this amendment further proposes modifications to the OFL, ABC, total and sector annual catch limits (ACLs), and sector annual catch targets (ACTs) for red grouper based on the stock assessment results and the resultant yield projections, considering the severity of the 2018 red tide event.

Amendment 53 consists of two actions.  Action 1 would modify the sector allocations, OFL, ABC, and ACLs for red grouper.  **Preferred Alternative 3** would revise the sector allocations of the total ACL between the recreational and commercial sectors using the average recreational landings with MRIP-FES adjusted data during the years 1986 through 2005, based on the Southeast Fisheries Science Center (SEFSC) ACL monitoring datasets.  The allocations for red grouper would be 59.3% commercial and 40.7% recreational.  The OFL and ABC would be revised as recommended by the SSC based on SEDAR 61 (2019) to 4.66 mp gw and 4.26 mp gw, respectively, and the stock ACL would be set equal to the stock ABC of 4.26 mp gw.  The commercial ACL would be 2.53 mp gw, and the recreational ACL would be 1.73 mp gw.

Action 2 would modify the red grouper ACTs.  **Preferred Alternative 3** would maintain the current buffer between the ACL and ACT for the commercial sector, and apply the ACL/ACT Control Rule to revise the buffer between the ACL and ACT for the recreational sector.  The commercial buffer would remain at 5% and result in a 2.40 mp gw commercial ACT, and the

recreational buffer would increase from 8% under **Alternative 1** to 9% under **Preferred Alternative 3** and result in a 1.57 million pounds (mp)  gutted weight (gw) recreational ACT.

Biological Effects

The biological effects of changing allocation, ACLs, and ACTs mostly relate to the impacts of fishing on a species' population size, life history, and the role of the species within its habitat. Removal of fish from the population through fishing reduces the overall population size.  Fishing gears have different selectivity patterns, which refer to a fishing method's ability to target and capture organisms by size and species.  This would include the size distribution of fish caught by the gear as well as the number of discards, mostly sublegal fish or fish caught during seasonal closures, and the mortality associated with releasing these fish.

*Action 1* –Under **Preferred Alternative 3**, more fish would be allocated to the recreational sector, which would result in a shift in the number and size caught by that sector and results in a reduction in the resulting OFL, ABC, and stock ACL compared to keeping the current allocation. This is because total landings have to be constrained more to account for the greater numbers of dead discards from recreational red grouper fishing.  As described in Appendix B, the recreational sector discards are an order of magnitude greater than the commercial sector. However, the purpose of the OFL and ACLs is to provide catch limits that constrain harvest and reduce the likelihood of overfishing, which protects the stock.  The OFL is based on a fixed level of fishing mortality ($F_{30\%SPR}$), and thus is expected to manage the stock at $B_{30\%SPR}$, a level considered sustainable.

*Action 2* – **Preferred Alternative 3** would likely have little effect on red grouper biology.  The commercial ACT buffer would not change from its current value of 5%.  The recreational ACT would provide a little more protection to the stock because the buffer between the ACL and ACT would marginally increase from 8% to 9%.  The small increase in the recreational buffer is not expected to substantially shorten the recreational fishing season.

Economic Effects

Compared with Action 1 **Alternative 1**, Action 1 **Preferred Alternative 3** would decrease the red grouper commercial ACL and ACT (when paired with Action 2 **Alternative 1**) by 0.63 mp gw and 0.60 mp gw, respectively.  The decrease in the ACT is estimated to result in a decrease in revenue of $2,898,000 resulting in an expected change in producer surplus (PS) of -$695,520. The expected decrease in revenue is expected to result in a 16.51% decrease in red grouper purchases by dealers.  In addition, the proposed decrease in the ACL with **Preferred Alternative 3**, when paired with Action 2 **Alternative 1**, would result in a decreased ACT, which would then decrease the availability of annual individual fishing quota (IFQ) allocation for sale, compared with Action 1 **Alternative 1**, and the allocation price would be expected to increase in response. **Preferred Alternative 3** would also be expected to result in an increase in red grouper share price, to reflect the expected supply of annual allocation available in the future.  Changes in red grouper harvests, as a result of the change in ACT, could result in additional economic effects because of the potential effects on ex-vessel prices due to less (or more) red grouper available for sale in wholesale and retail markets.  The decrease in the commercial ACT under **Preferred**

**Alternative 3** is expected to result in a positive average price change ($0.51/lb) and a decrease in consumer surplus (CS) of $1,235,707. Net economic benefits for the commercial sector from **Preferred Alternative 3**, relative to **Alternative 1**, would be expected to decrease by $1,931,227 in 2022.

Under **Preferred Alternative 3**, the red grouper recreational ACL would decrease by 0.37 mp gw (in MRIP-FES units) in comparison with **Alternative 1**. The red grouper recreational ACL under **Alternative 1** is 1.00 mp gw in MRIP-CHTS units and 2.10 mp gw in MRIP-FES units; the red grouper recreational ACL under **Preferred Alternative 3** is 1.73 mp gw in MRIP-FES units. The CS would be expected to decrease by $6,564,516 under **Preferred Alternative 3**, relative to **Alternative 1**. The for-hire component of the recreational sector, being comprised of charter vessels and headboats, would also be impacted under **Preferred Alternative 3** by an estimated decrease of 665 targeted trips, resulting in a short-term decrease in PS of $93,723.

Summing the annual changes in CS and PS for the recreational sector provides the net economic benefits for that sector in a given year. Net economic benefits for the recreational sector from **Preferred Alternative 3**, relative to **Alternative 1**, would be expected to decrease by $6,658,239 in 2022. Net economic benefits from the commercial and recreational sectors combined from **Preferred Alternative 3**, relative to **Alternative 1**, would be expected to decrease by $8,589,466 in 2022.

Action 2 **Preferred Alternative 3** would would retain the current commercial buffer of 5% between the ACL and ACT. Therefore, no additional economic effects to the commercial sector would be expected under **Preferred Alternative 3**, in comparison to **Alternative 1**.

**Preferred Alternative 3** would modify the recreational buffer between the ACL and ACT from 8%, currently, to 9%. Of note, any economic effects to the recreational sector from Action 2 would only be expected to result if the recreational sector's post-season accountability measure is triggered, requiring the recreational sector to be managed to the ACT instead of the ACL. When paired with Action 1 **Preferred Alternative 3**, the change in ACT under Action 2 **Preferred Alternative 3** compared to Action 2 **Alternative 1** is -0.02 mp gw. The expected change in CS under Action 2 **Preferred Alternative 3** compared to Action 2 **Alternative 1** is -$354,839. The for-hire component of the recreational sector, being comprised of charter vessels and headboats, would also be impacted under Action 2 **Preferred Alternative 3** when paired with Action 1 **Preferred Alternative 3** by an estimated decrease of 204 targeted trips resulting in a short-term decrease in PS of $28,838.

Summing the annual changes in CS and PS for the recreational sector provides the net economic benefits for that sector in a given year. When paired with Action 1 **Preferred Alternative 3**, net economic benefits for the recreational sector under Action 2 **Preferred Alternative 3** compared to Action 2 **Alternative 1** would decrease by $383,677 in 2022.

<u>Social Effects</u>

Action 1 would reduce the catch levels, update the recreational landings and data units from MRIP-CHTS units to MRIP-FES units, and adjust the sector allocation (**Preferred Alternative**

**3**).  Each of these changes are interrelated, but could result in different effects to one or both sectors.  Reducing the catch levels would be expected to result in negative effects for both sectors, but the extent of these effects would relate to whether and how much future landings are constrained by the lower catch levels.  Theoretically, updating the recreational data units from MRIP-CHTS to MRIP-FES should have no social effects as it is a conversion to a new data system for the recreational sector only.  Although direct effects would not be expected for the commercial sector from updating the recreational data units to MRIP-FES, this change, however, would have an indirect negative effect on the commercial sector and indirect positive effect on the recreational sector.  As a result of this change in data units, the sector allocation would realize a 16% adjustment from the commercial sector to the recreational sector.  Although this change would not reduce the amount of fish available to the commercial sector, the reallocation has negative socio-cultural impacts for the commercial sector, for which the red grouper has historically been the most important grouper stock.

For Action 2, the commercial ACT would not change, so additional effects would not be expected from **Preferred Alternative 3** for the commercial sector.  For the recreational sector, the ACT would increase 1%, creating a larger buffer between the ACL and ACT.  Alongside the reduction to the recreational sector ACL in Action 1, the increased ACT could be expected to further shorten the fishing season by an estimated four days (Table 2.2.4).  However, any in-season closure based on the ACT would not occur until the year following one in which the ACL is exceeded.  Thus, the earliest an in-season closure could occur would be in 2023, and would only occur if the recreational sector's landings exceed its ACL in 2022.

<u>Effects on Participants in the Fisheries Conducted in Adjacent Areas Under the Authority of another Fishery Management Council</u>

The Gulf red grouper stock is managed under the Council's Reef Fish FMP.  Therefore, the actions of this amendment are not expected to impact fishery participants in areas adjacent to the Gulf, such as fisheries managed under the Caribbean and South Atlantic Councils' jurisdiction.

<u>Effects on Safety at Sea</u>

Under the current preferred alternatives, the commercial sector's ACT would decrease by 0.60 mp gw.  However, the IFQ program and resulting allocation should mitigate any incentive to engage in red grouper commercial fishing under adverse weather or ocean conditions.  The recreational sector's ACL would decrease by 0.37 mp gw.  The recreational season is expected to end on December 19, whereas no closure is currently anticipated under the No Action alternatives.  This is expected to result in 665 canceled charter trips due to an expected shorter recreational season.  In order to avoid further effects on profit, some trips could potentially not be canceled due to adverse weather or ocean conditions during the recreational season.  Likewise, private anglers could face a similar decision when facing a shorter recreational season.  The recreational sector is constained by the sector ACT only when a post-season accountability measure is triggered, and that would be expected to result in an even shorter season. However, given the results of the assessment and the ABC recommendations, the catch levels provided in **Preferred Alternative 3** from Actions 1 and 2 would promote safety at sea to the extent practicable.

# EXECUTIVE SUMMARY

Amendment 53 to the Fishery Management Plan for Reef Fish Resources of the Gulf of Mexico (Reef Fish FMP) is being developed by the Gulf of Mexico Fishery Management Council (Council) to address the results of the Southeast Data Assessment and Review (SEDAR) 61 (2019) stock assessment and subsequent overfishing limit (OFL) and acceptable biological catch (ABC) recommendations from the Council's Scientific and Statistical Committee (SSC). Amendment 53 revises the red grouper allocation between the commercial and recreational sectors and modifies the OFL, ABC, the total and sector annual catch limits (ACLs), and sector annual catch targets (ACT).

The Gulf of Mexico (Gulf) red grouper stock was determined to be overfished and undergoing overfishing in 2000.  A 10-year rebuilding plan was subsequently put in place to allow the stock to recover.  In 2007, the National Marine Fisheries Service (NMFS) determined that the red grouper stock was rebuilt.  The current OFL and ABC are based on the results of SEDAR 42, conducted in 2015.  However, fishermen had expressed concern about the condition of the red grouper stock because recent harvests had been well below the ACLs.  In 2018, the Council received a recommendation from their SSC to reduce the red grouper commercial and recreational ACLs and ACTs, effective for the 2019 fishing year.  Because an ongoing SEDAR 61 would not be completed until later in 2019, the Southeast Fisheries Science Center (SEFSC) performed an interim analysis that used a harvest control rule to adjust the catch advice based on an index of relative stock abundance.  The interim analysis suggested the stock might be in decline.  The SSC found the analysis was sufficient to recommend a 2019 stock ACL of 4.60 million pounds (mp) gutted weight (gw).  However, the Council decided to set a lower ACL equal to the 2017 landings that equaled 4.16 mp gw.  When the Council approved this reduction, they also noted the severe red tide conditions that occurred in the summer and fall of 2018 off the Florida west coast as part of their reasoning to reduce the ACL.  The red grouper stock has been shown to be adversely affected by red tide (*Karenia brevis*) events similar to what occurred in 2018.  Through an emergency rule followed by rulemaking to implement a framework action, the Council and NMFS applied the current red grouper sector allocation of 76% commercial and 24% recreational, and the sector specific ACT buffers to set the commercial ACL and ACT to 3.16 mp gw and 3.00 mp gw, respectively, and the recreational ACL and ACT to 1.00 mp gw and 0.92 mp gw, respectively.

The most recent assessment, SEDAR 61 (2019), used updated recreational data from the Marine Recreational Information Program (MRIP) Access Point Angler Intercept Survey (APAIS) and Fishing Effort Survey (FES), which collectively have resulted in higher catch and effort estimates for the recreational sector compared to previous estimates based on the Coastal Household Telephone Survey (CHTS).  The assessment concluded that red grouper in the Gulf is not overfished and overfishing is not occurring, but the stock remained below the spawning stock biomass (SSB) at 30% of the spawning potential ratio (SPR) in 2017, where SPR is the ratio of SSB to its unfished state.  Because the impacts of the 2018 red tide event could not be directly accounted for in SEDAR 61, the SSC recommended that projections from the assessment assume the 2018 red tide event had impacts on the stock similar to the 2005 red tide event. The SEFSC's

results indicated that the allocation assumed during projections affected the OFL, and because the MRIP-FES estimated higher recreational landings and the current commercial-recreational allocation is based on historic landings, the Council requested the SSC provide OFL and ABC recommendations based on different allocation scenarios.

The purposes of Amendment 53 are to revise the red grouper allocation between the commercial and recreational sectors using the best scientific information available and to modify the allowable harvest of red grouper based on results of the recent stock assessment and subsequent OFL and ABC**Error! Bookmark not defined.** recommendations from the SSC.  The need is to use the best scientific information available to establish Gulf red grouper sector allocations, ACLs, and ACTs, ensuring that the historical participation by the recreational and commercial sectors is accurately reflected by the sector ACLs, and that recreational ACL is consistent with the data used to monitor recreational landings and trigger accountability measures (AM).

Amendment 53 has two actions.  Action 1 considers modifying the OFL, ABC, and ACLs for Gulf red grouper based on different allocation scenarios, and it examines six alternatives.  Action 2 would modify the Gulf red grouper ACTs based on the application of the ACL/ACT control rule and considers three alternatives.

**Action 1 – Modify the Sector Allocations, OFL, ABC, and ACLs for Red Grouper**

**Alternative 1** (No Action) and **Alternative 2** would maintain the sector allocations established in Amendment 30B of 76% commercial: 24% recreational (Table 1).  **Alternative 1** would maintain the current OFL, ABC, and ACLs while **Alternative 2** would revise the OFL, ABC, and ACLs based on SEDAR 61 (2019) and SSC recommendations.

**Table 1.** OFL, ABC, total and sector ACLs for **Alternatives 1-6**.

|  | OFL* | ABC | Total ACL | Comm ACL | Rec ACL |
|---|---|---|---|---|---|
| Alternative 1** MRFSS data 1986-2005 (76% commercial:24% recreational) | 14.16 | 13.92 | 4.16 | 3.16 | 1.00 |
| MRIP-FES equivalent |  |  | (5.26) |  | (2.10) |
| Alternative 2*** Retain current percentages (76% commercial:24% recreational) | 5.35 | 4.90 | 4.90 | 3.72 | 1.18 |
| Preferred Alternative 3*** MRIP-FES data 1986-2005 (59.3% commercial:40.7% recreational) | 4.66 | 4.26 | 4.26 | 2.53 | 1.73 |
| Alternative 4*** MRIP-FES data 1986-2009 (60.5% commercial:39.5% recreational) | 4.70 | 4.30 | 4.30 | 2.60 | 1.70 |
| Alternative 5*** MRIP-FES data 1986-2018 (59.7% commercial:40.3% recreational) | 4.67 | 4.28 | 4.28 | 2.56 | 1.72 |
| Alternative 6*** MRIP-FES data but retain commercial ACL at 3.16mp (68.7% commercial:31.3% recreational) | 5.03 | 4.60 | 4.60 | 3.16 | 1.44 |

*Values for OFL, ACB, total ACL, commercial ACL, and recreational ACL are in mp gw.
**The recreational portion of the current OFL, ABC, and ACLs are based on MRIP-CHTS data.
***The recreational sector ACL is in MRIP-FES currency.

**Preferred Alternative 3** and **Alternatives 4-5** reflect recreational landings estimated using MRIP-FES from the SEFSC ACL monitoring datasets. **Preferred Alternative 3** would base the commercial and recreational sector allocations of red grouper on landings from the same timeframe as used in Amendment 30B (1986 – 2005), but would use MRIP-FES landings from the SEFSC ACL monitoring dataset. The resulting allocations are 59.3% commercial and 40.7% recreational and the OFL, ABC, and ACLs are shown in Table 1. **Preferred Alternative 3** would revise the OFL and ABC based on SEDAR 61 (2019) and then set the stock ACL equal to the stock ABC. **Alternatives 4** and **5** would base the commercial and recreational sector allocations on landings from the timeframes 1986 through 2009 and 1986 through 2018, respectively. The resulting allocations from **Alternative 4** are 60.5% commercial:39.5% recreational and would revise the OFL and ABC based on SEDAR 61 (2019) and then set the stock ACL equal to the stock ABC (Table 1). For **Alternative 5**, the resulting allocations are 59.7% commercial:40.3% recreational and would also revise the OFL and ABC based on the stock assessment and then set the stock ACL equal to the stock ABC.

**Alternative 6** would base the sector commercial and recreational allocation by holding the commercial ACL at its current level (3.16 mp gw) and then base the recreational allocation as the

difference between the stock and commercial ACLs.  This provides an allocation of 68.7% commercial and 31.3% recreational.

Although the commercial and recreational allocations were in effect for the timeframe 2010-2018, the commercial ACL has never been exceeded and the recreational ACL was only exceeded in 2013, and was subject to in-season closures in 2014 and 2015.  The various time series under consideration in **Preferred Alternative 3** and **Alternatives 4-5** have relatively small differences in sector allocations (at most 1.2%).  The difference in the commercial and recreational allocations when **Alternatives 1-2** are compared to **Preferred Alternative 3** and **Alternatives 4-5** is, at most, 16.7%, due to shifting allocation from the commercial sector to the recreational sector to account for an increase in the estimated historical harvests attributable to the recreational sector.  The **Alternative 6** allocation is between the current allocation (**Alternatives 1-2**) and those derived from historical time series (**Preferred Alternative 3** and **Alternatives 4-5).**

In comparison to the MRIP-FES equivalent total ACL of 5.26 mp gw under **Alternative 1**, **Alternatives 2-6** would result in a decrease of the total ACL (Table 1).  In comparison to **Alternative 1**, **Alternative 2** would result in an increase of the commercial sector ACL; **Preferred Alternative 3** and **Alternatives 4-5** would result in a decrease of the commercial sector ACL; and **Alternative 6** would be equal.  In comparison to the MRIP-FES equivalent recreational sector ACL of 2.10 mp gw under **Alternative 1**, **Preferred Alternative 3** as well as **Alternatives 2 and 4-6** would result in a decrease of the recreational sector ACL.  The MRIP-FES equivalent of total ACL and recreational sector ACL under **Alternative 1** is used for comparison with **Preferred Alternative 3** as well as **Alternatives 2 and 4-6,** in order to have equivalent currency in recreational units.

In general, the effects on the physical environment from management actions primarily include changes to interactions of fishing gear with the habitat.  This action could affect the physical environment if changes in the allocation result in a shift in the use of fishing gear types used to harvest the stock ACLs.  Under **Alternatives 2-6**, all the yield streams that provide OFLs are based on a fixed level of fishing mortality ($F_{30\%SPR}$).  The difference is that the application of the sector fishing selectivities to the different allocations yields different OFLs, and subsequent ABCs.  Under the stock ACLs, **Alternative 1**, no action, would likely have the greatest effect on the physical environment.  This alternative is then followed by **Alternative 2**, **Alternative 6**, **Alternative 4, Alternative 5,** and **Preferred Alternative 3** in descending order of ACLs.  **Alternatives 3-5** have very similar stock ACLs (4.26-4.30 mp gw) and any effects would be expected to be very similar.  The effects from the recreational and commercial sectors on the physical environment would be opposite.  Where commercial ACLs are higher, recreational ACLs decrease.  Thus, the effects from the sectors on this environment likely offset each other to a certain extent.

Management actions that affect the biological environment mostly relate to the impacts of fishing on a species' population size, life history, and the role of the species within its habitat. This action could affect the biological/ecological environment because changes in the allocation result in a shift in the amount of fish caught by each sector.  When this occurs, the sector selectivity patterns affect the numbers and sizes of fish caught and influences the resulting

estimates of OFL, ABC, and stock ACL.  **Alternative 1**, no action, would have the greatest adverse effect on the red grouper population as the commercial ACL and recreational ACL (using MRIP-FES units for comparison purposes) would allow for harvests above **Alternative 2**'s ABC even though both alternatives have the same allocation.  Thus, the likelihood of overfishing under **Alternative 1** would be greater than **Alternative 2**, assuming NMFS can constrain harvests to the sector ACLs.  The likelihood of overfishing under **Alternatives 2-6** would be similar as the management goal is the same.  Under **Alternatives 2-5**, all the OFLs are based on a fixed level of $F_{30\%SPR}$, and thus each of these alternatives would result in a similar stock size ($B_{30\%SPR}$).  The difference in the alternatives is where more fish are allocated to the recreational sector, total landings have to be constrained more to account for the greater dead discards from recreational red grouper fishing.

In addition to the OFL and ABC, Action 1 would modify sector allocations and the sector ACLs, and analysis of the economic impacts on the commercial and recreational sectors uses the current sector buffers between the ACLs and ACTs.  For the commercial sector, **Alternative 2** would result in a positive total expected change in net economic benefits due to the increase in the commercial ACL, while **Alternatives 1** and **6** would result in a zero total expected change, as they both retain the current commercial ACL.  **Preferred Alternative 3** and **Alternatives 4-5** would be expected to result in negative changes, as the commercial ACL decreases relative to current commercial ACL.  For the recreational sector, **Alternative 1** would be expected to result in a zero total expected change in net economic benefits.  The remaining alternatives would result in negative total expected changes, with **Alternative 2** resulting in the largest negative change, followed by **Alternative 6**.

In general, higher catch limits would be associated with fewer negative social effects as they would allow for more fish to be landed, while lower catch limits would be associated with greater negative social effects as they would allow for less fish to be landed.  Additional social effects would not be expected under **Alternative 1**, as the catch limits for both sectors would remain the same.  **Preferred Alternative 3 and Alternatives 2** and **4-6** would reduce the OFL and ABC, and set the stock ACLs equal to the respective ABCs, resulting in direct negative social effects as the sector ACLs are reduced from **Alternative 1**.  The proposed commercial ACLs under **Preferred Alternative 3** and **Alternatives 4-6** would result in negative social effects.  The commercial ACL would be the same under **Alternative 1** and **Alternative 6**. Compared to **Alternative 1**, the commercial sector would realize an ACL increase under **Alternative 2**, suggesting positive effects would result.  For the recreational sector, the most negative social effects would be expected under **Alternative 2**.  **Preferred Alternative 3** and **Alternatives 4-6** would also result in negative social effects.  These direct negative social effects that may result for either sector in relation to an ACL reduction would be expected in the short-term as less fish are available to be landed.  In the long-term, these negative social effects would be mitigated by increasing protection for the stock, resulting in increased catch limits and positive effects in the future for both sectors.

Converting the recreational sector's ACL from MRIP-CHTS units to MRIP-FES units would directly affect the recreational sector only.  In theory, there should be no direct effects under any of the alternatives, as the change from MRIP-CHTS units to MRIP-FES units is intended to be a

0009418

conversion, such that the current recreational sector ACL of 1.00 mp gw in MRIP-CHTS units is equivalent to a recreational sector ACL of 2.10 mp gw in MRIP-FES units (Table 4.1.4.2). While no direct effects would be expected for the recreational sector, indirect effects of the conversion would result for both sectors, as the conversion affects the sector allocation.

The quality and nature of social impacts differs between the sectors in the long term, in that a loss of commercial access to red grouper could affect the livelihoods of commercial fishermen, especially small-scale owner-operators, hired captains and crew who do not own red grouper shares, and the well-being of commercial fishing communities.  In addition, some negative social effects would be expected for red grouper consumers if decreased commercial access for the long term is associated with decreased availability.  For the recreational sector, the gains in recreational allocation would provide additional recreational opportunities to retain red grouper, while a loss in the underlying amount of ACL would represent decreased opportunities to retain red grouper.  For the for-hire component of the recreational sector, these effects would result in similar social effects as to the commercial sector.

By retaining the same allocation as **Alternative 1**, additional social effects would not be expected from **Alternative 2** in terms of the sector allocation.  However, as discussed in the section above on revising the catch limits, the sector ACLs underlying the allocation for **Alternative 2** reflect a change in the amount of fish that would go to each sector compared to **Alternative 1**, with more fish going to the commercial sector and less fish going to the recreational sector.  Compared to **Alternatives 1** and **2**, **Preferred Alternative 3** and **Alternatives 4-5** would result in negative effects for the commercial sector and positive effects for the recreational sector.  Because **Preferred Alternative 3** and **Alternatives 4-5** all result in a shift in allocation from the commercial sector to the recreational sector, **Error! Bookmark not defined.**the types of effects on the social environment would be similar among the alternatives.  By holding the commercial ACL at the same amount as under **Alternative 1**, **Alternative 6** would reallocate approximately 7% of the new stock ACL from the commercial sector to the recreational sector, resulting in intermediary negative social effects between **Alternatives 1-2** and **Preferred Alternative 3** and **Alternatives 4-5**.

Three potential impacts on the administrative environment under Action 1 alternatives include: 1) potentially managing recreational landings using MRIP-FES data, which would preclude the need to convert landings back to MRIP-CHTS for management; 2) in-season closures of the recreational sector to fishing because of the decrease in recreational ACL that occurs under all of the action alternatives (**Alternatives 2-6**); and 3) allocating a greater percentage of the ACL to a sector that has more uncertainty in landings, which is more likely to result in overfishing/overfished status for Gulf red grouper.  Potential impacts 1 and 2 would have minor effects on the administrative environment, while implementation of a rebuilding plan would have major effects.  **Alternative 1** would continue monitoring landings using MRIP-CHTS currency, which is not considered the best scientific information available.  **Alternatives 2-6** would use MRIP-FES currency, which is the best scientific information available.  Because the recreational ACL in **Alternative 2** is lower than in those for **Preferred Alternative 3** and **Alternatives 4-6**, there is a greater risk of an in-season closure of the fishery, which would result in a slight negative impact to the administrative environment.  The increased chances of a closure are due to the higher percentage of the landings coming from the recreational sector, where data are more

uncertain and are based on estimates of catch.  The effects from **Alternative 6** would be intermediate to **Alternative 2**, **Preferred Alternative 3**, and **Alternatives 4-5** as that stock ACL falls midway between the stock ACLs.

## Action 2 – Modify the Gulf Red Grouper ACTs

**Alternative 1** (No Action) would maintain the current buffer between the ACL and ACT for the commercial and recreational sectors set in the April 2019 framework action.  The buffer between the sector ACLs and ACTs was determined by applying the Council's ACL/ACT Control Rule and used Marine Recreational Fisheries Statistics Survey (MRFSS) data for the recreational sector.  The buffers for this alternative applied to the ACLs in Action 1 to derive the respective ACTs are shown in Table 2.

**Table 2.**  Commercial and recreational sector ACTs resulting from alternatives selected in Actions 1 and 2.

|  |  | Action 2 | | | | | |
|---|---|---|---|---|---|---|---|
|  |  | **Alt 1** | | **Alt 2** | | **Preferred Alt 3** | |
|  |  | Comm | Rec | Comm | Rec | Comm | Rec |
| **Action 1** | Alt 1 | 3.00 | 0.92** (1.93) | N/A | N/A | N/A | N/A |
|  | Alt 2 | 3.53 | 1.09 | 3.72 | 1.07 | 3.53 | 1.07 |
|  | Preferred Alt 3 | 2.40 | 1.59 | 2.53 | 1.57 | 2.40 | 1.57 |
|  | Alt 4 | 2.47 | 1.56 | 2.60 | 1.55 | 2.47 | 1.55 |
|  | Alt 5 | 2.43 | 1.58 | 2.56 | 1.57 | 2.43 | 1.57 |
|  | Alt 6 | 3.00 | 1.32 | 3.16 | 1.31 | 3.00 | 1.31 |

* Values are in millions of pounds, gutted weight and in MRIP-FES currency.
**The recreational sector ACT for Action 1, Alternative 1 is in CHTS currency; the recreational sector ACT in MRIP-FES currency is in parentheses.

**Alternative 2** would use a buffer between the commercial ACL and ACT of 0%, and a buffer between the recreational ACL and ACT of 9%, based on the application of the Council's ACL/ACT Control Rule.  **Alternative 2** represents a strict application of the ACL/ACT Control Rule for the prescribed reference period, and does not account for multi-use provisions in the commercial gag IFQ program.  However, with a commercial buffer of 0%, the gag multi-use allocation would be zero, and therefore, only gag could be landed with gag allocation.  To allow for gag multi-use allocation while using current information to set an appropriate buffer for the recreational sector, **Preferred Alternative 3** would use a buffer between the commercial ACL and ACT of 5% to account for the multi-use provision in the gag commercial IFQ program, and a buffer between the recreational ACL and ACT of 9% would be based on the application of the Council's ACL/ACT Control Rule.

With respect to the physical environment, this action is expected to have minimal effects.  **Alternative 1** would maintain the buffers between the respective commercial and recreational ACLs and ACTs.  For the commercial sector, this buffer allows for gag and red-grouper multi-use shares to be fished under the IFQ program.  Thus, the buffer is not used to constrain harvest and consequently fishing effort, but likely maintains fishing effort similar to if there were no buffer.  However, for the recreational sector, the buffer is used to account for management

uncertainty and decrease the likelihood the recreational ACL is exceeded if exceeded in the previous year.  Thus, a greater buffer would be expected to result in lower recreational fishing effort from the sector.  Under these circumstances, **Alternatives 2** and **Preferred Alternative 3** would likely have similar effects because the recreational buffer is the same at 9%.  The recreational buffer for **Alternative 1** is 8% and so could result in slightly more adverse effects than the other two alternatives given it could allow for a minimal increase in effort.

Effects on the biological/ecological environment from fishing are described in Section 4.1.2, which describes how increasing fishing effort leads to increasing effects on this environment. The decision regarding Action 1 sets the overall OFL, ABC, and sector ACLs. This action sets the buffer between the ACL and ACT.  The buffer is not used to constrain the commercial harvest and consequently fishing, but likely maintains fishing levels similar to if there were no buffer and no multi-use shares (e.g., **Alternative 2**).  However, for the recreational sector, the buffer is used to account for management uncertainty and decrease the likelihood the recreational ACL is exceeded.  Thus, the greater the buffer, the less recreational fishing would likely occur from the sector.  Under these circumstances, **Alternative 2** and **Preferred 3** would likely have similar effects as the recreational buffer is equal at 9%.  The recreational buffer for **Alternative 1** is 8% and so would likely be slightly more adverse than the other two alternatives given it could allow for a minimal increase in fishing.

Action 2 would modify the sector ACTs.  The commercial sector harvest is capped by its sector ACT, while the recreational ACT is used only as a post-season AM for the recreational sector. For the commercial sector, **Alternatives 1** and **3** of Action 2 result in the same impact, as they use the same ACL/ACT buffer.  When paired with a respective alternative from Action 1, Action 2 **Alternative 2** has a greater positive total expected change in net economic benefit and a lesser negative change, than Action 2 **Alternatives 1** or **3**.

For the recreational sector, **Alternatives 2** and **3** of Action 2 result in the same impact, as they use the same ACL/ACT buffer.  When paired with a respective alternative from Action 1, Action 2 **Alternative 1** has a lesser negative total expected change in net economic benefit than Action 2 **Alternatives 2**-**3**.

No additional social effects would be expected to result for the commercial sector under **Alternative 1** or **Preferred Alternative 3**, as no change would be made to the commercial sector's ACT.  Limited negative social effects would be expected under **Alternative 2**, which would decrease the commercial buffer to 0% and effectively remove the multi-use provision for red grouper allocation, requiring gag to be landed with gag allocation only.  These negative social effects would be expected to accrue to those fishermen who use the multi-use provision for landing gag with red grouper allocation, as they would no longer be able to do so.

No additional social effects would be expected to result for the recreational sector under **Alternative 1**.  Increasing the buffer to 9% (**Alternative 2** and **Preferred Alternative 3**) alongside any of **Alternatives 2**-**6** under Action 1 would be expected to shorten the length of the recreational fishing season in the year following a recreational sector ACL overage (Table 2.2.4), resulting in greater negative social effects compared to **Alternative 1**.

Action 2 would affect the administrative environment in two ways: 1) through in-season closures of the recreational fishery resulting from implementing AMs that are more likely to be triggered than under current management, and 2) by implementing an ACT that changes the likelihood of Gulf red grouper stocks being declared as overfished, which would require development and implementation of a rebuilding plan. In the commercial sector, there is no risk of an in-season closure and little risk of exceeding the ACL because this sector is managed under an IFQ system. The recreational buffer under **Alternative 1** is less than the buffer for **Alternative 2** and **Preferred Alternative 3**.  Thus, **Alternative 1** would be most likely to result in exceeding the recreational ACL.  However, the difference between **Alternative 1** and **Alternative 2** and **Preferred Alternative 3** is only 1 percent of the ACL.  Given the constraints associated with monitoring recreational data to relatively small values, the increased chance of exceeding recreational component ACL is expected to be negligible.  The impact to the administrative environment associated with implementing a recreational fishery closure is higher under **Alternative 1** than under **Alternative 2** and **Preferred Alternative 3** due to the lower ACT in **Alternative 1**.  However, due to the relatively minor differences in these values among the alternatives coupled with the difficulty in monitoring the recreational component to small values, it is expected that the effect on the administrative environment due to a recreational component closure will be negligible.

With respect to cumulative effects, the effects from setting an allocation and setting the red grouper ACLs (Action 1) and ACTs (Action 2) on the biophysical environment are likely neutral because it should not have much effect on overall fishing effort.  For the socioeconomic environment, depending on the sector, some effects would likely be positive and some negative. However, short-term negative impacts on the fisheries' socioeconomic environment may occur due to the need to limit directed harvest and reduce bycatch mortality.  These negative impacts can be minimized for the recreational sector by using combinations of bag limits, size limits and closed seasons. For the commercial sector, these impacts can be minimized through individual fishing quota programs, size limits, and season-area closures.

# CHAPTER 1. INTRODUCTION

## 1.1 Background

Amendment 53 to the Fishery Management Plan for Reef Fish Resources of the Gulf of Mexico (Reef Fish FMP) is being developed by the Gulf of Mexico Fishery Management Council (Council) to address the results of the Southeast Data Assessment and Review (SEDAR) 61 (2019) stock assessment and subsequent overfishing limit (OFL) and acceptable biological catch**Error! Bookmark not defined.** (ABC**Error! Bookmark not defined.**) recommendations from the Council's Scientific and Statistical Committee (SSC).  Amendment 53 revises the red grouper allocation between the commercial and recreational sectors and modifies the OFL, ABC, the total and sector annual catch limits (ACL), and sector annual catch targets (ACT).

In October 2000, the National Marine Fisheries Service (NMFS) determined that the Gulf of Mexico (Gulf) red grouper stock was overfished and undergoing overfishing.  This determination was based on the results of a 1999 red grouper stock assessment (Schirripa et al. 1999), which assessed the status of the stock as of 1997, and several subsequent analyses by the NMFS Southeast Fisheries Science Center (SEFSC) and the Council's Reef Fish Stock Assessment Panel.  Secretarial Amendment 1 established a 10-year rebuilding plan for red grouper, based on a 3-year interval rebuilding strategy, with the initial ABC**Error! Bookmark not defined.** set for 2003-2005 at 6.56 million pounds (mp) gutted weight (gw).

Although Secretarial Amendment 1 set the initial ABC**Error! Bookmark not defined.** for 2003-2005, the recreational sector experienced large increases in red grouper catch in 2004, and so the total catch was held at 6.56 mp gw, with new regulations to control recreational harvest implemented in 2005 and 2006.  In 2007, NMFS determined that the red grouper stock was rebuilt, in part due to higher than average recruitment and modifications to how natural mortality is calculated (SEDAR 12 2006).  Consistent with the statutory requirement to achieve optimum yield (OY) from each fishery, Reef Fish Amendment 30B (GMFMC 2008c) set the red grouper total allowable catch (TAC) [1] at 7.57 mp gw, which was the constant catch level corresponding to fishing at equilibrium OY.

*Allocation of Red Grouper*

For grouper species in aggregate, an initial allocation between the commercial and recreational sectors was established in 1990 through Amendment 1 (GMFMC 1989) to the Reef Fish FMP. The amendment specified a framework procedure for setting the total allowable catch (TAC) to allow for annual management changes.  A part of that specification was to establish a species' allocation, which were based on the percentage of total landings during the reference period of 1979-1987.  For grouper in aggregate, the commercial sector landed 65% and the recreational sector landed 35% over the reference period.

---

[1] The Generic ACL/Accountability Measures (AM) Amendment (GMFMC 2011a) established a mechanism for specifying annual catch limits, which replaced the use of TACs.

Noting that allocation procedures should be regularly reviewed, the Council examined the red grouper allocation in 2007. Because grouper was not identified to the species level in commercial landings until 1986, the new red grouper allocation was based on the percentage of average red grouper landings from 1986 through 2005. This resulted in a 76% commercial: 24% recreational allocation, which was set through the final rule for Reef Fish Amendment 30B (GMFMC 2008c) and remains in effect. This was considered an interim allocation that would be in effect until the Council could implement a separate amendment to allocate grouper resources between recreational and commercial sectors, based on the recommendations of the Ad Hoc Allocation Committee.

The Council established the Ad Hoc Allocation Committee composed of Council members to assist in drafting an allocation policy that would streamline future allocation decisions. The Council's allocation policy was adopted in early 2009 and provides principles, guidelines, and suggested methods for allocating fisheries resources between or within sectors (Appendix C). In February 2012, NMFS released a technical memorandum on the principles and practice of allocating fishery harvests, which provides additional guidance to the Council (Plummer et al. 2012). Additionally, NMFS and the Council Coordination Committee released further guidance through an Allocation Review Policy[2] (01-119) and two procedural directives (01-119-01 and 01-119-02, respectively as Appendix D and Appendix E) in 2016. These documents were developed to provide relevant information for allocation decision-making as well as what factors should be considered. In April 2019, the Council selected time-based criteria as its primary allocation review trigger bolstered by general monitoring of indicators for reallocation justification through the Council's general deliberative process including public input channels as a secondary trigger (Appendix F). The review of the recreational and commercial allocations of red grouper has a time interval of 7 years, with the next scheduled review beginning in April 2026. In addition to the allocation reviews scheduled based on the review triggers selected above, the Council may initiate supplementary allocation reviews at any time.

*Commercial IFQ Management Measures*

Reef Fish Amendment 29 (GMFMC 2008a) established an individual fishing quota (IFQ) program for grouper harvested by the commercial sector, which began January 1, 2010. The IFQ program shifted away from a traditional command and control approach that resulted in an overcapitalized commercial grouper fishery. Under the IFQ program, the red grouper quota is based on the commercial sector's red grouper ACT, and red grouper allocation is distributed on January 1 of each year to those who hold red grouper shares. The amount of allocation distributed is based on the annual quota and the amount of shares possessed in each shareholder account (expressed as a percent of the quota). By having the red grouper quota based on the commercial sector's red grouper ACT, the IFQ program provides flexibility to accommodate the multi-species nature of the grouper fishery and to reduce bycatch. As discussed in more detail in Section 2.2, both the red grouper and gag share categories have a multi-use provision that allows a portion of the red grouper quota to be harvested under the gag allocation, and vice versa.

---

[2] The Allocation Review Policy and two procedural directives may be accessed at https://www.fisheries.noaa.gov/national/laws-and-policies/fisheries-management-policy-directives.

For more information on the IFQ program, see the NMFS's Southeast Regional Office webpage on limited access programs.[3]

*Current Recreational Accountability Measures (AMs)*

Both in-season and post-season AMs apply to harvest by the recreational sector. The in-season AM for red grouper requires NMFS to close the recreational sector when red grouper landings reach or are projected to reach the ACL. If landings exceed the red grouper ACL in a fishing year, the post-season AM requires NMFS to shorten the length of the following fishing year by the amount necessary to ensure landings do not exceed the ACT. If the red grouper stock is overfished, NMFS must also reduce the ACL and ACT by the amount of the overage in the prior year.

*Overview of Stock Assessments and Stock Status*

Red grouper in the Gulf has been assessed four times through the SEDAR process:  SEDAR 12 in 2006, SEDAR 12 Update in 2009, SEDAR 42 in 2015, and most recently SEDAR 61 in 2019. The current OFL and ABC**Error! Bookmark not defined.** are based on the results of SEDAR 42. The SSC reviewed the assessment results at its January 2016 meeting and agreed with the determination that red grouper was not overfished or experiencing overfishing. However, the OFL and ABC recommendations from the 2015 stock assessment (Table 1.1.1) would have increased catch limits in excess of the observed harvest levels over the management history of this species, and were largely driven by a computation error later identified in SEDAR 61 (2019). The projected yields from SEDAR 42 (2015) assumed recruitment levels equivalent to the long-term average; however, red grouper recruitment spikes are sporadic, and recent annual recruitment has been generally lower than that suggested by the long-term average (SEDAR 42 2015; NMFS 2018a).

**Table 1.1.1.**  SEDAR 42 (2015) yield projections for red grouper at a constant catch level, averaged over the 2016-2020 time series. Recreational data used to create these projections include the Marine Recreational Information Program (MRIP) Coastal Household Telephone Survey (CHTS). OFL and ABC**Error! Bookmark not defined.** values are in mp gw.

| Year | OFL (mp gw) | ABCError! Bookmark not defined. (mp gw) |
|------|-------------|------------------------------------------|
| 2015 | 8.10 | 7.93 |
| 2016-2020(+) | 14.16 | 13.92 |

Fishermen expressed their concern about the health of the stock because they were unable to harvest the allowable quota based on the outcomes of SEDAR 42 (2015), suggesting that the stock size may be smaller than anticipated. In addition, 2017 landings were the second lowest since 2004, and a severe red tide occurred in 2018. The Council requested that the SEFSC conduct an interim analysis for developing updated harvest advice for 2019 (NMFS 2018a). The

---

[3] at http://portal.southeast.fisheries.noaa.gov/cs/main.html

SSC reviewed this analysis at its October 2018 meeting and recommended a 2019 ACL of 4.6 mp gw that would remain in place until the next stock assessment.  The Council began work on a framework action to reduce the red grouper ACL and requested that NMFS implement an emergency rule to specify a red grouper ACL for 2019 of 4.6 mp gw or the 2017 total (commercial and recreational) landings, whichever was lower, while the framework action was being developed.  The 2017 total landings were 4.16 mp gw; therefore, the 2019 red grouper stock ACL was temporarily set at 4.16 mp gw through the emergency rule and resulted in a commercial ACL and ACT of 3.16 mp gw and 3.00 mp gw, respectively, and a recreational ACL and ACT of 1.00 mp gw and 0.92 mp gw, respectively.  These values from the emergency rule were formally adopted through a framework action implemented in the fall of 2019 (GMFMC 2019a).

*Red Grouper Recreational Data and Recalibration*

NMFS created the Marine Recreational Fisheries Statistics Survey (MRFSS) in 1979.  In the Gulf, MRFSS collected recreational data on catch and effort, including red grouper, since 1981.  MRFSS included both offsite telephone surveys and onsite interviews at marinas and other points where recreational anglers fish.  In 2008, the MRIP replaced MRFSS to meet increasing demand for more precise, accurate, and timely recreational catch estimates.  Until 2013, recreational catch, effort, and participation were estimated through a suite of independent but complementary surveys:  telephone surveys of households and for-hire vessel operators that collected information about recreational fishing activity; and an angler intercept survey that collected information about the fish that were caught.

The MRIP Access Point Angler Intercept Survey (APAIS) began incorporating a new survey design in 2013.  This new design addressed concerns regarding the validity of the survey approach, specifically that trips recorded during a given time period are representative of trips for a full day (Foster et al. 2018).  The more complete temporal coverage with the new survey design provides for consistent increases or decreases in APAIS angler catch rate statistics, which are used in stock assessments and management, for at least some species (NOAA Fisheries 2019).

MRIP also transitioned from the legacy CHTS to a new mail survey (Fishing Effort Survey [FES]) beginning in 2015, and in 2018, the FES replaced the CHTS.  Both survey methods collect data needed to estimate marine recreational fishing effort (number of fishing trips) by shore and private/rental boat anglers on the Atlantic and Gulf coasts.  The CHTS used random-digit dialing of homes in coastal counties to contact anglers.  The new mail-based FES uses angler license and registration information as one way to identify and contact anglers (supplemented with data from the U.S. Postal Service, which includes virtually all U.S. households).  Because the FES and CHTS are so different, NMFS conducted side-by-side testing of the two methods from 2015 to 2017 to develop a calibration model.

In general, total recreational fishing effort estimates generated from the FES are higher — and in some cases substantially higher — than the CHTS estimates (NOAA Fisheries 2019).  This is because the FES is designed to more accurately measure fishing activity than the CHTS, not because there was a sudden rise in fishing effort.  NMFS developed a calibration model to adjust

historic effort estimates so that they can be accurately compared to new estimates from the FES. The new effort estimates alone do not lead to definitive conclusions about stock size or status in the past or currently.

Following the completion of SEDAR 61 (2019), an update to the weight estimation metrics for red grouper for the recreational sector was finalized. This data update modifies the recreational data from what were used in SEDAR 61 (2019) but has no impact on the assessment results because the assessment model input recreational landings and discards as numbers of fish, not as weights. Weight is estimated internally in the model, after the model results for the recreational sector are generated in numbers of fish. This means that stock status is determined before the application of this weight estimation procedure. In SEDAR 61 (2019; SEDAR 42 2015), the shore mode was excluded from recreational analyses in the assessment because of very sporadic landings throughout the time series combined with the exceptionally low probability of harvesting a legal size (20 inches total length [TL]) red grouper via that mode. As such, the SEFSC has determined that the best scientific information available for updating sector allocations are the Accumulated Landings System/IFQ program data for the commercial landings and the FES-adjusted MRIP data, excluding the shore mode, for recreational landings. These datasets are also used to monitor the quotas for all stocks, including red grouper, and are therefore referred to as the ACL monitoring datasets.

*Red Grouper Most Recent Stock Assessment (SEDAR 61 2019)*

The SEDAR 61 (2019) assessment was completed in September 2019 and used updated recreational data from the MRIP APAIS and FES, which collectively estimate larger than previously calculated catch and effort data for the recreational sector.

The assessment concluded that red grouper in the Gulf is not overfished and overfishing is not occurring, but the stock remained below the spawning stock biomass (SSB) at 30% of the spawning potential ratio (SPR) in 2017, where SPR is the ratio of SSB to its unfished state. Because of the unknown impacts of the 2018 algal bloom attributable to red tide (*Karenia brevis*) occurring off the west Florida shelf in summer and fall, SEDAR 61 (2019) provided projections for retained yield and associated depletion under assumed conditions (e.g., recent average recruitment and catch allocations of 76% commercial and 24% recreational) for five red tide scenarios (red tide-associated "mortality" noted in parentheses): a) no red tide mortality in 2018; b) half 2014 magnitude (0.1285); c) same as 2014 (0.257); d) same as 2005 (0.339); and e) double 2005 magnitude (0.678). The assessment indicated that maintaining landings at the levels observed in 2017 (and in the 2019 emergency action) resulted in a low probability of overfishing in 2020–2024 under all red tide scenarios with the exception of the most severe simulation of double the 2005 red tide mortality, which resulted in an 83% chance of overfishing.

After reviewing the full report at its September 2019 meeting, the SSC decided to treat the 2018 red tide event as similar to the red tide event observed in 2005 for the purpose of the projections. The SSC reviewed the assessment and the analyses of the 2018 red tide event at its September 2019 meeting. The SSC accepted SEDAR 61 (2019) as the best scientific information available and indicated that the stock is not overfished and is not experiencing overfishing as of 2017 (Table 1.1.2). The SSC further agreed that the 2018 red tide event (which persisted from

0009427

November 2017 through February 2019) was equivalent in severity to the event in 2005, and adjusted projections of future harvest accordingly (see Section 2.2). A December 2019 interim analysis of red grouper abundance (SEFSC 2019), reviewed by the SSC in January 2020, provided support for the assumption that the 2018 red tide event was severe, and likely similar to the 2005 red tide event (outlined in "scenario d" above). The SSC recommended an OFL of 5.35 mp gw and an ABC**Error! Bookmark not defined.** of 4.9 mp gw, but recommended that the decision table from the stock assessment presentation be conveyed to the Council to illustrate the probabilistic risk of a given catch level, based on various assumptions about the severity of the 2018 red tide. This catch level recommendation assumed status quo sector allocations for red grouper, which were based on MRFSS data from 1986-2005. At its October 2019 meeting, the Council reviewed the SSC's recommendations and requested that the SSC examine alternative sector allocation scenarios using MRIP-FES data and the resulting catch level projections. The SSC reviewed these alternative sector allocation scenarios in January 2020 and, after affirming that the SEDAR 61 (2019) assessment, which uses MRIP-FES recreational landings, represented the best scientific information available, recommended the projections in Table 1.1.3 as scientifically valid estimates of OFL and ABC.

This amendment considers alternatives that would modify the allocation of red grouper between the recreational and commercial sectors based on updated historical recreational harvest data. Based on the allocation decision made in Action 1 (Section 2.1), this amendment further proposes modifications to the OFL, ABC, ACLs, and ACTs for red grouper based on the stock assessment results and the resultant yield projections, considering the severity of the 2018 red tide event.

**Table 1.1.2.** Status determination criteria and stock status of red grouper based on SEDAR 61 (2019) and Amendment 44 (2017).

| Criteria | Definitions | SEDAR 61 Values | Status |
|---|---|---|---|
| M | Avg M for Fully Selected Ages | 0.144 | |
| Steepness | | 0.99 | |
| Virgin Recruitment | 1,000s of fish | 20,443 | |
| SSB Unfished | Relative # of eggs | 2,494,130 | |
| **Mortality Rate Criteria** | | | |
| $F_{MSY}$ or proxy | $F_{SPR30\%}$ | 0.259 | |
| MFMT* | $F_{SPR30\%}$ | 0.259 | |
| $F_{CURRENT}$ | geometric mean ($F_{2015-2017}$) | 0.203 | |
| $F_{CURRENT}$/MFMT | | 0.784 | No overfishing |
| **Biomass Criteria** | | | |
| $SSB_{MSY}$ or proxy (relative # of eggs) | $SSB_{SPR30\%}$ | 748,241 | |
| MSST (relative # of eggs) @ (1-M) | (1-M)*$SSB_{SPR30\%}$ | 640,494 | |
| MSST (relative # of eggs) @ 50% | 0.50*$SSB_{SPR30\%}$ | 374,120 | |
| $SSB_{CURRENT}$ (relative # of eggs) | $SSB_{2017}$ | 613,517 | |
| $SSB_{CURRENT}$/$SSB_{SPR30\%}$ | $SSB_{2017}$ | 0.82 | |
| $SSB_{CURRENT}$/MSST @ 50% | MSST = 0.50* $SSB_{SPR30\%}$ | 1.64 | Not overfished |

*Maximum fishing mortality threshold (MFMT); fishing mortality (F); maximum sustainable yield (MSY); minimum stock size threshold (MSST).

**Table 1.1.3.** Alternative yield projections accepted as scientifically valid by the SSC at its January 2020 meeting. Recreational data used to create these projections include MRIP-FES, which informs both the sector allocations and resulting yields.

| Landings Time Series | Comm % | Rec % | Million pounds gutted weight | |
|---|---|---|---|---|
| | | | OFL (P*=0.5) | ABCError! Bookmark not defined. (P*=0.3) |
| 1986-2005 | 59.3 | 40.7 | 4.66 | 4.26 |
| 1986-2009 | 60.5 | 39.5 | 4.70 | 4.30 |
| 1986-2018 | 59.7 | 40.3 | 4.67 | 4.28 |

# 1.2 Objectives of the Reef Fish Fishery Management Plan

At its August 2019 meeting, the Council last modified the objectives of the Reef Fish FMP. Through Reef Fish Amendment 51 (GMFMC 2019b), the Council adopted the updated objectives as shown below.  Any allocation or reallocation must be consistent with the Reef Fish FMP objectives.

The overall goal of the Reef Fish FMP is:

*To manage the reef fish fishery of the United States within the waters of the Gulf of Mexico Fishery Management Council jurisdiction to attain the greatest overall benefit to the nation with particular reference to food production and recreational opportunities on the basis of the maximum sustainable yield as reduced by relevant ecological, economic, or social factors.*

The new Reef Fish FMP objectives are as follows:

1. To prevent overfishing and rebuild overfished stocks.
2. To achieve robust fishery reporting and data collection systems across all sectors for monitoring the reef fish fishery, which minimizes scientific, management, and risk uncertainty.
3. To conserve and protect reef fish habitat.
4. To minimize conflicts between user groups.
5. To minimize and reduce dead discards.
6. To manage Gulf stocks at OY as defined in Magnuson-Stevens Conservation Management Act.
7. To revise the definitions of the fishery management unit and fishery to reflect the current species composition of the reef fish fishery.
8. To encourage and periodically review research on the efficacy of artificial reefs for management purposes.
9. To promote stability in the fishery by allowing for enhanced fisher flexibility and increasing fishing opportunities to the extent practicable.
10. To avoid to the extent practicable the "derby" type fishing season.
11. To provide for cost-effective and enforceable management of the fishery.
12. To promote and maintain accountability in the reef fish fishery.

## 1.3 Purpose and Need

The purposes are to revise the red grouper allocation between the commercial and recreational sectors using the best scientific information available and to modify the allowable harvest of red grouper based on results of the recent stock assessment and subsequent OFL and ABC**Error! Bookmark not defined.** recommendations from the SSC.

The need is to base the Gulf red grouper sector allocations, ACLs, and ACTs on the best scientific information available and to prevent overfishing while achieving optimum yield on a continuing basis, while ensuring that the historical participation by the recreational and commercial sectors is accurately reflected by the sector ACLs, and that the recreational ACL is consistent with the data used to monitor recreational landings and trigger AMs.

## 1.4  History of Management

The following summary describes management actions that affect the management of red grouper in the Reef Fish FMP.  More information on the Reef Fish FMP can be obtained from the Council.[4]

**Amendments to the Reef Fish FMP**

**Amendment 1** was implemented in January 1990.  It set a 20-inch TL minimum size limit on red grouper; set a five-grouper recreational daily bag limit; set an 11.0 mp ww commercial quota for grouper, with the commercial quota divided into a 9.2 mp ww shallow-water grouper quota and a 1.8 mp ww deep-water grouper quota; and defined shallow-water grouper as black grouper, gag, red grouper, Nassau grouper, yellowfin grouper, yellowmouth grouper, rock hind, red hind, speckled hind, and scamp; and defined deep-water grouper as misty grouper, snowy grouper, warsaw grouper, and yellowedge grouper.  The amendment also allowed a two-day possession limit for charter vessels and headboats on trips that extended beyond 24 hours, provided the vessel has two licensed operators aboard as required by the United States Coast Guard (USCG), and each passenger can provide a receipt to verify the length of the trip.  In addition, the amendment limited fishermen fishing under a bag limit to a single day limit; established a longline and buoy gear boundary at the 50-fathom depth contour west of Cape San Blas, Florida, and the 20-fathom depth contour east of Cape San Blas, inshore of which the directed harvest of reef fish with longlines and buoy gear was prohibited, and limited the retention of reef fish captured incidentally in other longline operations (e.g., shark) to the recreational daily bag limit; limited trawl vessels to the recreational size and daily bag limits of reef fish; established fish trap permits, allowing a maximum of 100 fish traps per permit holder; prohibited the use of entangling nets for directed harvest of reef fish; limited retention of reef fish caught in entangling nets for other fisheries to the recreational daily bag limit; established the fishing year to be January 1 through December 31; and established a commercial reef fish vessel permit.

A **July 1991 regulatory amendment**, implemented in November 1991, provided a one-time increase in the 1991 quota for shallow-water grouper from 9.2 mp ww to 9.9 mp ww to provide the commercial fishery an opportunity to harvest 0.7 mp ww that was not harvested in 1990.

A **November 1991 regulatory amendment**, implemented in June 1992, raised the 1992 commercial quota for shallow-water grouper to 9.8 mp ww after a red grouper stock assessment indicated that the red grouper SPR was well above the Council's minimum target of 20%.

An **August 1999 regulatory amendment**, implemented in June 2000, prohibited commercial sale of red grouper each year from February 15 to March 15 (during the peak gag spawning season) and established two marine reserves (Steamboat Lumps and Madison-Swanson) that are closed year-round to fishing for all species under the Council's jurisdiction.

**Generic Sustainable Fisheries Act Amendment** was partially approved and implemented in November 1999.  This amendment set the MFMT for most reef fish stocks at a fishing mortality rate (F) corresponding to $F_{30\% \text{ SPR}}$.

---

[4] http://www.gulfcouncil.org/fishery_management_plans/index.php.

**Amendment 19**, also known as Generic Essential Fish Habitat Amendment 2, was implemented in August 2002.  This amendment established two marine reserves off the Dry Tortugas where fishing for any species and anchoring by fishing vessels is prohibited.

**Amendment 21** was implemented in July 2003, and continued the Steamboat Lumps and Madison-Swanson reserves for an additional 6 years, until June 2010.

**Secretarial Amendment 1** was implemented in July 2004.  It established a rebuilding plan for red grouper with a 5.31 mp gw commercial quota and a 1.25 mp gw recreational target catch level; reduced the commercial quota for shallow-water grouper from 9.35 to 8.80 mp gw; reduced the commercial quota for deep-water grouper from 1.35 to 1.02 mp gw; and reduced the red grouper recreational bag limit to two fish per person per day.

An **emergency rule**, published in February 2005, established a series of trip limit reductions for the commercial grouper fishery to extend the commercial fishing season.  The trip limit was initially set at 10,000 lbs gw.  By August 1, if the fishery had landed more than 50% of either the shallow-water or red grouper quotas, then a 7,500-lb gw trip limit would take effect; and if by October 1, if more than 75% of either the shallow-water or red grouper quotas had been landed, then a 5,500-lb gw trip limit would take effect.

An **interim rule**, published in July 2005, established a temporary reduction in the red grouper recreational bag limit from two to one fish per person per day.  The approved measure was subsequently extended through July 22, 2006.

An **October 2005 regulatory amendment**, implemented in January 2006, established a 6,000-lb gw aggregate deep-water grouper and shallow-water grouper trip limit for the commercial sector.

A **March 2006 regulatory amendment**, implemented in July 2006, established a red grouper recreational bag limit of one fish per person per day as part of the five grouper per person aggregate bag limit; prohibited for-hire vessel captains and crews from retaining bag limits of any grouper while under charter; and established an annual recreational closed season for red grouper from February 15 to March 15, beginning with the 2007 season.

**Amendment 18A** was implemented in September 2006.  It prohibited vessels from retaining reef fish caught under recreational bag/possession limits when commercial quantities of Gulf reef fish are aboard; adjusted the maximum crew size on charter vessels that also have a commercial reef fish permit and a USCG certificate of inspection (COI) to allow the minimum crew size specified by the COI when the vessel is fishing commercially for more than 12 hours; prohibited the use of reef fish for bait except for sand perch or dwarf sand perch; required devices for the safe release of endangered sea turtles and smalltooth sawfish; changed the permit application process to an annual procedure and simplified income qualification documentation requirements; and required electronic vessel monitoring systems aboard vessels with federal reef fish commercial and charter vessel permits (implemented May 6, 2007).

The majority of the regulatory actions in **Amendment 27** were implemented in February 2008.  However, the regulatory actions which addressed the use of non-stainless-steel circle hooks

when using natural baits to fish for Gulf reef fish and also required the use of venting tools and dehooking devices when participating in the commercial or recreational reef fish fisheries were effective June 1, 2008.

An **emergency rule** was implemented in May 2009 through October 2009 prohibiting the use of bottom longline (BLL) gear to harvest reef fish east of 85°30′ W longitude shoreward of the 50-fathom (91.4 m) contour as long as the 2009 deep-water grouper and tilefish quotas are unfilled. After the quotas have been filled, the use of BLL gear to harvest reef fish in water of all depths east of 85°30′ W longitude was prohibited.

**Amendment 30B** was implemented in May 2009.  It set an interim allocation of red grouper between the recreational and commercial sectors; made adjustments to the red grouper TACs; established ACLs and AMs for the commercial and recreational red grouper sectors and the commercial aggregate shallow-water grouper fishery; adjusted recreational grouper bag limits and seasons; adjusted commercial grouper quotas; reduced the red grouper commercial minimum size limit; replaced the one-month commercial grouper closed season with a four-month seasonal area closure at the Edges; eliminated the end date for Madison-Swanson and Steamboat Lumps marine protected areas; and required that vessels with a federal charter vessel/headboat permit for Gulf reef fish must comply with the more restrictive of state or federal reef fish regulations when fishing in state waters.

An **emergency rule under the Endangered Species Act** was implemented in October 2009 that prohibited bottom longlining for Gulf reef fish east of 85°30'W longitude (near Cape San Blas, Florida) shoreward of a line approximating the 35-fathom depth contour.  It restricted the number of hooks on board to 1,000 hooks per vessel with no more than 750 hooks being fished or rigged for fishing at any given time.

**Amendment 29** was implemented in January 2010 and established an IFQ program for the commercial harvest of grouper and tilefish species in the reef fish fishery.

**Amendment 31** was implemented in May 2010.  It prohibited the use of BLL gear shoreward of a line approximating the 35-fathom contour from June through August; reduced the number of longline vessels operating in the fishery through an endorsement provided only to vessel permits with a history of landings, on average of at least 40,000 lbs of reef fish annually with fish traps or longline gear during 1999-2007; and restricted the total number of hooks that may be possessed onboard each reef fish BLL vessel to 1,000, only 750 of which may be rigged for fishing.

An **emergency rule**, implemented in May 2010, temporarily closed a portion of the Gulf exclusive economic zone (EEZ) to all fishing in response to the *Deepwater Horizon* oil spill. The initial closed area extended from approximately the mouth of the Mississippi River to south of Pensacola, Florida and covered an area of 6,817 square statute miles.  The coordinates of the closed area were subsequently modified periodically in response to changes in the size and location of the area affected by the spill.  At its largest size on June 1, 2010, the closed area covered 88,522 square statute miles, or approximately 37% of the Gulf EEZ.  The size of the

0009433

closed area was subsequently reduced in stages, and on April 19, 2011, all remaining waters that had been closed were reopened.

An **August 2010 regulatory amendment**, implemented in January 2011, reduced TAC for red grouper from 7.57 mp gw to 5.68 mp gw, based on the projections from the 2009 red grouper update assessment. Based on the 76:24 commercial and recreational allocation of red grouper, the commercial quota was reduced from 5.75 to 4.32 mp gw, and the recreational allocation was reduced from 1.82 to 1.36 mp gw.
An **interim rule** was published in December 2010, suspending the use of red grouper multi-use IFQ allocation so it could not be used to harvest gag; and continuing the suspension of red grouper multi-use IFQ allocation from June 1, 2011, through November 27, 2011, and subsequently extended through June 12, 2012.

An **August 2011 regulatory amendment**, implemented in November 2011, increased the 2011 red grouper TAC to 6.88 mp gw with subsequent increases each year from 2012 to 2015; and increased the red grouper bag limit to four fish per person.

**Generic ACL/AM Amendment**, largely implemented in January 2012 with other elements implemented later in the same year, established in-season and post-season AMs for all stocks that did not already have such measures defined. The AM states that if an ACL is exceeded, in subsequent years an in-season AM will be implemented that will close all shallow-water grouper fishing when the ACL is reached or projected to be reached.

**Amendment 32** was implemented in March 2012. It set the red grouper commercial ACL at 6.03 mp gw and the recreational ACL at 1.90 mp gw; modified grouper IFQ multi-use allocations; added an overage adjustment and in-season measures to the red grouper recreational AMs to avoid exceeding the ACL; and added an AM for the red grouper bag limit that would reduce the four red grouper bag limit in the future to three red grouper, and then to two red grouper, if the red grouper recreational ACL is exceeded.

A **December 2012 framework action**, implemented in July 2013, eliminated the February 1 through March 31 recreational shallow-water grouper closed season shoreward of 20 fathoms (except for gag). However, the closed season remained in effect beyond 20 fathoms to protect spawning aggregations of gag and other species that spawn offshore during that time.

**Amendment 38** was implemented in March 2013. It revised the post-season recreational AM to reduce the recreational season the following fishing year of only the species for which the ACL was exceeded (to specify gag or red grouper); and modified the reef fish framework procedure to include the addition of AMs to the list of items that can be changed through the standard framework procedure.

A **December 2014 framework action**, implemented in May 2015, reduced the red grouper bag limit from four fish to two fish per person per day and eliminated the bag limit reduction AM.

A **June 2016 framework action**, implemented in October 2016, increased the commercial ACL to 8.19 mp gw and the commercial quota to 7.78 mp gw.  The recreational ACL was increased to 2.58 mp gw; and the recreational ACT to 2.37 mp gw.

**Amendment 44**, implemented in December 2017, standardized the MSST for certain reef fish species, including red grouper, to 50% of the biomass at MSY.

A **June 2017 framework action**, implemented in February 2018, removed the 1,000 total hook limit per BLL vessel, while maintaining the limit of 750 hooks which may be rigged for fishing.

**Amendment 36A** returned shares from non-activated accounts and provided the Regional Administrator the authority to withhold the amount of red snapper or grouper-tilefish allocation before distribution at the beginning of a year in which a commercial quota reduction is expected to occur.  Withheld red snapper and grouper-tilefish annual allocation will be distributed to shareholders if the effective date of the final rule implementing the quota reduction has not occurred by June 1.  These actions were implemented in July 2018.  The amendment also implemented a requirement that all reef fish permitted vessels make an advance landing notification, which was implemented in January 2019.

A **December 2018 temporary rule**, implemented in January 2019, withheld a portion of the Gulf red grouper commercial quota from the IFQ for 2019 as a result of a proposed commercial quota reduction.  NMFS withheld 59.4% of the red grouper IFQ allocation (4.78 mp gw) in anticipation of the reduction.

An **emergency rule**, implemented in May 2019, reduced the red grouper commercial and recreational ACLs and ACTs consistent with a stock ACL of 4.16 mp gw, to provide a temporary reduction in harvest levels while a framework action was developed to reduce catch limits on a long-term basis.  The commercial ACL is 3.16 mp gw; the commercial quota is 3.00 mp gw. The recreational ACL is 1.00 mp gw; the recreational ACT is 0.92 mp gw.

An **April 2019 framework action**, implemented in October 2019, reduced the catch limits for red grouper consistent with the May 2019 emergency rule.

# CHAPTER 2. MANAGEMENT ALTERNATIVES

## 2.1  Action 1 – Modify the Sector Allocations, OFL, ABCError! Bookmark not defined., and ACLs for Red Grouper

Note:  This action considers modifying the overfishing limit (OFL), acceptable biological catch**Error! Bookmark not defined.** (ABC**Error! Bookmark not defined.**), and annual catch limits (ACL) for red grouper in the Gulf of Mexico (Gulf).

**Alternative 1:**  No Action – Maintain the sector allocations of the total ACL for red grouper between the commercial and recreational sectors.  The allocations for red grouper are 76% commercial and 24% recreational.  The allocation was derived from the average landings using Marine Recreational Fisheries Statistics Survey (MRFSS) data from the years 1986 through 2005, established in Reef Fish Amendment 30B.  Maintain the current OFL, ABC**Error! Bookmark not defined.**, and ACLs.

**Alternative 2:**  Maintain the sector allocations of the total ACL as 76% commercial and 24% recreational.  Revise the OFL and ABC**Error! Bookmark not defined.** as recommended by the Scientific and Statistical Committee (SSC) based on Southeast Data Assessment and Review (SEDAR) 61 (2019).  Set the stock ACL equal to the stock ABC.

**Preferred Alternative 3:**  Revise the sector allocations of the total ACL between the recreational and commercial sectors as the average landings using Fishing Effort Survey (FES)-adjusted Marine Recreational Information Program (MRIP-FES) data during the years 1986 through 2005, based on the Southeast Fisheries Science Center (SEFSC) ACL monitoring datasets.  The allocations for red grouper are 59.3% commercial and 40.7% recreational.  Revise the OFL and ABC**Error! Bookmark not defined.** as recommended by the SSC based on SEDAR 61 (2019).  Set the stock ACL equal to the stock ABC.

**Alternative 4:**  Revise the sector allocations of the total ACL between the recreational and commercial sectors as the average landings using MRIP-FES data during the years 1986 through 2009, based on the SEFSC ACL monitoring datasets.  The allocations for red grouper are 60.5% commercial and 39.5% recreational.  Revise the OFL and ABC**Error! Bookmark not defined.** as recommended by the SSC based on SEDAR 61 (2019).  Set the stock ACL equal to the stock ABC.

**Alternative 5:**  Revise the sector allocations of the total ACL between the recreational and commercial sectors as the average landings using MRIP-FES data during the years 1986 through 2018, based on the SEFSC ACL monitoring datasets.  The allocations for red grouper are 59.7% commercial and 40.3% recreational.  Revise the OFL and ABC**Error! Bookmark not defined.** as recommended by the SSC based on SEDAR 61 (2019).  Set the stock ACL equal to the stock ABC.

**Alternative 6:**  Revise the sector allocations of the total ACL between the recreational and commercial sectors, such that the commercial ACL is retained at 3.16 million pounds gutted weight.  The allocations for red grouper are 68.7% commercial and 31.3% recreational.  Revise the OFL and ABC**Error! Bookmark not defined.** to retain the commercial ACL.  Set the stock ACL equal to the stock ABC.

**Table 2.1.1.**  OFL, ABC**Error! Bookmark not defined.**, total and sector ACLs, and sector ACTs for **Preferred Alternative 3** and **Alternatives 1-2** and **4-6**.

|  | OFL* | **ABC**Error! Bookmark not defined. | Total ACL | Comm ACL | Rec ACL | Comm ACT | Rec ACT |
|---|---|---|---|---|---|---|---|
| **Alt 1\*\*** | 14.16 | 13.92 | 4.16 | 3.16 | 1.00 | 3.00 | 0.92 |
| **MRIP-FES equivalent** |  |  | (5.26) |  | (2.10) |  | (1.93) |
| **Alt 2\*\*\*** | 5.35 | 4.90 | 4.90 | 3.72 | 1.18 | 3.53 | 1.09 |
| **Preferred Alt 3\*\*\*** | 4.66 | 4.26 | 4.26 | 2.53 | 1.73 | 2.40 | 1.59 |
| **Alt 4\*\*\*** | 4.70 | 4.30 | 4.30 | 2.60 | 1.70 | 2.47 | 1.56 |
| **Alt 5\*\*\*** | 4.67 | 4.28 | 4.28 | 2.56 | 1.72 | 2.43 | 1.58 |
| **Alt 6\*\*\*** | 5.03 | 4.60 | 4.60 | 3.16 | 1.44 | 3.00 | 1.32 |

*Values for OFL, ACB, total ACL, commercial ACL and ACT, and recreational ACL and ACT are in millions of pounds (mp) gutted weight (gw).  The sector ACTs are based on the No Action alternative from Action 2.
**The recreational portion of the current OFL, ABC**Error! Bookmark not defined.**, and ACLs are based on MRIP-CHTS data.
***The recreational sector ACL and ACT are in MRIP-FES currency.

**<u>Discussion</u>:**

At its October 2019 meeting, the Gulf of Mexico Fishery Management Council (Council) discussed the implications of the FES-adjusted MRIP recreational data on allocation.  Given that Amendment 30B to the Fishery Management Plan (FMP) for Reef Fish Resources in the Gulf of Mexico (Reef Fish FMP; GMFMC 2008c) used SEDAR 12 (2006) and the MRFSS data for the recreational sector in determining the sector allocations, the Council requested that the SSC review red grouper projections for the OFL and ABC**Error! Bookmark not defined.** using the best available landings data.  The Council also directed staff to begin work on a plan amendment to update the red grouper allocation and establish catch levels based on the best available landings data.  At the January 2020 SSC meeting, the SEFSC presented estimates of OFL and ABC associated with the time series of 1986-2005, 1986-2009, and 1986-2018; the SSC affirmed that those time series yield scientifically valid estimates of OFL and ABC as shown in Table

1.1.3.[5]  The time series chosen directly affects the resulting sector allocations, which affects the yield projections for OFL and ABC.  As more of the ACL is allocated to the recreational sector, the proportion of discards by that sector increases.  Even though recreational discard rates are assumed to be lower than commercial discard rates, the magnitude of recreational discards is considerably greater than commercial discards, resulting in additional mortality and a lower annual projected yield.[6]

**Alternative 1** (No Action) would maintain the sector allocations established in Amendment 30B (GMFMC 2008c), with commercial and recreational allocation of the red grouper stock ACL divided 76% and 24%, respectively.  **Alternative 1** would use MRFSS landings data from SEDAR 12 (2006) to set the allocation.  When Amendment 30B was developed, the resulting sector allocations were based on all available years during which grouper were identified by species and also on the longest and most robust time series for landings at the time (1986-2005). A long time series reduces the influence of short-term shifts in landings resulting from changes in recruitment or regulations.  As seen in Table 2.1.1, **Alternative 1** would also maintain the current OFL, ABC**Error! Bookmark not defined.**, and ACLs.  The stock ACL in **Alternative 1** was set by the Council in 2019 through an emergency rule and subsequent framework action discussed in Chapter 1, and is equivalent to the landings from the 2017 fishing year (GMFMC 2019a).  The framework action did not change the OFL and ABC, so those values provided in **Alternative 1** are based on recommendations by the SSC after reviewing the SEDAR 42 2015 stock assessment of red grouper.  The recreational portion of the current OFL, ABC, and ACLs are based on MRIP Coastal Household Telephone Survey (CHTS) data, and the current recreational ACL of 1.00 million pounds in MRIP-CHTS units is equivalent to 2.10 million pounds in MRIP-FES units.  **Alternative 1** is not legally viable because it is not based on the best scientific information available, and would retain the current OFL and ABC, which are above the values produced by the SEDAR 61 stock assessment and recommended by the SSC.

As in **Alternative 1**, **Alternative 2** would maintain the allocation established in Amendment 30B (GMFMC 2008c), with commercial and recreational allocation of the red grouper stock ACL divided 76% and 24%, respectively.  However, **Alternative 2** would revise the OFL and ABC**Error! Bookmark not defined.** based on SEDAR 61 (2019) and SSC recommendations.  The stock ACL is equal to the stock ABC.

While the allocations in **Alternatives 1-2** reflect recreational landings estimated using MRFSS, the allocations in **Preferred Alternative 3** and **Alternatives 4-6** reflect recreational landings estimated using MRIP-FES from the SEFSC ACL monitoring datasets.  To compare recreational landings to the current recreational ACL and annual catch target (ACT), the SEFSC converted the MRIP-FES estimates into MRIP-CHTS units.  If Amendment 53 is implemented, MRIP-FES units would be used to compare recreational landings to the recreational ACL and ACT. Therefore, although **Alternative 2** retains the current percentage allocation, it would result in a decrease in the recreational ACL when compared to the MRIP-FES equivalent of 2.10 million pounds in **Alternative 1,** and an increase in the commercial ACL.  In effect, because the

---

[5] The OFL and ABC associated with **Alternative 2** was recommended at the September 2019 meeting; the OFLs and ABCs associated with **Preferred Alternative 3** and **Alternatives 4-5** were recommended at the January 2020 meeting, based on timeframes from a Council motion in October 2019.  http://gulfcouncil.org/meetings/ssc/archive/
[6] See SEDAR 61 (2019) for more information on the sector discard mortality rates and estimated sector discards.

recreational ACL would decrease compared to its MRIP-FES equivalent, and because the increase in estimated stock productivity is attributable to historic estimates of recreational catch and effort, not reallocating using the MRIP-FES data results in a *de facto* reallocation to the commercial sector.

**Preferred Alternative 3** would base the commercial and recreational sector allocations of red grouper on landings from the same timeframe as used in Amendment 30B (GMFMC 2008c), 1986 through 2005, but would use MRIP-FES landings from the SEFSC ACL monitoring dataset,[7] which is considered the best scientific information available (Table 2.1.2). By using the SEFSC ACL monitoring dataset, **Preferred Alternative 3** best reflects the landings from each sector from 1986-2005. The resulting allocations are 59.3% commercial and 40.7% recreational. **Preferred Alternative 3** would revise the OFL and ABC**Error! Bookmark not defined.** based on SEDAR 61 (2019) and then set the stock ACL equal to the stock ABC. The

**Alternative 4** would base the commercial and recreational sector allocations on landings from the timeframe 1986 through 2009 (Table 2.1.2), ending the time series upon implementation of the commercial grouper-tilefish individual fishing quota (IFQ) program, which includes management of red grouper (GMFMC 2008a). Beginning in 2010, the IFQ program has constrained the commercial sector from exceeding its red grouper quota, as a commercial vessel must have a sufficient amount of allocation before landing red grouper. In contrast, the recreational sector could exceed its quota, which would trigger accountability measures (AMs), as landings are not monitored in-season and it may not be possible to close the fishing season before the quota is met. The resulting allocations are 60.5% commercial and 39.5% recreational. **Alternative 4** would revise the OFL and ABC**Error! Bookmark not defined.** based on SEDAR 61 (2019) and then set the stock ACL equal to the stock ABC.

**Alternative 5** would base the commercial and recreational allocations on landings from the timeframe 1986 through 2018, which incorporates the longest time period of landings currently available (Table 2.1.2). The *Deepwater Horizon* MC252 oil spill began in April 2010 and resulted in extensive fishery closures; therefore, landings from 2010 should be viewed with caution. This timeframe also includes landings after implementation of the grouper-tilefish commercial IFQ program discussed in **Alternative 4**. The resulting allocations are 59.7% commercial and 40.3% recreational. **Alternative 5** would revise the OFL and ABC**Error! Bookmark not defined.** based on the stock assessment and then set the stock ACL equal to the stock ABC.

**Alternative 6** would revise the sector allocations of the total ACL between the recreational and commercial sectors, such that the commercial ACL is retained at 3.16 mp gw. The resulting allocations are 68.7% commercial and 31.3% recreational. **Alternative 6** would revise the OFL and ABC**Error! Bookmark not defined.** to retain the 3.16 mp gw commercial ACL and then set the stock ACL equal to the stock ABC. The OFL and ABC for **Alternative 6** are within the range of the OFL and ABC values for **Preferred Alternative 3** and **Alternatives 2** and **4-5**, which were recommended by the SSC at its September 2019 and January 2020 meetings.

---

[7] Dates for when data sources were accessed are noted in Table 2.1.2.

Although the commercial and recreational allocations were in effect for the timeframe 2010-2018, the commercial ACL has never been exceeded, and the recreational ACL has only been exceeded in 2013, and was subject to in-season closures in 2014 and 2015. Commercial and recreational ACLs, ACTs, and landings are displayed in Table 2.1.3. The various time series under consideration in **Preferred Alternative 3** and **Alternatives 4-5** have relatively small differences in sector allocations (at most 1.2%; Table 2.1.2). The difference in the commercial and recreational allocations when **Alternatives 1-2** are compared to **Preferred Alternative 3** and **Alternatives 4-5** is, at most, 16.7%, shifting allocation from the commercial sector to the recreational sector to account for an increase in the estimated historical harvests attributable to the recreational sector. At its January 2020 meeting, the Council noted that **Preferred Alternative 3** would maintain the historical participation rate of the two sectors in the red grouper component of the reef fish fishery, when using MRIP-FES landings.

In comparison to the MRIP-FES equivalent total ACL of 5.26 mp gw under **Alternative 1**, **Alternatives 2-6** would result in a decrease of the total ACL, due to decreases in both the OFL and ABC under those alternatives, following SEDAR 61 (2019) as noted in Section 1.1. In comparison to **Alternative 1**, **Alternative 2** would result in an increase of the commercial sector ACL; **Preferred Alternative 3** and **Alternatives 4-5** would result in a decrease of the commercial sector ACL. The commercial sector ACL for **Alternatives 1** and **6** would be the same. In comparison to the MRIP-FES equivalent recreational sector ACL of 2.10 mp gw under **Alternative 1**, **Preferred Alternative 3** as well as **Alternatives 2** and **4-6** would result in a decrease of the recreational sector ACL. The MRIP-FES equivalent of total ACL and recreational sector ACL under **Alternative 1** is used for comparison with **Preferred Alternative 3** as well as **Alternatives 2** and **4-6** in order to have equivalent currency.

**Table 2.1.2.**  Commercial and recreational landings for red grouper in pounds gutted weight (gw) from SEDAR 12 (MRFSS) and the SEFSC ACL monitoring datasets (MRIP-FES) used to calculate sector allocations.

| Year | SEDAR 12 Landings | | SEFSC ACL Monitoring Landings | |
|---|---|---|---|---|
| - | Comm | Rec | Comm | Rec |
| 1986 | 6,312,986 | 2,400,380 | 6,222,162 | 3,348,897 |
| 1987 | 6,717,890 | 1,464,710 | 6,567,225 | 2,495,130 |
| 1988 | 4,742,496 | 2,476,070 | 4,559,441 | 4,652,818 |
| 1989 | 7,367,911 | 2,761,150 | 7,270,424 | 7,632,792 |
| 1990 | 4,809,282 | 1,131,710 | 4,744,711 | 3,565,320 |
| 1991 | 5,094,501 | 1,775,110 | 5,071,083 | 3,755,576 |
| 1992 | 4,463,277 | 2,658,180 | 4,456,473 | 6,046,978 |
| 1993 | 5,379,626 | 2,091,160 | 6,364,065 | 4,057,934 |
| 1994 | 4,902,862 | 1,808,240 | 4,890,106 | 3,827,267 |
| 1995 | 4,746,140 | 1,862,570 | 4,652,487 | 3,496,544 |
| 1996 | 4,454,146 | 893,755 | 4,336,214 | 910,313 |
| 1997 | 4,848,486 | 562,328 | 4,673,786 | 1,142,958 |
| 1998 | 3,948,566 | 643,058 | 3,703,816 | 1,513,890 |
| 1999 | 5,974,706 | 1,152,810 | 5,800,592 | 3,428,553 |
| 2000 | 5,838,300 | 2,107,730 | 5,702,622 | 4,242,231 |
| 2001 | 5,964,506 | 1,327,770 | 5,802,442 | 2,435,456 |
| 2002 | 5,907,248 | 1,611,110 | 5,791,795 | 3,172,348 |
| 2003 | 4,937,970 | 1,275,830 | 4,832,294 | 2,201,496 |
| 2004 | 5,749,039 | 3,000,140 | 5,635,577 | 7,983,239 |
| 2005 | 5,410,594 | 1,630,140 | 5,380,603 | 3,081,979 |
| 2006 | | | 5,109,824 | 2,655,065 |
| 2007 | | | 3,650,777 | 2,031,867 |
| 2008 | | | 4,748,224 | 1,604,398 |
| 2009 | | | 3,698,227 | 1,600,063 |
| 2010 | | | 2,910,970 | 1,963,762 |
| 2011 | | | 4,783,668 | 1,534,113 |
| 2012 | | | 5,219,133 | 4,131,722 |
| 2013 | | | 4,599,001 | 4,990,310 |
| 2014 | | | 5,601,905 | 5,368,575 |
| 2015 | | | 4,798,007 | 3,790,614 |
| 2016 | | | 4,497,582 | 2,632,907 |
| 2017 | | | 3,328,271 | 1,692,513 |
| 2018 | | | 2,363,280 | 2,053,526 |
| 2019 | | | 2,037,046 | 1,638,076 |
| Alts 1 and 2 (1986-2005) | 76% | 24% | | |
| Preferred Alt 3 (1986-2005) | | | 59.3% | 40.7% |
| Alt 4 (1986-2009) | | | 60.5% | 39.5% |
| Alt 5 (1986-2018) | | | 59.7% | 40.3% |

Source:  SEDAR 12 (2006) (http://sedarweb.org/sedar-12).  1986-2009 landings, SEFSC Commercial ACL dataset
(11/15/19) and 2010-2019 landings, the IFQ database (accessed 5/20/20).  SEFSC MRIP-FES Recreational dataset
(5/18/20).

**Table 2.1.3.** Commercial and recreational ACLs, ACTs, and landings for red grouper in pounds gutted weight (gw) in CHTS units for years in which an ACL and/or an ACT was in place.

| Year | Commercial | | | | Recreational | | | |
|------|-----|-----|----------|-------|-----|-----|----------|-------|
| | ACL | ACT | Landings | % ACT | ACL | ACT | Landings | % ACL |
| 2004 | N/A | 5,310,000 | 5,635,577 | 106.1% | N/A | N/A | N/A | |
| 2005 | N/A | 5,310,000 | 5,380,603 | 101.3% | N/A | N/A | N/A | |
| 2006 | N/A | 5,310,000 | 5,109,824 | 96.2% | N/A | N/A | N/A | |
| 2007 | N/A | 5,310,000 | 3,650,777 | 68.8% | N/A | N/A | N/A | |
| 2008 | N/A | 5,310,000 | 4,748,224 | 89.4% | N/A | N/A | N/A | |
| 2009* | 5,870,000 | 5,750,000 | 3,698,227 | 64.3% | N/A | N/A | N/A | |
| 2010 | 5,870,000 | 5,750,000 | 2,910,970 | 50.6% | 1,850,000 | 1,820,000 | 635,680 | 34.4% |
| 2011 | 5,680,000 | 5,230,000 | 4,783,668 | 91.5% | 1,850,000 | 1,650,000 | 643,745 | 34.8% |
| 2012 | 5,680,000 | 5,370,000 | 5,219,133 | 97.2% | 1,900,000 | 1,700,000 | 1,752,930 | 92.3% |
| 2013 | 6,030,000 | 5,530,000 | 4,599,001 | 83.2% | 1,900,000 | 1,740,000 | 2,377,111 | 125.1% |
| 2014 | 6,030,000 | 5,630,000 | 5,601,905 | 99.5% | 1,900,000 | 1,780,000 | 1,600,475 | 89.9%** |
| 2015 | 6,030,000 | 5,720,000 | 4,798,007 | 83.9% | 1,900,000 | 1,800,000 | 1,847,573 | 97.2% |
| 2016 | 8,190,000 | 7,780,000 | 4,497,582 | 57.8% | 2,580,000 | 2,370,000 | 1,403,236 | 54.4% |
| 2017 | 8,190,000 | 7,780,000 | 3,328,271 | 42.8% | 2,580,000 | 2,370,000 | 807,085 | 31.3% |
| 2018 | 8,190,000 | 7,780,000 | 2,363,280 | 30.4% | 2,580,000 | 2,370,000 | 872,045 | 33.8% |
| 2019 | 3,160,000 | 3,000,000 | 2,037,046 | 67.9% | 1,000,000 | 920,000 | 764,985 | 76.5% |

*From 2004 to May 2009, red grouper was part of the overall SWG quota; however, it had its own quota within the species group. Beginning in May 2009, red grouper was removed from SWG, and an Other SWG quota established.
**In 2013, a post-season AM was triggered for the recreational sector, and the recreational sector was managed to the ACT in 2014. In Table 2.1.3, the landings are shown as a percentage of the ACT in 2014. In 2015, an in-season closure was triggered for the recreational sector.

Source: Commercial data from 2010 through 2019 were obtained from the Quotas and Catch Allowances, accessed December 3, 2020 (https://portal.southeast.fisheries.noaa.gov/reports/cs/CommercialQuotasCatchAllowanceTable.pdf), remaining years were obtained from the Gulf of Mexico Historical Commercial Landings and Annual Catch Limits (ACLs), updated November 7, 2018 (https://www.fisheries.noaa.gov/southeast/gulf-mexico-historical-commercial-landings-and-annual-catch-limit-monitoring). Recreational data from 2010 through 2018 were obtained from recreational historical landings, updated June 25, 2021 (*https://www.fisheries.noaa.gov/southeast/recreational-fishing-data/gulf-mexico-historical-recreational-landings-and-annual-catch*), data from 2019 was obtained December 3, 2020 from *https://www.fisheries.noaa.gov/southeast/2019-and-2020-gulf-mexico-recreational-landings-and-annual-catch-limits-acls-and-annual*.

Changes in the recreational sector ACLs are predicted to impact the recreational sector's season length.[8] Landings data for Gulf of Mexico red grouper were obtained from the SEFSC recreational ACL dataset obtained in May of 2020. The current ACT is being tracked using MRIP-CHTS) equivalent landings. However, this analysis uses MRIP-FES data to match the same currency as the most recent assessment (SEDAR 61).[9] Future landings were determined from taking a three-year average of the three most recent years of complete MRIP-FES data, as the most recent data are assumed to be the best approximation of future harvest. Additionally, the current 2-red grouper per angler bag limit became effective on May 7, 2015 precluding using landings prior to 2016 without adjusting for the previously higher bag limits. Recreational landings are collected in two-month increments called waves (e.g., January and February = wave

[8] This information is also displayed in Appendix I, which was provided at the April 2021 Council meeting.
[9] As noted in Section 1, in general, total recreational fishing effort generated from the FES are higher — and in some cases substantially higher — than the CHTS estimates (NOAA Fisheries 2019).

1, March and April = wave 2, etc.).  Landings from 2017 through 2019 and a prediction of future
landings (average landings from 2017-2019) by wave are shown in Figure 2.1.1.  Season lengths
were projected with upper and lower 95% confidence intervals for each recreational ACL being
considered in Amendment 53 (Table 2.1.4).  The predicted closure dates for the ACL options
span from August 8 to no closure (Table 2.1.4).  There is considerable uncertainty in the
predictions since the confidence intervals range from mid-June to no closure needed (Table
2.1.4; Figure 2.1.2).



**Figure 2.1.1.**  Gulf recreational landings by two-month wave and predicted future landings.
Source: SEFSC MRIP-FES Recreational ACL Dataset (May 8, 2020).

**Table 2.1.4**.  The predicted closure dates for each recreational ACL (mp gw) currently in
Amendment 53 generated from predicted landings with 95% confidence intervals.

| Action 1 Alternative | ACL | Predicted Closure Date | Season Length (95% Confidence Interval) |
|---|---|---|---|
| **Alt 1** | 2.10 | No Closure | October 25 - No Closure |
| **Alt 2** | 1.18 | August 8 | June 13 - No Closure |
| **Preferred Alt 3** | 1.73 | December 19 | August 15 - No Closure |
| **Alt 4** | 1.70 | December 13 | August 11 - No Closure |
| **Alt 5** | 1.72 | December 17 | August 14 - No Closure |
| **Alt 6** | 1.44 | October 11 | July 10 - No Closure |

Source: SEFSC MRIP-FES Recreational ACL Dataset (May 8, 2020).



**Figure 2.1.2.** Cumulative predicted red grouper recreational landings with 95% confidence interval (dashed lines).
Source:  SEFSC MRIP-FES Recreational ACL Dataset (May 8, 2020).

As with most predictions, the reliability of the results is dependent upon the accuracy of their underlying data and input assumptions.  The analyses have attempted to create a realistic baseline as a foundation for comparisons, under the assumption that projected future landings will accurately reflect actual future landings.  Uncertainty exists in this projection, as economic conditions, weather events, changes in catch-per-unit effort, fisher response to management regulations, and a variety of other factors may cause departures from this assumption.

## 2.2  Action 2 – Modify the Gulf Red Grouper Annual Catch Targets (ACT)

**Alternative 1:**  No Action – Maintain the current buffer between the ACL and ACT for each sector.  The commercial buffer is 5%, and the recreational buffer is 8%.

**Alternative 2:**  Apply the ACL/ACT Control Rule to revise the buffer between the ACL and ACT for each sector.  The commercial buffer is 0%, and the recreational buffer is 9%.

**Preferred Alternative 3:**  Maintain the current buffer between the ACL and ACT for the commercial sector, and apply the ACL/ACT Control Rule to revise the buffer between the ACL and ACT for the recreational sector.  The commercial buffer is 5%, and the recreational buffer is 9%.

**Discussion:**

**Alternative 1** (No Action) would maintain the current buffer between the ACL and ACT for the commercial and recreational sectors set in the April 2019 framework action (GMFMC 2019a).  The application of the ACL/ACT Control Rule was used to set the buffer between the sector ACLs and ACTs.  The recreational buffer in **Alternative 1** used MRFSS data, which are no longer in use for quota monitoring.  Data from the IFQ program for red grouper were used for the commercial sector.  Normally, a sector managed using an IFQ program without a quota overage during its reference period would yield a 0% buffer from the ACL/ACT Control Rule; however, this tool is advisory only and does not account for the overage allowance or gag multi-use provisions in the IFQ program.  As such, following the SEDAR 42 (2015) stock assessment, the Council set the buffer for the recreational sector using the ACL/ACT Control Rule at 8% and the commercial sector's buffer at 5% to account for the multi-use provision for the gag quota under the commercial IFQ program (GMFMC 2016a).  The recreational sector ACT is used as an AM in the subsequent year to one in which the recreational ACL has been exceeded.  Both the red grouper and gag share categories have a multi-use provision that allows a portion of the red grouper quota to be harvested under the gag allocation, and vice versa.  Each year, the program assigns a portion of each shareholder's red grouper and gag as a multi-use allocation category.  The intent of the multi-use provision is to provide for allocation if either gag or red grouper are landed as incidental catch.  The formulas for determining red grouper multi-use (RGM) and gag multi-use (GGM) allocation is as follows:

$$RGM\ allocation = 100 * \frac{(Gag\ ACL - Gag\ Commercial\ Quota)}{Red\ Grouper\ Commercial\ Quota}$$

$$GGM\ allocation = 100 * \frac{(Red\ Grouper\ ACL - Red\ Grouper\ Commercial\ Quota)}{Gag\ Commercial\ Quota}$$

The Council's ACL/ACT Control Rule is used to determine the buffer (if any) between the ACL and the ACT, using a 4-year reference period of recent landings from each sector.  The reference period selected for **Alternative 2** and **Preferred Alternative 3** was 2016 – 2019, with 2019

landings for the recreational sector still considered preliminary by the National Marine Fisheries Service (NMFS).  The ACL/ACT Control rule adjusts the buffer between the ACL and ACT based on a number of factors, including the number and magnitude of quota overages in the reference period, AMs in place to account for any quota overages, and the method by which the quota is monitored.  Considering that the SEFSC ACL monitoring dataset using MRIP-FES data more than doubles the MRIP-CHTS landings estimates, increases in the ACT of greater than 50% may be necessary to allow the fishery to continue at current effort and catch levels.

**Alternative 2** would use a buffer between the commercial ACL and ACT of 0%, and a buffer between the recreational ACL and ACT of 9%, based on the application of the Council's ACL/ACT Control Rule following SEDAR 61 in 2019.  The data used by year for applying the ACL/ACT Control Rule for **Alternative 2** are shown in Table 2.2.1, and the tool as applied to each fishing sector is shown in Appendices G (recreational) and H (commercial).  **Alternative 2** represents a strict application of the ACL/ACT Control Rule for the prescribed reference period, and does not account for multi-use provisions in the commercial gag IFQ program.  With a commercial buffer of 0%, the gag multi-use allocation would be zero, and therefore, only gag could be landed with gag allocation.  Table 2.2.2 displays the percentage of multi-use landings used for red grouper and for gag with the gag multi-use allocation from 2010 to 2019.  From 2016 to 2018, 0.3% to 2% of the GGM was used to land red grouper; however, the 2019 data show an increase to 19% of the GGM being used for landing red grouper.

**Table 2.2.1.**  ACL/ACT Control Rule data inputs for **Alternative 2** of Action 2.

| Year | Sector | Landings (lbs gw)* | PSE** | ACL | Exceeded ACL? | Buffer | Data Used |
|------|--------|--------------------|-------|-----|---------------|--------|-----------|
| **2016** | Commercial | 4,497,582 | 0 - IFQ | 7,780,000 | No | | IFQ |
| **2017** | Commercial | 3,328,271 | 0 - IFQ | 7,780,000 | No | 0% | IFQ |
| **2018** | Commercial | 2,363,280 | 0 - IFQ | 7,780,000 | No | | IFQ |
| **2019** | Commercial | 2,037,046 | 0 - IFQ | 3,000,000 | No | | IFQ |
| Year | Sector | Landings (lbs gw)* | PSE** | ACL | Exceeded ACL? | Buffer | Data Used |
| **2016** | Recreational | 1,373,337 | 21.6 | 2,580,000 | No | | MRIP-CHTS |
| **2017** | Recreational | 739,073 | 21.0 | 2,580,000 | No | 9% | MRIP-CHTS |
| **2018** | Recreational | 913,978 | 21.5 | 2,580,000 | No | | MRIP-CHTS |
| **2019*** | Recreational | 725,105 | 21.6 | 1,000,000 | No | | MRIP-CHTS |

Source:  SERO ACL Monitoring dataset and SEFSC Commercial ACL dataset, retrieved 8 May 2020.
*2019 recreational data are preliminary.
*Pounds (lbs) gutted weight (gw).
**"PSE" stands for proportional standard error, which is a measure of the precision of the estimated landings for a given year.
***2019 recreational data are preliminary.

**Table 2.2.2.** Percentage (and weight in pounds [lbs]) of multi-use allocations used by fishermen for landing red grouper and gag.

| Year | RGM | | GGM | |
|------|-----|-----|-----|-----|
| | Red Grouper (lbs) | Gag (lbs) | Red Grouper | Gag |
| **2010** | 73% (13,833) | 27% (5,091) | 28% (2,203) | 72% (5,654) |
| **2011** | NA* | NA | 14% (1,474) | 86% (8,700) |
| **2012** | NA | NA | 6% (1,928) | 94% (32,230) |
| **2013** | NA | NA | 1% (4,329) | 99% (376,528) |
| **2014** | NA | NA | 35% (103,151) | 65% (188,950) |
| **2015** | 82% (98,466) | 18% (20,998) | 26% (33,165) | 74% (92,661) |
| **2016** | 8% (11,441) | 92% (135,471) | 1% (1,665) | 99% (220,088) |
| **2017** | 11% (6,145) | 89% (51,137) | 2% (2,198) | 98% (116,163) |
| **2018** | 4% (1,656) | 96% (41,364) | 0.3% (344) | 99.7% (114,984) |
| **2019** | 38% (43,610) | 62% (71,349) | 19% (9,209) | 81% (39,266) |

*2011-2014 did not have an RGM allocation because gag was under a rebuilding plan.
Sources:  NMFS 2020.

**Preferred Alternative 3** would use a buffer between the commercial ACL and ACT of 5% to account for the multi-use provision in the gag commercial IFQ program, and a buffer between the recreational ACL and ACT of 9%, based on the application of the Council's ACL/ACT Control Rule following SEDAR 61 in 2019.  **Preferred Alternative 3** uses the same recreational buffer described in **Alternative 2,** but maintains the current commercial buffer as described in **Alternative 1**.

The commercial and recreational sector ACTs resulting from alternatives selected in Actions 1 and 2 are displayed in Table 2.2.3.  The commercial buffer under **Alternative 2** of Action 2 would result in greater commercial ACTs than with the commercial buffers under **Alternative 1** and **Preferred Alternative 3**, for the corresponding alternative under Action 1 (across a given row in Table 2.2.3).  The current recreational buffer under **Alternative 1** would result in greater recreational ACTs than with the recreational buffers under **Alternative 2** and **Preferred Alternative 3**, for the corresponding alternative under Action 1 (across a given row in Table 2.2.3).

**Table 2.2.3.** Commercial and recreational sector ACTs resulting from alternatives selected in Actions 1 and 2.

| | | Action 2 | | | | | |
|---|---|---|---|---|---|---|---|
| | | Alt 1 | | Alt 2 | | Preferred Alt 3 | |
| | | Comm | Rec | Comm | Rec | Comm | Rec |
| | **Alt 1** | 3.00 | 0.92** (1.93) | N/A | N/A | N/A | N/A |
| | **Alt 2** | 3.53 | 1.09 | 3.72 | 1.07 | 3.53 | 1.07 |
| **Action 1** | **Preferred Alt 3** | 2.40 | 1.59 | 2.53 | 1.57 | 2.40 | 1.57 |
| | **Alt 4** | 2.47 | 1.56 | 2.60 | 1.55 | 2.47 | 1.55 |
| | **Alt 5** | 2.43 | 1.58 | 2.56 | 1.57 | 2.43 | 1.57 |
| | **Alt 6** | 3.00 | 1.32 | 3.16 | 1.31 | 3.00 | 1.31 |

* Values are in millions of pounds, gutted weight and in MRIP-FES currency.

\*\*The recreational sector ACT for Action 1, Alternative 1 is in CHTS currency; the recreational sector ACT in MRIP-FES currency is in parentheses.

Assuming the recreational sector's post-season AM has been triggered, changes in the recreational sector ACTs are predicted to impact the recreational sector's season length.[10] Landings data for Gulf of Mexico red grouper were obtained from the SEFSC recreational ACL dataset obtained in May of 2020.  The current ACT is being tracked using MRIP-CHTS equivalent landings.  However, this analysis uses MRIP-FES data to match the same currency (MRIP-FES) as the most recent assessment (SEDAR 61).  Future landings were determined from taking a three-year average of the three most recent years of complete MRIP-FES data, as the most recent data are assumed to be the best approximation of future harvest.  Additionally, the current 2-red grouper per angler bag limit became effective on May 7, 2015 precluding using landings prior to 2016 without adjusting for the previously higher bag limits.  Recreational landings are collected in two-month increments called waves (e.g., January and February = wave 1, March and April = wave 2, etc.).  Landings from 2017 through 2019 and a prediction of future landings (average landings from 2017-2019) by wave are shown in Figure 2.1.1.  Season lengths were projected with upper and lower 95% confidence intervals for each recreational ACT being considered in Amendment 53 (Table 2.2.4).  The predicted closure dates for the ACT options span from July 23 to no closure (Table 2.2.4).  There is considerable uncertainty in the predictions since the confidence intervals range from early June to no closure needed (Table 2.2.4; Figure 2.1.2).

**Table 2.2.4.**  The predicted closure dates for each recreational ACT (mp gw) currently in Amendment 53 generated from predicted landings with 95% confidence intervals.

| Alternatives (Action 2 – Action 1) | ACL | Buffer | ACT | Predicted Closure Date | Season Length (95% Confidence Interval) |
|---|---|---|---|---|---|
| **1-1** | 2.10 | 8% | 1.93 | No Closure | Sep 15 - No Closure |
| **1-2** | 1.18 | 8% | 1.09 | July 26 | June 5 - No Closure |
| **2-2; 3-2** | 1.18 | 9% | 1.07 | July 23 | June 3 - No Closure |
| **1-3** | 1.73 | 8% | 1.59 | November 20 | July 29 - No Closure |
| **2-3; 3-3\*** | 1.73 | 9% | 1.57 | November 16 | July 26 - No Closure |
| **1-4** | 1.70 | 8% | 1.56 | November 14 | July 25 - No Closure |
| **2-4; 3-4** | 1.70 | 9% | 1.55 | November 12 | July 24 - No Closure |
| **1-5** | 1.72 | 8% | 1.58 | November 18 | July 27 - No Closure |
| **2-5; 3-5** | 1.72 | 9% | 1.57 | November 16 | July 26 - No Closure |
| **1-6** | 1.44 | 8% | 1.32 | August 27 | June 27 - No Closure |
| **2-6; 3-6** | 1.44 | 9% | 1.31 | August 25 | June 26 - No Closure |

Source:  SEFSC MRIP-FES Recreational ACL Dataset (May 8, 2020).
\*The combination of preferred alternatives from Actions 1 and 2 are highlighted.

As with most predictions, the reliability of the results is dependent upon the accuracy of their underlying data and input assumptions.  The analyses have attempted to create a realistic

---

[10] This information is also displayed in Appendix I, which was provided at the June 2020 Council meeting.

baseline as a foundation for comparisons, under the assumption that projected future landings will accurately reflect actual future landings. Uncertainty exists in this projection, as economic conditions, weather events, changes in catch-per-unit effort, fisher response to management regulations, and a variety of other factors may cause departures from this assumption.

*Data Currencies for Red Grouper Private Mode Landings*

Although the Southeast Regional Office monitors the sector ACTs through MRIP-FES, the Council requested, at its June 2020 meeting, that the red grouper private mode landings from Florida be provided in three currencies: Gulf Reef Fish Survey[11] (GRFS), MRIP-CHTS, and MRIP-FES. The request was based on the concept that the majority of private recreational landings of red grouper occur in Florida and that all landings data currencies should be considered to inform decisions on stock sustainability. These landings are displayed in Table 2.2.5. GRFS is conducted by the Florida Fish and Wildlife Conservation Commission (FWC), and is a catch and fishing effort monitoring program for 13 Gulf reef fish species (mutton snapper, yellowtail snapper, hogfish, red snapper, vermilion snapper, gag, red grouper, black grouper, greater amberjack, lesser amberjack, banded rudderfish, almaco jack, and gray triggerfish). The program was certified by NMFS, indicating that the methodologies proposed for use by the program to monitor catch and effort were statistically appropriate, and has been in place since 2015. GRFS uses dockside intercepts to monitor catch, and a mail survey to measure fishing effort, with the former augmenting APAIS and the latter FES. GRFS is considered a supplemental survey to MRIP, increasing spatiotemporal sample coverage of catch and effort for the subject reef fish species. GRFS was replaced on July 1, 2020, by the FWC's State Reef Fish Survey, which expanded the coverage area of GRFS to include the east coast of Florida. The first full year of data from GRFS sampling was 2016, so MRIP landings (CHTS and FES) from 2016-2019 are included for comparison.

**Table 2.2.5.** Red grouper private mode Florida landings (pounds whole weight) from GRFS, MRIP-CHTS, and MRIP-FES surveys.

| Year | GRFS | MRIP-CHTS | MRIP-FES |
|------|------|-----------|----------|
| **2016** | 907,291 | 962,299 | 2,273,809 |
| **2017** | 497,239 | 385,577 | 1,377,751 |
| **2018** | 747,082 | 548,205 | 1,736,801 |
| **2019** | 679,529 | 421,351 | 1,378,144 |

*Landings exclude Monroe County and are in lbs ww.
Source: GRFS data provided July 6, 2020; SEFSC MRIP-CHTS recreational ACL file (5/18/20); SEFSC MRIP-FES recreational ACL file (6/22/20).

---

[11] On July 1, 2020, the State Reef Fish Survey replaced the Gulf Reef Fish Survey, and the survey expanded to cover the Atlantic coast of Florida in addition to the Gulf coast.

# CHAPTER 3. AFFECTED ENVIRONMENT

## 3.1  Description of the Fishery

Detailed descriptions of the red grouper component of the Gulf of Mexico (Gulf) reef fish fishery can be found in Reef Fish Amendments 38 (GMFMC 2012a) and 44 (GMFMC 2017c) to the Fishery Management Plan (FMP) for the Reef Fish Resources in the Gulf of Mexico (Reef Fish FMP).  Additionally, Sections 3.4 and 3.5 provide information on the respective economic and social environments of the fishery.  Management of the commercial and recreational sectors fishing for reef fish in federal waters began in 1984 with the implementation of the Reef Fish FMP.  This FMP has been continuously updated through plan amendments and framework actions (also known as regulatory amendments).  Resultant regulatory measures are codified at 50 CFR 622.  A summary of reef fish management actions can be found on the Gulf of Mexico Fishery Management Council's (Council) web page.[12]  Management actions associated with red grouper can also be found in this document in Section 1.4.

The allocation between the commercial and recreational sector in the red grouper fishery is 76% and 24%, respectively.  Total landings of red grouper have ranged from 4.4 to 13.6 million pounds (mp) gutted weight (gw) between 2001 and 2018 (using Marine Recreational Information Program – Fishing Effort Survey [MRIP-FES] data for the recreational component; Table 2.1.2).[13]  The years with the lowest landings occurred in 2010 (4.9 mp gw - likely associated with the Deepwater Horizon oil spill) and 2018 (4.4 mp gw – likely associated with the large red tide event).  The highest landings in this series occurred in 2004 at approximately 13.6 mp gw.  In general, annual landings have been between 5 and 10 mp gw (using MRIP-FES data for the recreational component).

Historically, relative spawning biomass (i.e. spawning potential ratio [SPR]) of red grouper was below the 30% management target from 1990 through 1996, gradually increased as the 1998 cohort matured, but declined considerably in 2005 following a severe red tide event that killed an estimated 29.5% of the red grouper population.  The spawning stock biomass (SSB) increased from 2006 and peaked in 2012, likely due to the large 2005 cohort moving through the population in combination with effective management measures (e.g., a reduction in the commercial size limit in 2009, implementation of the commercial individual fishing quota (IFQ) program in 2010, etc.).  Relative spawning biomass has been decreasing since 2012, and reached a low of 0.246 in 2017.  This decrease is due at least in part to the severe 2014 red tide event that killed an estimated 21.3% of the population (Southeast Data Assessment and Review [SEDAR] 61 Executive Summary 2019).

---

[12] http://gulfcouncil.org/fishery-management/

[13] Prior to 2013, red grouper recreational landings data were collected and monitored in Marine Recreational Fisheries Statistics Survey (MRFSS) currency.  Data referenced here have been converted to MRIP-FES currency for consistency and to match current collection and monitoring protocols.

Landings in both 2017 (~5.0 mp gw) and 2018 (~4.4 mp gw), were among the lowest in the time series presented in Table 2.1.2, and there was other evidence of declining Gulf red grouper stocks. Some fishermen testified to the Council in 2018 that red grouper were harder to catch and stated that the current acceptable biological catch**Error! Bookmark not defined.** (ABC**Error! Bookmark not defined.**) of 13.92 mp gw was too high. They expressed concern that the stock condition may be declining, citing an apparent lack of legal-size and larger individuals throughout the species' range on the West Florida shelf. In addition, there were severe red tide conditions that occurred in summer and fall of 2014 and 2018 off the Florida west coast that could have adversely affected the red grouper stock. Both the SEDAR 12 Update 2009 and SEDAR 42 2015 found that the large 2005 red tide event (likely similar in scope to the red tide events in 2014 and 2018) depressed the red grouper spawning stock biomass (SSB).

At present, it is not yet clear whether or to what extent the 2018 red tide event affected the red grouper stock, or why harvests have declined in recent years. The Council requested the National Marine Fisheries Service (NMFS) take emergency action in 2019 to reduce the annual catch limit (ACL) and annual catch target (ACT) for both the recreational and commercial red grouper fisheries. Based on the Council request, NMFS withheld distribution of the amount of IFQ allocation equal to the amount of anticipated reduction of the commercial quota (83 FR 64480). In May 2019, NMFS issued an emergency rule (84 FR 22389) temporarily reducing the stock ACL until a final rule could be implemented. In October 2019, NMFS implemented a framework action (84 FR 52036) setting the stock ACL at 4.16 mp gw -- equal to the 2017 combined red grouper commercial and recreational landings.

**Commercial Sector**

For the commercial sector, red grouper harvest is managed under an individual fishing quota (IFQ) program administered through the Southeast Regional Office (SERO) of NMFS. Under the IFQ program, allocation is distributed annually on January 1 to IFQ shareholders with red grouper shares. The amount of allocation distributed is based on the annual quota and shares possessed by an entity (expressed as a percent of the quota). To harvest IFQ species, a vessel permit must be linked to an IFQ account and possess sufficient allocation for the species to be harvested. IFQ accounts can be opened and valid permits can be linked to IFQ accounts at any time during the year. Eligible vessels can receive allocation from other IFQ participants. For more information on the IFQ program, see the SERO webpage on limited access programs.[14]

Commercial operators harvesting reef fish from the Gulf exclusive economic zone (EEZ) must have a Gulf reef fish permit, which is a limited access permit. In 2018, a total of 845 vessels held Gulf commercial reef fish permits. Over 99% of those permits have the mailing recipient in a Gulf state (Table 3.1.1). These vessels combine to make up the federal Gulf reef fish fleet, and any vessel in the fleet must have a vessel monitoring system onboard.

---

[14] http://portal.southeast.fisheries.noaa.gov/cs/main.html

**Table 3.1.1.** Number and percentage of vessels with a Gulf reef fish permit by state, final totals for 2018.

| State | Gulf Reef Fish Permits | |
|---|---|---|
| | Number | Percent |
| **AL** | 38 | 4.5% |
| **FL** | 677 | 80.1% |
| **LA** | 43 | 5.1% |
| **MS** | 7 | 0.8% |
| **TX** | 74 | 8.8% |
| **Subtotal** | 839 | 99.3% |
| **Other** | 6 | 0.7% |
| **Total** | **845** | **100.0%** |

Source: NMFS SERO PIMS.

The commercial red grouper fishery is open throughout the year to fishermen with Gulf commercial reef fish permits and red grouper allocation. The minimum commercial size limit is 18 inches total length (TL), and there are no trip limits. Primary commercial gear types used to harvest red grouper include vertical lines (handlines and bandit gear) and bottom longlines (BLLs) (GMFMC 2016a). Traps are no longer a legally acceptable method for red grouper harvest.

Vessels fishing with BLLs off the coast of Florida generally target red grouper in shallower waters and yellowedge grouper, tilefish, and sharks in deeper waters. Vessels that use BLL gear in the Gulf EEZ east of 85º30′W must have a valid Eastern Gulf longline endorsement in addition to their valid Gulf reef fish permit. In 2018, 62 permit holders held the longline endorsement (61 valid and one renewable/transferrable), and all but one of the endorsement holders had a mailing address in Florida (1 in Texas).

**Table 3.1.2.**  Red grouper landings in pounds gutted weight for the commercial sector.

| Year | Landings | Quota | Percent of Quota |
|------|----------|-------|------------------|
| 2000 | 5,702,622 | N/A | N/A |
| 2001 | 5,802,442 | N/A | N/A |
| 2002 | 5,791,795 | N/A | N/A |
| 2003 | 4,832,294 | N/A | N/A |
| 2004 | 5,635,577 | 5,310,000 | 106.1 |
| 2005 | 5,380,603 | 5,310,000 | 101.3 |
| 2006 | 5,109,824 | 5,310,000 | 96.2 |
| 2007 | 3,650,777 | 5,310,000 | 68.8 |
| 2008 | 4,748,224 | 5,310,000 | 89.4 |
| 2009 | 3,698,227 | 5,750,000 | 64.3 |
| 2010 | 2,910,970 | 5,750,000 | 50.6 |
| 2011 | 4,783,668 | 5,230,000 | 91.5 |
| 2012 | 5,219,133 | 5,370,000 | 97.2 |
| 2013 | 4,599,001 | 5,530,000 | 83.2 |
| 2014 | 5,601,905 | 5,630,000 | 99.5 |
| 2015 | 4,798,007 | 5,720,000 | 83.9 |
| 2016 | 4,497,582 | 7,780,000 | 57.8 |
| 2017 | 3,328,271 | 7,780,000 | 42.8 |
| 2018 | 2,363,280 | 7,780,000 | 30.4 |

Source.  2000-2009: SEFSC Commercial ACL dataset (11/15/19) and, 2010-2019: IFQ database (accessed 8/19/19).

Current regulations prohibit a longline vessel from having more than 750 hooks rigged for fishing at any given time.  In addition, longline vessels must abide by seasonal prohibitions as follows: 1) From June through August each year, bottom longlining for Gulf reef fish is prohibited in the portion of the Gulf EEZ east of 85°30' W longitude that is shoreward of rhumb lines as specified in 50 CFR 622.35(b)(1);  2) A person aboard a vessel that uses longline or buoy gear in the reef *longline and buoy gear restricted area* (as specified in Table 1 of Appendix B to §622) is limited on that trip to the bag limits for Gulf reef fish specified in §622.38(b) and, for Gulf reef fish for which no bag limit is specified in §622.38(b), the vessel is limited to 5 percent, by weight, of all fish on board or landed.

Estimates for longline sector characteristics and catch are based on a 2011 study of observer data (Scott-Denton et al., 2011). Average BLL trips in the Gulf are estimated to last 11.7 days. Longline vessels are estimated on average to set 5.6 nautical miles of mainline, and fish at a depth of 92 m (309 ft), with a soak time of 5.1 hours.  Sets generally occur over rocky bottoms during daylight hours.

Data from Scott-Denton et al. indicate that approximately 46% of the BLL fish catch is kept, while the rest is discarded.  Of the catch that is released alive, about 42% exhibit signs of stress including barotrauma symptoms (airbladder expansion and/or eyes protruding), while 46% exhibit a normal appearance.  In all, it is estimated that the immediate mortality for red grouper

is approximately 20% in the longline sector.  Data provided during the most recent red grouper stock assessment (SEDAR 61 2019) supported discard mortality estimates for red grouper captured on BLLs at 44.1% post-IFQ. For parsimony, the most recent red grouper stock assessment assumed a discard mortality rate of 41.5% for the commercial bottom longline fleet, following SEDAR 42 (SEDAR 61 2019 Executive Summary).

The species predominantly caught in the longline fishery include red grouper (56% of catch), yellowedge grouper (10%), and blueline tilefish (5%).  Red grouper, yellowedge grouper, golden tilefish, and blueline tilefish are the species most commonly kept (82% of total), while red grouper, Atlantic sharpnose shark, smooth dogfish, and red snapper are the most common species released alive (83%).  Red grouper, blueline tilefish, Atlantic sharpnose shark, and red snapper comprise about 81% of the catch that is discarded dead, and red grouper comprise 77% of the fish released in unknown condition (Scott-Denton et al., 2011).

The longline component's catch of red grouper is largely indiscriminate of size, ranging from below 10 to above 35 inches, with a mode of 18 inches.  Approximately 32% of red grouper captured are below the legal-size limit of 18 inches.  Of the 68% of red grouper catch that is legal size, 62% is kept (Scott-Denton et al., 2011).

Red grouper are also a primary target species in the commercial vertical line sector.  Effort and catch in the red grouper vertical line sector are highest in the eastern Gulf.  Scott-Denton et al. found that 71% of the individual fish captured in the vertical line component are kept, with red snapper ranked highest in catch composition (31% of catch), followed by vermilion snapper (29%) and red grouper (16%).  Vermilion snapper, red snapper, red grouper, and red porgy comprise an estimated 86% of kept individuals.  Of fish that are released alive, approximately 35% exhibit visual signs of stress, including barotrauma.  Red snapper, vermilion snapper, and red grouper comprise 87% of the fish that are discarded dead, and the immediate mortality rate for red grouper for vertical line fishery is estimated at 11% (Scott-Denton et al., 2011).  The two most recent stock assessments assumed discard mortality for red grouper in the commercial vertical line sector at 19.0% (SEDAR 42 2015; SEDAR 61 2019).

Gauging the scope of discarding of captured fish is a vital element in predicting overall fishery impacts on the red grouper population.  Red grouper commercial dead discards were estimated beginning in 1990 with the implementation of federal minimum size limits. SEDAR 61 2019 assumed discard mortality rates of 41.5% for the commercial BLL fleet, 19.0% for the commercial vertical line fleet, and 10.0% for the trap fishery (no longer operational).  Commercial longline fleet discards averaged about 465,000 fish from 1993-2017, with a low of 153,000 fish in 2009 and a peak of 878,000 fish in 1997. Commercial vertical line fleet discards of red grouper averaged about 134,000 fish from 1993-2017, with a low of about 49,000 fish in 1995 and a peak of over 290,000 fish in 2011 (Table 3.1.3).  Pulver and Stephen (2018) found that nearly 95 percent of reported red grouper discards were because of the minimum size limit.

**Table 3.1.3.**  Red grouper commercial discards (number of fish) by gear.

| Year | Vertical Line | Longline |
|------|--------------:|---------:|
| 1993 | 79,662 | 514,033 |
| 1994 | 94,368 | 668,159 |
| 1995 | 49,123 | 302,219 |
| 1996 | 112,944 | 667,938 |
| 1997 | 132,132 | 878,497 |
| 1998 | 127,683 | 718,051 |
| 1999 | 140,955 | 754,469 |
| 2000 | 142,683 | 633,778 |
| 2001 | 146,668 | 652,257 |
| 2002 | 151,052 | 579,902 |
| 2003 | 158,908 | 596,105 |
| 2004 | 151,788 | 567,853 |
| 2005 | 133,793 | 440,858 |
| 2006 | 146,203 | 506,568 |
| 2007 | 150,881 | 405,702 |
| 2008 | 127,661 | 480,530 |
| 2009 | 219,006 | 153,431 |
| 2010 | 198,729 | 177,525 |
| 2011 | 290,423 | 346,979 |
| 2012 | 178,703 | 402,936 |
| 2013 | 96,399 | 209,867 |
| 2014 | 59,449 | 324,659 |
| 2015 | 86,568 | 195,727 |
| 2016 | 96,899 | 242,272 |
| 2017 | 71,658 | 216,046 |

Source: SEDAR 61 Final Report (NMFS 2019)

**Recreational Sector**

For the recreational sector, red grouper harvest is managed with ACLs, ACTs, accountability measures (AMs), season/area closures, a minimum size limit, and a bag limit.  The primary gear type in the recreational sector is vertical line gear (rod-and-reel).  During the months of February and March, the possession of red grouper caught in waters beyond the 20 fathom (120 feet) contour is prohibited.  This closure is to protect red grouper and other grouper species that are in spawning condition.  Red grouper have a 20-inch TL recreational minimum size limit and are a part of the four-grouper aggregate recreational bag limit.  However, only two of the fish in that aggregate bag limit can be red grouper.  Private recreational fishing vessels are not required to have a federal permit to harvest individual species or species complexes in the reef fish fishery from the Gulf EEZ.  Anglers aboard these vessels, however, must either be federally registered or licensed in states that have a system to provide complete information on that state's saltwater anglers to the national registry.  Any for-hire fishing vessel that takes anglers into the Gulf EEZ to harvest species or complexes in the reef fish fishery must have a limited-access charter vessel/headboat (for-hire) permit for reef fish that is specifically assigned to that vessel.  State regulations are different from federal regulations in some cases.  In those circumstances (e.g., red grouper closed season outside 20 fathom contour), private anglers must obey the regulations for

the waters they are fishing in. For charter vessels and headboats, if federal regulations for Gulf reef fish are more restrictive than state regulations, operators must comply with those federal regulations regardless of where the fish are harvested. For federal waters, if landings meet or are projected to meet the red grouper ACL, then the season will be closed.

In 2018, there were 1,312 for-hire fishing vessels with a valid or renewable/transferrable for-hire permit for reef fish: 1,279 vessels with a for-hire permit and another 33 with a historical captain for-hire permit (Table 3.1.4). Approximately 61% (806) of the 1,312 for-hire vessel reef fish permits have mailing recipients in Florida. Texas recipients hold the second highest number of permits, with 16%. Collectively, approximately 99% of the permits have mailing recipients in one of the Gulf States.

**Table 3.1.4.** Number and percentage of for-hire reef fish permits by state of mailing recipient (of permit).

| State | For-Hire Reef Fish Permits by State of Recipient | |
|---|---|---|
| | Number | Percentage |
| **Alabama** | 137 | 10.4% |
| **Florida** | 806 | 61.4% |
| **Louisiana** | 121 | 9.2% |
| **Mississippi** | 32 | 2.4% |
| **Texas** | 206 | 15.7% |
| **Other** | 10 | 0.8% |
| **Total** | 1,312 | 100.0% |

Source: Permit Information Management System (PIMS) final data for 2018.

Recreational total red grouper landings (Table 3.1.5) peaked in the Gulf in 2004 (8.0 mp), but were also high in 2013 (5.0 mp) and 2014 (5.4 mp). Recreational catch was low from 2007-2011 (range 1.6 mp – 2.0 mp) and again in 2017 (1.7 mp) and 2018 (2.1 mp). From 2001-2018, private anglers landed 86.0% of the total recreational landings, while charter boats landed 12.6%, and headboats 1.4% (Table 3.1.5).

**Table 3.1.5.**  Red grouper landings in pounds gutted weight for recreational fleets.

| Year | Charter | Headboat | Private | Total |
|------|---------|----------|---------|-------|
| **2001** | 334,963 | 30,181 | 2,070,312 | 2,435,456 |
| **2002** | 268,079 | 23,508 | 2,880,760 | 3,172,348 |
| **2003** | 269,853 | 38,489 | 1,893,154 | 2,201,496 |
| **2004** | 519,621 | 65,145 | 7,398,473 | 7,983,239 |
| **2005** | 513,070 | 75,009 | 2,493,900 | 3,081,979 |
| **2006** | 262,350 | 25,479 | 2,367,236 | 2,655,065 |
| **2007** | 145,391 | 24,674 | 1,861,802 | 2,031,867 |
| **2008** | 293,645 | 37,604 | 1,273,149 | 1,604,398 |
| **2009** | 193,864 | 29,583 | 1,376,617 | 1,609,247 |
| **2010** | 326,603 | 26,064 | 1,611,095 | 1,963,762 |
| **2011** | 244,092 | 36,697 | 1,253,324 | 1,534,113 |
| **2012** | 575,589 | 83,324 | 3,472,809 | 4,131,722 |
| **2013** | 796,929 | 77,542 | 4,115,840 | 4,990,310 |
| **2014** | 586,680 | 45,107 | 4,737,128 | 5,368,916 |
| **2015** | 500,305 | 50,621 | 3,239,928 | 3,790,853 |
| **2016** | 406,066 | 56,851 | 2,169,801 | 2,632,718 |
| **2017** | 342,871 | 21,423 | 1,328,134 | 1,692,428 |
| **2018** | 362,021 | 22,310 | 1,669,115 | 2,053,446 |

Source. SEFSC MRIP-FES (Fishing Effort Survey) Recreational dataset (11/26/19).

Red grouper recreational discards were derived from MRIP-FES estimates of live released fish between 1993 and 2017 and self-reported discards in the Southeast Region Headboat Survey (SRHS) logbook since 2007.  Red grouper discards from headboats for years prior to 2007 in Florida were estimated using the MRIP Charter: SRHS discard ratio as a proxy.  SEDAR 61 2019 assumed recreational discard mortality at 11.6%.  Red grouper recreational discard estimates averaged 4.25 million fish from 1993 to 2017, with a low of 1.53 million fish in 1996 and a peak of 8.10 million fish in 2004 (Table 3.1.6).

**Table 3.1.6**.  Red grouper recreational discards (number of fish).

| Year | Charter | Headboat | Private | Total |
|------|---------|----------|---------|-------|
| **1993** | 86,379 | 78,702 | 3,158,040 | 3,323,121 |
| **1994** | 146,510 | 84,039 | 3,236,051 | 3,466,600 |
| **1995** | 236,720 | 107,149 | 3,835,677 | 4,179,546 |
| **1996** | 114,829 | 163,725 | 1,246,516 | 1,525,070 |
| **1997** | 127,887 | 78,504 | 2,014,957 | 2,221,348 |
| **1998** | 202,616 | 83,492 | 3,337,806 | 3,623,914 |
| **1999** | 375,157 | 180,087 | 5,405,117 | 5,960,361 |
| **2000** | 471,536 | 98,791 | 4,227,094 | 4,797,421 |
| **2001** | 272,157 | 72,878 | 3,502,720 | 3,847,755 |
| **2002** | 228,016 | 63,624 | 3,909,476 | 4,201,116 |
| **2003** | 343,210 | 136,745 | 3,752,560 | 4,232,515 |
| **2004** | 423,964 | 160,995 | 7,512,527 | 8,097,486 |
| **2005** | 248,419 | 92,489 | 2,701,327 | 3,042,235 |
| **2006** | 123,352 | 32,695 | 2,220,260 | 2,376,307 |
| **2007** | 111,913 | 17,365 | 1,599,693 | 1,728,971 |
| **2008** | 367,994 | 89,615 | 6,294,612 | 6,752,221 |
| **2009** | 398,022 | 153,829 | 6,276,296 | 6,828,147 |
| **2010** | 497,987 | 117,879 | 5,379,955 | 5,995,821 |
| **2011** | 433,964 | 134,114 | 6,021,306 | 6,589,384 |
| **2012** | 464,256 | 117,809 | 4,392,740 | 4,974,805 |
| **2013** | 620,479 | 112,266 | 4,895,361 | 5,628,106 |
| **2014** | 435,470 | 84,237 | 4,293,342 | 4,813,049 |
| **2015** | 326,901 | 74,376 | 2,550,817 | 2,952,094 |
| **2016** | 322,165 | 79,409 | 2,164,044 | 2,565,618 |
| **2017** | 299,920 | 73,658 | 2,202,611 | 2,576,189 |

Source: SEDAR 61 Final Report (NMFS 2019)

## 3.2  Description of the Physical Environment

**General Description of the Physical Environment**

The physical environment for Gulf reef fish and red drum is detailed in the Environmental Impact Statement for the Generic Essential Fish Habitat (EFH) Amendment (GMFMC 2004a), Generic Amendment 3 (GMFMC 2005), and the Generic ACL/AM Amendment (GMFMC 2011a), which are hereby incorporated by reference.

The Gulf has a total area of approximately 600,000 square miles (1.5 million km$^2$), including state waters (Gore 1992).  It is a semi-enclosed, oceanic basin connected to the Atlantic Ocean by the Straits of Florida and to the Caribbean Sea by the Yucatan Channel (Figure 3.2.1).

0009459

Oceanographic conditions are affected by the Loop Current, discharge of freshwater into the northern Gulf, and a semi-permanent, anti-cyclonic gyre in the western Gulf.  The Gulf includes both temperate and tropical waters (McEachran and Fechhelm 2005).  Gulf water temperatures range from 54º F to 84º F (12º C to 29º C) depending on time of year and depth of water.  Mean annual sea surface temperatures ranged from 73 º F through 83º F (23-28º C) including bays and bayous (Figure 3.1.1) between 1982 and 2009, according to satellite-derived measurements (NODC 2011)[15].  In general, mean sea surface temperature increases from north to south with large seasonal variations in shallow waters.

**General Description of the Reef Fish Physical Environment**

In general, reef fish are widely distributed in the Gulf, occupying both pelagic and benthic habitats during their life cycle.  A planktonic larval stage lives in the water column and feeds on zooplankton and phytoplankton (GMFMC 2004a).  Juvenile and adult reef fish are typically demersal and usually associated with bottom topographies on the continental shelf (less than 100 m) which have high relief, i.e., coral reefs, artificial reefs, rocky hard-bottom substrates, ledges and caves, sloping soft-bottom areas, and limestone outcroppings.  However, several species are found over sand and soft-bottom substrates.  For example, juvenile red snapper are common on mud bottoms in the northern Gulf, particularly off Texas through Alabama.  Also, some juvenile snapper (e.g., mutton, gray, red, dog, lane, and yellowtail snappers) and grouper (e.g., goliath, red, gag, and yellowfin groupers) are associated with inshore seagrass beds, mangrove estuaries, lagoons, and larger bay systems.

Red grouper are known to alter the offshore hard bottom areas.  They remove sand and other debris from limestone solution holes using their mouths and fins.  The removal of the sediment creates sites for organisms such as sponges and corals to colonize, which in turn provides shelter for small sessile creatures like shrimp and small fish.  Coleman et al. (2010) labeled red grouper as ecological engineers as their habitat modification increases biodiversity around the holes and depressions they associate with.

---

[15] NODC 2011:  http://accession.nodc.noaa.gov/0072888



**Figure 3.2.1.** Physical environment of the Gulf, including major feature names and mean annual sea surface temperature as derived from the Advanced Very High-Resolution Radiometer Pathfinder Version 5 sea surface temperature data set (http://accession.nodc.noaa.gov/0072888).

**Historic Places**

With respect to the National Register of Historic Places, there is one site listed in the Gulf.  This is the wreck of the *U.S.S. Hatteras*, located in federal waters off Texas.  Historical research indicates that over 2,000 ships have sunk on the Federal Outer Continental Shelf in the Gulf between 1625 and 1951; thousands more have sunk closer to shore in state waters during the same period.  Only a handful of these have been scientifically excavated by archaeologists for the benefit of generations to come[16].

**Northern Gulf of Mexico Hypoxic Zone**

Every summer in the northern Gulf, a large hypoxic zone forms.  It is the result of allochthonous materials and runoff from agricultural lands by rivers to the Gulf, increasing nutrient inputs from the Mississippi River, and a seasonal layering of waters in the Gulf.  The layering of the water is temperature and salinity dependent and prevents the mixing of higher oxygen content surface water with oxygen-poor bottom water.  For 2019, the extent of the hypoxic area was estimated to

---

[16] http://www.boem.gov/Environmental-Stewardship/Archaeology/Shipwrecks.aspx.

be 6,952 square miles and ranks as the eighth largest event over the past 33 years the area has been mapped.[17]   The hypoxic conditions in the northern Gulf directly affect less mobile benthic macroinvertebrates (e.g., polychaetes) by influencing density, species richness, and community composition (Baustian and Rabalais 2009).  However, more mobile macroinvertebrates and demersal fishes (e.g., gray snapper) are able to detect lower dissolved oxygen levels and move away from hypoxic conditions.  Therefore, although not directly affected, these organisms are indirectly affected by limited prey availability and constrained available habitat (Baustian and Rabalais 2009; Craig 2012).

**Greenhouse Gases**

The Intergovernmental Panel on Climate Change[18] has indicated greenhouse gas emissions are one of the most important drivers of recent changes in climate.  Wilson et al. (2014) inventoried the sources of greenhouse gases in the Gulf from sources associated with oil platforms and those associated with other activities such as fishing.  A summary of the results of the inventory are shown in Table 3.2.1 with respect to total emissions and from fishing.  Commercial fishing and recreational vessels make up a small percentage of the total estimated greenhouse gas emissions from the Gulf (2.04% and 1.67%, respectively).

**Table 3.2.1.**  Total Gulf greenhouse gas emissions estimates (tons per year) from oil platform and non-oil platform sources, commercial fishing, and percent greenhouse gas emissions from commercial fishing vessels of the total emissions*.  Data are for 2011 only.

| Emission source | $CO_2$ | Greenhouse $CH_4$ | Gas $N_2O$ | Total $CO_{2e}$** |
|---|---|---|---|---|
| Oil platform | 5,940,330 | 225,667 | 98 | 11,611,272 |
| Non-platform | 14,017,962 | 1,999 | 2,646 | 14,856,307 |
| **Total** | **19,958,292** | **227,665** | **2,743** | **26,467,578** |
| Commercial fishing | 531,190 | 3 | 25 | 538,842 |
| Recreational fishing | 435,327 | 3 | 21 | 441,559 |
| Percent commercial fishing | 2.66% | >0.01% | 0.91% | 2.04% |
| Percent recreational fishing | 2.18% | >0.01% | 0.77% | 1.67% |

*Compiled from Tables 6-11, 6-12, and 6-13 in Wilson et al. (2014).  **The $CO_2$ equivalent ($CO_2e$) emission estimates represent the number of tons of $CO_2$ emissions with the same global warming potential as one ton of another greenhouse gas (e.g., $CH_4$ and $N_2O$).  Conversion factors to $CO_{2e}$ are 21 for $CH_4$ and 310 for $N_2O$.

## 3.3  Description of the Biological/Ecological Environment

The biological environment of the Gulf, including the species addressed in this amendment, is described in detail in the Generic EFH Amendment (GMFMC 2004a), Generic ACL/AM Amendment (GMFMC 2011a), and Reef Fish Amendments 30B (GMFMC 2008c) and 32 (GMFMC 2011b) and is incorporated here by reference and further summarized below.

---

[17] http://gulfhypoxia.net
[18] https://www.ipcc.ch/srocc/

**Red Grouper Life History and Biology**

Larval red grouper are found in the plankton across the west-Florida shelf (SEDAR 42 2015). Juvenile red grouper are generally found in shallow waters around structures and patch reefs. When juveniles reach approximately 16 inches (40 cm), after they have become sexually mature, they move offshore (Moe 1969).  Red grouper reach a maximum length and weight of 43 inches (110 cm TL) and 50.7 pounds. (23 kg) (Robins et al. 1986).  Maximum age of red grouper in the Gulf of Mexico has been estimated at 29 years (SEDAR 61 2019).  Clear determinations of size and age of maturity have been difficult for red grouper (Fitzhugh et al. 2006 and references cited therein).  Fitzhugh et al. (2006) estimated the size and age at 50% maturity was 11 inches (27 cm fork length [FL]) and age 2.  For SEDAR 42 2015, the values were approximated at 11.5 inches (292 mm FL) and 2.8 years following the addition of samples collected from the West Florida Shelf by Florida Fish and Wildlife Conservation Commission (FWC)/Fish and Wildlife Research Institute (FWRI) (Lowerre-Barbieri et al. 2014): however, the inclusion of 2014-2017 data led to a slightly younger age of 2.2 years in SEDAR 61 2016. Red grouper are protogynous hermaphrodites, transitioning from females to males at older ages, and form harems for spawning (Dormeier and Colin 1997).  Age and size at sexual transition is approximately 10.5 years and 30 inches TL (76.5 cm TL) (Fitzhugh et al. 2006).  Size and age at sexual transition was re-estimated both for SEDAR 42 2015 and SEDAR 61 (2019).  These were estimated at 11.2 and 11.4 years and 707 and 708-mm FL, respectively.  Red grouper spawn from February until mid-July with peak spawning occurring in the eastern Gulf of Mexico during March through May (Fitzhugh et al. 2006).  Over the last 25-30 years, there has been little change in the sex ratio of red grouper, likely because they do not aggregate (Coleman et al. 1996).

**Status of the Red Grouper Stock**

A summary of the red grouper benchmark stock assessment (SEDAR 12 2006) and 2009 update stock assessment (SEDAR 12 Update 2009) can be found in GMFMC (2010a) and is incorporated here by reference.  These assessments showed that the red grouper stock was neither overfished nor undergoing overfishing. The 2009 update stock assessment did suggest the stock had declined since 2005, much of which was attributed to an episodic mortality event in 2005 (most likely associated with red tide).  In late 2010, the assessment was revised to incorporate new information on historical discards in the commercial sector and updated projections considering the reduction in the commercial size limit from 20 inches to 18 inches TL (Walter 2011).  Given these changes, the assessment rerun resulted in a slightly improved estimate of the stock status for the last year of the assessment (2008) and indicated the total allowable catch in the near term could be substantially increased.  Therefore, the SSC recommended that the overfishing limit (OFL) for red grouper be set at 8.10 mp (the equilibrium yield at the fishing mortality rate associated with harvesting the equilibrium maximum sustainable yield) and the ABC**Error! Bookmark not defined.** be set at 7.93 mp (the equilibrium yield at the fishing mortality rate associated with harvesting the equilibrium optimum sustainable yield).

*SEDAR 42 Assessment*

In October 2015, the SEDAR 42 2015 stock assessment for red grouper was completed using the Stock Synthesis model.  SEDAR 42 2015 found the red grouper stock was not undergoing overfishing and was not overfished.  Given this determination (as of 2013), SSC members determined that it was appropriate to provide OFL and ABC**Error! Bookmark not defined.** recommendations for a 5-year period beginning in 2016.  However, a decision was needed on how to handle landings for the years 2014-2015, which were not in the assessment.  For 2014, final landings were available and used, but for 2015, the SSC recommended that the assessment group use landings estimates based on the current quotas and ACLs.

The SSC recommended that the annual OFL for Gulf red grouper for years 2016-2020 be set at the 50th percentile of the OFL probability distribution function (PDF), assuming estimated landings for 2014 and 2015 fishing years.  This value was 14.16 mp gw.  The annual ABC**Error! Bookmark not defined.** for years 2016-2020 was computed as the 43rd percentile of the OFL PDF, which was 13.92 mp.

*2018 Red Grouper Interim Analysis*
The SEFSC conducted an interim analysis on red grouper to assist the Council in developing harvest advice for 2019 because red grouper was between assessments (NMFS 2018a).  The interim analysis prepared by the SEFSC developed a harvest control rule (HCR), which uses an index from a fishery-independent survey to compare where the stock seems to be now (observed index value) with where the stock should be (forecast index value).  The chosen HCR adjusts the ABC**Error! Bookmark not defined.** recommendation based on variation between projected and observed index values.  The SEFSC found that the fishery-independent BLL index was the best index for use in the HCR.

The SSC reviewed the SEFSC's interim analysis at its October 2018 meeting and concluded it was suitable for interim catch advice.  However, because the method had not been fully tested and required a number of assumptions, the SSC considered this method inappropriate to rely on to provide an ABC**Error! Bookmark not defined.** recommendation.  The SSC did determine the analysis could support a recommendation that the Council reduce the 2019 ACL to 4.6 mp gw.

*SEDAR 61 Assessment*
Similar to SEDAR 42 2015, SEDAR 61 2019 was completed using the Stock Synthesis model.  The base model time series began in 1986 with 2017 as the terminal year and length-based selectivity was modeled for fishing fleets and fishery-independent surveys.  Age composition data began in 1991.  Model fits to input data streams were similar to the SEDAR 42 2015 model, with some, such as commercial and recreational discard data, fitting better.  Recruitment remains highly variable for red grouper with strong recruitment events observed in 1995, 1998, 2001, 2005, and 2013.  In reviewing the assessment, the SSC noted that as of the end of 2017, the stock is not overfished ($SSB_{2017}$/ minimum stock size threshold (MSST) = 1.64; MSST = $0.5^*B_{MSY}$) and is not undergoing overfishing ($F_{Current\ (2015-2017)}$/maximum fishing mortality threshold (MFMT) = 0.784; MFMT = $F_{30\%SPR}$).  However, this determination does not account for the 2018 red tide episodic mortality event, which was known to be a significant mortality event in the eastern Gulf.  The SSC also noted that under the old definition of MSST (1-$M^*B_{MSY}$), the stock would have been considered overfished as of 2017 ($SSB_{2017}$/$MSST_{OLD}$ = 0.96).

**General Information on Reef Fish Species**

The National Ocean Service (NOS) collaborated with NMFS and the Council to develop distributions of reef fish (and other species) in the Gulf (SEA 1998). The NOS obtained fishery-independent data sets for the Gulf, including Southeast Area Monitoring and Assessment Program and state trawl surveys. Data from the Estuarine Living Marine Resources Program (ELMRP) contain information on the relative abundance of specific species (highly abundant, abundant, common, rare, not found, and no data) for a series of estuaries, by five life stages (adult, spawning, egg, larvae, and juvenile) and month for five seasonal salinity zones (0-0.5, 0.5-5, 5-15, 15-25, and greater than 25 parts per thousand). NOS staff analyzed these data to determine relative abundance of the mapped species by estuary, salinity zone, and month. For some species not in the ELMRP database, distribution was classified as only observed or not observed for adult, juvenile, and spawning stages.

Reef fish are widely distributed in the Gulf, occupying both pelagic and benthic habitats during their life cycle. Habitat types and life history stages can be found in more detail in GMFMC (2004a). In general, both eggs and larval stages are planktonic. Larvae feed on zooplankton and phytoplankton. Exceptions to these generalizations include gray triggerfish, which lay their eggs in depressions in the sandy bottom (Simmons and Szedlmayer 2012), and gray snapper whose larvae are found around submerged aquatic vegetation. Juvenile and adult reef fish are typically demersal, and are usually associated with bottom topographies on the continental shelf (less than 328 feet; less than 100 m) which have high relief, i.e., coral reefs, artificial reefs, rocky hard-bottom substrates, ledges and caves, sloping soft-bottom areas, and limestone outcroppings. However, several species are found over sand and soft-bottom substrates. Juvenile red snapper are common on mud bottoms in the northern Gulf, particularly from Texas to Alabama. Also, some juvenile snappers (e.g., mutton, gray, red, dog, lane, and yellowtail snappers) and groupers (e.g., goliath grouper, red, gag, and yellowfin groupers) have been documented in inshore seagrass beds, mangrove estuaries, lagoons, and larger bay systems (GMFMC 1981). More detail on hard bottom substrate and coral can be found in the FMP for Corals and Coral Reefs (GMFMC and SAFMC 1982).

**Status of Reef Fish Stocks**

The Reef Fish FMP currently encompasses 31 species (Table 3.3.1). Eleven other species were removed from the FMP in 2012 through the Generic ACL/AM Amendment (GMFMC 2011a). The NMFS Office of Sustainable Fisheries updates its Status of U.S. Fisheries Report to Congress[19] on a quarterly basis utilizing the most current stock assessment information. Stock assessments and status determinations have been conducted and designated for 14 stocks and can be found on the Council[20] and SEDAR[21] websites. Of the 14 stocks for which stock assessments have been conducted and accepted by the SSC, the fourth quarter report of the 2020 Status of U.S. Fisheries classifies only one as overfished (greater amberjack) and two stocks undergoing

[19] https://www.fisheries.noaa.gov/national/population-assessments/fishery-stock-status-updates
[20] www.gulfcouncil.org
[21] http://sedarweb.org/

overfishing (cobia and lane snapper). The status of both assessed and unassessed stocks, as of the writing of this amendment is provided in Table 3.3.1.

A stock assessment was conducted for Atlantic goliath grouper (SEDAR 47 2016). The SSC accepted the assessment's general findings that the stock was not overfished nor experiencing overfishing. Although the SSC determined Atlantic goliath grouper to not be experiencing overfishing based on annual harvest remaining below the OFL, the SSC deemed the assessment not suitable for stock status determination and management advice.

Stock assessments were conducted for seven reef fish stocks using the Data Limited Methods Tool (DLMTool; SEDAR 49 2016). This method allows the setting of OFL and ABC**Error! Bookmark not defined.** based on limited data and life history information, but does not provide assessment-based status determinations. Data were requested for almaco jack, lesser amberjack, snowy grouper, speckled hind, and yellowmouth grouper but it was determined not enough information was available to complete an assessment even using the DLMTool. These stocks are not experiencing overfishing based on annual harvest remaining below the OFL, but no overfished status determination has been made (Table 3.3.1). Lane snapper was the only stock with adequate data to be assessed using the DLMTool methods resulting in OFL and ABC recommendations by the SSC.

The remaining species within the Reef Fish FMP have not been assessed at this time. Therefore, their stock status is unknown (Table 3.3.1). For those species that are listed as not undergoing overfishing, that determination has been made based on the annual harvest remaining below the OFL. Scamp is undergoing a research track assessment at this time.

**Table 3.3.1.** Status of species in the Reef Fish FMP grouped by family.

| Common Name | Scientific Name | Stock Status | | Most recent assessment or SSC workshop** |
| --- | --- | --- | --- | --- |
| | | Overfishing | Overfished | |
| **Family Balistidae – Triggerfishes** | | | | |
| gray triggerfish | *Balistes capriscus* | N | N | SEDAR 43 2015 |
| **Family Carangidae – Jacks** | | | | |
| greater amberjack | *Seriola dumerili* | N† | Y | SEDAR 70 2020 |
| lesser amberjack | *Seriola fasciata* | Y | Unknown | SEDAR 49 2016 |
| almaco jack | *Seriola rivoliana* | Y | Unknown | SEDAR 49 2016 |
| banded rudderfish | *Seriola zonata* | Y | Unknown | |
| **Family Labridae – Wrasses** | | | | |
| hogfish | *Lachnolaimus maximus* | N | N | SEDAR 37 2014 |
| **Family Malacanthidae – Tilefishes** | | | | |
| tilefish (golden) | *Lopholatilus chamaeleonticeps* | N | N | SEDAR 22 2011a |
| blueline tilefish | *Caulolatilus microps* | N | Unknown | |
| goldface tilefish | *Caulolatilus chrysops* | N | Unknown | |
| **Family Serranidae – Groupers** | | | | |
| gag | *Mycteroperca microlepis* | N | N | SEDAR 33 Update 2016b |
| red grouper | *Epinephelus morio* | N | N | SEDAR 61 2019 |
| Scamp | *Mycteroperca phenax* | Unknown | Unknown | |
| black grouper | *Mycteroperca bonaci* | N | N | SEDAR 19 2010 |
| yellowedge grouper | *Hyporthodus flavolimbatus* | N | N | SEDAR 22 2011b |
| snowy grouper | *Hyporthodus niveatus* | N | Unknown | SEDAR 49 2016 |
| speckled hind | *Epinephelus drummondhayi* | N | Unknown | SEDAR 49 2016 |
| yellowmouth grouper | *Mycteroperca interstitialis* | Unknown | Unknown | SEDAR 49 2016 |
| yellowfin grouper | *Mycteroperca venenosa* | Unknown | Unknown | |
| warsaw grouper | *Hyporthodus nigritus* | N | Unknown | |
| *Atlantic goliath grouper | *Epinephelus itajara* | N | Unknown | SEDAR 47 2016 |
| **Family Lutjanidae – Snappers** | | | | |
| queen snapper | *Etelis oculatus* | N | Unknown | |
| mutton snapper | *Lutjanus analis* | N | N | SEDAR 15A Update 2015 |
| blackfin snapper | *Lutjanus buccanella* | N | Unknown | |
| red snapper | *Lutjanus campechanus* | N | N | SEDAR 52 2018 |
| cubera snapper | *Lutjanus cyanopterus* | N | Unknown | |
| gray snapper | *Lutjanus griseus* | N | N | SEDAR 51 2018 |
| lane snapper | *Lutjanus synagris* | Y | Unknown | SEDAR 49 Update 2019 |
| silk snapper | *Lutjanus vivanus* | N | Unknown | |
| yellowtail snapper | *Ocyurus chrysurus* | N | N | SEDAR 64 2020 |
| vermilion snapper | *Rhomboplites aurorubens* | N | N | SEDAR 67 2020 |
| Wenchman | *Pristipomoides aquilonaris* | N | Unknown | SEDAR 49 2016 |

Note:  *Atlantic goliath grouper is a protected grouper (i.e., ACL is set at zero), and benchmarks do not reflect appropriate stock dynamics.  Species status based on the NOAA Quarter 4 2020 FSSI report.  The most recent stock assessment is provided for reference, and the stock status determination may reflect more current information than reported in the latest stock assessment.  †The greater amberjack assessment (SEDAR 70) which determined the stock was overfished and undergoing overfishing was accepted by the SSC in January 2021.  However, the Quarter 4 2020 FSSI report does not include this update for greater amberjack.

**Bycatch of Managed Finfish Species**

Many of the reef fish species co-occur with each other and can be incidentally caught when fishermen target certain species.  In some cases, these fish may be discarded for regulatory reasons and thus are considered bycatch.  Bycatch practicability analyses have been completed for red snapper (GMFMC 2004b, GMFMC 2007, GMFMC 2014a, GMFMC 2015), grouper (GMFMC 2008a, GMFMC 20010b, GMFMC 2011a, GMFMC 2011b, GMFMC 2012a), vermilion snapper (GMFMC 2004c, GMFMC 2017a), greater amberjack (GMFMC 2008b, GMFMC 2012b, GMFMC 2015b), gray triggerfish (GMFMC 2012c), and hogfish (GMFMC 2016b).  These analyses examined the effects of fishing on these species.  In general, these analyses have found that reducing bycatch provides biological benefits to managed species as well as benefits to the fishery through less waste, higher yields, and less forgone yield.  However, in some cases, actions are approved that can increase bycatch through regulatory discards such as increased minimum sizes and closed seasons.  Under these circumstances, there is some biological benefit to the managed species that outweigh any increases in discards from the action.

Appendix B analyses the ten bycatch practicability factors.  The main benefits of reducing grouper bycatch are: 1) less waste and 2) increased yield in the directed fishery.  Reducing discards and discard mortality rates would result in less forgone yield.  Reducing red grouper ACLs is expected to reduce bycatch and discard mortality.  The benefits of the ACL reduction on red grouper bycatch in the recreational sector may be partially mitigated by the regulatory discards that would occur by fishermen that target other species and catch red grouper should AMs lead to closure of the fishery.  There are likely to be negative social and economic effects to the commercial sector, stemming largely from the expected reduction in income that is likely if the subject action is implemented.  The Council will have to weigh the benefits of reducing bycatch with the negative social and economic effects that the commercial sector would face.

**Protected Species**

NMFS manages marine protected species in the Southeast region under the Endangered Species Act (ESA) and the Marine Mammal Protection Act (MMPA).  A very brief summary of these two laws and more information is available on NMFS Office of Protected Resources website[22].  There are 21 ESA-listed species of marine mammals, sea turtles, fish, and corals that may occur in the EEZ of the Gulf.  There are 91 stocks of marine mammals managed within the Southeast region plus the addition of the stocks such as North Atlantic right whales, humpback, sei, fin, minke, and blue whales that regularly or sometimes occur in Southeast region managed waters for a portion of the year (Hayes et al. 2018).  All marine mammals in U.S. waters are protected under the MMPA.

Of the four marine mammals that may be present in the Gulf (sperm, sei, fin, and Gulf Bryde's), the sperm, sei, and Gulf of Mexico Bryde's whale are listed as endangered under the ESA.  Bryde's whales are the only resident baleen whales in the Gulf.  Manatees, listed as threatened under the ESA, also occur in the Gulf and are the only marine mammal species in this area managed by the U.S. Fish and Wildlife Service.

---

[22] https://www.fisheries.noaa.gov/topic/laws-policies#endangered-species-act

The gear used by the Gulf reef fish fishery is classified in the MMPA 2019 List of Fisheries as a Category III fishery (84 FR 22051).  This classification indicates the annual mortality and serious injury of a marine mammal stock resulting from any fishery is less than or equal to 1% of the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population.  Dolphins are the only species documented as interacting with the reef fish fishery.  Bottlenose dolphins prey upon bait, catch, and/or released discards of fish from the reef fish fishery.  They are also a common predator around reef fish vessels, feeding on the discards.  Marine Mammal Stock Assessment Reports and additional information are available on the NMFS Office of Protected Species website.[23]

Sea turtles, fish, and corals that are listed as threatened or endangered under the ESA occur in the Gulf.  These include the following: six species of sea turtles (Kemp's ridley, loggerhead (Northwest Atlantic Ocean distinct population segment (DPS)), green (North Atlantic and South Atlantic DPSs), leatherback, and hawksbill); five species of fish (Gulf sturgeon, smalltooth sawfish, Nassau grouper, oceanic whitetip shark and giant manta ray); and six species of coral (elkhorn, staghorn, lobed star, mountainous star, boulder star, and rough cactus).  Critical habitat designated under the ESA for smalltooth sawfish, Gulf sturgeon, and the Northwest Atlantic Ocean DPS of loggerhead sea turtles occur in the Gulf, though only loggerhead critical habitat occurs in federal waters.

The most recent biological opinion (BiOp) for the FMP was completed on September 30, 2011.  The BiOp determined the operation of the Gulf reef fish fishery managed under the Reef Fish FMP is not likely to adversely affect ESA-listed marine mammals or coral, and was not likely to jeopardize the continued existence of sea turtles (loggerhead, Kemp's ridley, green, hawksbill, and leatherback) or smalltooth sawfish.  Since issuing the opinion, in memoranda dated September 16, 2014, and October 7, 2014, NMFS concluded that the activities associated with the Reef Fish FMP are not likely to adversely affect critical habitat for the Northwest Atlantic Ocean loggerhead sea turtle DPS and four species of corals (lobed star, mountainous star, boulder star, and rough cactus).  On September 29, 2016, NMFS requested re-initiation of Section 7 consultation on the operation of reef fish fishing managed by the Reef Fish FMP because new species (i.e., Nassau grouper [81 FR 42268] and green sea turtle North Atlantic and South Atlantic DPSs [81 FR 20057]) were listed under the ESA that may be affected by the proposed action.  NMFS documented a determination that the operation of the fishery to continue during the re-initiation period is not likely to adversely affect these species.

On January 22, 2018, NMFS published a final rule (83 FR 2916) listing the giant manta ray as threatened under the ESA.  On January 30, 2018, NMFS published a final rule (83 FR 4153) listing the oceanic whitetip shark as threatened under the ESA.  In a memorandum dated March 6, 2018, NMFS revised the request for re-initiation of consultation on the Reef Fish FMP to address the listings of the giant manta and oceanic whitetip.  In that memorandum, NMFS also determined that fishing under the Reef Fish FMP during the extended re-initiation period will not jeopardize the continued existence of the giant manta ray, oceanic whitetip shark, Nassau grouper, or the North Atlantic and South Atlantic DPSs of green sea turtles.

---

[23] http://www.nmfs.noaa.gov/pr/sspecies/

NMFS published a final rule on April 15, 2019, listing the Gulf Bryde's whale as endangered. In a memorandum dated June 20, 2019, NMFS revised the re-initiation request to include the Gulf Bryde's whale and determined that fishing under the Reef Fish FMP during the re-initiation period will not jeopardize the continued existence of any of the newly listed species discussed above.

**Climate Change**

Climate change projections predict increases in sea-surface temperature and sea level; decreases in sea-ice cover; and changes in salinity, wave climate, and ocean circulation.[24] These changes are likely to affect plankton biomass and fish larvae abundance that could adversely affect fish, marine mammals, seabirds, and ocean biodiversity. Kennedy et al. (2002) and Osgood (2008) have suggested global climate change could affect temperature changes in coastal and marine ecosystems that can influence organism metabolism and alter ecological processes such as productivity and species interactions, change precipitation patterns and cause a rise in sea level. This could change the water balance of coastal ecosystems; altering patterns of wind and water circulation in the ocean environment; and influence the productivity of critical coastal ecosystems such as wetlands, estuaries, and coral reefs. The National Oceanic and Atmospheric Association (NOAA) Climate Change Web Portal[25] predicts the average sea surface temperature in the Gulf will increase by 1-3ºC for 2010-2070 compared to the average over the years 1950-2010. For reef fishes, Burton (2008) speculated climate change could cause shifts in spawning seasons, changes in migration patterns, and changes to basic life history parameters such as growth rates. The smooth puffer and common snook are examples of species for which there has been a distributional trend to the north in the Gulf. For other species, such as red snapper and the dwarf sand perch, there has been a distributional trend towards deeper waters. For other fish species, such as the dwarf goatfish, there has been a distributional trend both to the north and to deeper waters. These changes in distributions have been hypothesized as a response to environmental factors, such as increases in temperature.

The distribution of native and exotic species may change with increased water temperature, as may the prevalence of disease in keystone animals such as corals and the occurrence and intensity of toxic algae blooms. Hollowed et al. (2013) provided a review of projected effects of climate change on the marine fisheries and dependent communities. Integrating the potential effects of climate change into the fisheries assessment is currently difficult due to the time scale differences (Hollowed et al. 2013). The fisheries stock assessments rarely project through a time span that would include detectable climate change effects. However, some stocks have shown increases in abundance in the northern Gulf (Fodrie et al. 2010). This may be a result of increasing water temperatures in coastal environments.

***Deepwater Horizon* MC252 Oil Spill**

The presence of polycyclic aromatic hydrocarbons (PAH), which are highly toxic chemicals that tend to persist in the environment for long periods of time, in marine environments can have detrimental impacts on marine finfish, especially during the more vulnerable larval stage of

---

[24] http://www.ipcc.ch/
[25] https://www.esrl.noaa.gov/psd/ipcc/

development (Whitehead et al. 2012).  When exposed to realistic, yet toxic levels of PAHs (1–15 µg/L), greater amberjack larvae develop cardiac abnormalities and physiological defects (Incardona et al. 2014).  The future reproductive success of long-lived species, including red drum and many reef fish species, may be negatively affected by episodic events resulting in high-mortality years or low recruitment.  These episodic events could leave gaps in the age structure of the population, thereby affecting future reproductive output (Mendelssohn et al. 2012).  Other studies have described the vulnerabilities of various marine finfish species, with morphological and/or life history characteristics similar to species found in the Gulf, to oil spills and dispersants (Hose et al. 1996; Carls et al. 1999; Heintz et al. 1999; Short 2003).

Increases in histopathological lesions were found in red snapper in the area affected by the oil, but Murawski et al. (2014) found that the incidence of lesions had declined between 2011 and 2012.  The occurrence of such lesions in marine fish is not uncommon (Sindermann 1979; Haensly et al. 1982; Solangi and Overstreet 1982; Khan and Kiceniuk 1984, 1988; Kiceniuk and Khan 1987; Khan 1990).  Red snapper diet was also affected after the spill.  A decrease in zooplankton consumed, especially by adults (greater than 400 mm TL) over natural and artificial substrates may have contributed to an increase in the consumption of fish and invertebrate prey – more so at artificial reefs than natural reefs (Tarnecki and Patterson 2015).

In addition to the crude oil, over a million gallons of the dispersant, Corexit 9500A®, was applied to the ocean surface and an additional hundreds of thousands of gallons of dispersant was pumped to the mile-deep wellhead (National Commission 2010).  No large-scale applications of dispersants in deep water had been conducted until the *Deepwater Horizon* MC252 oil spill.  Thus, no data exist on the environmental fate of dispersants in deep water.  The effect of oil, dispersants, and the combination of oil and dispersants on fishes of the Gulf remains an area of concern.

**Red Tide**

Red tide is a common name for harmful algal blooms caused by species of dinoflagellates and other organisms that cause the water to appear to be red.  Red tide blooms occur in the Gulf almost every year, generally in late summer or early fall.  They are most common off the central and southwestern coasts of Florida between Clearwater and Sanibel Island but may occur anywhere in the Gulf.  More than 50 species capable of causing red tides occur in the Gulf, but one of the best-known species is *Karenia brevis*.  This organism produces toxins capable of killing fish, birds and other marine animals.[26]

The effects of red tide on fish stocks have been well established.  In 2005, a severe red tide event occurred in the Gulf along with an associated large decline in multiple abundance indices for red grouper, gag, red drum, and other species thought to be susceptible to mortality from red tide events.  It is unknown whether mortality occurs via absorption of toxins across gill membranes (Abbott et al. 1975, Baden 1988), ingestion of toxic biota (Landsberg 2002), or from some indirect effect of red tide such as hypoxia (Walter et al. 2013).  In 2018, a severe red tide event occurred off the southwest coast of Florida from Monroe County to Sarasota County that

---

[26] http://myfwc.com/research/redtide/general/about/

persisted for more than 10 months; the impacts on fish stocks will likely be considered in future stock assessments.

## 3.4 Description of the Economic Environment

A description of the red grouper stock affected by the actions considered in this amendment is provided in Section 3.3. Additional details on the economic environment of the recreational and commercial sectors of the red grouper component of the Gulf reef fish fishery are provided in the Framework Action to Modify Red Grouper Annual Catch Limits and Annual Catch Targets (GMFMC 2019b), Reef Fish Amendment 36A (GMFMC 2017b) and the Framework Action to Adjust Red Grouper Allowable Harvest (2016a).

This amendment contains management measures that would directly or indirectly affect Gulf red grouper dealers, and thus additional details on the economic environment of that component of the commercial sector are also provided. Sections 3.4.1 and 3.4.2 contain additional information on the economic environment of the commercial sector and the for-hire and private recreational components of the recreational sector in the Gulf reef fish fishery, with a specific focus on the red grouper portion of the fishery.

### 3.4.1 Commercial Sector

**Permits**

Any fishing vessel that harvests and sells any of the reef fish species, including red grouper, managed under the Reef Fish FMP from the Gulf EEZ must have a valid Gulf commercial reef fish permit. The commercial sector of the reef fish fishery has been managed under a limited access program since 1992, which in turn capped the number of commercial reef fish permits. Therefore, new entrants must buy a permit in order to participate in the commercial sector. As shown in Table 3.4.1.1, the number of permits that were valid or renewable in a given year has continually decreased in the years after the red snapper (RS)-IFQ program was implemented in 2007. This decline has continued since the gray triggerfish (GT)-IFQ program was implemented in 2010, but at a slower rate. As of February 27, 2020, there were 834 valid or renewable commercial reef fish permits, 763 of which were valid. A renewable permit is an expired limited access permit that cannot be actively fished, but can be renewed for up to one year after expiration.

**Table 3.4.1.1.**  Number of valid or renewable commercial reef fish permits, 2008-2019.

| Year | Number of Permits |
|------|-------------------|
| **2008** | 1,099 |
| **2009** | 998 |
| **2010** | 969 |
| **2011** | 952 |
| **2012** | 917 |
| **2013** | 895 |
| **2014** | 882 |
| **2015** | 868 |
| **2016** | 852 |
| **2017** | 850 |
| **2018** | 845 |
| **2019** | 842 |

Source:  NMFS SERO Sustainable Fisheries (SF) Access permits database.

A single permit is attached to a single vessel and many businesses only own one vessel. However, some businesses hold or own multiple permits and vessels.  Multiple vessels owned by a single business are often referred to as a "fleet."  Although each vessel is often legally organized under an individual corporate or other business name, for economic purposes, the fleet is treated as a single business because the same, or mostly the same, individuals are determining how those vessels operate.  A single business may include other types of operations that possess shares in addition to fishing vessels.

As illustrated in Table 3.4.1.2, at the end of 2018, which is essentially equivalent to Jan. 1, 2019, 94 businesses owned two or more valid or renewable reef fish permits.  Although these businesses represented only 14.8% of the businesses with permits, they held 35.5% of the permits, which illustrates some degree of concentration in the ownership of permitted vessels. The maximum number of permitted vessels held by a single business was 16.

**Table 3.4.1.2.**  Vessels and businesses with a commercial reef fish permit, end of year (EOY) 2018.

| No. of Vessels Owned by a Business | No. of Businesses | No. of Total Permitted Vessels | % of Businesses | % of Permitted Vessels |
|------------------------------------|-------------------|--------------------------------|-----------------|------------------------|
| **1** | 543 | 543 | 85.2% | 64.5% |
| **2** | 60 | 120 | 9.4% | 14.3% |
| **3** | 15 | 45 | 2.4% | 5.3% |
| **4** | 8 | 32 | 1.3% | 3.8% |
| **5-6** | 3 | 17 | .5% | 2.0% |
| **7-10** | 6 | 53 | .9% | 6.3% |
| **15-16** | 2 | 32 | .3% | 3.8% |
| **Total** | **637** | **842** | **100%** | **100.0%** |

Source:  NMFS SERO permits and IFQ databases, March 23, 2020.

Although all permitted vessels may harvest non-IFQ reef fish species (e.g., vermilion snapper), not all permitted vessels are eligible to harvest red grouper (RG). A permitted vessel must be linked to an active IFQ account in order to be eligible to harvest RG and IFQ species.[27] Thus, because some vessels are not linked to an active IFQ account, fewer permitted vessels are eligible to harvest IFQ species and, in turn, fewer businesses may accrue revenue from the harvest of IFQ species.

**Table 3.4.1.3.** IFQ eligible vessels and businesses with a Gulf reef fish permit, EOY 2018.

| No. of Vessels Owned by a Business | No. of Businesses | No. of Total Permitted Vessels | % of Businesses | % of Permitted Vessels |
|---|---|---|---|---|
| 1 | 450 | 450 | 84.6% | 63.1% |
| 2 | 52 | 104 | 9.8% | 14.6% |
| 3 | 13 | 39 | 2.4% | 5.5% |
| 4 | 6 | 24 | 1.1% | 3.4% |
| 5-6 | 3 | 17 | .6% | 2.4% |
| 7-10 | 6 | 48 | 1.1% | 6.7% |
| 15-16 | 2 | 31 | .4% | 4.3% |
| **Total** | **532** | **713** | **100%** | **100.0%** |

Source: NMFS SERO permits and IFQ databases, March 23, 2020.

Table 3.4.1.3 shows that, at the end of 2018, only 713 permitted vessels were linked to an IFQ account, and these vessels were owned by 532 businesses. Thus, 129 permitted vessels were not eligible to harvest IFQ species and 105 businesses with reef fish permits could not accrue revenue from the harvest of IFQ species. The degree of concentration among IFQ-eligible permitted vessels is slightly greater than with all permitted vessels, as businesses owning multiple IFQ-eligible vessels represent only 15.4% of the businesses, but hold 36.9% of the permitted vessels that can harvest IFQ species.

**IFQ Accounts with RG Shares**

As of February 19, 2020, there were 684 IFQ accounts with shares in one or more share categories. Of these accounts, 495 held red grouper shares. The total percentage of RG shares held by accounts with RG shares does not sum to 100% in Table 3.4.1.4 because a small percentage of RG shares were reclaimed under Reef Fish Amendment 36A.[28] The total percentages for other share categories also do not sum to 100% because some accounts with RG shares do not possess shares in other categories, though a small amount of shares in the other categories were also reclaimed under Reef Fish Amendment 36A.

On average (mean), each of these 495 accounts holds just over 0.2% of the RG shares. However, as discussed in Reef Fish Amendment 36A, the distribution of shares within the RG share

---

[27] The vessel account must have a valid permit and be linked to an active IFQ account. The vessel account must also have annual allocation in it in order for the permitted vessel to harvest IFQ species. Vessel accounts are considered active when a permit is valid. A renewable permit status is not an active status. An IFQ account status is active if the account holder submitted an affirmative answer to the bi-annual citizenship requirement.
[28] Shares were reclaimed from accounts that had never been activated since the start of the GT-IFQ program.

category, and in fact all categories, is highly skewed.  In other words, some accounts have a relatively high percentage of the shares in a category while others have no or a very low percentage of the shares.  For accounts that hold RG shares, the largest or maximum percent of shares held by a single account in each category ranges from 2.33% for gag grouper (GG) to 4.265% for RG, 4.433% for other shallow-water grouper (SWG), 4.139% for RS, 12.212% for tilefish (TF), and 14.704% for deep water grouper (DWG).  The account that has the highest percentages of DWG and TF shares are at the share cap for those categories.  The account that has the highest percentage of RG shares is near the 4.331% share cap for RG.  Thus, in percentage terms, these estimates indicate there are some relatively large shareholders in the DWG and TF categories in particular.  This finding is consistent with findings in GMFMC (2018) which indicate the concentration of shares is greatest in the TF and DWG categories and least in the GG category.  Even though the concentration of shares is relatively high for TF and DWG, concentration levels in those and other categories, as well as for all categories combined, are still considered to be "unconcentrated" and thus quota share markets are considered to be competitive (i.e., no business or other entity has the ability to exercise market power by controlling an "excessive" amount of the shares and thereby share prices).[29]

**Table 3.4.1.4.**  Quota share statistics (in percent) for accounts with RG shares, Feb. 19, 2020.

| Statistic | DWG Shares | RG Shares | GG Shares | SWG Shares | TF Shares | RS Shares |
|---|---|---|---|---|---|---|
| Maximum | 14.704 | 4.265 | 2.330 | 4.433 | 12.212 | 4.139 |
| Total | 88.587 | 99.900 | 93.519 | 90.852 | 83.187 | 59.887 |
| Mean | 0.179 | 0.202 | 0.189 | 0.184 | 0.168 | 0.121 |

Source:  NMFS SERO IFQ database accessed 2/19/2020.

As with permitted vessels, although it is common for a single IFQ account with shares to be held by a single business, some businesses have multiple IFQ accounts with shares.  The 495 IFQ accounts with RG shares are owned by 436 businesses.

Further, although some IFQ accounts with RG shares are linked to a single permitted vessel, others are linked to multiple permitted vessels or are not linked to a permitted vessel at all.  The latter accounts are held by businesses that are likely to sell their annual allocation rather than harvest it.  Of the 495 IFQ accounts with RG shares, 290 accounts were linked to one or more permitted vessels, while 205 accounts were not linked to a permitted vessel.  The 290 accounts were linked to a total of 365 permitted vessels and these accounts and vessels were owned by 260 businesses.  Most businesses only own one or two accounts and permitted vessels.  But, one business has 12 accounts and 3 businesses own 10 or more permitted vessels.  The 205 accounts that were not linked to a vessel were owned by 176 businesses and all of these businesses only held one or two accounts with RG shares.

---

[29] These conclusions hold regardless of the measure of concentration (e.g., the Herfindahl-Hirschman Index (HHI), C5, or C3) or the unit of analysis (e.g., IFQ account, lowest known entity (LKE), and affiliated accounts/businesses). The Horizontal Merger Guidelines from the US Department of Justice and the Federal Trade Commission identify markets with an HHI below 1,500 to be Unconcentrated (no concerns over the exercise of market power), HHI between 1,500 and 2,500 to be Moderately Concentrated (possible concern with market power being exercised given a sufficient increase in concentration), and above 2,500 to be Highly Concentrated (exercise of market power is likely, particularly if concentration increases further).

As shown in Table 3.4.1.5, the 260 businesses that own RG shares and permitted vessels hold the vast majority of shares held by businesses that own RG shares in all share categories, ranging from a low of just over 50% of the RS shares to a high of over 84% of the RG shares. On average, these 260 businesses own between 0.19%-0.32% of the shares in each category. The maximum percentage of shares owned by a business varies considerably, ranging from about 3.86% of the GG shares to 19.7% of the DWG shares.[30]

As shown in Table 3.4.1.6, the 176 businesses that own RG shares, but do not own permitted vessels, own less shares in total compared to the businesses that own permitted vessels. Specifically, these businesses own slightly more than 4% of the TF shares but just above 17% of the DWG shares. These businesses own between 0.02% and 0.1% of the shares in each category on average. The maximum percentage of shares owned by one of these businesses varies somewhat, ranging from about 1.14% of the TF shares to 2.33% of the GG shares.

In general, the information in Tables 3.4.1.5 and 3.4.1.6 can be used to determine the distribution of annual allocation, the market value of shares, the market value of annual allocation, and the potential ex-vessel value of annual allocation if used for harvesting between businesses with RG shares that own permitted vessels and businesses with RG shares that do not own permitted vessels. However, ex-vessel value would not accrue to businesses that do not possess a permit because a permit is needed to harvest IFQ species, including RG.

**Table 3.4.1.5.** Quota share statistics (in percent) for businesses with RG shares and permitted vessels, Feb. 19, 2020.

| Statistic | DWG Shares | RG Shares | GG Shares | SWG Shares | TF Shares | RS Shares |
|---|---|---|---|---|---|---|
| **Maximum** | 19.719 | 6.262 | 3.857 | 5.136 | 14.743 | 5.076 |
| **Total** | 78.536 | 84.166 | 76.507 | 77.175 | 79.155 | 50.204 |
| **Mean** | 0.302 | 0.324 | 0.294 | 0.297 | 0.304 | 0.193 |

Source: NMFS SERO IFQ database accessed 2/19/2020.

**Table 3.4.1.6.** Quota share statistics (in percent) for businesses with RG shares and no permitted vessels, Feb. 19, 2020.

| Statistic | DWG Shares | RG Shares | GG Shares | SWG Shares | TF Shares | RS Shares |
|---|---|---|---|---|---|---|
| **Maximum** | 1.991 | 1.745 | 2.330 | 1.536 | 1.136 | 2.346 |
| **Total** | 10.051 | 15.734 | 17.012 | 13.677 | 4.032 | 9.683 |
| **Mean** | 0.057 | 0.089 | 0.097 | 0.078 | 0.023 | 0.055 |

Source: NMFS SERO IFQ database accessed 2/19/2020.

The amount of annual allocation (quota pounds) that an account holder receives each year is not only conditional on the percentage of shares held in a category, but also the commercial quota applicable to that category. The 2019 quotas for each share category were as follows: 6,937,838 lbs gw for RS, 3 mp gw for RG, 1.024 million lbs gw for DWG, 582,000 lbs gw for TF, and 525,000 lbs gw for SWG. Table 3.4.1.7 presents statistics regarding annual allocation to IFQ

---

[30] Share caps are applied at the IFQ account and LKE levels, but not at the business level as defined here. Thus, it is possible for a business to control a share percentage above the cap.

accounts based on the share statistics in Table 3.4.1.4 and these quotas.  Based on this information, the average account holder with RG shares received 6,055 lbs gw of RG allocation in 2019, while the largest account holder received almost 128,000 lbs gw.  Across all categories, the average account holder with RG shares received about 20,000 lbs gw of allocation in 2019.

**Table 3.4.1.7.**  Annual allocation (lb gw) statistics for accounts with RG shares, Feb. 19, 2020.

| Statistic | DWG Allocation | RG Allocation | GG Allocation | SWG Allocation | TF Allocation | RS Allocation |
|---|---|---|---|---|---|---|
| Maximum | 150,572 | 127,945 | 21,879 | 23,275 | 71,076 | 287,124 |
| Total | 907,132 | 2,996,996 | 878,139 | 476,974 | 484,149 | 4,154,869 |
| Mean | 1,833 | 6,055 | 1,774 | 964 | 978 | 8,394 |

Source:  NMFS SERO IFQ database accessed 2/19/2020.

Table 3.4.1.8 provides statistics regarding the amount of allocation held by the 260 businesses that possess RG shares and at least one permit.  Information in this table reflects that these businesses control just over 84% of the RS allocation, or around 2.54 mp gw.  The largest amount of RG allocation controlled by a single business with RG shares and a permit is almost 180,000 lb gw, while the average amount of RG allocation held by a business with a permit is about 9,700 lb gw.

Table 3.4.1.9 provides statistics regarding the amount of allocation held by the 176 businesses that possess shares but are not associated with a permit.  Information in this table reflects that these businesses control almost 16% of the RG allocation, or around 472,000 lb gw.  The largest amount of allocation controlled by a single business with RG shares but without a permit is slightly more than 52,300 lb gw, while the average amount of RG allocation held by a business without a permit is almost 2,700 lb gw.

**Table 3.4.1.8.**  Annual allocation (lb gw) statistics for businesses with RG shares and permitted vessels, February 19, 2020.

| Statistic | DWG | RG | GG | SWG | TF | RS |
|---|---|---|---|---|---|---|
| Maximum | 201,920 | 187,868 | 36,216 | 26,965 | 85,803 | 352,131 |
| Total | 804,209 | 2,524,968 | 718,400 | 405,168 | 460,681 | 3,483,095 |
| Mean | 3,093 | 9,711 | 2,763 | 1,558 | 1,772 | 13,397 |

Source: NMFS SERO IFQ database accessed 2/19/2020).

**Table 3.4.1.9.**  Annual allocation (lb gw) statistics for businesses with RG shares and no permitted vessels, February 19, 2020.

| Statistic | DWG | RG | GG | SWG | TF | RS |
|---|---|---|---|---|---|---|
| Maximum | 20,386 | 52,359 | 21,879 | 8,064 | 6,613 | 162,774 |
| Total | 102,923 | 472,028 | 159,739 | 71,806 | 23,468 | 671,773 |
| Mean | 585 | 2,682 | 908 | 408 | 133 | 3,817 |

Source: NMFS SERO IFQ database accessed 2/19/2020).

Quota shares have value in multiple ways.  First, shares have value because they are an asset.  The asset value of each account's shares is determined by the market price of the shares and the amount of shares it contains.  Statistics regarding the value of the shares held by accounts with RG shares are in Table 3.4.1.10.  The total value of all shares held by accounts with RG shares is

just over $212 million (2019$), with the bulk of that value coming from ownership of RS shares, which accounts for more than 80% of the combined total value.  This is also true for the average account that holds RG shares.  The average value of an account that holds RG shares is about $428,000, though only about 8% of that value is based on RG shares.  The account with the largest asset value of shares is worth about $12.1 million, with RS shares representing the bulk of that value (98%).

**Table 3.4.1.10.**  Quota share value statistics for accounts with RG shares (2019$).

| Statistic | DWG | RG | GG | SWG | TF | RS | All |
|---|---|---|---|---|---|---|---|
| Maximum | $1,376,230 | $728,007 | $208,945 | $130,804 | $675,221 | $11,820,887 | $12,100,160 |
| Total | $8,291,186 | $17,052,906 | $8,386,229 | $2,680,593 | $4,599,417 | $171,055,937 | $212,066,267 |
| Mean | $16,750 | $34,450 | $16,942 | $5,415 | $9,292 | $345,568 | $428,417 |

Note:  Share value estimates are based on average 2019 share prices per pound.
Source:  NMFS SERO IFQ database accessed 2/11/2020.

The information in Table 3.4.1.10 reflects the asset value of shares based on 2019 share prices. However, with the exception of RS shares, and TF shares to a lesser extent, average share prices for other share categories have continuously declined over the past 5 years, as illustrated in Table 3.4.1.11.  Specifically, RG and GG share prices have declined by 59% during this time.  The declines for DWG and TF prices have been less, but are still noticeable.  TF share prices have been relatively steady, while RS share prices have increased by more than 14%.  Compared to conditions in 2015, RG shares currently represent a far smaller percentage of an RG share account holder's IFQ asset portfolio, which was around 29% at that time.  The same is true for the other GT share categories, with RS shares now dominating that portfolio.

**Table 3.4.1.11.**  Average share prices by share category, 2015-2019 (2019$).

| Share category | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| RS | $36.07 | $32.56 | $36.27 | $36.90 | $41.17 |
| RG | $13.80 | $10.74 | $5.39 | $4.17 | $5.69 |
| GG | $23.58 | $15.18 | $16.55 | $9.95 | $9.55 |
| DWG | $13.67 | $13.25 | $13.16 | $11.11 | $9.14 |
| SWG | $7.23 | $6.20 | $9.06 | $4.96 | $5.62 |
| TF | $9.85 | $10.64 | $9.07 | $10.89 | $9.50 |

Source:  IFQ database accessed 2/11/2020.

Table 3.4.1.12 provides statistics regarding the value of the shares held by the 260 businesses that possess RG shares and at least one permit.  Information in this table again reflects that these businesses control just over 84% of the total RG share value.  The largest RG share value controlled by a single business with a permit is almost $1.07 million, while the average value of RG shares held by a business with a permit is just over $55,200.  RG shares only represent about 8% of the total share value held by these businesses, while RS shares represent about 80% of the total share value held by these businesses.

**Table 3.4.1.12.** Quota share value statistics for businesses with RG shares and permitted vessels, February 19, 2020 (2019$).

| Statistic | DWG | RG | GG | SWG | TF | RS | All |
|---|---|---|---|---|---|---|---|
| Maximum | $1,845,546 | $1,068,972 | $345,865 | $151,544 | $815,125 | $14,497,248 | $18,724,299 |
| Total | $7,350,467 | $14,367,067 | $6,860,720 | $2,277,046 | $4,376,474 | $143,399,025 | $178,630,799 |
| Mean | $28,271 | $55,258 | $26,387 | $8,758 | $16,833 | $551,535 | $687,042 |

Note:  Share value estimates are based on average 2019 share prices per pound.
Source:  NMFS SERO IFQ database accessed 2/19/2020.

Table 3.4.1.13 provides statistics regarding the value of the shares held by the 176 businesses that possess RG shares but are not associated with a permit.  Information in this table again reflects that these businesses control about 16% of the total RG share value.  The largest RG share value controlled by a single business without a permit is about $298,000, while the average value of shares held by a business with RG shares but without a permit is just over $15,200. RG shares only represent about 8% of the total share value held by these businesses, while RS shares represent almost 83% of the total share value held by these businesses.

**Table 3.4.1.13.** Quota share value statistics for businesses with RG shares but no permitted vessels, February 19, 2020 (2019$).

| Statistic | DWG | RG | GG | SWG | TF | RS | All |
|---|---|---|---|---|---|---|---|
| Maximum | $186,331 | $297,923 | $208,945 | $45,319 | $62,823 | $6,701,407 | $7,502,747 |
| Total | $940,718 | $2,685,839 | $1,525,509 | $403,547 | $222,943 | $27,656,913 | $33,435,468 |
| Mean | $5,345 | $15,260 | $8,668 | $2,293 | $1,267 | $157,142 | $189,974 |

Note:  Share value estimates are based on average 2019 share prices per pound.
Source:  NMFS SERO IFQ database accessed 2/19/2020).

In addition to their asset value, shares have value because they result in annual allocation, which can either be sold or used for harvesting purposes (i.e., landings).  Annual allocation that is sold results in revenue for the business holding the allocation.  This revenue likely represents an equivalent amount of profit as the business does not pay cost recovery fees when selling allocation and any other monetary costs associated with selling allocation are likely trivial. Statistics regarding the potential market value associated with the annual allocation for each account with RG shares are provided in Table 3.4.1.14.

The average market value of annual allocation should approximate the expected net revenue or economic profit of the annual allocation in the short-term (i.e., in a given year).  Thus, if the annual allocation held by accounts with RG shares was harvested, economic profits from those landings would be expected to be about $19.4 million, with the bulk of those profits (79%) arising from the harvest of RS while RG would only account for about 9%.  Although one account would be expected to earn about $1.1 million in short-term profits, if the account holders with RG shares retain their initial annual allocations, the average short-term profit per account would only be expected to be around $39,000.[31]  Realized value in the form of actual annual

---

[31] "Accounts" do not actually harvest landings and thus do not earn profits per se; rather, vessels and the businesses that own them do.  Further, annual allocation is often transferred, so the actual distribution of short-term profits would likely differ from the potential distribution based on the distribution of annual allocation at the beginning of the year.  The purpose of these estimates is to characterize the distribution of annual allocation and its value across accounts in the short-term.

revenue and profits is likely less from RG allocation and other allocation in the GT-IFQ program as quota utilization for those species is typically well below 100% in those categories (68% for RG in 2019).  Thus, annual profit from the sale of RG allocation is more likely to be around $1.24 million in total and $2,500 per business on average.

**Table 3.4.1.14.**  Potential market value of annual allocation in 2020 for all accounts with RG shares (2019$).

| Statistic | DWG | RG | GG | SWG | TF | RS | All |
|---|---|---|---|---|---|---|---|
| Maximum | $158,101 | $75,488 | $18,597 | $51,175 | $13,732 | $1,059,487 | $1,089,420 |
| Total | $952,488 | $1,768,227 | $746,418 | $348,587 | $281,415 | $15,331,465 | $19,428,601 |
| Mean | $1,924 | $3,572 | $1,508 | $704 | $569 | $30,973 | $39,250 |

Note:  Annual allocation market value estimates are based on average 2019 allocation prices.
Source:  NMFS SERO IFQ database accessed 2/11/2020)

The information in Table 3.4.1.14 reflects the potential market value of allocation based on 2019 allocation prices and commercial quotas.  However, with the exception of RS allocation, allocation prices for other share categories have declined over the past 5 years, as illustrated in Table 3.4.1.15.  Specifically, RG and GG allocation prices have declined by 49% and 58% during this time.  The decline in the RG allocation price is most likely due to the significant commercial quota increase in late 2016.  The declines for DWG and TF allocation prices have been less, but are still noticeable.  If these trends continue, then the estimate in Table 3.4.1.14 may overestimate the market value of these allocations in 2020.  Conversely, RS allocation price has increased by more than 14%.  Thus, if the upward trend in the RS allocation price continues, the estimated market value of RS allocation in Table 3.4.1.14 may underestimate actual market value in 2020.  Compared to conditions in 2015, RG allocation currently represent a far smaller percentage of an RG share account holder's allocation portfolio, which was around 29% at that time.  The same is true for the other GT-IFQ share categories, with RS allocation now dominating that portfolio.

**Table 3.4.1.15.**  Average allocation prices by share category, 2015-2019 (2019$).

| Share category | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| RS | $3.31 | $3.41 | $3.46 | $3.46 | $3.69 |
| RG | $1.15 | $0.95 | $0.44 | $0.33 | $0.59 |
| GG | $2.03 | $1.47 | $1.51 | $1.03 | $0.85 |
| DWG | $1.26 | $1.23 | $1.23 | $1.01 | $1.05 |
| SWG | $0.64 | $0.59 | $0.60 | $0.54 | $0.59 |
| TF | $0.83 | $0.71 | $0.75 | $0.73 | $0.72 |

Source:  IFQ database accessed 2/11/2020.

Similar to shares, annual allocation tends to be "unconcentrated" across accounts.  According to GMFMC (2018), concentration is low across all share categories combined and for most share categories, with the exception of TF which is typically "moderately concentrated."  Also, concentration of annual allocation is the lowest at the beginning of each year, when it is based on the distribution of shares.  Concentration in all categories is seasonal and increases as the year progresses or stabilizes in the 3rd or 4th quarter, but the markets are still largely "unconcentrated"

with the exception of TF. But even at moderate levels of concentration, there is no evidence of market power being exercised in any of the markets for annual allocation (i.e., markets for annual allocation are competitive).

Table 3.4.1.16 provides statistics regarding the value of the allocation held by the 260 businesses that possess RG shares and at least one permit. Information in this table again reflects that these businesses control just over 84% of the total value of RG allocation. The largest RG allocation value controlled by a single business with a permit is worth almost $111,000, while the average value of RG allocation held by a business with a permit is just over $5,700. Realized value in the form of actual annual revenue and profits is likely less from RG allocation as quota utilization is typically well below 100% (70% in 2019). Thus, annual profit for these businesses from the sale of RG allocation is more likely to be around $1.04 million in total and $4,000 per business on average.

**Table 3.4.1.16.** Allocation value statistics for businesses with RG shares and permitted vessels, February 19, 2020 (2019$).

| Statistic | DWG | RG | GG | SWG | TF | RS | All |
|---|---|---|---|---|---|---|---|
| Maximum | $212,016 | $110,842 | $30,784 | $15,909 | $61,778 | $1,299,365 | $1,334,171 |
| Total | $844,419 | $1,489,731 | $610,640 | $239,049 | $331,691 | $12,852,621 | $16,368,151 |
| Mean | $3,248 | $5,730 | $2,349 | $919 | $1,276 | $49,433 | $62,954 |

Note: Allocation value estimates are based on average 2019 allocation prices per pound.
Source: NMFS SERO IFQ database accessed 2/19/2020.

Table 3.4.1.17 provides statistics regarding the value of the allocation held by the 176 businesses that possess shares but are not associated with a permit. Information in this table again reflects that these businesses control about 16% of the total value of RG allocation. The largest allocation value controlled by a single business without a permit is worth almost $278,500, while the average value of allocation held by a business without a permit is almost $1,600. Again, realized value in the form of actual annual revenue and profits is likely less from RG allocation as quota utilization is typically well below 100% (70% in 2019). Thus, annual profit for these businesses from the sale of RG allocation is more likely to be around $195,000 in total and $1,100 per business on average.

**Table 3.4.1.17.** Allocation value statistics for businesses with RG shares but no permitted vessels, February 19, 2020 (2019$).

| Statistic | DWG | RG | GG | SWG | TF | RS | All |
|---|---|---|---|---|---|---|---|
| Maximum | $21,406 | $30,892 | $18,597 | $4,758 | $4,761 | $600,636 | $603,859 |
| Total | $108,069 | $278,496 | $135,778 | $42,365 | $16,897 | $2,478,844 | $3,060,450 |
| Mean | $614 | $1,582 | $771 | $241 | $96 | $14,084 | $17,389 |

Note: Allocation value estimates are based on average 2019 allocation prices per pound.
Source: NMFS SERO IFQ database accessed 2/19/2020.

These same general findings regarding the market value of annual allocation also apply to the potential ex-vessel value of that annual allocation. The markets for landed product largely have the same characteristics as the markets for annual allocation (i.e., unconcentrated overall and for most categories, except landings of TF which are "moderately concentrated"). Thus, markets for landed product of IFQ species are thought to be competitive. Even if market power is not

detected in these markets, the Council may have distributional or "fairness" concerns as the distributions of shares, allocation, landings, and revenue in the Gulf IFQ programs are highly unequal.  In fact, they are the most unequal of any catch share program in the U.S. (GMFMC, 2018).

**Table 3.4.1.18.**  Potential ex-vessel value of annual allocation in 2020 for accounts with RG shares (2019$).

| Statistic | DWG | RG | GG | SWG | TF | RS | All |
|---|---|---|---|---|---|---|---|
| Maximum | $844,710 | $675,549 | $132,149 | $129,408 | $204,699 | $1,516,014 | $2,057,576 |
| Total | $5,089,010 | $15,824,137 | $5,303,960 | $2,651,974 | $1,394,349 | $21,937,706 | $52,201,137 |
| Mean | $10,281 | $31,968 | $10,715 | $5,358 | $2,817 | $44,319 | $105,457 |

Note:  Potential ex-vessel value estimates are based on 2019 average ex-vessel prices.
Source:  NMFS SERO IFQ database accessed 2/11/2020).

The information in Table 3.4.1.18 reflects the potential ex-vessel value of allocations in 2020 based on 2019 ex-vessel prices and commercial quotas in 2020.  Again, realized ex-vessel value will likely be less for RG and other species in the GT-IFQ program as quota utilization rates are typically well below 100%.  Only businesses with IFQ accounts that are linked to a permit are allowed to harvest IFQ species.  Therefore, estimates of ex-vessel value are not germane to businesses that do not possess permits.

As illustrated in Table 3.4.1.19, with the exception of TF, and RS to some extent, ex-vessel prices at the share category level have steadily increased from 2015 through 2019.  For example, ex-vessel prices for gag, SWG, DWG, and TF have increased by 11%, 12%, 13%, and 13%, respectively.  Although not shown here, this increase is also seen at the individual species level within the DWG, SWG, and TF categories, with the exception of yellowmouth grouper in the SWG category, which declined by 9%, and goldface tilefish in the TF category, which declined by 10%.  The ex-vessel price for RS has only increased by 2%, and that increase almost entirely occurred in 2019.  The ex-vessel price for RG has increased by almost 26%.  These trends are nearly the opposite of the trends for allocation prices, suggesting that it is likely becoming relatively more profitable for those with shares to harvest their allocation rather than sell it, all other things being equal.[32]

**Table 3.4.1.19.**  Average ex-vessel prices by share category, 2015-2019 (2019$).

| Share category | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| RS | $5.18 | $5.17 | $5.18 | $5.19 | $5.28 |
| RG | $4.23 | $4.26 | $4.45 | $4.83 | $5.31 |
| GG | $5.44 | $5.45 | $5.47 | $5.76 | $6.04 |
| DWG | $4.96 | $4.91 | $4.93 | $5.17 | $5.61 |
| SWG | $4.95 | $4.92 | $4.96 | $5.30 | $5.56 |
| TF | $3.11 | $3.12 | $3.10 | $2.87 | $2.88 |

Source:  IFQ database accessed 2/11/2020.

---

[32] Preliminary information suggests that the recent pandemic has caused ex-vessel prices for most IFQ species to decline, thus reversing the previous trend.  As effects on allocation prices have not yet been determined, whether it is currently more profitable for IFQ account holders to sell or use allocation for landings purposes is unknown.

**Vessels**

The information in Table 3.4.1.20 describes the landings and revenue for vessels that harvested RG in each year from 2014 through 2018, as well as their revenue from other IFQ species, Gulf non-IFQ fisheries, and South Atlantic non-IFQ fisheries.  Although a majority of these vessels' gross revenue came from harvesting IFQ species, a significant portion came from harvesting non-IFQ species in the Gulf, with a minor amount coming from harvests in the South Atlantic.

Some important trends can be seen in Table 3.4.1.20.  In general, vessel participation in the IFQ programs tends to be very fluid.  However, the number of vessels that harvested RG in each year from 2015 through 2018 was relatively stable, ranging between 374 and 384 vessels, with only a small decrease occurring from 2015 to 2016.  Contrary to the upward trends for the IFQ fisheries as a whole from 2011 through 2015 (GMFMC 2017b), RG landings and revenue have decreased significantly from 2014 through 2018, with landings falling by 57% and revenue decreasing by 49%.  The revenue decrease was slightly less because of the increase in ex-vessel price that occurred during this time.  However, not only did revenue from RG landings decrease, so did revenue from other IFQ species and even from non-IFQ species in the Gulf, which declined by about 23% and 26%, respectively.  As a result, total revenue for these vessels declined by almost 35% from 2015 through 2018.

**Table 3.4.1.20.**  Landings and revenue statistics for vessels harvesting RG by year, 2014-2018 (2019$).

| Year | Number of Vessels | Statistic | RG Landings (gw) | RG Revenue | Other IFQ Revenue | Gulf Non-IFQ Revenue | South Atlantic Revenue | Total Revenue |
|---|---|---|---|---|---|---|---|---|
| **2014** | 384 | Maximum | 149,013 | $612,691 | $2,384,847 | $300,104 | $120,440 | $2,387,842 |
|  |  | Total | 5,497,993 | $22,461,241 | $24,116,831 | $7,903,415 | $581,764 | $55,063,252 |
|  |  | Mean | 14,318 | $58,493 | $62,804 | $20,582 | $1,515 | $143,394 |
|  |  |  |  |  |  |  |  |  |
| **2015** | 376 | Maximum | 102,900 | $430,908 | $900,697 | $287,607 | $112,904 | $949,740 |
|  |  | Total | 4,665,528 | $19,690,531 | $21,836,770 | $6,111,639 | $530,598 | $48,169,538 |
|  |  | Mean | 12,408 | $52,368 | $58,077 | $16,254 | $1,411 | $128,110 |
|  |  |  |  |  |  |  |  |  |
| **2016** | 375 | Maximum | 113,282 | $471,797 | $1,070,173 | $242,494 | $99,390 | $1,081,789 |
|  |  | Total | 4,484,476 | $18,899,691 | $21,676,244 | $7,403,384 | $568,194 | $48,547,514 |
|  |  | Mean | 11,959 | $50,399 | $57,803 | $19,742 | $1,515 | $129,460 |
|  |  |  |  |  |  |  |  |  |
| **2017** | 374 | Maximum | 92,586 | $416,127 | $1,024,611 | $216,904 | $149,465 | $1,031,572 |
|  |  | Total | 3,319,928 | $14,675,817 | $18,159,067 | $6,717,016 | $606,509 | $40,158,409 |
|  |  | Mean | 8,877 | $39,240 | $48,554 | $17,960 | $1,622 | $107,375 |
|  |  |  |  |  |  |  |  |  |
| **2018** | 376 | Maximum | 64,498 | $312,486 | $1,033,603 | $190,863 | $107,512 | $1,038,980 |
|  |  | Total | 2,361,280 | $11,367,060 | $18,456,902 | $5,809,073 | $440,279 | $36,073,314 |
|  |  | Mean | 6,280 | $30,232 | $49,088 | $15,450 | $1,171 | $95,940 |

Source:  NMFS SERO IFQ database accessed 2/19/2020 and SEFSC Socioeconomic Panel (Version 10).

It is counterintuitive that the fleet size would remain stable given such declines, and this result deserves further research. Nonetheless, these findings reflect the interdependency between species harvested in the commercial sector of the reef fish fishery (i.e., biological or economic factors that affect the commercial harvest of one species can and often do affect the commercial harvest of other species). Further, these declines occurred even though the RG commercial quota increased from 5.63 mp in 2014 to 7.78 mp by late 2016, and remained at that level through 2018. Also, the RS commercial quota increased from approximately 5.054 mp gw in 2014 to 6.312 mp gw through mid-2017, and remained at that level through 2018. Landings and revenue would be expected to increase, likely significantly, with such increases under stable biological and economic conditions. Thus, it is clear that biological and/or economic conditions for red grouper, and the reef fish fishery as a whole, are not stable.

The maximum annual gross revenue earned by a single vessel during this time was about $2.39 million (2019$) in 2015, though the average gross revenue per vessel was only about $143,000 that year. Similar to the trends in total revenue for RG vessels, these values had decreased to $1.04 million and about $96,000 by 2018, representing a 33% decline in total revenue per vessel. Average red grouper landings and revenue per vessel also decreased from 14,318 lbs and $58,493 to 6,280 lbs and $30,232 per vessel or by about 56% and 45%, respectively.

Estimates of economic returns have not been available historically for the commercial sector of the Gulf reef fish fishery. Recent reports (Overstreet, Perruso, and Liese 2017, Overstreet and Liese 2018a, and Overstreet and Liese 2018b) provided the first such estimates. These estimates are specific to economic performance in 2014, 2015 and 2016, respectively. Overstreet and Liese (2018b) also provides average estimates of economic returns across 2014-2016, which are the most useful for current purposes, and thus findings from that report are summarized below. Given the declines in landings and revenue for RG vessels discussed above, it is quite likely that economic returns were likely different by 2018 than they were in 2016, and thus the estimates below should be used with some caution. However, some of the findings for 2014-2016 seem to be consistent with the results above for 2014-2016.

Estimates in these reports are based on a combination of Southeast Coastal logbook data, a supplemental economic add-on survey to the logbooks, and an annual economic survey at the vessel level. The economic surveys collect data on gross revenue, variable costs, fixed costs, as well as some auxiliary economic variables (e.g., market value of the vessel). The report provides estimates of critical economic variables for the commercial sector of the Gulf reef fish fishery as a whole, but also provides estimates by "subsets" within this sector. These subsets are referred to as Segments of Interest (SOI). SOIs are generally defined at the individual species (e.g., red snapper), species group (e.g., Jacks), and/or gear-level (e.g., longline). In addition, estimates are provided at the trip level and the annual vessel level for each SOI. For current purposes, the most important results are those for vessels that harvested RG.

From an economic returns perspective, the two most critical results at the trip level are the estimates of trip net cash flow and trip net revenue. Trip net cash flow is trip revenue minus the costs for fuel, bait, ice, groceries, miscellaneous, hired crew, and purchases of annual allocation from other allocation holders. Thus, this estimate represents the amount of cash generated by a typical reef fish trip over and above the cash cost of taking the trip (i.e., variable costs of the trip)

and is a proxy for producer surplus (PS) at the trip level.  Trip net revenue is trip revenue minus the costs for fuel, bait, ice, groceries, miscellaneous, hired crew, and the opportunity cost of owner's time as captain.  By including opportunity cost of the owner's time and excluding purchases of annual allocation, trip net revenue is a measure of the commercial fishing trip's economic profit.

Table 3.4.1.21 illustrates the economic "margins" generated on red grouper trips, i.e., trip net cash flow and trip net revenue as a percentage of trip revenue.  As shown in this table, 30%, 18%, and 18% (or 67% in total) of the average revenues generated on RG trips were used to pay for crew costs, fuel/supplies costs, and purchases of annual allocation, while the remaining 33% was net cash flow back to the owner(s).  The margin associated with trip net revenue was higher at 44%. Thus, trip cash flow and trip net revenue were both positive on average from 2014 through 2016, generally indicating that red grouper trips were profitable during this time.

Table 3.4.1.22 provides estimates of the important economic variables at the annual level for all vessels that had RG landings from 2014 through 2016.  Similar to the trip level, the three most important estimates of economic returns are net cash flow, net revenue from operations,[33] and economic return on asset value.  Of these measures, net revenue from operations most closely represents economic profits to the owner(s).  Net cash flow is total annual revenue minus the costs for fuel, other supplies, hired crew, vessel repair and maintenance, insurance, overhead, loan payments, and purchases of annual allocation.  Net revenue from operations is total annual revenue minus the costs for fuel, other supplies, hired crew, vessel repair and maintenance, insurance, overhead, and the opportunity cost of an owner's time as captain as well as the vessel's depreciation.  Economic return on asset value is calculated by dividing the net revenue from operations by the vessel value.

---

[33] Net revenue from operations accrues to the vessel owner and, when applicable, the IFQ shareholder, who may not be the same entity.

**Table 3.4.1.21.** Economic characteristics of RG trips 2014-2016 (2019$).

| | 2014 | 2015 | 2016 | Average |
|---|---|---|---|---|
| Number of Observations | 829 | 1,066 | 1,228 | |
| Response Rate (%) | 78% | 85% | 94% | |
| **SOI Trip** | | | | |
| Owner-Operated | 68% | 62% | 64% | 64.7% |
| Fuel Used per Day at Sea (gallons/day) | 41 | 39 | 37 | 39 |
| **Total Revenue** | 100% | 100% | 100% | 100% |
| **Costs (% of Revenue)** | | | | |
| Fuel | 8% | 6.3% | 5.1% | 6.5% |
| Bait | 3.7% | 4% | 4.1% | 3.9% |
| Ice | 1.5% | 1.6% | 1.7% | 1.6% |
| Groceries | 3% | 3.2% | 4.1% | 3.4% |
| Miscellaneous | 2.2% | 3% | 3.5% | 2.9% |
| Hired Crew | 30% | 31% | 30% | 30.3% |
| IFQ Purchase | 15.4% | 21.8% | 17.7% | 18.3% |
| OC Owner-Captain Time | 7.5% | 6.9% | 8.1% | 7.5% |
| **Trip Net Cash Flow** | 36% | 29% | 34% | 33% |
| **Trip Net Revenue** | 44% | 44% | 43% | 44% |
| Labor - Hired & Owner | 37% | 38% | 38% | 37.7% |
| Fuel & Supplies | 18% | 18% | 19% | 18% |
| **Input Prices** | | | | |
| Fuel Price (per gallon) | $4.06 | $2.93 | $2.28 | $3.10 |
| Hire Crew Wage (per crew-day) | $313 | $292 | $257 | $288 |
| **Productivity Measures** | | | | |
| Landings/Fuel Use (lbs./gallon) | 11.9 | 10.5 | 9.7 | 11 |
| Landings/Labor Use (lbs./crew-day) | 183 | 160 | 140 | 161 |

Net cash flow and net revenue from operations at the annual vessel level were both positive from 2014-2016, generally indicating that RG vessels in the commercial sector were profitable, though some vessels earned much greater profits than others. More specifically, net cash flow and net revenue from operations averaged 24% and 39%, respectively, while the economic return on asset value was approximately 40% during this time.

Overstreet and Liese (2018b) only provide estimates of economic returns from 2014 through 2016, and thus it cannot be used to assess how economic returns and related measures have changed since the implementation of the IFQ programs. However, Liese (pers. communication, Nov. 22, 2017) has conducted an analysis that compares economic returns and related measures in 2006 and 2014, and thus examines how they have changed since the implementation of the GT and RS-IFQ programs. Because of the years chosen, the changes in economic performance indicated by these results can only, at best, be attributed to the combination of the two IFQ programs as opposed to one or the other. Also, these results apply to all trips that landed Gulf reef fish species as opposed to landings of species managed under one or both of the IFQ programs. Further, as these results are preliminary, only a generally qualitative overview can be provided.

**Table 3.4.1.22.** Economic characteristics of RG vessels from 2014-2016 (2019$).

|  | **2014** | **2015** | **2016** | **Average** |
|---|---|---|---|---|
| Number of Observations | 66 | 81 | 97 | |
| Response Rate (%) | 65% | 78% | 84% | |
| **SOI Vessel** | | | | |
| Owner-Operated | 75% | 66% | 79% | 73% |
| For-Hire Active | 6% | 19% | 11% | 12% |
| Vessel Value | $135,478 | $105,527 | $80.428 | $107,144 |
| **Total Revenue** | 100% | 100% | 100% | 100% |
| **Costs (% of Revenue)** | | | | |
| Fuel | 8.2% | 7.6% | 6.8% | 7.5% |
| Other Supplies | 10.6% | 11.1% | 13.2% | 11.6% |
| Hired Crew | 26.5% | 29.4% | 26.5% | 27.5% |
| Vessel Repair & Maintenance | 7.2% | 8.6% | 9.1% | 8.3% |
| Insurance | 0.5% | 1.1% | 0.9% | 0.8% |
| Overhead | 4.2% | 6.3% | 5.8% | 5.4% |
| Loan Payment | 0.9% | 1.8% | 1.3% | 1.3% |
| IFQ Purchase | 11.4% | 15.4% | 14.9% | 13.9% |
| OC Owner-Captain Time | 5.6% | 5.6% | 7.1% | 6.1% |
| **Net Cash Flow** | 30% | 19% | 22% | 24% |
| **Net Revenue for Operations** | 33% | 27% | 27% | 29% |
| Depreciation | 3.8% | 3.7% | 3.3% | 3.6% |
| Fixed Costs | 12% | 16% | 16% | 15% |
| Labor - Hired & Owner | 32% | 35% | 34% | 34% |
| Fuel & Supplies | 19% | 19% | 20% | 19% |
| **Economic Return (on asset value)** | 44.2% | 36% | 41% | 40.4% |

First, effort in the commercial sector of the fishery has decreased significantly according to multiple measures. Specifically, the number of vessels, trips, and days at sea decreased by 31%, 38%, and 28%, respectively, between 2006 and 2014. At the same time, landings of Gulf reef fish were relatively unchanged, decreasing by about 4% during that time. Thus, output per unit of input (one measure of productivity) has increased significantly since the IFQ programs were implemented. Further, even though landings have remained about the same, the average ex-vessel price of Gulf reef fish landings increased by 20% during this time, resulting in a 16% increase in total annual revenues from these landings.

Because productivity increased, costs decreased. Specifically, crew costs decreased by 6%, other variable costs (supplies, fuel, etc.) decreased by 33%, and fixed costs decreased by 19%. The decrease in crew costs was driven by a decrease in crew days of 26%, as crew compensation per day actually increased by 24% (i.e., the amount of labor used decreased significantly, but "wages" increased somewhat significantly as well). Similarly, even though fuel prices increased by 25%, a 49% decrease in fuel usage was the primary driver of the decline in other variable costs. In addition, the opportunity costs associated with the owner's labor time and capital invested in the vessel decreased by 16% and 31%, respectively.

Because costs decreased, significantly lower percentages of the total revenues had to be used to cover these costs, in turn resulting in much higher economic returns and margins.  Net cash flow to the owner(s) increased by more than 300% while net revenue from operations increased by more than 400%.  Trip net revenue as a percentage of total trip revenue increased by 94% while, at the vessel level, net revenue from operations as a percentage of total revenues increased by 180%.  While such increases may appear to be exorbitant, it must be kept in mind that, in 2006, net cash flows were only slightly above the break-even point and net revenues from operations were negative (i.e., commercial reef fish levels were earning economic losses on average).

**Dealers**

The information in Table 3.4.1.23 illustrates the purchasing activities of dealers that bought RG landings from vessels from 2014 through 2018.[34]  Like vessels, dealer participation in the RG component of the GT-IFQ program is fluid and not all dealers purchased RG in each year during this time.  Unlike the number of vessels harvesting RG during this time, the number of dealers that purchased RG landings steadily decreased from 110 in 2014 to 89 in 2018, or by 19%, with an average of 101 dealers purchasing RG landings each year.

**Table 3.4.1.23.**  Dealer statistics for dealers that purchased RG landings by year, 2014-2018.  All dollar estimates are in 2019$.

| Year | Number Dealers | Statistic | RG Purchases | Other IFQ Purchases | Gulf Non-IFQ Purchases | South Atlantic Purchases | Total Purchases |
|------|------|------|------|------|------|------|------|
| **2014** | 110 | Maximum | $4,194,263 | $3,522,317 | $4,122,768 | $4,128,319 | $7,400,909 |
|  |  | Total | $22,771,884 | $22,999,036 | $39,753,737 | $16,730,832 | $102,255,489 |
|  |  | Mean | $207,017 | $209,082 | $361,398 | $152,098 | $929,595 |
| **2015** | 107 | Maximum | $3,342,217 | $7,737,791 | $3,651,599 | $3,406,249 | $8,412,438 |
|  |  | Total | $20,133,195 | $29,815,086 | $38,083,517 | $12,362,712 | $100,394,510 |
|  |  | Mean | $188,161 | $278,646 | $355,921 | $115,539 | $938,266 |
| **2016** | 101 | Maximum | $3,717,521 | $9,873,515 | $8,079,619 | $3,848,256 | $10,541,374 |
|  |  | Total | $18,874,947 | $32,555,979 | $44,293,742 | $16,839,568 | $112,564,236 |
|  |  | Mean | $186,881 | $322,336 | $438,552 | $166,728 | $1,114,497 |
| **2017** | 96 | Maximum | $2,794,976 | $8,060,687 | $6,374,817 | $5,151,898 | $8,741,043 |
|  |  | Total | $14,655,988 | $26,557,008 | $41,215,887 | $23,485,925 | $105,914,808 |
|  |  | Mean | $152,667 | $276,635 | $429,332 | $244,645 | $1,103,279 |
| **2018** | 89 | Maximum | $1,615,223 | $2,592,992 | $6,247,425 | $4,403,264 | $8,219,395 |
|  |  | Total | $11,343,604 | $19,471,016 | $42,731,861 | $20,120,140 | $93,666,621 |
|  |  | Mean | $127,456 | $218,775 | $480,133 | $226,069 | $1,052,434 |

Source: SEFSC Fishing Communities Web Query Tool, Version 1.

In addition, although the trend in purchases of RG landings by dealers necessarily mimics the trend in RG vessel revenues, the trends in purchases of other IFQ species as well non-IFQ species in the Gulf and South Atlantic do not mirror the trends for vessels.  For example, purchases of other IFQ landings in the Gulf by RG dealers increased significantly (over 41%)

---

[34] The estimates in this table are based on Accumulated Landings System (ALS) data, which tends to produce slightly different estimates of ex-vessel landings and value for RG due to waterbody code assignment issues in the Keys.

from 2014 through 2016. Further, purchases of non-IFQ species in the Gulf also increased by 11% during this time. These increases generally reflect increases in the commercial quotas for other species. Thus, even though purchases of RG were declining, the value of all the RG dealers' purchases increased. However, these trends did not continue after 2016 as purchases of other IFQ and non-IFQ species in the Gulf declined in addition to the continuing decline of RG purchases. Greater purchases of landings from the South Atlantic partially offset these declines, but the total value of the RG dealers' purchases declined by 17% from 2016 through 2018. Still, this decline is less than the decline in revenues experienced by RG vessels, reflecting the greater diversity in the purchasing portfolios of RG dealers, which in turn allowed them to be more flexible and adaptive to changes in the RG component of the GT-IFQ program. In combination with the decline in the number of RG dealers, the average value of purchases per RG dealer actually increased by 13% from 2014 through 2018, unlike the RG vessels which experienced a noticeable decline in their average total revenue per vessel during this time.

**Imports**

Imports of seafood products compete in the domestic seafood market and have in fact dominated many segments of the seafood market. Imports aid in determining the price for domestic seafood products and tend to set the price in the market segments in which they dominate. Seafood imports have downstream effects on the local fish market. At the harvest level for red grouper, imports affect the returns to fishermen through the ex-vessel prices they receive for their landings. As substitutes to domestic production of reef fish, imports tend to cushion the adverse economic effects on consumers resulting from a reduction in domestic landings. The following describes the imports of fish products which directly compete with domestic harvest of red grouper. All monetary estimates are in 2019 dollars.

Total imports of snapper increased significantly (36%) from 2014 through 2016, increasing from about 33 mp product weight (pw) to 45 mp pw during this time. However, snapper imports declined slightly thereafter to about 43 mp pw in 2018. Revenue from snapper imports followed a similar pattern, increasing from almost $105 million in 2014 to $136 million in 2016, but then falling to about $134 million in 2018. Although the average price per pound fluctuated somewhat between 2014 and 2016, moving inversely to volume, it generally vacillated around $3.05/lbs. Imports of fresh snapper increased steadily from 23.6 mp pw in 2014 to 31.2 mp pw in 2017, before declining slightly to 31.2 mp pw in 2018. Total revenue from fresh snapper imports increased from $78 million in 2014 to an all-time high of $98.5 million in 2018. The average price decreased from $3.32/lbs. to $3/lbs between 2014 and 2017 as volume increased, but rose to $3.21/lbs in 2018 when volume declined. Imports of fresh snappers primarily originated in Mexico, Panama, and Nicaragua, and entered the U.S. through the port of Miami. Imports of frozen snapper were substantially less than imports of fresh snapper from 2014 through 2018. Frozen snapper imports ranged from 9.3 mp pw worth $26.5 million in 2014 to 14.4 mp pw worth $40.2 million in 2018. The average price fluctuated around $2.85/lbs during this time. Imports of frozen snapper primarily originated in Brazil. The majority of frozen snapper imports entered the U.S. through the ports of Miami and New York.

Total imports of grouper increased significantly (64%) from 10.4 mp pw in 2014 to 17.1 mp pw in 2018. Total revenue from grouper imports also increased significantly (43%) from $42.3

million to $60.3 million during this time period.  Revenue from grouper imports did not increase as significantly as the volume due to a 15% decrease in the average price per pound of grouper imports.  Imports of frozen grouper were minimal from 2014 through 2016, decreasing from 1.75 mp pw in 2014 to only 0.81 mp pw in 2016.  However, frozen grouper imports increased significantly in 2018, up to 4.6 mp pw.  As a result, frozen grouper composed 27% of total grouper imports in 2018 compared to only 17% in 2014.  Further, the average price per pound of frozen imports decreased significantly, from $2.67/lbs to only $1.27/lbs between 2015 and 2018. Similarly, total revenue from frozen grouper decreased from $3.8 million to $1.5 million from 2014 to 2016, but then increased to $5.8 million in 2018.  The decline in the average price of frozen grouper in combination with frozen product making up a higher proportion of total imports explains why revenue from grouper imports, frozen and in total, did not increase as significantly as volume from 2014 through 2018.  The volume and revenue from fresh grouper imports also increased from 2014 through 2018, increasing from 8.6 mp pw and $38.5 million in 2014 to 12.5 mp pw and $54.5 million in 2018, respectively.  Average price was relatively stable at around $4.38/lbs.  Thus, the price premium attached to fresh grouper relative to frozen grouper is much greater than the premium attached to fresh snapper compared to frozen snapper.  The bulk of fresh and frozen grouper imports originated in Mexico and entered the U.S. through Miami and Tampa.

**Economic Impacts**

The commercial harvest and subsequent sales and consumption of fish generates business activity as fishermen expend funds to harvest the fish and consumers spend money on goods and services, such as red grouper purchased at a local fish market and served during restaurant visits. These expenditures spur additional business activity in the region(s) where the harvest and purchases are made, such as jobs in local fish markets, grocers, restaurants, and fishing supply establishments.  In the absence of the availability of a given species for purchase, consumers would spend their money on substitute goods and services.  As a result, the analysis presented below represents a distributional analysis only; that is, it only shows how economic impacts may be distributed through regional markets and should not be interpreted to represent the impacts if these species are not available for harvest or purchase.

In addition to these types of impacts, economic impact models can be used to determine the sources of the impacts.  Each impact can be broken down into direct, indirect, and induced economic impacts.  "Direct" economic impacts are the results of the money initially spent in the study area (e.g., country, region, state, or community) by the fishery or industry being studied. This includes money spent to pay for labor, supplies, raw materials, and operating expenses.  The direct economic impacts from the initial spending create additional activity in the local economy, i.e., "indirect" economic impacts.  Indirect economic impacts are the results of business-to-business transactions indirectly caused by the direct impacts.  For example, businesses initially benefiting from the direct impacts will subsequently increase spending at other local businesses. The indirect economic impact is a measure of this increase in business-to-business activity, excluding the initial round of spending which is included in the estimate of direct impacts. "Induced" economic impacts are the results of increased personal income caused by the direct and indirect economic impacts.  For example, businesses experiencing increased revenue from the direct and indirect impacts will subsequently increase spending on labor by hiring more

employees, increasing work hours, raising salaries/wage rates, etc.  In turn, households will increase spending at local businesses.  The induced impact is a measure of this increase in household-to-business activity.

**Table 3.4.1.24.**  Average annual economic impacts of red grouper in the commercial sector of the Gulf reef fish fishery.  All monetary estimates are in thousands of 2018 dollars[35] and employment is measured in full-time equivalent jobs.

| Harvesters | Direct | Indirect | Induced | Total |
|---|---|---|---|---|
| Employment impacts | 382 | 59 | 79 | 520 |
| Income impacts | $9,241 | $1,716 | $4,149 | $15,106 |
| Total value-added impacts | $9,850 | $6,177 | $7,099 | $23,126 |
| Output Impacts | $17,116 | $13,925 | $13,781 | $44,822 |
| **Primary dealers/processors** | Direct | Indirect | Induced | Total |
| Employment impacts | 80 | 32 | 55 | 167 |
| Income impacts | $3,015 | $2,779 | $2,628 | $8,422 |
| Total value-added impacts | $3,214 | $3,546 | $4,948 | $11,708 |
| Output impacts | $9,705 | $7,310 | $9,672 | $26,687 |
| **Secondary wholesalers/distributors** | Direct | Indirect | Induced | Total |
| Employment impacts | 37 | 8 | 36 | 81 |
| Income impacts | $1,796 | $534 | $1,889 | $4,220 |
| Total value-added impacts | $1,915 | $896 | $3,227 | $6,038 |
| Output impacts | $4,811 | $1,754 | $6,276 | $12,841 |
| **Grocers** | Direct | Indirect | Induced | Total |
| Employment impacts | 158 | 18 | 35 | 211 |
| Income impacts | $3,695 | $1,228 | $1,855 | $6,777 |
| Total value-added impacts | $3,939 | $1,978 | $3,140 | $9,057 |
| Output impacts | $6,315 | $3,213 | $6,164 | $15,693 |
| **Restaurants** | Direct | Indirect | Induced | Total |
| Employment impacts | 986 | 66 | 161 | 1,213 |
| Income impacts | $14,822 | $4,495 | $8,490 | $27,808 |
| Total value-added impacts | $15,800 | $8,036 | $14,305 | $38,141 |
| Output impacts | $28,890 | $12,574 | $28,228 | $69,693 |
| **Harvesters and seafood industry** | Direct | Indirect | Induced | Total |
| Employment impacts | 1,643 | 183 | 366 | 2,191 |
| Income impacts | $32,570 | $10,752 | $19,011 | $62,333 |
| Total value-added impacts | $34,718 | $20,632 | $32,719 | $88,069 |
| Output impacts | $66,837 | $38,777 | $64,121 | $169,735 |

Estimates of the U.S. average annual business activity associated with the commercial harvest of red grouper in the Gulf were derived using the model developed for and applied in NMFS (2018)[36] and are provided in Table 3.4.1.24.  Specifically, these impact estimates reflect the expected impacts from average annual gross revenues generated by landings of Gulf red grouper from 2014 through 2018.  This business activity is characterized as jobs (full- and part-time),

---

[35] The commercial economic impact model has not been updated yet to produce estimates in 2019$.

[36] A detailed description of the input/output model is provided in NMFS (2011).

income impacts (wages, salaries, and self-employed income), value-added impacts (the difference between the value of goods and the cost of materials or supplies), and output impacts (gross business sales). Income impacts should not be added to output (sales) impacts because this would result in double counting.

The results provided should be interpreted with caution and demonstrate the limitations of these types of assessments. These results are based on average relationships developed through the analysis of many fishing operations that harvest many different species; specifically reef fish in this case. Separate models for individual species such as red grouper are not available. Between 2014 and 2018, landings of Gulf red grouper resulted in approximately $17.12 million (2018$) in gross revenue on average. In turn, this revenue generated employment, income, value-added, and output impacts of 2,191 jobs, $62.3 million, $88.1 million, and $169.7 million per year, respectively, on average.

### 3.4.2  Recreational Sector

The Gulf recreational sector is comprised of the private and for-hire modes. The private mode includes anglers fishing from shore (all land-based structures) and private/rental boats. The for-hire mode is composed of charter boats and headboats (also called party boats). Charter boats generally carry fewer passengers and charge a fee on an entire vessel basis, whereas headboats carry more passengers and payment is per person. The type of service, from a vessel- or passenger-size perspective, affects the flexibility to search different fishing locations during the course of a trip and target different species since larger concentrations of fish are required to satisfy larger groups of anglers.

**Landings**

Private vessels accounted for the majority of red grouper landings on average (2014 through 2018), followed by charter vessels and headboats, with no recorded landings from shore (Table 3.4.2.1). Charter vessels were responsible for an increasingly higher percentage of red grouper landings during this period, accounting for only 11% of the landings in 2014 but 20% and 18% of the landings in 2017 and 2018, respectively. Although not shown in the table, approximately 99.7% of red grouper landings on average were recorded in the state of Florida.[37] As a result, landings in some states may be confidential and landings by state and mode outside of Florida are confidential in most instances. Therefore, landings by state or by state and mode are not presented.

Landings in the recreational sector largely mirror the downward trend seen in the commercial sector from 2014-2018, with the exception of a relatively small increase (21%) in 2018. However, landings in 2018 were still 62% below their level in 2014, which is very similar to the reduction in the commercial sector. Significant reductions were experienced in all modes, though the largest reduction in absolute and percentage terms was in the private angling mode (65%). A portion of the decrease in landings over this time is due to the reduction in the bag

---

[37] Prior to 2013, Northwest Florida and Alabama headboat landings were reported together so it is not possible to disaggregate them.

limit from four fish to two fish per person per day in May 2015, but the at least some of the decrease is likely due to the declining health of the stock.

**Table 3.4.2.1**. Recreational landings (lbs gw) and percent distribution of red grouper across all states by mode for 2014-2018.

| | Landings (pounds gw) | | | | | Percent Distribution | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **Charter vessel** | **Headboat** | **Private** | **Shore** | **Total** | **Charter vessel** | **Headboat** | **Private** | **Shore** |
| **2014** | 586,714 | 45,107 | 4,737,128 | 0 | 5,368,949 | 11% | 1% | 88% | 0% |
| **2015** | 500,305 | 50,621 | 3,239,928 | 0 | 3,790,853 | 13% | 1% | 85% | 0% |
| **2016** | 406,088 | 56,851 | 2,169,801 | 0 | 2,632,740 | 15% | 2% | 82% | 0% |
| **2017** | 342,871 | 21,423 | 1,328,134 | 0 | 1,692,428 | 20% | 1% | 78% | 0% |
| **2018** | 362,101 | 22,310 | 1,669,115 | 0 | 2,053,526 | 18% | 1% | 81% | 0% |
| **AVG** | **439,616** | **39,262** | **2,628,821** | **0** | **3,107,699** | **14%** | **1%** | **85%** | **0%** |

Source: Southeast Fisheries Science Center MRIP-FES recreational ACL dataset (1/2/2020) and LA Creel.

**Angler Effort**

Recreational effort derived from the MRIP database can be characterized in terms of the number of angler trips as follows:

- Target effort - The number of individual angler trips, regardless of duration, where the intercepted angler indicated that the species or a species in the species group was targeted as either the first or the second primary target for the trip.  The species did not have to be caught.
- Catch effort - The number of individual angler trips, regardless of duration and target intent, where the individual species or a species in the species group was caught.  The fish did not have to be kept.
- Total recreational trips - The total estimated number of recreational trips in the Gulf, regardless of target intent or catch success.

Other measures of effort are possible, such as directed trips (the number of individual angler trips that either targeted or caught a particular species).  All of the estimated target trips and almost all of the estimated catch trips for Gulf red grouper occurred in Florida from 2014 through 2018 (Table 3.4.2.2 and Table 3.4.2.3).  The majority of estimated target and catch effort came from the private angling mode.  Although there were a small number of red grouper target and catch trips estimated for the shore mode, there were no actual landings reported from 2014 through 2018, suggesting only discards were encountered.  The trend in total target effort was very similar to the trend in total landings, decreasing by 44% from 2014 through 2018.  However, target effort in the charter mode only fell by about 13%.  Catch effort also consistently decreased in total and by mode from 2014 through 2016, but increased in the private angling mode in 2017 and 2018.  Thus, the reduction in catch effort was relatively less (21%) from 2014 through 2018, though catch effort in the charter mode fell by 36%.  Estimates of red grouper target or catch

effort for additional years, and other measures of directed effort, are available on the NOAA website.[38]

**Table 3.4.2.2.**  Number of red grouper recreational target trips, by mode and state, 2014-2018.*

| Mode | Year | Alabama | Florida | Total |
|---|---|---|---|---|
| **Shore** | 2014 | 0 | 79,563 | 79,563 |
| | 2015 | 0 | 0 | 0 |
| | 2016 | 0 | 22,513 | 22,513 |
| | 2017 | 0 | 0 | 0 |
| | 2018 | 0 | 44,346 | 44,346 |
| | Average | 0 | 29,284 | 29,284 |
| | | | | |
| **Charter** | 2014 | 0 | 40,144 | 40,144 |
| | 2015 | 0 | 44,460 | 44,460 |
| | 2016 | 0 | 51,275 | 51,275 |
| | 2017 | 0 | 33,915 | 33,915 |
| | 2018 | 0 | 34,797 | 34,797 |
| | Average | 0 | 40,918 | 40,918 |
| | | | | |
| **Private** | 2014 | 0 | 703,390 | 703,390 |
| | 2015 | 0 | 493,326 | 493,326 |
| | 2016 | 0 | 443,244 | 443,244 |
| | 2017 | 1,470 | 281,783 | 283,253 |
| | 2018 | 0 | 380,124 | 380,124 |
| | Average | 294 | 460,373 | 460,677 |
| | | | | |
| **All** | 2014 | 0 | 823,098 | 823,098 |
| | 2015 | 0 | 537,786 | 537,786 |
| | 2016 | 0 | 517,032 | 517,032 |
| | 2017 | 1,470 | 315,699 | 317,169 |
| | 2018 | 0 | 459,267 | 459,267 |
| | Average | 294 | 530,576 | 530,870 |

Source: MRIP Survey Data available at https://www.fisheries.noaa.gov/recreational-fishing-data/recreational-fishing-data-downloads.
* Headboat information is unavailable.  Louisiana effort estimates are not currently available.  However, landings were negligible and thus target effort is likely zero.  No target effort occurred in Mississippi or Texas.

---

[38] https://www.st.nmfs.noaa.gov/recreational-fisheries/data-and-documentation/queries/index

**Table 3.4.2.3.** Number of red grouper recreational catch trips, by mode and state, 2014-2018.*

| Mode | Year | Alabama | Florida | Total |
|------|------|---------|---------|-------|
| **Shore** | 2014 | 0 | 12,246 | 12,246 |
| | 2015 | 0 | 33,439 | 33,439 |
| | 2016 | 0 | 18,563 | 18,563 |
| | 2017 | 0 | 38,470 | 38,470 |
| | 2018 | 0 | 15,177 | 15,177 |
| | Average | 0 | 23,579 | 23,579 |
| | | | | |
| **Charter** | 2014 | 124 | 134,904 | 135,028 |
| | 2015 | 2,083 | 125,388 | 127,471 |
| | 2016 | 2,053 | 141,114 | 143,167 |
| | 2017 | 1,762 | 102,737 | 104,499 |
| | 2018 | 187 | 86,800 | 86,987 |
| | Average | 1,242 | 118,189 | 119,430 |
| | | | | |
| **Private** | 2014 | 5,182 | 1,201,577 | 1,206,759 |
| | 2015 | 2,169 | 894,001 | 896,170 |
| | 2016 | 0 | 751,858 | 751,858 |
| | 2017 | 3,666 | 754,646 | 758,312 |
| | 2018 | 7,723 | 957,299 | 965,022 |
| | Average | 3,748 | 911,876 | 915,624 |
| | | | | |
| **All** | 2014 | 5,306 | 1,348,727 | 1,354,033 |
| | 2015 | 4,252 | 1,052,828 | 1,057,080 |
| | 2016 | 2,053 | 911,535 | 913,588 |
| | 2017 | 5,428 | 895,853 | 901,281 |
| | 2018 | 7,910 | 1,059,276 | 1,067,186 |
| | Average | 4,990 | 1,025,421 | 1,058,625 |

Source: MRIP Survey Data available at https://www.fisheries.noaa.gov/recreational-fishing-data/recreational-fishing-data-downloads.
* Headboat information is unavailable.  Louisiana effort estimates are not currently available.  However, landings were negligible and thus catch effort is likely negligible.  No catch effort occurred in Mississippi or Texas.

As shown in tables 2.4.2.4 and 2.4.2.5, across all modes, target and catch effort was the highest in the 4th (July-Aug) and 3rd (May-June) waves.  Target effort is the lowest in wave 6 (Nov-Dec) and wave 5 (Sept-Oct) while catch effort is the lowest in wave 1 (Jan-Feb) across all modes.  For the private mode, target effort was highest in wave 4 and lowest in wave 1.  For the charter mode, target effort was highest in wave 3 and lowest in wave 1.

**Table 3.4.2.4**.  Red grouper target trips by wave and mode, 2014 – 2018.*

| | 1 (Jan-Feb) | 2 (Mar-Apr) | 3 (May-Jun) | 4 (Jul-Aug) | 5 (Sep-Oct) | 6 (Nov Dec) | Total |
|---|---|---|---|---|---|---|---|
| | | | | **Shore** | | | |
| **2014** | 0 | 32,901 | 8,659 | 38,003 | 0 | 0 | 79,563 |
| **2015** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **2016** | 0 | 0 | 0 | 0 | 0 | 22,513 | 22,513 |
| **2017** | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **2018** | 0 | 0 | 0 | 44,346 | 0 | 0 | 44,346 |
| **Average** | 0 | 6,580 | 1,732 | 16,470 | 0 | 4,503 | 29,285 |
| | | | | **Charter** | | | |
| **2014** | 6,266 | 5,440 | 8,317 | 9,776 | 9,607 | 736 | 40,144 |
| **2015** | 6,926 | 10,765 | 14,007 | 10,016 | 2,277 | 469 | 44,460 |
| **2016** | 11,488 | 7,134 | 15,384 | 7,302 | 3,329 | 6,639 | 51,275 |
| **2017** | 5,826 | 3,155 | 9,327 | 8,646 | 1,615 | 5,345 | 33,915 |
| **2018** | 6,529 | 3,783 | 17,217 | 1,907 | 2,957 | 2,404 | 34,797 |
| **Average** | 7,407 | 6,055 | 12,850 | 7,530 | 3,957 | 3,119 | 40,918 |
| | | | | **Private/Rental** | | | |
| **2014** | 40,458 | 68,852 | 155,561 | 342,796 | 52,558 | 43,165 | 703,390 |
| **2015** | 73,196 | 47,748 | 135,343 | 181,621 | 40,374 | 15,044 | 493,326 |
| **2016** | 78,235 | 54,576 | 89,379 | 101,146 | 72,121 | 47,787 | 443,244 |
| **2017** | 15,120 | 33,740 | 59,038 | 86,551 | 30,233 | 58,570 | 283,253 |
| **2018** | 39,119 | 67,214 | 70,317 | 98,735 | 50,903 | 53,837 | 380,124 |
| **Average** | 49,226 | 54,426 | 101,928 | 162,170 | 49,238 | 43,681 | 460,668 |
| | | | | **All** | | | |
| **2014** | 46,725 | 107,193 | 172,538 | 390,575 | 62,166 | 43,901 | 823,098 |
| **2015** | 80,122 | 58,513 | 149,350 | 191,637 | 42,651 | 15,513 | 537,786 |
| **2016** | 89,722 | 61,710 | 104,763 | 108,448 | 75,450 | 76,939 | 517,032 |
| **2017** | 20,947 | 36,895 | 68,366 | 95,198 | 31,848 | 63,915 | 317,169 |
| **2018** | 45,648 | 70,996 | 87,535 | 144,988 | 53,859 | 56,241 | 459,267 |
| **Average** | 56,633 | 67,062 | 116,510 | 186,169 | 53,195 | 51,302 | 530,870 |

Source: MRIP Survey Data available at https://www.fisheries.noaa.gov/recreational-fishing-data/recreational-fishing-data-downloads

* Texas and headboat information unavailable. Louisiana effort estimates are not currently available.  However, landings were negligible and thus target effort is likely zero.

**Table 3.4.2.5**.  Red grouper catch trips by wave and mode, 2014 – 2018.*

| | 1 (Jan-Feb) | 2 (Mar-Apr) | 3 (May-Jun) | 4 (Jul-Aug) | 5 (Sep-Oct) | 6 (Nov Dec) | Total |
|---|---|---|---|---|---|---|---|
| **Shore** | | | | | | | |
| 2014 | 0 | 2,585 | 0 | 0 | 0 | 9,661 | 12,246 |
| 2015 | 0 | 24,580 | 5,230 | 0 | 3,629 | 0 | 33,439 |
| 2016 | 0 | 0 | 16,658 | 0 | 1,906 | 0 | 18,563 |
| 2017 | 0 | 4,921 | 0 | 26,137 | 0 | 7,806 | 38,865 |
| 2018 | 0 | 15,177 | 0 | 0 | 0 | 0 | 15,177 |
| Average | 0 | 9,453 | 4,378 | 5,227 | 1,107 | 3,493 | 23,658 |
| **Charter** | | | | | | | |
| 2014 | 15,529 | 23,143 | 36,296 | 37,648 | 13,643 | 8,769 | 135,028 |
| 2015 | 10,565 | 37,494 | 36,151 | 28,297 | 8,560 | 6,405 | 127,471 |
| 2016 | 22,832 | 19,559 | 51,443 | 26,243 | 11,157 | 11,934 | 143,168 |
| 2017 | 22,274 | 12,394 | 24,913 | 17,482 | 5,243 | 22,193 | 104,499 |
| 2018 | 18,346 | 11,500 | 39,557 | 8,645 | 3,223 | 5,717 | 86,987 |
| Average | 17,909 | 20,818 | 37,672 | 23,663 | 8,365 | 11,004 | 119,431 |
| **Private/Rental** | | | | | | | |
| 2014 | 44,011 | 181,549 | 215,978 | 519,085 | 72,589 | 173,548 | 1,206,760 |
| 2015 | 93,354 | 75,375 | 178,400 | 272,836 | 142,895 | 133,309 | 896,170 |
| 2016 | 91,774 | 57,198 | 199,822 | 212,818 | 88,587 | 101,660 | 751,858 |
| 2017 | 48,708 | 84,566 | 222,760 | 157,890 | 45,657 | 198,293 | 757,874 |
| 2018 | 73,295 | 129,137 | 278,331 | 233,233 | 178,261 | 72,764 | 965,022 |
| Average | 70,228 | 105,565 | 219,058 | 279,172 | 105,598 | 135,915 | 915,537 |
| **All** | | | | | | | |
| 2014 | 59,540 | 207,277 | 252,274 | 556,733 | 86,232 | 191,978 | 1,354,034 |
| 2015 | 103,919 | 137,449 | 219,781 | 301,133 | 155,084 | 139,714 | 1,057,080 |
| 2016 | 114,606 | 76,757 | 267,923 | 239,061 | 101,650 | 113,594 | 913,589 |
| 2017 | 70,982 | 101,881 | 247,673 | 201,509 | 50,900 | 228,292 | 901,238 |
| 2018 | 91,641 | 155,814 | 317,888 | 241,878 | 181,484 | 78,481 | 1,067,186 |
| Average | 88,138 | 135,836 | 261,108 | 308,063 | 115,070 | 150,412 | 1,058,625 |

Source: MRIP Survey Data available at https://www.fisheries.noaa.gov/recreational-fishing-data/recreational-fishing-data-downloads

* Texas and headboat information unavailable. LA effort estimates are not currently available.  However, landings were negligible and thus catch effort is likely negligible.  No catch effort occurred in Mississippi or Texas.

Similar analysis of recreational effort is not possible for the headboat mode because headboat data are not collected at the angler level.  Estimates of effort by the headboat mode are provided in terms of angler days, or the number of standardized 12-hour fishing days that account for the different half-, three-quarter-, and full-day fishing trips by headboats.  The stationary "fishing for

demersal (bottom-dwelling) species" nature of headboat fishing, as opposed to trolling, suggests that most, if not all, headboat trips and, hence, angler days, are demersal or reef fish trips by intent.

Headboat angler days were fairly stable across the Gulf states from 2014 through 2018 (Table 3.4.2.6). There was, however, a noticeable peak in reported angler days in Florida in 2016 and modest fluctuations elsewhere. On average (2014 through 2018), Florida accounted for the majority of headboat angler days reported, followed by Texas and Alabama; whereas, Mississippi and Louisiana combined accounted for only a small percentage.

**Table 3.4.2.6**. Gulf headboat angler days and percent distribution by state (2014-2018).

| | Angler Days | | | | Percent Distribution | | | |
|---|---|---|---|---|---|---|---|---|
| | **FL** | **AL** | **MS-LA**\*\* | **TX** | **FL** | **AL** | **MS-LA** | **TX** |
| **2014** | 174,599 | 16,766 | 3,257 | 51,231 | 71.0% | 6.8% | 1.3% | 20.8% |
| **2015** | 176,375 | 18,008 | 3,587 | 55,135 | 69.7% | 7.1% | 1.4% | 21.8% |
| **2016** | 183,147 | 16,831 | 2,955 | 54,083 | 71.3% | 6.5% | 1.1% | 21.0% |
| **2017** | 178,816 | 17,841 | 3,189 | 51,575 | 71.1% | 7.1% | 1.3% | 20.5% |
| **2018** | 171,996 | 19,851 | 3,235 | 52,160 | 69.6% | 8.0% | 1.3% | 21.1% |
| **Average** | 176,987 | 17,859 | 3,245 | 52,837 | 70.5% | 7.1% | 1.3% | 21.1% |

Source: NMFS SRHS.
\*\*Headboat data from Mississippi and Louisiana are combined for confidentiality purposes.

**Permits**

There are no specific federal permitting requirements for recreational anglers to fish for or harvest reef fish, including red grouper. Instead, private anglers are required to possess either a state recreational fishing permit that authorizes saltwater fishing in general, or be registered in the federal National Saltwater Angler Registry system, subject to appropriate exemptions. As a result, it is not possible to identify with available data how many individual anglers would be expected to be affected by the actions in this amendment.

A federal charter/headboat (for-hire) vessel permit is required for fishing in federal waters for Gulf reef fish. Gulf reef fish for-hire permits are limited access permits. From a historical perspective, the number of permits that were valid in a given year has continually decreased over the past several years, as illustrated in Table 3.4.2.5. However, the rate of attrition with for-hire reef fish permits has been relatively slow and far less compared to commercial reef fish permits.

As of February 27, 2020, there were 1,270 valid or renewable for-hire reef fish permits, 1,179 of which were valid. A renewable permit is an expired limited access permit that cannot be actively fished, but is renewable for up to one year after expiration.

Although the for-hire permit application collects information on the primary method of operation,[39] the permit itself does not identify the permitted vessel as either a headboat or a charter vessel and vessels may operate in both capacities.  However, if a vessel meets the selection criteria used by the SRHS and is selected to report by the Science Research Director of the SEFSC, it is determined to operate primarily as a headboat and is required to submit harvest and effort information to the SRHS.

**Table 3.4.2.7.**  Number of valid or renewable for-hire Gulf reef fish permits, 2008-2019.

| Year | Number of Permits |
|------|-------------------|
| **2008** | 1,458 |
| **2009** | 1,417 |
| **2010** | 1,385 |
| **2011** | 1,353 |
| **2012** | 1,336 |
| **2013** | 1,323 |
| **2014** | 1,310 |
| **2015** | 1,294 |
| **2016** | 1,282 |
| **2017** | 1,280 |
| **2018** | 1,279 |
| **2019** | 1,277 |

Source:  NMFS SERO SF Access Permits Database.

The number of federally permitted Gulf headboats in the SRHS ranged from 68 in 2014 and 2015 to 72 in 2018 (K. Fitzpatrick, NMFS SEFSC, pers. comm.).  Souza and Liese (2019) estimate that approximately 10% of all permitted Southeast (Gulf and South Atlantic) for-hire vessels determined to be headboats were not actively fishing in 2017.[40]  Further, of those that were active, 14% were not active in offshore waters.  Thus, approximately 23% of the permitted Southeast headboats were likely not active in the EEZ.  With respect to permitted Gulf charter vessels, they estimate that 24% were not active in 2017, while 10% of those that were active were not active in offshore waters.  Thus, approximately 34% of the permitted Gulf charter vessels were likely not active in the EEZ in 2017.

Information on Gulf charter vessel and headboat operating characteristics is included in Savolainen et al. (2012) and is incorporated herein by reference.  The average charter vessel operation took 46 full-day (9 hours) and 55 half-day (5 hours) trips per year, carried 4.8 and 4.6 passengers per trip type, respectively, targeted reef fish species on 64% of all trips, and took 68% of all trips in the EEZ.  The average headboat operation took 83 full-day (10 hours) and 37 half-day (6 hours) trips per year, carried 13.1 and 14.6 passengers per trip type, respectively, targeted reef fish species on 84% of all trips, and took 81% of all trips in the EEZ.

---

[39] In 2019, of the 1,277 vessels with valid for-hire permits, 90 were primarily used for commercial fihsish, 83 were primarily used as headboats, and 1,104 were primarily used as charter vessels.
[40] Sample sizes were too small to generate reliable estimates for Gulf and South Atlantic headboats separately.

**Economic Value**

Participation, effort, and harvest are indicators of the value of saltwater recreational fishing. However, a more specific indicator of value is the satisfaction that anglers experience over and above their costs of fishing. The economic value of this satisfaction is referred to as consumer surplus (CS).  The value or benefit derived from the recreational experience is dependent on several quality determinants, which include fish size, catch success rate, and the number of fish kept.  These variables help determine the value of a fishing trip and influence total demand for recreational fishing trips. For example, the estimated value of the CS for catching and keeping a second red snapper[41] on an angler trip is approximately \$85 (2019\$), and decreases thereafter (approximately \$57 for a third red snapper, \$42 for a fourth red snapper, and \$34 for a fifth red snapper) (Carter and Liese 2012).  In comparison, the estimated value of the CS for catching and keeping a grouper is approximately \$110 for the second fish, \$73 for the third fish, \$54 for the fourth fish, and \$43 for the fifth fish (Carter and Liese 2012).

Estimates of average annual gross revenue for charter vessels in 2009 are provided in Savolainen, et al. (2012).  According to Savolainen, et al. (2012), the average annual gross revenue for a Gulf headboat is \$271,794 while the average annual gross revenue for a Gulf charter vessel is \$89,670 (2019\$).  More recent estimates of average annual gross revenue for Gulf headboats are provided in Abbott and Willard (2017) and D. Carter (pers. comm., March 15, 2018.  Abbott and Willard (2017) suggest that Savolainen, et al.'s estimate of average annual gross revenue for headboats may be an underestimate as data in the former suggest that average gross revenue in 2009 for the vessels in their sample was about \$480,000 (2019\$).  Further, their data suggests average annual gross revenue per vessel had increased to about \$580,000 (2019\$) by 2014.  However, Abbott and Willard's estimates are based on a sample of 17 headboats that chose to participate in the Headboat Collaborative Program in 2014 while Savolainen, et al.'s are based on a random sample of 20 headboats.  The headboats that participated in the Collaborative may be economic highliners, in which case Abbott and Willard's estimates would overestimate average annual gross revenue for Gulf headboats.  D. Carter (2018) recently estimated that average annual gross revenue for Gulf headboats was approximately \$427,600 (2019\$) in 2017, while the maximum gross revenue for a single headboat was about \$1.38 million.  This estimate is likely the best current estimate of annual gross revenue for Gulf headboats as it is based on a relatively large sample of 63 boats, or more than 90% of the active fleet, and is more recent.

However, gross revenues overstate the annual economic value and profits generated by for-hire vessels.  Economic value for for-hire vessels can be measured by annual producer surplus (PS). In general, PS is the amount of money a vessel owner earns in excess of variable (trip) costs. Economic profit is the amount of money a vessel owner earns in excess of variable and fixed costs, inclusive of all implicit costs, such as the value of a vessel owner's time as captain and as entrepreneur, and the cost of using physical capital (i.e., depreciation of the vessel and gear).  In 2019\$, Savolainen, et al. (2012) estimated the annual PS for Gulf headboats and charter vessels was approximately \$190,167 and \$58,990, respectively.  Their best estimates of economic profit

---

[41] The study only considered trips with at least one fish caught and kept in its experimental design; thus, an estimate for the first caught and kept fish is not available.

were $79,340 and $26,514 (2019$), respectively.[42] Estimates of PS and economic profit for headboats is not available from Abbott and Willard (2017) or D. Carter (2018) as they did not collect comprehensive cost data at the vessel level.[43]

With regard to for-hire trips, economic value can be measured by PS per angler trip, which represents the amount of money that a vessel owner earns in excess of the cost of providing the trip. Estimates of revenue, costs, and trip net revenue trips taken by headboats and charter vessels in 2017 are available from Souza and Liese (2019). They also provide estimates of trip net cash flow per angler trip, which are approximates of PS per angler trip. As shown in Table 3.4.2.5, after accounting for transactions fees, supply costs, and labor costs, net revenue per trip was 42% of revenue for Gulf charter vessels and 54% of revenue for Southeast headboats, or $780 and $1,812 (2019$), respectively. Given the respective average number of anglers per trip for each fleet, PS per trip is estimated to be $141 for charter vessels and $64 for headboats.

**Table 3.4.2.8.** Trip economics for offshore trips by Gulf charter vessels and Southeast headboats in 2017 (2019$).

|  | **Gulf Charter Vessels** | **Southeast Headboats** |
|---|---|---|
| **Revenue** | 100% | 100% |
| **Transaction Fees (% of revenue)** | 3% | 6% |
| **Supply Costs (% of revenue)** | 27% | 19% |
| **Labor Costs (% of revenue)** | 27% | 22% |
| **Net Revenue per trip including Labor costs (% of revenue)** | 42% | 54% |
| **Net Revenue per Trip** | $780 | $1,812 |
| **Average # of Anglers per Trip** | 5.5 | 28.2 |
| **Trip Net Cash Flow per Angler Trip** | $141 | $64 |

**Economic Impacts**

The desire for recreational fishing generates economic activity as consumers spend their income on various goods and services needed for recreational fishing. This spurs economic activity in the region where recreational fishing occurs. In the absence of the opportunity to fish, the income would likely be spent on other goods and services and these expenditures would similarly generate economic activity in the region where the expenditure occurs. As such, the analysis below represents a distributional analysis only.

Estimates of the economic impacts (business activity) associated with recreational angling for Gulf reef fish were calculated using average trip-level impact coefficients derived from the 2016 Fisheries Economics of the U.S. report (NMFS 2018b) and underlying data provided by the NOAA Office of Science and Technology. Economic impact estimates were adjusted to 2018

---

[42] Although Savolainen, et al. (2012) account for all explicit variable and fixed costs, they do not account for implicit costs, and thus they over-estimate actual economic profits for these vessels.
[43] Abbott and Willard (2017) do report revenue net of fuel costs, but this ignores important costs such as processing fees, commissions, ice, bait, tackle, and labor.

dollars using the annual, not seasonally adjusted gross domestic product implicit price deflator provided by the U.S. Bureau of Economic Analysis.[44]

Recreational fishing generates economic impacts (business activity).  Business activity for the recreational sector is characterized in the form of jobs (full- and part-time), income impacts (wages, salaries, and self-employed income), value-added impacts (the difference between the value of goods and the cost of materials or supplies), and output impacts (gross business sales). Estimates of the average red grouper target effort by mode and state (2014 through 2018) and the associated business activity are provided in Table 3.4.2.9.

**Table 3.4.2.9.**  Estimated economic impacts from average annual Gulf red grouper recreational target trips by state and mode (2014-2018), using state-level multipliers.  All monetary estimates are in thousands of 2018$ and employment is in full-time equivalent jobs.*

| Mode | | FL | AL |
|---|---|---|---|
| **Shore** | Target Trips | 29,284 | 0 |
| | Value Added Impacts | $1,040 | $0 |
| | Sales Impacts | $1,625 | $0 |
| | Income Impacts | $548 | $0 |
| | Employment (Jobs) | 15 | 0 |
| **Charter** | Target Trips | 40,918 | 0 |
| | Value Added Impacts | $13,879 | $0 |
| | Sales Impacts | $23,307 | $0 |
| | Income Impacts | $8,111 | $0 |
| | Employment (Jobs) | 221 | 0 |
| **Private** | Target Trips | 460,373 | 294 |
| | Value Added Impacts | $16,091 | $13 |
| | Sales Impacts | $24,940 | $20 |
| | Income Impacts | $8,443 | $5 |
| | Employment (Jobs) | 235 | 0 |
| **All** | Target Trips | 530,576 | 294 |
| | Value Added Impacts | $31,010 | $13 |
| | Sales Impacts | $49,872 | $20 |
| | Income Impacts | $17,102 | $5 |
| | Employment (Jobs) | 472 | 0 |

Source: MRIP Survey Data available at https://www.fisheries.noaa.gov/recreational-fishing-data/recreational-fishing-data-downloads.
* Headboat information is unavailable.  LA effort estimates are not currently available.  However, landings were negligible and thus target effort is likely zero.  No target effort occurred in Mississippi or Texas.

The estimates provided in Table 3.4.2.9 use state-level multipliers and thus only apply at the state-level.  For example, estimates of business activity in Florida represent business activity in

---

[44] The recreational economic impact model has not yet been updated to generate estimates in 2019$.

Florida only and not to other states (for e.g., a good purchased in Florida may have been manufactured in a neighboring state) or the nation as a whole. The same holds true for each of the other states. Income impacts should not be added to output (sales) impacts because this would result in double counting. The results provided should be interpreted with caution and demonstrate the limitations of these types of assessments. These results are based on average relationships developed through the analysis of many fishing operations that harvest many different species.

Addition of the state-level estimates to produce a regional (or national) total may underestimate the actual amount of total business activity because state-level impact multipliers do not account for interstate and interregional trading. National-level multipliers must be used to account for interstate and interregional trading. Between 2014 and 2018, and using national-level multipliers, red grouper target effort generated employment, income, value-added, and output (sales) impacts of 570 jobs, $27 million, $47.7 million, and $83.9 billion per year, respectively, on average. These estimates are considerably less than the economic impacts in GMFMC (2016) based on target effort from 2011-2015, which reflects the significant decline in red grouper target effort after 2015.

Estimates of the economic impacts resulting from headboat target effort for reef fish are not available. Headboat vessels are not covered in MRIP so, in addition to the absence of estimates of target effort, estimates of the appropriate business activity coefficients for headboat effort have not been generated.

## 3.5  Description of the Social Environment

This section provides community background and current descriptions of red grouper fishing for which the proposed actions will be evaluated in Chapter 4. The following description focuses on both the commercial and recreational sector fishing communities that can be identified as having some relationship to the red grouper fishery. Recent amendments, Reef Fish Amendment 36A (GMFMC 2017b) and the Framework Action to Adjust Red Grouper Allowable Harvest (2016), include additional detailed descriptions of both sectors.

### 3.5.1  Commercial Sector

As mentioned earlier, red grouper is one species in a multispecies IFQ program established through Amendment 29 to the reef fish management plan (GMFMC 2008a) which means that commercial red grouper is required to be landed through IFQ dealers only. The commercial fishing community description is predicated on landings by vessel homeport which provide one perspective on the importance of the species within a community. As mentioned, information on commercial fishing communities was included in the Reef Fish Amendment 36A (GMFMC 2017b) that includes community demographics and discussions of historic participation with the red grouper component of the reef fish fishery.

Another important factor in the harvest of commercial red grouper is the longline endorsement (Reef Fish Amendment 31, 2010) which requires reef fish BLL fishing to be restricted to outside

the 35-fathom depth contour from June – August without an endorsement. Some vessels switched gear types to use bandit reels to fish within the restricted area while others either sought to purchase the limited access endorsements or fished further offshore (see GMFMC 2010a for discussion of impacts).  Since most red grouper is harvested off the west coast of Florida, the majority of communities that are involved in the fishery are located there and will be discussed in the following description of the commercial sector.

Another recent factor that has affected red grouper harvest are the red tide events that have occurred over the past few years, with red tide affecting the Middle Grounds in 2015 and Southwest Florida in 2018.  According to interviews conducted with fishermen (Karnauskas et al., 2019) red tide events seemed shorter and patchier in their appearance from year to year in the past.  More recently these events seem to be more widespread and occur for longer periods of time.  These events seem to affect red grouper more than other species and have forced fishermen to change fishing behavior by switching to other species or changing their fishing location.

**Vessels**

As mentioned earlier, the majority of red grouper landings are along the west coast of Florida. That is reflected in Table 3.5.1.1 where the top ten counties with vessels having red grouper landings in 2018 are all in Florida.  Pinellas County has the most vessels with landings, while Bay County is second with less than half the number of vessels in Pinellas.  Lee County is third, with Franklin County fourth, followed by Manatee County.

**Table 3.5.1.1.**  Number of vessels landing red grouper by top 10 county homeports.

| State | County | Vessels |
|-------|--------|---------|
| FL | Pinellas | 94 |
| FL | Bay | 43 |
| FL | Lee | 28 |
| FL | Franklin | 21 |
| FL | Manatee | 17 |
| FL | Monroe | 16 |
| FL | Okaloosa | 14 |
| FL | Wakulla | 13 |
| FL | Citrus | 10 |
| FL | Collier | 9 |

Source:  IFQ database accessed 2/20/2020 NOAA Fisheries, NMFS, SERO.

The number of vessels with red grouper landings by community (Figure 3.5.1.2) shows that Panama City has the most vessels, with Madeira Beach second.  Tarpon Springs is third, with Apalachicola fourth, and Key West follows within the top five communities.

**Table 3.5.1.2.** Number of vessels landing red grouper by top 10 community homeports.

| State | Community | Vessels |
|-------|-----------|--------:|
| FL | Panama City | 37 |
| FL | Madeira Beach | 23 |
| FL | Tarpon Springs | 18 |
| FL | Apalachicola | 14 |
| FL | Key West | 14 |
| FL | Cortez | 12 |
| FL | Destin | 10 |
| FL | Panacea | 8 |
| FL | Fort Myers | 8 |
| FL | Crystal River | 8 |

Source: IFQ database accessed 2/20/2020 NOAA Fisheries, NMFS, SERO.

In Figure 3.5.1.1 the regional quotient (RQ) for pounds of red grouper landed is provided for 2018 by county homeport. The RQ is the amount of red grouper landed within a particular geographical location out of all red grouper landed within the region. All of the top ten counties are in Florida as would be expected, in fact the top twenty counties are all in Florida. Pinellas County remains the top county and has been throughout the recent history of the fishery. Manatee County follows in second, with Lee County third, and Franklin and Sarasota rounding out the top five counties.



**Figure 3.5.1.1.** Red grouper regional quotient by top 10 homeport counties.
Source: IFQ database accessed 2/20/2020 NOAA Fisheries, NMFS, SERO.

Madeira Beach and Cortez are the leading communities in terms of RQ for red grouper (Figure 3.5.1.2). The communities of Largo, Redington Shores and Tarpon Springs are next in terms of RQ with nearly equal amounts. The difference in terms of RQ and the number of vessels within a homeport is likely due to differences in predominant gear type used by the vessels within a

community, e.g. bandit reel vs longline.  The community of Cortez has fewer vessels and ranks sixth in number of vessels landing red grouper, but ranks second in terms of regional quotient. This is likely due to the fact that most vessels in Cortez are longline vessels which make longer trips and land more red grouper per trip.  Other ports may have a mix of vessel types.



**Figure 3.5.1.2.**  Red grouper regional quotient by top 20 homeport communities.
Source: IFQ database accessed 2/20/2020 NOAA Fisheries, NMFS, SERO.

**Commercial fishing engagement**

Figure 3.5.1.3 is an overall measure of a community's commercial fishing engagement.  Most communities in Figure 3.5.1.3 would be considered to be highly or moderately engaged in commercial fishing as many are at or above 1 standard deviation of the mean factor score and all have been at ½ standard deviation at one point in time.  Redington Shores, Indian Shores, and Palmetto show the least amount of engagement in commercial fishing overall, while most of the others are highly engaged, having engagement scores over 1 standard deviation if not over ½ standard deviation.  Few communities are highly reliant, although communities like Panacea, Apalachicola and Cortez seem to exhibit fairly high reliance with moderate to high engagement.



**Figure 3.5.1.3.** Commercial fishing engagement and reliance of the top 15 red grouper homeports for 2017.
Source: Social Indicators Database, NOAA Fisheries, NMFS, SERO.

## 3.5.2 Recreational Sector

Although we do not have data that would allow for a recreational RQ, we do have an overall measure of recreational fishing engagement and reliance for communities along Florida's west coast. The communities were chosen because of their location and likely participation in the red grouper component of the reef fish fishery. These engagement and reliance measures consist of recreational permit and infrastructure counts (boat ramps and marinas) within a community to gauge absolute recreational fishing activity and relative to its population. These measures are not specific to red grouper, but a measure of overall recreational fishing. Figure 3.5.2.1 indicates that most of these communities have a high engagement in recreational fishing as most are at or above the 1 standard deviation threshold, with Destin having the highest engagement score and high reliance. Cedar Key demonstrates high reliance on recreational fishing. This is likely due to its small population and probably a small amount of infrastructure related to recreational fishing, but substantial enough for a small community to depend on it for a good portion of its local economy. Other smaller communities like Apalachicola, Carrabelle, Crystal River, Everglades City, Port St. Joe and Panacea also demonstrate high reliance on recreational fishing.



**Figure 3.5.2.1.** Recreational fishing engagement and reliance for communities on Florida's west coast for 2017.
Source: Social Indicators Database 2017, NOAA Fisheries, NMFS, SERO.

The brief description of fishing activities presented here highlights which communities may be most involved in red grouper fishing. It is expected that the impacts from the regulatory action in this amendment, whether positive or negative, will most likely affect those communities identified above. At this time, it is not possible to provide a more detailed description of vessel involvement at the community level. It is likely that certain vessels within a community are more dependent upon red grouper than others, as are particular households. Until those types of data become accessible, the impacts upon either vessels or households within communities cannot be determined.

### 3.5.3  Environmental Justice Considerations

Executive Order 12898 requires federal agencies conduct their programs, policies, and activities in a manner to ensure individuals or populations are not excluded from participation in, or denied the benefits of, or subjected to discrimination because of their race, color, or national origin. In addition, and specifically with respect to subsistence consumption of fish and wildlife, federal agencies are required to collect, maintain, and analyze information on the consumption patterns of populations who principally rely on fish and/or wildlife for subsistence. This executive order is generally referred to as environmental justice (EJ).

Commercial and recreational anglers and associated industries could be impacted by the proposed actions. However, information on the race and income status for groups at the different participation levels is not available. Although information is available concerning a community's overall status with regard to minorities and poverty (e.g., census data), such information is not available specific to anglers and those involved in the industries and activities,

themselves.  To help assess whether any EJ concerns arise from the actions in this amendment, a suite of indices was created to examine the social vulnerability of coastal communities.  The three indices are poverty, population composition, and personal disruptions.  The variables included in each of these indices have been identified through the literature as being important components that contribute to a community's vulnerability.  Indicators such as increased poverty rates for different groups, more single female-headed households and households with children under the age of five, disruptions such as higher separation rates, higher crime rates, and unemployment all are signs of populations experiencing vulnerabilities.  Again, for those communities that exceed the threshold it would be expected that they would exhibit vulnerabilities to sudden changes or social disruption that might accrue from regulatory change.

Figure 3.5.3.1 provides the social vulnerability index scores of the top commercial and recreational communities that have been identified as having some association with red grouper.  Some communities appear in both figures to allow comparison with other communities included in that sector.  The communities of Carrabelle and Crystal River both exceed the threshold of 1 standard deviation for poverty, with Cedar Key close to that threshold, demonstrating some vulnerability when combined with other index scores.  Several communities exceed the threshold of 1/2 standard deviation above the mean for more than one index (Carrabelle, Crystal River and Panama City).  These fishing communities would be the most likely to exhibit vulnerabilities to social or economic disruption due to regulatory change.  Most communities on Florida's west coast exhibit few vulnerabilities.



**Figure 3.5.3.1.**  Community social vulnerability indices for communities on Florida's west coast.
Source: Social Indicators Database 2020 (ACS 2016), NOAA Fisheries, SERO.

Although no EJ issues have been identified or are expected to arise, information on the race and income status for groups at the different participation levels (for-hire captains and crew, and employees of associated support industries, etc.) is not available.  There is no known subsistence consumption of red grouper, nor are there any claims to customary subsistence consumption of red grouper by any indigenous or tribal group in the Gulf.  One aspect that should be noted is that the community of Cortez, Florida is recognized as being on the National Register of historic places.  The working waterfront where many fish houses and boat yards are located are within that historic district.

## 3.6  Description of the Administrative Environment

### 3.6.1  Federal Fishery Management

Federal fishery management is conducted under the authority of the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act) (16 U.S.C. 1801 *et seq*.).  It was originally enacted in 1976 as the Fishery Conservation and Management Act.  The Magnuson-Stevens Act claims sovereign rights and exclusive fishery management authority over most fishery resources within the EEZ, an area extending 200 nautical miles from the seaward boundary of each of the coastal states, and authority over U.S. anadromous species and continental shelf resources that occur beyond the EEZ.

Responsibility for federal fishery management is shared by the Secretary of Commerce (Secretary) and eight regional fishery management councils that represent the expertise and interests of constituent states.  Regional councils are responsible for preparing, monitoring, and revising management plans for fisheries needing management within their jurisdiction.  The Secretary is responsible for promulgating regulations to implement proposed plans and amendments after ensuring management measures are consistent with the Magnuson-Stevens Act and with other applicable laws summarized in Appendix A.  In most cases, the Secretary has delegated this authority to NMFS.

The Council is responsible for fishery resources in federal waters of the Gulf.  These waters extend to 200 nautical miles offshore from the seaward boundaries of the Gulf States of Alabama, Florida, Louisiana, Mississippi, and Texas, as those boundaries have been defined by law.  The length of the Gulf coastline is approximately 1,631 miles.  Florida has the longest coastline of 770 miles along its Gulf coast, followed by Louisiana (397 miles), Texas (361 miles), Alabama (53 miles), and Mississippi (44 miles).

The Council consists of seventeen voting members:  11 public members appointed by the Secretary; one each from the fishery agencies of Texas, Louisiana, Mississippi, Alabama, and Florida; and one from NMFS.  The public is also involved in the fishery management process through participation on advisory panels and through Council meetings that, with few exceptions for discussing personnel matters, are open to the public.  The regulatory process is also in accordance with the Administrative Procedures Act, in the form of "notice and comment" rulemaking, which provides extensive opportunity for public scrutiny and comment, and requires consideration of and response to those comments.

Regulations contained within FMPs are enforced through actions of NOAA's Office of Law Enforcement, the United States Coast Guard, and various state authorities. To better coordinate enforcement activities, federal and state enforcement agencies have developed cooperative agreements to enforce the Magnuson-Stevens Act. These activities are being coordinated by the Council's Law Enforcement Technical Committee and the Gulf States Marine Fisheries Commission's Law Enforcement Committee, which have developed joint enforcement agreements and cooperative enforcement programs.[45]

Reef fish stocks are assessed through the SEDAR process. As species are assessed, stock condition and acceptable biological catch**Error! Bookmark not defined.** levels are evaluated. As a result, periodic adjustments to stock ACLs and other management measures are deemed needed to prevent overfishing. Management measures are implemented through plan or regulatory amendments.

### 3.6.2  State Fishery Management

The purpose of state representation at the Council level is to ensure state participation in federal fishery management decision-making and to promote the development of compatible regulations in state and federal waters. The state governments of Texas, Louisiana, Mississippi, Alabama, and Florida have the authority to manage their respective state fisheries. Each of the five Gulf States exercises legislative and regulatory authority over their respective state's natural resources through discrete administrative units. Although each agency is the primary administrative body with respect to the states' natural resources, all states cooperate with numerous state and federal regulatory agencies when managing marine resources. A more detailed description of each state's primary regulatory agency for marine resources is provided on their respective web pages (Table 3.6.2.1).

**Table 3.6.2.1.**  Gulf state marine resource agencies and web pages.

| State marine resource agency | Web page |
|---|---|
| Alabama Marine Resources Division | http://www.outdooralabama.com/ |
| Florida Fish and Wildlife Conservation Commission | http://myfwc.com/ |
| Louisiana Department of Wildlife and Fisheries | http://www.wlf.louisiana.gov/ |
| Mississippi Department of Marine Resources | http://www.dmr.ms.gov/ |
| Texas Parks and Wildlife Department | http://tpwd.texas.gov/ |

---

[45] www.gsmfc.org

# CHAPTER 4. ENVIRONMENTAL CONSEQUENCES

## 4.1 Action 1 – Modify the Sector Allocations, Overfishing Limit (OFL), Acceptable Biological Catch (ABCError! Bookmark not defined.), and Annual Catch Limits (ACL) for Gulf of Mexico (Gulf) Red Grouper

### 4.1.1 Direct and Indirect Effects on the Physical Environment

A brief summary of red grouper use of the physical environment is provided in Section 3.2. A more detailed description is included in the Generic Essential Fishery Habitat (EFH) Amendment (GMFMC 2004a) and Amendment 32 (GMFMC 2011b) which are incorporated by reference. The effects of fishing gears used in the reef fish fishery on the physical environment are also briefly described in Section 3.2 and in more detail in Amendment 32.

The degree to which a habitat is affected by fishing gear depends largely on the vulnerability of the affected habitat to disturbance, and on the rate that the habitat can recover from disturbance (Barnette 2001). For example, the complex structure and vertical growth pattern of coral reef species makes reef habitat more vulnerable to adverse impacts from fishing gear and slower to recover from such impacts than sand and mud bottom habitat (Barnette 2001). Red grouper is also associated with hard bottom habitat, but tend to prefer lower relief habitat than other grouper species such as gag.

The primary effects of grouper fishing on the physical environment generally result from fishing gear interactions with the sea floor. Most grouper are caught with hook-and-line fishing gear, although some spearfishing does occur. Fishing gear can damage or disturb bottom structures, and occasionally incidentally harvest such habitat.

*Longlines*

Commercial longline gear is deployed over hard bottom habitats when targeting red grouper using weights to keep the gear in direct contact with the bottom. Its potential for adverse impact is dependent on the type of habitat it is set on, the presence or absence of currents, and the behavior of fish after being hooked. In addition, this gear upon retrieval can abrade, snag, and dislodge smaller rocks, corals, and sessile invertebrates (Bohnsack in Hamilton, 2000; Barnette 2001). Direct underwater observations of longline gear in the Pacific halibut fishery by High (1998) noted that the gear could sweep across the bottom. Some halibut were observed pulling portions of longlines 15 to 20 feet over the bottom. Although the gear was observed in contact with or snagged on a variety of objects including coral, sturdy flexible corals usually appeared unharmed while hard corals often had portions broken off. However, another study that directly observed deployed longline gear (Atlantic tilefish fishery) found no evidence that the gear shifted significantly, even when set in currents. This was attributed to anchors set at either end of the longline as well as sash weights along the line to prevent movement (Grimes et al. 1982). Based on the direct observations, it is logical to assume that bottom longline gear would have a

minor impact on sandy or muddy habitat areas. However, due to the vertical relief that hard bottom and coral reef habitats provide, it would be expected that bottom longline gear may become entangled, resulting in potential negative impacts to habitat (Barnette 2001).

*Vertical lines*

Concentrations of many managed reef fish species are higher on hard bottom areas than on sand or mud bottoms, thus vertical line gear fishing generally occurs over hard bottom areas (GMFMC 2004a). Vertical lines include multi-hook lines known as bandit gear, handlines, and rod-and-reels. Vertical-line gear is less likely to contact the bottom than longlines, but still has the potential to snag and entangle bottom structures and cause tear-offs or abrasions (Barnette 2001). In using bandit gear, a weighted line is lowered to the bottom, and then the lead is raised slightly off the bottom (Siebenaler and Brady 1952). The gear is in direct contact with the bottom for only a short period of time. Barnette (2001) suggests that physical impacts may include entanglement and minor degradation of benthic species from line abrasion and the use of weights (sinkers). Commercial or recreational fishing with rod-and-reel and handlines also puts gear on the bottom. The terminal part of the gear is either lifted off the bottom like fishing with bandit gear, or left contacting the bottom. Sometimes the fishing line can become entangled on coral and hard bottom outcroppings. The subsequent algal growth can foul and eventually kill the underlying coral (Barnette 2001). Researchers conducting studies in the Madison-Swanson Marine Protected Area reported seeing lost fishing line on the bottom, much of which appeared to be fairly old and covered with growth (A. David, pers comm), a clear indication that bottom fishing has had an impact on the physical environment prior to fishing being prohibited in the area (GMFMC 2003). The National Fish and Wildlife Foundation, in issuing grants to remove marine debris, established monofilament fishing line is a priority marine debris issue.

Anchor damage is also associated with vertical-line fishing vessels, particularly by the recreational sector where fishermen may repeatedly visit well marked fishing locations. Bohnsack in Hamilton (2000) showed that "favorite" fishing areas such as reefs are targeted and revisited multiple times, particularly with the advent of global positioning technology. The cumulative effects of repeated anchoring could damage the hard bottom areas where fishing for grouper occurs.

*Spear and Powerhead*

Spear guns and slings are used in both commercial and recreational grouper fishing but are a relatively minor component of both. Barnette (2001) cited a study by Gomez et al. (1987) that concluded that spearfishing on reef habitat may result in some coral breakage, but damage is probably negligible. In addition, there could be some impacts from divers touching coral with hands or from resuspension of sediment by fins (Barnette 2001). Such impacts should be negligible to non-existent for well-trained and experienced spear fishermen who stay in the water column and avoid contact with the bottom, but would be expected to occur among spear fisherman who are less experienced, which would include more recreational fishermen.

*Effects*

This action could affect the physical environment (directly and indirectly) if changes in the allocation result in a shift in the use of fishing gear types used to harvest the stock ACLs. Under **Alternatives 2-6**, all the yield streams that provide OFLs are based on a fixed level of fishing mortality ($F_{30\%SPR}$). The difference is that the application of the sector fishing selectivities to the different allocations yields different OFLs, and subsequent ABCs. Under the stock ACLs, **Alternative 1**, no action, when compared to the other alternatives, would likely have the greatest effect on the physical environment (5.26 million pounds (mp) gutted weight (gw) using the recreational Fishing Effort Survey-adjusted Marine Recreational Information Program [MRIP-FES] equivalent units). This alternative is then followed by **Alternative 2** (4.90 mp gw), **Alternative 6** (4.60 mp gw), **Alternative 4** (4.30 mp gw), **Alternative 5** (4.28 mp gw), and **Alternative 2** (4.26 mp gw) in descending order of ACLs and effects. **Alternatives 3-5** have very similar stock ACLs (4.26-4.30 mp gw) and any effects would be expected to be very similar.

In general, the effects from the recreational and commercial sectors on the physical environment would be opposite. Where commercial ACLs increase, recreational ACLs decrease. Thus, the effects from the sectors on this environment likely offset each other to a certain extent because of the directionality of fishing effort. Given longlines are a commercial gear type, where the commercial ACL is greater, the effects from longlines would be expected to be greater. The recreational sector primarily uses vertical gear, so where recreational ACLs are greater, effects on the physical environment from this gear type would be expected to be greater. With respect to the reef fish fishery in general, this action would likely not change the way the reef fish fishery is prosecuted because it targets multiple species providing options for fishermen should red grouper not be available for harvest.

## 4.1.2  Direct and Indirect Effects on the Biological Environment

Direct and indirect effects from fishery management actions have been discussed in detail in Amendments 30B (GMFMC 2008c) and 32 (GMFMC 2011b) as well as in several red grouper framework actions (GMFMC 2010b, 2012d, 2014b, 2016a, 2019a) and are incorporated here by reference. Potential impacts of the 2010 *Deepwater Horizon MC252* oil spill and red tide on the biological/ecological environment are discussed in Section 3.3, the aforementioned references, and are incorporated here by reference. These impacts may include recruitment failure and reduced fish health. Management actions that affect this environment mostly relate to the impacts of fishing on a species' population size, life history, and the role of the species within its habitat. Removal of fish from the population through fishing reduces the overall population size. Fishing gears have different selectivity patterns which refer to a fishing method's ability to target and capture organisms by size and species. This would include the size distribution of fish caught by the gear as well as the number of discards, mostly sublegal fish or fish caught during seasonal closures, and the mortality associated with releasing these fish.

Fishing can affect life history characteristics of reef fish such as growth and maturation rates. For example, Lombardi-Carlson et al. (2006) found that the mean size of gag at age was larger

pre-1990 than in post-1990 years and suggests this decrease may be due to fishing. In red snapper, Fischer et al. (2004) and Nieland et al. (2007) found that the average size-at-age of red snapper had declined and associated this trend with fishing pressure. However, this trend has not been linked to fishing effort for Gulf red grouper (Lombardi-Carlson et al., 2008). The reef fish fishery can also affect species outside the reef fish complex. Section 3.3 discusses determinations by the National Marine Fisheries Service (NMFS) with how the fishery interacts with listed and endangered species. Specifically, sea turtles have been observed to be directly affected by the longline component of the Gulf reef fish fishery resulting with some incidental captures and are summarized in GMFMC (2010a and 2019b). The last biological opinion by the NMFS concluded the Gulf reef fish fishery as managed by the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico (Reef Fish FMP) is not likely to jeopardize the continued existence of sea turtles, smalltooth sawfish, or table coral species (NMFS 2011). NMFS has requested a re-initiation of consultation on the Reef Fish FMP.

This action could affect the biological/ecological environment (directly and indirectly) because changes in the allocation result in a shift in the amount of fish caught by each sector. When this occurs, the sector selectivity patterns affect the numbers and sizes of fish caught and influences the resulting estimates of OFL, ABC, and stock ACL. **Alternative 1**, no action, would have the greatest adverse effect on the red grouper population as the commercial ACL and recreational ACL (using MRIP-FES units for comparison purposes) would allow for harvests above **Alternative 2**'s ABC even though both alternatives have the same allocation. This is because the F under **Alternative 1** is greater and so the likelihood of overfishing under **Alternative 1** would be greater than **Alternative 2**, assuming NMFS can constrain harvests to the sector ACLs. The likelihood of overfishing under **Alternatives 2-6** would be similar as the management goal is the same. Under **Alternatives 2-6**, all the OFLs are based on a fixed level of fishing mortality ($F_{30\%SPR}$), and thus each of these alternatives would result in a similar stock size ($B_{30\%SPR}$). The difference in the alternatives is where more fish are allocated to the recreational sector, total landings have to be constrained more to account for the greater dead discards from recreational red grouper fishing. As described in Appendix B, although the recreational discard mortality rate is lower than the commercial rate, the recreational fishery discards an order of magnitude more fish than the commercial fishery. This difference is especially pronounced in the most recent 5 years (2013-2017), where commercial discards (~320k/year) have been less than a tenth of recreational discard (~3.71 million/year). Thus, despite a higher discard mortality rate in the commercial fishery (due largely to the bottom longline fishery), the recreational sector is responsible for more discards and more dead discards.

The relationships among species in marine ecosystems are complex and poorly understood, making the nature and magnitude of ecological effects difficult to predict with any accuracy. It is possible that forage species and competitor species could increase or decrease in abundance in response to a decrease or increase in red grouper abundance. However, the relationships between red grouper and non-target species caught on trips where red grouper are directly targeted are not fully understood. Further, substantial changes in the prosecution of the reef fish fishery are not expected from this action because the fishery is comprised of many species and so fishermen have harvesting choices. As a result, no additional effects to non-target species or protected resources (see Section 3.3) are anticipated.

## 4.1.3  Direct and Indirect Effects on the Economic Environment

**Commercial Sector**

**Alternative 1** (No Action) would maintain the current commercial sector allocation of 76% of the total ACL, as well as the current OFL, ABC**Error! Bookmark not defined.**, and recreational ACL.  **Alternative 1** would maintain a commercial sector ACL of 3.16 mp gw.  Therefore, changes in economic value would not be expected to result from this alternative.  While not legally viable as a preferred alternative, the landings expected to occur under **Alternative 1** and the associated economic value are still used in this analysis as the benchmark for changes in economic value for the other alternatives.  The changes in producer surplus (PS) estimated in Table 4.1.3.1 capture the annual potential changes in PS from the commercial sector and assumes that the commercial sector lands the entire allocated ACT.  The 5-year average (2015-2019) of commercial landings exceeds the current commercial annual catch target (ACT) from **Alternative 1** with the current 5% buffer between the ACL and ACT, so this analysis assumes the commercial sector will land the entire allocated commercial ACT, as **Preferred Alternative 3** and **Alternatives 2** and **4-6** either retain or decrease the current commercial ACL as shown in Table 2.1.1.  **Alternative 2** increases the current commercial ACL.  Still, the 5-year average of commercial landings (3.40 mp gw) is near the associated ACT (3.53 mp gw), with the current 5% buffer between the ACL and ACT, and the red grouper stock is expected to continue to rebound.

The economic impacts expected to result from **Preferred Alternative 3** and **Alternatives 2** and **4-6** are analyzed as a function of the ACT.  For Action 1, the current commercial buffer of 5% between the ACL and ACT is used to determine the ACT.  An average dockside price from 2018 of $4.83 (2019 dollars) is used from Table 3.4.1.19 to calculate the change in revenue, as displayed in Table 4.1.3.1.

**Table 4.1.3.1.**  Expected change in landings for the red grouper commercial sector, expected change in revenue, and expected change in PS for **Preferred Alternative 3** and **Alternatives 2** and **4-6** relative to **Alternative 1**.

| Alternative | Expected change in landings (mp gw) | Expected change in revenue | Expected change in PS (2019 dollars) |
|---|---|---|---|
| Alt 2 | 0.53 | $2,559,900 | $614,376 |
| **Preferred Alt 3** | -0.60 | -$2,898,000 | -$695,520 |
| Alt 4 | -0.53 | -$2,559,900 | -$614,376 |
| Alt 5 | -0.57 | -$2,753,100 | -$660,744 |
| Alt 6 | 0.00 | $0 | $0 |

**Alternative 2** would be expected to result in an increase in revenue of $2,559,900, compared to **Alternative 1**, due to the increase in ACT. **Preferred Alternative 3** and **Alternatives 4-5** would be expected to result in a decrease in revenue, relative to **Alternative 1**. Using the estimate of 24% as the average net cash flow from 2014-2016 in Table 3.4.1.22, **Alternative 2** would be expected to result in an increase in PS of $614,376, compared to **Alternative 1**. **Preferred Alternative 3** and **Alternatives 4-5** would be expected to result in a decrease in PS, relative to **Alternative 1**. **Alternative 6** would be expected to result in no change in PS, relative to **Alternative 1**.

The expected change in revenue in Table 4.1.3.1 also reflects the expected change in red grouper purchases by dealers. The average of the total red grouper purchases from 2014-2018 from Table 3.4.1.23 is $17,557,924. The expected change in revenue with **Alternative 2** would be expected to result in an increase of 14.58% of the average total red grouper purchases, compared with **Alternative 1**. The expected changes in revenue with **Preferred Alternative 3** and **Alternatives 4-5** would be expected to result in, respectively, a decrease of 16.51%, 14.58%, and 15.68% of the average total red grouper purchases, compared with **Alternative 1**. **Alternative 6** would be expected to result in no expected change in revenue and no change in the average total red grouper purchases, relative to **Alternative 1**.

With the current commercial buffer of 5% between the ACL and ACT, the proposed increase in the ACL with **Alternative 2** would increase the availability of annual IFQ allocation for sale, compared with **Alternative 1**. As the supply of annual IFQ allocation increases, the allocation price would be expected to decrease. As shares reflect the expected supply of annual allocation available in the future, **Alternative 2** would be expected to result in a decrease in red grouper share price. In contrast, the proposed decrease in the ACL with **Preferred Alternative 3** and **Alternatives 4-5** would decrease the availability of annual IFQ allocation for sale, compared with **Alternative 1**, and the allocation price would be expected to increase in response. **Preferred Alternative 3** and **Alternatives 4-5** would be expected to result in an increase in red grouper share price, to reflect the expected supply of annual allocation available in the future. **Alternative 6** would not change the availability of annual IFQ allocation for sale, compared with **Alternative 1**, so the allocation price would not be expected to change. No change in red grouper share price would be expected with **Alternative 6**.

Changes in red grouper harvests, as a result of the change in ACT, could result in additional economic effects because of the potential effects on ex-vessel prices due to less (or more) red grouper on the markets. The potential effects to the consumer surplus (CS) are based on work on price flexibilities by Keithly and Tabarestani (2018). An average dockside price from 2018 of $4.83 (2019 dollars) is used from Table 3.4.1.12. An own-price flexibility of -0.533 is used from the Habit Formation model (Keithly and Tabarestani 2018) to derive the average price change and change in CS for **Preferred Alternative 3** and **Alternatives 2** and **4-6** in comparison to **Alternative 1** as seen in Table 4.1.3.2.

**Table 4.1.3.2.  Preferred Alternative 3** and **Alternatives 2** and **4-6** - Proposed change in the red grouper commercial sector ACT (relative to **Alternative 1**) and associated estimated average price change ($/lb) and change in CS.

| Alternative | Change in ACT (mp gw) | Expected average price change ($/lb) | Expected change in CS (2019 dollars) |
|---|---|---|---|
| Alt 2 | 0.53 | -$0.45 | $1,605,475 |
| Preferred Alt 3 | -0.60 | $0.51 | -$1,235,707 |
| Alt 4 | -0.53 | $0.45 | -$1,123,378 |
| Alt 5 | -0.57 | $0.49 | -$1,188,596 |
| Alt 6 | 0.00 | $0.00 | $0 |

Under **Alternative 2**, the red grouper commercial sector ACT would increase by 0.53 mp gw, compared to **Alternative 1**.  As a result, the CS would be expected to increase by $1.605 million under **Alternative 2**, compared to **Alternative 1**.  **Preferred Alternative 3** and **Alternatives 4-5** result in decreases to the commercial sector ACT, relative to **Alternative 1**, resulting in decreases in CS.  Compared to **Alternative 1**, the red grouper commercial sector ACT would decrease by 0.60 mp gw under **Preferred Alternative 3**, resulting in a decrease of the CS by $1.236 million.  Under **Alternative 4**, the red grouper commercial sector ACT would decrease by 0.53 mp gw, compared to **Alternative 1**.  As a result, the CS would be expected to decrease by $1.123 million under **Alternative 4**, compared to **Alternative 1**.  Compared to **Alternative 1**, the red grouper commercial sector ACT would decrease by 0.57 mp gw under **Alternative 5**, resulting in a decrease of the CS by $1.189 million.  Compared to **Alternative 1**, the red grouper commercial sector ACT would not change under **Alternative 6**, and therefore result in no change in the CS.

The total expected change in net economic benefits for the commercial sector from **Preferred Alternative 3** and **Alternatives 2** and **4-6**, relative to **Alternative 1**, are displayed in Table 4.1.3.3.  These changes are the addition of the expected change in PS from Table 4.1.3.1 to the expected change in CS from Table 4.1.3.2.

**Table 4.1.3.3.  Preferred Alternative 3** and **Alternatives 2** and **4-6** – Total Expected Change in Net Economic Benefits for the Commercial Sector relative to **Alternative 1**.

| Alternative | Total Expected Change in Net Economic Benefits (2019 dollars) |
|---|---|
| Alt 2 | $2,219,851 |
| Preferred Alt 3 | -$1,931,227 |
| Alt 4 | -$1,737,754 |
| Alt 5 | -$1,849,340 |
| Alt 6 | $0 |

**Recreational Sector**

**Alternative 1** (No Action) would maintain the current recreational sector allocation of 24% of the total ACL, as well as the current OFL, ABC**Error! Bookmark not defined.**, and recreational ACL.  Alternative 1 would maintain a recreational sector ACL of 1.00 mp gw (MRIP-FES

0009518

equivalent of 2.10 mp gw). Therefore, changes in economic value would not be expected to result from this alternative. While not legally viable as a preferred alternative, the landings expected to occur under **Alternative 1** and the associated economic value are still used in this analysis as the benchmark for changes in economic value for the other alternatives. In addition, the 5-year average (2015-2019) of MRIP-FES equivalent recreational landings exceeds the current recreational ACL from **Alternative 1**, so this analysis assumes the recreational sector will land the entire allocated recreational ACL, as **Preferred Alternative 3** and **Alternatives 2** and **4-6** decrease the current MRIP-FES equivalent recreational ACL as shown in Table 2.1.1.

The economic impacts expected to result from **Preferred Alternative 3** and **Alternatives 2** and **4-6** are analyzed as a function of the ACL. The MRIP-FES equivalent of the recreational sector ACL for **Alternative 1** is used in this analysis, in order to be in the same currency as the recreational sector ACLs for **Preferred Alternative 3** and **Alternatives 2** and **4-6**. The evaluation of changes in economic value expected to result from ACL changes for the recreational sector is based on work by Carter and Liese (2012). The CS value per fish for a second red grouper kept is estimated at $110.00 (2019 dollars). A conversion factor of 1.05 between gutted weight and whole weight of red grouper is used (SEDAR 42 2015). Estimated increases in economic value are approximated by dividing the change in ACL by 6.51 lbs ww, which is the average weight of a Gulf recreationally landed red grouper from 2015-2017 (SEFSC Southeast Region Headboat Survey [SRHS]) data, accessed March 2018; MRIP Intercept data available at: https://www.st.nmfs.noaa.gov/st1/recreational/MRIP_Survey_Data/), to obtain the increase in number of red grouper, which is then multiplied by the CS value per fish of $110.00. The proposed changes in the recreational sector ACL and estimates of associated annual changes in economic values for **Preferred Alternative 3** and **Alternatives 2** and **4-6** are provided in Table 4.1.3.4.

**Table 4.1.3.4. Preferred Alternative 3** and **Alternatives 2** and **4-6** - Proposed change in the red grouper recreational sector ACL (relative to **Alternative 1**) and associated estimated annual change in CS.

| Alternative | Change in ACL (mp gw) | Expected annual change in CS (2019 dollars) |
|---|---|---|
| Alt 2 | -0.92 | -$16,322,581 |
| **Preferred Alt 3** | -0.37 | -$6,564,516 |
| Alt 4 | -0.40 | -$7,096,774 |
| Alt 5 | -0.38 | -$6,741,935 |
| Alt 6 | -0.66 | -$11,709,677 |

Under **Alternative 2**, the red grouper recreational sector ACL would decrease by 0.92 mp gw, compared to **Alternative 1**. As a result, the CS would be expected to decrease by $16.323 million (in 2019 dollars) under **Alternative 2**, compared to **Alternative 1**. Compared to **Alternative 1**, the red grouper recreational sector ACL would decrease by 0.37 mp gw under **Preferred Alternative 3**, resulting in an expected decrease in CS by $6.565 million (in 2019 dollars). Under **Alternative 4**, the red grouper recreational sector ACL would decrease by 0.40 mp gw, compared to **Alternative 1**. As a result, the CS would be expected to decrease by $7.097 million (in 2019 dollars) under **Alternative 4**, compared to **Alternative 1**. Compared to

0009519

**Alternative 1**, the red grouper recreational sector ACL would decrease by 0.38 mp gw under **Alternative 5**, resulting in an expected decrease in CS by $6.742 million (in 2019 dollars). Under **Alternative 6**, the red grouper recreational sector ACL would decrease by 0.66 mp gw, compared to **Alternative 1**. As a result, the CS would be expected to decrease by $11.710 million (in 2019 dollars) under **Alternative 6**, compared to **Alternative 1**.

The PS of the for-hire component of the recreational sector, being comprised of charter vessels and headboats, would be impacted by a change in the number of targeted trips. In the long run, factors of production such as labor and capital can be used elsewhere in the economy, and so only short-term changes to PS are expected. In the Gulf, headboat trips take a diverse set of anglers on a single vessel, generally advertising a diverse range of species to be caught. Therefore, an assumption that no headboat trips would be lost due to a change in ACL would be reasonable. However, charter vessel trips that are targeting red grouper may be subject to cancellation by anglers and are the focus of the recreational sector PS analysis.

Predicted closure dates based on recreational ACL are seen in Table 2.1.4. Charter vessel trips by 2-month wave from 2014-2018 targeting red grouper are seen in Table 3.4.2.4. Based on the predicted closure dates, **Alternative 1** would have no closure, **Alternatives 2** would close in the 4th wave (July/August), and **Preferred Alternative 3** and **Alternatives 4-5** would close in the 6th wave (November/December). **Alternative 6** would close in the 5th wave (September/October). The total number of canceled trips for **Alternatives 2** and **6** would therefore also include all of the targeted trips for the rest of year (waves 5 and 6 for **Alternative 2**; wave 6 for **Alternative 6**). The number of trips cancelled in the wave in which the predicted closure date would occur, along with the total number of canceled trips, is shown in Table 4.1.3.5. The number of trips cancelled in the interrupted wave is calculated using a ratio of the number of closed days in the wave and the total number of days in the 2-month wave, multiplied by the average trips for that wave from Table 3.4.2.4. This assumes that trips within a 2-month wave are evenly distributed among days.

**Table 4.1.3.5.** Wave in which predicted closure date occurs, canceled charter trips in the interrupted wave, and total canceled charter trips for **Preferred Alternative 3** and **Alternatives 2** and **4-6**.

| Alternative | Interrupted Wave | Canceled Charter Trips in Interrupted Wave | Total Canceled Charter Trips |
|---|---|---|---|
| Alt 2 | 4 | 2,915 | 9,991 |
| Preferred Alt 3 | 6 | 665 | 665 |
| Alt 4 | 6 | 971 | 971 |
| Alt 5 | 6 | 767 | 767 |
| Alt 6 | 5 | 1,362 | 4,481 |

The Net Cash Flow per Angler Trip (CFpA) from Souza and Liese (2019) of $136 (2017 dollars) is used to derive an upper bound for the short-term change in PS for charter vessels; Table 3.4.2.8 updates that estimate to $141 (2019 dollars). The CFpA accounts for the lost revenue, while recognizing that canceled trips do not have certain expenditures such as fuel, trip supplies, and labor. The short-term change in PS is displayed in Table 4.1.3.6. **Preferred Alternative 3**

and **Alternatives 2** and **4-6** are all expected to result in a negative short-term change in PS.  As the earliest predicted closure date occurs with **Alternative 2**, the short-term change in PS is greatest (-$1,408,708), compared to **Alternative 1**.  Following **Alternative 2**, the next earliest predicted closure date occurs with **Alternative 6**, which results in the next greatest short-term change in PS (-$631,856), compared to **Alternative 1**.  The predicted closure dates for **Preferred Alternative 3** and **Alternatives 4-5** occur within 6 days of each other, and so the short-term changes in PS of those alternatives have a relatively close range from -$93,723 to -$136,980.

**Table 4.1.3.6.**   Short-term change in PS for charter vessels under **Preferred Alternative 3** and **Alternatives 2** and **4-6** relative to **Alternative 1**.

| Alternative | Short-term change in PS (2019 dollars) |
|---|---|
| Alt 2 | -$1,408,708 |
| Preferred Alt 3 | -$93,723 |
| Alt 4 | -$136,980 |
| Alt 5 | -$108,142 |
| Alt 6 | -$631,856 |

The total expected change in net economic benefits for the recreational sector from **Preferred Alternative 3** and **Alternatives 2** and **4-6**, relative to **Alternative 1**, are displayed in Table 4.1.3.7.  These changes are the addition of the expected annual change in CS from Table 4.1.3.4 to the short-term change in PS from Table 4.1.3.6.

**Table 4.1.3.7.**   **Preferred Alternative 3** and **Alternatives 2** and **4-6** – Total Expected Change in Net Economic Benefits for the Recreational Sector relative to **Alternative 1**.

| Alternative | Total Expected Change in Net Economic Benefits (2019 dollars) |
|---|---|
| Alt 2 | -$17,731,289 |
| Preferred Alt 3 | -$6,658,239 |
| Alt 4 | -$7,233,754 |
| Alt 5 | -$6,850,077 |
| Alt 6 | -$12,341,533 |

The total expected change in net economic benefits for both the commercial and recreational sectors are displayed in Table 4.1.3.8.  Relative to **Alternative 1**, **Preferred Alternative 3** would have the least negative expected change in net economic benefits, followed by **Alternatives 5**, **4**, **6**, and **2**.

**Table 4.1.3.8.   Preferred Alternative 3** and **Alternatives 2** and **4-6** – Combined Total Expected Change in Net Economic Benefits for both the Commercial and Recreational Sectors relative to **Alternative 1**.

| Alternative | Total Expected Change in Net Economic Benefits (2019 dollars) |
|---|---|
| Alt 2 | -$15,511,438 |
| **Preferred Alt 3** | -$8,589,466 |
| Alt 4 | -$8,971,508 |
| Alt 5 | -$8,699,417 |
| Alt 6 | -$12,341,533 |

## 4.1.4  Direct and Indirect Effects on the Social Environment

The purpose of this amendment is to revise the red grouper allocation between the commercial and recreational sectors based on the best scientific information available and to modify the catch limits based on the results of the recent stock assessment.  The Southeast Fisheries Science Center (SEFSC) has determined the Fishing Effort Survey (FES) adjusted Marine Recreational Information Program (MRIP) data represent the best scientific information available for recreational landings and should replace MRIP-Coastal Household Telephone Survey (CHTS) data.  Updating the units for monitoring recreational landings and calibrating historical landings affects the sector allocation when MRIP-FES data are applied to the same time series used for the current allocation (**Alternative 1**).  Thus, updating the MRIP-CHTS data with MRIP-FES data would also change the sector allocation at the same time; two interrelated things that would affect the social environment in different ways.  Further, this action modifies the catch limits.  In order to evaluate the interrelated changes that would result in different effects for the two sectors, the social effects are discussed and compared separately for each related change.

*Revise the OFL, ABC, and ACL for red grouper*

In general, higher catch limits would be associated with fewer negative effects as they would allow for more fish to be landed, while lower catch limits would be associated with greater negative effects as they would allow for less fish to be landed.  When catch limits are not met, it can be due to multiple factors and may relate to the stock size being smaller than estimated for the existing catch levels.  Fishermen had been reporting concerns with the health of the red grouper stock prior to the 2016 increase to the ACL.  Although the catch limits were increased from 2016 through 2018, landings for each sector actually decreased at the same time, providing support for the observations reported by fishermen.  Landings have remained well below each sector's ACT and ACL in recent years (Table 2.1.3), suggesting that the catch levels were not the factor constraining harvest.  However, the reduced ACLs proposed through this action would be expected to constrain harvest.

Additional effects would not be expected under **Alternative 1**, as the catch limits for both sectors would remain the same.  **Alternatives 2-6** would reduce the OFL and ABC, and set the stock ACL equal to the new ABC, potentially resulting in direct negative effects if a sector's ACL is

reduced from **Alternative 1**. The ACLs under **Alternatives 2-6** are provided in Table 4.1.4.1, with the recreational sector ACLs provided in MRIP-CHTS units based on the ratio of MRIP-CHTS to MRIP-FES units provided for **Alternative 1** (Section 2.1), for the purpose of comparison.

**Table 4.1.4.1.** Sector ACLs for **Alternatives 1-2**, **4-6**, and **Preferred Alternative 3** with the recreational sector ACLs provided in MRIP-CHTS units based on the ratio of MRIP-CHTS units to MRIP-FES units provided for **Alternative 1**.

| Alternative | Comm ACL | Rec ACL (CHTS) |
|-------------|----------|----------------|
| **1** (No Action) | 3.16 | 1.000 |
| **2** | 3.72 | 0.562 |
| **Pref. 3** | 2.53 | 0.824 |
| **4** | 2.60 | 0.810 |
| **5** | 2.56 | 0.819 |
| **6** | 3.16 | 0.686 |

Note: The recreational ACLs in MRIP-CHTS are calculated using the ratio of 1.00:2.10, representing the conversion of the recreational ACL under Alternative 1 from MRIP-CHTS to MRIP-FES units. Values in million pounds gutted weight.

The commercial sector's red grouper landings have decreased each year since 2014 (Table 2.1.2) and landings remain below both the ACT (Table 2.1.3), which is the quota and represents the amount of distributed allocation. The ACT is used for the commercial sector to provide multi-use allocation, which can be used to land either red grouper or gag. In recent years, most of the multi-use red grouper allocation was used to land gag, while most of the gag multi-use allocation was also used to land gag (Table 2.2.2). This trend is likely due to the increased red grouper ACL in 2017 and 2018 and the higher ex-vessel price and ACL for gag compared to red grouper (NMFS 2020). Except for landings in 2018 and 2019, the proposed commercial ACLs under **Preferred Alternative 3** and **Alternatives 4-5** are lower than the commercial red grouper landings since the GT-IFQ program was implemented (Table 2.1.2), suggesting negative effects are possible for the commercial sector if landings rebound to levels prior to 2018. The greatest potential negative effects would be expected under **Preferred Alternative 3**, which would reduce the commercial sector's ACL the most among the alternatives, with slightly fewer negative effects expected under **Alternative 5**, followed by **Alternative 4**. If commercial landings continue to remain below the ACT and ACL, no effects would be expected. The commercial ACL would be the same under **Alternative 1** and **Alternative 6** and no effects would be expected. Compared to **Alternative 1**, the commercial sector would realize an ACL increase under **Alternative 2**, suggesting positive effects could result. Since the GT-IFQ program was implemented, commercial landings have been greater than 3.72 mp gw (**Alternative 2**) in 6 out of 10 years. However, these effects may not be realized due to continuing issues with the stock size, which has likely been the limiting factor for landings, rather than the availability of IFQ allocation for the sector to reach its quota.

Similar to the commercial sector, recreational landings have remained well below the sector's ACL since it was increased in 2016, likely limited due to the availability of the stock rather than to effort. However, in the years prior, recreational landings were meeting or even exceeded (in one year) its ACL (Table 2.1.3). Compared to the commercial sector, the effects of modifying

Amendment 53 - Red Grouper
Allocations and Annual Catch Levels and Targets
101
Chapter 4. Environmental
Consequences

0009523

the catch limits are nearly inverted for the recreational sector, such that the greatest negative effects would be expected under **Alternative 2**, which would reduce the recreational sector ACL by nearly half.  If red grouper landings remain at 2017-2019 levels, negative effects may not be expected; if red grouper landings return to levels seen in 2016 and years prior, negative effects would likely result as the ACL is met, triggering the ACT to be used to close the fishing season in the subsequent year.  **Preferred Alternative 3** and **Alternatives 4-5** represent a reduction of approximately 20% of the recreational sector's ACL, with the greatest negative effects expected under **Alternative 4**, followed by decreasing effects under **Alternative 5** then **Preferred Alternative 3**.  **Alternative 6** would represent a reduction of approximately 30% compared to **Alternative 1**, and thus be intermediary between **Alternative 2** and the approximate reductions under **Preferred Alternative 3** and **Alternatives 4-5**.

The direct negative effects that may result for either sector in relation to an ACL reduction would be expected in the short-term as less fish are available to be landed, and would only occur if the fish are available to be caught.  Although the alternatives for reducing the catch limits under **Alternative 2** compared to **Preferred Alternative 3** and **Alternatives 4-6** would negatively affect the recreational sector in the short term, it would be expected that for the long-term, these negative effects would be mitigated by increasing protection for the stock, resulting in increased catch limits and positive effects in the future for both sectors.  In turn, short term negative effects from reducing the commercial catch limits (**Alternatives 4, 6**, and **Preferred Alternative 3**) would be expected to be mitigated in the long term.  The effects for the commercial sector would be similar, with the order of effects inverted for the alternatives, corresponding to the sector allocation, further demonstrating the interrelation of effects due to the changes that would occur through this action.

*Adjust the recreational sector ACL from MRIP-CHTS to MRIP-FES units*

Converting the recreational sector's ACL from MRIP-CHTS units to MRIP-FES units would directly affect the recreational sector only.  In theory, there should be no direct effects under any of the alternatives, as the change from MRIP-CHTS units to MRIP-FES units is intended to be a conversion, such that the current recreational sector ACL of 1.00 mp gw in MRIP-CHTS units is equivalent to a recreational sector ACL of 2.10 mp gw in MRIP-FES units (Table 4.1.4.2).  Applying this conversion to the recreational sector ACLs under **Preferred Alternative 3** and **Alternatives 2, 4,** and **6** results in an equivalent amount of fish between the MRIP-CHTS and MRIP-FES derived units, meaning that the amount of harvest available to the recreational sector would not change under any of the alternatives. While no direct effects would be expected for the recreational sector, indirect effects of the conversion would result for both sectors, as the conversion affects the sector allocation.

**Table 4.1.4.2.**  Recreational sector ACLs for **Alternatives 1-6** in MRIP-CHTS units and MRIP-FES units, based on the ratio in Alternative 1.

| Alternative | Rec ACL (CHTS) | Rec ACL (FES) |
|---|---|---|
| **1** (No Action) | 1.000 | 2.10 |
| **2** | 0.562 | 1.18 |
| **Pref. 3** | 0.824 | 1.73 |
| **4** | 0.810 | 1.70 |
| **5** | 0.819 | 1.72 |
| **6** | 0.686 | 1.44 |

*Reallocate the red grouper ACL between the commercial and recreational sectors*

Allocation is an inherently controversial topic as competing user groups strive to obtain the largest share for their group.  Although reallocation is the primary purpose of this amendment, the reallocation between the commercial and recreational sectors would be an indirect effect from the conversion of the recreational sector's ACL from MRIP-CHTS units to MRIP-FES units.  Table 4.1.4.3 provides the resulting sector allocation under **Alternatives 1-6** and the basis for each allocation.  **Alternative 1** (No Action) would retain the current sector allocation for red grouper and would have no effect on either the commercial or recreational sector.  A sector allocation is a policy designation of the rights to access, but the reallocation of red grouper also has socio-cultural significance.  The current 76% commercial to 24% recreational allocation reflects the greater historical engagement with the red grouper stock by the commercial sector compared to the recreational sector.  For comparison, the sector allocation of gag reflects the greater historical engagement of that resource to the recreational sector (61%) compared to the commercial sector (39%).

**Table 4.1.4.3.**  Resulting sector allocations under **Alternatives 1-6** and the basis for the recreational sector allocation.

| Alternative | Commercial | Recreational | Basis for Allocation |
|---|---|---|---|
| **1** | 76% | 24% | No Action |
| **2** | 76% | 24% | Retain Alternative 1 |
| **Pref. 3** | 59.3% | 40.7% | 1986-2005 landings in MRIP-FES |
| **4** | 60.5% | 39.5% | 1986-2009 landings in MRIP-FES |
| **5** | 59.7% | 40.3% | 1986-2018 landings in MRIP-FES |
| **6** | 68.7% | 31.3% | Retain Commercial ACL under Alternative 1 |

By retaining the same allocation as **Alternative 1**, additional effects would not be expected from **Alternative 2** in terms of the sector allocation.  However, as discussed in the section above on revising the catch limits, the sector ACLs underlying the allocation for **Alternative 2** reflect a change in the amount of fish that would go to each sector compared to **Alternative 1**, with more fish going to the commercial sector and less fish going to the recreational sector.  Compared to **Alternatives 1** and **2**, **Preferred Alternative 3** and **Alternatives 4-5** would reallocate

approximately 16% of the new stock ACL from the commercial sector to the recreational sector, resulting in negative effects for the commercial sector and positive effects for the recreational sector.  Because **Preferred Alternative 3** and **Alternatives 4-5** all result in a shift in allocation from the commercial sector to the recreational sector, the types of effects on the social environment would be similar among the alternatives.  The direct effects from **Preferred Alternative 3** and **Alternatives 4-5** would vary in scope and strength relative to the amount of quota that is reallocated, which is within 1.2% among **Preferred Alternative 3** and **Alternatives 4-5**.  That the different time series of recreational landings used for the allocations under **Alternatives 3-5** result in a narrow range of resulting allocations suggests that the effects between these alternatives would be smaller than between **Alternatives 1-2** and **Preferred Alternative 3** and **Alternatives 4-5**.  By holding the commercial ACL at the same amount as under **Alternative 1**, **Alternative 6** would reallocate approximately 7% of the new stock ACL from the commercial sector to the recreational sector, resulting in intermediary negative effects between **Alternatives 1-2** and **Preferred Alternative 3** and **Alternatives 4-5**.

## 4.1.5  Direct and Indirect Effects on the Administrative Environment

Under **Alternative 1**, sector allocations would remain the same as in current management (76% commercial / 24 % recreational), which uses data based on average landings from MRIP-CHTS. **Alternative 1** would also retain the current OFL, ABC, and ACLs. Under **Alternatives 2-5**, sector allocations of the total ACL between the recreational and commercial sector would be revised based on average landings using MRIP-FES data.  **Alternative 2** would result in an increase in the commercial ACL, while **Preferred Alternative 3** and **Alternatives 4 and 5** would result in a decrease in the commercial ACL, and vary only slightly among each other based on the data years used as the reference period.  **Alternative 6** would result in the same commercial ACL as **Alternative 1**.  Using the MRIP-FES equivalent recreational ACL in **Alternative 1** for comparison, all of the action alternatives would result in a decrease in the recreational ACL.  **Alternative 2** would result in the largest decrease and **Preferred Alternative 3** and **Alternatives 4 and 5** vary only slightly from each other and would result in the least decrease. **Alternative 6** would result in a recreational ACL that is in between the ACL resulting from **Alternative 2** and the ACLs resulting from **Preferred Alternative 3** and **Alternatives 4 and 5**.

The potential impacts on the administrative environment depend on the action necessary to compare landings to the catch limits and the likelihood of needing to implement a recreational closure or take additional action to prevent overfishing.  All alternatives, except **Alternative 1**, would result in beneficial effects because they would eliminate the need to convert landings back to MRIP-CHTS for management. However, all alternatives, except Alternative 1, would result in a decrease in recreational ACL, which may increase the likelihood of needing to implement an in-season closure.  Alternatives that result in larger allocations to the recreational sector could increase the likelihood of overfishing because of the uncertainty in determining recreational landings.  However, the recreational ACT is used to monitor landings in years after the ACL has been exceeded, which reduces the likelihood of successive years of overharvest by the recreational sector, and there has been an overall decreasing trend in total landings.  Thus, it is

unlikely that any of the action alternatives will result in any significant increase in exceeding the OFL.

## 4.2  Action 2 – Modify the Gulf Red Grouper Annual Catch Targets (ACT)

### 4.2.1  Direct and Indirect Effects on the Physical Environment

Effects on the physical environment from fishing are described in Section 4.1.1, which describes how increasing fishing effort leads to increasing effects on this environment. Action 1 sets the overall OFL, ABC, and sector ACLs. This action sets the buffer between the ACL and ACT. Action 1 would maintain the buffers between the respective commercial and recreational ACLs and ACTs. For the commercial sector, this buffer allows for gag and red-grouper multi-use shares to be fished under the IFQ program. Thus, the buffer is not used to constrain harvest and consequently fishing effort, but likely maintains fishing effort similar to if there were no buffer. However, for the recreational sector, the buffer is used to account for management uncertainty and decrease the likelihood the recreational ACL is exceeded if exceeded in the previous year. Thus, the greater the buffer, the lower recreational fishing effort would be from the sector. Under these circumstances, **Alternatives 2** and **3** would likely have similar effects because the recreational buffer is the same at 9%. The recreational buffer for **Alternative 1** is 8% and so could result in slightly more adverse effects than the other two alternatives given it could allow for a minimal increase in effort.

### 4.2.2  Direct and Indirect Effects on the Biological Environment

Effects on the physical biological/ecological environment from fishing are described in Section 4.1.2, which describes how increasing fishing effort leads to increasing effects on this environment. Action 1 sets the overall OFL, ABC, and sector ACLs. This action sets the buffer between the ACL and annual catch target (ACT). Action 1 would maintain the buffers between the respective commercial and recreational ACLs and ACTs. For the commercial sector, this buffer allows for gag and red-grouper multi-use shares to be fished under the IFQ program. It is the IFQ program that limits the commercial catch to the ACL through the distribution of allocation and allocation reporting that acts as an accountability measure (AM) to ensure the ACL is not exceeded. Thus, the buffer is not used to constrain harvest and consequently fishing, but likely maintains fishing levels similar to if there were no buffer and no multi-use shares (e.g., **Alternative 2**). However, for the recreational sector, the buffer is used to account for management uncertainty and decrease the likelihood the recreational ACL is exceeded if exceeded in the previous year. Thus, the greater the buffer, the less recreational fishing would likely occur from the sector. Under these circumstances, **Alternatives 2** and **3** would likely have similar effects as the recreational buffer is equal at 9%. The recreational buffer for **Alternative 1** is 8% and so could result in slightly more adverse effects than the other two alternatives given it could allow for a minimal increase in fishing.

Amendment 53 - Red Grouper
Allocations and Annual Catch Levels and Targets

105

Chapter 4.  Environmental
Consequences

0009527

## 4.2.3  Direct and Indirect Effects on the Economic Environment

**Commercial Sector**

**Alternative 1** (No Action) would maintain the current commercial buffer of 5% between the ACL and ACT.  Therefore, changes in economic value would not be expected to result from this alternative, only if paired with Action 1 **Alternative 1**.  As Action 1 **Alternative 1** is not legally viable as a preferred alternative, the landings expected to occur and associated economic values under alternatives from Action 2 must be analyzed with additional alternatives from Action 1.  However, the landings expected to occur from Action 2 **Alternative 1** under Action 1 **Alternative 1** (No Action) and the associated economic values are still used in this analysis as the benchmark for changes in economic value for the other alternatives.  Action 2 **Alternative 2** and **Preferred Alternative 3** are not examined under Action 1 **Alternative 1**, as they would not be legally viable or provide an economic benchmark.  The changes in producer surplus (PS) estimated in Table 4.2.3.1 capture the annual potential changes in PS from the commercial sector and assumes that the commercial sector lands the entire allocated ACT.  The 5-year average (2015-2019) of commercial landings exceeds the current commercial ACT, so this analysis assumes the commercial sector will land the entire allocated commercial ACT, as all combinations of Action 2 alternatives with Action 1 **Preferred Alternative 3** and **Alternatives 1** and **4-5** either retain or decrease the current commercial ACT.  Action 2 **Alternatives 1-2** and **Preferred Alternative 3** either retain or increase the current commercial ACT when paired with Action 1 **Alternative 6**.  Action 1 **Alternative 2** would increase the current commercial ACT when paired with any of the Action 2 alternatives, and the 5-year average of commercial landings (3.40 mp gw) is near the potential ACTs, as combined with Action 1 alternatives, with the current 5% buffer between the ACL and ACT (3.53 mp gw) or a new 0% buffer between the ACL and ACT (2.53 mp gw).  In addition, the red grouper stock is expected to continue to rebound.

The economic effects expected to result from **Alternatives 1-2** and **Preferred Alternative 3** are analyzed as a function of the ACT and compared with Action 2 **Alternative 1** paired with Action 1 **Alternative 1**.  An average dockside price from 2018 of $4.83 (2019 dollars) is used from Table 3.4.1.19 to calculate the change in PS, as displayed in Table 4.2.3.1.

As noted in Section 2.2., both the red grouper and gag share categories have a multi-use provision that allows a portion of the red grouper quota to be harvested under the gag allocation, and vice versa.  Under **Alternative 2**, with a commercial buffer of 0%, the gag multi-use (GGM) allocation would be zero, and therefore, only gag could be landed with gag allocation.  From 2016 to 2018, 0.3% to 2% of the GGM was used to land red grouper; however, the 2019 data show an increase to 19% of the GGM being used for landing red grouper.  Under Alternative 2, minor direct, negative economic effects would therefore result from the lack of red grouper landings, although some mitigation may occur as the poundage that would be used for GGM with red grouper might be instead used for landing gag.  As such, these effects are described qualitatively, rather than quantitatively.

**Table 4.2.3.1.**  Expected change in landings for the red grouper commercial sector, expected change in revenue, and expected change in PS for Action 2 **Preferred Alternative 3** and **Alternatives 2** and **4-6**, relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**.

| | | Action 2 **Alt 1** | |
|---|---|---|---|
| Action 1 | Expected change in landings (mp gw) | Expected change in revenue | Expected change in PS (2019 dollars) |
| **Alt 2** | 0.53 | $2,559,900 | $614,376 |
| **Preferred Alt 3** | -0.60 | -$2,898,000 | -$695,520 |
| **Alt 4** | -0.53 | -$2,559,900 | -$614,376 |
| **Alt 5** | -0.57 | -$2,753,100 | -$660,744 |
| **Alt 6** | 0.00 | $0 | $0 |
| | | Action 2 **Alt 2** | |
| Action 1 | Expected change in landings (mp gw) | Expected change in revenue | Expected change in PS (2019 dollars) |
| **Alt 2** | 0.72 | $3,477,600 | $834,624 |
| **Preferred Alt 3** | -0.47 | -$2,270,100 | -$544,824 |
| **Alt 4** | -0.40 | -$1,932,000 | -$463,680 |
| **Alt 5** | -0.44 | -$2,125,200 | -$510,048 |
| **Alt 6** | 0.16 | $772,800 | $185,472 |
| | | Action 2 **Preferred Alt 3** | |
| Action 1 | Expected change in landings (mp gw) | Expected change in revenue | Expected change in PS (2019 dollars) |
| **Alt 2** | 0.53 | $2,559,900 | $614,376 |
| **Preferred Alt 3** | -0.60 | -$2,898,000 | -$695,520 |
| **Alt 4** | -0.53 | -$2,559,900 | -$614,376 |
| **Alt 5** | -0.57 | -$2,753,100 | -$660,744 |
| **Alt 6** | 0.00 | $0 | $0 |

Action 2 **Alternative 1** and **Preferred Alternative 3** would result in the same expected change in revenue and in PS for the commercial sector as seen in Section 4.1.3, as Action 1 was also analyzed with the current 5% commercial buffer.  Therefore, Action 2 **Preferred Alternative 3** is not expected to have any effect on landings, revenue, or PS, relative to **Alternative 1**. Compared with Action 2 **Alternative 1** and **Preferred Alternative 3**, Action 2 **Alternative 2** results in a larger positive change in PS when paired with Action 1 **Alternatives 2** and **6**, due to a smaller commercial buffer.  As such, Action 2 **Alternative 2** would be expected to increase revenue by an additional $917,700 relative to Action 2 **Alternative 1**, if Action 1 **Alternative 2** is selected; Action 2 **Alternative 2** would be expected to increase revenue by an additional $772,800 relative to Action 2 **Alternative 1**, if Action 1 **Alternative 6** is selected.  In addition, when compared with Action 2 **Alternative 1** and **Preferred Alternative 3**, Action 2 **Alternative 2** results in a smaller negative change in PS when paired with Action 1 **Preferred Alternative 3** or **Alternatives 4-5**.  As such, revenue under Action 2 **Alternative 2** would be expected to decrease by $627,900 less than under Action 2 **Alternative 1**, if Action 1 **Preferred Alternative 3 or Alternatives 4-5** are selected.  This relative change in revenue is the same regardless of whether **Preferred Alternative 3** or **Alternatives 4-5** is selected under Action 1, as the relative expected change in landings, -0.13 mp gw, is the same between Action 2 **Alternative 1** and **Alternative 2**.

The expected change in revenue in Table 4.2.3.1 also reflects the expected change in red grouper purchases by dealers.  The average of the total red grouper purchases from 2014-2018 from Table 3.4.1.23 is $17,557,924.  Action 2 **Alternative 1** and **Preferred Alternative 3** would result in the same expected change in revenue and, therefore, expected changes in red grouper purchases by dealers as seen in Section 4.1.3, as Action 1 was also analyzed with the current 5% commercial buffer.  Action 2 **Preferred Alternative 3** is not expected to have any effect on red grouper purchases, relative to **Alternative 1**.   The expected change in revenue with Action 2 **Alternative 2** paired with Action 1 **Alternative 2** would be expected to result in an increase of 19.81% of the average total red grouper purchases, compared with Action 2 **Alternative 1** paired with Action 1 **Alternative 1**.  Similarly, the expected change in revenue with Action 2 **Alternative 6** paired with Action 1 **Alternative 2** would be expected to result in an increase of 4.40% of the average total red grouper purchases, compared with Action 2 **Alternative 1** paired with Action 1 **Alternative 1**.  The expected changes in revenue with Action 2 **Alternative 2** paired with Action 1 **Preferred Alternative 3** or **Alternatives 4-5** would be expected to result in, respectively, a decrease of 12.93%, 11.00%, and 12.10% of the average total red grouper purchases, compared with Action 2 **Alternative 1** paired with Action 1 **Alternative 1**.  Relative to Action 2 **Alternative 1**, Action 2 **Alternative 2** when paired with Action 1 **Alternative 2** would be expected to result in a 5.23% increase in total red grouper purchases.  Relative to Action 2 **Alternative 1**, Action 2 **Alternative 2** when paired with Action 1 **Alternative 6** would be expected to result in a 4.40% increase in total red grouper purchases.  Relative to Action 2 **Alternative 1**, Action 2 **Alternative 2** when paired with Action 1 **Preferred Alternative 3 or Alternatives 4-5** would be expected to result in a 3.58% less of a decrease in total red grouper purchases.

0009530

The proposed increase in the ACT with Action 2 **Preferred Alternative 3** or **Alternatives 1-2** paired with Action 1 **Alternative 2** would increase the availability of annual IFQ allocation for sale, as compared with being paired with Action 1 **Alternative 1**.  As the supply of annual IFQ allocation increases, the allocation price would be expected to decrease.  As shares reflect annual allocation, the expected decrease in allocation price under Action 2 **Preferred Alternative 3** or **Alternative 1-2** paired with Action 1 **Alternative 2** would be expected to result in a decrease in red grouper share price.  In contrast, the proposed decrease in the ACL with Action 2 **Preferred Alternative 3** and **Alternatives 1-2** paired with Action 1 **Preferred Alternative 3** and **Alternatives 4-5** would decrease the availability of annual IFQ allocation for sale, compared with being paired with Action 1 **Alternative 1**, and the allocation price would be expected to increase in response.  The expected increase in allocation price under Action 2 **Preferred Alternative 3** and **Alternatives 1-2** paired with Action 1 **Preferred Alternative 3** and **Alternatives 4-5** would be expected to result in an increase in red grouper share price.

The proposed increase in the ACT with Action 2 **Alternative 2** paired with Action 1 **Alternative 6** would increase the availability of annual IFQ allocation for sale, as compared with being paired with Action 1 **Alternative 1**.  As the supply of annual IFQ allocation increases, the allocation price would be expected to decrease.  As shares reflect annual allocation, the expected decrease in allocation price under Action 2 **Alternative 2** paired with Action 1 **Alternative 2** would be expected to result in a decrease in red grouper share price.  Due to the commercial buffer of 5%, Action 2 **Preferred Alternative 3** or **Alternative 1** paired with Action 1 **Alternative 6** would result in no change in the ACL and no change in the availability of annual IFQ allocation for sale, as compared with being paired with Action 1 **Alternative 1**.  Therefore, since the supply of annual IFQ allocation would not be expected to change, the allocation price would not be expected to change.  As shares reflect annual allocation, the expected lack of change in allocation price under Action 2 **Preferred Alternative 3** or **Alternative 1** paired with Action 1 **Alternative 2** would be expected to result in no change in red grouper share price.

Changes in red grouper harvests, as a result of the change in ACT, could result in additional economic effects because of the potential effects on ex-vessel prices due to less (or more) red grouper on the markets.  The potential effects to the consumer surplus are based on work on price flexibilities by Keithly and Tabarestani (2018).  An average dockside price from 2018 of $4.83 is used from Table 3.4.1.12.  An own-price flexibility of -0.533 is used from the Habit Formation model (Keithly and Tabarestani 2018) to derive the average price change and change in CS for **Alternatives 1-2** and **Preferred Alternative 3** as seen in Table 4.1.3.2.

**Table 4.2.3.2.  Alternatives 1-2** and **Preferred Alternative 3** - Proposed change in the red grouper commercial sector ACT (relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**) and associated estimated average price change ($/lb) and change in CS.

| | | Action 2 **Alt 1** | |
|---|---|---|---|
| Action 1 | Expected change in landings (mp gw) | Expected average price change ($/lb) | Expected change in CS (2019 dollars) |
| **Alt 2** | 0.53 | -$0.45 | $1,605,475 |
| **Preferred Alt 3** | -0.60 | $0.51 | -$1,235,707 |
| **Alt 4** | -0.53 | $0.45 | -$1,123,378 |
| **Alt 5** | -0.57 | $0.49 | -$1,188,596 |
| **Alt 6** | 0.00 | $0.00 | $0 |
| | | Action 2 **Alt 2** | |
| Action 1 | Expected change in landings (mp gw) | Expected average price change ($/lb) | Expected change in CS (2019 dollars) |
| **Alt 2** | 0.72 | -$0.62 | $2,298,415 |
| **Preferred Alt 3** | -0.47 | $0.41 | -$1,020,402 |
| **Alt 4** | -0.40 | $0.34 | -$892,455 |
| **Alt 5** | -0.44 | $0.38 | -$966,598 |
| **Alt 6** | 0.16 | -$0.14 | $433,871 |
| | | Action 2 **Preferred Alt 3** | |
| Action 1 | Expected change in landings (mp gw) | Expected average price change ($/lb) | Expected change in CS (2019 dollars) |
| **Alt 2** | 0.53 | -$0.45 | $1,605,475 |
| **Preferred Alt 3** | -0.60 | $0.51 | -$1,235,707 |
| **Alt 4** | -0.53 | $0.45 | -$1,123,378 |
| **Alt 5** | -0.57 | $0.49 | -$1,188,596 |
| **Alt 6** | 0.00 | $0.00 | $0 |

Action 2 **Alternative 1** and **Preferred Alternative 3** would result in the same expected change in average price loss and in CS for the commercial sector as seen in Section 4.1.3, as Action 1 was also analyzed with the current 5% commercial buffer.  Therefore, Action 2 **Alternative Preferred Alternative 3** is not expected to have any effect on landings, average price loss, or CS, relative to **Alternative 1**.  Compared with Action 2 **Alternative 1** and **Preferred Alternative 3**, Action 2 **Alternative 2** results in a larger positive change in CS when paired with Action 1 **Alternatives 2** and **6**, due to a smaller commercial buffer.  For instance, Action 2 **Alternative 2** would be expected to increase CS by an additional $692,940 relative to Action 2 **Alternative 1**, if Action 1 **Alternative 2** is selected.  In addition, when compared with Action 2 **Alternative 1** and **Preferred Alternative 3**, Action 2 **Alternative 2** results in a smaller negative change in CS when paired with Action 1 **Preferred Alternative 3** or **Alternatives 4-6**.  For instance, CS under Action 2 **Alternative 2** would be expected to decrease by $215,305 less than under Action 2 **Alternative 1**, if Action 1 **Preferred Alternative 3** is selected.

The total expected change in net economic benefits for the commercial sector from **Preferred Alternative 3** and **Alternatives 2** and **4-6**, relative to **Alternative 1**, are displayed in Table

4.2.3.3.  These changes are the addition of the expected change in PS from Table 4.2.3.1 to the expected change in CS from Table 4.2.3.2.

**Table 4.2.3.3.   Alternatives 1-2** and **Preferred Alternative 3** – Total Expected Change in Net Economic Benefits for the Commercial Sector, relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**.

| | Action 2 **Alt 1** |
|---|---|
| Action 1 | Total Expected Change in Net Economic Benefits (2019 dollars) |
| **Alt 2** | $2,219,851 |
| **Preferred Alt 3** | -$1,931,227 |
| **Alt 4** | -$1,737,754 |
| **Alt 5** | -$1,849,340 |
| **Alt 6** | $0 |
| | Action 2 **Alt 2** |
| Action 1 | Total Expected Change in Net Economic Benefits (2019 dollars) |
| **Alt 2** | $3,133,039 |
| **Preferred Alt 3** | -$1,565,226 |
| **Alt 4** | -$1,356,135 |
| **Alt 5** | -$1,476,646 |
| **Alt 6** | $619,343 |
| | Action 2 **Preferred Alt 3** |
| Action 1 | Total Expected Change in Net Economic Benefits (2019 dollars) |
| **Alt 2** | $2,219,851 |
| **Preferred Alt 3** | -$1,931,227 |
| **Alt 4** | -$1,737,754 |
| **Alt 5** | -$1,849,340 |
| **Alt 6** | $0 |

**Recreational Sector**

**Alternative 1** (No Action) would maintain the current recreational buffer of 8% between the ACL and ACT.  Therefore, changes in economic value would not be expected to result from this alternative, only if paired with Action 1 **Alternative 1**.  As Action 1 **Alternative 1** is not legally viable as a preferred alternative, the landings expected to occur and associated economic values associated with alternatives from Action 2 must be analyzed with additional alternatives from Action 1.  However, the landings expected to occur and the associated economic value from Action 2 **Alternative 1** under Action 1 **Alternative 1** (No Action) is still used in this analysis as the benchmark for changes in economic value for the other alternatives.  Action 2 **Alternative 2** and **Preferred Alternative 3** are not examined under Action 1 **Alternative 1**, as they would not legally viable or provide an economic benchmark.  In addition, this analysis assumes the recreational sector will land the entire recreational ACT if the post-season AM was triggered, as all recreational ACTs resulting from combinations of alternatives of Action 1 with Action 2 fall below the 5-year average (2015-2019) of MRIP-FES equivalent recreational landings.

The economic effects expected to result from Action 2 **Alternatives 1-2** and **Preferred Alternative 3** are analyzed as a function of the ACT and would only be expected to result if the recreational sector's post-season AM is triggered.  The MRIP-FES equivalent of the recreational sector ACT resulting from Action 1 **Alternative 1** is used in this analysis, in order to be in the same currency as the recreational sector ACTs resulting from Action 1 **Preferred Alternative 3** and **Alternatives 2** and **4-6**.  The evaluation of changes in economic value expected to result from ACT increases for the recreational sector is based on work by Carter and Liese (2012).  The CS value per fish for a second red grouper kept is estimated at $110.00 (2019 dollars).  Estimated increases in economic value are approximated by dividing the change in ACT by 6.51 lbs ww, which is the average weight of a Gulf recreationally landed red grouper from 2015-2017 (SEFSC SRHS data, accessed March 2018[46]), to obtain the increase in number of red grouper, which is then multiplied by the CS value per fish of $110.00.  The proposed changes in the recreational sector ACL and discounted estimates of associated changes in economic values for **Alternatives 1-2** and **Preferred Alternative 3** are provided in Table 4.2.3.4.

**Table 4.2.3.4.  Alternatives 1-2** and **Preferred Alternative 3** - Proposed change in the red grouper recreational sector ACT (relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**) and associated estimated change in CS.

| Action 2 **Alt 1** | | |
|---|---|---|
| Action 1 | Change in ACT (mp gw) | Expected change in CS (2019 dollars) |
| **Alt 2** | -0.84 | -$14,903,226 |
| **Preferred Alt 3** | -0.34 | -$6,032,258 |
| **Alt 4** | -0.37 | -$6,564,516 |
| **Alt 5** | -0.35 | -$6,209,677 |
| **Alt 6** | -0.61 | -$10,822,581 |
| Action 2 **Alt 2** | | |
| Action 1 | Change in ACT (mp gw) | Expected change in CS (2019 dollars) |
| **Alt 2** | -0.86 | -$15,258,065 |
| **Preferred Alt 3** | -0.36 | -$6,387,097 |
| **Alt 4** | -0.38 | -$6,741,935 |
| **Alt 5** | -0.36 | -$6,387,097 |
| **Alt 6** | -0.62 | -$11,000,000 |
| Action 2 **Preferred Alt 3** | | |
| Action 1 | Change in ACT (mp gw) | Expected change in CS (2019 dollars) |
| **Alt 2** | -0.86 | -$15,258,065 |
| **Preferred Alt 3** | -0.36 | -$6,387,097 |
| **Alt 4** | -0.38 | -$6,741,935 |
| **Alt 5** | -0.36 | -$6,387,097 |
| **Alt 6** | -0.62 | -$11,000,000 |

The changes in ACT and CS under Action 2 **Alternative 2** and **Preferred Alternative 3** are identical, as they both consider a 9% recreational buffer between the ACL and ACT.  As the recreational buffer is greater under **Alternative 2** and **Preferred Alternative 3** than under

---

[46] MRIP Intercept data available at: https://www.st.nmfs.noaa.gov/st1/recreational/MRIP_Survey_Data/)

**Alternative 1**, a greater decrease is expected to result in the expected change in CS, under identical alternatives from Action 1. For instance, compared to Action 2 **Alternative 1** with Action 1 **Alternative 1**, the expected change in CS for Action 2 **Alternative 2** (or **Preferred Alternative 3**) is expected to result in an annual change in CS of -$15.258 million (in 2019 dollars), whereas the annual change in CS for Action 2 **Alternative 1** is expected to result in annual change in CS of -$14.903 million (in 2019 dollars). Additionally, under Action 2 **Alternative 2** and **Preferred Alternative 3**, the changes observed in Table 4.2.3.3 are identical if either Action 1 **Preferred Alternative 3** or **Alternative 5** are selected, as they would result in the same change in the recreational sector ACT, a decrease of 0.36 mp gw.

Compared with Action 2 **Alternative 1**, Action 2 **Alternative 2** and **Preferred Alternative 3** would be expected to result in a larger decrease in CS when paired with Action 1 **Preferred Alternative 3** and **Alternatives 2** and **4-6**, due to a larger recreational buffer. For instance, Action 2 **Alternative 2** and **Preferred Alternative 3** would be expected to decrease CS by an additional $354,839 relative to Action 2 **Alternative 1**, if Action 1 **Alternative 2** or **Preferred Alternative 3** is selected. Likewise, Action 2 **Alternative 2** and **Preferred Alternative 3** would be expected to decrease CS by an additional $177,419 relative to Action 2 **Alternative 1**, if Action 1 **Alternatives 4-6** is selected.

The PS of the for-hire component of the recreational sector, being comprised of charter vessels and headboats, would be impacted by a change in the number of targeted trips. In the long run, factors of production such as labor and capital can be used elsewhere in the economy, and so only short-term changes to PS are expected. In the Gulf, headboat trips take a diverse set of anglers on a single vessel, generally advertising a diverse range of species to be caught. Therefore, an assumption that no headboat trips would be lost due to a change in ACT would be reasonable. However, charter vessel trips that are targeting red grouper may be subject to cancellation by anglers and are the focus of the recreational sector PS analysis.

Predicted closure dates based on recreational ACT are seen in Table 2.2.4. Charter vessel trips by 2-month wave from 2014-2018 targeting red grouper are seen in Table 3.4.2.4. Based on the predicted closure dates, Action 2 **Alternatives 1-2** and **Preferred Alternative 3** would close in the 4th wave when paired with Action 1 **Alternatives 2** and **6**; Action 2 **Alternatives 1-2** and **Preferred Alternative 3** would close in the 6th wave with paired with Action 1 **Preferred Alternative 3 or Alternatives 4-5**. The number of trips cancelled in the wave in which the predicted closure date would occur, along with the total number of canceled trips, is shown in Table 4.2.3.5. The number of trips cancelled in the interrupted wave is calculated using a ratio of the number of closed days in the wave and the total number of days in the 2-month wave, multiplied by the average trips for that wave from Table 3.4.2.4. This assumes that trips within a 2-month wave are evenly distributed among days.

Action 2 **Alternative 2** and **Preferred Alternative 3** would result in the same change in total canceled charter trips. Compared with Action 2 **Alternative 1**, Action 2 **Alternative 2** and **Preferred Alternative 3** result in a larger total number of canceled charter trips when paired with Action 1 **Preferred Alternative 3** or **Alternative 2** or **4-6**, due to earlier predicted closure dates. As such, Action 2 **Alternatives 2** and **Preferred Alternative 3** would be expected to result in an additional 364 canceled charter trips relative to Action 2 **Alternative 1**, if Action 1

Alternative 2 is selected.  Action 2 **Alternatives 2** and **Preferred Alternative 3** would be expected to result in an additional 204 canceled charter trips relative to Action 2 **Alternative 1**, if Action 1 **Preferred Alternative 3** is selected.  Action 2 **Alternatives 2** and **Preferred Alternative 3** would be expected to result in an additional 102 canceled charter trips relative to Action 2 **Alternative 1**, if Action 1 **Alternative 4** or **5** is selected.  Finally, Action 2 **Alternatives 2** and **Preferred Alternative 3** would be expected to result in an additional 243 canceled charter trips relative to Action 2 **Alternative 1**, if Action 1 **Alternative 6** is selected.

**Table 4.2.3.5.**  Wave in which predicted closure date occurs, canceled charter trips in the interrupted wave, and total canceled charter trips for Action 2 **Alternatives 1-2** and **Preferred Alternative 3** paired with Action 1 **Preferred Alternative 3** and **Alternatives 2** and **4-6**.

| | Action 2 **Alt 1** | | |
|---|---|---|---|
| Action 1 | Interrupted Wave | Canceled Charter Trips in Interrupted Wave | Total Canceled Charter Trips |
| **Alt 2** | 4 | 4,494 | 11,570 |
| **Preferred Alt 3** | 6 | 2,148 | 2,148 |
| **Alt 4** | 6 | 2,454 | 2,454 |
| **Alt 5** | 6 | 2,250 | 2,250 |
| **Alt 6** | 4 | 607 | 7,683 |
| | Action 2 **Alt 2** | | |
| Action 1 | Interrupted Wave | Canceled Charter Trips in Interrupted Wave | Total Canceled Charter Trips |
| **Alt 2** | 4 | 4,858 | 11,934 |
| **Preferred Alt 3** | 6 | 2,352 | 2,352 |
| **Alt 4** | 6 | 2,557 | 2,557 |
| **Alt 5** | 6 | 2,352 | 2,352 |
| **Alt 6** | 4 | 850 | 7,926 |
| | Action 2 **Preferred Alt 3** | | |
| Action 1 | Interrupted Wave | Canceled Charter Trips in Interrupted Wave | Total Canceled Charter Trips |
| **Alt 2** | 4 | 4,858 | 11,934 |
| **Preferred Alt 3** | 6 | 2,352 | 2,352 |
| **Alt 4** | 6 | 2,557 | 2,557 |
| **Alt 5** | 6 | 2,352 | 2,352 |
| **Alt 6** | 4 | 850 | 7,926 |

The CFpA from Souza and Liese (2019) of $136 (2017 dollars) is used to derive an upper bound for the short-term change in PS for charter vessels; Table 3.4.2.8 updates that estimate to $141 (2019 dollars).  The CFpA accounts for the lost revenue, while recognizing that canceled trips do not have certain expenditures such as fuel, trip supplies, and labor.  The short-term change in PS is displayed in Table 4.2.3.6.  Action 2 **Alternatives 1-2** and **Preferred Alternative 3** are all expected to result in a negative short-term change in PS, regardless of the Action 1 alternative selected.  The short-term change in PS for Action 2 **Alternative 1** was previously examined in Section 4.1.3, as the Action 1 alternatives were analyzed with the current recreational buffer of 8%.  Since both alternatives would set a 9% recreational buffer, Action 2 **Alternative 2** and

Amendment 53 - Red Grouper
Allocations and Annual Catch Levels and Targets
114
Chapter 4.  Environmental
Consequences

0009536

**Preferred Alternative 3** are expected to result in the same short-term change in PS, when paired with the same Action 1 alternative.  As compared to Action 2 **Alternative 1** with Action 1 **Alternative 1**, Action 2 **Alternative 2** and **Preferred Alternative 3** would be expected to result in larger short-term changes in PS compared to Action 2 **Alternative 1**, when paired with the same Action 1 alternative.  When paired with Action 1 **Alternative** 2, Action 2 **Alternative 2** and **Preferred Alternative 3** would be expected to result in the largest short-term change in PS, -$1,682,703.  When paired with Action 1 **Alternative 2**, Action 2 **Alternative 1** would be expected to result in the smallest short-term change in PS, -$302,799.

Action 2 **Alternative 2** and **Preferred Alternative 3** would result in the same short-term change in PS.  Compared with Action 2 **Alternative 1**, Action 2 **Alternative 2** and **Preferred Alternative 3** result in a larger short-term change in PS when paired with Action 1 **Preferred Alternative 3** and **Alternatives 2** and **4-6**, due to additional canceled charter trips.  As such, Action 2 **Alternatives 2** and **Preferred Alternative 3** would be expected to result in an additional decrease in PS of $51,374 relative to Action 2 **Alternative 1**, if Action 1 **Alternative 2** is selected.  Action 2 **Alternative 2** and **Preferred Alternative 3** would be expected to result in an additional decrease in PS of $28,838 relative to Action 2 **Alternative 1**, if Action 1 **Preferred Alternative 3** is selected.  Action 2 **Alternative 2** and **Preferred Alternative 3** would be expected to result in an additional decrease in PS of $14,419 relative to Action 2 **Alternative 1**, if Action 1 **Alternative 4** or **5** is selected.  Finally, Action 2 **Alternative 2** and **Preferred Alternative 3** would be expected to result in an additional decrease in PS of $34,249 relative to Action 2 **Alternative 1**, if Action 1 **Alternative 6** is selected.

**Table 4.2.3.6.**  Short-term change in PS (2019 dollars) for charter vessels under Action 2 **Alternatives 1-2** and **Preferred Alternative 3** paired with Action 1 **Preferred Alternative 3** and **Alternatives 2** and **4-6**.

|  | Action 2 **Alt 1** | Action 2 **Alt 2** | Action 2 **Preferred Alt 3** |
|---|---|---|---|
| Action 1 |  |  |  |
| **Alt 2** | -$1,631,329 | -$1,682,703 | -$1,682,703 |
| **Preferred Alt 3** | -$302,799 | -$331,637 | -$331,637 |
| **Alt 4** | -$346,056 | -$360,475 | -$360,475 |
| **Alt 5** | -$317,218 | -$331,637 | -$331,637 |
| **Alt 6** | -$1,083,339 | -$1,117,589 | $1,117,589 |

The total expected change in net economic benefits for the recreational sector from **Preferred Alternative 3** and **Alternatives 2** and **4-6**, relative to **Alternative 1**, are displayed in Table 4.2.3.7.  These changes are the addition of the expected annual change in CS from Table 4.2.3.4 to the short-term change in PS from Table 4.2.3.6.

**Table 4.2.3.7.**  **Alternatives 1-2** and **Preferred Alternative 3** – Total Expected Change in Net Economic Benefits for the Recreational Sector relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**.

| | Action 2 **Alt 1** | | |
|---|---|---|---|
| Action 1 | Total Expected Change in Net Economic Benefits (2019 dollars) | | |
| **Alt 2** | -$16,534,555 | | |
| **Preferred Alt 3** | -$6,335,057 | | |
| **Alt 4** | -$6,910,572 | | |
| **Alt 5** | -$6,526,895 | | |
| **Alt 6** | -$11,905,920 | | |
| | Action 2 **Alt 2** | | |
| Action 1 | Total Expected Change in Net Economic Benefits (2019 dollars) | | |
| **Alt 2** | -$16,940,768 | | |
| **Preferred Alt 3** | -$6,718,734 | | |
| **Alt 4** | -$7,102,410 | | |
| **Alt 5** | -$6,718,734 | | |
| **Alt 6** | -$12,117,589 | | |
| | Action 2 **Preferred Alt 3** | | |
| Action 1 | Total Expected Change in Net Economic Benefits (2019 dollars) | | |
| **Alt 2** | -$16,940,768 | | |
| **Preferred Alt 3** | -$6,718,734 | | |
| **Alt 4** | -$7,102,410 | | |
| **Alt 5** | -$6,718,734 | | |
| **Alt 6** | -$12,117,589 | | |

The total expected change in net economic benefits for both the commercial and recreational sectors are displayed in Table 4.2.3.8.  When paired with Action 1 **Preferred Alternative 3**, Action 2 **Alternative 1** would have the least negative expected change in net economic benefits for both sectors, followed by **Alternative 2** and **Preferred Alternative 3**.  However, this assumes the post-season AM has been triggered for the recreational sector.  If the post-season AM has not been triggered for the recreational sector and if the Council does not want to set the GGM allocation at zero (**Alternative 2**), then both **Alternative 1** and **Preferred Alternative 3** would result in similar expected net economic benefits based on the commercial sector in Action 2.

**Table 4.2.3.8.   Alternatives 1-2** and **Preferred Alternative 3** – Combined Total Expected Change in Net Economic Benefits for both the Commercial and Recreational Sectors relative to Action 2 **Alternative 1** with Action 1 **Alternative 1**.

| Action 2 **Alt 1** | |
|---|---|
| Action 1 | Total Expected Change in Net Economic Benefits (2019 dollars) |
| **Alt 2** | -$14,314,704 |
| **Preferred Alt 3** | -$8,266,284 |
| **Alt 4** | -$8,648,326 |
| **Alt 5** | -$8,376,235 |
| **Alt 6** | -$11,905,920 |
| Action 2 **Alt 2** | |
| Action 1 | Total Expected Change in Net Economic Benefits (2019 dollars) |
| **Alt 2** | -$13,807,729 |
| **Preferred Alt 3** | -$8,283,960 |
| **Alt 4** | -$8,458,545 |
| **Alt 5** | -$8,195,380 |
| **Alt 6** | -$11,498,246 |
| Action 2 **Preferred Alt 3** | |
| Action 1 | Total Expected Change in Net Economic Benefits (2019 dollars) |
| **Alt 2** | -$14,720,917 |
| **Preferred Alt 3** | -$8,649,961 |
| **Alt 4** | -$8,840,164 |
| **Alt 5** | -$8,568,074 |
| **Alt 6** | -$12,117,589 |

## 4.2.4  Direct and Indirect Effects on the Social Environment

The ACT is used as an in-season AM to reduce the likelihood of exceeding the ACL. In general, a smaller buffer between the ACL and ACT allows for more fish to be harvested before triggering an attending in-season closure. For the commercial sector's harvest of IFQ-managed gag and red grouper, an ACT is used to allow for some gag allocation to be used to land red grouper, and for some red grouper allocation to be used to land gag (i.e., multi-use provision). For the recreational sector's harvest of red grouper, the ACT is used to decrease the likelihood the recreational ACL is exceeded in the year following an overage of the ACL, when it would be used to trigger an in-season closure.

For the commercial sector, this action evaluates retaining the existing buffer of 5% (**Alternative 1** and **Preferred Alternative 3**) or decreasing it to 0% (**Alternative 2**). In general, a stock managed under an IFQ program would not need to set an ACT, as the availability of annual allocation ensures that the ACL is not exceeded. In this case, the ACT is used to specify an amount of red grouper allocation that may be used to land gag. No additional effects would be expected to result for the commercial sector under **Alternative 1** or **Preferred Alternative 3**, as no change would be made to the commercial sector's ACT. Limited negative effects would be expected under **Alternative 2**, which would decrease the buffer to 0% and effectively remove the multi-use provision for red grouper allocation, requiring gag to be landed with gag allocation only. These negative effects would be expected to accrue to those fishermen who use the multi-use provision for landing gag with red grouper allocation, as they would no longer be able to do so.

For the recreational sector, this action considers retaining the current 8% buffer (**Alternative 1**) or increasing it to 9% (**Alternative 2** and **Preferred Alternative 3**).  In recent years, the recreational sector has not been catching its quota.  However, in addition to the conversion of the ACL to MRIP-FES units which estimates greater landings, the proposed quota reduction that would occur under Action 1 is large enough that recreational landings are likely to meet the new sector ACL.  The AM for the recreational sector states that in a year following an ACL overage, the ACT will be used to trigger an in-season closure.  Table 2.2.4 provides the predicted closure dates for the multiple combinations of preferred alternatives across Actions 1 and 2; these predicted closure dates represent the date the ACT for each alternative is predicted to be met, which would be used to trigger an in-season closure in the year after one in which the ACL was exceeded.  Thus, any effects from changing the recreational sector ACT would not occur until at least the year following the year this amendment is implemented, as the recreational sector ACL implemented through Action 1 would have to be exceeded before the recreational sector ACT is used to trigger an in-season fishing closure.

No additional effects would be expected from **Alternative 1** and the 8% buffer between the recreational sector ACL and ACT would remain in place.  Increasing the buffer to 9% (**Alternative 2** and **Preferred Alternative 3**) alongside any of **Alternatives 2-6** under Action 1 would be expected to shorten the length of the recreational fishing season in the year following a recreational sector ACL overage (Table 2.2.4) resulting in greater negative effects compared to **Alternative 1**.

## 4.2.5  Direct and Indirect Effects on the Administrative Environment

Action 2 would affect the administrative environment in two ways: 1) through in-season closures of the recreational fishery resulting from implementing AMs that are more likely to be triggered than under current management, and 2) by implementing an ACT that changes the likelihood of exceeding the recreational ACL and overfishing of the Gulf red grouper stock.  Closure of the recreation red grouper sector would have a minor effect on the administrative environment, while overfishing could have more significant effects.  However, the likelihood of overfishing is low given the use of an ACT to constrain landings in years following an ACL overage.

Each of the three alternatives in Action 2 would set ACTs which implement management buffers below the ACL with the exception of the commercial ACT for **Alternative 2** where the buffer equals zero.  These buffers include options for 0 percent and 5 percent for the commercial fishery, and 8 percent and 9 percent for the recreational sector.

In the commercial sector, there is no risk of an in-season closure and little risk of exceeding the ACL.  The IFQ system that is in place for regulating commercial landings is designed to prevent ACL overages by allocating quota to individual entities, and holding them accountable stay under that catch limit.  The intent of the commercial buffer is to allow for gag multi-use, which allows red grouper to be harvested incidentally when targeting gag.  Thus, the choice between a 0% and 5% buffer is not expected impact the likelihood of exceeding the ACL, or causing overfishing.

The recreational buffer under **Alternative 1** is the lowest of the alternatives.  In the year following a year in which catch exceeded the ACL, **Alternative 1** would be most likely to result in exceeding the recreational ACL.  Recreational landings are generated based on estimates of catch, and they have substantial uncertainty associated with them.  In addition, recreational landings are not timely, with lags often exceeding several months from when fishing takes place and landings estimates are generated.  Thus, implementing the lower ACT/buffer in **Alternative 1** in the recreational sector is more likely to result in exceeding the recreational and overall ACL (and potentially the OFL) than the higher buffers in **Alternatives 2** and **3**.  However, the difference between **Alternative 1** and **Alternatives 2** and **3** is only 1 percent of the ACL (11,800 lb to 17,300 lb depending on Action 1 decision).  Given the constraints associated with monitoring recreational data to relatively small values, the increased chance of exceeding recreational component ACL is expected to be negligible.  Thus, the recreational buffers proposed in the Action 2 alternatives are not likely to affect the administrative environment

Impact to the administrative environment associated with implementing a recreational fishery closure is higher under **Alternative 1** than under **Alternatives 2** or **3** due to the lower ACT in **Alternative 1**.  However, due to the relatively minor differences in these values among the alternatives coupled with the difficulty in monitoring the recreational component to small values, it is expected that the effect on the administrative environment due to a recreational component closure will be negligible.  Although the alternatives have different effects on the administrative environment, these effects are likely minor. Assessing the effects of management decisions on stock status are routine endeavors by NMFS. Actions to control harvest by the Gulf of Mexico Fishery Management Council (Council) and NMFS are mostly routine and conducted through the Council system established by the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act).

## 4.3  Cumulative Effects Analysis (CEA)

As directed by the National Environmental Policy Act (NEPA**Error! Bookmark not defined.**), federal agencies are mandated to assess not only the indirect and direct impacts, but cumulative impacts of actions as well.  Cumulative impact are defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions**Error! Bookmark not defined.** (RFFA**Error! Bookmark not defined.**) regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time" (40 C.F.R. 1508.7).  Cumulative effects can be either additive or synergistic.  A synergistic effect occurs when the combined effects are greater than the sum of the individual effects.

This section uses an approach for assessing cumulative effects that was initially used in Amendment 26 to the Reef Fish FMP**Error! Bookmark not defined.** and is based on guidance in the Council**Error! Bookmark not defined.** on Environmental Quality**Error! Bookmark not defined.**'s (CEQ**Error! Bookmark not defined.**) Considering Cumulative Effects handbook (CEQ 1997).  The report outlines 11 items for consideration in drafting a CEA**Error! Bookmark not defined.** for a proposed action.

1. Identify the significant cumulative effects issues associated with the proposed action and define the assessment goals.
2. Establish the geographic scope of the analysis.
3. Establish the timeframe for the analysis.
4. Identify the other actions affecting the resources, ecosystems, and human communities of concern.
5. Characterize the resources, ecosystems, and human communities identified in scoping in terms of their response to change and capacity to withstand stress.
6. Characterize the stresses affecting these resources, ecosystems, and human communities and their relation to regulatory thresholds.
7. Define a baseline condition for the resources, ecosystems, and human communities.
8. Identify the important cause-and-effect relationships between human activities and resources, ecosystems, and human communities.
9. Determine the magnitude and significance of cumulative effects.
10. Modify or add alternatives to avoid, minimize, or mitigate significant cumulative effects.
11. Monitor the cumulative effects of the selected alternative and adapt management.
Cumulative effects on the biophysical environment, socio-economic environment, and administrative environments are analyzed below.

**1. Identify the significant cumulative effects**Error! Bookmark not defined. **issues associated with the proposed action and define the assessment goals.**

The CEQ**Error! Bookmark not defined.** cumulative effects guidance states this step is accomplished through three activities as follows:

I. The direct and indirect effects**Error! Bookmark not defined.** of the proposed actions (Section 4.1 – 4.2);
II. Which resources, ecosystems, and human communities are affected (Chapter 3); and
III. Which effects are important from a cumulative effects perspective (information revealed in this CEA**Error! Bookmark not defined.**).

**2.     Establish the geographic scope of the analysis.**

The primary effects of the actions in this amendment would be to the social, economic, and administrative environments of the Gulf**Error! Bookmark not defined.**.  The physical and biological/ecological environments would be less affected as described in Sections 4.1-4.2, Subsections 1 and 2.

The geographic scope affected by these actions, including red grouper, is detailed in the Generic Essential Fish Habitat (EFH**Error! Bookmark not defined.**) Amendment, Reef Fish Amendment 30B, and the Generic ACL**Error! Bookmark not defined.**/AM**Error! Bookmark not defined.** Amendment (GMFMC 2004a; GMFMC 2008c; GMFMC 2011a, respectively) which are incorporated by reference and further summarized in Section 3.2.  The Gulf**Error! Bookmark not defined.** has a total area of approximately 600,000 square miles (1.5 million km$^2$), including state waters (Gore 1992).  In general reef fish are widely distributed in the Gulf,

occupying both pelagic and benthic habitats during their life cycle.  A planktonic larval stage lives in the water column and feeds on zooplankton and phytoplankton (GMFMC 2004a). Juvenile and adult reef fish are typically demersal and usually associated with bottom topographies on the continental shelf (less than 100 m) which have high relief.

As noted in Section 3.3, larval red grouper are found in the plankton across the west-Florida shelf and juveniles are generally found in shallow waters around structures and patch reefs. Adult red grouper are mostly found in the eastern Gulf on hard substrate.  Adult red grouper are known as ecological engineers because they are able to sediment and debris from favored hard substrate habitat (see Section 3.3).  There are environmental sites of special interest that are relevant to red snapper management.  These include the longline/buoy area closure**Error! Bookmark not defined.**, the Edges Marine Reserve, Tortugas North and South Marine Reserves, the Florida**Error! Bookmark not defined.** Middle Grounds habitat area of particular concern (HAPC), and the Pulley Ridge HAPC.  These areas are managed with gear restrictions to protect habitat and specific reef fish species.

Commercial and recreational fishing for reef fish occurs throughout the Gulf; however, most red grouper fishing occurs on the west Florida Shelf (see Section 3.5.1)**Error! Bookmark not defined.**.  There were 845 vessels with commercial reef fish permits at the end of 2018 (Table 3.1.1) and approximately 80% of the commercial reef fish permits have mailing recipients in Florida**Error! Bookmark not defined.**.  Final data for 2018 showed 1,312 for-hire permits (Table 3.1.4) and approximately 64% of the permits had mailing addresses in Florida.  The distribution of commercial and for-hire permits from other states can be found in Tables 3.1.1 and 3.1.4.

### 3.    Establish the timeframe for the analysis.

The timeframe for this analysis is 1984 to 2022.  Red grouper have been managed in the Gulf**Error! Bookmark not defined.** since the implementation of the Reef Fish FMP**Error! Bookmark not defined.** in 1984, which put in place a 20-inch TL**Error! Bookmark not defined.** minimum size limit.  The red grouper stock has been assessed periodically since 1991. The most recent stock assessment**Error! Bookmark not defined.** (SEDAR**Error! Bookmark not defined.** 61 2019) used data through 2017.  The current allocation of 76% commercial: 24% recreational allocation was established through Reef Fish Amendment 30B (GMFMC 2008c).  In 2018, the effort survey for MRIP changed from a phone-based survey to a mail-based survey. Those calibrations were incorporated into the SEDAR 61 assessment.  ABC projections from the SSC generally go out three years, or in the case, cover 2020-2022.

The following is a list of reasonably foreseeable future management actions.  These are described in more detail in Step 4.  Should new regulations be needed for the management of the red grouper stock, they would likely not be implemented until 2022 at the earliest, the end of the timeframe discussed in this analysis.

- The next assessment for red grouper through SEDAR**Error! Bookmark not defined.** has not been scheduled yet.  The current SEDAR schedule shows assessments through 2024.

The SEFSC conducted a red grouper interim analysis in late 2020; however, the SSC has not reviewed it, as of March 31, 2021.

The Council**Error! Bookmark not defined.** is currently developing several actions that could affect the reef fish fishery.  Actions affecting red grouper include:

- A generic amendment to revise the ABC control rule and framework procedures.
- A generic amendment to carryover**Error! Bookmark not defined.** unharvested quota to subsequent fishing years.
- Amendments 36B and 36C to modify commercial individual fishing quota**Error! Bookmark not defined.** (IFQ) programs.
- Amendment 48 to establish or revise status determination criteria and optimum yield**Error! Bookmark not defined.** (OY**Error! Bookmark not defined.**) for reef fish.

## 4.    Identify other actions affecting the resources, ecosystems, and human communities of concern.

Past actions affecting reef fish and red grouper are summarized in Section 1.4 and on the Council's website[47] and are incorporated here by reference.

### a.  The following are red grouper specific related actions and activities.

### i.        The following list identifies past actions affecting red grouper:

From 2009 to 2019, the Council**Error! Bookmark not defined.** took actions to revise the red grouper stock ACL.  The ACL increased from 7.72 mp in 2009 to **Error! Bookmark not defined.**10.77 mp in 2016.  However, the Council reduced the ACL to 4.16 mp in 2019 for several reasons including decreases in harvests, input from fishermen, and an interim stock analysis as detailed in Section 1.1.  Details on changes to the recreational ACL and fishing seasons are provided in Sections 1.4 and 3.1.

In May 2009, Amendment 30B was implemented, which set the current red grouper allocation between the recreational and commercial sectors.  It also established red grouper ACLs and AMs for the commercial and recreational sectors, adjusted recreational grouper bag limits and seasons, and reduced the red grouper commercial minimum size limit.  See Section 1.4 for more details on this amendment.

In January 2010, Amendment 29 was implemented and established an IFQ program for the commercial harvest of grouper and tilefish species in the reef fish fishery.

In May 2010, Amendment 31 was implemented.  It prohibited the use of bottom longline (BLL) gear shoreward of a line approximating the 35-fathom contour from June through August, created a BLL endorsement, and restricted the number of hooks a BLL vessel could carry. The area closure and hook requirements were initially established through an emergency rule.

---

[47] https://gulfcouncil.org/fishery-management/

A regulatory amendment implemented in January 2011 reduced total allowable catch (TAC) for red grouper from 7.57 mp gw to 5.68 mp gw resulting in a 4.32 mp gw commercial quota and 1.36 mp gw recreational catch limit.

A regulatory amendment implemented in November 2011 increased the red grouper TAC to 6.88 mp gw with subsequent increases each year from 2012 to 2015.  It also increased the red grouper bag limit to four fish per person.

In March 2012, Amendment 32 was implemented and set the red grouper commercial ACL at 6.03 mp gw and the recreational ACL at 1.90 mp gw.  It also added an overage adjustment, in-season, and bag limit reduction process to the red grouper recreational AMs.

In March 2013, Amendment 38 was implemented that revised the post-season recreational AM and modified the reef fish framework procedure to include the addition of AMs to the list of items that can be changed through the standard framework procedure.

In May 2015, a framework action was implemented to reduce the red grouper bag limit from four fish to two fish per person per day and eliminated the bag limit reduction AM.

In October 2016, a framework action was implemented that increased the commercial ACL to 8.19 mp gw and the commercial ACT, also called a quota in the codified regulations at 50 CFR 622, to 7.78 mp gw.  The recreational ACL was increased to 2.58 mp gw; and the recreational ACT to 2.37 mp gw.

In December 2017, Amendment 44 was approved and set the red grouper MSST to 50% of the biomass at maximum sustainable yield (MSY).

On June 12, 2018, NMFS**Error! Bookmark not defined.** published a final rule to implement Amendment 36A that requires owners or operators of federally permitted commercial Gulf**Error! Bookmark not defined.** reef fish vessels landing any commercially harvested, federally managed reef fish from the Gulf to provide notification prior to landing and to land at approved locations.  It also requires shares from the red snapper IFQ**Error! Bookmark not defined.** program and the grouper-tilefish IFQ program that are in non-activated IFQ accounts to be returned to NMFS for redistribution, and allows NMFS to withhold a portion of IFQ allocation**Error! Bookmark not defined.** at the start of a fishing year equal to an anticipated commercial quota reduction.

A temporary rule implemented in January 2019 withheld 59.4% of the red grouper IFQ allocation (4.78 mp gw) as a result of a proposed quota reduction.

> **ii.**    **The following list identifies more recent and present actions affecting red grouper:**

A May 2019 emergency rule reduced the red grouper commercial and recreational ACLs and ACTs consistent with a stock ACL of 4.16 mp gw.

A framework action implemented in October 2019 reduced the catch limits for red grouper consistent with the May 2019 emergency rule.

A Reef Fish framework action was approved by the Council and currently undergoing rulemaking that would prohibit fishing year-round in the Madison-Swanson and Steamboat Lumps Marine Protected Areas and prohibit the possession of Gulf reef fish, with no exception for vessels in transit unless the vessel has an operating vessel monitoring system and a valid federal commercial Gulf reef fish permit.

A Reef Fish framework action was implemented in March 2019 that modifies the on-board multi-day possession limit of fish species so that a second bag-limit can be retained at any time after the vessel leaves the dock for fishing trips that are greater than 30 hours in duration on qualifying vessels.

### iii.     The following list identifies RFFAs and activities affecting red grouper.

The purpose of Reef Fish Amendment 36B is to limit IFQ share ownership in shareholder accounts without a valid or renewable commercial reef fish permit, thereby promoting share ownership by fishermen who have the ability to land reef fish within the red snapper and grouper-tilefish IFQ programs.

The purpose of Amendment 36C is to assist small participants and new entrants to the IFQ programs, to reduce discards, and to increase access to shares to actively fishing eligible commercial fishermen.

The purpose of a generic amendment to revise the ABC control rule and framework procedures is to revise or replace the current ABC control rule, and to consider incorporating provisions to allow carry-over of uncaught ACLs, phase-in of changes to ABCs, and to consider developing a process to evaluate "economic, social, or ecological trade-offs when determining the risk policy for an ABC control rule."

### b.  The following are reef fish and ecosystem related actions and activities that also affect red grouper.

### i.     The following list identifies past actions/events affecting red grouper:

In April 2010, the *Deepwater Horizon***Error! Bookmark not defined.** MC252 deep-sea drilling rig exploded and sank off the coast of Louisiana**Error! Bookmark not defined.**.  Because of the resulting oil spill, approximately one-third of the Gulf**Error! Bookmark not defined.** was closed to fishing for much of the summer months.  The direct loss of fishing opportunities due to the closure**Error! Bookmark not defined.**, plus the reduction in tourism throughout the coastal Gulf, resulted in a much lower catch than had been projected (NMFS 2010).  Additionally, deep-water corals are particularly vulnerable to episodic mortality events such as oil spills, since corals are immobile.

In 2005 and 2014, severe red tide events are thought to have negatively affected red grouper populations.  A red tide event also occurred in 2017-2018 and is described in the next section.  During these years, stock assessments showed declines in the spawning stock biomass.  These red tide events are most common off the central and southwestern coasts of Florida where red grouper are primarily found.  For 2020, the Florida Fish and Wildlife Conservation Commission (FWC) did not report any severe red tide events through September (https://myfwc.com/research/redtide/).  The effects of red tide on fish are discussed in Section 3.3.

Amendment 34, effective on November 19, 2012, eliminated the earned income qualification requirement for the renewal of Gulf**Error! Bookmark not defined.** commercial reef fish permits and increased the maximum number of crew members for dual-permitted (commercial and for-hire) vessels.  The Council**Error! Bookmark not defined.** determined the existing earned income requirement in the reef fish fishery was no longer necessary and increasing the number of crew on dual-permitted vessels increased the safety on commercial trips, particularly for commercial spear fishermen.

A framework action effective March 5, 2014, required headboats to report their logbooks electronically in the Gulf**Error! Bookmark not defined.** reef fish and coastal migratory pelagic fisheries.

On April 9, 2014, NMFS**Error! Bookmark not defined.** published a final rule to modify the permitting and reporting requirements for seafood dealers who first receive species managed by the Council**Error! Bookmark not defined.**.  These revisions created a single dealer permit for dealers who first receive fish managed by the Council, required both purchase and non-purchase reports to be submitted online on a weekly basis, prohibited dealers from first receiving fish from federally permitted vessels if they are delinquent in submitting reports, and changed the sale and purchase provisions based on the new dealer permitting requirements.

Effective June 17, 2019, Amendment 49 adds three new sea turtle release gear options and simplifies existing requirements for fishermen with federal commercial or charter/headboat permits.  The amendment also modified the FMP framework procedure to streamline future changes to release gear and handling requirements for sea turtles.

ii.     **The following list identifies more recent and present actions/events affecting reef fish and related ecosystems:**

In February 2015, the National Oceanic and Atmospheric Administration**Error! Bookmark not defined.** (NOAA**Error! Bookmark not defined.**) published a Notice of Intent to consider possible expansion of the Flower Garden Banks National Marine Sanctuary**Error! Bookmark not defined.** (FGBNMS**Error! Bookmark not defined.**).  The preferred alternative establishes nine new areas and two areas that are expansions of existing sanctuary boundaries.  The potential impacts of the FGBNMS expansion are detailed in Chapter 5 of the FGBNMS Expansion draft environmental impact statement**Error! Bookmark not defined.** (EIS**Error! Bookmark not defined.**) and incorporated here by reference (Office of

National Marine Sanctuaries 2016).  Long-term beneficial impacts are anticipated if the proposed action is implemented.  The proposed alternatives limit some types of commercial fishing, but would not establish regional closures of fishing grounds or impact other fishery management activities arising from the review process by the Council**Error! Bookmark not defined.**.  The impacts on commercial fishing from the regulations were identified as minor.

In October 2017, Florida**Error! Bookmark not defined.** began to experience what would become one of the widest spread and most persistent red tide events on record.  As of November 2018, the red tide had spread to the western panhandle as well as the southeast coast of Florida.  It was reported as having dissipated in March 2019.  Its impacts on reef fish stocks are unknown, but may be taken into account in future stock assessments.

In 2018, the effort survey for MRIP**Error! Bookmark not defined.** changed from a phone-based survey to a mail-based survey.  On average, fishing effort estimates are higher with the new survey and calibrations between data from the old and new surveys have been completed.  Calibrations will be incorporated into future reef fish **Error! Bookmark not defined.**assessments as they are scheduled.  These calibrations were incorporated into SEDAR 61 (2019) to estimate landings.

In 2018, NMFS**Error! Bookmark not defined.** certified data collection programs for Alabama**Error! Bookmark not defined.**, Florida**Error! Bookmark not defined.**, and Mississippi**Error! Bookmark not defined.**.  Texas**Error! Bookmark not defined.** has its own sampling program and Louisiana**Error! Bookmark not defined.**'s has been used since 2013.  The Mississippi and Alabama programs are specific to red snapper, but the programs used by the other states collect information for other species, including red grouper.

In November 2018, NMFS**Error! Bookmark not defined.** published a proposed rule to modify charter vessel and headboat reporting requirements. The modifications require the owner or operator of a vessel with a federal for-hire permit to electronically declare (hail-out) a fishing trip before leaving port; submit an electronic fishing report for each trip prior to the vessel offloading the fish; and install NMFS-approved hardware and software with GPS capabilities that at a minimum archive the vessels position data and transmit data to NMFS.  The final rule for this action published in July 2020 and NMFS expects to implement the reporting program in 2021

In 2020, NMFS**Error! Bookmark not defined.** expects to publish a final rule to implement the actions in Amendment 9 to the Fishery Management Plan for Coral and Coral Reefs of the Gulf**Error! Bookmark not defined.** of Mexico**Error! Bookmark not defined.**, U.S. Waters (Coral Amendment 9; GMFMC 2018).  The rule would establish 13 new HAPCs with prohibitions on bottom tending fishing gear, 8 new HAPCs without fishing regulations, and prohibit dredge fishing in all HAPCs in the Gulf.  While data showed little fishing occurs in a majority of these areas, any reduction would help prevent impacts to reef fish habitat.

 **iii.** **The following list identifies RFFAs and activities affecting reef fish and related ecosystems:**

Amendment 53 - Red Grouper 126 Chapter 4.  Environmental
Allocations and Annual Catch Levels and Targets Consequences

0009548

The Council is working on several actions affecting reef fish.  These include framework actions to address lane snapper ACLs and AMs; greater amberjack bag limits, fishing year, and season; vermilion snapper ACLs and bag limit; gray triggerfish ACLs and recreational fixed closed season; and red snapper conversion ratios between state and MRIP landing estimates.

The overall harvest of recreational red grouper will continue to be monitored by NMFS**Error! Bookmark not defined.**, and will also be monitored by Florida, Louisiana, and Texas under their respective landings monitoring program.  Florida**Error! Bookmark not defined.** uses MRIP**Error! Bookmark not defined.** catch estimates paired with their own effort estimates.  The programs used by Louisiana**Error! Bookmark not defined.**, Alabama**Error! Bookmark not defined.**, Florida, and Mississippi**Error! Bookmark not defined.** to estimate landings of some reef fish have been certified by MRIP as statistically and scientifically valid.

An abbreviated framework action has been developed to replace reef fish and coastal migratory pelagic historical captain endorsements held by approximately 32 for-hire operators in the Gulf**Error! Bookmark not defined.** with standard Gulf charter/headboat (for-hire) permits.  This would reduce the regulatory and potential economic burden on historical captain permit holders.

A generic amendment to carryover**Error! Bookmark not defined.** unharvested quota to subsequent fishing years is being developed.  This would implement provisions to allow carryover of portions of ACLs that were unused due to landings uncertainty and management limitations, and to modify the framework procedure to allow carryover and other changes to operate in a timely manner.  Since Amendment 50 has an action to address carryover specifically for red snapper, the effects of this action have been analyzed in this document.

In April 2017, the Council**Error! Bookmark not defined.** passed a motion to begin working on an amendment, subsequent to Coral Amendment 9 (GMFMC 2018), that would address the 24 areas proposed by the Coral Working Group that were not included in Coral Amendment 9.  The 24 areas encompass existing HAPCs that do not currently have fishing regulations, and include some areas under consideration for the FGBNMS**Error! Bookmark not defined.**.  Additional recognition of sensitive coral and coral reef habitat or actions to reduce impacts to those areas could be beneficial for reef fish.

The Florida**Error! Bookmark not defined.** Keys National Marine Sanctuary is in the process of finalizing the draft EIS**Error! Bookmark not defined.** for the sanctuary management plan.  At this time, NMFS**Error! Bookmark not defined.** does not anticipate that actions and activities outlined in that plan would directly affect the Gulf**Error! Bookmark not defined.** reef fish fishery.  If the sanctuary area is expanded, reef fish fishermen could be affected; on the other hand, additional recognition of sensitive coral and coral reef habitat or actions to reduce impacts to those areas could be beneficial for reef fish.

Climate change projections show increases in sea surface temperature and sea level; decreases in sea ice cover; and changes in salinity, wave climate, and ocean circulation

(Intergovernmental Panel on Climate Change[48]).  These changes are likely to affect plankton biomass and fish larvae abundance that could adversely impact fish, marine mammals, seabirds, and ocean biodiversity.  NOAA**Error! Bookmark not defined.**'s Climate Change Web Portal[49] indicates that the average sea surface temperature in the Gulf**Error! Bookmark not defined.** will increase by 1.2-1.4ºC for 2006-2055 compared to the average over the years 1956-2005.  For reef fishes, Burton (2008)**Error! Bookmark not defined.** could cause shifts in spawning seasons, changes in migration patterns, and changes to basic life history parameters such as growth rates.  For species such as red grouper, there has been a distributional trend towards deeper waters.

Liquefied natural gas (LNG**Error! Bookmark not defined.**) facilities are being proposed in the western and northern Gulf**Error! Bookmark not defined.**.  These facilities can have a negative effect on species with pelagic larvae, like most reef fish species.  At this time, the effect of LNG facilities is unknown and is likely to be less for reef fish species than other more coastal species.  Other factors such as climate change**Error! Bookmark not defined.**, hurricanes, and oil and gas extraction could have detrimental effects on reef fish species, but these effects are poorly understood.

**5.     Characterize the resources, ecosystems, and human communities identified in scoping in terms of their response to change and capacity to withstand stress.**

This step should identify the trends, existing conditions, and the ability to withstand stresses of the environmental components.  According to the CEQ**Error! Bookmark not defined.** guidance describing stress factors, there are two types of information needed.  The first are the socioeconomic driving variables identifying the types, distribution, and intensity of key social and economic activities within the region.  The second are the indicators of stress on specific resources, ecosystems, and communities.

**a.   Socioeconomic driving variables identifying the types, distribution, and intensity of key social and economic activities within the region**

The socioeconomic driving variables identifying the types, distribution, and intensity of key economic and social activities within the region are described in detail in Sections 3.4-3.5.  As of February 27, 2020, there were 1,270 valid or renewable for-hire reef fish permits.  From 2014 through 2018, the majority of headboat angler days occurred in Florida, followed by Texas and Alabama.  Combined, Mississippi and Louisiana accounted for only a small percentage of headboat angler days.  From 2012 through 2016, the private angling component of the recreational sector took an average of at least 228,122 directed angler trips annually.  From 2014 through 2018, the private angling component of the recreational sector took an average of 460,677 red grouper target trips and an average of 915,624 catch trips.  By mode, the majority of charter trips and private angler trips occurred in Florida, followed by a small number of trips in Alabama.  Landings from the private angling component constituted 85% of the total recreational sector's landings from

---

[48] http://www.ipcc.ch/
[49] http://www.esrl.noaa.gov/psd/ipcc/ocn/

2014 through 2018.  As of February 27, 2020, there were 834 valid or renewable commercial reef fish permits.  The number of vessels commercially harvesting red grouper from 2015 to 2018 has been relatively stable, ranging between 374 and 384 vessels. Between 2014 and 2018, commercial red grouper landings have fallen by 57%, and revenue has fallen by 49%.  As of February 19, 2020, there were 495 IFQ accounts holding red grouper shares, and those IFQ accounts are held by 436 businesses.  The number of dealers purchasing red grouper landings decreased by 19% from 2014 to 2018, from 110 dealers to 89 dealers.  The majority of commercial red grouper landings occur along the west coast of Florida, and the top ten counties with commercial vessels with red grouper landings in 2018 are all in Florida.

**b. Indicators or stress specific resources, ecosystems, and communities**

### i.       Ecosystem

With respect to stresses to the ecosystem from actions in this amendment, modifying sector allocations and setting ACLs and ACTs are not likely to create additional stress. Vertical-line gear, the primary gear used by the reef fish fishery, and longlines can damage habitat through snagging or entanglement; however, these impacts are minimal. Changes in the population size structure as a result of shifting red grouper fishing selectivities and increases in stock abundance could lead to changes in the abundance of other reef fish species that compete with red grouper for shelter and food.  Predators of red grouper could increase if red snapper abundance is increased, while species competing for similar resources as red grouper could potentially decrease in abundance if food and/or shelter are less available.  As described in Part 4 of this CEA**Error! Bookmark not defined.**, red tide, the *Deepwater Horizon***Error! Bookmark not defined.** MC252 and climate change**Error! Bookmark not defined.** have affected the Gulf**Error! Bookmark not defined.** overall.

### ii.      **Reef Fish/Red Grouper**Error! Bookmark not defined. **Stock**

In the early 2000's major stresses to the red grouper stock have primarily come from the stock being overfished and experiencing overfishing**Error! Bookmark not defined.**, which was documented in the 2002 stock assessment (Schirrippa and Legault 2002). Subsequent assessments have shown the stock is neither overfished or undergoing overfishing.  Trends in landings and the status of the red grouper stock are based on NMFS**Error! Bookmark not defined.** and SEDAR**Error! Bookmark not defined.** stock assessments (summarized in Sections 3.1 and 3.3) and are incorporated here by reference.  It is likely the red grouper stock has been adversely affected by the red tide eventsas evidenced in dips in recruitment  following the red tide events in 2005, 2014, and 2017-2018.

As mentioned previously, natural events such as red tide could be a source of stress on reef fish, including red grouper.  However, the extent and magnitude of that impact is unknown, and may not be apparent for several years, until subsequent recruitment data are available.  Additionally, climate change**Error! Bookmark not defined.** is already

influencing red grouper.  For reef fishes, Burton (2008) speculated that climate change could cause shifts in spawning seasons, changes in migration patterns, and changes to basic life history parameters such as growth rates.  For red grouper, declines in biomass have been linked to large-scale and persistent red tide events (SEDAR 61 2019).

### iii.        Reef Fish Fishing Communities

Fisheries are subject to stress as a result of increases in fishing costs, increases in harvesting efficiency, more restrictive regulations (particularly for red grouper), and changes in the stock status of certain species (effort shifting).  Reductions in dollars generated would likely be felt in the fishery infrastructure (e.g., marinas, bait and tackle shops).  For the reef fish fishery, an indicator of stress would be a decline in the number of permitted vessels or a decrease in landings.

In the Gulf, red grouper is harvest primarily in Florida.  Total recreational and commercial landings for the years 1986 through 2005, based on SEDAR 12, and for the years 1986 through 2019, based on the SEFSC ACL monitoring dataset, are provided in Table 2.1.1.

Declines in fishing permits may be a signal of stress within the fishery.  The number of valid or renewable for-hire Gulf reef fish permits has declined gradually from 1,458 permits in 2008 to 1,277 permits in 2019.  Likewise, the number of valid or renewable commercial Gulf reef fish permits has gradually declined from 1,099 permits in 2008 to 842 permits in 2019.  The number of businesses in 2019 associated with the 1,099 commercial reef permits is 637, with 543 business (85.2% of the businesses) holding only one permit each (64.5% of the permits).  The number of commercial vessels harvesting red grouper has remained relatively stable at 384 in 2014 and at 376 in 2018, while red grouper landings have declined from 5,497,993 lbs gutted weight in 2014 to 2,361,280 lbs gutted weight in 2018.  In addition, the number of dealers that purchased red grouper landings steadily decreased from 110 in 2014 to 89 in 2018, or by 19%.  These declines may reflect the difficulties in maintaining participation in the fishery.

With a broad view for the reef fish fishery, effort in the commercial sector has decreased significantly according to multiple measures.  Between 2006 and 2014, the number of vessels, trips, and days at sea decreased by 31%, 38%, and 28%, respectively.  However, landings of Gulf reef fish were relatively unchanged, decreasing by about 4% during that time.  Thus, output per unit of input (one measure of productivity) has increased significantly since the IFQ programs were implemented.  Further, even though landings have remained about the same, the average ex-vessel price of Gulf reef fish landings increased by 20% during this time, resulting in a 16% increase in total annual revenues from these landings.

Because productivity increased, costs decreased, with crew costs decreasing by 6% and other variable costs (supplies, fuel, etc.) decreasing by 33%.  Even though fuel prices increased by 25%, a 49% decrease in fuel usage served as the primary driver of the decline in other variable costs.

Table 3.5.1.1 identifies the number of vessels landing red grouper by top 10 county homeports.  All 10 of those county homeports are located in Florida.

Several natural disasters have impacted coastal communities in the Gulf**Error! Bookmark not defined.** in recent years.  The effects of these events on fishing communities may take several years to understand and become fully apparent.  The Department of Commerce determined commercial fishery disasters for Hurricane Harvey (2017) in Texas,**Error! Bookmark not defined.** and Hurricanes Irma (2017) and Michael (2018) in Florida**Error! Bookmark not defined.**.  As of December 15, 2020, determinations are pending for Florida Red Tide Events (2015-2019), Gulf of Mexico Freshwater Flooding (2019) in Louisiana, Mississippi, and Alabama, and Hurricane Laura (2020) in Louisiana.  These determinations provide the basis for Congress to appropriate fishery disaster assistance for the new fiscal year in which it is declared.

### iv.        Administrative Environment

The stresses to the administrative environment from these actions would include: 1) converting landings from MRIP-CHTS data to MRIP-FES; 2) rulemaking for in-season fishing closures for the recreational sector due to managing to decreased recreational ACLs; 3) an increased potential for overfishing of red grouper if there is an increase in allocation the recreational sector, which is associated with more uncertainty in constraining harvest.  However, none of these stresses are likely to be significant.  Updating catch levels using MRIP-FES estimates for historical recreational landings would result in some beneficial impacts because NMFS would not be required to convert landings estimates to monitor harvest.  Shifting allocation to the recreational sector could increase the likelihood of overfishing because of the uncertainty associated with monitoring landings.  However, an ACT will remain in place to help ensure that the recreational ACL is not exceeded on a regular basis, which will reduce the likelihood of total red grouper landings exceeding the OFL.

**6.    Characterize the stresses affecting these resources, ecosystems, and human communities and their relation to regulatory thresholds.**

This section examines whether resources, ecosystems, and human communities are approaching conditions where additional stresses could have an important cumulative effect beyond any current plan, regulatory, or sustainability threshold (CEQ**Error! Bookmark not defined.** 1997).  Sustainability thresholds can be identified for some resources, which are levels of impact beyond which the resources cannot be sustained in a stable state.  Other thresholds are established through numerical standards, qualitative standards, or management goals.  The CEA**Error! Bookmark not defined.** should address whether thresholds could be exceeded because of the contribution of the proposed actions to other cumulative activities affecting resources.

Overall the purposes of this amendment are to revise the red grouper allocation between the commercial and recreational sectors using the best scientific information available and to modify the total and sector ACLs based on results of the recent stock assessment (SEDAR 61 2019) and

subsequent OFL and ABC recommendations from the SSC. These actions are not being implemented because a resource, ecosystem, or human community is approaching conditions where additional stresses could have an important cumulative effect beyond any current plan, regulatory, or sustainability threshold.

### i.  Ecosystem

The stresses associated with the proposed actions in relation to regulatory thresholds are not likely to cause beneficial or adverse effects on the ecosystem.  The actions would not change the way the reef fish fishery as a whole is prosecuted.  Actions in the amendment would directly affect red grouper fishing and not fishing for the other species in the fishery management unit with the possible exception of gag, which can be caught with red grouper multi-use IFQ allocation.  Thus, significant effects on the ecosystem are not expected.  The overall Gulf-wide fishing effort would remain constrained by actions that keep quotas and ACLs from being exceeded.  As described in Steps 4 and 5, red tide and climate change may affect red grouper.  Effects from red tide have been shown to have adverse effects on the red grouper population as described in SEDAR 61 (2019).  Effects from climate change are poorly understood as described in Section 3.3.

### ii. Reef Fish/Red GrouperError! Bookmark not defined. Stock

Amendment 1 to the Reef Fish FMP (GMFMC 1989), implemented in 1990 before the Sustainable Fisheries Act (SFA) was passed, established the minimum spawning stock biomass at 20% SPR for all reef fish species as well as established the shallow-water grouper quota, which included red grouper.  The commercial shallow-water quota was increased through two 1991 framework actions (GMFMC 1991a and 1991b).  The Generic SFA Amendment (GMFMC 1999) proposed SFA definitions for OY, MSST, and maximum fishing mortality threshold (MFMT) for reef fish species.  The red grouper definition of MFMT was $F_{30\%SPR}$.  Definitions for OY and MSST were disapproved because they were not biomass-based.  Due to over harvest, Secretarial Amendment 1 (GMFMC 2004) established a rebuilding plan, set OY and MSST, and established a red grouper quota within the shallow water grouper quota.  Amendment 30B (GMFMC 2008) established red grouper ACLs and AMs.  In 2017, the definition of MSST was revised from $(1-m)*B_{MSY}$ to $0.50*B_{MSY}$.

Prior to the SEDAR assessment process, red grouper was assessed by the SEFSC on a periodic basis.  A 1999 stock assessment (Schirripa et al. 1999) found the red grouper stock to be overfished, but a subsequent 2002 assessment (NMFS 2002) found the stock to no longer be overfished or undergoing overfishing.  Subsequently, the red grouper stock has been assessed through SEDAR stock assessments (SEDAR 12 2006, SEDAR 12 Update 2009, and SEDAR 42 2015) and these assessments have found the stock not to be overfished or undergoing overfishing.  However, the assessments have found declines in the population that are likely associated with large-scale red tide events.  A brief description of the stock and its status can be found in Section 3.3 and Step 5 of this CEA.  Measures proposed in this amendment are not likely to adversely affect the red grouper

stock status as long as landings do not exceed the OFL.  At this time, it is unclear how climate change may affect these regulatory thresholds (see Steps 4 and 5).

The actions in this amendment, particularly those to set the OFL, ACLs, and ACTs are likely to benefit the stock as they provide harvest limits not to be exceeded.  The actions are consistent with the Magnuson-Stevens Act**Error! Bookmark not defined.** and the Reef Fish FMP.**Error! Bookmark not defined.Error! Bookmark not defined.** Consistency with the Magnuson-Stevens Act and Reef Fish FMP requires, among other things, preventing overfishing**Error! Bookmark not defined.**, rebuilding declining reef fish stocks, monitoring the reef fish fishery, conserving and increasing reef fish habitats, and minimizing conflicts between user groups.  Under all alternatives, red grouper fishing would remain subject to a Gulf**Error! Bookmark not defined.**-wide closure**Error! Bookmark not defined.** if the recreational sector total ACL**Error! Bookmark not defined.** is projected to be met.  The commercial sector is managed under an IFQ program that limits harvest to the ACL due to strict management protocols commercial fishermen must follow.

### iii.       Reef Fish Fishing Communities

Regulatory thresholds for reef fish fishing communities would not be exceeded because of the combined effects of modifications to sector allocations, OFL, ABC, ACLs, ACTs and other activities affecting the fishery and fishing communities.  For specific information regarding the effects of actions in this amendment on the economic and social environment of fishing communities see Sections 4.1.3-4.1.4 and 4.2.3-4.2.4.  Fishing communities are subject to stress as a result of increases in fishing costs, increases in harvesting efficiency, more restrictive regulations (particularly for red grouper), and changes in the stock status of certain species (effort shifting).  Reductions in dollars generated would likely be felt in the fishery infrastructure.  The purposes of the actions in this amendment are to revise the red grouper allocation between the commercial and recreational sectors using the best scientific information available and to modify the total and sector ACLs based on results of the recent stock assessment and subsequent OFL and ABC recommendations from the SSC.  Lack of consideration of the best scientific information available would result in a de facto reallocation between the commercial and recreational sectors.

### iv.       Administrative Environment

Thresholds would likely not be exceeded because of the combined effects of reallocating red grouper catch among the commercial and recreational sectors are actions that fall within the confines of the Magnuson-Stevens Act.  For specific information regarding the effects of actions in this amendment on the administrative environment, see Sections 4.1.5 and 4.2.5.  The effects on the administrative environment for the federal government are expected to be positive, because they are less likely to result in exceeding thresholds, although there could be minor periodic increases in administrative burden due to closures necessitated by exceeding recreation catch limits.  However, federal entities have mechanisms in place to help address any increase in administrative impacts, such as

monitoring and enforcement programs.  In addition, federal and state entities monitor the harvest of many species of fish and even if seasonal closures occurred with increased frequency, it would not significantly increase the existing burden.

Ultimately, if the actions in this amendment result in management using more accurate catch data, it should reduce stresses on the administrative environment because it would reduce the risk of overfishing and of the stock becoming overfished, which would necessitate implementation of a rebuilding plan.

**7.    Define a baseline condition for the resources, ecosystems, and human communities.**
The purpose of defining a baseline condition for the resource and ecosystems in the area of the proposed actions is to establish a point of reference for evaluating the extent and significance of expected cumulative effects.

### i.    Ecosystem

A baseline for analysis of the physical environment, as discussed in Section 3.2, was conducted in the EIS**Error! Bookmark not defined.** for the Generic EFH**Error! Bookmark not defined.** Amendment.  The Gulf**Error! Bookmark not defined.** has a total area of approximately 600,000 square miles (1.5 million km$^2$), including state waters (Gore 1992).  It is a semi-enclosed, oceanic basin connected to the Atlantic Ocean by the Straits of Florida**Error! Bookmark not defined.** and to the Caribbean Sea by the Yucatan Channel.  Oceanographic conditions are affected by the Loop Current, discharge of freshwater into the northern Gulf, and a semi-permanent, anti-cyclonic gyre in the western Gulf.  The Gulf includes both temperate and tropical waters (McEachran and Fechhelm 2005).  Gulf water temperatures range from 54º F to 84º F (12º C to 29º C) depending on time of year and depth of water.  Mean annual sea surface temperatures ranged from 73º F through 83º F (23-28º C) including bays and bayous between 1982 and 2009, according to satellite-derived measurements.[50]  In general, mean sea surface temperature increases from north to south with large seasonal variations in shallow waters.  In the Gulf, larval red grouper are found in the plankton across the west-Florida shelf (SEDAR 42 2015) and juvenile red grouper are generally found in shallow waters around structures and patch reefs.  As red grouper mature, they move offshore to hard bottom areas (Moe 1969).  Red grouper are known to alter the offshore hard bottom areas by removing sand and other debris from limestone solution holes using their mouths and fins.  The removal of the sediment creates sites for organisms such as sponges and corals to colonize, which in turn provides shelter for small sessile creatures like shrimp and small fish (Coleman et al. 2010).

### ii.    Reef Fish/Red Grouper Stock

The biological environment of the Gulf**Error! Bookmark not defined.**, including that of red grouper, is described in Section 3.3 of this amendment.  Red grouper demonstrate the typical reef fish life history pattern.  Eggs and larvae are pelagic while juvenile red

---

[50] NODC 2012:  http://accession.nodc.noaa.gov/0072888

Amendment 53 - Red Grouper
Allocations and Annual Catch Levels and Targets
134
Chapter 4.  Environmental
Consequences

0009556

grouper are generally found in shallow waters around structures and patch reefs. Juveniles then migrate offshore to hard-bottom habitats. Red grouper are protogynous hermaphrodites, transitioning from females to males at older ages, and form harems for spawning.

Red grouper is not considered overfished or undergoing overfishing. Recruitment remains highly variable with strong recruitment events observed in 1995, 1998, 2001, 2005, and 2013. However, episodic red tide events have been linked to significant mortality events, such as the one in 2018. As such, SEDAR 61 estimated the stock size to be below $B_{30\% \, SPR}$, although above MSST.

### iii.    Reef Fish Fishing Communities

See Sections 3.4 and 3.5 for more information relative to fishing communities. Information on the social environment of the reef fish fishery is available, primarily for the commercial sector; information on the social environment for the recreational sector is general to reef fish and not specific to red grouper. Approximately 99.7% of red grouper recreational landings on average were recorded in Florida. However, as previously mentioned, red grouper landings for the recreational sector are not available at the community level, making it difficult to identify communities as dependent on recreational fishing for red grouper. Private vessels account for the majority of red grouper recreational landings on average (2014 through 2018), followed by charter vessels and headboats. In 2018, 376 commercial vessels harvested red grouper in the Gulf, and 89 dealers purchased red grouper landings. Also, see Section 5.b.iii in this CEA**Error! Bookmark not defined.** for more information about the baseline condition of the reef fish fishing communities.

### iv.    Administrative Environment

Federal fishery management is conducted under the authority of the Magnuson-Stevens Act**Error! Bookmark not defined.** (16 U.S.C. 1801 *et seq.*), originally enacted in 1976 as the Fishery Conservation and Management Act. The Magnuson-Stevens Act claims sovereign rights and exclusive fishery management authority over most fishery resources within the exclusive economic zone**Error! Bookmark not defined.**, an area extending 200 nautical miles**Error! Bookmark not defined.** from the seaward boundary of each of the coastal states, and authority over U.S. anadromous species and continental shelf resources that occur beyond the EEZ**Error! Bookmark not defined.**. State waters refer to the area from shore out to the seaward boundary of each state. The seaward boundary of Florida**Error! Bookmark not defined.** on the Gulf**Error! Bookmark not defined.** coast and Texas**Error! Bookmark not defined.** is 9 nautical miles (nm**Error! Bookmark not defined.**) from shore. The seaward boundary of Alabama**Error! Bookmark not defined.**, Mississippi**Error! Bookmark not defined.**, and Louisiana**Error! Bookmark not defined.** is generally 3 nm from shore. However, the 2016 Department of Commerce Appropriations Act extended the seaward boundary of Alabama, Mississippi, and Louisiana to 9 nm from shore for purposes of management activities under the Reef Fish FMP**Error! Bookmark not defined.**, which includes the management of red snapper. Responsibility for federal fishery management is shared by

the Secretary**Error! Bookmark not defined.** of Commerce**Error! Bookmark not defined.** and the Council**Error! Bookmark not defined.** for the federal waters of the Gulf.

Recreational red grouper landings in the Gulf**Error! Bookmark not defined.** are obtained through multiple sources (see Section 2.2).  The SRHS covers headboats in the Gulf and South Atlantic.  The MRIP**Error! Bookmark not defined.** provides private angling and charter vessel landings and effort data for Gulf states other than Texas**Error! Bookmark not defined.** and Louisiana**Error! Bookmark not defined.**.  Texas conducts its own sampling program (Marine Sport-Harvest Monitoring Program) and provides recreational landings, except for headboat landings, from Texas.  Data from Louisiana's sampling program (LA Creel) has been used since 2013.  The other Gulf states have developed sampling programs that have recently been certified by MRIP, which originated to monitor the harvest of red snapper, including Mississippi**Error! Bookmark not defined.** (Tails n' Scales), Alabama**Error! Bookmark not defined.** (Snapper Check), and Florida**Error! Bookmark not defined.** (Gulf Reef Fish Survey); however, Alabama and Mississippi do not track red grouper landings.  Commercial landings and effort are monitored through NOAA Fisheries' Grouper-Tilefish IFQ program and through trip ticket data.  All sampling programs track red snapper landings, and may not sample red grouper.

The Southeast Region issues several fishing permits and endorsements for fisheries activities in federal waters**Error! Bookmark not defined.**.  There are 41 permits and are as follows:  33 vessel permits and endorsements, 3 dealer permits, 1 operator permit, 1 high seas permit, 1 wreckfish permit, 1 aquaculture of live rock permit, and 1 Columbia treaty waters permit.  In addition, there is an endorsement required to be able to bottom longline with a commercial reef fish permit.  More details on the administrative environment can be found in Section 3.6.

**8.  Identify the important cause-and-effect relationships between human activities and resources, ecosystems, and human communities.**

Cause and effect relationships are presented in Table 4.3.1.

**Table 4.3.1.** The cause and effect relationship of fishing and regulatory actions for red grouper within the time period of the CEA**Error! Bookmark not defined.**.

| Time Period | Cause | Observed and/or expected effects |
|---|---|---|
| **1800-2022** | Climate Change | Changes in ocean acidity and temperature modifies fish and prey distributions and productivity; threaten fishing communities through sea level rise and changing weather patterns. |
| **1962-2004** | Growth and recruitment overfishing**Error! Bookmark not defined.** | Declines in mean size and weight |
| **1990** | 9.2 mp shallow-water grouper quota for commercial sector, 20-inch minimum size limit and 5-grouper fish bag limit**Error! Bookmark not defined.** | Slowed rate of fishing**Error! Bookmark not defined.** |
| **1991-1992** | 9.8 mp shallow-water grouper quota for commercial sector | Increased rate of fishing**Error! Bookmark not defined.** |
| **1999 - 2010** | Prohibit commercial sale of red grouper from February 15-March 15 | Slow commercial fishing and protect spawning stock |
| **2004 - 2009** | Establish 5.31 mp gw commercial quota and a 1.25 mp gw recreational target catch level, reduced the red grouper bag limit to two fish | Constrain harvest |
| **2005 - 2010** | Establish a series of trip limit reductions for the commercial sector's harvest of grouper; reduce recreational bag limit to one fish | Constrain commercial and recreational harvest |
| **2006 - 2010** | Establish a 6,000-pound gw aggregate deep-water grouper and shallow-water grouper trip limit, prohibit for-hire vessel captains and crews from retaining bag limits | Constrain commercial and recreational harvest |
| **2007 – 2015** | Recreational closed season for red grouper from February 15 to March 15 | Slow commercial fishing and protect spawning stock |
| **2009 - present** | Establish ACLs and AMs for the commercial and recreational sectors, adjusted recreational grouper bag limits and seasons, reduced the red grouper commercial minimum size limit | Constrain commercial and recreational harvest |
| **2010 - present** | Prohibit the use of BLL gear shoreward of a line approximating the 35-fathom contour from June through August | Protect sea turtles |

| Time Period | Cause | Observed and/or expected effects |
|---|---|---|
| **2010** | Reduce the commercial quota from 5.75 to 5.23 mp gw, and the recreational catch limit from 1.82 to 1.65 mp gw | Constrain commercial and recreational harvest |
| **2010 - present** | Establish a grouper-tilefish IFQ program that includes red grouper | Manage the commercial grouper quotas so to stay within its ACLs |
| **2012 - 2015** | Increase the red grouper commercial ACL to 6.03 mp and the recreational ACL to 1.90 mp | Improved stock size allowing greater harvests**Error! Bookmark not defined.** |
| **2015 - present** | Reduce the red grouper bag limit from four fish to two fish per person. Revise fixed closed season of February 1 through March 31 to waters beyond the 20-fathom contour | Constrain recreational harvest of red grouper |
| **2016-2018** | Increase the red grouper commercial ACL to 6.19 mp and the recreational ACL to 2.58 mp | Improve stock size allowing greater harvests |
| **2019 - present** | Reduce the commercial ACL to 3.16 mp gw and the recreational ACL is 1.00 mp gw | Constrain commercial and recreational harvest and protect the stock spawning biomass |

9.  **Determine the magnitude and significance of cumulative effects**Error! Bookmark not defined.**.**

The primary objectives of this amendment and associated EIS**Error! Bookmark not defined.** are to revise the red grouper allocation between the commercial and recreational sectors using the best scientific information available and to modify the total and sector ACLs based on results of the SEDAR 61 2019 stock assessment and subsequent OFL and ABC recommendations from the SSC.  The short and long-term direct and indirect effects**Error! Bookmark not defined.** of each these actions are provided in Sections 4.1-4.2.  The following discussion refers to the effects of past, present, and RFFAs on the various valued environmental components**Error! Bookmark not defined.** (VEC**Error! Bookmark not defined.**).  Important VECs were identified for the overall actions to be taken with this amendment.  VECs are "any part of the environment that is considered important by the proponent, public, scientists and government involved in the assessment process.  Importance may be determined on the basis of cultural values or scientific concern" (Environmental Information Partnership 1998).  For purposes of this analysis, an initial 22 VECs were identified, and the consequences of each alternative proposed in this amendment on each VEC were evaluated.  Some of these VECs were combined into a revised VEC because many of the past, current, and RFFAs were similar.  Based on this analysis, four VECs were determined to be the most important for further consideration.  The four VECs are shown in Table 4.3.2.

**Table 4.3.2.** Valued environmental components (VEC**Error! Bookmark not defined.**) identified.

| VECs considered for further evaluation | VECs consolidated for further evaluation | VECs not included for further evaluation |
|---|---|---|
| **Ecosystem** | Hard bottom/EFH**Error! Bookmark not defined.** Prey species Competitors Predators | Sharks Protected species |
| **Reef Fish/Red Grouper**Error! Bookmark not defined. **Stock** | Red grouper Other reef fish | |
| **Reef Fish Fishery** | Vessel owner Captain Crew Anglers Dealers Fishing Communities Fishing support businesses (ice and gear suppliers, marinas, fuel docks) | |
| **Administration** | Federal Rulemaking Federal Permitting Federal Education Federal Enforcement Federal Monitoring State Rulemaking State Education State Enforcement State Monitoring | |

VECs not included for further analysis were sharks, protected resources, and consumers. Many longline vessels that target reef fish also target sharks.  However, sharks were not considered as an important VEC**Error! Bookmark not defined.** because, as shark stocks have declined, the shark fishery has become more and more regulated, limiting the effects of this fishery and the stock on reef fish stocks.  Protected resources were also eliminated from further analyses in this section.  As described in Section 3.3, biological opinions have concluded the primary reef fish gear (longline and hook-and-line) were not likely to jeopardize listed species or their critical habitat.  Because actions considered in this amendment are not expected to change how reef fish fishing gear is used in the prosecution of the reef fish fishery, any take associated with reef fish fishing should not exceed that considered in biological opinions.  All other ESA**Error! Bookmark not defined.**-listed species heave been found not likely to be adversely affected or not affected by the reef fish fishery.  For marine mammals, gear used in the reef fish fishery were classified as Category III fisheries (see Section 3.3).  This means this fishery has minimal impacts on marine mammals.  Consumers were eliminated due to a lack of data for this aspect of the reef fish fishery.

i.   **Ecosystem**

EFH**Error! Bookmark not defined.**, as defined for the Reef Fish FMP**Error!**

**Bookmark not defined.** (GMFMC 2004a) consists of all Gulf**Error! Bookmark not defined.** estuaries; Gulf waters and substrates extending from the US/Mexico border to the boundary between the areas covered by the Gulf and South Atlantic Fishery Management Councils from estuarine waters out to depths of 100 fathoms.  Section 3.2 and GMFMC (2004a) describe the physical environment inhabited by red grouper as well as reef fish in general.  Red grouper is a carnivorous bottom dweller, generally associated (as adults) with hard-bottom substrates (GMFMC 2004a).  Eggs and larvae are pelagic while juveniles are found in shallow waters around structures and patch reefs.

From fishing, the most sensitive gear/habitat combinations include EFH**Error! Bookmark not defined.** for reef fish species.  These include fish otter trawls, shrimp otter trawls, roller frame trawls, and pair trawls over coral reefs; crab scrapes over coral reefs; oyster dredges over submerged aquatic vegetation, oyster reefs, or coral reefs; rakes over coral reefs; and patent tongs over submerged aquatic vegetation, oyster reefs, or coral reefs (GMFMC 2004a).  Some of these gear/habitat interactions are unlikely to occur in actual practice (e.g., shrimp trawls towed through hard bottom areas can destroy shrimp nets and so are avoided).  In general, gear that are actively fished by towing have the highest potential to alter habitats.  However, some habitats, such as coral reefs and hard bottoms are sensitive to interactions with passive gear (e.g., traps) as well.  Most directed reef fish fishing activities, as described previously in this document and CEA**Error! Bookmark not defined.**, use longlines and handlines, although a few fish are taken by spearfishing gear.  These have low levels of impacts compared to other gear types.

In the past, some fishing practices have had detrimental effects on the physical environment.  Gear such as roller trawls and fish traps damaged habitats while harvesting fish species.  Because of these effects, the Council**Error! Bookmark not defined.** developed stressed areas to reduce these impacts.  Further protections have been developed, primarily by either prohibiting fishing or limiting fishing activities that can occur within certain areas.  Detailed information on the closures and preserves is provided in Coral Amendment 9 (GMFMC 2018).  In addition, regulatory changes through Generic EFH**Error! Bookmark not defined.** Amendment 3 (GMFMC 2005; implemented in 2006) prohibited bottom anchoring and the use of trawling gear, bottom longlines, buoy gear, and all traps/pots to protect coral reefs in several HAPCs.  Generic EFH Amendment 3 also required a weak link in the tickler chain of bottom trawls on all habitats throughout the Gulf**Error! Bookmark not defined.** federal waters to minimize damage done to habitats should the chain get hung up on natural bottom structures.

Current allowable gear types can adversely affect hard bottom areas; however, these impacts are not considered significant (see Section 4.1.1).  Vertical-line gear and longlines used in the reef fish fishery can damage habitat through snagging or entanglement.  Longlines can also damage hard bottom structures during retrieval as the line sweeps across the seafloor.  Additionally, anchoring over hard-bottom areas can also affect benthic habitat by breaking or destroying hard bottom structures.  However, these gear types are not believed to have much negative impact on bottom structures and are considerably less destructive than other commercial gear, such as traps and trawls, which

are not allowed for reef fish fishing.

Damage caused from reef fish fishing, although minor, is associated with the level of fishing effort (see Section 4.1.1). Therefore, actions reducing levels of effort would result in greater benefits to the physical environment, because fishing related interactions with habitat would be reduced. Thus, actions described in Steps 3 and 4 of this CEA**Error! Bookmark not defined.** which have reduced fishing effort for some species, and possibly the fishery on the whole, have had a positive effect on hard bottom habitats. RFFAs, such as Coral Amendment 9 (GMFMC 2018) and the FGBNMS**Error! Bookmark not defined.** management plan, should also benefit these habitats as they would also reduce or limit fishing effort. As described in Sections 4.1-4.3, effects on the physical environment from the proposed actions would likely be minimal because prosecution of the fishery should not be changed.

Reef fish EFH**Error! Bookmark not defined.**, particularly coral reefs and submerged aquatic vegetation, are particularly susceptible to non-fishing activities (GMFMC 2004a). The greatest threat comes from dredge-and-fill activities (ship channels, waterways, canals, and coastal development). Oil and gas activities as well as changes in freshwater inflows can also adversely affect these habitats. As described in Step 4.b.i of this CEA**Error! Bookmark not defined.**, the potential harm to reef fish habitat was highlighted by the *Deepwater Horizon***Error! Bookmark not defined.** MC252 incident. Essential fish habitat and HAPC**Error! Bookmark not defined.** designations are intended to promote careful review of proposed activities that may affect these important habitats to assure that the minimum practicable adverse impacts occur on EFH. However, NMFS**Error! Bookmark not defined.** has no direct control over final decisions on such projects. The cumulative effects of these alternatives depend on decisions made by agencies other than NMFS, as NMFS and the Council**Error! Bookmark not defined.** have only a consultative role in non-fishing activities. Decisions made by other agencies that permit destruction of EFH in a manner that does not allow recovery, such as bulkheads on former mangrove or marine vegetated habitats, would constitute irreversible commitments. However, irreversible commitments should occur less frequently as a result of EFH and HAPC designations. Accidental or inadvertent activities such as ship groundings on coral reefs or propeller scars on seagrass could also cause irreversible loss.

At this time, it is unclear what effects climate change**Error! Bookmark not defined.** will have on red grouper EFH**Error! Bookmark not defined.**. Factors associated with climate change such as ocean acidification could negatively affect important biotic components of red grouper EFH such as corals (IPCC 2014). Hollowed et al. (2013) has identified important ecosystem paths that deserve future study to determine climate change cause and effects.

Hypoxic events such as the Northern Gulf Hypoxic Zone and hypoxia associated with red tide can adversely affect fish including red grouper. However, red grouper is not likely to be adversely affected by the Northern Gulf Hypoxic Zone as is most commonly found in the eastern Gulf. Many marine species, including reef fish species, are adversely affected

by red tide not only through hypoxia associated with red tide, but from the toxins released by the red tide algae itself.  These adverse effects show themselves declines in stock abundance following events as shown for red grouper (see Section 3.3 and SEDAR 61 2019).

**ii.      Reef Fish/Red Grouper**Error! Bookmark not defined. **Stock**

The Reef Fish FMP**Error! Bookmark not defined.** currently encompasses 31 species (Table 3.3.1).  Eleven other species were removed from the FMP in 2012 through the Generic ACL**Error! Bookmark not defined.**/AM**Error! Bookmark not defined.** Amendment (GMFMC 2011a).  Of the stocks for which stock assessments have been conducted, the fourth quarter report of the 2020 Status of Stocks classifies greater amberjack as considered overfished and two reef fish stocks are considered undergoing overfishing (lane snapper and the Gulf jacks complex).[51]

In the past, the lack of management of reef fish allowed many stocks to undergo both growth and recruitment overfishing**Error! Bookmark not defined.**.  This allowed some stocks to decline as indicated in numerous stock assessments.  Red grouper were considered overfished in 1999 (Schirripa et al. 1999); however, as described in subsequent stock assessments in Section 6(ii), have found the stock not overfished.  For red grouper, management measures including a minimum size limit, commercial quota, and aggregate bag limit**Error! Bookmark not defined.** were put in place as part of the initial Reef Fish FMP**Error! Bookmark not defined.** and Amendment 1 (Section 1.4).  None of these measures halted increases in landings.  However, over time, management measures have become more restrictive and held landings more closely to the quotas/ACLs.

The present red grouper ACLs are based on 2017 landings that are consistent with an interim stock assessment (SEFSC 2019).  However, these ACLs are greatly reduced from values recommended after review of the SEDAR 42 (2015) for reasons explained in Section 1.1.  The current recommendations for this action are based on SEDAR 61 (2019) would set the OFL, ABC, ACLs, and ACTs at a level of harvest that would reduce the likelihood of overfishing to occur.  With respect to other actions, the grouper tilefish IFQ**Error! Bookmark not defined.** program has successfully held landings by the commercial sector below its quota since implementation in 2010.  However, these measures, may have, at least for the commercial sector, redirected effort towards other non-IFQ managed reef fish species such as gray triggerfish and greater amberjack by fishermen without IFQ shares or allocation**Error! Bookmark not defined.**.  Landings of these non-IFQ managed species are closely monitored to prevent them from exceeding their ACLs and protect them from overharvest.  In fact, measures for gray triggerfish and greater amberjack allow the harvest to be closed if it is projected to meet their respective commercial and recreational quotas.  For the recreational sector, bag limits, size limits, and season closures are the primary tool to control harvest.  These measures have been

---

[51]  Note a recent stock assessment has determined greater amberjack are undergoing overfishing, but this occurred after the  fourth quarter report of the 2020 Status of Stocks was completed.

successful for red grouper with landings only exceeding the ACL in 2013 (Table 4.3.3). The red grouper bag limit has varied from one to four fish within the aggregate grouper bag limit with changes occurring in response to changes in the health of the stock.  Note that in 2014, the bag limit was reduced from four to three fish as a result of an AM implemented in 2011, which reduced the bag limit because the ACL was exceeded in 2013.  This AM was removed in 2015 when the bag limit was reduced to two fish as a result of rulemaking from a 2014 framework action (GMFMC 2014b).

**Table 4.3.3.**  Recreational landings of red grouper from 2010-2018, the recreational annual catch limit (ACL), and landings as a percent of the ACL.  Landings are in pounds gutted weight.

| Year | Landings* | ACL | Percent |
|------|-----------|-----|---------|
| **2010** | 635,680 | 1,850,000 | 34.36 |
| **2011** | 643,745 | 1,650,000 | 39.01 |
| **2012** | 1,752,930 | 1,900,000 | 92.26 |
| **2013** | 2,377,111 | 1,900,000 | 125.11 |
| **2014** | 1,600,475 | 1,900,000 | 84.24 |
| **2015** | 1,847,573 | 1,900,000 | 97.24 |
| **2016** | 1,403,236 | 2,580,000 | 54.39 |
| **2017** | 807,085 | 2,580,000 | 31.28 |
| **2018** | 872,045 | 2,580,000 | 33.80 |

*Recreational landings data from the Gulf of Mexico Historical Recreational Landings and Annual Catch Limit Monitoring webpage (https://www.fisheries.noaa.gov/southeast/recreational-fishing-data/gulf-mexico-historical-recreational-landings-and-annual-catch)

Fishery management RFFAs are expected to benefit managed species.  These actions are expected to manage the stocks at OY**Error! Bookmark not defined.** per National Standard 1 and are described in steps 3 and 4 of this CEA**Error! Bookmark not defined.**.  This amendment is intended to improve the management of the red grouper in ways that are likely to better keep harvests within the ACLs.  Other RFFAs described in steps 3 and 4 are intended to improve the management of reef fish stocks either through revising ACLs, improving data reporting, or allowing more flexibility in management.

Non-fishing activities are likely to adversely affect reef fish stocks as listed in Step 4.  For example, severe red tide events are thought to negatively affect reef fish stocks including red grouper populations as described in Step 4.  In 2005, 2014, and 2017-2018, severe red tide events occurred in the western Gulf.  During these years, red grouper stock assessments showed declines in the spawning stock biomass.  Other factors such as climate change**Error! Bookmark not defined.**, LNG facilities, hurricanes, and oil and

gas extraction could have detrimental effects on reef fish species, but these effects are poorly understood.

### iii.    Reef Fish Fishing Communities

Adverse or beneficial effects of actions on vessel owners, captains, and crew are tied to the ability of a vessel to make money.  In commercial fisheries, these benefits are usually derived from shares awarded after fishing expenses are accounted for.  The greater the difference between expenses and payment (revenue) for harvested fish, the more profit is generated by the fishing vessel.  For-hire businesses generate revenue by selling trips either at the vessel level (charter businesses) or passenger level (headboats).

Current management measures have been effective in maintaining the red grouper stock as the stock is neither overfished nor experiencing overfishing, based on the results of SEDAR 42 and of SEDAR 61.  Beginning in 2010, the IFQ program has constrained the commercial sector from exceeding its red grouper quota, as a commercial vessel must have a sufficient amount of allocation before landing.  In contrast, the recreational sector could exceed its quota, which would trigger AMs, as landings are monitored in-season and it may not be possible to close the fishing season before the quota is met.  Although the commercial and recreational allocations were in effect for the timeframe 2010-2018, the commercial ACL has never been exceeded and the recreational ACL has only been exceeded in 2013, and was subject to in-season closures in 2014 and 2015.

*Commercial Sector*
Non-FMP factors have adversely affected the reef fish commercial fleets.  Factors that have had an adverse effect on the commercial fleet include hurricanes, oil spills, red tide events, and increases in fishing costs, which may have pushed marginal fishing operations out of business.  Hurricanes are unpredictable and localized in their effects.  Increases in fishing costs, unless accompanied by an increase in prices or harvest quality, decrease the profitability of fishing.  As described in Section 3.4.1, red grouper landings and revenue have decreased significantly from 2014 through 2018, with landings falling by 57% and revenue decreasing by 49%.  The revenue decrease was slightly less because of the increase in ex-vessel price that occurred during this time.  Still, the number of vessels harvesting red grouper in each year from 2015 through 2018 was relatively stable.

Current management measures may have had a negative, short-term impact on the commercial sector.  An April 2019 framework action reduced the annual catch limit for the commercial sector to 3.16 mp gw and the commercial quota to 3.00 mp gw.  This was in response to concerns about red grouper stock decline due to environmental conditions and low landings from both the commercial and recreational sectors.

*Recreational Sector*
As with the commercial sector, non-management-related RFFAs that could affect anglers include hurricanes, oil and gas extraction, and increases in fishing costs. Hurricanes are unpredictable and localized in their effects.  Oil spills, which are also unpredictable, can have extensive adverse impacts over large areas as evidenced by the Deepwater Horizon

spill.  Increases in fishing costs as well as lost fishing opportunities would likely reduce the amount of angler effort.

Current management measures may have had a negative, short-term impact on the recreational sector.  A December 2014 framework action reduced the red grouper bag limit from four fish to two fish per person per day, in an effort to extend the recreational red grouper season.  As detailed in Section 3.4.2, red grouper recreational target trips decreased from 40,144 to 34,797 for the charter component and from 703,390 to 380,124 for the private angling component from 2014 to 2018.  An April 2019 framework action reduced the annual catch limit for the recreational sector to 1.00 mp gw and the recreational ACT to 0.92 mp gw.  This was in response to concerns about red grouper stock decline due to environmental conditions and low landings from both the commercial and recreational sectors.

Infrastructure refers to fishing-related businesses and includes marinas, rentals, snorkel and dive shops, boat dockage and repair facilities, tackle and bait shops, fish houses, and lodgings related to the recreational fisheries industry.  This infrastructure is tied to the commercial and recreational sectors and can be affected by adverse and beneficial economic conditions in those fisheries.  Actions allowing the recreational and commercial sectors to expand have had a beneficial effect providing business opportunities to service the need of these industries.  However, actions which have constrained the recreational sector likely have had an adverse effect, because lower revenues generated from the fishery would be available to support the infrastructure.

### iv.    Administrative Environment

Administration of fisheries is conducted through federal (including the Council) and state agencies that develop and enforce regulations, collect data on various fishing entities, and assess the health of various stocks.  As more regulations are required to constrain stock exploitation to sustainable levels, greater administration of the resource is needed.  The NMFS Office of Law Enforcement (OLE), in cooperation with state agencies, would continue to monitor regulatory compliance with existing regulations and NMFS would continue to monitor both recreational and commercial landings to determine if landings are meeting or exceeding specified quota levels.  Further, stock status needs to be periodically assessed to ensure stocks are being maintained at proper levels.

Some recent actions have assisted the administration of fisheries in the Gulf.  In 2010, an IFQ program was implemented for the commercial sector's harvest of red grouper, requiring NMFS to monitor the sale of red grouper IFQ shares.  Recordkeeping requirements for IFQ shares have improved commercial quota monitoring and prevented overages from occurring.  A vessel monitoring system (VMS) was implemented for all permitted commercial reef fish vessels in 2007 that has helped OLE identify vessels violating various fishing closures.  The implementation of ACLs and AMs for most federally managed species has required careful monitoring of landings.  For red grouper, NMFS prohibits harvest upon projected that landings will exceed the ACL within that season.  In 2017, the Council approved new requirements for electronic reporting by for-

hire vessels, which are scheduled to become effective at the beginning of 2021.  This is expected improve quota monitoring and help constrain harvest to the ACL.

Setting the recreational ACL in MRIP-FES rather than MRIP-CHTS is expected to reduce burden on the administrative environment. Currently, recreational landings for red grouper (as well as many other reef fish) are calculated in MRIP-FES, and must be converted to MRIP-CHTS for quota monitoring.  This conversion would no longer be required.  Although this conversion will still be necessary for other reef fish species and thus will not affect the short-term administrative burden, this is a step in eliminating this conversion for all reef fish species, which would reduce long-term administrative burden.

Overall, the proposed changes in this Amendment are likely to have low positive to neutral impacts on the administrative environment.  ACT buffers proposed in Action 2 for the commercial and recreational sector are expected to have negligible impacts to the administrative environment, no matter the alternative chosen in Action 2 or in Action 1 (see Section 4.2.5 for discussion).  In addition, the proposed change in the red grouper commercial and recreational allocation to more accurately reflect historic catch rates (based on NMFS and SSC has determination of best scientific information available) is not expected to affect administrative burden.  This is because regardless of the allocation, no significant increase in risk of overfishing is expected.  Each of the alternatives in Action 1 will result in ACLs that are below the OFL, and provisions are in place to decrease the chance of reaching or exceeding the OFL.  However, Action 1 alternatives (coupled with any Action 2 alternative) may increase administrative burden in other ways.  Each of the viable alternatives for Action 1 would result in reduced quota for the recreational sector, which is more likely to result in a minor administrative burden associated with seasonal closures.  In addition, several alternatives in Action 1 would allocate a greater percentage of the ACL to the recreational sector, which has greater uncertainty with catch and landings than the commercial sector.  Because these landings would not need to be converted back to MRIP-CHTS for management, this would reduce uncertainty and result in beneficial effects to the administrative environment.  On the other hand, because most of the alternatives would result in a reduced recreational ACL (relative to the current ACL), this would increase the likelihood of needing to implement an in-season closure.  Alternatives that result in larger allocations to the recreational sector could increase the likelihood of overfishing because of the uncertainty in determining recreational landings as discussed in Section 4.1.5.  The ACL in each alternative is set below the overfishing limit (OFL) to decrease the likelihood of overfishing even if the ACL is exceeded or if recreational landings are higher than estimated.  Previous estimates of recreational catch were lower (often by 2-3 times) than current estimates, and thus the likelihood of unknowingly overfishing the stock, and potentially approaching an overfished state, was higher.  The risk of overfishing associated with an increase in recreational allocation, in spite of uncertainty in recreational landings, may be partially or fully mitigated by the use of more accurate landings data in quota monitoring.

10.  **Modify or add alternatives to avoid, minimize, or mitigate significant cumulative effects.**

The primary objectives of this amendment and associated EIS are revise the red grouper allocation between the commercial and recreational sectors using the best scientific information available, modify the total and sector annual catch limits based on results of the SEDAR 61 2019 stock assessment and subsequent OFL and ABC recommendations from the SSC, and modify ACTs to reduce the likelihood the ACL would be exceeded.  The cumulative effects of revising the red grouper sector allocation and ACLs (Action 1) and ACTs (Action 2) on the biophysical environment are likely neutral because it should not have much effect on overall reef fish fishing effort (see Sections 4.1.1, 4.1.2, 4.2.1, and 4.2.2), but may influence red grouper fishing effort due to the influence of recreational fishing on ABCs.  For the socioeconomic environment, depending on the sector, some effects will be likely be positive and some negative (see Sections 4.1.3, 4.1.4, 4.2.3, and 4.2.4).  However, short-term negative impacts on the fisheries' socioeconomic environment may occur due to the need to limit directed harvest and reduce bycatch mortality.  These negative impacts can be minimized when actions are considered for the recreational sector by using combinations of bag limits, size limits and closed seasons and for the commercial sector through individual fishing quota programs, size limits, and season-area closures.

**11.   Monitor the cumulative effects**Error! Bookmark not defined. **of the selected alternatives and adapt management.**

NMFS**Error! Bookmark not defined.** would continue monitoring the harvest of red grouper. Monitoring the harvest is necessary to determine if the ACLs are exceeded and to prohibit further harvest to insure the OFL**Error! Bookmark not defined.** is not also exceeded.  It is uncertain if the states would be able to constrain harvest within their allocation**Error! Bookmark not defined.** and whether the monitoring data would provide timely data to prevent overages.  The timing of the data may be critical for NMFS to determine if the quota has been met.  The effects of the proposed actions are, and will continue to be, monitored through collection of landings data by NMFS and the Gulf states, stock assessments and stock assessment updates, life history studies, economic and social analyses, and other scientific observations. Landings data for the recreational sector in the Gulf is collected through MRIP, NMFS' Headboat Survey, Florida's Gulf Reef Fish Survey, Louisiana's LACreel Survey, and the Texas Marine Recreational Fishing Survey.  In addition, red snapper landings are monitored through Alabama's Snapper Check program and Mississippi's Tails n' Scales program.  MRIP replaced the previous MRFSS program and this program has moved from the CHTS to the mailed FES. Port sampling through MRIP is conducted through the Access Point Angler Intercept Survey. Commercial data is collected through trip ticket programs, port samplers, and logbook programs. Currently, no SEDAR assessments of Gulf red grouper are scheduled between the present and 2025, but if the need for an assessment in the short-term arises, an assessment or interim analysis could be scheduled.

# CHAPTER 5. REGULATORY IMPACT REVIEW

## 5.1  Introduction

The National Marine Fisheries Service (NMFS) requires a Regulatory Impact Review (RIR) for all regulatory actions that are of public interest.  The RIR does three things: 1) it provides a comprehensive review of the level and incidence of impacts associated with a proposed or final regulatory action; 2) it provides a review of the problems and policy objectives prompting the regulatory proposals and an evaluation of the major alternatives that could be used to solve the problem; and, 3) it ensures that the regulatory agency systematically and comprehensively considers all available alternatives so that the public welfare can be enhanced in the most efficient and cost-effective way.  The RIR also serves as the basis for determining whether the regulations are a "significant regulatory action" under the criteria provided in Executive Order (E.O.) 12866.  This RIR analyzes the impacts this action would be expected to have on the red grouper component of the Gulf of Mexico (Gulf) reef fish fishery.

## 5.2  Problems and Objectives

The problems and objectives addressed by this action are discussed in Section 1.3.

## 5.3  Description of Fisheries

A description of the red grouper component of the Gulf reef fish fishery is provided in Section 3.4.

## 5.4  Impacts of Management Measures

### 5.4.1  Action 1:  Modify the Sector Allocations, Overfishing Limit (OFL), Acceptable Biological Catch (ABCError! Bookmark not defined.), and Annual Catch Limits (ACL) for Gulf of Mexico (Gulf) Red Grouper

A detailed analysis of the economic effects expected to result from this action is provided in Section 4.1.3.   The following discussion analyzes the expected economic effects of the preferred alternative relative to the No Action alternative.

Under **Preferred Alternative 3**, the red grouper commercial ACL and ACT would decrease by 0.63 million pounds (mp) gutted weight (gw) and 0.60 mp gw, respectively.  Using an average dockside price from 2018 of $4.83 (2019 dollars), the expected change in revenue would be -$2,898,000.  Applying the average net cash flow from 2014-2016 of 24% to the expected change in revenue provides the expected change in producer surplus (PS); for **Preferred Alternative 3**, the expected change in producer surplus (PS) would be -$695,520.  The expected change in revenue also reflects the expected change in red grouper purchases by dealers.  The expected

change in revenue from **Preferred Alternative 3** would be a decrease of 16.51% compared to the average of the total red grouper purchases from 2014-2018 ($17,557,924). In addition, the proposed decrease in the ACL with **Preferred Alternative 3** would result in a decrease in ACT, when paired with Action 2 **Alternative 1**, and would then decrease the availability of annual individual fishing quotient (IFQ) allocation for sale, compared with **Alternative 1**, and the allocation price would be expected to increase in response. **Preferred Alternative 3** would also be expected to result in an increase in red grouper share price, to reflect the expected supply of annual allocation available in the future.

Changes in red grouper harvests, as a result of the change in ACT, could result in additional economic effects because of the potential effects on ex-vessel prices due to less (or more) red grouper on the markets. The potential effects to the consumer surplus (CS) are based on work on price flexibilities by Keithly and Tabarestani (2018). The decrease in commercial ACL under **Preferred Alternative 3** would result in a decrease in commercial ACT, when paired with Action 2 **Alternative 1**, and is expected to result in a positive average price change ($0.51/lb) and a decrease in CS of $1,235,707.

Summing the annual changes in CS and PS for the commercial sector provides the net economic benefits for that sector in a given year. Net economic benefits for the commercial sector from **Preferred Alternative 3**, relative to **Alternative 1**, would be expected to decrease by $1,931,227 in 2022.

Under **Preferred Alternative 3**, the red grouper recreational ACL would decrease by 0.37 mp gw. The MRIP-FES equivalent of the recreational sector ACL for **Alternative 1** is used in this analysis, in order to be in the same currency as the recreational sector ACL for **Preferred Alternative 3**. The evaluation of changes in economic value expected to result from ACL changes for the recreational sector is based on work by Carter and Liese (2012). The CS value per fish for a second red grouper kept is estimated at $110.00 (2019 dollars). A conversion factor of 1.05 between gutted weight and whole weight of red grouper is used (SEDAR 42 2015). Estimated increases in economic value are approximated by dividing the change in ACL by 6.51 lbs ww, which is the average weight of a Gulf recreationally landed red grouper from 2015-2017 (SEFSC SRHS data, accessed March 2018; MRIP Intercept data available at: https://www.st.nmfs.noaa.gov/st1/recreational/MRIP_Survey_Data/), to obtain the increase in number of red grouper, which is then multiplied by the CS value per fish of $110.00. The CS would be expected to decrease by $6,564,516 (2019 dollars) under **Preferred Alternative 3**, relative to **Alternative 1**.

The PS of the for-hire component of the recreational sector, being comprised of charter vessels and headboats, would be impacted by a change in the number of targeted trips. In the long run, factors of production such as labor and capital can be used elsewhere in the economy, and so only short-term changes to PS are expected. In the Gulf, headboat trips take a diverse set of anglers on a single vessel, generally advertising a diverse range of species to be caught. Therefore, an assumption that no headboat trips would be lost due to a change in ACL is reasonable. However, charter vessel trips that are targeting red grouper may be subject to cancellation by anglers and are the focus of the recreational sector PS analysis. Using the predicated closure date based on the recreational ACL seen in Table 2.1.4 and the charter vessel

trips by 2-month wave from 2014-2018 target red grouper in Table 3.4.2.4, **Preferred Alternative 3** would be expected to result in 665 canceled charter trips.  The Net Cash Flow per Angler Trip (CFpA) from Souza and Liese (2019) of $136 (2017 dollars) is used to derive an upper bound for the short-term change in PS for charter vessels; Table 3.4.2.8 updates that estimate to $141 (2019 dollars).  The short-term change in PS expected to result from **Preferred Alternative 3** would be -$93,723.

Summing the annual changes in CS and PS for the recreational sector provides the net economic benefits for that sector in a given year.  Net economic benefits for the recreational sector from **Preferred Alternative 3**, relative to **Alternative 1**, would be expected to decrease by $6,658,239 in 2022.

Net economic benefits from the commercial and recreational sectors combined from **Preferred Alternative 3**, relative to **Alternative 1**, would be expected to decrease by $8,589,466 in 2022.  Over a seven-year timeframe of 2022-2028, the expected change in the discounted net present value of economic benefits to both sectors would be -$55,120,248 using a 3% discount rate and -$49,531,496 using a 7% discount rate.  As an average annual net present value, these expected changes would be -$7,874,321 and -$7,075,928 with 3% and 7% discount rate, respectively.  This analysis uses a seven-year timeframe in accordance with the time-based criteria for allocation review triggers in Appendix F, which lists a seven-year timeframe for commercial and recreational allocations of red grouper.

In addition to the cost-benefit analysis, **Preferred Alternative 3** in Action 1 is expected to result in reduced gross revenues in the commercial sector, which would be expected to reduce economic impacts in the onshore sector (e.g., dealers and processors) and related industries (e.g., grocers and restaurants).  More specifically, **Preferred Alternative 3** in Action 1 is expected to result in an annual gross revenue reduction of approximately $2.898 million in the Gulf of Mexico harvesting sector in 2019$, or $2.848 million in 2018$.[52]  Based on the model used to estimate the average annual economic impacts of the commercial sector for red grouper, as illustrated in Table 3.4.1.24, the expected decrease in annual gross revenue in the commercial sector is expected to decrease employment, income, total value added, and output by 365 jobs, $10.37 million, $14.65 million, and $28.24 million in 2018$, respectively.

**Preferred Alternative 3** in Action 1 is also expected to result in fewer target trips for red grouper by charter vessels, which would be expected reduce spending on various goods and services needed to conduct charter fishing trips and reduce the economic impacts resulting from those expenditures.  This assumes the income that would have been spent on red grouper target trips by charter vessels is not spent on other goods and services unrelated to charter fishing (e.g., tourists choose not to spend that income on other activities such as site-seeing tours).  **Preferred Alternative 3** in Action 1 is expected to result in a reduction of 665 red grouper target trips by charter vessels.  Based on the model used to estimate the average annual economic impacts of the recreational sector for red grouper, as illustrated in Table 3.4.2.9, the expected decrease in red grouper target trips by charter vessels is expected to decrease employment, income, total

---

[52] The commercial and recreational economic impact models have not yet been updated to generate estimates in 2019$.

value added, and output by 4 jobs, $132,000, $226,000, and $379,000 in 2018$, respectively. All of these impacts are expected to occur in Florida.

## 5.4.2  Action 2 – Modify the Gulf Red Grouper Annual Catch Targets (ACT)

A detailed analysis of the economic effects expected to result from this action is provided in Section 4.2.3.   The following discussion analyzes the expected economic effects of the preferred alternative relative to the No Action alternative.

**Preferred Alternative 3** would retain the current commercial buffer of 5% between the ACL and ACT.  Therefore, no additional economic effects to the commercial sector would be expected under **Preferred Alternative 3**, in comparison to **Alternative 1**.

**Preferred Alternative 3** would modify the recreational buffer between the ACL and ACT from 8%, currently, to 9%.  Of note, any economic effects to the recreational sector from Action 2 would only be expected to result if the recreational sector's post-season accountability measure (AM) is triggered, requiring the recreational sector to be managed to the ACT instead of the ACL.  The ACT that would result from Action 1 **Preferred Alternative 3** when paired with Action 2 **Alternative 1** would be 1.59 mp gw.  The ACT would further decrease when Action 1 **Preferred Alternative 3** is paired with Action 2 **Preferred Alternative 3** to 1.57 mp gw, and this shift from 1.59 mp gw to 1.57 mp gw is the focus of the Action 2 analysis.  When paired with Action 1 **Preferred Alternative 3**, the change in ACT under Action 2 **Preferred Alternative 3** compared to Action 2 **Alternative 1** is -0.02 mp gw.  The evaluation of changes in economic value expected to result from ACL changes for the recreational sector is based on work by Carter and Liese (2012).  The CS value per fish for a second red grouper kept is estimated at $110.00 (2019 dollars).  A conversion factor of 1.05 between gutted weight and whole weight of red grouper is used (SEDAR 42 2015).  Estimated increases in economic value are approximated by dividing the change in ACL by 6.51 lbs ww, which is the average weight of a Gulf recreationally landed red grouper from 2015-2017 (SEFSC SRHS data, accessed March 2018; MRIP Intercept data available at: https://www.st.nmfs.noaa.gov/st1/recreational/MRIP_Survey_Data/), to obtain the increase in number of red grouper, which is then multiplied by the CS value per fish of $110.00.  When paired with Action 1 **Preferred Alternative 3**, the expected change in CS under Action 2 **Preferred Alternative 3** compared to Action 2 **Alternative 1** is -$354,839.

The PS of the for-hire component of the recreational sector, being comprised of charter vessels and headboats, would be impacted by a change in the number of targeted trips.  In the long run, factors of production such as labor and capital can be used elsewhere in the economy, and so only short-term changes to PS are expected.  In the Gulf, headboat trips take a diverse set of anglers on a single vessel, generally advertising a diverse range of species to be caught.  Therefore, an assumption that no headboat trips would be lost due to a change in ACL would be reasonable.  However, charter vessel trips that are targeting red grouper may be subject to cancellation by anglers and are the focus of the recreational sector PS analysis.  Using the predicated closure date based on the recreational ACL seen in Table 2.1.4 and the charter vessel trips by 2-month wave from 2014-2018 target red grouper in Table 3.4.2.4, when paired with

Action 1 **Preferred Alternative 3**, the expected change in cancelled trips under Action 2 **Preferred Alternative 3** compared to Action 2 **Alternative 1** is -204.  The CFpA from Souza and Liese (2019) of $136 (2017 dollars) is used to derive an upper bound for the short-term change in PS for charter vessels; Table 3.4.2.8 updates that estimate to $141 (2019 dollars). When paired with Action 1 **Preferred Alternative 3**, the short-term change in PS expected under Action 2 **Preferred Alternative 3** compared to Action 2 **Alternative 1** is -$28,838.

Summing the annual changes in CS and PS for the recreational sector provides the net economic benefits for that sector in a given year.  When paired with Action 1 **Preferred Alternative 3**, net economic benefits for the recreational sector under Action 2 **Preferred Alternative 3** compared to Action 2 **Alternative 1** would decrease by $383,677 in 2022.

Over a seven-year time frame of 2022-2028, the expected change in the discounted net present value of economic benefits to the recreational sector (as no change is expected for the commercial sector) would be -$2,462,129 using a 3% discount rate and -$2,212,489 using a 7% discount rate.   As an average annual net present value, these expected changes would be -$351,733 and -$316,070 with 3% and 7% discount rate, respectively.  This analysis uses a seven-year timeframe in accordance with the time-based criteria for allocation review triggers in Appendix F, which lists a seven-year timeframe for commercial and recreational allocations of red grouper.

In addition to the cost-benefit analaysis, **Preferred Alternative 3** in Action 2 would be expected to reduce the number of target trips for red grouper by charter vessels if the post-season AM is triggered.  Specifically, an additional 204 target trips are expected to be canceled under this alternative if the post-season AM is triggered.  This reduction in target trips would be expected to lead to additional decreases in employment, income, total value added, and output of 1 job, $40,000, $69,000, and $116,000 in 2018$, respectively.  Thus, in total, the combination of these alternatives could reduce target trips for red grouper by charter vessels by 869 trips, and thereby decrease employment, income, total value added, and output by $172,000, $295,000, and $485,000 in 2018$, respectively.  Again, all of these impacts are expected to occur in Florida.

**Preferred Alternative 3** in Action 1 and **Preferred Alternative 3** in Action 2 are not expected to reduce the number of target trips for red grouper taken by anglers in the private recreational and shore modes, and therefore are not expected to reduce employment, income, total value added, or output resulting from those trips.  Unlike charter vessels, whose fishing activity is determined by the demand of the anglers who book trips with them, in terms of both desired species and timing, private recreational anglers are better able to change when they take trips that target red grouper (i.e., it is relatively easier for them to take trips targeting red grouper before a potential closure occurs). Further, unlike federally permitted charter vessels in Florida that have relatively few good substitute species to target in December when the recreational sector is expected to be closed under these alternatives, it is assumed that private anglers will still have a number of species to target at that time of year, and therefore are much better able to change their target species if necessary.

## 5.5  Public and Private Costs of Regulations

The preparation, implementation, enforcement, and monitoring of this or any federal action involves the expenditure of public and private resources which can be expressed as costs associated with the regulations.  Costs to the private sector are discussed in Section 5.4.  Estimated public costs associated with this action include:

Council costs of document preparation, meetings, public hearings, and information dissemination……………………………………………………………………………$81,640

NMFS administrative costs of document preparation, meetings and review …...............................................................................$22,537

TOTAL …...................................................................................................................$104,177

This action is not expected to result in any changes in law enforcement costs.  Any enforcement duties associated with this action would be expected to be covered under routine enforcement costs rather than an expenditure of new funds.  Council and NMFS administrative costs directly attributable to this amendment and the rulemaking process will be incurred prior to the effective date of the final rule implementing this amendment.

## 5.6  Net Benefits of the Regulatory Action

It is important to specify the time period being considered when evaluating benefits and costs.  According to the Office of Management and Budget's Frequently Asked Questions regarding Circular A-4,[53] "When choosing the appropriate time horizon for estimating costs and benefits, agencies should consider how long the regulation being analyzed is likely to have resulting effects.  The time horizon begins when the regulatory action is implemented and ends when those effects are expected to cease.  Ideally, analysis should include all future costs and benefits.  Here as elsewhere, however, a 'rule of reason' is appropriate, and the agency should consider for how long it can reasonably predict the future and limit its analysis to this time period.  Thus, if a regulation has no predetermined sunset provision, the agency will need to choose the endpoint of its analysis on the basis of a judgment about the foreseeable future.  For most agencies, a standard time period of analysis is 10 to 20 years."

For current purposes, the reasonably "foreseeable future" is considered to be the next 7 years (2022-2028).  The reason that this analysis uses a seven-year timeframe is to serve in accordance with the time-based criteria for allocation review triggers in Appendix F, which lists a seven-year timeframe for commercial and recreational allocations of red grouper.  Therefore, it stands to reason that a review of the commercial and recreational allocations of red grouper will commence in 2028.

---

[53] See p. 4 at https://obamawhitehouse.archives.gov/sites/default/files/omb/assets/OMB/circulars/a004/a-4_FAQ.pdf

For Action 1, net economic benefits from the commercial and recreational sectors combined from **Preferred Alternative 3**, relative to **Alternative 1**, would be expected to decrease by $8,589,466 in 2022.  Over a seven-year timeframe of 2022-2028, the expected change in the discounted net present value of economic benefits to both sectors would be -$55,120,248 using a 3% discount rate and -$49,531,496 using a 7% discount rate.  As an average annual net present value, these expected changes would be -$7,874,321 and -$7,075,928 with 3% and 7% discount rate, respectively.  When paired with Action 1 **Preferred Alternative 3**, net economic benefits for the recreational sector under Action 2 **Preferred Alternative 3** compared to Action 2 **Alternative 1** would decrease by $383,677 in 2022.  Over a seven-year timeframe of 2022-2028, the expected change in the discounted net present value of economic benefits to the recreational sector (as no change is expected for the commercial sector compared to Action 2 **Alternative 1**) would be -$2,462,129 using a 3% discount rate and -$2,212,489 using a 7% discount rate.  As an average annual net present value, these expected changes would be -$351,733 and -$316,070 with 3% and 7% discount rate, respectively.

The non-discounted public costs resulting from the regulation are $103,677.  The $103,677 in costs resulting from the amendment and the associated rulemaking process should not be discounted as they will be incurred prior to the effective date of the final rule.

Based on this information, this regulatory action is expected to decrease net benefits to the Nation.

## 5.7  Determination of Significant Regulatory Action

Pursuant to E.O. 12866, a regulation is considered a "significant regulatory action" if it is likely to result in:  1) an annual effect of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or state, local, or tribal governments or communities; 2) create a serious inconsistency or otherwise interfere with an action taken or planned by another agency; 3) materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights or obligations of recipients thereof; or 4) raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in this executive order (E.O). Based on the information in Sections 5.4-5.5, the costs and benefits resulting from this regulatory action are expected to be XYZ and therefore are not expected to meet or exceed the $100 million threshold.  Thus, this action has been determined to not be economically significant for the purposes of E.O. 12866.

# CHAPTER 6. INITIAL REGULATORY FLEXIBILITY ACT ANALYSIS

## 6.1  Introduction

The purpose of the Regulatory Flexibility Act (RFA) is to establish a principle of regulatory issuance that agencies shall endeavor, consistent with the objectives of the rule and of applicable statutes to fit regulatory and informational requirements to the scale of businesses, organizations, and governmental jurisdictions subject to regulation.  To achieve this principle, agencies are required to solicit and consider flexible regulatory proposals and to explain the rationale for their actions to assure such proposals are given serious consideration.  The RFA does not contain any decision criteria; instead the purpose of the RFA is to inform the agency, as well as the public, of the expected economic effects of various alternatives contained in the regulatory action and to ensure the agency considers alternatives that minimize the expected economic effects on small entities while meeting the goals and objectives of the applicable statutes (e.g., the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act)).

With certain exceptions, the RFA requires agencies to conduct an initial regulatory flexibility analysis (IRFA) for each proposed rule.  The IRFA is designed to assess the effects various regulatory alternatives would have on small entities, including small businesses, and to determine ways to minimize those effects.  An IRFA is primarily conducted to determine whether the proposed regulatory action would have a significant economic effect on a substantial number of small entities.  In addition to analyses conducted for the Regulatory Impact Review (RIR), the IRFA provides: 1) a description of the reasons why action by the agency is being considered; 2) a succinct statement of the objectives of, and legal basis for, the proposed regulatory action; 3) a description and, where feasible, an estimate of the number of small entities to which the proposed regulatory action will apply; 4) a description of the projected reporting, record-keeping, and other compliance requirements of the proposed regulatory action, including an estimate of the classes of small entities which will be subject to the requirements of the report or record; 5) an identification, to the extent practicable, of all relevant federal rules, which may duplicate, overlap, or conflict with the proposed rule; and 6) a description of any significant alternatives to the proposed regulatory action which accomplish the stated objectives of applicable statutes and would minimize any significant economic effects of the proposed regulatory action on small entities.

In addition to the information provided in this section, additional information on the expected economic effects of the proposed action is included in the RIR.

Amendment 53 - Red Grouper                  155         Chapter 6.  Initial Regulatory Flexibilty
Allocations and Annual Catch Levels and Targets                                Act Analysis

0009577

## 6.2  Statement of the need for, objectives of, and legal basis for the rule

A discussion of the reasons why action by the agency is being considered is provided in Section 1.1.  The purposes of this proposed regulatory action are to revise the red grouper allocation between the commercial and recreational sectors using the best scientific information available and to modify the allowable harvest of red grouper based on results of the recent stock assessment and subsequent overfishing limit (OFL) and allowable biological catch (ABC)**Error! Bookmark not defined.** recommendations from the Gulf of Mexico Fishery Management Council's (Council) scientific and statistical committee (SSC).  The objective of this proposed regulatory action is to use the best scientific information available to establish Gulf red grouper sector allocations, annual catch limits (ACLs), and annual catch targets (ACTs), thereby ensuring that the sector ACLs accurately reflect the recreational and commercial sectors' historical participation and the recreational ACL is consistent with data used to monitor recreational landings and trigger accountability measures (AM).  The Magnuson-Stevens Act serves as the legal basis for the proposed regulatory action.  All monetary estimates in the following analysis are in 2019 dollars.

## 6.3  Description and estimate of the number of small entities to which the proposed action would apply

This proposed regulatory action would revise the sector allocations of the total ACL for Gulf of Mexico (Gulf) red grouper from 76% for the commercial sector and 24% for the recreational sector to 59.3% for the commercial sector and 40.7% for the recreational sector.  The current OFL, ABC, and total ACL are 14.16 million pounds (mp) gutted weight (gw), 13.92 mp gw, and 4.16 mp gw, respectively.  The recreational portion of these values are based on Marine Recreational Information Program (MRIP) Coastal Household Telephone Survey (CHTS) data.  This proposed regulatory action would change the OFL and ABC to 4.66 mp gw and 4.26 mp gw, consistent with the results of the most recent stock assessment and the recommendations of the Council's SSC, and set the total ACL equal to the ABC of 4.26 mp gw.  The recreational portion of these values are based on MRIP Fishing Effort Survey (FES) data.  Applying the new sector allocations would reduce the commercial ACL from 3.16 mp gw to 2.53 mp gw and the recreational ACL from 2.1 mp gw in MRIP-FES units (or 1 mp gw in MRIP-CHTS units) to 1.73 mp gw in MRIP-FES units.  This proposed regulatory action would retain the current 5% buffer between the commercial ACL and ACT (quota), resulting in a reduction of the commercial ACT (quota) from 3 mp gw to 2.4 mp gw.  It would also increase the buffer between the recreational ACL and ACT from 8% to 9%, and thereby reduce the recreational ACT from 1.59 mp gw to 1.57 mp gw given the proposed reduction in the recreational ACL.  As a result, this proposed regulatory action is expected to directly regulate commercial fishing businesses that possess Gulf red grouper (RG) shares in the Grouper-Tilefish (GT) Individual Fishing Quota (IFQ) program and for-hire fishing businesses that target red grouper.

The commercial red grouper quota is allocated annually based on the percentage of RG shares in each IFQ account (e.g., if an account possesses 1% of the RG shares and the commercial quota is

Amendment 53 - Red Grouper                    156          Chapter 6.  Initial Regulatory Flexibilty
Allocations and Annual Catch Levels and Targets                                     Act Analysis

0009578

1 mp, then that account would receive 10,000 pounds of commercial red grouper quota). Although it is common for a single IFQ account with RG shares to be held by a single business, some businesses have multiple IFQ accounts with RG shares. As of February 19, 2020, 495 IFQ accounts held RG shares. These accounts and RG shares were owned by 436 businesses. Thus, it is assumed this proposed regulatory action would directly regulate 436 commercial fishing businesses.

A valid charter-headboat (for-hire) Gulf reef fish vessel permit is required to legally harvest red grouper in the Gulf of Mexico (Gulf). NMFS does not possess complete ownership data regarding businesses that hold charter-headboat (for-hire) Gulf reef fish vessel permits, and thus potentially harvest red grouper. Therefore, it is not currently feasible to accurately determine affiliations between vessels and the businesses that own them. As a result, for purposes of this analysis, it is assumed each for-hire vessel is independently owned by a single business, which is expected to result in an overestimate of the actual number of for-hire fishing businesses directly regulated by this proposed regulatory action.

NMFS also does not have data indicating how many for-hire vessels actually harvest Gulf red grouper in a given year. However, in 2019, there were 1,277 vessels with valid charter-headboat Gulf reef fish vessel permits. Further, Gulf red grouper is only targeted and almost entirely harvested in waters off the west coast of Florida. Of the 1,277 vessels with valid charter-headboat Gulf reef fish vessel permits, 799 were homeported in Florida. Of these permitted vessels, 60 are primarily used for commercial fishing rather than for-hire fishing purposes and thus are not considered for-hire fishing businesses. In addition, 48 of these permitted vessels are considered headboats. Headboats take a relatively large, diverse set of anglers to harvest a diverse range of species on a trip, and therefore do not typically target a particular species. Therefore, it is assumed that no headboat trips would be canceled, and thus no headboats would be directly affected as a result of this proposed regulatory action. However, charter vessels often target red grouper. Of the 799 vessels with valid charter-headboat Gulf reef fish vessel permits that are homeported in Florida, 691 vessels are charter vessels. Souza and Liese (2019) reported that 76% of charter vessels with valid charter-headboat permits in the Gulf were active in 2017 (i.e., 24% were not fishing). A charter vessel would only be directly affected by this proposed regulatory action if it is fishing. Given this information, our best estimate of the number of charter vessels that are likely to harvest Gulf red grouper in a given year is 525, and thus this proposed regulatory action is estimated to directly regulate 525 for-hire fishing businesses.

On December 29, 2015, NMFS issued a final rule establishing a small business size standard of $11 million in annual gross receipts (revenue) for all businesses primarily engaged in the commercial fishing industry (NAICS code 11411) for RFA compliance purposes only (80 FR 81194, December 29, 2015). In addition to this gross revenue standard, a business primarily involved in commercial fishing is classified as a small business if it is independently owned and operated, and is not dominant in its field of operations (including its affiliates). NMFS does not collect revenue data specific to commercial fishing businesses that have IFQ accounts; rather, revenue data is collected for commercial fishing vessels. It is not possible to assign revenues earned by commercial fishing vessels back to specific IFQ accounts and the businesses that possess them because quota is often transferred across many IFQ accounts before it is used by a vessel for harvesting purposes, and specific units of quota cannot be tracked. However, from

Amendment 53 - Red Grouper                157          Chapter 6.  Initial Regulatory Flexibilty
Allocations and Annual Catch Levels and Targets                            Act Analysis

0009579

2014 through 2018, the maximum annual gross revenue earned by a single vessel during this time was about $2.39 million in 2015.  The average gross revenue per vessel was about $143,000 in that year.  By 2018, the maximum and average gross revenue per vessel had decreased to about $1.04 million and $96,000, respectively.  Based on this information, all commercial fishing businesses directly regulated by this proposed regulatory action are determined to be small entities for the purpose of this analysis.

For other industries, the Small Business Administration (SBA) has established size standards for all major industry sectors in the U.S., including for-hire businesses (NAICS code 487210).  A business primarily involved in for-hire fishing is classified as a small business if it is independently owned and operated, is not dominant in its field of operation (including its affiliates), and has annual receipts (revenue) not in excess of $8 million for all its affiliated operations worldwide.  The maximum annual gross revenue for a single headboat in the Gulf was about $1.38 million in 2017 (D. Carter, pers. comm.).  According to Savolainen, et al. (2012), on average, annual gross revenue for headboats in the Gulf is about three times greater than annual gross revenue for charter vessels, reflecting the fact that businesses that own charter vessels are typically smaller than businesses that own headboats.  Based on this information, all for-hire fishing businesses directly regulated by this proposed regulatory action are determined to be small businesses for the purpose of this analysis.

## 6.4  Description of the projected reporting, record-keeping and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for the preparation of the report or records

This proposed regulatory action would not establish any new reporting or record-keeping requirements.

## 6.5  Identification of all relevant federal rules, which may duplicate, overlap or conflict with the proposed rule

No duplicative, overlapping, or conflicting federal rules have been identified.

## 6.6  Significance of economic effects on small entities

<u>Substantial number criterion</u>

If implemented, this proposed regulatory action is expected to directly regulate 436 of the 532 businesses with IFQ accounts, or approximately 82% of those commercial fishing businesses.  Further, this proposed regulatory action is expected to directly regulate 525 of the 1,187 for-hire fishing businesses valid charter/headboat permits in the Gulf reef fish fishery, or approximately

Amendment 53 - Red Grouper                      158        Chapter 6.  Initial Regulatory Flexibilty
Allocations and Annual Catch Levels and Targets                                    Act Analysis

0009580

44% of those for-hire fishing businesses. All directly regulated commercial and for-hire fishing businesses have been determined, for the purpose of this analysis, to be small entities. Based on this information, the proposed regulatory action is expected to affect a substantial number of small businesses.

Significant economic effects

The outcome of "significant economic impact" can be ascertained by examining two factors: disproportionality and profitability.

Disproportionality: Do the regulations place a substantial number of small entities at a significant competitive disadvantage to large entities?

All entities directly regulated by this regulatory action have been determined to be small entities. Thus, the issue of disproportionality does not arise in the present case.

Profitability: Do the regulations significantly reduce profits for a substantial number of small entities?

Because revenue and cost data are not directly collected for commercial fishing businesses that own RG shares are expected to be directly regulated by this proposed regulatory action, direct estimates of their economic profits are not available. However, economic theory suggests that annual allocation (quota) prices should reflect expected annual economic profits, which allows economic profits to be estimated indirectly. The 436 commercial fishing businesses that own RG shares, and therefore receive RG quota at the beginning of each calendar year, also own shares and receive quota in the other IFQ share categories i.e., red snapper (RS), gag grouper (GG), shallow water grouper (SWG), deep-water grouper (DWG), and tilefish (TF). These businesses earn economic profits because of their ownership of these shares as well their RG shares. However, economic profits are only realized if the quota allocated to these businesses with shares is actually used for harvesting purposes (i.e., no economic profits will accrue unless the quota results in the production and sale of seafood). Because the average annual commercial landings of RG from 2014-2018 and the proposed RG commercial quota are almost identical, it is assumed that all of the RG commercial quota will be harvested in the foreseeable future. Similarly, practically all of the commercial RS quota has been used for harvesting in recent years, and so it is assumed that all of the commercial RS quota allocated to these businesses will be harvested in the foreseeable future. However, based on 2015-2019 data, it is expected that only 84% of the DWG commercial quota, 50% of the GG commercial quota, 35% of the SWG commercial quota, and 78% of the TF commercial quota allocated to these businesses will be used for harvesting in the foreseeable future. Given these quota utilization rates in combination with average annual allocation prices in 2019 and annual commercial quotas in 2020 by share category (see Table 3.4.1.14), total economic profits for commercial fishing businesses with RG shares are estimated to be at least $18.61 million. This estimate does not account for any economic profits that may accrue to commercial fishing businesses that own RG shares and also harvest non-IFQ species. Such profits are likely to be small because harvest of IFQ species accounts for around 85% of commercial IFQ vessels' average annual gross revenue, and economic profits from the harvest of non-IFQ species tend to be much smaller than those from

Amendment 53 - Red Grouper                     159          Chapter 6.  Initial Regulatory Flexibilty
Allocations and Annual Catch Levels and Targets                          Act Analysis

0009581

IFQ species (C. Liese, pers. communication, April 9, 2019).  Given that there are 436 commercial fishing businesses that own RG shares, the average annual expected economic profit per commercial fishing business is at least $42,700.

However, most of these economic profits (82%) are the result of owning RS shares.  Only approximately $1.77 million (or 9.5%) of their economic profits are due to the ownership of RG shares.  This proposed regulatory action is only expected to affect economic profits from the ownership of RG shares.  Specifically, the action that proposes to reduce the OFL, ABC, total ACL, and the commercial sector allocation of the total ACL results in a reduction of the red grouper commercial ACL from 3.16 mp gw to 2.53 mp gw and the commercial red grouper ACT (quota) from 3 mp gw to 2.4 mp gw.  Given an annual allocation price of $.59/lb in 2019 for RG, this reduction in the commercial red grouper quota is expected to reduce economic profits to these commercial fishing businesses by $354,000, or about $812 per business.  Thus, economic profits are expected to be reduced by no more than 1.9% on average per commercial fishing business.

According to Savolainen, et al. (2012), which contains the most recent estimates of economic returnsin the for-hire sector, average annual economic profits are $26,514 per charter vessel.  The action that modifies the sectors allocations and the OFL, ABC, and total ACL, results in a reduction of the red grouper recreational ACL from 2.1 mp gw in MRIP-FES units to 1.73 mp gw in MRIP-FES units.  The ACL reduction is expected to reduce the recreational season length by 12 days, and thereby cause the number of trips targeting red grouper on charter vessels to decrease by 665 angler trips.  Net Cash Flow per Angler Trip (CFpA) is the best available estimate of profit per angler trip by charter vessels.  According to Souza and Liese (2019), CFpA on charter vessels is estimated to be $141 per angler trip.  Thus, the estimated reduction in charter vessel profits from this action is expected to be $93,723, or $179 per vessel.

The action that proposes to increase the buffer between the recreational ACL and recreational ACT from 8% to 9% would decrease the recreational ACT from 1.59 mp gw to 1.57 mp gw.  The ACT reduction is only germane if the recreational sector exceeds its ACL in the future, as that would trigger the post-season AM, causing the recreational sector to be constrained to the recreational ACT rather than the recreational ACL.  Average annual landings in the recreational sector from 2016 through 2019 are greater than the proposed recreational ACL, and so it is possible that the post-season AM may be triggered, causing the recreational sector, including the for-hire component, to be constrained to the ACT.   If the post-season AM is triggered, the additional reduction in the recreational season length caused by this action is estimated to be 4 days, which would be expected to cause the number of trips targeting red grouper on charter vessels to decrease by an additional 204 angler trips.  Thus, if the post-season AM is triggered, the estimated reduction in charter vessel profits from this action would be $28,764, or $55 per vessel.

Based on the above, the total reduction in profits for charter vessels from this proposed regulatory action is expected to be no more than $122,487, or $234 per charter vessel.  Thus, profits would potentially be reduced by approximately 0.9% on average per for-hire fishing business.

Amendment 53 - Red Grouper                    160          Chapter 6.  Initial Regulatory Flexibilty
Allocations and Annual Catch Levels and Targets                              Act Analysis

0009582

## 6.7  Description of significant alternatives to the proposed action and discussion of how the alternatives attempt to minimize economic impacts on small entities

**To be completed after Council takes final action**

Amendment 53 - Red Grouper                   161          Chapter 6.  Initial Regulatory Flexibilty
Allocations and Annual Catch Levels and Targets                              Act Analysis

0009583

# CHAPTER 7. LIST OF AGENCIES, ORGANIZATIONS, AND PERSONS TO WHOM A COPY OF THE EIS IS SENT

## AGENCIES and ORGANIZATIONS CONSULTED

National Marine Fisheries Service
- Southeast Fisheries Science Center
- Southeast Regional Office
- Office for Law Enforcement
National Oceanic Atmospheric Administration General Counsel
Environmental Protection Agency (Region 4 and 6)
United States Coast Guard
United States Fish and Wildlife Services
Department of Interior, Office of Environmental Policy and Compliance
Department of State, Office of Marine Conservation
Marine Mammal Commission
Texas Parks and Wildlife Department
Alabama Department of Conservation and Natural Resources/Marine Resources Division
Louisiana Department of Wildlife and Fisheries
Mississippi Department of Marine Resources
Florida Fish and Wildlife Conservation Commission

# CHAPTER 8. LIST OF PREPARERS AND REVIEWERS

**PREPARERS**

| Name | Expertise | Responsibility | Agency |
|------|-----------|----------------|--------|
| Matthew Freeman | Economist | Co-Team Lead – Amendment development, economic effects, Regulatory Impact Review, cumulative effects analysis | GMFMC |
| Peter Hood | Fishery biologist | Co-Team Lead – Amendment development, biological environment, cumulative effects**Error! Bookmark not defined.** analysis | SERO |
| Ava Lasseter | Anthropologist | Social effects | GMFMC |
| Mike Travis | Economist | Economic environment | SERO |
| Mike Jepson | Anthropologist | Social analyses | SERO |
| Daniel Luers | Fishery biologist | Biological environment, biological effects, administrative environment, administrative effects, cumulative effects analysis | SERO |
| Jeff Pulver | Fishery biologist/data analyst | Data analyst | SERO |
| Skyler Sagarese | Fishery biologist | Assessment analyst | SEFSC |

**REVIEWERS** (Preparers also serve as reviewers)

| Name | Expertise | Responsibility | Agency |
|------|-----------|----------------|--------|
| Noah Silverman | Natural resource management specialist | National Environmental Policy Act**Error! Bookmark not defined.** review | SERO |
| Mara Levy | Attorney | Legal review | NOAA GC |
| John Froeschke | Fishery biologist | Review | GMFMC |
| Assane Diagne | Economist | Review | GMFMC |
| Ryan Rindone | Fishery biologist | Review | GMFMC |
| Jennifer Lee | Protected resource specialist | Protected resources review | SERO |
| Scott Sandorf | Regulatory writer | Regulatory preparation and review | SERO |
| Carrie Simmons | Fishery biologist | Review | GMFMC |
| Larry Perruso | Economist | Review | SEFSC |
| John McGovern | Fishery biologist | Review | SERO |

GMFMC = Gulf of Mexico Fishery Management Council; NOAA GC = National Oceanic and Atmospheric Administration General Counsel; SEFSC = Southeast Fisheries Science Center; SERO = Southeast Regional Office of the National Marine Fisheries Service

Amendment 53 - Red Grouper
Allocations and Annual Catch Levels and Targets

163

Chapter 8.  List of
Preparers and Reviewers

0009585

# CHAPTER 9. REFERENCES

Abbott, B, A. Siger, and M. Spiegelstein. 1975. Toxins from the blooms of *Gymnodinium breve*. In: LoCicero, V.R. (ed). Proceedings of the first international conference on toxic dinoflagellate blooms. Massachusetts Science and Technology Foundation, Wakefield, Massachusetts

Abbott, J. and D. Willard. 2017. Rights-based management for recreational for-hire fisheries: Evidence from a policy trial. Fisheries Research, 196: 106-116.

Baden, D. 1988. Public health problems of red tides. In: Tu, A.T. (ed) Handbook of natural toxins, book 3. Marcel Dekker, New York, p 259–277

Barnette, M. C. 2001. A review of the fishing gear utilized within the Southeast Region and their potential impacts on essential fish habitat**Error! Bookmark not defined.**. NOAA Technical Memorandum. NMFS-SEFSC-449. National Marine Fisheries Service. St. Petersburg, Florida.

Baustian, M. M. and N. N. Rabalais. 2009. Seasonal composition of benthic macroinfauna exposed to hypoxia in the northern Gulf of Mexico. Estuaries and Coasts. 32:975–983.

Burton, M. 2008. Southeast U.S. Continental Shelf, Gulf of Mexico, and U.S. Caribbean. In Osgood, K. E. (ed). Climate Impacts on U.S. Living Marine Resources: National Marine Fisheries Service Concerns, Activities and Needs. U.S. Dep. Commerce, NOAA Tech. Memo. NMFSF/ SPO-89, pp 31-43.

Carls, M. G., S. D. Rice, and J. E. Hose. 1999. Sensitivity of fish embryos to weathered crude oil: Part I. Low-level exposure during incubation causes malformations, genetic damage, and mortality in larval Pacific herring (*Clupea pallasi*). Environmental Toxicology and Chemistry 18(3): 481–493.

Carter, D.W. and C. Liese. 2012. The Economic Value of Catching and Keeping or Releasing Saltwater Sport Fish in the Southeast USA. North American Journal of Fisheries Management, 32:4, 613-625. http://dx.doi.org/10.1080/02755947.2012.675943

Coleman, F.C., C.C. Koenig, and L.A. Collins. 1996. Reproductive styles of shallow-water groupers (Pisces: Serranidae) in the eastern Gulf of Mexico and the consequences of fishing on spawning aggregations. Environmental Biology of Fishes 47: 129-141.

Coleman, F. C., C. C. Koenig, K. M. Scanlon, S. Heppell, S. Heppell, and M. W. Miller. 2010. Benthic habitat modification through excavation by red grouper, *Epinephelus morio*, in the Northeastern Gulf of Mexico. The Open Fish Science Journal, 3:1-15

Craig, J. K. 2012. Aggregation on the edge: effects of hypoxia avoidance on the spatial distribution of brown shrimp and demersal fishes in the Northern Gulf of Mexico. Marine Ecology Progress Series 445: 75–95.

Fischer, A. J., M. S. Baker, Jr., and C. A. Wilson. 2004. Red snapper (*Lutjanus campechanus*) demographic structure in the northern Gulf of Mexico based on spatial patterns in growth rates and morphometrics. Fishery Bulletin 102:593–603.

Fitzhugh, G.R., H.M. Lyon, W.T. Walling, C.F. Levins, and L.A. Lombardi-Carlson. 2006. An update of Gulf of Mexico red grouper reproductive data and parameters for SEDAR 12. Draft working document for SEDAR 12 Data Workshop. 17p. SEDAR 12-DW-04.

Fodrie, F. J., K. L. Heck, Jr., S. P. Powers, W. M. Graham, and K. L. Robinson. 2010. Climate-related, decadal-scale assemblage changes of seagrass-associated fishes in the northern Gulf of Mexico. Global Change Biology, 16(1):48-59.

Foster, J., F.J. Breidt, and J.D. Opsomer. 2018. APAIS data calibration methodology report. 10 pp. https://www.fisheries.noaa.gov/webdam/download/68183814

Gomez, E.D., A.C. Alcala, and H.T. Yap. 1987. Other fishing methods destructive to coral. pp. 65-75 in Human Impacts on Coral Reefs: Facts and Recommendations. Antenne Museum, French Polynesia.

GMFMC. 1981. Environmental impact statement and fishery management plan for the reef fish resources of the Gulf of Mexico and environmental impact statement. Gulf of Mexico Fishery Management Council, Tampa, Florida. 328 pp. https://gulfcouncil.org/wpcontent/uploads/FISHERY%20MANAGEMENT/REEF%20FISH/RF%20FMP%20and%20EIS%201981-08.pdf

GMFMC. 1989. Amendment 1 to the reef fish fishery management plan includes environmental assessment, regulatory impact review, and regulatory flexibility analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 356 pp. https://gulfcouncil.org/wpcontent/uploads/FISHERY%20MANAGEMENT/REEF%20FISH/RF%20Amend-01%20Final%201989-08-rescan.pdf

GMFMC. 2003. Corrected amendment for a charter/vessel headboat permit moratorium amending the fishery management plans for: reef fish (Amendment 20) and coastal migratory pelagics (Amendment 14) including environmental assessment, regulatory impact review, and initial regulatory flexibility act. Gulf of Mexico Fishery Management Council, Tampa, Florida. http://www.gulfcouncil.org/Beta/GMFMCWeb/downloads/CBAmendmentFINAL-corrected.pdf

GMFMC. 2004a. Final environmental impact statement for the generic essential fish habitat amendment to the following fishery management plans of the Gulf of Mexico: Shrimp fishery of the Gulf of Mexico, red drum fishery of the Gulf of Mexico, reef fish fishery of the Gulf of Mexico, stone crab fishery of the Gulf of Mexico, coral and coral reef fishery of the Gulf of Mexico, spiny lobster fishery of the Gulf of Mexico and South Atlantic, coastal migratory pelagic resources of the Gulf of Mexico and South Atlantic. Gulf of Mexico Fishery Management Council, Tampa, Florida. 682 pp. https://gulfcouncil.org/wp-content/uploads/March-2004-Final-EFH-EIS.pdf

GMFMC. 2004b. Final amendment 22 to the reef fish fishery management plan to set red snapper sustainable fisheries act targets and thresholds, set a rebuilding plan, and establish bycatch reporting methodologies for the reef fish fishery, includes final supplemental environmental impact statement and regulatory impact review. Gulf of Mexico Fishery Management Council. Tampa, Florida. 291 pp.
https://gulfcouncil.org/wpcontent/uploads/FISHERY%20MANAGEMENT/REEF%20FISH/Amend%2022%20Final%2070204.pdf

GMFMC. 2004c. Final amendment 23 to the reef fish fishery management plan to set vermilion snapper sustainable fisheries act targets and thresholds and to establish a plan to end overfishing and rebuild the stock, including a final supplemental environmental impact statement and regulatory impact review. Gulf of Mexico Fishery Management Council. Tampa, Florida. 296 pp.
https://gulfcouncil.org/wpcontent/uploads/FISHERY%20MANAGEMENT/REEF%20FISH/VS%2023%20Oct%20Final%2010-21-04%20with%20Appendix%20E.pdf

GMFMC. 2005. Final ggeneric amendment 3 for addressing essential fish habitat requirements, habitat areas of particular concern, and adverse effects of fishing in the following fishery management plans of the Gulf of Mexico: Shrimp fishery of the Gulf of Mexico, United States waters, red drum fishery of the Gulf of Mexico, reef fish fishery of the Gulf of Mexico, coastal migratory pelagic resources (mackerels) in the Gulf of Mexico and South Atlantic, stone crab fishery of the Gulf of Mexico, spiny lobster fishery of the Gulf of Mexico and South Atlantic, coral and coral reefs of the Gulf of Mexico. Gulf of Mexico Fishery Management Council, Tampa, Florida. 106 pp.
https://gulfcouncil.org/wp-content/uploads/March-2005-FINAL3-EFH-Amendment.pdf

GMFMC. 2007. Final amendment 27 to the reef fish fishery management plan and amendment 14 to the shrimp fishery management plan, including supplemental environmental impact statement, regulatory impact review, and regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 480 pp.
https://gulfcouncil.org/wpcontent/uploads/FISHERY%20MANAGEMENT/REEF%20FISH/Final%20RF%20Amend%2027-%20Shrimp%20Amend%2014.pdf

GMFMC. 2008a. Amendment 29 to the reef fish fishery management plan – effort management in the commercial grouper and tilefish fisheries, including final environmental impact statement and regulatory impact review. Gulf of Mexico Fishery Management Council. Tampa, Florida. 88 pp.
https://gulfcouncil.org/wpcontent/uploads/FISHERY%20MANAGEMENT/REEF%20FISH/Final%20Reef%20Fish%20Amdt%2029-Dec%2008.pdf

GMFMC. 2008b. Final reef fish amendment 30A: Greater amberjack – revise rebuilding plan, accountability measures; gray triggerfish – establish rebuilding plan, end overfishing, accountability measures, regional management, management thresholds and benchmarks, including supplemental environmental impact statement, regulatory impact review, and

regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 346 pp.
http://www.gulfcouncil.org/docs/amendments/Amend-30A-Final%20208.pdf

GMFMC. 2008c. Final amendment 30B: gag – end overfishing and set management thresholds and targets. Red grouper – set optimum yield, TAC, and management measures, time/area closures, and federal regulatory compliance including environmental impact statement, regulatory impact review, and regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 462 pp.
https://gulfcouncil.org/wpcontent/uploads/FISHERY%20MANAGEMENT/REEF%20FISH/Final%20Amendment%2030B%2010_10_08.pdf

GMFMC. 2010a. Final amendment 31 to the fishery management plan for reef fish resources in the Gulf of Mexico (revised) addresses bycatch of sea turtles in the bottom longline component of the Gulf of Mexico reef fish fishery, includes revised final environmental impact statement and regulatory impact review. Gulf of Mexico Fishery Management Council. Tampa, Florida. 305 pp.
https://gulfcouncil.org/wpcontent/uploads/FISHERY%20MANAGEMENT/REEF%20FISH/Final%20Amendment%2031%20-%20revised%20-%2002-2010.pdf

GMFMC. 2010b. Regulatory amendment to the reef fish fishery management plan to set 2011 total allowable catch**Error! Bookmark not defined.** for red grouper and establish marking requirements for buoy gear. Gulf of Mexico Fishery Management Council, Tampa, Florida. 125 p.

GMFMC. 2011a. Final generic annual catch limits/accountability measures amendment for the Gulf of Mexico Fishery Management Council's red drum, reef fish, shrimp, coral and coral reefs fishery management plans, including environmental impact statement, regulatory impact review, regulatory flexibility analysis, and fishery impact statement. Gulf of Mexico Fishery Management Council, Tampa, Florida. 406 pp.
https://gulfcouncil.org/wp-content/uploads/Final-Generic-ACL-AM-Amendment-September-9-2011-v.pdf

GMFMC. 2011b. Final reef fish amendment 32 – gag grouper – rebuilding plan, annual catch limits, management measures, red grouper – annual catch limits, management measures, and grouper accountability measures, including final environmental impact statement, regulatory impact review, regulatory flexibility analysis, and fishery impact statement. Gulf of Mexico Fishery Management Council, Tampa, Florida. 406 pp.
http://www.gulfcouncil.org/docs/amendments/Final%20RF32_EIS_October_21_2011[2].pdf

GMFMC. 2012a. Final amendment 38 to the fishery management plan for the reef fish resources of the Gulf of Mexico: Modifications to the shallow-water grouper accountability measures, including an environmental assessment, fishery impact statement, regulatory impact review, and regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 94 pp.
http://www.gulfcouncil.org/docs/amendments/Final%20Amendment%2038%2009-12-2012.pdf

GMFMC. 2012b. Final amendment 35 to the fishery management plan for the reef fish resources of the Gulf of Mexico:  Modifications to the greater amberjack rebuilding plan and adjustments to the recreational and commercial management measures, including an environmental assessment, fishery impact statement, regulatory impact review, and regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 226 pp. https://gulfcouncil.org/wpcontent/uploads/FISHERY%20MANAGEMENT/REEF%20FISH/Final_Amendment_35_Greater_Amberjack_Rebuilding_8_May_2012.pdf

GMFMC. 2012c. Final amendment 37 to the fishery management plan for the reef fish resources of the Gulf of Mexico: Modifications to the gray triggerfish rebuilding plan including adjustments to the annual catch limits and annual catch targets for the commercial and recreational sectors. Gulf of Mexico Fishery Management Council, Tampa, Florida. 193 pp. http://www.gulfcouncil.org/docs/amendments/Final_Reef_Fish_Amend_37_Gray_Triggerfish_12_06_12[1].pdf

GMFMC. 2012d. Framework action to set the 2013 gag recreational fishing season and bag limit and modify the February-March shallow-water grouper closed season. Gulf of Mexico Fishery Management Council, Tampa, Florida. 111 p. http://www.gulfcouncil.org/docs/amendments/2013GagRecreationalSeason.pdf

GMFMC. 2014a. Final amendment 40 to the fishery management plan for the reef fish resources of the Gulf of Mexico Recreational red snapper sector separation, including final environmental impact statement, fishery impact statement, regulatory impact review, and regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 304 pp. http://www.gulfcouncil.org/docs/amendments/RF%2040%20-%20Final%2012-17-2014.pdf

GMFMC.  2014b.  Framework Action to Modify the Red Grouper Recreational Management Measures of the Reef Fish Management Plan for the Reef Fish Resources of the Gulf of Mexico. Gulf of Mexico Fishery Management Council, Tampa, Florida.  97 p.

GMFMC. 2015a. Final amendment 28 to the fishery management plan for the reef fish resources of the Gulf of Mexico: Red snapper allocation, including final environmental impact statement, fishery impact statement, regulatory impact review, and regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 328 pp. http://gulfcouncil.org/docs/amendments/Final%20Red%20Snapper%20Allocation%20-RF%20Amendment%2028.pdf

GMFMC. 2015b. Modifications to greater amberjack allowable harvest and management measures. Framework action to the fishery management plan for the reef fish resources of the Gulf of Mexico including environmental assessment, regulatory impact review, and regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council. Tampa, Florida. 145 pp. http://gulfcouncil.org/docs/amendments/Greater%20AJ%20FINAL%20VERSION%207-10-15.pdf

GMFMC. 2016a. Framework action to the fishery management plan for reef fish resources in the Gulf of Mexico, including environmental assessment, fishery impact statement, regulatory impact review, and regulatory flexibility act analysis. Adjust red grouper allowable harvest. Gulf of Mexico Fishery Management Council, Tampa, Florida. 117 pp.
http://gulfcouncil.org/docs/amendments/Red%20Grouper%20Allowable%20Harvest%20Framework%20Action%20060716%20final.pdf

GMFMC. 2016b. Final amendment 43 to the fishery management plan for the reef fish resources of the Gulf of Mexico, including environmental assessment, fishery impact statement, regulatory impact review, and regulatory flexibility act analysis. Hogfish stock definition, status determination criteria, annual catch limit, and size limit. Gulf of Mexico Fishery Management Council, Tampa, Florida. 164 pp.
http://gulfcouncil.org/docs/amendments/Final%20Amendment%2043%20-%20Hogfish_10-11-2016.pdf

GMFMC. 2017a. Final amendment 47 to the fishery management plan for the reef fish resources of the Gulf of Mexico: Establish a vermilion snapper MSY proxy and adjust the stock annual catch limit, including environmental assessment, fishery impact statement, regulatory impact review, and regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 146 pp.
http://gulfcouncil.org/wp-content/uploads/Final-Amendment-47-Vermilion-snapper-ACL-and-MSY-proxy.pdf

GMFMC. 2017b. Final amendment 36A to the fishery management plan for the reef fish resources of the Gulf of Mexico: Modifications to commercial individual quota programs, including environmental assessment, fishery impact statement, regulatory impact review, and regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 193 pp.
http://gulfcouncil.org/wp-content/uploads/RF36A-Post-Final-Action-5-25-2017-with-bookmarks.pdf

GMFMC. 2017c. Final amendment 44( revised) to the fishery management plan for the reef fish resources of the Gulf of Mexico: Minimum stock size threshold (MSST) revision for reef fish stocks with existing status determination criteria, including environmental assessment and fishery impact statement. Gulf of Mexico Fishery Management Council, Tampa, Florida. 124 pp.
http://gulfcouncil.org/wp-content/uploads/Final-Amendment-44-revised-MSST-GOM-Reef-Fish-update-2.pdf

GMFMC. 2018. Coral habitat areas considered for habitat area of particular concern designation in the Gulf of Mexico. Final Amendment 9 to the Fishery Management Plan for the Coral and Coral Reefs of the Gulf of Mexico, U.S. Waters including environmental impact statement. Gulf of Mexico Fishery Management Council, Tampa, Florida.  289 pp.

GMFMC. 2019a. Final framework action to the fishery management plan for the reef fish fishery of the Gulf of Mexico: Modification of Gulf of Mexico red grouper annual catch limits and annual catch targets, including environmental assessment, regulatory impact review, and

regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 87 pp.
http://gulfcouncil.org/wp-content/uploads/FINAL-Red-Grouper-2019-ACL-Modification-042919-1.pdf

GMFMC. 2019b. Final amendment 51 to the fishery management plan for the reef fish resources of the Gulf of Mexico: Establish gray snapper status determination criteria and modify annual catch limits. Gulf of Mexico Fishery Management Council, Tampa, Florida. 122 pp.
https://gulfcouncil.org/wp-content/uploads/RF-Amendment-51-Gray-Snapper-11132019.pdf

GMFMC. 2019c. Draft environmental assessment for an emergency rule to the fishery management plan for reef fish resources of the Gulf of Mexico: Modification of Gulf of Mexico red grouper annual catch limit, including regulatory impact review and regulatory flexibility act analysis. Gulf of Mexico Fishery Management Council, Tampa, Florida. 106 pp.
https://www.fisheries.noaa.gov/action/emergency-rule-modify-gulf-mexico-red-grouper-annual-catch-limit

GMFMC.  2020.  Framework Action to the Fishery Management Plan for Reef Fish Resources in the Gulf of Mexico Modifications to Gulf of Mexico Greater Amberjack Commercial Trip Limits.  Gulf of Mexico Fishery Management Council, Tampa, Florida.  67 pp.

GMFMC and SAFMC. 1982. Fishery Management Plan for Coral and Coral Reefs in the Gulf of Mexico and South Atlantic Fishery Management Councils.  Gulf of Mexico Fishery Management Council, Lincoln Center, Suite 881, 5401 W.  Kennedy Boulevard, Tampa, Florida; South Atlantic Fishery Management Council, Southpark Building, Suite 306, 1 Southpark Circle, Charleston , South Carolina, 29407.  332 p.
https://gulfcouncil.org/wp-content/uploads/Coral-FMP.pdf

Gore, R. H. 1992. The Gulf of Mexico: A treasury of resources in the American Mediterranean. Pineapple Press. Sarasota, Florida.

Haensly, W. E., J. M. Neff, J. R. Sharp, A. C. Morris, M. F. Bedgood, and P. D. Beom 1982. Histopathology of *Pleuronectes platessa* from Aber Wrac'h and Aber Benoit, Brittany, France: long-term effects of the Amoco Cadiz crude oil spill. Journal of Fish Disease 5:365-391.

Hamilton, A. N., Jr. 2000. Gear impacts on essential fish habitat**Error! Bookmark not defined.** in the Southeastern Region.  NOAA, NMFS, SEFSC, 3209 Frederick Street, Pascagoula, Mississippi 39567. 45 pp.

Hayes SA, Josephson E, Maze-Foley K, Rosel PE, Byrd B, Chavez-Rosales S, Col TVN, Engleby L, Garrison LP, Hatch J, Henry A, Horstman SC, Litz J, Lyssikatos MC, Mullin KD, Orphanides C, Pace RM, Palka DL, Soldevilla M, Wenzel FW. 2018. TM 245 US Atlantic and Gulf of Mexico Marine Mammal Stock Assessments - 2017. NOAA Tech Memo NMFS NE-245; 371 p.

Heintz, R. A., J. W. Short, and S. D. Rice. 1999. Sensitivity of fish embryos to weathered crude oil: Part II. Increased mortality of pink salmon (*Oncorhynchus gorbuscha*) embryos incubating downstream from weathered Exxon *Valdez* crude oil. Environmental Toxicology and Chemistry 18(3):494–503.

Hollowed, A. B., Barange, M., Beamish, R., Brander, K., Cochrane, K., Drinkwater, K., Foreman, M., Hare, J., Holt, J., Ito, S-I., Kim, S., King, J., Loeng, H., MacKenzie, B., Mueter, F., Okey, T., Peck, M. A., Radchenko, V., Rice, J., Schirripa, M., Yatsu, A., and Yamanaka, Y. 2013. Projected impacts of climate change on marine fish and fisheries. ICES Journal of Marine Science 70: 1023–1037.

Hose, J.E., M.D. McGurk, G.D. Marty, D.E. Hinton, E.D Brown, and T.T. Baker. 1996. Sublethal effects of the (Exxon Valdez) oil spill on herring embryos and larvae: morphological, cytogenetic, and histopathological assessments, 1989–1991. Canadian Journal of Fisheries and Aquatic Sciences 53: 2355-2365.

Incardona, John P., L.D. Gardner, T.L. Linbo, T.L. Brown, A.J. Esbaugh, E.M. Mager, J.D. Stieglitz, B.L. French, J.S. Labenia, C.A. Laetz, M. Tagal, C.A. Sloan, A. Elizur, D.D. Benetti, M. Grosell, B.A. Block, and N.L. Scholz. 2014. Deepwater Horizon crude oil impacts the developing hearts of large predatory pelagic fish. Proceedings of the National Academy of Sciences Apr 2014, 111 (15) E1510-E1518.

Karnauskas, M., M. McPherson, S. Sagarese, A. Rios, M. Jepson, A. Stoltz and S. Blake. 2019. Timeline of severe red tide events on the West Florida Shelf: insights from oral histories. White paper submitted to SEDAR 61. Southeast Fisheries Science Center. https://sedarweb.org/docs/wpapers/S61_WP_20_Karnauskasetal_red_tide.pdf

Keithly W.R., Jr. and M. Tabarestani. 2018. The Gulf of Mexico grouper/tilefish fishery after introduction of an individual fishing quota program: the impact on ex-vessel prices.

Kennedy, V. S., R. R. Twilley, J. A. Kleypas, J. H. Cowan, and S. R. Hare. 2002. Coastal and marine ecosystems & global climate change: Potential effects on U.S. resources. Pew Center on Global Climate Change, Arlington, Virginia. 52 pp. https://www.c2es.org/site/assets/uploads/2002/08/marine_ecosystems.pdf

Khan, R. A. and J. W. Kiceniuk. 1984. Histopathological effects of crude oil on Atlantic cod following chronic exposure. Canadian Journal of Zoology 62:2038-2043.

Khan R.A. and J.W. Kiceniuk. 1988. Effect of petroleum aromatic hydrocarbons on monogeneids parasitizing Atlantic cod, *Gadus morhua*. Bulletin of Environmental Contamination and Toxicology 41: 94-100.

Khan, R. A. 1990. Parasitism in marine fish after chronic exposure to petroleum hydrocarbons in the laboratory and to the Exxon *Valdez* Oil Spill. Bulletin of Environmental Contamination and Toxicology 44:759-763.

Kiceniuk J. W. and R. A. Khan. 1987. Effect of petroleum hydrocarbons on Atlantic cod, *Gadus morhua*, following chronic exposure. Canadian Journal of Zoology 65:490-494.

Landsberg, J.H. 2002. The effects of harmful algal blooms on aquatic organisms.  Reviews in Fisheries Science 10(2):113-390

Lombardi-Carlson. L.A., G.R. Fitzhugh, B.A. Fable, M. Ortiz, C. Gardner. 2006. Age, length and growth of gag from the NE Gulf of Mexico 1979-2005. NMFS Panama City Lab Contribution 06-03.57 p. SEDAR10-DW2.

Lombardi-Carlson, L., G. Fitzhugh, C. Palmera, C. Gardner, R. Farsky, and M. Ortiz.  2008. Regional size, age and growth differences of red grouper (*Epinephelus morio*) along the west coast of Florida.  Fisheries Research 91(2–3): 239-251.

Lowerre-Barbieri, S., L. Crabtree, T.S. Switzer, and R.H. McMichael, Jr. 2014. Maturity, sexual transition, and spawning seasonality in the protogynous red grouper on the West Florida Shelf. SEDAR42-DW-7. SEDAR, North Charleston, SC. 21 pp.

McEachran, J.D. and J.D. Fechhelm. 2005. Fishes of the Gulf of Mexico, Vol. 2. University of Texas Press. Austin, Texas.

Mendelssohn, I. A., G. L. Andersen, D. M. Baltz, R. H. Caffey, K. R. Carman, J. W. Fleeger, S. B. Joye, Q. Lin, E. Maltby, E. B. Overton, and L.P. Rozas. 2012. Oil impacts on coastal wetlands: Implications for the Mississippi River Delta ecosystem after the *Deepwater Horizon* oil spill. BioScience 62: 562–574.

Moe, M.A. 1969. Biology of the red grouper *Epinephelus morio* (Valenciennes) from the eastern Gulf of Mexico. Professional Papers Series Number Ten. Florida Department of Natural Resources, Marine Research Laboratory, St. Petersburg, Florida. 95 pp.

Murawski, S. A., W. T. Hogarth, E. B. Peebles, and L. Barbieri. 2014. Prevalence of external skin lesions and polycyclic aromatic hydrocarbon concentrations in Gulf of Mexico fishes, post-Deepwater Horizon. Transactions of the American Fisheries Society 143(4):1084-1097.

National Commission. 2010. The use of surface and subsea dispersants during the BP *Deepwater Horizon*  oil spill. National Commission on the BP *Deepwater Horizon* Oil Spill and Offshore Drilling (National Commission). Staff Working Paper No. 4. 21 pp. https://cybercemetery.unt.edu/archive/oilspill/20130215212124/http://www.oilspillcommission.gov/sites/default/files/documents/Updated%20Dispersants%20Working%20Paper.pdf

NMFS. 2002. Status of red grouper in United States waters of the Gulf of Mexico during 1986-2001. Sustainable Fisheries Division Contribution SFD-01/02-175. NMFS, Southeast Fisheries Science Center, Miami, FL. 47 p.

NMFS. 2011. Biological opinion on the continued authorization of reef fish fishing under the Gulf of Mexico reef fish fishery management plan.  September 30, 2011. Available at:

http://sero.nmfs.noaa.gov/pr/esa/Fishery%20Biops/03584%20GOM%20Reef%20Fish%20BiOp%202011%20final.pdf

NMFS. 2018a. Red grouper interim analysis update to the SSC. PowerPoint presentation to the Gulf of Mexico Fishery Management Council's Scientific and Statistical Committee. October 2, 2018. 18 pp.

NMFS. 2018b. Fisheries Economics of the United States, 2016. U.S. Dept. of Commerce, NOAA Tech. Memo. NMFS-F/SPO-187, 243 p.

NMFS. 2020. Gulf of Mexico 2019 grouper-tilefish individual fishing quota annual report. SERO-LAPP-2020-3. NMFS Southeast Regional Office, St. Petersburg, Florida. 80 pp.

NOAA Fisheries. Office of Science & Technology; Southeast Fisheries Science Center; Southeast Regional Office. 2019. Recommended use of the current Gulf of Mexico surveys of marine recreational fishing in stock assessments. 32 pp.

NODC (National Oceanographic Data Center). 2011. 4 km NODC/RSMAS AVHRR Pathfinder v5 Seasonal and Annual Day-Night Sea Surface Temperature Climatologies for 1982-2009 for the Gulf of Mexico (NODC Accession 0072888). Version 3.3. National Oceanographic Data Center, NOAA.  https://data.nodc.noaa.gov/cgi-bin/iso?id=gov.noaa.nodc:0072888

Nieland, D. L., C. A. Wilson III, and A. J. Fischer. 2007.  Declining size-at-age among red snapper in the Northern Gulf of Mexico off Louisiana, USA: recovery or collapse? Pages 329-336 in W. F. Patterson, III, J. H. Cowan, Jr., G. R. Fitzhugh and D. L. Nieland, editors. Red snapper ecology and fisheries in the U.S. Gulf of Mexico. American Fisheries Society, Symposium 60, Bethesda, Maryland.

Osgood, K. E. (ed.) 2008. Climate impacts on U. S. living marine resources: National Marine Fisheries Services concerns, activities and needs. Silver Spring, Maryland, National Oceanic and Atmospheric Administration, 118pp. (NOAA Technical Memorandum NMFS-F/SPO, 89).

Overstreet, E., L. Perruso, and C. Liese. 2017. Economics of the Gulf of Mexico reef fish fishery - 2014. NOAA Technical Memorandum NMFS-SEFSC-716. 84 pp.

Overstreet, E. and C. Liese. 2018a. Economics of the Gulf of Mexico Reef Fish Fishery - 2015. NOAA Technical Memorandum NMFS-SEFSC-724. 78 p.

Overstreet, E. and C. Liese. 2018b. Economics of the Gulf of Mexico Reef Fish Fishery -2016. NOAA Technical Memorandum NMFS-SEFSC-725. 116 p.

Plummer, M.L., W. Morrison, and E. Steiner. 2012. Allocation of fishery harvests under the Magnuson-Stevens Fishery Conservation and Management Act:  Principles and practice. U.S. Dept Commer.. NOAA Tech. Memo. NMFS-NWFSC-115. 84 p.

Robins, C. R., G. C. Rey, and J. Douglass. 1986. A field guide to Atlantic coast fishes. Houghton Mifflin Co., New York City, NY.  354 p.

Savolainen, M. A., R. H. Caffey, and R. F. Kazmierczak, Jr. 2012. Economic and attitudinal perspectives of the recreational for-hire fishing industry in the U.S. Gulf of Mexico. Center for Natural Resource Economics and Policy, LSU AgCenter and Louisiana Sea Grant College Program, Department of Agricultural Economics and Agribusiness, Louisiana State University, Baton Rouge, LA. 171 pp. Available at: http://www.laseagrant.org/wp-content/uploads/Gulf-RFH-Survey-Final-Report-2012.pdf

Schirripa, M.J., C.M. Legault, and M.Ortiz. 1999. The red grouper fishery of the Gulf of Mexico: assessment 3.0 (with corrected tables). NMFS/SEFSC, Miami Laboratory, Sustainable Fisheries Division Contribution. No. SFD-98/99-56. 121 pp.

Scott-Denton, E., Cryer, P.F., Gocke, J.P., Harrelson, M.R., Kinsella, D.L., Pulver, J.R., Smith, R.C., Williams, J.A., 2011. Descriptions of the U.S. Gulf of Mexico reef fish bottom longline and vertical line fisheries based on observer data. Marine Fisheries Review, 73(2), 1–26.

SEDAR 12. 2006. Stock assessment report of Gulf of Mexico red grouper. Southeast Data, Assessment, and Review. North Charleston, South Carolina. http://sedarweb.org/docs/sar/S12SAR1%20Gulf%20Red%20Grouper%20Completev2.pdf

SEDAR 12 Update.  2009.  Stock assessment of red grouper in the Gulf of Mexico – SEDAR update assessment.  Report of assessment workshop, Miami, FL. http://sedarweb.org/docs/suar/Red_Grouper_2009_Assessment_Update_Report.pdf

SEDAR 42. 2015. Stock assessment report of Gulf of Mexico red grouper. Southeast Data, Assessment, and Review. North Charleston, South Carolina. http://sedarweb.org/sedar-42

SEDAR 47. 2016. Final stock assessment report: Southeastern U.S. goliath grouper. Southeast Data, Assessment, and Review. North Charleston, South Carolina. http://sedarweb.org/sedar-47

SEDAR 49. 2016. Stock assessment report for Gulf of Mexico data-limited species: red drum, lane snapper, wenchman, yellowmouth grouper, speckled hind, snowy grouper, almaco jack, lesser amberjack. Southeast Data, Assessment, and Review. North Charleston, SC. http://sedarweb.org/sedar-49-final-stock-assessment-report-gulf-mexico-data-limited-species

SEDAR 61. 2019. Stock assessment report of Gulf of Mexico red grouper. Southeast Data, Assessment, and Review. North Charleston, South Carolina. http://sedarweb.org/sedar-61

Short, J. 2003. Long-term effects of crude oil on developing fish: Lessons from the Exxon Valdez oil spill. Energy Sources 25(6):509-517.

Siebenaler, J.B**Error! Bookmark not defined.**., and W. Brady.  1952.  A high speed manual commercial fishing reel.  Florida Board of Conservation Tech. Series No. 4.

Simmons, C. M., and S. T. Szedlmayer. 2012. Territoriality, reproductive behavior, and parental care in gray triggerfish, *Balistes capriscus*, from the northern Gulf of Mexico. Bulletin of Marine Science 88:197-209.

Sindermann, C.J. 1979. Pollution-associated diseases and abnormalities of fish and shellfish: a review. Fisheries Bulletin 76: 717-749.

Solangi, M.A. and R.M. Overstreet. 1982. Histopathological changes in two estuarine fishes, *Menidia beryllina* (Cope) and *Trinectes maculatus* (Bloch and Schneider), exposed to crude oil and its water-soluble fractions. Journal of Fish Disease 5: 13-35.

Souza, Philip M., Jr. and Christopher Liese. 2019. Economics of the Federal For-Hire Fleet in the Southeast - 2017. NOAA Technical Memorandum NMFS-SEFSC-740, 42 p.

Tarnecki, J.H. and W.F. Patterson III. 2015. Changes in Red Snapper Diet and Trophic Ecology. Marine and Coastal Fisheries: Dynamics, Management, and Ecosystem Science 7: 135–147.

Walter, J. 2011. Rerun of Gulf of Mexico red grouper assessment and projections with observer-derived discard estimates.  NOAA National Marine Fisheries Service, Southeast Fisheries Science Center, Miami, Florida. 19 p.

Walter, J, M.C. Christman, J.H. Landsberg, B. Linton, K. Steidinger, R. Stumpf, and J. Tustison. 2013.  Satellite derived indices of red tide severity for input for Gulf of Mexico gag grouper stock assessment. SEDAR33-DW08. SEDAR, North Charleston, SC, 43 pp.

Whitehead, A., B. Dubansky, C. Bodinier, T. Garcia, S. Miles, C. Pilley, V. Raghunathan, J. L. Roach, N. Walker, R.B. Walter, C. D. Rice, F. Galvez. 2012. Genomic and physiological footprint of the Deepwater Horizon oil spill on resident marsh fishes. Proceedings of the National Academy of Sciences Dec 2012, 109 (50) 20298-20302

Wilson, D., R. Billings, R. Chang, H. Perez, and J. Sellers. 2014. Year 2011 Gulf wide emissions inventory study. US Dept. of the Interior, Bureau of Ocean Energy Management, Gulf of Mexico OCS Region, New Orleans, LA. OCS Study BOEM 2014-666.

# CHAPTER 10. INDEX

ABC   iii, xvii, xviii, xix, xxi, xxiv, 1, 3, 6, 7, 8, 13, 14, 15, 16, 17, 28, 39, 40, 42, 88, 91, 92, 94, 98, 102, 103, 119, 122, 129, 130, 135, 139, 143, 145, 153, 183, 196, 197, 199, 201

acceptable biological catch                                              i, iii, xvii, 1, 13, 28, 87

Access Point Angler Intercept Survey                                        iii, xvii, 4, 144

accountability measures                                            xviii, 16, 141, 153, 163, 164, 196

ACL  iii, xiii, xvii, xviii, xix, xx, xxi, xxii, xxiii, xxiv, xxv, 1, 3, 5, 6, 8, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 28, 30, 32, 35, 38, 40, 41, 43, 44, 69, 87, 88, 90, 91, 92, 93, 94, 95, 96, 98, 99, 100, 101, 102, 103, 104, 107, 109, 110, 115, 116, 117, 118, 120, 121, 122, 124, 126, 127, 128, 129, 130, 134, 135, 138, 139, 140, 141, 142, 143, 144, 145, 146, 148, 153, 164, 166, 167, 183, 195, 196, 197, 198, 199, 200, 201, 202, 243, 244, 245, 246, 247, 248

ACT   iii, xiii, xiv, xvii, xviii, xxi, xxiii, xxiv, xxv, 1, 3, 4, 6, 8, 12, 13, 16, 17, 19, 22, 23, 24, 25, 26, 28, 32, 92, 93, 94, 102, 103, 104, 107, 108, 109, 110, 111, 115, 116, 117, 121, 126, 128, 130, 139, 141, 142, 143, 146, 153, 183, 195, 196, 197, 199, 200, 243, 244, 245, 247

Alabama          33, 36, 41, 68, 70, 71, 74, 86, 87, 124, 126, 128, 132, 133, 144, 159, 178

allocation   xiii, xviii, xix, xx, xxi, 1, 2, 5, 6, 7, 8, 12, 13, 14, 15, 16, 17, 18, 24, 53, 55, 56, 57, 58, 88, 90, 101, 102, 126, 130, 141, 143, 145, 153, 170, 196, 200, 204, 205, 206, 207, 224, 240

Allocation  i, xiii, xvii, xviii, xix, xx, xxii, xxiii, xxiv, xxv, 1, 2, 6, 7, 8, 11, 12, 13, 15, 16, 17, 22, 23, 24, 27, 28, 29, 50, 51, 52, 53, 55, 56, 57, 58, 60, 61, 90, 91, 92, 93, 94, 98, 100, 101, 103, 104, 107, 115, 119, 120, 121, 128, 129, 130, 135, 139, 141, 143, 144, 153, 165, 182, 187, 191, 193, 196, 197, 198, 200, 201, 204, 205, 206

AM   iii, xviii, xxv, 1, 3, 11, 12, 32, 35, 38, 41, 115, 116, 118, 120, 121, 124, 129, 134, 138, 142, 153, 164

annual catch limit                          i, iii, xvii, 1, 13, 28, 140, 141, 143, 164, 165, 166, 167, 183

annual catch target                          i, iii, xvii, 1, 16, 28, 103, 165, 166, 183

APAIS                                              iii, xiii, xvii, 4, 5, 26, 162, 243

buffer    xxiii, xxiv, xxv, 22, 23, 24, 25, 92, 93, 103, 104, 106, 107, 108, 109, 110, 111, 112, 115, 116, 117, 196, 197, 198, 200, 243, 244, 247

bycatch                                              44, 182, 184, 188, 191, 199, 202

Bycatch   xxv, 2, 44, 143, 163, 164, 182, 185, 190, 191, 192, 193, 194, 195, 196, 197, 198, 199, 201, 202

CEA                          iii, 117, 118, 126, 129, 130, 132, 134, 137, 138, 140

CEQ                                              iii, 117, 118, 125, 129

CHTS     iii, xvi, xvii, xix, xxi, xxii, xxiii, 3, 4, 14, 15, 16, 19, 23, 25, 26, 99, 100, 101, 102, 128, 142, 143, 153, 196, 200, 245

closure      xx, xxii, xxv, 11, 16, 17, 20, 25, 32, 44, 90, 96, 97, 102, 111, 112, 115, 116, 117, 119, 120, 122, 123, 128, 130, 131, 137, 139, 141, 142, 143, 144, 164, 182, 193, 194, 195, 202, 245, 247

Coastal Household Telephone Survey                          iii, xvii, 3, 15, 144, 196, 245

consumer surplus                                              iii, 76, 93, 107, 146

Council  i, iii, xvii, xviii, xxiii, 1, 2, 3, 6, 7, 8, 9, 15, 19, 22, 23, 24, 25, 26, 27, 28, 40, 41, 44, 58, 86, 87, 117, 119, 120, 121, 123, 124, 125, 133, 137, 138, 142, 164, 167, 180, 182, 190, 191, 194, 195, 202, 205, 206

Council on Environmental Quality                                              iii, 117

CS                               iii, 76, 93, 94, 95, 97, 107, 108, 109, 110, 111, 113, 146, 148, 172
cumulative effect                iii, xxv, 89, 117, 118, 128, 129, 131, 135, 138, 143, 144, 160
cumulative effects               iii, xxv, 89, 117, 118, 131, 135, 138, 143, 144, 160
cumulative effects analysis      iii, 160
Cumulative Effects Analysis      117
Deepwater Horizon                11, 16, 27, 46, 47, 122, 126, 138, 141, 168, 169, 172
direct effect                    xxi, xxii, 100, 102
discard mortality                15, 31, 34, 44, 91, 183, 184, 188, 192, 194, 197, 202, 206
discards       xxi, 5, 8, 15, 31, 32, 34, 35, 39, 44, 45, 69, 90, 91, 122, 182, 183, 184, 185, 186, 187,
               188, 192, 193, 194, 195, 196, 197, 198, 199, 201, 202
distinct population segment      iii, 45, 189
DPS                              iii, 45
E.O.                             178, 180, 181
economic benefit                 xxi, xxiv, 94, 97, 108, 113, 201
EEZ                              iii, 11, 28, 29, 30, 32, 44, 48, 75, 86, 132
EFH                              iii, 35, 38, 88, 118, 131, 136, 137, 138, 162, 163
EIS                              i, ii, iii, 123, 125, 131, 135, 143, 159, 162, 164
EJ                               iii, 84, 85, 86
Endangered Species Act           iii, 11, 44, 178
endorsement                      11, 29, 79, 120, 133, 190, 195
endorsements                     80, 124, 133
environmental impact statement   i, iii, 123, 162, 163, 164, 165, 166
environmental justice            iii, 84
ESA                              iii, 44, 45, 136, 180, 189
essential fish habitat           iii, 161, 162, 163, 167
exclusive economic zone          iii, 11, 28, 132, 178
Executive Order                  84, 180, 181
FES iii, xiii, xvii, xix, xx, xxi, xxii, 4, 5, 6, 13, 15, 16, 17, 19, 25, 26, 27, 100, 101, 102, 128, 142,
               196, 245
FGNMS                            iii, 123, 125, 138
fishery impact statement         164, 165, 166
fishery management plan          iii, 162, 163, 164, 165, 166, 167, 169, 178, 179, 205
Fishing Effort Survey            iii, xiii, xvii, 4, 13, 27, 34, 90, 144, 245
fishing mortality                iii, xx, 5, 7, 9, 39, 90, 91, 182, 191, 192, 198, 199
fishing season                   xxiv, 8, 10, 16, 116, 120, 141, 165
Florida i, iii, xvii, 5, 9, 11, 26, 28, 29, 33, 34, 35, 39, 47, 68, 69, 70, 71, 74, 78, 80, 81, 83, 84, 85,
               86, 87, 119, 122, 123, 124, 125, 126, 127, 128, 131, 132, 133, 144, 159, 161, 162, 163, 164,
               165, 166, 167, 168, 169, 170, 171, 172, 178, 184, 186, 203
Flower Garden Banks National Marine Sanctuary                iii, 123, 181
FMP iii, xvii, 1, 7, 8, 9, 15, 27, 41, 42, 43, 45, 46, 48, 91, 117, 119, 123, 129, 130, 132, 136, 138,
               139, 141, 167, 190, 204, 206
for-hire component               xv, xxii, 96, 111, 146, 148
framework procedure              1, 12, 119, 121, 122, 123, 124
Gulf  1, i, iii, xvii, xviii, xxii, xxiii, xxv, 1, 3, 4, 5, 8, 10, 11, 13, 15, 19, 20, 22, 25, 26, 27, 28, 29,
               30, 31, 32, 33, 35, 36, 37, 38, 39, 40, 41, 44, 45, 46, 47, 48, 50, 58, 59, 60, 62, 63, 64, 67, 68,
               69, 74, 75, 76, 77, 78, 86, 87, 88, 91, 95, 96, 103, 110, 111, 116, 117, 118, 119, 121, 122, 123,

124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 136, 137, 138, 139, 140, 142, 144, 145, 146, 148, 153, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 179, 180, 181, 183, 184, 188, 189, 190, 191, 193, 194, 195, 198, 202, 203, 204, 205, 245, 246, 248

Gulf of Mexico 1, i, iii, xvii, 1, 8, 13, 15, 19, 25, 27, 37, 39, 44, 88, 117, 124, 128, 140, 145, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 180, 181, 184, 194, 198, 202, 203, 204, 205, 245, 246, 248

Gulf of Mexico Fishery Management Council  1, i, iii, xvii, 1, 8, 15, 27, 117, 160, 162, 163, 164, 165, 166, 167, 170, 204, 205

habitat area of particular concern                                                                              166

HAPC                                                                    iii, 119, 124, 125, 137, 138, 181

IFQ  iii, xxiii, xxv, 2, 3, 5, 11, 12, 13, 16, 19, 22, 23, 24, 27, 28, 30, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 61, 62, 63, 64, 79, 80, 81, 82, 93, 103, 107, 115, 116, 119, 120, 121, 122, 126, 128, 129, 130, 133, 135, 139, 140, 142, 154, 182, 183, 184, 185, 187, 188, 191, 192, 193, 194, 200, 203, 244

indirect effect                                                         xxii, 47, 100, 101, 118, 135

individual fishing quota                                iii, xxv, 2, 16, 27, 119, 144, 168, 170, 182

liquefied natural gas                                                                                      iii

LNG                                                                                      iii, 125, 140

Louisiana       33, 70, 71, 72, 74, 86, 87, 122, 124, 126, 128, 132, 133, 144, 159, 170, 171, 178

Magnuson-Stevens Act                                    iii, 86, 87, 117, 130, 131, 132, 178, 179

Magnuson-Stevens Fishery Conservation and Management Act        iii, 86, 117, 170, 178

Marine Mammal Protection Act                                                         iii, 44, 45

Marine Recreational Information Program                          iv, xvii, 3, 13, 27, 90, 153, 186

maximum sustainable yield                                                             7, 8, 39, 121

million pounds                                                         iii, 1, 14, 15, 16, 27, 185

minimum stock size threshold                                                            iv, 7, 40

Mississippi       11, 33, 37, 70, 71, 73, 74, 78, 86, 87, 124, 126, 128, 132, 133, 144, 159, 167, 169, 178, 190

mortality  xxv, 1, 5, 7, 30, 31, 39, 40, 44, 45, 47, 90, 122, 132, 143, 161, 167, 182, 183, 184, 188, 189, 190, 191, 192, 194, 195, 196, 197, 198, 199, 202, 206

mp    iii, xvii, xix, xx, xxii, 1, 3, 6, 9, 10, 11, 12, 13, 14, 17, 20, 25, 27, 28, 33, 39, 40, 52, 53, 60, 65, 90, 92, 94, 95, 100, 105, 106, 108, 110, 111, 120, 121, 134, 135, 141, 185, 186, 187, 195, 197, 247

MRFSS                                         iv, xix, xxiii, 4, 6, 13, 15, 16, 18, 22, 27, 144

MRIP iv, xiii, xvi, xvii, xix, xx, xxi, xxii, xxiii, 3, 4, 5, 6, 7, 13, 14, 15, 16, 17, 18, 19, 20, 21, 23, 24, 25, 26, 27, 34, 69, 70, 71, 72, 73, 78, 79, 90, 91, 94, 95, 99, 100, 101, 102, 110, 116, 119, 123, 124, 128, 133, 142, 143, 144, 146, 186, 196, 200,243, 245, 246, 247, 248

MRIP-FES   xiii, xvi, xviii, xix, xx, xxi, xxii, xxiii, 6, 7, 13, 14, 15, 16, 17, 18, 19, 20, 21, 23, 24, 25, 26, 27, 34, 69, 90, 91, 94, 95, 99, 100, 101, 102, 110, 116, 128, 142, 146, 196, 200, 245, 246, 247, 248

MSST                                                  iv, 7, 12, 40, 121, 129, 132, 166

MSY                                                            7, 12, 121, 166

multi-use       iii, iv, xxiii, xxiv, 2, 12, 22, 23, 24, 103, 104, 115, 116, 129, 193, 196, 197, 198

National Environmental Policy Act                                             i, 117, 160

National Marine Fisheries Service          i, iv, 1, 23, 28, 159, 160, 161, 170, 172, 178, 202

National Oceanic and Atmospheric Administration                    1, iv, 123, 160, 170

nautical miles                                                                    30, 86, 132
NEPA                                                                                       117
NMFS  iv, xvii, xxi, 1, 2, 3, 4, 13, 23, 24, 26, 28, 29, 32, 35, 40, 41, 44, 45, 46, 49, 50, 52, 53, 55,
      57, 59, 67, 74, 75, 77, 80, 81, 82, 83, 84, 86, 91, 117, 121, 122, 123, 124, 125, 127, 128, 130,
      138, 142, 143, 144, 161, 167, 169, 170, 171, 172, 178, 179,180, 181, 183, 184, 188, 189, 190,
      192, 193, 195, 202, 203
NOAAiv, 4, 19, 43, 46, 70, 77, 80, 81, 82, 83, 84, 85, 87, 123, 125, 133, 160, 161, 167, 170, 172,
      178, 180, 203, 243, 244
OFL    iv, xvii, xviii, xix, xxi, xxiv, 1, 3, 6, 7, 8, 13, 14, 15, 16, 17, 39, 40, 42, 88, 91, 92, 94, 98,
      102, 103, 117, 128, 129, 130, 135, 139, 143, 144, 145, 153, 183, 196, 199
optimum yield                                                                        iv, 1, 120, 164
overfished  xvii, xxii, xxv, 1, 3, 5, 7, 8, 39, 40, 41, 42, 43, 126, 130, 131, 132, 139, 140, 143, 191,
      198, 199
Overfished                                                                                 43
overfishing i, iv, xvii, xxi, xxii, 1, 3, 5, 7, 8, 13, 39, 40, 41, 42, 43, 87, 88, 91, 102, 116, 126, 128,
      130, 131, 132, 134, 139, 140, 143, 145, 163, 164, 183, 191, 198, 199, 201
Overfishing                                                                                43
overfishing limit                                               i, iv, xvii, 1, 13, 39, 143, 183
OY                                                          iv, 1, 8, 120, 129, 140, 204, 206
private angling component                                                            126, 141
producer surplus                                                             iv, 61, 92, 104
proportional standard error                                                          iv, 23
PS       iv, 61, 76, 77, 92, 93, 94, 96, 97, 104, 105, 106, 109, 111, 112, 113, 146, 147, 148, 149
PSE                                                                       iv, 23, 243, 244
quota     2, 3, 5, 9, 10, 11, 12, 13, 16, 19, 22, 23, 28, 30, 40, 51, 52, 53, 54, 55, 56, 57, 58, 60, 65,
      102, 104, 116, 119, 120, 121, 124, 129, 134, 135, 139, 140, 141, 142, 143, 144, 166, 182, 193,
      195, 196, 197, 200, 202, 205, 206
Quota                                                                                      102
reasonably foreseeable future actions                                                      117
rebuilding                          xvii, xxii, xxv, 1, 10, 24, 129, 130, 131, 163, 164, 165, 191
regional quotient                                                                    iv, 81, 82
Regulatory Impact Review                                                                   160
rq iv, 81, 83
Scientific and Statistical Committee                                        iv, xvii, 1, 13, 170
sea turtle                                   10, 44, 45, 91, 123, 134, 164, 184, 188, 189, 190
Season                                                                       20, 25, 245, 247
Secretary                                                                 iv, 86, 133, 178
Secretary of Commerce                                                      iv, 86, 133, 178
SEDAR iv, xiii, xvii, xviii, xix, 1, 3, 5, 7, 13, 14, 15, 16, 18, 19, 22, 23, 24, 25, 27, 28, 31, 32, 34,
      35, 39, 40, 41, 42, 43, 87, 95, 119, 123, 127, 129, 130, 131, 132, 135, 138, 139, 140, 143, 144,
      146, 148, 162, 168, 169, 171, 172, 183, 184, 185, 186, 187, 191, 192, 194, 198, 199, 202, 203,
      245
SERO      23, 28, 29, 49, 50, 52, 53, 55, 57, 59, 75, 80, 81, 82, 83, 84, 85, 160, 170, 189, 203, 243
size limit       xxv, 9, 11, 27, 29, 31, 32, 39, 119, 120, 134, 139, 143, 166, 182, 184, 187, 191, 192,
      194, 203
Southeast Data Assessment and Review                                          xvii, 1, 13, 27

Southeast Fisheries Science Center   iv, xiii, xvii, xix, 1, 3, 5, 6, 14, 15, 16, 18, 19, 20, 21, 23, 25, 26, 30, 34, 40, 59, 64, 75, 95, 110, 119, 127, 130, 139, 146, 148, 160, 161, 167, 170, 171, 172, 185, 188, 192, 202, 203, 244, 245, 246, 247, 248

Southeast Region Headboat Survey                                        iv, 34

Southeast Regional Office               i, 3, 26, 28, 159, 160, 170, 189, 193, 245

SRHS                                  iv, 34, 74, 75, 95, 110, 146, 148, 186

SSC    iv, xvii, xviii, 1, 3, 5, 7, 8, 13, 14, 15, 17, 39, 40, 41, 42, 43, 119, 129, 130, 135, 143, 170, 196, 199

stock assessment      xiii, xvii, xviii, xix, 1, 3, 4, 6, 8, 9, 15, 16, 22, 31, 39, 41, 42, 43, 46, 48, 98, 119, 122, 123, 127, 129, 130, 135, 138, 139, 140, 143, 144, 153, 170, 171, 172, 182, 183, 184, 198

TAC                                   iv, 1, 11, 12, 120, 164

Texas    29, 33, 36, 37, 41, 70, 71, 72, 73, 74, 78, 86, 87, 124, 126, 128, 132, 133, 144, 159, 169, 178, 180, 203

valued environmental components                                         135

VEC                                                        iv, 135, 136

whole weight                                           iv, 26, 95, 146, 148

ww                                       iv, 9, 26, 41, 87, 95, 110, 146, 148

# APPENDIX A.   OTHER APPLICABLE LAW

The Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act) (16 U.S.C. 1801 et seq.) provides the authority for management of stocks included in fishery management plans in federal waters of the exclusive economic zone.  However, management decision-making is also affected by a number of other federal statutes designed to protect the biological and human components of U.S. fisheries, as well as the ecosystems that support those fisheries.  Major laws affecting federal fishery management decision-making include the Endangered Species Act and Marine Mammals Protection Act (Section 3.3), E.O. 12866 (Regulatory Planning and Review, Chapter 5) and E.O. 12898 (Environmental Justice, Section 3.5.2).  Other applicable laws are summarized below.

**Administrative Procedure Act**

All federal rulemaking is governed under the provisions of the Administrative Procedure Act (5 U.S.C. Subchapter II), which establishes a "notice and comment" procedure to enable public participation in the rulemaking process.  Under the Act, the National Marine Fisheries Service (NMFS) is required to publish notification of proposed rules in the *Federal Register* and to solicit, consider, and respond to public comment on those rules before they are finalized.  The Act also establishes a 30-day waiting period from the time a final rule is published until it takes effect.

**Coastal Zone Management Act**

Section 307(c)(1) of the federal Coastal Zone Management Act of 1972 (CZMA), as amended, requires federal activities that affect any land or water use or natural resource of a state's coastal zone be conducted in a manner consistent, to the maximum extent practicable, with approved state coastal management programs.  The requirements for such a consistency determination are set forth in National Oceanic and Atmospheric Administration (NOAA) regulations at 15 CFR part 930, subpart C.  According to these regulations and CZMA Section 307(c)(1), when taking an action that affects any land or water use or natural resource of a state's coastal zone, NMFS is required to provide a consistency determination to the relevant state agency at least 90 days before taking final action.

Upon submission to the Secretary of Commerce, NMFS will determine if this plan amendment is consistent with the Coastal Zone Management programs of the states of Alabama, Florida, Louisiana, Mississippi, and Texas to the maximum extent possible.  Their determination will then be submitted to the responsible state agencies under Section 307 of the CZMA administering approved Coastal Zone Management programs for these states.

**Data Quality Act**

The Data Quality Act (Public Law 106-443) effective October 1, 2002, requires the government to set standards for the quality of scientific information and statistics used and disseminated by

federal agencies.  Information includes any communication or representation of knowledge such as facts or data, in any medium or form, including textual, numerical, cartographic, narrative, or audiovisual forms (includes web dissemination, but not hyperlinks to information that others disseminate; does not include clearly stated opinions).

Specifically, the Act directs the Office of Management and Budget to issue government wide guidelines that "provide policy and procedural guidance to federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information disseminated by federal agencies."  Such guidelines have been issued, directing all federal agencies to create and disseminate agency-specific standards to:  (1) ensure information quality and develop a pre-dissemination review process; (2) establish administrative mechanisms allowing affected persons to seek and obtain correction of information; and (3) report periodically to Office of Management and Budget on the number and nature of complaints received.

Scientific information and data are key components of fishery management plans (FMPs) and amendments and the use of best available information is the second national standard under the Magnuson-Stevens Act.  To be consistent with the Act, FMPs and amendments must be based on the best information available.  They should also properly reference all supporting materials and data, and be reviewed by technically competent individuals.  With respect to original data generated for FMPs and amendments, it is important to ensure that the data are collected according to documented procedures or in a manner that reflects standard practices accepted by the relevant scientific and technical communities.  Data will also undergo quality control prior to being used by the agency and a pre-dissemination review.

## Fish and Wildlife Coordination Act

Fish and Wildlife Coordination Act of 1934 (16 U.S.C. 661-667e) provides the basic authority for the United States Fish and Wildlife Service's (USFWS) involvement in evaluating impacts to fish and wildlife from proposed water resource development projects.  It also requires federal agencies that construct, license or permit water resource development projects to first consult with the Service (and NMFS in some instances) and State fish and wildlife agency regarding the impacts on fish and wildlife resources and measures to mitigate these impacts.

The fishery management actions in the Gulf are not likely to affect wildlife resources pertaining to water resource development as the economic exclusive zone is from the state water boundary extending to 200 nm from shore.

## National Historic Preservation Act

The National Historic Preservation Act (NHPA) of 1966, (Public Law 89-665; 16 U.S.C. 470 *et seq.*) is intended to preserve historical and archaeological sites in the United States of America. Section 106 of the NHPA requires federal agencies to evaluate the impact of all federally funded or permitted projects for sites listed on, or eligible for listing on, the National Register of Historic Places and aims to minimize damage to such places.

Typically, fishery management actions in the Gulf of Mexico are not likely to affect historic places with exception of the *U.S.S. Hatteras*, located in federal waters off Texas, which is listed in the National Register of Historic Places.  Reef fish fishing does occur off Texas; therefore, the proposed actions are a part of the normal fishing activities that occur at this site.  Thus, no additional impacts to the *U.S.S. Hatteras* would be expected.

**Executive Orders (E.O.)**

### E.O. 12630:  Takings

The E.O. on Government Actions and Interference with Constitutionally Protected Property Rights that became effective March 18, 1988, requires each federal agency prepare a Takings Implication Assessment for any of its administrative, regulatory, and legislative policies and actions that affect, or may affect, the use of any real or personal property.  Clearance of a regulatory action must include a takings statement and, if appropriate, a Takings Implication Assessment.  The NOAA Office of General Counsel will determine whether a Taking Implication Assessment is necessary for this amendment.

### E.O. 12962:  Recreational Fisheries

This E.O. requires federal agencies, in cooperation with states and tribes, to improve the quantity, function, sustainable productivity, and distribution of U.S. aquatic resources for increased recreational fishing opportunities through a variety of methods including, but not limited to, developing joint partnerships; promoting the restoration of recreational fishing areas that are limited by water quality and habitat degradation; fostering sound aquatic conservation and restoration endeavors; and evaluating the effects of federally-funded, permitted, or authorized actions on aquatic systems and recreational fisheries, and documenting those effects. Additionally, it establishes a seven-member National Recreational Fisheries Coordination Council (NRFCC) responsible for, among other things, ensuring that social and economic values of healthy aquatic systems that support recreational fisheries are considered by federal agencies in the course of their actions, sharing the latest resource information and management technologies, and reducing duplicative and cost-inefficient programs among federal agencies involved in conserving or managing recreational fisheries.  The NRFCC also is responsible for developing, in cooperation with federal agencies, States and Tribes, a Recreational Fishery Resource Conservation Plan - to include a five-year agenda.  Finally, the E.O. requires NMFS and the USFWS to develop a joint agency policy for administering the ESA.

### E.O. 13089:  Coral Reef Protection

The E.O. on Coral Reef Protection requires federal agencies whose actions may affect U.S. coral reef ecosystems to identify those actions, utilize their programs and authorities to protect and enhance the conditions of such ecosystems, and, to the extent permitted by law, ensure actions that they authorize, fund, or carry out do not degrade the condition of that ecosystem.  By definition, a U.S. coral reef ecosystem means those species, habitats, and other national resources associated with coral reefs in all maritime areas and zones subject to the jurisdiction or control of the United States (e.g., federal, state, territorial, or commonwealth waters).

Regulations are already in place to limit or reduce habitat impacts within the Flower Garden Banks National Marine Sanctuary.  Additionally, NMFS approved and implemented Generic Amendment 3 for Essential Fish Habitat (GMFMC 2005), which established additional habitat areas of particular concern (HAPCs) and gear restrictions to protect corals throughout the Gulf of Mexico.  There are no implications to coral reefs by the actions proposed in this amendment.

### E.O. 13132:  Federalism

The E.O. on Federalism requires agencies in formulating and implementing policies, to be guided by the fundamental Federalism principles.  The E.O. serves to guarantee the division of governmental responsibilities between the national government and the states that was intended by the framers of the Constitution.  Federalism is rooted in the belief that issues not national in scope or significance are most appropriately addressed by the level of government closest to the people.  This E.O. is relevant to FMPs and amendments given the overlapping authorities of NMFS, the states, and local authorities in managing coastal resources, including fisheries, and the need for a clear definition of responsibilities.  It is important to recognize those components of the ecosystem over which fishery managers have no direct control and to develop strategies to address them in conjunction with appropriate state, tribes and local entities (international too).

No Federalism issues were identified relative to the action to modify the management of mutton snapper and gag.  Therefore, consultation with state officials under Executive Order 12612 was not necessary.  Consequently, consultation with state officials under Executive Order 12612 remains unnecessary.

### E.O. 13158:  Marine Protected Areas

This E.O. requires federal agencies to consider whether their proposed action(s) will affect any area of the marine environment that has been reserved by federal, state, territorial, tribal, or local laws or regulations to provide lasting protection for part or all of the natural or cultural resource within the protected area.  There are several marine protected areas, HAPCs, and gear-restricted areas in the eastern and northwestern Gulf of Mexico.  The existing areas are entirely within federal waters of the Gulf of Mexico.  They do not affect any areas reserved by federal, state, territorial, tribal or local jurisdictions.

# APPENDIX B.   BYCATCH PRACTICABILITY ANALYSIS

Background/Overview

Bycatch is defined as fish harvested in a fishery, but not sold or retained for personal use.  This definition includes both economic and regulatory discards.  Economic discards are generally undesirable from a market perspective because of their species, size, sex, and/or other characteristics.  Regulatory discards are fish required by regulation to be discarded, but also include fish that may be retained but not sold.

Guidance provided at 50 CFR 600.350(d)(3) identifies ten factors to consider in determining whether a management measure minimizes bycatch or bycatch mortality to the extent practicable.  These are:

1. Population effects for the bycatch species.
2. Ecological effects due to changes in the bycatch of that species (effects on other species in the ecosystem).
3. Changes in the bycatch of other species of fish and the resulting population and ecosystem effects.
4. Effects on marine mammals and birds.
5. Changes in fishing, processing, disposal, and marketing costs.
6. Changes in fishing practices and behavior of fishermen.
7. Changes in research, administration, and enforcement costs and management effectiveness.
8. Changes in the economic, social, or cultural value of fishing activities and non-consumptive uses of fishery resources.
9. Changes in the distribution of benefits and costs.
10. Social effects.

The Fishery Management Councils are encouraged to adhere to the precautionary approach outlined in Article 6.5 of the Food and Agriculture Organization (FAO) of the United Nations Code of Conduct for Responsible Fisheries when uncertain about these factors.

The red grouper fishery is currently regulated through a commercial individual fishing quota (IFQ) program, as well as measures such as quotas, size limits, bag limits, and seasonal/area closures.  These measures are intended to protect red grouper during spawning and limit fishing mortality, while also specifying the size of fish that may be kept.  However, these management tools have the unavoidable adverse effect of creating regulatory discards, which reduce yield from the directed fishery.

In this amendment, the Gulf of Mexico Fishery Management Council (Council) is considering adjusting the red grouper allocation between commercial and recreational sectors to more accurately reflect historical recreational catch levels based on the best scientific information available, which was used in the 2019 stock assessment.  In addition, the Council is considering

Amendment 53 - Red Grouper                    185                    Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                    Practicability Analysis

0009607

revisions of the overfishing limit (OFL), allowable biological catch (ABC), annual catch limits (ACL), and annual catch targets (ACT) based on the results of the 2019 stock assessment.

## Red Grouper Release Mortality Rates

Discard mortality rates for red grouper in the most recent stock assessment (SEDAR 61 2019) were updated using National Marince Fisheries Service (NMFS) observer data through 2017. SEDAR 61 (2019) estimated commercial discards using a weighted mean discard mortality rate based on the number of fishing sets in each depth bin. This method was previously employed in SEDAR 42 (2015).

In Southeast Data Assessment and Review (SEDAR) 61 (2019), the commercial discard mortality in the Post-IFQ bottom longline fishery was estimated at 44.1% (+0.5% from SEDAR 42 2015), while the Pre-IFQ estimate remained at 41.5%. These values were calculated based on assumptions that 100% of fish that floated at the surface upon release suffer immediate mortality and 20% latent mortality for discards that re-submerge for each 10-m depth bin (i.e. 20% of fish that re-submerge in each depth bin are assumed to die). The discard mortality rates for each depth bin were combined using the weighted mean average based on the number of fishing sets in each bin.

In the commercial vertical line fishery, estimated discard mortality remained the same as in SEDAR 42 2015 at 19.0%. This value was based on the recreational hook-and-line gear depth-dependent discard mortality function from the 2014 Florida Fish and Wildlife Conservation Commission (FWC) study (Sauls et al.) for live red grouper discarded in fishing depths between 41 meters and 50 meters, where the vertical line fishery primarily operates. This estimate assumes vertical line gear is fished similar to recreational hook-and-line gear (with regards to retrieval and handling time). Commercial observer data were used to select the mean fishing depth range for vertical line gear that is representative of the Gulf-wide fishery. Thus, this single mortality percentage was applied to estimated discards across regions in the Gulf.

The discard mortality rate used in SEDAR 61 (2019) for recreational discards was 11.6%, which remained unchanged from SEDAR 42 (2015). This estimate included all sources of latent discard mortality for fish that were able to re-submerge and those that were alive and floating after release. Dead discards were included in recreational landings estimates, and therefore, no immediate mortality was applied to recreational discards.

Estimates of red grouper release mortality used in SEDAR 61 (2019) were collected in a variety of ways, and mirrored the methods used in SEDAR 42 (2015). An ad-hoc panel convened during the SEDAR 42 (2015) Data Workshop to specifically discuss discard mortality and review new data and results from studies available since SEDAR 12 (2006), with the intent to formulate recommended mortality percentages to apply to estimated discards. Participants included data providers, analysts, and professionals from the fishing industry representing both commercial and private recreational sectors. For SEDAR 12 (2006), 10% discard mortality was recommended for both recreational hook-and-line gear and commercial vertical line gear, and 40% discard mortality was recommended for commercial bottom long-line gear. Two data sources that were explored between SEDAR 12 (2006) and SEDAR 42 (2015) are summarized here.

Amendment 53 - Red Grouper                              186                    Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                         Practicability Analysis

0009608

A Florida FWC/Florida Fish and Wildlife Research Institue (FWRI) (detailed by Sauls et al., 2014) study found that red grouper that re-submerged with assistance from venting (fair condition), and that demonstrated difficulty re-submerging or suffered internal hook injuries or gill injuries (poor condition) survived at lower rates (survival 82.7% and 60.9%, respectively) compared to fish that re-submerged on their own immediately without the need for venting (good condition).  Point estimates for overall discard mortality across all depths fished were 10.4% and 12.9% in the charter fishery (for areas fished adjacent to Tampa Bay and the northwestern panhandle, respectively), and were comparable to the headboat fishery (9.7% to 13.8%, respectively per area).  Confidence intervals for all four-point estimates overlapped, indicating that a single mean value may be applied across fleets and areas.

Pulver (2015) showed that red grouper retention rates in the commercial sector increased after implementation of the IFQ program in 2010, most likely due to the lowering of the commercial size limit to 18 in TL.  Since 2006, NMFS has placed fishery observers on commercial vessels fishing with vertical line and bottom longline gears.  Beginning in February 2009, increased observer coverage levels were directed at the bottom longline fishery in the eastern Gulf due to concerns regarding sea turtle interactions.  Additionally, in 2011, increased funding allowed enhanced coverage of both the vertical line and bottom longline fisheries through 2014.  The immediate discard mortality rate for red grouper was estimated by combining fish that were dead on retrieval or that were unable to re-submerge following release as a percentage of overall fish discarded (not including discards with unknown conditions).  In the vertical line fishery, the mean immediate discard mortality rate (weighted based on the number of fishing sets for each depth bin) was 13.8%. Immediate discard mortality was higher in the bottom longline fishery (27.0% pre-IFQ; 29.5% post-IFQ), likely because these vessels typically fish in deeper depths than the vertical line fishery, and tend to have longer soak times.

### Magnitude of Red Grouper Bycatch

Commercial discards are available by gear for trap, vertical line, and longline.  Red grouper commercial dead discards were estimated beginning in 1990 with the implementation of federal minimum size limits.  The numbers of discards for the commercial trap fishery were taken from red grouper stock assessments prior to SEDAR 61 (2019), since fish traps were banned in the Gulf of Mexico (Gulf) beginning in 2006.

During the SEDAR 42 (2015) Data Workshop, commercial red grouper discards for vertical line and longline were calculated using discard rates as reported by fisheries observers, with the discard rates multiplied by year-specific total effort reported to the coastal logbook program to estimate total discards.  However, additional analyses were conducted post-SEDAR 42 (2015) due to concerns over the reliability of the logbook effort data, and as a result, commercial discards were re-estimated based on observed discard and kept rates from the NMFS Observer Program database.  Even with the modifications during SEDAR 42 (2015), estimated commercial discards received considerable attention as they were substantially higher than previous assessments, but were maintained at the time due to anecdotal information supporting high discard fractions.

Prior to SEDAR 61 (2019), additional research was undertaken to investigate the methodology for calculating commercial discards, specifically by exploring available effort units for

Amendment 53 - Red Grouper                                     187                          Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                                    Practicability Analysis

0009609

estimating commercial discards.  The general approach for estimating discards uses the Southeast Fisheries Science Center's (SEFSC) Reef Fish Observer Program (RFOP) and the Supplemental Discard Logbook (self-reported discard information).  Catch per unit effort has been determined from the coastal observer program in which scientific observers on commercial fishing vessels recorded detailed information on catch and effort for a subset of trips.  This investigation utilized data from the complete calendar years 2007-2017.  RFOP observer coverage levels were not consistent through the years, with coverage levels ranging between 1% and 5% of sea days.

Total effort was determined from the commercial logbook program in which fishers reported basic information on effort and catch by species for every trip (complete calendar years 1993-2017).  Logbook effort metrics were recorded at the trip level, whereas observer effort metrics were recorded at a finer scale (usually individual 'sets' within a trip).  A suite of effort metrics recorded on commercial logbooks and collected by onboard observers were evaluated to identify unbiased and consistent effort variables between the two programs for carrying out the catch expansion.

In 2020, Pulver updated data (where available) from SEDAR 61 (2019) to further examine bycatch/discard patterns from 2012-2018 in IFQ fisheries (Grouper/Tilefish and Red Snapper).  Despite the variations in coverage levels, RFOP data (accessed May 2019) are the best and most recent data available for the fishery.  Commercial discards in numbers of red grouper are summarized in Table B.1.

**Table B.1.** Commercial vertical line and longline discards (number of red grouper) using the SEDAR 61 recommended approach.

| Year | Vertical Line | Longline | Total | Year | Vertical Line | Longline | Total |
|------|---------------|----------|-------|------|---------------|----------|-------|
| 1993 | 79,662 | 514,033 | 593,695 | 2006 | 146,203 | 506,568 | 652,771 |
| 1994 | 94,368 | 668,159 | 762,527 | 2007 | 150,881 | 405,702 | 556,583 |
| 1995 | 49,123 | 302,219 | 351,342 | 2008 | 127,661 | 480,530 | 608,191 |
| 1996 | 112,944 | 667,938 | 780,882 | 2009 | 219,006 | 153,431 | 372,437 |
| 1997 | 132,132 | 878,497 | 1,010,629 | 2010 | 198,729 | 177,525 | 376,254 |
| 1998 | 127,683 | 718,051 | 845,734 | 2011 | 290,423 | 346,979 | 637,402 |
| 1999 | 140,955 | 754,469 | 895,424 | 2012 | 178,703 | 402,936 | 581,639 |
| 2000 | 142,683 | 633,778 | 776,461 | 2013 | 96,399 | 209,867 | 306,266 |
| 2001 | 146,668 | 652,257 | 798,925 | 2014 | 59,449 | 324,659 | 384,108 |
| 2002 | 151,052 | 579,902 | 730,954 | 2015 | 86,568 | 195,727 | 282,295 |
| 2003 | 158,908 | 596,105 | 755,013 | 2016 | 96,899 | 242,272 | 339,171 |
| 2004 | 151,788 | 567,853 | 719,641 | 2017 | 71,658 | 216,046 | 287,704 |
| 2005 | 133,793 | 440,858 | 574,651 | | | | |

Amendment 53 - Red Grouper                          188                          Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                          Practicability Analysis

0009610

Commercial longline fleet discards averaged 0.45 million pounds (mp) gutted weight (gw) from 1990-2017, with a low of 0.08 mp gw in 2009 and a peak of 0.85 mp gw in 1993 (Figure B.1.). Commercial vertical line fleet discards averaged 0.08 mp gw from 1990-2017, with a low of 0.02 mp gw in 2016 and a peak of 0.21 mp gw in 1990. Commercial trap fleet discards averaged 0.04 mp gw from 1990-2006, with a low of 0.01 mp gw in 1998 and a peak of 0.05 mp gw in 1995. Note that reef fish traps were banned in 2007.



**Figure B.1.** Red Grouper dead discard estimates from SEDAR 61 (2019) assessment for commercial (left panel, by fleet) and recreational (right panel) fisheries in millions of pounds, 1986-2017.

Red Grouper recreational discards were derived from Marine Recreational Information Program (MRIP) Fishing Effort Survey (FES) estimates of live released fish between 1986 and 2017 and self-reported discards in the Southeast Region Headboat Survey (SRHS) logbook since 2007 (Table B.1). Red Grouper discards from headboats for years prior to 2007 in Florida were estimated using the ratio of MRIP Charter to SRHS discards as a proxy. Red Grouper recreational dead discard estimates averaged 0.87 mp gw from 1986 to 2017, with a low of 0.22 mp gw in 1987 and a peak of 1.92 mp gw in 2004 (Figure B.1.). This equates to about 15 % of the recreational removals and 27 % of the total dead discards of red grouper.

Amendment 53 - Red Grouper                    189                    Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                    Practicability Analysis

0009611

**Table B.1.** Recreational discards (number of Red Grouper) by fishing mode (using SEDAR 61 recommended approach).

| Year | Charter | Headboat | Private | Total | Year | Charter | Headboat | Private | Total |
|------|---------|----------|---------|-------|------|---------|----------|---------|-------|
| 1986 | 86,363 | 46,587 | 813,907 | **946,857** | 2002 | 228,016 | 63,624 | 3,909,476 | **4,201,116** |
| 1987 | 50,123 | 43,031 | 690,377 | **783,531** | 2003 | 343,210 | 136,745 | 3,752,560 | **4,232,515** |
| 1988 | 70,652 | 79,240 | 1,932,133 | **2,082,025** | 2004 | 423,964 | 160,995 | 7,512,527 | **8,097,486** |
| 1989 | 196,089 | 540,610 | 5,872,992 | **6,609,691** | 2005 | 248,419 | 92,489 | 2,701,327 | **3,042,235** |
| 1990 | 196,883 | 72,542 | 4,374,994 | **4,644,419** | 2006 | 123,352 | 32,695 | 2,220,260 | **2,376,307** |
| 1991 | 215,954 | 104,719 | 5,426,844 | **5,747,517** | 2007 | 111,913 | 17,365 | 1,599,693 | **1,728,971** |
| 1992 | 204,602 | 66,174 | 5,157,606 | **5,428,382** | 2008 | 367,994 | 89,615 | 6,294,612 | **6,752,221** |
| 1993 | 86,379 | 78,702 | 3,158,040 | **3,323,121** | 2009 | 398,022 | 153,829 | 6,276,296 | **6,828,147** |
| 1994 | 146,510 | 84,039 | 3,236,051 | **3,466,600** | 2010 | 497,987 | 117,879 | 5,379,955 | **5,995,821** |
| 1995 | 236,720 | 107,149 | 3,835,677 | **4,179,546** | 2011 | 433,964 | 134,114 | 6,021,306 | **6,589,384** |
| 1996 | 114,829 | 163,725 | 1,246,516 | **1,525,070** | 2012 | 464,256 | 117,809 | 4,392,740 | **4,974,805** |
| 1997 | 127,887 | 78,504 | 2,014,957 | **2,221,348** | 2013 | 620,479 | 112,266 | 4,895,361 | **5,628,106** |
| 1998 | 202,616 | 83,492 | 3,337,806 | **3,623,914** | 2014 | 435,470 | 84,237 | 4,293,342 | **4,813,049** |
| 1999 | 375,157 | 180,087 | 5,405,117 | **5,960,361** | 2015 | 326,901 | 74,376 | 2,550,817 | **2,952,094** |
| 2000 | 471,536 | 98,791 | 4,227,094 | **4,797,421** | 2016 | 322,165 | 79,409 | 2,164,044 | **2,565,618** |
| 2001 | 272,157 | 72,878 | 3,502,720 | **3,847,755** | 2017 | 299,920 | 73,658 | 2,202,611 | **2,576,189** |

Annually, the commercial sector dead discards averaged 0.6-0.9 mp gw of red grouper prior to IFQ implementation in 2009, and have been considerably lower since. Estimated red grouper discards for both commercial gears for the most recent years available (2012 through 2017) were some of the lowest of the time series. The number of discards dropped substantially beginning in 2013 with vertical line discards estimated under 100,000 fish through 2017. The lowest total number of discards in the entire time series was recorded in 2015. Some of the reduction in estimated discards from 2012 through 2017 is likely due to the reduction in the commercial minimum size limit from 20 to 18 inches total length (TL) in May 2009. The RFOP listed red grouper as the most common IFQ species observed with a relatively high percentage of 35% discarded compared to other IFQ species (0-20.2%; Table B.2.). Data from the RFOP (2019) used to calculate the discard ratio (number discarded:one landed) stratified by year and gear found that less than one fish was being discarded for each fish being retained for almost all the time series, except in 2017 for longline and 2018 for both gears.

Amendment 53 - Red Grouper                    190                    Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                                        Practicability Analysis

0009612

In addition to the number of self-reported discards per trip, the discard logbook attempts to quantify the reason why discarding occurs using four categories: 1) not legal size, 2) other regulation, 3) market conditions, and 4) out of season.  For IFQ species, other regulation could include a lack of allocation.  Using these categories, discard logbooks reported 97% of self-reported discards of red grouper were due to the minimum size limit from 2012-2018.  Length data collected by the RFOP supports that the current minimum size limit is the principal reason discards were occurring from 2012-2018, although a small amount of discarding may have occurred due to lack of allocation.

The recreational fishery discards substantially more fish than the commercial fishery, averaging 4.14 million fish per year, versus approximately 600,000 fish/year in the commercial fishery. This difference is especially pronounced in the most recent 5 years (2013-2017), where commercial discards (~320k/year) have been less than a tenth of recreational discard (~3.71 million/year).  Thus, despite a higher discard mortality rate in the commercial fishery (due largely to the bottom longline fishery), the recreational sector is responsible for more discards and more dead discards.

**Table B.2.**  The number of captures and percentage for each disposition observed by the RFOP from 2012-2018 for IFQ species.

|  | Number Observed | Kept | Discarded |
|---|---|---|---|
| **Red Grouper** | 283,879 | 64.9% | 35.1% |
| **Gag Grouper** | 14,570 | 79.8% | 20.2% |
| **Shallow-water Grouper** |  |  |  |
| **Scamp** | 11,344 | 94.5% | 5.5% |
| **Black Grouper** | 298 | 87.6% | 12.4% |
| **Yellowmouth Grouper** | 83 | 91.6% | 8.4% |
| **Yellowfin Grouper** | 11 | 90.9% | 9.1% |
| **Deep-water Grouper** |  |  |  |
| **Yellowedge Grouper** | 19,672 | 98.7% | 1.3% |
| **Snowy Grouper** | 3,268 | 98.7% | 1.3% |
| **Speckled Hind** | 1,205 | 88.0% | 12.0% |
| **Warsaw Grouper** | 205 | 100% | 0.0% |

Source: SEFSC RFOP (2019)

**Other Bycatch**

U.S. fisheries are classified under the Marine Mammal Protection Act (MMPA) according to the level of interactions that result in incidental mortality or serious injury of marine mammals.  In the most recent List of Fisheries (84 FR 22051; May 16, 2019), the Gulf commercial reef fish fishery is listed as a Category III fishery under the MMPA.  Category III contains fisheries where annual mortality and serious injury of a marine  mammal  stock  resulting  from  any  fishery  is less  than  or  equal  to  1%  of  the  maximum number of animals, not including natural

Amendment 53 - Red Grouper                    191                         Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                         Practicability Analysis

0009613

mortalities, that may be removed from a marine mammal stock, while allowing that stock to reach or maintain its optimum sustainable population. The risk of serious injury or mortality to marine mammals resulting from the recreational sector of the reef fish fishery, which uses similar gear (i.e., handlines, rod and reel, spears, etc.), is also expected to be low, although interactions with dolphins are known to occur when dolphins prey on discarded fish (Powell and Wells, 2011).

NMFS has conducted specific analyses ("Section 7 consultations") evaluating potential effects from the Gulf reef fish fishery, including the directed red grouper fishery, on sea turtles (as well as on other Endangered Species Act [ESA]-listed species and critical habitat) as required by the ESA. On September 30, 2011, the Southeast Regional Office (SERO) completed a biological opinion (BiOp), which concluded that the authorization of the Gulf reef fish fishery is not likely to jeopardize the continued existence of any sea turtles (loggerhead, Kemp's ridley, green, hawksbill, and leatherback) (NMFS 2011). An incidental take statement was issued specifying the amount and extent of anticipated take, along with reasonable and prudent measures and associated terms and conditions deemed necessary and appropriate to minimize the impact of these takes. The BiOp concluded that NMFS capture estimates produced using the NMFS (2005a) approach with updated data (i.e., 125 annual sea turtle captures or 375 sea turtles over any three-year period) is the most reasonable estimate of sea turtle captures in the recreational vertical line component of the Gulf reef fish fishery. In the commercial vertical line fishery, interactions are believed to be much lower, with an estimate 114 captures over any three-year period. The bottom longline fishery has a higher estimated sea turtle take, with NMFS estimating that in 2011 and subsequent years, a total of 208 turtles (204 loggerhead, 1 green, 1 hawksbill, 1 Kemp's ridley, 1 leatherback) would be taken on a yearly basis. On September 29, 2016, NMFS reinitiated consultation on the authorization of the Gulf reef fish fishery because new species (Nassau grouper and green sea turtle North Atlantic and South Atlantic distinct population segments) have been listed under the ESA that may be affected by the fishery. Since the consultation was reinitiated, three additional species that may be affected by the fishery have been listed under the ESA. These include the giant manta ray (2018), oceanic white tip shark (2018) and Bryde's whale (2019). This consultation is currently being conducted and results are not yet available.

Smalltooth sawfish are also adversely affected by the Gulf reef fish fishery, but are interacted with to a much lesser extent than sea turtles. Although the long, toothed rostrum of the smalltooth sawfish causes this species to be particularly vulnerable to entanglement in fishing gear, incidental captures in the commercial and recreational hook-and-line components of the reef fish fishery are rare events. Only eight smalltooth sawfish are anticipated to be incidentally caught every 3 years in the entire reef fish fishery, and none are expected to result in mortality (NMFS 2011). In the 2011 BiOp, NMFS concluded that the authorization of the Gulf reef fish fishery is not likely to jeopardize the continued existence of smalltooth sawfish. An incidental take statement was issued specifying the amount and extent of anticipated take, along with reasonable and prudent measures and associated terms and conditions deemed necessary and appropriate to minimize the impact of these takes. Participants in this fishery are required to follow smalltooth sawfish safe handling guidelines.

Amendment 53 - Red Grouper                            192                            Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                                        Practicability Analysis

0009614

NMFS determined that the following reasonable and prudent measures were necessary and appropriate to minimize stress and increase survival of sea turtles and smalltooth sawfish:

*Avoiding and Minimizing Take Through Outreach and Education*
Most, if not all, sea turtles and smalltooth sawfish released after capture experience some degree of physiological injury from forced submergence and/or abrasions/lacerations caused by hooking or entanglement.  The ultimate severity of these events is dependent not only upon the actual capture, but the amount of gear remaining on the animal at the time of release.  The handling of an animal also greatly affects its chance of recovery.  Therefore, the experience, knowledge, ability, and willingness of fishers to remove gear is crucial to the survival of sea turtles and smalltooth sawfish following release.  Certain behavior by fishermen may also help to reduce the likelihood of takes.  For these reasons, NMFS shall conduct outreach and education to ensure that takes are avoided to the extent practicable and sea turtles and smalltooth sawfish are handled in a way that minimizes adverse effects from incidental take and reduces the likelihood of mortality.

*Minimizing Future Gear Impacts through Research*
Fishing gear and fishing behavior may influence the frequency and severity of interactions with sea turtles and smalltooth sawfish.  However, fishing characteristics and behavior vary from vessel to vessel.  To achieve a better understanding of how these characteristics, differ and how these differences may affect sea turtles and smalltooth sawfish, NMFS shall conduct research to better characterize the fishery and its interactions with sea turtles and smalltooth sawfish.

*Monitoring the Frequency, Magnitude, and Impact of Incidental Take*
Monitoring and tracking both the level of take occurring specific to the reef fish fishery and the status of listed species are important aspects of sustainable management of protected species.  NMFS shall ensure that monitoring and reporting of any sea turtles or smalltooth sawfish encountered: (1) detect any adverse effects resulting from the Gulf reef fish fishery; (2) provide an assessment that confirms the ITS has not been exceeded, and if the ITS may have been exceeded, determine the actual level of incidental take in comparison with the anticipated incidental take, and (3) collect improved data from individual encounters.

The Council originally addressed protected species bycatch in Amendment 18A to the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico (Reef Fish FMP) (GMFMC 2005b), which established regulations to minimize stress to endangered species incidentally caught in the reef fish fishery.  Since then, the Council and NMFS have implemented several other actions aimed at reducing sea turtle bycatch and enhancing survival of captured turtles including:
- Reef Fish Amendment 31 (75 FR 21512, 4/26/2010)- Established a longline endorsement requirement; restricted fishing to outside the 35-fathom depth contour from June – August; and limited vessels to 1000 hooks onboard, of which only 750 could be rigged at any time.  The 1000 hook limitation was removed in a 2018 framework action (83 FR 5210, 2/26/2018), but the limitation on the 750 hooks rigged at any time remains in place.
- Reef Fish Amendment 49 (84 FR 25009, 5/30/2019)- Added three new sea turtle release and handling devices; updated requirements for several previously approved devices for

Amendment 53 - Red Grouper                    193                    Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                    Practicability Analysis

0009615

clarity; and allowed changes to handling/release gear requirements to be made through the Council's Framework process.

There are three primary orders of seabirds present in the Gulf including Procellariiformes (petrels, albatrosses, and shearwaters), Pelecaniformes (pelicans, gannets and boobies, cormorants, tropic birds, and frigate birds), and Charadriiformes (phalaropes, gulls, terns, noddies, and skimmers) (Clapp et al., 1982; Harrison, 1983). Several other bird species also occur in the Gulf, and are listed as threatened or endangered by the U.S. Fish and Wildlife Service, including piping plover, roseate tern, and brown pelican (the brown pelican is endangered in Mississippi). Human disturbance of nesting colonies and mortalities from birds being caught on fishhooks and/or entangled in monofilament line are primary factors affecting seabirds. Oil or chemical spills, erosion, plant succession, hurricanes, storms, heavy tick infestations, and unpredictable food availability are other threats. There is no evidence that the directed grouper fishery adversely affects seabirds.

Other species of reef fish are also incidentally caught and often intentionally targeted when targeting red grouper. Gag or black grouper may be targeted or incidentally captured on trips targeting red grouper. In the eastern Gulf, scamp and other shallow-water grouper (SWG; grouping includes black grouper, scamp, yellowfin grouper, and yellowmouth grouper), red snapper, greater amberjack, and vermilion snapper are also caught when targeting red grouper. Neither black grouper nor gag are overfished or are undergoing overfishing (SEDAR 19, 2010 and SEDAR 33 Update, 2016, respectively). Vermilion snapper are not overfished or undergoing overfishing (SEDAR 67, 2020) and bycatch is not expected to jeopardize the status of this stock. Greater amberjack (SEDAR 33 Update 2016) are overfished but are not undergoing overfishing. Greater amberjack release mortality is estimated to be fairly low, ranging from 10% to 20%. Discards are slightly higher for commercially caught greater amberjack than they are for recreationally caught greater amberjack because of differences in minimum size limits (36 inches fork length [FL] commercial vs. 34 inches FL recreational). Because greater amberjack are pelagic and grouper are bottom fish, bycatch of greater amberjack is relatively low when fishing for red grouper and likely not greatly affected by changes in grouper management measures. Red snapper are not overfished or undergoing overfishing, but are under a rebuilding plan because stocks are below targeted population levels (SEDAR 52, 2017). Red snapper have been increasing in abundance in the eastern Gulf over the past two decades and fishermen have indicated they are discarding more red snapper. Most commercial grouper fishermen in the eastern Gulf were allocated few red snapper IFQ shares and therefore are unable to retain large quantities of red snapper when fishing for grouper (GMFMC, 2008c). Bycatch is a significant source of mortality in the red snapper fishery, resulting in the Council approving actions in Amendment 27/14 to reduce directed fishery bycatch such as the requirement to carry dehooking devices and venting tools as well as use circle hooks (note the venting tool requirement was rescinded in a 2013 framework action). The status of other shallow-water grouper species are unknown. Bycatch is not known to be significant for other SWG and deep-water grouper species, since many (e.g., yellowmouth grouper, rock hind, scamp, and red hind) have no or small minimum size limits (e.g. scamp – 16 inches TL).

Amendment 53 - Red Grouper                                      194                          Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                                    Practicability Analysis

0009616

**Practicability of current management measures in the directed red grouper fishery relative to their impact on bycatch and bycatch mortality.**

Bycatch and bycatch mortality can negatively affect a stock by reducing the number of fish that survive and become susceptible to harvest. Fishery management regulations are intended to constrain effort and control fishing mortality, but in some cases increase bycatch or bycatch mortality. When proposing fishing regulations, managers must balance the competing objectives of maximizing yield, ending overfishing, and reducing bycatch to the extent practicable.

The following describes current management measures and their relative impact on bycatch and bycatch mortality in the directed red grouper fishery. The commercial red grouper fishery is managed under an IFQ program, whereby catch shares are allocated among shareholders with measures to prevent fishermen from harvesting more than their individual allocation. The fishery also has gear restrictions and requirements, seasonal management measures (requirement for longline vessels to fish outside 35 fathom contour from June through August and outside 20 fathom contour for the rest of the year), and minimum size limits. The recreational red grouper fishery is managed with size limits, bag limits (four grouper aggregate bag limit of which two can be red grouper), gear restrictions, and a closed season from February 1 through March 31 where SWG cannot be possessed if captured in waters beyond the 20-fathom contour. There are also several restricted fishing areas intended to protect reef fish (in particular gag) spawning aggregations.

Size limits

Size limits are the greatest factors contributing to bycatch in the red grouper IFQ fishery (Pulver & Stephen, 2019). Currently, there is an 18-inch TL commercial and a 20-inch recreational red grouper minimum size limit. There are also minimum size limits for gag (24-inch TL minimum size limit for both the recreational and commercial), black grouper (24- inches TL), yellowfin grouper (20-inches TL), and scamp (16-inches TL). Recent analysis of observer data from 2012-2018 indicate that over 99% of all commercially discarded red grouper and gag are discarded due to regulations. The minimum size limit is the primary regulatory reason cited for discarding red grouper (97.0% of discards), gag (54.3%), and other SWG (46.4%-89.2%) in the commercial sector. Size limits are also the primary reason for red grouper discards in the recreational red grouper sector. Size limits are intended to protect immature fish and reduce fishing mortality. The red grouper minimum size limit in the commercial sector is similar to the size at 50% maturity (~16- 20 inches; Moe 1969; Collins et al. 2002). Gag minimum size limits are at or slightly above the size at 50% maturity (~21 inches; SEDAR 33 Update 2016). Sizes at maturity for black grouper, yellowfin grouper, and scamp are 33 inches TL (NMFS 2005), 20 inches TL (Cummings, 2007), and 14 inches TL (NMFS 2005), respectively. Size limits for yellowfin grouper and scamp are at or above the size at 50% maturity, while the size limit for black grouper is below the size at 50% maturity.

SEFSC conducted analyses (Ortiz 2007; Walter 2007) for gag and red grouper to identify the sizes that best balance the benefits of harvesting fish at larger sizes against losses due to natural mortality. Walter (2007) found that yield per recruit (YPR) would increase as minimum size decreased for the red grouper commercial sector, but that there would be a corresponding decrease in spawning per recruit (SPR). By reducing the red grouper size limit from 20 to 18

Amendment 53 - Red Grouper                    195                    Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                    Practicability Analysis

0009617

inches, the study predicted an increase in YPR of 2.6%, and a corresponding decrease in SPR of 1.5 percent.  Observer data collected onboard reef fish vessels during 2006 and 2007 supported the findings of Walter (2007), suggesting that red grouper longline discards would be reduced by approximately 38%, and handline discards would be reduced by approximately 33 percent upon reduction of the size limit to 18-inches TL.  Other analyses indicated that a reduction in size limit would reduce discard mortality by reducing the number of fish released after catch.  Coggins et al. (2007) found minimum size limits did not help fisheries for long-lived low-productivity species, such as groupers, achieve sustainability if discard mortality exceeded five percent.  Rudershausen et al. (2005) also concluded minimum size limits are only moderately effective for reef fish caught in shallower portions of their depth ranges, and nearly ineffective in deep waters.

A comparison of discards in the five years prior to the reduction in the commercial size limit from 20 to 18 inches (2004-2008) to the most recent 5 years available (2013-2017) reveals a vast decrease in discards in both the vertical line fishery (average decrease from 142,100 to 82,200 fish) and the longline fishery (480,300 to 237,700 fish).  The reduced minimum size is believed to be the primary reason behind this decrease.

**Closed Seasons and Quota Closures**

The commercial sectors of the Gulf reef fish fishery for groupers (including deep water grouper (DWG) and SWG) is managed under an IFQ program composed of four share categories:  red grouper, gag, DWG (which includes yellowedge grouper, warsaw grouper, snowy grouper, speckled hind, and scamp) and SWG (which includes black grouper, scamp, yellowfin grouper, yellowmouth grouper, warsaw grouper, and speckled hind).  IFQ shares are assigned to shareholders in percentages of the annual commercial quotas for DWG, red grouper, gag, and Other SWG, based on their applicable historical landings.  Shares determine the amount of IFQ allocation for Gulf groupers (in pounds gutted weight) a shareholder is initially authorized to possess, land, or sell in a given calendar year.  Fishing is open to shareholders throughout the fishing year, provided they have allocated quota available to them.  For more information on the IFQ program, see the NMFS's Southeast Regional Office Catch Shares webpage at http://portal.southeast.fisheries.noaa.gov/cs/main.html.

Discards by individual fishermen who have exhausted their red grouper annual allocation are not thought to be significant in the commercial sector, as several measures are available that may allow catch after a shareholder has exhausted their annual allocation (Pulver & Stephen, 2019).  Both red grouper and gag have a "multi-use allocation," which allows for, under certain conditions, continued harvest of either species after an IFQ account holder's allocation for that species has been landed and sold, or transferred.  This allocation is intended to reduce bycatch of both red grouper and gag by allowing fishermen to retain catch that they would otherwise be required to release as bycatch.  In addition, shareholders that have exhausted their annual allocation are permitted to purchase additional annual allocation from other entities with annual allocation.  This provision allows fishermen to retain catch that would otherwise be required to be released as bycatch.

The recreational SWG fishery is closed from February 1 through March 31 in waters beyond the 20-fathom contour (the recreational gag fishery is closed in Gulf waters from January through

Amendment 53 - Red Grouper                        196                        Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                                    Practicability Analysis

0009618

May).  This closed season was originally implemented for the recreational sector in all Gulf waters, but was modified in a 2012 framework to apply only in waters deeper than 20 m as specified by NMFS.  The closure is intended to protect SWG (especially gag, black, and red grouper) during spawning.  The closure is intended to reduce bycatch, since these species are commonly caught in the same areas and habitat.  Closed season discards are not believed to be significant in the recreational red grouper sector, as closures of other species that often occupy similar habitats (e.g. other SWG, gag) occur simultaneously.  Anglers are more likely to fish in other areas (i.e. less likely to be occupied by red grouper and other SWG) when the red grouper season is closed.

**Bag and Trip Limits**

The recreational SWG fishery is regulated by a 4-grouper aggregate bag limit, which may not include more than 1 speckled hind, more than 1 warsaw grouper, more than 2 red grouper, or more than 2 gag.  Recreational red grouper discards are primarily the result of the capture of undersized fish prior to reaching the bag limit, and the targeting of other reef fish in areas where red grouper are present after the red grouper bag limit has been reached.  In addition, some fishers may discard legally sized fish in effort to catch larger fish of the same species (high-grading).  High-grading is thought to be underreported in fisheries worldwide (Batsleer et al., 2016), and its prominence in the Gulf red grouper fishery in unknown.  However, discards of legal-size grouper occur less frequently at larger sizes, indicating that high-grading may occur.

**Allowable Gear**
Vertical hook-and-line gear (bandit rigs, manual handlines) and bottom longlines are the primary gears used in the commercial grouper sector.  Fish traps accounted for a small portion (generally 10-15%) of grouper catch prior to 2007, when they were prohibited in federal waters of the Gulf of Mexico.  In 2008, regulations were implemented requiring commercial and recreational fishermen to use circle hooks, venting tools, and dehooking devices when harvesting reef fish in the Gulf.  Circle hooks were commonly used in the commercial grouper industry prior to implementation of this new regulation.  In a 2013 framework, the venting tool requirement was rescinded.  It is unknown how extensively dehooking devices were used prior to these new gear requirements.

Longlines account for a majority of the red grouper commercial discards.  From 2013 through 2017, approximately 74 percent of red grouper commercial discards were from the bottom longline fishery (see Table B.2 above).   In addition, the bottom longline has a higher estimated discard mortality rate at 44.1 percent (post-IFQ; SEDAR 61 2019), so this fishery contributes to a proportionally higher percentage of red grouper dead discards, as well as to dead discards of other reef fish species.

Recreational discards are primarily due to the recreational size limit, but allowable gears can affect release mortality rates.  Rod-and-reel is the primary gear used in the recreational sector.  Circle hooks are required gear for all hook and line anglers to harvest grouper and other reef fishes.  Brulé et al. (2015) found that larger circle hooks caught significantly larger sizes of red grouper.  Garner et al. (2020) also projected that larger circle hooks could modestly increase retained catch while drastically reducing the number of discarded fish.  We don't currently have

Amendment 53 - Red Grouper                                    197                        Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                                              Practicability Analysis

0009619

adequate information on the size of circle hooks used by anglers in the Gulf or on the affect that has on bycatch of undersized species. Recreational anglers also use spears to capture grouper. Spearfishing does not affect release mortality since all fish caught are killed. Only undersized grouper mistakenly killed while spearfishing would contribute to dead discards.

No gear restrictions are proposed in this amendment to further limit bycatch or bycatch mortality of reef fishes, including grouper.

**Time/Area Closures**

The Council created two restricted fishing areas to specifically protect spawning aggregations of gag in 2000. The Madison-Swanson and Steamboat Lumps marine restricted fishing areas are located in the northeastern Gulf at a depth of 40 to 60 fathoms. Both areas prohibit bottom fishing and possession of Gulf reef fish (except during transit under certain conditions). The Council and NMFS are currently considering more stringent regulations in these areas that would prohibit trolling (except for highly migratory species [HMS] species) and possession of reef fish at all times. All fishing is also prohibited in the Tortugas marine reserves in the southern Gulf near the Dry Tortugas. Marine reserves and time/area closures benefit fish residing within reserve boundaries by prohibiting their capture during part or all of the year. Within marine reserves, fish that are undersized potentially have an opportunity to grow to legal size without the threat of being captured by fishing gear. If these fish emigrate from the marine reserve (i.e., spillover effect), then they may be caught as legal fish outside the reserve, thereby reducing bycatch. However, anglers and commercial fishermen may redistribute their effort to areas surrounding the marine reserve. If fishing pressure in these areas is increased, then any benefits of reduced bycatch of fish in the marine reserve may be partially or fully offset by increases in bycatch of fish residing outside the marine reserve.

In addition, the Council created several seasonal restrictions to protect red grouper. Commercial fishermen with a bottom longline endorsement must fish outside the 35-fathom contour from June – August (must fish outside 20 fathom contour the rest of the year). The recreational red grouper fishery has a seasonal closure each year from February 1 through March 31.

**Alternatives being considered to minimize bycatch**

No measures are proposed in this amendment to directly reduce the bycatch of red grouper and other species. However, the choice of alternatives in Action 1 is likely to impact the amount of bycatch. **Alternative 2** would result in an increase in the commercial ACL and a decrease in the recreational ACL. A decrease in the recreational red grouper ACL (as proposed in Action 1, **Alternative 2**) is likely to indirectly reduce bycatch, as it is expected to result in reduced effort in the recreational sector. The recreational sector is responsible for higher levels of bycatch and bycatch mortality than the commercial sector, and thus the reduced effort and catch in this sector is expected to reduce bycatch and mortality. Although the commercial ACL would increase under **Alternative 2**, the increase is outweighed by the larger decrease in the recreational sector ACL (where bycatch is higher), and thus **Alternative 2** is expected to result in a net decrease in bycatch and bycatch mortality. **Alternatives 3-5** in Action 1 would result in a decrease in both the recreational and commercial ACL, which is expected to reduce bycatch and bycatch

0009620

mortality. **Alternative 6** would implement an ACL that is in between **Alternative 2** and **Alternatives 3-5**. The commercial ACL would remain the same as it is currently (3.16 mp), and the recreational ACL would be higher than **Alternative 2**, but lower than **Alternatives 3-5**. Because the commercial ACL would not change, there is expected to be no change in impact on bycatch species in the commercial fishery. The decrease in recreational quota under **Alternatives 2-6** is expected to result in a corresponding decrease in overall bycatch and bycatch mortality, although this decrease may be partially mitigated by an increase in regulatory discards by reef fishermen targeting other species.

The alternatives in Action 2, which set the ACT for the commercial and recreational sector, are expected to have only minor impacts on bycatch. Alternative 1 (no action), which would maintain the buffers currently in place, would have no impact beyond that discussed above in Action 1. **Alternative 2** would have the largest impact of the three alternatives, as it would eliminate the commercial buffer (from 5%). Elimination of the 5% buffer would in effect negate the multi-use provision in which red grouper can be captured and kept while fishing for gag. If this buffer is eliminated, then all red grouper captured in the gag fishery (by those without available red grouper shares) would be required to be released. This would result in greater bycatch of and mortality of red grouper. Both **Alternatives 2** and **3** would increase the recreational buffer from 8% to 9%, but the relatively small scope of the additional buffer is expected to have minor to negligible impacts on bycatch.

## Practicability Analysis

### Criterion 1: Population effects for the bycatch species

Measures being considered in this action would 1) modify the allocation of red grouper catch among the recreational and commercial fisheries and set the OFL, ABC, and ACLs (Action 1), and 2) set the ACTs for the commercial and recreational sectors (Action 2). These actions are intended to ensure that the historical participation by the recreational and commercial sectors are accurately reflected and that recreational catch levels are consistent with the data used to monitor recreational landings and trigger accountability measures.

The impact on populations of red grouper as a result of the measures considered in this action are likely to be both positive and negative. Action 1 includes alternatives that either maintain current sector allocations percentages (**Alternatives 1** and **2**) or decrease the commercial allocation percentage with a corresponding increase in recreational sector allocation percentage (**Alternatives 3-6**). **Alternative 1** (No Action) is not a legally defensible option, so will not be analyzed here. **Alternatives 2-6** would update the recreational ACL to MRIP-FES units as opposed to MRIP-Coastal Household Telephone Survey (CHTS) units. The MRIP-FES dataset is a more accurate representation of actual catch by the recreational sector. Because recreational catch estimates are higher under MRIP-FES than they were under MRIP-CHTS, there is a resultant increase in recreational and decrease in commercial sector allocation percentages under **Alternatives 3-6**, which would likely affect red grouper bycatch rates and totals.

**Alternative 2** would maintain the current percentages used for sector allocations, but would update the OFL, ABC, and ACL based on the Council's Scientific and Statistical Committee

Amendment 53 - Red Grouper                    199                    Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                    Practicability Analysis

0009621

(SSC) recommendations, which are derived from the projections that use the MRIP-FES time series of recreational landings. Therefore, **Alternative 2** would implement a slightly higher total ACL and a substantially higher commercial ACL than any other alternative (including the no action), while also resulting in the largest decrease in the recreational ACL. Because the recreational sector is responsible for greater red grouper bycatch/mortality than the commercial sector, **Alternative 2** would have more positive impacts on the populations of red grouper than the other alternatives. Because the recreational quota would be substantially reduced (by ~44%), it is expected to result in a reduction in recreational fishing effort for red grouper, and thus a decrease in bycatch/mortality of red grouper. This beneficial impact could be partially offset by an increase in regulatory discards that could occur when red grouper are captured by fishermen targeting other species. Although the commercial ACL would increase (by ~15%), the increase would be small relative to the decrease in the recreational ACL, and would still be expected to result in a net reduction in bycatch from the current rate. In addition, when compared to other recent years, the ACL (and thus expected bycatch) will be substantially lower, and would be expected to result in greatly reduced bycatch of red grouper when compared to levels from the recent past.

**Alternatives 3-5** in Action 1 are very similar (a 1.2% difference in quota allocation is the largest disparity), and differences between them are likely insignificant in how they would affect populations of bycatch species. However, each of the three action alternatives would likely result in a decrease in bycatch and in dead discards of red grouper when compared to current management. Each of these alternatives would have a lower ABC and ACL due to the higher discard and discard mortality in the recreational sector. A decrease would occur because the action alternatives would decrease both the recreational ACL (by 0.37-0.40 mp) and the commercial ACL (by 0.56-0.63 mp). The decreases in both quotas are expected to result in a corresponding decrease in red grouper bycatch and bycatch mortality.

**Alternative 6** would implement an ACL that is in between **Alternative 2** and **Alternatives 3-5**. The commercial ACL would remain the same as it is currently (3.16 mp), and the recreational ACL would be higher than **Alternative 2**, but lower than **Alternatives 3-5**. Because the commercial ACL would not change, there is expected to be no change in impact on red grouper bycatch in the commercial fishery. The decrease in recreational quota under **Alternative 6** is expected to result in a corresponding decrease in red grouper bycatch and bycatch mortality, although this decrease may be partially mitigated by an increase in regulatory discards by reef fishermen targeting other species.

All alternatives in Action 2 are likely to have similar and negligible impacts on red grouper bycatch in the recreational sector. All of the Action 2 alternatives would either maintain or slightly increase the recreational buffer (by 1%, or 11,800-17,300 lb). In spite of relatively high bycatch rates in the recreational sector, the potential increase in the buffer is small relative to the ACL, especially when compared to the higher red grouper ACLs in recent years. Thus, none of the recreational buffers in the Action 2 alternatives are likely to appreciably impact the populations of red grouper.

The alternatives in Action 2 are likely to have impacts on red grouper populations in the commercial sector that range from negligible to slightly negative. **Alternatives 1** and **3**, which

0009622

would maintain the current 5% buffer in the commercial sector, are expected to have negligible impacts on red grouper bycatch as they are not expected to increase bycatch compared to current levels.  **Alternative 2**, which would eliminate the 5% commercial buffer, is likely to have negative impacts on bycatch, but more so for gag grouper than red grouper.  Both the red grouper and gag share categories have a multi-use provision that allows a portion of the red grouper quota to be harvested under the gag allocation, and vice versa.  Each year, the program assigns a portion of each shareholder's red grouper and gag as a multi-use allocation category, which is equal to the difference between each species' ACL and the ACT.  The intent of the multi-use provision is to provide for allocation if either gag or red grouper are landed as incidental catch.  If this buffer is eliminated, then all gag grouper captured in the red grouper fishery (by those without available gag grouper shares) would be required to be released.  This would result in greater bycatch of and mortality of gag grouper.

**Criterion 2: Ecological effects due to changes in the bycatch of red grouper (effects on other species in the ecosystem)**

The relationships among species in marine ecosystems are complex and poorly understood, making the nature and magnitude of ecological effects difficult to predict with any accuracy.  The most recent red grouper stock assessment (SEDAR 61 2019) indicates that although the red grouper stock in the Gulf of Mexico is not overfished nor undergoing overfishing, it remains below the target spawning stock biomass (SSB) in 2017.

Alternatives in Action 1 of this amendment vary, but all of the alternatives are expected to have a similar impact on fishing mortality for red grouper.  Increases in the recreational ACLs in **Alternatives 3-6** relative to **Alternative 2** are only due to how catch is estimated in the recreational sector, and none of the alternatives is expected to result in greater landings of red grouper.  However, as explained in criterion 1 above, **Alternative 2** is likely to result in lower bycatch because of the higher allocation to the commercial sector over the recreational sector, and the decrease in allocation to the recreational sector.  However, this may be partially offset by regulatory discards of red grouper by fishermen targeting other species during the closed season.  **Alternative 2** does increase the commercial ACL from current management, but the increased bycatch expected from the higher ACL is expected to be outweighed by the decrease in the recreational bycatch associated with that lower ACL.  In addition, when compared to the substantially higher ACLs in the red grouper fishery (and likely bycatch totals) in the recent past, any impacts of **Alternative 2** are expected to be relatively minor.  **Alternatives 3-6** are expected to decrease fishing effort and catch/mortality for bycatch species by decreasing the ACL to both the recreational and commercial sectors of the fishery.

With regard to recreational fishing, all alternatives in Action 2 are likely to have similar and negligible ecological impacts.  These alternatives would either maintain or slightly increase the recreational buffer.  Although the recreational sector has high bycatch, the 1% increase in the recreational buffer (**Alternatives 2** and **3**) is small relative to the ACL, especially when compared to the higher ACLs in the red grouper fishery in recent years.  The recreational buffers in the Action 2 alternatives are likely to maintain or nominally reduce fishing effort, and are unlikely to have appreciable ecological effects.

Amendment 53 - Red Grouper                 201                Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                            Practicability Analysis

0009623

With regard to commercial fishing, the alternative in Action 2 are likely to have ecological impacts that range from negligible to slightly negative. **Alternatives 1** and **3**, which would maintain the current 5% buffer in the commercial sector, are expected to have negligible ecological impacts as they are not expected to increase catch, bycatch, or alter fishing practices (beyond the potential impacts discussed in Action 1). **Alternative 2**, which would eliminate the 5% commercial buffer, is likely to have slightly negative ecological impacts. This is because elimination of the 5% buffer would in effect negate the multi-use provision in which gag grouper can be captured and kept while fishing for red grouper. If this buffer is eliminated, then all gag grouper captured in the red grouper fishery (by those without available red grouper shares) would be required to be released. This would result in greater bycatch of and mortality of gag grouper, which may have slightly negative ecological impacts.

SEDAR 61 (2019) projected that biomass for red grouper is estimated to increase until 2020, after which the stock may decline due to the diminishing size of the large 2013 recruitment year class. Additionally, much is unknown about the effect that the 2018 red tide event had on red grouper populations. The model that the SSC used for projections assumed a red tide mortality rate similar to the 2005 event. However, another scenario that was modelled in the assessment that assumed higher mortality in the 2018 red tide event resulted in a greatly increased probability of overfishing. In spite of this, the best science available supports that the proposed alternatives for OFL, ABC, ACL, and ACT would result in stable or increased red grouper stocks. Because red grouper stocks are currently lower than recent and historic high levels, it is unlikely that any population increases resulting from this amendment would be substantively detrimental to other species. However, it is possible that forage species and competitor species could decrease in abundance in response to an increase in grouper abundance. Changes in the bycatch of red grouper is not expected to directly affect other species in the ecosystem. Although birds, dolphins, and other predators may feed on grouper discards, there is no evidence that any of these species rely on grouper discards for food.

**Criterion 3: Changes in the bycatch of other species of fish and invertebrates and the resulting population and ecosystem effects**
Population and ecosystem effects resulting from changes in the bycatch of other species of fish and invertebrates are difficult to predict. Other SWGs, gag, snappers, greater amberjack, gray triggerfish and other reef fishes are commonly caught in association with red grouper (Scott-Denton et. al, 2011). Most of these species are not undergoing overfishing and are not overfished, with the exception of greater amberjack (overfished/undergoing overfishing). Because greater amberjack are pelagic, they are uncommonly captured when fishing for demersal species such as SWG and red grouper. Regulatory discards significantly contribute to fishing mortality in all of these reef fish fisheries, except gray triggerfish and vermilion snapper.

No measures are proposed in this amendment to directly reduce the bycatch of other reef fish species. However, changes in the commercial red grouper ACL and ACT are likely to indirectly affect bycatch totals. Each alternative in Action 1 is likely to result in reduced overall bycatch due to decreased recreation fishing effort for red grouper. However, this reduction may be partially mitigated be regulatory discards of red grouper that are captured by fishermen targeting other reef fish species. Likewise, alternatives in Action 2 are expected to result in decreased bycatch, except that **Alternative 2** is likely to result in greater bycatch/mortality of red grouper.

0009624

However, none of the alternatives in Action 2 are likely to result in increased bycatch/mortality of other fish or invertebrates.  In any case, due to the relatively modest proposed changes in ACL and ACT in any of the alternatives, the effect of any alternative on bycatch and bycatch mortality of other species of fish and invertebrates, and resulting population and ecosystem effects, are expected to be minimal and positive.

**Criterion 4: Effects on marine mammals and birds**

The effects of current management measures on marine mammals and birds are described above.  Bycatch minimization measures evaluated in this amendment are not expected to significantly affect marine mammals and birds.  There is no information to indicate marine mammals and birds rely on grouper for food.

**Criterion 5: Changes in fishing, processing, disposal, and marketing costs**

If the red grouper commercial sector allocation is reduced relative to the recreational sector, it would result in a reduction in allocation for commercial fishermen and is thus expected to result in economic loss.  However, the economic loss to commercial fishermen may be partially offset by increased market prices as a result of the decrease in domestic harvest and supply.  Recreational anglers would be allotted similar or slightly decreased levels of catch through this action, so it is unlikely to have a substantive negative effect on that sector.  In general, changes to the ACTs in Action 2 are small in scope relative to current management levels, and are unlikely to result in appreciable economic loss or gain.  However, **Alternative 2** of Action 2, which would eliminate the commercial buffer, would result in reduced revenue for gag fishers who do not have red grouper annual allocation because they would be required to release all captured red grouper.  For a more complete discussion of the changes in fishing costs associated with the various management actions, see Section 3.4 of this document.

**Criterion 6: Changes in fishing practices and behavior of fishermen**

Measures proposed in this action are expected to have negative impacts on fishing practices for recreational red grouper anglers.  All of the alternatives in Action 1 (except for the No Action-which is not legally viable) would set recreational catch limits that are reduced from current measures.  Each of these alternatives would require monitoring the recreational landings in MRIP-FES currency.  As explained previously in Section 1.1 of this document, this currency is more than double MRIP-CHTS currency which is currently used in management.  Thus, even though the recreational ACL values would increase over the No Action alternative, it would equate to a reduction in recreational ACL no matter the alternative selected.  **Alternative 2** would result in the greatest reduction to recreational component (~44%) while **Alternatives 3-6** would result in more modest reductions (~21-31%).  Thus, any of the alternatives are likely to reduce fishing opportunities, effort, and landings in the recreational sector.

Measures proposed in this action could also result in changes to fishing practices and behavior of commercial fishermen.  **Alternative 6** would maintain the current commercial allocation, and thus is not expected to impact commercial fishing practices or behavior.  **Alternative 2** would increase the commercial ACL, and would provide larger IFQ shares for the commercial sector.  This increase would potentially result in greater fishing effort and increased landings.  However,

Amendment 53 - Red Grouper                203                Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                Practicability Analysis

0009625

because the increase would be small in scope, it is not expected to appreciably change fishing practices and behavior beyond a modest increase in effort. The reduced allocations for the commercial sector proposed in **Alternatives 3-5** are expected to result in reduced annual allocation for those with IFQ shares. These shareholders would have a smaller quota which is expected to reduce effort and may affect decisions about when and where to fish. These shareholders are likely to spend additional time targeting other fish species. In addition, these shareholders may choose to fish only when red grouper market prices are high in attempt to maximize profits from their reduced allocation. While all impacts of the reduced commercial allocation are not known, these are a few of many potential changes in fishing practices and behaviors that could occur.

## Criterion 7: Changes in research, administration, and enforcement costs and management effectiveness

Proposed measures are not expected to significantly impact administrative costs. The impetus for implementing changes in allocation between the recreational and commercial sectors is to more accurately reflect what has been occurring in the fishery. None of the actions are expected to diminish regulatory effectiveness.

## Criterion 8: Changes in the economic, social, or cultural value of fishing activities and non-consumptive uses of fishery resources

Constraining red grouper catch to the ACLs is expected to positively benefit the red grouper stock by reducing the likelihood of overfishing and increasing the ABC and ACL in the future. However, if allocation to the commercial sector is reduced, it is likely to reduce profits and potentially shift fishing effort to other species and fisheries. Any reduction in bycatch may result in an increase in the red grouper stock, which will positively affect the social and economic value of fishing activities. For a more complete discussion, see sections 3.4 and 3.5 and sections 4.1.3, 4.2.3, 4.1.4, and 4.2.4 of this document.

## Criterion 9: Changes in the distribution of benefits and costs

Currently, the red grouper ACL is split between the commercial sector (76% of the allocation) and the recreational sector (24%) of the allocation. This ratio was developed based on historical catch from each sector using the best data available at the time. However, new data collection techniques in the recreational sector, have resulted in revised estimates of recent and historic recreational catch. This action would consider revising the commercial/recreational allocation ratio based on this new technique.

Alternative 2 is expected to result in net long-term economic benefit to the commercial fishery and reduced benefits to the recreational sector, while Alternatives 3-5 are expected to result in net long-term economic reductions in benefits to both the commercial and recreational sector, although the reductions to the recreational sector would be less than under Alternatives 2. Alternative 6 would result in no change in economic benefit to the commercial fishery, but would reduce economic benefits to the recreational sector (the reduction in benefits would be about midway between that of Alternative 2 and that of Alternatives 3-5). The recreational

Amendment 53 - Red Grouper                    204                    Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                    Practicability Analysis

0009626

sector discards a much larger amount of red grouper as bycatch, but the increases in recreational allocation are accompanied by a decrease in overall ACL to mitigate the effects of the increased bycatch. The allocation splits proposed in **Alternatives 3-5** (and to a lesser extent **Alternative 6**) are more representative of tradition and recent fishery harvest. If the change in allocation results in an increase in the red grouper stock relative to the current population level, there would be longer-term economic benefits to both the recreational and commercial sectors. However, Alternatives 3-5 may be perceived by the commercial sector as inequitable, since the total commercial sector ACL would be reduced (thus decreasing pounds of allocation for shareholders) relative to the recreational sector. This is likely to reduce profits in the commercial sector, especially in the short-term, and may result in a shift in focus to fishing for other species.

**Criterion 10: Social effects**

Bycatch is considered wasteful because it reduces overall yield obtained from the fishery. Because this action is expected to indirectly reduce bycatch and mortality, it will increase efficiency, reduce waste, and benefit stocks, thereby resulting in net social benefits. Higher recreational catch limits should have positive social effects, while reduced commercial catch limits, and the resulting economic loss to the commercial sector, are likely to have negative social effects.

## <u>CONCLUSIONS</u>

Analysis of the ten bycatch practicability factors indicates there would likely be neutral to low positive biological impacts associated with reallocating catch among the recreational and commercial sectors by further reducing bycatch and bycatch mortality in the directed grouper fishery. This reallocation is intended to more accurately follow historical catch rates, and the implementation of new catch levels will reduce overall catch in the fishery, including both targeted catch and bycatch. The main benefits of reducing grouper bycatch are: 1) less waste and 2) increased yield in the directed fishery. Reducing discards and discard mortality rates would result in less forgone yield. Reducing red grouper ACLs is expected to reduce bycatch and discard mortality. The benefits of the ACL reduction on red grouper bycatch may be partially offset by the regulatory discards that would occur by fishermen that target other species and catch red grouper after the closure. There are likely to be negative social and economic effects to the commercial sector, stemming largely from the expected reduction in income that is likely if this Amendment is implemented. The Council will have to weigh the benefits of reducing bycatch with the negative social and economic effects that the commercial sector would face.

**Additional Citations**

Thierry Brulé, T., J. Montero-Muñoz, N. Morales-López and A. Mena-Loria. 2015. Influence of Circle Hook Size on Catch Rate and Size of Red Grouper in Shallow Waters of the Southern Gulf of Mexico, North American Journal of Fisheries Management, 35:6, 1196-1208, DOI: Batsleer J., K. G. Hamon, H. M. J. van Overzee, A. D. Rijnsdorp & J. J. Poos. High-grading and over-quota discarding in mixed fisheries. *Rev Fish Biol Fisheries* **25,** 715–736 (2015). https://doi.org/10.1007/s11160-015-9403-0

Amendment 53 - Red Grouper                205                Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                Practicability Analysis

0009627

Coggins, L.G., M.J. Catalano, M.S. Allen, W.E. Pine, and C.J. Walters. 2007. Effects of cryptic mortality and the hidden costs of using length limits in fishery management. Fish and Fisheries 8:196-210.

Collins, L. A., G. R. Fitzhugh, L. A. Lombardi-Carlson, H. M. Lyon, W. T. Walling, and D. W. Oliver. 2002. Characterization of red grouper (Serranidae: *Epinephelus morio*) reproduction from the eastern Gulf of Mexico: 1992-2001. NMFS SEFSC Panama City Lab Contrib. Ser 2002-07.

Cummings, N.J. 2007. Important aspects of the life history of the yellowfin grouper, *Mycteroperca venenosa*, with emphasis on populations in the Caribbean. SEDAR 14. National Marine Fisheries Service, Southeast Fisheries Science Center, Sustainable Fisheries Division, Miami, FL. Sustainable Fisheries Division Contribution SFD 2007-005 (SEDAR14-DW-01). 20 pp.

Garner, S.B., W.F. Patterson III, J.F. Walter, and C.E. Porch, 2020.  Simulating effects of hook-size regulations on recreational harvest efficiency in the northern Gulf of Mexico red snapper fishery. *Fisheries Research* **228**, 105561 (2020).  https://doi.org/10.1016/j.fishres.2020.105561

Moe, M.A., Jr. 1969. Biology of red grouper (*Epinephelus morio* Valenciennes) from the eastern Gulf of Mexico. Prof. Pap. Ser. Mar. Lab. Fla. 10, 95 p.

NMFS (2005). Stock Assessment and Fishery Evaluation for the Snapper Grouper Fishery of the South Atlantic. NOAA, NMFS, SERO, 263 13th Ave. South, St. Petersburg, Florida. 130pp.

Ortiz, M. 2007. Analysis on the effects of yield per recruit of alternative minimum size limit regulations for the fisheries of gag grouper Gulf of Mexico. NOAA Fisheries Service, SEFSC, Miami, Florida. SFD Contribution No. SFD-2007- 030. 10 pp.

Powell, J.R. and Wells, R.S. 2011. "Recreational fishing depredation and associated behaviors involving common bottlenose dolphins (Tursiops truncatus) in Sarasota Bay, Florida". Publications, Agencies and Staff of the U.S. Department of Commerce. 308. https://digitalcommons.unl.edu/usdeptcommercepub/308

Pulver, J.R., and J.A. Stephen.  2019.  Factors that influence discarding in the Gulf of Mexico commercial grouper-tilefish IFQ reef fish fishery. Fisheries Research 218 (2019), 218-228. https://doi.org/10.1016/j.fishres.2019.05.018

Pulver, Jeffrey Robert (2015). Modeling Community Structure and Abundance Using Observer Data for the U.S. Gulf of Mexico Deepwater Reef Fishery. Master's thesis, Texas A & M University. Available electronically from http : / /hdl .handle .net /1969 .1 /155417.

Rudershausen, P.J., A. Ng, and J.A. Buckel. 2005. By-catch, discard composition, and fate in the snapper/grouper commercial fishery, North Carolina. NC Sea Grant 04-FEG-08.

Sauls, B. 2005. Headboat at-sea sampling protocols. Florida Fish and Wildlife Conservation Commission Internal Report. 8 pp.

Amendment 53 - Red Grouper                206              Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets              Practicability Analysis

0009628

Scott-Denton, E., Cryer, P. F., Gocke, J. P., Harrelson, M. R., Kinsella, D. L., Pulver, J. R., Smith, R. C. & Williams, J. A. (2011). Descriptions of the U.S. Gulf of Mexico reef fish bottom longline and vertical line fisheries based on observer data. *Marine Fisheries Review* **73**, 1– 26.

SEDAR 33 Update Report. 2016. SEDAR 33 Update Report Gulf of Mexico Gag Grouper. NOAA Fisheries Service, SEFSC, Miami, Florida. 123 pp.

Walter, J. 2007. Yield per recruit analysis for red grouper. NOAA Fisheries Service, SEFSC, Miami, Florida. 21 pp.

Amendment 53 - Red Grouper                     207                     Appendix B. Bycatch
Allocations and Annual Catch Levels and Targets                     Practicability Analysis

0009629

# APPENDIX C.   GULF OF MEXICO FISHERY MANAGEMENT COUNCIL – ALLOCATION POLICY

**Gulf of Mexico Fishery Management Council**
**Fishery Allocation Policy**
(http://gulfcouncil.org/wp-content/uploads/GMFMC-SOPPs-Fishery-Allocation-Policy.pdf)

The allocation policy presented herein was developed by the Gulf of Mexico Fishery Management Council to provide principles, guidelines, and suggested methods for allocation that would facilitate future allocation and reallocation of fisheries resources between or within fishery sectors.

Issues considered in this allocation policy include principles based on existing regulatory provisions, procedures to request and initiate (re)allocation, (re)allocation review frequency, tools and methods suggested for evaluating alternative (re)allocations.

1.  Principles for Allocation

    a.  Conservation and management measures shall not discriminate between residents of different states.

    b.  Allocation shall:

        (1)  be fair and equitable to fishermen and fishing sectors;
             • fairness should be considered for indirect changes in allocation
             • any harvest restrictions or recovery benefits be allocated fairly and equitably among sectors

        (2)  promote conservation
             • connected to the achievement of OY
             • furtherance of a legitimate FMP objective
             • promotes a rational, more easily managed use

        (3)  ensure that no particular individual, corporation, or other entity may acquire an excessive share.

    c.  Shall consider efficient utilization of fishery resources but:

        (1)  should not just redistribute gains and burdens without an increase in efficiency

        (2)  prohibit measures that have economic allocation as its sole purpose.

    d.  Shall take into account: the importance of fishery resources to fishing communities by utilizing economic and social data in order to:

(1)   provide for the sustained participation of fishing communities

(2)   minimize adverse economic impacts on fishing communities.

e.   Any fishery management plan, plan amendment, or regulation submitted by the Gulf Council for the red snapper fishery shall contain conservation and management measures that:

(1)   establish separate quotas for recreational fishing (including charter fishing) and commercial fishing

(2)   prohibit a sector (i.e., recreational or commercial) from retaining red snapper for the remainder of the season, when it reaches its quota

(3)   ensure that the recreational and commercial quotas reflect allocation among sectors and do not reflect harvests in excess of allocations.

2.   Guidelines for Allocation

a.   All allocations and reallocations must be consistent with the Gulf of Mexico Fishery Management Council's principles for allocation.

b.   An approved Council motion constitutes the only appropriate means for requesting the initiation of allocation or reallocation of a fishery resource.  The motion should clearly specify the basis for, purpose and objectives of the request for (re)allocation.

c.   The Council should conduct a comprehensive review of allocations within the individual FMPs at intervals of no less than five years.

d.   Following an approved Council motion to initiate an allocation or reallocation, the Council will suggest methods to be used for determining the new allocation. Methods suggested must be consistent with the purpose and objectives included in the motion requesting the initiation of allocation or reallocation.

e.   Changes in allocation of a fishery resource may, to the extent practicable, account for projected future socio-economic and demographic trends that are expected to impact the fishery.

f.   Indirect changes in allocation, i.e., shifts in allocation resulting from management measures, should be avoided or minimized to the extent possible.

3.   Suggested Methods for Determining (Re)Allocation
a.   Market-based Allocation

(1)   Auction of quota
(2)   Quota purchases between commercial and recreational sectors

- determine prerequisites and conditions;
    - o quota or tags or some other mechanism required in one or both sectors
    - o mechanism to broker or bank the purchases and exchanges
    - o annual, multi-year, or permanent
    - o accountability for purchased or exchanged quota in the receiving sector.

b.   Catch-Based (and mortality) Allocation

(1)   historical landings data
- averages based on longest period of credible records
- averages based on a period of recent years
- averages based on total fisheries mortality (landings plus discard mortality) by sector
- allocations set in a previous FMP
- accountability (a sector's ability to keep within allocation)

c.   Socioeconomic-based Allocation

(1)   socio-economic analyses
- net benefits to the nation
- economic analysis limited to direct participants
- economic impact analysis (direct expenditures and multiplier impacts)
- social impact analysis
- fishing communities
- participation trends
- "efficiency" analysis
    - o lowest possible cost for a particular level of catch;
    - o harvest OY with the minimum use of economic inputs

d.   Negotiation-Based Allocation

(1)   Mechanism for sectors to agree to negotiation and select representatives

(2)   Mechanism to choose a facilitator

(3)   Negotiated agreement brought to Council for normal FMP process of adoption and implementation.

# APPENDIX D.   ALLOCATION TRIGGERS

Department of Commerce * National Oceanic & Atmospheric Administration * National Marine Fisheries Service

**NATIONAL MARINE FISHERIES SERVICE PROCEDURAL DIRECTIVE 01-119-01**

**July 27, 2016**

**Fisheries Management**

**Criteria for Initiating Fisheries Allocation Reviews.  Council Coordinating Committee Allocation Workgroup Guidance Document.**

**NOTICE:**  This publication is available at:  http://www.nmfs.noaa.gov/op/pds/index.html

**OPR:** F/SF (CCC Allocation Workgroup)                **Certified by: F/SF (A. Risenhoover)**
**Type of Issuance:** Initial

*SUMMARY OF REVISIONS:*

Signed _____

Alan Risenhoover
Director, Office of Sustainable Fisheries

## Criteria for Initiating Fisheries Allocation Reviews
## Council Coordinating Committee Allocation Workgroup
## Guidance Document
## Approved by the CCC June 24, 2015

### Introductory Comments

Fishery allocations can occur at a variety of levels:  among countries, communities, sectors within a fishery, gear types within a sector, across seasons, and among individual participants.  While allocations between commercial and recreational sectors often figure prominently in fisheries allocations, this guidance document is intended to apply to any type of allocation review Regional Fishery Management Councils (councils) may consider.  This Council Coordination Committee (CCC) working group report explores several potential mechanisms for allocation reviews, including criteria based on fishery indicators, time, or public interest. Although the alternatives are not mutually exclusive, the effective implementation of one alternative may ameliorate the need for others.

U.S. marine fisheries and the human interactions with those fisheries are dynamic. Populations in U.S. coastal shoreline counties increased by 34.8 million from 1970 through 2010 (stateofthecoast.noaa.gov). Despite the dynamic nature of these interactions, fisheries allocations are difficult to review and amend.

At the same time, demands for fishery allocation reviews have been increasing. Consider that the ten highest priority recommended actions to improve saltwater recreational fisheries management at the 2014 NMFS Recreational Fisheries Summit included two council-related priorities relevant to the review of allocations: 1) Achieving more equitable council representation and 2) Readjust recreational and commercial allocations.

A number of factors contribute to the challenges in allocation review. Allocation reviews are demanding with respect to the technical work necessary to analyze complex social and economic tradeoffs associated with existing or prospective allocations.  In addition, while fishery resources are public trust resources, allocation discussions are inherently politically challenging since they are viewed in zero-sum terms by stakeholders.  Despite these challenges, careful consideration of allocation decisions is necessary to meet the mandates of the Magnuson Stevens Fishery Conservation and Management Act (MSA).

The MSA defines optimum yield as "the amount of fish which—
"(A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities,..." Allocation is immediately relevant to achieving optimum yield.

Allocation review mechanisms should provide transparent processes for adequate reviews of allocations to ensure that U.S. fisheries are managed to achieve National Standard 1.  While the demographic composition of some regional councils closely mirrors that of the commercial and recreational fisheries within a specific region, some councils do not have significant recreational representation among their political appointees. Asymmetrical council compositions further underscore the need for well-defined and transparent processes to ensure fairness and responsiveness to the issue of allocation.

Regardless of the mechanism ultimately used to trigger an allocation review, councils may benefit from developing and maintaining a prioritized schedule for review of allocation issues. Such an effort could provide for a more orderly consideration of this topic and help manage expectations among stakeholders and managers.

In order to address the above issues the CCC Allocation Working Group proposes a protocol based on adaptive management consisting of three separate steps:  (a) Triggering an allocation review; (b) the allocation review; (c) and if deemed necessary by the review, a reallocation action to amend the FMP.  Critical aspects are the decision threshold for initiating an allocation review and the subsequent  reallocation action.  The focus of the CCC working group's exploration is the first of those steps – triggering an allocation review. Therefore, the remainder of this document is organized as follows:

   A. Adaptive Management
     1. Introduction
     2. Goals and objectives of the allocation decision as criteria for triggering allocation review

<div align="center">2</div>

NMFSPD-01-119-01 July 27, 2016

3. Defining the management action for potential review
4. Monitoring the achievement of management goals and objectives and the effects of the allocation
5. Evaluating the achievement of management goals and objectives and the impacts of the allocation
6. Adapting in response to evaluation and learning
7. Reconsidering management goals and objectives

B. Definitions
1. Statement of Purpose
2. What are the steps involved in adaptive management of allocation decisions?
3. What is an allocation review?
4. What is a reallocation action?

C. Three approaches to triggering allocation reviews
1. Public interest-based criteria
   a. Ongoing public input on fishery performance
   b. Solicitation of public input on fishery performance
   c. Formal petitions
2. Time-based criteria
3. Indicator-based criteria
   a. Economic criteria
   b. Social criteria
   c. Ecological criteria

## Adaptive Management

### Introduction

The concept of adaptive management –evaluating successful attainment of management objectives and adjusting strategies in response – has been thoroughly explored in natural resource management literature. While the discussion of requiring a review of allocation decisions by councils has emerged more recently, it is one that contemplates an adaptive approach to one of the most challenging and controversial aspects of federal fisheries management. This section characterizes important considerations in identifying the need to review allocation decisions in the context of adaptive management and its process components.

The working group notes the importance of a common understanding regarding what is meant by "review." To this end, the working group clarifies that "review" is the evaluation described in the preceding paragraph that leads to the decision of whether or not the development and analysis of new alternatives is warranted, and is not, in and of itself, an implicit trigger to consider new alternatives. Instead, the identification of purpose and need for an action and the development of action alternatives (re-allocation) should occur in response to allocation review findings that a re-allocation is warranted.

### Establishment of management goals and objectives

The foundation of the active adaptive management process described in this section is the articulation of management goals and objectives upon which management measures

0009635

NMFSPD-01-119-01 July 27, 2016

are based, monitoring is designed and implemented, and analysis is focused. This assumes, however, that the goals and objectives on which the original allocation decision was based remain relevant and that ecological, social, and economic conditions do not indicate consideration of different goals and objectives.

A council should consider the contemporary relevance of previously stated goals and objectives and revise its goals and objectives for the fishery and the allocation as appropriate. New goals and objectives or significant revisions to existing ones may necessitate an allocation review, even if those identified at the time of the original action have been met.

It should be made very clear that updating and maintaining contemporary fishery management plan objectives is essential and will likely require considerable effort.  The selection of the proper management objectives is critical because they are the "indicators" that are to be used when ascertaining that the current allocation is appropriate. This is important for two reasons. First, it will ensure that the proper criteria are used to judge success and it will narrow the range of inquiry that staff will have to focus on to support the decision.   To be specific, the material in both the CCC document and the NMFS document on possible indicators to consider will be very useful in framing the discussion on the selection of management objectives but they should not be viewed as a mandatory list of needed research. The research should focus on the indicators relevant to the selected fishery including its management objectives.

### Goals and objectives of the allocation decision as criteria for triggering allocation review

Clearly articulated goals and objectives for an allocation action as informed by broader FMP goals and objectives are the foundation upon which to base allocation decisions and serve as essential criteria for evaluating whether or not a review of such decisions is warranted. The original record of a council decision should therefore be closely examined and thoroughly understood by a council considering an allocation review, as should any expression of expected outcomes (improvements or changes in the social, economic, and ecological performance of the fishery) resulting from the allocation. To the extent that the original record does not include a description of expected outcomes of the allocation decision, the council should consider identifying potential outcomes that logically flow from the action for use as criteria in reviewing the need for an allocation review.

It is important to note that a council's goals and objectives associated with an allocation decision may reach beyond the simple intent to make an orderly division of access to the resource and could reflect or reinforce broader management objectives as detailed in an FMP. Management objectives could include issues such as achievement of optimum yield, maintaining equity among states, providing for the sustained participation of coastal communities, etc. that can be addressed through allocation.

4

### Defining the management action for potential review

When considering the need for allocation review it is important to clearly identify the action or actions that represent the "allocation decision." In some cases this may be straightforward, as with an action that allocates percentages of a resource to two or more long-established fishery sectors.

More often it is the case that allocation actions include multiple decision points —rather than a single, well-defined action – such as identifying and defining specific fishery users or sectors, limiting access to other fisheries by allocation recipients, managing effects of incidental bycatch on other sectors or fisheries, and other measures intended to support implementation of the allocation and mitigate unintended impacts. In these instances, councils should carefully consider the scope of decision elements that comprise the "allocation" for which a review is being considered. A failure to address the appropriate scope of management components and to ensure that the set of included decision elements represent "the allocation" could result in misguided conclusions regarding the need to review an allocation.

Impacts and outcomes of allocation decisions can be observed at a variety of levels within the fishery, from individual participants, to subsets of participants and stakeholders, to sectors, communities, states, etc. For purposes of establishing indicator and public interest-based criteria for allocation review, careful attention should be given to the scope of consideration or standing; triggering review of an entire allocation decision in response to an isolated or small-scale challenge may prove destabilizing to a fishery at large.

Many management actions have, indirectly, some allocative impacts and effects. Closure of near shore fishing grounds to protect habitat may, for example, constrain access to a fishery by small vessels while favoring access by larger vessels capable of fishing further from shore. While such outcomes should come under review by councils and may warrant a management response, these indirect effects are not the focus of this document.

### Monitoring the achievement of management goals and objectives and the effects of the allocation

Active adaptive management requires the design and use of monitoring systems that will collect data useful for evaluating the outcomes of management decisions. The quantity and quality of data available for analysis to inform the review of an allocation decision should be carefully assessed and is an important criterion for triggering an allocation review; it is challenging at best to evaluate the achievement of management goals and objectives without reliable data from the fishery and communities. To the extent that existing data collection programs are not contributing to the monitoring of allocation decision outcomes and impacts, efforts should be made to design and implement an effective monitoring system.

5

**Evaluating the achievement of management goals and objectives and the impacts of the allocation**

In the multi-step process described in this document, this evaluation is achieved through the consideration of indicators to trigger an allocation review and, if indicated, the allocation review itself. Evaluating the extent to which allocation and broader FMP goals and objectives have been met through an allocation's implementation and ecological, social, and economic impacts associated with the action is the critical component of an adaptive approach to management and of any consideration of the need for allocation review. It is the process through which a council might identify the need to initiate a formal review of an allocation decision or find that implementation of an allocation was successful in meeting its goals and did not result in unanticipated negative impacts.

**Adapting in response to evaluation and learning**

This component of active adaptive management would be the potential result of an allocation review and would therefore occur only if previous analytical steps indicated the need for such a review. It represents the consideration of reallocation alternatives when indicated by an allocation review.

**It is important to note that the recommendations contained herein are based on the assumption that a council's management goals and objectives as related to an FMP, specific management actions, or otherwise, are subject to periodic review and adaptation and are relevant and/or contemporary at the time of consideration for triggering an allocation review, of conducting an allocation review, and of taking a reallocation action.**

## Definitions

**Statement of purpose:**

In order to keep to keep allocation policy and decisions responsive to social, economic, and ecological change it is necessary to consider those polices and decisions from time to time.

**What are the steps involved in adaptive management of allocation decisions?**

Adaptive management of allocation decisions is a sequence of up to three steps consisting of (a) triggering an allocation review according to time-based, public interest-based, or indicator-based criteria; (b) an allocation review; and (c) if the results of the review so indicate, an reallocation action. The working group addressed (a), the criteria for triggering an allocation review.

6

NMFSPD-01-119-01 July 27, 2016

**What is an allocation review?**

An allocation review is a structured review of current allocations based on adaptive management (i.e., evaluating successful attainment of management objectives) to determine if further action is required. The purpose is to determine if current management objectives are being achieved through the existing allocation, with the caveat that management objectives are up to date and address the relevant operational, economic, social and ecological aspects of the fishery, including new and expected changes in such things as climate, demography, technology, etc. If it is determined that minimum threshold criteria for meeting management objectives are not being achieved under the existing allocation, then a Reallocation Action should be initiated and new allocation alternatives identified. Otherwise, no further action is required until an allocation review is triggered once again.

**What is a reallocation action?**

A reallocation action is a formal procedure to amend a FMP to allow for a reallocation of access to fishery resources that follows normal amendment procedures such as scoping, developing a statement of purpose and need for action, developing alternatives (one of which is a no action alternative), assessing the effects of implementing different alternatives, and selecting a preferred alternative.

## Three approaches to triggering allocation reviews

This document identifies considerations associated with the design and application of three types of allocation review triggers: 1) public interest-based triggers; 2) time-based triggers; and 3) indicator-based triggers. It is important to note that while this document offers guidance on what aspects of fishery indicators might be considered in triggering an allocation review, monitoring, evaluating, and responding to fishery performance is foundational to adaptive management and the council process. Use of public interest or time-based criteria for triggering allocation review is not mutually exclusive to ongoing formal and informal evaluation of fishery performance and outcomes. This points out as well some inter-relatedness among review trigger criteria options. For example, some forms of public interest criteria are driven and informed by the public's perception of fishery performance.

It is unlikely that one type of criterion serves as the best allocation review trigger for all fisheries. Councils should carefully consider the attributes, dynamics, and relationships of and among various trigger criteria and choose approaches that best fit a specific fishery. Councils may choose to establish different criteria at the species, fishery, or FMP level. This includes species that are managed internationally, but for which a council may have authority for a domestic quota allocation. When applying time-based criteria to a number of fisheries, intervals between reviews of specific allocations may reflect prioritization for review based on specific fishery attributes where the size, variability, or inter-sector dynamics of a fishery may indicate more or less frequent review.

7

NMFSPD-01-119-01 July 27, 2016

It should be noted that in some instances review trigger criteria are complementary. This is a particularly important dynamic when considering the use of some public interest-based trigger criteria. When considering the use of ongoing or council initiated public comment, the elements identified in the indicator-based criteria may be useful in the council's determination of need of an allocation review.

Within three years of the issuance of this guidance, or as soon as practicable, it is recommended that councils establish transparent criteria for triggering allocation review for all fisheries that have allocations between sectors (e.g. commercial, recreational, for-hire, gear-specific, international, etc.) In the case of fisheries managed under catch shares, councils may choose not to review allocations made to individual fishery participants, but rather consider review of allocations between sectors.

In addition to determining the trigger or triggers that a council will use for initiating review of specific allocations, councils should also develop a structured and transparent process by which allocation reviews will be conducted, including consideration of current council priorities, other actions under deliberation, and available resources.

8

0009640

NMFSPD-01-119-01 July 27, 2016

Steps in the Adaptive Management of Allocations

May 29, 2015

| | Trigger basis | Timing | Decision Criteria | Outcome | Source of Guidance | Comments |
|---|---|---|---|---|---|---|
| | | | Step 1: What triggers an allocation review? | | | |
| Public interest | Ongoing public input on fishery performance | Ongoing – decision to initiate review may occur at any time | See indicators – is review indicated? | If indicated, allocation review initiated. If not, continue Step 1. | CCC Working Group Paper | From a timing standpoint, this approach is similar to status quo. |
| | Solicitation of public comment regarding allocation review | Ongoing – decision to solicit public comment may occur at any time | See indicators – is review indicated? | If indicated, allocation review initiated. If not, continue Step 1. | CCC Working Group Paper | Public comment regarding the need for allocation review may be triggered by early indicators that FMP or management objectives are not being met. |
| | Public interest: Formal petitions | Ongoing – public may submit petition at any time | Does public petition have standing? | Public petition with standing may trigger review. | CCC Working Group Paper | This approach requires an allocation review without consideration of timing or indicators. |
| | Time | Specific time intervals (7-10 years) | None – response to scheduled review non-discretionary | Allocation review automatically triggered | CCC Working Group Paper | This approach requires an allocation review without consideration of indicators. |
| | Indicators | Ongoing – Indicators may be evaluated at any time | Is review indicated per social, economic, or ecological criteria? | If indicated, allocation review triggered. If not, continue Step 1. | CCC Working Group Paper | From an evaluation standpoint, this approach is similar to status quo. |
| | | | Step 2: Allocation Review: Is consideration of new allocation alternatives justified? | | | |
| | See above | See above | Are the FMP and allocation objectives still relevant? Are they being met? What's changed? | If objectives not being met, then a reallocation is initiated | NMFS Working Group Paper | It is assumed that that a council's management goals and objectives are current at the time of consideration for triggering an allocation review, of conducting an allocation review, and of taking a reallocation action. |
| | | | | If objectives are relevant and are being achieved, then no further action. Continue Step 1. | | |
| | | | Step 3: Initiating consideration of new allocation alternatives: should there be a reallocation and what needs to be considered? | | | |
| | Conclusion through allocation review that reallocation is warranted | See above | What alternatives will meet FMP and allocation objectives? | Selection of a preferred alternative | NMFS Working Group Paper | |

## Public interest-based criteria

If a council develops effective indicator or time-based allocation review mechanisms, then a public-interest review trigger mechanism may not be necessary. However, if those review mechanisms are not established, or if they are not responsive to changing conditions within a fishery, then a public-interest review mechanism could be used to trigger an allocation review.

The U.S. regional fishery management council system is transparent and open to public input throughout the process. Councils implement extensive work plans throughout the year, and manage some regulatory initiatives, including plan amendments, over the span of several years. Managing to meet the councils' statutory requirements and other competing priorities requires effective planning, which typically includes an annual priority-setting process. Ideally, public input on the need to review a specific fishery allocation would feed into this process to enable an orderly consideration of the question, in the context of competing priorities and organizational resources.

This guidance addresses the solicitation or consideration of statements of public interest at three different levels within the regional fishery management council process:

1. Ongoing public input on fishery performance
2. Solicitation of public comment regarding allocation review
3. Formal initiatives

### Ongoing public input on fishery performance

As noted above, the council process is open, transparent, and offers frequent opportunities for public comment and input. This dynamic establishes a feedback loop between the council and the public in regard to both the specific issues under the council's consideration and broader indicators of fishery performance. Given the extent to which the impacts of allocation decisions are associated by the public (both through direct observation and perception) with fishery performance, public interest in allocation review is likely to be expressed at many points within the council process and in reference to a variety of fisheries management issues.

This feedback loop of ongoing public comment is a valuable opportunity for the public to express interest in allocation review, and for the council to gauge how effectively allocation objectives are being met. It also serves as an opportunity for the council to understand and evaluate the extent to which allocation lies at the root of fisheries management challenges, and the need to initiate allocation review may be indicated through this process.

### Solicitation of public comment regarding allocation review

Councils may choose to engage in allocation review "scoping discussions" with stakeholders and other interested parties. Unlike the collection of feedback through ongoing public comment described above, this process is deliberate and specifically

10

targets public input on the need for allocation review. Councils rely on outreach and information-gathering mechanisms to achieve public input including the solicitation of written comments, scoping discussion at council meetings, and port meetings and other community engagement strategies.

One of the benefits of this approach to consideration of triggering allocation review is that it is focused directly on the allocation and the necessity for potential review rather than on the secondary and tertiary impacts of the allocation. An additional benefit to this strategy is the council's ability to dictate a schedule. While more demanding of time and resources than identification of allocation review triggers in the course of ongoing public comment, the process for soliciting, receiving, and considering public input can be designed by the council and scheduled in a manner that does not conflict with other council initiatives and priorities.

When considering the solicitation of public input regarding allocation review, councils should be aware of, and sensitive to, the expectations among stakeholders that could develop as a result of the council indicating interest. The council should carefully consider its ability (resources and capacity) and willingness to follow through with an allocation review if warranted before reaching out to the community for focused input.

**Formal petition mechanism**

The first two approaches to gathering, evaluating, and responding to public input are already possible within the current regional fishery management council system. In both cases, the decision to initiate the review would rest with the council. A stronger public-interest review mechanism could include a provision for a stakeholder request or petition requesting review, together with a requirement for a Council to initiate an allocation review within a reasonable period of time. Such a provision would have more potential to impose a cost on a council's established work plan and priorities but would provide another mechanism to ensure that allocations receive due consideration in response to public concern. If such a mechanism is established, it may be appropriate to incorporate indicator-based criteria to establish a minimum threshold for initiating review.

Any petition-based review process should establish requirements that identify specific conditions or outcomes upon which such requests may be based.  In addition, councils should include establishment of guidelines for petitions.  While a council has discretion to determine whether or not to move forward with an allocation review as per the requirements it establishes under a petition-based process, it should at least respond to the *request* for a review under this process.  This response could be a simple as a letter to the petitioner(s), explaining the council's rationale for its  decision (e.g., petition did not meet conditions for consideration, lack of standing by petitioners, etc).

**Time-based criteria**

Establishment of a time-based trigger has figured prominently in recent discussions regarding allocation review, including provisions for periodic allocation review in

11

several MSA re-authorization drafts. In several respects periodic allocation review on a set schedule is the most simple and straightforward criterion for triggering an allocation review; the approach is unambiguous and less vulnerable to political and council dynamics. That said, the attributes of simplicity and the mandate of a strict schedule render time-based criteria less sensitive to other council priorities and the availability of time and resources to conduct an allocation review.

Time-based triggers for initiating allocation review might be most suitable for those fisheries or FMPs where the conflict among sectors or stakeholder groups make the decision to simply initiate a review so contentious that use of alternative criteria is infeasible. In such a situation, a fixed schedule ensures that periodic reviews occur regardless of political dynamics or specific fishery outcomes. Given the inflexible nature of time-based triggers, however, it is recommended that they be used only in those situations where the benefit of certainty outweighs the costs of inflexibility.

The inflexible nature of time-based triggers can impact both the work and effectiveness of the council as well as the outcomes of the allocation process itself. As noted above, fixed, time-based triggers for review may conflict with other council priorities. To the extent that those priorities include consideration of actions to mitigate significant social, economic, or conservation concerns, adherence to a fixed review schedule may prevent a council from achieving significant and beneficial management outcomes while achieving at best marginal improvements through allocation review. Given the fact that there is potentially no relationship between the pace at which fishery performance evolves and a fixed schedule for allocation review, use of such a trigger creates the potential of a significant expenditure of council time and resources with little need for review or likely improvement in fishery performance.

Time-based triggers for review may impede stability in subject fisheries. To the extent that reviews are conducted on a regularly scheduled basis, there is an incentive for sectors receiving allocations to continuously employ operational and political tactics to improve their allocation at the next review. The assurance of a "new" allocation review may as well encourage speculative entry into subject fisheries. When considering the adoption of a time-based review trigger, care should be taken to identify if and to what extent the process is likely to be manipulated or "gamed", and measures to minimize that activity should be considered.

The selection of review intervals using time-based triggers should be informed by fishery characteristics, data availability, and council resources. Newly developed or rapidly changing fisheries may warrant more frequent review, while established fisheries with stable participation and performance can likely be reviewed less frequently. Whether following an initial allocation or a re-allocation, the timing of further review should accommodate the collection and analysis of a data series from which meaningful and accurate review and analysis can be achieved. The five-year initial review and subsequent reviews every (up to) seven years of limited access privilege programs (LAPPs) as required under Section 303A of the MSA may indicate a desirable minimum interval between reviews. Similarly, the 10-year durability of LAPP permits may suggest a maximum interval for time-based review triggers.

12

0009644

## Indicator-based criteria

The MSA requires that fisheries be managed for Optimum Yield (OY), which is Maximum Sustainable Yield (MSY) as reduced by relevant social, economic and ecological factors.  In defining OY, the NS1 guidance provides that these factors should be "quantified and reviewed in historical, short term and long term contexts." Furthermore, it recommends that each FMP should contain a mechanism for periodic review of the OY specification, in order to respond to changing conditions in the fishery. In establishing indicator-based metrics for review of allocations – whether among sectors (e.g., commercial, recreational, for-hire, gear, international, etc.), within a sector (e.g., among catch share recipients), or for purposes such as bycatch accounting –it is logical to apply similar parameters to an allocation review as to an OY review, particularly if the goals and objectives of an FMP specifically address these items.  In support of such an approach, the NS4 guidance states that allocation decisions should be "rationally" linked to attaining OY, and/or to the objectives of an FMP. It follows that selection of indicator-based criteria to trigger an allocation review should inherently be linked to those same objectives.  In the interest of public transparency and clarity, councils may even consider establishing an objective that is specific to allocation within an FMP.

A time component is inherent in any indicator-based criteria for review of allocations, whether explicitly included (e.g., achieving a desired economic efficiency within XX years) or not.  Evaluating a criterion used in establishing an allocation, particularly if it requires the addition of ensuing years of data to a quantitative analysis, indirectly applies a timeframe for review.
There are several categories of indicator-based criteria to consider as triggers for initiating review of allocations, all stemming from the definition of OY: social, economic and ecological.  Ideally, the rationale for an initial allocation decision would consider a mix of criteria from all categories, although data limitations may preclude quantitative consideration.  This could impact the ability to set an objective, specific review trigger for a particular criterion.

It follows that use of several criteria, either singly or in combination, and across multiple categories, may be optimal when using indicator-based criteria as a trigger for an allocation review.  For example, a council may select one social, one ecological and one economic criterion as indicators, and define the "trigger" for review as any two of the three criteria meeting predetermined limits. This clearly defines the minimum threshold to trigger an allocation review. Taking this example to Step 2 (as per Table 1), consideration of allocation alternatives may occur if the selected indicators meet established limits within a particular timeframe, effectively combining indicator- and time-based triggers in order to ensure an adaptive management approach.  As noted above, it may be difficult to set measurable values as triggers for  indicator-based criteria, and use of quantitative thresholds is likely to be more the exception than the norm.  In such cases, qualitative triggers should be considered to ensure that FMP goals and objectives are addressed.

13

0009645

In selecting indicator-based criteria, it is important to recognize there are factors that are not in and of themselves measurable metrics for a particular criterion or set of criteria; however, they may impact selected criteria and thus influence the "triggering" of a review. These factors may include acquisition of new data, natural disasters, etc. that are not necessarily measurable on their own, but can impact measurable criteria from any of the three categories.

Finally, while there is overlap in the discussion of indicator-based criteria in this document with the NMFS guidance document, the purpose of the two documents is different. The latter document refers to the indicators below as "factors" (in addition to many others) to be considered by councils in the context of establishing initial allocations, or if a re-allocation action is undertaken. The CCC document discusses their use as one of three possible types of triggers for an allocation review. While some overlap is inevitable, the context in which that overlap occurs is important.

**Economic Criteria**

While the quality and quantity of fisheries economic information has improved over the years, there may be instances in which a disparity exists in the available data for one or more industry sectors, user groups or communities impacted by an allocation decision. This should be explicitly noted and accounted for should quantitative economic criteria be selected by councils as a trigger for allocation review. Because economic outcomes are often closely tied to social outcomes, links between economic and social triggers should also be acknowledged (Jepson and Colburn 2013).

The NS5 regulations prohibit the establishment of allocations for economic purposes alone, however, economic efficiency "shall" be considered where practicable. Multiple economic tools are available to assist in establishing indicator-based triggers for review: cost-benefit analysis, economic impact analysis, and economic efficiency (Edwards 1990; Plummer et al. 2012). However, public understanding of the differences between and proper use of these tools is often limited[1]. Whatever the economic triggers for allocation review, it will be of utmost important to explain the tool(s) used in plain language that stakeholders can understand. Although not all sectors of the public may agree with the criteria or trigger value, public understanding of the tool is critical to its acceptance as a means of informing both an initial allocation decision and its subsequent review. Failure to achieve a desired economic efficiency within a particular timeframe, and unanticipated or greater than anticipated/analyzed costs (e.g., outside of a certain error level) are examples of triggers for initiating a review of allocation decisions.

---

[1] For example, constituents often cite the results of economic impact analyses as justification for allocation of resources to a particular user group. However, the peer-reviewed economic literature clearly states that cost-benefit analyses, not economic impact analysis, are the appropriate tool for informing allocation decisions.

14

**Social Criteria**

As noted above, social and economic impacts are often linked, and changes in social criteria may lead to changes in economic criteria and vice versa. National Standard 8 requires that management measures account for social and economic impacts to communities, as well as provide for "sustained participation." This is defined in the NS8 guidelines as "continued access" to the resource, depending on resource condition.

A number of studies and technical memoranda have been published detailing the development and measurement of social metrics such as community resilience, vulnerability and well-being. Jepson and Colburn (2013) describe categories of indices --social, gentrification, fishing dependence-- that can be used to estimate social impacts of management decisions at the community level. Councils may choose to select several indices among the above categories or an entire category of indices as indicator-based criteria to trigger an allocation review. The methods used in Jepson and Colburn provide a quantifiable means of tracking the potential social impacts of an allocation decision. As alluded to earlier, setting a minimum threshold (e.g., a 0.5 standard deviation change in a social index score, etc.) or a timeframe (e.g., every three or five years) for undertaking a review of selected criteria will ensure that a fishery is not in a constant state of "allocation flux," again illustrating the inter-relationship of the various criteria discussed in this document. While councils may lack a quantitative means of developing social criteria, use of public-interest based criteria may provide a means for doing so (e.g., public input regarding loss of processing capacity or tackle shops in a community), or for establishing qualitative criteria.

Finally, for many communities, social change can be closely linked to ecological change (i.e. a sudden harvest moratorium as a result of a stock assessment; Jepson and Colburn 2013). While ecological criteria for allocation review are addressed in the following section, this relationship is worth noting as it further demonstrates that the categories of indicator-based criteria do not exist independent of one another.

**Ecological Criteria**

Ecological criteria may be considered some of the most self-evident criteria for triggering an allocation review. Changes in fishery status resulting from a stock assessment, undocumented sources of mortality (fishing or otherwise), increases in discards, changes in species distribution and food web dynamics are all examples of factors that may influence an allocation review. However, as noted previously, not all of these factors are necessarily measurable, indicator-based metrics that the councils have any control over. Measureable criteria that could be considered are failure to end overfishing within a specified timeframe, failure to achieve or rebuild to a certain level of abundance, a significant increase in discard mortality from a particular sector, significant changes in landings (e.g., an increase/decrease greater than one to two standard deviations within a three-year timeframe, etc.). As with social metrics, public-interest based criteria may at least provide a means of establish qualitative ecological criteria (e.g., anecdotal evidence of changes in distribution, discards, size of fish, etc.).

15

**References**

Edwards, Steven F. 1990. An Economics Guide to Allocation of Fish Stocks Between Commercial and Recreational Fisheries. U.S. Dept. of Commerce, NOAA Technical Report NMFS 94, 29 p.

Jepson, Michael and Lisa L. Colburn 2013. Development of Social Indicators of Fishing Community Vulnerability and Resilience in the U.S. Southeast and Northeast Regions. U.S. Dept. of Commerce., NOAA Technical Memorandum NMFS-F/SPO-129, 64 p.

Plummer, M.L., W. Morrison, and E. Steiner. 2012. Allocation of fishery harvests under the Magnuson-Stevens Fishery Conservation and Management Act: Principles and practice. U.S. Dept. Commerce, NOAA Tech. Memo. NMFS-NWFSC-115, 84 p.

16

Filename:            CCC Allocation Procedural Directive 7.27
Directory:           G:\SF3\National Standard 4\Workgroup - Policy\Final Versions
Template:
                     C:\Users\tara.scott\AppData\Roaming\Microsoft\Templates\Normal.do
     tm
Title:
Subject:
Author:              Wendy_Morrison
Keywords:
Comments:
Creation Date:       7/27/2016 4:31:00 PM
Change Number:       4
Last Saved On:       7/27/2016 5:27:00 PM
Last Saved By:       Tara_Scott
Total Editing Time:  12 Minutes
Last Printed On:     7/27/2016 5:38:00 PM
As of Last Complete Printing
    Number of Pages:   16
    Number of Words:   6,385 (approx.)
    Number of Characters:      36,401 (approx.)

# APPENDIX E.   ALLOCATION FACTORS

Department of Commerce * National Oceanic & Atmospheric Administration * National Marine Fisheries Service

**NATIONAL MARINE FISHERIES SERVICE PROCEDURAL DIRECTIVE 01-119-02**
**July 27, 2016**

**Fisheries Management**
**Fisheries Allocation Review Policy**
**RECOMMENDED PRACTICES AND FACTORS TO CONSIDER WHEN REVIEWING**
**AND MAKING ALLOCATIONDECISIONS**

**NOTICE:** This publication is available at: http://www.nmfs.noaa.gov/op/pds/index.html

**OPR:** F/SF (W. Morrison)                    **Certified by:** F/SF (A. Risenhoover)
**Type of Issuance:** Initial

**SUMMARY OF REVISIONS:**

Signed
Alan Risenhoover
Director, Office of Sustainable Fisheries

**Recommended practices and factors to consider when reviewing[1] and making allocation decisions**

**Background**

An allocation (or assignment) of fishing privileges is defined by the National Oceanic and Atmospheric Administration's (NOAA) National Marine Fisheries Service (NMFS) as "a direct and deliberate distribution of the opportunity to participate in a fishery among identifiable, discrete user groups or individuals" 50 CFR 600.325(c)(1)[2]. The Magnuson-Stevens Fishery Conservation and Management Act (MSA)[3] as well as other guidance or policy documents written by NOAA or NMFS include provisions, guidance, or information relevant to allocation decisions (see Appendix A for details). The guidance provided here does not modify or supersede any guidance associated with the National Standards, other provisions of the MSA or other applicable laws; rather, it is intended to help the Councils and NOAA review and update allocations under the MSA. Allocation can be across jurisdictions (e.g., state, regional), across sectors (e.g., commercial, for-hire, private anglers, tribal, research), and within sectors (e.g., individual fishermen, gear types). Allocation of fishery resources is a complex issue facing

---

[1] For the purposes of this document "review" is the evaluation that leads to the decision of whether or not the development and analysis of alternative allocations is warranted, and is not, in and of itself, an implicit trigger to consider alternative allocation.
[2] www.nmfs.noaa.gov/sfa/laws_policies/national_standards/documents/national_standard_4_cfr.pdf
[3] www.nmfs.noaa.gov/sfa/laws_policies/msa/documents/msa_amended_2007.pdf

NMFSPD 01-119-02 July 27, 2016

fishery managers because of the history and tradition of access to fishery resources, the perceptions of equity that arise with allocation decisions, and differences in the economic and social values competing user groups place on those resources. In addition, fisheries management is not static and should be adaptable as environmental, ecological, social, and economic influences change. Therefore, allocation decisions need to be considered in the context of adaptive management.[4]

In 2011, NMFS issued a contract for an outside entity to interview stakeholders about allocation issues. The report (Lapointe, 2012)[5] is the first comprehensive compilation of fisheries allocation issues. NMFS commissioned the report to facilitate a productive discussion about allocation decisions and socio-economic objectives for fisheries management. It summarizes input from discussions with a wide range of stakeholders and suggests five steps NMFS can take to address allocation issues: 1) increase stakeholder engagement in allocation decisions, 2) increase biological and social science research and data, 3) periodically review allocation decisions, 4) compile a list of past allocation decisions, and 5) create a list of factors to guide allocation decisions.

This document addresses the fifth recommendation by providing a summary of recommended practices and guidance on allocation factors that a Regional Fishery Management Council (Council)[6] should consider when making allocation (initial or reallocation) decisions. The factors are drawn from, or are relevant to, MSA provisions and other legal mandates and thus should already be considered in the fisheries management process. The recommended practices are ideas that could improve the allocation process by increasing transparency and minimizing conflict. The Council Coordinating Committee created a companion document[7] that describes triggers that can be used to determine when to review allocation decisions, addressing the Lapointe report's third recommendation. For the other three recommendations, NMFS has published two technical memorandums that contain a list of past allocation decisions[8, 9] and is continuing to work to increase stakeholder engagement and biological and social science research.

---

[4] We describe adaptive management as the on-going process of evaluating if management objectives have been met and adjusting management strategies in response. We do not include large scale scientific manipulations aimed at answering scientific questions.
[5] Lapointe, GD. 2012. Marine Fisheries Allocation Issues: Findings, Discussions and Options. George Lapointe Consulting LLC.58 pgs. External Assessment Completed for NMFS (December 2012). Available: www.nmfs.noaa.gov/stories/2013/01/docs/lapointe_allocation_report_final.pdf
[6] Throughout this document, guidance for Fishery Management Councils also pertains to Atlantic High Migratory Species Secretarial actions.
[7] NMFS Procedural Directive 01-119-01, Criteria for Initiating Fisheries Allocation Reviews, Council Coordinating Committee Allocation Working Group Document. http://www.nmfs.noaa.gov/op/pds/documents/01/119/01-119-01.pdf
[8] Morrison, W.E., T.L. Scott. 2014. Review of Laws, Guidance, Technical Memorandums and Case Studies Related to Fisheries Allocation Decisions. U.S. Dept. of Commerce. NOAA Technical Memorandum NMFS-F/SPO-148, 32 p. www.nmfs.noaa.gov/sfa/laws_policies/national_standards/documents/morrison_scott_nmfs_f_spo_148.pdf
[9] Plummer, M.L., Morrison, W., and E. Steiner. 2012. The Allocation of Fishery Harvests under the Magnuson-Stevens Fishery Conservation and Management Act: Principles and Practice. U.S. Department of Commerce, NOAA Tech. Memo NMFS-NWFSC-115, 84 p. www.nmfs.noaa.gov/sfa/laws_policies/national_standards/documents/plummer_allocationfishharvests_tm115_web_final.pdf

2

NMFSPD 01-119-02 July 27, 2016

<u>Recommended Practices When Reviewing and Making Allocation Decisions</u>

**Several recommended practices would improve the allocation process by increasing transparency and minimizing conflict. A list of recommended practices is below, although it should not be considered comprehensive and may not be applicable to all circumstances.**

    a. **Evaluate and Update Council and Fishery Management Plan (FMP) Objectives.**
Council fishery management decisions often involve trade-offs (e.g., between management objectives within a fishery, or between two fisheries under the Council's jurisdiction). For example, maintaining employment may be in conflict with improving economic efficiency. Similarly, long-term goals related to rebuilding stocks may also be in conflict with short-term goals of minimizing impacts on fishery-dependent communities. Updated and measurable objectives help clarify decisions about these trade-offs within and between FMPs. If FMP objectives are not current, clear, or measurable, a Council should re-assess the FMP objectives prior to or concurrent to initiating the allocation discussion.[10] In addition, the Council should use a transparent process for analyzing and determining trade-offs between FMP objectives and/or FMPs.

    b. **Identify User Needs**.
The specific needs and interests of the different types of fishery participants or sectors within a fishery may vary. For example, recreational fishermen may be more interested in stable fishing opportunities than absolute numbers of fish retained. Therefore, articulating the needs of each type or sector should be completed near the beginning of the allocation discussion to facilitate identification of alternatives, which may reduce conflict. Once user needs are identified through a public process, those needs should be communicated and publicly available.

    c. **Minimize Speculative Behavior.**
To limit situations which may lead to speculative behavior or practices[11] whenever allocations are being considered, the Council should consider announcing a control date for a given fishery, by sector as appropriate, which is published by NMFS as an advance notice of proposed rulemaking. The control date provides notice that, if an allocation decision is made in an FMP or FMP amendment, there is no assurance that any entrance or increased effort into a fishery beyond said date will be used to determine allocations. Announcing a control date is common practice when creating limited access and catch share programs, but could also be used for allocation decisions between gear types, sectors, or groups.

    d. **Plan for Future Conditions.**
To plan for future conditions, Councils may consider adopting in an FMP or FMP amendment mechanisms for implementing actions in an expedited manner, where

---

[10] For general information on FMP objectives in the National Standard Guidelines, *see* 50 C.F.R. § 600.305(b): http://www.fisheries.noaa.gov/sfa/laws_policies/national_standards/documents/national_standards_general_cfr.pdf.
[11] For example, if fishermen expect future allocations to be based on catch history, they may decide to increase catch in order to improve their catch history, etc.

3

appropriate and as consistent with the MSA, Administrative Procedure Act, National Environmental Policy Act, Executive Order 13653, and other applicable law. [12]  For example, the Bering Sea and Aleutian Islands FMP includes pre-arranged "if/then" allocations for yellowfin sole between two sectors depending on the total allowable catch (TAC).  If the TAC for the two sectors is greater than 125,000 metric tons (mt), then the first sector is allocated 60 percent; if the TAC for the two sectors is less than 125,000 mt, then the first sector receives an increasing apportionment.[13]  The Mid-Atlantic bluefish FMP provides an example of a mechanism that incorporates more discretion than the example provided above.  The Mid-Atlantic bluefish allocation is currently set as 83% recreational and 17% commercial.[14]  However, the FMP states that if the recreational sector is not projected to land its harvest limit for the upcoming year, then the commercial catch limit may be increased for that year as long as the combination of the projected recreational landings and the commercial quota does not exceed the total allowable landings.

A pre-arranged management response may be one option for allocating catch of a species that is expected to rebuild or shift distribution due to climate change, for example.  Identifying, upfront, specific conditions that may result in changes in allocations could decrease controversy.  We note that not all circumstances may be amenable to pre-arranged responses.  For example, if external factors change significantly, the original analysis of impacts may no longer be considered adequate because the analysis would not capture the complete range of potential impacts or outcomes.

---

[12] Some of these types of mechanisms are referred to by regions as "frameworks".  *See* Appendix 3 of the NMFS Operational Guidelines at p. 3 at
http://www.fisheries.noaa.gov/sfa/management/councils/operational_guidelines/og_append.pdf.  As the Guidelines explain, frameworking is not intended to circumvent standard FMP/amendment and rulemaking procedures, and must be done consistent with the MSA and other applicable law. To the extent that MSA and other statutory requirements can be addressed up front when establishing such a mechanism, this may result in less analysis and process being needed when individual actions are executed under that mechanism. What analysis and process (including public comment) is required for each individual action will depend on the specific facts and circumstances of that action. *Id.*
[13] Northern Economics, Inc. *Five-Year Review of the Effects of Amendment 80 to the Bering Sea and Aleutian Islands Groundfish Fishery Management Plan.* Prepared for North Pacific Fishery Management Council. April 2014.
[14] Amendment 1 to the FMP for the Atlantic Bluefish Fishery, 65 FR 45844 (January 26, 2000).

4

NMFSPD 01-119-02 July 27, 2016

**Factors to Consider When Reviewing and Making Allocation Decisions**

**Typically allocation decisions are closely aligned with historical use of the resource because the government[15] is hesitant to limit historically established privileges and access (Rolph, 1983).[16] While historical use may (or in some instances, shall) be taken into consideration when reviewing and making an allocation decision,[17] the MSA requires achieving on a continuing basis the optimum yield (OY) from each fishery, which encompasses a broader range of considerations.[18] Recognizing this, below is a list of different factors to consider when reviewing and making an allocation decision.**

**The list of factors is not all-inclusive, as there may be other appropriate factors to consider. The factors do not prescribe any particular outcome with respect to allocations, but rather, are intended to provide a framework for the allocation analysis. Factors should be compared between groups for which an allocation decision is relevant. The priority and weight afforded each factor will vary depending on the time horizon of the decision,[19] the objectives of the allocation decision, the objectives of the FMP, and the overarching Council[20] goals. If a factor is determined not applicable or unimportant for the allocation decision in question, the Council should clearly document its rationale for the determination for the record. Such documentation is necessary to produce a strong record demonstrating that the factor has been considered. Analysis of an allocation decision under these factors is not a substitute for documenting compliance with MSA mandates, although there may be overlap between certain factors and MSA mandates. Of particular note, National Standard 4, discussed under Social Factors below, has explicit requirements pertaining to allocations of fishing privileges.**

1. **Ecological Factors**
   Weakened or damaged marine ecosystems support a lower abundance and diversity of fish species, and may have a harder time adjusting to acute (e.g., hurricane) or long-term (e.g., climate change[21]) impacts than healthy ecosystems. Because different fishing practices

---

[15] Rolph includes a wide range of resources in his analysis (forests, air waves, etc.). However, in most marine fisheries, Councils and Commissions in coordination with federal and state governments make the allocation decisions.

[16] Rolph, E.S. 1983. Government allocation of property rights: Who gets what? Journal of Policy Analysis and Management 3:45-61.

[17] For example, for limited access privilege programs, historical harvests and historical participation of fishing communities are among the required considerations for establishing procedures for allocations. 16 U.S.C. § 1853a(c)(5)(A).

[18] 16 U.S.C. § 1851(a)(1) (National Standard 1). "'[O]ptimum', with respect to the yield from a fishery, means the amount of fish which— (A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems; (B) is prescribed as such on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant economic, social, or ecological factor; and (C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery". 16 U.S.C. § 1802(33).

[19] For example, factors may be weighed differently when considering in-season allocation changes versus longer term changes such as decisions that last years.

[20] Whenever Fishery Management Councils are mentioned, this guidance also pertains to Atlantic High Migratory Species Secretarial actions.

[21] Climate change impacts could be positive or negative for individual species or systems.

5

(locations fished, gear types used, etc.) can have varied impacts on the marine ecosystem, decisions that determine the allocation between different sectors or groups should take into consideration the potential ecological impacts of allocation alternatives.  When making allocation decisions, relevant ecological questions could include, but are not limited to:

**a.  What are expected ecological impacts on target species?**
Sectors can differ in their impacts on the target species.  For example, sectors may target different stocks, sizes, or age classes, which could impact the productivity, distribution, yield, and/or recovery potential of the species.

**b.  What are the expected ecological impacts on other fisheries?  What is the status of non-target species[22]?  What are the expected impacts on bycatch and bycatch mortality of both non-target species and protected species?**
Ecological impacts can overlap among fisheries.[23]  Some ways ecological interactions occur are through bycatch, habitat, predator-prey dynamics, etc.  For example, target species in one fishery can be incidental catch or bycatch in another.  In addition, if the allocation of one species decreases, fishermen may increasingly target another species.  Managers should assess the potential ecological impacts of a change in allocation to other fisheries when making allocation decisions.  For example, if reducing bycatch is a priority then lowering allocations to sectors or gear types that have high bycatch could be considered.

**c.  What are the impacts on the marine ecosystem?[24]  What are the impacts on habitat?  What are the impacts on the ecological community (e.g., relevant predator, prey, or competitive dynamics)?**
Fishing can change an ecosystem through both direct and indirect effects.  Direct effects include mortality of target and non-target stocks, interactions with marine mammals or other protected species, and disturbance of marine habitat.  Indirect impacts to the ecosystem include removal of predators, prey, competitors, or structure that could result in shifts in the ecological community.  Managers should consider the direct and indirect impacts of different allocation alternatives to the ecosystem when making allocation decisions.  For example, decreasing allocations to gears that have high impacts on biotic hard-bottom habitats could be considered.

2.  **Economic Factors**
Allocation of a fishery resource has economic consequences for affected user groups that should be considered.  Councils should be very specific in articulating what economic questions they want to consider when making allocation decisions.  When making allocation decisions, relevant economic questions could include, but are not limited to:

**a.  Can economic efficiency be improved?**
Councils should consider if the current or preferred allocation results in the most economically efficient[25] use of resources.  Cost-benefit analyses should be used to

---

[22] For the purpose of this document, non-target species are the species that were retained but were not the primary target species.
[23] *See* 16 U.S.C. §§ 1853(a)(7) (requiring that FMP measures minimize, to the extent practicable, adverse effects on essential fish habitat caused by fishing) and (9) (requiring fishery impact statement) and 1851(a)(9) (requiring under National Standard 9 that FMP measures minimize to the extent practicable bycatch and bycatch mortality).
[24] *See supra* note 22.

6

estimate how a proposed allocation would change consumer and producer surplus (i.e., net economic benefits). From an economic analysis perspective, economic efficiency refers to how well resources are utilized in production and consumption[26]; economic efficiency is achieved when all resources are allocated to their most productive use.[27] Analyses that estimate the monetary value individuals or sectors place on the marginal value of their share of the harvest (i.e., "willingness to pay") can inform how allocation changes could improve economic efficiency. However, if use within each sector is not allocated according to those who value the resource most, then information about access to the resource in each sector may also be necessary to determine the efficient allocation among sectors (Holzer and McConnell, 2014)[28]. Methods for estimating the economic efficiency of an allocation decision are being continually improved.[29]

**b.  What are the economic impacts of potential changes in allocation?**

Changes to sales, income, and employment levels as measured by economic impact analyses (i.e., input-output models) should only be used to understand the potential short-term distributive effects of allocation decisions on the affected communities[30], states, or regions (see social impacts below). Analyses should be completed at the finest scale possible, given available data and models. Unlike economic efficiency, economic impact – from an economic analysis perspective – does not measure social welfare. An allocation that maximizes economic impacts could reward the highest spender or highest cost producer, and thereby promote inefficient practices and processes and reduce economic efficiency relative to alternative allocations. Additionally, those affected by a change in allocation will likely adjust their behavior in response to a different allocation. For example, when recreational fishermen spend money on other recreational alternatives under a reduced allocation, it is difficult to determine whether the economic impacts of an alternative allocation on the economy will be positive or negative after those behavioral adjustments have occurred.

---

[25] *See* 16 U.S.C. § 1851 (a)(5) (requiring under National Standard 5 that FMP measures "shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose."). According to the National Standard 5 Guidelines, "[t]his standard prohibits only those measures that distribute fishery resources among fishermen on the basis of economic factors alone, and that have economic allocation as their only purpose." 50 C.F.R. § 600.330(e). "Given a set of objectives for the fishery, an FMP should contain management measures that result in as efficient a fishery as is practicable or desirable." 50 C.F.R. § 600.330(b)(1).

[26] *Op. Cit.* Plummer et al. 2012.

[27] The National Standard 5 Guidelines explain: "In theory, an efficient fishery would harvest the OY with the minimum use of economic inputs such as labor, capital, interest, and fuel. Efficiency in terms of aggregate costs then becomes a conservation objective, where 'conservation' constitutes wise use of all resources involved in the fishery, not just fish stocks." 50 C.F.R. § 600.330(b)(2). The Guidelines further explain that "[a]n FMP should demonstrate that management measures aimed at efficiency do not simply redistribute gains and burdens without an increase in efficiency." 50 C.F.R. § 600.330(b)(2)(i).

[28] Holzer, Jorge, and Kenneth McConnell. 2014. "Harvest Allocation without Property Rights." *Journal of the Association of Environmental and Resource Economists* 1: 209-232

[29] NMFS is developing technical guidance on best practices that will clarify emerging issues and the appropriate implementation and use of economic impact and economic efficiency analyses.

[30] *See* 16 U.S.C. §§ 1851(a)(8) (requiring under National Standard 8 that FMP measures take into account the importance of fishery resources to fishing communities and, to the extent practicable, minimize adverse economic impacts on such communities) and 1853 (a)(9) (requiring fishery impact statement).

7

0009656

3. **Social Factors**

Allocation of a fishery resource can have social consequences on individuals and communities. For example, updating geographically-based allocations could impact the surrounding community by changing the demand for processing facilities, boats, and supplies such as bait and ice. When making allocation decisions, relevant questions on social factors could include, but are not limited to:

a. **Is an allocation fair and equitable?**

Equity is an important issue in fisheries management. National Standard 4 requires, in relevant part, that if an allocation is made "among various United States fishermen, such allocation shall be…fair and equitable to all such fishermen…"[31] Methods exist to gather information on the impacts of an allocation alternative, though assigning labels of "fairness" will remain subjective and the perception of "fair and equitable" will vary among individuals and sectors.[32] Social impact analyses can point to potential disproportionate impacts of allocation decisions. Relevant sectors and sub-groups may include, among others, vessels of different size categories, target species, or gear; communities of different sizes and different levels of social vulnerability and fisheries dependence; large versus small businesses[33]; or groups of fishermen from different states.

"Well-being" can also inform equity. Two broad principles of equity may be considered: vertical equity and horizontal equity. The former refers to different treatment of entities that are not alike while the latter refers to equal treatment among equal entities. Horizontal equity means that the distribution of well-being before and after a change in allocation is preserved. This might be the case for allocations that are primarily based on historical landings records. Vertical equity means that the distribution of well-being before and after a change in allocation has changed. Creating set-asides for entities that may have been disadvantaged by history-based allocations is an example of a measure that would affect vertical equity. In this case, vertical equity would become more even as a result of the set-aside.

b. **Are there disproportionate adverse effects on low income and/or minority groups?**

Consistent with Executive Order 12898 and guidance from the Council on Environmental Quality[34], NEPA analyses should continue to assess proposed actions for disproportionate and adverse effects on low-income and/or minority groups, including federally recognized tribes. Environmental justice assessments should include a review

---

[31] 16 U.S.C. § 1851(a)(4). *See* National Standard 4 Guidelines, 50 C.F.R. § 600.325(c) (addressing analysis of allocations and factors to be used in making allocations, including fairness and equity).

[32] *Op. cit.* Lapointe 2012.

[33] *See* 5 U.S.C. §§ 601 et seq. (requiring agency to review impacts of proposed regulations on small businesses and entities) and Executive Order 13272 (setting forth requirements for agencies when considering impacts on small businesses and entities).

[34] *See* Council on Environmental Quality, Environmental Justice Guidance Under the NEPA (Dec. 10, 1997): http://www.energy.gov/sites/prod/files/nepapub/nepa_documents/RedDont/G-CEQ-EJGuidance.pdf (providing guidance to Federal agencies on considering environmental justice in the NEPA process).

8

of impacts on both directly and indirectly affected entities[35] (e.g., minority processing workers whose jobs might change due to fisheries allocation decisions that impact the amount and/or timing of fish processing).

**c.   What is the importance of fishery resources to fishing communities?**

National Standard 8 requires that "[c]onservation and management measures shall, consistent with the conservation requirements of this Act…, take into account the importance of fishery resources to fishing communities…in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities".[36] When making allocation decisions, relevant fishing community questions could include, but are not limited to:

   **i.   What is the individual, local, and regional dependence and engagement in each sector[37, 38]?**

   What is the current dependence and engagement and how are these expected to change in the future (both under the status quo and under the allocation alternatives being considered)?  Fishing dependence and engagement analyses should include potential impacts to commercial, for-hire, private angler, and subsistence fishing, as well as shoreside support industries, and should consider impacts at the local level (and could expand to regional/national level) if data are available.  For example, dependence and engagement may decrease locally based on decreased opportunities in a particular fishery, but increase on a regional level based on greater opportunities in a different fishery.  In addition, the importance of a given species or fishing activity to a culture should be considered when making allocation decisions.

   **ii.   What is the community's vulnerability and adaptive capacity?**

   Some communities may be more negatively impacted by changes to fishing production or fishery access than others.  Social indicators have been developed that describe the vulnerability of a fishing community to "disruptive events" (Jepson and Colburn 2013)[39], such as a change to a group or sector's access to a fishing resource.  For example, a community's current and historical dependence on a fishery can suggest a community's vulnerability and possible response to a change in commercial or recreational fishing access.[40]  Similarly, understanding a community's ability to adapt to changes may be useful (e.g., the adaptive capacity metric developed by Mathis et al. 2014[41]).

---

[35] *Op.cit.* Council on Environmental Quality, Environmental Justice Guidance Under the NEPA, page 8; *see also* 40 C.F.R. § 1508.8 (defining "effects" under NEPA to include direct and indirect effects).

[36] 16 U.S.C. § 1851(a)(8).  *See also id.* § 1802(17) (defining "fishing community") and 50 C.F.R. § 600.345 (setting forth requirements for analyses under National Standard 8 Guidelines).

[37] NMFS, Guidance for Social Impact Assessment:
www.nmfs.noaa.gov/sfa/laws_policies/economic_social/index.html

[38] Sepez, J., K. Norman and R. Felthoven. 2007. A quantitative model for ranking and selecting communities most involved in commercial fisheries. *NAPA Bulletin* 28, 43-56. 160.

[39] Jepson, M., and L. L. Colburn 2013.  Development of Social Indicators of Fishing Community Vulnerability and Resilience in the U.S. Southeast and Northeast Regions.  U.S. Department of Commerce, NOAA Tech. Memo NMFS-F/SPO-129, 64p, available at spo.nmfs.noaa.gov/tm/TM129.pdf.

[40] *Ibid.*

[41] Mathis, J. T., S. R. Cooley, N. Lucey, S. Colt, J. Ekstrom, T. Hurst, C. Hauri, W. Evans, J. N. Cross, R.A Feely. 2014. Ocean acidification risk assessment for Alaska's fishery sector.  Progress in Oceanography.

9

    iii.    **Are there other social impacts?**

Changes to how fisheries are managed can have other social impacts. For example, reducing an allocation may decrease safety if access to a fishery is restricted to a limited number of days (e.g., shortened season) and fishermen must decide whether to fish despite unsafe conditions or miss the year's landings of that fishery (referred to as "derby" fishing).[42] Another example is potential impacts to non-consumptive uses of the resource, such as tourism or the intrinsic beauty of the ecosystem. Will other groups (e.g., beach goers, whale watchers, birders) be negatively impacted by a change in allocation?

**4. Indicators of Performance and Change**

Councils should assess the current conditions of a fishery and document changes to the fishery that may indicate the need for updated allocations. When making allocation decisions, questions on performance and change could include, but are not limited to:

    a.    **What are the trends in catch/landings?**

Historical and current catch and landings data[43] can provide important information about demand, after accounting for changes in annual catch limits and quotas. Past overages or underages should not be used to penalize or reward a group or sector; however, short-term, in-season adjustments based on expected underages could be used to ensure full utilization of resources. Paybacks (reducing a catch limit in a subsequent year to account for an overage in the previous year) have been instituted as a mechanism to account for the biological impacts of overages; however, similar to in-season adjustments, they represent short-term fixes and not long-term changes to the allocations specified in fishery management plans. If there is a perpetual need for paybacks, this could indicate the need to reassess and change allocation, recognizing that there could also be monitoring or other management changes that need to be addressed. Caution should be exercised to avoid creating a perverse incentive system in the fishery and in its management. It is important to consider the reasons behind the overages or underages, such as lag time between catch and reporting, poor prediction of catch, ineffective effort controls, misreporting by fishermen, or intentional underages (e.g., for the purpose of maintaining higher catch rates).

    b.    **What is the status of fishery resources?**

A Council should consider the status of a stock (e.g., stock is undergoing overfishing, not undergoing overfishing, overfished, approaching an overfished condition, rebuilding, or rebuilt)[44] when determining allocations. The MSA clarifies that harvest restrictions and recovery benefits must be allocated "fairly and equitably among the commercial, recreational, and charter fishing sectors in the fishery"[45]; therefore, the costs and benefits

---

[42] *See* 16 U.S.C. § 1851(a)(10) (requiring under National Standard 10 that FMP measures shall, to the extent practicable, promote the safety of human life at sea) and 50 C.F.R. § 600.355 (National Standard 10 Guidelines).
[43] *See* 16 U.S.C. § 1853 (a)(13) (requiring that FMP describe sectors which participate in the fishery and, to the extent practicable, quantify trends in landings of the managed fishery).
[44] *See* 16 U.S.C. § 1853 (a)(10) (requiring that FMP specify objective and measurable criteria for identifying when fishery is overfished) and 50 C.F.R. § 600.310(e)(2) (providing under National Standard 1 Guidelines for specification of criteria for determining overfishing and overfished status of stock or stock complex).
[45] 16 U.S.C. § 1853 (a)(14).

0009659

to individuals and/or sectors should be considered when updates to stock status result in increases or decreases in allocations.

**c.   Has the distribution of the species changed?**
The distributions of species alter over time for reasons such as climate change (Nye et al., 2009)[46] or natural fluctuations in abundance (Bell et al., 2014)[47], among others.  This may create jurisdictional disputes when the distribution crosses international, state, or council boundaries.  Where the spatial distribution of the species does not match the spatial distribution of the allocation or geographic location of the fishermen, the allocation may need to be updated, recognizing that there could also be other management changes that need to be addressed.[48]  If a stock moves and it is financially viable for fishermen to follow the stock/species, then there can be conflict because fishermen in an area who are historically dependent on the stock will catch fish as well as fishermen new to the area, creating potential for overfishing and reducing the sustainability of the stock.  Conversely, if a stock moves and it is not financially viable to follow the stock, there may be less potential for conflict if allocations can be updated to match the new distribution.  For stocks expected to change geographic distribution, determining pre-arranged management responses is recommended (see above, "Recommended Practices When Reviewing and Making Allocation Decisions," Section d – Planning for Future Conditions).

**d.   What is the quality of information available for each sector or group?**
In order to properly manage a fishery, scientists need information on stock specific catch rates, abundance, and biology (age, growth, mortality, etc.), as well as data on social and economic aspects of the fishery[49].  Information can be compiled through fishery-dependent and fishery-independent data sources.  Fishery dependent data may be collected through use of dockside monitors, at-sea observers, logbooks, electronic monitoring and reporting systems, telephone surveys, and vessel-monitoring surveys.  Fishery-dependent data collected varies between sectors.  Improvements in the data collected through a fishery can result in a better understanding of the species and the appropriate management actions.[50]

Councils should consider the quality and availability of fishery dependent data collected through each sector when making allocation decisions.  Lack of detailed data should not be used to penalize a sector or a group; however, increased allocations could be

---

[46] Nye, J. A., Link, J. S., Hare, J. A., and Overholtz, W. J.  2009.  Changing spatial distribution of fish stocks in relation to climate and population size on the Northeast United States continental shelf.  Marine Ecology Progress Series 393: 111-129.

[47] Bell, R.J, J.A. Hare, J.P. Manderson, and D. E. Richardson.  2014.  Externally Driven Changes in the Abundance of Summer and Winter Flounder.  ICES Journal of Marine Science. doi: 10.1093/icesjms/fsu069.

[48] Changes in stock distribution implicate other MSA mandates, such as National Standards 1 (preventing overfishing and achieving optimum yield) and 3 (management of stocks as a unit, to extent practicable).  For example, reference points and catch targets may need to be updated if stock productivity changes with the shifting distribution.

[49] *See* 16 U.S.C. § 1853(a)(5) (requiring that FMP specify pertinent data to be submitted to agency with respect to commercial, recreational, charter fishing, and fishing processing in the fishery).

[50] For example, due to scientific uncertainty, data poor stocks are often managed more conservatively than data rich stocks.  Increasing an allocation to a group or sector that provides better biological information may allow for higher retainable catch (due to less of a buffer for uncertainty) in the future.

11

0009660

NMFSPD 01-119-02 July 27, 2016

considered as an incentive to improving data quality. Where appropriate, allocation decisions which incentivize cooperative research or improvements in self-reported data could also be considered in data poor situations, consistent with relevant MSA requirements.

**Summary**

Allocation of fishery resources is a complex issue facing fishery managers. Because fisheries management, and the conditions surrounding fisheries, are not static, allocation decisions need to be considered in the context of adaptive management. This document provides recommended practices and guidance on allocation factors that a regional fishery management council should consider when making allocation decisions. The Council Coordinating Committee created a companion document that describes triggers that can be used to determine when to review allocation decisions. NMFS is committed to working with the Councils to assist them in their allocation decisions.

12

**Appendix A:  Existing National Policy**

**1. Magnuson-Stevens Fishery Conservation and Management Act (MSA)[51]**
Language relevant to allocation decisions is found throughout the MSA, most significantly in National Standards 1, 4, 5, 8, and 9 concerning optimum yield, allocation, economic efficiency, communities, and bycatch, respectively.  MSA sections 303A(c)(3) and (c)(5) specify requirements for determining initial allocations and fishing community allocations for Limited Access Privilege Programs (LAPPs)[52].  MSA sections 303(a)(14), 303(b)(6), 303(b)(11), and 304(e)(4)(b) also detail considerations for allocation decision making.[53]

   a.  **National Standard 1[54]:**  "Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."

   b.  **National Standard 4[55]:**  "Conservation and management measures shall not discriminate between residents of different States.  If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be
      (A) fair and equitable to all such fishermen;
      (B) reasonably calculated to promote conservation; and
      (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges."

   c.  **National Standard 5[56]:**  "Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose."

   d.  **National Standard 8[57]:**  "Conservation and management measures shall, consistent with the conservation requirements of this Act (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of [National Standard 2], in order to
      (A) provide for the sustained participation of such communities, and
      (B) to the extent practicable, minimize adverse economic impacts on such communities."

   e.  **National Standard 9[58]:**  "Conservation and management measures shall, to the extent practicable,
      (A) minimize bycatch and
      (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch."

   f.  **LAPP: Eligibility of fishing communities to participate in a LAPP[59]:**  "To be eligible to participate in a limited access privilege program to harvest fish, a fishing community shall—

---

[51] www.nmfs.noaa.gov/sfa/laws_policies/msa/documents/msa_amended_2007.pdf
[52] 16 U.S.C. § 1853a.  Limited Access Privilege Programs are a subset of Catch Share Programs.
[53] 16 U.S.C. §§ 1853(a)(14), (b)(6), (b)(11); 16 U.S.C. § 1854(e)(4)(b).
[54] MSA 301(a)(1) [16 U.S.C. § 1851(a)(1)].
[55] MSA 301(a)(4) [16 U.S.C. § 1851(a)(4)].
[56] MSA 301(a)(5) [16 U.S.C. § 1851(a)(5)].
[57] MSA 301(a)(8) [16 U.S.C. § 1851(a)(8)].
[58] MSA 301(a)(9) [16 U.S.C. § 1851(a)(9)].

13

0009662

NMFSPD 01-119-02 July 27, 2016

(I) be located within the management area of the relevant Council;

(II) meet criteria developed by the relevant Council, approved by the Secretary, and published in the Federal Register;

(III) consist of residents who conduct commercial or recreational fishing, processing, or fishery-dependent support businesses within the Council's management area; and

(IV) develop and submit a community sustainability plan to the Council and the Secretary that demonstrates how the plan will address the social and economic development needs of coastal communities, including those that have not historically had the resources to participate in the fishery, for approval based on criteria developed by the Council that have been approved by the Secretary and published in the Federal Register."

g. **LAPP: Requirements for allocation**[60]: "In developing a limited access privilege program to harvest fish a Council or the Secretary shall—

(A) establish procedures to ensure fair and equitable initial allocations, including consideration of— (i) current and historical harvests; (ii) employment in the harvesting and processing sectors; (iii) investments in, and dependence upon, the fishery; and (iv) the current and historical participation of fishing communities;

(B) consider the basic cultural and social framework of the fishery, especially through— (i) the development of policies to promote the sustained participation of small owner-operated fishing vessels and fishing communities that depend on the fisheries, including regional or port-specific landing or delivery requirements; and (ii) procedures to address concerns over excessive geographic or other consolidation in the harvesting or processing sectors of the fishery;

(C) include measures to assist, when necessary and appropriate, entry-level and small vessel owner-operators, captains, crew, and fishing communities through set-asides of harvesting allocations, including providing privileges, which may include set-asides or allocations of harvesting privileges, or economic assistance in the purchase of limited access privileges;

(D) ensure that limited access privilege holders do not acquire an excessive share of the total limited access privileges in the program by—(i) establishing a maximum share, expressed as a percentage of the total limited access privileges, that a limited access privilege holder is permitted to hold, acquire, or use; and (ii) establishing any other limitations or measures necessary to prevent an inequitable concentration of limited access privileges; and

(E) authorize limited access privileges to harvest fish to be held, acquired, used by, or issued under the system to persons who substantially participate in the fishery, including in a specific sector of such fishery, as specified by the Council."

h. **LAPP: Authorization of the use of Auctions**[61]: "In establishing a limited access privilege program, a Council shall consider, and may provide, if appropriate, an auction system or other program to collect royalties for the initial, or any subsequent, distribution of allocations in a limited access privilege program if—

---

[59] MSA 303A(c)(3)(A)(i) [16 U.S.C. § 1853a(c)(3)(A)(i)].
[60] MSA 303A(c)(5) [16 U.S.C. § 1853a(c)(5)]; for programs established after the 2007 MSA reauthorization.
[61] MSA 303A(d) [16 U.S.C. § 1853a(d)].

14

(1) the system or program is administered in such a way that the resulting distribution of limited access privilege shares meets the program requirements of this section; and

(2) revenues generated through such a royalty program are deposited in the Limited Access System Administration Fund established by section 305(h)(5)(B) and available subject to annual appropriations."

**i.   Other Applicable Sections:**

**MSA 303(a)(14)**[62] stipulates that, when harvest reductions are required, the harvest restrictions and recovery benefits must be allocated "fairly and equitably among the commercial, recreational and charter fishing sectors."

**MSA 303(b)(6)**[63] provides that a Council may establish a "limited access system" provided that it takes into account present and historical participation in the fishery, dependence on the fishery, the economics of the fishery, the capability of the vessels to engage in other fisheries, the cultural and social framework relevant to the fishery, the fair and equitable distribution of access privileges, and any other relevant considerations.

**MSA 303(b)(11)**[64] authorizes setting aside a portion of the total quota "for use in scientific research."

**MSA 304(e)(4)(B)**[65] provides that rebuilding programs must allocate "overfishing restrictions and recovery benefits fairly and equitably among sectors of the fishery."

**2.   Select Relevant NMFS Documents.   For additional documents, see Morrison and Scott (2014).**[66]

**a.   National Standard Guidelines.**[67]

NMFS provides official guidance on what the National Standards mean for fisheries management.   Guidance for NS4 and NS5 were revised in 1998, NS8 and NS9 were revised in 2008, and NS1 were revised in 2009 and proposed to be revised again in 2015.

**b.   NOAA Catch Share Policy.**[68]

The NOAA Catch Share Policy provides guidance on making initial allocation decisions for catch share[69] programs.   In addition, the policy states that all allocation decisions should be revisited on a regular basis under a catch share program or other management approach.

---

[62] 16 U.S.C. § 1853(a)(14).
[63] 16 U.S.C. § 1853(b)(6).
[64] 16 U.S.C. § 1853(b)(11).
[65] 16 U.S.C. § 1854(e)(4)(B).
[66] Morrison, W.E., T.L. Scott. 2014.  Review of Laws, Guidance, Technical Memorandums and Case Studies Related to Fisheries Allocation Decisions. U.S. Dept. of Commerce. NOAA Technical Memorandum NMFS-F/SPO-148, 32
p.www.nmfs.noaa.gov/sfa/laws_policies/national_standards/documents/morrison_scott_nmfs_f_spo_148.pdf.
[67] www.nmfs.noaa.gov/sfa/laws_policies/national_standards/index.html
[68] www.nmfs.noaa.gov/sfa/management/catch_shares/about/documents/noaa_cs_policy.pdf
[69] "Catch share" is a general term for several fishery management strategies that allocate specific portions of a fishery's total allowable catch to individuals, cooperatives, communities, or other entities. Each recipient of a catch share is directly accountable to stop fishing when its exclusive allocation is reached.  The term includes specific programs defined in law such as "limited access privilege" (LAP) and "individual fishing quota" (IFQ) programs, and other exclusive allocative measures such as Territorial Use Rights Fisheries (TURFs) that grant an exclusive privilege to fish in a geographically-designated fishing ground.

15

0009664

    c. **NMFS Economic and Social Impact Assessment Guidance.**[70]
NMFS has created guidance for completing economic and social impact analyses for fishery regulations.  These documents provide guidance on completing these analyses for any fishery management decision, including allocation decisions.

    d. **NOAA Fisheries National Saltwater Recreational Fisheries Policy.**[71]
As explained in the policy, "this policy identifies goals and guiding principles to be integrated into NMFS' planning, budgeting, decision-making, and activities, and includes examples of implementation concepts and strategies supported by NMFS."  The policy establishes six guiding principles, and under the second principle, one example of an implementation strategy is the "recurring evaluation of fishery allocations to facilitate equitable distribution of fishing opportunities as fisheries develop and evolve."

    e. **NOAA Fisheries Climate Science Strategy**.[72]
The strategy is part of a proactive approach to increase the production, delivery, and use of climate-related information in fulfilling NMFS mandates.  The Strategy identifies seven objectives which will provide decision-makers with the information they need to reduce impacts and increase resilience in a changing climate.  It is designed to be customized and implemented through Regional Action Plans that focus on building regional capacity, partners, products and services to address the seven objectives.

---

[70] www.nmfs.noaa.gov/sfa/laws_policies/economic_social/index.html
[71] www.nmfs.noaa.gov/sfa/management/recreational/documents/noaa_recfish_policy.pdf
[72] www.st.nmfs.noaa.gov/Assets/ecosystems/climate/documents/NCSS_Final.pdf

16

# APPENDIX F.   ALLOCATION REVIEW TRIGGERS

006763APR2019



**Gulf of Mexico Fishery Management Council**

*Managing Fishery Resources in the U.S. Federal Waters of the Gulf of Mexico*

4107 West Spruce St Suite 200
Tampa, Florida  33607  USA
Phone: 813.348.1630 • Toll free: 888.833.1844 • Fax: 813.348.1711
www.gulfcouncil.org

April 23, 2019

Mr. Chris Oliver
Assistant Administrator
NOAA Fisheries
1315 East-West Highway
Silver Spring, MD 20910

Dear Mr. Oliver

The Fisheries Allocation Review Policy (NMFS Policy Directive 01-119) and the associated Procedural Directive on allocation review triggers (NMFS Procedural Directive 01-119-01) request that Regional Fishery Management Councils establish review triggers and present three types of triggers: indicator-based, public interest-based, and time-based criteria.  Councils are expected to identify their allocations subject to the policy and establish review triggers, i.e., select the criteria for initiating fisheries allocation reviews, by August 2019.

The Gulf of Mexico Fishery Management Council (Council) initially reviewed a discussion paper introducing the allocation review policy and procedural directive during its August 2018 meeting.  Follow-up discussions during the October 2018 meeting included an evaluation of the types of triggers considered in the policy and procedural directives and a preliminary identification of Gulf allocations that would be subject to the policy.  Additional discussions, including the formal selection of triggers for relevant Gulf of Mexico allocations and the adoption of the policy on allocation reviews detailed below were held in January 2019 and finalized during the April 2019 Council meeting.  For relevant fisheries in the Gulf of Mexico, the Council adopted the following policy on allocation reviews:

> The Council selects time-based criteria as primary allocation review triggers bolstered by general monitoring of indicators for reallocation justification through the Council's general deliberative process including public input channels as a secondary trigger. Consistent with the adaptive management process suggested in the Allocation Review Policy (referenced above), the incorporation of the Council's public input process as secondary public interest-based review triggers will include the consideration of relevant social, economic, and ecological indicators as an intermediate step before determining whether an allocation review is triggered.  For example, economic tools that might contribute to the development of indicator-based review triggers could include cost-benefit analysis, economic impact analysis, economic efficiency, and others.  Social indicators could include a range of social metrics such as community resilience, vulnerability and well-being.  Examples of ecological criteria include changes in fishery

Amendment 53 - Red Grouper                            244                     Appendix F. Allocation Review
Allocations and Annual Catch Levels and Targets                              Triggers

0009666

status resulting from a stock assessment, undocumented sources of mortality, increases in discards, or changes in species distribution and food web dynamics. Allocations included are:

- red snapper allocations within the recreational sector, i.e., between the federal for-hire and private angling components (with a 4-year timeframe);

- red snapper allocations between the five Gulf states (with a 5-year timeframe);

- gray triggerfish and greater amberjack allocations between the commercial and recreational sectors (with a 6-year timeframe);

- Gulf of Mexico group king mackerel allocations between the recreational and commercial sectors, zones, and gear types (with a 6-year timeframe);

- recreational and commercial allocations of red snapper, gag, red grouper, shallow water grouper IFQ aggregate, deep water grouper IFQ aggregate, and tilefish IFQ aggregate (with a 7-year timeframe);

- black grouper, mutton snapper, yellowtail snapper allocations between the Gulf and South Atlantic Councils (with a 7-year timeframe).

The Council will publish this policy on allocation reviews on its website and looks forward to working with the Southeast Regional Office and Science Center staff to set the schedule for the allocation reviews. The table appended to this letter lists the time intervals to be used with the time-based allocation review triggers and provides anticipated start dates for the initial allocation reviews. In addition to the allocation reviews scheduled based on the review triggers selected above, the Council may initiate supplementary allocation reviews at any time. For example, the Council could initiate an allocation review should relevant new information, e.g., data recalibration, be made available.

Sincerely,

Thomas Frazer, Ph.D.
Council Chair

cc: Alan Risenhoover
    Regional Fisheries Management Councils
    Roy Crabtree, Ph.D.
    Andy Strelcheck
    Jack McGovern, Ph.D.
    Mara Levy
    Clay Porch, Ph.D.

Timeframes for the time-based allocation review triggers and expected starts of initial reviews

| Allocations | Time Intervals | Expected start of the first review |
|---|---|---|
| Recreational red snapper ACL allocation between the private angling and federal for-hire components | 4 years | April 2023 |
| Red snapper allocations between the Gulf states | 5 years | April 2024 |
| Gray triggerfish and greater amberjack allocations between the recreational and commercial sectors | 6 years | April 2025 |
| Gulf of Mexico group king mackerel allocations between the recreational and commercial sectors, zones, and gear types | 6 years | April 2025 |
| Recreational and commercial allocations of red snapper, gag, red grouper, shallow water grouper IFQ aggregate, deep water grouper IFQ aggregate, and tilefish IFQ aggregate | 7 years | April 2026 |
| Black grouper, mutton snapper, yellowtail snapper allocations between the Gulf and South Atlantic Councils | 7 years | April 2026 |

# APPENDIX G.   ACL/ACT CONTROL RULE FOR THE RECREATIONAL SECTOR

| | | | | | Red Grouper | |
|---|---|---|---|---|---|---|
| As of 05/21/2020 | | | | | | |
| **ACL/ACT Buffer Spreadsheet** | | version 4.1 - April 2011 | | | **Sector: Recreational** | |
| sum of points | 2 | | | | **Data: 2016-2019** | |
| max points | 5.0 | | | Buffer between ACL and ACT (or ABC and ACL) | Unweighted | 8 |
| **Min. Buffer** | 0 | **min. buffer** | User adjustable | | **Weighted** | **9** |
| Max Unw.Buff | 19 | max unwt. Buff | | | | |
| **Max Wtd Buff** | 25 | **max wtd. buffer** | User adjustable | | | |
| | | | | | | Element |
| | Component | Element score | Element | | Selection | result |
| | Stock assemblage | 0 | This ACL/ACT is for a single stock. | | x | 0 |
| | | 1 | This ACL/ACT is for a stock assemblage, or an indicator species for a stock assemblage | | | |
| | | | | | | |
| | Ability to | 0 | Catch limit has been exceeded 0 or 1 times in last 4 years | | x | 0 |
| | Constrain Catch | 1 | Catch limit has been exceeded 2 or more times in last 4 years | | | |
| | | | | | | |
| | | | For the year with max. overage, add 0.5 pts. For every 10 percentage points (rounded up) above ACL | | 0.0 | |
| | | | Not applicable (there is no catch limit) | | | |
| | | | | | | |
| | | | Apply this component to recreational fisheries, not commercial or IFQ fisheries | | | |
| | Precision of | 0 | Method of absolute counting | | | 2 |
| | Landings Data | 1 | MRIP proportional standard error (PSE) <= 20 | | | |
| | Recreational | 2 | MRIP proportional standard error (PSE) > 20 | | x | |
| | | | Not applicable (will not be included in buffer calculation) | | | |
| | | | | | | |
| | Precision of | | Apply this component to commercial fisheries or any fishery under an IFQ program | | | not applicable |
| | | 0 | Landings from IFQ program | | | |
| | Landings Data | 1 | Landings based on dealer reporting | | | |
| | Commercial | 2 | Landings based on other | | | |
| | | | Not applicable (will not be included in buffer calculation) | | x | |
| | | | | | | |
| | Timeliness | 0 | In-season accountability measures used or fishery is under an IFQ | | x | 0 |
| | | 1 | In-season accountability measures not used | | | |
| | | | | | | |
| | | | | | Sum | 2 |
| | **Weighting factor** | | | | | |
| | | Element weight | Element | | Selection | Weighting |
| | Overfished status | 0 | 1. Stock biomass is at or above $B_{OY}$ (or proxy). | | | 0.2 |
| | | 0.1 | 2. Stock biomass is below $B_{OY}$ (or proxy) but at or above $B_{MSY}$ (or proxy). | | | |
| | | 0.2 | 3. Stock biomass is below $B_{MSY}$ (or proxy) but at or above minimum stock size threshold (M | | x | |
| | | 0.3 | 4. Stock is overfished, below MSST. | | | |
| | | 0.3 | 5. Status criterion is unknown. | | | |

*2016-2019 landings data from NOAA Fisheries ACL Monitoring Dataset.  Accessed May 8, 2020.

| ACL/ACT Control Rule Data | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Sector | Landings | PSE | ACL | Exceeded ACL? | Buffer | Data Used |
| 2016 | Recreational | 1,373,337 | 21.6 | 2,580,000 | No | | MRIP-APAIS |
| 2017 | Recreational | 739,073 | 21 | 2,580,000 | No | 9% | MRIP-APAIS |
| 2018 | Recreational | 913,978 | 21.5 | 2,580,000 | No | | MRIP-APAIS |
| 2019* | Recreational | 725,105 | 21.6 | 1,000,000 | No | | MRIP-APAIS |

Source:  Source:  SERO ACL Monitoring dataset, retrieved 8 May 2020 (recreational).  *2019 recreational data are preliminary.

Amendment 53 - Red Grouper                247                Appendix G. ACL/ACT
Allocations and Annual Catch Levels and Targets        Control Rule for the Recreational Sector

0009669

# APPENDIX H.   ACL/ACT CONTROL RULE FOR THE COMMERCIAL SECTOR

| | | | | | Red Grouper | |
|---|---|---|---|---|---|---|
| As of 05/21/2020 | | | | | | |
| **ACL/ACT Buffer Spreadsheet** | | version 4.1 - April 2011 | | | Sector: Commercial | |
| sum of points | 0 | | | | Data: 2016-2019 | |
| max points | 5.0 | | Buffer between ACL and ACT (or ABC and ACL) | Unweighted | | |
| **Min. Buffer** | 0 | min. buffer | User adjustable | | Weighted | 0 |
| Max Unw.Buff | 19 | max unwt. Buff | | | | |
| **Max Wtd Buff** | 25 | max wtd. buffe | User adjustable | | | |

| | Component | Element score | Element | | Selection | Element result |
|---|---|---|---|---|---|---|
| | Stock assemblage | 0 | This ACL/ACT is for a single stock. | | x | 0 |
| | | 1 | This ACL/ACT is for a stock assemblage, or an indicator species for a stock assemblage | | | |
| | | | | | | |
| | Ability to | 0 | Catch limit has been exceeded 0 or 1 times in last 4 years | | x | 0 |
| | Constrain Catch | 1 | Catch limit has been exceeded 2 or more times in last 4 years | | | |
| | | | | | | |
| | | | For the year with max. overage, add 0.5 pts. For every 10 percentage points (rounded up) above ACL | | 0.0 | |
| | | | Not applicable (there is no catch limit) | | | |
| | | | | | | |
| | | | Apply this component to recreational fisheries, not commercial or IFQ fisheries | | | |
| | Precision of | 0 | Method of absolute counting | | | not applicabl |
| | Landings Data | 1 | MRIP proportional standard error (PSE) <= 20 | | | |
| | Recreational | 2 | MRIP proportional standard error (PSE) > 20 | | | |
| | | | Not applicable (will not be included in buffer calculation) | | x | |
| | | | | | | |
| | | | Apply this component to commercial fisheries or any fishery under an IFQ program | | | |
| | Precision of | 0 | Landings from IFQ program | | x | 0 |
| | | 1 | Landings based on dealer reporting | | | |
| | Landings Data | 2 | Landings based on other | | | |
| | Commercial | | Not applicable (will not be included in buffer calculation) | | | |
| | | | | | | |
| | Timeliness | 0 | In-season accountability measures used or fishery is under an IFQ | | x | 0 |
| | | 1 | In-season accountability measures not used | | | |
| | | | | | Sum | 0 |

| | Weighting factor | Element weight | Element | | Selection | Weighting |
|---|---|---|---|---|---|---|
| | Overfished statu | 0 | 1. Stock biomass is at or above $B_{OY}$ (or proxy). | | | 0.2 |
| | | 0.1 | 2. Stock biomass is below $B_{OY}$ (or proxy) but at or above $B_{MSY}$ (or proxy). | | | |
| | | 0.2 | 3. Stock biomass is below $B_{MSY}$ (or proxy) but at or above minimum stock size threshold (M | | x | |
| | | 0.3 | 4. Stock is overfished, below MSST. | | | |
| | | 0.3 | 5. Status criterion is unknown. | | | |

*2016-2019 landings data from NOAA Fisheries ACL Monitoring Dataset.  Accessed May 8, 2020.

| ACL/ACT Control Rule Data | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Sector | Landings | PSE | ACL | Exceeded ACL? | Buffer | Data Used |
| 2016 | Commercial | 4,497,582 | 0 - IFQ | 7,780,000 | No | | IFQ |
| 2017 | Commercial | 3,328,271 | 0 - IFQ | 7,780,000 | No | 0% | IFQ |
| 2018 | Commercial | 2,363,280 | 0 - IFQ | 7,780,000 | No | | IFQ |
| 2019 | Commercial | 2,037,046 | 0 - IFQ | 3,000,000 | No | | IFQ |

Source:  SEFSC Commercial ACL dataset, retrieved 15 November 2019 (commercial).

Amendment 53 - Red Grouper                248                Appendix H. ACL/ACT
Allocations and Annual Catch Levels and Targets                Control Rule for the Commercial Sector

0009670

# APPENDIX I.   MODIFICATION OF MANAGEMENT FOR RED GROUPER IN THE GULF

**Modification of Management for Red Grouper in the Gulf of Mexico: Amendment 53**

Jeff Pulver; March 23, 2021

LAPP/DM Branch

Southeast Regional Office

**Modeling Season Length for the Recreational Sector**

Landings data for Gulf of Mexico red grouper were obtained from the Southeast Fisheries Science Center (SEFSC) recreational Annual Catch Limit (ACL) dataset obtained in May of 2020.  The current annual catch target (ACT) is being tracked using Marine Recreation Information Program (MRIP) Coastal Household Telephone Survey (CHTS) equivalent landings. However, this analysis uses MRIP Fishing Effort Survey (FES) data to match the same currency (MRIP-FES) as the most recent assessment (SEDAR 61).  Future landings were determined from taking a three-year average of the three most recent years of complete MRIP-FES data, as the most recent data are assumed to be the best approximation of future harvest.  Additionally, the current 2-red grouper per angler bag limit became effective on May 7, 2015 precluding using landings prior to 2016 without adjusting for the previously higher bag limits.  Recreational landings are collected in two-month increments called waves (e.g., January and February = wave 1, March and April = wave 2, etc.).  Landings from 2017 through 2019 and a prediction of future landings (average landings from 2017-2019) by wave are shown in Figure 1.  Season lengths were projected with upper and lower 95% confidence intervals for each recreational ACL and ACT being considered in Amendment 53 (Tables 1 and 2).  The predicted closure dates for the ACL and ACT options span from July 23 to no closure (Tables 1 and 2).  There is considerable uncertainty in the predictions since the confidence intervals range from early June to no closure needed (Table 1; Figure 2).

Amendment 53 - Red Grouper            249            Appendix I. Modification of
Allocations and Annual Catch Levels and Targets            Management for Red Grouper in the Gulf

0009671



**Figure 1.** Gulf of Mexico recreational landings by two-month wave and predicted future landings. Source: SEFSC MRIP-FES Recreational ACL Dataset (May 8, 2020).

Amendment 53 - Red Grouper                250                Appendix I. Modification of
Allocations and Annual Catch Levels and Targets                Management for Red Grouper in the Gulf

0009672

**Table 1**.  The predicted closure dates for each recreational ACL (million pounds [mp] gutted weight [gw]) currently in Amendment 53 generated from predicted landings with 95% confidence intervals.

| Action 1 Alternative | ACL | Predicted Closure Date | Season Length (95% Confidence Interval) |
|---|---|---|---|
| Alternative 1 | 2.10 | No Closure | October 25 - No Closure |
| Alternative 2 | 1.18 | August 8 | June 13 - No Closure |
| Alternative 3 | 1.73 | December 19 | August 15 - No Closure |
| Alternative 4 | 1.70 | December 13 | August 11 - No Closure |
| Alternative 5 | 1.72 | December 17 | August 14 - No Closure |
| Alternative 6 | 1.44 | October 11 | July 10 - No Closure |

Source: SEFSC MRIP-FES Recreational ACL Dataset (May 8, 2020).

**Table 2**.  The predicted closure dates for each recreational ACT (mp gw) currently in Amendment 53 generated from predicted landings with 95% confidence intervals.

| Alternatives (Action 2 – Action 1) | ACL | Buffer | ACT | Predicted Closure Date | Season Length (95% Confidence Interval) |
|---|---|---|---|---|---|
| 1-1 | 2.10 | 8% | 1.93 | No Closure | Sep 15 - No Closure |
| 1-2 | 1.18 | 8% | 1.09 | July 26 | June 5 - No Closure |
| 2-2; 3-2 | 1.18 | 9% | 1.07 | July 23 | June 3 - No Closure |
| 1-3 | 1.73 | 8% | 1.59 | November 20 | July 29 - No Closure |
| 2-3; 3-3 | 1.73 | 9% | 1.57 | November 16 | July 26 - No Closure |
| 1-4 | 1.70 | 8% | 1.56 | November 14 | July 25 - No Closure |
| 2-4; 3-4 | 1.70 | 9% | 1.55 | November 12 | July 24 - No Closure |
| 1-5 | 1.72 | 8% | 1.58 | November 18 | July 27 - No Closure |
| 2-5; 3-5 | 1.72 | 9% | 1.57 | November 16 | July 26 - No Closure |
| 1-6 | 1.44 | 8% | 1.32 | August 27 | June 27 - No Closure |
| 2-6; 3-6 | 1.44 | 9% | 1.31 | August 25 | June 26 - No Closure |

Source: SEFSC MRIP-FES Recreational ACL Dataset (May 8, 2020).

Amendment 53 - Red Grouper          251          Appendix I. Modification of
Allocations and Annual Catch Levels and Targets          Management for Red Grouper in the Gulf

0009673



**Figure 2.**  Cumulative predicted Gulf of Mexico red grouper recreational landings with 95% confidence interval (dashed lines).  Source: SEFSC MRIP-FES Recreational ACL Dataset (May 8, 2020).

As with most predictions, the reliability of the results is dependent upon the accuracy of their underlying data and input assumptions.  We have attempted to create a realistic baseline as a foundation for comparisons, under the assumption that projected future landings will accurately reflect actual future landings.  Uncertainty exists in this projection, as economic conditions, weather events, changes in catch-per-unit effort, fisher response to management regulations, and a variety of other factors may cause departures from this assumption.

Amendment 53 - Red Grouper                    252                    Appendix I. Modification of
Allocations and Annual Catch Levels and Targets                    Management for Red Grouper in the Gulf

0009674

# ADMINISTRATIVE

# RECORD NO. 201

RECORD OF DECISION
for the
FINAL ENVIRONMENTAL IMPACT STATEMENT (EIS)
on
AMENDMENT 53 TO THE FISHERY MANAGEMENT PLAN (FMP) FOR THE REEF FISH
RESOURCES OF THE GULF OF MEXICO (Reef Fish FMP)
(Amendment 53)

National Marine Fisheries Service
Southeast Region
St. Petersburg, Florida
March 2022

**Introduction**

This Record of Decision (ROD) documents the determination by NOAA's National Marine
Fisheries Service (NMFS), on behalf of the Secretary of Commerce (Secretary), to approve
Amendment 53. Amendment 53 addresses the results of the most recent Southeast Data,
Assessment, and Review (SEDAR) 61 stock assessment for Gulf of Mexico (Gulf) red grouper
and related catch level advice from the Gulf of Mexico Fishery Management Council's (Council)
Scientific and Statistical Committee (SSC). That assessment was completed in September 2019
and incorporated data through 2017, including updated recreational catch and effort data from
the Marine Recreational Information Program (MRIP) Access Point Angler Intercept Survey
(APAIS) and Fishing Effort Survey (FES), which indicate recreational landings are larger than
previously calculated. The assessment concluded that the stock is not overfished or undergoing
overfishing, but the spawning stock biomass (SSB) remains below the target level and, therefore,
reductions in harvest are necessary. The stock assessment also incorporated updated recreational
catch and effort data, which shows that historic recreational harvest was greater than previously
calculated. The Council developed Amendment 53 to modify the Gulf red grouper sector
allocations and catch limits to ensure that the historical participation by the recreational and
commercial sectors is accurately reflected by the sector catch limits, and that recreational catch
limits are consistent with the data used to monitor recreational landings and trigger
accountability measures (AM)

After reviewing the impacts of several allocation alternatives, including the status quo, the
proposed revise the red grouper allocation using the same time methodology used to establish the
existing allocation current percentages, but to incorporate the updated and more accurate
estimates of commercial and recreational harvest as reflected in the Southeast Fisheries Science
Center's (SEFSC) Annual Catch Limit (ACL) monitoring datasets. The Council determined that
this allocation is fair and equitable and provides the greatest net economic benefits. These
measures are in accordance with the procedures prescribed in the Magnuson-Stevens Fishery
Conservation and Management Act (Magnuson-Stevens Act). This ROD is issued pursuant to
the National Environmental Policy Act (NEPA), the Council on Environmental Quality (CEQ)
NEPA regulations at 40 CFR Parts 1500-1508, and NOAA's Administrative Order NAO 216-6A,
Sections 3 (Determining the Proper Level of NEPA Analysis and Preparing an Environmental
Impact Statement [EIS]). The decision to approve Amendment 53 is based on analyses in the

0009684

final EIS prepared in association with this action and in accordance with NEPA.

*Background*

The Magnuson-Stevens Act requires NMFS and regional fishery management councils to prevent overfishing, and achieve, on a continuing basis, the optimum yield (OY) from federally managed fish stocks. These mandates are intended to ensure fishery resources are managed for the greatest overall benefit to the nation, particularly with respect to providing food production and recreational opportunities, and protecting marine ecosystems.

At its June 2021 meeting, the Council approved Amendment 53 for review by the Secretary of Commerce by a vote of 12-5. Amendment 53 would revise the allocation of the red grouper catch between the recreational and commercial sectors, and modify the overfishing limit (OFL), acceptable biological catch (ABC), sector ACLs, and sector annual catch targets (ACT). This action is being taken in response to the most recent SEDAR 61 stock assessment and is intended to ensure that the historical participation by the recreational and commercial sectors are accurately reflected, and that recreational catch levels are consistent with the data used to monitor recreational landings and trigger accountability measures. Specifically, Amendment 53 and the proposed rule would:

- Revise the Gulf red grouper allocation from 76% commercial and 24% recreational to 59.3% commercial and 40.7% recreational.
- Increase the recreational ACT buffer from 8% to 9% and set new sector ACTs.
- Modify the OFL, ABC, stock ACL, and sector ACLs and ACTs as provided in Table 1.

**Table 1.** Current and proposed OFLs, ABCs, stock ACL, sector ACLs, and sector ACTs in million pounds (mp) gutted weight (gw). Note that current recreational ACLs and ACTs are in Marine Recreational Information Program (MRIP) Coastal Household Telephone Survey (CHTS) units and the proposed recreational ACLs and ACTs are in MRIP Fishing Effort Survey (FES) units.

|  | OFL | ABC | Stock (Total) ACL | Commercial ACL | Recreational ACL | Commercial ACT | Recreational ACT |
|---|---|---|---|---|---|---|---|
| **Current** | 14.16 | 13.92 | 4.16 | 3.16 | 1.00 | 3.00 | 0.92 |
| **MRIP-FES equivalent** |  |  | (5.26) |  | (2.10) |  | (1.93) |
| **Proposed** | 4.66 | 4.26 | 4.26 | 2.53 | 1.73 | 2.40 | 1.57 |

The current stock ACL is equal to the 2017 landings and was implemented at the Council's request for a reduction in catch levels through an emergency rule in May 2019, and then made permanent through a framework action implemented in October 2019. This reduction was informed by concerns of fishermen who expressed to the Council in 2018, about the condition of the red grouper stock and the results of an interim analysis the SEFSC conducted while awaiting completion of the 2019 assessment. The SSC did provide a new ABC based on the analysis,

0009685

which suggested the stock might be in decline, but recommended that the Council reduce the 2019 stock ACL from 10.70 million pounds (mp) gutted weight (gw) to 4.60 mp gw. In response, the Council further reduced the stock ACL to equal the 2017 landings, noting the uncertain impact of the severe red tide conditions that occurred in the summer and fall of 2018 off the Florida west coast.

MRIP began incorporating a new survey design for APAIS in 2013 and replaced the Coastal Houshold Telephone Survey (CHTS) with FES in 2018. Prior to the implementation of MRIP, recreational landings estimates were generated using the Marine Recreational Fisheries Statistics Survey (MRFSS). As explained in Section 1.1 of Amendment 53 (pages 4-5), total recreational fishing effort estimates generated from MRIP–FES are generally higher than both the MRFSS and MRIP-CHTS estimates. For example, the current red grouper recreational ACL is based on 2017 landings and was estimated as 1.00 mp gw in MRIP-CHTS units. The same 2017 landings estimated using the scientifically-certified MRIP-FES survey methodology units is 2.10 mp gw (Table 1), or 1.1 mp and 110% larger than the old methodology for calculating catch. Based on the 2019 stock assessment findings that red grouper SSB is below the target level of 30% of the spawning potential ratio (SPR), where SPR is the ratio of SSB to its unfished state, the SSC recommended an OFL of 5.35 mp gw and an ABC of 4.9 mp gw. These catch levels were derived using the current allocation of 76% percent commercial and 24% recreational. Because these catch levels were derived from an assessment that incorporated MRIP-FES based catch estimates, the recommended ABC appears to be larger than the current stock ACL of 4.16 mp gw. However, because recreational harvest will now be monitored in MRIP-FES units, which are higher than estimates from the MRIP-CHTS survey, this change would actually result in a decrease in allowable harvest when compared to the stock ACL in MRIP-FES units of 5.26 mp gw (Table 1).

The 2019 assessment and related OFL and ABC recommendations reflect status quo sector allocations for red grouper. How fish are allocated between the two sectors impacts the catch level projections produced by the assessment. Compared to the commercial sector, the recreational sector selects for smaller and younger fish. Therefore, increasing allocation to that sector results in more encounters and higher overall discards, changing the age-specific population structure of the stock (100 years into the future), which leads to a lower maximum sustainable yield and annual OFL. The ABC and stock ACL reflect the amount of fish available for food production and recreational opportunities, both of which the Council and NMFS must consider in evaluating whether a fishery is achieving optimum yield on a continuing basis. Because the allocation affects the OFL projections, the Council asked the SSC to review alternative catch level projections based on allocation alternatives that incorporated MRIP-FES data into several time series (1986-2005, 1986-2009, and 1986-2018), as well as an alternative that retained the status quo commercial ACL. The SSC reviewed these alternative catch level projections based on the allocation scenarios and affirmed its conclusion that the SEDAR 61 (2019) assessment, which included MRIP-FES recreational landings, represented the best scientific information available. The SSC also determined that all of the alternative catch level projections were acceptable, and deferred to the Council's decision on the appropriate allocation.

The Council considered six sector allocation/catch limit alternatives: maintaining the current

0009686

sector allocation, as well as the catch limits which are in MRIP-CHTS units; maintaining the current sector allocation and revising the catch limits consistent with MRIP-FES units; revising the sector allocations based on landings data from the three different time series; and maintaining the current commercial ACL and allocating the remaining pounds to the recreational sector. All of the resulting OFLs and ABCs are within the range recommended by the SSC. The Council ultimately proposed to reallocate red grouper using the same time series of data used to set the current allocation (1986-2005), but to incorporate the updated MRIP-FES recreational landings data. The Council determined that this alternative was most equitable approach because it best represents what was actually happening in the fishery during the years used to establish the initial allocation. However, the impact of all three-time series landing alternatives was similar, with resulting allocations varying by approximately one percent.

The Council's proposed reallocation alterative would reduce the commercial and recreational ACLs by similar percentages (approximately 20% and 18%, respectively). If the status quo allocation were maintained, then the recreational sector would be required to assume the full burden of the catch reduction proposed in Amendment 53, while the commercial sector ACL is increased. Although this would increase food production, it would significantly decrease recreational opportunities, potentially reducing the recreational season by over four months. Similarly, maintaining the current commercial ACL results in the recreational sector bearing the impacts of all of the reduction in harvest that is necessary for the stock to build back to the target biomass. These impacts are demonstrated in the recreational season closure analysis as well as the economic analysis, the latter indicating that the Council's preferred reallocation alternative would result in the greatest net economic benefits to the Nation.

Action 2 would adjust the commercial and recreational ACTs because of the changes to the other catch levels. The Council considered three alternatives: no action; apply the commercial and recreational ACT/ACL control rules to determine the ACT buffers of 0% and 9%, respectively; and maintaining the 5% buffer between the ACL and ACT for the commercial sector and apply the ACL/ACT control rule for the recreational sector. The Council selected the latter alternative and maintained the 5% buffer between the ACL and ACT for the commercial sector to allow for multi-use shares in the individual fishing quota program. For the recreational sector, the Council applied its ACL/ACT Control Rule, which indicated that the buffer between the ACL and ACT should increase from 8% to 9%. The proposed ACTs are shown in Table 1.

*Scoping Process and Public Involvement*

Through the EIS, as documented in this ROD, the Council and NMFS have analyzed the various alternatives, the associated environmental impacts, and the extent to which the impacts could be mitigated, in relation to the objectives of the proposed action. As summarized below, NMFS and the Council have considered public and agency comments received during the various review periods, including the review period on the draft EIS. Consequently, NMFS concludes that all practical means to avoid, minimize, or compensate for environmental harm from the proposed action have been adopted, and the public has had adequate opportunity for involvement, input, and comment during the deliberative phases of amendment/EIS development.

The Council submitted Amendment 53 and its integrated EIS to NMFS on September 24, 2021.

0009687

The range of actions and alternatives considered in the EIS were based on information derived from public hearings and several other public input opportunities.  Three public hearing meetings and two webinars were held in June 2021.  Opportunity for further public input was provided during each Council meeting at which Amendment 53 was discussed.  A notice of intent to prepare an EIS was published in the *Federal Register* on April 20, 2020 (85 FR 22137).  The comment period was open until May 21, 2020, and 16 comments were received.  These comments may be reviewed at https://www.regulations.gov/document/NOAA-NMFS-2020-0062-0001.  Comments from recreational fishermen either wanted recreational regulations to stay the same or become more restrictive, while commercial fishermen and organizations did not feel reallocation was appropriate at this time and questioned the use of MRIP-FES data as the basis for recreational landings.  The notice of availability (NOA) of the Draft EIS published on May 14, 2021 (86 FR 26514).  The comment period was open until June 28, 2021, and 13 comments were received including comments from the Environmental Protection Agency (EPA).  These comments may be viewed at https://www.regulations.gov/docket/NOAA-NMFS-2021-0098.

Anglers and a sport fishing association generally supported revising the allocation to address a technical change in how recreational landings were estimated.  Commercial fishermen and commercial fishing organizations supported no change in the current allocation and had several comments on the draft EIS.  NMFS responded to these comments in the final EIS by adding additional information, and explaining the approach NMFS and the Council used to revise the allocation and set the OFL, ABC, ACLs and ACTs.  The NOA of the final EIS published in the *Federal Register* on January 7, 2022 (87 FR 964).  The cooling off period for the EIS ended February 6, 2022.  NMFS received no comments during the cooling off period other than comments from EPA who did not identify any significant environmental impacts associated with the actions in Amendment 53 and its integrated EIS.

*The Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act)*
NMFS received a minority report signed by four Council members with the final version of Amendment 53 submitted by the Council.  NMFS published an NOA for Amendment 53 in the *Federal Register* on December 9, 2021 (86 FR 70078), and the comment period ended on February 7, 2022.  A proposed rule published in the *Federal Register* on January 19, 2022, with a comment period ending February 18, 2022 (87 FR 2737).  NMFS received 81 comments on the NOA and 102 comments on the proposed rule including signed letters as part of a petition.  The petition, which opposed Amendment 53, had 2,588 signatures.  The minority report raises several objections to the preferred allocation in Amendment 53, including allegations that the preferred allocation violates several provisions of the Magnuson-Stevens Act.  These issues were also raised in comments submitted on the draft EIS, as well as those submitted on the NOA and proposed rule.  Many of these comments were addressed in the final EIS and so will not be addressed here.  These include:
- Amendment 53 is inconsistent with national standards (NS) 4 and 9,
- The Council was not able to review any comments or concerns submitted to NMFS on the draft EIS after taking final action,
- NMFS has not been forthcoming about how it converted the historical recreational landings estimates for red grouper used to develop reallocation alternatives in Amendment 53.

- Reallocation would reward recreational overharvesting,
- Reallocation increases the risk of overfishing and does not allow the fishery to harvest OY,
- Amendment 53 fails to assess the extensive economic harms of reallocation on the commercial sector,
- The bycatch practicability analysis fails to indicate the recreational sector is responsible for more dead discards and that reallocation to the recreational sector will increase dead discards,
- Commercial landings from the SEFSC ACL monitoring database are different than landings from SEDAR 12,
- The SSC has never determined that the revised MRIP-FES landings estimates constitute the best scientific information available,
- Amendment 53 states the recreational ACL has only been exceeded in 2013; however, the revised MRIP-FES-based landings indicate that the recreational sector exceeded its catch limits for at least two years in the base period, 2004 and 2005,
- The MRIP-FES landings estimates for historical landings are highly uncertain, dated, and should not be used for reallocation purposes,
- MRIP-FES does not provide realistic estimates of historical landings because the fishery has changed over time,
- Reallocation will harm both the commercial and recreational sectors, Amendment 53 is an attempt by the recreational sector to reallocate the fishery when the action is really meant as a technical correction to the allocation, and
- Amendment 53 is based on is dated information because the data used in SEDAR 61 only go through 2019.

A comment relative to NEPA suggested that NMFS used an inappropriate no action alternative for Action 1, did not look at a sufficient range of alternatives for Action 1, and did not take a hard look at the environmental impacts. With respect to the no action alternative, because a red grouper management system is in place, "the 'no action' alternative may be thought of in terms of continuing with the present course of action until that action is changed."[1] Thus, the no action alternative (Alternative 1) maintains the current allocation and catch levels in MRIP-CHTS units. However, selecting this alternative would not be consistent with the requirements of the Magnuson-Stevens Act because the best scientific information available, which the SSC used to make its catch level recommendations, indicates the OFL and ABC (and consequently ACLs) need to be revised. With respect to a reasonable range of alternatives, six alternatives were considered in Action 1 including a no action alternative. These alternatives considered maintaining the current sector allocation percentages, adjusting the allocation percentages by maintaining the current commercial ACL, and adjusting the allocation percentages using three different time series in keeping with amendment's need to ensure the allocation accurately reflects historical participation of both sectors. In the analysis of these alternatives as well as Action 2 alternatives, NMFS did take a hard look at the environmental impacts, explaining that a shift in allocation to the recreational sector will likely have the most impact on red grouper

---

[1] Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations
https://www.energy.gov/nepa/downloads/forty-most-asked-questions-concerning-ceqs-national-environmental-policy-act

0009689

discards because of how that sector operates. In sum, the alternatives addressed the purpose and need laid out in the EIS, identified alternative ways of meeting the need, analyzed the physical, biological, economic, social, and administrative impacts to the human environment of each alternative, and using the results of these analyses, determined which alternative to select as preferred.

A comment asserted that NMFS improperly made changes to Amendment 53 after the Council voted to submit the amendment for review and implementation and that these changes include post hoc justifications related to arguments made in the minority report. At its June 2021 meeting, the Council expressly authorized staff to make any required editorial changes to the amendment. Further, Amendment 53 in an integrated document that incorporates the requirements of the MSA, as well as other applicable laws such as NEPA and the Regulatory Flexibility Act. As the federal agency responsible for NEPA compliance, NMFS published a draft EIS and responded to comments on the draft in the final EIS. As those responses indicate, NMFS used comments submitted on the draft EIS to improve the final EIS. With respect to the assertion that any changes were post hoc justifications, NMFS is responsible for approving or disapproving Amendment 53, and any changes to the document were made before that decision occurred.

A comment indicated that Amendment 53 violates Section 303(a)(15) of the Magnuson-Stevens Act and NS 1's requirement to achieve OY on a continuing basis. With respect to Section 303(a)(15), the comment states that catch, as defined in the NS 1 Guidelines, includes landed fish and dead discards.[2] Because the ACLs proposed in Amendment 53 are landed fish, the comment suggests the ACLs violate the definition of catch. However, the NS 1 Guidelines at 600.310(f)(3)(i) state that the ABC, which the ACLs are based on, should be expressed in terms of catch, but may be expressed in terms of landings as long as estimates of bycatch and any other fishing mortality not accounted for in the landings are incorporated into the determination of ABC. The ABCs recommended by the SSC were derived from SEDAR 61 and included discards and other sources of mortality (e.g., red tide). In fact, it is in the consideration of discard estimates that ABCs differ between allocation scenarios used for the alternatives. With respect to NS 1, the response to comment 4 on the Draft EIS explains how Amendment 53 is consistent with the requirement to achieve OY on a continuing basis.

A comment indicated that Amendment 53 is inconsistent with NS 2 because the foundation of the revised allocation is based on using MRIP-FES landing estimates that have not been fully resolved as the best scientific available information. The SEDAR 61 stock assessment incorporated landings data from the MRIP-FES survey, which is considered a better survey than the prior MRIP-CHTS survey. As discussed in the Section 1.1 of the EIS, the SSC accepted SEDAR 61 (2019) as the best scientific information available, specifically acknowledging that it utilizes MRIP-FES recreational landings estimates. The motion passed at the January 2020 SSC Meeting reads: "Given the SEDAR 61 red grouper stock assessment, which was accepted by the SSC as the best scientific information available and utilized the FES recreational landings estimates, the time series of 1986-2005, 1986-2009, 1986-2018 yield scientifically valid estimates of OFL and ABC as found in the following table." The table referenced in the motion is Table 1.1.3 in the EIS. In addition, the SEFSC certified that Amendment 53 is based on the

---

[2] 50 C.F.R. § 600.310(f)(1)(i).

0009690

best available science in a memorandum dated September 8, 2021.

A comment indicated that reallocation violates NS 5 because there is no conservation crisis that justifies reducing the quota available to the commercial sector, which more efficiently uses the resource. National Standard 5 requires that conservation and management measures, "where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose." The NS 5 Guidelines explain that "[g]iven a set of objectives for the fishery, an FMP should contain management measures that result in as efficient a fishery as is practicable or desirable." 50 C.F.R. § 600.330(b). As explained above, the preferred allocation best reflects the historical participation by the recreational and commercial sectors, fairly and equitably distributes the needed reduction in catch between the sectors, and provides the greatest net economic benefits. Therefore, Amendment 53 is consistent with the requirement to, where practicable, consider efficiency in the utilization of fishery resources.

Several comments suggested that Amendment 53 violates NS 8. Some of these comments equate a sector to a fishing community, which is inconsistent with the definition of fishing community under NS 8 and the Magnuson-Stevens Act. Others indicate that Amendment 53 would benefit some fishing communities at the expense of others or that the analysis does not acknowledge that some communities would be adversely affected. However, given the reduction in the total ACL and sector ACLs, no communities would be expected to be better off because of the actions in Amendment 53 and most if not all communities are expected to be adversely affected. Other comments indicate that preferred **Alternative 3** under Action 1 in Amendment 53 would maximize adverse economic impacts to fishing communities associated with the commercial sector. While that is likely true within the context of the considered alternatives, as the expected reduction in commercial gross revenue is the largest among the considered alternatives, the differences in the gross revenue reductions between **Alternatives 4** and **5** and **Preferred Alternative 3** are relatively small, and thus so would be the differences in economic impacts on these communities. Other comments suggest that Amendment 53 does not identify which communities would be adversely affected by Amendment 53. However, those communities are identified in section 3.5 of the document.

A comment suggested there is no standardized bycatch reporting methodology (SBRM) for the recreational sector of the Gulf reef fish fishery as required by the Magnuson-Stevens Act. NMFS and the Council recently completed a review of SBRMs for the Gulf and Joint Gulf-South Atlantic Fishery Management Plans. NMFS and the Council determined that the SBRMs meet the purpose of section 303(a)(11) of the Magnuson-Stevens Act, as described in 50 C.F.R § 600.1600, by specifying a standardized reporting methodology to collect, record, and report bycatch data in a fishery that, in conjunction with other relevant sources of information, are used to assess the amount and type of bycatch occurring in the fishery and inform the development of conservation and management measures that, to the extent practicable, minimize bycatch and bycatch mortality. The Council and NMFS further determined that the SBRMs met the four requirements under 50 C.F.R. § 600.1610(a)(2): (1) the methodology must address information about the characteristics of the bycatch occurring in the fishery; (2) the methodology must be feasible from cost, technical, and operational perspectives; (3) the methodology must be

0009691

designed so that the uncertainty associated with the resulting bycatch data can be described, quantitatively or qualitatively, and the methodology must seek to minimize uncertainty; and (4) the methodology must address how the data resulting from the methodology are used to assess the amount and type of bycatch occurring in the fishery.  The review describes the SBRMs currently used by NMFS and the Gulf states for the recreational sector of the reef fish fishery.  The review recognized that all recreational data sources have a high level of uncertainty because self-reported data are not considered overly reliable and not all recreational fishermen are surveyed, and the Council recommended evaluation and coordination with state and federal partners to improve bycatch data collection in the future.

A commenter asked why the Florida Fish and Wildlife Conservation Commission's (FWC) Gulf Reef Fish Survey (GRFS) was not used for allocation.  The Council did look at GRFS landings at its June 2020 meeting.  Although discussed in Amendment 53, this survey was not used to set allocation because they were not provided or reviewed for consideration for the SEDAR 61 assessment.

Several comments indicated that under **Preferred Alternative 3**, the commercial sector loses 1.19 mp gw of quota compared to maintaining the existing allocations under **Alternative 2** while the recreational sector only gains an increase of 550,000 pounds.  This leaves the remaining 640,000 pounds to cover increased dead discards from the recreational sector.  In addition, a comment questioned where the ABCs came from for the different allocations and what methodology was used to estimate dead discards that went into these calculations.  With respect to the 640,000 pounds difference, there is an incorrect assumption that the difference are all dead discards by the recreational sector and a misunderstanding of how projections are parameterized and conducted.  Section 5 of the SEDAR 61 Stock Assessment Report describes the standard projection approach and the model assumptions as does also the presentation[3] given by the SEFSC at the September 2019 SSC meeting.  To answer both comments, the projections assume that fishing behavior will remain the same as the terminal year of the assessment (2017), including fleet-specific selectivity patterns, discard mortality, and retention.  The stock dynamics (including numbers-at-age and biomass-at-age) are projected forward in time 100 years under these assumed conditions, and stock status and catch advice is derived using equilibrium conditions (i.e., when the stock abundance levels off).  The catch advice for each projection scenario considered in Action 1 (with the exception of **Alternative 6**), is specific to a set of assumptions made during the projections, with the only difference in assumptions being the allocation ratio between the commercial and recreational sectors (presented to GMFMC SSC in January 2020).[4]  Because the recreational sector selects for smaller and younger fish compared to the commercial sector as shown in SEDAR 61 (see Figures 4.28 and 4.29), an increase in allocation to the recreational fleet results in more encounters and higher overall discards (of which 11.6% will die).  As discussed in Amendment 53, the reduction in the stock OFL is due to the differences in selectivities between sectors.  Shifts in allocations ultimately change the age-specific population structure of the stock.  Harvest of larger numbers of smaller, younger fish result in a smaller overall population at equilibrium (100 years into the future).  Therefore, when the inputs into the assessment model include more recreational harvest than previously assumed, this leads to a lower overall OFL estimate at equilibrium.  For **Alternative 6**, and as explained in Amendment 53, the OFL and ABC were obtained after determining the allocation which would

---

[3] gulfcouncil.org/scientific-and-statistical-meetings/archive/

0009692

maintain the commercial ACL at 3.16 mp gw. The resulting commercial and recreational ACLs from the SEDAR 61 projection runs from **Alternatives 2** through **5** were regressed against each other and the recreational ACL that would correspond to a commercial ACL of 3.16 mp gw was solved for. After the allocation percentages were obtained for this scenario (31.3% recreational, 68.7% commercial), the SEDAR 61 assessment model was projected again to confirm that the allocation was maintained as expected, and used to obtain the OFL and ABC estimates.

A comment asked how the ratio of MRIP-CHTS to MRIP-FES was estimated. At the October 2019 Council meeting, a presentation was provided to the Council by the SEFSC on SEDAR 61.[4] In this presentation, 2017 recreational landings estimates in both MRIP-CHTS and MRIP-FES were provided. The 2019 emergency rule and subsequent framework set the recreational ACL in MRIP-CHTS units based on 2017 landings as approved by the Council. These recreational landings were estimated to be 1.00 mp gw in MRIP-CHTS units and 2.10 mp gw in MRIP-CHTS units. The current ACL is based on the estimated 2017 recreational landings of 1.00 mp gw in MRIP-CHTS units.

Another commenter asked why the Council failed to recalculate historical ACLs for red grouper as was done for other species, like king mackerel, and refers to the minutes from the June 2021 Council meeting during which one Council member discussed historical ACLs relative to Gulf king mackerel and wanted to see something similar for red grouper. However, it is unclear exactly what information the commenter is referencing and the Council did not pursue the Council member's request. The Council continued its deliberations on the final draft of Amendment 53, ultimately voting to submit the amendment for review and implementation. NMFS has reviewed Amendment 53 as submitted by the Council and determined that it is consistent with the Magnuson-Stevens Act and other applicable law.

A commenter suggested that Amendment 53 arbitrarily applies an ACT buffer to the commercial sector but not the recreational sector and the commercial sector is subject to an in-season ACT while the recreational sector has a post-season ACT. This comment mistakenly refers to the commercial ACT (quota) as an accountability measure (AM) for the commercial sector. The commercial AM is the Grouper/Tilefish individual fishing quota (IFQ) program put in place through Amendment 29 to the Reef Fish FMP. The red grouper commercial ACT (quota) is the amount of fish distributed to IFQ shareholders at the beginning of the fishing year and is used to calculate gag multiuse allocation. Multiuse allocation allows fishermen to use a small portion of their allocation for one species (either red grouper or gag) to harvest another species (either gag or red grouper). Multiuse allocation is intended to reduce commercial discards and is derived at the beginning of each year by converting a portion of the pounds of allocation available for red grouper and gag to allocation that can be used for either species. The formula for gag and red grouper multiuse allocation shown below uses both the ACT (quota) and ACL.

$$Red\ grouper\ multiuse\ allocation = 100 * \frac{(Gag\ ACL - Gag\ Commercial\ Quota)}{Red\ Grouper\ Commercial\ Quota}$$

---

[4] https://gulfcouncil.org/council/october-council-meeting-2019/

$$Gag\ multiuse\ allocation = 100 * \frac{(Red\ Grouper\ ACL - Red\ Grouper\ Commercial\ Quota)}{Gag\ Commercial\ Quota}$$

The 9% buffer for the recreational sector is based on the application of the Council's ACL/ACT Control Rule and is explained in Amendment 53. The purpose of this control rule is to account for management uncertainty. The recreational ACL for red grouper is used for an in-season AM that closes the recreational sector if NMFS determines that the ACL be met or projected to be met during the fishing year. The ACT is used as a post-season AM. If the recreational ACL is exceeded in a fishing year, then the ACT is used to limit recreational harvest in the subsequent fishing year.

A comment suggested the proposed allocation is not fair because the Council is unbalanced and biased toward the recreational sector, and this bias is evident in the preferred alternative. Council members are trustees of the nation's fishery resources and each Council member must take an oath of office in which they "promise to conserve and manage the living marine resources of the United States of America by carrying out the business of the Council for the greatest overall benefit of the Nation." 50 C.F.R. § 600.220. Council members must also adhere to high standards of ethical conduct. 50 C.F.R. § 600.225. Therefore, NMFS expects Council members take to make decisions that are best for the fishery resources. Further, regardless of who sits on the Council, NMFS must determine whether Amendment 53 is consistent with the Magnuson-Stevens Act and other applicable law, and NMFS has determined that the preferred allocation is fair. As explained above, the Council selected the preferred allocation because it best represents the historical landings for the years originally used to establish the allocation while also accounting for the change in the estimation of recreational harvest from MRFSS data to MRIP-FES. In addition, the preferred alternative more evenly distributes the reduction in the total ACL required by the results of SEDAR 61 and the ABC recommendations from the SSC, reducing the commercial and recreational ACLs by similar percentages (approximately 20% and 18%, respectively).

A comment indicated that recreational fishermen may misunderstand that the proposed recreational catch limits are an increase from the current catch levels and may anticipate a longer red grouper season. Amendment 53 includes a recreational season closure analysis and includes a table with estimated season lengths as well as the degree of uncertainty in the estimates indicated through 95% confidence intervals for Action 1 alternatives (see Table 2.1.4) and for each alternative combination between Actions 1 and 2 (see Table 2.2.4).

Several comments suggested that commercial fishing businesses that buy red grouper allocation will be hurt by Amendment 53 because the supply for allocation is being reduced, which will increase the price of allocation. Some individuals reported they had seen a two- to three-fold increase in the allocation price. Related comments indicated that this effect was not discussed in the economic analysis of Amendment 53. Other comments noted this effect was discussed, but projections of the expected increase were not provided. The economic analysis does indicate an expected increase in the allocation price for red grouper. However, the magnitude of that increase was not projected because there are effectively only eight data points representing different average allocation prices at different commercial quota levels that could be used, and these are not enough data to generate a statistically valid estimate. Further, the proposed

0009694

commercial quota of 2.4 mp gw is outside the bounds of the existing data points, which would further decrease the validity of any estimate that might be generated based on the existing data. Available data on the allocation price for red grouper does indicate that the allocation price has increased since the Council voted to submit Amendment 53 for review and implementation. However, this information was not available to the Council prior to its decision.  In addition, while an increase in the allocation price would be expected to increase costs and decrease profits for commercial fishing businesses that buy red grouper allocation, it would simultaneously benefit those businesses that sell red grouper allocation by increasing their revenues and profits. The opposite effects occurred when the commercial red grouper quota was increased significantly from 5.72 to 7.78 mp gw in late 2016.  Changes in the allocation price only result in the transfer of economic benefits and costs between buyers and sellers and therefore do not affect the estimate of net economic benefits to the Nation.

One comment indicated that commercial fishing operations targeting red grouper will not be able to mitigate the adverse economic effects from the implementation of Amendment 53 because they cannot switch to other species.  However, as discussed on pp. 55-63 of Amendment 53, the businesses that possess Gulf red grouper shares and allocation also possess shares and allocation for other species or species groups managed by IFQs in the Gulf, most notably for red snapper, which makes up the largest part of their share and allocation portfolio.  Further, most of these businesses also have a reef fish permit that can be used to harvest non-IFQ reef fish species, and many also possess permits for non-reef fish species.  The fact that businesses engaged in the commercial harvest of Gulf red grouper also harvest other species is illustrated in Table 3.4.1.20 of Amendment 53.  Further, any businesses that do not possess shares and allocation for other IFQ species have the option to purchase them through the markets for shares and allocation, which is a fundamental purpose of the market-based IFQ programs the Council implemented.

Several comments suggested that Amendment 53 did not provide estimates of the economic impacts (e.g., employment, income, value-added, and output) of the commercial sector for Gulf red grouper.  Those impact estimates are provided on pp. 72-74 of Amendment 53 based on average values from 2014-2018.  Some of those comments also provided estimates of the commercial sector's economic impacts based on more recent data provided by industry for 2021, and then compared those to the average economic impacts for the recreational sector from 2014-2018 provided in the amendment.  The estimates for 2021 are not germane as they were not and could not have been available when the Council took final action, and comparing economic impacts between the sectors from different time periods is not appropriate.  Some of those comments also suggested that the amendment did not demonstrate that the reduction in economic impacts in the commercial sector exceeds the reductions in economic impacts in the recreational sector.  The reduction in economic impacts in the commercial sector due to the actions in Amendment 53 are in fact provided on p. 156, while the reduction in economic impacts in the recreational sector are discussed on pp. 157-158 (based on whether the recreational sector is managed to its ACL or ACT).  These estimates do show that the reduction in economic impacts in the commercial sector are higher than in the recreational sector.

Several comments suggested that the analysis in Amendment 53 underestimated the reduction in net economic benefits to the commercial sector because indirect and induced economic impacts were not included in that estimate.  Indirect and induced economic impacts and changes thereto

do not represent economic value or changes in economic value and therefore are not germane to the determination of net economic benefits to the Nation.  Net economic benefits are measured by the combination of consumer and producer surplus in each of the affected sectors.

Some comments suggested that the economic analysis underestimated the reduction in gross revenue to the commercial sector.  Specifically, they state that the commercial sector would lose 1.19 mp in red grouper landings and that each pound lost would have an ex-vessel price of $4.83.  However, the loss in landings is actually 600,000 lb gw when comparing the status quo commercial quota of 3 mp gw to the commercial quota of 2.4 mp gw under the preferred alternatives in Amendment 53.  Further, the analysis also indicates that the ex-vessel price is expected to increase by $.51/lb to $5.34 because of the decrease in landings, thereby partially mitigating the loss in landings.

Some comments suggest that the expected increase in the ex-vessel price for red grouper will be passed along to consumers, causing economic harm to them.  These comments assume that relative supply and demand conditions are the same at the ex-vessel and retail levels, which is unlikely.  Although it is possible that some of the ex-vessel price increase may be passed along to consumers, it is highly unlikely that all or even most of it would be passed along to consumers because the number of good substitutes available to buyers increases as product moves further up the distribution chain.  For example, if Gulf red grouper has become relatively more expensive by the time it reaches the retail level, many consumers will simply switch to other substitute products as they would have become relatively cheaper (e.g., other Gulf groupers, red grouper and other groupers from the Atlantic, various snapper species from the Gulf and Atlantic, imports of grouper or snapper, other types of seafood and protein sources, etc.).  Several other comments from buyers up the distribution chain indicate these substitution effects will happen.  As a result, NMFS expects a decrease in demand for Gulf red grouper at the retail level, thereby keeping the price from increasing much if at all.

Some comments suggested that the economic analysis either did not provide an estimate of the expected loss in consumer surplus to the commercial sector, that the loss in consumer surplus was underestimated, or that the approach used to estimate loss in consumer surplus was invalid.  Amendment 53 includes an analysis of the expected change in consumer surplus to the commercial sector on p. 99.  This analysis is based on an Inverse Almost Ideal Demand System (IAIDS) model provided by Keithly and Tabarestani (2018) that was included in the 5-year review of the grouper-tilefish IFQ program.  The Council's SSC reviewed this study at their March 2017 meeting and raised no concerns regarding its validity.  Inverse demand models that make use of ex-vessel rather than retail level data are often used when retail level data are not available, as was the case in this instance.  These models generate estimates of either demand elasticity or flexibility, which can then be used to estimate expected changes in ex-vessel price and thus changes in consumer surplus when landings are expected to change.  The use of indirect demand models is not novel (see https://spo.nmfs.noaa.gov/sites/default/files/TM111.pdf), and in fact their use has been subject to peer review in other cases (see https://www.mafmc.org/s/scup_allocation_review_panel_report_FINAL.pdf).  Further, as noted in the amendment, the estimated loss in consumer surplus is likely a maximum estimate because the flexibility estimate is not compensated for income.  In fact, because ex-vessel level data were used rather than retail level data, and demand for flexibility would likely be less at the retail level

13

than at the ex-vessel level for reasons noted above.  NMFS' estimate of the loss in consumer surplus is almost certainly an overestimate of the actual change in consumer surplus, but is still the best available estimate given available data.

Some comments indicated that the economic analysis in Amendment 53 ignored changes in producer surplus in the commercial sector beyond the harvesting sector, or that available estimates on mark-ups could be used to generate such estimates.  These issues are addressed on p. 70 of the amendment.  On average, purchases of Gulf red grouper represented approximately 17% of all seafood purchases by Gulf red grouper dealers between 2014 and 2018.  While this suggests these dealers have some dependency on purchases of Gulf red grouper, it is far less than the percentage of revenue that Gulf red grouper represents for commercial vessels (46%).  In addition, these dealers' dependency on Gulf red grouper purchases steadily declined from 2014 through 2018, as they accounted for 22% of their total seafood purchases in 2014 but only 12% of their total seafood purchases in 2018.  Also, the ability of federally permitted dealers to change which species they purchase is greater than commercial vessels' ability to change which species they harvest.  Unlike commercial vessel permits, dealer permits do not restrict which species dealers can purchase.  Although Keithly and Wang (2018) estimate the mark-ups between the ex-vessel price and dealer sales price for Gulf red grouper and certain other grouper and tilefish species, those estimates are insufficient to estimate producer surplus for Gulf red grouper dealers, or changes to producer surplus as a result of regulatory changes.  This is in part because costs other than the raw fish costs (which are equivalent to the ex-vessel value) are not taken into account.  NMFS does not have estimates of those other costs for Gulf red grouper dealers, or seafood dealers more broadly, and thus does not have estimates of net cash flow or net revenue from operations for Gulf red grouper dealers comparable to those in the commercial harvesting sector.  Thus, while it is likely that the harvest of Gulf red grouper generates some producer surplus for Gulf red grouper dealers, NMFS does not possess the data to estimate that producer surplus.  Further, because these dealers have the ability to switch to purchasing other species, changes to those values as a result of the management measures considered in Amendment 53 are likely to be relatively small.  Similarly, any additional producer surplus generated from Gulf red grouper sales further up the distribution chain to wholesalers/distributors, grocers, and restaurants is likely minimal, given the vast number of seafood and other products they sell and their even greater ability to shift to purchasing other substitute products should the availability of Gulf red grouper decrease and/or its price increase.

Some comments suggested that the selection of **Alternative 2** under Action 1 would not have any discernible negative economic effects on recreational anglers or for-hire operations, or that the harvest of recreationally harvest fish in general does not generate net economic benefits (economic value) to the Nation or positive economic impacts.  These comments are incorrect as illustrated by the discussion on pp. 82-85 and analysis on pp. 101-104 of the amendment.

Some comments suggested that the reduction in economic value (net economic benefits) to the commercial sector was disproportionately higher relative to the recreational sector, or that **Preferred Alternative 3** under Action 1 increases economic benefits to the recreational sector relative to the status quo.  In fact, Tables 4.1.3.3 and 4.1.3.7 in Amendment 53 demonstrate that net economic benefits to the commercial sector are expected to decrease by about 9.1% while net economic benefits to the recreational sector are expected to decrease by about 15.5%, assuming

14

harvest is limited to its ACL. The percentage reduction to the recreational sector would be even higher if it recreational harvest is limited to the ACT. Thus, the net economic benefits to the recreational sector are expected to be reduced under **Preferred Alternative 3** relative to the status quo and the reduction to the recreational sector is proportionally higher than in the commercial sector.

Several comments questioned the scientific validity of the willingness to pay estimate used to generate economic value (consumer surplus) estimates for Gulf red grouper harvested by recreational anglers, questioned the use of stated preference models to generate willingness to pay estimates for recreationally harvested fish, and also assert that use of that estimate is inconsistent with NS 2. These comments further state that the willingness to pay estimate used in Amendment 53 is too high, which in turn lead to a significant overestimate of the net economic benefits resulting from such harvest and invalid estimates of the net economic benefits associated with each alternative considered in Amendment 53. The inflation-adjusted willingness to pay estimate in Amendment 53 comes from a peer-reviewed article published in the North American Journal of Fisheries Management (Carter and Liese 2012). This estimate is specific to grouper and the study included species that recreational anglers would consider good substitutes. In contrast, the EPA's estimates of economic value per recreationally harvested fish referenced in these comments are from very old studies. Specifically, although the comments suggest the EPA estimates are from 2014 or 2022, the meta-analysis was actually conducted in 2006. Further, a review of the 2006 meta-analysis reveals that it was based on 48 studies that were published between 1982 and 2004 founded on survey data collected between 1977 and 2001. In addition, the meta-analysis included 21 studies based on random utility models, 11 based on travel cost models, and 20 studies that were based on stated preference. Thus, the comments make use of some estimates generated by an approach (stated-preference models) they simultaneously criticize. In addition, only two studies were specific to the Gulf, and one of those was limited to "small game" species that are not comparable to red grouper. As the EPA estimates are not comparable to grouper, they are not appropriate for use in Amendment 53. The estimate from Carter and Liese (2012) is specific to grouper and also more recent than the EPA estimates. Some of these comments also suggest that use of the estimate from Carter and Liese (2012) in Amendment 53 was faulty as the uncertainty around the point estimate of $110 per recreationally harvested fish was not specifically provided in the amendment. Carter and Liese (2012) do provide an estimate of the confidence interval (i.e., 8 percent), which is sufficient for NS 2 purposes. Given this estimate of uncertainty, the lower and upper bounds for the point estimate are $101.20 and $118.80, respectively. Importantly, use of the lower and upper bounds would not affect the relative estimates of net economic benefits across the alternatives considered under action 1 in Amendment 53 and therefore they are of no consequence to the results. Some of these comments also point to more recent analyses in Carter, Liese, and Lovell (2022) and Carter, Lovell and Liese (2020) and suggest that the estimate from 2012 Carter and Liese study is too high. Both papers look at differences in economic value associated with different bag limits (i.e., option prices). However, the 2022 paper was not available at the time the analysis for Amendment 53 was conducted and the 2020 paper provides option prices that were not converted to an economic value per fish given a change in expected harvest. Therefore, consistent with NS 2, estimates of consumer surplus and expected changes to consumer surplus in the recreational sector under the different alternatives are based on the best available science at the time the analysis for Amendment 53 was conducted.

15

0009698

One comment suggested that the economic analysis of net economic benefits should have included differences in the carbon footprints and resulting costs associated with commercially harvested fish versus recreationally harvested fish. The comment offers a "back of the envelope" approach for how to look at those differences. No guidance is available to federal agencies as of yet regarding what an acceptable approach to look at this issue in the context of fisheries. Further, the commenter's suggested approach has not undergone any type of review and NMFS has many concerns with it. For example, comparing fuel use for commercial and recreational sectors is comparing apples to oranges because the objective functions for commercial and recreational fishing are completely different. Commercial fuel use is a cost to vessel owners so vessel operators have an incentive to minimize fuel consumption to maximize their share of the profit. Commercial fuel use should be based on time rather than landings otherwise, high catch per unit (CPUE) fisheries will appear to be more fuel efficient than lower CPUE fisheries. Recreational trips maximize utility from the experience, and the motivation for recreational fishing is not just about catching or keeping fish. Further, recreationally harvested fish that are not landed are not considered in the estimates. The commenter's estimate of fuel expense comes from studies from 2005 and 2009, and thus is based on outdated data for this purpose, particularly as more recent and more consistent information is reported in Lovell et al. (2020). Moreover, applying a recent fuel price to back-calculate fuel consumption from data collected in a particular year is incorrect because fuel consumption by either commercial or recreational fishermen is not independent of the price of fuel. Recreational trip expenditures depend on fuel prices at the time the expense is incurred. Thus, the fuel price in the year the data were collected is necessary. Observer data from commercial fisheries show that trip duration goes down as fuel prices increase. Expecting that recreational trip duration and number of trips would also respond to changes in the fuel price is reasonable.

Some comments indicated that the economic analysis of net economic benefits in Amendment 53 did not follow the same approach as in Amendment 28 to the Reef Fish FMP or that the estimated loss in producer surplus to the commercial harvesting sector was based on an unpublished paper. As explained in the NS 2 Guidelines, an "FMP must take into account the best scientific information available at the time of preparation." 50 C.F.R. § 600.315(e)(1). As new information becomes available, that will often lead to modifications in the approach. For example, when the Council was preparing Amendment 28, NMFS did not have direct estimates of net cash flow or net operating revenue that could be used to directly estimate changes in producer surplus and profit in the commercial harvesting sector. Therefore, Amendment 28 used the average allocation price as a proxy for these values. Where necessary, Amendment 53 continues to explain that "economic theory suggests that annual allocation (quota) prices should reflect expected annual economic profits, which allows economic profits to be estimated indirectly." But, it is always preferable to use direct estimates when they are available rather than proxies. Per pp. 65-68 of the amendment, estimates of net cash flow and net operating revenue were available from the Overstreet and Liese (2018b) technical memorandum, and therefore were used in the economic analysis of Amendment 53. Further, unlike when Amendment 28 was being considered, NMFS had estimates of trip net cash flow and trip net revenue for for-hire trips that were also used in Amendment 53 to estimate expected changes in producer surplus and profits in the for-hire sector.

0009699

Some comments suggested that the general approach taken in the analysis of net economic benefits in Amendment 53 is invalid for the same reasons the approach taken in Amendment 28 was invalid, or that it is invalid because the Council's SSC did not review it. Absent a request from the Council, the SSC is not required to review economic or other specific analyses in an FMP amendment. With respect the analysis in Amendment 53, these comments essentially assert that net economic benefits or changes to net economic benefits cannot be estimated because harvest privileges have not been assigned in the recreational sector as they have been in the commercial sector. This assertion is based on a misunderstanding of statements in Amendment 28 as well as in the quoted literature. Specifically, because fishing privileges have not been assigned in the recreational sector, economic theory does suggest that it is not possible to maximize net economic benefits to the Nation because resources are not being efficiently allocated in that sector. As a result, it is not possible to maximize net economic benefits to the Nation from the fishery as a whole regardless of which sector allocation is selected. However, the economic analysis in Amendment 53 does not say that the selected sector allocation maximizes net economic benefits to the Nation, or what sector allocation would maximize net economic benefits to the Nation. It only demonstrates that the selected sector allocation in conjunction with the resulting ACLs is expected to generate relatively greater net economic benefits to the Nation compared to the other alternatives that were considered. Therefore, the economic analysis in Amendment 53 does not conflict with the analysis in Amendment 28 or the referenced literature and is not invalid for the suggested reasons.

Some comments suggested that Amendment 53 could lead to a significant increase in imports because of the reduction in commercial harvest of Gulf red grouper. It is possible that imports of grouper and snapper products that directly compete with Gulf red grouper could increase in response to the decrease in Gulf red grouper landings. However, given that landings are expected to decrease by 600,000 lb gw, even if all of that production was replaced by imports, that would only lead to about a 1% increase in imports since total imports of grouper and snapper were about 62.1 mp gw in 2018 (see p. 71 of Amendment 53).

One comment suggested that the Initial Regulatory Flexibility Act is faulty because it does not address adverse effects on restaurants and seafood dealers, and that all such businesses should be considered small businesses. The comment does not provide any information to support the conclusion that all restaurants and seafood dealers are small under the Small Business Administration's definitions for businesses in those industries. Further, the Regulatory Flexibility Act requires an analysis of effects on entities that will be directly regulated by the rule. The rule for Amendment 53 would directly regulate commercial fishing businesses that possess red grouper shares and for-hire fishing businesses that target red grouper, not seafood dealers or restaurants. Potential indirect economic effects on dealers are discussed in section 4.2.3 and on p. 70 of Amendment 53.

Some comments indicated that the Council did not follow NMFS' Policy Directive 01-119, Fisheries Allocation Review Policy or NMFS' Procedural Directive 01-119-01, Criteria for Initiating Allocation Reviews. Specifically, these comments suggest that these directives require the Council to undertake an allocation review before it considers a potential change to an existing allocation in an amendment document (i.e., an allocation action). The NMFS Allocation Review Policy recommends a three-step process to ensure fisheries allocations are periodically

0009700

evaluated to remain relevant to current conditions: trigger, review, evaluation of options. Nothing in the policy states that the steps are mandatory or that the review and evaluation of options must happen sequentially.  Amendment 53 incorporated both the Council's allocation review and evaluation of options.  NMFS expects that all of the factors to be considered in an allocation review would also be  considered in an FMP amendment.

Some commenters did not feel there was a problem with the red grouper stock and wondered why this action was being taken.  SEDAR 61 was completed in September 2019 and used updated recreational catch and effort data from MRIP-APAIS and FES, which collectively estimated larger catch and effort data than previously calculated for the recreational sector.  The assessment concluded that red grouper in the Gulf is not overfished and overfishing is not occurring, but the stock remained below the SSB at 30% of the SPR in 2017.  After reviewing SEDAR 61 at its September 2019 meeting, the SSC decided to treat the 2018 red tide event as similar to the red tide event observed in 2005 for the purpose of OFL and ABC projections. These projections recommended by the SSC form the basis for the Action 1 alternatives are and indicate the stock, particularly due to concerns about red tide, is not as robust as it could be.

NMFS will respond to all comments received on the NOA and proposed rule in the final rule. The final rule will publish in the *Federal Register*.

**Decision to be Made**

*Decision*

This ROD documents the decision by NOAA NMFS to approve the measures within Amendment 53 as proposed by the Council.  These measures are in accordance with the procedures prescribed in the Magnuson-Stevens Act.  This ROD is issued pursuant to NEPA, the CEQ NEPA regulations at 40 CFR Parts 1500-1508, and NOAA's Administrative Order NAO 216-6A.  The decision to approve Amendment 53 is based on analyses in the EIS for compliance with the Magnuson-Stevens Act and other applicable law, including, but not limited to, NEPA, the Coastal Zone Management Act, and the Information Quality Act.  The rationale for this decision is supported by the EIS and is summarized below.  The actions are viewed as those that achieve the purpose and need for action in a way that best addresses Magnuson-Stevens Act mandates and the multiple objectives outlined in the Reef Fish FMP.

**Alternatives Considered**

<u>Action 1</u>

**Action 1 – Modify the Sector Allocations, OFL, ABC, and ACLs for Red Grouper**

> **Preferred Alternative 3:** Revise the sector allocations of the total ACL between the recreational and commercial sectors as the average landings using Fishing Effort Survey (FES)-adjusted Marine Recreational Information Program (MRIP-FES) data during the years 1986 through 2005, based on the Southeast Fisheries Science Center (SEFSC) ACL monitoring datasets.  The allocations for red grouper are 59.3% commercial and 40.7% recreational.  Revise the OFL and ABC as recommended by the SSC based on SEDAR

18

61 (2019). Set the stock ACL equal to the stock ABC.

*Rationale for Decision*

NMFS has **approved** setting the allocations for red grouper at 59.3% commercial and 40.7% recreational and has **approved** the following OFL, ABC, and sector ACLs in mp gw.

|  | OFL | ABC | Commercial ACL | Recreational ACL |
|---|---|---|---|---|
| **Approved** | 4.66 | 4.26 | 2.53 | 1.73 |

NMFS determined that the Council's selection of **Preferred Alternative 3** is consistent with the requirements of the Magnuson-Stevens Act.  This alternative best represents the historic landings as the years used in Reef Fish Amendment 30B (1986-2005) while accounting for MRIP-FES data, and therefore continues to allow for the achievement of OY while preventing overfishing.  As explained above, the most recent stock assessment and SSC catch level recommendations require a reduction in the total ACL regardless of the allocation when compared to the **Alternative 1** catch limits in MRIP-FES units.  The catch levels under **Preferred Alternative 3** would reduce the commercial and recreational ACLs by similar percentages (approximately 20% and 18%, respectively), which more equitably distributes the required reduction than the allocations proposed in **Alternatives 2** and **6**, which increase or maintain the commercial ACL, respectively.  Compared to **Alternatives 2** and **4-6**, **Preferred Alternative 3** is also expected to result in the greatest net economic benefits to the Nation.

For Action 1, the effects on the physical environment are expected to be minimal.  This action would likely not change the way the reef fish fishery is prosecuted because it targets multiple species.  For red grouper, the most likely biological effects on the stock from this action would be from changing the allocation, which will result in a shift in the amount of fish caught by each sector.  However, as discussed in Section 4.1.2, all the OFLs are based on a fixed level of fishing mortality ($F_{30\%SPR}$), and thus each of these alternatives would result in a similar stock size ($SSB_{30\%SPR}$).  For alternatives that allocate more red grouper to the recreational sector, total harvest decreases to account for the greater dead discards from recreational red grouper fishing and to prevent overfishing.  Regardless of the alternative, NMFS expects to constrain recreational landings to the recreational ACL or ACT as appropriate.  As shown in Table 2.1.3, recreational harvest exceeded the applicable catch limit only once between 2009 and 2019.  Thus, the biological effects from **Preferred Alternative 3** are similar to the other alternatives with the exception of the no action alternative.  Because this action is not likely to change the way the reef fish fishery is prosecuted, there is likely little effect by this action on other reef fish species or protected resources.

**Preferred Alternative 3** would have the least negative expected change in net economic benefits (6.4%) compared to the other alternatives.  For the social environment, allocation is an inherently controversial topic, as competing user groups strive to obtain the largest share for their group.  The reallocation between the commercial and recreational sectors would be an indirect effect from the conversion of the recreational sector's ACL from MRIP-CHTS units to MRIP-FES units.  **Preferred Alternative 3** would reallocate approximately 16% of the new stock ACL from the commercial sector to the recreational sector, resulting in negative effects for the commercial

19

sector and positive effects for the recreational sector. However, these effects are tempered by the changing of recreational catch units from MRIP-CHTS to MRIP-FES.

For the Administrative Environment, **Preferred Alternative 3** (like **Alternatives 2-6**) would result in beneficial effects because they would eliminate the need to convert landings back to MRIP-CHTS for ACL monitoring. However, the reductions seen in the recreational ACL compared to **Alternative 1** in MRIP-FES units may increase the likelihood of needing to implement an in-season closure.

<u>Rejected alternatives to the proposed **Action 1.1**</u>

**Alternative 1:** No Action – Maintain the sector allocations of the total ACL for red grouper between the commercial and recreational sectors. The allocations for red grouper are 76% commercial and 24% recreational. The allocation was derived from the average landings using Marine Recreational Fisheries Statistics Survey (MRFSS) data from the years 1986 through 2005, established in Reef Fish Amendment 30B. Maintain the current OFL, ABC, and ACLs.

**Alternative 2:** Maintain the sector allocations of the total ACL as 76% commercial and 24% recreational. Revise the OFL and ABC as recommended by the Scientific and Statistical Committee (SSC) based on Southeast Data Assessment and Review (SEDAR) 61 (2019). Set the stock ACL equal to the stock ABC.

**Alternative 4:** Revise the sector allocations of the total ACL between the recreational and commercial sectors as the average landings using MRIP-FES data during the years 1986 through 2009, based on the SEFSC ACL monitoring datasets. The allocations for red grouper are 60.5% commercial and 39.5% recreational. Revise the OFL and ABC as recommended by the SSC based on SEDAR 61 (2019). Set the stock ACL equal to the stock ABC.

**Alternative 5:** Revise the sector allocations of the total ACL between the recreational and commercial sectors as the average landings using MRIP-FES data during the years 1986 through 2018, based on the SEFSC ACL monitoring datasets. The allocations for red grouper are 59.7% commercial and 40.3% recreational. Revise the OFL and ABC as recommended by the SSC based on SEDAR 61 (2019). Set the stock ACL equal to the stock ABC.

**Alternative 6:** Revise the sector allocations of the total ACL between the recreational and commercial sectors, such that the commercial ACL is retained at 3.16 million pounds gutted weight. The allocations for red grouper are 68.7% commercial and 31.3% recreational. Revise the OFL and ABC to retain the commercial ACL. Set the stock ACL equal to the stock ABC.

**Alternative 1** (no action) would maintain the current OFL, ABC, and ACLs, and the current allocation of 76% commercial:24% recreational were is based on MRFSS landings data from SEDAR 12 (2006). The stock ACL in **Alternative 1** was set by the Council in 2019 through an emergency rule and subsequent framework action that are discussed in Chapter 1 of the EIS, and is equivalent to the landings from the 2017 fishing year. The framework action did not change

0009703

the OFL and ABC, so those values provided in **Alternative 1** are based on recommendations by the SSC after reviewing the SEDAR 42.  Because SEDAR 61 found the stock condition remained below the target biomass of $SSB_{30\%SPR}$, the OFL and ABC projections from the assessment and accepted by the SSC to be based on the best scientific information available are lower than those in , **Alternative 1**.  For this reason, as well as because the catch levels in **Alternative 1** are in MRIP-CHTS units, **Alternative 1** is not a viable option.

Like **Alternative 1**, **Alternative 2** would maintain the current allocation established in Amendment 30B to the Reef Fish FMP, with commercial and recreational allocation of the red grouper stock ACL divided 76% and 24%, respectively.  Although **Alternative 2** retains the current percentage allocation, it would result in a decrease in the recreational ACL when compared to the MRIP-FES equivalent of 2.10 mp in **Alternative 1,** and an increase in the commercial ACL.  In effect, because the recreational ACL would decrease compared to its MRIP-FES equivalent, and because the increase in estimated stock productivity is attributable to historic estimates of recreational catch and effort, not reallocating using the MRIP-FES data results in a reallocation to the commercial sector.

Like **Preferred Alternative 3**, **Alternatives 4** and **5** are similar because they use a time series of recreational and commercial landings as the basis for sector allocations.  **Alternative 4** uses the timeframe 1986 through 2009, ending upon implementation of the commercial grouper-tilefish IFQ program, which includes management of red grouper.  **Alternative 5** would adjust the commercial and recreational allocation on the longest period of landings available when the EIS was developed, 1986-2018.  This timeframe includes landings after implementation of the grouper-tilefish commercial IFQ program discussed for **Alternative 4**.  The resulting allocations from **Alternatives 4** and **5** are 60.5% commercial and 39.5% recreational and 59.7% commercial and 40.3% recreational, respectively.  These allocations are very similar to that in **Preferred Alternative 3**; however, the Council chose to   1986-2005 to keep the same years used in Reef Fish Amendment 30B but address change to MRIP-FES data.

**Alternative 6** would revise the sector allocations of the total ACL between the recreational and commercial sectors, such that the commercial ACL is retained at its current level of 3.16 mp gw.  The resulting allocations are 68.7% commercial and 31.3% recreational.  **Alternative 6** would revise the OFL and ABC to retain the 3.16 mp gw commercial ACL and then set the stock ACL equal to the stock ABC.  The OFL and ABC for **Alternative 6** are within the range of the OFL and ABC values for **Preferred Alternative 3** and **Alternatives 2** and **4-5**, which were recommended by the SSC at its September 2019 and January 2020 meetings.

With respect to **Alternative 2** and **Alternative 6**, the Council determined that historical participation by the recreational and commercial sectors would not be accurately reflected in the sector allocations, when accounting for MRIP-FES data, and that these alternatives would cause disproportionate adverse economic effects to the recreational sector compared to the commercial sector.  Furthermore, the lowest net economic benefits to the Nation would occur under **Alternative 2**.

0009704

Environmentally Preferred Alternative

**Alternatives 2-6** have OFLs that are based on a fixed level of fishing mortality ($F_{30\%SPR}$), and thus each of these alternatives would result in a similar stock size if $SSB_{30\%SPR}$. The difference in the alternatives is that when more fish are allocated to the recreational sector, total landings have to be constrained more to account for the greater dead discards from recreational red grouper fishing (e.g., **Preferred Alternative 3** and **Alternatives 4** and **5** compared to **Alternative 2** and **6**). Therefore, each of these alternatives can be considered environmentally preferred because they equally protect the red grouper stock.

## Action 2

**Action 2 – Modify the Gulf Red Grouper Annual Catch Targets**

> **Preferred Alternative 3:** Maintain the current buffer between the ACL and ACT for the commercial sector, and apply the ACL/ACT Control Rule to revise the buffer between the ACL and ACT for the recreational sector. The commercial buffer is 5%, and the recreational buffer is 9%.

*Rationale for Decision*

NMFS has **approved** the setting the buffer between the ACL and the Act at buffer is 5% for the commercial sector and 9% for the recreational sector and has approved the following ACTs in mp gw.

|  | Commercial ACT | Recreational ACT |
|---|---|---|
| **Approved** | 2.40 | 1.57 |

**Preferred Alternative 3** would best account for the multiuse provision for gag in the commercial IFQ program by retaining a 5% buffer between the commercial ACL and ACT. The 2019 data show that 19% of the gag multi-use allocation was used to land red grouper. The gag allocation would be zero under **Alternative 2**, removing the flexibility provided by multiuse shares. With **Preferred Alternative 3**, the Council also determined that it is appropriate to increase the buffer between the recreational ACL and ACT from 8% to 9%, based on the application of the Council's ACL/ACT Control Rule using more recent catch history.

Rejected alternatives to the proposed **Action 2**

> **Alternative 1:** No Action – Maintain the current buffer between the ACL and ACT for each sector. The commercial buffer is 5%, and the recreational buffer is 8%.

> **Alternative 2:** Apply the ACL/ACT Control Rule to revise the buffer between the ACL and ACT for each sector. The commercial buffer is 0%, and the recreational buffer is 9%.

**Alternative 1** (No Action) would maintain the current buffer between the ACL and ACT for the

22

commercial and recreational sectors set in the April 2019 framework action (GMFMC 2019a). The application of the ACL/ACT Control Rule was used to set the buffer between the sector ACLs and ACTs. The recreational buffer in Action 1, Alternative 1 used MRFSS data, which would no longer be used for quota monitoring. Data from the IFQ program for red grouper were used for the commercial sector. Normally, a sector managed using an IFQ program without a quota overage during its reference period would yield a 0% buffer from the ACL/ACT Control Rule; however, this tool is advisory only and does not account for the overage allowance or gag multi-use provisions in the IFQ program. As such, following the SEDAR 42 stock assessment, the Council set the buffer for the recreational sector using the ACL/ACT Control Rule at 8% and the commercial sector's buffer at 5% to account for the multi-use provision for the gag quota under the commercial IFQ program.

**Alternative 2** differs from **Preferred Alternative 3** by setting the buffer between the commercial ACL and ACT at 0%, but would match the recreational buffer between the recreational ACL and ACT at 9%. This alternative strictly applies the Council's commercial and recreational ACL/ACT Control Rules following SEDAR 61 in 2019. With a commercial buffer of 0%, the gag multi-use allocation would be zero, and therefore, only gag could be landed with gag allocation. This reduces flexibility in the IFQ program and likely result in incidentally caught gag being discarded rather than retained. Like **Preferred Alternative 3**, **Alternative 2** applies the Council's ACL/ACT Control Rule using more recent catch history to determine the buffer.

<u>Environmentally Preferred Alternative</u>

**Preferred Alternative 3** would be the environmentally preferred alternative. For the commercial sector, a 5% buffer allows for the use of gag multiuse allocation and would allow incidentally caught red grouper to be retained rather than discarded if a fishermen does not have any red grouper allocation. **Alternative 2** would not allow for gag multiuse allocation. For the recreational sector, the buffer is used to account for management uncertainty and decrease the likelihood the recreational ACL in a year following an overage of the ACL. Thus, the greater the buffer, the less recreational fishing would likely occur from the sector if use of the ACT is triggered. Under these circumstances, **Preferred Alternative 3** has a higher buffer than **Alternative 1** and so would better protect the red grouper stock

**Mitigation Measures and Monitoring**

CEQ regulations direct agencies to identify in the ROD whether all practical means to avoid or minimize environmental harm from the proposed actions have been adopted, and if not, why they were not (40 CFR Part 1505.2(a)(b)(c)). Mitigation measures are the practical means to avoid, minimize, and reduce impacts, and compensate for unavoidable impacts. Additionally, the regulations require a monitoring and enforcement program be adopted and summarized where applicable for any mitigation.

NMFS has thoroughly analyzed in the final EIS, and described in this ROD, a range of reasonable alternatives and their associated environmental impacts. NMFS has attempted to mitigate those impacts to the extent practicable. The primary objectives of this final EIS are: to

23

revise the red grouper allocation between the commercial and recreational sectors using the best scientific information available; modify the total and sector annual catch limits based on results of the SEDAR 61 2019 stock assessment and subsequent OFL and ABC recommendations from the SSC; and modify ACTs to reduce the likelihood the ACL being exceeded.  The effects on the biophysical environment are likely neutral because this action should not have much effect on overall reef fish fishing effort.  For the socioeconomic environment, depending on the sector, some effects will likely be positive and some negative.  However, short-term negative impacts on the fisheries' socioeconomic environment may occur due to the need to limit directed harvest and reduce bycatch mortality.  These negative impacts can be minimized when actions are considered for the recreational sector by using combinations of bag limits, size limits and closed seasons and for the commercial sector through individual fishing quota programs, size limits, and season-area closures.  The effects of the proposed actions are, and will continue to be, monitored through landings data, stock assessments and stock assessment updates, life history studies, economic and social analyses, and other scientific observations.  As a consequence to these considerations, NMFS concludes that all practical means to avoid, minimize, or compensate for environmental harm from the proposed actions have been adopted, and the public has had adequate opportunity for involvement, input, and comment during the deliberative phases of Amendment 53 and the EIS, as well as via the amendment approval and rulemaking process.

Regulations contained within FMPs are enforced through actions of the NMFS Office for Law Enforcement, the United States Coast Guard, and various state authorities.  To better coordinate enforcement activities, federal and state enforcement agencies have developed cooperative agreements.

**Implementation**

Actions proposed, analyzed, and approved by the Secretary will be implemented by promulgation of a final rule in the *Federal Register*.

STRELCHECK.ANDR
EW.JAMES.1365863152   Digitally signed by STRELCHECK.ANDREW.JAMES.1365863152
Date: 2022.03.08 15:32:23 -05'00'

03/08/2022

Andrew J. Strelcheck                                       Date
Regional Administrator
Southeast Regional Office
National Marine Fisheries Service

References

Carter, D.W., Lovell, S.J. and Liese, C.  2020.  Does angler willingness-to-pay for changes in harvest regulations vary by state?  Results from a choice experiment in the Gulf of Mexico.  Marine Policy, 121, p.104196.

Carter, D.W., Liese, C. and Lovell, S.J.  2022.  The option price of recreational bag limits and the value of harvest.  Marine Resource Economics, 37(1), pp. 35-52.

0009707

Lovell, S., J. Hilger, E. Rollins, N.A. Olsen, and S. Steinback. 2020.  The Economic Contribution of Marine Angler Expenditures on Fishing Trips in the United States, 2017.  U.S. Dep. Commerce, NOAA Tech. Memo. NMFS-F/SPO-201, 80 p.

0009708

# ADMINISTRATIVE

# RECORD NO. 205



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric**
**Administration**
National Marine Fisheries Service
Southeast Fisheries Science Center
75 Virginia Beach Drive
Miami, Florida 33149 U.S.A.
(305) 361-4200 Fax: (305) 361-4499

September 8, 2021

**MEMORANDUM TO:**     Andrew Strelcheck
                       Regional Administrator, Southeast Regional Office

**FROM:**              Clay Porch        *John F Walter for Clay Porch*
                       Director, Southeast Fisheries Science Center

**SUBJECT:**           Request for Expedited Certification of Amendment 53 to the Fishery
                       Management Plan for Reef Fish Resources in the Gulf of Mexico
                       (Amendment 53)

The SEFSC has reviewed Amendment 53 to the Fishery Management Plan for Reef Fish Resources in the
Gulf of Mexico (Amendment 53) and certifies that it is based on the best available scientific information.

cc:
    F/SEC –     John Walter
    F/SEC –     Lisa Desfosse
    F/SEC –     Larry Massey
    F/SER –     Virginia Fay,
    F/SER –     Heather Blough
    F/SER –     Richard Fickley
    F/SER2 –    John McGovern
    F/SER24 –   Peter Hood

# ADMINISTRATIVE

# RECORD NO. 227

# PUBLIC SUBMISSION

**As of:** 2/8/22 8:16 AM
**Received:** February 07, 2022
**Status:** Posted
**Posted:** February 08, 2022
**Tracking No.** kzd-8lhf-31yr
**Comments Due:** February 07, 2022
**Submission Type:** Web

**Docket:** NOAA-NMFS-2021-0098
Draft Amendment 53 to the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico:
Modify Red Grouper Allocations and Annual Catch Levels and Targets

**Comment On:** NOAA-NMFS-2021-0098-0002
Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic: Reef Fish Fishery of the Gulf of Mexico;
Amendment 53

**Document:** NOAA-NMFS-2021-0098-0097
Comment from Hobbs, Tim

## Submitter Information

**Name:** Tim Hobbs
**Address:**
   Seattle,  WA,  98104
**Email:** tim.hobbs@klgates.com
**Phone:** 206-370-7664

## General Comment

See attached comments on behalf of A.P. Bell Fish Company, Southern Offshore Fishing Association, and
Gulf of Mexico Reef Fish Shareholders' Alliance

## Attachments

2022-02-07_Am53_ AP Bell_SOFA_Shareholders' Alliance_Comments on NOA

# K&L GATES

February 7, 2022

J. Timothy Hobbs
Partner
tim.hobbs@klgates.com

Peter Hood
Branch Chief
NMFS Southeast Regional Office
263 13th Avenue South
St. Petersburg, FL 33701

T +1 206 370 7664
F +1 206 623 7022

Re:     Notice of Availability, Reef Fish Fishery of the Gulf of Mexico, Amendment 53; 86 Fed.
        Reg. 70078 (Dec. 9, 2021)

Dear Mr. Hood:

We submit this letter on behalf of A.P. Bell Fish Company, Southern Offshore Fishing Association,
and the Gulf of Mexico Reef Fish Shareholders' Alliance in response to the above referenced
notice regarding Amendment 53 to the Fishery Management Plan for the Reef Fish Resources of
the Gulf of Mexico: Red Grouper Allocations and Annual Catch Levels and Targets ("Amendment
53").

Amendment 53 is unlawful and irrational.  It would maximize bycatch of red grouper, minimize
yields, increase management uncertainty and thus undermine conservation of the stock, and
unfairly penalize commercial fishermen by taking away their quota to cover dead discards by
recreational anglers.  The analyses purporting to support this action are flawed, relying on secret
data undisclosed to the public, an economic theory NMFS itself has rejected as "not valid," and
tricks to artificially inflate the projected economic benefits of reallocation.   If approved,
Amendment 53 would violate numerous provisions of the Magnuson-Stevens Fishery
Conservation and Management Act ("MSA").  It would also violate the Administrative Procedure
Act ("APA") and National Environmental Policy Act ("NEPA").

Amendment 53 is a continuation of unfair and unlawful favoritism of the recreational sector at the
expense of commercial fishermen in the Gulf of Mexico.  The makeup of the Gulf of Mexico
Fishery Management Council ("Gulf Council" or "Council") is not fair and balanced as required by
the MSA, which shows in the actions it takes.[1]  There is no representative of the commercial reef

---

[1] 16 U.S.C. § 1852(b)(2)(B) ("The Secretary…shall, to the extent practicable, ensure a fair and balanced
apportionment, on a rotating or other basis, of the active participants (or their representatives) in the
commercial and recreational fisheries under the jurisdiction of the Council.").  *See, e.g.*, Ex. A (National
Academy of Sciences, LAPPs in Mixed Use Fisheries) at 14 ("[T]he rise of formal associations

fish fishery on the Council; in the past several decades only one such representative has ever served and only for a single term.  Presently, there are only two Gulf Council members associated with commercial fisheries the Gulf Council manages.  Private recreational angler interests dominate the Gulf Council and have for decades.  The result is perpetual mismanagement, serial overharvesting by recreational anglers, and unlawful efforts to penalize hardworking commercial fishermen, their family businesses, and the American consumers they serve while the private angler sector gets a free pass.[2]

For all of the following reasons the National Marine Fisheries Service ("NMFS") should disapprove Amendment 53 and remand it to the Gulf Council pursuant to 16 U.S.C. § 1854(a)(3).[3]

## A. Amendment 53 Violates MSA National Standard 9

1. Amendment 53 will maximize bycatch of red grouper.

National Standard 9 requires fishery management plans ("FMPs") to minimize bycatch and bycatch mortality to the extent practicable.[4] Amendment 53 violates this standard because it will dramatically increase bycatch relative to maintaining the status quo allocation between the commercial and recreational sectors.  Contrary to Congress's command to minimize bycatch, Preferred Alternative 3 in Action 1 would maximize bycatch compared to all the other alternatives the Council considered.

---

representing commercial fishing shareholders is seen as a counterweight to large nongovernmental organizations representing environmental or recreational fishing interests, especially at the Council level.").

[2] *See, e.g., Guindon v. Pritzker*, 31 F. Supp. 3d 169 (D.D.C. 2014) (holding that NMFS violated numerous MSA provisions by repeatedly failing to hold the recreational sector accountable to its quotas); *Guindon v. Pritzker*, 240 F. Supp. 3d 181 (D.D.C. 2017) (striking down a reallocation that effectively rewarded the recreational sector for overharvesting as not "fair and equitable"); 82 Fed. Reg. 27777, 27779 (June 19, 2017) (NMFS re-opening the private angler fishing season, despite projecting that "the private recreational sector will substantially exceed its annual catch limit" as a result); 87 Fed. Reg. 51 (Jan. 3, 2022) (NMFS announcing a settlement with Texas in which NMFS abandoned its own "best available" data showing overharvesting by Texas in favor of Texas's uncertified recreational catch data which showed no overage.  NMFS is also violating its own regulations at 50 C.F.R. § 622.23(b) by failing to enforce paybacks of serial overharvesting of red snapper by recreational anglers under state management.  *See* Ex. B (NMFS website page (https://media.fisheries.noaa.gov/2021-11/Gulf_red_snap_Private_%26_Charter_landings_Nov2021.pdf) showing red snapper landings (in MRIP-CHTS data) versus state landings estimates).

[3] These comments adopt and incorporate by reference the Minority Report Regarding the Gulf of Mexico Fishery Management Council's Approval of Amendment 53 (Red Grouper Allocations and Annual Catch Levels and Targets) to the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico (Aug. 9, 2021) ("Minority Report") submitted by four Gulf Council members who opposed Amendment 53, including all arguments in, and information supporting, that report.

[4] 16 U.S.C. § 1851(a)(9); *see also id*. § 1853(a)(11).

0009891

The recreational sector discards an average of 3.71 million red grouper each year.[5]  An estimated 11.6% of these fish die after being discarded.[6]   Dead discards from the recreational sector average 870,000 pounds of red grouper each year, but have reached 1.92 million pounds.[7] Commercial sector discards are comparatively minimal – "less than a tenth of recreational discard[s]."[8]

**Figure 1.  Red Grouper Discards by Sector (#s of  fish)[9]**



Amendment 53 will exacerbate this problem because reallocating more quota to the recreational sector will dramatically increase dead discards.  Under Preferred Alternative 3, the commercial sector loses 1.19 million pounds of quota compared to maintaining the existing allocations under Alternative 2.  But the recreational sector only gains an increase of 550,000 pounds: the remaining 640,000 pounds go to covering increased dead discards from recreational anglers.[10]

Amendment 53 explains that "total landings have to be constrained more to account for the greater numbers of dead discards from recreational red grouper fishing estimated by the [Marine Recreational Information Program – Fishing Effort Survey ("MRIP-FES")]."[11]  Private anglers are

---

[5] Am. 53 at 200.

[6] Ex. C (SEDAR 61 Stock Assessment Report), at p. 12.

[7] Am. 53 at 199.

[8] Am. 53 at 200.  *See also* Am. 53 at p. xiv ("the recreational sector discards are an order of magnitude greater than the commercial sector").

[9] Am. 53 at 198-199.

[10] *See* Am. 53, p. xx, Table 1.

[11] Am. 53 at p. xiv.

0009892

evidently discarding as much or more dead fish than they're taking home.[12]  This is a waste of limited natural resources.  As the Minority Report points out,[13] fish that would otherwise be served to consumers in restaurants and fish markets will instead be floating off dead in the Gulf of Mexico after anglers discard them.

**Figure 2. Effect of FES Calibration on Recreational Discard Estimates**[14]



Amendment 53 only looks at one side of the coin: it rewards the recreational sector for higher landings in the past, but does nothing to address the new information learned about higher discards that accompany those landings.

Indeed, 13 years ago when the Council first adopted the base years used for allocation (1986-2005) under Amendment 30B, the Council was under the impression that dead discards between the recreational and commercial sectors were roughly equivalent:

> The proportion of dead discards to landings for red grouper is similar between the two sectors and the proposed shifts in allocation are small, so the difference in red grouper dead discards among [reallocation] alternatives would be minimal.[15]

---

[12] If 640,000 pounds of quota goes to cover discards associated with 550,000 pounds of landings, then anglers would evidently be discarding 1.16 pounds of red grouper for each pound landed.  But Amendment 53 fails to specify how these calculations were made.

[13] Minority Report at p. 8.

[14] *See* Am. 53 at 199 (Table B.1); SEDAR 42 at 177 (Table 4.9.5).  This comparison only spans 1993 to 2013 because only those years were covered in both SEDAR 42 (Ex. Z) and SEDAR 61. *See also* Ex. ZZ (SEDAR 12) at p. 28, Table 1.

[15] Ex. D (Amendment 30B) at p. 45.

4

0009893

Now, faced with new information that recreational dead discards are *10 times higher* than the commercial sector,[16] the Council did nothing to address them.  Instead it adopted the same base years for allocation and formulaically plugged in the higher recreational landings, but ignored how a key finding about discards supporting the prior allocation scheme had drastically changed.  This is irrational decision making, particularly in light of the statutory command to minimize bycatch to the extent practicable.[17]

    2.  <u>NMFS's excuses for increased discards are unjustified</u>.

Material revisions made to Amendment 53 after the Council voted on it[18] try to explain away these increased discards but none of these post-hoc justifications have merit.

Amendment 53 now asserts that "projected discards are higher for the recreational sector due to the new allocations based on FES-adjusted MRIP data, rather than due to any change in how the recreational sector prosecutes the fishery."[19] This statement merely reaffirms that the Council learned new information about how the recreational sector prosecutes the fishery with higher discards, and failed to do anything about it.

Amendment 53 also reverses course on the effect of "closed seasons" for red grouper.  The Council-adopted version of Amendment 53 stated that "[c]losed season discards are not believed to be significant in the recreational red grouper sector."[20] The "final" version of Amendment 53 (that the Council never reviewed or approved) states that closed seasons "likely do[] impose some negative impacts on the red grouper stock."[21]

But NMFS carries its post-hoc assumption too far: NMFS now asserts that reductions in bycatch from maintaining the existing allocations "could be partially <u>or fully diminished</u> because anglers

---

[16] Am. 53 at p. 200.  In addition, since Amendment 30B, the commercial sector IFQ program took effect.  Commercial sector dead discards "have been considerably lower since" implementation of the IFQ program.  Am. 53 at 215.  The Council did not take this changed circumstance into account, either.

[17] 16 U.S.C. § 1851(a)(9); *see also id.* § 1853(a)(11).

[18] Three months elapsed between the time the Council took final action on Amendment 53 and when Amendment 53 was submitted to NMFS for approval.  Significant changes were made to the document (presumably by NMFS) in that time period that the Council never reviewed or approved, many of which responded to arguments made in the Minority Report.  Attached as Ex. E is a redline showing these revisions.  Under the MSA, the "fishery management plan" must be prepared by the Council, not NMFS. *See, e.g.*, 16 U.S.C. § 1853(a).  Thus, whatever changes NMFS made to Amendment 53 after the Council voted on it are not properly part of the FMP.  Instead they are post-hoc justifications that were not part of the Council's deliberation, and therefore cannot be considered when evaluating the FMP's compliance with MSA requirements.   These and other procedural defects render Am. 53 invalid.

[19] Am. 53 at 15.

[20] Ex. F (Draft Amendment 53 (June 2021)) at 195.

[21] Am. 53 at 205.

0009894

may still catch red grouper while fishing for other species and would be forced to discard them."[22] In other words, reallocation might have no impact on discards whatsoever, because anglers may catch and discard the same amount of red grouper whether their season is open or closed.  If that were true, then the projected annual catch limits ("ACLs") for all the reallocation alternatives in Action 1 would be the same; they are not.  NMFS's bald new assertion conflicts with the SSC's determinations about catch limits from various allocation scenarios, and contradicts NMFS's own statement that a closed season "does reduce red grouper catch and mortality."[23] This is arbitrary and capricious reasoning.

NMFS also asserts that the "effects of closed seasons on red grouper discards are not known,"[24] which is a concession that there is no standardized bycatch reporting methodology ("SBRM") for the recreational sector of the Gulf reef fish fishery as the MSA requires.[25]  To the extent MRIP-FES is intended to serve as that methodology, it fails because it's not comparable to the stringent reporting that occurs in the commercial sector.  The commercial sector is limited access, all commercial fishermen must report effort and landings data in logbooks, and 20% of commercial fishermen must also file mandatory discard reports.[26]  Those reports along with observer data are used to determine total commercial discards.  The recreational sector, by contrast, is open access and anglers do not even need a federal permit to fish for red grouper.[27]  Any reporting is random and voluntary if anglers happen to be intercepted at dockside or decide to mail in a form months later.  The two systems are not comparable or statistically equivalent.  Recreational data sources have a higher level of uncertainty than commercial data "because self-reported data is not considered as reliable and not all recreational fishermen are surveyed."[28] "Recreational discard data are all self-reported, and thus are highly uncertain and difficult to validate."[29]

---

[22] Am. 53 at 207 (emphasis added).

[23] Am. 53 at 205.

[24] Am. 53 at 205.

[25] 16 U.S.C. § 1853(a)(11).

[26] Ex. G at 26 ("Since 2001, commercial reef fish fishermen have been required, if selected, to report the number and average size of fish being discarded by species (includes sea turtles and ESA-listed fish) and the reasons for those discards (regulatory or market conditions). These bycatch data are collected using a supplemental form sent to a stratified, random sample of the commercial reef fish permit holders (20% coverage).").

[27] Ex. G at 24 ("Anglers on privately owned or rented vessels do not need a federal permit to harvest reef fish in federal waters.").

[28] Ex. G at 62.  The percent standard error (PSE) for private angler red grouper discard estimates is 18.5. *Id*. at 42.

[29] Ex. H (Gulf Council's Sustainable Fisheries Committee Report, Jan. 26, 2022) at 2.

0009895

The MSA requires standardization "to assess the amount and type of bycatch occurring <u>in the</u> <u>fishery</u>."[30] Having non-standardized reporting across sectors in the mixed-use reef fish fishery does not meet this MSA requirement.

NMFS also justifies higher discards from the recreational sector by claiming reallocation will increase net economic benefits.[31] But NMFS relies on a methodology that NMFS itself found "not valid" and "not useful" when it promulgated Amendment 28 a few years ago. *See* Section E.1 below.

At bottom, Amendment 53 acknowledges that "managers must balance the competing objectives of maximizing yield, ending overfishing, and reducing bycatch to the extent practicable."[32] But there is no "balancing" here: Amendment 53 reduces yields,[33] increases uncertainty and thus risk of overfishing,[34] and increases bycatch.[35]  Because Amendment 53 fails on all these scores, NMFS must disapprove it.

### B.  Amendment 53 Violates National Standard 4

National Standard 4 requires that an allocation "promote conservation" and be "fair and equitable."[36]  Amendment 53, by contrast, degrades conservation and unfairly penalizes the commercial sector.

Under National Standard 4, it is not sufficient that an allocation change is conservation neutral; the plain language requires an allocation to "promote" conservation.  NMFS claims that the risk

---

[30] 16 U.S.C. §1853(a)(11).

[31] Am. 53 at 289 ("although Alternative 2 would increase net economic benefits in the commercial sector, it would also decrease net economic benefits in the recreational sector by a significantly larger amount, which would not only result in a decrease in net economic benefits to the Nation, but in fact the largest decrease of the alternatives considered").

[32] Am. 53 at 219.

[33] Am. 53 at 230 ("[I]ncreases in recreational allocation are accompanied by a decrease in the overall ACL to mitigate the effects of increased [recreational] bycatch…Bycatch is considered wasteful because it reduces overall yield obtained from the fishery.").

[34] *See* 50 C.F.R. § 600.350(b); Am. 53 at 109 ("Alternatives that result in larger allocations to the recreational sector could increase the likelihood of overfishing because of the uncertainty in determining recreational landings."); xxiii ("allocating a greater percentage of the ACL to a sector that has more uncertainty in landings…is more likely to result in an overfishing or eventual overfished status for Gulf red grouper"); 125 ("Recreational landings are generated based on estimates of catch, and they have substantial uncertainty associated with them. In addition, recreational landings are not timely, with lags often exceeding several months from when fishing takes place and landings estimates are generated."); 137 (noting "an increased potential for overfishing of red grouper if there is an increase in allocation to the recreational sector, which is associated with more uncertainty in constraining harvest").

[35] Preferred Alternative 3 would result in roughly 640,000 pounds of additional dead discards compared to maintaining the existing allocations under Alternative 2.  *See* section A(1), *supra*.

[36] 16 U.S.C. § 1851(a)(4).

0009896

of overfishing is "the same" between the allocation alternatives because the resulting ACLs all have the same probability of overfishing.[37]  That contention is fatal because the allocation change will not "promote" conservation, (i.e., reducing bycatch or the risk of overfishing).  That contention is also wrong.  The calculated probability of overfishing associated with the reallocation alternatives does not account for the increased uncertainty associated with increased bycatch, which admittedly increases risk of overfishing.[38]  Indeed, the overfishing limit ("OFL") set by Amendment 53 *unlawfully excludes dead discards* (see Section C below), so the probability calculations exclude a major source of fishing mortality that is increased by reallocating more quota to the recreational sector. In addition, recreational landings are uncertain estimates, and Amendment 53 is clear that allocating more fish to that sector increases uncertainty and management risk.[39]

Amendment 53 also violates National Standard 4 because it unfairly forces the commercial sector to subsidize dead discards in the recreational sector.  Of the 1.19 million pounds of quota the commercial sector loses under Preferred Alternative 3 compared to Alternative 2, 640,000 pounds go to cover increased dead discards in the recreational sector.  The recreational sector should be responsible for its own dead discards.

NMFS's National Standard 4 guidelines explain that, to be fair and equitable, an allocation should "be rationally connected with the achievement of [optimum yield] or with the furtherance of a legitimate FMP objective."[40]  Amendment 53 decreases yields and thus thwarts achievement of optimum yield (see Section D below).  Nor does Amendment 53 promote any particular FMP objective.  Amendment 53 lists the FMP objectives,[41] but nowhere explains how reallocation promotes any single one of them.

### C.  Amendment 53 Violates MSA Section 303(a)(15)

Section 303(a)(15) of the MSA requires FMPs to "establish a mechanism for specifying annual catch limits…such that overfishing does not occur in the fishery, including measures to ensure accountability."[42] NMFS defines "catch" to mean "fish that are retained for any purpose, as well as mortality of fish that are discarded."[43] The annual catch limit ("ACL") therefore must include

---

[37] Am. 53 at 287 ("The risk of overfishing under Alternatives 2-5 in Action 1 is the same. When considering the overfishing limit (OFL) values for the four alternatives, the same probability of overfishing (P*) value of 0.5 was used to determine the value as recommended by the SSC (Table 1.1.3). P* is the chance of overfishing. For setting the acceptable biological catch (ABC), the SSC recommended landing projections be based on a more conservative P* of 0.30 (Table 1.1.3).").

[38] *See supra* note 34.

[39] *See, e.g.*, Am. 53 at p. xxiii.

[40] 50 C.F.R. § 600.325(c)(3)(i).

[41] Am. 53 at 8.

[42] 16 U.S.C. § 1853(a)(15).

[43] 50 C.F.R. § 600.310(f)(1)(i) (emphasis added).

8

dead discards.  Similarly, the overfishing limit ("OFL") must include mortality from all "fishing," which also includes dead discards.[44]

Amendment 53 does not comport with this provision because it sets OFLs and ACLs for the red grouper fishery that exclude dead discards, particularly the significant amount of dead discards occurring in the recreational sector.  Instead, estimated dead discards are taken off the top of the maximum allowable catch in an obscure process NMFS has failed to adequately explain, and then the SSC and Council select OFLs and ACLs that cover only red grouper landings.  This is a problem in the red grouper fishery because recreational dead discards are significant.

By attempting to account for this significant source of fishing mortality "off the books," the Council and NMFS undermine key conservation goals of the MSA.  There is no mechanism to track recreational discards on an annual basis and account for such discards as part of the ACL and OFL.  The recreational sector thus has no incentive to avoid or reduce dead discards; the recreational sector can discard red grouper with impunity and it will not affect its fishing seasons or catch limits.  No effort is made to assess annually whether the recreational sector discarded more or less red grouper than projected when setting OFLs/ACLs that cover only landings.

When Congress amended the MSA to require ACLs and accountability measures, it did not intend for the Councils to simply exclude a significant source of fishing mortality from these limits.  Indeed, inadequate accounting for a significant source of fishing mortality is one possible explanation for why the red grouper stock has not rebuilt on the anticipated schedule.[45]

The flaw in this approach is evident in NMFS's contention that the probability of overfishing is "the same" between the reallocation alternatives (see Section B above).  That's only possible because the term "overfishing" in that statement is unlawfully defined to exclude a major source of fishing mortality, namely recreational discards.  But Amendment 53 acknowledges that reallocating more quota to the recreational sector will result in increased discards, which increases management uncertainty and risk because these discards are not effectively tracked or accounted for.[46]

---

[44] *See* 16 U.S.C. §§ 1802(34), 1802(16) (defining "overfishing" as the "level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis," and defining "fishing" as "catching, taking, or harvesting of fish" or "any other activity which can reasonably be expected to result in the catching, taking, or harvesting of fish.").

[45] *See* Am. 53 at 3-5 (explaining concerns with stock health and how the latest assessment found "the stock remain[s] below the spawning stock biomass (SSB) at 30% of the spawning potential ratio (SPR) in 2017").  The stock was supposed to have been rebuilt by 2014.  *See* 69 Fed. Reg. 1278 (Jan. 8, 2004) (setting a 10-year rebuilding plan).

[46] *See supra* note 34.

0009898

### D.  Amendment 53 Violates National Standard 1 and MSA Provisions Pertaining to OY

National Standard 1 requires management measures to "prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."[47] Amendment 53 frustrates both of these primary objectives of the MSA.

First, because the recreational sector discards 10 times more than the commercial sector, reallocating more quota to that sector will increase dead discards.  This necessitates a corresponding reduction in the Total ACL to accommodate these discards: this is why the ACL under Preferred Alternative 3 (4.26 million pounds) is 640,000 pounds less than the ACL under Alternative 2 (4.90 million pounds).  "[I]ncreases in the recreational allocation are accompanied by a decrease in overall ACL to mitigate the effects of the increased bycatch."[48]

Amendment 53 explains that "[b]ycatch is considered wasteful because it reduces overall yield from the fishery."[49]  To "mitigate the effects of increased bycatch,"[50] Amendment 53 therefore admittedly reduces overall yield.  And, because it increases bycatch, it "increase[s] substantially the uncertainty concerning total fishing-related mortality, which makes it more difficult to assess the status of stocks, to set the appropriate [optimum yield ("OY")] and define overfishing levels, and to ensure that OYs are attained and overfishing levels are not exceeded" as NMFS recognizes.[51]

Optimum yield "is prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor."[52]  Councils can thus make a deliberate choice to achieve less than the maximum sustainable yield based on those factors. But accommodating increased bycatch is not a "relevant social, economic, or ecological factor" that could be used to reduce OY, particularly under a statutory scheme that requires bycatch be minimized to the extent practicable. This increase in bycatch is a result of a selected management approach.

Other provisions of the MSA require an FMP to "assess and specify" the OY for the fishery and "the capacity and the extent to which fishing vessels of the United States, on an annual basis, will harvest the optimum yield."[53]  The Councils must also "review on a continuing basis, and revise

---

[47] 16 U.S.C. § 1851(a)(1).

[48] Am. 53 at 214.

[49] Am. 53 at 215.  *See also* Ex. G (Review of Standardized Bycatch Reporting Methodology for the Gulf of Mexico and Joint Gulf of Mexico-South Atlantic Fishery Management Plans) at 22 ("reducing bycatch provides biological benefits to managed species as well as benefits to the fishery through less waste, higher yields, and less forgone yield").

[50] Am. 53 at 214.

[51] 50 C.F.R. § 600.350(b).

[52] 16 U.S.C. § 1802(33)(B).

[53] 16 U.S.C. §§ 1853(a)(3), 1853(a)(4).

0009899

as appropriate," the assessment and specification of OY and its achievement.[54]  The assessment should include "a summary of information utilized in making such specification; an explanation of how the OY specification will produce the greatest benefits to the nation and prevent overfishing and rebuild overfished stocks; and a consideration of the economic, social, and ecological factors relevant to the management of a particular stock, stock complex, or fishery."[55]

Amendment 53 does not do any of this.  Secretarial Amendment 1 set OY for red grouper in 2004.[56]  To the extent reallocation to the recreational sector reduces OY, then Amendment 53 should have included a re-assessment and re-specification of OY with the information above.  It does not.  To the extent reallocation does not change OY, then it sets a lower ACL to accommodate recreational discards and thus reduces yields away from OY.  Either way the Amendment fails to comply with MSA requirements.

### E.  The Economic Justifications for Amendment 53 Are Flawed

The economic analyses in Amendment 53 suffer from numerous flaws.  They are based on a theory NMFS itself has found invalid, fail to use the best available science, and use tricks to wrongly inflate valuations for the recreational sector.  The Council's Scientific and Statistical Committee ("SSC") never reviewed these analyses,[57] which likely explains their shortcomings.  These analyses must be corrected and reconsidered by the Council after input from the SSC.

> 1.  The economic theory underlying Amendment 53 is inapplicable here.

Amendment 53 states that Preferred Alternative 3 is "expected to result in the greatest net economic benefits to the nation."[58] That conclusion is based upon a discredited application of economic theory.

The commercial and recreational sectors are different.  In the commercial sector, the Individual Fishing Quota ("IFQ") program creates a market that efficiently allocates quota among commercial fishermen.  The recreational sector, by contrast, is effectively open access: there is no market to efficiently allocate quota among anglers.  Recreational access is not allocated according to willingness to pay ("WTP").  In other words, anglers cannot compete for access to red grouper through price – instead they must show up during the season and compete with their time. The large incidence of recreational red grouper discards also demonstrates that these fishermen's time spent catching red grouper is not efficiently expended.

---

[54] 16 U.S.C. § 1852(h)(5).

[55] 50 C.F.R. § 600.310(e)(3)(iii).

[56] Am. 53 at 288 ("Secretarial Amendment 1 defined the OY as yield at 75% of $F_{MSY}$ (GMFMC 2004a).").

[57] *See* Ex. I (June 25, 2021 Council minutes) at 168 (NMFS Regional Administrator stating: "at least with regard to the economic analyses in this document, yes, they haven't gone before the SSC").

[58] Am. 53 at 22.

0009900

Quota is thus efficiently allocated across the commercial sector, but not across the recreational sector. Therefore, it is not possible to determine that shifting quota from the commercial sector to the recreational sector will produce any change in net economic benefits to the nation. There is simply no mechanism for an angler with a higher WTP to utilize the reallocated quota.

This fallacy is well established in the fisheries context[59] and was acknowledged by the Council and NMFS in Amendment 28 to the Reef Fish FMP:

> *The resource allocation within the commercial sector, which is managed under an IFQ system, would constitute a reasonable approximation for an efficient resource allocation… However, the open access management approach in the recreational sector cannot be conducive to an efficient allocation of red snapper within the recreational sector. As suggested by Holzer and McConnell (2014), by Abbott (2015) and in a recent report (OECD 2014), changes in net benefit estimates based on the generally accepted application of the equimarginal principle (as done in previous allocation studies including the 2013 Agar and Carter study in Appendix G) and associated inferences about economic efficiency are erroneous when each sector's quota is not efficiently allocated within the sector (i.e., quota is not assigned to those participants that have the highest willingness to pay for the resource). As a result, <u>policy prescriptions based on such inferences would not be valid, and therefore, not useful</u>.[60]*

An appendix to Amendment 53 makes the same point:

> *However, if use within each sector is not allocated according to those who value the resource most, then information about access to the resource in each sector may also be necessary to determine the efficient allocation among sectors.[61]*

But it is undisputed that use within each sector is <u>not</u> allocated according to those who value the resource the most. Only the commercial sector is allocated in this way. Valuations cannot be sorted on the recreational side. Amendment 53 does not present both commercial and recreational per-pound value estimates for comparison, and never addresses the "equimarginal principle" underlying the quoted statements above.

Experience with red snapper reallocation showed that the equimarginal principle (that economic efficiency is maximized when incremental net benefits are equalized across sectors) does not

---

[59] *See* Ex. J (Holzer, J. and K. McConnell. 2014. Harvest allocation without property rights. *Journal of the Association of Environmental and Resource Economists*. http://dx.doi.org/10.1086/676451); Ex. K (Abbott, J.K. 2015. Fighting over a red herring: the role of economics in recreational-commercial allocation disputes. *Marine Resource Economics* 30(1). https://doi.org/10.1086/679464.)).

[60] Ex. L (Amendment 28 to the Reef Fish FMP) at 90 (emphasis added).

[61] Amendment 53 at 244.

0009901

hold when each sector's quota is not efficiently managed within the sector.[62]   Yet reallocation under Amendment 53 is <u>still</u> motivated by comparison of net benefits conditioned on a recreational management regime that does not exist.  In other words, it is arbitrary to use WTP for valuation of the recreational sector when assessing net benefit changes because there is no market in which such values can or will be realized.  Red grouper quota is not efficiently managed within the recreational sector, and therefore the net benefit estimates are misspecified.  The approach used for Amendment 53 is "not…valid" and "not useful" for the same reasons that approach was rejected in Amendment 28.[63]

NMFS's reliance on this approach is both wrong, as a matter of economics, and capricious after just rejecting it in the last reallocation FMP amendment.

>    2. <u>Amendment 53 is not based upon the best available economic information</u>

Even if the economic theory underlying Amendment 53 was applicable here, the Council did not use the most recent data in the model. Amendment 53 uses an estimate of $110 per fish to determine the consumer surplus valuation of incremental catch by anglers, citing a 2012 paper.[64] But more recent work shows much lower valuations.  Specifically, some of the same authors of the 2012 paper published new work in 2021, prior to the Amendment's finalization, estimating the value of incremental grouper allocation at $46 per fish (within a range of $16 to $137) in the recreational sector, less than half the value used in Amendment 53.[65] Amendment 53 does not acknowledge the 2021 paper or explain why it relies on the older 2012 paper in light of more recent work.

The effect of using outdated data is material.  By using $46 per fish instead of $110 per fish, the projected changes in recreational sector net economic benefits from reallocation are far less than projected in Amendment 53.  Specifically, while the Amendment estimates recreational sector net economic benefit savings of $11 million by selecting Preferred Alternative 3 instead of Alternative 2 assuming consumer surplus of $110/fish, the savings are reduced to $5.4 million by assuming $46/fish.  Using the most recent data, the benefits of Preferred Alternative 3 are less than half of what is projected in the amendment.

---

[62] Ex. L (Amendment 28) at  pp. xiv, 90.

[63] *Id*.

[64] Am. 53 at 101 (citing Carter and Liese (2012)).

[65] *See* Ex. M (Carter, D.W., C. Liese, and S.J. Lovell. 2021.The Option Price of Recreational Bag Limits and the Value of Harvest. Marine Resource Economics 37(1). https://doi.org/10.1086/717284. The value is estimated for incremental catch of grouper generically, not red grouper specifically.).

0009902

**Table 3. Recreational Net Economic Benefits Using Most Recent Consumer Surplus Data**

| Recreational Total Expected Change in Net Economic Benefits (2019 dollars) | | |
|---|---|---|
| Alternative | CS $110 | CS $46 |
| Alt 2 | -$17,731,289 | -$8,234,514 |
| Preferred Alt 3 | -$6,658,235 | -$2,838,884 |
| Alt 4 | -$7,233,754 | -$3,104,722 |
| Alt 5 | -$6,850,077 | -$2,927,497 |
| Alt 6 | -$12,341,533 | -$5,528,630 |

Looking at estimated changes in total commercial and recreational sector net economic benefits is even more striking.  Amendment 53 estimates net economic benefit savings of $7.6 million by choosing Preferred Alternative 3 over Alternative 2 and assuming recreational consumer surplus of $110/fish.  If instead we assume recreational consumer surplus is $46/fish per the latest study, total economic benefits shrink to just $1.9 million.  This undercuts the analysis in Amendment 53 and suggests the benefits projected in the amendment are inflated.  The Council should have had this analysis based on more recent data.

**Table 4.  Net Economic Benefits Using Most Recent Recreational Consumer Surplus Data**

| Commercial + Recreational Total Expected Change in Net Economic Benefits (2019 dollars) | | |
|---|---|---|
| Alternative | CS $110 | CS $46 |
| Alt 2 | -$15,892,678 | -$6,395,903 |
| Preferred Alt 3 | -$8,295,706 | -$4,476,351 |
| Alt 4 | -$8,704,748 | -$4,575,716 |
| Alt 5 | -$8,413,649 | -$4,491,069 |
| Alt 6 | -$12,341,533 | -$5,528,630 |

14

Indeed, by using the lower end of the range of values projected in the 2021 paper ($16 per fish), Alternative 2 (maintaining the existing allocations) is the net benefit maximizing alternative. To help demonstrate this, Table 5 below uses Alternative 2 as the baseline for comparison (FES units but existing allocations) and shows the changes in net economic benefits projected using NMFS's methodology and three different consumer surplus values. Relative to Alternative 2, at $16 per fish Preferred Alternative 3 has a negative value. This would mean that economic *losses* will result from reallocating quota to the recreational sector. Amendment 53 does not acknowledge and the Council did not consider this contrary information, but it directly undercuts the Council's determination.

**Table 5. Net Benefits Relative to Alternative 2 (Status Quo Allocations)**

| Recreational + Commercial Total Expected Change in Net Economic Benefits Relative to Alternative 2 (2019 dollars) | | | |
|---|---|---|---|
| Alternative | CS $110 | CS $46 | CS $16 |
| Preferred Alt 3 | $7,596,972 | $1,919,552 | -$741,738 |
| Alt 4 | $7,187,929 | $1,820,188 | -$695,942 |
| Alt 5 | $7,479,028 | $1,904,835 | -$708,069 |
| Alt 6 | $3,551,144 | $867,273 | -$390,791 |

Other recent work similarly suggests that the recreational sector valuations used in Amendment 53 are inflated. Jungers et al. (2021)[66] propose a recreational regulatory system where quota could be allocated efficiently through markets, making cross-sector value comparison appropriate. The policy context in the paper is Gulf of Mexico red snapper, but the management approach and findings are just as applicable to red grouper.

Jungers et al. (2021) find that a hypothetical harvest tag for red snapper would trade at a price of approximately $15 per fish. Assuming 6.3 pounds per red snapper, this is $2.38 per pound of recreational red snapper, an estimate much lower than others in the literature.[67] This significantly undermines the economic efficiency case for reallocating red snapper quota to the recreational sector. Compared with a commercial red snapper IFQ lease price of $3 per pound during the same time period, opening up a quota market between commercial and recreational sectors could

---

[66] Ex. N (Jungers, B., J.K. Abbott, P. Lloyd-Smith, W. Adamowicz, and D. Willard. 2021. "A la Carte" Management of Recreational Resources: Evidence from the US Gulf of Mexico. Manuscript submitted for publication. https://www.joshuakabbott.com/uploads/9/5/6/1/95618488/recreation_a_la_carte_wp.pdf).

[67] *See* Agar, J. J. and D.W. Carter. 2014. Is the 2012 allocation of red snapper in the Gulf of Mexico economically efficient? NOAA Technical Memorandum NMFS-SEFSC-659.

0009904

lead to market reallocation *to the commercial sector*. Alternatively, in the absence of an intersector quota market, NMFS and the Council could more credibly justify political reallocation to the commercial sector on the basis of improving net economic benefits, as each sector would be rationalized with efficient internal quota allocations.

While the approach developed by Jungers et al. (2021) is applied to red snapper, that fishery shares its management approach with red grouper: i.e., IFQs for the commercial sector and regulated open access for the recreational sector. Therefore, the efficiency case for reallocating red grouper to the recreational sector is just as dubious as the red snapper case.

   3. Amendment 53 uses tricks to inflate recreational sector valuations

Apart from using old data showing inflated recreational values, Amendment 53 uses other tricks to make it seem like the economic benefits from reallocation are greater than they really are.

Preferred Alternative 3 would effectively codify the "status quo" by re-setting the recreational sector's ACL to match that sector's landings as measured by FES. The stated need for Amendment 53 is to "ensur[e] that the historical participation by the recreational and commercial sectors is accurately reflected by the sector ACLs."[68] So in reality, there will be no economic benefits from reallocation on the recreational side; that sector will continue catching what it has been in these new FES units. The impact change is zero and WTP change is zero. By contrast, the harm to the commercial sector is real: commercial fishermen will lose 1.19 million pounds of quota from what they would otherwise have had. The analyses in Amendment 53 are thus misleading in suggesting that reallocation will produce any net benefits.

In addition, different catch limits were used to assess economic effects. For the commercial sector, "economic effects…are analyzed as a function of the ACT."[69] But for the recreational sector, "economic effects…are analyzed as a function of the ACL."[70]

The difference is material because the ACT is lower than the ACL. Specifically, the commercial sector ACT is 5% lower than its ACL, and the recreational ACT is 9% lower that its ACL. Amendment 53 thus uses and apples-to-oranges comparison, using the buffered ACT for the commercial sector but the un-buffered ACL for the recreational sector. This affects the number of pounds of quota used in the analyses. In effect, recreational values are 9% inflated by this approach.

It is possible that the differential treatment is explained by the choice in Action 2 to manage the commercial sector to its ACT but to manage the recreational sector to its ACL (see Section G below). But that choice is not rational, and NMFS's own data shows that the recreational sector

---

[68] Am. 53 at 8.

[69] Am. 53 at 98-99; Table 4.1.3.1.

[70] Am. 53 at 101; Table 4.1.3.4.

0009905

should be managed to its ACT in any event given its management uncertainty and overharvesting of red grouper in 2020 and 2021.  In addition, the commercial sector ACT buffer is not due to management uncertainty, but to account for multi-use allocation.  That 5% of quota will still be harvested, it might just be a combination of red and gag grouper.  That is not a reason to exclude that catch from the economic analysis.

### F. Amendment 53 Relies on Secret, Inconsistent, and Unexplained Data

A fundamental principle of administrative law is that an agency cannot rely on secret data, but must make publicly available the technical studies and data it has employed to develop regulations.

> To allow an agency to play hunt the peanut with technical information, hiding or disguising the information that it employs, is to condone a practice in which the agency treats what should be a genuine interchange as mere bureaucratic sport. An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary.[71]

This is particularly true in the MSA context.  NMFS's own regulations recognize that the MSA "provides broad public and stakeholder access to the fishery conservation and management process, including access to the scientific information upon which the process and management measures are based."[72]   Unfortunately, Amendment 53 is erected upon a pile of secret and unexplained data and methodologies that precludes meaningful public review and renders the action procedurally defective.  Below is a list of the most egregious examples.

#### 1. SEFSC ACL Monitoring Datasets

Amendment 53 repeatedly cites the  Southeast Fisheries Science Center's ("SEFSC") ACL Monitoring Datasets as the source of landings estimates used to calculate allocation percentages.[73]  NMFS confirmed by email that these datasets are "not available to the public."[74] Yet they are the very basis for reallocation, and have errors and inconsistencies that call them into question.[75] Indeed, the SEFSC's ACL Monitoring Datasets conflict with landings estimates used in the latest stock assessment, and conflict with other data that *are* publicly available from

---

[71] *Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 530 (D.C. Cir. 1982).

[72] *See* 50 C.F.R. § 600.315(a)(6)(iv)(A); *see also Washington Trollers Ass'n v. Kreps*, 645 F.2d 684 (9th Cir. 1981).

[73] See, e.g., Am. 53 at pp. xiii, xx, 5, 14, 16, 19, etc.

[74] *See* Ex. O (email from SEFSC confirming that these datasets "are not available to the public, and would need to be a request sent to the science center").  A request was sent but no data were provided.

[75] For example, the recreational landings data used for Amendment 53 (see Table 2.1.2 on p. 19) do not match the recreational landings data used in SEDAR 62 (see Ex. P (SEDAR 61 Executive Summary) at pp. 8-9).

0009906

NMFS's own website.[76] Which dataset is the best available science and how did NMFS make that determination?  No one has been able to tell us.

NMFS maintains its own landings estimates in secret, they are not generally available to the public until pasted into a document like Amendment 53, they conflict with landings information that is available to the public through NMFS's own website, and NMFS refuses to make disclosures about its secret data.  These data are not appropriate for any rulemaking, much less for allocation decisions.

In addition, at the present time there are numerous sources of recreational landings data, all of which conflict with one another, and NMFS uses some datasets for some purposes and other datasets for other purposes.  NMFS purports to use Coastal Household Telephone Survey ("CHTS") data to manage the red snapper fishery,[77] but in reality NMFS manages that fishery with the Gulf States' own landings data.[78]  The Council itself recently stated "that consensus has not been reached on which of the survey methods [Marine Recreational Information Program or various state surveys] is both most precise and accurate with respect to producing private recreational red snapper catch and effort data."[79]

Moreover, Florida's Gulf Reef Fish Survey ("GRFS") landings data for red grouper generate estimates more in-line with CHTS than FES.[80]  NMFS has certified GRFS and found it "statistically appropriate."[81]  Yet Amendment 53 fails to explain why FES estimates, and not GRFS estimates, should be the basis for reallocation.  An explanation is required because NMFS is effectively using GRFS to manage red snapper, but now proposes to use FES to manage red grouper.

All of this is arbitrary because the choice of which data system to use for management is driven by whatever produces the best outcome for the recreational sector.  This also violates MSA National Standard 2.  NMFS should defer action on reallocation until a reliable and consistent set of recreational landings data is available.

## 2.  Recalibration of recreational red grouper landings

NMFS made available the documents supporting development of the calibration model used to revise historical recreational landings estimates.  But what NMFS has never provided is the

---

[76] *See id.*; also compare Ex. Q (showing recreational landings from 1981-2021 from NMFS's website), with Am. 53, Table 2.1.2.

[77] *See* Ex. B; *supra* note 3.

[78] *See id.*  If NMFS were actually managing the red snapper fishery with CHTS data (which must be calibrated from FES data as CHTS no longer exists), it would impose paybacks for the observed overages pursuant to 50 C.F.R. §622.23(b).  But NMFS has not done so.

[79] *See* Ex. R (NMFS letter to Council re: National Standard 6, quoting Council request for analysis).

[80] Am. 53 at 27.

[81] Am. 53 at 27.

0009907

dataset of red grouper landings that were fed into the calibration model, or any explanation about what other inputs or parameters may have been used specifically to adjust red grouper landings. In essence, NMFS employs a black box that spits out new numbers.  The public has no knowledge about what goes into the box or what happens in the box.   This is troubling because of the uncertainty and imprecision in these estimates to begin with, which may have been compounded by running them through the calibration model.

The allocation formula uses the years 1986-2005, when Marine Recreational Fisheries Statistic Survey ("MRFSS") was used to estimate recreational landings.  MRFSS was widely discredited.[82] MRIP was not developed until after the 2006 report from the National Academy of Sciences that was critical of MRFSS.[83]  Over time MRIP was improved, such as by improving the Access Point Angler Intercept Survey ("APAIS") and ultimately dispensing with the Coastal Household Telephone Survey ("CHTS") and moving to the Fishing Effort Survey ("FES").

The calibration model compared CHTS to FES landings during 2015-2017 when CHTS was the most unreliable it ever was.[84]  So how did NMFS calibrate earlier years, such as 1986-2005, when MRFSS was being used to collect landings data? MRFSS estimates from 1986-2005 evidently went through a series of calibrations (to MRIP, CHTS, APAIS, and FES).[85]  That is an elaborate process, fraught with compounding uncertainty, and the public has little idea how NMFS accomplished this or trust in the outcome.   No data are available for the public to track the evolution of landings estimates through these serial calibrations.

Published peer-reviewed papers have questioned this approach.  Thunberg and Fulcher (2005) find marine recreational fishing participation rates are not stable over time, and therefore recreational fishing participation is unpredictable: "Even subtle changes in participation probabilities among demographic cohorts can lead to an unreliable understanding of the composition of the fishing public."[86] This suggests that recent changes in estimated recreational fishing effort and landings—as now better measured with MRIP-FES compared with MRIP-CHTS or MRFSS—are unrelated to recreational fishing trends during the 1986-2005 baseline years used to set red grouper allocations in Amendment 30B. In other words, projecting recent catch and efforts trends back that far in time is unrealistic, regardless of the latest catch survey

---

[82] *See* Ex. S (NAS Report on MRFSS (2006)).

[83] *See id.*.

[84] *See* Ex. T (NMFS, *Recommended Use of the Current Gulf of Mexico Surveys of Marine Recreational Fishing in Stock Assessments*) at 25 ("It is clear that CHTS-based estimates since 2000 are not really comparable to CHTS-based estimates prior to 2000, and they have become increasingly less comparable over the more recent years.").

[85] *See* Ex. U at 2 (NMFS website referencing multiple calibrations).

[86] *See* Ex. V (Thunberg, E.M. and C.M. Fulcher 2006. Testing the stability of recreational fishing probabilities. In Sumaila, U.R. and D.A. Marsden (eds.) 2005 North American Association of Fisheries Economists Forum Proceedings. Fisheries Centre Research Reports 14(1). Fisheries Centre, the University of British Columbia, Vancouver, Canada) at 176.

0009908

methodology.[87] Amendment 53 does not address changes in recreational participation over time or explain how or why these serial recalibrations have merit in light of such changes.

The problem here is the wide discrepancy in reliability between commercial and recreational landings estimates, and the unfounded assumption for management purposes that they are comparable enough to make allocation decisions.

### 3.   Commercial sector landings

For some reason, commercial sector landing data over the 1986-2005 base period changed significantly between Amendment 30B/SEDAR 12 (2006) and 2021 (See Am. 53, Table 2.1.2). While recreational landings changed due to MRIP-FES and other calibrations, Amendment 53 provides no explanation for the changes in commercial landing data, which are more precise and not subject to any calibration.  NMFS says this would require a "forensic analysis."[88]  That does not provide a rational explanation to the public for the source of numbers that drive reallocation and harm commercial fishermen's livelihoods.  How is the public supposed to assess NMFS's assertion that these revised commercial sector landings are the "best available" science when even NMFS cannot explain how or why they changed over time?

### 4.   Recreational dead discards

Somehow NMFS and/or the SSC projected changes in ACLs based on different allocation scenarios.  As more quota is shifted to the recreational sector, the ACLs go down to cover increased dead discards from recreational fishing.  Once again, these calculations were never made available to the public.  For example, how did NMFS determine that increasing the recreational sector's ACL by 550,000 pounds (comparing Alternative 2 with Preferred Alternative 3) would necessitate a 640,000 pound reduction in the Total ACL?  See Table 1 of Am. 53.  This suggests that anglers are discarding more pounds than they are landing.  What assumptions were used about numbers and sizes of fish being discarded?  Where did these numbers come from? Is this the same methodology used to estimate dead discards "off the books" when setting an OFL that excludes dead discards?  What is that methodology?  The public has no idea.

---

[87] A NMFS Regional Administrator argued this point in 2015: "Our allocations are mostly all based on our perception of what the historic mix in the fishery is and one of the problems with red snapper, and a number of other species, is those allocations were put in place in Amendment 1, way back in 1990, and they're based on a landings back from I think 1970 to 1986 and that's a problem for us now, because it's hard to correct all those landings that far back… somewhere we need to find a better basis for deciding what the optimal allocation is other than what we think it looked forty years ago, because I don't think anybody is really going to be happy with that kind of thing." Ex. W (Gulf Council meeting minutes, January 28-29, 2015) at 147.

[88] Am. 53 at 290.

0009909

5. The assumption that 2.10mp in CHTS units = 1.00mp in FES units

Much of the analysis in Amendment 53 assumes that the ratio of CHTS estimates to FES estimates is 2.10 to 1.00.[89]  The Amendment never explains the basis for this ratio, how it was calculated, or what data were used as inputs.  Indeed, the calibration exercise showed wide variation between CHTS to FES landings estimates year over year, not a fixed 2:10:1.00 ratio.  See, e.g., Table 2.1.2 of Am. 53.   The public has no idea where this ratio came from or basis to assess its validity.

6. Unexplained economic analyses

NMFS used a commercial sector valuation approach that is different from what NMFS used for red snapper reallocation analysis.[90]  Instead of using commercial IFQ lease price as a measure of annual rents from a marginal unit of commercial harvest (i.e., WTP or "value" per pound of quota)—a well established framework in the economics literature,[91] based on how much a commercial fisher would be willing to pay in a market for a pound of quota up to the revenue they would get from that pound, less fishing costs—NMFS now estimates commercial sector value by assuming producer surplus is 24% of annual net revenue from grouper fishing, citing an unpublished NMFS white paper.[92]  No explanation is given for this departure from past and established practice.

In addition, there are also estimates of changes in consumer surplus based on anticipated changes in ex-vessel prices, but this material is unclear. There is no explanation of the methodology or mechanism through which allocation changes impact producers and consumers, there is no per pound or per-fish commercial value estimate that would allow comparison with recreational quota values (unlike the red snapper analysis), and the public is left to take these estimates as given.  Without that information, meaningful public comment cannot be provided.

7. Failure to recalculate historical ACLs for red grouper as was done for other species

Higher recreational landings in the past would have been fed into stock assessments and influenced historical catch limits for both the commercial and recreational sectors.  The Council had the ability to recalculate what historical ACLs may have been during 1986-2005 had new estimates about recreational landings been known at the time.  The Council performed such

---

[89] See, e.g., Am. 53, Table 1; Table 4.1.4.1 ("The recreational ACLs in MRIP-CHTS are calculated using the ratio of 1.00:2.10, representing the conversion of the recreational ACL under Alternative 1 from MRIP-CHTS to MRIP-FES units.").

[90] See Ex. L (Amendment 28).

[91] See, e.g., Newell, R.G., J.N. Sanchirico, and S. Kerr. 2005. Fishing Quota Markets. Journal of Environmental Economics and Management 4:437-462; Grainger, C.A. and C.J. Costello. 2014. Capitalizing Property Rights Insecurity in Natural Resource Assets. Journal of Environmental Economics and Management 67(2):224-40.

[92] Am. 53 at 98-99.

0009910

calculations for other species, such as king mackerel,[93] but not for red grouper.  The calculations would show that commercial sector landings would likely have been higher over that period as well.  But the Council only chose to look at the recreational sector.  This, like many other aspects in Amendment 53, skewed the analysis in favor of the recreational sector.

### G.  Amendment 53 Arbitrarily Applies an ACT Buffer to the Commercial Sector but not the Recreational Sector

Action 2 in Amendment 53 ostensibly sets sector ACTs as accountability measures ("AMs") to help protect against overfishing.  But only the commercial sector is subject to an ACT; for the recreational sector, ACT kicks in only when that sector's ACL is exceeded in the prior year.  Otherwise the recreational sector is managed to its ACL while the commercial sector is managed to its ACT.  There is no basis for this disparate treatment of the sectors.

The recreational sector's ACT is ostensibly set using the ACL/AM Control Rule.  But that rule specifies that the recreational buffer should be 9% even without an overage.[94]  The Control Rule does not specify that the ACT should only be applied when the ACL is exceeded in a prior year.  This is more like a payback, which is a post-season AM, than a true in-season AM designed to prevent overages before they occur.  This is a problem because data reporting in the recreational fishery is delayed for months and there is no adequate mechanism to track quota usage in real-time.  Thus, an ACT is necessary to "ensure accountability"[95] to catch limits for the recreational sector and prevent overharvesting before it occurs.

In addition, the data used to determine whether an overage has occurred[96] are outdated.  Data from NMFS's website indicate that the recreational sector exceeded its quota in 2020 and 2021 (both the 1.00mp ACL codified in regulations, and the 2.10mp ACL in "CHTS units" NMFS illegally uses; see Section I below).[97]  That data was not presented to the Council or included in Amendment 53.  Thus, even assuming there was some justification for withholding application of the ACT until the ACL is exceeded (there is none), that trigger has now been pulled.  An ACT for the recreational sector is required.  Amendment 53 wrongly assumes otherwise.

### H.  Amendment 53 Violates National Standard 8

Under National Standard 8, NMFS must "take into account the importance of fishing resources to fishing communities…in order to (A) provide for the sustained participation of such communities,

---

[93] *See* Ex. I at 169.

[94] *See* Am. 53 at 257.

[95] 16 U.S.C. § 1853(a)(15).

[96] Am. 53 at 257.

[97] *See* Ex. Q(red grouper landings, 1981-2021, from NMFS's website).

0009911

and (B) to the extent practicable, minimize adverse economic impacts on such communities."[98] NMFS's guidelines recognize that an allocation "may benefit some communities at the expense of others,"[99] but explain that "[d]eliberations regarding the importance of fishing communities…must not compromise the achievement of conservation requirements and goals of the FMP."[100]

Thus, National Standard 8 does not tolerate an action that benefits one fishing community at the expense of another if that action undermines conservation objectives. Yet that is precisely what Amendment 53 does: it codifies a level of participation by the recreational fishing community that, due to increased discards and management risk, undermines achievement of conservation requirements and goals of the FMP while simultaneously maximizing adverse economic impacts to the commercial fishing community.

### I.   Amendment 53 Violates NEPA

1.   The "No Action" Alternative is Unlawful

The action alternatives for Action 1 (Alternatives 2-6) are all evaluated against a "status quo" alternative (Alternative 1) as required by NEPA.[101] Amendment 53 concedes that Alternative 1 is "not legally viable."[102] Comparing action alternatives against an illegal status quo does not provide for meaningful analysis and is therefore unlawful.[103]

But there is a bigger problem. Amendment 53 is not forthcoming about why Alternative 1 is not legally viable. The reality is that NMFS has been illegally managing the recreational sector for years by pretending that the recreational sector's quota is more than twice the quota codified in NMFS's own regulations.

Existing regulations provide that the Total ACL is 4.16mp, of which the commercial sector has an ACL of 3.16mp and the recreational sector has an ACL of 1.00mp (the 76% to 24% allocation set by Amendment 30B).[104] NMFS should be using MRIP-FES to track landings against the recreational sector's 1.0mp ACL (and ACT), based on NMFS's position that MRIP-FES is the best available science. But that is not what NMFS has been doing. NMFS has instead ignored the 1.0mp ACL set by its own regulations and assumed the recreational sector's ACL should be

---

[98] 16 U.S.C. § 1851(a)(8).

[99] 50 C.F.R. § 600.345(c)(1).

[100] 50 C.F.R. § 600.345(b)(1).

[101] 40 C.F.R. § 1502.14(c).

[102] *See, e.g.*, Am. 53 at pp. 16, 98, 101.

[103] *See, e.g., Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1038 (9th Cir. 2008) (finding the "no action" alternative invalid under NEPA where it was based on an unlawful plan).

[104] 50 C.F.R. § 622.41(e).

0009912

2.10mp.[105]  The new FES data may indeed show that quotas could be modified, but until they are changed through the regulatory process, they must be adhered to using the best available science.  NMFS has no authority and has undertaken no public rulemaking process to reset the recreational sector to 2.10mp.

The illegality of NMFS's action is apparent from Table 1 on p. xx of Am. 53:

**Table 1.**  OFL, ABC, total and sector ACLs for **Alternatives 1-6**.

|  | OFL* | ABC | Total ACL | Comm ACL | Rec ACL |
|---|---|---|---|---|---|
| Alternative 1** MRFSS data 1986-2005 (76% commercial:24% recreational) | 14.16 | 13.92 | 4.16 | 3.16 | 1.00 |
| MRIP-FES equivalent |  |  | (5.26) |  | (2.10) |
| Alternative 2*** Retain current percentages (76% commercial:24% recreational) | 5.35 | 4.90 | 4.90 | 3.72 | 1.18 |
| Preferred Alternative 3*** MRIP-FES data 1986-2005 (59.3% commercial:40.7% recreational) | 4.66 | 4.26 | 4.26 | 2.53 | 1.73 |
| Alternative 4*** MRIP-FES data 1986-2009 (60.5% commercial:39.5% recreational) | 4.70 | 4.30 | 4.30 | 2.60 | 1.70 |
| Alternative 5*** MRIP-FES data 1986-2018 (59.7% commercial:40.3% recreational) | 4.67 | 4.28 | 4.28 | 2.56 | 1.72 |
| Alternative 6*** MRIP-FES data but retain commercial ACL at 3.16mp (68.7% commercial:31.3% recreational) | 5.03 | 4.60 | 4.60 | 3.16 | 1.44 |

*Values for OFL, ACB, total ACL, commercial ACL, and recreational ACL are in mp gw.
**The recreational portion of the current OFL, ABC, and ACLs are based on MRIP-CHTS data.
***The recreational sector ACL is in MRIP-FES units.

If the fictional "MRIP-FES equivalent" total ACL was actually 5.26mp as represented in the second row of Table 1 above, then the recreational sector's status quo 24% share would be 1.26mp, not 2.10mp.  Similarly, if the Total ACL was actually 5.26mp, then the commercial sector's status quo 76% share would be 4.00mp, not 3.16mp.

NMFS has simply engineered its own backdoor reallocation, giving the recreational sector 40% of the quota (2.10mp of a fictional 5.26mp Total ACL, while holding the commercial sector to its codified 3.16mp quota) in direct violation of the Reef Fish FMP and NMFS's own regulations.  Alternative 1 is illegal because "status quo" reflects NMFS's unlawful reallocation to the recreational sector.  Viewed in this light, Amendment 53 is a post-hoc rulemaking to cover an action NMFS took years ago on its own in derogation of the MSA process.  This violates NEPA.[106]

---

[105] *See* Am. 53 at pp. xxiii, 20 ("The current ACT is being tracked using MRIP-CHTS equivalent landings.").  NMFS has never explained where its assumed 2.10:1.00 ratio between CHTS and FES is derived from.

[106] *See* 40 C.F.R. § 1502.2(g) ("Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, <u>rather than justifying decisions already made</u>.") (emphasis added).

0009913

The problem here arises from NMFS's ongoing reluctance to hold the recreational sector accountable to its quotas.[107]  Under MRIP-FES, NMFS is evidently counting fish better than it was before.  But the recreational sector still has a codified quota; NMFS has illegally authorized the recreational sector to catch 2.10mp when its ACL is only 1.00mp.  The "no action" alternative is flagrantly illegal for this reason.

2.    <u>NMFS Committed to a Course of Action Before the Comment Period Closed on the DEIS.</u>

An agency violates NEPA where it predetermines the result of its environmental analysis.[108]  The record makes clear that NMFS has advocated in favor of reallocation all along and that the outcome was predetermined.

As described above, NMFS has already effectuated a reallocation by authorizing the recreational sector to take 40% of landings each year.  Amendment 53 would simply adjust the regulations to match NMFS's past (unlawful) practice.  Then-NMFS Regional Administrator, Dr. Roy Crabtree, made the motion at the Council to initiate the development of Amendment 53 in October 2019.[109]  The current NMFS Regional Administrator, Andy Strelcheck, urged the Council to proceed with Amendment 53 and voted with the Council majority to approve it.[110]  That vote was taken on June 25, 2021, three days before the comment period closed on the Draft EIS.[111]

At that point, the policy choice was made.  Under the MSA, once the Council acts, NMFS has no authority to select a different alternative; it can only approve, disapprove, or partially approve the Council's action if inconsistent with law.[112]  The policy choice was locked in before the comment period closed on the DEIS, and NMFS led the charge.

3.    <u>The Range of Alternatives Was Too Narrow</u>

NEPA requires that management actions like Amendment 53 "specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action," and "[r]igorously explore and objectively evaluate all reasonable alternatives."[113]

---

[107] *See supra* note 3.

[108] *See, e.g., Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 714 (10th Cir. 2010).

[109] *See* Ex. X (Reef Fish Committee minutes, Oct. 22, 2019) at p. 102 ("DR. CRABTREE: I am going to make a motion. I move that we ask the SSC to review red grouper projections based on the allocation time series from Amendment 30B (1986 to 2005) and the best available landings used as inputs in the new stock assessment, which is approximately 40.52 percent recreational and 59.48 percent commercial, and direct staff to start work on a plan amendment to update the red grouper allocation and establish catch levels based on the new assessment.").

[110] Ex. I (June 25, 2021 Council minutes) at 157-158, 168, 180.

[111] 86 Fed. Reg. 26514 (May 13, 2021) (comment period on the DEIS closed on June 28, 2021).

[112] 16 U.S.C. § 1854(a)(3).

[113] 40 C.F.R. §§ 1502.13, 1502.14.

25

A purpose of Amendment 53 is to "revise the red grouper allocation between the commercial and recreational sectors using the best scientific information available" and the need is to "ensur[e] that the historical participation by the recreational and commercial sectors is accurately reflected by the sector ACLs, and that the recreational ACL is consistent with the data used to monitor recreational landings and trigger AMs."[114]

Yet Amendment 53 only looked at reallocating quota to the recreational sector, ostensibly to reflect that sector's historical "participation" as informed by MRIP-FES.  But the recreational sector ACL set by Amendment 53 does not reflect historical participation because it excludes red grouper dead discards by anglers, which are caused by anglers' participation in the fishery.

Further, the Gulf Council has an Allocation Policy that requires a comprehensive allocation review where, as here, "relevant new information, e.g., data recalibration," is made available.[115]  The data recalibration using MRIP-FES should therefore have triggered an allocation review, looking at a range of allocation changes to better achieve FMP objectives.  This allocation review should have included analyses by the SSC and Council Advisory Panels.[116]  Amendment 53 nowhere explains why the Council jettisoned its own Allocation Policy[117] and proceeded directly to an allocation change untied to promoting FMP objectives.[118]  Had the Council followed its Allocation Policy, a reasonable range of alternatives might have been developed to better achieve FMP objectives.  But because the outcome was predetermined to apportion roughly 40% of the quota to anglers, the range of alternatives only achieved that result and was too narrow.

4.  <u>NMFS Failed to Take a Hard Look at Environmental Impacts</u>

NEPA requires NMFS to take a "hard look" at environmental impacts of Amendment 53.[119]  This standard is not met where an agency relies on incorrect assumptions[120] or minimizes negative side effects.[121]

---

[114] Am. 53 at 8.

[115] Am. 53 at 255.

[116] *See* Ex. Y (Gulf Council Allocation Review Procedures).

[117] *See Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017) (when an agency decides to depart from official policies, it must at a minimum acknowledge the change and offer a reasoned explanation for it).  NMFS urged the Council to adopt allocation policies following a GAO Report GAO-20-216 authorized by the Modern Fish Act.  The Council adopted a policy. But Amendment 53 departs from that policy without a reasoned explanation.

[118] The only explanation for how Amendment 53 achieves FMP objectives was added to the document after the Council voted on it and the Minority Report pointed out this flaw.  The Council never reviewed or approved that post-hoc justification and it is thus not relevant for assessing compliance with MSA or NEPA requirements.

[119] *See Kleppe v. Sierra Club*, 425 US 390 410.21 (1976).

[120] *See Jayne v. Sherman*, 706 F.3d 994, 1005-06 (9th Cir. 2013).

[121] *See N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 975 (9th Cir. 2006).

0009915

All of the defects discussed above demonstrate that NMFS has not taken the requisite hard look at the environmental consequences of Amendment 53.  Amendment 53 minimizes the effects of increased bycatch from reallocating quota to the recreational sector, and the attendant effects on management uncertainty and risk of overfishing.  For example, by asserting that the "risk of overfishing" is "the same" between allocation alternatives, but defining "overfishing" to exclude dead discards, NMFS minimizes the real effects.  Nor does Amendment 53 assess how prior misunderstandings about recreational dead discards may have inhibited stock rebuilding.

## I.      CONCLUSION

We urge you to disapprove Amendment 53 for the foregoing reasons.


Sincerely,

J. Timothy Hobbs

27

# PUBLIC SUBMISSION

<div style="border">

**As of:** 2/8/22 8:19 AM
**Received:** February 07, 2022
**Status:** Posted
**Posted:** February 08, 2022
**Tracking No.** kzd-90c8-od8j
**Comments Due:** February 07, 2022
**Submission Type:** Web

</div>

**Docket:** NOAA-NMFS-2021-0098
Draft Amendment 53 to the Fishery Management Plan for the Reef Fish Resources of the Gulf of Mexico:
Modify Red Grouper Allocations and Annual Catch Levels and Targets

**Comment On:** NOAA-NMFS-2021-0098-0002
Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic: Reef Fish Fishery of the Gulf of Mexico;
Amendment 53

**Document:** NOAA-NMFS-2021-0098-0098
Comment from Hobbs, Tim

---

## Submitter Information

**Name:** Tim Hobbs
**Address:**
    Seattle,  WA,  98104
**Email:** tim.hobbs@klgates.com
**Phone:** 206-370-7664

---

## General Comment

Exhibits (Ex. A throuh Ex. T) to comment letter from Tim Hobbs/K&L Gates LLP on behalf of A.P. Bell
Fish Company, Southern Offshore Fishing Association, and Gulf of Mexico Reef Fish Shareholders'
Alliance

---

## Attachments

Ex A - NAS Report_LAPPs in Mixed Use Fisheries

Ex B - NMFS GOM Red Snapper Private and State Charter Rec Landings_Nov 2021

Ex C - SEDAR 61 Red Grouper Stock Assessment Report

Ex D - Final Amendment 30B_Oct 2008

Ex E - Redline of Am 53 (Sept vs June 2021 versions)

Ex F - Draft Am 53 (June 2021)

Ex G - Review of SBRM_w PPT

0009917

Ex H - Sustainable Fisheries Cmte Report Jan 2022

Ex I - GMFMC-Full-Council-June-2021

Ex J - Holzer and McConnell 2014

Ex K - Abbott 2015

Ex L - Final Amendment 28

Ex M - Carter et al 2021

Ex N - Jungers et al 2021

Ex O - Gulf Council Email re SEFSC ACL monitoring datasets

Ex P - SEDAR 61_Exec-Summary

Ex Q - Red Grouper Rec Landings_NMFS Website_1981-2021

Ex R - NMFS NS6 Ltr to Council

Ex S - NAS Report on MRFSS - 2006

Ex T - NMFS OST_Recommended Use of the Current GOM Surveys